UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:15-cv-00077-JHM

CHARLES MORRIS, MORVATT                                                    PLAINTIFFS
ENTERPRISES, LLC, WILLIAM RICKARD,
SONDRA RICKARD, RICKARD FARMS, LLC,
ICU CHICKENS, LLC, WISHBONE POULTRY,
DENNIS CLAPP, JOHN PINKSTON, LOI
HONG, H & L FARMS, LLC, DOUG BROWN,
TIM VINCENT, TLC POULTRY, LLC,
POULTRY SPECIALTY SERVICE, LLC,
KEITH CRABTREE, CHRISTOPHER BURCH,
MIKE MURPHY, MURPHY FARMS, LLC, and
CALVIN LEISURE

v.

TYSON CHICKEN, INC., JAMES                                                 DEFENDANTS
GOTTSPONER, DAVID DICKEY, DAVID
MEARS, NEIL BARFIELD, and JARED
SHELTON

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Partial Motion to Dismiss [DN 29]. Fully briefed, this matter is ripe for decision. For the following reasons, Defendant's Motion to Dismiss Counts III (against all Defendants) and VI (against all Defendants) is **GRANTED**. Defendant's Motion to Dismiss Count V against Defendants Barifeld, Dickey, and Shelton is **GRANTED**, but Defendants' Motion to Dismiss Count V against Defendant Tyson, Gottsponer, and Mears is **DENIED**. Counts I (against all individual Defendants) and IV (against all individual Defendants) are additionally **DISMISSED** per Plaintiffs' voluntary stipulation.

### I. BACKGROUND

Plaintiffs filed their initial Complaint on April 27, 2015 in Hopkins County Circuit Court. (Compl. [DN 1-1].) Defendants then successfully removed the action to this Court, and

Plaintiffs subsequently filed their Amended Complaint on July 30, 2015 asserting a violation of the Packers and Stockyards Act (Count I against all Defendants), breach of contract (Count II against Defendant Tyson), unconscionability (Count III against Defendant Tyson), breach of the implied covenant of good faith and fair dealing (Count IV against all Defendants), fraud (Count V against all Defendants), and ratification (Count VI against all Defendants). (Am. Compl. [DN 18] ¶¶ 165–197.) All of the alleged claims stem from broiler production contracts (hereinafter "grow-out contracts") between Plaintiffs and Defendant Tyson. (Id. ¶ 42.) Defendants then filed a Motion to Dismiss Counts III, V, and VI for unconscionability, fraud, and ratification. (Defs.' Mtn. Dismiss [DN 29] at 2.) In their Response Brief, Plaintiffs agreed to voluntarily dismiss Counts I (against individual Defendants only), III (against all Defendants), IV (against individual Defendants only), and VI (against all Defendants) for unconscionability, breach of the implied covenant of good faith and fair dealing, and ratification. (Pls.' Resp. [DN 32] at 6.) Therefore, the only claims left in the action are the alleged violation of the Packers and Stockyards Act (Count I against all Defendant Tyson), breach of contract (Count II against Defendant Tyson), breach of the implied covenant of good faith and fair dealing (Count IV against Defendant Tyson), and fraud (Count V against all Defendants). The only claim left to be disposed of in Defendants' Motion to Dismiss is Count V for fraud against all Defendants. (Id. at 5–7.)

Defendant Tyson is a poultry integrator that breeds, processes, packages, produces, sells and distributes poultry. (Am. Compl. [DN 18] ¶ 42.) Plaintiffs are poultry growers who contract with Tyson to grow Tyson's chickens, meaning Tyson supplied Plaintiffs with chicks, feed, and medicine, and, in return, Plaintiffs cared for the chickens until they reach maturity, at which time they were returned to Tyson for slaughter. (Id.) The individual Defendants here, Barfield, Dickey, Gottsponer, Mears, and Shelton, were not parties to any of the contracts with Plaintiffs,

2

as they are employees of Defendant Tyson. (Defs.' Mem. Supp. Mtn. Dismiss [DN 29-1] at 3.) Under the contracts, Tyson retained title to the chickens and paid the growers a guaranteed minimum per pound plus a bonus based on "Average Net Pound Value" as compensation for housing and caring for the chickens. (Id.) In order to compensate growers, Tyson placed Plaintiffs in a "tournament system" along with other growers, in which all growers whose chickens are up for slaughter competed with one another. (Am. Compl. [DN 18] ¶ 35.) This means that the "top producing growers—as solely determined by Tyson—[were] paid a premium and the lower ranked growers are subjected to offsetting discounts or deductions," which, according to Plaintiffs, disadvantaged all growers and harmed their profits. (Id. ¶ 35.)

