# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

-------------------------------------------------------

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

vs. Case No. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

-------------------------------------------------------

Videotape Deposition of KYLE W. STIEGERT, Ph.D.

Thursday, October 10, 2019

9:01 a.m.
at
COYNE, SCHULTZ, BECKER & BAUER, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin

Stenographically Reported by Shelly A. Loniello, RPR

Page 2

Deposition of KYLE W. STIEGERT, Ph.D., a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to all the applicable rules for the State of Kentucky, pursuant to Notice, before Shelly Loniello, Registered Professional Reporter and Notary Public, State of Wisconsin, at COYNE, SCHULTZ, BECKER & BAUER, S.C., 150 East Gilman Street, Suite 1000, Madison, Wisconsin, on the 10th day of October, 2019, commencing at 9:01 a.m. and concluding at 4:49 p.m.

A P P E A R A N C E S:

WHITFIELD, BRYSON & MASON LLP, by
Mr. John C. Whitfield
19 North Main Street
Madisonville, Kentucky 42431
john@wbmllp.com
Appeared on behalf of Plaintiffs.

SHOOK, HARDY & BACON LLP, by
Mr. Mark C. Tatum
Mr. Steve Soden, via telephone
2555 Grand Boulevard
Kansas City, Missouri 64108
mtatum@shb.com
Appeared on behalf of Defendants.

TYSON FOODS, INC., by
Mr. Eli J. Glasser
2200 Don Tyson Parkway
Springdale, Arkansas 72762
eli.glasser@tyson.com
Appeared via telephone on behalf of Tyson Chicken, Inc.

ALSO PRESENT: Jon Hansen, Videographer.

Page 3

I N D E X


| Examination by: | Page |
|---|---|
| Mr. Tatum | 5 |
| Mr. Whitfield | 312 |
| Mr. Tatum | 320 |


E X H I B I T S


| EXHIBIT NO. | | PAGE IDENTIFIED |
|---|---|---|
| Exhibit 1 | Deposition notice | 65 |
| Exhibit 2 | 7/15/19 Report | 66 |
| Exhibit 3 | Ansong-Danquah study | 117 |
| Exhibit 4 | Sample contract | 147 |
| Exhibit 5 | June 2014 MacDonald report | 167 |
| Exhibit 6 | July 2008 MacDonald and Key paper | 206 |
| Exhibit 7 | 2012 MacDonald and Key article | 209 |
| Exhibit 8 | Supplemental declaration | 317 |


(Original exhibits attached to the original transcript; copies provided to attorneys ordering exhibit copies.)

Page 4

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are now on the record. Today's date, October 10, 2019. The time is 9:01. This is the video recorded deposition of Kyle Stiegert, M.D.(sic.) in the matter of Charles Morris, et al. versus Tyson Chicken, Inc., et al., United States District Court for the Western District of Kentucky, Owensboro -- Owensboro Division, Case No. 15-CV-00077.

This deposition is being held in Madison, Wisconsin. My name is Jon Hansen, CLVS, and I am the certified legal videographer with Alaris Litigation Services.

At this time, if the attorneys would announce their presence and introduce themselves, who they represent; after which, our reporter will swear the witness.

MR. TATUM: Mark Tatum on behalf of defendants.

MR. WHITFIELD: I'm John Whitfield. I'm counsel for the plaintiffs.

THE VIDEOGRAPHER: On the phone, please.

MR. SODEN: On the phone, Steve Soden, from Shook, Hardy & Bacon, for defendant.

MR. GLASSER: Eli Glasser, of Tyson

associate professor years involved teaching that econometrics course I referred to earlier.
**Q Does your CV cover all classes you've taught at the University of Wisconsin?**
A To the best of my knowledge. I was involved in a summer course involving Kazakhstan students, I'd have to look and see if that got included. It wasn't really a traditional course.
**Q Does the University of Wisconsin have a poultry department?**
A We have a -- you know, I don't know if it's called poultry science; I don't know that. There's animal science, there's dairy science, there's -- there is some sort of poultry lab here on campus I'm -- I believe.
**Q Have you ever taught any classes at the University of Wisconsin dealing with the poultry industry?**
A No.
**Q Have you ever published any materials dealing with the poultry industry?**
A No.
**Q Have you ever taken any courses dealing with the poultry industry?**
A No.
**Q Have you ever attended any -- and -- and I want to**



**be inclusive, because there's so many different names for meetings and trade groups and things like that, but have you ever attended any conferences or symposiums or anything of that nature dealing with the poultry industry?**
A Well, I was involved in a -- an eggs litigation case, which is -- would be inclusive of the poultry industry, and in those years, this is starting back in 2009, I watched various webinars, things of that nature, trying to learn about the poultry industry through that lens. I've done similar things, trying to get up to speed in the -- what's going on in chicken growing, and I've read academic journal articles on -- on poultry pricing, so -- that's the -- that's the most common vehicle that professors would tend to take, would be reading other people's work.
**Q So when it comes to the poultry industry, you've read other people's work?**
A Yes.
**Q And you've -- in the context of expert consultation, you've worked in an eggs litigation case?**
A I did.
**Q And then in the context of that work, you've**



**watched some webinars and things like that to get up to speed on the industry and industry practices?**
A Yes.
**Q Have you ever been in a broiler farm?**
A Have I ever --
**Q Do you --**
A No, I've never gone on a broiler farm.
**Q -- do you know what the definition of a broiler is?**
A I believe so.
**Q What is the definition, as you understand it, of a broiler?**
A It's a -- a chicken that is -- that is grown for -- for the purpose of human consumption.
**Q So have you ever been in a broiler house?**
A No.
**Q Have you ever been in an integration plant?**
A No.
**Q And you know what -- what I mean by an integration plant, in other words I mean the processing facility that processes broilers?**
A I've watched various videos on that process.
**Q Okay. But you've never been in one?**
A I have not actually been in one, no.
**Q Okay. Have you ever been in a broiler hatchery?**
A No.



**Q Have you ever been in a broiler feed mill?**
A No.
**Q Have you ever been on a broiler -- or, excuse me, a pullet farm?**
A No.
**Q Have you ever been on -- in a breeder farm?**
A No.
**Q Have you ever published anything dealing with broiler -- the broiler industry?**
A No.
**Q Have you ever consulted with the USDA or any governmental body in relation to the broiler industry?**
A Not to my recollection, no.
**Q Have you ever consulted with any trade organization or association such as the Poultry Science Association or anything of that nature dealing with the broiler industry?**
A No.
**Q Prior to this case, have you ever consulted, on an expert basis, in relation to the broiler industry?**
A Not directly, no. There was some indirect involvement of the broilers in that eggs case I needed to develop in -- in making -- in developing conceptual models of -- of chicken growing and --

Page 25

Q Okay. So as you understood it, they were looking for help in a role they had been hired to do?
A Yes, I think that would be a good way to describe it.
Q Okay. Other than these two things then, the egg situation in '09 and this two-hour issue on an Illinois case, any other work --
A No.
Q -- relating to poultry?
A Not to my knowledge, no, no.
Q Okay. In the Illinois case, do you know the name of the case?
A No.
Q Do you know the jurisdiction of it?
A I don't know --
Q Okay.
A -- anything about it other than the --
Q Do you know -- remember any of the parties to the case?
A No.
Q Okay. I -- you -- you also said that -- I believe you -- at University of Wisconsin, full professor; prior to that, you were an associate professor; do you have any other titles at the University of Wisconsin?

Page 26

A Well, I -- I am the director of the food system research group, but --
Q What does a research group do?
A Well, the -- the -- the -- the funding for the food system research group is now -- is now gone, due largely to the Great Recession, and -- so I -- I'm still the named director, but the -- the program is not operating right now.
Q How long has it been not operating?
A I -- our last research papers were completed around 2012; the last funding cycle was 2009 or '10.
Q Okay. In that role, did that group ever publish anything under your watch in relation to the poultry business?
A That's a -- I'd have to go back and look at all the working papers, but I'm thinking no.
Q Okay. Have you ever worked for any entity in any respect in relation to the poultry business?
A No.
MR. WHITFIELD: Objection to form.
MR. TATUM: What -- I can break it down.
BY MR. TATUM:
Q Have you ever worked for a poultry producer?
A No.
Q Such as Tyson or a -- you know, a competitor like

Page 27

Pilgrim's, Perdue, there's a number of them?
A No.
Q Okay. Have you ever worked for anyone on the grower side in relation to poultry?
A No.
Q Have you ever worked for any government agency in relation to poultry?
A No.
Q Have you ever worked for any trade association or anything like that in relation to poultry?
A No.
Q Prior to the University of Wisconsin, what was your employment?
A I was an assistant and an associate professor at Kansas State University.
Q And what years were you at K State?
A '93 to 2001.
Q Okay. What -- did you reside in a particular department?
A Yes. It was the department of agricultural economics.
Q Okay. Were you in that department during your entire tenure at K State?
A Yes.
Q And what were your -- you said you were a -- an --

Page 28

I can't read my acronym. You were an associate professor and what else?
A Assistant professor.
Q Assistant professor.
What's the difference between an assistant professor and an associate professor?
A Well, the title of assistant professor usually comes when you first start out of your Ph.D. program as a -- as a young professor; and then after six years, roughly, after six years, you go up for tenure with promotion, and it's at that point -- it's usually an up or out decision for the department, so I was awarded tenure and promotion to associate professor in -- in and around '99 or 2000.
Q Okay. What was your responsibilities as an assistant professor at K State?
A It's pretty much the same as I -- as it was at Wisconsin, although they -- they -- the numbers that they used were a little different, I think it was like 60/40.
Q In other words --
A 60 percent research, 40 percent teaching, but essentially the same number of classes.
Q And how about as an associate professor?

Page 33

A And some of the farmers were feeling like this was in violation of their free speech, because they were trying to develop differentiated products, and generic ad campaigns were making pork look like it was homogeneous.
**Q So they filed a lawsuit?**
A So they filed a lawsuit. And the case was going in beef too and I think also mushrooms, there may have been a few others.
**Q And you were retained by the plaintiffs in that case?**
A Yeah, I don't know -- are -- would they be the plaintiffs in that case?
**Q Plaintiffs, meaning the folks who sued --**
A Yes, I guess they would be. Yes, yes, yes.
**Q Okay. And they were the folks seeking to exercise their free speech rights to not participate in a generic campaign?**
A Right.
**Q And you filed a report in support of that?**
A I filed a -- not in support or -- I -- I filed a report in response to the Texas A&M study.
**Q Okay. And then you were deposed?**
A I was deposed.
**Q Do you know if that report was subject to any motion to strike or exclude, what we might call Daubert?**

Page 34

A Like the Daubert? No. No, nothing like that.
**Q Okay. Do you know if that case went to trial?**
A It -- I don't think it did, because the Supreme Court ruled on beef, and that effectively ended the -- the pork case.
**Q And what was the Supreme Court's ruling on beef?**
A The Supreme Court ruling is that generic -- generic ad campaigns were not a violation of free speech.
**Q So the side that you were representing lost because of that Supreme Court case?**
A I don't -- I don't know if I would characterize it as supporting them, I simply provided a -- a reaction to the Texas A&M study.
**Q Ultimately, the Supreme Court --**
A But the plaintiffs lost the case -- yeah, the plaintiff -- the Farmers' Legal Action Group, which is a nonprofit, representing these smaller farmers, they lost -- they lost their -- their bid to --
**Q Okay. Do you remember when this was?**
A Maybe -- I'd have to look at my CV, but it was early 2000s, like we'll say 2004.
**Q Okay. Do you remember where the case resided, filed?**

Page 35

A I'd have to look here. I wouldn't know that.
**Q Sure.**
A My role in that situation was pretty narrow, so I didn't really delve into all of that.
**Q Okay. Have you taught anywhere other than K State and the University of Wisconsin?**
A I've done various teaching -- short-term teaching assignments in several other places.
**Q Where?**
A I taught a two-week course to -- to the competition authority in Armenia, I did guest lectures at Justus Liebig University in my recent sabbatical, I've done other guest lectures when I was in sabbatical at the University of Connecticut, this is back in 2000, but --
**Q Have any of your guest lectures or speeches or anything like that concerned the poultry industry?**
A No.
**Q Okay. As far as, you know, working as a -- as far as being an employee, then you've worked for K State and University of Wisconsin in your professional life?**
A As a -- as a -- as a professor, yes. I was a graduate fellow at Purdue during my -- my Ph.D. years, and I was a research assistant at the University of Nebraska during my master's degree years.

Page 36

**Q Would you consider yourself a Wildcat or a Badger? And you're under oath.**
A Yeah.
MR. WHITFIELD: That's a main -- that's a main question, it truly is.
MR. TATUM: I'll re -- pull the question back. My niece -- my niece is a Wildcat.
THE WITNESS: Actually, I'm a -- actually I'm a Cornhusker.
MR. WHITFIELD: There you go.
MR. TATUM: Good answer.
BY MR. TATUM:
**Q You are retained as an expert in this case on behalf of plaintiffs, you understand that, right?**
A Yes.
**Q And just -- I ask you that just to frame, do you have an expert consulting business or entity through which you operate?**
A Yes, I have an LLC.
**Q And what's the name of that LLC?**
A Stiegert Agro-Food Economics.
**Q And is that a -- a company that's formed here in Wisconsin?**

Page 53

**University of Wisconsin and your consulting practice?**
A I don't think that characterizes my full professional life.
**Q What am I missing?**
A I graduated from undergraduate in '81.
**Q Oh, okay.**
A And I worked as a -- as a market analyst in -- in the futures industry as a meat market analyst. So I would provide commentary and research on beef futures, feeder cattle futures, hog futures, pork belly futures, so --
**Q Okay. And you did that until you returned to receive your master's?**
A I did that for three years, and then I -- then I -- then I worked as a bank -- as a bank software installer, so my role would be to carry modern software into these banks and -- and convert them on to a -- the company's name was Information Technology --
**Q Uh-huh.**
A -- so I would convert them over to the -- our software.
**Q Uh-huh.**
A And then I would train the bank on how to operate

Page 54

the bank in the new environment.
**Q Okay. Anything else in that --**
A In 1987, I left there and started my master's program.
**Q Okay. And what did you receive your master's in?**
A In '89.
**Q What -- what did you receive it in?**
A In agricultural economics.
**Q Did anything within your master's program have anything to do with the poultry industry?**
A Not directly. It was a -- my master's thesis was on the imperfect competition in the beef sector, which is somewhat related.
**Q Anything have to do with the broiler industry, within your master's program?**
A No, no.
**Q How about your Ph.D. program, what was your Ph.D. dissertation in?**
A It was on real option theory in -- applied to the anhydrous ammonia, which is nitrogen fertilizer, so real option theory applied to the anhydrous ammonia industry.
**Q Did anything about your Ph.D. program or dissertation have to do with the poultry industry?**
A No.

Page 55

**Q Have you ever published a paper dealing with monopsony?**
A Yes.
**Q How many times?**
A Well, I would have to look at my CV, but I've written three papers on monopsony power in the beef industry, at least.
**Q Have you ever written any papers dealing with monopsony in the poultry industry?**
A No.
**Q During your professional career within the university settings, have you ever -- I want to make sure I use the right word, have you ever had any -- subject to any censors or reprimands or demotions, things of that nature?**
A No. No.
**Q Have you ever had any papers rejected for publication?**
A Yes.
**Q How many?**
A If you don't -- if you don't get a paper rejected, it means you didn't aim high enough, so --
**Q How many papers have you had rejected for publication?**
A You mean rejected and never published?

Page 56

**Q Yeah.**
A Maybe one.
**Q And what was that about?**
A Well, it's still -- still not done yet. I'm still going to publish it. It's dealing with the theory of -- it's a theoretical paper on international -- industrial -- on imperfect competition in international markets and -- kind of overlaid against these policies called special safeguards, so --
**Q Have anything to do with the poultry industry?**
A Not directly.
**Q In other words, it -- the subject matter is not the poultry industry?**
A Well, a lot of countries may have special safeguard provisions that could involve poultry. I mean, I --
**Q Understood. But --**
A The -- the -- the case we're looking at in Japan was focusing on special safeguards in pork products, so it wouldn't surprise me that there's numerous special safeguards and provisions in place for poultry. So yeah, I think it has somewhat of an indirect -- I mean, the paper is all theoretical.

