# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | | |
|---|---|---|
| CHARLES MORRIS, ET AL. | ) | Civil Action No. 4:15-cv-00077 |
| Plaintiffs, | ) | Judge: Joseph H. McKinley, Jr. |
| v. | ) | |
| TYSON CHICKEN, INC., ET AL. | ) | |
| Defendants. | ) | |

ORAL AND VIDEO DEPOSITION OF NEIL BARFIELD

The oral and video deposition of Neil Barfield, taken pursuant to Notice on the 19th day of September, 2018, at the hour of 11:00 a.m., at the law offices of Whitfield, Bryson & Mason, LLP, 19 North Main Street, Madisonville, Kentucky, before me, Andrea Riggs, Court Reporter, and Notary Public in and for the State of Kentucky at Large, to be used for any and all purposes allowed by the Kentucky Rules of Civil Procedure.

Andrea Riggs
Court Reporter
195 Lake Scene Drive
Eddyville, Kentucky 42038
(270) 206-0720
amriggs007@aol.com



A P P E A R A N C E S

FOR THE PLAINTIFFS,
CHARLES MORRIS, et al.:

JOHN C. WHITFIELD, ESQUIRE
WHITFIELD, BRYSON & MASON, LLP
19 North Main Street
Madisonville, Kentucky 42431

J. DUDLEY BUTLER, ESQUIRE
BUTLER FARM & RANCH LAW GROUP, PLLC
499-A Breakwater Drive
Benton, Mississippi 39039

FOR THE DEFENDANT,
TYSON CHICKEN, INC., et al.:

MARK C. TATUM, ESQUIRE
SHOOK, HARDY & BACON, LLP
2555 Grand Blvd.
Kansas City, Missouri 64108

ELI GLASSER, ESQUIRE
BOIES SCHILLER FLEXNER, LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301

ALSO PRESENT: ALAN JACKSON, VIDEOGRAPHER



I N D E X


| | Page |
|---|---|
| Title | 1 |
| Appearance | 2 |
| Index | 3 |
| Exhibits | 4 |
| Examination by Mr. Whitfield | 5 |
| Reporter's Certificate | 256 |




E X H I B I T S


| Plaintiffs' Exhibit | Description | Page |
|---|---|---|
| 1 | Notice of Oral and Video Deposition | 8 |
| 2 | Tyson-167473 -- List of Service Techs' Farms | 80 |
| 3 | Tyson-167404 -- E-mail to Jim Gottsponer | 127 |
| 4 | Tyson-136959 -- Broiler Production Settlement by Plant by Flock | 131 |
| 5 | 11/30/14 Letter to Jim Gottsponer from Charles Morris | 166 |
| 6 | High 40 Grower Spreadsheet | 244 |
| 7 | Grow-Out Broiler Tech Audit Form | 245 |
| 8 | E-Mail Re 6/30/17 Meeting | 248 |
| 9 | Broilers Preplacement Checklist | 250 |

Q. All right. And, in this particular instance, you're talking about broiler houses. When you say, "broiler," what does that mean?
A. That are birds that are grown for meat to be sold in a grocery store.
Q. Okay. And so your Uncle Bart then, he had four houses. How large were these houses?
A. I'm wanting to think those houses are 40 -- somewhere around 40 by 400.
Q. Okay. 40 feet wide --
A. Wide.
Q. -- by 400 feet long?
A. Long.
Q. So big, long houses. Okay. Now, do you remember the age of the birds that were being grown by your Uncle Bart in these four houses?
A. They were in the upper 50s, I believe.
Q. What do you mean by, "upper 50s"? Explain what that might mean.
A. Fifty-seven, 58 days.
Q. Okay. So what you're -- I think what you're telling me is he would get these birds as chicks?
A. Right.
Q. Okay. And then he would grow them or have them in the houses for 57-58 days?



A. Right.
Q. Okay. And then at the end of the 57 or 58 days, the company would come and they would take the birds back?
A. Right.
Q. All right. And I assume then your Uncle Bart was responsible for feeding the birds?
A. Correct.
Q. Okay. How did that work with him? Did the company bring the feed to him, or was he responsible for buying the feed --
A. The company provided feed.
Q. Okay. And about how old were you when you were hanging around Uncle Bart's four houses?
A. Twenty-one.
Q. Okay. So you were older?
A. Yes.
Q. And do you know how long your Uncle Bart had these houses?
A. Still does.
Q. Still has the same four?
A. Yes.
Q. Okay. And what did you do around these houses?
A. Just helped out.
Q. What do you mean, "helped out"? What does that



mean?
A. Helped put out feed.
Q. You put out feed. What else did you do?
A. I mean, we mowed grass, just general chores.
Q. Okay. Now, let's talk about then what you remember about Uncle Bart. Now, Uncle Bart would get feed from the company and the company -- so the company would provide the feed to him?
A. Yes.
Q. Okay. And what about the type of birds that he had, if you remember. What kind of birds did he have?
A. I do not remember.
Q. Okay. You're -- being that you're a tech now for Tyson, you do know that there are different types of birds that are grown on these farms?
A. I do.
Q. Do you know whether or not the type of birds that you're familiar with now working with Tyson were the same type of birds that your Uncle Bart had back in the day?
A. I do not know. I mean, not off the top of my head. At this point, I'm not sure.
Q. Okay. What responsibility did Uncle Bart have in regard to growing these birds for the, let's say, 58 days? What was he to provide?



MR. TATUM: Objection. It calls for speculation.
Q. (By Mr. Whitfield:) Go ahead. He's just talking to the judge.
A. We would basically -- you're responsible for -- where do you want to start? Well, so you just -- they came up and picked up one flock --
Q. I'm sorry?
A. The company would come and pick up a flock, so from that point on, you're responsible for preparing the houses, preparing the litter, getting ready for the next flock. The company had recommended ways to provide feed throughout the lifecycle of the chickens, more in the beginning, you know, to get them started off. You're responsible for removing dead; responsible for disposing of the dead; responsible for the basic day-to-day care of the chickens.
Q. Okay. Let's talk about that then. Was Uncle Bart an employee of the company?
A. A contract grower.
Q. A contract grower. When you say, "contract grower," what do you mean by that?
A. He had a contract with ConAgra to grow chickens.
Q. Okay. Fair enough. He would sign a contract with ConAgra, and so he would not be an employee of