# EXHIBIT 8

In the Matter Of:

CHARLES MORRIS v TYSON CHICKEN

CASE NO. 4:15-cv-00077

---

CHARLES HARLEY MORRIS, JR.

February 09, 2018

---

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 73

Q. And also on the last page of Schedule B?
A. Yes.
Q. Also on the acknowledgement page?
A. Yes.
Q. Also on the amendment to Schedule A dated February 7, 2015?
A. Yes, sir.
Q. Do you remember having any discussions with anyone at Tyson about signing this contract?
A. No, sir.
(Exhibit 7 was marked.)
Q. (By Mr. Tatum) Exhibit 7 should be a copy of your contract for Highway 56 #2. Is that what that is?
A. Yes.
Q. Is that your signature on the second page?
A. Yes.
Q. And again on the second page of Exhibit A?
A. Yes.
Q. Again on the last page of Exhibit B which is Schedule B? Sorry.
A. Yes.
Q. And again on the acknowledgement page?

Page 74

A. Yes.
Q. And then again on the amendment to Schedule A dated February 7, 2015?
A. Yes.
Q. Do you remember any discussions you had with anyone at Tyson in relation to signing this agreement?
A. No, sir.
Q. All of these contracts are a second contract for your farms; correct?
A. Yes, sir.
Q. So you had one series of contracts for each one before?
A. Yes.
Q. Are you aware of any changes between the first series of contracts and the second series?
A. I mean, I really didn't read them, Mark. I just took their word at it and really didn't read it.
Q. When you signed Exhibits 1 through 7, did you consult with an attorney or any advisor?
A. No, sir. No, sir.
Q. When you signed your first group of contracts with Tyson, did you consult with an attorney or any advisors?

Page 75

A. You know, my partner was an attorney, but I didn't ask for advice. No, sir.
Q. Did your partner sign any of the contracts, or did you?
A. I signed them. I was the managing member, so I signed them all, yes, sir.
Q. Did he review any of them?
A. To my recollection -- I don't remember, but I don't think so.
Q. Do you recall any conversations you had with Tyson in relation to signing your first series of contracts?
A. No, sir. No.
Q. Now, as I understand it, there are basically three types of pay you receive under your contracts -- a base pay, a fuel pay, and a premium house pay?
A. Correct.
Q. Is that right?
A. Yes, sir.
Q. And the fuel pay for the premium house pay is based on square footage if you comply with certain requirements, upgrades in the house, equipment needs; right?
A. Correct. Yes, sir.

Page 76

Q. Since a certain time you've made those upgrades -- we talked about the money used to do that -- you've been receiving premium pay for each house?
A. Yes, sir.
Q. And then fuel pay is also set by square footage in the contract; correct?
A. I believe that's how it's set, yes.
Q. I mean, you receive that for each flock; right?
A. Yes, sir.
Q. And then what's your understanding of how the base pay works?
A. When you say "understanding," what do you -- I mean, it is what it is. In all honesty, I don't even know what it is right now. I know that sounds ridiculous, but I'm so dern busy I can't keep up with all those numbers.
Q. Is it the same among your farms or different? Do you know?
A. These are the same across all the farms, yes.
Q. Are you familiar with the tournament system of pay?
A. Yes.

Page 77

Q. What's your understanding of that?
A. It's just competition. Everybody competes for a pot of money.
Q. Do you know how it works?
A. It's a competition.
Q. Do you know what variables go into determining base pay under the competition method you're talking about?
A. Are you saying base pay or --
Q. Well, your fuel pay is not dependent upon competition?
A. No, it's not.
Q. Your premium house pay is not dependent on competition?
A. No.
Q. But the base pay is; right?
A. What you get paid, yeah. How you do in the tournament system, yes, determines how much money you made; that's correct.
Q. Do you know what elements go into determining the base pay?
A. Feed conversion, livability, weight -- daily weight gain, excuse me -- daily weight gain. Feed conversion, daily weight gain.
Q. Anything else?

Page 78

A. Not right off the top of my head, no.
Q. Have you ever had any discussions with anyone at Tyson about how the base pay works?
A. Not really, no.
Q. Do you know if the tournament system of base pay has been the way you've been paid since you started growing at Tyson?
A. It has been, yes.
Q. Was the tournament system of pay utilized at Gold Kist?
A. Yes. One last thing, if we could back up: Condemn, also, is part of the -- I forgot to tell you that.
Q. When you were operating at Gold Kist, your 12 houses, you were operating under a tournament system?
A. Correct, yes, sir.
Q. Similarly, as a board of director, you were overseeing a company that had a tournament system in effect?
A. Correct, yes, sir. If there was a difference, do I need to -- I mean, we didn't just charge condemn to growers.
Q. What were the differences?
A. Everything but condemn at Gold Kist. We

