# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

-----------------------------------------------------

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

-vs- Case No. 4:15-cv-00077

Judge: Honorable Joseph H. McKinley

TYSON CHICKEN, INC., et al.
Defendants.

-----------------------------------------------------

Video Deposition of DR. KYLE STIEGERT
Thursday, January 16th, 2020
9:03 a.m.
at
COYNE, SCHULTZ, BECKER & BAUER, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin

Reported by: Wendy L. Hanneman, RPR



Video Deposition of DR. KYLE STIEGERT, a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to the Federal Rules of Civil Procedure, pursuant to notice, before WENDY L. HANNEMAN, Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at COYNE, SCHULTZ, BECKER & BAUER, S.C., 150 East Gilman Street, Suite 1000, Madison, Wisconsin, on the 16th day of January, 2020, commencing at 9:03 a.m. and concluding at 1:03 p.m.

A P P E A R A N C E S:

WHITFIELD, BRYSON & MASON, LLP, by
Mr. John Whitfield
19 North Main Street
Madisonville, Kentucky 42431
Appeared on behalf of the Plaintiffs.

SHOOK, HARDY & BACON, LLP, by
Mark C. Tatum
2555 Grand Boulevard
Kansas City, Missouri 64108
Appeared on behalf of the Defendants.

TYSON FOODS, by
Mr. Eli J. Glasser
2200 West Don Tyson Parkway
Springdale, Arkansas 72762-6901
Appeared telephonically as in-house counsel for Tyson Chicken, Inc.

ALSO PRESENT: Dennis Winter - Videographer



I N D E X


| EXAMINATION | PAGE |
|---|---|
| MR. TATUM | 333 |
| MR. WHITFIELD | 490 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Exh. 9 | Curriculum vitae | 334 |
| Exh. 10 | Elam/Thurman reports | 334 |
| Exh. 11 | Original report | 334 |
| Exh. 12 | Second report | 334 |
| Exh. 13 | Supplemental declaration | 342 |


(Exhibits were retained by the court reporter. Originals attached to original transcript and copies to copy transcripts.)



TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We're on the record. This is Volume 2 in the videotaped deposition of Kyle Stiegert, M.D., in the matter of Charles Morris, et al. versus Tyson Chicken, et al., Case Number 415CV00077. This deposition is taking place at Coyne, Shultz, Becker & Bauer, 150 East Gilman Street, Madison, Wisconsin, on January 16th, 2020, at 9:03 a.m.

My name is Dennis Winter, I'm the videographer with U.S. Legal Support located at 411 East Wisconsin Avenue, Milwaukee, Wisconsin. Video and audio recording will be taking place unless all counsel have agreed to go off the record. Will counsel please state their appearances for the record and who they represent, starting with the Plaintiff, and then the court reporter will swear in the witness.

MR. WHITFIELD: I'm John Whitfield, I represent the Plaintiffs in this case.

MR. TATUM: And Mark Tatum on behalf of the Defendants. And we have Eli Glasser from Tyson Foods on the phone and present as well.

Page 353

Q Okay. And Nathan Consulting, I believe we talked about before, is the -- is an underlying group that you used in development of your analysis in this case, correct?
A Yes.
Q Are you still utilizing their services in this case, the Morris case?
A Yes. I'm instructing them on what we're doing.
Q Have you attended any poultry or broiler-based seminars, meetings, trade organization groups? You know, I'm trying to cover it all, where you've been physically present somewhere where someone's talked about poultry --
A No.
Q -- or broiler issues since your prior depo?
A No.
Q Have you, and I may have asked this, but I just want to be -- make sure I'm covering it, have you consulted in any way in the broiler or poultry industry since your prior depo?
A No.
Q And that would include, from my view, consulting with anyone, not only in the context of your expert work, but with the government or anyone else?
A No.

Page 354

Q Your second report, I think I marked there is --
A Exhibit 12.
Q Yeah, you have a copy of it, and the copy I marked is Exhibit 13. It looks like your copy is Exhibit 12. I'll just use this for ease of reference so you've got yours. Did anyone assist you in development of your second report?
A Yes, this was a work product that I developed with the help of the folks at Nathan, Jonathan, Ram and Maggie Harrington. Ram Tamara.
Q And that's the same team you've been working on throughout this litigation that we talked about in your first deposition?
A Yes.
Q Okay. Did anyone else assist in development of any of the underlying analysis or work product that resulted in your supplemental report?
A No.
Q How much time did you bill in development for your supplemental report?
A I don't recall.
Q Have you been paid for developing any part of your underlying analysis or the written work product that resulted in your supplemental report?
A Ah, I don't think so. I think I've been paid up

Page 355

through the Ju -- July 15th report. That was the original report.
Q Mm-hmm.
A So the, ah, re -- the, um, this report here, the supplemental report, um, I believe I sent a bill in, but there was a -- and, um, I've been -- I've been slowly pulling my bills together, so there's a little bit more to go on that.
Q How much have you billed for your work in relation to the supplemental report?
A I don't recall. Somewhere maybe between 10- and 20,000. That's the best I can come up with.
Q And is that for your work personally?
A Yes.
Q That's independent of the work that Nathan & Associates may have billed for it?
A Yes.
Q Do you have visibility to Nathan & Associates' billings for their work --
A No.
Q -- in this regard? Do you know how much Nathan & Associates have billed for their work --
A No.
Q -- in relation to your supplemental report?
A No.

