**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| CHARLES MORRIS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:15-cv-00077 |
| v. | ) | |
| | ) | Judge: Honorable Joseph H. McKinley |
| TYSON CHICKEN, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE TESTIMONY OF DR. KYLE STIEGERT**

---

## I. Introduction and Summary.

Dr. Kyle Stiegert is a Professor of Agricultural and Applied Economics at the University of Wisconsin—Madison, Director of the University's Food Research Group, and holds Visiting Professor positions at additional universities in the United States, Europe, and New Zealand. First Stiegert Report, Appx. A (Defs.' Ex. 2). He has been tenured at the University of Wisconsin for nineteen years, after first obtaining tenure at Kansas State University, where he was on faculty for eight years. *Id.* He holds a Ph.D. in Agricultural Economics from Purdue University and a Master's of Science in Agricultural Economics from the University of Nebraska. *Id.* He has published more than thirty peer-reviewed articles that examine agricultural economics. *Id.* And, among the numerous courses he has taught, from 2006-2016 he ran the University of Wisconsin's graduate-level course Econometric Analysis, which focused on how to construct economic models, gather proper data for those models, and analyze the results. *Id.*

In this case, Dr. Stiegert was retained to testify in support of Plaintiffs' Packers and Stockyards Act claim, which can be proven by showing Defendants' "practices have the effect of injuring competition or are likely to do so." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1231-32, 33 (10th Cir. 2007); *see also Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277 (6th Cir. 2010) ("practices that will likely affect competition adversely violate the Act"). Dr. Stiegert produced two reports totaling 121 pages, which contained 245 footnotes, 25 tables, and 8 figures. On the basis of his experience and analysis, he concluded: (i) Defendant Tyson Chicken, Inc. ("Tyson") possess anticompetitive monopsony (buyer) power over the chicken growers who serve its Robards complex, making Tyson likely to harm competition; and (ii) Tyson wields that power, further confirming its anticompetitive position, and damaging Plaintiffs.

Despite this background, Defendants move to strike Dr. Stiegert's testimony claiming he lacks "necessary expertise," failed to perform "testing," and did not provide "scholarly support." Defs.' Br., Dkt. 175, at 1. As the above suggests, these assertions rely on omitting large swaths of Dr. Stiegert's work and, even then, Defendants must repeatedly misstate the reports and law.

Defendants' claim that Dr. Stiegert lacks "necessary expertise" is based on the headshaking assertion he cannot opine on the economics of this case because he has not "been in a broiler house" or "taught a class on poultry." Defs.' Br. 27. This is factually misleading. Dr. Stiegert testified his work requires him to keep-up on scholarly articles regarding the poultry industry, Stiegert First Depo. 39:22-40:11 (collectively attached as Ex. A), and he has studied the economic implications of "breed differences among birds," *id.* at 103:22-25, and "trends in productivity" of bird feed, *id.* at 105:3. Moreover, it is well-established that even general practitioners in a field—unlike Dr. Stiegert who specializes in agricultural economics—are entitled to testify as experts about causes and effects based on their experience and analysis. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 754 (3d Cir. 1994). This is particularly true of economics experts, who Rule 702 and the courts recognize draw from general economic rules and their broad experience with markets to identify how those principles play out in the particular case. *See, e.g.*, § II, *infra*.

Similarly, Defendants' claim that Dr. Stiegert's approach to analyzing Tyson's conduct needed to proceed differently, Defs.' Br. 11-13, both misstates antitrust law and the *Daubert* standard. In "almost all antitrust cases," damages are calculated by determining what the "selling price would have been, absent the violation," *i.e.* "but for" the violation, the approach Dr. Stiegert employs and Defendants oddly portray as an outlier. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 758-59 (1977). Moreover, the Supreme Court has explained a "but for" methodology is

"sound" if, as Dr. Stiegert did here, the expert "attribute damages to [each] particular theory of anticompetitive impact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013). While Defendants insist they can declare how Dr. Stiegert should have conducted his analysis, Rule 702 has long recognized that it is for the expert to determine based on the facts of the case, not opposing counsel. *See* §§ II-III, *infra*.

Defendants' attacks on Dr. Stiegert's individual conclusions and their support further deny reality. For instance, they claim five paragraphs of the 262 paragraphs Dr. Stiegert wrote—which address the ability of growers to move between Tyson and Perdue Farms, Inc. ("Perdue"), another poultry company that operates in *one* of the relevant geographic markets—represents Dr. Stiegert's entire basis for concluding Tyson possess monopsony power. Defendants then claim that those paragraphs relied exclusively on Plaintiffs' testimony, which they state render Dr. Stiegert's conclusion unreliable. Defs.' Br. 6-10. They cite two sentences from Dr. Stiegert's depositions in support of their reading. *Id.*

In fact, Dr. Stiegert writes "[t]he lack of multiple integrators competing" for Plaintiffs' growing services is only one fact supporting "Tyson's monopsony power." Stiegert Second Report ¶ 111. His report details how, based on established economic principles, Tyson's own conduct provides substantial evidence of that anticompetitive power. Indeed, in the same deposition exchange Defendants rely on, Dr. Stiegert states his conclusion that Tyson possesses monopsony power also stems from the "contract economy" he determined Tyson created, Stiegert First Depo. 238:22-329:9, 240:17-241:14 (same); Stiegert Second Depo. (collectively attached as Ex. B) 368:12-18 (same), which derives from contracts of adhesion Tyson creates and mandates be used, First Stiegert Report ¶¶ 27, 80. Moreover, even when analyzing the geographic markets, his reports consider a variety of other evidence besides Plaintiffs' testimony.

Again, his complete depositions make this clear. *See, e.g.*, Stiegert Second Depo. 415:15-416:24; 462:11-21 (used Department of Justice "SSNIP test" to determine geographic markets and then examined the potential for competition within those markets).

Likewise, Defendants criticize Dr. Stiegert's damages calculations for failing to provide an "independent review of [an] article" that describes how Tyson's monopsony power reduces growers' base pay, Defs.' Br. 14, and failing to "provide[] any support" for his conclusion that in a competitive market growers' wages would rise in response to increased demand for chicken and Tyson's increased profits, Defs.' Br. 17. But, here too, any reading of Dr. Stiegert's reports disproves Defendants' claims. *See, e.g.*, Stiegert Second Report (Defs.' Ex. 23) ¶¶ 71-72, 107 (discussing why he credited article), 112-14 (explaining economic theory behind calculations).

