**here is the first engagement you've ever had dealing with the broiler industry, correct?**

A Like a paid engagement, is --

**Q Right.**

A Yes, yes.

**Q And -- and you -- you emphasized paid, because you're trying to be clear that when you had the egg case, you did do some research in relation to the broiler industry, correct?**

A Yes.

**Q Okay. But other than that, you've not done anything in the broiler industry?**

A Not directly. I mean, in -- in agriculture economics, like -- so, for example, you're working in the -- you're working on the beef industry, you might very well pull up an article on poultry that is somewhat related to what you're working on, so you'd read that paper.

**Q But can you identify for me an instance when you actually did that? I understand you may have, but --**

A I can't tell you the year, but I know there's a -- a classic paper written by Jean-Paul Chavas, who's an -- who's a -- a member of my faculty here at UW, who wrote a paper on rational expectations in

poultry growing and did a nice job and read a -- I read that paper. I -- I remember that because I know Jean-Paul so well --

**Q Okay.**

A -- so -- but there were other instances. I couldn't remember the author names or the journal articles in particular, but yes, it's just part of -- it's just part of gaining a -- a general knowledge of -- of the entire meat sector, so yeah, you -- it's something I would be picking up knowledge on over the years.

**Q Okay. How much of your time -- or how many engagements do you have right now through Stiegert Agro-Food Economics LLC?**

A Well, I'm involved in a -- I'm involved in a litigation case of North America cranberry industry that's ongoing right now, and I -- I've had this on and off relationship with a -- with a -- a consulting firm here in Madison involving utilities, and I provide -- I provide support to them on econometrics. They go through a rate regulation adjustment -- you -- in regulated utilities, they have to -- they have to justify rate increases to their board, and so they -- they do statistical analysis of -- of data in the

systematically analyze that, so you rely on the deposition testimony is what I did.

MR. TATUM: I understand.

BY MR. TATUM:

**Q But the bottom line is, what I'm asking you is, you didn't form any opinions, and there's none in your report here, we just went through them, that led to some underpayment to plaintiff in some category beyond the three we just went to?**

A Right.

**Q You're not claiming --**

A Oh, no.

**Q -- and you didn't do any analysis that says they counted your chickens wrong?**

A Well, I -- I object to not doing any analysis. I don't think there's the data to support --

**Q Data provided to you?**

A -- a -- a systematic analysis of it.

**Q When you say data to support, you mean data provided to you, correct?**

A Yeah.

**Q Right. Now, did you do -- you've never studied breed differences among birds, correct?**

A In -- in my experience with the eggs litigation case, I really did get into that.

A It's not the same here.
**Q It's 30.6 percent. You can't identify for me another industry you're aware of where --**
A Oh.
**Q -- that is constant --**
A Well --
**Q -- whether the buyer's market -- or income goes up or down?**
A This is an approach that I've -- I've used in -- in two of my other studies, a benchmarking approach. It doesn't -- it -- it doesn't suggest, nor should it suggest, that that is a constant throughout the entire time period of an -- of -- of any economic condition, but rather it's a statement that after adjusting for 7 percent, we looked at say well, let's -- let's look at this and say 30.6 percent of the -- of the gross margin, gross of grower pay, is going back to the growers, and could have included 2011, but if we'd have taken that, the damages would have been even higher, could have taken the average of '10, '11 and '12, but the damages would have been even higher, so we just settled on a conservative approach and said let's just take 2010, it's the first year of the -- of the -- of the market and said that's what we came up with,

and it's a -- it's a practice used in -- in the scientific literature of applied economics, and so I adopted it.

Q **Understood.**

A I've used it in two different studies.

Q **Understood. But the answer to my question is no, right; you can't tell me an industry where that number has been constant between a buyer and a seller every year, regardless of how they've performed economically?**

A This is my way of trying to -- to assess what would have happened in a market that has been totally manufactured and controlled by integrators that are creating contracts in their board rooms and passing them downstream to the growers.

