**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| CHARLES MORRIS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>TYSON CHICKEN, INC., et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:15-cv-00077<br><br>Judge: Joseph H. McKinley, Jr. |

**DEFENDANT TYSON CHICKEN INC.'S STATEMENTS OF UNCONTROVERTED AND MATERIAL FACTS**

# Tyson[1]

## The Robards Complex

1. Tyson owns and operates the Robards Complex, which is a complex of multiple buildings located at 14660 US-41 S, Robards, KY 42452.

2. The Robards Complex is vertically integrated, meaning it has integrated various levels of production into one complex, such as a breeder department, a hatchery, feed mill, a live haul (transportation) department, a processing plant, and other animal welfare functions. Ex. 1, Deposition of David Mears, 58:19-59:6; Ex. 2, Deposition of Jim Gottsponer, 98:18-24.

3. The Robards Complex processes broiler chickens for human consumption. Mears Dep., 44:17-45:6, 113:4-6, 123:6-12.

[1] Tyson does not herein concede any facts for purposes of trial or otherwise. Tyson provides these uncontroverted facts in light of the burdens applicable under Rule 56 for the purpose of this Motion.

4. A "broiler" is a chicken that is raised and processed for human consumption, i.e. for its meat. Mears Dep., 44:17-45:6. A "pullet" is a young female chicken that will develop into a hen and lay the eggs that become broilers. Gottsponer Dep., 55:1-9. Pullets are breeder chickens and are not bred or raised for human consumption. *Id.*

5. The Plaintiffs in this case are broiler growers who contract with the Robards Complex to receive chicks and raise them to processing weight. Ex. 3, Deposition of Christopher Burch, 34:1-10.

6. Contractually, the broiler growers furnish the "labor, material, and utilities necessary for the receipt of chickens and the production of Broilers." *See* Ex. 4, Broiler Contract of Charles Morris (5157), ¶ 3; Ex. 5, Deposition of Charles Morris, 231:7-232:22.

7. The Robards Complex and Tyson, on the other hand, develop and process broilers for human consumption, which includes breeding the grandparent, parent, and broiler generation of chicken; managing the breeder hen operations; collecting and hatching the eggs into broiler chicks; delivering those chicks to the contract growers; providing the proper feed, veterinary, and service assistance to help raise those broilers; retrieving the broilers when they are fully grown; and processing them at the plant. *See* Mears Dep., 58:19-59:6, 121:20-23, 123:6-8, 125:8-10, 126:22-24, 130:3-5; Gottsponer Dep., 98:18-24, 107:7-108:1; Broiler Contract of Charles Morris (5157), ¶ 2.

8. "Processing" a broiler, as it is referred to here, is the process of slaughtering, de-feathering, eviscerating, and cleaning a broiler to an end product of consumable chicken. Ex. 6, Deposition of Ben Grant, 34:8-37:16.

**Employees**

9. **David Mears**: For the period of 2007 through the end of 2009, David Mears worked at the Robards Complex as Live Production Manager. Mears Dep., 49:3-11. Mears served in the Army as a battalion commander and in 2009 his battalion was called up for duty in Afghanistan. *Id.* 15:1-15. For the period of 2014 until October 2017, Mears returned to the Robards Complex and worked as Complex Manager. *Id.* 57:4-5. As Complex Manager, Mears was generally responsible for all aspects of the poultry complex, including the contract grower relations, processing facility, hatchery, feed mill, delivery, and live haul aspects. *Id.* 58:19-59:4.

10. **Kenny Bartley**: For the period of December 2009 to 2013, Kenny Bartley worked at the Robards Complex as Live Production Manager. Ex. 7, Deposition of Kenny Bartley, 64:25-65:20, 250:1-13. As Live Production Manager, Bartley was generally responsible for all aspects of live bird production, from the breeder farms to the hatchery, and through broiler development until the meat entered the plant. *Id.* 58:7-15; Gottsponer Dep., 87:11-15.

11. **Jim Gottsponer**: For the period of December 2013 to May 2017, Gottsponer worked at the Robards Complex as Live Production Manager. Gottsponer Dep. 82:4-5. *Id.* 87:11-15.

12. **David Dickey**: David Dickey started at the Robards Complex as a Broiler Manager, and held that position from January 2015 to summer 2017. Ex. 8, Deposition of David Dickey, 56:13-21. Since the summer of 2017, Dickey has worked at the Robards Complex as Live Production Manager. *Id.* 59:10-12, 60:6-21.

13. **Jared Shelton**: Jared Shelton began working with Tyson in 2005 as a supervisor trainee. Ex. 9, Deposition of Jared Shelton, 23:12-24:11. From 2006 to 2008, Shelton supervised catch crews, which caught and transported broilers at the end of their growing period. *Id.* 27:20-29:4. For the period of March/April 2008 to 2011, Jared Shelton worked at the Robards Complex as a

Service Technician. *Id.* 38:21-39:12. For the period of March/April 2011 to December 2014, Shelton was a Broiler Manager at the Robards Complex. *Id.* 52:25-53:10. From January 2015 to February 2016, Shelton was the Feed, Order, and Delivery Supervisor. *Id.* 89:1-12. And since February 2016, Shelton serves as the Breeder Manager for the Robards Complex. *Id.* 95:23-96:9.

**The Hatchery**

14. The Robards Complex hatches on average 1.3 million chicks every week. Grant Dep., 90:4-24.

15. Tyson does not sex its broilers upon hatch, meaning its hatchery does not sort the gender of the chick before delivery to a given grower. Bartley Dep., 101:20-103:18.

16. Chick deliveries to the growers are set by the placement schedule. In general, the placement schedule functions on a first-in, first-out basis, meaning when a grower's house is empty his farm is placed in line to receive chicks. In general, the hatchery delivers whatever chicks it has to whichever grower is next in line. Dickey Dep., 113:22-116:2, 182:20-183:23, 185:14-18, 186:8-14.

17. As a species, chickens have two chromosomes: Z and W. A female chicken has ZW, and a male chicken has ZZ. Like humans, each parent chicken donates one chromosome to its offspring at random. As a result, like humans, any given chicken has a 50/50 chance of being born female or male, depending on the female chicken's donating chromosome. Ex. 10, Expert Report of Dr. Michael Lacy, Sec. V.

**Placement of Flocks**

18. The time between when a broiler grower's flock is picked up for processing and he or she receives a new flock is referred to as "out-time" or "days-out." *See, e.g.*, Ex. 11, Deposition of Keith Crabtree, 178:7-21.

19. Broiler growers use the time between flocks to clean out the litter in the chicken houses, sanitize the water system, and generally prepare for a new flock. Burch Dep., 42:12-23.

**The Feed Mill**

20. The Robards Complex's feed mill mills, stores, weighs, and distributes feed for all the broiler growers. Dickey Dep., 69:9-17.

21. "Milling" feed is the process of mixing together the various ingredients which make up chicken feed, the two main ingredients being corn and soybeans. Gottsponer Dep., 102:4-7.

22. The feed mill has four types of feed: starter feed, finisher feed, withdraw feed, and withdraw 2 feed. Dickey Dep., 70:20-71:4. Starter feed is a crumbled feed which is easier for smaller chickens to eat and digest. *Id.* 71:5-14. Chicks are usually placed on this feed for 14 days. *Id.* After starter feed, chickens are placed on finisher feed until they are 26 to 28 days old. *Id.* 72:14-73:10. At the age of 26 to 28 days until the last 10 days of the growing period, broilers will eat withdraw feed, which is lower in nutritional value, but sufficient for gaining mass. *Id.* 73:17-74:4; Gottsponer Dep., 102:11-22. And for the final 10 days before harvesting, broilers will eat withdraw 2 feed. Gottsponer Dep., 102:23-103:15.

23. The feed mill delivers the feed it has, as appropriate to the age of the chicken. *Id.* 209:12-22; Dickey Dep., 72:14-73:10.

24. The Robards Complex delivers the broiler feed to each Plaintiffs' farm and typically, the feed delivery truck will deliver around 50,000 pounds of feed at a time. Ex. 12, Timothy Vincent Feed Ticket Report.

25. The Robards Complex weighs and documents the amount of feed delivered to each broiler grower, and uses that number in calculating feed conversion for a given flock. *See* Dickey Dep., 69:9-22; Ex. 13, Deposition of Neil Barfield, 150:7-151:21; Ex. 14, Calvin Leisure Settlement

Sheet for 3/19/16; Ex. 15, Morgan Rickard Settlement Sheet and Grower Recap for 8/2/14 (showing total feed consumed and feed conversion for each flock in tournament settlement).

26. When it delivers feed, the Robards Complex provides a feed ticket to the broiler grower, showing how much feed was delivered. *See* Ex. 16, Timothy Vincent Feed Tickets.

27. When a broiler grower's flock is retrieved for processing, Tyson picks up any feed the grower did not use, and this feed is commonly referred to as "reclaimed feed." Reclaimed feed is then delivered to a grower who needs withdraw feed. Reclaimed feed is only fed to broilers for the last seven days of the grow-out period. Ex. 17, Deposition of Beau McGuire, 159:9-17; Gottsponer Dep., 209:23-210:9; Ex. 18, Deposition of John Pinkston, 152:6-21. Reclaimed feed is always withdraw feed, because it is the feed given to broilers in the final days before harvesting. Ex. 19, Deposition of Jennifer Heltsley, 67:21-68:19.

**Mortality and Condemnation**

28. Broiler growers are responsible for removing dead or sick broilers from their houses to prevent disease. This is referred to as culling. Morris Dep., 231:21-232:2.

29. Broiler growers track the broilers culled from their broiler houses on a mortality card, which are filled out by the broiler growers themselves and later retrieved by the Robards Complex to track the number of broilers remaining in the house. Ex. 20, Deposition of Douglas Brown, 130:3-21; Ex. 21, Dennis Clapp Mortality Sheets.

30. Broilers that have been delivered to the processing plant, but are not fit for human consumption, are condemned. Gottsponer, 124:2-4.

31. The USDA Inspectors control condemnation within the Robards Complex, and determine whether a broiler received into the plant may move on to processing for human consumption or must be condemned as not fit for human consumption. Dickey Dep., 137:7-138:22.

32. Generally, there are roughly 10-20 USDA inspectors inside the plant at any given time. *Id.*; Barfield Dep., 144:3-146:16.

33. The Robards Complex tracks the number of condemned broilers. In accordance with the contract terms, broilers that are wholly condemned are subtracted from a grower's total live weight, by multiplying the number of condemned birds by the average weight of the broiler in the flock. Broiler Contract of Charles Morris (Farm 5157), Schedule A, ¶ B.

34. If a boiler is only partially condemned, meaning, some portion of the broiler remains fit for human consumption, then there is no debit of any kind to the grower and the grower receives full weight credit as if the broiler was wholly fit for human consumption. *Id.*; Barfield Dep., 147:3-13; Morris Dep., 125:12-25.

**Catching and Weighing Chickens**

35. When a contract grower's broilers are fully grown, the Robards Complex sends a catch crew to retrieve the broilers and deliver them to the processing plant. Gottsponer Dep., 90:22-92:4.

36. To determine the gross weight of a broiler flock, the catch crew weighs its empty truck before going to pick up a flock of broilers; it then loads the broilers on the truck and returns to the processing plant, where it is weighed again. Dickey Dep., 141:7-142:19; Shelton Dep., 121:18-21; Mears Dep., 131:11-24; Bartley Dep, 178:2-23.[2]

---

[2] Any shrinkage in flock weight that occurs between the time the flock is weighed and the time the flock is ultimately taken to be processed is absorbed by Tyson, as the weight used to determine a broiler grower's pay is the weight determined when the flock arrives at the plant. Dickey Dep., 274:10-276:24.

# **Contracts**

37. Plaintiffs are, or were, contract growers with the Robards Complex and grow broilers for the Robards Complex under a Broiler Contract. *See* First Amended Compl., ECF No. 18, "Parties" ¶¶ 2-20.

38. The Broiler Contracts refer to each contract growers as "Producer", and addresses each parties' roles under the broiler contract. Paragraph 2 states:

> A. Company will furnish Producer with and will retain title and ownership to chickens, feed, and medication. Company will determine the amount, type, frequency, and time of delivery to and pick-up from Producer of chickens, feed, and medication.
> B. Company will provide veterinary services and technical advice to assist Producer's production of Broilers.
> C. Company will comply with all applicable federal, state, and local rules, regulations, and ordinances in performance of this Contract.

*See, e.g.*, Broiler Contract of Charles Morris (Farm 5157), ¶ 2.

39. Paragraph 3 states:

> A. Producer will furnish labor, material, and utilities necessary for the receipt of chickens and the production of Broilers and will when appropriate seek Company's technical advice.
> B. Producer will maintain biosecure housing for Company's chickens, feed, and medication, and will promote a disease-free environment.
> C. Producer will implement Company's recommended best animal management practices, including recommendations regarding lighting, brooding, watering, ventilation, and bedding.
> D. Producers will comply with all applicable federal, state, and local statutes, rules, regulations, and ordinances in performance of this Contract, including but not limited to all those governing environmental and poultry litter management.

*Id.*, ¶ 3.

