# Exhibit 3

# Deposition of Christopher Burch

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVAT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LO HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, And CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., ET AL,

Defendants.

DEPOSITION OF CHRISTOPHER BURCH
February 15, 2018
Taken on Behalf of the Defendants

---

Videotaped deposition of CHRISTOPHER BURCH, held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:30 a.m., on the above date, before Marilyn Morgan, Kentucky Licensed Court Reporter, pursuant to the Federal Rules of Civil Procedure governing depositions.

Page 2

APPEARANCES

John C. Whitfield, Esq.
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esq.
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Also Present: Ms. Tosha Lemley, Videographer

Page 3

I N D E X


| WITNESS | PAGE |
|---|---|
| CHRISTOPHER BURCH | |
| Examination by Mr. Tatum . . . . . . . . . | 5 |


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| 1 | Contract and Documents | 132 |
| 2 | 10/28/05 Letter | 140 |
| 3 | Letter | 141 |
| 4 | 12/22/09 letter | 141 |
| 5 | 3/31/10 Letter | 143 |
| 6 | 6/7/10 Letter | 144 |
| 7 | 4/20/12 Letter | 146 |
| 8 | Letter to Tyson | 147 |
| 9 | Letter from Tyson | 149 |


Page 4

VIDEOGRAPHER: This is tape No. 1 to the videotaped deposition of Christopher Burch in the matter of Charles Morris, et al, versus Tyson Chicken, Incorporated, et al, being heard before the United States District Court for the Western District of Kentucky, Owensboro division, Case No. 4:15-cv-00077. This deposition is being held at Whitfield, Bryson, and Mason, LLP on February 15, 2018, at 9:36 a.m.

My name is Tosha Lemley and I'm the videographer. The court reporter is Marilyn Morgan.

Counsel, will you please introduce yourselves and affiliations and then the witness will be sworn in.

MR. WHITFIELD: I'm John Whitfield. I represent the plaintiff in this case.

MR. TATUM: Mark Tatum representing the defendants.

Page 5

CHRISTOPHER BURCH
after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. TATUM:
Q. Would you state your full name?
A. Christopher Shawn Burch.
Q. S-h-a-w-n?
A. U-n.
Q. S-h-a-u-n?
A. Yes, sir.
Q. Where do you live?
A. 2080 Bethel Church Road, Calhoun, Kentucky.
Q. Is that a farm or --
A. No.
Q. -- just a neighborhood?
A. No. Just a residential house, just out in the country.
Q. Is it on land?
A. Yep.
Q. How many acres?
A. An acre.
Q. Who do you live with?
A. Myself.

Page 6

Q. Not married?
A. Nope.
Q. Been married?
A. No.
Q. Any kids?
A. Nope.
Q. How long have you lived there?
A. Moved in in June of 2016.
Q. Do you rent or own?
A. Owning.
Q. Where did you live before that?
A. 1423 Bazel Young Road, Calhoun, Kentucky.
Q. Was that a farm?
A. No.
Q. Did you live there alone?
A. Yep.
Q. How long did you live there?
A. '06 to -- ten years, '06 to '16.
Q. Do you have any dependents?
A. Nope.
Q. Where do you work?
A. Chicken houses.
Q. Do you currently operate chicken houses?
A. Yep.

Page 7

Q. Is that your sole source of income?
A. Yes, sir.
Q. Who do you operate chicken houses with?
A. Are you talking about the integrator?
Q. Yes, sir.
A. Perdue Farms.
Q. How long have you been with Perdue Farms?
A. Roughly two and a half years.
Q. So you started with Perdue Farms in 2015?
A. Yeah. June, I think, of 2015.
Q. How many houses do you have?
A. Four.
Q. Your houses, where are they located?
A. 500 Leslie Smith Lane.
Q. What town?
A. Calhoun, Kentucky.
Q. How far are your farms from the Perdue complex?
A. About an hour.
Q. Do you know how many miles that is?
A. No. I honestly don't, no.
Q. How many contracts do you have with Perdue?

Page 8

A. One.
Q. Is it a flock-to-flock or is it for a term?
A. I'm going to guess flock-to-flock.
Q. Not sure, though?
A. No.
Q. Are you paid under what's considered the tournament style system of pay?
A. Yep.
Q. How big are your houses?
A. 43-by-460. I think it's 19,780 square footage.
Q. And that's chicken space?
A. Yeah.
Q. Interior space too?
A. Yeah.
MR. WHITFIELD: I'm sorry. How many did you say?
THE WITNESS: 43-by-460. 19,780, I believe, is the square footage.
MR. WHITFIELD: Okay.
THE WITNESS: I may be off just a hair.
MR. WHITFIELD: That's fine.
Q. (By Mr. Tatum) So approximately 79,000 square foot? I think I got --

Page 33

associated with chickens.
Q. Have your parents told you any other reason why they switched back to Tyson?
A. No. That was the main reason.
Q. Do you know why they switched from Tyson to Perdue two and a half years ago?
A. Something new, try something. And then they was wanting to build some breeder houses and they wouldn't -- they told them yes, Tyson told them yes, and then come back and told them no. So they was --
Q. So they wanted to get into building houses to specifically raise --
A. Chicks.
Q. -- chicks themselves?
A. Yes.
Q. Not broilers?
A. They wanted to do both.
Q. And Tyson didn't want to contract with them to do --
A. They said yes at first and then they come back and said no.
Q. Okay. So they wanted to expand into growing a different type of chicken?
A. Yeah.

