# Exhibit 5

# Deposition of Charles Morris

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, TO HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, And CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., ET AL,

Defendants.

DEPOSITION OF CHARLES HARLEY MORRIS, JR
February 9, 2018
Taken on Behalf of the Defendants

---

Videotaped deposition of CHARLES HARLEY MORRIS, JR., held at 19 North Main Street, Madisonville, Kentucky, commencing at 8:30 a.m., on the above date, before Marilyn Morgan, Kentucky Licensed Court Reporter, pursuant to the Federal Rules of Civil Procedure governing depositions.

Page 2

APPEARANCES

John C. Whitfield, Esq.
Caroline Taylor, Esq.
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esq.
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Kerri C. Boling, Esq.
Corporate Counsel II, Tyson Foods
2200 West Don Tyson Parkway
Springdale, Arkansas 72762
479.871.1965
Kerri.boling@tyson.com

Also Present: Mr. Todd Davis, Videographer

Page 3

INDEX


| WITNESS | PAGE |
|---|---|
| CHARLES HARLEY MORRIS, JR. | |
| Examination by Mr. Tatum | 5 |
| Examination by Mr. Whitfield | 230 |
| Examination by Mr. Tatum | 258 |


EXHIBITS


| Number | Description | Page |
|---|---|---|
| 1 | Collins Road Contracts | 63 |
| 2 | Morvatt #1 Contract | 67 |
| 3 | Gravel Pit Road Contract | 68 |
| 4 | Honeysuckle Lane Contract | 70 |
| 5 | B. D. Luck Farm Contract | 71 |
| 6 | Highway 56 Farm 1 Contract | 72 |
| 7 | Highway 56 Farm 2 Contract | 73 |
| 8 | Photographs of Feed | 133 |
| 9 | Settlement Documents | 135 |
| 10 | 9/6/14 Grower Meeting Memo | 147 |
| 11 | Typed Notes | 151 |
| 12 | Document dated 11/30/14 | 164 |
| 13 | Letter dated 12/7/14 | 166 |
| 14 | Letter dated 12/14/14 | 169 |
| 15 | Letter dated 1/8/15 | 170 |
| 16 | Letter dated 1/10/15 | 171 |
| 17 | Letter dated 5/11/15 | 172 |
| 18 | Email dated 12/8/15 | 173 |


Page 4

EXHIBITS (Contd.):


| | | |
|---|---|---|
| 19 | Email dated 1/21/16 | 177 |
| 20 | Letter to Donny Smith | 179 |
| 21 | Letter from Growers | 181 |
| 22 | Letter dated 12/20/12 | 183 |
| 23 | Letter dated 3/1/13 | 184 |
| 24 | Letter dated 4/28/13 | 185 |
| 25 | Letter dated 4/28/13 | 185 |
| 26 | Letter dated 7/9/14 | 187 |
| 27 | Letter dated 11/20/14 | 189 |
| 28 | Letter dated 12/23/14 | 190 |
| 29 | Handwritten Note dated 12/31/14 | 190 |
| 30 | Letter dated 1/2/15 | 192 |
| 31 | Letter dated 1/23/15 | 195 |
| 32 | Letter dated February 19, 2015 | 198 |
| 33 | Letter dated 5/27/15 | 200 |
| 34 | Letter dated 6/23/15 | 201 |
| 35 | Letter dated 7/27/15 | 202 |
| 36 | Letter dated 8/18/15 | 206 |
| 37 | Letter dated 8/27/17 | 210 |
| 38 | Letter dated 11/18/15 | 210 |
| 39 | Interrogatory Responses | 210 |

Page 5

VIDEOGRAPHER: This is the videotape deposition of Charles Morris on February 9, 2018, at the time indicated on the video screen, which is 8:34. Full introduction has been waived. The court reporter will please swear in the witness.

CHARLES HARLEY MORRIS, JR.

after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. TATUM:

Q. Would you state your full name?
A. Charles Harley Morris, Jr.
Q. Where do you live?
A. Henderson, Kentucky.
Q. What's the address?
A. 1044 North Forest Oak. That's 42420.
Q. How long have you lived there?
A. Approximately two years.
Q. Do you live alone?
A. With my daughter, yes.
Q. How old is your daughter?
A. She's eight.
Q. Is that your only child?
A. No. I have three other boys.

Page 6

Q. How old are your boys?
A. 20, 24, and 26.
Q. Do they live here in Kentucky?
A. No, they live in Florida.
Q. Are you married?
A. Yes. Legally, yes. Separated.
Q. So your divorce has not been finalized?
A. No, sir.
Q. Is that expected to be finalized soon?
A. I hope so, yes, sir.
Q. How long have you been separated?
A. Since June of 20 -- let me make sure this is right -- 2016, yes, about 17 months.
Q. What is that separated wife's name?
A. Caroline.
Q. Caroline Morris?
A. Yes, sir.
Q. When was the divorce filed?
A. I actually filed back in '15. I don't know the exact date. It's been almost two and a half years.
Q. So are your assets and all that still pending --
A. Yes.
Q. -- resolution?

Page 7

A. Uh-huh, yes, sir.
Q. Do you have any other dependents besides your daughter?
A. Three boys.
Q. They're all --
A. Okay. Oh, no.
Q. She's the only one dependent on you for tax purposes?
A. Yes, sir.
Q. Is your house at 1044 North Forest Oak, is that on one of your farms?
A. No, sir.
Q. You have -- how many farms do you have?
A. We've got -- how we've got them split up, we've got seven different names. We've got six up and running.
Q. I think I've got them for you. Let's see. You've got Morvatt No. 1?
A. And 2, yes, sir.
Q. What's the address of those?
A. 1061 Collins Road.
Q. And then you've got the Gravel Pit Road?
A. Yes, sir.
Q. Is that what you call the farm?
A. Yes, sir.

Page 8

Q. What's the address?
A. I don't know the exact address.
Q. What town are these in?
A. Now, Gravel Pit, B. D. Luck, and Honeysuckle are all in Onton, O-n-t-o-n.
Q. Onton, Kentucky?
A. Yes, sir.
Q. Where is Morvatt?
A. It's a Sebree address, just south of Sebree.
Q. Sebree, Kentucky?
A. Yes, sir.
Q. Then you've got Highway 56?
A. 56 North, yeah, 1 and 2. That's Beech Grove, Kentucky.
Q. Are those are all your farms? Morvatt 1, 2, Gravel Pitt Road, B. D. Luck, Honeysuckle, Highway 56 1 and 2?
A. Yes, sir.
MR. WHITFIELD: Highway what?
MR. TATUM: Highway 56 1 and 2.
Q. (By Mr. Tatum) Morvatt #1, how long have you owned Morvatt #1?
A. When I originally purchased it, I think it was in 2008, I think.

Page 9

Q. And that sits on farmland?
A. Yes, sir.
Q. How many houses?
A. Well, Morvatt 1 -- there's a hundred acres, and Morvatt #1 and 2 both sit on that hundred acres, kind of split in the middle.
Q. There are six houses?
A. Sixteen total.
Q. Sixteen houses?
A. Morvatt #1 and 2, yes, sir.
Q. How many are Morvatt #1?
A. Eight houses.
Q. Morvatt #2?
A. Eight houses.
Q. It sits on the same hundred acres?
A. Yes, sir.
Q. Did you purchase -- the same purchase date, approximately 2008?
A. Yes, sir. All of them, yes, sir.
Q. Do you do any other business operations on that hundred acres?
A. We lease out -- we crop share some land and just lease it out. We don't have time to farm it ourselves, so we just lease it out.
Q. How many acres do the houses take up?

Page 10

Or maybe I should say, how many acres do the chicken operations take up?
A. With the tanks and all that, I'd say probably 40 acres total, give or take.
Q. And then the rest of it is leased out?
A. Yes, sir.
Q. Did you build the houses?
A. No.
Q. Bought them?
A. Yes, sir.
Q. Who did you buy them from?
A. I actually bought them from Tyson. They were repossessed.
Q. Who was the prior owner? Do you know?
A. I'll remember here in a minute, Mark. I'll let you know. I can't . . .
Q. When did you first start engaging in poultry operations at Morvatt #1 and 2?
A. It was probably -- I would have to look at the contracts. It was probably about three months after I purchased it. We got the first farm ready and then we just went to Morvatt #2 and got it ready, and we started taking chickens and just went all the way around to all seven farms.
And by the end of the year, we had all

Page 11

seven farms up and running.
Q. What did you pay for the farm?
A. I really don't know.
Q. Did you -- you said you bought from Tyson. Did you buy the houses from Tyson, the houses and the land from Tyson?
A. Yes, sir, I bought the entire thing. What I did, I flew up here to look at them. And I went back home and said, No way. That's too much work.
Then Michael Sheets, the guy that I talked to -- then they called me back and dropped the price. I don't know exactly what the price is. I can get it. But then I decided, you know, I said, I'll go ahead and do it.
Q. So you bought a hundred acres from Tyson?
A. I bought all seven farms.
Q. But I'm trying to figure out the operations versus the land. You bought it all?
A. All at one time, yes, sir. Houses, tenant houses, land.
Q. What structures are on that Morvatt 1 and 2 property?
A. There's two dwelling houses, tenant

Page 12

houses I call them, 16 poultry houses. And that's it on them.
Q. And all that was there when you bought it?
A. Yes, sir.
Q. Have you made any upgrades to any of the tenant houses?
A. Yes, sir. We went -- they were destroyed. We had to go in there and, I mean, everybody -- they were vacant for I don't know how long, two years, and people just destroyed it and stole wire out of them. So we had to go in there and get them livable again. Yes, sir.
Q. What did you pay to upgrade those structures?
A. I don't know.
Q. Did you make any -- did you do that in 2008 when you bought them?
A. Yes, sir, because we had to get people in those houses to help us with chickens, yes, sir.
Q. Did you make any upgrades to the chicken operations?
A. Yes, sir.
Q. What did you do?
A. A long list of stuff. Cool cell pads,

Page 17

A. In this area, they just -- during the propane shortage a few years ago, they just quit bringing propane to everybody. I mean, you know, nobody else did; but he just baled on us and left us out. There were chickens with no gas.
So we had to take action. We worked with the governor's office some, and we finally had to file suit against them.
Q. Who is "we"?
A. Well, when I say "we," I sued them. So we're talking about me, yeah. I sued them.
Q. How did that lawsuit come out?
A. It came out exactly what we agreed on to start with, $1.18 a gallon. He was trying to charge $4 a gallon, but we were under contract for $1.18. So we met, and we paid $1.18 a gallon.
Q. Did you go to court, or did it settle?
A. No. We settled it.
Q. So you sued them, and then you settled it for them to continue under the contract at $1.18 a gallon?
A. Right. Yes, sir.
Q. Did you get any pay for them not delivering propane in the meantime?
A. You know, I was going to, you know, go

Page 18

for damages. But I just -- sometimes just put it behind you and just move on.
Q. When was this?
A. I'm guessing, Mark. I'm going to say around 2014, but don't hold me to that.
Q. Did any other growers join you in that lawsuit?
A. No, you know, they was -- no, sir.
Q. Have you been involved in any other lawsuits besides your divorce?
A. No.
Q. How was your time at Gold Kist? Were you a good performer?
A. Yes. We stayed in the top 25 percent year after year.
Q. So you just decided to get out of the business at Gold Kist because of the divorce?
A. It was a lot easier, yes, sir, instead of just fighting. Because she didn't want me to keep the farm and . . .
Q. You weren't terminated?
A. No, no, no, sir.
Q. So you got Morvatt -- we'll talk about how all these originated. But you've got Morvatt #1 and 2, a hundred acres. You've got

Page 19

eight houses on each of those farms.
And then you've got Gravel Pit Road?
A. Yes, sir. It's roughly 20 acres. It's just -- it's out there, but it's just a little ways from the other farms.
Q. And how many houses do you have there?
A. I've got eight.
Q. When did you buy it?
A. The same time as I bought the rest of them.
Q. You bought them all at the same time?
A. Yes, sir, I bought all of them -- because I was going to cherry pick me a couple of farms. I didn't want all of them. They were like -- they wanted to sell all of them.
Q. Did you buy all of them from Tyson?
A. Yes, sir.
Q. Land and all?
A. Yes, sir, all the tenant houses and everything.
Q. What structures are on Gravel Pit Road?
A. It's just eight poultry houses and it's got an 18,000-gallon propane tank sitting on it.
Q. What did you pay for it?
A. I really don't know. It was just all

Page 20

one -- it was one number for all of them. I mean, I could get that, but I don't have it.
Q. So you paid one price for all seven farms?
A. Yes, sir, all seven farms and everything. Yes, sir.
Q. Did you make any upgrades to Gravel Pit Road?
A. Yes, sir, the same upgrades I made to all of them.
Q. Do you have documents that show that?
A. Yes, sir. The banks had to do inspections, and Tyson had to come out there and inspect them. They gave me a list of what they wanted me to do, and we had to do what their list told us to do. So we did what they told us to do.
Q. Do you know what you paid in upgrades to get them up and running?
A. No, sir.
Q. Do you know when Gravel Pit first took flocks?
A. It went Morvatt #1 and went Morvatt #2. And we've got when the chickens were delivered, but I don't know the exact dates.
Q. Was it roughly all at the same time,

Page 21

just on a schedule?
A. Yeah. What I did, Mark, was they was needing these houses up and running, so I got one farm ready at a time. As soon as I got it ready, we put chickens in there. While we were getting upgrades on the next farm, we just went ahead and started growing chickens too.
They needed production. David Mears come out there and asked if we could get them ready, and I told him we would, trying to be a team player. I had a year and a half to get these things ready and stay on the construction loan, but I just went ahead and put chickens in there and started growing chickens immediately, pretty quick.
Q. Did Tyson provide any financing for these purchases?
A. No, sir.
Q. You got it all separate?
A. Yes, sir.
Q. Who did you get it through?
A. It was First Financial, I guess in Arkansas at the time. And my initial down payment was with People's State Bank from my banker I've dealt with my whole life down in Florida. I put up some assets in Florida.

