# Exhibit 11

# Deposition of Keith Crabtree

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,
Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,
Defendants.

DEPOSITION OF KEITH M. CRABTREE
FEBRUARY 14, 2018

- - - -

Videotaped deposition of KEITH M. CRABTREE held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:42 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.



I N D E X


| WITNESS | PAGE |
|---|---|
| KEITH M. CRABTREE | |
| Examination by Mr. Tatum | 4 |


EXHIBITS


| Number | | |
|---|---|---|
| 1 | Broiler Production Contract Robards between Tyson Chicken, Inc. and Keith Crabtree (5192) K&C | 68 |
| 2 | New House Incentive Agreement Robards between Tyson Poultry, Inc. and Keith Crabtree dated October 14, 2011, Bates TYSON_167550 through _569 | 78 |
| 4 | Letter dated July 6, 2010 from Allen Chamber, Bates TYSON-108569 | 103 |
| 3 | Letter dated May 21, 2012 from Jared Shelton, Bates TYSON-108573 | 104 |
| 5 | Letter dated October 27, 2015 from David R. Dickey, Bates TYSON-108574 | 121 |
| 6 | 7 Photographs, Bates CRABTREE 000172 through _178 | 129 |
| 7 | 7 pages of Texts, Bates CRABTREE 000179 through _185 | 139 |
| 8 | Composite of Documents Produced by Keith Crabtree, Bates CRABTREE 000186 through _269 | 179 |




A P P E A R A N C E S

John C. Whitfield, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 654108
816.474.6550
mtatum@shb.com

Also Present: Mr. Todd Davis, Videographer



VIDEOGRAPHER: This is the videotaped deposition of Keith Crabtree on February 14, 2018, at the time indicated on the video screen, which is 9:42. Full introduction has been waived. Will the court reporter please swear in the witness.

- - - -

WHEREUPON,

KEITH M. CRABTREE

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. TATUM:

Q Would you state your full name, please.
A Keith Morgan Crabtree.
Q You don't need to hold your hand up the rest of the day.
What's your full name?
A Keith Morgan Crabtree.
Q Where do you live?
A 1565 Highway 797, Calhoun, Kentucky.
Q How long have you lived there?
A Two years.
Q Is that a house?
A That's a house.
Q Is that on a farm?

Page 25

hopefully, you know, when you -- when you get them paid for, then you'll start making money.
Q Okay. And who always told you that?
A Chicken farmers. That's Mr. Dickens, Mr. Howard.
Q That's why you've been working hard to pay that loan down, I guess?
A Right.
Q You said when you initially bought these four houses on 30 acres, you had to do some work to them?
A Yes, sir.
Q What did you have to do?
A Just was going in, you know -- feed leaks, fix the feed leaks. Water leaks, fix the water leaks. Motors, you know, heaters, fans. Anything, you know, functionality-wise inside the chicken house that makes it run, I was just going through repairing things.
Q Do you remember how much you spent on fixing things?
A No. It's an ongoing process. It just --
Q Did you -- did you consider the houses in disrepair, or was this more routine maintenance you felt like ought to be done?
A The first time I was doing it, it's kind of maintenance that was just let go for so long that I come this here and repairing it, repairing it, you know.

Page 26

Q So the houses had been kind of let go when you bought them?
A Yes, sir.
Q And they needed some work?
A Yes, sir.
Q To get them up to par to perform?
A Yes, sir.
Q Did you have any help with any of that?
A The first -- first month I had some friends, you know, volunteer time just to come down and help me do some stuff, but after that it was me.
Q So I guess you took flocks on that farm with Perdue for several years --
A Yes, sir.
Q -- before you bought 10 acres and put two more houses on?
A Right.
Q Do you remember how many years that was?
A Four years.
Q So for about four years you operated four houses on about 30 acres, and did you operate with Perdue that whole time?
A Yes, sir.
Q When did you stop contracting with Perdue?
A When I switched to Tyson.

Page 27

Q Do you remember what year that was?
A Around '11, 2011.
Q I'll show you contracts. We'll go through those. Just to frame your mental part around it, I've got a contract date of February 24, 2012. And you can tell me if I'm wrong. I'm just trying to --
A You can probably help me out.
Q It looks like maybe your contract on 5192 was executed on October 14, 2011, and then on 5198 on February 24, 2012.
Does that ring a bell? I mean, I could be wrong.
A Say it one more time.
Q So your first four houses, it looks like you signed a contract with Tyson -- it looks like you signed both of them in 2011; is that right?
A I believe so.
Q Okay. So you operated with Perdue from about 2007 to 2011, right?
A Yes, sir.
Q And that was, you had four houses on the 30 acres, and then at some point you built two more houses, right?
A Yes, sir.
Q And did you build those two houses while with Perdue or with Tyson?