Plaintiffs allege that all Defendants concealed material facts and fraudulently induced them into entering these grow-out contracts with Tyson. (Am. Compl. [DN 18] ¶ 55.) Plaintiffs generally assert that Tyson represented that it "would take into account *all* [growers'] needs" and would "even absorb certain costs to ensure that growers could profit." (Id.) The overall strategy was to "convince the growers that Tyson's business interests and plans align[ed] with those of the grower, so that the grower [could] trust and rely upon Tyson." (Id.) Plaintiffs further emphasize that in order to enter into the grow-out contracts with Tyson, Plaintiffs were required to build new or renovate existing facilities for which they took out massive personal loans. (Id. ¶ 35, 37.) Despite updating their facilities, Plaintiffs claim that they did not see a return on their investments as guaranteed by Defendants because Tyson manipulated the tournament system to work against Plaintiffs. (Id. ¶¶ 36–37.) The manipulation allegedly included scheduling slaughters in a way that pitted "growers with older houses against those with newer equipment, knowingly advantaging the growers with newer houses, even though the other growers were producing efficiently and, had they been placed in a different tournament, they would have

3

received greater compensation." (Id.) This allowed Tyson to successfully avoid its obligations to pay reasonable compensation to growers for their services. (Id.)

Additionally, Plaintiffs state that certain Defendants made specific representations regarding Plaintiffs' expected future income, costs, and expenses associated with growing chickens. (Id. ¶ 97.) For example, Defendant Mears guaranteed that Plaintiff Morris would receive five and a half flocks of birds per year and a fuel bonus throughout the duration of the agreement in order to convince Morris to enter into the contract with Tyson because "it would work to reduce . . . risk and ensure a certain rate of return." (Id. ¶ 57.) Mears further explained that the fuel bonus was one example of Tyson's philosophy to "help [its] farmers out," and because of this deep institutional commitment, Morris should enter into the contract. (Id.)

Plaintiffs similarly assert that Defendant Gottsponer represented that the average pay for growers was $2.47 per pound. (Id. ¶ 58.) Plaintiffs claim that they relied on this representation as it indicated that "Tyson would work to ensure growers received a certain level of compensation." (Id.) At a later time, Gottsponer admitted to Plaintiff "Rickard that the average pay is indeed not $2.47 per pound, but much less," which Plaintiffs claim demonstrates Tyson's intent to artificially inflate compensation figures to induce Plaintiffs into entering grow-out agreements. (Id. ¶¶ 58, 74.)

Plaintiffs further allege that these statements demonstrate fraud on behalf of the Defendants because Tyson's corporate policies and practices do not align with the representations made by its agents. (Id. ¶ 97.) Generally, Plaintiffs support this claim by noting that Tyson's corporate strategy is to "not act in the interests of growers, but to advance the company's bottom line regardless of its impact on growers." (Id. ¶ 60.) More specifically, Tyson discontinued the promised fuel bonus, decreased the amount of time growers could care

4

for birds to achieve higher weights and more compensation, placed chickens with growers at inconsistent rates, extended the amount of time between receipt of new flocks to reduce the total number of chickens Plaintiffs could care for, refused to provide veterinary services for chickens, supplied poor quality and inadequate amounts of food causing higher mortality rates, refused to allow Plaintiffs to cull chickens in order to negatively influence the tournament system, and manipulated the tournament system to pit growers against each other in order to reduce grower compensation as much as possible. (Id. ¶¶ 60–75.)