Page 77

-- if Jonathan or Ram was involved in a phone call --
**Q Okay.**
A -- but I was not.
**Q And your understanding though is this was obtained in furtherance of your report in Exhibit 2?**
A Yes. Yes, there was a -- there was an interest in understanding this whole dimension of free-range and organic chicken, so it was --
**Q Do you agree that generally producing free-range chicken or nonfree-range chicken involves the same processes from a grower's perspective?**
A Say that -- can I have the question back.
**Q Yeah.**
**Do you agree with -- do you agree that, from a broiler farm perspective, growing free-range chicken or nonfree-range chicken generally involves the same processes?**
MR. WHITFIELD: Objection to form.
THE WITNESS: You're -- you're separating the organic?
MR. TATUM: Well, including organic.
THE WITNESS: Well --
BY MR. TATUM:
**Q Did you do anything to study that?**

Page 78

A Yeah, there's a -- there's a certification process for organic, and I would have to go back and look at what the -- what's in the details to call something free-range.
**Q Okay. So you're not --**
A I don't know that -- I don't know that every chicken housing operation can call their chickens free-range chickens.
**Q But you don't know it from a day-to-day farm management perspective as a broiler grower that's either dealing with free-range and organic chickens or not, what the differences are?**
A Well, I have a pretty good background on organics. It takes -- to be certified organic in any agricultural commodity, it takes quite a few steps to prove that you're certified organic. The free-range, I'd have to go back and look that over again, but I don't think that chicken houses can -- can claim they're -- they're all free-range.
**Q All right. Did you review Chris Burch's testimony on this point, where -- who grows for Perdue?**
A I -- I read Burch, yes.
**Q And you're aware that he said he does the same thing at Perdue that he did with Tyson, there's no real difference?**

Page 79

A And he's -- he's free-range -- he's certified free-range now, is that --
**Q Did you -- did you --**
A Yeah.
**Q -- look into his testimony to determine?**
A We have been looking into that testimony, and I was more dialed into why he switched than I --
**Q So you didn't analyze whether or not his belief that his processes were the same is accurate or not?**
A I didn't analyze that sentence in his deposition, where he makes that --
**Q Okay.**
A -- where he makes that claim.
**Q Did you review any Perdue contract documents in the context of your analysis for your July 15 report, I don't see any listed in your Appendix B?**
A I didn't -- I didn't review the Perdue contracts.
**Q Did you review any Perdue settlement information in preparation for your report on July 15?**
A No.
**Q Did you review any pricing or cost data of any kind in relation to Perdue in relation to your report prepared on July 15?**
A Just -- I -- the -- relied on the deposition

Page 80

information, is -- is that what you're referring to as data?
**Q You relied on deposition information from plaintiffs?**
A Is that data in your estimation; is that what you're saying data is?
**Q I'm fine if you say yeah, you looked at depositions --**
A Okay.
**Q -- but independent of deposition testimony, did you look at any contracts of Perdue?**
A No, no contracts.
**Q Okay. Did you look at any settlement data of Perdue?**
A No.
**Q Did you look at any production related data of Perdue?**
A No.
**Q Okay. Did you review any contracts of any Robards growers who are not a plaintiff in this case?**
A I'd have to look at -- I don't -- I don't -- sitting here today, I don't know that answer. There was the production contracts that were directly related to the plaintiffs, and they -- they all looked very much similar, so --

Page 81

Q Are you -- are you aware of whether any contracts among the plaintiffs differed from each other?
A Sitting here today, I -- I couldn't identify the differences.
Q Okay.
A It's -- I looked at these contracts quite a ways back, and they're largely similar, so --
Q Okay.
A -- any nuance differences that might be in there is a little hard to remember right now, if there are any.
Q Do you know if all the plaintiffs were on what we commonly refer to as a tournament contract?
A That's my understanding, they were --
Q Okay.
A -- all these were -- were in the tournament.
Q Are you -- are you aware if any plaintiffs were not on the tournament contract, in other words a tournament contract that settled week to week?
A That -- that's my understanding, is that these were all plaintiffs in the tournament.
Q So does anything in your report account for any plaintiff who was not on the tournament contract?
A Not to my memory, no. I don't think so.
Q Did you review any settlement data for any

Page 82

nonplaintiff growers at Robards?
A I would have to go back and look at the report to see if there's -- some of our tournament analysis included all of the growers, so the answer is yes, we did consider some of those.
Q And that would be found within the grower recap by grower sheets that you list here on Exhibit -- Appendix B?
A That's my memory at this point, yes.
Q Okay. Did you review any data in relation to the age of the laying hens that provided flocks to any given grower?
A No.
Q Did you review any information relating to the settlement packets that were provided to the growers, upon each settlement?
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q Are you aware that every time a grower settles, they receive a settlement packet of information?
A I might have seen one, but I don't recall --
Q I don't see one listed in your appendix.
A Yeah. I mean --
Q Did you review any condemnation certificates for any grower?

Page 83

A Not to my memory, no.
Q Did -- did you review any mortality cards for any grower?
A I don't -- no.
Q Did you review any feed tickets for any grower?
A No feed tickets.
Q Okay. Did you review any grower recap reports, grower copies?
A What -- may I have that back, please.
Q Did you receive -- did you review the grower copy of any grower recaps?
A No. I don't recall that.
Q Did you review any actual settlement statements for any growers for any of their settlements? You have listed the settlement data spreadsheet, I'm just asking if you reviewed any of the actual settlement statements?
A No, not to my recollection.
Q Did you review any feed delivery tickets for any growers?
A No, not to my recollection.
Q Did you review any scale tickets for any growers?
A No scale tickets.
Q So the sum total of settlement data in relation to the growers that you reviewed is found in

Page 84

Appendix B, which is the grower recap sheets listed by Bates number and the settlement data listed by Bates number; is that fair?
A My understanding, this is what we relied on, so --
Q Did you review plaintiff's tax returns?
A I don't -- I don't recall getting any tax return data.
Q Did you review any bank records of plaintiffs?
A No bank records.
Q Loan records?
A Can you tell me --
Q Did you review any --
A -- the difference between loan records and bank records?
Q Well, I guess I was trying to be all-inclusive, in case you looked at it differently. I mean, a bank record might be a -- you know, your -- your check balance --
A Uh-huh.
Q -- but, you know, I'm just trying to be inclusive, loan, finance, credit records, things of that nature, did you review anything like that?
A No.
Q Okay. You noted in Appendix B that you reviewed the Agri Stats data provided to you that I believe

**covered the time period roughly 2010 to 2016?**
A Yes.
**Q Did you review any Agri Stats data post 2016?**
A I'm trying to recall if -- you know, at the time we wrote this report, I would say no. I don't know if we're -- if we're going down that path yet or not.
**Q Did you review, in preparation for your July 15 report, any Robards production data?**
A Robards production --
**Q -- production data.**
A What does --
**Q Well, meaning plant production data, volume of chickens being produced --**
A We --
**Q -- purchases of --**
A I relied on data from the tournaments that -- are we talking about the output side of Robards?
**Q Uh-huh, the -- on the output side.**
A No, no.
**Q No.**
**And you're not able to opine whether Robards' output has went down or up or remained constant over the last ten years, correct?**
A You mean output as compared to inputs?
**Q Output as compared to meat leaving the plant.**



A I don't -- I don't -- I didn't rely on that data.
**Q Okay. You're not able to say whether or not Robards has ever changed its output in any way over the last ten years, whether they've decreased output or increased output, correct?**
A Well, the relationship between chicken meat input is pretty strongly correlated with the output side, so --
**Q But you didn't analyze that?**
A But I didn't analyze it, no.
**Q Right. And you didn't --**
A It would be some differences over time.
**Q But you didn't analyze that?**
A No.
**Q You've never -- you did not analyze anything about Robards' own financial positions, whether -- its financial statements, for example?**
A When you say Robards, are you referring to --
**Q Robards Complex.**
A -- Tyson?
**Q I'm referring to the Robards Complex.**
**Did you review any financial statements for the Robards Complex?**
A Not to my recollection.
**Q Any -- any income statements, profits and loss,**



**anything of that nature, I just want to make sure I'm being inclusive on that?**
A I don't think so, no.
**Q Okay. Did you, in preparation for your July 15, 2019 report, look at any other integrator's production history?**
A What -- define other, please.
**Q Any other integrators.**
A Oh, other -- other complexes, other --
**Q Yeah. Did you actually look at their actual production data for any other integrator?**
A No.
**Q Did you look at any contracts for any other integrator?**
A No.
**Q Okay. Did -- so did you look at any other integrator's actual contract terms with any particular grower?**
A I may have looked at a contract or two down in -- but -- but I don't recall with -- what they would be or where they were at.
**Q Okay.**
A Some of that stuff is available online, I think I might have just looked at them on a --
**Q But you can't recall?**



A I don't recall.
**Q Okay. Did you look at any other integrator to determine whether or not their contract terms were similar to or different from Tyson's?**
A That was my intent. I think I looked at a couple -- there's a -- there's quite a bit of similarity in these contracts, so I think I just moved on.
**Q Can you identify a contract that you looked at?**
A I can't.
**Q I don't see anything listed in Exhibit B about other contracts?**
A Yeah, it was just a -- a cursory check.
**Q But not something you considered and relied on for your opinion?**
A No, no.
**Q Okay. Did you look at any other integrator's equipment requirements for producing broilers in a grower house, what we might commonly call house requirements or upgrade costs and requirements over time?**
A I -- I've become aware of these -- of some of this -- the dimensions of chicken growing --
**Q But you --**
A -- through various -- through various, you know, information sources.

**Q But you did not, for example, look to see if Perdue's house -- housing requirements are similar to Tyson's?**
A Yeah, I relied there -- no, I didn't -- I didn't investigate that.
**Q Okay. Or any other integrator for that matter, you didn't investigate to see who's requiring what equipment and are there differences?**
A Up to the January -- up to the July 15 report, the answer would be no.
**Q Okay.**
A Subsequent to that, I have been working down this pathway some.
**Q Did you examine any condemnation practices of any other integrator versus Tyson and determine whether or not they handle it the same or different?**
A No.
**Q Did you examine any placement practices of any other integrator as compared to Robards at Tyson and determine whether they do it the same or different?**
A You're referring --
**Q And what -- by -- yeah, that's a good question.**
**By placement, what I really mean is frequency of placement. You have no --**



A Oh. Days out.
**Q -- opinion about days out, but I'm just asking you if you analyzed that in relation to any other integrator to see if Tyson or Robards does it different from anyone else?**
A No.
**Q Are you aware of any integrator that doesn't use the tournament system as a foundational element to pay in the broiler industry?**
A I am.
**Q And who is that?**
A Well, there's a new operation emerging in Nebraska by Costco.
**Q Any others?**
A In the -- in the research -- in the research that I relied on, there was a paper by a MacDonald and Key that collected something on the -- something around 1650 surveys, and they described that of those 1650 -- 1650 or so surveys, that 1350 were -- were useful for the -- useful for their study because they were -- they were tournament oriented production contracts.
**Q Do you agree with MacDonald and Key that the vast majority of broiler contracts are tournament based?**
A Yes, yes.



**Q Regardless of where the integrator sits?**
A Yes. It -- this -- this new development in Nebraska is something I'm -- I'm curious about. I haven't fully investigated it, but they don't sound like they're working on a tournament.
**Q But you don't know that for sure?**
A I don't know that yet.
**Q Okay. But you'd agree with me that regardless of whether an integrator sits to one next door or sits to one miles away, the tournament system is the -- is the system used in the industry and has been for quite some time?**
A It's the contract economy --
**Q And you would --**
A -- of chicken growing, yes.
**Q -- you would agree that that's been a win/win situation for 60 years?**
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q You would agree that that's been a win/win for the growers and the integrators for over 60 years?**
MR. WHITFIELD: Objection to form.
THE WITNESS: I can't agree to that, no.
BY MR. TATUM:
**Q You've cited an article that said that, so I'm**



**curious why you would disagree with an article you cited that says that?**
A Well, in my opinion, the -- the contract economy has been largely developed by the integrators, and I'm not saying there's no benefits to the growers, but I'm not saying that it would be best classified as a win/win. The real issue is what would the alternative actually look like, which we don't -- we can't easily observe because this contract economy has -- has been manufactured by the -- the integrators in this -- in this industry.
**Q What are the opinions, based on your July 15, 2019 report, that you intend to offer in this case?**
MR. WHITFIELD: I'm sorry, Mark, say that again.
BY MR. TATUM:
**Q What are the opinions based on your July 15, 2019 report that you intend to offer in this case?**
A You want me to read them or --
**Q Well, you can point me to them. I mean-- and -- and we can go over them. I just -- you know, this is my opportunity to just make sure I've got clarity on -- on -- on those and where they are in the report and where I should make sure I understand that.**

Page 93

A My -- my findings are summarized on page 8, Paragraph 18 -- page 8 and page 9.
**Q So as I understand it then, is it fair for me to say your opinions that you offer in this case is that, A, the Robards Complex for Tyson is in a monopsonist position, is that -- is that fair; and then, B, your opinion is that it is in fact exercising monopsony power because of that position?**
A Yes.
**Q And then, C, the effect of that exercise of monopsonist power has resulted in damages to plaintiffs in three categories; one, base pay suppression; two, days out inconsistent with expectations; and, three, condemnation calculations?**
A Yes.
**Q Are you offering any other opinions in this case besides what I've just summarized? And I understand there's a background to how you get to those opinions, but you can understand my view of just wanting to make sure I've got it.**
A These are the -- these are the three areas that -- that I felt like we could -- we could develop supportable damage estimates for. There are other

Page 94

aspects of this case that I didn't feel necessarily that they were helpful to the growers, they may have been an evidence of monopsony power, but quantifying it was -- was outside the scope of -- was outside of our ability to get to.
**Q In other words, it was speculative, but if --**
A Yeah, yeah. Yeah, if --
**Q Fair enough?**
A -- things like -- things like the risk exposure, you're really talking about something that is much more difficult to identify damage claims on and things of that nature, so -- so these are the things that I was able to -- to hone in on and develop a damage model for.
**Q And -- and were you asked to hone in and develop a damage model for these three things or was that your independent judgment, that these were the three things that you felt like you could come to a conclusion on?**
A This is my independent --
**Q Okay.**
A -- judgment.
**Q Were there other damage elements that you were asked to look into that you rejected as not meeting your professional judgment as appropriate?**

Page 95

A Well, plaintiff -- plaintiff counsel says a lot of things, you listen, and from that, you investigate, and like I say, I think some of the things that I heard and read had merit, but I -- in the -- in the amount of time that we had and the amount of resources that we were using, this -- we weren't -- we weren't able to sort of construct a framework for getting at any possible damages in these arenas. And one thing that comes to mind is just this whole dimension of risk and whether there was a proper payment for risk, we just didn't go down that path.
**Q Okay. So the individual --**
A Even though there -- there could be something there.
**Q So at the end of the day, the three buckets of damages you felt like in your judgment you could express to your satisfaction was in relation to condemnation, base pay and out-time, as reflected in Paragraph 19?**
A Yes.
**Q And your ultimate opinion is these are derivative of Robards' exercise of monopsony power; in other words but for the exercise of monopsony power, these elements would be paid differently?**

Page 96

A Yes.
**Q And theoretically, they would not have suffered that damage, correct?**
A Correct.
**Q So your ultimate damage conclusions are dependent upon the exercise of monopsony power?**
A Correct.
**Q Now --**
A I guess we should add one caveat to that. There's prejudgment interest that is -- I'm not sure how the court -- or the law classifies that. I'm simply saying this -- this is the time value of money.
**Q Uh-huh.**
A That's all I'm adding there, so --
**Q No, I -- that's a good -- that's a fair caveat. Obviously the exercise of interest is a legal function, but the ultimate principal amounts that you list here in Paragraph 19 in each bucket of category is derivative, in your judgment and opinion in this case, of the exercise of monopsony power by Robards?**
A Yep.
**Q And absent that --**
A Yes.

Page 97

**Q -- exercise of monopsony power, your opinion is these damages wouldn't exist?**
A Yes.
**Q Okay. Now, did you do any analysis in the formulation of your July 15, 2019 report to determine if Tyson, under the contracts that exist, in other words, you're familiar with the contracts have a base pay element?**
A Yeah.
**Q And they have a fuel pay element?**
A Yes.
**Q And they have a system, what we commonly call the tournament system, that -- that sets the formula on how the base pay element works, correct?**
A Yes.
**Q And -- and there may be a premium housing pay element, right? There's a variety of pay elements within the contract?**
A Yep.
**Q Did you do any analysis to determine whether or not under those contract terms, just what those terms are, in other words I'm supposed to get paid this, in writing, it may be a good amount or it may be a bad amount, but this is the amount in writing I'm supposed to get paid for this pound of meat --**

Page 98

A Yep.
**Q -- did you do any analysis to determine whether any plaintiff didn't get paid according to the terms as written in the contracts?**
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q And I'll start with base pay. So did you do any analysis to determine whether or not a given plaintiff just got shorted base pay, based on the amount; so if I was supposed to get 4.9, I got 4.8, or I got shorted the number of pounds I got paid for, whatever?**
A Well, some -- to my knowledge, the -- the contract terms were not -- are not at issue here.
**Q Okay.**
A That's my understanding of this --
**Q Okay.**
A -- of this -- my assignment.
**Q Okay. And so you --**
A And my -- I didn't -- in my discovery, I didn't come across anything that --
**Q Okay. You weren't asked to look in to see, you know, just from a pure pen to paper on the contract perspective, did it -- did each grower get paid what it says?**

Page 99

A Yeah, the -- the -- it -- it looks above board. The contracts look like they're being -- I didn't see anything that -- that raised alarm bells for me.
**Q Okay.**
A There's -- there's certain things with the condemnation process that make me wonder about if they're -- are there specifics in the contract itself or the way they handle those things that I -- I -- I -- I've yet -- not made a final opinion on, but I'm working on it.
**Q You -- in your July 15, 2019 report, you didn't analyze whether or not -- for example, we were just talking about the pay terms, now I'm --**
A Yeah.
**Q -- going to talk about the condemnation terms. In general, and I know you have an opinion on the appropriateness of this method, but in general, the contracts, as you know, have a condemnation process involved, right?**
A Yeah.
**Q And in general, if a whole bird is condemned, there's an average price metric applied to that whole bird and that bird is deducted from the pounds delivered, you understand that --**

Page 100

A Yes.
**Q -- right?**
A Because they apply a -- an average weight.
**Q Right. You understand that, right?**
A Yeah.
**Q And you understand that's what the contract says?**
A Right. I -- the part I -- the part I was still investigating, that I'm not quite comfortable with, is who gets to decide what a condemned bird is, how does that process work --
**Q So you're not familiar with who regulates what a condemned bird is?**
A I -- I am. And I'm still in the process of truly digesting all that.
**Q You -- in the -- preparation for your July 15, 2019 report, you didn't challenge and you didn't conduct any analysis to determine at the end of the day if any plaintiff had not been charged per the contract term for the number of birds condemned, you may have a -- you may have an issue, right?**
A Oh, yeah. The -- the financing of it all, the -- the accounting and the economics all looked fine to me. I didn't see anything that raised red flags.
**Q Okay.**
A I'm still trying to digest a little bit of that,

Page 101

what's going on -- it feels like a gray area, like there's not a crystal clear, black-and-white, this is a condemned bird, this is a -- this is not a condemned bird, and so I was just trying to get a little bit better feeling about what -- what defined a condemned bird.
**Q Understood. None of that's in your July 15, 2019 report?**
A No, it's not in the contracts --
**Q Okay.**
A -- exactly how they would make that determination and --
**Q Okay. Did you do anything, as part of your July 15, 2019 report, to analyze whether any given grower's farm mortality was miscounted, not quantified for to any given grower, plaintiff?**
A Yeah, they -- there's an accounting of the number of chicks that enter the farm and then, you know, if there's some mortality, I think it's -- there's an attempt to manage that, from an accounting perspective. I mean, I didn't --
**Q You didn't analyze that?**
A I didn't see anything along my pathway that raised red flags --
**Q Okay.**

Page 102

A -- so no, I didn't.
**Q And you understand there's also --**
A It wasn't really my assignment to dig into that, so -- I didn't see a need to either --
**Q Uh-huh.**
A -- so --
**Q Bottom line is you did no analysis and you're offering no opinion as to whether the process of delivering feed, delivering chickens, picking up chickens, paying the growers per the contract terms, you didn't do any analysis to determine whether or not that was properly accounted for or not?**
A Well --
**Q You're not here to say --**
A -- there's not --
**Q -- they didn't pay under the contract?**
MR. WHITFIELD: Let -- let him answer.
Go ahead.
THE WITNESS: -- there's -- there's not data -- there's not any systemic data collection for these kinds of complaints that showed up in the depositions, so if, for example, there's an unhealthy -- there's unhealthy chicks that arrive on the farm, there just isn't really a way to

Page 103

systematically analyze that, so you rely on the deposition testimony is what I did.
MR. TATUM: I understand.
BY MR. TATUM:
**Q But the bottom line is, what I'm asking you is, you didn't form any opinions, and there's none in your report here, we just went through them, that led to some underpayment to plaintiff in some category beyond the three we just went to?**
A Right.
**Q You're not claiming --**
A Oh, no.
**Q -- and you didn't do any analysis that says they counted your chickens wrong?**
A Well, I -- I object to not doing any analysis. I don't think there's the data to support --
**Q Data provided to you?**
A -- a -- a systematic analysis of it.
**Q When you say data to support, you mean data provided to you, correct?**
A Yeah.
**Q Right. Now, did you do -- you've never studied breed differences among birds, correct?**
A In -- in my experience with the eggs litigation case, I really did get into that.