Page 79

didn't charge condemn to growers.
Q. When you say "didn't charge condemn to the growers," what does that mean?
A. That means we didn't charge, you know, for sick birds because there wasn't really any fair way to implement the condemn. But it was still livability, daily weight gain.
Q. What is condemnation?
A. It's bad birds, IP birds, sep/tox birds that go to the plant.
Q. When you say "charge for condemnation," what does that mean?
A. It's charged against -- the condemn birds are taken off your weight when it goes to the plant. It's taken and charged against you.
Q. And your understanding is that at Gold Kist, growers got credit for weight of condemn birds?
A. Yes.
Q. They got to count it?
A. Yes, they got to count it, yes, sir.
Q. So you knew that was a difference between Gold Kist and Tyson?
A. I didn't know it at the time, but I mean --

Page 80

Q. You know it now?
A. But I know it now, yes, sir.
Q. And you know at least since you started growing?
A. Yes.
Q. With Tyson, that is?
A. Yes, sir. Yes, with Tyson.
Q. Did they also use feed conversion at Gold Kist?
A. Yes, sir.
Q. Do you do your own books and record keeping?
A. No, sir, my CPA does.
Q. Your CPA does?
A. Yes, sir.
Q. So how do your employees, like, clock in and clock out?
A. We don't. We just -- we work on the honor system. We just -- I trust them and they trust me. So we just --
Q. Just pay them a flat rate?
A. Yes, sir.
Q. How do you track your expenses?
A. My CPA does it. I don't.
Q. Do you have any idea what your expenses

up the meeting.
Q. Who typed this up?
A. I don't know.
Q. It came from you.
A. Well, I don't type. So I couldn't have typed it up.
Q. So you don't know who put this together?
A. No.
Q. Did your wife?
A. No.
Q. No?
A. Huh-uh.
Q. So what was the purpose of the meeting?
A. To discuss a raise.
Q. Discuss a raise, you mean, under your contract?
A. Yeah.
Q. So getting new contracts?
A. New contracts, new raises. They'll give you a raise every once in a while. There's been some small raises. There haven't been none in a long time.
Q. So the purpose was to get together and talk about --
A. Talk about issues, period, yeah.



Q. Do you remember any of the issues besides wanting a raise?
A. We were trying to -- I'm just -- I'm not reading this, but we were trying to get more fuel paid too. We were just trying to get some -- because our electricity rates have gone up tremendously in that area. We were trying to get some more fuel pay and electric bonuses and stuff.
Q. It says in the third paragraph that Jim has suggested -- is that Jim Gottsponer?
A. That's Gottsponer, yes.
Q. That he is attempting to get out-time reduced in order to increase grower W-2 pay.
A. Yeah. He did say that, yeah.
Q. And it goes on to say, Jim's suggestion does nothing for grower cash flow. So that wasn't something that growers wanted?
A. This was after the meeting. This was offering new incentive -- yeah.
Q. So the group here wasn't interested in reducing out-time?
A. No. Like I said, that varies from grower to grower, Mark. Like me, I want more out-time. Morgan wants more out-time. Some of your guys that, you know, have smaller farms want



it quicker so they have more cash flow. It really varies from grower to grower.
Q. So did you talk with growers who want less out-time about this issue? Because you wrote -- someone wrote on here --
A. I didn't write it, no.
Q. Well, it came from you. It says, Jim suggestions it does nothing for cash glow.
I'm trying to figure out, were you including growers in your meeting who might think less out-time would help them?
A. Yeah, there were several there that would like less out-time. It was a spectrum from top to bottom. I mean, it wasn't just --
Q. Obviously, not everyone agrees with that statement, if that's what you're saying.
A. This was a group meeting. We all had different things that we were interested in.
Q. So you would agree with me, then, that statement doesn't represent every grower's viewpoint on --
A. It doesn't represent me. I can't speak for other growers.
(Exhibit 11 was marked.)
Q. (By Mr. Tatum) I've got another set of



documents here that I marked as Exhibit No. 11. So these -- have you ever seen these before? These documents are marked Morris 393 to Morris 400.
Actually, it looks to me like I might need to individualize those Bates numbers. They're marked 393 to 395, and then they're marked 405 to 411, and the last one is marked 400. So these are documents that were produced to me from you. That's what the Morris stamp means on the bottom.
A. Okay.
Q. I got them from your attorney, but they're supposed to be from you.
A. Okay.
Q. Have you ever seen these before?
A. Not in this context. But yes, I remember giving these to Caroline, yeah, giving her instances.
Q. So the first three pages are labeled Morris 393 to 395?
A. Uh-huh.
Q. Now, you said you don't type. Do you know who typed these?
A. No, I don't.
Q. So they didn't come from your computer?
A. I don't know. I put these notes in my