Page 356

Q Okay. And I assume that would also be the same for the underlying work with the initial report?
A I don't have --
Q What is the rate you're billing?
A 400 per hour.
Q And what is the rate -- and that's the rate for development of your supplemental report?
A That's the rate for, yes.
Q And what's the rate you're billing for your deposition today?
A 400.
Q And you said you still have some accruing billing to invoice --
A Yes.
Q -- in relation to your supplemental report? How much is that?
A I -- I would have to look.
Q You don't know?
A I don't know.
Q Did any part of the analysis in your supplemental report rely or consider data that was not relied on or considered in your first report?
A I don't believe the data universe that we relied on had changed. That doesn't mean we didn't develop a different table or a figure.

Page 357

Q So you didn't obtain or re -- for your review some new data set that you didn't have at your disposal for the first report?
A Let me look at my -- to the best of my ability, I would say that the data universe did not change.
Q Within the unchanged data universe, is there anything that you utilized in coming to your opinions in the second report that you didn't utilize in your first report?
A You're speaking purely data at this point? Or are you talking about methods, or?
Q Data, documents, facts. The data universe, as you described it.
A There may have been a -- an item along the way that we added to the -- to the footnotes that was not identical to what was -- was relied upon in the second -- in the first report.
Q Sitting here today, can you identify for me any data that you relied on in coming to the conclusions in your second report, that you didn't rely on in coming to conclusions in your first report?
A Here again, um, I'm fairly sure that the data universe had not changed, but perhaps there was a paper that's been read and we added it to it.

Page 358

Q Can you identify any of that for me?
A Not -- not as I sit here.
Q Did you rely on any additional or different source materials in coming to your supplemental report, as opposed to your first report? And what I mean by supple -- "source materials" would be publications and the like.
A Here again, I would have to look at all the footnotes and compare. As I sit here, I cannot answer that. We certainly relied on the -- the, ah, reports that -- that, um, were provided from Professor Thurman, Dr. Elam, Dr. Lacy. And was it -- there's a fourth -- there's a fourth expert that submitted as well.
Q So you would have reviewed their reports?
A Yes.
Q Okay.
A Yes.
Q But I'm talking about publications, you know, third-party source materials. Is there anything that you researched, reviewed, that form the basis of your opinions in your second report, that is different from your first report?
A Well, as I sit here, I -- I don't know that with certitude that we did or did not.

Page 359

Q Nothing jumps out in your mind as material to that?
A Well, here's -- here's one I can spot. I spotted the Gujarati text.
Q Where are you and --
A I'm on page 20, footnote 43.
MR. WHITFIELD: Forty-three?
THE WITNESS: Yes.
MR. WHITFIELD: Okay.
THE WITNESS: That's been added. On the -- the construction of Figure 1, we relied on Dr. Thurman's backup materials.
BY MR. TATUM:
Q And that's page 30?
A Page 30, yes. And relied on Dr. Elam's production of a -- of coefficient of variation versus standard deviation, so.
Q And then you're referencing what page --
A Oh, yes --
Q -- in that statement?
A -- sure. Page 40.
Q Anything else?
A Not that I can recall as I sit here.
Q Who typed your supplemental declaration?
A Who typed it?
Q Mm-hmm.

Page 360

A Well, I typed quite a bit of it. Ah, it was passed back and forth between Nathan and myself.
Q So Nathan & Associates folks had a hand in actually drafting language as well?
A I was the -- I approved all the language.
Q Was the process that they provided you a draft, and then you reviewed and revised?
A Yes.
Q Did you physically create any of the tables or figures in your supplemental report, or did they create those for your revision --
A They --
Q -- or review?
A They created all the tables and figures. Under my supervision, of course.
Q Did you reject any of their proposed tables or figures for your supplemental declaration?
A There was a process. I -- I don't know that there was a final figure rejected, but, um, I asked for some changes along the way.
Q Can you identify for me any figures or tables where you asked for changes, and what those changes were?
A I would classify these changes as small. I don't recall them. There are only, what, five, I believe, in here. Yeah.

Page 361

**Q And can you identify any changes that you made to their proposals in any of those approximately five figures or tables?**
A No. The, ah, the development of the table was supervised by me, I instructed them to do the tables and figures, and they did them. And then we modified them, I think they were fairly slight modifications. They were good work product from the start.
**Q Can you identify any substantive changes you made to any of the opinions or text of the supplemental report, as compared to what they proposed?**
A I'm not -- I'm not tracking your question.
**Q Sure. They sent you a draft, you reviewed. I assume, did you have discussions with them about the draft?**
A Oh, yes.
**Q Did you --**
A That was --
**Q Were there any proposed -- was there any proposed language within your supplemental report that you directed them to change?**
A I just changed it myself.
**Q Can you identify for me where you made those changes --**

Page 362

A No.
**Q -- to the extent -- you cannot?**
A No.
**Q Were any of those changes -- I don't want to divide this question between what I'll just call punctuation and grammar, but non-substantive and substantive. Do you understand what I mean there?**
A Well, large sections of the report were -- were developed by me. And other parts were developed by -- by Nathan. And then I modified those sections to sort of fit into the overall theme of how I was approaching this.
**Q Do you recall --**
A I don't --
**Q -- what part of the report you developed and what part of the report Nathan developed?**
A Well, I think it's safe to say, and I don't want to -- I don't want to overstep and say something that wouldn't be true, but I believe the discussions around the figures would be -- would have been developed, because -- for obvious reasons. The person that developed the figure took the first crack at writing it, describing it.
**Q So do you recall the portions of the report you developed versus what Nathan developed?**