Defendants also repeatedly raise factual disputes with Dr. Stiegert's analysis when it is reversible error to "unduly scrutinize[] the quality of the expert's data." *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 807-09 (7th Cir. 2013). Thus, for example, their claim that Defendants did not actually extend Plaintiffs' "days out," thereby reducing the number of flocks Plaintiffs could raise and be compensated for, or that Dr. Stiegert overestimated the amount Defendants profited from chicken they did not compensate Plaintiffs' for, are not appropriate in this motion. Defs.' Br. 22-26. As Dr. Stiegert explained, his objective was to demonstrate how increasing the number of flocks or crediting Plaintiffs for a greater volume of chicken meat would impact Plaintiffs compensation. *See, e.g.*, Stiegert First Report ¶¶ 124-25, 130. Particularly, where, as here, Defendants do not dispute his models, it is the "role of the jury" to determine what numbers to enter after hearing all of the evidence at trial. *Manpower*, 732 F.3d at 807-09. Purported "'weaknesses in the factual basis of an expert witness' opinion'" determine the "'weight'" the jury should give the analysis and ultimately how they apply the model, not its

"'admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

Put simply, Defendants efforts to avoid facing Dr. Stiegert at trial depend on facts and principles of their own creation. Defendants' motion should be denied.

## II. Defendants Omit The Relevant *Daubert* Standards.

Defendants frame their selective presentation of Dr. Stiegert's reports with an incomplete discussion of Rule 702, particularly as it is applied to economics experts. The Sixth Circuit emphasizes *Daubert* motions are not a mechanism for early resolution of a case; "the *Daubert* standard is liberal" in favor of admissibility so that factual issues can be resolved through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *United States v. Lang*, 717 Fed. App'x. 523, 534 (6th Cir. 2010) (unpublished) (cleaned up); *see also Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) ("A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury."); (quoting *Allison v.* McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999); Fed. R. Evid. 702 Advisory Committee's Notes (2000 amend.) ("[T]he rejection of expert testimony is the exception rather than the rule.").

Thus, Defendants' impractical claim that *Daubert* prohibits testimony unless each "damage opinion[] [is] tested or peer-reviewed," Defs.' Br. 1, is incorrect. *Daubert* does not require an academic journal article related to each case. "Whether the *theory or technique* has been subject to peer review or publication," not the opinions, is one of the *non-exhaustive* considerations, that are particularly employed when a court is considering *scientific* testimony. *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (emphasis added) ("the fact that []opinions may not have been subjected to the crucible of peer review, or that their

validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, (1999) ("[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.").

Economics is labeled a "soft science[]," for which courts recognize testing is often not necessary or indicative of admissibility, rather it is "particularly appropriate" to "[d]efer[] to experts" and their "professional judgment" of how to approach the case. *In re Air Cargo Shipping Services Antitrust Litigation*¸ Master File No. 06–MD–1175 (JG)(VVP), 2014 WL 7882100, at *8 (E.D.N.Y 2014); *see also, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 n.25 (11th Cir. 1998) (testability not the proper focus of *Daubert* inquiry for economic and statistical opinions).

Economists can rely on their "extensive economics experience" to select sources that inform their opinions, *In the Matter of M&M Wireline & Offshore Servs., LLC,* Civil Action No. 15-4999, C/W No. 15-5338, 2017 WL 430063, at *6 (E.D. La. Jan. 31, 2017), and then use their "general knowledge of economic principles and of the market" to explain what that information communicates about the matter, *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014); *see also, e.g., Barbe v. Gov't Employees Ins. Co.*, Case No. 4:13-CV-441, 2014 WL 12601572, at *2 (E.D. Tex. June 30, 2014) (admitting economic expert testifying "based mainly on the observations, professional experience, and education of the expert witness"); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 462 (D.N.J. 1999) (admitting testimony because it is based on witnesses "extensive economic background and experience"). Even where economic experts construct models to test their conclusions, the courts

recognize that "depend[s] upon judgment and art" and thus the models should be admitted even if they are not indisputable. *Falise v. Am. Tobacco Co.*, 258 F. Supp. 2d 63, 67 (E.D.N.Y. 2000).

In fact, Rule 702 lists testimony on "'economic principles'" as a "'non-scientific subject[] [that] should be evaluated" for admissibility "by reference to the knowledge and experience of that particular field.'" Fed. R. Evid 702, Advisory Committee Notes (2000) (quoting American College of Trial Lawyers, *Standards and Procedures for Determining the Admissibility of Expert Testimony after Daubert*, 157 F.R.D. 571, 579 (1994)). As a result, since Rule 702 is not a proxy to examine the "conclusions [experts] generate," *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 323 (6th Cir. 2015), where a "foremost expert in the field of economics," and particularly this subset of economics "determine[s] th[e] data, although not perfect in its specificity, was sufficient to make certain reasonable conclusions … the Court has no place" to intervene. *Trollinger v. Tyson Foods, Inc.*, No. 4:02–CV–23, 2008 WL 305032, at *10 (E.D. Tenn. Jan. 31, 2008).

## III. Dr. Stiegert Is Eminently Qualified To Offer His Opinions And His Approach Is Well Accepted.

As the above case law makes clear, Defendants' claim that "the opinions [Dr. Stiegert] gives on the poultry industry are entirely beyond his qualifications" because he is "not a poultry scientist," Defs.' Br. 27, grossly misstates the requirements of Rule 702. The Eleventh Circuit explained in a case alleging fraudulent real estate investments, that a professional economist is entitled to estimate damages even though had no real estate development experience. *Maiz*, 253 F.3d at 665. Where an issue concerns "how economic markets work and how actors within those markets behave," economists are qualified to testify even if they did not work in industry. *Crowley v. Chait*, 322 F. Supp. 2d 530, 554 (D.N.J. 2004). This includes identifying necessary "background information on the [] industry" and the products at issue, which will provide

context for and inform their analysis. *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty., Tennessee v. Momenta Pharm., Inc.*, 333 F.R.D. 390, 401 (M.D. Tenn. 2019). As Defendants' own authority explains, it is expected that economists will turn to "relevant trade publications and comparable industry materials" to determine what data they will employ and then use that information to construct their models, which is where their expertise lies. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 995 (C.D. Cal. 2012).

Particularly with antitrust claims, experience with the "methods," rather than the product, is what is essential. *In re Mushroom Direct Purchaser Antitrust Litig.*, Master File NO. 06–0620, 2015 WL 5767415, at *4 (E.D. Pa. July 29, 2015) (citing The Sedona Conference, *The Sedona Conference Commentary on the Role of Economics in Antitrust Law*, 7 Sedona Conf. J. 69, 83 (2006)). Once that is established, it is understood that "analyzing market data based on their expertise is what economic experts do[.]" *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 02 C 5893, 2016 WL 374132, at *2 (N.D. Ill. Feb. 1, 2016).