Q **But your claim here is that Robards, by not having competition next door to it, is exercising that practice, right; that's the foundation of your claim? That's what we talked about earlier and that's what your report says, correct?**

A I -- I'm not following you. You'll have to re-ask that question. May I have the question back?

Q **Your claim here is that Robards is acting as a monopsonist in its area because it doesn't have competition next door, correct?**

**Q But your 7 percent did not factor any offset, for lack of a better term, over the fact that this complex deals with long-term contracts?**
A It -- it wouldn't.
**Q MacDonald and Key says it would?**
A No, it doesn't change the impact of the number of integrators.
**Q I didn't say it changed the impact of the number of integrators, but I said they said it affects the pay differential, and you didn't factor that into your 7 percent pay differential, correct?**
A There would be no reason to.
**Q Why not?**
A Because I was only measuring the impact -- I'm only looking at the impact of imperfect competition. Long-term contract is just a contract specification that -- for -- for both parties may yield some benefits and this is how it's settled, and so --
**Q But according to his analysis, an integrator with a long-term contract needs to be assumed to receive more per pound than his -- than his baseline, correct, and you didn't factor that in?**
A I did. It's controlled for in the study. It's after controlling for that, you still get the -- the -- the impact of the number of integrators.

A I -- I don't need to do that. That's being controlled here. After controlling for those factors, then you look at the impact of imperfect competition on the number of integrators. That's where you arrive at the 7 percent.

**Q Did you make any analysis to determine if Tyson's use of tunnel ventilation is any different from any other upgrade -- integrator?**

A I don't know the specifics of that, whether that would -- it would be different tunnel visions across integrators, different specs.

**Q Did you make any adjustments in your analysis for the fact that Tyson has fuel reimbursement payments?**

A Here again, I -- it's in the -- it's in the MacDonald study as being managed, so yes, I managed it.

**Q You might --**

A My 7 percent manages that impact.

**Q And it manages it by saying it's irrelevant, you're still underpaying by 7 percent?**

A Yeah, it's controlling for those benefits that growers receive.

**Q Did you make -- did you do any analysis to compare whether or not Robards is actually paying less --**

and --
Q Are you aware of any costs incurred to them to switch or switch back?
A I -- I didn't do an accounting of their costs, but there -- there was evidence that they would have to upgrade and change their facilities in order to qualify for a transfer, and they couldn't be too large, like in the case of Morris, and perhaps other -- perhaps other issues that might be going on. You know, for example -- I -- yeah, I'll stop there.
Q You didn't do any analysis of that is the bottom line?
A I looked at the marketplace for switching.
Q What is -- what else forms the basis of your claim that Robards is a monopsony, besides there's little switching between Perdue and Tyson?
A With little switching -- with little switching and -- and basically we're looking at a single integrator, that's -- that's the essential definition of a monopsony, monopsonist.
Q So the two elements that form the basis of your opinion that Robards is a monopsony is, A, they're a single integrator and, B, there's little switching between Perdue and Tyson?

A Yep.
**Q No other --**
A I mean, the contract economy is such that Tyson gets to, you know, run their gross margins, literally double them or maybe even triple them, and they don't have to pay anything extra for the grower's services, that is -- that is the -- that's the excessive exercise of monopsony power in this study of mine.
**Q Did you look at Tyson's gross margins prior to 2010?**
A I've seen them in the -- the report by Thomas Elam.
**Q But you didn't study those yourself?**
A No.
**Q I mean, you're aware that Tyson has had profit downturns as well?**
A Yeah.
**Q You do --**
A But one of the reasons we -- we started with 2010 is to avoid the -- the Great Recession, which impacted firms across the economic landscape, so that's a -- that's an exceptional structural shock that would have to be managed if you were to analyze -- include that kind of information in your assessment, so I just avoided it by -- by starting