40. Paragraph 7 of the broiler contract states "**COMPANY DOES NOT WARRANT QUALITY, MERCHANTABILITY, OR FITNESS FOR A PURPOSE OF, OR OTHERWISE WARRANT, ANY PROPERTY OR PRODUCT (NOT MANUFACTURED**

**OR PRODUCED BY COPMANY) DELIVERED OR RECOMMENDED BY COMPANY TO PRODUCER**." *Id.* ¶ 7.

41. Paragraph 12 states: "This Contract, including the attached Schedules, contains the entire agreement between Producer and Company regarding the production of Broilers. This Contract supersedes all prior agreements between Producer and Company." *Id.* ¶ 12.

42. Paragraph 9 of the broiler contract states: "Producer has the right to terminate this Contract at any time with no less than ninety (90) days written notice. Company has the right to terminate this Contract upon default by Producer." *Id.* ¶ 9.

43. The broiler contract states the following in relation to condemnation:

> A. The term "Farm Weight" used in the following formulas means the net difference between gross weight (i.e. tare weight plus weight of the flock of Broilers) and tare weight. Gross weight will be determined on a certified scale normally used for such purpose as promptly as possible after the flock of Broilers is loaded on the vehicle. . . .
> B. The phrase "farm-caused condemnation which is chargeable to Producer" used in the following formulas means whole chickens condemned as determined by approved U.S.D.A. inspection procedures for the following causes: tuberculosis, leucosis, septicemia, toxemia, synovitis, tumors, airsacculitis, and inflammatory process. Condemned weight will equal number of head condemned multiplied by the average live weight of the flock of Broilers. All bruises, parts condemnation, and plant condemnation consisting of chickens condemned for the following causes will not be charged against Producer's Farm Weight: cadavers, overscalds, no viscera, contamination, and other plant-caused condemnation.
> C. The term "Net Pound" used in the following formulas means Farm Weight less the farm-caused condemnation which is chargeable to Producer.

*Id.*, Schedule A.

44. The broiler contract includes three potential pay components to a broiler grower: Base Pay, Premium Pay, and Fuel Pay. *Id.*

45. Base Pay is determined by the "tournament" system, which is set out in the broiler contract as follows:

> D. . . . First, an average value per pound shall be computed for all Producers of Broilers at this Complex who settle a flock of Broilers during the same week. Any Producer

producing Broilers which are processed in more than one (1) calendar week will have his compensation calculated in the week of the final processing. The "Total Value" for all Producers at this Complex having flocks of Broilers settled in the week is determined by adding the "Chick Value" (equaling the number of chicks multiplied by [__] cents (xx¢) each) and the "Feed Value" (equaling the amount of feed multiplied by [__] and [__] cents (x.x¢) per pound). This Total Value is then divided by the Net Pounds [(Farm Weight of chickens less the farm-caused condemnation)] produced by the same Producers to arrive at an "Average Net Pound Value" at this Complex.

E. Second, each such Producer's "Individual Net Pound Value" is calculated in the same manner and using the same valuation factors as above.

F. Third, each Producer whose individual Net Pound Value, as calculated above, is [__] and [__] cents (x.x¢) more or less than the Average Net Pound Value shall be removed from the average. Also, each Producer who is known to be a Company management employee or a member of a Company management employee's immediate family (that is, spouse, parents, siblings, and children, whether by blood or marriage) shall be settled with all Producers for purposes of calculating the compensation of Company management employees/family, then shall be removed from the Average Net Pound Value for purposes of settling all other Producers. The Average Net Pound Value for the remaining Producers, calculated in the same manner set forth in Paragraph D, shall constitute the "Adjusted Average Net Pound Value" for Producers settling flocks of Broilers for the week.

G. Fourth, each Producer settling a flock of Broilers during the week whose Individual Net Pound Value is equal to the Adjusted Average Net Pound Value at this Complex, determined in Paragraph F, will receive the Base Pay of [__] and [__] hundredths cents (x.xx¢) per Net Pound. For each [__] hundredth cent (.xx¢) per Net Pound that Producer's Net Pound Value is less than the Adjusted Average Net Pound Value, Producer shall receive [__] hundredth cent (.xx¢) more per net Pound than the Base Pay per Net Pound. For each [__] hundredth cent (.xx¢) per Net Pound that the Producer's Net Pound Value is more than the Adjusted Average Net Pound Value, Producer shall receive [__] hundredth cent (.xx¢) less per Net Pound than the Base Pay per Net Pound. No Producer shall receive less than [__] and [__] hundredths (x.xx¢) cents per pound.

*Id.*

46. Premium Pay is set forth in the broiler contract for growers who comply with the "Premium Compensation Requirements." *Id.*, Schedule A, ¶ J.

47. How the contracts handle Fuel Pay has changed over the years. Before 2014, the contracts provided for an energy allowance based on total Net Pounds of broiler produced:

> Producer is eligible for a [__] hundredths cent (.xx¢) per Net Pound energy allowance for two (2) flocks of Broilers produced from chicks placed from the first accounting week of October through the last accounting week of February, and [__]

> hundredths cent (.xx¢) per Net Pound energy allowance for all additional flocks in addition to the Base Pay.[3]

*Id.*, Schedule A, ¶ H; *see also* Ex. 22, Letter from Jim Gottsponer dated September 26, 2014.

48. In late 2014, Fuel Pay changed to a system of paying based on square foot:

> Producer is eligible for a [__] and [__] hundredths cents (x.xx¢) per square foot of energy allowance for two (2) flocks of Broilers produced from chicks placed from the first accounting week of October through the last accounting week of February, in addition to the Base Pay. Producer is also eligible for an energy allowance of [__] and [__] hundredths cents (x.xx¢) per square foot energy allowance for all additional flocks, in addition to Base Pay.

See, *e.g.*, Ex. 23, Broiler Contract of Morgan Rickard (Farm 5174), Schedule A, ¶ H (executed on October 10, 2014).

49. This change benefitted the growers, as it eliminated tying their fuel allowance to pounds returned, and instead measured it against the square footage of their house, which remained constant. Pinkston Dep., 94:8-95:6.

50. The contracts include a **"Performance Improvement Program"** ("PIP") set out in Schedule B, ¶ A.1. Broiler Contract of Charles Morris (Farm 5157), Schedule B, ¶ A.1.

51. The PIP is a list of growing requirements for growers who settle two consecutive flocks with an Individual Net Pound Value of $0.0040 or more, higher than the weekly Adjusted Average Net Pound Value. *Id.*, Schedule B, ¶ A.1. Growers sometimes call settling at this level being in the "high 40s." Dickey Dep., 88:16-89:8.

52. The contracts also set forth the average number of flocks each grower will receive under the contracts:

> Provided Producer continues to meet all terms and conditions of this Contract, Producer will receive on average 5 placements of Broilers per year. . . . In the event Producer does not receive five (5) placements in a year, Company will pay Producer [__] hundredths cents (x.xx¢) per square foot per day for all Out-Time in excess of twenty-one (21) days. Out

[3] The precise cent per Net Pound provided in each Plaintiffs' contract varies.

time will begin when all Broilers are removed from Producer's farm and end the day a new flock of chickens is placed on Producer's farm.

Broiler Contract of Charles Morris (Farm 5157), Schedule A, ¶ M.

53. After each grower's broilers are returned to Tyson and processed, they are provided a "settlement packet" that includes copies of documentation pertaining to their flock cycle, including copies of their chick delivery tickets, scale tickets, feed delivery tickets, feed reclamation tickets, mortality cards, condemnation certificates, payroll summaries, payment terms, and settlement sheets. *See*, *e.g.*, Brown Dep., 114:18-140:23.

54. A settlement sheet summarizes data relating to that grower's flock, including that flock's average age at pick-up, number of chicks placed, number of broilers that were culled, pounds of feed consumed, pounds of chicken condemned, the broiler grower's Base Pay, Fuel Pay, Premium Pay, New House Pay, and settlement calculation data. *See*, *e.g.*, Morgan Rickard Settlement Sheet and Grower Recap for 8/2/14.

55. The broiler growers also receive a Grower Recap sheet that shows how they performed as compared to all other growers that settled flocks in the same week, which includes an itemization of flock placements, total pounds, condemnation percentage, feed conversion, average weight, age of the flock in days, and daily weight gain for each grower settling in that week. *See*, *e.g.*, *Id.*

## Experts

### Dr. Stiegert[4]

56. Plaintiffs presented one expert in this case, Dr. Kyle Stiegert. Ex. 25, Expert Report of Dr. Stiegert ("Stiegert Rep.").

[4] Defendants have challenged the admissibility of Dr. Stiegert's opinions under Rule 702, and that motion is pending before the Court. Mot. to Strike the Proposed Expert Op. of Dr. Stiegert, ECF No. 175. Defendants do not concede that any portion of Dr. Stiegert's opinions are admissible in this matter. However, because that motion remains pending and in light of the standards applicable

57. Dr. Stiegert did not offer any damage opinions or calculations for damages flowing from an alleged Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, or Fraud. Stiegert Rep. ¶ 19 ("I have also calculated damages to Plaintiffs based on (a) the suppression of grower pay per pound grown; (b) the reduction in pounds grown based on flocks being spaced out longer than projected (i.e., higher "days-out"); and (c) Tyson's policies regarding condemnation."); Ex. 26, First Deposition of Dr. Kyle Stiegert ("Stiegert Dep. 1"), 93:3-94:7.

58. Dr. Stiegert testified at deposition that he did not even know the contract terms were at issue in the case. *Id.*, 97:4-99:3.

59. Dr. Stiegert testified at deposition that the Robards Complex's charges for condemned birds, per the contract, "all looked fine" and that he "didn't see anything that raised red flags." *Id.* 100:15-23.

60. He also testified that: "Q: Okay. You weren't asked to look in to see, you know, just from a pure pen to paper on the contract perspective, did it – did each grower get paid what it says? A: Yeah, the -- the -- it -- it looks above board. The contracts look like they're being -- I didn't see anything that -- that raised alarm bells for me." *Id.* 98:22-99:4.

61. Dr. Stiegert testified that he did not "review any data in relation to the age of the laying hens that provided flocks to any given grower[.]" *Id.* 82:10-13.

62. Dr. Stiegert testified that he did not "run any analysis on, for example, whether over time everyone got an equal amount of breed combinations." *Id.* 302:22-303:13.

63. Dr. Stiegert testified that he was not offering any opinions on whether breed combinations were evenly distributed: "[Q]: you're not offering any opinions on whether, you know, breeds were

---

to summary judgment, Defendants refer to certain portions of his opinions here as they relate to Tyson's Motion for Summary Judgment.

evenly -- breed combinations were evenly distributed – A: Yeah. Q: -- over time? I'm just assuming you're not here to offer opinions on that; is that fair? A: I am not here to offer an opinion on that." *Id.* 303:19-304:1.

64. Dr. Stiegert also testified that he did not quantify any damages flowing from any difference in inputs. *Id.* 307:12-14 ("Q: And you've not quantified any damages based on any sort of variability of inputs to the growers? A: We didn't quantify that, no.").

65. Dr. Stiegert testified:

> Q Right. The focus of your work had, in fact, nothing to do with determining whether or not [Defendants] complied with the terms of the contract, correct?
> A: It wasn't my assignment, no.
> Q: Likewise, the focus of your assignment was not to determine whether or not any plaintiff versus other growers had been treated differently, it was to determine whether or not, as a general matter, pay was suppressed in this case, correct --
> A: That is --
> Q: -- through monopsony power?
> A: That is -- that is spot-on correct.
> Q: Right. So you have no opinion in this case as to whether or not any plaintiff was treated fairly or differently than anyone else at the Robards complex?
> A: I have -- as I sit here today, I have no opinion . . .

Ex. 27, Second Deposition of Dr. Stiegert, 392:4-20.

66. Dr. Stiegert did not look at the settlement data or the production data at the nearby Perdue Complex. Stiegert Dep. 1, 80:13-18.

67. Dr. Stiegert did not look at the production data or contracts of any other vertical integrator. ("Q Yeah. Did you actually look at their actual production data for any other integrator? A: No. Q: Did you look at any contracts for any other integrator? A: No.").

68. Dr. Stiegert did not review the production levels on the output side of the Robards Complex. *Id.* 85:7-86:14.

69. In calculating his damages, Dr. Stiegert used gross margin figures from the parent company Tyson Foods, Inc as published for its operations as a whole. *Id.* 177:20-179:7; Stiegert Rep., ¶¶ 120-122, Table 11, 12.

70. Dr. Stiegert testified:

> Q: Okay. And then what's the next column, gross margin?
> A: That comes from Tyson's data and there's a description of how we calculated that in the document.
> Q: And what data does it come from that you say is Tyson's data?
> A: I think it comes from the -- what do they call those, the -- the 10-K reports out of Tyson.
> Q: So that -- so that -- you're saying that there's a 10-K report that shows that Tyson receives, on average, a 13 cents per pound gross margin across the world?
> A: In their chicken growing operation, 13 cents per pound, yes.
> Q: Okay. Across the world?
> A: Well, here again, I would have to check that. I don't know what percentage of their business is overseas.
> Q: Let's just say everywhere they operate.
> A: I would want to check that.
> Q: Okay. It's not a Robards' gross margin number, right?
> A: Oh, no, no.
> Q: And you didn't cross-reference to see if the Robards complex operates at that margin or not?
> A: Well, that would be a -- it would be very difficult to get that out of Tyson, because they're -- they're taking all the chicken meat from all of their complexes and then selling them, selling the chicken meat and generating an operating margin for themselves.
> Q: You -- you don't -- you don't know if they run financial statements and profit margins by complex or not, correct?
> A: Well, I'm sure they do, but we don't --
> Q: Okay.
> A: -- I didn't have those.