Page 34

Q. And for those of us who aren't in the chicken industry, would you explain the difference between a breeder and a broiler?
A. A breeder lays the eggs that make the broilers. And the broilers are for meat production.
Q. Right. And so when we're talking about like your contract with Perdue and Tyson, you're a grower that raises broilers; right?
A. Yep, a hundred percent.
Q. These are chickens that get raised to be consumed by humans?
A. Yep.
Q. And when we talk about breeders, we're talking about chickens that are raised and kept for the sole purpose of laying eggs?
A. Exactly.
Q. And then those eggs might become broilers?
A. Yeah, they're broilers.
Q. Right. So they wanted to get into the breeding business?
A. Uh-huh, yep.
Q. And at first Tyson said, well, maybe we'll contract with you to be a breeder and then

Page 35

they said they decided not to?
A. Yeah.
Q. And your parents said, well, we still want to get into the breeding business so they switched to Perdue?
A. Well, I mean, they didn't -- I mean, yeah, basically.
Q. Did they ultimately get into the breeding business with Perdue?
A. No.
Q. So they never have?
A. No, no, no, they never have.
Q. Okay. They wanted to try something new, just a different integrator?
A. Yeah, a hundred percent.
Q. And then, too, were thinking we might want to get into the breeding business and maybe Perdue will let us --
A. Yeah.
Q. -- or contract with us?
A. No, they never went to Perdue with the intentions of becoming a breeder on that side. They went to Perdue just to try something new. They had been with Tyson for 15 years and why not try something new.

Page 36

Q. And so even -- they had eight houses before raising broilers?
A. Yeah.
Q. They've got eight houses now raising broilers?
A. Yeah.
Q. Never got into the breeding business?
A. No.
Q. So you said you purchased your farm in November 2015 and you bought all the acreage, the houses, and the barn at one time?
A. Yes.
Q. Did you have any partners?
A. No.
Q. You bought it yourself?
A. Yep.
Q. What did you pay for it?
A. 485 -- 485,000.
Q. And who did you buy it from?
A. Harold Murphy.
Q. Oh, I'm sorry. Was he in the chicken business?
A. Yep.
Q. Was he still in it when you bought it?
A. Yep.

Page 41

Q. Yes.
A. Maybe a month, six weeks, somewhere around in there when I got my first flock the day after Christmas, 2005.
Q. So up until that point in time, your experience in the chicken business had been working the family farm?
A. That and working for other people.
Q. Who else had you worked for?
A. Just different ones that had chicken houses around town. I say around town, around Beech Grove.
Q. Did you consult with anyone besides your parents on whether it was a good idea for you to invest and get into it?
A. No.
Q. Did Tyson help get you any of your loans?
A. No.
Q. Did Tyson talk to you at all about what they thought was a fair price to pay?
A. No.
Q. Did Tyson talk to you at all about any expectations you could have as far as what you might make?

Page 42

A. No.
Q. Are you currently employed anywhere else?
A. No.
Q. You're full-time poultry grower?
A. Yeah.
Q. And as of when you got into the poultry business, was that your only job?
A. Whenever I bought them?
Q. Yeah.
A. Yeah.
Q. So since 2005, you've done no other work besides raise chickens?
A. I mean, I do windrowing on the side just a little bit for different people.
Q. And what is windrowing?
A. I go in and windrow their litter in between flocks.
Q. Would you explain what windrowing is?
A. I mean, basically go in and pile the litter up in a pile, let it hit a certain temperature to try to kill bacteria, and then spread it back out.
Q. So basically go into a farm when the chickens have been taken away and obviously the

Page 43

floor is full of litter?
A. Uh-huh.
Q. Right? And you pile it up in one giant pile inside or outside?
A. Inside. I mean -- yeah.
Q. Because it gets into one pile, that causes it to heat up?
A. Yeah.
Q. And there's a certain temperature at which heat will kill certain bacteria?
A. Yeah.
Q. And then what do you do with it after that?
A. We spread it back out.
Q. Spread it back out?
A. Yeah.
Q. So does all of the litter in the pile reach that temperature or just the internal?
A. Yeah. Majority of it. Because, I mean, you pile it up and then you flip it so that, you know, the other parts can get it and then you spread it back out. So, yeah, I would say probably 95 percent of it gets to that temperature.
Q. And how long does it have to sit to reach the temperature?

Page 44

A. It varies every litter. All litter is different. Some of it may be one day. Some of it may be three days, you know.
Q. So when you're piling up the litter, what all are you piling up? You're piling up the bedding?
A. Yeah. That's what I call litter.
Q. Piling up the excrements from the chickens?
A. Yep.
Q. And you're putting it in a pile. Then what are you doing to the floor in the meantime?
A. Letting it air dry.
Q. Letting it air dry?
A. Yep.
Q. And then you're just putting the litter and the excrement back on the floor?
A. Yep.
Q. Then do you do anything to it after that?
A. Me personally I do. I decake it at the end, but, I mean, I don't know what other farmers do.
Q. What does decake mean?
A. When you go in and pull out the chicken

Page 57

that?
A. About me buying them?
Q. Yeah.
A. I mean, we ran it by Kevin Tierce. He was -- I don't know what the proper term, you know, title was.
Q. He was a Tyson person at Robards?
A. Yeah.
Q. When you say ran it by him, what do you remember about talking with him about?
A. We just told him I was going to buy that farm and he was like, Good deal.
Q. That's all you really remember?
A. Yeah.
Q. Otherwise, did Tyson talk to you at all about what your contracts might look like or anything like that before you bought them?
A. No. Because, you know, my parents, I was around my parents and they grew for Tyson. So I kind of knew the basics of it before getting into it.
Q. So you didn't talk with Tyson about you're going to give me a contract before you bought them?
A. I mean, they said they was. They were

Page 58

going to. So, I mean . . .
Q. So they had contracts with Harold Murphy. And they said, If you buy them, we'll continue to contract that farm?
A. Yep.
Q. But they said there's going to be some upgrades needed --
A. Yep.
Q. -- if you want premium pay?
A. A hundred percent.
Q. Okay. And so you made those upgrades so you could get the premium pay?
A. Yeah, uh-huh.
Q. So when you signed your first contract, that was in 2005?
A. With Tyson?
Q. Yeah.
A. Yep.
Q. At that point in time, did you look around about maybe not going with Tyson and going with someone else?
A. Huh-uh.
Q. Any reason why you were just focused on Tyson?
A. They were already Tyson houses and