Page 22

Q. Do you remember what that down payment was?
A. About 1.1 million. I'm just being real rough with that, so I don't really remember.
Q. Was that cash out of your pocket, or was that assets?
A. That's assets. It was financed through the bank and just put up assets. At the time, I had a partner. His name was Jimmy Prevatt. Because I couldn't afford all 56 houses at the time. So I took him on for a short period of time until we got him released and got him out of the picture.
Q. So you had a partner when you first bought all these houses?
A. Correct. Yes, sir.
Q. Was he 50/50?
A. Yes, sir. At the time, yes.
Q. And then you bought him out?
A. Yes, sir.
Q. When did you buy him out?
A. 2009 -- February 1st of 2009. I just know that because of my divorce. So February 1st of 2009.
Q. Did you have to pay him half?

Page 23

A. No, because I was going back to Florida. I said, You can have these houses. I'm going back to Florida and get my assets released. I said, I'm not doing this. He said, I'm not doing it either.
So I gave him $50,000 and . . .
Q. So you bought your half partner out for $50,000 in February '09 and got his assets released?
A. Yes, sir.
Q. What do you mean, got his assets released?
A. He put up some land for $1.2 million. It was 1.2 minus some closing fees and all that. He put up some land, and I put up some buildings and property and stuff to get the down payment.
Q. And you got that land released?
A. Yes, sir.
Q. What buildings and property did you put up?
A. My Mayo Fitness. I had a river home that was paid for on the Sewanee River.
Q. Do you still own those buildings and property?
A. No, sir. Well, I still own the Mayo Fitness building in downtown Mayo, yes, sir. I

Page 24

don't own the river house anymore, no, sir.
Q. Is Mayo Fitness still open for business?
A. No. One of my friends uses it as a physical therapy center now.
Q. Does he rent it from you?
A. Yes, sir.
Q. Where is Jimmy Prevatt now?
A. He's still got a law practice in Live Oak, Florida.
Q. Law practice?
A. Yes, sir, he's a lawyer. It was Prevatt and Sellers at the time.
Q. Did he ever actually do any of the chicken operations?
A. No, sir.
Q. He didn't do any work?
A. No, sir.
Q. Did you and he have a falling out?
A. No.
Q. Are you still friends?
A. Oh, yeah, yeah.
Q. So you did -- you were in charge of doing the work?
A. Yeah.
Q. So you've got Gravel Pit Road, and then

Page 25

you've got Honeysuckle?
A. Yes, sir.
Q. How many acres is that?
A. That sits on 65 acres, give or take, again, there, Mark. But it's around 65.
Q. How many houses?
A. Eight.
Q. Did it have eight houses to begin with?
A. Yes.
Q. Did you do any other business there?
A. No, sir.
Q. I didn't ask you that about Gravel Pit Road.
A. Same thing, no. Just chickens.
Q. What structures are there?
A. Right there, you've got eight chicken houses, and you have a tenant house on the right where you can throw a rock and hit it.
Q. Tenant house?
A. Yes, sir, a tenant house.
Q. Does someone live there?
A. Yes.
Q. Did you make upgrades to that place?
A. Yes, sir. It was destroyed also.
Q. The same as before?

Page 26

A. Yes, sir.
Q. And then you've got Highway 56 1 and 2?
A. Yes, sir. We've got B. D. Luck out there too.
Q. I was going to do that last.
A. Okay. I mean, it's in Onton. So . . .
Q. Is it on its own land?
A. Well, it's right across the road from Honeysuckle, and it sits on 235 acres -- I'm sorry, 140 acres. I'm sorry. Since then, we had a tornado come in and tear four of them down. So we've just got four houses there now.
Q. You used to have eight houses?
A. Yes, sir, used to have eight.
Q. When was the tornado that destroyed four?
A. I would say 2013 maybe. I just really can't remember.
Q. Did you get an insurance payment for that?
A. Yes, sir.
Q. What did you get paid?
A. Half a million dollars.
Q. So you've got four houses there in operation now?

Page 27

A. Not in operation, no, sir.
Q. So B. D. Luck is not taking chickens right now at all?
A. No, sir.
Q. Why is that?
A. According to Tyson, performance.
Q. Have you made any upgrades to those houses?
A. Yeah. They were upgraded just like the rest.
Q. In 2008?
A. Yes, at the same time.
Q. Have you made any upgrades to those houses since 2008?
A. No. Wait, wait. No, that's wrong. When I got that half million dollars, the bank let me take that half million dollars and put in new fans, get your static pressure up. They let me put in new heaters. Instead of paying down the debt, they let me invest it back in the chicken houses. We invested all of it back in the chicken houses with new heaters and different things that we needed.
Q. In B. D. Luck?
A. In all my farms. They let me do

Page 28

upgrades, some upgrades, to all my houses.
Q. So in every single house sometime around 2013, you put new fans and heaters in all of them?
A. We put some new heaters. We put all new fans in 52 of the houses -- not all new fans, but we added some fans, all the heaters that were bad. We put in some new brooders and we just cherry picked the stuff that we really needed at the time.
Q. Do you have a list that would identify what you put in where with that money?
A. We can get it. My CPA has got it. I don't.
Q. Do you know what it is right here?
MR. WHITFIELD: Objection to form.
Q. (By Mr. Tatum) Are you able to tell me what it is right here, what upgrades you made with that money?
A. I mean, I can just tell you we put six brooders in all 52 houses. I can tell you a lot of it. We put six new brooders in 52 houses.
Q. So six each?
A. Yes, sir. We put in a new 52-inch fan in the back of all the houses to get wind speed up so we could meet Tyson's new specs.
They asked me to replace a lot of box

heaters in the back. I did that.
I installed a camera system on all the farms.
We built a new composter over at B. D. Luck.
Q. Anything else?
A. Off the top of my head, that's pretty much it.
Q. Why did you install a camera system?
A. Well, we were having trouble with reclaim and getting more than our fair share of reclaim. Not only that, you know, when copper was high, we had people were stealing out of our chicken houses. So we put up a camera system so we can monitor.
Q. What were they stealing out of chicken houses?
A. Wiring. They would go in in the middle of the night while you had chickens and cut your wire. Next thing you know, you've got no power. They were snatching it and running.
Q. And then you've got the Highway 56 1 and 2 houses?
A. Yes.
Q. What land do they sit on?



A. Approximately 78 acres, I think.
Q. Any other businesses on that land?
A. No, sir.
Q. How about on B. D. Luck?
A. No, sir.
Q. You don't have my coal mining leases?
A. Yes, we do.
Q. Which land is that on?
A. They mine some -- we don't own it -- on Collins Road. The Onton farms, we own that. We still own the coal rights there, and we own the 56. We own -- I'm sorry. We own a partial at Morvatt. I don't know exactly where it is.
Q. So which ones are those -- are those providing income to you?
A. No. The coal mines are shut down.
Q. Have they ever?
A. Yes.
Q. When was that?
A. I'm going to be rough here, around 2010, '11, right around in there maybe.
Q. So as of today, the only source of income on your farms is the poultry business --
A. Correct.
Q. -- and then whatever graining you do?



A. Yeah, yeah, the cash crop. We charge $150 an acre. We've actually got 235 tillable acres on all of the farms, and we get $150 an acre for that.
Q. So all of them have some sort of lease involved for $150 --
A. Yes, sir, they do. Yes, sir. That's total tillable land we have.
Q. What's the total tillable land?
A. 235 acres.
Q. Among the various farms?
A. Yes, sir. That's all the farms combined.
Q. Are each of your farms set up under a different business structure like an LLC or something, or does it flow up to one?
A. It's all under Morvatt.
Q. What's the name of that company?
A. Morvatt, M-o-r-v-a-t-t, Enterprises, LLC.
Q. When was that established?
A. In 2008.
Q. Where does Morvatt come from?
A. My name is Morris, and Prevatt, his last name is Prevatt.



Q. Your former partner?
A. Yes, sir.
Q. Were there any other owners besides you and your partner?
A. No, sir.
Q. What about your in-laws or your wife?
A. No, no.
Q. Has there been a decision yet on how your farms are going to be split up in your divorce?
A. We have a premarital. More than likely, it's going to be all mine.
Q. But there's not been a final --
A. No. No, sir, no final yet. We have briefs -- we have to turn our briefs in on the 24th of this month.
Q. You have to turn what in?
A. The attorneys turn in their briefs on the 24th, whatever a brief is. I don't know.
Q. When were you married to Caroline?
A. We got married in 2009.
Q. So is your daughter her daughter?
A. Yes.
Q. Do you have full custody?
A. Yes, temporary full custody. She lives

Page 33

with me, yes. We expect it to go to permanent full custody.
Q. Then your sons are with a previous person?
A. My previous wife, yes, sir.
Q. Morvatt Enterprises, LLC, you started that in 2008. Was your partner -- that was the business he was 50/50 owner in?
A. Yes, sir.
Q. That's the business you bought him out for 50,000?
A. Correct, yes, sir.
Q. Do you have any employees?
A. Yes, sir.
Q. How many?
A. We've got seven full-time, and we've got two part-time.
Q. That's currently, obviously?
A. Yes, sir. We don't have any turnover. They're good help.
Q. Has that been relatively the same since you started in '08?
A. Probably a little bit more, because we were actually -- we did a lot of upgrades ourselves to try to save money. So me and some of the guys,

Page 34

we worked on chicken houses with other guys that grew chickens.
So probably at one time, we hired 13 or 14 employees. But now we just grow the chickens.
Q. Now, which -- just so I'm clear, which of your farms actually have a structure on it where someone lives?
A. Okay. Morvatt 1 and 2 have a structure. Honeysuckle has one. Gravel Pit has one. It's across the road, but still it's -- it's right across the road.
Then B. D. Luck does not have one, but it's right there within a couple of rock throws of the rest of them. But it doesn't have a structure. 56 North does have two dwelling houses there, tenant houses, one for each farm.
Q. Does someone live in each of those homes?
A. Yes, sir.
Q. Do they pay rent?
A. No, sir.
Q. Who are your seven full-time employees?
A. Okay. I'll start with Elor Diaz (ph). We've got Coy Long. We've got Drew Littrell, Antonio Cesar. I'm going to have to -- C-e-s-a-r

Page 35

-- Cesaraco (ph), I guess that's how you say it. Jacob -- I would have to locate his last name. Andrias Barahana (ph), if I said that right. I'm probably not even close. We've got Manuel Barahana (ph).
How many is that? Is that seven?
Q. Uh-huh.
A. I butchered those names. I could sure get them.
Q. Have you had any other full-time employees in the past who no longer work for you?
A. It's been years. I mean, we just don't really have any turnover.
Q. You can't think of any?
A. No, sir.
Q. Who are your part-time employees?
A. Natalie -- I would have to look her last name. It's the girlfriend of Elor Diaz. That's his girlfriend. She'll wash trays and stuff part-time. Then Antonio has got a girlfriend that lives with him. Her name is Briona. I'd have to look. She does just some, you know, cleaning and will do some mowing and just things to help out.
Q. What do you pay your full-time employees?