Page 28

A Tyson.
Q So did they ever operated more than four houses with Perdue?
A No, sir.
Q How far is -- and how far is the Perdue complex from your farm?
A I would say it was an hour and 15 minutes.
Q An hour and 15 minutes?
A Yes.
Q And how many miles would you say that is?
A Probably 50 miles.
Q And how far is the Tyson complex from your farm?
A About 10 -- 10 miles.
Q So you're contracting with Perdue. Did it ever go off flock-to-flock, or was it always a flock-to-flock contract?
A Tyson?
Q With Perdue.
A Perdue was flock-to-flock.
Q Okay. So did you just sign a contract every time they --
A No. They -- you just signed it the first time and just -- I don't know why they called it flock-to-flock.
Q So you just signed one contract with them ever?
A Actually, you signed three contracts because they

Page 29

raised three different birds.
Q And so you signed all three contracts at one time?
A Yes, sir.
Q Were the contracts the same other than the different birds?
A The pay scale was different for each one because you had what you call females, which were the smaller-grown bird. So I'd say it was probably the highest per pound. You had the males, and then you had the jumbos.
Q What are jumbos?
A It is a bird you kept for eight weeks, but they were the heaviest.
Q And so you got a different pay per pound for each of these?
A Mm-hmm.
Q Was it your understanding with Perdue you would receive all females in a flock or all males, or would it be mixed?
A They was all sexed.
Q So you would know when you got them which contract they applied to?
A Yes.
Q And the contract would say, well, this is the pay if you get males, this is the pay if you get females, and

Page 30

this is the pay if you jumbos?
A Yes, sir.
Q Was the payment method what's known as the tournament system of pay?
A Yes, sir.
Q And was the tournament system of pay that you got paid there based on how you did under your contract and then as compared to other growers who settled the flock in a week?
A Yes, sir.
Q Were you ever offered the opportunity at Perdue to sign any other type of contract?
A No, sir.
Q So you signed all three of these contracts when you first started with Perdue --
A Yes, sir.
Q -- and they just kept going? Did you ever have any problems with Perdue?
A I mean, say for instance, example I mean.
Q Did they ever say you were a good grower, bad grower?
A I mean, they didn't say I was a good grower or a bad grower. I just had to work with what I had.
Q You had to kind of learn the business on the fly?
A Mm-hmm.

Page 31

Q Did you have anyone helping you while you were with Perdue?
A No, sir.
Q So you do all your -- while with Perdue, you did all your chicken operations alone?
A Yes, sir.
Q No employees?
A No.
Q What made you -- what led to the decision to not contract with Perdue and instead contract with Tyson?
A Better opportunities with Tyson. I went, you know, to Tyson, and I talked to Mr. Allen. I can't remember his last name. And I brought him out to my farm. I said, "Would you be willing to take on some more houses?" He says, "Yes." I said, "Would you even be willing to build some more houses?" And he said, "Yes."
And I asked him -- and when he did that, when he gave me the opportunity, I thought that was a -- a better way to, you know, proposition myself.
Q So you wanted to build more houses?
A Yes, sir.
Q And had you asked Perdue if you could build more houses?
A Yes, sir.
Q And what did they say?

Page 32

A To be -- to build more houses with them, you had to be above positive APC rating with them, and I was not.
Q And what does that mean to be above positive -- did you say "APC"?
A Yes, sir.
Q And what is APC?
A Above-average grower.
Q And so at that time you were, at least under their system, not ranked as an above-average grower?
A Right.
Q Meaning week-to-week in your tournaments you were finishing below average?
A Yes, sir.
Q And so they said their requirements for you to build more houses and therefore receive chickens, either, you'd have to be an above-average grower?
A Yes, sir.
Q And so they were not open to giving you more chickens if you built more houses?
A No, sir.
Q Did Perdue ever threaten to terminate sending you chickens?
A They never threatened to terminate, but I was thrown into their management program.
Q Into what would be like an intensified management

Page 49

A No.
Q Did you have any -- where were you when you signed your first contract with Tyson?
A On my farm.
Q And who brought it to you?
A Rubin.
Q Do you remember Rubin's last name?
A Rubin Bruce.
Q Rubin Bruce. And what did you understand Rubin Bruce did for Tyson?
A He was a service tech.
Q Do you remember anything you guys talked about in relation to what the contract meant or anything like that? No?
A No.
Q Did you have the contract reviewed by anyone or looked at -- looked over?
A I mean, I took it, yes, and looked over it.
Q Did you talk with Rubin about whether or not there were different contract options under Tyson's program?
A I don't believe there was any other options.
Q Such as a 52-week performance contract or the term of the contract or anything like that?
A There was no 52-week contract.
Q So the contract you were offered was a tournament

Page 50

system contract?
A (The witness nodded.)
Q Did you have any understanding of any differences between Tyson's contract and that that you had with Perdue?
A Just the condemn.
Q Condemn was different? What did you understand the condemn differences to be?
A Perdue didn't have a condemn on their contract.
Q And Tyson did?
A Yes.
Q And what does that mean, Tyson had a condemn on their contract?
A At the time I didn't know. I just knew that they had a condemn.
Q What is condemn, as you understand it?
A Anything that Tyson wants to reject, they can condemn.
Q Do you know if Tyson actually does the condemnation or if anyone else does?
A They say that the USDA is the one that does it.
Q Do you have any reason to believe that's not true?
A No.
Q And so you knew there was a difference between how the condemn affected you under your contract with Tyson

Page 51

versus Perdue?
A Without experience, I really didn't know.
Q But you knew it meant something?
A I knew it meant something, but I didn't know what it meant.
Q Did you ask any questions of Tyson about it?
A No.
Q Did you have the contract looked over by anyone else?
A (The witness nodded.)
Q Did you have any understanding as to any expenses that you might have to incur on your own to contract with Tyson versus Perdue?
A At that time gas was separate versus, with Perdue, the gas was in -- in the -- basically their figure of how they paid you versus you take care of it yourself with Tyson.
Q With Tyson you bought your own fuel?
A Right.
Q Did you understand that you also got a fuel pay from Tyson under your contract?
A Yes.
Q So you said that was different from Perdue?
A Yes.
Q How was that different from Perdue?