Plaintiffs claim they have suffered great injury resulting from Defendants' fraudulent misrepresentations and concealment of material facts. Plaintiffs' damages include excessive losses stemming from the aforementioned fraudulent scheme, as "Plaintiffs have incurred damages in that their compensation under their Agreement has been significantly and consistently diminished." (Id. ¶¶ 96, 97, 107.) Further, "Plaintiffs were required to financially encumber their real and personal property and to convert their real property to a sole use thereby functionally depreciating said property and devaluing said property and rendering Plaintiffs as tenants totally at the mercy of Defendants." (Id. ¶ 44.) And, "Plaintiffs' real property has been further damaged by contaminants due to the chemicals required by the company to be used by Plaintiffs and the byproducts related to the growing of Tyson's chickens." (Id.) Plaintiffs claim that these injuries are both actual and proximate result of Tyson's fraudulent acts. (Id. ¶ 191.) Despite these factual allegations, Defendants have filed a Partial Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).

## II. STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiffs," League of United

Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true," id., and determine whether the "complaint . . . states a plausible claim for relief," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." Id. at 679.  Instead, "a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 663 (quoting Fed. R. Civ. P. 8(a)(2)).  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. DISCUSSION

The fraud claim is the only claim left at issue in Defendants' Motion to Dismiss. Defendants argue that it should be dismissed for two distinct reasons.  First, Defendants state that the economic loss doctrine bars recovery for fraud in this case.  Second, Defendants assert that Plaintiffs have not pled the fraud claim with enough particularity to pass muster under Fed. R. Civ. P. 9(b).  The Court will address these contentions in turn.

## A. Economic Loss Doctrine

The doctrine finds its roots in products liability law and lies at the intersection of contract and tort law. See Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 879 (1997); E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 869 (1986); Restatement (Third) of Torts: Products Liability § 21 (Am. Law Inst. 1998). The doctrine was designed to prevent a commercial purchaser from recovering in tort for purely economic losses resulting from a defective product, namely losses stemming from the malfunction or destruction of the product itself. Giddings & Lewis, Inc. v. Indus. Risk Insurers, 348 S.W.3d 729, 733 (Ky. 2011). The doctrine "recognizes that such damages must be recovered, if at all, pursuant to contract law," id., under the Uniform Commercial Code (hereinafter "U.C.C."), see Restatement (Third) of Torts: Products Liability § 21 cmt. d (Am. Law Inst. 1998). The underlying theory "is that commercial controversies involving 'insufficient product value' are best governed by contract and warranty law, since these bodies of law allow parties to allocate risk and ensure that both sides end up with the benefits and costs that they agreed to." Morris Aviation, LLC v. Diamond Aircraft Indus., Inc., 536 F. App'x 558, 565 (6th Cir. 2013) (citing E. River S.S. Corp., 467 U.S. at 873).

In Giddings, the Kentucky Supreme Court officially accepted the economic loss doctrine to preclude recovery in certain contract-based actions. 348 S.W.3d at 733. Both before and after Giddings, federal courts have predicted whether the Kentucky Supreme Court would apply the economic loss doctrine in certain situations. For example, despite the fact that the Kentucky Supreme Court has not specifically addressed the economic loss doctrine in the context of fraud claims, federal courts "in both the Eastern and Western Districts of Kentucky have either held or strongly indicated that the logical underpinnings of the doctrine, as expressed by the Kentucky

Supreme Court, would equally apply to allegations of fraud (at least those that are inextricably intertwined with breach of contract claims)." Biszantz v. Stephens Thoroughbreds, LLC, No. 5:13-CV-348-REW, 2015 WL 574594, at *12 (E.D. Ky. Feb. 11, 2015) aff'd sub nom., Biszantz v. Thoroughbreds (6th Cir. Oct. 27, 2015); see Ashland Hosp. Corp. v. Provation Med., Inc., No. CIV.A. 14-44-DLB-EBA, 2014 WL 5486217, at *6–7 (E.D. Ky. Oct. 29, 2014); Westlake Vinyls, Inc. v. Goodrich Corp., 518 F. Supp. 2d 955, 969 (W.D. Ky. 2007).

Federal courts have also "predicted that Kentucky courts would limit the application of the economic loss rule to products liability cases, business purchases cases, and construction cases." Brewer Mach. & Conveyor Mfg. Co. v. Old Nat'l Bank, 248 F.R.D. 478, 482 (W.D. Ky. 2008); see Mt. Lebanon Personal Care Home Inc. v. Hoover Universal Inc., 276 F.3d 845, 849 (6th Cir. 2002); Davis v. Siemens Med. Solutions, USA Inc., 399 F. Supp. 2d 785, 801 (W.D. Ky.2005); Ohio Casualty Ins. Co. v. Vermeer Mfg. Co., 298 F. Supp. 2d 575, 577–578 (W.D. Ky.2004); Bowling Green Mun. Utils. v. Thomasson Lumber Co., 902 F. Supp. 134 (W.D. Ky. 1995).