Page 104

**Q Okay. You've never written a paper on it?**
A No.
**Q Never taken a class on it?**
A No, but there's a --
**Q Never been a -- correct, no?**
A -- there's a whole poultry science program at North Carolina State University that deals with -- that deals with breeding and -- and hens.
**Q Is it fair to say you would not hold yourself out as an expert on --**
A Oh --
**Q -- what breed's better than another?**
A -- I'm not a poultry scientist, but it's not fair to say I've done nothing.
**Q Okay. But is it fair to say you would not hold yourself out as an expert on breed differences and what's better --**
A I'm not an -- no, I'm not an expert.
**Q Okay.**
A We can fairly say that.
**Q Is it also fair to say you would not hold yourself out as an expert on feed and what feed's good and what feed's bad, what ingredients should be in there and shouldn't?**
A I -- I've analyzed feed data over the years, not

Page 105

for its ingredients, like a -- like a poultry scientist might or an animal scientist might, but rather you're looking for trends in productivity, at least that's what an economist would be interested in --
Q Uh-huh. In the --
A -- so --
Q -- but not in the broiler industry?
A Yeah, there's -- there's a lot of similarity in the -- in the way feed gets developed. I mean, there's a whole poultry science industry, there's a whole hog science, there's a whole beef science.
Q I understand. But you've never done it in the poultry industry is what I'm --
A Of course I have not done it.
Q Right.
A I'm not a -- I'm not a feed specialist.
Q Right. And you've never written anything on that, in the poultry industry, right?
A I'm not a specialist in that area --
Q Right.
A -- so, naturally, I didn't write anything on that.
Q Right. I'm just trying to be clear.
You wouldn't hold yourself out as an expert on feed usage in a broiler farm?

Page 106

A As a -- as an economist, I -- I hold myself out as a person who could comprehend technological improvements in feed quality. Now, what I know the -- the -- the details of what actually that means in terms of how the feed ingredients changed, did they add a vitamin, did they add a -- did they add something like lysine to the feed, did they monkey with the percentages and get a better feed, I wouldn't necessarily hold myself out to be -- even -- even -- I wouldn't hold myself out to be a specialist in that arena --
Q Uh-huh.
A -- but I would be able to determine, you know, what are the economic effects of improved feed, for example.
Q But you -- I understand you could do it. You could look at inputs, look at the variable and see, did this make a difference or not --
A Sure.
Q -- in the outcome, but you haven't done that in the broiler industry?
A As a matter of my past research?
Q Right.
A No.
Q Okay. Similarly, you -- well, and let me just step

Page 107

back from that.
I did want to make sure, as we sort of wrap up this sort of background discussion a little bit, when I'm looking at your report that's marked as Exhibit No. 2, you attached a CV in Exhibit A, and you've referenced your CV several times in this discussion today, is this a full copy of your CV and your publishing history and your testimony history?
A Well, I'd have to look at -- I wanted to check that one thing. I just -- it -- it occurred to me this morning that I was -- that I worked on that very tiny, two -- two-hour deal. I don't know that that made it in here. I'm thinking maybe it did not.
Q Okay.
A And then I -- then I'm thinking maybe I need to add those -- those small involvements with the utilities sector in -- in terms of some consulting that I would -- I think I need to -- to update those. Those probably didn't make it here either.
Q Okay. Anything else?
A Oh, yeah, there's -- I noticed in this CV -- I was -- I don't think it shows my awards, and I was just recently awarded the -- the best journal article award in the Southern Agricultural Economics

Page 108

Association here in February, and I think that needs to be put in here as well, so --
Q Okay.
A I try to keep this updated, but, you know, over time, sometimes -- and then maybe not every presentation that I've ever given would be in here. I try -- I try to keep it up-to-date, but --
Q Okay.
A It's pretty complete.
Q All right. Thank you.
So in looking at your report, you come to the conclusion that there's been a condemnation shortage to the plaintiffs because of the exercise of monopsony power in the Robards Complex, correct?
A Say that again, please. I'm sorry.
Q You've come to the conclusion that there's been a -- a payment deficiency to the plaintiffs in this case as a result of condemnation practices at Robards that derive from its exercise of monopsony power, correct?
A Let me see what I say about the condemnation.
Q Well, you can look at page 9, we just went through your opinions, and I asked you what those were and how the damages --

Page 117

A The study by -- I always have a struggle saying that name, but it's a Canadian study.
**Q A Canadian study?**
A I'll have to go back and look at the --
**Q Let me show you what I'll mark as Exhibit 3. I think I have a copy of it here.**
**(Exhibit 3 marked for identification.)**
MR. TATUM: I don't have two copies of these studies.
BY MR. TATUM:
**Q I've marked as Exhibit 3 a copy of a study cited in your report, at Footnote 150, called a Survey of Carcass Condemnation at a Poultry Abattoir and its Application to Disease Management. Is this the Canadian study you just referenced?**
A It is.
**Q Is this the sole source material you used to determine that a condemned bird actually weighs 50 percent less than a noncondemned bird, on average?**
A It is.
**Q Did you use any other -- you don't cite any other source material for that in your report, are you aware of any other source material for that?**
A Nope.

Page 118

**Q Did you do any independent study to determine if in fact that's true at Robards?**
A I could not find any data on the -- the actual weights that -- that Tyson was -- was extracting from the flocks, so absent that information. I searched the literature to see what was out there, and this is the -- the one study I did find, and so I relied on it.
**Q This study is from data retrieved in -- from 1980 to 1985; do you agree with me on that?**
A I think that's about right.
**Q And do you agree with me that it relates to one processing facility in New Brunswick, Canada?**
A Yeah, that sounds consistent with my memory. I'd have to go back and reread this --
**Q But --**
A -- to be --
**Q -- you don't disagree with that?**
A I would have to go back and -- one -- one abattoir in New Brunswick.
**Q It's your understanding that therefore what this study was examining was condemnation rates at one facility in New Brunswick, Canada, from 1980 to 1985?**
A Yes.

Page 119

**Q Do you -- did you find anything in this study that provided underlying data or analysis to support that, on average, a condemned bird weighs half a healthy bird?**
A Anything -- you're asking me -- repeat the question.
**Q Yeah.**
**Are you aware of any data underlying your conclusion that a condemned bird weighs half of a healthy bird?**
A Well, as I stated earlier, I looked for weight information about this from -- in the context of this case, and it does not appear Tyson provides that to the growers, so absent that information, this is the -- the study I found that I felt like I could rely on.
**Q Do you agree that the statement in this study in relation to the half weight is found on the third page of the study, and it says the producer is charged for birds of a given weight when in fact the majority of these birds may be half this weight?**
A You'd have to show this to me. I'm not going to argue with you, but I -- I'd like to read it again. That's what the study says.

Page 120

**Q You would agree as an economist that -- that they may be half this weight is not empirically sound that they are half this weight?**
A The -- it's -- it's the one thing that I could find in the literature that would show that -- that showed a way to go forward with this -- this damage calculation.
**Q You would agree that --**
A I mean, I think the one thing that I think going into this is that there's virtually no way those birds were at the average weight, and so the question became, for me, is well, how low does it go? And --
**Q And you assumed it went all the way to 50 percent every time?**
A It could go -- it could go below that. We don't know.
**Q You don't know how a given disease affects bird growth, right; you're not an expert in that?**
A I'm not.
**Q You don't know, for example, if inflammation affects how big a bird gets at all?**
A As I've stated, I'm not a poultry scientist.
**Q Right. So you're not here to opine that certain diseases that ultimately become chargeable against**

a grower affect a bird in one way or another?
MR. WHITFIELD: Object --
THE WITNESS: I'm not a poultry scientist, so no, I don't.
BY MR. TATUM:
Q And you're not opining on that, right?
A I'm not.
Q You didn't do any analysis to determine, with the plaintiffs, whether a given disease that led to their condemnation numbers that you looked at had any effect on the size of the bird at all?
A Well --
Q Or is known to have any effect on the size of the bird; you didn't look into that, right?
A -- well, I -- I did look into it, and --
Q You -- you cited this study and nothing else?
A This is -- this is part of --
MR. WHITFIELD: Just let him answer.
Go ahead.
THE WITNESS: -- this is part of the process of trying to understand how these birds are identified and why they would -- why they would stick out in the process of being a condemned bird, but -- at the -- at the facility, and what exactly that means and -- and why is -- why are they not



weighed. I didn't really understand any of that, still don't, so I applied a -- I applied a -- a major, coming from this study, and -- and used it as a -- as a -- the only good piece of information I had.
MR. TATUM: Okay.
THE WITNESS: Tyson could provide weights to these -- to these questions, but to my knowledge, they haven't done so.
MR. TATUM: I understand.
BY MR. TATUM:
Q I'm just saying the bottom line is, you don't have any empirical basis for the conclusion that -- in your condemnation conclusion here that a condemned bird weighs half of a regular bird, right? All you have is this Canadian report; is that fair?
A That's all I could find.
Q Okay. And this Canadian report just simply says they may be half the weight, right?
A It says, on page 3, when in fact the majority of these birds may be half this weight.
Q And in fact right above that, it notes that the problem at that one plant in Canada was that birds weren't being culled at the farm and instead were being sent to the processing line for condemnation?



A It says these birds should have been culled and not shipped to the plant, yep.
Q Right. In other words, sick birds, instead of being culled out through normal processes were being shipped to the plant, causing them to have to be condemned; that's what the study says?
A Yes.
Q And you agree with that, right?
A I -- I read that, yes.
Q And would you agree that naturally implies that birds shouldn't have been at the plant in the first place; that was the issue in this report?
A That's what they're saying, yes.
Q There's no indication in this report of any kind that they did any empirical study to actually examine the weights of those birds; would you agree with that?
A It doesn't appear to have any. I'd have to go back and look back through it, but --
Q Do you agree with this report's statement in the next paragraph, further work to examine the relationship between disease and productivity is required, many disease conditions are influenced by management of the flock; do you agree with that statement, that disease conditions are influenced



by management of the flock?
A Well, I'm not a poultry scientist to --
Q You don't know?
A I don't know that.
Q Okay. Now, as I understand your claim as to condemnation for damages here is it's derivative of the fact that Robards is able to exercise monopsony power to pay an average weight instead of an actual weight; is that fair?
A Could you repeat the question.
Q As I understand your condemnation damage bucket, the opinion is because Robards is exercising monopsony power, it is paying growers an average weight element for condemnation or charging an average weight element for condemnation instead of an actual weight, or a reduced weight?
A Yes.
Q Okay. Now, in this study, note the sentence right above what we're discussing here, where it says when broilers are condemned, their weight is calculated by multiplying the number of condemned by the average weight of the live birds on entry to the plant; do you see that?
A Yep.
Q So in this study that you're relying on for the

Page 125

**basis of your condemnation claim that Robards shouldn't be paying average weight, they're doing it in that plant too, right?**
A Yes.
**Q Did you do any analysis to determine if this New Brunswick plant is a monopsonist?**
A No.
**Q Did you do any analysis to determine if any other integrator anywhere charges condemnation in a different way?**
A I don't -- I didn't do that, no.
**Q Okay. Does that change your opinion at all as to whether the basis of the condemnation claim is the exercise of monopsonist power through the use of average weights?**
A Given the -- given the manufactured economy created by this contractual structure, I think these are the kinds of things that emerge in -- would it surprise me that -- maybe if you'd asked me the question would it surprise me if this practice was also going on in Canada, I would say no, if it's a contract economy in which the contracts are indeed created by the integrator.
**Q Do you know anything about the poultry business in Canada --**

Page 126

MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q -- other than this article?**
A I know some -- I know some things, but not a lot, no.
**Q Do you know Canada poultry system operates on a quota basis mandated by the government?**
A I am aware that Canada has layers of policies in all of their agricultural products, from dairy to wheat to everything else.
**Q Do you know if the Canadian poultry industry operates on a tournament system contract?**
A I'm not familiar with that.
**Q Okay. So would you agree with me then that based on what you just said, it's not the exercise of a monopsony power in a given market that may lead to using average weights?**
A Well, I -- I believe it is a result of monopsony power.
**Q Even if everyone does it, even when they're not in a monopsony position?**
A One has to recognize this market structure for what it is, and that is a manufactured contractual economy that was literally pulled together at the corporate board level in -- in the hands of

Page 127

integrators, and so this policy -- this policy of charging average weight for birds doesn't necessarily depend on the -- the overall level of competition in any region.
**Q So it's not --**
A But this practice could become a focal point, a standardized process for dealing with condemned birds, and as long as no one upsets the applecart and tries to compete, then it could go on for a long, long time.
**Q I understand. But the bottom line is, what you just said is it's not dependent on someone being a monopsonist?**
A A pure monopsonist, you mean a single buyer; is that what you're referring to?
**Q Whatever you believe is --**
A Are you saying monopsony power or --
**Q The exercise of monopsony power.**
A The exercise of monopsony power is what I'm referring to.
**Q If it goes on in places where monopsony power does not exist because there are multiple integrators competing for services, what's it got to do with monopsony power?**
A I don't know that more than one integrator is

Page 128

evidence of no monopsony power, as I --
**Q You've not studied that?**
A Well, as I've stated, this contractual economy emerges from the corporate board rooms of large integrators, and if no one decides to compete along these parameters, if everyone simply accepts the average weight of a condemned bird is the correct weight, then maybe nothing changes. That's my whole point.
**Q Does Perdue have competitors, as you understand it, at its location that you cited in your report?**
A Perdue -- are you talking about the integrator, Perdue Farms?
**Q Uh-huh.**
A Okay.
**Q Do they have competitors?**
A In -- where?
**Q In the location you cited in your report as not relative to Robards, relevant?**
A I'm not understanding your question. Are you changing --
**Q I'm asking you --**
A -- gears here at all?
**Q -- I'm asking you if Perdue -- you cited Perdue in your report, you have a lengthy discussion on**

**Perdue in your report, correct?**
A Yeah.
**Q I'm asking you if know if they have any competitors in their market, for grower services?**
A Well, Perdue is involved in a lot of complexes. Are you -- what are you referring to?
**Q Are you aware that you discussed a particular Perdue integrator and complex in your report?**
A Yes.
**Q Okay. Do you know where that complex is?**
A Are you talking about the -- the Perdue processing facility in the Robards area?
**Q Uh-huh.**
A Yes, I'm aware --
**Q Yeah.**
A -- of that, yes.
**Q Do you know where that is?**
A Well, not specifically, but I know it's in the -- it's about 35 miles from --
**Q Do you know if they have any competitors?**
A Competitors?
**Q Competitor complexes, competitor integrators, however you want to phrase it?**
MR. WHITFIELD: Objection.
MR. TATUM: I'm just asking if you know.