Page 363

MR. WHITFIELD: Objection to form. Go ahead.
THE WITNESS: Oh, okay. May I have the question back?
BY MR. TATUM:
**Q Do you recall which parts of your supplemental report you developed, versus what Nathan developed?**
A I was mainly responsible for originating the content in, um, in the response to Professor Thurman and Professor Elam. Or Dr. Elam, excuse me.
**Q And by inference, therefore, the remaining was within the development domain of Nathan?**
A Well, the figures -- the figures in the context of writing up the material around these figures, I did not originate that content. There were a few paragraphs that dealt with this Clarksville Cummins material that I did not originate.
But here again, I approved everything, and I supervised this whole project from top to bottom. So I can't say I paid attention to everything that went on. It wasn't -- it wasn't, ah -- it wasn't something I was focusing on, the, um --
**Q When I look at your supplemental report that you have in front of you, it appears to me that the**

Page 364

**overall opinion you provided in your first report, and that we talked about in your dep -- deposition in relation to alleged damage categories in this case, remain the damages have shown themselves in three categories, condemnation, out time, and base pay; is that correct?**
A Yes.
**Q And I do not see in your report any opinion that there -- that you're offering in relation to a damage in some other category?**
A No.
**Q Okay. So your supplemental report does not change those ultimate calculations that we discussed and that show up in your original report, correct?**
A Correct.
**Q And if I look specifically at your section on condemnation, paragraph 115 --**
MR. WHITFIELD: Are you in the supplemental report, Mark?
MR. TATUM: Yes, sir.
MR. WHITFIELD: Page what?
MR. TATUM: Ah, paragraph --
MR. WHITFIELD: Sorry.
BY MR. TATUM:
**Q Starting at paragraph 115. You have a section on**

Page 365

condemnation, it starts on page 45.
Is it accurate that this supplemental report does not offer any additional basis for your opinion in relation to condemnation than you provided in your original report?
A May I have the question back, please?
Q Yeah. I read your section on condemnation in your supplemental report to simply be, in summary, a re-affirmance of your original opinion in that regard. I do not see in your supplemental report any additional analysis or source material to that point, and I just want to make sure that's the case.
A Yes, that is the case.
Q So you did not find, rely on any other additional material to come to your conclusions as to condemnation, other than what you've indicated in your original report and deposition?
A It's my understanding, as I sit here today, that any data about the actual weight of these birds that have been condemned, is not -- has not been made available to me.
Q I understand. But my question is pretty clear.
A So, yeah.
Q Did you --

Page 366

A I would love to -- I would love to rely on that data.
Q But did you?
A I did not.
Q Okay, so the sole source of your condemnation opinion remains the Canadian study?
A Yes. That's the best available data that we had to work with, so that's what I relied on.
Q And then you also have a section following on page 46 that's two paragraphs long, it's paragraphs 118 and 119 dealing with what you titled, "Days out." Do you see that?
A Yes.
Q And this relates to your second category of alleged damages in that case -- this case, and that is in relation to an allegation that Tyson didn't provide chickens at an appropriate frequency, right?
A Yes.
Q And you did not -- your supplemental report does not rely on any additional analysis or data to come to that conclusion that wasn't present in your first report, and that we discussed in your deposition, correct?
A Not as it directly relates to days out, or the condemnation.

Page 367

Q In other words, your sole source for your opinion for days out remains the affidavit -- the statement provided to you from Charles Morris as to what he was told?
A I'm relying on recommendation for counsel -- from counsel to use the 12 days for summer, and 17 days for winter months.
Q So your --
A And there is a supporting document from Charles Morris, a deposition, I believe.
Q So it remains the case that you didn't personally, that -- whether that was true or not, you were just told to assume it, right?
A I read the deposition that the specific numbers were relayed to me from counsel as the numbers to use.
Q Okay. And you didn't vet whether or not that assumption was believed to be the case by any other plaintiff or grower?
A Um, no. No.
Q Okay. You also did not, um, do any analysis, as I see in your supplemental report or your original report, to see if Tyson provided chickens consistent with the terms of the contract from a frequency basis, i.e. days out, or number of flocks

Page 368

per year?
A The -- the days out work was -- was built upon the 12 and 17 that is alleged to have been promised.
Q I understand. I'm just saying, you didn't -- and I'm just, you know, I've got to be clear on what you did and what you didn't do. And you didn't, in preparing your supplemental report, do any analysis at all to see if plaintiffs received flocks at the frequency set forth in the written broiler agreement in which they signed?
A I reviewed the contracts.
Q I understand, but you didn't analyze their flock placements to see if they received flocks consistent with those terms, correct? You simply looked at it through this assumption given to you to -- to analyze?
A Well, the -- the point of -- of this is -- is -- really speaks to more the monopsony control of the contract itself, so.
Q I understand, but you're --
A So --
Q Listen to my question. I understand, but I'm just saying, you didn't do any analysis to determine whether or not they received the number of flocks per year as mandated by the contract; whether you