Indeed, the sole case Defendants cite where an economics expert was determined unqualified to opine on economic-related issues rejected the expert because he was unfamiliar with the underlying approach. As that court explained, the question is whether the economists has performed this type of "analysis" before, not whether he has previously performed the analysis of this defendant before. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 694 (E.D. Mich. 2019). Even with non-economic experts, the Sixth Circuit explains that where an expert is relying on "principles [that] have some universality," Rule 702

allows the expert to "apply general principles to the case" despite the fact "he had never seen" the relevant item before. *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994).[1]

Defendants rightly do not contest Dr. Stiegert is an expert in economics, economic modeling, and, indeed, agricultural economics and modeling. As a result, Defendants also correctly do not dispute he is qualified to determine whether Tyson possess anticompetitive power in the Robards area and how it is using that power. Therefore, he is entitled to opine on what data regarding the chicken industry and chickens provides necessary background and is relevant and reliable for those models, even though he has not grown chickens himself.

**a. Dr. Stiegert's "But For" Approach Is The Norm.**

Defendants' claim that Dr. Stiegert's effort to determine how the market would operate "but for" Tyson's monopsony power, and the particular ways Dr. Stiegert models that represent "rejected method[ologies]," Defs.' Br. 10-13, misstate antitrust law, the case on which Defendants rely, and the flexibility required by *Daubert* to respond to the specifics of each case.

As the First Circuit explains, establishing the "but for" world is core to antitrust analysis.

> [A]s to the measure of antitrust damages: The plaintiff must show that the defendant's illegal conduct prevented the plaintiff from doing better than it actually did. The plaintiff must therefore project a hypothetical or 'but-for' condition that excludes only the effects of the defendant's illegal conduct. The difference between that projected condition and the plaintiff's actual condition (both stated in terms of some standard index, like profits or prices) is the claimed measure of damages.

---

[1] That the proposed experts were excluded in the other cases Defendants cite is irrelevant here. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 994 (economics expert excluded because he was not offering economic analysis, but lay musical opinion); *Weitlauf v. Parkway Sch. Dist.*, No. 4:07CV407SNL, 2008 WL 544716, at *2 (E.D. Mo. Feb. 26, 2008) (son who lacked "education and/or economics background" unqualified to testify as expert in mother's trial); *Davis v. ROCOR Int'l*, 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002) (economics expert not qualified to assess person's lost physical abilities).

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 24 n.3 (1st Cir. 1999). A court within this circuit has similarly stated the sole question for antitrust economic experts is whether the proposed methodology is helpful in determining the but-for cause of the prices in the relevant market. *Allan v. Realcomp II, Ltd.*, Case No. 10-cv-14046, 2013 WL 12333444, at *6 (E.D. Mich. Mar. 30, 2013); *see also In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La. 2016) ("Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation," (citing ABA Section of Antitrust Law, *Antitrust Law Developments* 783 (7th ed. 2012)). Thus, Defendants' attempt to present Dr. Stiegert's effort to construct the "but for" world as an idiosyncratic "theory," Defs.' Br. 13, is preposterous.

Defendants' related notion that *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), required Dr. Stiegert could only proceed by using one of "three accepted methods for determining damages," which they state he failed to employ, Defs.' Br. 11, misrepresents that case. *Conwood* states the expert there "employed three methods" to analyze damages and "[a]ll three are generally accepted methods for proving antitrust damages," not that they were required. *Conwood*, 290 F.3d at 793. In reaching this conclusion, *Conwood* relies on a Fifth Circuit case that holds "a plaintiff may prove damages by a different measure tailored to the facts of the case." *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 (5th Cir. 2000).

Defendants argument in the alternative that *In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 124 (E.D. Pa. 2015), impugns Dr. Stiegert's approach is likewise misleading. That court "credits" Dr. Stiegert's effort to demonstrate the extent of the

"identifiable impact" from "the alleged conspiracy" *i.e.*, to construct the "but for" world. *Id.* at 152-53; *see also id.* at 155-56, 161. Nonetheless, because the plaintiffs there were seeking to certify a nationwide class of indirect purchasers who alleged they suffered from collusion across the egg industry when: (i) not all egg sellers participated in the conspiracy; (ii) the class included "wide variation in the rate at which any overcharge was passed through"; and (iii) class members' contracts contained different pricing schemes, the court held "individualized issues [] are likely to predominate." *Id.* at 149-50, 153, 156, 159. Thus, the opinion simply does not speak to what is required to analyze the economic implications of a single company's power over its workers, who operate under standardized contacts of adhesion, in a single area, which is what is at issue here. *See also United States v. Valencia*, 600 F.3d 389, 428 (5th Cir. 2010) (There is no "mandatory feature in all applications of economics or statistics," rather how economics is best applied is determined by the surrounding facts and circumstances.).

Accordingly, Defendants' insistence Dr. Stiegert needed to account for parties "not involved in the conspiracy" in this case, as *In re Processed Egg Products Antitrust Litigation* stated was necessary to certify the class there, Defs.' Br. 13, is baseless. The specific "effects in [each] market[]" will determine whether one "needs [to] analyze changes in broader markets," and isolated claims of anticompetitive conduct like those at issue here are unlikely to require such analysis. Mark A. Allen et al., Fed. Judicial Ctr., *Reference Guide Estimation of Economic Damages*, in *Reference Manual on Scientific Evidence* 440 (3d ed. 2011). Moreover, where a court is considering an expert for trial, rather than at the class certification stage—where it needs to find limited factual issues in dispute—"purported failure to address and rule out other possible causes of the injury allegedly suffered" goes to "weight, and not the admissibility." *Cason-Merenda v. Detroit Med. Ctr.*, No. 06–15601, 2013 WL 1721651, at *13 (E.D. Mich. Apr. 22,

2013). In sum, Defendants' effort to discredit Dr. Stiegert asks the courts to override the expert judgment of a person skilled in economics through imposing non-existent requirements that ignore factual differences in the cases, precisely is not allowed

## IV. Dr. Stiegert's Opinion That Tyson Possesses Monopsony Power Is Based On Extensive Analysis And Numerous Facts Defendants Fail To Address.

Defendants claim Dr. Stiegert's "monopsony opinion," which establishes Defendants have anticompetitive buyer power and are likely to harm competition—thereby violating the Packers and Stockyards Act—"is based entirely on the Plaintiffs' allegations" regarding their inability to switch from working for Tyson to Perdue, Defs.' Br. 1, 6-10; that is make believe. Therefore, the Court need not address their attack on how he reached his opinion, as their argument relies entirely on the false statement the opinion derives solely from "reviewing biased, anecdotal testimony" of Plaintiffs. Defs.' Br. 6-7 (claiming Dr. Stiegert lacked a "scientific method" because he only reviewed testimony); *id.* at 9 (claiming Dr. Stiegert "does not have enough information" as he only reviewed testimony), *id.* at 10 (claiming Dr. Stiegert's analysis is unreliable because he only "informally reviewed a small fraction of the evidence" because he only reviewed the testimony of "12 growers," the plaintiffs). Yet, even if the Court were to entertain the argument, it is not a basis on which to exclude the opinion, particularly given the deference owed to economic analysis.