in 2010.
Q **You -- so the two factors are there's little switching across from Perdue and Tyson, and Robards, by -- is a single integrator, but I assume that's derivative of the little switching?**
A Yes.
Q **Okay. So really the factor is there's little switching between these two that are 30-some miles apart, and that's why you declare that Robards is in a position of a monopsony?**
A Yeah.
Q **Am I -- is that fair?**
A Yes, that they're in a position of having -- pure monopsony, having monopsony power --
Q **So if there was --**
A -- exercising monopsony power.
Q **-- so if there was more switching -- at some level of switching, you would not feel like they're in a position of monopsony power?**
A Well, you know, I would want to -- I would want to review all of the factors that I -- that led me to conclusion. There's a lot of deposition testimony and -- and --
Q **Can you tell me any other factor besides that one?**
A Well, the way condemnation is managed is a -- is,

to me, evidence of monopsony power, the -- the way the exceptions are tilted toward the -- the cases in which there were negative exceptions pulled from the tournament, which lowers the -- which lowers the -- the NPV and puts -- it changes the whole structure of the game, the -- of the tournament, pardon me, and then -- and then the -- the -- the relationship of base pay to gross margins by Tyson and the relationship of base pay to wage indexes and inflation and other -- other things that I have relied on, just overall, it creates an image of simply not keeping up with -- with the -- in -- in a competitive environment, they would be forced to pay up higher.

**Q Now, I want to differentiate between being a monopsony and exercising monopsony power.**

A Okay.

**Q You -- you agree there's two elements to it --**

A Yeah.

**Q -- one -- one, you can be sitting there and just be a really altruistic company and still be -- satisfy you that you're not exercising monopsony power; that's possible, right?**

A It's possible.

**Q It's possible for an entity to do that; you would**

A -- suggest that's what I'm doing.

**Q Okay. So the factors that lead you to the conclusion that Robards is a -- in a monopsony position, relative to not much switching, is the deposition testimony of plaintiffs, correct, the -- the underlying information that leads you to that conclusion?**

A Deposition testimony, condemnation pattern, the --

**Q How does condemnation pattern reflect whether there's grower turnover between the complexes?**

A It doesn't.

**Q Right. And I asked you a specific question, because you said --**

A Oh, maybe I misunderstood.

**Q -- on the basis of sitting there as a monopsony, you said that is derivative of switching, and so I'm asking you, the source of information that you utilized to come to the conclusion that there's not much switching is the deposition testimony; is that fair?**

A Yeah, the -- you know, one of the things that's in the deposition testimony is that there tended to be a -- there tended to be a pattern where people -- there was more switching from -- from Perdue to Tyson, but that switching back to Perdue wasn't

evident, so it -- it suggests that Perdue wasn't a -- wasn't a very good competitor with Tyson.

**Q Would it suggest that Tyson just paid more, had a better system, gave you more birds?**

A What I'm -- what I'm suggesting is -- is with no -- with no relevant competitor in their region, their power would be that of a monopsonist.

**Q So you discount the notion that maybe -- because there's testimony in this case from the plaintiffs that says I switched to Tyson because they gave me more birds more often?**

A Right.

**Q That's better -- that's better for the grower, right?**

A Right.

**Q And so why would you criticize that as anticompetitive?**

A What I'm saying is Perdue is not a relevant competitor with Tyson.

**Q So they're not a relevant competitor because they don't provide as good of grower benefits as Tyson does?**

A Yeah, so you -- there's not really a switching option there.

**Q And what benefits are -- is Perdue providing that**

A There's also a lot of deposition testimony about integrator specific assets --
**Q Can you --**
A -- that I was relying on as well.
**Q -- can you tell me --**
A Which is --
**Q -- how many growers have switched from Perdue to Tyson in the last ten years?**
A I -- I can't tell you the exact number, no.
**Q Do you have an estimate?**
A No.
**Q Can you tell me how many switched from Tyson to Perdue in the last ten years?**
A A few, but I don't have the exact number.
**Q Nothing you'd feel comfortable saying yeah, I know this is it?**
A Yeah, and there might be some nonplaintiff numbers, cases that didn't get talked about, so -- there -- there is this whole other dimension of -- of -- in the deposition testimony requiring integrator-specific assets, which makes switching harder.
**Q What are integrator-specific assets?**
A I'd have to look back at this material I wrote on --