Stiegert Dep. 1, 177:20-179:7.

71. Dr. Stiegert testified "Q Okay. Did you review any contracts of any Robards growers who are not a plaintiff in this case? A: I'd have to look at -- I don't -- I don't -- sitting here today, I don't know that answer. There was the production contracts that were directly related to the plaintiffs, and they -- they all looked very much similar, so --" *Id.* 80:19-25.

72. Dr. Stiegert testified that the opinions he gave in this case were limited to the following:

> Q: So as I understand it then, is it fair for me to say your opinions that you offer in this case is that, A, the Robards Complex for Tyson is in a monopsonist position, is that -- is that fair; and then, B, your opinion is that it is in fact exercising monopsony power because of that position?
> A: Yes.
> Q: And then, C, the effect of that exercise of monopsonist power has resulted in damages to plaintiffs in three categories; one, base pay suppression; two, days out inconsistent with expectations; and, three, condemnation calculations?
> A: Yes.
> Q: Are you offering any other opinions in this case besides what I've just summarized? And I understand there's a background to how you get to those opinions, but you can understand my view of just wanting to make sure I've got it.
> A: These are the -- these are the three areas that -- that I felt like we could -- we could develop supportable damage estimates for.

*Id.* 93:3-25.

**Dr. Elam**[5]

73. Dr. Thomas Elam is an economist retained by Defendants. Ex. 28, Expert Report of Dr. Thomas Elam, Sec. I.

74. Dr. Elam considered the following evidence in creating his report:

- Plaintiffs' First Amended Complaint and Jury Demand (Complaint).
- Plaintiffs' Expert Declaration of Dr. Kyle Stiegert (Declaration).
- Robards complex grower settlements from May 1, 2010 to March 3, 2019 (hereafter settlement data).
- Breeder hen flock data for chicks supplied from May 4, 2010 to December 13, 2018 to Robards live production growers (Hen Data Detail, hereafter hen data).
- Grower pay recaps for Robards settlements April 2010 to March 2019 (Grower Pay Recap by Grower - Accounting Copy 4.24.10 - 3.2.19)
- Grower 5163 production contract (Bates 116906-116931).
- Other Plaintiff contract documents.
- Grower 5163 original supporting documentation and settlements sheets for flocks delivered on January 29, 2016 and February 1, 2016 (Bates 016728-016915).
- Robards complex Grower Ranking by standard costs, various dates.

[5] Plaintiffs did not challenge Dr. Elam's opinions under Rule 702.

- Cobb 500 Breeder Management Supplement.
- Cobb 700 Breeder Management Supplement.
- Cobb 500 Broiler Performance & Nutrition Supplement.
- Defendant's depositions and supporting materials.
- Tyson Food annual 10-K reports 2005-2018 and quarterly 10-Q for Q1 and Q2 2019.
- Housing square footage data.
- Selected papers and other materials related to broiler industry and general farming economics, and other materials as shown in footnotes as cited sources all of which are referenced in this Report and its attachments.

*Id.* Sec. V.

75. The average days out for all growers at the Robards Complex, including Plaintiffs, is approximately 20 days. *Id.* Sec. IX, Table 1.

76. On average, contract growers at the Robards Complex receive 5.3 flocks per year. *Id.*

77. From 2010 to 2018, broiler grower performance was not statistically affected by which breed a grower received. *Id.* Sec. XI, ¶ 6.

78. From 2010 to 2018, Tyson evenly distributed chicks from different ages of hens to all Plaintiffs, resulting in no adverse effect for any Plaintiff based on hen age. *Id.* Sec. XII, ¶ 15.

79. From 2010 to 2018, Tyson evenly distributed feed so that feed conversion was statistically controlled and evenly distributed among all broiler growers. *Id.* Sec. XVI, ¶ 12.

80. From 2010 to 2018, there is no evidence that assignment of a given service technician had a material causal effect on broiler grower performance. *Id.* Sec. XV, ¶ 7.

81. From 2010 to 2019, there was no statistical difference among broiler growers at the Robards Complex for days-out between flocks. *Id.* Sec. XVIII, ¶ 4.

82. From 2010 to 2018, broiler density was consistent among growers at the Robards Complex, including Plaintiffs, and there is no evidence that Plaintiffs suffered any material disadvantage in the number of broilers placed per square foot as compared to others. *Id.* Sec. XX, ¶ 10.

83. Dr. Elam wrote: "As a matter of cost and biological realities an integrator has no ability to supply all chicks solely from 34-week-old hens." *Id.* Sec. XII, ¶ 7.

**Dr. Thurman**[6]

84. Dr. Walter Thurman is an economist retained by Defendants. Ex. 29, Expert Report of Dr. Walter Thurman, ¶ 1.

85. Plaintiffs received an average of five flocks per year. *Id.* Figure 12, ¶¶ 108-109.

86. By Plaintiff, each received the following average number of flocks per year from 2010 to 2018:

**Figure 12 – Plaintiff average flocks per calendar year**

| Plaintiff | Plaintiff Avg. |
|---|---|
| Doug Brown | 5.13 |
| Chris Burch | 5.00 |
| Dennis Clapp | 4.75 |
| Keith Crabtree | 5.00 |
| Loi Hong | 5.33 |
| Calvin Leisure | 5.13 |
| Charles Morris | 5.06 |
| Mike Murphy | 5.06 |
| John Pinkston | 5.25 |
| Sondra Rickard | 5.00 |
| William Rickard | 5.08 |
| Tim Vincent | 5.13 |

*Id.* Figure 12.[7]

[6] Plaintiffs did not challenge Dr. Thurman's opinions under Rule 702.
[7] Dennis Clapp received three flocks in 2012, which is the reason his overall average is 4.75. Barring 2012, Clapp received five flocks each year from 2010-2018. Thurman Rep., ¶ 109. Clapp also testified at deposition, "Q: Your contract says you'll get five [flocks per year]? A: Yes, sir. Q: You've always gotten at least five? A: Yes, sir." Clapp Dep., 148:3-6.

**Dr. Lacy**[8]

87. A given broiler chick has a 50/50 chance of being male or female. Lacy Rep., Sec. V.

88. Appropriate culling results in less condemnation at the plant and a more uniform delivery of birds within weight range, even if later condemned at the plant. *Id.* Sec. VII.

89. It is biologically impossible to produce perfectly identical chicks for every flock. *Id.* Sec. VIII.

90. There is no material difference between the breeds that the Robards Complex uses among its growers from a health, viability, feed efficiency, and target weight standpoint. *Id.* Sec. IV.

**Mr. Anderson**

91. Jason Anderson is an accountant retained by Defendants. Ex. 30, Expert Report of Jason Anderson, 1.

92. Mr. Anderson "reviewed tax returns, schedules of property, plant, and equipment, various financial statements or bookkeeping records, grower contracts, settlement statements, and deposition transcripts for each of the plaintiffs." *Id.*

93. Mr. Anderson opined that "the contracts between Tyson and the growers [are] economically viable." *Id.* 3.

94. Mr. Anderson opined "growers reported generally strong positive cash flow before and after funding debt service on an ongoing basis." *Id.*

## <u>Plaintiffs' Individual Damages</u>

95. All Plaintiffs provided collective Rule 26(a) disclosures for all of them, stating:

> Plaintiffs are unable to compute the amount of damages claimed by them at this time as much of the documentation which will prove these amounts is in the sole possession of Defendant Tyson. Plaintiffs anticipate using the documentation generated through discovery of this case, to support a damage computation.

[8] Plaintiffs did not challenge Mr. Lacy's opinions under Rule 702.

> Plaintiffs agree to supplement this disclosure once more evidence is generated through the discovery process and damages are better ascertainable.

Ex. 31, Plaintiffs' Disclosures Pursuant to Rule 26a.

96. Defendants served interrogatories on each individual grower Plaintiff in this suit. *See, e.g.*, Ex. 32, Plaintiffs' Answers to Defendants' First Interrogatories. Interrogatory No. 16 stated:

> **INTERROGATORY NO. 16:** Provide a computation of the total damages you claim you are owed in this lawsuit, and specifically indicate the methodology used by you in calculating this total.

97. Every Plaintiff grower provided the same response to Interrogatory 16:

> Plaintiff incorporates by reference each of his General Objections. Plaintiff further specifically objects to this interrogatory on the basis that it is premature as discovery is in its early stages and much of the documentation needed to answer this Interrogatory is in the sole control of Defendants. Plaintiff agrees to supplement this Interrogatory as more information becomes available.

*Id.*

98. And finally, in the 30(b)(6) depositions of ICU Chickens, LLC; Morvatt Enterprises, LLC; TLC Poultry, LLC; and Murphy Farms, LLC, Plaintiffs' Counsel deferred individual damage calculations for all Plaintiffs. Ex. 33, Deposition of ICU Chickens, LLC, 36:1-37:2; Ex. 34, Deposition of Morvatt Enterprises, LLC, 85:2-86:5, 123:20-124:7; Ex. 35, Deposition of Murphy Farms, LLC, 11:20-12:14; Ex. 36, Deposition of TLC Poultry, LLC, 8:4-16.

99. Defendants served a Notice of Deposition on ICU Chickens, Morvatt Enterprises, and Murphy Farms. *See* Ex. 37, Notice of Video Deposition, *Duces Tecum*, of Plaintiff ICU Chickens, LLC; Ex. 38, Notice of Video Deposition, *Duces Tecum*, of Plaintiff Morvatt Enterprises, LLC; Ex. 39, Notice of Video Deposition, *Duces Tecum*, of Plaintiff Murphy Farms, LLC; Ex. 40, Notice of Video Deposition, *Duces Tecum*, of Plaintiff TLC Poultry, LLC.

100. Each notice listed "Matters for Examination." *Id.* Item 7 of the matters for examination stated:

> 7. An itemization of the damages you allege to have incurred as result of the matters in this lawsuit, including the basis for those alleged damages, how incurred, when incurred, how calculated, and the dollar amounts so claimed.

*Id.*

101. Each deponent deferred responding to item 7 at deposition. ICU Chickens Dep., 36:7-9 ("[*Defense Counsel*]: The last topic -- is he designated, John, on Topic 7, the damages topic? [*Plaintiffs' Counsel*]: No."); Morvatt Enterprises Dep., 41:5-7 ("Q: You're not here to testify as to topic six or seven? A: No, sir."); Murphy Farms Dep., 11:9-19 ("Q: You've looked at this notice before and the topics? A: Yes. . . . Q: There's seven topics here. Are there any topics on this notice you're not prepared to testify to today? You're welcome to take a look at it. A: Just Number 7. Q: You don't have any testimony on Topic 7? A: No."); TLC Poultry Dep., 8:4-7 ("[*Defense Counsel*]: Is he testifying on Topic 7, John? [*Plaintiffs' Counsel*]: No, he's not.").

102. Plaintiffs' Counsel made the following statements on the record during depositions:

- At the deposition of Morvatt Enterprises, LLC, the following statement occurred:

  [*Plaintiffs' Counsel*]: Also for purposes of the record, which might streamline some of this, there was discussion early on about whether or not Morvatt Enterprises and Mr. Morris is going to initiate individual claims, individual damage calculation of claims, and --
  THE WITNESS: You can pull those -- those as well.
  [*Plaintiffs' Counsel*]: And for purposes of the record, those individuals claims of which the Court made reference to at the last hearing will not be utilized by Mr. Morris and Morvatt. The claims and damage calculations that I'm using generically calling these the 30,000-foot calculations will be initiated, and so for purposes of the record, we do not waive our right to discuss things that you're talking about here, but we do not intend to utilize those things in a calculation of individualized damage claims by Morvatt or Mr. Morris. All right.

  Morvatt Enterprises Dep., 85:9-86:2.

- At the deposition of ICU Chickens, LLC, the following statement occurred:

  [*Defense Counsel*]: The last topic -- is he designated, John, on Topic 7, the damages topic?

[*Plaintiffs' Counsel*]: No. And for purposes of the record, I'm going to make the same declaration I did in Mr. Morris' deposition in regard to Mr. Rickard and his companies. We intend not to make specific damage claims in regard to losses that may be incurred. We talked about, with Mr. Morris' deposition with the Court, we do intend to make an overall generic damage calculation, the 30,000-foot level, and we'll do that by and through our experts. So to that extent, he'll not be testifying on Topic 7 with damages, although we do reserve the right to talk about specific instances of damage to the extent that it applies to the damage calculation our experts will use.
[*Defense Counsel*]: All right. We'll just reserve whatever dispute or agreements we need to work out in that context down the road.

ICU Chickens Dep., 36:7-25.

- At the deposition of Murphy Farms, LLC, the following statement occurred:

[*Defense Counsel*] Q: So you're designated as the person on behalf of the company that can answer questions in relation to these topics. Do you understand that?
[*Witness*] A: Yes.
Q: There's seven topics here. Are there any topics on this notice you're not prepared to testify to today? You're welcome to take a look at it.
A: Just Number 7 [damages].
Q: You don't have any testimony on Topic 7?
A: No.
[*Defense Counsel*]: Do they have the same limitation as the others?
[*Plaintiffs' Counsel*]: For purposes of the record, I'll state that Murphy Farms, LLC will not bring individual claims relative to operation of this specific company, although like the other clients we have in this litigation, they'll be bringing a damage claim based on pleadings filed thus far in this case and will provide expert testimony as to the damages they claim in this litigation.
[*Defense Counsel*]: In relation to the 30,000-foot --
[*Plaintiffs' Counsel*]: Exactly. We've been talking about it as the 30,000-foot calculation, so that's what they're going to be utilizing in this case.
[*Defense Counsel*]: I probably should have asked you, John, does that apply to all the named plaintiffs?
[*Plaintiffs' Counsel*]: It will.