Page 59

Perdue wasn't taking any barns at that time. So, I mean, I just keep it simple.
Q. How do you know Perdue wasn't taking barns at that time?
A. You just know.
Q. Just kind of heard it?
A. Heard it through the grapevine.
Q. Did you have any interest with Perdue at that time?
A. Not really. You know, I mean, I had worked for Tyson and then my parents had grown chickens for Tyson.
Q. Did you have a good experience working for Tyson when you were an employee?
A. Decent.
Q. Hard work?
A. No. I mean, the hard work wasn't part of it. It was just all political stuff that comes with it.
Q. Did you quit or were you terminated?
A. I quit.
Q. And what did you quit to do?
A. I went to work for my cousin.
Q. Building the pole houses?
A. Pole barns.

Page 60

Q. Did that pay better?
A. Yeah. And plus I knew I was going to buy my chicken houses so I was already in the process of buying them. So I went to work for him because he, you know, could do that so that I could have more leniency to do what I needed to do to get the chicken houses.
Q. Working on a catch crew is full-time?
A. Yeah. I mean, I worked nights and I went to school during the day so it didn't really leave me a whole lot of time, you know, to meet with this person, meet with this person, to get my ducks in a row so that I could buy the chicken houses.
Q. So you quit Tyson so you could go to work for your cousin making a little bit more money and also have more freedom to get yourself lined up to buy some chicken houses?
A. Yes. But it was more of the being on the days, you know, and being family. It was more lenient. I could miss a day, you know, and not be frowned upon.
Q. Yeah. It was more strict requirements to show up at work for Tyson?
A. Well, I mean, not really strict. It's

Page 65

Q. So sitting here today, do you have any outstanding loans?
A. What do you mean?
Q. Do you have any -- have you paid them off?
A. No, no, no. They are still --
Q. How much do you owe today?
A. It's like 400. I'm not a hundred percent sure on the exact dime but roughly 400.
Q. Okay. So you paid it down some?
A. Yeah, yeah.
Q. Did you have a deductible on your insurance claim?
A. Yeah.
Q. What was the deductible?
A. A thousand.
Q. So they valued the loss as 145,000. You had a thousand dollars deductible?
A. They didn't -- something like that. My insurance didn't make me pay the deductible. They wrote me a check for $145,000.
Q. Was that -- do you know if that amount was determined based on replacement cost or current value?
A. No. That was just based on something --

Page 66

whenever I insured the houses in 2005, I had never gone back to reassess the value of the houses or the rebuild, you know. And so that was just something that was lacked on my end.
Q. So you don't know if that was based on a replacement value or current value that might have included depreciation and things like that?
A. I don't, no.
Q. Okay. Did you have any dispute with your insurance company?
A. No.
Q. Okay. So you started with Tyson and you got contracts after you made those initial upgrades?
A. Uh-huh.
Q. You had to make those to all four houses?
A. Yep.
Q. And your first contract, did you have that reviewed by anyone before you signed it?
A. Like have the lawyer look at it?
Q. Lawyer or accountant or anybody?
A. No.
Q. Did you talk with anyone at Tyson about it?

Page 67

A. No.
Q. How did you receive it to sign it?
A. They brought -- initially, I can't remember who brought it out but somebody brought it out to my farm and I signed it right there.
Q. No one talked to you about what you might expect to make under it or anything like that?
A. No.
Q. Did you consult with your parents or anybody else about it?
A. I mean, I talked to them about it.
Q. Did you understand it to basically be the same contract they had?
A. Yep.
Q. Were your parents qualified for premium pay under their contract?
A. Yep.
Q. The elements of pay under your contract as you understood it, there's a base pay per pound?
A. Yeah, there's a base pay.
Q. That's subject to a floor. There's a level at which you won't receive any less?
A. I don't know about that.
Q. You don't know?

Page 68

A. Huh-uh.
Q. Okay. And then there's a fuel pay?
A. Are we talking about now or whenever --
Q. Under your first contract.
A. With Tyson?
Q. Yeah. There was a fuel element?
A. I believe there was.
Q. And then there was a premium house element?
A. Yep.
Q. And at some point that fuel pay was based on poundage but then it changed to square foot; right?
A. I don't know if it did or not.
Q. Okay.
A. When I was with Tyson, it never was square footage.
Q. You don't think so? Okay.
A. No, I don't think so. I don't think -- I don't know how it is today. But whenever I left in '15, it was still --
Q. Based on pounds?
A. Based on pounds.
Q. Okay. And then the premium house, was that based on square footage?

Page 69

A. I really don't know what that was based on.
Q. Okay. Did you have any discussions with Tyson about the type of breed of chicken you might be receiving and growing?
A. No. They just bring whatever they want.
Q. Did you have any discussion with Tyson about out-time and how much out-time you might incur?
A. No.
Q. Did you have any discussion about growth time? What I mean by that, is the amount of days you pick up the chickens for growing?
A. No.
Q. Did you have any discussions with Tyson about condemnation processes or procedures or how that affected you?
A. Yeah. I've had several conversations with them. Are you talking about whenever my first contract?
Q. When you signed your first contract.
A. Oh, no, no, no, no.
Q. And you didn't ask?
A. No, no, not at that time.
Q. About any of these things?