Page 36

A. It ranges -- I'll just tell you, Antonio, he's probably my main guy. He's good. He brings home $1,800 every two weeks.
Elor is $1,700 every two weeks.
My part-time employees, they get paid $11 an hour.
Manuel is $1,550.
Jacob is $1,550 every two weeks.
Coy Long is $1,900.
Q. What about Tony and Andrias?
A. Andrias is $11 an hour. Who was that last one again?
Q. Tony Cesar -- I didn't catch the last name.
A. Me neither.
Q. Cesaraco, I think you said.
A. Antonio Cesaraco, he's the one that brings home 1,800 bucks.
Q. Do you pay them cash, or how do you pay them?
A. No, sir. We 1099 them. We pay them with a check.
Q. You 1099 them --
A. Yes, sir. --
Q. -- or W-2?

Page 53

money might be required?
A. Yes, yes.
Q. So what happened after you had those discussions? What was the next step?
A. Took a leap of idiocy, I would say. Way too many chicken houses.
Q. So you took a loan with First Financial Bank?
A. Yes, sir, and People's State Bank.
Q. And then ultimately bought the houses?
A. Yes, sir.
Q. So how many houses did you buy?
A. At that time, it was 56.
Q. Now you've got 52?
A. 52 because of the tornado, yes, sir.
Q. Do you remember when you bought them? Do you remember the dates or the year? '07? '08?
A. '08. I don't know the exact date, but it was '08.
Q. Then you said you bought them with your partner, Jimmy?
A. Yes, sir.
Q. You guys were 50/50?
A. Yes.

Page 54

Q. Was he on the loans and everything too?
A. Now, no, he's not on the loans.
Q. But was he at the time?
A. Yes, sir.
Q. Did you both have to put money in, a down payment or anything?
A. We used our assets, and I had some cash from my -- when I sold my farm down there that I put into the upgrades and stuff.
Q. Did he put cash in?
A. No, sir.
Q. He put assets in?
A. Yes, sir.
Q. Then at some point, the assets and cash were equal between you?
A. Yes.
Q. Up to that point, had you had any more discussions with Tyson about buying these farms other than, Hey, here's the price?
A. It happened pretty quick. It really did. It was pretty quick. Tyson was wanting to get them off the books, which is understandable. They needed them in production. They needed them, you know, up and running. So they were pretty ready to get rid of them, and it happened pretty

Page 55

quick.
Q. The folks you dealt with at Tyson were Sheets and Mears?
A. Mears would come in, but it was Michael. And he would talk to y'all's lawyers down in Arkansas, is who he communicated with. Mears just come in and introduced himself. He really wasn't a part of the meetings. For a little bit, he was, about the shape of the houses. He kind of told me how quick they would need them, and they just needed some place to put some birds. They were really -- their out-time was down to four and five days, and they was having some bird health issues and they needed to get some time out and those 56 houses would help.
Q. Was Mears on the same page as you and the banker, that they needed upgrades?
MR. WHITFIELD: Objection to form. Go ahead.
A. Yes, sir.
Q. (By Mr. Tatum) Did he indicate to you that he was on the same page that the houses needed upgrades before they could be up and running?
A. Absolutely, yes, sir. They were in bad shape.

Page 56

Q. Ultimately, were you-all on the same page as you understood it as to what those upgrades were?
A. They gave me a list, and I had to do what the list -- and they would come out and inspect every once in a while.
Q. Anything else you can remember talking with Mr. Sheets and Mr. Mears about up until the time you bought them?
A. Not really, no.
Q. Okay. So you bought them and then you moved up here?
A. Yes, sir.
Q. Or did you operate them for a while, while still in Florida?
A. No. I moved up here, yes, sir, in the middle of that ice storm.
Q. In the middle of the ice storm in '08?
A. It was a bad day. I should have went home. It was terrible.
Q. Where did you move to?
A. At first, we got one of the dwelling houses ready. But until then, I stayed in downtown Sebree in an apartment. Judy Case had a two-bedroom apartment by the railroad tracks. We

Page 65

Q. -- you've entered on this farm?
A. Yes, sir.
Q. Then if you turn to -- there's several places on these documents where you've signed it, and I've got to kind of verify that's your signature. So we're going to go through them.
A. Okay.
Q. If you turn to probably the fourth page of it, the end of Schedule A, is that your signature there on Tyson 116806?
A. Yes, sir.
Q. And then at the end of Schedule B, if you flip back, Tyson 116813, is that your signature?
A. Yes, sir.
Q. Then the next page is the acknowledgement page. Is that your signature on that also?
A. I think I skipped over that one. Yes. Okay. I'm with you.
Q. Is that your signature?
A. Yes, sir.
Q. You're looking at Schedule B right now.
A. Right. We went past the B. Are you on the last page?

Page 66

Q. No, I'm on the acknowledgement. On the lower right, there's like a tracking number.
A. Oh, I see it. Okay. Where is it at?
Q. Look for 116814.
A. Okay. Got it.
Q. Is that your signature on the acknowledgement page?
A. Yes, sir.
Q. Then the next page, which is 116825 to 116826, it looks like there was an amendment to Schedule A given to you. Is that your -- on February 7, 2015. Is that your signature there?
A. Yes, sir.
Q. Do you know what the purpose of this amendment was?
A. I really don't know, Mark. I don't know what that amendment was for.
Q. Do you remember when you signed this contract?
A. This right here?
Q. Yeah. The contract we just looked at, which is your existing Morvatt Enterprises #2 contract, 5157.
A. Well, it says here on 12/2/2013.
Q. Do you remember where you were?

Page 67

A. I don't know if they came to the farm or if I went up there. I really don't remember, Mark.
Q. Do you remember having any discussions with Tyson about this contract in 2013 when you signed it?
A. No, sir, not really.
Q. So I'm going show you the other contracts, too, just so I can make sure I know they're yours.
A. Do you want these back?
Q. Just keep it. She'll take it as a stack.
(Exhibit 2 was marked.)
Q. (By Mr. Tatum) Exhibit 2, I think, is actually your Morvatt #1 contract, No. 5156. Do you recognize that?
A. Yes, sir.
Q. Is that, in fact, what that is?
A. Yes, sir.
MR. WHITFIELD: Hang on a second. The first one was what? Morvatt #1.
MR. TATUM: The first one -- I actually showed them backwards. Exhibit No. 1 is Morvatt #2. And Exhibit No. 2 is Morvatt #1.
MR. WHITFIELD: Okay.

Page 68

Q. (By Mr. Tatum) Look on the second page of Exhibit No. 2. Is that your signature there?
A. Yes, sir.
Q. And then if you follow to the second page of Exhibit A, is that your signature there?
A. Yes, sir.
Q. Then if we follow to the last page of Schedule B of Exhibit No. 2, which is Tyson 134396, is that your signature?
A. Yes, sir.
Q. Then that's your signature on the acknowledgement page as well?
A. Yes, sir.
Q. It looks like again Schedule A was amended on February 7, 2015, shown on the last two pages of Exhibit 2. Is that your signature there?
A. Yes, sir.
Q. Do you remember any conversations you had with anyone at Tyson when you signed this contract?
A. Not sure.
Q. You can set that to the side.
(Exhibit 3 was marked.)
Q. (By Mr. Tatum) Exhibit 3, I think, is the Gravel Pit Road contract which is No. 5159.

Page 69

And 5159, like the other numbers we mentioned, are your tracking numbers; right?

A. Right.

Q. So if we look at contract 5159, this is your existing contract for Gravel Pit Road?

A. Yes, sir.

Q. I don't think I technically asked you that question. We just looked at your Morvatt #1 contract, Exhibit 2. That's your existing contract for that farm as well?

A. Yes, sir.

Q. The second page of Exhibit 3, is that your signature?

A. Yes, sir.

Q. The second page of Exhibit A, is that your signature?

A. Yes, sir.

Q. And if we follow through to Schedule B, is that your signature there?

A. Yes.

Q. And then on the acknowledgement page, is that your signature?

A. Yes.

Q. And then again on the amendment to Schedule A, which is the last two pages, is that

Page 70

your signature there dated 2/7/15?

A. Yes, sir.

Q. Do you remember any discussions you had with anyone at Tyson in signing this contract?

A. No, sir.

(Exhibit 4 was marked.)

Q. (By Mr. Tatum) Exhibit No. 4 is your Honeysuckle Lane contract, 5160. Do you recognize that contract?

A. Yes, sir.

Q. This is your existing contract with Honeysuckle Lane?

A. Correct.

Q. Then on the second page --

MR. WHITFIELD: Do you have a copy of that?

MR. TATUM: Oh, yes.

Q. (By Mr. Tatum) On the second page of Exhibit 4, is that your signature there?

A. Yes, sir.

Q. On the second page of Exhibit A, is that your signature? It's marked Tyson 116849.

A. Yes.

Q. And, then again, we'll follow through to Schedule B, the last page, is that your signature?

Page 71

A. Yes, sir.

Q. On the acknowledgement page, is that your signature?

A. Yes, sir.

Q. The last page of the amendment of Schedule A, is that your signature?

A. Yes, sir.

Q. Do you remember any discussions you had with Tyson about this contract?

A. No, sir.

(Exhibit 5 was marked.)

Q. (By Mr. Tatum) Exhibit No. 5 is a copy of your contract for the B. D. Luck farm. Do you recognize this?

A. Yes.

Q. Is this the existing contract for the B. D. Luck farm?

A. Yes.

Q. Is that your signature on the second page of Exhibit 5?

A. Yes, sir.

Q. Also, is that your signature on the second page of Exhibit A?

A. Yes.

Q. And, also, on the last page of

Page 72

Exhibit B?

A. Yes.

Q. And, also, on the acknowledgement page?

A. Yes, sir.

Q. Then finally on the amendment to Schedule A dated February 7, 2015, is that your signature?

A. Yes.

Q. Do you remember any discussions with anyone at Tyson about signing this contract?

A. No, sir.

(Exhibit 6 was marked.)

Q. (By Mr. Tatum) Exhibit 6 should be a copy of your contract with Highway 56 Farm 1. Do you recognize that?

A. Yes, sir.

Q. This is your existing contract for that farm?

A. Yes, sir.

Q. Is that your signature on the second page?

A. Yes, sir.

Q. And, then again, is that your signature on the second page of Schedule A?

A. Yes.

Page 73

Q. And also on the last page of Schedule B?
A. Yes.
Q. Also on the acknowledgement page?
A. Yes.
Q. Also on the amendment to Schedule A dated February 7, 2015?
A. Yes, sir.
Q. Do you remember having any discussions with anyone at Tyson about signing this contract?
A. No, sir.
(Exhibit 7 was marked.)
Q. (By Mr. Tatum) Exhibit 7 should be a copy of your contract for Highway 56 #2. Is that what that is?
A. Yes.
Q. Is that your signature on the second page?
A. Yes.
Q. And again on the second page of Exhibit A?
A. Yes.
Q. Again on the last page of Exhibit B which is Schedule B? Sorry.
A. Yes.
Q. And again on the acknowledgement page?

Page 74

A. Yes.
Q. And then again on the amendment to Schedule A dated February 7, 2015?
A. Yes.
Q. Do you remember any discussions you had with anyone at Tyson in relation to signing this agreement?
A. No, sir.
Q. All of these contracts are a second contract for your farms; correct?
A. Yes, sir.
Q. So you had one series of contracts for each one before?
A. Yes.
Q. Are you aware of any changes between the first series of contracts and the second series?
A. I mean, I really didn't read them, Mark. I just took their word at it and really didn't read it.
Q. When you signed Exhibits 1 through 7, did you consult with an attorney or any advisor?
A. No, sir. No, sir.
Q. When you signed your first group of contracts with Tyson, did you consult with an attorney or any advisors?

Page 75

A. You know, my partner was an attorney, but I didn't ask for advice. No, sir.
Q. Did your partner sign any of the contracts, or did you?
A. I signed them. I was the managing member, so I signed them all, yes, sir.
Q. Did he review any of them?
A. To my recollection -- I don't remember, but I don't think so.
Q. Do you recall any conversations you had with Tyson in relation to signing your first series of contracts?
A. No, sir. No.
Q. Now, as I understand it, there are basically three types of pay you receive under your contracts -- a base pay, a fuel pay, and a premium house pay?
A. Correct.
Q. Is that right?
A. Yes, sir.
Q. And the fuel pay for the premium house pay is based on square footage if you comply with certain requirements, upgrades in the house, equipment needs; right?
A. Correct. Yes, sir.