Page 52

A Perdue paid for it, and then they figured it in on every contract, I guess, how they figured your pay.
Q So Perdue paid the bill to the gas company?
A Mm-hmm.
Q But then they figured it into your contract?
A Mm-hmm.
Q And so they got paid back under the contract?
A I guess.
MR. WHITFIELD: Do you know that.
THE WITNESS: I don't know that.
MR. WHITFIELD: Don't be assuming.
THE WITNESS: I don't know for sure how that works.
BY MR. TATUM:
Q Did you understand any other differences on the expenses you were going to have to incur to contract with Tyson versus Perdue?
A No.
Q No, okay. Other than Mr. Bruce, did you have any conversations with anyone else about your contract with Tyson?
A No, sir.
Q Do you remember anything Mr. Bruce said to you about the contract?
A No, sir.

Page 65

anything else?
A No, sir.
Q Farming?
Okay. At some point once you built the next two houses, did you have any conversations with Tyson about whether or not they were up to par good enough to contract?
A No.
Q No. So you got them done, and someone brought you out contracts for those houses?
A Yes, sir.
Q And who was that?
A Rubin, I believe.
Q And did you understand it to be the same type of contract as you had before?
A Different contract.
Q What was different about it?
A There was a ten-year.
Q A ten-year contract. What was your first -- the contract you had the first time for the other four houses?
A Seven-year.
Q Okay. And that was because you had built new houses that you got a longer contract?
A Yes, for the -- to get the ten-year incentive pay, it was a ten-year deal.
Q So you got -- you got a contract to raise

Page 66

chickens for ten years, and you got an incentive payment contract because you built new houses?
A Yes, sir.
Q Otherwise, was the second contract the same as the first in the sense of how you got paid?
A Yes.
Q Do you remember having any discussions with anyone at Tyson, whether it's Ruben or someone else, about what that contract meant?
A (The witness nodded.)
Q Have you received your incentive payments so far?
A Yes, sir.
Q Are you due any more?
A Yes, sir.
Q How many more are left?
A Four -- four or five more, I believe. I think I got the first payment when I started.
Q One every year?
A That was 2012, so 2022 should be my --
Q So you've gotten those payments on time?
A Yes, sir.
Q And so now when you -- you said you operated the two houses independently from the four houses.
When you settle -- when you receive flocks and settle, are you getting six houses of chickens or four and

Page 67

two at different times?
A Four and two.
Q So you don't always fill the two houses when the other four get filled and vice versa?
A Right.
Q Okay. And is there a reason why you operate them that way, you know, a four and two as opposed to just filling six over and over?
A That was how Tyson made it.
Q And did they tell you -- did they ever tell you why they wanted to keep them separate like that?
A They said I had to keep it for new house pay.
Q I'm sorry. What?
A For the new house contract, I had to keep them separate.
Q And they told you that before you contracted with them and before you built them?
A Mm-hmm.
Q I think there are farm numbers attributed to the two different sets of houses --
A Yes, sir.
Q -- that Tyson uses for tracking. What's the two-house farm number?
A I think you said 5198.
Q I thought so. I was just getting lost track on

Page 68

my note here.
I thought 5198 was the two-house, and 5192 is the four-house.
A (The witness nodded.)
Q Have you ever talked with Tyson about building any more houses?
A No, sir.
Q So you're satisfied you don't want any more?
A No, sir.
MR. TATUM: So I think I have your current contracts here. That's the purpose of what I'm going to show you now. We'll mark these with stickers so we can track them.
(Exhibit 1 was marked for identification.)
BY MR. TATUM:
Q So Exhibit No. 1 should be a copy of your current contracts on farm 5192, which is your four-house?
A K&C.
Q K&C. So take a look at that. I'm going to ask you to flip through it a little bit.
MR. WHITFIELD: Is there a Bates number on this, Mark?
MR. TATUM: You know what? I just noticed that I guess I brought a copy without a Bates number.
MR. WHITFIELD: Okay.