However, federal courts applying Kentucky law unequivocally have refused to apply the rule to tort claims stemming from contracts for services. In Louisville Gas & Electric, Judge Heyburn noted the "conceptual difficulty in applying the economic loss rule to contracts for services." Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc., 420 F. Supp. 2d 764, 769 (W.D. Ky. 2005). He explained that Kentucky case law has aimed to "preserve the distinction between the remedies available under the U.C.C. and those available in tort," but "[s]uch a distinction would be immaterial" for service contracts "because the U.C.C. does not govern services." Id. at 769–70. Many federal courts, including this Court, have followed suit as well, refusing to expand the scope of the economic loss doctrine to preclude claims centered on service contracts.

Rodrock v. Gumz, No. 4:11-CV-00141-JHM, 2012 WL 1424501, at *4 (W.D. Ky. Apr. 24, 2012) (declining to extend the economic loss rule to a contract for the breeding of stallions and the care and maintenance of mares); Lewis v. Ceralvo Holdings, LLC, No. 4:11-CV-00055-JHM, 2012 WL 32607, at *3 (W.D. Ky. Jan. 6, 2012) (finding that, like service contracts, economic loss rule does not apply to mineral lease contract); Grace v. Armstrong Coal Co., No. 4:08-CV-109-JHM, 2009 WL 366239, at *4 (W.D. Ky. Feb. 13, 2009) (finding that the economic loss rule does not apply to employment contracts); Brewer, 248 F.R.D. at 481; (refusing to apply the economic loss rule to an account contract between plaintiff and its bank); Davis, 399 F. Supp. 2d at 801 (ruling the economic loss rule does not preclude tort claims based on an employment contract); NS Transp. Brokerage Corp. v. Louisville Sealcoat Ventures, LLC, No. 3:12-CV-00766-JHM, 2015 WL 1020598, at *5 (W.D. Ky. Mar. 9, 2015) (finding that the economic loss doctrine does not apply to construction *service* contracts).

Even though courts are generally inclined to extend the doctrine to fraud claims, federal courts have refused to apply the economic loss doctrine to fraud claims arising from service contracts, thus allowing the fraud claims to stand. Rodrock, 2012 WL 1424501, at *4 (refusing to apply the economic loss doctrine to dismiss the fraud claim based on a contract for equine services); Pioneer Res. Corp. v. Nami Res. Co., LLC, No. 6:04-465 DCR, 2006 WL 1778318, at *7 (E.D. Ky. June 26, 2006) (refusing to apply the economic loss doctrine when the fraud and breach of contract claims stemmed from a contract for investment in drilling and completion of wells); Davis, 399 F. Supp. 2d at 801 (finding the economic loss doctrine does not apply to fraudulent inducement claim involving an employment contract).

Defendants argue that the economic loss doctrine should preclude the fraud claim asserted herein because the crux of Plaintiff's fraud claim is the defective nature of the products

9

provided to Plaintiffs under the grow-out contracts. The Plaintiffs counter with two arguments, 1) that the doctrine should not apply because they have pled damages beyond economic contract damages and 2) that the contracts at issue are services contracts.

First of all, the Court disagrees with the Defendant's assertion that the crux of the Plaintiff's fraud claim is the defective nature of products provided under the contract. Instead, the Court finds that the crux of the Plaintiff's fraud claim is that they were fraudulently induced into entering into the contract in the first place. Potentially, there are damages flowing as a result of this tortious conduct which are separate and distinct from any economic damages allegedly suffered by virtue of a breach of the contract. Unlike some fraud claims which may be inextricably intertwined with breach of contract claims, a fraudulent inducement claim centers around conduct occurring prior to the formation of the contract. Despite the expansion of the economic loss rule into various areas, including some fraud claims, "[t]o expand the rule so as to bar a fraudulent inducement claim . . . without further guidance from the Kentucky courts would eviscerate the claim of fraudulent inducement and would contravene contrary Kentucky case law." Davis, 399 F. Supp. 2d at 801.