MR. WHITFIELD: Objection to form.
THE WITNESS: I don't -- I don't know that they have competitors for their grower services, no.
BY MR. TATUM:
**Q You don't know one way or the other?**
A There's just a tiny amount of switching going on between Perdue and -- and Tyson in that region, and then the next closest integrators are really quite beyond the -- the ability to ship to.
**Q Do you know if Perdue charges for condemnation?**
A I don't know their -- their calculation for condemnation.
**Q So you have no idea if it's the same or different from Tyson's?**
A I'm willing to look at that information if it's provided to me, but it has not yet been provided to me.
**Q I understand. I'm just asking if you know?**
A Okay.
**Q I mean, you either studied it or you didn't, I don't know the answer.**
A I attempted to ascertain it, but I did not -- I did not see that information.
**Q You attempted to find out if they charged for**



**condemnation?**
A Well, specifically how they would have charged for condemnation is what I was more interested in.
**Q And why couldn't you obtain that information if you're representing people who contract with Perdue right now?**
A I don't know. I think that's something we're going to continue to address is my expectation.
**Q Okay. So the bottom line is you didn't do any empirical analysis to determine if a bird actually weighs half of a healthy bird at a condemnation's base, correct?**
A Well, I did investigate it. I -- I looked for information about the weights of these birds, but Tyson doesn't supply that to the growers.
**Q I said you didn't do any empirical analysis --**
A Well --
**Q -- correct?**
A -- I did.
**Q You asked for information, but you didn't do a study --**
A Right.
**Q -- you didn't do an examination?**
**You're blaming someone else that they don't have the data, but you didn't do it**



**either, right?**
A But to say I didn't go down the path is incorrect.
**Q Right. But the bottom line --**
A I had to stop --
**Q -- is --**
A -- before I got to the data analysis --
**Q -- there is no empirical support for that conclusion, correct; you agree with that?**
A Well, there is --
**Q I know you're saying there's an absence of data, but -- if you're aware of empirical support, tell me what it is.**
MR. WHITFIELD: Okay. Let him answer the question.
THE WITNESS: I wish there were empirical -- I wish there were weights of these condemned birds so we could come up with a -- a very specific number, something, and -- so what we're relying on is the best available information that is -- in -- in the marketplace of ideas, and that is this Canadian study.
MR. TATUM: Okay.
BY MR. TATUM:
**Q That's it, the Canadian study's your source, right?**
A It's the -- to my knowledge, it's the best

Page 141

A Well, if there's a -- if --
**Q -- you understand that?**
A -- a bird is walking around with, yeah, two broken legs, yes, I imagine maybe you're right, that half the bird is lost, but if it's just a -- something like a wing or some of the more common, smaller items, you know, I don't think it would be half the bird is -- is damaged.
**Q You're not in a position to talk about what diseases cause what effects on meat production and volume coming from a whole bird?**
A I'm not a poultry scientist, so I -- here again, I think that's something that I would like to spend some time on to get a little more -- a little more familiar with that -- that role.
**Q Bottom line is you didn't factor any credit into your analysis that growers get paid full price for partial recovery of broilers, right?**
A No.
**Q Right. And -- and we -- and you told me earlier, I asked you, what's your understanding of a broiler, and you said a broiler is meat prepared for human consumption --**
A Yeah.
**Q -- right?**

Page 142

**And you understand the contract is about placement of broilers, right?**
A Right.
**Q You understand the birds being supplied and the birds that come back are designed for meat for human consumption?**
A Right.
**Q Yeah.**
A But I'm also aware -- I mean, it's -- it's unfair to say that I'm also -- I'm not aware that -- that the condemned birds go into a -- a viable economic channel and farmers are not paid for those.
**Q Are you aware as to whether farmers are paid for those in any other -- are you aware how many rendering -- you're talking about the rendering plant, right?**
A Well, I'm talking about the dog food channel.
**Q That's called a rendering plant; you understand that?**
A Yeah, yeah.
**Q You ever been in it?**
A No.
**Q Do you have a problem with that as a business plan?**
MR. WHITFIELD: Objection to form.
MR. TATUM: I mean, you're -- because you're smirking about the fact that someone makes dog food, so I'm wondering what's your problem with the dog food?

Page 143

THE WITNESS: Oh.
MR. WHITFIELD: He's not -- hang on a second.
THE WITNESS: Oh, no.
MR. WHITFIELD: He's not smirking. He's just trying to answer the question.
MR. TATUM: Okay. I -- I'm sorry, I don't mean to --
THE WITNESS: No, I'm not doing anything there.
MR. TATUM: Okay.
THE WITNESS: I was just -- I mean, the -- I mean, I was just -- all this interaction has made me smile.
MR. TATUM: Okay.
THE WITNESS: That's all it was.
MR. TATUM: No problem. I understand. And we do get to bouncing back and forth.
THE WITNESS: So --
BY MR. TATUM:
**Q Are you aware of how many rendering plants there are across the country?**

Page 144

A No.
**Q Are you aware if other integrators have rendering plants?**
A I don't know the -- the overall structure of the rendering versus the -- the --
**Q Okay. So you're not aware of whether Robards' use of a rendering plant is any different from any other integrator, where they might have three or four within 50 miles of each other?**
A I don't know the exact structure across the -- the chicken growing regions to know what the rendering --
**Q Are you aware -- did you factor in any credit in your condemnation damage calculation for payment for dead-on-arrival birds?**
A No.
**Q You -- are you aware that -- whether or not growers get paid for birds that are dead-on-arrival to the processing plant?**
A Here again, this has been -- this has been a challenging area to truly define what -- what is -- what is a condemned bird.
**Q I understand. But my question is --**
A So something as --
MR. WHITFIELD: Let him answer.

Page 145

MR. TATUM: -- real simple. Are you aware --
THE WITNESS: If there are live -- if there are --
MR. TATUM: -- or not as to whether a grower's paid for a bird dead-on-arrival? That's just my question.
THE WITNESS: I don't know if they're paid that -- that base -- that base pay.
MR. TATUM: Okay.
THE WITNESS: I was under -- I -- I've been under the impression, and here again, this is something that is -- that has been difficult to uncover, and that is what -- what is a -- what defines a condemned bird? Is it -- is a dead-on-arrival bird a condemned bird or is it a -- there's nothing in the contract that I can see that would make me understand that.
BY MR. TATUM:
**Q Are you aware that the USDA regulates the condemnation process?**
A Yes.
**Q Are you aware that the USDA regulates the parameters of how a bird is identified, tracked and condemned?**

Page 146

A Yes.
**Q Are you aware the USDA then certifies those condemned birds through certification certificates --**
A Yeah, I don't --
**Q -- condemnation certificates?**
A -- I don't know that they are on the ground at every moment that a condemned bird is -- is identified, but I know there's a certification process and that -- that you would try -- you would attempt to remain certified in your production practices if you're a -- a Tyson or a Perdue.
**Q Did you do any analysis to see if the volume of condemnation occurring at Robards was any different from any other integrator?**
A I did get into that some.
**Q Do you have an opinion one way or the other?**
A Well, I do believe that they are higher than the average.
**Q What is the average?**
A I don't know.
**Q What are they higher than?**
A The average, the average amount of condemned birds.
**Q I mean, what's the range that they're higher?**
A I don't recall the details, but --

Page 147

**Q Do you know if they're -- on average, they're greater or lower than the 2 percent discussed in the Canadian study from 1980 that you mentioned?**
A No, I don't know that.
**Q Okay.**
A There's -- we can -- I mean, we know how much pounds is condemned, we can figure out the -- the average.
**Q And I think we talked earlier, you didn't -- and I just want to make sure as we're kind of leaving this condemnation topic, you didn't do -- come to any conclusion that Tyson, at the end of the day, didn't count the pounds right? I know you disagree with how they charge it, but at the end of the day, you came to no conclusion that they didn't count the pounds and condemn the birds correctly and account for it properly under the contract?**
A I -- I didn't see anything that would show evidence that they -- I mean, no.
**Q Okay.**
A It looked like they --
**Q Okay. I'm going to show you what I'll have marked as Exhibit No. 4.**
**(Exhibit 4 marked for identification.)**
BY MR. TATUM:

Page 148

**Q Now, this is just a sample contract. This one happens to be one of Charles Morris's contracts. Take a look at it. You mentioned to me earlier that you reviewed the contracts --**
A Yes.
**Q -- as part of your effort and found that, you know, generally they're the same --**
A Yes.
**Q -- in some respects, right?**
A Yes.
**Q And if we look at the -- Schedule A of this contract, Paragraph B; you see that? It starts with --**
A Yes.
**Q -- the phrase farm-caused condemnation, which is chargeable to producer, used in the following formula means whole chickens condemned as determined by approved USDA inspection procedures for the following diseases, or causes, excuse me; do you see that?**
A Yep, yep.
**Q You didn't do anything to study how those diseases affect bird weight, correct?**
A No, no.
**Q So you can't tell me, for example, whether**

Page 157

out-time as attributable to him versus Charles Morris?
A I'm trying to -- not at this time.
Q Okay.
A I do believe at the -- that the data is available to -- for such a calculation, but we did not do that yet.
Q Okay. Did you calculate -- did you conduct any analysis to see if plaintiffs' out-time was any different from any other grower at the Robards complex?
A I didn't see a need to, so no, I did not.
Q Okay. Did you conduct any analysis to determine if the out-time of plaintiffs was any different from any other integrator anywhere else?
A Well, I didn't see a need to, so no.
Q Okay. Now, if I read page 130 -- Paragraph 130 of your report, as I understand Paragraph 130, third sentence, it says I have been asked to assume that 12 days out for summer months and 17.5 days out for winter months would have been the days out had Tyson honored its representations, correct?
A Yes.
Q And so your out-time bucket of damages is based on you analyzing whether or not they met these

Page 158

parameters in Paragraph 30, correct?
A 1 -- Paragraph 130.
Q Correct.
A You said 30.
Q I'm sorry. Yeah, let me rephrase.
So your out-time bucket of damages is based on a calculation using this formula here in Paragraph 130?
A Yes.
Q You did not run any analysis to determine if plaintiffs had received flocks per their frequency set forth in the contract, correct?
MR. WHITFIELD: Object to form.
BY MR. TATUM:
Q Look at Exhibit 4 for me, and if you flip it to Schedule A, Paragraph M, it's about -- probably the fourth page, paragraph -- let me see if you've got the right contract, just so I can make sure we get on the right page.
So Paragraph K in this particular contract you're looking for, it talks about receiving five flocks annually?
A Right.
Q Did you run any calculations or do any analysis in relation to whether any plaintiff received five

Page 159

flocks annually?
A I -- I don't recall any work done in that area where we actually calculated that on an individual plaintiff basis.
Q Okay. Did you run any analysis or calculation to determine whether or not plaintiffs received, on average, five placements per year?
A I didn't see a need to do that, so no, I didn't calculate the average --
Q All right. And you didn't do that --
A -- the average number of flocks.
Q -- because you were told to assume what we went over in Paragraph 130, correct, for the basis of your out-time parameters?
A Not -- not because of it, it's just that's -- when developing the work product, I didn't see a need to calculate that, so I did not.
Q Who told you to assume 12 days out for summer months and 17.5 days out for winter months?
A It was a -- a conversation with counsel.
Q With -- counsel told you that.
Now, your report indicates that Charles Morris told you that. Well, excuse me, Paragraph 127, and maybe that's the finer point you're making. In the second sentence, it says I

Page 160

have been informed that Tyson had represented to plaintiff, Charles Morris, that the days out, i.e., days between flocks, would be 10 to 14 days in the summer and would be 14 to 21 in the winter; so that wasn't a conversation you had with Charles?
A That may have been part of our conversation.
Q But someone informed you that that had happened?
A I don't -- to -- I sit here today and don't recall --
Q Okay.
A -- how I obtained that information.
Q But -- but the sole source of your analytical formula, which is I'm going to look at out-time based on this criteria is being informed that someone told plaintiff, Charles Morris, that, right?
A That -- that -- I imagine that is a part of the information that went into that decision, but the conversation between myself and counsel and my Nathan group, we determined that this would be the way to go to determine -- to calculate damages.
Q Did you review the depositions to determine if any plaintiffs had testimony inconsistent with what Charles Morris was -- represented here?
A I had not seen any.

A Oh, yes.
**Q And do you have any opinion as to what an appropriate amount of days out is?**
A Not specifically. A week to ten days, perhaps -- I -- I -- I forget. I want to back off of that. I don't want to say that.
**Q Okay.**
A I don't --
**Q You have not studied that issue?**
A Yeah, it's -- it's --
**Q Or you're not prepared to offer that opinion?**
A I'm not prepared to offer a point at this right -- right now, yes.
**Q Okay. Let's move on from out-time.**
**Your third and final bucket of damages, as I understand it, is what I'll call alleged base pay suppression; is that correct?**
A Yes.
**Q And getting back to page 9, Paragraph 19 of your report, that number of alleged damage is reflective in Paragraph 19A --**
A Correct.
**Q -- is that right?**
**What is the amount of base pay suppression you allege plaintiffs have suffered in**



**this case?**
A $10.74 million.
**Q That's the principal?**
A Yes. 12.33 when you add the prejudgment interest.
**Q And that interest was calculated per the formula we've prior -- previously discussed --**
A Yes.
**Q -- same time periods?**
**What time period for the base pay suppression is in play here?**
A Well, I want to be specific, so I'd have to go into the --
**Q That's fine.**
A -- meat of the report to get that right.
2010 to 2018. I'm not seeing any monthly designations, so --
**Q So 2010 to some point in '18?**
A Oh. Through July of 2018.
**Q Okay. Is that base pay suppression number derivative of base pay or total pay to a grower?**
A I'm not following your question.
**Q You understand under the contracts, that growers receive a base pay element --**
A Yes.
**Q -- per pound?**



A Yes.
**Q And you understand they receive other pay in relation to a settlement, such as fuel allowances, which at one time were per pound and now are per square foot; do you understand that?**
A Yes.
**Q And you understand that they can be eligible and -- and many do receive a premium pay for housing issues?**
A Right.
**Q And you understand that at times, there are other types of payments that may or may not apply, correct?**
A Yes.
**Q And that ultimately calculates, through their settlement, to total pay per pound?**
A Yep.
**Q So I'm asking, in Paragraph 19A, is that derivative of a base pay analysis per contract or total pay analysis?**
A That's a question that's -- I want to get correct, and as I sit here today, I don't know exactly. I -- I think this is the base pay that comes into play without those incentives --
**Q But you don't know?**



A -- so -- I -- I'm -- yeah. Hmm. Yeah, here it is.
**Q Where are you at?**
A I'm on Paragraph 118. Let's see what we have here. Well, here again, I'm going to have to -- I'm going to have to dig a little deeper to get that detail.
**Q I mean, you agree with me, your report just simply doesn't tell us whether you're factoring off base pay or total pay?**
A Right.
**Q Now, how did you calculate the damage amount of 10.74 million; what are the elements that went into that?**
A Well, let's see -- I'm looking at Table 12.
MR. WHITFIELD: What page?
MR. TATUM: 62 I think he's on.
THE WITNESS: 62.
We -- we benchmarked the 2010 year to obtain a -- a -- a but for grower pay that included a 7 percent adjustment following the study by MacDonald and Key. So if you take the first column of data, the -- in 2010, for example, you take .0536, multiple it by 1.07, you get what's in Column D, and then that -- so that becomes -- that moves over to the but for grower pay in 2010.
MR. TATUM: So when I look at --

Page 177

THE WITNESS: So that's the starting point of this.
BY MR. TATUM:
**Q So when I look at Table 12, for example, of your report, which is what we're looking at now, what is the number .0536 represent in Column A?**
A Well, that's the grower pay we're talking about.
**Q So is that an average grower pay or what is that; is that the contractual grower pay?**
A It's -- it's the grower pay that the -- that the tournaments in that year -- was -- experienced.
**Q So that's -- when you say the tournaments, you're talking about plaintiffs or the entire complex?**
A The entire complex.
**Q Is that -- is that the average pay received or is that the base pay received?**
A That's the average base pay received.
**Q Average base pay received by the complex?**
A Yes.
**Q Okay. And then what's the next column, gross margin?**
A That comes from Tyson's data and there's a description of how we calculated that in the document.
**Q And what data does it come from that you say is**

Page 178

**Tyson's data?**
A I think it comes from the -- what do they call those, the -- the 10-K reports out of Tyson.
**Q So that -- so that -- you're saying that there's a 10-K report that shows that Tyson receives, on average, a 13 cents per pound gross margin across the world?**
A In their chicken growing operation, 13 cents per pound, yes.
**Q Okay. Across the world?**
A Well, here again, I would have to check that. I don't know what percentage of their business is overseas.
**Q Let's just say everywhere they operate.**
A I would want to check that.
**Q Okay. It's not a Robards' gross margin number, right?**
A Oh, no, no.
**Q And you didn't cross-reference to see if the Robards complex operates at that margin or not?**
A Well, that would be a -- it would be very difficult to get that out of Tyson, because they're -- they're taking all the chicken meat from all of their complexes and then selling them, selling the chicken meat and generating an operating margin for

Page 179

themselves.
**Q You -- you don't -- you don't know if they run financial statements and profit margins by complex or not, correct?**
A Well, I'm sure they do, but we don't --
**Q Okay.**
A -- I didn't have those.
**Q Right. So you didn't -- you don't know if that is reflective of a gross margin of Robards or not, you're just saying that was derivative off a 10-K report of Tyson everywhere it operates chicken operations?**
A I'd have to check on everywhere --
**Q Okay.**
A -- versus U.S., so --
**Q Okay. Company wide though, Tyson Chicken Inc.?**
A Well, here again, I -- I want to check that --
**Q Okay.**
A -- against the possibility that it might just be U.S. only.
**Q Okay. We can at least agree it's not Robards?**
A Oh, no. No, no.
**Q Okay. Now, gross margin, gross of grower pay, what does this tell me?**
A That is the -- that is the taking -- see, when you

Page 180

have a gross margin, you're considering in that the part you're paying to the growers, so we're taking that back out and increasing their margin.
**Q Increasing whose margin?**
A Tyson's.
**Q Okay. So A plus B equals .19?**
A Yes.
**Q What's the purpose of doing that?**
A It's to get a sense for how large their margins would be before they paid anybody in the growing sector.
**Q What's the next column, Column D?**
A Well, that's -- that's Column A times 1.07. That's the monopsony effect.
**Q So in other words, you took -- basically you said well, if I -- if their average pay is 5. -- 0.536, I'm going to add 7 percent to it, and that's how I get Column D?**
A Yeah, relying once again on the -- the MacDonald and Key report --
**Q Right.**
A -- that was published in two thousand -- using a 2006 survey.
**Q Right. What's Column E?**
A Okay. Column E is the -- it's in -- the

denominator is the .19, and in the numerator is the .0574.
**Q So what does 30.6 represent? It says share of grower pay to gross margin in the -- what is that?**
A What this says is Tyson, before it paid any growers, it was getting 19 cents as its operating margin, 30.6 percent of that is going back to the growers. This -- this -- actually, it should be the .0536 divided by .19.
**Q Why is Column D the same number if you took the average pay times 7 percent and yet Column A changes?**
A Hmm. Grower pay in 2010 adjusted for the monopsony effect. That's -- we're going to calibrate this -- this time period using 2010 data, so that's why that is the same.
**Q So what you assumed in 2018 -- I mean, the same -- I'm just trying to figure out if -- what you told me was Column D represented .0536 times 7 percent, and that equaled .0574. Well, that -- that formula doesn't work for the rest of the columns.**
A Hmm. I have to -- hmm.
**Q You can't explain that to me?**
A Right now I am -- well, I'm under the -- under the gun here, I'm having a little trouble. Let's see



here, so the -- Column C is a summation of everything, that's getting our gross margin. I don't think -- I think the answer to your question is is I don't think we really used that Column D in anything other than in 2010, I'd have to go back and take a look. Yeah, because there is a -- I think there is a typo here in Column F. I think it should be E times C. E times C, yeah, that's correct.
**Q So Column F is incorrect as stated, it should be E times C would equal .0574?**
A Yes. And then -- and then column -- we get that .0425 as -- as .1 -- the next one down is .14 times 30.6 percent and so on down the line there.
**Q So you have two elements to your base pay suppression claim, and -- and I know -- realize right now -- I'm going to rephrase that, to your pay suppression claim, because we've already established we don't know if it's base pay or total pay. But to the pay suppression claim, as I understand it, there are two elements, the first is you applied an assumption that everyone should have been paid, on average, 7 percent more than what -- than the average that was paid in the complex?**
A Right.