Page 369

liked the contract or not, you didn't do that
analysis, correct?
A I did not present that analysis. Um, here again, the contract terms are -- are what's at question in this case.
Q I understand.
A Yeah.
Q Similarly with condemnation, whether or not you liked the contract or not, you did not do any analysis to determine if in fact the growers had been paid according to the contract terms governing condemnation payments, correct?
A My -- I'm trying to recall what the contract specifies. I would have to look back at that.
Q You don't recall doing any analysis to determine, look, I may or may not like this contract, I may or may not think it's even fair, but I didn't analyze whether or not they paid according to what it says?
A I'm just trying to recall if the contract said they were going to be paid on -- they were being paid zero dollars for, um, condemned weight.
Q So sitting here today, you can't recall whether you did that analysis?
A I can't recall whether that was in the contract.
Q My question is, can you recall doing any analysis

Page 370

under condemnation to determine whether it was consistent, and paid consistently with the language of the contract? I don't see it in your supplemental or original report.
A Here again, I don't -- I don't recall what was in the contract, that's my point. So I don't know if I can answer that question today.
Q Okay, but my question is, do you recall doing any analysis in -- to determine if under the contract language, condemnation was paid consistent with those terms? It's okay if you don't recall, but I don't see it in your report --
A I just --
Q -- so I'm trying to make sure.
A I just don't recall.
Q Okay. And then the third category of damage flowing from your original report is what I'll call base pay suppression; is that a fair term?
A Grower pay.
Q Grower pay suppression. What do you call it? Grower pay suppression?
A Suppression of grower pay.
Q Okay. And in working through your second report -- and we'll get into the details of your report, but what I don't see from a -- sort of a bigger picture

Page 371

perspective is a change in the numbers that you calculate --
A No.
Q -- under that element. Does your second report change that in any way?
A No. No.
Q Okay. Did you, in preparation of your second report, examine any of the condemnation processes at any other facilities besides Robards?
A Examine --
MR. WHITFIELD: Are you talking about any of the Robards facilities?
MR. TATUM: No, I'm sorry.
MR. WHITFIELD: Tyson facilities?
MR. TATUM: Yeah, that's -- that's a good question.
Q Did you examine the condemnation processes for any other facilities not owned by Tyson, other than Robards?
A Physically examine?
Q Did you look at any data? Did you look at any contracts?
A I looked at these contracts from the new Costco program starting up in Nebraska, but I don't recall their -- their condemnation, the contents of the

Page 372

condemn -- condemnation.
Q And I don't see any source material anywhere in relation --
A No.
Q -- to the Costco contracts?
A No.
Q Didn't rely on that or consider that in forming your opinions here?
A No.
Q Okay, so other than that, did you look or examine the condemnation processes and procedures for any non-Tyson facility, i.e., processing plant?
A Well, as I sit here today, I'll -- I don't recall.
Q Okay. Did you look at the condemnation policies and procedures and how they pay out, obviously, for condemnation for any other Tyson complex besides Robards?
A No.
Q Okay. Did you look at how any other Tyson complex operates days out?
A No.
Q Did you look at how any other non-Tyson complex operates days out with its growers?
A Well, I reviewed the Costco contracts again, and --
Q But that did not form the basis of any of your --

Page 373

A No.
**Q -- opinions here, correct?**
A I was reviewing them in the very last days of this report, so it didn't enter into the report.
**Q So you don't know sitting here today whether or not the Robards complex processes and procedures as to days out are any different from anyone else, correct?**
MR. WHITFIELD: Object to the form.
THE WITNESS: I don't think they're very different, um, from what I've -- what I've gathered through just a general reading of the industrial practices.
BY MR. TATUM:
**Q You also --**
A But I did not say -- I cannot say sitting here today that I have a contract in front of me from, say, a complex in Mississippi that does it differently. I don't -- I don't have that.
**Q Right. You just don't know, right?**
A Yeah. There's -- there's a general conformity in these contracts across the board.
**Q Similarly, with how Tyson's contracts handle condemnation, and how they pay for condemnation, you don't know one way or the other whether they do**

Page 374

**it the same or different from any other processor, or any other complex, correct?**
MR. WHITFIELD: Are you talking about days out?
MR. TATUM: No, I'm talking about condemnation.
MR. WHITFIELD: Oh, sorry.
THE WITNESS: I think to say I have no -- no idea whatsoever is too strong.
BY MR. TATUM:
**Q But you've done no analysis of that?**
A Done no analysis, correct.
**Q So you don't have an opinion on that one way or the other, correct?**
A I have an opinion of a general consistency across these contracts.
**Q But you don't know that?**
A I don't have the analysis to back it, to show that.
**Q Okay. Looks like we've been going about an hour, so let's take a five-minute break.**
MR. TATUM: Okay.
THE VIDEOGRAPHER: We're off the record at 10:03.
(Short recess taken.)
THE VIDEOGRAPHER: We're back on the

Page 375

record at 10:14.
BY MR. TATUM:
**Q Okay, Dr. Stiegert, just working through your deposition today and your supplemental report. In your supplemental report, I have not identified any section in that addressing the opinions provided by Mr. Anderson in this case on behalf of the defendants. It's my -- therefore my assumption you have no opinions in relation to his report; is that accurate?**
A To say I have no opinions about that report is incorrect.
**Q Is it -- is it correct to say that you are not offering any opinions in the context of this case in relation to his report because you didn't, in either written report?**
A In my -- well, my -- to be fair, my first report was written before any of the experts responded.
**Q I understand, but --**
A So I couldn't have responded to -- to him in that report.
**Q I understand, but you also didn't respond --**
A In this report I simply didn't respond, it doesn't mean I don't have opinions.
**Q Okay, but you're not here to offer an opinion, and**