### a. Dr. Stiegert Analyzed Tyson's Conduct To Establish It Is A Monopsonist.

Contrary to Defendants' characterization, Dr. Stiegert's primary basis for concluding Tyson possesses monopsony power had nothing to do with Plaintiffs' testimony, but rather Tyson's conduct; including the practices Dr. Stiegert concluded damaged Plaintiffs, thereby linking Tyson's power and the harm to Plaintiffs, as Defendants state is necessary. Defs.' Br. 11.

Dr. Stiegert explained that economic theory establishes a monopsonist—a buyer "for a particular good or service, such as [the] chicken growing services" provided by Plaintiffs, which does not need to compete with other buyers because it is the "only effective buyer in the market"—will be able to "dictate the terms of trade and purchase according to its requirements." First Stiegert Report ¶ 63; *see also id.* ¶¶ 64-67. In other words, "the monopsonist is able to extract a portion of the revenue that the providers of goods or services [*e.g.*, Plaintiffs] would have made in a competitive market." *Id.* ¶ 111. "[redacted]. *Id.* ¶ 112.[2]

Specifically, Dr. Stiegert analyzed the outcomes of Tyson's "tournament payment" system, in which "[redacted]." *Id.* ¶¶ 12, 32. After examining years of data across all growers at the Robards complex, Dr. Stiegert demonstrates that because "[redacted]" a subset of growers to include in each tournament, "[redacted]," depending on who Tyson decides they should be ranked against. *Id.* ¶¶ 42-44 & Fig. 1, & Tables 2-3. To wit, the collection of points running parallel along the X-axis below demonstrates how equivalent Net Pound Values can result in either a reward or demerit, depending entirely on the tournament Tyson creates. Dr. Stiegert explained this is inconsistent with the economic principles of a "competitive marketplace," as it places risks on the growers

[2] Portions of this brief that quote Dr. Stiegert's reports are being redacted and filed preliminarily under seal pursuant to Defendants request and claims that it contains confidential information that must be shielded from the public. Plaintiffs disagree with this characterization and will respond to Defendants' motion to seal that information with supporting law.

they cannot offset by “adjust[ing] their practices.” *Id.* Because they do not know what conduct will lead to a penalty or reward, as they do not know who they will be competing against, they cannot determine how to operate most efficiently. *Id.*

[redacted]

Dr. Stiegert demonstrates in a separate table that the only beneficiary of this system is Tyson, who is able to hold its payouts constant across tournaments no matter the growers’ performance, while creating the appearance of effort-based rewards that are actually the product of Tyson’s decision making. *Id.* ¶¶ 39-40 & Table 1.

Dr. Stiegert continues that he views Tyson’s transfer of risk to growers as particularly anticompetitive because, his analysis of the Robards complex-wide data reveals “[redacted]” Net Pound Value can be the difference “[redacted]” resulting in 20 to 35 percent differences in pay for growers who cannot control their outcome. *Id.* ¶ 45 & Table 4. This transfer of risk is all the more severe because, as Dr. Stiegert

documents, Tyson's grower pay has not moved up with Tyson's profits, a fact that economic theory establishes is itself evidence of Tyson's monopsony power, as growers are not reaping the reward of their labor. *Id.* ¶ 91 & Table 6.

Further revealing Tyson's monopsony power, Dr. Stiegert established that Tyson shifts onto the growers "nearly all the economic and financial risks related to feed and chick quality," quantity, and timing (the last of which corresponds to "days out"). *Id.* ¶ 61. In a truly competitive environment, economic theory provides, Tyson would allow "growers [to] choose their input suppliers" and then a fair ranking system "would help them select … more optimal combinations." *Id.* Likewise, growers would control the number of flocks they raised, so they could determine the correct input purchases to production ratios. *Id.* ¶ 105. However, here, Tyson selects growers' inputs, chick placement, and pick-up. *Id.* ¶¶ 47-54.

Dr. Stiegert demonstrated that, in addition to regulating how many flocks growers can produce and be paid for, the literature establishes Tyson's selection of the individual inputs and their timing has drastic consequences for growers' outputs. *Id.* ¶ 55 (literature provides that "[s]ex variability" in the makeup of flocks can result in 17.1% greater weight and 32.8% greater mortality, depending on pick-up time selected by Tyson), ¶¶ 56-57 & Figs. 2-3 (demonstrating differences in weight by different types of breed Tyson can provide growers). Because Net Pound Value is a calculation based on inputs and outcome, Tyson's decisions impact growers' rankings and income, as Dr. Stiegert established is empirically the case at the Robards complex. *Id.* ¶ 58 & Fig. 4. In this manner, Dr. Stiegert concluded, Tyson "pass[es] the risk of quality variation onto the growers"—it determines growers' inputs, but then charges them for any harms—which "is consistent with monopsony power." *Id.* ¶ 62.

"[redacted]," *i.e.*, how diseased chickens are addressed. *Id.* ¶ 98. The literature establishes "the grower did not cause" every disease that arises. *Id.* Nonetheless, under Tyson's system, although Tyson hatches the chicks and selects which chicks go to which grower, "[redacted]" *Id.* Tyson operates in this manner even though it is able to turn a profit off the fully condemned birds, using them to produce dog food. *Id.* ¶ 103.

Lastly (in relation to examining Tyson's conduct), Dr. Stiegert explained USDA economists recognize poultry companies demand growers invest in their houses to satisfy company-specific requirements, which, they demonstrate, is indicative of "monopsony power." *Id.* ¶ 81. The houses have little use outside of growing chickens, thus if the companies demand unique investments, the only way growers can recoup their investments is to maintain their relationship with the company, providing the company monopsony power. *Id.* ¶ 81; Stiegert Second Report ¶ 67. Dr. Stiegert demonstrated this is what has happened to Plaintiffs, Stiegert First Report ¶ 83 & Table 5, yet further establishing Tyson's monopsony power in this case.