**Q Well --**
A -- so -- do you want me to go through it?
**Q Yeah. I mean, I want to know what you know that forms your opinion that Perdue's not a competitor.**
A There was also the case -- yeah, there was one other case too, Tyson -- Charles -- Charles Morris wanted to switch, and was told he -- he couldn't switch because his farm was too large, and he had to decide -- there was some -- there's -- there's -- there's uncertainty about whether he could split the farm, and I guess he didn't want to do that, so he didn't switch.
**Q That was his choice, right?**
A I'm not really sure. Little fuzzy on that right now.
**Q Okay.**
A There's a Kathleen Heinz, I'd have to go back to see where -- that summary report on Tyson grower survey, that I relied on, it talks about this, nearly two-thirds reported that contracts did not offer them a sense of security, in fear they would be cut off by Tyson.
**Q Are you aware of --**
A Fear that they had to maintain their facility upgrades in order to keep their contracts.

are -- things are that -- all of a sudden magic occurred between 2006 and 2010 and they unbaked this monopsony power that was in their marketplace.

**Q Would you agree with me that grower pays went up over the last many years; are you aware of that?**

A Oh, yes, I'm -- grower pay has gone up, I believe, 14 percent, from '10 to -- '10 to '18, 2018.

**Q And that's grower pay at Robards?**

A Yes.

**Q You don't know if that -- how that compares to any other integrator?**

A Well, in the supplemental work, we looked at some of that, so --

**Q So you just assumed Robards is just below and always going to be below?**

A We -- we -- what we did is said listen, it looks like this is all baked into the cake in 2006, it doesn't appear that there was any -- any structural adjustment to the way the Robards Complex functioned, so it seemed safe to go ahead and just apply the 7 percent to the 2010 adjustment and maintain that and -- and -- to bake that into the -- into the -- the cake between 2010 and 2018.

**Q And so let's hypothetically, tomorrow, Robards says boom, everyone's getting a 7 percent raise --**

A I mean, I'm not going to rule out that I wouldn't do that, but I'm not going to use confidential information from deposition testimonies and --

**Q No, I understand.**

A I mean, I'm not doing that at all.

**Q But in the event this information becomes public at trial, then that's something beyond your control?**

A Right.

**Q Okay. Now -- but -- but the basis of the report, the July report that you did in this case, the -- the opinions that you have derived, do you feel comfortable that those have been peer-reviewed?**

A I'm not sure I understand what you mean by peer-reviewed.

**Q Well, the methodologies that you've come up with --**

A Oh.

**Q -- and -- and the -- the analysis and the economic theory that you're utilizing --**

A Yes.

**Q -- do you feel comfortable with those?**

A Very comfortable. In particular, that was something that was brought up earlier today when we were talking about the -- the -- the damages associated with that grower pay. And, actually, the methodology that I applied to -- to use that

base year, that 2010 base year that led to the 30.6 adjustment, that's actually an idea that I got -- at the time I wrote the -- wrote this material, I didn't remember about a study that I -- I had did, but it was a paper in 1990 actually when I was a -- a graduate student that I published that -- that I used, and I'm the lead author on that study, where I used that method precisely, we used a base year and then -- and then we allowed the -- the rest of the data to take us into the -- into the future, and we were working on something called desired consumption, which is a very abstract term, much like -- much like this manufactured economy, chicken economy, there's a -- there's things in here that are just -- that are just -- it's -- you can't -- you can't hone in on and say there's data on that, you -- and -- there's no free market principles for the most part, and so you -- you kind of rely on some of these methodologies that have been in the literature and that are peer-reviewed. So yes, the answer is absolutely, that 30.6 percent is part of my record of peer-reviewed work.

**Q And we've talked about the MacDonald work, and we -- that -- that is the basis for the 7 percent that**