Murphy Farms Dep., 11:5-12:13.

- At the deposition of TLC Poultry, LLC, the following statement occurred:

Q: You've seen this notice before?
A: Mm-hmm.
[*Defense Counsel*]:· Is he testifying on Topic 7, John?

> [*Plaintiffs' Counsel*]: No, he's not. For purposes of the record, I'll say that TLC Poultry, LLC, there will be no individual claims as to particular damage in regard to this case.
>
> There will be a claim of damage from what I'm generically calling the 30,000-foot level, which our experts will opine as to. But for any individual claims, he will not.
>
> And thus for purposes of today's deposition, he will not be testifying in regard to Item 7.
>
> TLC Poultry Dep., 8:4-16.

103. Plaintiffs' expert, Dr. Kyle Stiegert opined on damages in three categories:

> 19. I have also calculated damages to Plaintiffs based on (a) the suppression of grower pay per pound grown; (b) the reduction in pounds grown based on flocks being spaced out longer than projected (i.e., higher "days-out"); and (c) Tyson's policies regarding condemnation.

Stiegert Rep., ¶ 19.

104. Dr. Stiegert testified at deposition:

> Q: So at the end of the day, the three buckets of damages you felt like in your judgment you could express to your satisfaction was in relation to condemnation, base pay and out-time, as reflected in Paragraph 19?
> A: Yes.
> Q: And your ultimate opinion is these are derivative of Robards' exercise of monopsony power; in other words but for the exercise of monopsony power, these elements would be paid differently?
> A: Yes.

Stiegert Dep. 1, 95:16-96:1.

## Plaintiffs

105. The Plaintiffs in this case include 11 different broiler growers. Four of these growers operate their broiler businesses under formal business entities, which are also named Plaintiffs.[9]

### Douglas Brown

[9] The Plaintiffs actually include 12 individuals, but one individual, Sondra Rickard, is William Morgan Rickard's wife, who does not operate the chicken houses and was not deposed in this case. Rickard Dep., 4:19-20, 11:8-10. The four entities are all business forms through which the

106. Plaintiff Doug Brown ("Brown)" operates under three Broiler Contracts with Tyson which operate under the following farm names: Farm No. 1; Farm No. 2; Charleston Road. Brown Dep., 5:19-22; 15:4-6; 17:9-15.

107. Farm No. 1 has four houses; Farm No. 2 has four houses; Farm No. 3 has two houses. *Id.*

108. Brown originally contracted with Tyson in 1999. *Id.* 42:22-43:14. Brown's contracts have been continually renewed and he continues to operate with Tyson. *Id.* 68:15-24; Ex. 41, Broiler Contracts of Douglas Brown.

109. Brown's contract dates and renewal dates are as follows:

- o The Farm No. 1 (5032) contract was originally entered into in 1999. Brown Dep., 42:22-43:14. It was renewed on August 30, 2017, with a scheduled conclusion date of August 1, 2020. Broiler Contracts of Douglas Brown.
- o The Farm No. 2 (5098) contract was originally entered into in 1999. Brown Dep., 9:13-19. It was renewed on June 27, 2017, with a scheduled conclusion date of June 28, 2020. Broiler Contracts of Douglas Brown.
- o The Farm No. 3 (5184) contract was originally entered into with Tyson on July 20, 2010, with a scheduled conclusion date of April 1, 2018. Broiler Contracts of Douglas Brown.

110. Regarding the contract for Farm 1 (5032), which Brown renewed in 2017, he testified: "Did Tyson -- anyone at Tyson make any representations to you about the nature of your production that led you to sign this? A: I mean, the only thing, you know, I'm assuming that they're going to

---

individual growers operate their chicken houses. There were previously six entities, but two were voluntarily dismissed by Plaintiffs. *See* Agreed Order Voluntarily Dismissing Wishbone Poultry, ECF No. 108; Motion by Poultry Specialty Service, LLC to Voluntarily Dismiss, ECF No. 100.

bring me chickens and feed and I'm going to raise them to the best of my ability." Brown Dep., 71:20-72:2.

111. Regarding the contract for Farm 1 (5032), which Brown renewed in 2017, he testified: "Q: Did you ask to have any meetings with David Mears or anyone else at the complex to discuss entering into a new contract? A: No, sir." *Id.* 72:3-6

112. Brown did not have any discussions relating to his relationship with Tyson before signing his 2017 contract for Farm 2. *Id.* 74:3-7 ("Q: Did you call anyone at the complex and inquire and have any discussions about anything relating to your relationship with Tyson before signing this? A: No, sir.").

113. Plaintiff Doug Brown ("Brown") did not "ask to have any meetings with David Mears or anyone else at the complex to discuss entering into a new contract." *Id.* 72.3-6. When asked to name an instance where David Mears has lied to him about something, Brown again answered that he "never really had much dealings with David Mears." *Id.* 113-23:114.1.

114. Brown testified that regarding the contract for Farm 3, which was originally signed in 2010, he "had conversations with Steve Keys about number of birds placed and about the heating element." *Id.* 78:11-16.

115. Brown testified he believed Steve Keys was the Broiler Manager at the time. *Id.* 52:3-7.

116. Regarding this conversation with Steve Keys, Brown testified at deposition:

> Q: Did you have any discussions with anyone at Tyson about how many chickens you were going to get, how many chickens you were going to process --
> A: Yes.
> Q: -- any of the parameters? And what discussions did you have?
> A: Well, with Steve Keys. He met me at the farm and we talked over different things and I questioned him, you know, well, how many birds are we going to get in these new houses, this, that, and the other, and he said 35,000.
> Q: 35,000 per house?
> A: Per house.
> ***

> Q: Okay. Have you ever received, to your knowledge, 35,000 birds in either house?
> A: Never.
> Q: Do you know what you have received?
> A: 32,000 something is the most I can ever recall getting in there. And then as low as around 30,400 or so about the least.
> Q: Have you ever had any discussions with anyone at Tyson since you've been operating these superhouses, as you call them, that you thought you would be getting 35,000 birds each?
> A: Well, the discussion was between me and Steve Keys and then he left shortly -- he left, I think actually may have been gone before the new houses was completed. I don't remember when exactly he left.
> Q: Was he gone before you started construction?
> A: I don't believe so. I believe he was still here at that time.
> Q: Do you remember when you started construction?
> A: It was in '08, the best I can remember.

*Id.* 55:22-56:9, 58:3-25.

117. Brown also stated in his interrogatories:

> In approximately 2008, while discussions were happening regarding the potential of building super houses on his farm, Steve Keys told Plaintiff (while meeting at Doug Brown Number 2) that when he built the super houses he would get 35,000 birds per house per flock. Plaintiff relied on this statement when deciding to build his two super houses. Plaintiff has never gotten that many birds placed in his super houses for any given flock.

Plaintiffs' Answers to Defendants' First Interrogatories, Brown Inter. No. 14.

118. Throughout his career with Tyson, Brown received his average of five flocks per year. Brown Dep., 80:1-7 (Q: Do you believe you've received on average five placements of broilers per year on this farm? A: I would say close, yes, sir.").

119. Brown received his payment for days-out exceeding 21 days. *Id.* 80:8-16. ("Q: And in the times that you've had excess 21-day out-time, did you receive your excess payment? A: Yes, sir.").

120. Regarding Fuel Pay, Brown testified, "Q: Okay. And are you aware of any instance where Tyson has failed to make the fuel payment to you per the contract? A: Not to me." *Id.* 88:19-22.

121. Regarding Premium Pay, Brown testified, "Q: And have you always received your premium pay? A: Yes, sir." *Id.* 89:14-16.

122. Brown testified that he was not aware of any instance where his mortality cards did not match the figures on his settlement. *Id.* 130:22-131:2 ("Q: Are you aware of any instance where your mortality cards didn't match the summary weekly mortality report that ultimately went into your settlement on any of your farms? A: None that I'm thinking of at this point in time, no.").

123. Regarding the accuracy of his settlement figures, Brown testified, "Q: So you can't pinpoint for me a time where you think the birds looked different than what the documentation came back? A: No, sir."). *Id.* 141:20-23.

124. Brown testified that sometime around 2016 he "got cheated out of about 8- or 10,000 pounds of feed" on a particular feed delivery, in which the feed ticket stated 55,000 pounds of feed had been delivered. *Id.* 97:22-99:15.

125. Brown testified he knew the feed amount delivered was not 55,000 pounds "from looking in the bins to see how much feed is in the bin" and because it took his broilers "less than 48 hours to go through the 55,000 pounds of feed" which Brown believed was less time than typical for his broilers to eat 55,000 pounds of feed. *Id.*

126. Brown blamed David Dickey for failing to remedy the situation. But at deposition, when asked if he had "any reason to think that Dickey knew you were right and the [feed] ticket was wrong," Brown responded "No." *Id.* 108:22-109:3.

127. When asked if he "ran that math and said this is what it cost me," Brown answered "It would not have mattered. No, I didn't, no." *Id.* 102:8-11.

128. Brown was not able to say how much money he believed this error cost him, or how he might figure that out. *Id.* 105:10-21.

129. Brown testified:

> Q: Do you have any other instances where you think anyone else at Tyson has lied to you? We've talked about your 35,000 bird issue. So I don't --

> A: Yeah.
> Q: -- want to make you think I'm thinking about that. I'm thinking about other instances.
> A As far as verbal speaking, no.

*Id.* 113:15-22.

130. Brown testified, "Q: Are there any other instances where anyone at Tyson has, you think, lied to you? A: None that I can recall sitting here." *Id.* 114:2-4.

**Christopher Burch**

131. Burch operates under one Broiler Contract with Tyson, operating as the Burch Poultry farm. Burch Dep., 132:5-13.

132. Under this contract, Burch operates four houses. *Id.* 66:12-17.

133. Burch Poultry contract was first entered into in 2005. *Id.* 7:13-14, 98:2-102:25.

134. That contract was renewed on October 17, 2012, with a scheduled conclusion date of May 17, 2019. Ex. 42, Broiler Contract of Christopher Burch.

135. In 2015, prior to his current contract's expiration, Burch terminated his contract with Tyson and moved his operations to Purdue Farms, and he has not contracted with Tyson since that time. Burch Dep., 7: 7-11.

136. Burch testified, "Q: Otherwise, did Tyson talk to you at all about what your contracts might look like or anything like that before you bought [your farms]? A: No." *Id.* 57:15-18.

137. Burch testified, "Q: And your first contract, did you have that reviewed by anyone before you signed it? A: Like have the lawyer look at it? Q: Lawyer or accountant or anybody? A: No. Q: Did you talk with anyone at Tyson about it? A: No." *Id.*, 66:19-67:1.

138. When he signed his first contract, Burch did not "have any discussions with Tyson about the type of breed of chicken [he] might be receiving and growing." *Id.* 69:3-6, 69:21-22.

139. When he signed his first contract, Burch did not have "any discussion about growth time" or "the amount of days you pick up the chickens for growing." *Id.* 69:7-10, 69:21-22.

140. When he signed his first contract, Burch did not have "any discussions with Tyson about condemnation processes or procedures or how that affected [him]." *Id.* 69:15-22.

141. When he renewed his contract with Tyson in 2012, Burch does not recall any discussions he had with anyone at Tyson. *Id.* 139:10:19.

142. Burch's interrogatory responses include two instances in which he believed Tyson employees made misrepresentations to him:

- Approximately 4 years ago (when the Georgia-08 became a problem) Plaintiff had 3 bad flocks in a row and his technician at the time, Eric Brown, told Plaintiff that it was his fault. Approximately 6 months later Plaintiff was told by Neil Barfield while eating lunch with him at Subway that Georgia-08 was found on his farm from testing done surrounding the bad flocks. Plaintiff went to the Tyson plant and met with Kenny Bartley and Jared Shelton who ended up compensating him $1,000 because of the problems with his past flocks.
- During Plaintiff's second to last flock he was told by his technician Eric that his chickens would be caught on Monday night. At 3:00 a.m. Monday night/Tuesday morning Plaintiff called Tyson's headquarters and was told they were not going to catch his chickens that night but would be caught the next night (Tuesday) which caused his birds to be taken off feed for an extended period of time. Tyson paid Plaintiff $120 which was to cover 10 hours of his time for waiting on the catch crew to never come.

Plaintiffs' Answers to Defendants' First Interrogatories, Burch Inter. No. 14.

143. Burch testified, "Q: Okay. So you don't -- sitting here today, you're not able to say, well, I think my settlement statement, you know, had the wrong numbers on it? A: No. I wouldn't say that, no." *Id.* 154:2-6.

144. Burch testified, "Q: Did you ever go through any of these materials and feel like the numbers reported on the settlement didn't match up with feed delivered? A: Like they -- no, I don't -- I mean, the feed tickets would match that." *Id.* 152:15-19.

145. Burch testified, "Q: Did you ever go through and determine that the live scale information didn't match up with the numbers or the settlement that you were paid? A: No." *Id.* 153:14-18.

146. Burch testified, "Q: Did you ever go through and determine that the amount you were paid was calculated incorrectly based on mor[t]ality, based on feed conversion, based on condemnation? A: No." *Id.* 153:19-23.