Page 70

A. No. I was still wet behind the ears.
Q. Did you talk with any other growers about any of these things?
A. No. To my parents mainly.
Q. Did you have any discussions with Tyson about feed, what kind of feed they used or anything like that when you went to the first contract with Tyson?
A. No.
Q. You just talked with your parents about this stuff?
A. Huh-uh.
Q. Anybody else?
A. Huh-uh.
Q. Anybody warn you about any of these things, say they were good ideas or bad ideas?
A. No.
Q. Anybody warn you that the chicken business was hard to make money in?
A. On my first contract?
Q. Yeah.
A. No. Because I think I was just too young. I didn't listen to nobody.
MR. TATUM: Want to take a quick break? It's been a little over an hour. We're

Page 71

plugging along, so I think we'll make your time frame if we don't break for lunch, if that's okay for everybody.
MR. WHITFIELD: Let's not break for lunch. I've got maybe a 15-minute window I have to do something real quick.
MR. TATUM: Right now?
MR. WHITFIELD: Yeah. Let me do it now if you don't mind and then I'll be right back.
VIDEOGRAPHER: Stand by. Here marks the end of media No. 1. Going off the record. The time is 10:44 a.m.
(A break was taken.)
VIDEOGRAPHER: Back on the record. Here marks the beginning of media No. 2. The time is 11:05 a.m.
Q. (By Mr. Tatum) Have you -- we talked about the upgrades you made when you first contracted with Tyson after you bought the chicken houses?
A. Yeah.
Q. Have you made any -- did you make any upgrades to those houses at any other time while growing with Tyson?
A. Yep.

Page 72

Q. And what were those?
A. I put in new fans. I put in 6-inch recirculating pads. I put in stir fans. Right offhand, that's just all I can think of.
Q. Okay. When you say new fans, what did you put in?
A. I don't understand.
Q. I mean, how many fans? Is new fans different from stir fans?
A. Yeah, because we have sidewall fans. We have tunnel fans and we have --
Q. What kind of fans are we talking about?
A. Tunnel fans.
Q. So these are the ones at the end of the --
A. Uh-huh.
Q. So you put in new tunnel fans?
A. Yes, sir.
Q. And when did you do that?
A. 2007, '08, maybe. I put in all new heaters too. That was another one. I forgot about that.
Q. Did you put new tunnel fans in each house?
A. Yeah. I put two new tunnel fans in each

Page 97

A. Every one of them.
Q. Okay. So every service tech?
A. They would just -- yeah.
Q. OKay. Give me -- where were you when they told you this?
A. On my farm.
Q. What year?
A. 2012.
Q. In 2012, every service tech told you that you got different breeds from someone else?
A. If I asked, yes.
Q. Okay. Did you ask?
A. Yes. I asked every flock because you want to know what -- because you would have different programs for different birds. So you would ask what bird did I get this time? And then they would tell you and that's how you would run your program.
Q. I understand that. But that's them telling you what bird you got and how to run that program?
A. Yep.
Q. What you told me was every service tech told you the grower down the street got different birds from you in the same flock.

Page 98

A. Yeah.
Q. That's what I'm asking you about.
A. Yep.
Q. What service tech told you, I just want you to know the grower down the street has different birds than you?
A. What service tech?
Q. Yeah.
A. I had Bo McGuire. I had Jared Shelton. I had Wayne Hendricks. I had Eric Brown. I had Reuben -- what was his name. Reuben Bruce. I can't remember all the other service techs right offhand.
Q. Which one told you you have different birds than the grower down the street?
A. Every one that I just named.
Q. When?
A. Whenever they were my service techs.
Q. What years were they your service techs?
A. I don't recall.
Q. And why did this come up in conversation?
A. I would ask.
Q. And what growers were they referring to?
A. Just different ones in my week. And

Page 99

whenever I say "my week," the week that I settle in.
Q. Can you give me an example?
A. They wouldn't say no names. They would just say, you know -- they wouldn't mention no names. They would be like somebody got Cobbs this time.
Q. Can you give me a single example that you remember when that happened?
A. I don't understand.
Q. Can you give me a single example of when you said, yeah, I remember Jared said it about grower X, and this was the bird difference and this is when it happened?
A. They don't mention names. They would be like, oh, yeah, they had -- if I see my settlement and then I go to my service tech and ask him, be like, why did they do so much better than I did? It would be like, Well, they had four houses of Cobb chickens and you had four houses of 700s.
Q. Okay. Who? Which one of them told you that?
A. Bo McGuire.
Q. When did he tell you that?
A. '12, '13. I don't know.

Page 100

Q. And was it in relation to a particular flock?
A. Yeah.
Q. Do you remember the flock in '12 or '13 it was in relation to?
A. Which flock? No.
Q. Do you remember what birds you had?
A. No.
Q. Do you remember what birds he said someone else had?
A. No.
Q. Do you have a breed preference that you like best?
A. Now that I've been growing Ross with Perdue, I prefer those.
Q. When you were with Tyson, did you have a breed preference?
A. Huh-uh.
Q. Have you ever done any analysis to determine whether one breed performs better than another?
MR. WHITFIELD: Objection to form. Go ahead.
A. Like pull a blood sample or something? I mean, I know --

Page 101

Q. (By Mr. Tatum) Whatever you would do in your experience --
A. I mean, I look at my settlement.
Q. Okay. But there's a lot of things that go into the settlement. We can agree with that; right?
A. At the end of the day, it's the bottom-line of money. And I look at as far as who performs better with what bird, and that usually makes more money.
Q. Do you agree with me that there's a lot of factors that go into how well chickens grow, how many live, and how big they get?
A. All the inputs are different.
Q. Do you agree there's a lot of factors that go into it?
A. Yeah.
Q. Do you agree one factor -- you think one factor is the breed; right?
A. Yeah.
Q. You think one factor is the feed you mentioned; right?
A. Yeah.
Q. Another factor, would you agree, is how well they're taken care of in the barn?