Page 76

Q. Since a certain time you've made those upgrades -- we talked about the money used to do that -- you've been receiving premium pay for each house?
A. Yes, sir.
Q. And then fuel pay is also set by square footage in the contract; correct?
A. I believe that's how it's set, yes.
Q. I mean, you receive that for each flock; right?
A. Yes, sir.
Q. And then what's your understanding of how the base pay works?
A. When you say "understanding," what do you -- I mean, it is what it is. In all honesty, I don't even know what it is right now. I know that sounds ridiculous, but I'm so dern busy I can't keep up with all those numbers.
Q. Is it the same among your farms or different? Do you know?
A. These are the same across all the farms, yes.
Q. Are you familiar with the tournament system of pay?
A. Yes.

Page 85

it. And, you know, the tornado came through and it was a way for me to . . .
Q. So you operated four houses. They were lost. You have no desire to rebuild them?
A. No, sir.
Q. And then you operated four houses until when?
A. I really don't know what date that was, Mark.
Q. And at some point, you stopped receiving birds at B. D. Luck?
A. B. D. Luck, yes, sir.
Q. What's your understanding as to why you stopped receiving birds at those four houses?
A. Well, first of all, we haven't had a conversation with Tyson. I didn't reach out to them, and they didn't reach out to me.
But, you know, they said, If your performance is not above a minus 40 this time, they was going to terminate the contract.
Q. The performance had been low at B. D. Luck?
A. Before the tornado, it was okay. But it had been low.
Q. So you've heard of the intensified

Page 86

management program?
A. Correct. Intensified management, yes, sir.
Q. Do you know what leads to a farm being put on that program?
A. Yes, sir. Being below minus 40 for three flocks in a row.
Q. What does below minus 40 for three flocks in a row mean to you?
A. Below average, 40 points below average.
Q. That means below the average --
A. Of the competition that week, yes, sir.
Q. That week?
A. Yes, sir.
Q. So that farm was below average for three weeks in a row leading to the IM program?
A. Correct.
Q. Then did it continue to have performance issues?
A. Correct, yes.
Q. And was the farm in need of repair?
A. No more than the rest of them. I mean, you know, just normal maintenance. They had been upgraded also.
Q. Did you have any discussions with Tyson

Page 87

about repairs they thought ought to be made to that farm?
A. No. They never.
Q. They didn't discuss with you water issues?
A. There was no water issues. I mean . . .
Q. They didn't discuss with you foliage issues, you know, weeds all around the house and things like that? They didn't discuss with you that?
A. No. I keep some clean farms.
Q. They didn't discuss with you litter management issues of that farm?
A. No. We do the same litter on all farms.
Q. But you're saying no one discussed those issues with you?
A. No, no, no. As a matter of fact, they just quit talking to me.
Q. So your position is no one at Tyson contacted you and said, These are the problems with that farm and this is what needs to be fixed?
A. No.
Q. And so at some point, you were told birds wouldn't be placed at that farm any longer?
A. I never was told. Just they never

Page 88

showed up again.
Q. Did you ever contact anyone and say --
A. No, I did not.
Q. So you've never had a discussion with Tyson about why you're not getting birds at B. D. Luck?
A. Huh-uh.
Q. I'm curious as to why you wouldn't follow up and say, Why aren't I getting birds at my farm?
A. Well, we were below minus 40 three times in a row. I mean, it was a given, I guess. I just assumed it was a given.
Q. Okay.
A. I'm not going to go out there and beg for birds.
Q. Do you, sitting here today, know why you were below minus 40 three times in a row?
A. No.
Q. Have you ever been below minus 40 three times in a row at any other farm?
A. No other farm has been terminated, no, sir.
Q. But you have received notices of --
A. We all receive notices from time to

Page 89

time.
Q. You all receive them?
A. I have, yes.
Q. Oh, okay.
A. Yeah.
Q. So you said your position is you didn't receive any letter or anything notifying you that B. D. Luck wouldn't receive further birds?
A. I received a letter.
Q. Oh, you did?
A. Yeah. But you asked to me if I talked to anybody. I haven't talked to anybody. We did receive a letter, yes.
Q. So what are you doing with B. D. Luck farm now?
A. It's just sitting there empty, yes, sir. Just sitting there empty.
Q. Who is your current service tech?
A. Okay. Okay. I don't know them on -- I'll have to give you the farms. Okay?
Q. Okay.
A. Because I've got two techs. I've got John -- and I don't know his last name -- but he's on the Onton farms and the Morvatt farms. And then I've got Bo McGuire on the 56 1 and 2 farms. And I

Page 90

don't know John's last name.
Q. How long have you had those?
A. Those two techs?
Q. Yeah.
A. I've had John now going on probably about a year and a half, and Bo has just come back on my farms.
Q. Is Bo a good guy?
MR. WHITFIELD: Objection to form.
Q. (By Mr. Tatum) You don't like Bo? Do you not like him?
A. No.
Q. Do you like John?
A. Yeah, a wonderful guy, easy to work with.
Q. What is it you don't like about Bo?
A. If there is an issue on the farm, instead of coming and talking to me, he's going to run up -- which I don't mind. He can talk to whoever he wants to. But we try to do a good job.
It's not -- you know, John, if he sees an issue, he'll say, Hey, Charles, you know, I saw a water leak in house 5. It's nice that he calls and he interacts with us, but Bo doesn't.
Q. Bo doesn't interact with you?

Page 91

A. He thinks he going to move up the corporate ladder by . . .
Q. What does he do?
A. I really don't know.
Q. Does he come out and inspect your farms?
A. He comes out and tries to tell you what to do all the time.
Q. Do you follow his directions?
A. No. He's never grown a chicken in his life.
Q. Do you know how long he's been a service tech?
A. I really don't know.
Q. Have you ever worked with any other service techs besides John and Bo?
A. Yeah. I've had Neil. I've had Wayne Hendrix before he retired. I worked with all of them.
Q. Do you like Neil?
A. I do like Neil, yes.
Q. Did you order Neil not to come to or come to your farm ever again?
A. No. Neil -- we talk all the time.
Q. You're saying you didn't tell Neil that, just being clear?

Page 92

A. Ask that one more time.
MR. WHITFIELD: Tell what?
Q. (By Mr. Tatum) You've never told Neil, Don't talk to me and don't come to my farm again?
A. I couldn't do that. He can come to my farm anytime he wants to.
Q. Did you ever tell him not to come to your farm again?
A. No, never.
Q. Did you ever tell him you'll only communicate with him in writing and no other way?
A. No, not only. I said, We need to communicate in writing so everybody is clear.
Q. Did you ever tell him you'll only communicate with him in writing?
A. No.
Q. Did you ever tell that to any service tech?
A. No.
Q. Did you ever tell any service tech not to come to your farm again?
A. I can't do that, no. It never happened.
Q. How about Wayne? Do you like him?
A. A good guy, yes, sir.
Q. What did Neil do to make you sue him?

Page 97

Q. So have you put a hold on that? So do we have tapes from 2016?
A. No. There wouldn't be no video from 2016, no.
Q. So you've been recording since when?
A. It records daily. It's recording as we're sitting here today.
Q. When did you start recording?
A. When I put the camera system in.
Q. Is that when B. D. Luck was --
A. Yeah. When -- yeah.
Q. So you've done nothing to preserve those videos?
A. No. Just when you have issues.
I mean, Tyson has actually had me look at some when they had a truck fell off on an occasion one time. You know, they wanted to look at it because they wanted to see what was going on.
Q. Do you have any tapes or CDs or anything you've made of any --
A. No.
Q. So like right here, right now, the most I could look back would be 60 days on your videos?
A. Yes.
Q. And anything that happened 61 days or

Page 98

more --
A. Is gone.
Q. -- is deleted?
A. Yes.
Q. And you've done nothing to preserve any of that?
A. No, huh-uh. It's a lot, you know, to catch thieves.
Q. Can you give me an examples of when you say you ran out of feed and he said he was there yesterday and there was feed?
A. I don't know what days are examples, but it's happened.
Q. You can't tell me when?
A. No. Not exactly, no.
Q. Did you talk to anyone else about it?
A. I probably done a lot of talking over the years.
Q. You can't recall specifically?
A. Not specific, no.
Q. Can you recall whether that caused you loss of money?
A. If you don't have feed, your chickens don't grow.
Q. Can you tell me if it caused you loss of

Page 99

money?
A. Yes. That would cost you money, yes.
Q. How much money?
A. I don't know.
Q. Did you run any kind of calculations to see?
A. No, no.
Q. You said, He said don't cull within seven days?
A. Yeah, don't cull within seven days. Yes.
Q. That was a lie?
A. I didn't say it was a lie.
Q. Well, I had asked you what he said to you that was a lie.
A. I said lie. He asked me to take -- you're lying about the mortality that you had in the first week. He said, Take and spread it out over the second week. That's a lie.
Q. So explain to me what you're saying
A. Say on day five, you know, that's usually when your chickens spike up. Say if you spike up 300 dead chickens, don't put 300 on day five. Take those 300 after day seven, and spread it out on the other days so it doesn't look as bad.

Page 100

Q. When did that happen?
A. It's happened frequently over the years. They've quit doing that, yeah. They've quit coming out and telling us to do that.
Q. When did -- you can't give me --
A. Not an exact date, no.
Q. Can you give me a flock it happened to?
A. Not sitting in here today.
Q. Can you give me a particular farm it happened to?
A. Not sitting here today, no.
Q. Can you give me a number of birds that were affected by those numbers?
A. Not exactly, no.
Q. Did you ever run any calculations as to whether that cost you any money?
A. No. I didn't run any calculations, no.
Q. What would be your understanding as to why you would log first-week mortality into second-week?
A. Whatever the policy. I don't know what it is. They're seven-day mortality. They're big on seven-day mortality.
Q. Do you have any idea if that would adversely affect the grower?

Page 101

A. We get paid for pounds out the door. So it really shouldn't make any difference unless that number was extraordinarily high and you get a chick credit.
Q. Any other lies you think he's told you?
A. I don't know.
Q. Any other service techs you feel like have lied to you?
A. No. All the techs are really, really wonderful guys and girls. They really are, honest and truthful.
MR. TATUM: What about -- let me see what time it is. Do you want to take a quick break?
THE WITNESS: That's up to y'all.
MR. WHITFIELD: That's fine.
VIDEOGRAPHER: This is the end of disc 1. The time is 10:30. We're off the record.
(A break was taken.)
VIDEOGRAPHER: This is the beginning of disc 2. The time is 10:41. We're back on the record.
Q. (By Mr. Tatum) Do you have any contact with any of your former service techs?
A. No, I don't, Mark.

Page 102

Q. Do you ever work with Jim Gottsponer?
A. I did, yes.
Q. What do you think of him?
A. Can you really say how you feel in here?
MR. WHITFIELD: Yes, you can.
THE WITNESS: Can I use bad words?
MR. WHITFIELD: Yes, sir.
A. Piece of shit.
Q. (By Mr. Tatum) Why is that?
A. Talking about a liar.
Q. What's that?
A. You was talking about a liar.
Q. He called you a liar?
A. No. I said, you talk about somebody that would lie. He come to my gym one day. Can I elaborate?
Q. He came to your gym in Florida?
A. No, here in town. I had a gym at the house. Him and Neil Bradford come to the house when all this started about all the exceptions he was giving everybody.
I said, Jim, I said, we're trying to compete week in and week out for the same dollar. Why are you giving exceptions? He said, I feel like I'm doing the right thing. I said, Okay.

Page 103

He just -- you never know if he's telling you the truth or not.
Q. What was he lying about when he said he felt like he was doing the right thing?
A. Just like Doug was in here yesterday. We both had the same flock numbers. On Doug's farm, it was he's losing chickens bad. Him and I talk. We all talk. We all talk.
So they eventually called his Reo and gave Doug a check. And they called mine E.coli, and, Charles, you caused it.
Q. When was this?
A. I don't know the exact date, but it was before he was terminated.
Q. What year?
A. A couple of years ago.
Q. So they were saying you had birds in the house or --
A. No, sir. No, sir. In the houses on the farm. We were in the same week, Doug and I were. He was losing them. And we all talk, and Charles is losing the same number. So we talked, same symptoms, same everything.
Q. And yours were called what?
A. Mine was called E.coli, and his was

Page 104

called Reo. They come about a week later and took him a check and said he didn't cause Reo, but piss on Charles.
Q. Did you have any independent evaluation of the birds they said had E.coli?
A. Tried to. Tried to get the vet out. I even asked Tyson if I could hire my own vets, and they refused.
Q. Why do you need Tyson's permission to have a vet come look at your birds?
A. Because Tyson owns the birds.
Q. But you're free to have anyone come look at the birds, aren't you?
A. No.
Q. No?
A. No, sir.
Q. Who told you you couldn't have --
A. Jim Gottsponer.
Q. When?
A. Whenever that was.
Q. Which flock was it?
A. It was my 56 South flock, and I don't know which one it was.
Q. You don't remember what year?
A. It's been a few years ago, Mark.