Page 69

MR. TATUM: This might be -- we had a couple people, that when we were preparing for depos, we realized that their latest greatest contracts were post our production two years ago.
MR. WHITFIELD: Yeah.
MR. TATUM: I don't -- let me see the date. This one is not that, obviously, from the date of it. I don't know why it doesn't have a Bates number on it.
MR. WHITFIELD: Yeah, it's no big deal.
BY MR. TATUM:
Q All right. Okay. So I want to look at this contract. Do you recognize this as a copy of your current broiler production contract for farm 5192?
A I believe so.
Q And on the second page, as we flip through, is that your signature there on the left side?
A Yes, sir.
Q So this was dated February 24, 2012; is that right?
A Yes, sir.
Q And do you recall who brought this out to you to sign?
A I would believe either Rubin Bruce or James Catlin.
Q Do you remember any discussions you had with them

Page 70

on what this contract was or meant or anything like that?
A I asked him what it was about, but it's been so long, I'm not sure the conversation.
Q Can't recall?
A No.
Q And this is the second contract you signed for those four houses with Tyson, right?
A Right.
Q And it looks like it's also for a 7-year term there in paragraph 10? Is that your understanding?
A Yes, sir.
Q And then if you flip the page, you see Schedule A? And if you flip to the second page, it's Schedule A.
A Turning one more page?
Q Yes, sir.
A Do I want to keep both of them out or --
Q Oh, just flip them. I'm just going through where you signed it to make sure it's your signature.
A Oh, okay.
Q So we'll probably do a lot of flipping.
Is that your signature there on the second page of Exhibit A -- or Schedule A to Exhibit 1 on the left side?
A Yes, sir.
Q It is?
A Yes, sir.

Page 71

Q And then we're going to flip again to Schedule B. And then Schedule B is multiple pages. And we're going to go to the last page of Schedule B of Exhibit 1, maybe six or seven pages down. There you go.
Is that your signature there on the last page of Schedule B of Exhibit 1?
A Yes, sir.
Q And then we're going to flip the page to not your taxpayer page, but the next page of Exhibit 1 that's captioned "Acknowledgment."
Is that your signature there?
A Yes, sir.
Q Okay. And then we're going to flip a couple pages to a document that says, "Broiler Production Contract Robards Schedule A."
Keep going. Right there. And this is an amendment to Schedule A. And if you look at the second page, it looks like it was signed on 10/22/14.
Is that your signature there?
A Is this the same --
Q It's an amendment to Schedule A, if you read the first paragraph.
A Oh, I went two pages too far.
Q Now you're there.
A I was looking at this one, and I was like, no,

Page 72

it's different.
Q Is that your signature there on the second page of the amendment to Schedule A --
A Yes, sir.
Q -- of Exhibit 1 dated 10/22/14?
A Yes, sir.
Q Do you recall having any discussion with Tyson as to what was amended in Schedule A from your original broiler production contract?
A I believe -- you're talking about this one right here?
Q Yes, sir.
A Yes, I believe I went down to talk to Jim about it, and I had a discussion with him and Jared. I believe it was a pay incentive or a raise.
Q You believe this was indicating that you were receiving a raise?
A Yes. And I went down and spoke with them over kind of a -- I went down there and told them that -- I took my electric and gas and all my bills down there to kind of explain what they was trying to give us were -- what they were trying to give us wasn't really enough to compensate for what the utilities had gone up in the past five years.
Q So the utilities that you were paying, not to Tyson, but utility companies, had gone up?

Page 77

The specs that they tell you, we're building you a 56 by 501, in my mind, when I put that together, that's 28,000 square feet.

In their instance, they considered it 55 by 500 inside living space quarters. You take the 6 inches out on each side, and that makes it 27,500, and that's where they get their 55.

Q Oh, so you're measuring outer wall, and they're measuring inner wall?

A Yeah. When they tell you, well, we're building you a 56 by 501, that's how I --

Q So it actually does inner wall to inner wall at 55,000 square foot?

A Yes, sir.

Q And that's the actual living space for the chickens?

A Right.

Q Okay. I think this is your existing contract with farm 5192 that's here in Exhibit 1; is that right?

Any other amendments that you're aware of or anything?

A No, sir.

Q I'll try to do the same drill with you on contract 5198.

Yeah, you can -- we'll take that, put a clip on

Page 78

it and set it aside. I might put a better clip on this one, when you look at it, so it's easier to flip around.

(Exhibit 2 was marked for identification.)

BY MR. TATUM:

Q Now let me show you what's been marked as Exhibit No. 2. I think Exhibit No. 2 is a set of your contracts for farm 5198, which is your two-house contract; is that right?

A Yes, sir.

Q And this -- is that your signature on the first page of Exhibit No. 2 dated 10/14/2011?

A It is.

Q And it looks to me like this was -- this is actually another copy of your new house incentive agreement because it actually goes with this farm; right?

A Right.

Q And again, 55,000 square foot is the chicken space; right?

A Right.

Q And then the contract itself, the broiler production contract for this farm is on the second page, Exhibit No. 2.

Is that your signature on the second page of the broiler production contract, which is the third page of Exhibit No. 2?

A It is.

Page 79

Q And it looks like, like you said, if you look at paragraph 10 of this broiler production contract, this is a 10-year contract?

A It is.

Q Do you remember any discussions you had with anyone about the signing of this contract?

A No, sir.

Q Do you remember any discussions you had with anyone about the terms of this contract?

A No, sir.

Q If you flip to Schedule A on the second page of Schedule A of Exhibit No. 2, is that your signature there on the lower left?

A It is.

Q And then again we'll flip to Schedule B, and we'll go to the signature page of Schedule B, which is labeled Tyson 167561.

Is that your signature on the last page of Schedule B in Exhibit 2?

A It is.

Q And then we'll flip again past your tax payer number to the acknowledgment form, which is Tyson 167563. Is that your signature there?

A Yes, sir.