Additionally, to the extent that the fraud claim can be said to arise from the contract itself, the economic loss rule is not applicable here because the contracts in question are for services, not goods. Kentucky has officially adopted the U.C.C., and it specifically "applies to transactions in goods." KRS § 355.2-102. Contracts within its scope "are limited to those relating to the present or future sale of goods," meaning "the passing of title from the seller to the buyer for a price." KRS § 355.2-106. In mixed contracts, which include both goods and services, the U.C.C. applies to transactions "where the predominant factor is the sale of goods." Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc., 280 F. Supp. 2d 651, 659 (W.D.

Ky. 2003) (citing KRS § 355.2-102). In applying the "predominant factor test to mixed contracts, '[t]he question is whether the purchaser's ultimate goal is to acquire a product or produce a service.'" <u>Jair United Inc. v. Inertial Airline Servs., Inc.</u>, No. 3:12-CV-799-H, 2013 WL 4048539, at *3 (W.D. Ky. Aug. 9, 2013) (quoting <u>Mecanique C.N. C., Inc. v. Durr Envtl., Inc.</u>, 304 F. Supp. 2d 971, 977 (S.D. Ohio 2004)).

Both parties make clear that Plaintiffs care for Defendant Tyson's chickens and grow them to maturity. (Defs.' Mem. Supp. Mtn. Dismiss [DN 29-1] at 3; Pls.' Resp. [DN 32] at 10.) The consideration in this contract is as follows: Defendant Tyson provides Plaintiffs with chicks, feed, medicine, and veterinary services necessary for the chickens to develop so that Plaintiffs can house, look after, feed, and supervise the chickens in their own facilities in exchange for compensation from Tyson. (Pl.'s Resp. [DN 32] at 10.) "Plaintiffs never take ownership or sell the chickens that they care for—they are always the property of Tyson," and title never passes to Plaintiffs. (<u>Id.</u>) Plaintiffs are compensated for their care of the chickens alone. (<u>Id.</u>) Defendants attempt to counter by arguing that Plaintiffs' grievances stem from defective chickens, poor quality feed, and inadequate medicine. (Defs.' Reply [DN 33] at 7.) Though these products are part and parcel to the contract, the allegedly defective products simply provide the means for and frustrate Plaintiffs' ability to perform their services; thus, the contracts in no way involve a sale or transfer of title of goods for value. Tyson's ultimate goal as a purchaser is not to "acquire a product" but to receive a service. <u>Jair</u>, 2013 WL 4048539, at *3. Because there is no exchange of goods "for a price," the UCC cannot apply and the contract must be considered one for services. KRS § 355.2-106.

In fact, many courts in other jurisdictions have found similar grow-out contracts to be service contracts. <u>Ctr. State Farms v. Campbell Soup Co.</u>, 58 F.3d 1030, 1031–32 (4th Cir.

11

1995) (finding the contract at issue to be one for services when the defendants contracted "to provide poults, feed and medicine and pay for grown turkeys" in exchange for plaintiff growing the turkeys for several months and returning the mature birds to defendants for use in their food products); Smith v. Cent. Soya of Athens, Inc., 604 F. Supp. 518, 522–23 (E.D.N.C. 1985) ("The contracts involved in this action are clearly for services and not for the sale of goods. Plaintiffs were not buyers of the chickens, rather they were paid for the care and housing of the chickens."); see Bunting v. Perdue, Inc., 611 F. Supp. 682, 691 (finding that the contract in which plaintiff was to raise birds to maturity was a service contract). Further, Defendant Tyson itself has seen the Supreme Court of Oklahoma characterize its contracts with growers as service contracts with similar, if not identical, facts as are presented here:

> The contracted growers purchase nothing. Title to the flocks, the food the fowl eat, and any medicine provided rests with Tyson. They also sell nothing. Once the flock matures, they are paid based on how much feed it took for the chickens to gain the poundage put on during the time they were under the care of the contract growers. The contracts entered into between the poultry growers and Tyson were nothing more than service contracts, in which the growers contracted to raise birds to maturity.