**Q So number one was average paid in complex times 7 percent.**
**And then the second thing you did was you assumed everyone also should have received some additional or consistent share of a profit -- of an income margin --**
A Yes.
**Q -- correct?**
A Yes.
**Q And the income margin you assumed everyone should have received every flock is 30.6 percent, right?**
A 30.6 percent of the gross margin calculated in Column C.
**Q Of the gross margin calculated in Column C.**
**So you assumed that, A, under their contract, they had a pay rate that they were supposed to be paid per pound, right?**
A Yep.
**Q And you assumed, either on the base pay or the total pay, or some formulation of that, that should have been up by 7 percent --**
A Following the MacDonald --
**Q -- every time they got paid?**
A -- following the MacDonald and Key --
**Q Understood.**



A Yep.
**Q But you just assumed, anytime someone got paid, I can add 7 percent to it, right? But you didn't do it on -- but you did it on averaging basis of throughout the whole complex, you didn't look at it by plaintiff, right? So --**
A Right.
**Q -- you didn't look at their contracts and their pay and -- and their terms and apply 7 percent to that, right?**
A We applied 7 percent across the average pay --
**Q Right.**
A -- to go from 5.36 cents to 5.74 cents.
**Q Right. So if I wanted to know for a given plaintiff, look, this is what you got paid, this is what you were paid per pound, and I add 7 percent to that, you didn't do that, you just assumed they were part of the average?**
A In this calculation. You certainly can do it at the individual level.
**Q But you -- but you didn't, right?**
A We didn't need to.
**Q I understand you could decide you needed to or not, but if I wanted to know -- if I'm looking at Mr. Pinkston --**

Page 189

pay, and then, B, they should have got some relative constant gross margin differential; in other words, if Tyson's -- if -- I'm just reading this to basically say if Tyson's profits go up, their pay must go up at the exact same ratio for all time; am I correct on that?
A That's what this damage calculation is attempting to do.
Q Right.
A Yes.
Q So this damage calculation includes a component that says if Tyson's profits go up in a given year, regardless of what their contract says, regardless of any circumstances, it assumes growers have to receive that same ratio of profit?
A You know, one -- let me back up and explain where this comes from.
Q Right now I'm just asking you if that's built into this model, that fact?
A It's a damage --
Q So I understand the two elements.
A -- it's a damage calculation. It's not a claim for how the world should have worked. It's a damage calculation.
Q Okay. Understood. Not a -- not a calculation for

Page 190

how the world should have worked?
A But in the but for -- but in the but for world, had there been a very competitive process, a vibrant source of competition, these increased margins enjoyed by Tyson would have been -- would -- would flow back to the growers.
Q So in --
A And this captures that force.
Q -- in your damage model --
A Yeah.
Q -- you have two elements that basically equate to the damage column, the first is a 7 percent increase in anything they were paid --
A Yeah, starting in --
Q -- going forward?
A -- yeah, we adjusted --
Q But we don't know what --
A -- adjusted in 2010.
Q -- we don't know whether that was the base pay or total pay, but it was a 7 percent increase on something; and then, two --
A It -- does the -- does the 5.36 cents include other incentives you're saying?
Q Yeah. I've already asked you that --
A Right.

Page 191

Q -- and you don't know?
A Yeah, I have to work on that. Yes.
Q Right. So -- but we know -- but we know --
A Yeah, that's --
Q -- we know generally --
A -- no, that's a -- that's a small deal, but we can get that.
Q -- we understand conceptually --
A Yeah.
Q -- A, it's a 7 percent increase on every pound they were paid on some factor?
A Yep.
Q And then, two, we know that it also assumes that every time they turned in a flock, if Tyson's profits had went up, they're getting paid at a ratio of 30.6 percent of that profit?
A Well, that's not true. There's -- in 2011, Tyson's profits went down, and we're crediting back some -- some $1.25 million, so --
Q Right. I said if it went up.
A And if it goes down.
Q And if it goes down.
So you assume, two, is the buyers are -- were entitled to always receive the same ratio of profit margin, or what you call share of

Page 192

grower pay to gross margin, correct?
A You have to understand this is -- this is a manufactured economy.
Q I understand. I'm just -- I mean, it's not that complicated. I mean, that's true, right; that's what you calculated?
A Yeah.
Q Okay. And then you base that off of Tyson's gross margin from its 10-K for all operations anywhere reported under those 10-K's?
A All chicken operations.
Q All chicken operations anywhere reported.
You did not crosscheck that against whether it's consistent with Robards, correct?
A Here again, I don't see a need for that.
Q But did you or didn't you? I mean, the answer's no, right?
MR. WHITFIELD: Object to form. Objection.
THE WITNESS: I didn't see -- I didn't see a need to, so I didn't.
MR. TATUM: Okay.
BY MR. TATUM:
Q You also didn't crosscheck to see if any integrator anywhere in the world pays someone on a constant

Page 193

**share of grower pay to gross margin?**
A Well --
**Q Correct?**
A -- none of these -- none of these integrators are into these --
**Q No one does?**
A -- vibrant competition markets.
**Q Right. Now --**
A So naturally they're not going to --
**Q -- would you please tell me --**
MR. WHITFIELD: Let him finish.
MR. TATUM: Go ahead.
THE WITNESS: -- so naturally they're not going to -- they're not going to -- once this contract economy is established and everybody's playing according to the rules of the contract economy, no, these payments are not going up by other integrators.
MR. TATUM: So you --
THE WITNESS: I agree with you.
BY MR. TATUM:
**Q -- so you agree with me that gross margin is not constant under any integrator you're aware of?**
A Well, why would it be constant? I mean, financial accounting is what it is. It changes every year.

Page 194

**Q Can you -- can you identify for me the economic doctrine that says a buyer of services must always receive a constant share -- or a seller of services must always receive a constant share of grower margin from a buyer of those services?**
A You have to remember what I've done here.
**Q I'm just -- but listen to my question.**
MR. WHITFIELD: Let him answer -- Mark -- let him answer the question. You're interrupting --
MR. TATUM: My question is real simple.
MR. WHITFIELD: Hang on a second. You're interrupting him. Let me him answer -- let him answer the question.
MR. TATUM: Okay. Let me just strike it and rephrase, so we're clear.
MR. WHITFIELD: All right.
BY MR. TATUM:
**Q Can you describe for me the economic principal that stands for the proposition that a seller of services must constantly and always receive the same share of grower pay to gross margin from its buyer?**
A I object to the use of the word must.
**Q How about does?**

Page 195

A There is -- there are forces at work here that -- that support what I've done here as a damage calculation.
**Q Can you identify for me the economic principal that you've relied on that says a seller's share should always be the same ratio to the buyer's gross margin?**
A Well, I object to always be, that's the same phrase as must.
**Q Well, but here you've assumed it always is, so I'm just trying to find -- I'm just trying to harmonize that.**
A I am not -- I am not suggesting that there is a -- there is a free market economy that must adhere to that rule. This -- this damage calculation is -- is supported by economic principles of -- of what happens when there is such a -- a change in the revenue structure of the buyer. They should immediately go out and try to -- try to increase more supply, which means they would have to bid up their prices.
**Q Can you identify for me a market where the share of grower pay to the buyer's gross margin is always the same, regardless of highs and lows in the economy?**

Page 196

A I -- I object to the is always. It's the same as must or only.
**Q Well, but we're -- I understand, but --**
A You're -- you're being --
**Q -- in the chart, it is always.**
A Yeah.
**Q So it's fair for me to say tell me another industry where it is always, like in your chart?**
A You have to remember, this is a manufactured economy. We're trying to tease out what we -- what is the damage situation involved here. What would have happened in a competitive environment is when Tyson's margins rise, they would immediately try to secure more supply, that would cause them to have to bid up the price of these grower services. It's related to the marginal product and the value of the marginal product of the grower services. There's a direct connection here.
**Q Now, did you do any -- so just so I'm clear, you cannot identify for me another industry where the share of gross margin has been the same from 2010 to 2018?**
A Share of gross margin. Well, it's not the same here.
**Q Like in your chart.**

Page 197

A It's not the same here.
**Q It's 30.6 percent. You can't identify for me another industry you're aware of where --**
A Oh.
**Q -- that is constant --**
A Well --
**Q -- whether the buyer's market -- or income goes up or down?**
A This is an approach that I've -- I've used in -- in two of my other studies, a benchmarking approach. It doesn't -- it -- it doesn't suggest, nor should it suggest, that that is a constant throughout the entire time period of an -- of -- of any economic condition, but rather it's a statement that after adjusting for 7 percent, we looked at say well, let's -- let's look at this and say 30.6 percent of the -- of the gross margin, gross of grower pay, is going back to the growers, and could have included 2011, but if we'd have taken that, the damages would have been even higher, could have taken the average of '10, '11 and '12, but the damages would have been even higher, so we just settled on a conservative approach and said let's just take 2010, it's the first year of the -- of the -- of the market and said that's what we came up with,

Page 198

and it's a -- it's a practice used in -- in the scientific literature of applied economics, and so I adopted it.
**Q Understood.**
A I've used it in two different studies.
**Q Understood. But the answer to my question is no, right; you can't tell me an industry where that number has been constant between a buyer and a seller every year, regardless of how they've performed economically?**
A This is my way of trying to -- to assess what would have happened in a market that has been totally manufactured and controlled by integrators that are creating contracts in their board rooms and passing them downstream to the growers.
**Q But your claim here is that Robards, by not having competition next door to it, is exercising that practice, right; that's the foundation of your claim? That's what we talked about earlier and that's what your report says, correct?**
A I -- I'm not following you. You'll have to re-ask that question. May I have the question back?
**Q Your claim here is that Robards is acting as a monopsonist in its area because it doesn't have competition next door, correct?**

Page 199

A I'm saying there's a 7 percent -- there's a 7 percent adjustment associated with the number of integrators. I am in no -- I am in no way claiming that any other region is competitive.
**Q But you've not analyzed --**
A I don't believe --
**Q -- but you've not analyzed any other region?**
A -- I don't believe the contract economy that's been manufactured by the integrated structure in the chicken growing industry is competitive.
**Q I understand. But you haven't done any studies and analysis of that. I understand you believe it, but we're dealing here with -- you've not studied it, correct?**
A Well, in this case I've studied it.
**Q You've studied this case --**
A No, in the context of --
**Q -- right?**
A -- in the context of understanding this case, I have read -- I have read all kinds of research studies to try to help me get a handle on how this economy's functioning. You know --
**Q Don't you agree then, based on the studies you've read and the studies you cite in your report, do you -- I mean, does -- you -- you cite things in**

Page 200

**your report that say this is a win/win system for the growers and the integrator?**
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q Do you just ignore that?**
A I don't -- I don't ignore it, nor do I necessarily believe it.
**Q But you haven't studied it to know one way or the other, right?**
A I have studied it.
**Q You've studied it in this case at Robards?**
A And I've reviewed all of the relevant literature that's been published in agricultural journals for the past, what, ten, twenty years.
**Q If we eliminate this constant share of grower pay to gross margin element from your damage suppression calculation, what's the damage number?**
MR. WHITFIELD: What number is that; what number are you looking at, Mark?
BY MR. TATUM:
**Q I'm saying if we eliminate his -- as I understand his base pay suppression claim, there's really two elements, there's the element of 7 percent across the board, and then there's the element that's creating an acceleration effect to growers, meaning**

Page 201

because they're sharing in a constant profit, so if these profits go up for the buyer, their grower pay is going up, at a rate -- at a ratio of 30.6 percent, that's how you get to 10 million, correct?
A I have -- I have no -- I have no reason to take away that -- that Column E.
Q I -- I didn't ask if you had a reason to, I asked what the number is if you take it away? Do you know?
A I -- I would have to look -- get out a calculator.
Q I mean --
A You mean move it to -- you mean move it to zero?
Q No, move it to whatever it actually is. In other words, if you --
A If you move it to the observed rate each year, you're going to come back with what they -- what they already got, in the contract economy. You're going to have --
Q 7 percent, but not --
A Just -- just a -- yeah.
Q -- not your escalating ratio of gross margin, that's the number I'm asking about?
A Well, the 7 -- the 7 percent is -- is part of -- is part of the -- the contract economy that's been

Page 202

identified as baked in prior to 2010.
Q But I'm asking you, what's the number -- did you calculate a number, because you've got two elements for you to get to 10, you've got 7 percent across the board, and then you've got an escalation factor based on constantly staying --
A There's no --
Q -- at the same ratio?
A -- there's no escalation. The only -- the only reason it rises and then later falls is because Tyson's markets are rising and then later falling.
Q What's the damage number if it's just based on 7 percent --
A You mean --
Q -- and not a constant ratio of gross margin?
A -- you mean if I get rid of Column E or just --
Q Uh-huh.
A -- change them all to zeroes?
Q Change them all to you just got paid something and you should have gotten 7 percent more, what's the damage number?
A I haven't calculated that.
Q Okay.
A I don't have any idea why I would. I mean, this is fundamental to what's going on in this -- in this

Page 203

market.
Q Would you agree with me --
MR. WHITFIELD: Let him finish, Mark.
MR. TATUM: I understand, but would you --
THE WITNESS: This is -- this is fundamental. This is based --
MR. TATUM: It's your theory.
BY MR. TATUM:
Q This theory is nowhere in your MacDonald articles or anywhere else in your source material?
A Well, MacDonald --
Q Where is the source material for that?
A -- MacDonald compared -- MacDonald compared integrator -- one integrator in a region to four or more.
Q Do you agree with me that this escalation or ratio consistency of share of buyer pay to gross margin is nowhere supported and nowhere studied in any source material in your report?
A I don't -- I don't know that.
Q Okay.
A I know that in a free market economy and someone -- and -- and the downstream buyer is enjoying incredible profitability in a competitive

Page 204

environment, their natural tendency is to go out and get more of that good thing, and the only way they can go out and get more of that good thing is to bid it up.
Q I'm just -- you can't point me --
A That's exactly what --
Q -- you can't point me to a source material that supports that in the poultry business --
A Well --
Q -- in your report, correct?
A -- the -- the theory is well established in economics, it's simply the value of the marginal product, and that's what determines the -- the grower rate in a free market economy.
Q You haven't seen a single study in the poultry business that says that's going on --
MR. WHITFIELD: Object.
THE WITNESS: Well, this is --
MR. TATUM: -- correct?
THE WITNESS: -- this is my analysis.
MR. TATUM: It's your analysis.
BY MR. TATUM:
Q And that's not been peer-reviewed by anyone, right?
A Well, of course not. It's --
Q Okay.