Page 376

**you've not been retained to offer an opinion, because you didn't do it, fair enough?**
A Well, this is a supplement report, it's -- I wasn't -- it just -- I have opinions, but I -- I didn't put them in the supplement.
**Q You have not analyzed his report, correct?**
A I've read his report.
**Q You've not analyzed whether or not the conclusions within his report are consistent with the data he examined, correct?**
A It's incorrect to say I didn't analyze the, ah, the report and the data that he provided. I looked at it.
**Q So you --**
A Just -- I just don't --
**Q You looked at all --**
A I didn't see a need to respond to it in my supplement.
**Q You looked at plaintiffs' tax returns?**
A Um, I didn't see a need to look at the plaintiff tax returns, no.
**Q Okay. You looked at -- you did -- also did not look at plaintiffs' underlying financial records, like their bank statements --**
A Well, yeah, we --

to address.
And it's completely inappropriate to specify a model where you're going to explain the variable Y, with a variable, we'll call it X1, X2 and X3, and then run a second regression where you're also going to explain Y, but you're going to use variables X4, X5 and X6. That is not -- that is a complete violation of very basic econometrics.
And so all of these regressions are suffering from this encompassing problem. They don't, ah -- as a result, none of the -- none of the model variables are -- are, um, are valid.
And you know what's really interesting, too, you can see that play out in, ah, in MacDonald and Key's paper. Because in MacDonald and Key's paper, they do this step routine where they take a group of variables and they run a regression and they present them. Then they add a group of variables, and they run the regression and present them. And then they test whether that new group is statistically important. Then they do that two more times, so they end up with a sort of four regression models, I think that's the number. And you can see the movement in the variables as you do this.



The question isn't -- and the issue isn't that, well, MacDonald and Key had it wrong because they only introduced the first regression; they were simply stepping through the process of getting relevant variables and building toward a final model. And -- and so it demonstrates in a crystal clear way just how bad those regression estimates are likely to be. So, no, I don't -- I don't -- I don't think any of them are of any value at all.
**Q You did not conduct your own, though, correct, regression analysis?**
A I didn't render a regression in this -- in this case, no.
**Q Anything else other than the encompassing issue you discussed here that you challenged within Dr. Elan's --**
A That's the -- that's the big one.
**Q Anything else?**
A Um, I think we're having a difference of opinion about -- this really relates to the -- this relates to the, um, the final report from Dr. Elam. And that is this whole issue of coefficient of variation versus standard deviation. And he's -- he's made a -- a serious error in -- in -- in that.
**Q You disagree with both he and Dr. Thurman's opinion**



**that coefficient of variation literally has no application to this process, correct, and you know they both have that opinion?**
A Yes, I disagree with that entirely. These are -- these are dollar amounts, stream of -- stream of, ah, information that's all positive numbers. Um, coefficient -- with different means. Coefficient of variation is a completely valid way to approach that.
**Q Do you understand the difference between grower pay and base pay?**
A Yes.
**Q But your supplemental report says that they're to be used interchangeably, and, in fact, your analysis does so?**
A Where do I say that at?
**Q In your re -- supplemental report.**
A Where at?
**Q Do you -- if you disagree it says it, just say you disagree it says it?**
A I would have to read it.
**Q What is grower pay in your mind?**
A Well, I'm defining grower pay as the final payment that would include fuel premiums, and, um, housing premiums, and adjustments from the tournament.



**Q What is base pay in your analysis?**
A Okay. Base pay is the -- pardon me, let me just look that up. I can't recall the base pay. Well, here again, it just, all of a sudden it escapes me. There's the, ah -- there's the, ah -- the base pay -- there's the, ah, the contracted amount they're going to pay, and then there's the tournament. And that -- that that is the -- I think that's the base pay after the -- sort of the post tournament number.
**Q So you're not sure sitting here today?**
A Yeah, all of a sudden it just escapes me, I'm sorry.
**Q Do you know if in this case that any plaintiffs have guaranteed pay under their contracts?**
A There are certain provisions in the contract for like catastrophic failure of the farm. Um, is that what you're referring to?
**Q I'm just asking if you know if there are any pay guarantees within the contracts here?**
A Well, there's the stated amount that they're going to get that the -- the, ah -- like, for example, in, um, we have an example here in my original report that has a .053 in there, and that's the -- that's the amount before they get to the

Page 401

tournament, ah, where it changes.
**Q Do you know if they have guaranteed floor pay?**
A Floor pay?
**Q Yeah. So an amount they're guaranteed to be paid per pound that it will not fall below?**
A Yeah, here again, I don't know if that addresses the whole question of catastrophic failure of the farm, say a tornado goes through there, I'd have to go back and review that.
But I -- I believe if they did perform very poorly, that I think that the number is, what, four cents per pound, is kind of the -- the guarantee. And then of course there are provisions for if you fall below -- if you -- if you were in the inefficient range for several tournaments in a row, there's other things that are going on, too, so.
**Q So the two things we've discussed about that you criticized Dr. Elam for so far, is the encompass and principle, and his disagreement and Dr. Thurman's disagreement with you on the applicability of the coefficient of variation analysis. Anything else?**
A You want me to go back to that, okay. Is that what you're saying?
**Q I just asked you a question.**