**b. Dr. Stiegert Did Not Rely On Plaintiffs For His Analysis Of The Market.**

While the above is sufficient to reject Defendants' assertion that Dr. Stiegert's "monopsony opinion" is inadmissible because it relied exclusively on Plaintiffs' testimony, Defendants are also incorrect that to the extent Dr. Stiegert's "monopsony opinion" was

informed by the conditions in the Robards area, including competition from Perdue, he relied exclusively on Plaintiffs' testimony. Instead, Dr. Stiegert began his analysis by explaining USDA states poultry companies will only contract with "growers who are within approximately 35-to-50 mile[s]" from the slaughterhouse given the costs of transportation and the like. *Id.* ¶¶ 28, 70; *see also* Stiegert Second Report ¶ 17 (detailing additional support in the literature). Tyson's own website confirmed the same. Stiegert First Report ¶ 71. Dr. Stiegert also performed the "SSNIP test" recommended by the Department of Justice's Horizontal Merger Guidelines to determine the relevant geographic market for Plaintiffs' growing services. Stiegert Second Report ¶¶ 17-18. That resulted in a similar picture. *Id.*

Given this, despite Defendants' treatment of all Plaintiffs as the same, Dr. Stiegert detailed there are actually *two* distinct geographic markets in this case. For two Plaintiffs, Tyson is the *only* company within the relevant radius. There is no potential for competition for their labor. Tyson is by definition a monopsony. Stiegert First Report ¶ 73. For the remaining Plaintiffs, there is a single potential competitor, a Perdue complex. *Id.* ¶ 72. The next closest poultry operation is 119 miles away. *Id.* Thus, at best, these Plaintiffs are experiencing a duopsony, which the literature establishes still provides the companies anticompetitive buyer power. Stiegert Second Report ¶ 35.

For those Plaintiffs within the radius of the Perdue facility, Dr. Stiegert hardly relied on testimony regarding switching between the two companies to conclude Tyson has monopsony power because Tyson and Perdue are not meaningfully competing for growing services. He explained, "The Department of Justice is currently investigating allegations against Tyson and the other major integrators" that they are colluding to manipulate the chicken market, undermining the notion that they would be competing for growers. *Id.* ¶ 80. Even were that not

the case, the record establishes a variety of structural barriers Dr. Stiegert concluded prevent actual competition between Tyson and Perdue, namely: (i) there is evidence, independent of Plaintiffs' testimony, that for the past three years Perdue has not accepted a single Tyson grower, Stiegert First Report ¶ 73; (ii) independent evidence also establishes Perdue is altering its method of chicken production, to only produce organic birds, which require different houses than Plaintiffs have invested in and thus there is only one company Plaintiffs can work for absent substantial additional investment, *id.* ¶ 75; Second Stiegert Report ¶ 30; and (iii) [redacted], Stiegert First Report ¶ 74. Dr. Stiegert explained, and no party has disputed, "It is possible for a firm to have monopsony power even if it is not the only buyer for a product located in a geographic area," depending on the competition (or lack thereof) between the firms. *Id.* ¶ 65. It is precisely that absence of competition between Tyson and Perdue that Dr. Stiegert documented in a variety of ways. Stiegert Second Report ¶ 31 ("I do not conclude that there is no competition whatsoever between Tyson and Perdue at the Robards facility, but rather that the amount of competition is insufficient to discipline Tyson[].")

In sum, while Defendants insist "Dr. Stiegert's 'method' is reviewing [Plaintiffs] testimony and extrapolating from there," Defs.' Br. 6, that is far from the case. In fact, although Dr. Stiegert was entitled to rely on his experience with markets to formulate his analysis as he saw fit, just as Defendants claim was required, he put forward a variety of analysis that can be "tested" and examined for "error," in doing so he drew on well-accepted economic theory and rules, including "peer reviewed" literature. Defs.' Br. 8. That Defendants are not willing to

engage with his actual analysis demonstrates where the Court should see the "red flags" Defendants claim exists. *Id.*

**c. Defendants' Efforts To Impeach Dr. Stiegert Is Not A Basis To Exclude.**

Putting aside the extensive analysis Defendants fail to present, their attack on Dr. Stiegert's "monopsony opinion" is also part and parcel of their improper effort to rewrite the *Daubert* standard to supplant the role of the jury. Defendants claim Dr. Stiegert's analysis of Plaintiffs' testimony regarding their movement between Tyson and Perdue is unreliable because they assert that testimony shows switching occurred, which they claim establishes competition. Defs.' Br. 9. Dr. Stiegert explained he did not depend on counting up the number of switches, but focusing on the direction. Based on his experience as an economist, that "switching largely flowed one-way from Perdue towards Tyson," indicated Perdue was not "a relevant competitor" for Tyson growers. Stiegert First Depo. 262:21-263:7. He credited this testimony in part because it was confirmed by a Perdue grower. Stiegert First Report ¶ 73. Moreover, he detailed that because Tyson demanded Plaintiffs invest in Tyson "specific assets"—company specific features of their houses—Plaintiffs would be financially encumbered from moving. *Id.* at 268:17-22. This is particularly the case given the size of Charles Morris' operation, *id.* at 269:5-11, and that Perdue had decided to produce organic birds, which require additional investments to switch, First Stiegert Report ¶ 75.

Continuing to leave to the side that this is far from a complete picture of Dr. Stiegert's "monopsony opinion," such differing interpretations of the record are precisely what should be resolved at trial. Rule 702 does not "authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, Advisory Committee Notes (2000). The Sixth Circuit has similarly explained, "It is not proper

for the Court to exclude expert testimony 'merely because the factual bases for an expert's opinion are weak.'" *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 729 (6th Cir. 2012). *Daubert* motions are not an alternative to the presentation of evidence or cross-examination. Particularly, where factual disputes go to "central question of liability in the case," an expert can opine based on "assumptions" deriving one view of the record and the dispute over whether the expert's view of the facts is correct is "properly presented to the jury." *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed. App'x. 479, 486-87 (6th Cir. 2002) (unpublished).

Defendants' related demand that Dr. Stiegert do more analysis of the evidences and facts on which he relies before his opinion is put before the jury, Defs.' Br. 6-9, derives from the rules for "hard sciences," not economic analysis. *Rodrigues v. Baxter Healthcare Corp.*, 567 Fed. App'x. 359, 361 (6th Cir. 2014) (products liability case concerning biological effects of medication); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 528 (6th Cir. 2012) (concerning whether a "latching or spring-loaded rear door is … feasible").