**Dennis Clapp**

147. Dennis Clapp operates under one Broiler Contract with Tyson, operating as the Dennis Clapp Farm (Farm 5081). Ex. 60, Deposition of Dennis Clapp, 104:3-13.

148. Farm 5081 includes eight houses. *Id.* 11:21-25.

149. Clapp first contracted with Tyson to raise Broilers in 1999. *Id.* 11:21-22. His contract has been continually renewed and he continues to operate under a contract with Tyson. Ex. 43, Broiler Contract of Dennis Clapp.

150. The Dennis Clapp Farm contract was originally entered in 1999. Clapp Dep., 11:21-22. It was renewed on April 11, 2012, with a scheduled conclusion date of April 11, 2019. Broiler Contract of Dennis Clapp.

151. Clapp does not remember "any discussions [he's] ever had with a Tyson employee regarding what the Broiler Production Contract means." Clapp Dep., 105:7-10.

152. Clapp does not remember "any discussions [he] had with anyone about" his contract executed in 2015 amending schedule A. *Id.* 108:22-109:11; Broiler Contract of Dennis Clapp.

153. Clapp testified, "Q: Do you recall anything anyone at Tyson told you about Exhibit No. 1 [Clapp's contract for Farm 5081] and what it meant? A: No. Q: Do you recall any discussions with Tyson over Exhibit No. 1 or the various amendments we looked at and how that affected your pay or anything? A: At this point I don't." Clapp Dep., 110:5-11; Broiler Contract of Dennis Clapp.

154. Regarding his contracts, Clapp testified, "I don't remember speaking to anybody specifically, no, sir." Clapp Dep., 111:2-3.

155. When asked if anyone at Tyson ever lied to him, Clapp testified, "Q: Is there anyone at Tyson that you think lied to you about something? A: The only different -- yes. Q: What was that? A: Just different issues, Kenny Bartley. He's the only one." *Id.* 145:19-24.

156. When asked what Kenny Bartley had lied about, Clapp responded that he did not know any specific lies, he just did not trust Mr. Bartley. *Id.* 145:25-146:8 ("Q: And what do you think he lied? A: It -- it was just lots -- lots of issues. No particular thing. One thing can come back. It's just dealing with Kenny Bartley. I didn't believe anything he said at that point. Q: Can you give me – A: No, sir. Q: any examples of him lying to you? A: No, sir. No, sir.").

157. Clapp testified at deposition that he had never dealt with Mears, but indicated that Mears was nice to him. *Id.* 85:20-86:3. In fact, until the deposition itself, Clapp was unaware that Mears was a defendant in the case. *Id.* 149:24-151:4

158. Clapp has always been paid for out-time exceeding 21 days. *Id.* 116:1-9 ("Q: Have you ever not gotten paid for out time over 21 days? A: No, no, no.").

159. Regarding the accuracy of his settlement sheets Clapp testified:

> Q: Have you ever, in a settlement, had an experience where you thought -- you're looking right now at the settlement document of Exhibit No. 2, which is Tyson 054959. And so that's a settlement reflected in this settlement packet. Exhibit No. 2, this would be for week end date January 16, 2016.
>
> Have you ever had an occasion where you went through your settlement, which ultimately translated to what you got paid, and thought that it misidentified the number of head placed at your farm?
>
> A: No, sir.
>
> Q: Have you ever had an instance where you thought it miss identified the mortality at your farm?
>
> A: No, sir.
>
> Q: Mortality is birds pulled out, right? Have you ever had a situation where you went through and you thought it miss identified the number -- level condemnation off your farm?
>
> A: The condemnation is done there at the plant.
>
> Q: Right. But have you ever had a situation where you went and looked at your condemnation certificates that are provided in this packet, and they're provided here in Exhibit No. 2, and thought, wait, those numbers don't match up?

> A: No, sir.
> ***
> Q: You've never had an occasion where you thought you were looking at your condemnation certificates and thought they weren't tracked right on your settlement?
> A: No, sir.
> Q: Have you ever had a discussion with anyone at Tyson that you can recall over any of your settlements where you said, I don't think this is right. Something is off on what I'm getting paid or how my pounds are being counted or whatever?
> A: The only thing is, one time with Morris Hill, that was the only time I've discussed anything with them.
> ***
> Q: Do you -- have you ever had any instance in looking at your settlement sheets where you didn't think it properly accounted for the feed usage that was done at your farm?
> A: No, sir. One time.
> Q: Okay. What happened?
> A: I thought I actually received an extra load of feed, and they couldn't prove I did or didn't, just like I thought I was shorted one time.
> ***
> Q·: Have you ever felt like your pay wasn't right, in other words, you got shorted what you were due under your settlement?
> A: Just the one time with Morris Hill.
> Q: Just the load of birds?

*Id.* 120:5-121:4, 121:20-122:5, 122:22-123:5, 124:19-22.

160. Regarding the episode with Morris Hill, Clapp testified that "[he] thought [he] had been shorted a load of birds, and we never could find paperwork on it." *Id.* 87:6-7.

161. Clapp testified that he believed "there were 4,400 birds that left [his] farm that didn't report back to [him]." *Id.* 89:22-90:9.

162. Clapp based this belief on the fact that "my pay was lower" and "poundage [was] lower." *Id*. 90:10-19.

163. In the way of evidence to support his belief, Clapp testified, "Nobody could prove anything." *Id.* 90:23.

164. As to how much an error might have cost him, Clapp testified, "Q So do you know how much that affected your pay? A: At this point, no. Q: Have you ever calculated what that is? A: Back then we might have, but now I don't have a clue." *Id.* 92:2-6.

165. Clapp testified, "[Q]: Do you know if you get any different feed from anybody else? A: I don't know, sir." *Id.* 124:15-17.

**Keith Crabtree**

166. Plaintiff Keith Crabtree ("Crabtree") operates under two different Broiler Contracts with Tyson which operate under the following farm names: K&C (Farm 5192); Farm 5198. Crabtree Dep., 68:16-18, 78:5-8.

167. K&C includes four houses; Farm 5198 includes two houses. *Id.* 27:13-16, 27:20-23.

168. Crabtree's contract dates are as follows:

- The K&C contract was entered into on February 24, 2012, with a scheduled conclusion date of February 24, 2019. Ex. 44, Broiler Contracts of Keith Crabtree.
- The Farm 5198 contract was entered into on October 14, 2011, with a scheduled conclusion date of October 14, 2021. *Id.*

169. Prior to contracting with Tyson in 2011, Crabtree was a contract grower for Perdue. Crabtree Dep., 27:17-19.

170. Crabtree switched to Tyson from Perdue due to "[b]etter opportunities with Tyson," including the opportunity to "build some more houses." *Id*. 26:24-27:19, 31:9-19.

171. Crabtree testified that in 2011, when he switched to Tyson, he dealt with a person named Mr. Allen when he transitioned from Perdue to Tyson, and signed his contracts as brought to him by Rubin Bruce and James Catlin. *Id*. 31:9-16; 69:21-24.

172. Rubin Bruce was a Service Technician at the time. *Id.* 49:7-11.

173. James Catlin was a Service Technician for Crabtree. *Id.* 155:5-11.

174. Crabtree testified he could not recall "any discussions [he] had with [Rubin Bruce and James Catlin] on what this contract was or meant or anything like that." *Id.* 69:25-70:8.

175. Crabtree testified that he believed his service technician once lied to him; but then clarified that he was not lying to him but rather he "lies on his paperwork that he turns into Tyson." *Id.* 159:8-162:2 ("Q: Has Beau [(Crabtree's Service Technician)] ever lied to you? A: Yes. Q: What has he lied to you about? A: He lies on his paperwork that he turns into Tyson. He's -- he deceivingly writes it to make it, you know, look the way it ain't supposed to -- you know, he'll misuse dates. He'll misrepresent things that he writes down.").

176. Regarding the effects these lies had on him, Crabtree testified, "Q: Any of that ever cause you to lose money? A: No." *Id.* 161:23-24.

177. Crabtree testified that he believed Jim Gottsponer lied to him one time:

> Q: How about Jim Gottsponer?
> A: Yes.
> Q: What did he lie to you about?
> ·A: When I went to that meeting, you know, showing him everything that I had, you know, presenting my case, hey, this is what's been going on.
> Q: Is this about the feed or about --
> A: No.· About the --
> Q: Density?
> A: -- the density and then the raise, both. I went up there and showed him all my papers and how all the utilities have went up, you know, that the raise they were trying to give us really didn't compensate for the – what do you call it -- the price of --
> Q: Propane?
> A: -- inflation, you know, just propane, electric, you know.
> Q: What do you think he lied to you about?
> A: After it was all said and done, he said, "Keith, I'm going to try to get you a little raise every year." Well, he got us a raise that one time, and never seen another one after that.
> And then he said that he would go to corporate and present what I showed to him. So I took everything to him, and he made copies of it and said, "I'll get back with you," and he never got back with me.
> Q: Do you know -- you don't know whether he went to corporate with it or not?

> A: He never come back -- he never spoke to me.
> Q: And so he did get you, we saw two amendments. He got you two raises, but that's it?
> A: I think the one might have come before he was in there. I'm not sure. But I know he got the one 15th of a cent. I do -- I do remember, you know, on the 14th. And then he said, you know, "If you'll just bear with me, I'll get you a little bit every year," he said, "But get what you want, you know, I can't do that, but if you'll just go ahead and sign it now, you know, that way you don't lose out all together. I'll try to get you a little bit every year."
> Q: So he said he'll try to get you a little bit every year?
> A: Yeah.
> Q: Do you know if he tried?
> A: I don't know.
> Q: And this was in around 2014?
> A: '14.

*Id.* 170:3-172:24.

178. Crabtree further testified he was not aware what Gottsponer did to negotiate for a price raise for Crabtree. *Id.* 175:2-18 ("Q. And so you signed it and took it, and then you don't know what he did from there to try to get more raises under the contract; right? A. No, sir.").

179. During his time with Tyson, Crabtree's farms have received the following increases in Base Pay on October 22, 2014 and November 15, 2015. Broiler Contracts of Keith Crabtree.

180. Regarding Jared Shelton and Kenny Bartley, Crabtree testified, "Q: What about Jared Shelton? Has he ever lied to you about anything? A: No. Q: What about Ken Bartley? A: No." Crabtree Dep., 176:4-8.

**Loi Hong**

181. Plaintiff Loi Hong ("Hong") operated under one Broiler Contract with Tyson, as H&L (5210) farm. Ex. 45, Broiler Contract of Loi Hong.

182. H&L farm operated eight houses. Ex. 46, Deposition of Loi Hong, 73:23-74:11.

183. H&L farm operated as H&L Farms, LLC, which he formed shortly after purchasing the farm from a third party. *Id.* 186: 13-25; 187:8-9.

184. Hong entered into the H&L 5210 contract with Tyson on September 9, 2013. *Id.* 73:23-74:2; Broiler Contract of Loi Hong.

185. His contract had a scheduled conclusion date of September 9, 2020. Broiler Contract of Loi Hong.

186. Hong stopped receiving broilers from Tyson in December 2016. Hong Dep., 93:11-12,

187. Hong testified he stopped receiving broilers because he was having animal welfare issues at his farm, "Q: And you were having high mortality at your farm and animal welfare issues; correct? A: Yes. Q: And you were having high condemnation at your farm because of all these issues, too; correct? A: Yes. Q: And so the water seepage issues was important for bird health. Do you agree with that? A: I agree with that." *Id.* 121:15-23.

188. At the time Hong stopped receiving broilers, he had "water coming in" his houses and a "water leakage issue." *Id.* 102:9-16, 120:22-121:17.

189. Hong testified he had a rat issue on his farm, "Q: Did you have rat issues on your farms? A: Yes." *Id.*134:1-2; Ex. 47, Pictures of Loi Hong's Farm.

190. Before signing his contract, Hong testified he did not discuss with anyone at Tyson about "what that contract might be, what it meant or anything along those lines." Hong Dep., 86:19-22.

191. Hong also testified that he talked with Tyson about out-time, and they told him out-time would be 21 days and sometimes more: "Q: Did you have any discussions with Tyson about out time and how long out time would be between flocks? A: Yes, they did tell me. They say 21 day. Q: Told you 21 days? A: Yes, sometimes more." *Id.* 90:5-9.

192. Hong did not sign a tournament contract like the other Plaintiffs in this case. Broiler Contract of Loi Hong. Hong testified that Tyson "gave him the option to signing a tournament contract and a performance contract" and he chose the performance contract. *Id.* 87:16-18.

193. A performance contract pays broiler growers a flat fee as opposed to entering the grower's broilers into the weekly tournament and determining Base Pay through the settlement process. Broiler Contract of Loi Hong, Schedule A.I, Base Pay.

194. Hong testified that the person who sold him his farm "told [him] that he thought [he'd] bring in about $420,000 a year" operating the farm. Hong Dep., 178:17-20.

195. Hong showed these numbers to Kenny Bartley, who told Hong that the numbers looked "doable." *Id.* 180:2-3.

196. Hong testified that he believed Bartley "lied" to him because "that the paper I showed to him, he said was good. Two years later I have to refinance." *Id*. 164:18-24.

197. In terms of lies Tyson told Hong, Hong testified that the Bartley statement about his papers was "all I can think of." *Id.* 164:25-165:2.

198. Regarding the accuracy of his settlement packets, Hong testified: "Q: Did you ever go through any settlement packet you received from Tyson and determine that the numbers reflected in your settlement and ultimately your pay were not correct based on the heads placed at your farm? A: The truth, I don't know." *Id.* 170:24-171:3.