Page 102

A. I mean, to a point, yes.
Q. If the barn is 110 degrees, they're all going to die; right?
A. Yeah.
Q. You had that happen?
A. Yeah.
Q. I mean, one thing is how good the grower is at raising the chickens; right?
A. Yes.
Q. And those are important factors at the end of the day in how a settlement come out; right?
A. Yeah.
Q. And do you agree that some growers are better than others?
A. I think they're all about the same.
Q. Do you agree that barn condition, equipment, equipment failures, all that can plays into performance?
A. To an extent.
Q. Do you agree that litter control and management plays into performance?
A. To an extent.
Q. Disease plays into performance?
A. To an extent.
Q. Okay. All these things ultimately play

Page 103

into how many chickens are alive and did they grow well; right?
A. Yeah.
Q. Temperature?
A. Uh-huh.
Q. Wind and light -- would you agree with that?
A. Yeah. So does mother nature.
Q. Right. And some chickens just aren't survival of the fittest; right?
A. Yes.
Q. All these things play into it?
A. Yes.
Q. Now, would you have considered yourself with Tyson a good grower or a bad grower?
A. I mean, that's kind of a loaded question.
Q. I'm just asking how you considered yourself?
A. Decent.
Q. And you said the reason you switched at Tyson was -- one was the tournament system you were unhappy with?
A. Yeah.
Q. But you're under the tournament system

Page 104

at Perdue; right?
A. Yeah.
Q. Another one was you felt like the inputs for chicks and feed were not consistent?
A. Yeah.
Q. Anything else?
A. Not that I can think of at this point.
Q. What is it about the feed that you thought was not consistent?
A. I mean, it's just not consistent. I mean, you get -- you may get reclaimed feed and who knows where it's been.
Q. Do you agree that reclaimed feed is only used in the last days of the chicken's grow-out period?
A. I'm assuming.
Q. You understand that at least is what's supposed to happen?
A. Yes. Supposed to happen yes.
Q. You're not saying you got reclaimed feed at any other time?
A. Not that I know of.
Q. You don't know if you got any different amount of reclaimed feed than anyone else?
A. What do you mean?

Page 129

Q. And this is total between morality and condemn that were --
A. No. I'm just talking about morality. Condemn isn't until it gets to the plant.
Q. Right.
A. Morality -- I'm talking about morality for when they were on my farm.
Q. Okay. Well, you had 9,913 head counted as morality against you in February 2013. But that wouldn't be the summer months. So that doesn't ring a bell?
A. Like I said, I can't recall the exact three flocks or four flocks that it was, whatever.
Q. You did have high morality three months in a row in late '14 and '15 but that's not the right months; right?
A. It could be.
Q. Okay. You got chick credits those months, though. You don't recall that?
A. Huh-uh.
Q. I mean, I guess sitting here today, that's what I'm trying to nail down, is I thought we were clear it's on the '13. Now you're saying it could be '12, '13, '14, or '15 when this happened?

Page 130

A. It could be.
Q. Okay. How would we --
A. I don't think it's '15 because I left in '15. It was either '13 or '14. I'm almost sure that it was '13 or '14.
Q. Okay. Well, on August 31st, 2013, that was your settlement payment date, you finished third. That probably wasn't it.
A. What day?
Q. August 31st, 2013. That was for your flock placed -- that was for the flock placement of -- that was payment date. But you finished third that time, so I guess that wouldn't be the right flock; right?
A. I don't know. I don't know when it was placed.
Q. Okay. I'm just trying to -- that's all I'm trying to do is figure it out. Now, you finished tenth out of tenth May 6, 2013. Does that ring a bell as to maybe that was when this happened?
A. No.
Q. No, okay. Bottom-line is you can't remember when it happened, it sounds like?
A. I mean, I know that it happened, though.

Page 131

But the exact date, no, I do not recall.
Q. I was trying to get in point a little bit so I could figure out whether you got chick credits for it or not, because you got chick credits quite a bit, but that doesn't necessarily mean it's the time period you're talking about. I was just trying to match it up, but you can't help me with that at this point it sounds like.
A. What are you trying to ask?
Q. You don't know when it happened, what year?
A. It was '13 or '14.
Q. So '12 is off the table?
A. Probably.
Q. It either is or it isn't. I mean --
MR. WHITFIELD: He didn't know.
Q. (By Mr. Tatum) You don't know?
A. No.
Q. Fair enough. I want to ask you just about some documents. There's not a whole lot of them.
Let me show you what we'll mark Exhibit 1. What I think Exhibit 1 is is the last contract you had at Tyson and related documents to that that we've kind of put into a packet. Take a look at

Page 132

it. 5136 is the number of your farm code, right, with Tyson?
A. I'm sure.
(Exhibit 1 was marked.)
Q. (By Mr. Tatum) Did you have a company that you run your farm production through or do you have an LLC or Inc. or anything?
A. No.
Q. It's just Chris --
A. Chris Burch.
Q. Chris Burch, okay. Do you call it Burch Poultry?
A. Yep.
Q. Now if you look at the second page of Exhibit 1, is that your signature on the left side?
A. Sure is.
Q. And this contract is dated 10/17/12, and if you look up there at paragraph 10, it says it was going to last until May 17, 2019. Do you see that?
A. Yeah.
Q. So this was the contract that was in place with you until you stopped working with Tyson?
A. Yeah.

Page 137

A. Uh-huh.
Q. And on the second page, is that your signature?
A. On the 86 page?
Q. Yeah.
A. Yeah.
Q. And you signed this on June 11, 2014?
A. This may be from whenever I built my new house back, this one, because that's about the time that that house burned.
Q. And do you know if this also included an increase in your base pay?
A. No.
Q. You don't know one way or the other?
A. I mean, I'm looking at it as fast as I can but no, I don't know.
Q. And do you know if it also made any changes to the amount or the type of fuel pay you were receiving?
A. No.
Q. You don't know?
A. No, I don't know.
Q. Okay. And then on the last two pages of Exhibit 1 is another amendment to Schedule A.
A. Which page?