Page 105

Q. Do you know how many birds were affected?
A. No. We were losing by the hundreds. I don't -- I would have to go back and look what the livability was, but it was terrible.
Q. You can't tell me sitting here today though --
A. No, sir, not sitting here today.
Q. Did you do any calculations as to what that cost you?
A. No.
Q. So how would I go back and figure out when this happened?
A. I mean, I can get you that information.
Q. What would you look at to figure it out?
A. I would go back to my settlement dates and my notes and go back and figure out when it was.
Q. Anything else you think he's -- so what do you think he had to do with determining whether one was E.coli and one was Reo?
A. I have no idea.
Q. Why are you talking about this in the context of Jim?
A. Because he's the guy that was in charge.

Page 106

He was outside -- I forgot what he's called.
Q. But you didn't talk with him about this issue?
A. Oh, yes, I did.
Q. What did he tell you about this issue?
A. They would get some vets out and look and see what it was. They never showed up. Then without a vet even coming to my farm, they called it E.coli.
Q. What did he tell you that was a lie in that context?
A. I mean, you're on my farm, you're telling me I've got E.coli, and a veterinarian did not even look at my chickens. That's a lie.
Q. Well, you don't know if they had E.coli or not?
A. I don't know, You're right. But how did he know? He didn't bring a vet -- no vet come to my farm.
Q. So you don't know whether they had E.coli or not?
A. No, I don't.
Q. Any other examples you have as to what he lied to you about, ever?
A. I mean, it's just, you know, you ask

Page 107

him, Why are you giving exceptions? One grower is getting exceptions, and one is not getting exceptions.
That's not a lie. But you, you know, he said that was his call who got exceptions and who didn't.
Q. Do you have any -- can you think of a situation where someone got an exception?
A. I can go back and look at the paperwork.
Q. But you can't think of one here?
A. No, not sitting here today.
Q. Any other instances where you believe Jim lied to you?
A. We had a fat thing a few years ago, and I don't know what year. Let me go ahead and tell that. The chickens wouldn't eat. Water consumption went down to nothing. It affected some of the farms; it didn't affect all of them.
And the first thing, you know, Jim comes out with, Well, it's your water. Then two or three days, we all find out it's not the water. They've got some fat and the chickens just wouldn't eat.
They gave everybody exceptions. But, you know, initially, it was the farmer's fault. So it was a lie. They got some bad fat.

Page 108

Q. Ultimately, they figured out it was the fat?
A. Yes, sir, they did figure it out.
Q. And you got an exception for that too?
A. All of us did. All of us that had that particular fat from that company got an exception because the chickens just would not eat.
Q. So it was affecting multiple growers?
A. Yes, sir.
Q. What did he lie to you about?
A. Just what I said. You know, It's your water, Charles. No, that's a lie. It wasn't my water. It was the fat that come from Tyson Foods.
Q. Do you think maybe he initially thought it might be the water?
A. What he thought -- you know.
Q. You're just saying it ended up he was wrong, that it ended up --
A. Well, that's good enough.
Q. Do you know if he told other people there might have been water?
A. Oh, yeah, Morgan, all. Because we talk. We all talk now.
Q. So basically, he was trying to figure it out, got it wrong?

Page 109

A. Well, at first, he wasn't figuring it out. It was just all our fault. It was your water.
Q. You don't think he was trying to figure it out?
A. Huh-uh. It took several days before they could finally figure it out.
Then they came out -- that's when Neil come out on my farm and said, Charles, it wasn't your water. It was the feed. We got some bad -- I mean, fat in the feed. They've finally figured it out. I said, Good. I said, you know, I was thinking it was me.
Q. What farm was it?
A. That was actually 56 North when that happened.
Q. That was one flock?
A. Yes.
Q. What did you get as an exception?
A. You got your average pay for six flocks.
Q. Do you know if that cost any money?
A. I'm sure it did, but I don't know the calculations.
Q. And you haven't done one?
A. No, sir.

Page 110

Q. Any other instance where you think Jim's lied to you?
A. I don't know. We just -- I really don't know, Mark.
Q. How about David Mears? Do you like him?
A. Pretty decent guy, yeah.
Q. Do you believe he's ever lied to you?
A. A time or two, yeah.
Q. What's he lied to you about?
A. I can't recall right this second. But it's been some untruths told, yeah.
Q. Can you give me an example?
A. Not right this second.
Q. How about David Dickey? Do you like him?
A. Yeah, I do. Yeah. He's been a very good guy to work with.
Q. Do you feel like he's ever lied to you?
A. I don't know.
Q. Is there anyone else at Tyson that you feel like has lied to you about something?
A. That's there now?
Q. Ever. I mean, I guess we could start with there now just to compartmentalize it.
A. Yeah, I mean, that's the ones -- Mears

Page 111

is not here. Gottsponer is not here. You know, right offhand, Mark, I mean, I would have to go back and look at my notes on my computer. But it just got to be --
Q. You can't think of anybody?
A. Not right now, no.
Q. How about former Tyson employees? Anybody you think has lied to you?
A. Right off the top of my head, not right now.
Q. So under your contract that you have to grow poultry, Tyson -- they provide the chickens; right?
A. Correct.
Q. And they provide service support?
A. Services, yes.
Q. They provide the feed?
A. Correct.
Q. And they provide vaccinations?
A. Correct.
Q. Do they provide anything else under the contract?
A. That's basically it. I mean, there might be something else.
Q. And then you have the house; correct?

Page 112

A. Uh-huh.
Q. And the equipment?
A. Correct.
Q. And then the maintenance and labor?
A. Correct.
Q. Is there anything else that is on sort of your shoulders as far as growing the chickens?
A. Can you go through that one more time with me just a second?
Q. I wrote down the house, the equipment, the maintenance, and the labor.
A. Maintenance. We've got utilities, yes.
Q. Anything else?
A. That's basically it, yeah, basically.
Q. Now, so you have people who help you with the labor; right?
A. Correct. My guys, my employees, yes.
Q. They've been there all along?
A. Most of them have, yes, sir. I've got a good group of guys.
Q. Your utility bills, are they broken out by farm, or do they come in one bill?
A. We just started that this year. They come -- each farm has a meter on it. So we're, like I say, this year we just itemize all the farms

Page 113

and just see what's what.
Q. But always in the past, it was just one bulk bill?
A. Yes, sir, just pay them all at one time.
Q. And what are those utilities?
A. Of course, electricity, propane. That's it.
Q. That's it?
A. Uh-huh.
Q. They've got those in each house?
A. Yes.
Q. Do you have any understanding as to -- Tyson provides the chickens. Do you have a preferred breed?
A. Yeah. I'd like to have the Cobb byproducts all the time.
Q. Do you have a breed you prefer?
A. Cobb byproducts.
Q. You like Cobb byproducts?
A. Yes, sir.
Q. So you like that better than 500 or --
A. 708, 700s, 500s, yes, sir. That's your all-males. It's 90 percent males, yeah.
Q. Cobb byproducts are?
A. That's what they call them, yeah. They

Page 114

come on the mortality card called Cobb.
Q. So your preference is Cobb byproducts?
A. Yes. Second would be 708s, and then 700s, and then 500s last.
Q. 500s last?
A. Yes, sir.
Q. Do you have any idea if the percentage of birds' breeds you get is any different than anyone else's over a year's period?
A. I don't know what their percentages are. I don't know what they have. It's just when it comes on your mortality card.
And I'll just give you an example. Like 56 North No. 1, we've got five houses of 708s. And then we've got the rest 700s. So . . .
Q. Recently?
A. Yes, sir.
Q. Okay.
A. Your mortality cards have what breed and doesn't have what -- yeah, it does have your flock number too. It tells you where it has to come from.
Q. But you don't know if whether over a period of time, let's say a year, you get any different percentage of breeds than anyone else?

Page 115

A. I don't know what percentage that I get over anybody else, no.
Q. What is it about the Cobb byproduct that --
A. They're 90 percent males.
Q. And they grow bigger?
A. They really perform, yes, sir.
Q. What about feed? Do you have any preference for feed?
A. You know, the only thing I can say here is the reclaimed feed, the least amount of reclaimed you get, generally the better off you are. Because if you had a good fresh -- you know, those chickens just love that fresh out-of-the-mill feed.
When you've got one that's been reclaimed from one farm and maybe it come from two farms, the next thing you know, you might have 20-day-old feed. Without fresh feed, I mean, you can see water consumption go up. And they really perform well.
Q. Do you have any idea what percentage of reclaimed feed you get versus fresh?
A. Not now, no, sir.
Q. Do you have any idea if it's any

Page 116

different than any other grower in the complex?
A. I don't know the percentages.
Q. Do you have an understanding that reclaimed feed is not used at the early growth period?
A. That's correct, yes, sir. It's at the end, yes, sir.
Q. It's only used at the end?
A. Correct. Yes, sir.
Q. Do you know what that period is?
A. I've heard 41 days. Don't hold me to that, because I really don't know what their period is.
Q. What that means is it's only used post 40 days?
A. Right. 40, 41 days.
Q. What's the normal grow-out period, as you understand it?
A. It can be anywhere from 50 days to 55 days at this complex.
Q. Do you know if the grow-out periods you've been afforded are any different from any other grower, other complexes, on average?
A. Not average. But, you know, different complexes grow different size birds. It might be

for tray pack. It might be for further processing. You know, they're all kind of different.
Q. What about, do you know what out-time is?
A. Do I know what it is or what it is here?
Q. Do you know what it is?
A. Oh, yeah.
Q. What is it?
A. It's time in between flocks.
Q. And do you know what it is at the Robards Complex?
A. With the farms I've got this last time, I had some 18 days. I had some 22 days. From week to week, it will vary.
Q. Do you know if there's a minimum out-time requirement?
A. Tyson doesn't want to go under 14 days. They want to be 14 and up, is what they want.
Q. Per your contract, do you know if you get paid if it goes over 21?
A. Yes, sir. They've got an out-time pay. I don't know what it is.
Q. But you're not aware of a situation where you've been over 21 and not gotten paid for out-time?



A. No. They've been good about that.
Q. Do you know if your average out-time is any different than any other growers?
A. The growers?
Q. Yeah.
A. Not here of everywhere --
Q. At Robards.
A. At Robards. You know, week to week, those people in that same week are generally, you know, the same time. You know, it could vary a few days.
Q. Do you know what the term "density" means?
A. Yes, sir.
Q. Do you have a preference for density within your houses?
A. Yes, sir. The less, the better.
Q. Less chickens, the better?
A. Yes, sir, for me.
Q. Because you're a volume grower?
A. Right. For me, less. And it's less work. Chickens perform better, yes.
Q. Because, I mean, you know, more might be better for someone that only owns four houses?
A. Yes, sir. I'm speaking for Charles



Morris. Most guys really want to cram them in there because they want pounds out the door, because that's what they need.
Q. So you would at least agree with me that density, you know, a small farmer might want more birds to make more money?
A. Correct.
Q. But a volume farmer like you may want less?
A. I'm stressed. I want less, yes. I've actually requested less.
Q. And that was granted; right?
A. For one flock. And we're about back to full density again, yeah.
Q. Do you know what the current density preference is?
A. I can just tell you how many birds I got yesterday at the farm. It was 24,900 in one of those square foot houses. I don't know if it was .09 or something. I don't really know.
Q. Did you request to go to 1.0 density last summer?
A. Yes, sir.
Q. Was that granted?
A. For one flock, yes.



Q. Was that an opportunity for your farm to get better improvement?
A. And a little less stress on Charles, yeah. And it worked, yeah.
Q. And your farm did improve, didn't it?
A. Oh, yeah. Yeah.
Q. But that also meant less birds to you; right?
A. I made less money.
Q. And less birds to Tyson?
A. Correct. Right.
Q. And they made less money?
A. And I made less money.
Q. Well, if your performance was better, have you actually analyzed whether you made less money compared to higher density?
A. No, I don't --
Q. You don't know that for sure; right?
A. No. I can look at the checks. It's less money.
Q. But you haven't done that?
A. No, I haven't. I can't sit around and do all this analyzing stuff all day, huh-uh.
Q. What's that?
A. I can't sit around and analyze. I've

Page 121

got to work.
Q. Well, some people do.
A. Some people do. You're right. I would say --
Q. Some people are on top of it, but some people aren't. I don't know where you stand.
A. I'm not a book guy.
Q. So on the density issue, do you have any idea whether your birds per square foot, which is density, is any different than anybody else's in the complex?
A. As far as performancewise?
Q. No, as far as birds delivered per square foot.
A. I don't know anybody else's density.
Q. Your contract says that -- you're welcome to look at it -- you receive on average five flocks a year. Are you aware of that?
A. I'm not aware of it. But if it says it, that's fine.
Q. Do you receive on average five flocks per year?
A. On average, I would say so. Sometimes it's six.
Q. So you . . .