Q Then flip a few pages now to Tyson 167566. One

Page 80

more page. And this is an amendment to Schedule A to contract 5198. Is that your signature on the second page?

A Yes, sir.

Q And then there's another amendment to this one. The first amendment is dated 10/24/14, and the second amendment is dated 11/15/15. Is that your signature there on the last page as well?

A It is.

Q Do you have any understanding, sitting here today, what these two amendments did?

A I believe they give us a 15th of a percent raise.

Q So, for example, in the first amendment, if we look at paragraph F, it references 5.10 cents per net pound. And then if we look at the same paragraph on the second amendment, the paragraph represents 5.30 cents per pound. So it was offering you a base rate raise; correct?

A I'm lost.

Q Your understanding is, the amendments increased your base rate pay; right?

A Right.

Q That was the purpose of them?

A Right.

Q You didn't have to sign these, but it got you more money if you did; right?

Page 153

A One, I talk to my neighbors. They tell me what they have.
Q Can you give me one example of when you think you've had a flock settle with those three, and each had different breeds of birds from each other?
MR. WHITFIELD: Objection, asked and answered.
Go ahead.
A I feel like I'm repeating myself. I'm going to say it's been the past two flocks. But from the time when we transitioned, you know, I've -- like I said, I can't say which flock. When I've talked to Morgan, I got Cobbs this time. I got 500s. I got 708s. I got 700s. We've had three different breeds running at one time -- four different breeds, actually.
BY MR. TATUM:
Q So you've all three had three or four different breeds running at the same time --
A Yep.
Q -- within your own farms?
A Well, I guess, you know, one of us might have one or two other breeds, and the other one might have, you know --
Q Have you made any -- have you done any analysis to determine whether or not that caused you to do worse or better than them?

Page 154

A I've done no analysis. I mean, I'm -- I'm not sure what you're asking by saying that.
Q I'm just trying to figure out if, at the end of the day, you've ever figured out that that caused you to do worse or better than them.
A No. Usually just every bird is different, and some perform better than others. So, you know, some are -- seem to have more roosters in them. Some seem to grow quicker at different stages in their life, you know, depending on the days you take them out, you know. There's variables on how each bird, you know, lives its life course, you know. Some don't grow until later in the flock. Some grow quicker earlier.
Q Even within the same breed profile that's true; right? I mean, not every chicken conducts itself like a robot.
A Right.
Q And so even if you've got all 500s, I mean, you're going to have survivors and you're going to have none survivors and things like that; is that right?
A That's where your job is to call out the small ones.
Q You're going to have birds naturally aggressive and some that are naturally passive, right? Do you agree with that?

Page 155

A I guess so.
Q We're dealing with a living breathing animal, not a machine?
A Everybody is unique in their own way.
Q Right. Who have been your service techs while you've been with Tyson?
A Ruben, John, James, Beau.
Q So that's Beau McGuire?
A Yes.
Q And James Shelton?
A James Catlin.
Q Oh, I'm sorry. John?
A Snell.
Q Snell. And Ruben what?
A Bruce.
Q Who's your current service tech?
A Eric Brown.
Q He's your current service tech?
A No. Beau is.
Q How long was Ruben your service tech?
A He was my service tech for the first two or three flocks.
Q And then how about John Snell?
MR. WHITFIELD: John who?
MR. TATUM: Snell, S-n-e-l-l.

Page 156

MR. WHITFIELD: Okay.
A He was my current or previous service tech for two or three flocks -- I think two flocks, and then a year before that or so he was a couple -- I probably had John four or five flocks.
BY MR. TATUM:
Q And how about James?
A I've had James probably six to eight flocks.
Q And then how about Beau?
A I don't know. I've probably had several with him.
Q And Eric?
A Eric I had probably three or four.
Q And which ones your current one?
A Beau.
Q How long has he been your service tech?
A He just started back this previous flock.
Q Is there a particular service tech you worked with the longest?
A I know the one that keeps coming back is like probably Beau.
Q So you've worked with him more than just this recent flock?
A Mm-hmm.
Q What's your understanding of the role of the

service techs?
A To me, the role should be, you know, they're here to aid the growers to help them do the best -- do the best that they can, you know.
Q Do you understand that Tyson's goal is to get as much pounds back as they can from the grower?
A Right.
Q And the growers' goal is to grow as much pounds as they can?
A Exactly.
Q So at least in that sense there's a common goal; correct?
A Right.
Q And in a perfect world, if you can do that and save expenses and Tyson can do that and save expenses, everybody makes money, right?
A Right.
Q Do you understand the service techs' role within that environment is to try to facilitate a link with the grower to make recommendations to achieve that goal?
A What do you mean facilitate?
Q In other words, be the person out looking at the farm and looking at the chickens and making recommendations to try to maximize pounds?
A I understand that.



Q Have you ever felt like any of your service techs weren't trying to achieve that goal?
MR. WHITFIELD: Objection to form. Go ahead.
A Yeah, they all are trying to, you know, help you to get the biggest birds you can get.
BY MR. TATUM:
Q Do you feel like any of these service techs have ever treated you wrongly?
A Yes, sir.
Q Which one?
A Beau.
Q What has Beau done? Is he the only one?
A Yes, sir.
Q What has Beau done?
A Beau tries to -- he doesn't like the word recommend more than he will try to get you to try to make you do it his way, you know, and if it means lying to make you do it, he's going to do it.
Q So he -- he really wants you to do what he says needs to be done?
A Yes.
Q To maximize the chickens?
A Right.
MR. WHITFIELD: Objection to form.