James v. Tyson Foods, Inc., 292 P.3d 10, 18 (Okla. 2012).

The Court finds that these grow-out contracts are for services and the economic loss rule has no application here.

## B. Specificity of Fraud Claim

Defendants additionally argue that Plaintiffs' fraud claim must be dismissed because it was not pled with sufficient particularity. "Under Kentucky law, a fraud claim requires that a plaintiff establish six elements by clear and convincing evidence: (1) a material misrepresentation, (2) which is false, (3) known to be false or made recklessly, (4) made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury." Derby City

Capital, LLC v. Trinity HR Servs., 949 F. Supp. 2d 712, 726 (W.D. Ky. 2013) (citations omitted). Further, for an actionable misrepresentation claim:

> It is a general rule that fraud cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct, upon mere failure to perform a promise—nonperformance of a contractual obligation—or upon failure to fulfill an agreement to do something at a future time or to make good subsequent conditions which have been assured. Such nonperformance alone has frequently been held not even to constitute evidence of fraud.

Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp., 379 S.W.2d 736, 740 (Ky. 1964) (quoting 24 Am. Jur. Fraud and Deceit § 267); see C.A.F. & Assocs., LLC v. Portage, Inc., 913 F. Supp. 2d 333, 353 (W.D. Ky. 2012); Reece v. Blevins, No. 2001-CA-001826-MR, 2003 WL 1251447, at *5 (Ky. Ct. App. Feb. 7, 2003). "However, a statement as to future conduct may form the basis for a misrepresentation claim if made with the intent to induce the other party to enter into a contract." Davis, 399 F. Supp. 2d at 800 (citing Evola Realty Co. v. Westerfield, 251 S.W.2d 298, 300–01 (Ky. 1952); Schroerlucke v. Hall, 249 S.W.2d 130, 131 (Ky. 1952)).

In order to simply survive a motion to dismiss under Fed. R. Civ. P. 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Further, plaintiffs must additionally plead "(1) the time, place, and content of any allegedly false representations; (2) the fraudulent scheme; (3) the defendant's fraudulent intent; and (4) the resulting injury." Bosch v. Bayer Healthcare Pharm., Inc., 13 F. Supp. 3d 730, 744 (W.D. Ky. 2014). However, "the rule requiring pleading of fraud and mistake with particularity is to be considered in light of the entire spirit of modern pleading which lays emphasis upon short, concise and direct pleading." Scott v. Farmers State Bank, 410 S.W.2d 717, 722 (Ky. 1966). Ultimately "it is not necessary to recite each minute detail," Derby City, 949 F. Supp. 2d at 726 (citations omitted), but "[t]he threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentations,

13

allowing the defendants to answer, addressing in an informed way the plaintiffs' claim of fraud." St. Martin v. KFC Corp., 935 F. Supp. 898, 909 (W.D. Ky. 1996) (citation omitted).

Upon review of Plaintiffs' fifty-four-page Complaint, which describes Defendants' allegedly fraudulent behavior in great detail, the Court finds that Plaintiffs have pled sufficient facts under Fed. R. Civ. P. 9(b) to state a claim of fraud as to certain Defendants.[1] Plaintiffs have alleged that they were induced into entering grow-out contracts with growers due to statements made by Defendants "before they entered into [those] agreements." (Am. Compl. [DN 18] ¶¶ 35, 36, 39, 39(a), 39(b), 39(f), 39(h), 40, 41, 55–58.) These statements included pledges that Defendant Tyson's corporate policy was to look out for its farmers and absorb costs so that growers could retain profits, assertions regarding specific amounts of chickens that growers could expect to receive and anticipated compensation for those chickens, assurances that Plaintiffs would receive fuel bonuses in order to pay off their loans and receive high returns on investment, and demands that Plaintiffs needed to build new or renovate existing facilities in order to enter into the agreements and in order to be profitable. (Id. ¶¶ 55–58.) Defendants argue that these claims are simply future promises; however, as seen, when a statement regarding future conduct is made to specifically induce a party to enter into a contract, as is the case here, a claim for fraud may stand. Davis, 399 F. Supp. 2d at 800. Each of these examples demonstrates Defendants' attempts to induce Plaintiffs into signing contracts with promises of beneficial future action, and they each can form the basis for a claim of fraud.