Page 213

**Q The underlying data that was utilized in the Exhibit 7 that you're looking at is a grower survey --**
A Yes.
**Q -- conducted --**
A ARMS, yeah.
**Q -- in 2006, correct?**
A Yes.
**Q Do you know if any Tyson grower participated in that survey?**
A Do I know --
**Q Yeah.**
A -- for -- with absolute certitude?
**Q Did you do anything to look at that?**
A No.
**Q Did you do anything to look if any Robards grower --**
A But it's virtual certitude that some growers were in the survey.
**Q You don't know -- why would it be a virtual certitude?**
A Because they're a large share of the marketplace.
**Q Did you look in to see if any Robards growers participated in it?**
A No. I don't know that that data's even remotely

Page 214

available.
**Q You didn't go look, correct?**
A Not in the ARMS data. The ARMS data is privatized. They stripped the identifiers from the -- from the growers.
**Q So the bottom line is you don't know if any Tyson grower or Robards grower participated in the survey, but you're assuming they did?**
A I don't -- I don't even understand why it's relevant. It's not the way statistical analysis is conducted.
**Q Is the answer no to my question?**
A Could you repeat the question.
**Q Yeah.**
**The question is, the bottom line is, you don't know if any Tyson grower or Robards grower participated in the survey?**
A I don't see the relevance of the question, but the answer is I don't know that.
**Q Okay. Now, MacDonald talks in this article about a number of things and he talks about grower contracts, and he talks about how certain terms in contracts can have an increasing pay effect; are you aware of that?**
A Oh, yeah.

Page 215

**Q Did you factor -- are you aware that in Tyson's contracts, Tyson's contracts are typically for terms?**
A It's my understanding they're -- I don't know if it covers all of the years of the contracts, but the ones I've seen seem to be a little more of the seven-year range.
**Q Right.**
A Right around seven years.
**Q And that would be considered a long-term contract in the poultry industry, wouldn't it?**
A According to MacDonald and Key's dummy variable, that would classify as a long-term contract.
**Q And that would cause them to believe, according to their dummy variable, that that would -- that particular plant would create a pay advantage for a grower who's running long-term contracts, correct?**
A They found a -- a statistically significant impact using the logarithm version of the model of around 4.4 percent.
**Q But your analysis -- and in fact his study also finds that over half of contracts are not long-term, correct?**
A Rough -- yeah, I forget the exact share. We could look at the --

Page 216

**Q But your 7 percent did not factor any offset, for lack of a better term, over the fact that this complex deals with long-term contracts?**
A It -- it wouldn't.
**Q MacDonald and Key says it would?**
A No, it doesn't change the impact of the number of integrators.
**Q I didn't say it changed the impact of the number of integrators, but I said they said it affects the pay differential, and you didn't factor that into your 7 percent pay differential, correct?**
A There would be no reason to.
**Q Why not?**
A Because I was only measuring the impact -- I'm only looking at the impact of imperfect competition. Long-term contract is just a contract specification that -- for -- for both parties may yield some benefits and this is how it's settled, and so --
**Q But according to his analysis, an integrator with a long-term contract needs to be assumed to receive more per pound than his -- than his baseline, correct, and you didn't factor that in?**
A I did. It's controlled for in the study. It's after controlling for that, you still get the -- the -- the impact of the number of integrators.

Page 217

**Q So your opinion is that even though they have long-term contracts at Robards, which is different than at least half the industry, according to your own study, it's not a benefit to growers?**
A Well, 2006.
**Q Do you have any idea if it's different today?**
A I don't know.
**Q Well, did you read the plaintiffs' depos who are working at Perdue?**
A I read some depos from the plaintiff.
**Q Are you aware that they testified their contracts are flock to flock over there?**
MR. WHITFIELD: Object to form.
THE WITNESS: I -- I don't recall that, but I read the depositions.
BY MR. TATUM:
**Q Do you think it's more favorable to a grower or less favorable to have a contract for long-term?**
A Well, it's my understanding that to get a long-term contract, for example, you have to have -- in a lot of these growing regions, you need to have premier technology available, so the -- the very fact that you have a long-term contract, in my estimation, from what I've been hearing about and reading about, the very fact that you have a long-term

Page 218

contract generally means that your growing technology is superior, and as a result, you're going to get more pay that way.
**Q In fact, increasing growing technology, you would agree, makes growers more efficient and enables them to make more money, according to MacDonald and Key?**
A Not necessarily more money, because they had to invest in those technologies. They might get more money, but their -- their return on their investment may not be better, so there's two moving parts there.
**Q Do -- are you aware of Tyson requiring any equipment upgrades that any other integrator doesn't require?**
A I'm not aware of any.
**Q Okay.**
A But there -- there's been a lot of discussion in the depositions about asset specificity within each integrator, and I -- that's something that's --
**Q Did you make any offset in your calculation for the fact that Tyson's premium contracts have tunnel ventilation, which according to MacDonald and Key, can approximate to .45 cents per pound, or an 8 percent increase in what they receive?**

Page 219

A I -- I don't need to do that. That's being controlled here. After controlling for those factors, then you look at the impact of imperfect competition on the number of integrators. That's where you arrive at the 7 percent.
**Q Did you make any analysis to determine if Tyson's use of tunnel ventilation is any different from any other upgrade -- integrator?**
A I don't know the specifics of that, whether that would -- it would be different tunnel visions across integrators, different specs.
**Q Did you make any adjustments in your analysis for the fact that Tyson has fuel reimbursement payments?**
A Here again, I -- it's in the -- it's in the MacDonald study as being managed, so yes, I managed it.
**Q You might --**
A My 7 percent manages that impact.
**Q And it manages it by saying it's irrelevant, you're still underpaying by 7 percent?**
A Yeah, it's controlling for those benefits that growers receive.
**Q Did you make -- did you do any analysis to compare whether or not Robards is actually paying less --**

Page 220

**7 percent less, in preparation of this July 15 report, compared to anyone else?**
A This is the best information I have to rely on in terms of the impact of only having a single integrator versus four or more.
**Q So you don't know if they -- if they're -- you -- you can't say whether Robards fits in that average or not, you're just saying MacDonald figured out on average that can happen, and here's the baseline, and I'm going to assume it's happening at Robards, correct?**
A It's the best information I have to rely on --
**Q Okay.**
A -- so that's what I used.
**Q I understand. But at the end of the day, you just assumed it's happening at Robards based on MacDonald's article saying it can happen?**
MR. WHITFIELD: Objection to form.
THE WITNESS: The -- you know, the -- the 95 percent confidence interval on this -- on this -- setting this 7.4 percent in -- in MacDonald and Key's 7 -- regression -- Label No. 7, here again, I would have to back out the standard error from that T-statistic, it's very easy to do, and then from there, you can calculate the 95 percent

Page 237

something? I mean, I don't get it. So I'd have to look at that.
**Q What is the basis for your belief -- well, let's -- let's just go to your report here.**
**What is the basis for your opinion that the Robards Complex is a monopsony?**
A Well, as I described earlier, there's this -- there's next to -- there's little to no switching across Perdue and -- and Tyson.
**Q How much switching would there be, in your opinion, before that would change?**
A Well, here again, you'd have to look at a contract economy without so many restrictions. I mean, you mentioned cell phones, I mean, I just recently switched, it was literally costless to switch. I keep my number because the courts said that I can get to keep my number, even though the --
**Q Are you --**
A -- powerful cell phone companies wanted to keep control of their numbers.
**Q -- are you aware of any cost to any grower to switch one integrator to another?**
A Well, it seems like there are significant costs because there's only -- I think there's only one example where one switched and then switched back

Page 238

and --
**Q Are you aware of any costs incurred to them to switch or switch back?**
A I -- I didn't do an accounting of their costs, but there -- there was evidence that they would have to upgrade and change their facilities in order to qualify for a transfer, and they couldn't be too large, like in the case of Morris, and perhaps other -- perhaps other issues that might be going on. You know, for example -- I -- yeah, I'll stop there.
**Q You didn't do any analysis of that is the bottom line?**
A I looked at the marketplace for switching.
**Q What is -- what else forms the basis of your claim that Robards is a monopsony, besides there's little switching between Perdue and Tyson?**
A With little switching -- with little switching and -- and basically we're looking at a single integrator, that's -- that's the essential definition of a monopsony, monopsonist.
**Q So the two elements that form the basis of your opinion that Robards is a monopsony is, A, they're a single integrator and, B, there's little switching between Perdue and Tyson?**

Page 239

A Yep.
**Q No other --**
A I mean, the contract economy is such that Tyson gets to, you know, run their gross margins, literally double them or maybe even triple them, and they don't have to pay anything extra for the grower's services, that is -- that is the -- that's the excessive exercise of monopsony power in this study of mine.
**Q Did you look at Tyson's gross margins prior to 2010?**
A I've seen them in the -- the report by Thomas Elam.
**Q But you didn't study those yourself?**
A No.
**Q I mean, you're aware that Tyson has had profit downturns as well?**
A Yeah.
**Q You do --**
A But one of the reasons we -- we started with 2010 is to avoid the -- the Great Recession, which impacted firms across the economic landscape, so that's a -- that's an exceptional structural shock that would have to be managed if you were to analyze -- include that kind of information in your assessment, so I just avoided it by -- by starting

Page 240

in 2010.
**Q You -- so the two factors are there's little switching across from Perdue and Tyson, and Robards, by -- is a single integrator, but I assume that's derivative of the little switching?**
A Yes.
**Q Okay. So really the factor is there's little switching between these two that are 30-some miles apart, and that's why you declare that Robards is in a position of a monopsony?**
A Yeah.
**Q Am I -- is that fair?**
A Yes, that they're in a position of having -- pure monopsony, having monopsony power --
**Q So if there was --**
A -- exercising monopsony power.
**Q -- so if there was more switching -- at some level of switching, you would not feel like they're in a position of monopsony power?**
A Well, you know, I would want to -- I would want to review all of the factors that I -- that led me to conclusion. There's a lot of deposition testimony and -- and --
**Q Can you tell me any other factor besides that one?**
A Well, the way condemnation is managed is a -- is,

Page 245

monopsonist and not exercise market power, not exercise monopsony power, it's really an empirical question, and I -- I believe MacDonald and Key have answered that question.
**Q Okay. So you believe -- you don't believe a -- some -- an entity in a monopsony position can fail to exercise monopsony power; that's your belief?**
A Well, let's -- let's put it this way, Tyson is a big company with lots of complexes all over the country. For MacDonald and Key to come up with that estimate, you would really -- what you'd have to say of Robards -- let's just take the example of Robards not having market power, not exercising its monopsony power, they would have to be different than all the other Tyson growers, all the other Tyson complexes. Tyson is too big a part of -- of the MacDonald and Key dataset for -- for -- for them to just simply say oh, we're just a benevolent -- we're a benevolent dictator, we have power and we're not exercising it.
**Q I understand the discussion.**
A And -- you know, but I -- I just don't -- I just don't think that's -- that makes any sense.
**Q I understand, but you didn't study it? You -- you -- you're just saying --**

Page 246

A Well, I'm relying --
**Q -- you're just saying I assume they do?**
A -- on MacDonald and Key, I'm relying on a decade of -- of teaching econometrics, and -- and I understand what those numbers mean and imply, and I get the standard errors around them and -- there's -- there's -- there's overwhelming evidence that --
**Q So this really --**
A -- that this -- that this region has been impacted by the -- the few -- the -- the number one integrator in this region.
**Q So the fact of the matter is you could have reached your position on these plaintiff growers are owed 7 percent just by picking up MacDonald's article and not doing another thing, that would have satisfied you? At that moment, you would have said I don't need to know another thing, as long as I know they're sitting there and not transferring many people to Robards and I got this article, I'm done with that analysis?**
MR. WHITFIELD: Object to form.
MR. TATUM: Is that fair?
MR. WHITFIELD: Object to the form.
THE WITNESS: No. No.
BY MR. TATUM:

Page 247

**Q What other analysis did you do?**
A All that -- all that does is establish that what's baked into this cake in 2010, that's all that 7 percent does.
**Q When did it start? When in -- when -- why do you assume 2010's when it started?**
A It's my understanding that that's when the -- the -- the counsel said analyze from 2010 forward.
**Q Why -- but what is it about the competition level between Perdue and Tyson in 2010 to 2019? I mean, did you do any type of analysis to determine when this monopsony began, to the benefit of Tyson vis-a-vis not being in a competitive position with Perdue?**
A It's fairly evident that there were only two integrators in this region dating well back even before 2006, so --
**Q Okay.**
A -- I simply applied the 7 percent number that was coming out of MacDonald, and I took the conservative end of that range and applied it.
**Q But two integrators would have been a 4 percent difference, according to MacDonald?**
A Two -- two -- two vibrant integrators with easy opportunities to switch and plenty of evidence of

Page 248

switching and -- we would have also seen perhaps even more of a pattern of those that are closer to the -- if they're that much competitors, we would have seen some switching, maybe to get closer to the plant.
**Q Did you analyze --**
A You didn't see anything like that.
**Q -- mobility in 2010 versus 2019, between the two complexes?**
A Well, there were such few -- there's such little --
**Q Did you or didn't you?**
A Pardon me. Pardon me. Okay. There's such little --
**Q I don't see it in your report?**
A -- there's such little substitution, it's not really comparable.
**Q You don't know the answer, do you? You don't actually have the data to make that statement.**
A Not --
**Q You don't have anything in your report to make that statement.**
A I have lots of deposition testimony.
**Q You -- you haven't analyzed the entire complex, you haven't talked to all the other growers, you don't know who's moved in and moved out in -- in the last**

Page 249

**ten years; isn't that fair for me to say?**
A I know -- I know a good deal of what's going on in terms of the switching.
**Q You know among your plaintiffs, several have switched?**
A I have a pretty strong record of what these plaintiffs are about.
**Q Right. And you know among your plaintiffs, several of their family members have switched, correct; that's fair, right?**
A Right.
**Q Now, what you don't know is everyone else that might have switched back and forth over the last ten years; is that fair?**
A I'd have to go back and look at the deposition testimony of Tyson employees and Perdue employees to see if there's anything else in there about the nonplaintiff population.
**Q You -- you don't remember that being part of your analysis, fair enough?**
A We could get that information from Tyson and Perdue if we can -- it might help me.
**Q I'm just asking you if you did the analysis or not? I don't know what you asked for to conduct this and get to this opinion, what you didn't ask for, I'm**

Page 250

**just asking if you did it at this moment in time?**
A I have a pretty strong sense at the amount of switching going on. My impression of all the deposition testimony, all the articles that we looked at, there just wasn't a lot going on. Now, there may be some additional information that might cause me to change that, but I haven't seen.
**Q How many does it require for you to think hmm, there's some movement back and forth that -- that's material to my analysis --**
A I'd have to --
**Q -- in this setting?**
A Well, here again, I don't know the exact number of growers, so it would be a percentage of the growers.
**Q Have you seen any studies in the context of the setting we're dealing with here that would -- that would guide us to say, you know, if you see two integrators next door and there's this amount of switching, you know, it may not be a monopsony here?**
A I -- I don't know of any -- I don't know of any economy that looks like this one, so I couldn't compare it to any other industry.
**Q Okay. You haven't seen any studies that get to**

Page 251

**that point, right?**
A I just -- I just haven't seen anything like this.
**Q And you haven't -- you haven't developed any empirically-based analysis of, you know, it kind of takes this much switching before -- to get me unworried about monopsony, or to help me move the needle away from feeling like there's a monopsony?**
A You mean -- versus a duopsony, the -- in order to switch from 7 percent to the 4 percent damage number, is that --
**Q To switch at all.**
A -- is that what you're saying?
**Q Switch at all. I'm trying to figure out, you know --**
A What would it take for me to -- to say oh, it looks like a -- it looks like a pretty vibrant duopsony?
**Q Yeah. You've not -- what I'm saying is you've not done any study to determine that, correct?**
A Well, you know, for --
**Q I'm not asking you to guess.**
A There is no example that looks like this economy, so we'd have a lot -- a lot of work to do within the economy of various duopsony structures within -- within other growing regions, and that data has not been presented to me, nor do I think it's

Page 252

available, but --
**Q And therefore --**
A -- we're only battling between a -- a -- what I took was a very conservative 4 percent, we drop it down to -- I mean 7 percent, and we move it to 4 and a half percent, I mean, that's just --
**Q I understand. But -- but you said there were a hundred growers at Robards?**
A No.
**Q If 10 percent --**
A That's not what I said. I said I've heard there's at least a hundred growers.
**Q Okay. Let's just assume there's at least a hundred growers.**
A Right.
**Q If ten of them have moved over the last couple years, that's 10 percent.**
A No, I --
**Q Is 10 percent not enough for you to indicate movement is available?**
A Actually, I would say that the denominator is not a hundred.
**Q You think there's more -- how many growers are there at the Robards Complex?**
A It's -- it's the total number --

Page 253

MR. WHITFIELD: Objection.
THE WITNESS: -- the denominator should be the total number of growers that could switch in a given year, so there's about nine -- if there's only a hundred growers, but I think there's more, that would mean there's about 900 in the denominator.
MR. TATUM: But let's deal with the facts.
BY MR. TATUM:
**Q Do you know how many growers there are, because you're throwing around --**
A No, I'm not. I think it's over a hundred though, using --
**Q Okay. But you don't know what the number is?**
A Well, I've been told it's -- it's well above a hundred, so I'm just being careful.
**Q Who -- who told you that?**
A Either -- either one of the counsel or Ram, Ram Tamara.
**Q Okay. So the factors are little switching, single integrator -- well, the single integrator is derivative of the little switching, right? If -- can you identify for me -- I know that you assumed this has existed since 2010 in your damage**

Page 254

**hypothetical?**
A Yep.
**Q But what I want to know is, is there any point in time that you can identify or analyze where that wasn't the case?**
A Okay. Repeat the question, please.
**Q Yeah. I mean, the reason you believe Robards is sitting as a monopsony is because there's little switching between Perdue and Tyson; did you run any analysis to determine a time when that wasn't the case?**
A I relied on the deposition testimony and -- and it is my opinion that the low level of switching is supportive of the concept of a monopsonist by Tyson.
**Q Understood.**
A And there's --
**Q When did that start, in your opinion?**
A Yeah, I don't -- I don't have a specific time or date --
**Q Okay.**
A -- in mind.
**Q Did you run any analysis geographically out to -- to determine how far this monopsony extends before market equalizes?**

Page 255

A Well, yes, we looked at the number of -- we looked at two other integrators that were -- the next two closest, and they're so far away that it -- they couldn't possibly be in this -- in this relevant region.
**Q And so that didn't find its way into your report, but you looked at them in preparation for this report?**
A Well, I did a supplement, and I -- sometimes I remember things I put in the supplement that might not in there, so --
**Q Did you --**
A It's in one of them.
**Q -- did you look at any other integrators in the context of this report?**
A I believe -- yes, we -- yes.
**Q Who did you look at?**
A Well, we looked at the other integrators outside of our region and -- and found they were too far away to be relevant to this market region.
**Q Did you examine whether or not their pay structures were greater than Robards?**
A Prior to July 15 --
**Q Uh-huh.**
A -- is that what you're saying?