Page 402

A Okay. Talked about the endogeneity issues, um, how that biases the results. There's one of his regressions that is basically the -- is basically, regresses grower pay, or average grower pay on literally the factors that -- that drive grower pay, um, in the equation.
So naturally those are statistically significant, because that's what they use to calculate grower pay, so, um. And then there was the functional form discussion. I didn't see a lot of work, or any work, for that matter, that would have suggested there's any non-linearities in his regressions, and those are the kinds of things that -- that I would, as a scientist, I would have looked at.
And you can also see that in the MacDonald and Key study, they compared logarithmic versions to linear versions of their model, which is a statement, really, about whether things are moving in -- in linear versus non-linear forms. And so, um, yeah, that was an area of critique. So, but, here again, I wouldn't call this supplement comprehensive. So there may be more.
**Q So you challenge essentially the methodology to his regression analysis, is that where all this flows?**

Page 403

A Well, the -- the encompassing, the endogeneity of the functional form issues are all -- they're all -- they all speak to the methodology. The, ah -- but the encompassing really gets more to the model development. Encompassing is about getting the right model on the table.
**Q What does the -- the functional form speak to?**
A Speaks to the possibility that there are relationships between the variable you're trying to explain and the variable that you're using to explain that variable, are they of a non-linear form.
**Q What about endogeneity issues?**
A Um, that is when you have -- there's a number of ways of describing endogeneity. I'll pick the one that I'm most comfortable with. Um, a typical ordinarily squared regression model is assumed that all the right-hand side variables are what they call exogenous. That means they were -- they were brought in from outside the system.
When it occurs that the left-hand side variable is actually influencing the right-hand side variables, you get this two-way process going, and that leads to bias parameter estimates. So -- but I -- I would -- I would add a point there, that

Page 404

endogeneity is -- it's an important part of the science that we do, and it's very hard to get a paper published any more that doesn't formally address endogeneity.
But often times the parameter estimates aren't terribly biased, just sometimes they can be -- they can be biased. So, but the bigger issue was this encompassing problem.
**Q And so this flows to the ultimate opinion that -- that he offered, and he offered a number of opinions, but the opinion he offered that you're challenging, as I understand it, is that certain inputs don't affect grower pay?**
A I'm just -- I'm just saying that the econometrics was so poorly done, that I just -- it's not really an issue of challenging it or not challenging it, I just -- I just can't accept those regression results --
**Q Okay. And --**
A -- as valid at all.
**Q Understand. And you didn't do your own regression analysis to determine whether or not the opinion ultimately was correct or not?**
MR. WHITFIELD: Objection to form, asked and answered.

BY MR. TATUM:
Q Correct? I mean, I understand you didn't -- your opinion -- the foundation of your opinion is this claim of monopsony, I understand that. And I also understand that you didn't -- that you challenge some of the methodology Dr. Elam utilized to render his opinions in this case, and we've talked about this. But at the end of the day, you didn't do a counter-analysis to his opinions, correct?
A I didn't see a need to do it.
Q Okay.
A Um --
Q But, therefore, you didn't do it, right?
A Yeah, I didn't fail to do it, I just didn't do it.
Q Okay. And so while you challenge his methodology for the reasons we've described here, you don't have an opinion as to whether a given input affects grower pay one way or the other, correct? It's not part of what you --
A I have --
Q -- did here?
A -- I have -- I have a very strong opinion about that.
Q Well, you didn't do the analysis.
A There is --



MR. WHITFIELD: Let him answer the question.
THE WITNESS: There are quality variations in -- in -- in every part of agriculture.
BY MR. TATUM:
Q I understand, but --
A It doesn't -- it doesn't -- you can't get perfect, unless you're dealing with something like anhydrous ammonia, which is a chemical. That's 80 -- 88.2 percent nitrogen. It's a chemical formula, you're going to have variability. You're going to have variability in every bag of feed that's ever been -- ever been -- ever been put together.
Q Yeah, that's a natural con -- consequence of the process here, of growing a live biological being with --
A Exactly.
Q -- naturally --
A There's going to be variability.
Q -- made goods, right?
A Right.
Q But my -- my point was, you have your opinion on monopsony, I understand that, but you didn't do an underlying analysis to determine whether or not



certain inputs affected grower pay, or whether or not certain inputs were distributed evenly or unevenly over time; you were just doing a different -- you just did a different analysis, right?
A Yes. The, um -- yeah. I didn't -- I didn't perform a regression to look at that.
Q Right. And so you don't have an opinion --
A I think it stands to reason --
Q Yeah.
A -- that it has to be there, there's some variability in everything we do.
Q So your -- your challenge to Dr. Elam is you're concerned about his method, his methodology in reaching his conclusions, but it's not as if you did a counter-analysis of that? That's all I'm trying to make clear.
A I think you already asked that question.
Q And we're clear on that, right, you didn't do it?
A I think I already answered it.
Q Which is no, right?
A Didn't I already answer it?
Q You can feel free to answer it again just so I'm clear.
A I -- I didn't see a need to do it for this -- for this particular supplemental report, so, yeah.