Defendants' own authority adds to the plethora of case law cited above that Dr. Stiegert is entitled to rely on his judgment to determine what data is relevant and sufficient, and how it should be analyzed. For antitrust opinions, the central *Daubert* inquiry is whether experts "bring [their] expertise to bear on the relevant factual issue." *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1142 (N.D. Ala. 2010) (Defendants' authority). The Court may provide a limiting instruction if the facts underlying the opinions are not established at trial and thus the analysis lacks foundation. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (Defendants' authority). But, determining which fact are relevant and sufficient and how to examine them is as much a product of "judgment and art" as science, and only the experience of an economist provides the

background to make those judgments. *Falise*, 258 F. Supp.2d at 67; *see also In the Matter of M&M Wireline & Offshore Servs., LLC*, 2017 WL 430063, at *6; *Fort Worth Employees' Ret. Fund*, 301 F.R.D. at 129; *In re Air Cargo Shipping Services Antitrust Litigation*¸ 2014 WL 7882100, at *8; *Barbe v. Gov't Employees Ins. Co.*, 2014 WL 12601572, at *2; *Voilas*, 73 F. Supp. 2d at 462. Dr. Stiegert, an agricultural economics expert, has explained and grounded his methodological decisions, which is all that is required. *Trollinger v. Tyson Foods, Inc.*, 2008 WL 305032, at *10; *see also Manpower*, 732 F.3d at 809.[3]

## V. Dr. Stiegert's Damages Calculations Are Well Grounded, Defendants' Disputes Of Fact Are Issues For Trial.

Defendants' efforts to discredit Dr. Stiegert's damages calculations follow the same pattern: misstate the report and then augment those misrepresentations with arguments that are untrue and should be left for trial.

### a. Tyson's Reduction of Plaintiffs' Base Pay By 7%.

Dr. Stiegert explained economic theory provides "monopsony power involves the ability of buyers to lower input prices below competitive levels." First Stiegert Report ¶66 (cleaned up). Consistent with this, having concluded that Tyson is a monopsonist and is actively exercising that power, Dr. Stiegert concluded Tyson has reduced the "base pay" it offers chicken growers for their services, off of which the debits and rewards from the tournaments are calculated.

Because Tyson cannot refute this established effect of its monopsony power, it claims Dr. Stiegert did not "independent[ly] review" the literature that provides a measure of that harm.

---

[3] Defendants only other cases are inapplicable. The first concerns an instance where an expert failed to provide the necessary report and thus did not explain how a 1996 land survey led to his conclusion about damages suffered by the property in 2004, *Ward v. Chesapeake Appalachia*, L.L.C., Civil Action No. 07–244–EBA, 2009 WL 2913447, at *1-3 (E.D. Ky. Sept. 8, 2009). The second involves an expert that offered calculations that were not allowable under the law and also could not "explain[]" his choices. *Rondigo, L.L.C. v. Casco Twp.*, 537 F. Supp. 2d 891, 898 (E.D. Mich. 2008).

Defs.' Br. 14. This is false. Dr. Stiegert explained that he relied on a published peer-reviewed study by MacDonald and Key, *Market Power in Poultry Production Contracting? Evidence from a Farm Survey*, to determine how much lower Tyson set Plaintiffs' base pay. He did so because, drawing from his expertise in agricultural economics and econometrics, his review of the article established the authors "buil[t] a complete regression model" that controlled for "variables," particularly "varying market contract conditions," so they could isolate the impact of anticompetitive power like Tyson's on base pay for chicken growers. Stiegert Second Report ¶¶ 71-72.

Defendants' next claim, that Dr. Stiegert did not have good reason to rely on this peer-reviewed research because it is only reliable if it examined Tyson's Robards complex during the damages period, is both false and legally irrelevant. Defs.' Br. 14-15. As Dr. Stiegert explained, in his view it is precisely because the article was based on "many observations" that it is able to strip out the "many factors that impact grower pay" and determine the extent to which monopsony power alone lowers pay. Second Stiegert Report ¶ 71. That percentage reduction represents the "profit maximizing strategy" that economic principles states would be employed by an entity with monopsony power, like Dr. Stiegert concluded Tyson possesses. First Stiegert Report ¶ 66. Further still, Dr. Stiegert confirmed that he could not locate any "structural adjustment[s]" regarding Tyson's Robards complex during the damages period that would undermine the applicability of MacDonald and Key's analysis. Stiegert First Depo. 283:16-21.

Moreover, Defendants' argument that MacDonald and Key is inapplicable because the Robards complex is distinct is not a basis for the *Daubert* motion. *See, e.g., Andler*, 670 F.3d at 729. "The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *Conwood*

*Co.*, 290 F.3d at 794-95 (Defendants' authority). As Defendants' own (incorrect) insistence on the "yardstick" approach establishes, experts can and often do rely on proxies, they are not limited to opining based on studies from the exact year and county at issue. *See also In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 281 (6th Cir. 2014) (antitrust analysis can rely on "estimates," including those are not "based on the particular parties' behaviors"). It is for the trier of fact to determine the weight to give Dr. Stiegert's analysis in light of Defendants' efforts to discredit it. *See, e.g.*, *McLean,* 224 F.3d at 801; *Lang,* 717 Fed. App'x. at 534; *Avery Dennison Corp.*, 45 Fed. App'x. at 486-87.

Likewise, Defendants' claim that Dr. Stiegert should be excluded because, based on their interpretation of MacDonald and Key, the presence of Perdue reduced Plaintiffs' wages by 4%, rather than 7%, is not the sort of dispute for a *Daubert* motion. Defs.' Br. 16-17. Indeed, this argument largely credits Dr. Stiegert's analysis, that Tyson possesses anticompetitive buyer power, and merely disagrees that Tyson is effectively a monopsonist, presenting a different interpretation of the record and article to claim it is a duopsonist. The Sixth Circuit recently explained, "Multiple courts of appeal have held that market definition is a question of fact. Accordingly, that question is better left for a jury to decide." *In re Southeastern Milk Antitrust Litig.*, 739 F.3d at 282-83.[4]

---

[4] Defendants also claim Dr. Stiegert overlooked instances in which MacDonald and Key stated growers' pay might increase. Defs.' Br. 15, 17. Not so. To claim Dr. Stiegert was required to consider offsets, Defendants point to a statement MacDonald and Key make about a different component of their analysis, *not* the impact of monopsony power, where MacDonald and Key controlled for these variables. Defs.' Ex. 16, Dkt. 177-13, at 13. Dr. Stiegert explained as much to Defendants during his deposition. Stiegert First Depo. 216:6-25, 219:1-5, 219:15-29. That Defendants rely on their lawyers' selective presentation of facts to second guess an economics expert on how to read economics literature is precisely why this motion should be denied. *See also In re Southeastern Milk Antitrust Litig.*, 739 F.3d at 281 ("Including some facts while omitting others goes to the accuracy of the conclusions, not to the reliability of the testimony.").

Dr. Stiegert closely reviewed the article on which he relied to determine how Tyson's anticompetitive power would impact growers' base pay. Defendants' arguments that having performed the analysis they claimed was necessary, Dr. Stiegert was still incorrect to rely on this published peer-reviewed article because they disagree with his conclusions is an issue for trial.