199. Hong testified: "Q: So you never had occasion to believe, based on what you were paid under a settlement, that some part of the feed or the mortality or the condemnation or the head placements was wrong? [*Plaintiffs' Counsel*]: Objection to form. Q: Wrongly calculated based on the records? A: The beginning work with Tyson, I already told you I trusted them. So whatever number they give it to me, and I believe in it." *Id.* 171:24-172:8.

200. Hong testified: "Q: And sitting here today, do you have any reason to think -- has anything changed in your mind to say now I have reason to believe it was miscounted here or there, and here's when? A: I cannot prove it. I can't say anything about it." *Id.* 172:23-173:3.

**Calvin Leisure**

201. Calvin Leisure operates under two Broiler Contracts with Tyson, operating as Farm 5171 and Farm 5186. Ex. 49, Deposition of Calvin Leisure, 191:9-16; 197:7-17.

202. Farm 5171 operates three houses; Farm 5186 operates two houses. *Id.* 20-15:21.

203. Leisure began growing with Tyson in 2008. *Id.* 25:7-9, 79:10-19.

204. The Farm 5171 contract was renewed on January 21, 2015, with a scheduled conclusion date of January 26, 2022. Ex. 50, Broiler Contracts of Calvin Leisure.

205. The Farm 5198 contract was renewed on February 3, 2012, with a scheduled conclusion date of December 4, 2019. *Id.*

206. Leisure's contract dates are as follows:

- The Farm 5171 contract was entered into on January 21, 2015, with a scheduled conclusion date of January 26, 2022. *Id.*
- The Farm 5198 contract was entered into on February 3, 2012, with a scheduled conclusion date of December 4, 2019. *Id.*

207. Prior to contracting with Tyson, Leisure was a contract grower for Perdue. *Id.* 115:3-10.

208. Leisure switched to Tyson from Perdue because "Tyson doesn't nitpick as much as Perdue." Leisure Dep., 115:11-13.

209. Leisure testified that he could not recall any conversations with anyone at Tyson when renewing his contract in 2015 for on Farm 5171. *Id.* 195:5-19, exhibit 1 ("Q. Do you recall any conversations with anyone before you signed this one? A. Nothing specifically, nothing stands out.").

210. Leisure testified that he could not remember anything specific about any conversations he had when renewing his contract in 2012 for Farm 5198, "Q: Before you signed this in 2012, did

you have any talks with Tyson about whether or not you wanted to continue to grow with them? A: Every time there was a contract, yes. Q: Do you remember any of those conversations? A: Nothing specifically. Q: You wanted to continue to grow with them? A: Yes." *Id.* 199:16-23, exhibit 2.

211. Leisure testified he could not identify anyone at Tyson who lied to him. Leisure Deposition, 202:19-22 ("Q. Is there anyone at Tyson that you can recall right now that you feel like, you know, I do think this one person lied to me about something?" A. No.").

212. Leisure testified he has never noticed a miscalculation of his mortality on his settlement statements: "Q: Okay. Have you ever had an occasion to go through any of your settlement statements and think that it miscalculated your mortality cards? A: I haven't noticed one ever." *Id.* 225:22-25.

213. Leisure testified he has never thought Tyson miscalculated his condemnation certificates: "Q: Have you ever had occasion to go through and think it miscalculated your condemnation certificates? A: No, not miscalculation." *Id.* 226:1-3.

214. Leisure testified he has never thought the feed conversion numbers on his settlements were miscalculated: "Q: Have you ever looked at one of your settlement packets like we're looking at here in Exhibit 10 and thought your feed conversions were not calculated as actually used in that flock? A: I think the numbers they use are correct." *Id.* 229:17-21.

215. Leisure testified he believed one time he was shorted 12,000 pounds of feed. *Id.* 230:1-8. Leisure testified that he did not "see the truck come in," did not "call anyone and talk to anyone about that," and did not "do anything about it." *Id*. 230:21-231:4.

216. Leisure testified that this 12,000 pound shortfall occurred sometime around 2009 or 2010, but he was not sure, "Q: Can you tell me what year it was? A: It was early in my production,

probably the second year, thereabouts. Q: About '09? A: Yeah, '09, '10 or something like that.”). *Id.* 237:4-14.

217. Leisure testified that after this incident, he did not check his settlement packet and that the feed tickets showed no corrections: “Q: Did you -- have you crossed checked -- have you received a settlement for that yet? A: No. Yeah, I had the settlement. Q: Did you cross-check that against your feed delivery tickets to see if you were 6 tons short? A: No. I didn't have it calculated. It showed the feed ticket, and it showed no corrections.” *Id.* 231:5-11.

218. Leisure testified that one time he believed that the Robards Complex charged him for a load of feed it did not deliver, but that he discussed it with the feed mill and they disagreed, showing him the tickets. *Id.* 236:3-24. (“Q: So the ramp broke, and they couldn't get the feed in? A: Now, I couldn't tell you that. I just know he left a ticket, and I got charged for it, but I didn't get no feed. Q: Did you ever raise that with Tyson? A: That's when I was in the middle of it, yes. . . . Q: Who did you report it to? A: Feed mill. Q: And what did they say? A: Said they brought the ticket and brought the feed. Q: So they disagreed with you? A: Yes.”).

219. Leisure did not “do anything to quantify what that cost [him].” *Id.* 236:25-237:3.

**Charles Morris; Morvatt Enterprises, LLC**

220. Plaintiff Charles Morris (“Morris”) established Plaintiff Morvatt Enterprises, LLC in 2008. Morris Dep., 31:14-22.

221. Morris’s farms are established under the Morvatt Enterprises entity. *Id.*

222. Collectively, Morris operates under seven different Broiler Contracts with Tyson which operate under the following farm names: Morvatt #1; Morvatt #2; Gravel Pit; Honeysuckle Lane; B. D. Luck; Highway 56 #1; Highway 56 #2. *Id.* 7:13-8:19.

223. In total, Morris has 52 chicken houses. *Id.* 28:15-20. Each of Morris's seven farms operate eight houses each, except for the B. D. Luck farm. *Id.* 9:9-11, 9:13-14, 19:2-7, 24:25-25:7, 26:3-18, 29:22-30:1.

224. One of the farms, B.D. Luck, is not currently raising chickens. The Robards Complex stopped placing birds at this farm after it entered into intensified management and continued to settle at $0.0040 or higher than the average pound value for three flocks. *Id.* 85:25-86:20, 88:4-89:17.

225. Morris testified that the performance at B.D. Luck "had been low." *Id.* 85:10-24.

226. Jim Gottsponer testified at his deposition that Morris had significant animal welfare concerns at his farms: "[*Gottsponer*]: Well, there was a lot of management issues [at Morris's farms], a lot of equipment issues. Ammonia would be too high, the birds weren't being, obviously, walled correctly and the culls weren't being removed. There was a lot of light control issues with leg issues. Q: Were there mortality issues that he was having? A: Yes, tremendous." Gottsponer Dep., 196:22-197:11.

227. Morris first contracted with Tyson to raise Broilers under each of his seven contracts in 2008. *Id.* 9:17-19.

228. Morris' contract dates and renewal dates are as follows:

- The Morvatt #1 (Collins Road #1) contract was originally entered into in 2008. *Id.* 8:22-25. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. Ex. 51, Broiler Contracts of Charles Morris (TYSON_134386).
- The Morvatt #2 (Collins Road #2) contract was originally entered into in 2008. *Id.* 9:13-19. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116803).

- o The Gravel Pit Road contract was originally entered into in 2008. *Id.* 19:2-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116829).
- o The Honeysuckle Lane contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116846).
- o The B. D. Luck contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116872).
- o The Highway 56 South #1 contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116889).
- o The Highway 56 North #2 contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116906).

229. Morris does not recall having any discussions with Tyson about any of his contracts at the time of renewals. He stated:

- o Morvatt #1: "Q. Do you remember having any discussions with Tyson about this contract in 2013 when you signed it? A. No, sir, not really." Morris Dep., 67:3-6.
- o Morvatt #2: "Q. Do you remember any conversations you had with anyone at Tyson when you signed this contract?" A. Not sure." *Id.* 68:18-21.
- o Gravel Pit: "Q. Do you remember any discussions you had with anyone at Tyson in signing this contract? A. No, sir." *Id.* 70:3-5.

- Honeysuckle Lane: "Q. Do you remember any discussions you had with Tyson about this contract? A. No, sir." *Id.* 71:8-10.
- B. D. Luck: "Q. Do you remember any discussions with anyone at Tyson about signing this contract? A. No, sir." *Id.* 72:9-11.
- Highway 56 #1: "Q. Do you remember having any discussions with anyone at Tyson about signing this contract?" A. No, sir." *Id.* 73:8-10.
- Highway 56 #2: "Q. Do you remember any discussions you had with anyone at Tyson in relation to signing this agreement? A. No, sir." *Id.* 74:5-8

230. Morris testified that "in the spring of 2007 . . . [he was] told that Tyson gives an extra fuel allowance to each eight-house farm each year" by Michael Sheets. *Id.* 212:1-3.

231. Morris testified that "[t]he first year I was there, they stopped doing it." *Id.* 212:25.

232. Morris acknowledged that the extra fuel pay was not a contractual provision, testifying, "I mean, it's not in the contract. So I know they weren't contractually obligated to give it to us. I know that." *Id.* 214:3-9.

233. At deposition, Morris identified only one instance where a Tyson employee lied to him. Morris claimed that at an unspecified time, "a couple of years ago," Jim Gottsponer told him that Gottsponer believed a certain flock of Morris' birds had E. coli. Morris alleged Gottsponer said "[t]hey would get some vets out and look and see what it was. They never showed up. Then without a vet even coming to my farm, they called it E.coli." *Id.*, 103:5-16; 106:2-14.

234. Morris claimed this was a lie because "I mean, you're on my farm, you're telling me I've got E.coli, and a veterinarian did not even look at my chickens. That's a lie." *Id.* 106:10-14.

235. When asked if he knew if the birds had E.coli or not, Morris responded "I don't know." *Id.* 106:15-22.

236. Morris was unable at deposition to quantify any damages he suffered due to his birds contracting E. coli, and did not "do any calculations as to what that cost [him]." *Id.* 105:1-11.

237. When asked about Mears's role in communicating with Morris, Morris replied: "A. Mears would come in, but it was Michael … Mears just come in and introduce himself. He recall wasn't a part of the meetings. *Id.* 55:2-8.

238. When asked at deposition whether Mears had ever lied to Morris, Morris responded: "I can't recall right this second. But it's been some untruths told, yeah." *Id.* 110:5-13. When asked to elaborate with an example, Morris was unable to think of any such examples. *Id.*

239. Morris alleges in his Interrogatory Responses that he "was assured by Tyson supervisor David Mears that Tyson would increase the number of employees inspecting birds delivered to the plant." Plaintiffs' Answers to Defendants' First Interrogatories, Morris Inter. No. 14.

240. At deposition, Morris indicated that Mears's staffing decision was actually following "industry average, which is three." Morris Dep., 128:16-19.

241. At deposition, Morris indicated that Mears's staffing decision following "industry average, which is three." *Id.* 128:16-19.

242. When asked if he had "run any calculations to determine any money [Morris has] not earned because birds could have been salvaged that weren't," Morris replied that he had not run such calculations. *Id.* 129:7-10.

243. Morris could not identify any other Tyson employee who had lied to him. *Id.* 110:20-111:10. He testified:

> Q: Is there anyone else at Tyson that you feel like has lied to you about something?
> A: That's there now?
> Q: Ever. I mean, I guess we could start with there now just to compartmentalize it.
> A: Yeah, I mean, that's the ones – Mears is not here. Gottsponer is not here. You know. right offhand, Mark, I mean, I would have to go back and look at my notes on my computer. But it just got to be –

> Q: You can't think of anybody?
> A: Not right now, no.
> Q: How about former Tyson employees? Anybody you think has lied to you?
> A: Right off the top of my head, not right now.

*Id.*

244. Morris testified that he has always received his proper Premium Pay: "[Q]: you've been receiving premium pay for each house? A: Yes, sir." *Id.* 76:1-5.

245. Morris testified that he was "not aware of a situation where [he has] been over 21 [days] and not gotten paid for out-time." *Id.* 117:23-118:1.

246. Regarding the number of flocks he received each year, Morris testified: "Q: Do you receive on average five flocks per year? A: On average, I would say so. Sometimes it's six." *Id.* 121:21-25.

247. Morris testified he did not know of "a situation where the condemnation certificate didn't match up to [his] settlement statement." *Id.* 141:9-15.

248. Regarding the accuracy of the poundage and mortality numbers of his settlement statements, Morris testified: "Q: Have you ever reviewed your settlement statement and come to the conclusion that the pounds reported or the heads placed at your farm or the mortality numbers inputted into your settlement statement were wrong? A: Not me, I haven't." *Id.* 141:16-21.

249. When asked if he had "ever come to the conclusion that feed reported as delivered to [his] farm and the feed conversion numbers reported on [his] farm [were] wrong," Morris testified that there were situations in which "feed was sent to the wrong farm" but that "that got fixed." *Id.* 141:25-142:18, 143:22-144:14.

250. Morris testified that he did not "have any idea if the percentage of birds' breeds [he] get[s] is any different than anyone else's over a year's period." *Id.* 114:7-12.