Page 138

Q. The last two pages of Exhibit 1.
A. Okay.
Q. Is that your signature on October 14, 2014?
A. Which page are you looking at?
Q. The last page.
A. 88?
Q. Yes, sir.
A. Yeah, that's mine.
Q. Do you recall why you signed this?
A. No.
Q. Do you recall any discussions with Tyson about it?
A. No.
Q. Are you aware that this increased your base pay?
A. No.
Q. Are you aware that it also changed your energy allowance to a square foot payment?
A. No.
Q. You testified earlier today that you didn't think you were ever on the square foot energy allowance payment?
A. I didn't think I was. I mean, yeah, with that, yeah, from '14, whatever it was. What

Page 139

was it, '10?
Q. You weren't before?
A. Yeah. So I think that may be about the time I got the new house also.
Q. Are you aware of any other contract documents you were under with Tyson at the time --
A. No.
Q. -- that your relationship ended?
A. Huh-uh.
Q. Okay. Do you recall any discussions with anyone at Tyson over signing anything in Exhibit 1?
A. I don't understand.
Q. Do you recall any discussions you had with anyone at Tyson?
A. Like what we talked about whenever they handed me this to sign?
Q. Uh-huh.
A. No. Here you go, sign this.
Q. Okay.
A. And I would sign it. I mean, I wanted to keep growing chickens so I would kind of do what they say.
Q. Were you aware that some of those amendments are actually paying you more money?

Page 140

A. No. I was not informed of that.
Q. Do you have any understanding that any of those amendments decreased any of your pay in any way?
A. No. I was not informed of that either.
Q. Did you ever have any contracts or documents that Tyson asked you to sign reviewed by anybody?
A. Reviewed by?
Q. Anybody.
A. I don't know what you mean.
Q. Did you ever take the documents and say, hey, I'd like for someone else to look at these and tell me what they say?
A. Not that I know of.
(Exhibit 2 was marked.)
Q. (By Mr. Tatum) I'll ask you about a series of documents. This is Exhibit No. 2 which is an October 28, 2005, letter to you from Kevin Tierce. This is memorializing, I think, what you told me earlier that you had contacted Tyson about entering into a broiler agreement?
A. Uh-huh.
Q. Do you remember receiving this?
A. No.

Page 141

Q. But is it, in fact, true?
A. That I got this?
Q. That you had contacted Tyson?
A. Yeah. I mean, you have to contact them to get a contract so, yeah.
Q. They didn't call you and say, We'd like you to grow for us?
A. No, no, no. Because I bought the farm, so . . .
(Exhibit 3 was marked.)
Q. (By Mr. Tatum) Let me show you what's been marked as Exhibit No. 3. Do you recall receiving that letter? And that shell of the letter says that they need to increase production, will be placing each farm at a lower density level?
A. I don't recall getting this.
Q. Do you recall having any discussions with anyone at Tyson about density change?
A. I can't recall. I don't remember.
Q. Okay.
(Exhibit 4 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 4. Exhibit No. 4 is a letter to you dated 12/22/09. Do you see that?
A. Uh-huh.

Page 142

Q. Do you recall receiving this letter from Tyson?
A. No.
Q. Are you saying you didn't get it or you just don't remember it?
A. I don't remember it. But this is whenever I lost the house full of chickens.
Q. This letter says that you've had three flocks. It says, This letter is to inform that you to due to poor performance on your farm, you are in the intensified management status. Your last three flocks --
A. Uh-huh.
Q. -- settled higher than the adjusted average net pound value. You said this is in relation to what in 2009?
A. Whenever I lost my -- whenever I had the equipment failure with the whole house.
Q. So one of these flocks had the morality due to heat?
A. No, not due to heat. Due to they suffocated.
Q. Oh, I'm sorry. What we talked about earlier?
A. Yes.

Page 143

Q. Okay. And then what was the problem with the other two flocks?
A. I'm not sure. I don't remember them.
Q. Did you ultimately work through this and come out of this status?
A. I believe so.
Q. And that meant you performed better going forward?
A. They kept me around, so I'm assuming I did.
(Exhibit 5 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 5. It's a letter dated March 31, '10. Do you recall receiving that one?
A. No.
Q. This says, This letter is to inform you that due to poor performance on your farm, you are in an intensified management status. Your last three flocks settled higher than the adjusted average net pound value. Do you recall any circumstances as to why you had had three flocks in a row?
A. I mean, that's still counting the -- that's still with the one that I lost the whole house on.

Page 144

Q. You believe it's the same three flocks?
A. Yeah. Because this is dated 3/15 and this is dated 12/15. So, yeah, if this is the third, then this would be the second flock, and then there would be a flock right before that.
Q. So did you end up working out of this?
A. I'm assuming.
Q. So you don't recall why two flocks were bad but you think one of them was due to the suffocation issue?
A. Yeah.
(Exhibit 6 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 6 dated June 7, 2010.
A. Uh-huh.
Q. This is a letter to you from Tyson expressing their understanding that you were requesting a different density. You were requesting reduced placement of chickens on your farm?
A. Uh-huh.
Q. It indicated that at the time, the complex was being placed at a .88 density unless advised by the grower they prefer less birds; correct?

A. Yep.
Q. You were requesting less birds?
A. Yes.
Q. And they said that your density would be .94 at 21,000 birds per house?
A. Yes.
Q. And that was your request and what you wanted?
A. Yes.
Q. And that was -- why were you requesting that?
A. I thought with less birds, it would be better performance.
Q. Give you an opportunity to kind of get under control?
A. Yes, uh-huh.
Q. And did they, in fact, reduce your density to get you --
A. I think so, uh-huh.
Q. Then at some point did they increase your density back?
A. Yeah.
Q. And did that help you get things back under control?
A. Yes.