Page 122

A. I mean, five is a safe number, yes.
Q. At least in regards to that, you believe you get --
A. Correct.
Q. -- what the contract calls for?
A. Yeah, yeah. And it might vary year to year, you know. But you'll make it up the next year.
Q. Do you know if your average flock placement per year is any different from any other grower in the complex?
A. I really don't know.
Q. Now, the condemnation process, that occurs at the plant; right?
A. Correct.
Q. That's a process by which it's determined that birds are either going to be totally condemned or partially condemned; right?
A. Correct. Yes, sir.
Q. What's your understanding as to who makes that decision?
A. As far as the bird, a bird being condemned?
Q. Uh-huh.
A. Well, you've got USDA inspectors who

Page 123

would put it on the salvage line. And the complex manager has control over how many people are on the salvage line.
Q. Do you know if a USDA inspector makes whole bird or partial bird condemnation decisions?
A. That, I don't know.
Q. So you don't know if the USDA inspector makes whole bird condemnation decisions?
A. When I've been in there looking, the USDA is on the whole bird, and they get to a salvage line. I don't know about the USDA on the salvage line.
Q. In other words, you don't know who makes the decision of whole versus partial?
A. No, sir. I don't know who makes that decision, no.
Q. And then the salvage line is what you're referring to as to whether a partial bird gets salvaged?
A. Correct. Yes, sir.
Q. So it may be part of a bird is --
A. Breast, leg, anything they can salvage, yes.
Q. What are you talking about when you talk about when it goes to salvage line? You're just

Page 124

saying you don't know what happens at that point, or what are you saying?
A. I don't know who makes that determination as to what you . . .
Q. Do you have any idea as to whether your average condemnation numbers are better or worse than anyone else's at Robards?
A. Here lately mine has been just as good as anybody's. Two weeks ago, I had the best, the best I've had in ten years.
So what happened, you know what? They staffed the salvage line. I've been in there to watch my birds run. And there would be three people on the salvage line, four, maybe two. But I -- the new complex guy has said, I'm going to salvage these birds for these farmers. And all condemn has gone way down.
I mean, it's been really -- I mean, it's phenomenal for this time of year. I mean, out of 0.008 out of 11 growers, it's the best I've ever done two weeks ago.
Q. Are you aware that -- is it your understanding or do you have any knowledge at all as to whether Robards itself as a complex tends to have high condemnation?

Page 125

A. I can only speak from experience. We did talk to people at other complexes. The condemn don't run as high as it does here.
Q. And you said you heard they put more people on the salvage line recently?
A. Well, Morgan went and actually watched them, there was 10 to 12 people on the salvage line. That's never happened. I've watched birds five or six times, you know, because you want your birds salvaged and you want those pounds. You don't want them to go to that rendering plant.
Q. So when they get salvaged, that means you're at least going to get credit for partial pounds?
A. I'm going to get for that whole bird. If they can salvage one leg, Charles gets paid for the whole bird. So, no. I mean, you want those chickens to be salvaged.
Q. Right. And I'm sorry I said that. You actually get -- a grower actually gets paid for an entire bird's weight even if only half of the bird is salvaged?
A. Correct. But if they condemn it, on the other hand, they take that whole bird and it's charged against you.

Page 126

Q. Right.
A. So it's a give and take there.
Q. So if the entire bird is condemned, you don't get credit for those pounds?
A. Correct.
Q. On the other hand, if half a bird is condemned you get credit for all the pounds, not just the salvaged pounds but the whole weight of the bird; right?
A. Correct. That's the way it works, yes, sir.
Q. So on the one hand --
A. That's what I'm saying.
Q. -- you get something more here; but if it's whole bird condemned, you get nothing?
A. Yeah. But looking at what -- one thing, Mark, mostly your salvaged birds -- I'm not going to say all of them -- are your smaller birds. So if you've got a 4-pound bird in there and you're going to get charged, if it's going to be charged against you, a whole bird -- say it's sep/tox bird -- you get charged what your average weight is. So, you know, it could be two or three pounds of invisible weight there that's not there.
Q. On the other hand, if it's partially

Page 127

salvaged, you get the same --
A. You get the whole bird weight.
Q. Say it's a 4-pound bird, but you get a 6-pound credit?
A. Yes.
Q. Right?
A. Right.
Q. Because you get that same -- as you said, ghost weight?
A. Right.
Q. Have you ever had a conversation with anyone about the salvage line and manning the salvage line at Tyson?
A. Yes, we've asked -- you know, and, of course, they're not going to tell us. That's fine, you know. Your condemn comes high. Well, did y'all staff the salvage line? I mean, they run the business. We can't tell them what to do. I mean, that's up to the complex manager.
Q. Has anyone ever told you, Well, we'll put more on it or less on it, or we're doing what we can?
A. Yeah. Mears promised one time, Guys, I'm going to start salvaging -- putting more guys on the salvage line.

Page 128

Q. When did --
A. We got people in the plant that are friends and neighbors, and they'll . . .
Q. When did that happen? When did he tell you that?
A. I don't know exactly when, Mark.
Q. Was it --
A. It was an ongoing thing.
Q. -- in the last couple of years?
A. Oh, yes. It's been --
Q. While he was the complex manager?
A. Yes, sir, while he was the complex manager. Yes, sir.
Q. So since your contracts and all of that?
A. Correct. Yes, sir.
Q. What did he say?
A. Well, you know, we would ask him, How many are you staffing? He said, Well, I'm just going to do industry average, which is three.
I mean, you've got ten stations there. I've been in there many times. Just it's a real priority to salvage them for the farmers, you know, because it does help us.
Q. But it's an expense to Tyson; right?
A. It's an expense to Tyson.

Q. Kind of like hiring more employees is an expense to you?
A. Exactly.
Q. So it's a numbers game; right?
A. It's a numbers game. That's the bottom-line.
Q. Have you run any calculations to determine any money you've not earned because birds could have been salvaged that weren't?
A. No. Steve Key, you know, he was out on my farm. And he said, Charles, he said, most of these birds can be salvaged.
And the complex manager, he's actually -- the one there now is actually doing it. I mean, the condemn the last few weeks has just been awesome. Usually this time of year is when it's the worst because of the cold weather.
But condemns are really, really good for all the farmers.
Q. Are you getting along good with the new complex manager?
A. Haven't met him yet.
Q. But at least no problems yet?
A. So far. I don't know him.
David Dickey is doing a good job. I'm



going to say Neil Barfield is doing a good job. They've all stepped up. And us, the farmers, you know, we all stepped up. We all want to be . . .
Q. Do you want to meet with the complex manager?
A. We would like to know who -- I mean, if I was the complex manager, I would be out introducing myself. He hasn't come out to talk to none of us, no.
Q. Do you know if he's doing that or not? I mean, he might be.
A. He might be, but nobody that I know.
Q. So you don't know, relatively speaking to other growers in the complex, whether your condemnation is higher or lower?
A. No, sir. I just get to see the ones in that week and look at that settlement. Like, you know, my last settlement, there was 11 growers. I could see everybody's condemn in that week plus mine.
Q. Right.
A. I don't know they are, but I can look and see what the condemn percentage was.
Q. And you can see where you rank --
A. Correct.



Q. -- and what everybody else's pounds were, feed conversions, and all that?
A. Yeah. You can look at all that, livability, just where you can compare with everybody else.
Q. Is it your plan to continue to grow chickens?
A. I like growing chickens. I really do.
Q. Have you ever talked with any other integrators about growing with them?
A. Yeah. I contacted Perdue at one time, but they said I was way too big.
Q. And when was that?
A. Probably a couple of years ago. I don't know exactly when.
Q. Did you talk them about maybe piecemealing and doing part of your farms with them?
A. No, I didn't. I mean, they just weren't interested in somebody the size of what we are.
Q. So is it that you have too many houses for their needs?
A. Yes, sir.
Q. And you didn't talk to them about, Well, maybe I'll just do one of my farms over there?



A. No. I mean, because then you get into then Tyson wouldn't like it, and you've got -- you know, if one complex got a disease and the farms are so close to each other, you don't want to -- it would be bad business to have one farm at Perdue and one at Tyson, I think.
Q. But you didn't --
A. Biosecurity.
Q. You didn't talk to Tyson about that?
A. No, no, no.
Q. Does Perdue pay on the tournament system?
A. Yes.
Q. How far is each of your farms from Perdue?
A. 20 miles, depending on which way you go across the river.
Q. I mean, you've got neighbors --
A. Oh, yes, sir.
Q. -- that grow Perdue, don't you?
A. Yes, I do, yes. If I wasn't so large, I mean, I would be in the mix. Yes.
Q. Have you made any attempts to sell any of your farms?
A. No.

Page 141

Q. Do you know if that resulted in --
A. That, I don't know.
Q. -- a negative performance consequence for you or positive?
A. I don't know.
Q. Do you know if it resulted in more or less dollars for you?
A. I don't know.
Q. Have you ever had a situation where the condemnation certificate didn't match up to your settlement statement?
A. Again, we would have to ask my CPA. She matches them up and does her thing.
Q. So you don't know?
A. I don't know, no.
Q. Have you ever reviewed your settlement statement and come to the conclusion that the pounds reported or the heads placed at your farm or the mortality numbers inputted into your settlement statement were wrong?
A. Not me, I haven't.
Q. Has anyone ever done it for you and come to that conclusion?
A. Not and called me, no.
Q. Have you ever come to the conclusion

Page 142

that the feed reported as delivered to your farm and the feed conversion numbers reported on your farm was wrong?
A. We've had some feed issues. I mean, Morgan has had them. I know we're talking about me. But feed was sent to the wrong farm.
And this happened -- we had feed that was supposed to go to Honeysuckle and was sent to Gravel Pit. And then you go back to looking and searching. Then you find out where it's at. When the feed conversions are so out of whack. Something went on.
So we check our mailboxes and look. And we've caught feed taken to the wrong farms.
Q. So you've had feed taken to the wrong farm -- took to it one of your farms instead of the other farm?
A. Right. Right. Yes.
Q. Any other instances where there's been a feed issue?
A. I'll just say a couple of years ago, a feed truck driver was trying to sell feed to a grower. The grower met him at the store, and that grower actually called Jared Shelton and told him, You've got a feed truck driver out trying to sell

Page 143

feed.
And Jared said, Well, do you mind signing something so that we can go have a talk with him? And the grower didn't want to get him in trouble, which I would have. But I had a feed truck driver and I did call Jared. I said, Jared, I said -- he said, Charles, I can't discuss it, he said.
Q. So that might have been taken care of? You don't know?
A. I don't know.
Q. You didn't buy any feed?
A. No.
Q. Obviously, he was trying to sell off the books; right?
A. Yeah, yeah, yeah.
Q. And you realized you might have a rogue employee here?
A. Exactly.
Q. It didn't cause you any losses?
A. No, no, no.
Q. You said feed delivered to the wrong farm, that got fixed?
A. Yes. And I'm going to -- can I elaborate on that?

Page 144

Q. Sure.
A. Tyson a few years ago -- I don't know what year -- they were going to put in this GPS system. They were actually going to even have -- this is what we were told, that the growers could actually look and see if you got your feed, you know, a tracking system, you know, to see if you got the load of feed.
I know they had hooked it up and they actually -- Ken Bartley was there at the time. Here it is, Charles. Look at this. This is what we're going to implement, this is going to help out, you know, for y'all's concerns.
And that's never happened.
Q. So that was during Kenny Bartley's tenure?
A. Yes, sir. Yes, sir. He's the one who actually --
Q. Was this ten years ago?
A. No. I ain't been here but ten years.
Q. Well, eight years ago?
A. No.
Q. It was pre David Mears; right?
A. Yeah. Well, you had Craig Coberley, yeah. It was before David Mears, yes. I'm going

up the meeting.
Q. Who typed this up?
A. I don't know.
Q. It came from you.
A. Well, I don't type. So I couldn't have typed it up.
Q. So you don't know who put this together?
A. No.
Q. Did your wife?
A. No.
Q. No?
A. Huh-uh.
Q. So what was the purpose of the meeting?
A. To discuss a raise.
Q. Discuss a raise, you mean, under your contract?
A. Yeah.
Q. So getting new contracts?
A. New contracts, new raises. They'll give you a raise every once in a while. There's been some small raises. There haven't been none in a long time.
Q. So the purpose was to get together and talk about --
A. Talk about issues, period, yeah.