BY MR. TATUM:
Q Is that right?
A Yes.
Q Whereas others might be -- you know, they might make a recommendation, but if you don't do it, they're not as hard-nosed about it?
A Right.
Q Has Beau ever lied to you?
A Yes.
Q What has he lied to you about?
A He lies on his paperwork that he turns into Tyson. He's -- he deceivingly writes it to make it, you know, look the way it ain't supposed to -- you know, he'll misuse dates. He'll misrepresent things that he writes down.
Q Give me -- tell me when he's done that and on what document.
A I will send a letter back when I was giving the arc 99 that, you know, just say for instance I have 40 something DO birds. My houses are running in full tunnel. It's raining outside. 100 percent humidity in there. You're not running enough air. I mean, then you get a thing saying, you know, this could have caused the real reason why your birds were sick. I don't know. That one form that they sent out to me, there was a bunch of stuff he wrote in



there that's miss guiding. This flock he has come out the first of the flock, and on a certain date he wrote -- he give me a call and said, Keith, I need you to cover up your chickens. Two and half weeks later he comes in. There's chickens that are being moved to the side while the litter is being removed. He writes down on a big long note, Keith, I told you to cover them birds up last week. Why haven't you done this? Once again, he's misguided what he wrote down that was something that happened two and a half weeks ago. Them birds were covered up, but misrepresents that says, hey, I see a farmer moving the litter. When you get done, cover the birds up.
He's also lied on a Cert -- his paperwork. I've watched him go around all my computers and never put on a suit. Go through my computers, write do you know when he gets off of them, calls me, talks to me for 15 minutes and asks me every question he needs to do to fill out his report.
And I have a witness.
Q And you think that's bad to ask you information to put in his report?
A If it's your job to walk to that house and get every answer that you're supposed to do, and that's what you get paid for. Why would you call on me to answer all them questions for you?

Page 161

Q I guess -- so you don't want him to call you and ask you questions about your farm operations?
A Well, he's been given a report that he's supposed to go through and answer these questions. It is his job to walk through the houses and make sure that each -- you know, this is done, that's done, this is done, that's done, but if you just as soon go through all my computers, write down, you know, off of them, not go in my house and do what you're paid to do, and then call me and let me answer every question for you.
Q Has he ever not taken your word for it?
A He knows I tell the truth so he calls on me and allows me to do his work for him.
Q So you believe he trusts you?
A Oh, yeah, he -- but it's -- when you go in there and you write some of the stuff on there that you never really even checked, that's falsifying records. There will be some stuff on that that I -- what he actually says it is --
Q Is it because he took your word for it?
A No. Because he's just trying to get in, get out and --
Q Any of that ever cause you to lose money?
A No. But I mean, you know, you see this right here is this if you don't do what I say, you could lose your

Page 162

contract. I've had him come to me and say that. Is that how service techs are supposed to represent their sells?
Q Would you consider yourself an above-average, or below-average performer with Tyson?
A Average.
Q Is your goal to be above average?
A My goal is to make what's due to me.
Q But my question was, is your goal to be above average?
A Knowing that I take money from other farmers, my goal is to make average what's due to me.
Q I don't understand. You said take from other farmers.
A Where do you think my bonus money comes from?
Q I didn't know you received bonus money.
A They take money away from one grower and give it to another in the tournament system.
Q So you believe that certain growers don't have full basis to their pay like you do?
A I think everybody is paid -- in the tournament system, and if somebody does better than the other, they take money from one farmer and give it to the next.
Q You're not trying to say they actually take money out of the farmer's pocket?
A Yes, sir.

Page 163

Q You think they actually go to their account and remove money from it?
MR. WHITFIELD: Come on.
BY MR. TATUM:
Q You're not trying to say that?
MR. WHITFIELD: Mark, you know what he's saying.
A Mark, I'm saying it's immoral to pay people like that.
BY MR. TATUM:
Q Why did you sign a contract to do that?
A At the time when I signed the contract, like I said, I wanted to get out of working the factory life and work in the farm life. Did I know what I was getting into? No. But you know what? Sometimes you just got to take a step in and try it out.
Q Well, I mean, that was with Perdue, not Tyson.
A The same way all the way around.
Q And then you chose to go to Tyson because you were unhappy at Perdue.
A I wanted to, like I said, build more houses.
Q So you wanted to build more houses and stay in the business.
A Yes. Like I said, I was mowing and raising tobacco. I'd rather just be able to stay on the farm and invest all my time into it.