Further, Plaintiffs allege that Defendants' fraudulent scheme included providing many assurances to induce Plaintiffs into building new or renovating preexisting facilities, to encumber their real and personal property in the process, and to enter into these grow-out contracts with

---

[1] Plaintiffs have pled their fraud claim with sufficient particularity as to Defendants Tyson, Gottsponer, and Mears, but not as to Defendants Barfield, Dickey, and Shelton. See infra Part C. for further discussion as to the particular Defendants.

14

Defendant Tyson in order to participate in the tournament system and receive large profits. (Am. Compl. [DN 18] ¶¶ 60–75.) Meanwhile, Tyson had no plans to follow through with these representations regarding its policies and business strategies, instead aiming "to advance the company's bottom line regardless of its impact on growers." (Id.) In fact, Plaintiffs claim Tyson pitted growers against each other to reduce their compensation and returns on investment, discontinued the promised fuel bonus, decreased the amount of time Plaintiffs could care for the birds thereby decreasing compensation, provided chickens at inconsistent rates with inconsistent compensation, refused to provide veterinary services, provided substandard and insufficient feed, allowed birds to sit for days without feed, condemned excessive amounts of birds, and generally disregarded interests and needs of the growers. (Id.) Defendants misrepresented and concealed the nature of their relationships with and commitments to growers by maintaining corporate structures, policies, and practices that prevented Defendants from following through on their obligations, thus illustrating fraudulent intent. (Id. ¶¶ 35–75.)

Finally, Plaintiffs have adequately pled that they have suffered injury due to Defendants' fraudulent acts. (Id. ¶¶ 108–118, 198–207.) Plaintiffs have outlined their financial losses due to the discrepancy in their expected and actually received compensation, along with other losses including those associated with renovating existing and building new grow houses that ultimately underperformed due to Tyson's tournament system. (Id. ¶¶ 36–39, 108–118, 198–207.)

Overall, Plaintiffs have pled their fraud claims with enough specificity under Fed. R. Civ. P. 9(b) to survive Defendants' Motion to Dismiss. Though Defendants argue that the fraud claims lack sufficient detail, any "information 'missing' from [P]laintiffs' complaint in this case is far outweighed by the sufficiency of the description of the claim[s] against the [D]efendants.

15

Discovery will therefore not be a 'fishing expedition' for . . . otherwise claimless [P]laintiffs." Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 680 (6th Cir. 1988).[2]

### C. Defendants Barfield, Dickey, and Shelton

Though Plaintiffs generally have pled their fraud claims with enough specificity to survive under Fed. R. Civ. P. 9(b), they have failed to do so in regards to Defendants Barfield, Dickey, and Shelton. Plaintiffs are required not only plead with particularity all required elements of the fraudulent statements or acts, but they are also required to "plead with particularity facts which could support such an allegation against the individual defendants." Cook v. Easy Money of Kentucky, Inc., 196 F. Supp. 2d 508, 513 (W.D. Ky. 2001). This means that generally a plaintiff must "identify the speaker of the alleged statements" instead of "referring vaguely only to 'defendants.'" Cataldo v. U.S. Steel Corp., 676 F.3d 542, 551 (6th Cir. 2012); see Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012) (noting that Rule 9(b)'s heightened pleading requirements call for a plaintiff who pleads fraud to identify the speaker of the statement); see also U.S. ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio, 188 F.3d 510, 1999 WL 618018, at *9 (6th Cir. Aug. 5, 1999) (Clay, J., concurring in part and dissenting in part) (noting that "Rule 9(b) does not permit a plaintiff to allege fraud by indiscriminately grouping all of the individual defendants into one wrongdoing monolith") (citation omitted). This Court has specifically ruled that a "[p]laintiff should not