Page 256

**Q Uh-huh.**
A Because I did it after July 15. Prior to July 15, no.
**Q Okay. Well, I mean, it's not relevant to your decision -- opinion, because you've already made the opinion. So, you know, you've issued an opinion --**
A Well --
**Q -- that they're a monopsony and they've exercised it, you didn't feel the need to compare their prices to another integrator, so I'm just making sure I know whether that was part of this analysis or not --**
A Well, let me --
**Q -- in July?**
A Yeah, let me back up a little bit. That's not -- that's not a form of good science. We have it with -- we have -- the best science available is MacDonald and Key. They have controlled for all of the factors in all of the regions, and they have come up with this 7 to 8 percent range impact of -- of imperfect competition monopsony power for a single integrator. All of this other stuff that --
**Q And so --**
A -- that is being talked about now --

Page 265

**that factor and you said you hadn't seen anything?**
A Yeah.
**Q And I understand that's your opinion, but --**
A Yeah, but there's nothing -- there's nothing to compare this economy to. This is a totally unique economy, where all the growers get paid different prices and --
**Q Well, you could compare -- you could go find a four-integrator locale, they're -- you know they're all over the place, and you could say how much switching goes on here?**
A We could. We could analyze within the industry --
**Q Right.**
A -- but not --
**Q But you didn't do it, right?**
A Not -- not yet.
**Q Right.**
A Sure.
**Q So switching's a factor for you to say Perdue's not a competitor. What else?**
A Well, we looked at the -- to me, the -- the softness of the -- of the way condemnations are handled, just the -- the general acceptance that -- that a full weighted bird is what -- what we're going to apply.

Page 266

**Q But you don't know how Perdue handles condemnation, right?**
A We'd have to look at their contract. I think it's in -- there is a Purdue contract in the -- in the -- I'd have to look back at that.
**Q There's not one cited in your report.**
A Okay. Well, we -- I think there's one in the -- in the -- we could take a look at that and --
**Q You don't know though, right?**
A Yeah. I mean, some of the things I relied on generating general impressions and -- you know, so -- anyway -- anyway --
**Q I understand. But there's nothing in your report about condemnation process, correct?**
A Yeah. I -- I feel like there's -- there's -- I feel like there's something I'm -- I'm not recalling right now.
**Q Okay. And you -- facts are, sitting here today, you can't tell me how Perdue does condemnation, if at all?**
A Not right now, no.
**Q Okay. You don't know if it's better for the grower or worse for the grower at Perdue?**
A Yeah, there was -- there was the one thing too that most of the switching seemed to go from Perdue to

Page 267

Tyson but not back, there was -- very little -- very little evidence of being able to switch to -- to Perdue, which tells me they're not a -- they're not really relevant in this competitive structure.
**Q So the factor that they're not -- factors that they're not competitive is, one, switching; two, condemnation; three -- what's three, if there is a three?**
A The fact that the switching tended to be more one way, not -- not exclusively one way, but mostly one way.
**Q And can you tell me how many folks you've observed switch from Perdue to Tyson over this 2010 forward period that you analyzed?**
A I would have to go back to the deposition testimony in the report and --
**Q There's nothing -- there's nothing in your report about it, so did you -- I mean, did you analyze that?**
A Well, here again --
**Q You didn't count them up.**
A We didn't do a count if that's what you're asking.
**Q Right. Can you tell me how many people have switched from Perdue to Tyson in the last ten years?**

Page 268

A There's also a lot of deposition testimony about integrator specific assets --
**Q Can you --**
A -- that I was relying on as well.
**Q -- can you tell me --**
A Which is --
**Q -- how many growers have switched from Perdue to Tyson in the last ten years?**
A I -- I can't tell you the exact number, no.
**Q Do you have an estimate?**
A No.
**Q Can you tell me how many switched from Tyson to Perdue in the last ten years?**
A A few, but I don't have the exact number.
**Q Nothing you'd feel comfortable saying yeah, I know this is it?**
A Yeah, and there might be some nonplaintiff numbers, cases that didn't get talked about, so -- there -- there is this whole other dimension of -- of -- in the deposition testimony requiring integrator-specific assets, which makes switching harder.
**Q What are integrator-specific assets?**
A I'd have to look back at this material I wrote on --

Page 269

**Q Well --**
A -- so -- do you want me to go through it?
**Q Yeah. I mean, I want to know what you know that forms your opinion that Perdue's not a competitor.**
A There was also the case -- yeah, there was one other case too, Tyson -- Charles -- Charles Morris wanted to switch, and was told he -- he couldn't switch because his farm was too large, and he had to decide -- there was some -- there's -- there's -- there's uncertainty about whether he could split the farm, and I guess he didn't want to do that, so he didn't switch.
**Q That was his choice, right?**
A I'm not really sure. Little fuzzy on that right now.
**Q Okay.**
A There's a Kathleen Heinz, I'd have to go back to see where -- that summary report on Tyson grower survey, that I relied on, it talks about this, nearly two-thirds reported that contracts did not offer them a sense of security, in fear they would be cut off by Tyson.
**Q Are you aware of --**
A Fear that they had to maintain their facility upgrades in order to keep their contracts.

Page 270

**Q -- are you aware of Tyson terminating any contract in the Robards complex?**
A In the Robards area, not that I'm aware of, no.
**Q So the facts are you're not -- you know, you're saying theoretically that could happen, but you're not aware of Tyson ever actually doing it, fair?**
A Yes.
**Q And --**
A That's fair.
**Q -- looking at your report, since you brought up this issue, I'm concerned that you never read a contract, but I could be wrong. You had -- state in your report, Paragraph 82, Tyson -- although growers are labeled independent contracts, they have to adhere to Tyson's requirements or face the risk of losing the contract because it can be cancelled at any time. And you don't source that. What is the source for that statement?**
A I don't have a source right now on that.
**Q Do you agree with me that that is in fact inconsistent with the contract, that -- do you agree with me on that?**
A Well, I think the -- the phrase anytime, meaning -- what I meant by that is that anytime they can announce that they're going to end someone's

Page 271

contractual arrangement, it might take a while to implement that cancellation.
**Q But why don't you look at the contract exhibit that I gave you a while ago, it's Exhibit No. 4 --**
A Sure.
**Q -- and look at -- probably -- if you flip it over, Paragraph 9.**
A Yeah, and --
**Q Now, Paragraph 9, it says termination -- it's right above that. Doesn't it actually -- let's make sure we're reading from the same place.**
A It says -- yeah, I mean, you could announce to that grower that -- that you're not renewing the contract. At any time you could announce that.
**Q Doesn't it say producer has a right to terminate this contract with no less than 60 days' notice; company has the right to terminate the contract on the following conditions only?**
A Where do you read that at?
**Q Right there in the paragraph that talks about termination, Paragraph 8.**
A Oh, you told me Paragraph 9. I'm sorry. Let me --
**Q Paragraph 8. I'm sorry.**
**The bottom line is Tyson can't terminate it at any time, it has to be based on a**

Page 272

**default, right, set forth in the contract; on the other hand, the grower can terminate at any time they want to?**
A What I -- what I meant -- I think there's just a semantics there. What I meant by anytime is that they can announce that we're not renewing your contract.
**Q Have you ever -- are you aware of a single situation in the Robards Complex that Tyson has not renewed someone's contract?**
A I am not aware of that.
**Q Okay. So it's --**
A But at any time, they --
**Q -- it's a theoretical issue that you consider, but you're not aware of it actually happening at Robards?**
A I don't consider it a theoretical issue, I consider it a practical issue that's always present. Every time -- every time a -- a grower goes to the bank and gets out a loan, that's a question that would come up, is this going to be a viable -- are you going to have a viable integrator ready to buy your chickens over the life of this asset.
**Q And, again, you're not aware of any grower ever being terminated, right?**

Page 277

Q You understand that?
A The tunnel technology is the biggie, yes.
Q Yes. And -- or they can choose not to engage in these premium housing requirements and not get the premium pay, correct?
A Right.
Q All right. So there's to two-way street there. If you input more equipment into your system, such as tunnel vision, computer control programs and things like that that create more efficiencies, Tyson will pay more under the contract, if you don't do that, you don't qualify for that premium housing pay; you understand that, right?
A Yeah. It's --
Q Yeah.
A -- well documented in the literature. It's included in the MacDonald and Key study, yes.
Q But that's -- and it's well-documented in those studies in fact that those things promote more efficiency?
A But what I'm referring to is -- is renewal of the contract.
Q I know, but I've already asked if you knew anyone who never renewed or -- or was threatened with nonrenewal unless they made upgrades, and you said

Page 278

no?
A I said -- I said sitting here today, I don't know of one.
Q Right.
Are you aware of any plaintiff in this case ever defaulting on any loan?
A I don't recall that showing up in the -- whether anything had to be refinanced or did it fall all the way to bankruptcy, which also causes refinancing, I didn't -- I don't recall that occurring. But here again, that's no inconsistent with monopsony power.
Q I'm just asking the simple question if you're aware of any grower defaulting on a loan?
A I -- sitting here right now, I don't know of a case that showed up in the deposition testimony where a -- a plaintiff said I defaulted on a loan.
Q Are you aware of Tyson, at the Robards Complex, turning down any grower that wanted to grow with them that they thought had the skill and the ability to do it?
A I'd have to look back at the deposition testimony. I think there was -- I can't remember if there was any way that Tyson rejected anybody that wanted to switch from Perdue or not, and they said no.

Page 279

Q You can't think of an example off the top --
A I can't think of an example as I sit here.
Q Okay.
A They have added -- they have added new barns, new houses to their -- to their -- to their base.
Q But in fact, a number of the plaintiffs in this case have over time added houses, correct?
A Yes, yes. And so I mean, I don't know where they're -- whether -- it -- I don't know if Tyson's capacity has grown in their processing facility, if it hasn't, that would suggest that some of the growers are falling out, exiting the market because there's a -- there's a limited amount of chickens that they can take.
MR. TATUM: What time is it? You want to take a break? We've been going awhile. Yeah, let's take a five-minute break here.
THE VIDEOGRAPHER: Going off the record at 3:42.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 3:49.
BY MR. TATUM:
Q We were talking about the factors in relation to your conclusion that monopsony power is exercised

Page 280

here, are there any others that you haven't identified?
A Well, I'd have to take a look at some of the -- structurally, you've got -- you have a limited amount of switching, you have these -- this contract economy, which I see throughout the U.S., and present also in Robards is the -- that the contracts are not negotiated between growers and -- and integrators, and once they're -- once they're set in motion, there really isn't a lot of power to -- for -- for there to be a vibrant form of competition between these integrators, and those -- that tells me that -- that this is a monopsony market structure, which -- which causes me to want to use the 7 percent rate.
Q Are you aware that -- are you aware of how Tyson pays for fuel allowances?
A I'm aware there's a fuel allowance associated with the winter months.
Q Are you aware that there's a fuel allowance associated with the summer months as well?
A Yes.
Q Are you aware of how it's paid, whether it's paid by pound or by square foot?
A I studied that, but I don't recall as I sit here.

Page 281

Q Okay. Are you aware that it changed to square foot at one time at the Robards Complex through consultation and request of the growers, because they didn't want the fuel allowance -- the energy use to be dependent on the pounds delivered, because the house is the same size?
A I don't recall that in the deposition testimony.
Q You were not made aware of that fact and didn't identify that fact?
A No.
Q The fact that that resulted in -- from discussions with growers in changes would that affect your opinion at all whether there is some level of a cooperative relationship between the Robards group and the growers on terms and conditions of their contract?
A I've never said there wasn't some level of -- of -- of cooperation between two vertical parties like this. Obviously they don't want the farmers to go out of business or -- or aggressively switch to the other competitor, so they're not going to be pushing for bankruptcies and -- and foreclosures of the -- of the farms and -- and negative profitability at the farm level. The -- the premise of monopsony power is never built on that.

Page 282

The premise of monopsony power in this context is built on the concept they're going to push the grower all the way to the point where they're still going to participate, in fact in the economic literature, they call it the participation constraint, so that's the -- that's the lower bound of what the monopsony power is, is this participation constraint, forcing it down as low as they can possibly go and still keep the participants in the marketplace.
Q How do you know that Tyson Robards hadn't already overcome a 7 percent hurdle; in other words, you just assume they haven't based on a 2006 study, correct?
A Yeah, with -- yes.
Q How do you know someone at Robards didn't read that and increase grower pay to overcome -- overcome it?
A You know, there was -- I was looking at the average grower pay from the MacDonald study and was looking at where this was starting here, and it really wasn't very different, so -- and -- and I would have to go back and look at whether -- how far back grower pay data is available for the Robards area, but it doesn't look like they were -- it doesn't look like they were -- it doesn't look like things

Page 283

are -- things are that -- all of a sudden magic occurred between 2006 and 2010 and they unbaked this monopsony power that was in their marketplace.
Q Would you agree with me that grower pays went up over the last many years; are you aware of that?
A Oh, yes, I'm -- grower pay has gone up, I believe, 14 percent, from '10 to -- '10 to '18, 2018.
Q And that's grower pay at Robards?
A Yes.
Q You don't know if that -- how that compares to any other integrator?
A Well, in the supplemental work, we looked at some of that, so --
Q So you just assumed Robards is just below and always going to be below?
A We -- we -- what we did is said listen, it looks like this is all baked into the cake in 2006, it doesn't appear that there was any -- any structural adjustment to the way the Robards Complex functioned, so it seemed safe to go ahead and just apply the 7 percent to the 2010 adjustment and maintain that and -- and -- to bake that into the -- into the -- the cake between 2010 and 2018.
Q And so let's hypothetically, tomorrow, Robards says boom, everyone's getting a 7 percent raise --

Page 284

MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q -- that negates the MacDonald problem as to them, right?
A I'm -- I'm not really prepared to do a -- do a study of the injunctive relief in this case. I'm not really sure what this hypothetical really is -- what you're talking about.
Q Well, I'm trying to figure out if -- if you're trying to suggest that this is a perpetual problem that a company can't just decide to cure? I mean, it seems to me pretty simple, if someone says you're part of a group of people that I believe by nature pays 7 percent lower, I could just say well, to hell with it, I'm going to increase pay by 7 percent, and I may be the only one to do it, but my growers are going to be real happy, and I'm going to have benefits from that?
A I -- all I can say is I -- I didn't see a 7 percent across the board increase in grower pay.
Q But you saw a 14 percent increase?
A Over ten years, or nine -- nine years, pardon me.
Q Over -- over time, right?
A Yeah. 14 percent --
Q Yeah.

Page 285

A -- over nine years is about, what, 1 and a half percent a year?
**Q And is that base pay? That's a base pay analysis, right?**
A Yeah, it's nominal pay too.
**Q Right.**
A It's not -- not inflation adjusted.
**Q But you didn't look at increases in fuel allowance pay over time, premium pay over time, facts -- things of that nature, right?**
A I -- I looked at it, but I didn't -- I didn't calculate that into my damage model.
**Q Okay. You also didn't look at things that Robards does for its growers as a cost center to -- that may be different from others, such as are you aware as to whether or not Robards pays for litter for its growers?**
A Yeah, I would have to investigate that further. I didn't calculate that into my -- my damage analysis.
**Q Okay. Are you aware of whether Robards pays for pesticides for its growers?**
A I don't know where they stand on that --
**Q Okay.**
A -- on that position.