Q And, therefore, no opinions are you offering in this case as to whether any one input affects grower pay, correct?
A I have an opinion about grower pay.
Q But you -- but you're not offering an opinion here --
A Based on --
Q -- because you didn't do the analysis?
A Based on a statistical assessment, no.
Q And you certainly didn't offer any opinions of that in your reports, one or two?
A Yeah, we had -- there's deposition testimony, people under oath talking about this.
Q I understand, but --
MR. WHITFIELD: Let him answer the question.
BY MR. TATUM:
Q I understand, but I'm -- you know, you're hired to come in and say I've done an analysis and my expertise says this. And your expertise says I think there's a monopsony here and here's how it's affected things. I understand that's your opinion.
A Yeah.
Q And then you've looked at some reports that Tyson has provided, such as Dr. Elam's, and you said I'm

Page 425

way to sell that farm is have the contract with it.
Q Okay.
A The farm has no value.
Q Listen to my question.
A The farm has no value.
Q Do you believe it's at least a factor to look at as to whether or not there is demand to buy grower farms if they want to sell and get out of the poultry business?
A Well, I'm going to withhold my answer until I have a chance to relook at all the factors that go into, um, how the horizontal merger guidelines takes a look at that.
Q Do you believe it's a factor to look at under the guidelines as to whether in fact people in this market, as you've defined it, have sold for profit and got out of the poultry business?
A Not in -- not in the context of the SSNIP test.
Q Okay.
A The SSNIP test, um, it fails the SSNIP test. It would not lead to a significant reduction in supply. Because the only way to get out of the business and sell your -- and sell your farm, or the growing component of your farm in a -- any kind of profitable way at all, would be is if you have

Page 426

an integrator contract associated with that -- with those facilities.
Q Have you done any examination at all to determine what value a -- a farm, an existing farm with chicken houses has once those chicken houses have been fully paid off?
A The value of the chicken houses, it's not relevant whether there's debt on that. On the -- the value is what the market would bear in terms of a sale. So whether you own debt on it or not is immaterial.
Q So you've done no analysis to determine whether or not a farm of a given size that --
A No --
Q -- also has chicken houses on it is somehow less valuable than another farm without chicken houses on it?
A Certainly more valuable. I mean, a farm with just fields versus a farm with fields and a -- chicken houses, of course they're going to be more valuable, if there's a contract with that.
Q Have you done any analysis to determine if they're less valuable if they're just dormant houses?
A With no contract?
Q Mm-hmm.
A Didn't observe that, so no, I can't analyze

Page 427

something I don't observe.
Q So you didn't -- you have no opinion on whether that's the case or not?
A I have -- yeah, I have no opinion on that.
Q So are there any other challenges you have to Dr. Thurman, other than his disagreement with you on the relevant market?
A Yeah, that one was -- of course as we talked about earlier, I disagree with the, ah, the standard deviation versus coefficient of variation content in his most latest report.
Um -- oh, the -- I wrote up that section on -- on what Dr. Thurman did a direct database approach to seeing which -- which complexes are getting higher grower pay or lower grower pay. And I think -- I think the MacDonald and Key national, um, national econometric analysis really captures the essence of this industry in a far better way.
I mean, it's just -- it's just wildly inappropriate to -- to use -- say, oh, I'm going to compare this to two other regions, and say, oh, look at, they're getting paid more, therefore -- therefore they're -- there's no evidence of monopsony power. That's not how you analyze monopsony power.

Page 428

Q You actually had the data before you to compare Robards to many different complexes, in fact, all of Tyson's complexes throughout the country, correct?
A The Agri Stats data, we're talking about now, I think?
Q Right.
A That's right.
Q Right, but you didn't do that?
A No, I didn't see a need to do it.
Q And, in fact, on page 30 of your report, you have a Figure 1, you have a chart that purports to show that average grower cost -- the differences in average grower cost of Robards from Sedalia and Noel, you see that, on page 30?
A Yeah. Yeah.
Q How did you decide to use Sedalia and Noel in that chart, instead of any other complex in the system?
A The, um -- the exercise, to me, was simply to point out that you can come up with whatever result you want here.
Q Right. So in fact what you did was you looked at the Agri Stat data, and you literally pulled the highest two from the data of many plants, and then only compared Robards to those two; isn't that what

Page 429

you did?
A Um, well, I just instructed Nathan to -- to do this. And I -- one of the things I remember saying is I bet you you can find regions where -- where the opposite is true, and then they went out and found it.
Q But you didn't include any where the opposite is true, right? You didn't -- in fact, there were many --
A Well, that's my -- but that's my point.
Q What you did in this chart, was you took the Agri Stats data, and you found the two plants in the data --
A You know --
Q -- with lower grower costs than Robards, and only put those two on the chart.
A You are missing the point here. The point is --
Q Is that -- is that true? Do you know if that's true or not?
A I'll explain to you why I did this.
MR. WHITFIELD: Let him answer the question, Mark.
MR. TATUM: But do you agree with me --
MR. WHITFIELD: Answer the -- hang on a second. Answer the question.