**b. Gross Margin Damages.**

Another established characteristic of monopsony power is that it allows Tyson to capture what it would otherwise have to share with its workers, like Plaintiffs. As Dr. Stiegert explained, [redacted]." First Stiegert Report ¶ 114. In a competitive market, if demand increases, all players along that supply chain will be able to require increased prices, and the downstream purchasers will be willing to pay it because they too are reaping the benefits of increased demand. "[redacted]" *Id.* Therefore, according to Dr. Stiegert, to construct the "but for" world and determine Plaintiffs' wages in a competitive market, one needs to determine how much "[redacted]," *i.e.*, how much of the increased upside Plaintiffs should have captured from Tyson. *Id.* ¶ 115.

Defendants' assertion that this approach lacks "scholarly sources" is inconsistent with their own presentation of the facts. Defs.' Br. 17. Defendants pejoratively refer to Dr. Stiegert's

"graduate student paper" as the only support for this analysis, but as Defendants are well aware, because they asked about this at his deposition, that is a peer-reviewed academic journal article, exactly what Defendants insist upon. Stiegert First Depo. 315:24-316:23. Dr. Stiegert's market share approach has also been described as an extension of the "before or after" approach endorsed by Defendants. Roman Weil et. al. *Litigation Services Handbook* (4th ed. 2007).

Regardless, as another judge in this district has held, because Dr. Stiegert is an expert in economic principles and detailed why he believes they lead to gross-margin damages in this case, he is entitled to offer such an opinion even if it lacks a footnote. *Crouch v. John Jewell Aircraft, Inc.*, Civil Action No. 3:07-CV-638-DJH, 2016 WL 157464, at *22 (W.D. Ky. Jan. 12, 2016) ("This lack of citation does not change the fact that his opinions are grounded in real data and that he has disclosed his reasons for choosing that data."). Moreover, Dr. Stiegert's report explained he tested the outcomes of his approach in this case against the findings of another peer-reviewed article about the chicken industry, which examines growers' relative contributions of "value" to the chicken market. In so doing, he was able to confirm that the pay he concluded was warranted using his approach was consistent with this scholarly analysis. Stiegert First Report ¶ 122 (citing C. Robert Taylor and David A. Domina (2010) "Restoring Economic Health to Contract Poultry Production" p. 4).

Defendants' further cross-examination of Dr. Stiegert's calculations are both factually false and improper for this *Daubert* motion. For instance, they state Dr. Stiegert used Tyson's worldwide profits to determine how much Plaintiffs' wages should have risen, Defs.' Br. 17, but, in actuality, Dr. Stiegert drew his initial figures from the "Agristats Database," which exclusively contains U.S. data. First Stiegert Report Table 11 & n.157. Defendants also claim that Dr. Stiegert "presents a drastically biased picture" by using this benchmark figure, which comes

from 2010, for all damages year. Defs.' Br. 20. Yet, as Dr. Stiegert detailed, he began with 2010 "for the simple reason that it is the start of the relevant time period for this litigation" and then he examined each subsequent year, "report[ing] negative value[s]," *i.e.* drops in Tyson revenue, and "offset[ing] [that] against the positive damage values in other years." Stiegert Second Report ¶ 114.[5] While Dr. Stiegert's economics background and judgment led him to conclude it is appropriate to use the same *proportion* of Tyson's margin year-over-year, he adjusted the damages figures based on Tyson's actual margins. It is only in this process that Dr. Stiegert looked at Tyson's international earnings. Because Tyson only produced AgriStats data through June 2016, Dr. Stiegert was "unable to calculate Tyson's gross margin for 2017 and 2018." First Stiegert Report Table 11 & n.157. Therefore, solely for damage years 2017 and 2018, Dr. Stiegert "uses the average of the ratio of Tyson's chicken segment percentage operating margin obtained from Tyson's annual reports" to calculate Plaintiffs' actual damages. *Id.*

Moreover—in addition to the fact that Dr. Stiegert subjected his particular technique of benchmarking to peer-review, and adjusted Plaintiffs' damages based on Tyson's actual margins—benchmarking is a well-accepted way to determine antitrust harms. *See, e.g.*, Stiegert First Depo. 197:2-198:15. The case law provides, "Criticisms … of potential benchmark years go to the weight of [expert] opinions and not their admissibility." *In re Urethane Antitrust Litig.*, MDL No. 1616, No. 04–1616–JWL, 2012 WL 6681783, at *6 (D. Kan. Dec. 21, 2012), *aff'd* 768 F.3d 1245 (10th Cir. 2014); *Universal Surveillance Corp. v. Checkpoint Systems, Inc.*, Case No. 5:11–CV–1755, 2015 WL 6082122, at *26 (N.D. Oh. Sep. 30, 2015) ("An expert's benchmarks and assumptions [] need not be perfect as long as they will give a reasonable estimate of damages."). If Defendants wish to argue for different benchmarks they are entitled to so, Defs.'

[5] As Defendants note, Dr. Stiegert also explained other benchmarks would have led to higher damages, making the 2010 benchmark a conservative estimation of damages. Defs.' Br. 21 n.16.

Br. 18, 21, but this is not a basis on which to exclude Dr. Stiegert's analysis, which the courts recognize will necessarily rely on proxies, *Conwood*, 290 F.3d at 794-95; *see also Manpower*, 732 F.3d at 807-08.

Finally, Defendants' effort to turn a "gotcha" moment at Dr. Stiegert's deposition into a fatal flaw, Defs.' Br. 18-20, is baseless. As even Defendants concede, once given the opportunity to examine his work, Dr. Stiegert was able to identify his report contains a single typographical error related to these complex calculations, the "but for grower pay" listed in Table 12 should say it is a calculation of [e]x[c] not [e]x[d]. *Id.* Defendants claim in a footnote that this correction does not rectify the problem demonstrates a lack of candor with the Court. *Id.* at 20 n.13. As Defendants are aware, they were provided an Excel file containing the formulas and data that are more precise than one can determine from the tables. Therefore, their suggestion that it is problematic they could not "reproduce Dr. Stiegert's figures in Table 12," *id.* only reflects, their continued failure to acknowledge the full analysis Dr. Stiegert produced.

In other words, contrary to Defendants' insistence, Dr. Stiegert built on published peer-reviewed work to come up with his approach to these damages, in addition to drawing on his experience and judgment as an economist. When Dr. Stiegert is allowed to testify it will become clear their factual criticisms are nothing more than a smokescreen, which is precisely why Defendants arguments are not a basis to exclude under *Daubert*.