**Michael Murphy; Murphy Farms, LLC**

251. Mike Murphy established Murphy Farms, LLC in 2005. Murphy Dep., 7:18-20.

252. Murphy's farms are established under the Murphy Farms, LLC entity. *Id.* 24:12-18.

253. Murphy operates under two Broiler Contracts with Tyson, operating as the Farm 5147 and Farm 5148 farms. *Id.* 80:14-18; 84:2-10.

254. Farm 5147 has six houses; Farm 5148 has five houses. *Id.* 24:8-11.

255. Murphy began growing with Tyson in 2006. *Id.* 86:2-16.

256. Murphy's contract dates are as follows:

- The Farm 5147 contract was entered into on November 23, 2011, with a scheduled conclusion date of November 23, 2018. Ex. 53, Broiler Contracts of Michael Murphy.
- The Farm 5148 contract was entered into on February 24, 2012, with a scheduled conclusion date of February 24, 2019. *Id.*

257. Murphy testified that he could not recall any conversations with anyone at Tyson before renewing his Farm 5147 contract in 2011. Murphy Dep., 82:1-7 ("Q. Do you remember any discussions you had with anyone at Tyson about signing this contract? A. No.").

258. Murphy testified that he could not recall any conversations with anyone at Tyson before renewing his Farm 5148 contract in 2012. *Id.* 84:2-21 ("Q. Do you remember any discussions you had with anyone at Tyson about this contract when you signed it? A. No.").

259. Murphy testified that he was not "aware of any time when [he has] gotten a settlement and [he] went and cross-checked [his] settlement against anything else and thought it was wrong." *Id.* 129:1-130:5.

260. One time, Murphy testified that there was a discrepancy in his settlement sheets. *Id.* 130:20-22. In that instance, Murphy testified that the delivery truck "left a ticket in my mailbox saying all four hoppers [of feed] were there" but "[t]hey only put three hoppers in my feed bin." *Id.* 131:2-9.

261. Murphy took photos of the feed bin and "got ahold of Tyson, the feed mill, and they credited me for 3,000 pounds, but I was still missing 3,000 pounds." *Id.* 132:14-17.

262. Regarding the 3,000 pounds Murphy felt were still short, he testified:

> [A Tyson employee] said the pictures didn't match up with what I took.
> Q: Pictures didn't match up with what?
> A: I took pictures of it, and I had him to come out and take pictures too. He said that's just what -- they thought it was just 3,000 pounds so that's what I got credit for, is 3,000 pounds.
> Q: So he felt like he looked at it, took pictures, you took pictures, and he felt like it was a 3,000 pound shortage?
> A: Yes.

*Id.* 133:11-21.

263. Murphy characterized this difference as simply a "disagreement" over how much feed was missing. *Id.* 134:19-24.

264. Murphy believes the feed miscalculation cost him $6,000, based on where he "would have otherwise finished" in the tournament. *Id.* 134:3-5.

265. Murphy testified he did not "have any idea if the average density that [he] receive[s] is any different from any other grower." *Id.* 92:5-8.

266. Murphy testified at deposition that he was upset with a Tyson truck driver "that come on the farm hitting his air horn" because it scared the broilers. *Id.*99:11-14. And that he was concerned with how "trashy" the catch crew's van was. *Id.* 127:2-18.

**John Pinkston**

267. John Pinkston sold his farm in 2015 and is now retired. Pinkston Dep., 6:22-7:2, 10:10-13.

268. Pinkston operated under one Broiler Contract with Tyson, for Farm 5177. Ex. 54, Broiler Contract of John Pinkston.

269. Farm 5177 included four houses. *Id*. 47:14-18.

270. Pinkston began growing with Tyson in 2008. *Id*. 44:20-21.

271. Pinkston originally grew with Perdue, and switched to Tyson in 2008 because Tyson's out time between flocks was shorter than Perdue's. *Id*. 33:7-14.

272. Pinkston's Farm 5147 contract was renewed on February 26, 2014, with a scheduled conclusion date of February 26, 2021. *Id*.

273. Pinkston testified that before signing his contract, he had phone call with Tyson and some conversations with Plaintiffs Morgan Rickard and Tim Vincent: "Q: Up until that point that you signed the contract, did you talk with anyone else besides that phone call you had with Tyson and then with Morgan and maybe Tim? A: In relation to growing for Tyson? Q: Yeah. A: No." *Id.* 39:18-23.

274. In this phone call from 2008, Pinkston testified that "Tyson said [he] might get about six flocks a year" but that he could not remember the name of the man with whom he spoke. *Id*. 39:24-40:23.

275. Pinkston also testified that when he renewed his contract in 2014, Tyson told him he "had to switch to the 52-week average" contract, as opposed to the tournament-style contract. *Id.* 45:1-22.

276. Pinkston testified he was on this contract for one flock, "[a]nd then [he] went back to the weekly." *Id.* 47:2-6.

277. Pinkston testified that he earned "$6,100 less" on that flock, based on his type of contract. *Id.* 47:23-25.

278. Pinkston testified that he discussed this shortfall with Jared Shelton: "Q: Do you recall having any discussions with anyone about signing this contract in February of 2014? A: Yes. Q: And who did you talk with about it? A: Jared Shelton." *Id.* 49:3-7.

279. Pinkston testified that Jared Shelton, "asked me if I wanted to go back to the tournament way of settlement, and I said I did. He said, well, I have a contract here for you to sign, and I signed it." *Id.* 49:17-20.

280. Pinkston testified he brought his concerns to Tyson, and the following resulted:

> Q: Did you have any discussions with anyone else at Tyson besides Jared Shelton about getting off the 52-week -- or what's called the performance incentive base system and back onto the weekly system?
> A: Yes.
> Q: And who was that?
> A: I guess it was Kenny Bartley at the time, yes.
> Q: And when did you have a discussion with Jim Bartley about this?
> A: That day or the next day.
> Q: And when you say that day or the next day?
> A: When Jared Shelton brought it to me to sign.
> Q: Brought you the agreement to put you back on the weekly?
> A: Yes. Yes.
> Q: And what did you and he talk about?
> A: I called him and asked if I was going to get the $6,100 that I didn't get because I was on the other pay scale.
> Q: And what did he say?
> A: He said, yes, he would give it to me.
> Q: Did you ever get it?
> A: Yes, I did.
> Q: So you got made whole on the $6,100?
> A: Yes, I did.

*Id.* 56:16-57:15.

281. Pinkston testified:

> Q: Did Kenny Bartley ever lie to you about anything?
> A: Yes, sir.
> Q: And what did he lie to you about?
> A: Well, several things.
> Q: And tell me what they are.

> A: I can't -- I can't specifically -- during Kenny Bartley's time there, I went from being this the top ten in the complex as far as down as in the upper 70s, 77, 78 out of 92. That's pretty bad. It's about as bad as you get. I didn't know what was going on. I didn't know why it was happening. Nothing changed on my end that I was aware of. Nothing changed on my end. And I repeatedly asked those people, and they kept telling me they didn't know, when they did know.
> Q: How do you know they knew? Well, what is it you're saying they knew?
> A: They knew why I was doing bad.
> Q: And why were you doing bad?
> A: I don't know.
> Q: So you're saying they knew, but they didn't tell you?
> A: Yes, sir.
> Q: Did they ever tell you?
> A: No, sir.

*Id.* 67:8-68:6.

282. Pinkston has checked the mortality cards against his settlement statements and found "for the most part, they were fairly consistent." *Id.* 97:22-98:19.

283. Pinkston testified that his condemnation numbers on his settlement packets were consistent with what the USDA determined: "[Q]: In other words, as we look through your packet, we'll see a condemnation certificate that you generally received; right? A: This is -- this is the -- I'm not sure I understand what you're asking. Q: Have you -- have you ever discovered that the numbers reported on your settlements as far as what was -- the number of chickens – A: Number condemned. Q: -- condemned and the reason was inconsistent with what the USDA determined on the line? A: No."). *Id.* 108:6-17; John Pinkston Settlement Packet.

284. Pinkston testified to the following regarding his feed numbers:

> Q: Have you ever cross-checked your settlement statements or your settlement packets against any other materials and found that the feed represented to be delivered was not accurate?
> A: Yes.
> Q: And when was that?
> A: On several occasions.
> Q: Can you tell me each one?
> A: No, sir.
> Q: Can you tell me any one?

A: No, sir.
Q: Can you tell me a year that happened?
A: No, sir.
Q: Can you tell me an amount that might have cost you money?
A: No, sir. I'd have to know more.

*Id.* 112:25-113:15.

285. Pinkston testified that there were “several times” his feed ticket summary “wasn’t consistent with the number of tickets [he] had in [his] house,” but that he could not identify specifically when. *Id.* 114:9-23; John Pinkston Settlement Packet.

286. Pinkston similarly testified regarding his mortality cards:

Q: Have you ever seen -- have you ever cross-checked your mortality cards against your settlement statements?
A: Yes.
Q: And have you ever found them to be different?
A: Yes.
Q: When? Can't name a time?
A: No.
Q: Name a year?
A: No.
Q: Give me a number that they were different?
A: Not really, no.
Q: Give me any calculation as to whether or not that cost you any money?
A: No.
Q: Have you ever talked to anyone at Tyson about it?
A: I don't remember.

*Id.* 117:21-118:11; Ex. 55, John Pinkston Mortality Cards.

287. When asked “Have you done anything to try to quantify what you think Tyson might owe you from when you were running your chicken business that it hasn’t paid you under your contract?” Pinkston replied, “No.” Pinkston Dep., 125:11-15.

**William Rickard; Sondra Rickard; Rickard Farms, LLC; ICU Chickens**

288. William Rickard, along with his wife Sondra Rickard, operates the entities Rickard Farms, LLC and ICU Chickens. Ex. 56, Deposition of Morgan Rickard, 11:21-12:7.

289. Rickard switched his operations from Perdue to Tyson in 2008. *Id.* 80:19-23. Rickard switched to Tyson because Perdue's out time was getting to be too long to be profitable. *Id.* 80:22-81:11.

290. Collectively, Rickard operates under four different Broiler Contracts with Tyson which operate under the following farm names: SMR; Wishbone; Branch Poultry; ICU. *Id.* 135:6-142:9.

291. SMR operates 2 houses; Wishbone operates 4 houses; Branch Poultry operates 4 houses; and ICU operates 4 houses. *Id.* 22:20-23, 23:4-5, 23:20-25.

292. Rickard first contracted with Tyson to raise Broilers under three of his four contracts in 2008. *Id.* 141:25-142:5.

293. Rickard contracted with Tyson to raise Broilers under the ICU contract in 2010. *Id.* 142:6-18.

294. His contracts have been continually renewed through 2018. Ex. 57, Broiler Contracts of Morgan Rickard.

295. Rickard's contract dates and renewal dates are as follows:

- The Farm 17 (5174) contract was originally entered into in 2008. *Id.* 141:25-142:5. It was renewed on August 29, 2017, with a scheduled conclusion date of September 1, 2020. *Id.* (TYSON_167625).
- The Wishbone (5175) contract was originally entered into in 2008. *Id.* 141:25-142:5. It was renewed on September 19, 2017, with a scheduled conclusion date of September 22, 2020. *Id.* (TYSON_167640).

- o The Branch Poultry (5176) contract was originally entered into in 2008. *Id.* 141:25-142:5. It was renewed on August 29, 2017, with a scheduled conclusion date of September 1, 2020. *Id.* (TYSON_167655).

- o The ICU (5193) contract was originally entered into on November 5, 2010. *Id.* 142:6-18. Its scheduled conclusion date is November 5, 2020. *Id.* (TYSON_116774).

296. When asked "[d]o you remember who you worked with in signing your contracts with Tyson," Rickard answered "James Catlin, Steve Keys." Rickard Dep., 97:18-20. Rickard testified that they discussed how the Robards Complex handled condemnation, as opposed to Perdue, and that "they explained how the condemn worked in general form." *Id.* 83:25-86:1.

297. James Catlin was a Service Technician for Rickard. *Id.* 166:24-167:3.

298. Steve Keys was a Broiler Manager. Brown Dep., 52:3-7.

299. Regarding his understanding of condemnation and his conversation with James Catlin and Steve Keys, Rickard testified:

> Q: So you knew that there was a charge for condemnation at Tyson that you didn't have at Perdue?
> A: I did.
> Q: And you knew that it was a whole bird condemnation process?
> A: Yes.
> Q: And you knew that it was based on the average weight of your flock?
> A: Yes.
> Q: And what you say you didn't know was the effect -- you knew you wouldn't be paid for those pounds?
> A: I understood that.
> Q: What you didn't know is how that would then run through the settlement and affect your overall numbers?
> A: Yes.
> Q: Did you go through that with them or just didn't understand it?
> A: Didn't understand it until I started seeing it in my settlements.

Rickard Dep., 85:18-86:11.

300. Other than his discussion with Caitlin and Keys, Rickard does not remember any other discussions related to his contracts before he signed them. *Id.* 97:24-98:2 ("Q: Do you remember any discussions about the contracts before you signed them, other than what we've talked about? A: No.").

301. Rickard testified he had "multiple" problems with Kenny Bartley. *Id.* 171:18-20.

302. Rickard testified he believed Bartley "lied" when Georgia-08 was affecting chickens and he told Rickard "that it wasn't nothing wrong with the chicken. It was the grower." *Id.* 174:14-19.