Q. So they were helping you out?
A. Yeah.
Q. And you were glad they did it?
A. Uh-huh.
(Exhibit 7 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 7. Exhibit No. 7 is an April 20, 2012, letter to you from Tyson regarding another request you had at that time to reduce your density. Do you recall that?
A. I believe so.
Q. And did you, in fact, around that time ask again that your density be changed so you would receive less chickens?
A. I think it did.
Q. And did they do that?
A. Do what? Yeah, I'm pretty sure they did.
Q. You thought that would help you get under control again?
A. Uh-huh.
Q. You were maybe getting too many birds for what you could handle and you wanted to get less and get it under control?
A. Sure.



Q. And did that last for a time period?
A. I'm assuming.
Q. Do you know how long that lasted?
A. No.
(Exhibit 8 was marked.)
Q. (By Mr. Tatum) Exhibit No. 8 is, I think, a document from you to Tyson. Is that your signature?
A. Yeah.
Q. Did you type this up?
A. Yeah.
Q. This was you notifying Tyson that you were no longer going to grow with them?
A. Yep.
Q. You said, Thanks for the opportunity to grow chickens for the last nine years?
A. Yep.
Q. Did you have any discussion with anyone at Tyson about your desire to quit growing with Tyson?
A. What do you mean?
Q. You know, you sent this letter to somebody. Who did you give it to?
A. I gave it to my service tech.
Q. Okay. You gave it to him. But, I mean,



did you talk with anyone at Tyson about it before you gave the letter?
A. No.
Q. Did you talk with your service tech about it when you gave them this letter?
A. Uh-huh.
Q. Who was your service tech?
A. Eric Brown.
Q. And what did you tell him?
A. I'm said I'm just not happy where I'm at. Different scenery, you know, maybe change of pace. Try something new.
Q. Did he try to dissuade you in any way from that?
A. No.
Q. Was he a jerk about it?
A. No.
Q. Do you remember anything he said?
A. Good luck. I mean, other than that, no, I don't recall.
Q. Okay. Did you tell him you were going to another complex or getting out of business or did you tell him anything?
A. No. I told him what I was doing.
Q. Okay. And he didn't say that's dumb or

Page 149

good?
A. No. Just, Good luck. I mean, it wasn't no skin off his back, you know. I mean, it didn't matter.
(Exhibit 9 was marked.)
Q. (By Mr. Tatum) And Exhibit No. 9, I think, is a letter back to you from Tyson confirming your desire to stop growing with Tyson; is that correct? Do you remember receiving that?
A. I guess I did. I don't remember getting that. But I'm not saying I didn't.
Q. Anything incorrect about what you wanted to happen in Exhibit 9?
A. What do you mean?
Q. Just as stated here, that you advised Eric Brown that you were no longer interested in continuing to grow birds for Tyson and requested that your contract be terminated at the sale of your current flock. Was that true?
A. Yeah.
Q. Okay. So you weren't looking for a nine-day notice window or anything like that. It was my flock's going to terminate --
A. I give it to them -- I got chicks maybe on the 13th or right around. And whenever I got my

Page 150

chicks is whenever I give him that letter.
Q. Okay. And you weren't asking Tyson to give any lag time or anything like that?
A. What do you mean?
Q. Other than running your flocks out, you weren't asking them to give you another 30 days after that or anything?
A. No, no.
Q. Okay. Did you ever have any discussion other than when you talked with Eric when you gave him your termination notice, did you have any discussion with anyone at Tyson ever again about stopping to work with Tyson?
A. No.
Q. Okay. Have you ever had any discussion with Tyson since about going back to Tyson?
A. Nope.
Q. Who did you -- did you keep any of your Tyson documentation like your settlement documents or anything like that?
A. I've got them. I may not have every single one of them, but I've got --
Q. You've got your packet of information you get --
A. I may not have the whole packet, you

Page 151

know, because they give everything with it. I may not have every single piece that goes in each packet.
Q. So when you get these packets for settlement, you get your settlement statement?
A. Uh-huh.
Q. You get your rankings form that tells you how you ranked in that settlement against everybody else?
A. Uh-huh.
Q. You get your morality cards back, copies of them?
A. Sometimes, sometimes no on that.
Q. Mortality card is what you track in the farm?
A. Yeah, uh-huh.
Q. Do you get your live scale tickets?
A. That's the pink tickets? I'm not sure. I mean, I haven't nitpicked through every little piece. You know, I looked at the main -- the settlement.
Q. You got your condemnation certificates?
A. Sure.
Q. What's your understanding of who condemns the birds at the plant?

Page 152

A. USDA.
Q. They make that decision?
A. As far as I know.
Q. You got your payment summary in these packets so you knew what you got paid?
A. Yeah, uh-huh.
Q. Any other materials you would get?
A. I think we got feed, maybe like whenever they brought feed, something to do with feed.
Q. You would get your feed summary, deliveries of feed?
A. I'm assuming that's what it was. It was something to do with feed. I don't know if it was each load or each whatever.
Q. Did you ever go through any of these materials and feel like the numbers reported on the settlement didn't match up with feed delivered?
A. Like they -- no, I don't -- I mean, the feed tickets would match that.
Q. Did you ever go through and feel like the numbers reported on condemnation didn't match up with the condemnation certificates?
A. I didn't go that deep. I would just look at the overall summary of the flock.
Q. Just looking to see what you got paid?