Q. Do you remember any of the issues besides wanting a raise?
A. We were trying to -- I'm just -- I'm not reading this, but we were trying to get more fuel paid too. We were just trying to get some -- because our electricity rates have gone up tremendously in that area. We were trying to get some more fuel pay and electric bonuses and stuff.
Q. It says in the third paragraph that Jim has suggested -- is that Jim Gottsponer?
A. That's Gottsponer, yes.
Q. That he is attempting to get out-time reduced in order to increase grower W-2 pay.
A. Yeah. He did say that, yeah.
Q. And it goes on to say, Jim's suggestion does nothing for grower cash flow. So that wasn't something that growers wanted?
A. This was after the meeting. This was offering new incentive -- yeah.
Q. So the group here wasn't interested in reducing out-time?
A. No. Like I said, that varies from grower to grower, Mark. Like me, I want more out-time. Morgan wants more out-time. Some of your guys that, you know, have smaller farms want



it quicker so they have more cash flow. It really varies from grower to grower.
Q. So did you talk with growers who want less out-time about this issue? Because you wrote -- someone wrote on here --
A. I didn't write it, no.
Q. Well, it came from you. It says, Jim suggestions it does nothing for cash glow.
I'm trying to figure out, were you including growers in your meeting who might think less out-time would help them?
A. Yeah, there were several there that would like less out-time. It was a spectrum from top to bottom. I mean, it wasn't just --
Q. Obviously, not everyone agrees with that statement, if that's what you're saying.
A. This was a group meeting. We all had different things that we were interested in.
Q. So you would agree with me, then, that statement doesn't represent every grower's viewpoint on --
A. It doesn't represent me. I can't speak for other growers.
(Exhibit 11 was marked.)
Q. (By Mr. Tatum) I've got another set of



documents here that I marked as Exhibit No. 11. So these -- have you ever seen these before? These documents are marked Morris 393 to Morris 400.
Actually, it looks to me like I might need to individualize those Bates numbers. They're marked 393 to 395, and then they're marked 405 to 411, and the last one is marked 400. So these are documents that were produced to me from you. That's what the Morris stamp means on the bottom.
A. Okay.
Q. I got them from your attorney, but they're supposed to be from you.
A. Okay.
Q. Have you ever seen these before?
A. Not in this context. But yes, I remember giving these to Caroline, yeah, giving her instances.
Q. So the first three pages are labeled Morris 393 to 395?
A. Uh-huh.
Q. Now, you said you don't type. Do you know who typed these?
A. No, I don't.
Q. So they didn't come from your computer?
A. I don't know. I put these notes in my

Page 153

phone, is what I do, and then I write them down.
Q. So these came off your phone?
A. I don't know. Like, say, Collins Road house 1, what I'll do when I'm there, I'll put me a note in my phone and then I'll write it down when I get home, yes.
Q. So at some point, this is a typed-up version of something that was on your phone or a note you wrote at home?
A. Right. Something, yeah.
Q. But you don't know how this came to be as far as these typed pages?
A. No, not these pages here. This is just some instances that we kept, you know, records of what was going on.
Q. It's only in 2012, you had made a -- December of 2012. Then there's a note for July 2013. Is that the only time you kept notes like this?
A. Well, it had just gotten to be so rampant, you would just wear yourself out trying to keep up with this stuff. It's a full-time job keeping up with feed outages and --
Q. So you don't have any other notes like this?

Page 154

A. We could probably type you up a bunch of them.
Q. So you do have more notes like this?
A. We've got instances -- we've got handwritten notes everywhere about feed outages.
Q. Oh, you do? Okay. And from what time period do you have those?
A. Shoot. I don't know.
Q. The whole time you've been growing chickens?
A. You're going to have instances all the time, and it's always -- it's good to always keep it down, keep it documented in case something, you know, happens.
Q. So do you keep those in like a file, or where do you keep them?
A. No. Most of the time, you just get rid of them. Because it's over; it's behind you. You just move on.
Q. No, I'm talking about these handwritten notes that you say you have. Where are they?
A. I think gave a lot of them to Caroline and John. I mean, I don't know exactly where they're all at.
Q. You don't have them anymore?

Page 155

A. I don't have them, no.
Q. So everything you've had along the lines of handwritten notes you've given to your attorney?
A. Yes.
Q. Since you've done that, because that was back in 2015 --
A. '15.
Q. Since you've done that, have you made new handwritten notes?
A. No. I just quit. Dang. I --
Q. None since then?
A. No, I haven't. I just quit.
Q. Any typed-up notes like you're looking at here since then?
A. No. I just quit.
Q. Anything on your phone?
A. No.
Q. So I can be assured, then, this one stops at -- you know, I guess since 2015, you just never kept a note about something?
A. Yeah. We just quit.
Q. What was the purpose of taking these notes?
A. Well, you want to keep up with some of the things. I mean, when you're out of feed, you

Page 156

want to keep up with it. You want to know. You want to know when your house 6 is out 6:00 p.m.
We can just go through -- I mean, we can go through all of them if you want to. Gravel Pit out at 10:05. Gravel Pit 4 out of feed at 10:35. We didn't get feed until next morning at 4:00 a.m.
All of these affect your paycheck. They affect the growth of that chicken.
Q. Where are you reading?
A. Page -- let me get my glasses on.
Q. So you were reading December 25, 2012, Gravel Pit house 4 was out of feed at 10:35 p.m. --
A. Yes, sir.
Q. -- and did not get feed until 4:00 a.m.
A. Right. December --
Q. So you didn't get feed until -- for six hours?
A. Right.
Q. Do you think that wasn't fast?
A. I didn't say you were out of feed. I mean, you shouldn't run out of feed.
Q. Okay. So your problem -- so where did you notify Tyson that you were almost out of feed?
A. You call them, call the feed mill.
Q. Do you have a record of that?

Page 181

the feed mill know, you know, contacted --
Q. Did it get fixed?
A. We got feed -- I'm just going by memory. We finally got feed out there later on, yes.
Q. Do you have any idea whether that ultimately caused any loss?
A. Chickens without feed are going to cost you. But, no, I didn't do whatever you call it.
Q. So you can't tell me whether or not it cost you any loss at the end of the day?
A. No. I can't tell you a number, no.
MR. TATUM: I think we're on 21.
(Exhibit 21 was marked.)
Q. (By Mr. Tatum) This one is not dated either, so I wasn't sure when or if this one was sent. Do you remember anything about this?
A. I just remember the meeting, yeah. I'm remembering a meeting, but it was right downtown here at Chad Jones' wife's flower shop, upstairs.
Q. That was a meeting among growers --
A. Growers.
Q. -- or the meeting with Tyson?
A. It was growers.
Q. What year are we talking about?
A. I'm going to say three years ago, four

Page 182

years ago maybe.
Q. Was it before you filed the lawsuit?
A. Probably, yeah. I would say so.
The lawsuit was filed when, John?
MR. WHITFIELD: 2015.
A. It was before 2015, yes.
Q. (By Mr. Tatum) Did you end up having a meeting with Kenny Bartley or Morris Mayer?
A. No, they wouldn't meet with us.
Q. Who is Morris Mayer?
A. At that time, he was complex manager. He come in for a short period of time in between Coberley and -- and we had quite a few more growers than what's on that address right there.
Q. I know the growers listed are Doug Brown, Doug Hartline, Greg Hefton, John Lloyd, and Charles Morris.
A. Yeah. Morgan Rickard was there.
Q. How come they're not listed on this?
A. I don't know.
Q. It looks like you've got some growers listed here who chose not to sue Tyson?
A. Uh-huh.
Q. So that happened?
A. Yeah, uh-huh.

Page 183

Q. So you had grower meetings with growers who had concerns and some wanted to pursue litigation and some didn't?
A. Yeah.
Q. Did you ever end up having a meeting with Tyson subsequent to this?
A. Not on that, no.
Q. Not a one-on-one meeting?
A. No. No one-on-one.
MR. TATUM: Let me catch up on numbers for a minute.
I'm going to ask you about some other letters.
(Exhibit 22 was marked.)
Q. (By Mr. Tatum) Exhibit No. 22, do you remember getting this letter dated December 20, 2012, from Ken Bartley?
A. Do you say, do I remember? No, I don't remember.
Q. You don't deny getting it?
A. No, no, no.
Q. You don't deny that in 2012, Highway 56 South was on intensified management?
A. No. Yeah, that's correct. Correct.
Q. So it was performing low in the --

Page 184

relatively speaking?
A. Uh-huh, yes.
Q. Did you dispute that, or was it actually performing low?
A. We didn't even discuss it. That farm was five out of 11 two weeks ago. So it's not the farm.
Q. Well, that was five years ago. Five years ago, do you have any reason --
A. I know. Five years ago, I was still running the show.
Q. Do you have any reason to dispute this letter sitting here today?
A. I don't dispute the letter. But how they get the numbers, we don't have any -- we're not in control of numbers. We have to take Tyson's word for it.
(Exhibit 23 was marked.)
Q. (By Mr. Tatum) Let me show you what's been marked as Exhibit 23. Do you remember getting that one?
A. No, I don't remember.
Q. It says that Highway 56 South 1 was placed on intensified management for three high 40 flocks.

Page 193

A. Right.
Q. Did you follow that instruction, or do you do it differently?
A. We decake and windrow. So we went above and beyond.
Q. But do you do it only after every flock in the winter, or do you do it all summer long?
A. I do it after every flock. I do it in the summertime too.
Q. So they were saying do it less?
A. They're trying to say do it less. And I'm spending more money. I'm doing more.
Q. It also said, We recommend that you personally manage the farm from placement to the end of the flock.
Did you begin doing that?
A. I'm on those farms every day.
Q. I thought you told me earlier that no one had ever mentioned that to you?
A. Nobody has ever told me -- no. You said there was somebody out there saying I don't -- I'm not a hands-on, is what you were insinuating. I'm out there seven days a week, busting my ass. And for you to insinuate that, you're dead wrong.
Q. So you disagree that there needed to be

Page 194

a recommendation for you to personally manage your farm?
A. I totally disagree with that. I was out there every day.
Q. It also says, We recommend that you install a mainline water pressure regulator prior to getting chicks.
Did you install that?
A. Oh, yeah.
Q. So B. D. Luck has that?
A. Oh, yeah.
Q. What did you spend on it?
A. I don't know. Whatever a regulator costs. It's fairly expensive to get a 2-inch regulator.
Q. You don't know though?
A. I don't keep up with the price of regulators. I just go get them.
Q. It also says, We also recommend that you start the turnout process at day 7 and finish it on day 9. Did you begin doing that?
A. Turnouts are different. Summertime, you might turn them out at four days. Wintertime, you might turn them out -- that's their recommendation. You have to look at the weather and figure out

Page 195

what's best for the birds. That's an animal welfare issue. You don't want to throw them back out there when it's minus 3 degrees.
Q. It says --
A. It's not that in the house, But you don't want to turn the birds out when it's minus 3 degrees.
Now, if it's good and hot, you can turn them out -- you can put them in whole house. We've whole-housed brood before, never even put them in the first chamber.
Q. It says, During the meeting, you committed to started doing this process. Is that true?
A. We can do some at seven days, some at eight days, some at nine days. We run about 42 flocks a year. We turn them back anywhere from three days to 12 days.
Q. So you're saying you did follow the recommendations of this letter?
A. We turn out anywhere from three to 12 days.
(Exhibit 31 was marked.)
Q. (By Mr. Tatum) Let me show you another one. This is Exhibit 31 dated January 23, 2015,

Page 196

regarding kinky-back issues you were having at Morvatt No. 1.
A. Okay.
Q. And it says in the second paragraph, We have found that the appropriate recommended dark out-time is essential to minimizing the development of kinky-back. In the case of Morvatt #1 farm, our program calls for eight hours of darkness and less than 25-foot candles. In your controller, it indicated that from day 22 until day 43, you ran four hours of darkness.
Do you agree with that?
A. That's the recommendation.
Q. But you weren't following it?
A. We're independent farmers. Whatever works for the bird is what we're trying to do.
Q. It wasn't working for the bird here, though; correct?
A. Maybe not there. But look at that performance now, big boy. It's 1 and 2.
Q. What's that?
A. Those farms are No. 1 and 2. They're moving up the page. You should have brought the last performances out here.
Q. Well, this is in 2015.