Page 164

Q So you said that -- what was you talking about with Beau in relationship to the Arkansas 99 issue?
A When I got the Arkansas 99, he was my service tech.
Q And what did he lie to you about in relation to Arkansas 99?
A Well, he never -- he didn't know what happened because -- it's his job to come out and check. He never seen anything wrong with them birds, you know. It's his job to come do blood work and post my chickens. You know, when he posted ten chickens out of every house and it was not seen then, and then when it goes to the plant, you know.
Q So he didn't -- you're saying he didn't see the Arkansas 99 issue?
A No, sir.
Q But I asked you what he lied to you about as far as the Arkansas 99 issue.
A I never said he lied about the Arkansas 99. I said he lied about how he facilitates his paperwork when he comes out and does reports every week.
Q By talking to you and not always doing a complete walk-through?
A Right.
Q Other than by talking to you and not always doing a complete walk-through, is there any other thing he's done

Page 169

MR. TATUM: Yeah, no problem.
MR. WHITFIELD: Take a break for a second.
VIDEOGRAPHER: This is the end of Disk 2. The time is 1902. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: This is the beginning of Disk 3. The time is 1516. We're back on the record.
BY MR. TATUM:
Q Who else have you dealt with at Tyson besides these service techs we talked about? We talked earlier about the guy you first met with when you were wanting to move over to Tyson.
A I mean, I've dealt with Kenny. I've talked to Jim, Jared.
Q Jared Shelton?
A Yes.
Q Jim Gottsponer?
A Yes, sir.
Q Ken Bartley?
A Mm-hmm.
Q Anybody else?
A I talked to David before too.
Q David Mears?
A Dickey.
Q Oh, sorry. Have you ever felt like David Dickey

Page 170

has lied to you about anything?
A No, I can't say that I have.
Q How about Jim Gottsponer?
A Yes.
Q What did he lie to you about?
A When I went to that meeting, you know, showing him everything that I had, you know, presenting my case, hey, this is what's been going on.
Q Is this about the feed or about --
A No. About the --
Q Density?
A -- the density and then the raise, both. I went up there and showed him all my papers and how all the utilities have went up, you know, that the raise they were trying to give us really didn't compensate for the -- what do you call it -- the price of --
Q Propane?
A -- inflation, you know, just propane, electric, you know.
Q What do you think he lied to you about?
A After it was all said and done, he said, "Keith, I'm going to try to get you a little raise every year."
Well, he got us a raise that one time, and never seen another one after that.
And then he said that he would go to corporate

Page 171

and present what I showed to him. So I took everything to him, and he made copies of it and said, "I'll get back with you," and he never got back with me.
Q Do you know -- you don't know whether he went to corporate with it or not?
A He never come back -- he never spoke to me.
Q And so he did get you, we saw two amendments. He got you two raises, but that's it?
A I think the one might have come before he was in there. I'm not sure. But I know he got the one 15th of a cent. I do -- I do remember, you know, on the 14th.
And then he said, you know, "If you'll just bear with me, I'll get you a little bit every year," he said, "But get what you want, you know, I can't do that, but if you'll just go ahead and sign it now, you know, that way you don't lose out all together. I'll try to get you a little bit every year."
Q So he said he'll try to get you a little bit every year?
A Yeah.
Q Do you know if he tried?
A I don't know.
Q And this was in around 2014?
A '14.
Q So what we're talking about is him trying to get

Page 172

an amendment to your contract to increase your base pay?
A Yes.
Q And what he told you was, "I'm going to try to get you one. I'll try to get you one every year"?
A He said, "I can't get you what you need. I mean, basically what you need, I can't get that for you, but this is all I've got for right now. I'll try to get you a little more later."
Q And what you're saying is, you didn't get a little more later?
A Never got -- never got a response, never got a call, hey, I'm still trying, you know, hey, I called corporate, hey, you know.
Q Did you ever follow up with him?
A I seen him, you know, and just kind of wanted to see if he would say anything to me, and he never responded.
Q Did you ever bring it up to him?
A I don't guess.
Q Was that a no?
A Right, I guess.
Q Pardon me?
A I guess.
Q You guess?
A I'm thinking I can't respond. I can't remember anytime -- I'm trying to think if any time I recollect

Page 173

talking to him at one of the meetings, but I don't think I ever brought it back up, no.
Q So the context of this was, you went and met with him and felt -- and wanted your contract rate pay increased?
A Well, what they did is, they come -- like I'm selling birds on a Friday, and he told me -- my service tech run the papers out on a Thursday -- "if you don't sign this, we're not going to give you a raise on this flock. "
I said, "Why do I have to sign that right now"? If you want a raise, you better take it right now."
Q That's the Amendment A to the broiler contract; right?
A Yeah, I said where's -- I mean, I said, "I want to talk to Jim." I said, "This -- I don't believe this is enough." I said, "I don't think he understands how much inflation has went up," I said.
"Well, if you want your money."
I said, well, I said, "I'm not going to sign it." I said, "I want to talk to Jim first."
And that way I can bring, you know, my gas receipts, my electric receipts, everything from four or five years there, throw it out, look how much everything has gone up, you know. And we're seeing percentages of, you know, raises on utility bills and stuff like that. He agreed that the raise wasn't enough but, you know --

Page 174

Q When you say "raise," you're talking about a change in your contract price; right?
A Right.
Q And so you had a contract with a price?
A Right. And if you wanted to get the 15-cent, you better sign it real quick. I'm like, where's the negotiation in that, you know?
Why, you know -- if I'm bringing you, you know papers showing how much my output keeps going up and keep going up, but what, you know -- that profit of mine is getting smaller because everybody else's hands are getting bigger, but the company ain't trying to do their job of keeping -- what you call it -- keeping up with the, you know, the times basically.
Q So you had a contract that had a price set in it; right?
A Right.
Q And then someone came to you and said, we're going to -- we're offering to increase that price, and here's what it is?
A A 15th of a cent.
Q Right. And you said, wait, I'd like to talk to Jim because I'd like my price to be increased more?
A Right.
Q And then you went and talked with Jim?