---

[2] This and other courts applying Kentucky law have found complaints sufficient with far less facts than are detailed in Plaintiff's Complaint here. See Bosch, 13 F. Supp. 3d at 746 (denying a motion to dismiss despite the fact that the Complaint did not specifically identify exact dates or places in which the defendant made the fraudulent statements); Davis, 399 F. Supp. 2d at 800 (finding that an allegation was enough to state a claim for fraud when the plaintiff simply alleged that the defendant "promised to pay [the plaintiff] commissions with the knowledge that it would never pay [the plaintiff] so as to induce [the plaintiff] into accepting the offer of employment"). However, when the pleadings supporting the fraud claims are conclusory, unlike in the Complaint here, the fraud claims are less likely to survive a motion to dismiss. See Miller v. Reminger Co., L.P.A., No. 3:11-CV-315-CRS, 2012 WL 529822, at *3 (W.D. Ky. Feb. 17, 2012) (finding that though the plaintiffs' amended complaint pled fraud, the plaintiffs did "not allege that [the defendant] made any specific fraudulent statements to [the plaintiffs], as is required to establish a claim of fraud.").

escape her pleading requirements because she has chosen to name numerous . . . defendants." Pixler v. Huff, No. 3:11-CV-00207-JHM, 2012 WL 3109492, at *8 (W.D. Ky. July 31, 2012).

Here, Plaintiffs have pled sufficient facts to survive this Motion to Dismiss in regards to Defendant Tyson, Gottsponer, and Mears with specific examples as detailed in the Complaint. (Am. Compl. [DN 18] ¶¶ 57, 58, 60–75.) However, Plaintiffs fail to allege facts with sufficient particularity to establish a claim for fraud against Defendants Barfield, Dickey, and Shelton. In the Complaint Plaintiff mentions these three Defendants' names in the introduction in regards to their residence and again in the concluding paragraphs where they are grouped in with all other Defendants. (Id. ¶¶ 25, 27, 28, 194–197, 201–203.) The final paragraphs of the Complaint that implicate Barfield, Dickey, and Shelton are far too general to satisfy Fed. R. Civ. P. 9(b) for fraud, as they are conclusory and only claim that they engaged in conduct that amounts to gross negligence, acted fraudulently, and failed to enforce policies and to treat growers equitably. (Id. ¶¶ 201–203.)

Because there are no other references to or particular examples of fraudulent statements or acts by Barfield, he must be dismissed from this action. In regards to Dickey, Plaintiffs also claim that he "refused to provide Plaintiff Dennis Clapp any medical care for his chickens, resulting in the deaths of 21,300 chickens in Clapp's care, for which he was not compensated." (Id. ¶ 66.) And, Plaintiff asserts that he "has begun to use intimidating and retaliatory tactics against some of the Defendants since the initial state court action was filed," and he "has wrongfully entered upon the property of some of the Plaintiffs and forced them to allow him to take pictures of their property without Plaintiffs' counsel being present." (Id. ¶ 105.) These facts, however, do not support fraud as they do not show that Dickey induced Plaintiff into a contract or concealed material facts. Instead, they demonstrate alleged wrongdoing in regards to

17

other claims in the Complaint and cannot satisfy the pleading requirement for fraud under Rule 9(b). Additionally, Shelton is also mentioned elsewhere in the Complaint, as he "informed Plaintiff Douglas Brown that Tyson made no effort to ensure that flocks were placed with growers at a consistent rate." (Id. ¶ 64.) Again, this assertion does not support a claim for fraud because it came after Plaintiffs had entered into contracts with Defendant Tyson, and it played no role in inducing Plaintiffs to sign the agreements. Moreover, these facts do not satisfy the particularity requirement under Rule 9(b) in regards to Shelton.

Plaintiffs' general statements grouping all Defendants together is insufficient to satisfy the pleading requirement for fraud under Fed. R. Civ. P. 9(b). Because Plaintiffs fail to specify other facts that could support an allegation of fraud against these individual Defendants, Plaintiffs' fraud claims against these three must fail. Therefore, this Court will grant Defendant's Motion to Dismiss the claims for fraud against individual Defendants Barfield, Dickey, and Shelton.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Counts III (against all Defendants) and VI (against all Defendants) is **GRANTED**. Defendant's Motion to Dismiss Count V against Defendants Barfield, Dickey, and Shelton is **GRANTED**, but Defendants' Motion to Dismiss Count V against Defendant Tyson, Gottsponer, and Mears is **DENIED**. Counts I (against all individual Defendants) and IV (against all individual Defendants) are additionally **DISMISSED** per Plaintiffs' voluntary stipulation.

*Joseph H. McKinley, Jr., Chief Judge*
*United States District Court*

November 12, 2015

cc: counsel of record