Page 286

**Q Are you aware of whether Robards pays for things like, you know, rat traps, you know, and things like that, for its growers?**
A Here again, I would have to look at the -- the -- I have not seen that in any of the deposition --
**Q Okay.**
A -- or records that I was shown.
**Q Okay.**
A And I --
**Q Go ahead.**
A -- and I don't know whether that's also being offered at Perdue in the --
**Q Okay. But if they did, that might cause you to take another look at your analysis, if those factors were true, correct?**
A I would -- I would be willing to look at any kind of new information and reassess at any time, so --
**Q Did you factor in at all in your analysis the fact that Tyson's contracts have price guarantees while MacDonald said most contracts don't?**
A I'd have to look at these contracts again. I'm not really sure what you mean by --
**Q The floor price. You're aware of the floor price?**
A Oh, yeah. The floor cent. The floor price --
**Q Yeah.**

Page 287

A -- for the exceptions.
**Q Right. In other words, you can't make less than that under their contracts?**
A Right.
**Q And that's obviously independent of their total pay, but that's the tournament -- the relative pay, they can't make less than a floor price, which may be 4 cents --**
A You know, on -- on --
**Q -- right?**
A -- that's the good news for the growers. The fact that they're pulled out of the tournament, it lowers the -- the NPV average, it changes who the winners and losers are in the tournament, and that's kind of the bad news, so -- it changes the amount of grower pay that each one of those will get.
**Q That's a function of the method by which the tournament --**
A Yeah.
**Q -- is set forth in the contract, right?**
A Right.
**Q And the contract clearly states that if you fall below the floor, you're going to be pulled out, right?**

Page 288

A Yeah, I'm just saying that when you're running the contract economy, you're not going to do anything that's going to take you under, and they've structured that in such a way to give themselves a benefit, while also offering a slight insurance protection to some of the growers who have a bad -- a bad tournament.
**Q Well, it's an important protection to the growers that have a bad tournament, correct?**
A Well, it depends on how much below 4 you're going to go. If you're at 3.99, it's a small -- small benefit, so --
**Q And if you're at 2.5, it's huge, right?**
A Yeah, it would be a -- much larger. It just depends on how -- the kind of conditions that led to the problem. And you -- and you only get 4 cents then too. It's not like you're going to make a -- an enormous profit in that environment, but at least you won't -- at least, you know, it's not going to --
**Q It's a price guarantee?**
A It's not going to -- it's an insurance policy --
**Q Right.**
A -- is what it is.
**Q And -- and you're -- you didn't conduct any**

Page 289

**analysis to determine if -- how that compares to other integrator contracts and whether they offer that, correct?**
A Well, I -- the MacDonald study provides information about some of that. I would have to look back at that.
**Q It actually says that most don't.**
A I'd have to look back at that.
**Q You wouldn't disagree with that?**
A I would want to look at the number. Is there a -- I don't see it in there. I don't see it in here, so -- price guarantees. Maybe they call it something different. Nope, I don't -- nope, I don't think -- I don't think so.
**Q Turn to page 3 in the article Market Power --**
A Oh, it's in the --
**Q -- Poultry Integration?**
A -- it's in the text? Are you looking at the -- at the journal article?
**Q No, I'm looking at your article --**
A Oh, okay. Okay.
**Q -- that you cited in Footnote 98.**
A Yeah.
**Q Third page, second full paragraph down on the left side, the second sentence, few contracts are**

Page 290

**written for long durations and many cover only a single flock. Integrators rarely commit to quantity or compensation guarantees; do you see that?**
A Which paragraph -- what's the start of the paragraph say, poultry growers or grower contracts?
**Q Grower Contracts.**
A Oh. I'm looking at -- okay. Yeah.
**Q You don't disagree with that, correct? You --**
A Well, I -- I don't -- I don't think that means what this price floor is about.
**Q You don't know one way or the other, right?**
A Well, if you look at the words here, again, rarely commit to quantity or compensation guarantees.
**Q I mean, he has a footnote right down there to this sentence that says grower contracts for hogs differ in this respect in they -- in that they often base compensation on spaces rather than raised, and they typically cover longer durations?**
A Yeah.
**Q So he's trying to explain, you know, this is just a different environment?**
A That's what added to my -- that's what added to my confusion when I read that footnote. I don't quite -- it would -- it would make -- it would make

Page 291

Robards, which is a -- a fairly traditional, mature growing region almost the exception, so I'm not really --
**Q Right.**
A -- I don't think it means that.
**Q Bottom line is, you don't know if other contracts have minimum pay guarantees or not, fair?**
A Integrators rarely commit to quantity or compensation guarantees. I think that is referencing the -- the quantity guarantee is about this whole thing about days out, they're guaranteeing, you know, a certain absolute minimum, and then on the compensation guarantee, they're not -- it's not about a specific price floor, it's just saying it's some sort of -- some sort of -- we will guarantee you this much revenue at the end of the year by the -- by the year, no matter what.
**Q You don't know that, right, you're just speculating that?**
A Well -- no, actually, I -- I do.
**Q What contract have you reviewed besides the contracts in this case, ever?**
A I've -- well, I've reviewed other contracts from Perdue and --
**Q Did they have a base floor guarantee?**

Page 292

A I don't recall.
**Q Okay.**
A So --
**Q That's my point, is you're just speculating on whether any other integrator has a base floor guarantee?**
A No, actually, it's the -- it's the Footnote 4 that's leading me to sort of conclude this, grower contracts for hogs differ in this respect, where they often base compensation on pig spaces, so they're saying -- they're saying whether there's a pig in the space or not, they're going to guarantee a quantity.
**Q I -- I understand --**
A That's different.
**Q -- that you don't know what he means in the article.**
A Oh, I think it's --
**Q All I'm asking is what you --**
A -- I think actually as I'm reading it, I do know what he means.
**Q -- what I'm asking you is, what have you done?**
MR. WHITFIELD: Answer the question.
BY MR. TATUM:
**Q What do you know, if anybody else has a base floor**

Page 293

**guarantee like Tyson's Robards contract?**
A I don't know the -- the -- I don't know the comprehensiveness of that whole dimension. I'm fairly confident that -- well, for example, that that's -- that that's a feature in many of the other markets. I feel confident from what I've been reading, but I can't cite you a specific source on that. I didn't see that as germane to this case, the -- the presence of this price floor as a major dimension of the market, so I just -- I analyzed it, I looked at it, I moved on, but I don't think this is unique -- I don't think this is unique to the Robards region at all.
**Q Well, Robards contracts are long-term versus flock-to-flock, correct?**
A Well, that's interesting because, you know, this one here is dated -- what -- this is dated 2008, and it's only a three-year contract.
**Q Okay.**
A This is -- this is something I mentioned earlier in my deposition, that there -- there may be some movement in the way the culture has evolved toward long-term contracts, and I don't know -- right now it sounds like it's more seven-year contracts than they're used to -- to doing.

Page 294

**Q Fair enough. But you're just speculating on that, you don't know --**
A Well --
**Q -- right? I'm just -- I'm just trying to be empirical here.**
**Robards has contracts for longer terms than most, according to MacDonald and Douglas, who said most are flock-to-flock; can we just agree he said that?**
A In 2006, there was a number coming out of the MacDonald and Key study. I don't know, and I can't say that -- whether Robards is -- is -- is now better than the nation -- national average in 2019, we would have to relook at the survey data. It does appear -- it does appear --
**Q What survey data would you look at?**
A Well, something like the ARMS data.
**Q Do you think there's been a survey since 2006?**
A I don't think there has been.
**Q Right. So you wouldn't actually look at that, right, you're speculating?**
A No, we wouldn't. No.
**Q Right.**
A But, you know, you -- you can't say that just because they trended toward more long-term

Page 295

contracts that everyone else hasn't done that as well --
**Q I understand. But I --**
A -- so --
**Q -- but you're the one offering expert opinions here, and so I'm just trying to figure out, did you determine if that's a different -- difference or not?**
A Well, here again, it -- it really wasn't germane to the damage assessment here.
**Q Did you determine whether or not other integrators offer base pay guarantees?**
A No.
**Q Did you determine whether or not other integrators have limits on the right to cancel on behalf of the integrator, like you've seen in Tyson's contract?**
A I don't think they have a right to cancel based on this contract. They just have a right -- they have a -- there's a stipulation in here that they are -- they are bound by the terms of the contract period.
**Q I said limitations. They can't cancel for any reason; do you agree with that?**
A Well, they could at the end of the contract.
**Q Well, the contract would be over at that point, right?**

Page 296

A Exactly.
**Q I'm talking about --**
A That's what the risk -- the risk we're dealing with here, so --
**Q Well, I understand. But you also told me you've never heard of that actually happening at Robards, correct? I mean, I have a risk that I'm going to wreck on the plane on the way home, and it's statistically provable --**
A Yeah.
**Q -- but it's never happened. I understand that.**
**So what I'm asking is, in the context -- your opinion then, despite what the contract says, is it can be cancelled at any time by Tyson, is that -- am I just -- following you?**
A Well, when I said anytime, they could announce anytime they're -- they're closing -- I mean, they can announce at any moment they're closing the Robards facility, and they would have some payouts that would be related to their contractual obligations.
**Q And that's --**
A But they wouldn't have to go beyond that contractual obligation.
**Q -- that's true in any industry anywhere, correct?**

Page 301

**party has investments in it, that the other contracting party has investments in it, you're not trying to discount that they both lose out?**
A I don't know about Tyson's situation, why -- they're so large that yeah, they might take a -- they might take a little ding in terms of their overall profitability, but I don't know that they don't have the means to manage a closedown of a factory in one region.
**Q Okay.**
A I'm suspecting it would be just a blip on their screen, whereas these farmers, that's their -- that's half or more of their livelihood, so I think the risks are not even close to similar.
**Q Do you agree with MacDonald, that poultry growers can make more than the average income across the country and more than household farm income across the country?**
A Well, that's --
**Q And on average do?**
A -- that's complicated because you -- you have an investment.
**Q I'm just saying --**
A You can't say make more money than a laborer.
**Q -- I'm just saying he --**

Page 302

A A laborer puts forth no investment.
**Q -- I'm just saying he says in the articles you cite that average household income of a chicken farmer is greater than the average household income of the rest of the population and to farmers specifically; do you agree with that?**
A I don't have any reason to dispute that, but here again, it's just not -- not even remotely relevant to this case.
**Q You don't think it's relevant?**
A No.
**Q No. Okay.**
A You can have monopsony power and have people earning above the average. It's really related about the profitability of the product that's being marketed. So if chicken is doing very well in the marketplace for food, there very well may be excessive profits in the system, some of which will filter down to the grower and give them a more -- give them a higher average income than, say, a tobacco farmer.
**Q Did you do any analysis to determine whether or not growers across the Robards system receive different inputs over time than anybody else?**
A I'm not sure what you mean by different inputs.

Page 303

What does that mean?
**Q Do you know what inputs means? You used the term in your report.**
A I know what import -- inputs are.
**Q Inputs.**
A Yeah, what -- but what different --
**Q Did you do -- I'm just saying --**
A -- what different inputs are you referring to?
**Q -- did you run any analysis on, for example, whether over time everyone got an equal amount of breed combinations; did you do any analysis of that?**
A Not -- not directly.
**Q Okay.**
A No.
**Q Do you -- and I don't see any conclusions about that in your report --**
A Yeah.
**Q -- at all, and so I'm assuming you're not offering any opinions on whether, you know, breeds were evenly -- breed combinations were evenly distributed --**
A Yeah.
**Q -- over time? I'm just assuming you're not here to offer opinions on that; is that fair?**

Page 304

A I am not here to offer an opinion on that.
**Q And you're not here to offer any opinions on whether or not over time growers received the same eggs from -- you know, same relative age of laying hens over time, I just -- I just want to make sure you're not here to offer opinions about that, because I don't see it in your report?**
A Yeah, there's a -- there's a lot of volatility in the data on these sorts of metrics.
**Q Well, you didn't even look at the laying hen information, it's not even in your report or your index, so I'm just -- I think it's fair for me to assume you're not here to offer opinions on whether or not over time growers in this case received eggs from the same relative ages of hens?**
A Yeah, there was a -- well, I'm -- I'm just thinking right now, there's three figures at the back of the -- of the Elam response to my report, and he -- there's just a tremendous amount of volatility in -- in average grower pay, average hen size, things of that -- and the average hen size relates to these genetics, and so there's plenty of information that there's volatility out there.
**Q But you're not offering an opinion on that, right, you didn't -- there's not one here. I'm just**

Page 313

Q Okay. Now -- I'm just going to call him -- I'm going to call him Mark, he and I have gotten to be friends in this case honestly. Mark asked you some questions about your report, your July report, and you indicated that -- I think you made the comment that -- that the report itself was not sent out from -- for some other third-party to review; is that a fact?
A I -- I mentioned something about it's not peer-reviewed.
Q Okay. What were you talking about when you said that?
A I was simply meaning this analysis that was conducted in the -- in -- I think we were talking specifically about some of the damage calculations, was not put into a publication -- into a publication process where I submitted it to a journal for peer-review publication. I mean, it's all confidential, I mentioned that.
Q I understand that.
A It's all confidential, so I wouldn't be able to send it to a journal.
Q Okay. So you've been in situations before in your practice where you have developed papers and then you have sent them out for review, I think you

Page 314

talked about one today as a matter of fact?
A Yeah, I have done that -- I'm into my low 40's for journal publications.
Q All right. And the process of that is that you write that and then send it out to third-parties for review, and then either your publication gets accepted for general dissemination or not?
A Yes.
Q Okay. And to that extent, that's not something you would be doing in this case, being that the information that you're relying upon is confidential; is that fair?
A Yeah, I'm not -- I'm not planning to publish anything in this -- that's coming from this record. That's confidential.
Q All right. And in fact the -- there is a confidentiality order in place, is there not?
A Right.
Q Okay.
A I mean, it is typical for a researcher that works on a case like this to, because you become so familiar with what's going on, that you might write a research report using public data, things of that nature.
Q Yeah.

Page 315

A I mean, I'm not going to rule out that I wouldn't do that, but I'm not going to use confidential information from deposition testimonies and --
Q No, I understand.
A I mean, I'm not doing that at all.
Q But in the event this information becomes public at trial, then that's something beyond your control?
A Right.
Q Okay. Now -- but -- but the basis of the report, the July report that you did in this case, the -- the opinions that you have derived, do you feel comfortable that those have been peer-reviewed?
A I'm not sure I understand what you mean by peer-reviewed.
Q Well, the methodologies that you've come up with --
A Oh.
Q -- and -- and the -- the analysis and the economic theory that you're utilizing --
A Yes.
Q -- do you feel comfortable with those?
A Very comfortable. In particular, that was something that was brought up earlier today when we were talking about the -- the -- the damages associated with that grower pay. And, actually, the methodology that I applied to -- to use that

Page 316

base year, that 2010 base year that led to the 30.6 adjustment, that's actually an idea that I got -- at the time I wrote the -- wrote this material, I didn't remember about a study that I -- I had did, but it was a paper in 1990 actually when I was a -- a graduate student that I published that -- that I used, and I'm the lead author on that study, where I used that method precisely, we used a base year and then -- and then we allowed the -- the rest of the data to take us into the -- into the future, and we were working on something called desired consumption, which is a very abstract term, much like -- much like this manufactured economy, chicken economy, there's a -- there's things in here that are just -- that are just -- it's -- you can't -- you can't hone in on and say there's data on that, you -- and -- there's no free market principles for the most part, and so you -- you kind of rely on some of these methodologies that have been in the literature and that are peer-reviewed. So yes, the answer is absolutely, that 30.6 percent is part of my record of peer-reviewed work.
Q And we've talked about the MacDonald work, and we -- that -- that is the basis for the 7 percent that

Page 321

**wrote in 1990?**
A I did not rely on that article. It -- in fact, literally I woke up this morning remembering that. I pulled the article up and I found that it was almost identical to this -- to this approach that I used in the --
**Q Okay.**
A -- 2010 base year, so had I remembered that, I certainly would have cited that paper.
**Q Okay.**
A And I -- and I can do that in any future reports.
**Q Are you aware of any other source material supporting that methodology, because I didn't see any cited in the report?**
A Yeah, there -- there was some discussion of -- of -- of that in -- in terms of this -- this -- it's really -- it's called a benchmark is really what it references, and there's -- and there apparently is benchmark work like this conducted in -- in price fixing cases, and --
**Q Have you ever done any of that in price fixing cases?**
A No, I didn't.
**Q Okay. And so this concept here is -- you know, at the end of the day, it's your idea, and it's your**

Page 322

**concept that you're applying here?**
A Yeah, it's my idea.
**Q Okay.**
A I'm surprised that I had already -- I'm -- I mean, I know where it came from now.
**Q Okay. And the spot that it might have come from was an article you wrote in 1990 as a grad student. What's the name of that article?**
A Yeah, it's the very first article in my CV, so it's like No. 53 on the list. Oh, I -- okay. I'm using bullets now, I guess. Okay. I'm going to take this off. I can't --
**Q I can help you look, if you'd tell me the name of it.**
A Something to do with less developed country, debt and wheat.
**Q LDC Debt and Wheat Trade?**
A Yeah. Was that in the journal article section? Does it show North Central, or is that a paper presentation?
**Q There's a selected paper, 1989, SAEA annual meetings, Nashville, Tennessee, called "LDC Debt and Wheat Trade," Kyle Stiegert and A. Azzam?**
A Yeah, that -- you know what, I'm going to need to update my CV here. This is not -- this got cut

Page 323

off, and --
**Q So the source material you're referring to, you cannot find on your CV?**
A Well, I'm -- I'm -- it seems like we got cut off right here. I'll have to resubmit my CV. Wait a minute. This is -- this is -- I wonder if it's -- where's that supplemental report? I wonder if it got -- somehow there was just some sort of mistake here, but -- or is it running over -- but yes, that paper presentation is -- it's sort of like that whole MacDonald and Key, you know, they had the paper -- had the selected paper in a meeting and then the final version of the paper.
**Q So where is it on your CV?**
A Yeah. It looks like a page got removed from my -- my CV, starting in --
**Q Is it under selected papers or is it under --**
A No, no, it's under -- it's under --
**Q -- conference proceedings and trade publications? I've got testimonies, I've got research papers and publications, would it be under that one?**
A Yeah, something happened here.
**Q Do you remember what it's called or who the co-author was or what year it was?**
A I can even send you a version of it, if that

Page 324

would --
**Q Well, right now what I'm trying to figure out is if it's on this CV?**
A It's not on this CV. It's -- for some reason, I stop at 2000 here.
**Q So it was published before 2000? I guess, yeah, you said 1990.**
A Published in 1990. Hmm. My apologies.
**Q And what was the name of it?**
A It's just -- just bizarre.
**Q What was the name of it?**
A Hang on. Frustrating. It would be something like that selected paper, LDC Debt and -- it would -- it would be something like that, so -- I mean, it could have changed. I have a hard time believing it just doesn't show up in the wrong spot, but --
**Q So bottom line is --**
A LDC Debt and Wheat Trade is the name of the selected paper, it's not going to be very different, so I guess it is cited here, but it's not the -- it's not the finished product, the -- the journal article, so -- the methodology would be identical.
**Q So the journal -- there was an article published post the selected paper?**