Page 430

THE WITNESS: The reason I did this is to show the fallacy of just saying, oh, we're going to do some piecewise comparison of some data and that will conclude that we have no monopsony of power. That is fundamentally flawed.
BY MR. TATUM:
Q Have you looked at Robards' average grower cost across all complexes to see where it falls in the Tyson system?
A Um, no.
Q You know that Dr. Thurman has, in response to this chart, correct?
A I'd have to look at that again.
Q You're not aware of that?
A I'd have to look at it again.
Q You know in fact his conclusion is these two were cherry-picked to make this point? My --
A But that -- but that's the point here. I'm not trying to say this is the correct analysis.
Q In fact what he --
A I'm saying --
Q -- found --
A -- anybody can do this.
Q Do you have any basis to disagree with his finding that in fact Robards' average grower cost is

Page 431

misrepresented on this chart as compared to every other complex?
A I don't know if it's -- I don't know if it's misrepresented. I think it's a simple point that a national econometrics study is vastly superior than this piecewise approach.
Q But your opinion is that the Robards complex within Tyson's system is operating as a monopsony, correct?
A The national econometrics study that I rely on suggests that it's a far wider -- um, that's the whole point. I mean, we don't know which ones of these -- we don't know which of these other complexes are also having -- I mean, the whole thing feels to me like there's a tremendous suppression of -- of grower pay.
Q But your opinion is --
A Because the contracts -- the contracts are for flat pricing no matter what quantity.
Q But your opinion -- well, that's just not accurate. You understand they get paid on the amount of pounds that are returned per their contract, correct?
A The price -- the average -- the average weight gain. The average price per pound.

Page 432

Q You're saying that that's a flat rate?
A The -- the starting point of that. And then there's the net present -- then there's the NPV, um, adjustment, and then there's the premiums for technology or fuel.
Q Right.
A And then of course you get paid more if you deliver more weight.
Q Right.
A Yeah.
Q More pounds gets more, right?
A Yeah.
Q There's not -- you don't get a flat payment?
A No, the price, I mean --
Q Do you have any basis to challenge Dr. Thurman's response to this graph that says when you compare grower cost of Robards to all complexes and not just the two adverse ones, you get a vastly different result?
A He got that different result. I'm saying you can get the opposite, that's all I'm pointing out here.
Q You've not --
A I'm not going --
Q You've not --
A I'm not going --

Page 437

prevalent in the Robards complex occurred in complexes facing competition."

Um, I never said that other -- other complexes were facing competition. That's a strawman that he set up in order to try to create an argument that defeats me, and I disagree with that approach. I never said that.

I think -- I think when -- in cases where there are four or more integrators following the MacDonald and Key study, the reality is, these contracts are put together in the boardroom of large -- large corporations that are traded on the New York Stock Exchange or other exchanges. They're handed down to the growers, and the growers have to accept them or reject them. They've got bank loans to -- to deal with. And so they're left with little choice.

**Q Do you --**

A Whether there were four integrators or not, that may not be all that relevant. So, no, I disagree with this right here when he says, ah, I failed to consider the case of comp -- I don't know that there's a competitive case out there.

**Q You've not studied that?**

A I don't necessarily observe one. The structure of

Page 438

this industry is for a one-way street. Contracts are set at the boardroom, and then they're handed down.

**Q I understand you have beliefs, but you haven't studied that --**

A Well --

**Q -- you've not published anything about it --**

A If we wanted to get --

**Q -- right?**

A If we wanted to get to something form of competition, why doesn't Tyson agree to say we're going to meet with all the growers in the country, we'll have one representative for you all, and then let's talk about contract terms, and let's hammer it out? That's not the way it works.

**Q I appreciate that, but you've done --**

A So I disagree with that. I disagree that he says --

**Q I'm --**

A -- I'm comparing this to competition. I'm not.

**Q I get you're emotionally --**

A No.

**Q -- angered by this industry.**

MR. WHITFIELD: Objection.

Page 439

BY MR. TATUM:

**Q But you've not studied this.**

A I object to that. I --

**Q Well --**

A -- what I'm saying here --

**Q It was a poor choice of words, and I didn't mean it the way -- my point is, you've not actually done any study, you've not actually analyzed any analysis.**

A Well, I've relied on -- I've relied on the -- the method and approach taken by MacDonald and Key.

**Q Well, but they disagree with that point, as you know, from their own publications. So you've not -- you've come to the conclusion, you think, well, I just think the whole thing may be a monopsony. But obviously your source material doesn't believe that, because it doesn't opine to that. And I'm just making the point you've not done that analysis yourself; is that fair?**

A I answered that question by -- already by saying I used the MacDonald and Key study as a starting point for dealing with this monopsony problem.

The other problem that -- that -- that this market doesn't contend with, is it signs these contracts guaranteeing kind of a level price for

Page 440

grower services, a price per pound, and then they play the tournament and they give out rewards and make the -- make the losers pay the winners. Um, that -- that framework for pricing is completely inconsistent with a -- that's completely consistent with monopsony power, it's completely inconsistent with how a competitive process would work. Because --

**Q So you disagree with MacDonald and Key that that has resulted in exceptionable risk elimination for growers over time? That they've not had to absorb all the risks of feed, vaccinations --**

A See, here again, that's the --

**Q -- broilers and all that, you just disagree with that?**

A That's the strawman argument.

**Q Right, you disagree --**

A In a --

**Q -- with your source material that that's been a benefit to growers?**

A You're -- you're mistaking -- you're missing my point. My point is, is in a contract economy, yes, Tyson owns the feed, Tyson owns the chickens, they have -- they have to carry that risk with them.

But what they have done instead, is that