**c. Condemnation Damages.**

As explained above, Dr. Stiegert's analysis of Tyson's conduct also led him to conclude its monopsony power allowed it to reduce Plaintiffs' Net Pound Value—the figure on which they were ranked and compensated—for each fully "condemned" bird, even though Tyson controlled

the birds Plaintiffs received and is able to extract value from the "condemned" meat. *See, e.g.*, First Stiegert Report ¶¶ 34, 98-99, 103.

Here, ironically, Defendants complain that Dr. Stiegert *did* rely on a peer-reviewed article to determine how much meat on average was likely salvaged, Defs.' Br. 22, and then used this to: (i) calculate what Plaintiffs' proper payments would have been under the tournaments had Plaintiffs not been overcharged for this meat—that is, how Plaintiffs would have ranked and been paid out had Tyson not deducted from Plaintiffs' pounds produced the average weight of Plaintiffs' flock for each condemned bird because, in actuality, "[redacted]," First Stiegert Report ¶¶ 124-25 & Tables 13-14; and (ii) how much Plaintiffs would have been owed for the "condemned" meat that Tyson actually put to profitable use by sending it to its dog food factory. *Id.* ¶ 126 & Table 15.

As discussed in Sections II and III, Defendants' notion that because "Dr. Stiegert is not a poultry scientist" he could not determine what are reliable inputs for these economic calculations is wrong. Defs.' Br. 23. An economist's "lack of experience with the automobile industry or vehicle purchasing behavior" does not prevent him from testifying in such a case, because his "extensive experience" in identifying relevant data and then "apply[ing] methods of examination" to determine the economic effect renders his opinion admissible. *In re FCA US LLC Monostable Electronic Gearshift Litigation*, 382 F. Supp. 3d. at 697-98 (Defendants' authority); *see also Bennington Foods, L.L.C. v. St. Croix Renaissance Grp., L.L.L.P.*, Civil Action No. 06-154, 2009 WL 4718099, at *5 (D.V.I. Dec. 9, 2009) (economist can "appl[y] his

economic expertise to calculate lost profits based on the information that he collects," the argument he "should have researched further" goes to "weight not admissibility").[6]

That Dr. Stiegert is providing a model for how condemnation impacts Plaintiffs is yet another reason this opinion should be admitted. "[T]he proper inquiry is whether the techniques utilized by the experts are reliable," not whether "similar facts" would result in different conclusions. *City of Tuscaloosa*, 158 F.3d at 566 n. 25. Particularly with damages calculations, where it is "straightforward to plug an alternative number into his model to generate an alternative damages calculation," the model, should be admitted. *In re Mushroom Direct Purchaser Antitrust Litigation*, 2015 WL 5767415, at *16; *see also McLean.*, 224 F.3d at 801 (dispute over "factual basis" of opinion not reason for exclusion). That Tyson believes growers should be compensated for less meat or are owed a lower "price for condemned chickens" are issues they can raise at trial. Defs.' Br. 24. Given the complex way in which growers' pay is calculated, Dr. Stiegert's undisputed method for determining how condemnation would result in damages is helpful for the jury and should be admitted.

**d. Days-Out Damages.**

Lastly, Dr. Stiegert determined that Tyson used its monopsony power to reduce the total number of flocks Plaintiffs received. *See, e.g.*, First Stiegert Report ¶ 105. Defendants' argument that he cannot opine on the damages this caused is a repeat of their contention that because they dispute the inputs for his model (not the model itself), the jury should be provided no way to

---

[6] While Defendants insist that Dr. Stiegert worked backward from a "preconceived opinion," Defs.' Br. 24, in actuality he first proved that the condemnation system resulted from monopsony power, and then used the exact techniques of his field to model that effect. Indeed, Dr. Stiegert explained the study on which he is relying was the "best estimate I have seen" that could be employed in economic analysis, and Defendants have offered no rebuttal of that fact. Stiegert Second Report ¶ 116. Dr. Stiegert's expertise allows him to determine the study is reliable for economic analysis. *See*, *e.g.*, *Maiz*, 253 F.3d at 665; *In the Matter of M&M Wireline & Offshore Servs.* 2017 WL 430063, at *6; *Lawrence E. Jaffe Pension Plan* 2016 WL 374132, at *2.

assess the damages. Defs.' Br. 24-26. Yet, enabling the jury to plug and chug figures once the facts are resolved is the definition of admissible testimony. *In re Mushroom Direct Purchaser Antitrust Litigation*, 2015 WL 5767415, at *16. Indeed, the Seventh Circuit, reversing the exclusion of an expert, explained, "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology." *Manpower, Inc.*, 732 F.3d at 807-09. In fact, *Manpower* explains an expert can rely on "information supplied by counsel," just like Dr. Stiegert's "days-out" calculations did here, which is evidence that the data should *not* be "the object of the *Daubert* inquiry," it was merely being used to present a "framework" that could be employed at trial. *Id.* at 808; *see also Crouch*, 2016 WL 157464, at *21-22 (*Manpower* "highly persuasive" authority).

This process is particularly sensible here, as Defendants acknowledge the correct number of "days out" will involve credibility determinations, with the contract stating one figure, but Plaintiffs contending they were actually promised another. Defs.' Br. 26. Thus, whether and how much Plaintiffs' "days out" were extended is an issue for the jury. Dr. Stiegert's model properly allows them to calculate damages once that is resolved.

## VI. Conclusion.

For the foregoing reasons, Defendants' motion should be denied.

RESPECTFULLY SUBMITTED this 17th day of April 2020.

/s/ John C. Whitfield
John C. Whitfield
Caroline Ramsey Taylor
**WHITFIELD BRYSON LLP**
19 North Main Street
Madisonville, Kentucky 42431
Telephone: (270) 821-0656

Fax: (270) 825-1163
john@whitfieldbrysonllp.com
caroline@whitfieldbrysonllp.com

J. Dudley Butler (MS Bar #7626)
**BUTLER FARM & RANCH LAW GROUP, PLLC**
499-A Breakwater Dr.
Benton, MS 39039
Telephone: (662) 673-0091
Fax: (662) 673-0091
jdb@farmandranchlaw.com

David S. Muraskin
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, D.C. 20036
Telephone: (202) 797-8600
Fax: (202) 232-7203
dmuraskin@publicjustice.net

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

On this the 17th day of April 2020, I hereby certify that a copy of the foregoing has been sent via the District Court electronic filing system and by email to:

Marc Wells
209 West Main Street
P.O. Box 644
Princeton, Kentucky 42445

Robert T. Adams
Mark C. Tatum
Shook, Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, Missouri 64108

***Attorneys for Defendants***

/s/ John C. Whitfield
John C. Whitfield
WHITFIELD BRYSON & MASON, LLP
19 N. Main Street
Madisonville, KY 42431
(270) 821-0656
john@wbmllp.com

***Attorney for Plaintiffs***