303. However, Rickard testified that he did not know if Bartley was actually lying when he told Rickard he thought the disease was caused by the grower:

> Q: And then later they determined it was some other problem?
> A: They determined it was Georgia 08 that they had all along, and it wasn't anything that we were doing or I was doing to cause it.
> Q: Why do you think -- do you think maybe he honestly thought that at first and then figured out it was another issue?
> A: No, I don't.
> Q: So you think he knew from the very beginning what the cause was?
> A: I don't know if he did or not. I'm just telling you I don't --
> Q: So you don't know if he was lying. You just know that turned out not to be true; right?
> A: Yes.

*Id.* 174:24-175:12.

304. Rickard testified that Bartley also "lied" by initially taking the stance that he did not know there was an issue with properly delivering feed: "Q: So he was saying he doesn't think there needs to be more documentation? That was the issue? A: He's saying there's not any -- ever been any issue with feed in his complex. Q: Okay. And you were saying, yes, there have. And then later they instituted a documentation program where they dropped off feed tickets to document the feed? A: Yeah." *Id.* 176:24-177:4.

305. However, Rickard acknowledged that, once Bartley became aware of a feed delivery issue, the issue was resolved. *Id.* 175:13-177:24 ("Q: So his opinion was, there were no issues when you first talked to him? A: Yes. Q: And then you proved to him that you did have issues? A: Yes. Q: And then they instituted a plan to better document the feed deliveries? A: Yes.").

306. Regarding damages he may have suffered for any feed miscalculations, Rickard testified:

> Q: Did you do anything to calculate whether or not that cost you any money, that issue of documentation of feed deliveries?
> A: It cost me on all the settlements we had problems on.
> Q: And what years was this?
> A: 2011 to whenever we put those in, 2004, maybe -- 2003, 2004.
> Q: So 2001 to 2004?
> A: Somewhere in that range.
> Q: And then about --
> [*Plaintiffs' Counsel*]: Did you say 2001?
> A: No, not 2001. 2011 to -- I'm off ten years. I'm sorry.
> BY [*Defense Counsel*]: Q: 2011 to 2014?
> A: Yes.
> Q: Do you have any idea how many flocks that affected?
> A: I settled 20 flocks a year.
> Q: How many pounds of feed are we talking about?
> A: Truckloads.
> Q: Well, I mean, if you're going to claim that you're suing over it, you need to tell me what the details are.
> A: That's why I got these lawyers.
> Q: So you don't know?
> A: Nope. We'll find out.
> Q: You can't -- you can't tell me how many truckloads of feed you got more or less than you should have; right?
> A: Nope.

*Id.* 177:25- 179:6.

307. In his Interrogatory Responses, Rickard alleged Mears told Rickard "that he was doing too good of a job because he was growing the chickens so fast that they were having leg problems and/or kinky back."). Plaintiffs' Answers to Defendants' First Interrogatories, Rickard Inter. No. 14.

308. At deposition, Rickard was asked whether slowing down the growth rate cured the chickens. Rickard admitted, after putting the chickens in 12 hours of darkness on the birds to try and slow them down, the leg problems lessened. Rickard Dep., 239:22-240:11.

309. Beyond this statement, Rickard did not identify any other misrepresentations by Mears. *Id.* 170:15-16 ("Q. Do you have any other issues with David Mears besides that feed issue? A. Not that I recall.")

310. When asked "Have you ever had an occasion to look at [the settlement documentation] and think the condemnation charts were calculation wrong?" Rickard testified, "No." *Id*. 186:4-7.

311. When asked "Have you ever had an occasion to look at [the settlement documentation] and think the mortality charts were calculated wrong?" Rickard testified "No." *Id.* 186:8-10.

312. When asked "Have you ever had an occasion to look at them and think the live scale tickets were calculated wrong?" Rickard testified "I have one time, but I don't remember the details of it. It's been too many years ago." *Id.* 186:11-14.

313. Rickard testified that on one occasion the feed delivery tickets on his settlement was not accurate. *Id.* 187:12-16. Rickard testified his feed tickets showed "A truckload more than my bins would even hold with the birds eating." *Id.* 188:6-7. Rickard testified that he raised this issue with Tyson and was given a credit: "Q: Did you raise that with anyone? A: Yes, I did. Q: Who's that? A: Craig Coberley, Ken Bartley, Jared Shelton. Q: And what did they say? A: They agreed. Q: And so did you get a credit for it? A: I did." *Id.* 188:11-18.

314. The Amended Complaint alleges that Gottsponer informed certain unnamed growers the Robards facility average pay was $2.47 per pound, then admitted to Rickard that the average pay was much less once expenses were factored in. First Amended Complaint, ECF #18, ¶¶ 58, 74.

315. Rickard repeated this assertion in his Interrogatory Responses and deposition testimony: "Q … Did you ever talk with Jim about any expectations of what you'll make, Jim Gottsponer? … A. Two or three growers he had talked to came by and talked to me about building new houses and the number he put out that they were going to make as average pay. Q. And what was that? A. $2.49 a square foot." Plaintiffs' Answers to Defendants' First Interrogatories, Rickard Inter. No. 14; Rickard Dep., 236:15-24.

316. At his deposition, Rickard clarified that Gottsponer did not make any statements about average pay to Rickard himself: "Q. $2.49 per square foot is what he told you? A. What he told them. He didn't tell me." Rickard Dep., 237:2-3.

317. In fact, Gottsponer was not a part of the Robards facility when Rickard built his houses and formed his relationship with Tyson: "Q. So he never told you that in relation to building new houses? He wasn't even there when you built your houses. A. No." *Id.* 238:5-8.

318. Rickard also testified that in 2015, another grower Adam Austin lost eight houses of chickens due to a failed generator. *Id.* 180:12-181:4.

319. In working to remediate that incident, Rickard testified that he was told by Gottsponer that Tyson "would stay until everything was cleaned up." *Id.* 181:14-16. However, once Tyson's staff finished assisting with the live chickens, the staff departed and stated "it was the farmer's responsibility to deal with the dead." *Id.*, 180:12-23.

320. However, Rickard admitted at deposition that this incident actually had nothing to do with his farm, but instead happened to another grower and did not affect any of Rickard's birds: "Q. Okay. So that didn't have anything to do with you? A. It did when I stayed and helped the guy get his chickens up." *Id.* 181:19-22.

321. Rickard further admitted that he understood growers were responsible for disposing of the dead chickens: "Q. And the grower as you understand it, is responsible for getting rid of dead chickens; right? A. Yes, sir." *Id.* 181:11-13.

322. Rickard claims Gottsponer represented in 2015 that "if we want heavier birds than the 7 pounds that we'd be compensated and adjusted." *Id.* 145:8-24.

323. At deposition, Rickard was unable to testify that any failure to pick up birds weighing over seven pounds resulted in any damage to Rickard or loss of any flocks. *Id.*, 180:5-11 ("Q. How many – did you actually get birds at 7 pounds that weren't picked up? A. Yes. Q. How many flocks? A. I can't tell you how many. Q. Did you lose any birds because of it? A. I can't remember.").

324. Beyond these statements, Rickard did not identify any other misrepresentations by Gottsponer. *Id.* 182:5-7 ("Q. Anything else he's done that you have a problem with? A. No, that's fine.").

**Timothy Vincent; TLC Poultry, LLC**

325. Timothy Plaintiff Tim Vincent ("Vincent") first became a contract broiler grower with a different integrator, Hudson, in 1997. Ex. 58, Deposition of Timothy Vincent, 51:18-23.

326. In 1998, Vincent became a contract grower for Tyson. *Id.* 58:7-9.

327. At that time, Vincent operated four houses as the Schoolhouse Road Farm. *Id.* 74:2-5, 119:1-4.

328. In 2004, Vincent switched his broiler operations from Tyson to Perdue because "Tyson said they didn't need us, and Perdue was expanding." *Id.* 62:7-14.

329. Vincent purchased the Rooster Ridge Farm in 2008. *Id.* 82:12-25.

330. In 2009, Vincent terminated his contracts with Perdue and switched back to Tyson. *Id.* 57:15-21.

331. Vincent returned to Tyson because Perdue's out time between flocks had gotten too long. *Id.* 85:9-11.

332. Upon returning to Tyson as a broiler grower in 2009, Vincent entered into two Broiler Contracts with Tyson for the Schoolhouse Road Farm he had previously operated with Perdue, as well as the new Rooster Ridge Farm. *Id.* 84:10-17.

333. The Rooster Ridge Farm contract was first entered with Tyson on December 2, 2008, with a scheduled conclusion date of December 2, 2013. Ex. 59, Broiler Contracts of Timothy Vincent.

334. In 2009, before the completion of the Rooster Ridge Farm contract, Vincent sold the Rooster Ridge property and terminated the Rooster Ridge Farm contract. Vincent Dep., 116:10-11.

335. The Schoolhouse Road Farm contract was renewed on July 11, 2017, with a scheduled completion date of July 12, 2020. Broiler Contracts of Timothy Vincent.

336. Schoolhouse Road Farm operates four houses. Vincent Dep., 9:12-15.

337. Vincent established Plaintiff TLC Poultry, LLC, and his farm operates under that name. *Id.* 7:18-20; 118: 24-119:4.

338. When asked: "Q: Any discussions you remember with Tyson about your new contracts and how they worked?" Vincent testified, "No." *Id.* 89:1-3.

339. Vincent testified that he remembered asking Neil Barfield and "Jennifer" about why his current contract was three years, and they replied that "They didn't know." *Id.* 119:12-120:14.

340. Beyond that, Vincent testified that he did not "remember having any other discussions with anyone at Tyson about [his] contract." *Id.* 120:12-14.

341. Regarding whether the Robards Complex miscalculated any of his numbers, Vincent testified:

> Q: So what I'm really trying to focus on -- I know you feel like a lot of my birds got condemned and I don't know why. We can talk about that. I want to know from a record keeping standpoint you ever looked in here and say the numbers aren't right. Less condemned according to the certificates than what accounted for economic check?
> A: Not less.
> Q: Or more?
> A: That I thought?
> Q: Yeah.
> A: Several times I thought it should have been less.
> Q: Thought it should have been less, but were the records different?
> A: I can only go by what they put on here. I don't know. Know what I mean?
> Q: How about on the mortality cards? Have you ever felt like my mortality cards added up to 100 dead birds, but I've got -- in my settlement they counted a different number?
> A: No.
> Q: How about on the feed? Have you ever looked at the feed tickets and it said, well, it says I got delivered X feed, but I think I got more or less feed than that?
> A: Oh, yeah.
> Q: When did that happen?
> A: I couldn't remember dates. I mean, over the years it's happened several times. Sometimes they catch it. Sometimes they don't.
> Q: And if they catch it, they credit you?
> A: You have to prove it to catch it, I mean, for them to do anything.
> Q: Right. You've got to prove that you either did or did not get the feed for the tickets that you got?
> A: Yeah.

*Id.* 128:11-129:19.

342. Regarding how much money any miscalculations cost him, Vincent testified: "Q: Can you give me an idea whether that ever cost you any money? A: Oh, yeah, sure. Q: How much? A: I couldn't tell you numbers." *Id.* 131:7-11.

343. Vincent testified that David Dickey "lied on me." *Id.* 105:7.

344. Vincent testified:

> Q: What did he lie to you about?

A: Him -- he said I blinded some birds. That's been a couple years ago, I guess. He said I blinded some birds. And after the flock -- that was about a third of the way through the flock. They came out. I had some issues. I couldn't get Jennifer out there the one week. I kept telling her I've got problems.

Finally the next week she comes out and brings some stuff to run on with them. Here comes David Dickey and the vet. I can't think of his name. But anyway, the veterinarian comes out and David Dickey and Jennifer, and they're looking at the birds. And the first thing David Dickey wants to say, oh, I think you blinded them. I don't blind birds.

The veterinarian had them -- had the birds on the tailgate, cut them open. And David is over there cutting the eyelids off of chicks -- or chickens. He's saying, "Yeah, they're just about blind." And the veterinarian says, "No, David. Here's the problem. They've got enteritis.

*Id.* 105:8-106:2.

345. Vincent testified that this occurred "maybe 2016, late 2015." *Id.* 106:23.

346. Vincent testified that "Q: And so you think David Dickey was lying about saying they had been blinded? A: Maybe in his mind he thought so, but me and Jennifer and the veterinarian all agreed it was enteritis." *Id.* 107:8-11.

347. Vincent testified that was the only problem he had with Dickey: "Q: Any other problems you've had with David Dickey? A: Not other than that, not really." *Id.* 108:15-16.

348. Vincent testified that James Catlin and Jennifer Parks never lied to him: "Q: Ever feel like they lied to you about anything? A: Not that I know of." *Id.* 103:23-24.

349. Regarding lies he had been told by other Tyson employees, Vincent testified:

Q: Okay. Did I ask you about Neil Barfield? Any problems with him?
A: No problems.
Q: Okay. How about David Mears?
A: No, no problems with David Mears.
Q: Never feel like he's lied to you about anything. And you mentioned Jim along with that other. You're talking about the Dickey issue over the flock with blindness or the enteritis?
A: Mm-hmm.
Q: Did he say anything in that meeting, or was he just there?
A: No, he spoke his piece, yeah.
Q: What did he say?

> A: He just backed up what David said. He was never there. He never looked at the birds.

*Id*. 112:1-16.

350. Regarding Kenny Bartley, Vincent testified that he could not remember any specific lie Bartley had told: "Q: Did he ever lie to you about anything? A: I can't recall a specific lie, nothing factual." *Id.* 114:11-12.