Page 153

A. That and plus it would show, you know, on that one sheet it would show how much you got paid, you know, condemn, your weight, you know, and things like that. So, I mean, I would just look at that one piece of paper and I could tell you the whole summary of my flock.
Q. Did you ever go through and determine that -- and you may not have but I've got to ask about each thing. Did you ever go through and determine whether or not the morality cards matched up with the settlement numbers that you were paid on?
A. Huh-uh.
Q. Did you ever go through and determine that the liVe scale information didn't match up with the numbers or the settlement that you were paid?
A. No.
Q. Did you ever go through and determine that the amount you were paid was calculated incorrectly based on morality, based on feed conversion, based on condemnation?
A. No.
Q. Did you ever go through and determine that the heads placed as indicated was wrong?

Page 154

A. No.
Q. Okay. So you don't -- sitting here today, you're not able to say, well, I think my settlement statement, you know, had the wrong numbers on it?
A. No. I wouldn't say that, no.
Q. Okay. Did you ever deal with David Dickey?
A. I think I talked to him maybe twice because I think he come in right as I was leaving. I think I talked to him once, maybe twice on the telephone.
Q. Did you ever have any problems with him?
A. I mean, I didn't deal with him enough to have any problems.
Q. What about Jim Gottsponer, did you ever deal with him?
A. I dealt with him whenever I was rebuilding my new house. You know, I had talked to him to see if I could and whatnot. But, no, I didn't have no --
Q. Did he treat you fairly?
A. I think so.
Q. You don't have any problems with him?
A. No.

Page 155

Q. Did you ever deal with David Mears?
A. I talked to him one time in nine years.
Q. Do you remember what you talked about?
A. Well, they -- yeah, because my service tech had screwed up my catch schedule and put me down for the wrong day and so I called Dave and let him know what had happened.
Q. And what was his response?
A. I'll take care of it.
Q. Okay. What had happened?
A. I was supposed to -- my service tech had wrote down that my chickens was going to go out on a Sunday night. It may be Monday night, whatever night it was.
Q. When you say -- just so I'm tracking with you, were you saying being delivered to your farm or being picked up?
A. Being picked up.
Q. Okay.
A. So whenever they was getting ready -- he had me down -- he give me my piece of paper saying this is your catch times, and it was a day before they were actually supposed to go out. So I had gotten two houses ready to go out, pulled them off feed, pulled them off water and, you know, waiting

Page 156

for the catch crews to show up.
Two hours after -- two or three hours after the time they were supposed to show up, they didn't show up, so I contacted my service tech. And that's whenever he informed me that he had written down the wrong day and I was like okay.
Q. How many hours delay was there between when you thought they were going to get there and when they actually got there?
A. It was a whole day, 24 hours.
Q. A one-day delay?
A. Yeah.
Q. Okay. And did you get back up and get them watered and get them fed?
A. Uh-huh.
Q. Okay. Do you know if caused you any losses? I know it caused a pain in the neck, but did it cause you any losses?
A. I mean, performance-wise, I'm sure it did.
Q. Did you lose any birds because of that?
A. I mean, not that I can recall.
Q. Do you know if you lost any pounds because of that?
A. I'm sure I did because you take them

Page 157

off, you know, I mean, you're messing up their whole routine.
Q. Do you have any idea how many pounds?
A. No.
Q. How long were they without feed and water?
A. 15 hours, and then they were back on it for, say, 12 or so, and then pulled them right back off for another 12, or whatever they recommended the shutoff time for.
Q. But you don't know at the end of the day, you haven't quantified whether that cost you anything?
A. I mean, I'm sure it did but I don't know, you know.
Q. That was one flock?
A. Uh-huh.
Q. When was that?
A. It was maybe right before I left, before I went to Perdue, so it was in '15.
Q. Okay. How were you performing in those last few flocks before you left?
A. Not good.
Q. Not good?
A. Huh-uh.

Page 158

Q. Have you ever finished number one at Perdue?
A. No.
Q. Number two?
A. Yeah.
Q. Where did you finish your last flock?
A. I'm thinking average.
Q. Have you ever finished last at Perdue?
A. Yeah.
Q. So you've kind of had some good weeks and bad weeks at Perdue?
A. Uh-huh.
Q. Top, in between --
A. Kind of a roller coaster.
Q. Okay. Any other interaction with David Mears?
A. Not that I can recall.
Q. Otherwise, you've got no problems with him?
A. Not that I know of, no.
Q. What about Neil Barfield, did you ever work with him?
A. Yeah. He was my service tech.
Q. When was he your service tech?
A. I'm trying to think. Maybe -- I started

Page 159

in '05. Maybe '06, '07, somewhere around in there maybe.
Q. So when you first started?
A. Well, I mean, I had two service techs. I can't remember the exact date whenever I had him. I had him in '09 whenever I lost that house of chickens.
Q. So it had been a long time ago?
A. Yeah.
Q. Have you got any problems with Neil Barfield?
A. No, not at all.
Q. Good guy?
A. Yeah.
Q. You think he's a good guy?
A. Yeah.
Q. What about Jared Shelton, do you have any problems with him?
A. I mean, we had our ups and downs. He was my service tech for a little while. Then he became production manager maybe. I can't remember what title. He moved right up. I can't remember what that exact title was. So, I mean, we had our ups and downs.
Q. But you think he's otherwise a good guy?

Page 160

A. I don't know.
Q. You don't know?
A. No.
Q. Did he ever do anything you think that mistreated you?
A. Nothing -- I think he was just jealous.
Q. What do you mean jealous?
A. That I was a little bit younger than him in farming and he wasn't capable of that and so I think he was just jealous of the handful of farmers around my age.
Q. Okay. Because you guys were running your own farms and doing your thing?
A. Yep.
Q. Do you know a lot of guys you deal with at Tyson raise broilers too? Did you know that?
A. Who?
Q. Do you know that at all? Have you ever even heard that?
A. I know I think Neil did. Kevin Tierce did. But other than that, I don't think anybody.
Q. You just don't know?
A. I'm pretty sure that they didn't grow chickens.
Q. You could be wrong. You are wrong, I'll