Page 197

A. Well, let's talk about today. My performance is going through the roof, and I'm doing exactly --
Q. Well, I'll look at it. I've got it.
A. Good. Pull it up.
Q. Let's check it out. So which farms are you proud of? 1 and 2 of Morvatt?
A. Yeah. Look at the last few settlements. Not only No. 1 but No. 2 also.
Q. So Morvatt No. 1 in 2015 --
A. No, we're today. Have you got today's in there?
Q. I'm asking if you followed the instructions of January 23, 2015, on your lighting program that was provided to you in this letter. It's that simple. Yes or no.
A. I might have, might not. I don't remember. I don't remember.
MR. WHITFIELD: Let's take a break.
MR. TATUM: Okay.
VIDEOGRAPHER: This is the end of disc 2. The time is 1332. We're off the record.
(A break was taken.)
VIDEOGRAPHER: This is the beginning of disc 3. The time is 1341. We're back on the

Page 198

record.
(Exhibit 32 was marked.)
Q. (By Mr. Tatum) Here's Exhibit No. 32. This is a letter of February 19, 2015, to you. It says, This letter is to inform you that your last flock on Morvatt Collins Road No. 1 was higher than the average third consecutive flock in the high 40. Do you dispute that happened?
A. No, I don't dispute it.
Q. It says at the bottom, The following is a list of items and recommendations we discussed with you during the meeting. That references on February 13, 2015.
Do you remember having a meeting?
A. Not right off the top of my head no.
Q. You're not saying it didn't happen?
A. No, I'm not saying it didn't happen.
Q. It says, Bullet Point No. 1, We have agreed to reduce placement to one per square foot when applicable; correct?
A. Uh-huh.
Q. It says, We recommend that you decake only after every flock in the winter. That was a recommendation that had been made earlier too --
A. Just a recommendation, yeah.

Page 199

Q. It says, We recommend that you personally supervise your hired help on the farm from placement to the end of the flock.
Did you follow that recommendation?
A. I work every day.
Q. I understand you work every day, but this is not asking you whether you work every day.
It says, We recommend that you personally supervise your hired help on the farm from placement to the end of flock, ensuring --
A. I have personally supervised all my employees for the entire ten years I've been here.
Q. So you disagreed with this recommendation?
A. No. I just said I do that already.
Q. Were you recommended that you install a mainline water pressure regulator to gain control of and reduce incoming water pressure?
A. Did both farms.
Q. Did you install that?
A. Both farms.
Q. You did install that?
A. Yes.
Q. Do you know how much that cost?
A. (Shakes head from side to side.)

Page 200

Q. Is that a no?
A. That's a no.
Q. We recommended that you start the turnout process at day 7 and finish it on day 9.
We talked about that a minute ago. Did you follow it this time?
A. Could have. We could have done it eight-day, nine-day, ten-day, five-day.
Q. You don't remember if you followed it?
A. No, I don't remember.
(Exhibit 33 was marked.)
Q. (By Mr. Tatum) I show you Exhibit No. 33. This is a letter to you dated May 27, 20155, concerning the B. D. Luck farm reaching the point in the performance improvement program where it is subject to termination. Do you see that?
A. Uh-huh.
Q. It says below, Your farm has settled three executive flocks in the high 40, and your B. D. Luck farm is now being placed on intensified management status. Do you see that?
A. Uh-huh, yes.
Q. And do you agree that it had finished three flocks in the high 40?
A. It did.

Ask him a question.
Q. (By Mr. Tatum) Do you agree that controlling ambient air is important?
A. Yeah, that's important.
Q. Okay. So you don't disagree with that recommendation? You need to fix the holes --
A. No. We do that all the time. It's a daily process.
Q. But the light, you disagree?
A. They haven't shown us any proof yet where light makes any difference. We're doing very well on that farm.
Q. On Honeysuckle?
A. Yeah.
Q. What do you consider very well?
A. When you've got 52 chicken houses, if you can be above average, that's good. Do I like being just average? No.
Q. So your view of what is well is based on the fact that you have a lot of chicken houses?
A. I have more than anybody in the state of Kentucky, yes. That's a lot of chicken houses.
Q. Other people's view may be that doing well is being No. 1.
A. All of our "wells" is different, yes,



sir.
(Exhibit 37 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 37. This is an August 27, 2017, letter in relation to the Honeysuckle farm that it had settled three consecutive times in the high 40. Do you recall receiving this?
A. No.
Q. Do you disagree that that was the case?
A. No, I don't disagree with it.
(Exhibit 38 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 38, a November 18, 2015, letter to you informing you that the Highway 56 North No. 2 farm finished twice consecutively in the high 40. Do you remember receiving this?
A. No.
Q. Do you disagree it happened?
A. No.
Q. Do you disagree that's where the house finished?
A. No.
(Exhibit 39 was marked.)
Q. (By Mr. Tatum) Let me ask you about some questions you answered for us. So this will



be Exhibit 39. It's your interrogatory responses. If you flip to the -- have you ever seen these before?
A. Are these online? I think I saw them.
Q. You think you saw them?
A. Yeah.
Q. Do you know if you ever signed off on them? In other words, signed a verification that they're accurate?
A. I've seen these before. What did you ask there?
Q. You've seen them before?
A. Yes.
Q. I just wondered if you remember signing anything in relation to them, what might sometimes be called a verification, in other words, signing of that, yeah, these are all accurate and true?
A. I mean, I've read them. When you say signed off on them, I mean, I got them and read them. But, I mean, that's all I can tell you on that.
Q. Okay. If you look at page 10, there's a page number in the middle of each page.
A. That's where I'm at.
Q. That first bullet talks about in the



spring of 2007, you were told that Tyson gives an extra fuel allowance to each eight-house farm each year.
A. Yes, sir.
Q. Who told you that?
A. Michael Sheets.
Q. That's something that's not in your contract; correct?
A. No, sir, it's not in the contract. It's something that he sold us on that each eight-house farm -- and it wasn't every year, but most years got an extra fuel bonus in December, and then they would get one in February. And it would total up to roughly around $15,000. With at times seven farms, that's $90,000. That's a lot of money.
Q. As you understood it, this was an across-the-board fuel allowance?
A. Sir? Say that again.
Q. It was an across-the-board fuel allowance for all growers?
A. It was extra. It wasn't in the contract. Tyson just did it to help growers out.
Q. Did you get a fuel allowance at any point in time?
A. The first year I was there, they stopped

Page 213

it.
Q. The first year you were there --
A. Yeah, my first full year in '08, they no longer did it.
Q. So you got it in '08?
A. No, I never got it.
Q. You never got a fuel allowance?
A. No, sir, never got one. Not a fuel allowance. Now, we got a fuel allowance according to the contract, but it was an extra thing they used to give to farmers.
Q. Yeah. I'm not talking about fuel pay.
A. Okay.
Q. I'm talking about an extra.
A. It was extra, yes, sir.
Q. But you never received it?
A. I never received it, no, sir.
Q. This was something you had a discussion with before you contracted the first time?
A. Right, with Michael Sheets, because he was selling us on the points about -- you know, because the difference between growing chickens in Florida, how much colder it was.
He said, Charles, you know, last year, we gave an extra $15,000 to an eight-house farm

Page 214

roughly. It was just a selling point to get us to buy the farms.
Q. When you reviewed your contract, did you have any discussions with anyone that that wasn't in your contract?
A. No. We took him at his word. And it happens; but, I mean, it's not in the contract. So I know they weren't contractually obligated to give it to us. I know that.
Q. Do you remember getting a fuel allowance in 2014 for each of your farms?
A. I don't remember. I think 2014 is when the propane shortage come. I don't remember exactly what happened. We was all -- Tyson actually paid for some, and they took it out of our settlements because we couldn't get it. Tyson was trucking in propane from Texas or something. It was just -- it was a fiasco. We was all scraping.
Q. It wasn't Tyson's fault that propane was short, was it?
A. No. We never blamed Tyson, no.
Q. Do you remember in 2014 getting checks for extra fuel payments?
A. Yes. And it was taken out of our settlements.

Page 215

Q. So you're saying -- what do you mean it was taken out of your settlements?
A. When the settlements came because Tyson paid for it, because they were actually having it shipped in here. They could get it cheaper than us. They went ahead and bought the propane, had it on our farm so we could keep the chickens warm. But they took it out of our settlements.
Q. So they got it at a price that was cheaper than you could get it?
A. Yes.
Q. But did they still pay you the fuel pay under the contract?
A. The same fuel pay, yes.
Q. So they saved you money from you having to go buy the propane?
A. From me having to buy it.
Q. That's normally what you have to do; right?
A. Right.
Q. The second bullet here says in 2013, you had a conference with Tyson regarding the amount of reclaimed feed.
A. Right.
Q. And you said, Brian admitted Plaintiff

Page 216

was getting 92 percent of the reclaimed feed from the Robards plant.
Where was this conversation?
A. It was in Craig Coberley's office with brian from the feed mill, he was there. Jared Shelton was there. And we brought in all of our feed tickets. Back then, it was marked red "reclaimed."
You know, Brian did say Charles, you know -- he admitted, Your farm is close; we bring you most of the reclaimed because we have to unload the trucks.
Q. Do you know what percentage of your feed was reclaimed at that time?
A. No. They didn't . . .
Q. It says here you were paid a settlement amount in a confidentiality clause?
A. Yes.
Q. So you settled that issue?
A. Yeah, we did. Yeah.
Q. How much did you get paid?
MR. WHITFIELD: Objection to form. Hang on a second. It's a confidentiality issue. So you're going to waive that?
MR. TATUM: Well, I mean, we can keep it

Q. Do you live on a golf course?
A. Yes, sir.
Q. Do you play a lot of golf?
A. I suck. But, yeah, I try.
Q. What golf course do you live on?
A. I live on Henderson Country Club.
Q. Are you going to stay there?
A. No. I think after the divorce -- I took one of the farm houses or tenant houses on 56 and redid it for me and my daughter. I like living on the farms. I'm not a country club guy. I kind of stand out, out there.
Q. How long have you lived on the country club?
A. About two years.
Q. Do you belong to the country club?
A. Yes, sir.
Q. Do you run that through the business?
A. You can only write off so much. I don't know what she does, to tell you the truth.
MR. TATUM: No more questions for now.
THE WITNESS: Damn, I was just getting warmed up, man. What are you doing? Come on.



EXAMINATION

BY MR. WHITFIELD:
Q. I've got a few questions I want to clean up with you, Charles, if you don't mind.
The first question I want to talk to you about deals with the relationship, the contractual relationship that you have with Tyson. Mr. Tatum went through numerous contracts that you signed with Tyson over the years.
Do you know whether or not you've ever heard the term "independent contractor"?
A. Yes. It's in our contract a bunch, yes, sir. That's what I'm supposed to be.
Q. But the word independent contractor is throughout the contracts that Mr. Tatum referenced to you?
A. Correct.
Q. I know you're not a lawyer and I'm not asking for a legal opinion here. But what is your interpretation from a lay person, from a grower, as to what an independent contractor is?
A. It gives me free rein to run the chicken houses the way I see fit with the knowledge that 27 years of growing chickens has brought me. You have to do morally and ethically the right thing for the



chickens, with animal welfare.
So I've got to make business decisions and decisions that I think work for me. We're competing for that dollar. If we all did the same thing -- you know, you've got to find a competitive advantage. You do.
Q. I understand. Mr. Tatum also talked about based upon the contract certain things that were your responsibility and certain things that are Tyson's responsibility.
And my recollection was that your responsibility, being an independent contractor, would be maintenance of the chicken houses, is one thing; correct?
A. Correct.
Q. And utilities is one thing that you're responsible for?
A. Yes.
Q. What else? Labor?
A. All the labor.
Q. What other things that you think under the contract that you have a responsible for, being an independent contractor?
A. You've got insurance, of course, utilities, building. You've got to get rid of the



dead birds once they die. It's our responsibility to get rid of the birds.
Everything except for the feeding of the chicken, you know, we own. So my responsibility is on the mechanical part of it and keep those birds alive and do the very best job I can.
Q. And grow them and get them as big as you can?
A. As big as you can, as fast as we can, as efficient as we can, and make sure, you know, the birds are taken care of. That's number one. I'm just saying we're glorified baby sitters, is what we are.
Q. Sure. So the birds basically are owned by Tyson. They're not basically -- they are owned by Tyson?
A. They do own them.
Q. So the Tyson chicks come to your facility and they are put in the houses, and then they are to survive under your care and guidance for anywhere from 50 to 55 days?
A. Roughly, yes, sir.
Q. Roughly like that. Okay. And we've heard, then, a lot of recommendations that were in these letters that Mr. Tatum attached to this