Page 175

A Right.
Q And he said, "This is the best we can do right now, but you don't have to take it"?
A Right.
Q And he said, "But I'll try, and I'll talk to corporate and try to get you something every year," right?
A Right.
Q And so you signed the amendment to take the increase in pay?
A And he said, "If you don't take it, I mean, you just keep making what you're making," you know.
Q And you understood that. You either take the new pay or don't take the new pay, your choice, right?
A Yeah.
Q And so you signed it and took it, and then you don't know what he did from there to try to get more raises under the contract; right?
A No, sir.
Q You just wanted it to be more than what Tyson was offering?
A I was just trying to show him what's going on, you know. You see -- I wanted them to see, you know, our utility bills are going up a lot more than what they think, you know.
Q And this was the same year that they also gave

Page 176

you a separate fuel bonus payment, correct, to offset some of those costs?
A You can look. It might be.
Q What about Jared Shelton? Has he ever lied to you about anything?
A No.
Q What about Ken Bartley?
A No. They tried -- I mean, they was trying to help me. I'm not knocking them. I'm just, you know -- I went to them, you know. I actually tried to listen to them about raising a bird, you know, and still settled last place.
Q You understand, from their perspective, there were folks settling in your flocks who were settling in first place?
A Right. And they didn't realize the density was too high either.
Q Well, you understand even today you're settling with people, and some people are settling first, and some people are settling last?
A But are they all on equal playing fields now?
Q Do you know?
A That's what I'm asking.
Q You don't know?
A I'm hoping. You've got to have faith in a

company. You can't --
Q You understand perspective from Tyson might have been, you need help being good at growing chickens; is that fair?
A That's fair.
Q And so sometimes just perspectives are different on how a grower -- what a grower needs to do to succeed?
A And I listened.
Q And you understand that maybe the perspective of your service techs is, they're trying to help you be better. You were new at this with Tyson?
MR. WHITFIELD: Is that a question?
BY MR. TATUM:
Q You understand that, right? I mean, you're not the most experienced chicken grower in the complex. You agree with that, don't you?
A You don't learn nothing overnight. It takes time.
Q Right. Right. I mean, you started from the ground up?
A Right.
Q Right? And so, you know, there was a time period when you just wasn't as good as the other growers. Do you acknowledge that?
A I acknowledge it.



Q But you've gotten better?
A I am.
Q Now, we talked about Jim, Ken, Jerry, Dickey, and your service techs. Is there anybody else you can remember that you dealt with at Tyson?
A No.
Q Let's see here. Do you know what your current average out time is for your flocks?
A The last time I believe is around 18 days.
Q Do you have a preference for what you want your out time to be?
A Preferential wintertime, 21 days would be nice just because it gives them more time to air out.
Q What about summer?
A Summer, I don't mind doing the 14.
Q Do you know that Tyson has a 14-day minimum out time policy?
A Right.
Q Do you know if your average out time is any different from anybody else's?
A No.
Q Do you know if your average growth time, in other words, a period the chicken is allowed to grow between dropoff and pickup, is any different from anyone else's?
A Sometimes it is. Between my two farms, I see it.



Q Sometimes it's 51 days, sometimes maybe 50?
A Fifty-five.
Q Based on logistics of dropping off and picking up and all that?
A Yeah, that would be my guess. I've never been, you know -- you get a different answer every week.
Q What do you mean "a different answer"?
A You know, you're told the way they go out is the way they're supposed to go in, you know, but it don't always work like that.
Q You understand there's a lot of logistics in picking up chickens and getting them in the door?
A Yeah. I don't make it a big deal or nothing.
Q You don't know whether on an annual basis whether your growth time is any different than anyone else's?
A No.
Q I want to -- you produced some documents here, and I just want to verify a set of these.
(Exhibit 8 was marked for identification.)
BY MR. TATUM:
Q It's Exhibit No. 10. I'll mark it. Let me make sure.
MR. WHITFIELD: Exhibit 10?
MR. TATUM: Well, I grabbed number 10 off this exhibit sticker list.



MR. WHITFIELD: I've only got seven exhibits. Did I miss some?
MR. TATUM: Let's see. Who knows. I'm just going to write 8 right here.
BY MR. TATUM:
Q Exhibit No. 8 is a packet of documents that I received from you, I believe. Do you recognize this?
A Me?
Q Yeah.
A Yes, sir.
Q Is this an example of a mailing you received when you settled flocks from Tyson?
A Yes, sir.
Q And this one has a note on the front. Do you know whose handwriting that is?
A Would be mine.
Q You wrote, "Didn't vaccinate chickens, condemned 70,000 pounds chicken, lost $14,734. Didn't get all my trucks tickets on" -- what is that word?
A "Condemn."
Q "Papers back. Papers and dates don't match on truck tickets and USDA inspection sheet."
So let's take a look at this. This is a settlement for October 2015. Am I right there, or would you call it a different date?