# Exhibit 18

# Deposition of John Pinkston

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,
Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC.,
et al.,
Defendants.

DEPOSITION OF JOHN L. PINKSTON
FEBRUARY 13, 2018

- - - -

Videotaped deposition of JOHN L. PINKSTON held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:49 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.

Page 2

I N D E X


| WITNESS | PAGE |
|---|---|
| JOHN L. PINKSTON | |
| Examination by Mr. Tatum | 5 |
| Examination by Mr. Whitfield | 132 |
| Further Examination by Mr. Tatum | 150 |


EXHIBITS


| Number | | |
|---|---|---|
| 1 | Broiler Production Contract, Bates TYSON_117005 through _117038 | 43 |
| 2 | Letter dated April 16, 2010, Bates PINKSTON003298 | 86 |
| 3 | Letter dated July 11, 2011, Bates PINKSTON003298 | 87 |
| 4 | Letter dated October 8, 2013, Bates TYSON_107243 | 88 |
| 5 | Letter dated October 17, 2013, Bates PINKSTON003305 | 89 |
| 6 | Letter dated January 23, 2014, Bates PINKSTON003311 | 91 |
| 7 | Supplemental Energy Payment Letter dated January 23, 2014, Bates PINKSTON003310 | 91 |
| 8 | Letter dated September 26, 2014, Bates PINKSTON003315 | 93 |
| 9 | Letter dated May 5, 2014, Bates PINKSTON003313 and _314 | 95 |
| 10 | Letter dated January 13, 2015, Bates PINKSTON003267 | 97 |
| 11 | Letter to David Dickey, Broiler Manager, Bates TYSON_117850 | 98 |
| 12 | Photograph, Bates PINKSTON002057 | 101 |


Page 3

EXHIBITS, (Continued)


| Number | | |
|---|---|---|
| 13 | Composite Exhibit of Documents Produced, Bates PINKSTON002125 through _2184 | 103 |
| 14 | Farm Observations Notes, Bates TYSON_071663 | 119 |
| 15 | Flock Visitation Summary Chart, Bates TYSON_107258 | 119 |


Page 4

A P P E A R A N C E S

John C. Whitfield, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 654108
816.474.6550
mtatum@shb.com

Also Present: Mr. Todd Davis, Videographer

Page 5

VIDEOGRAPHER: This is the videotaped deposition of John Pinkston on February 13, 2018 at the time indicated on the video screen, which is 9:49 a.m. Full introduction has been waived. Will the court reporter please swear in the witness.

- - - -

WHEREUPON,

JOHN L. PINKSTON

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. TATUM:

Q Would you please state your full name?
A Johnny Lauren Pinkston.
Q Where do you live, Mr. Pinkston?
A Sacramento, Kentucky.
Q What's the address there?
A 3084 Adams Schoolhouse Road.
Q Is this also the location of your farm?
A No, sir.
Q What's the location of your farm?
A 2000 Patterson Road.
Q Is that the location where your chicken houses used to be?
A Yes.

Page 6

Q At 2000 Patterson Road?
A Yes.
Q Are you married?
A Yes.
Q How long have you been married?
A Forty-eight years.
Q What's your wife's name?
A Brenda.
Q Brenda Pinkston?
A Yes.
Q Do you have any children?
A Yes.
Q How many children?
A Three.
Q How old are they?
A 47, 43, and 38.
Q Do you have any dependents that live with you other than your wife?
A No.
Q Are you employed?
A No.
Q Do you consider yourself self-employed or retired?
A Retired.
Q Where are you retired from?

Page 7

A Raising chickens and Alcan Aluminum, Sebree, Kentucky.
Q How do you spell Alcan?
A A-l-c-a-n.
Q What did you do at Alcan Aluminum?
A I worked in the environmental department. I was a technician.
Q For how long?
A Twenty years -- 19 or 20 years.
Q You retired 19 or 20 years or worked there 19 or 20 years?
A Oh, I'm sorry. I thought you were asking -- I worked there for 25 years.
Q And then do you remember about what year you retired?
A 1998.
Q Do you get a pension from them?
A Yes, I do.
Q Do you conduct currently any farming operation?
A Yes, I do.
Q What do you do today?
A I raise cattle.
Q How many head do you run on average?
A Twenty mama cows, a bull, and then whatever calves is on the farm that hasn't been sold -- not ready to sell.

Page 8

Q How many do you sell a year?
A Hopefully 20. That doesn't always happen.
Q Yeah. Do you have any other income sources from your farming operations?
A Yes, sir. I have two rental houses.
Q And this is all at your 2000 Patterson Road?
A No.
Q Oh, I'm sorry. Where are your two rental houses?
A One's in Sacramento, and one's on Highway 254 a couple miles out of Sacramento.
Q Sacramento, Kentucky?
A Yes.
Q How long have you had those?
A One of them, 254, approximately five years, hardly five years. The one on -- in town on Lyons Lane, about eight or ten years, nine years.
Q Do those have anything to do with your farming operations?
A The one on 254 did have, yes.
Q And your chicken operations, too?
A The chicken operation, yes.
Q How was it used for your chicken operations?
A I had a person helping me living in it.
Q Did they pay rent?

Page 9

A They did not.
Q Who was that?
A Angel Gonzales.
Q Do you have any contact with Angel Gonzales anymore?
A No, sir.
Q When did he quit working for you?
A When I sold my chicken houses.
Q Are your chicken houses on 2000 Patterson Road.
A Yes.
Q I think I looked at your contracts, and I thought they were listed as -- let me look at them real quick. I thought the address was 3084 Adams Schoolhouse Road. That's just your road?
A That's where I live.
Q Okay.
A The 2000 Patterson Road was established when I built the chicken houses.
Q At your Schoolhouse Road, is that acreage? Do you have acreage at Schoolhouse Road, or is that a residential area?
A I have acreage.
Q How many acres?
A Fifty-four, I believe it is.
Q But no farming operations, no chicken operations?

Page 10

A That's where the cattle are.
Q Okay. That's where the cattle is, okay. Do you do any graining or haying or anything like that for income?
A I raise hay for my cows, but nothing else.
Q No leasing?
A No.
Q All right. And then how many acres are at 2000 Patterson Road?
A I believe it's 28.
Q Do you still own that land?
A I do not. I sold it with the chicken houses.
Q When did you sell it?
A April of 2015.
Q Who did you sell it to?
A BP Poultry.
Q Who owns BP Poultry?
A Flat Branch Farms.
Q Who owns Flat Branch Farms?
A I'm not -- well, it's family.
Q Do you know the family?
A Patterson family.
Q Do you know who runs those chicken operations now?
A Yes.
Q Who's that?

Page 11

A Matt Bagget.
Q Is he part of the Patterson family?
A Yes.
Q Is that who took over operations from you once it was purchased?
A Yes.
Q Is he also currently a Tyson grower?
A Yes.
Q When did you buy 2000 Patterson Road?
A I don't know what year it was.
Q Do you know, was it in the '90s?
A No. I would say it was in the '80s.
Q In the '80s. And is that all 22 acres -- or 28 acres?
A Yes.
Q What was the purpose of you buying that property in the '80s?
A To grain farm.
Q So did you use it just for graining for a while?
A At that time, yes.
Q And then at some point did you ever conduct any other operations on that farm?
A Raised tobacco on it.
Q How long did you raise tobacco on it?
A I don't -- I don't --

Page 12

Q About how many years?
A Ten.
Q And did you sell the tobacco?
A Yes.
Q Did you have a contract with any particular --
A No.
Q -- entity? No.
Where did you sell it?
A Owensboro.
Q Is that like at an auction, or what is that?
A You take it to a tobacco warehouse, and the tobacco companies come to that warehouse and buy it, yes.
Q Did you raise a particular kind of tobacco?
A Burley. We always called it Dark. I think prior maybe is the -- Burley and Dark.
Q How do you spell that?
A B-u-r-l-e-y.
Q Burley Dark tobacco?
A Burley and Dark. It's two different --
Q Oh, okay.
A Two different varieties.
Q What's the uses of that tobacco; do you know?
A I'm sorry?
Q What uses is Burley and Dark tobacco? What's it used for?

Page 33

two-wheel -- like a two-wheel trailer I pull behind the tractor, and pump on it to run off the PTO on the tractor, and it generates tremendous pressure.
Q Right, okay. You say you grew with Perdue for 10 or 11 years?
A Yes.
Q What made you change from Perdue to another producer?
A At the time that I changed from Perdue, their out time between flocks was 28, 30 days, something like that. And if I recall, Tyson's out time was 10 days, 11 days.
If you don't have chickens in your houses, you're not making money, so obviously the shorter layout time paid -- you made more money.
Q Had Perdue's out time changed over time?
A They had.
Q They had gotten longer?
A They had gotten longer, yes.
Q So over time your out time was getting longer and longer with Perdue and you were getting less chickens per year?
A It had gotten longer, yes. Yes. Yes.
Q Do you know why their out time had increased over time?
A I do not know. I can only speculate it was

Page 34

chicken demand.
Q And you mean chicken demand by the public?
A Yeah, yeah.
Q Any other reasons why you started considering a change from Perdue to someone else?
A No, sir.
Q Did you consider any other producers besides Tyson to change to?
A No, sir. There was no other.
Q How did you first get in contact with Tyson?
A I called them. I heard that they was wanting growers.
Q And who did you hear that from?
A Oh, I -- maybe at the --
MR. WHITFIELD: Do you know who?
THE WITNESS: I don't know.
MR. WHITFIELD: Just tell him that.
A No, I don't know.
MR. WHITFIELD: It's okay to tell him you don't know.
BY MR. TATUM:
Q So you called up the Tyson complex at Robards?
A Yes.
Q And was that -- were they Hudson still, or were they Tyson?

Page 35

A No, they were Tyson then.
Q So Tyson by that time had bought the complex and bought out Hudson?
A Yes.
Q I think I asked you that, but just to make sure, do you remember why you chose Perdue over Hudson? I thought you said --
A At the time I just liked what they had to say better.
Q But you can't quite remember what that was?
A In general, no, I don't remember anything specific.
Q So do you remember who you talked to at Tyson?
A When?
Q When you first called them when you were thinking about making a change from Perdue.
A I do not remember what the man's name was.
Q You called the Robards Complex?
A Yes.
Q Do you remember what position that man was in?
A He was the -- I guess he was the grow-out manager.
Q Do you recall what you talked about?
A I asked him if he needed growers and what the pay was and the general things you would ask.

Page 36

Q Do you remember anything he said?
A That he definitely needed growers and that he would definitely take me on if I wanted to switch.
Q Do you remember anything else he said?
A No. I mean, obviously we talked about a lot of things, but I don't remember anything in particular. I mean, I'm sure I asked questions to satisfy myself, but --
Q You can't remember what those were?
A Yeah, just -- obviously what they furnished and what they didn't furnish and that sort of thing.
Q Do you remember anything that he said in relation to anything?
A Well, they didn't furnish propane for one thing. I had to start buying my own propane. They didn't furnish bedding, shavings. I had to start buying my own shavings. Other than that, I don't really remember any -- anything to amount to anything.
Q At that time, had your contract with Perdue expired?
A Yes.
Q So were you still growing for Perdue --
A Yes.
Q -- or were you in a lull period?
A No. I was still growing for Perdue.
Q But they had not renewed it?

Page 37

A They -- no.
Q Had they told you whether they would or not?
A I don't remember. That's why I was sitting here trying to think.
I don't remember if they renewed contracts after they the original contract. I do not remember. I know I had not signed a second contract.
Q Were you concerned that the point in time at all that Perdue was just going to stop sending you chickens, or was it just business as usual?
A No.
Q It was just business as usual?
A Business as usual.
Q You were just simply looking for an opportunity to get more chickens per year?
A Yes.
MR. TATUM: We've been talking about an hour. Let's just take a quick break.
MR. WHITFIELD: Yeah, let's do that.
MR. TATUM: You can -- you're welcome to take a break at anytime you want. I try to just look at my watch, and when it kind of feels like it's been awhile, I'll take one.
VIDEOGRAPHER: The time is 10:36. We're off the record.

Page 38

(Recess was taken.)
VIDEOGRAPHER: The time is 10:47. We're back on the record.
BY MR. TATUM:
Q Did you have any friends at the time that were growing with Tyson that you could talk about?
A No.
Q Okay. So after that first phone call with Tyson, did you -- did you talk with anyone else about whether you should jump from Perdue to Tyson?
A Yes.
Q Who did you talk to?
A Morgan Rickard.
Q Anyone else?
A Probably Tim Vincent.
Q Anybody else?
A I really can't think of anybody.
Q Was Morgan with Perdue?
A Yes.
Q Was Tim Vincent with Perdue?
A Yes.
Q Did either one of them, were they interested in switching?
A Yes.
Q Had they been looking into it before you, or did you kind of bring that idea to them?

Page 39

A Morgan before I.
Q Morgan had the idea before you?
A Yes.
Q Did he come and talk to you about it?
A Yes.
Q Why did he want to switch, as far as what he told you?
A Same reason.
Q Out time?
A Yes.
Q Did you talk with Tim Vincent about it at all?
A No.
Q Did you have any more discussions with Tyson?
A Yes. Leading up to my signing the contract, yes.
Q And who was that with?
A I cannot remember the man's name.
Q Up until that point that you signed the contract, did you talk with anyone else besides that phone call you had with Tyson and then with Morgan and maybe Tim?
A In relation to growing for Tyson?
Q Yeah.
A No.
Q And then so you had the phone call with Tyson, and then you said you had some conversations with Tyson leading up to signing a contract with them.

Page 40

Was that one -- was that on the phone or in person, or are you talking about one?
A Both. Both.
Q But you don't recall with who?
A I can't think what the man's name is. I'm sorry.
Q Do you remember anything that person told you?
A Like I say, the producer furnished the propane, and he furnished the shavings or rice hulls or whatever for the bedding.
And at that time Perdue was -- we were getting right at six flocks, maybe not quite, but right at six flocks a year.
Q And did you talk with Tyson about how many flocks you might get with them?
A That -- I thought we were talking about Tyson.
Q Oh, I'm sorry. I thought you were talking about Perdue. You said someone --
A What I just told you I meant -- when I was switching over to Tyson.
Q Oh, okay. Tyson said you might get about six flocks a year?
A Yeah.
Q Who said that?
A That's what -- I can't think of what the man's

Page 41

name was.
Q And was that based on your calculation of what their out time was?
A Yes.
Q And what did you understand their out time to be?
A It was around ten days at the time -- at that time.
Q And what was your understanding of their growth time?
A Seven weeks.
Q So it was about 49 days?
A 49, 50.
Q Did you have any other discussions with anyone at Tyson leading up to signing your contract?
A No, sir.
Q So ultimately you decided you were going to make the switch?
A Yes, sir.
Q Did you talk with anyone at Perdue about that? Did they try to talk you out of it?
A Actually, they did, yes.
Q So you went back and told them you were thinking about leaving for Tyson?
A I called Perdue and told them that I was switching, yes.

Page 42

Q And what did they say?
A Well, asked me not to.
Q Did they ask you why you were switching?
A I'm sure they did.
Q But you had already made your decision?
A I had already made my decision, yes.
Q Had anyone else helped you make your decision besides you on your end -- on your end of things?
A No. No. I was --
Q No lawyers or accountants or anything?
A Oh, no, no, no.
Q Did you run any numbers on what you thought you might make with Tyson versus what you were making with Perdue?
A Yes.
Q And what did you determine?
A That I would make more money with Tyson.
Q Do you know -- do you remember how much?
A Well, it would have been the equivalent of almost a flock of chickens, so that would have been somewhere in the neighborhood of 35, $40,000.
Q Did you factor in the additional overhead for having to provide your own gas and your own propane and your own litter?
A Yes. And that took away from that obviously, but

Page 43

it was still more money.
Q Do you recall how much annually that would have taken away from it?
A If I remember right, we were using about 8,000-gallon of propane a year, but I do not remember what the price was at that time. I don't remember how much it was per gallon.
Q How about litter?
A And the litter was about 1,500 bucks a year because we only changed the litter one time.
Q So ultimately you made the switch to Tyson. I think I've got your contract here. Oh, I wrote the wrong one.
A That's not right on that litter.
MR. WHITFIELD: You can correct if you want.
BY MR. TATUM:
Q Go ahead. You can correct it.
A It was $1,500 a load, and it took four loads, so it was about $6,000.
MR. TATUM: Okay. Let me show you a stack of documents that's marked Exhibit 1.
(Exhibit 1 was marked for identification.)
BY MR. TATUM:
Q I'm going to ask you to go through it, and I'll try to be clear with you so we can identify if this is your

Page 44

contract and your signatures and things like that.
So on the first page of Exhibit No. 1 do you recognize this as a copy of your broiler production contract with Tyson?
A Yes, sir.
Q And this one was executed on February 26, 2014. Do you see that on the second page?
A Yes, sir.
Q And this was your second contract you executed with Tyson, right?
A Yes, sir.
Q You executed one initially when you joined Tyson, and then you executed the second one, right?
A Yes, sir.
Q And the second one is what we're looking at here. It looks to me like you executed the first one on December 12 -- excuse me -- August 13, 2010; is that right? Do you recall, does that sound about right?
A No, sir, that is not right.
Q When did you execute the first contract?
A It would have been December of 2008.
Q December of 2008, okay. And then your second contract is this one here that you executed on February 26, 2014?
A Yes, sir.

Page 45

Q Do you know if the initial contract that you entered was a term contract based on your weekly flock performance, or was it a 52 average contract?
A When I first went to Tyson?
Q Yeah.
A It was tournament.
Q Weekly?
A Weekly.
Q Did it ever change?
A Not during that contract.
Q How about during your second contract?
A Yes it did.
Q Did it change to the 52-week average contract?
A Yes, it did.
Q And why is that?
A Because they told me I had to do it.
Q So they gave you the option between sticking with the weekly tournament contract or the 52-week average?
A No, sir, they did not.
Q Okay. Who told you you had to switch to the 52-week average?
A Tyson.
Q I know, but who?
A I guess at that time it would have been Kenny Bartley.

Page 46

Q And why did he say you had to switch?
A Because that's what Tyson was going to.
Q Did it matter to you whether you were on the 52 average or the weekly?
A Yes, sir, it did.
Q And why is that?
A Because it meant more money to me to stay on the tournament that I was on.
Q And how do you know that?
A Because for, I don't know, 18 months, two years prior to my contract, they had been pushing this -- I keep calling it new pay policy -- and they put in each one of our settlements, even though we were still on the tournament, they put on each one of the settlements what the new pay would be. And in almost all cases there was, I think, two, I would have made more money on the tournament.
Q Paying on a weekly?
MR. WHITFIELD: On the weekly versus 52.
THE WITNESS: The tournament, yeah, where you settle with everybody in your -- in your week.
MR. WHITFIELD: Right. Correct.
THE WITNESS: Okay.
MR. WHITFIELD: I think that's what Mark's asking.
THE WITNESS: Okay.

Page 47

BY MR. TATUM:
Q Do you know how long you were under the 52-week average contract?
A One flock.
Q And then you went back to the weekly; correct?
A Yes.
Q And do you know why you went back to the weekly after one flock?
A Yes, sir. They gave me the opportunity to go back, and I went back.
Q So you could have chosen to stay on the 52-week, but you wanted to go back to the weekly?
A Yes, sir.
Q So sum total of your relationship with Tyson was, you were on 52-week average contract for one flock?
A For one flock.
Q All four houses?
A All four houses.
Q And do you know, sitting here today, when that was that you settled under the 52-week average for the one flock?
A February of '14.
Q And do you know if in that settlement you made more or less than you would have made on the weekly?
A $6,100 less.

Page 48

Q And that's based on how the contract calculated pay under the 52-week versus what you would have done on the weekly?
A Yes.
Q And that was the February of 2014 settlement?
A Yes.
Q So when we look at Exhibit 1 here, this is your second contract. And is that your signature there on the second page?
A Yes.
Q And just so you know, there's a number on the lower right. I'll refer to it every now and then as we go through this document so you know what page I'm at. It's an easy way to track what page we're on. See it says Tyson 117006?
A Yes. Yes.
Q I'll mention that every now and then as I find your other signatures so you're just quick to find where I'm at. It's a tracking number we put on the --
A Oh, okay. Yes. Yes. I see it, yes.
Q And do you recognize the signature under -- above company signature on this?
A Yes.
Q Who is that?
A Craig Colby.

Page 49

Q And who was Craig Colby?
A He was the complex manager.
Q Do you recall having any discussions with anyone about signing this contract in February of 2014?
A Yes.
Q And who did you talk with about it?
A Jared Shelton.
Q Jared Shelton was your service tech?
A No, sir. He was assistant grow-out manager, I think was his title.
MR. WHITFIELD: Assistant what?
A Assistant grow-out manager, I think was his title.
BY MR. TATUM:
Q What did he tell you about this contract, if you remember anything?
A He asked me if I wanted to go back to the tournament way of settlement, and I said I did. He said, well, I have a contract here for you to sign, and I signed it.
Q That's when you went back to the weekly system, right?
A Yes.
Q Okay. But I'm talking about this initial contract on February 26, 2014 that you signed. And if you

Page 50

look at the next page, Schedule A, that is the performance incentive system, which that's the 52-week average system, right?
A Yes.
Q And so I'm asking about when you first signed this contract. And if you look at Tyson 117015, flip on through several pages, it's the signature page to Schedule A?
MR. WHITFIELD: What page number, Mark?
MR. TATUM: Tyson 117015.
A Fifteen.
BY MR. TATUM:
Q Is that your signature there on that page?
A Yes.
Q So this is on February 26, 2014, you had signed that you were going under the performance incentive basis tell, right, under this initial --
A Is that the tournament?
Q That's the 52-week.
A No. I signed the 52-week with them December. This is when I went back to the tournament, this 2/26/14.
Q Well, why don't we go through this, and maybe you'll -- so when you say back in December of 2008?
A No, sir. 2013.
Q 2013. So you think you signed something in

Page 51

December 2013 that did what?
A I signed the contract, my second contract, total contract in December of 2013. And that was the new pay policy, I call it, I think 52-week or whatever you're calling it.
Q I have it right here, but this one is dated 2014. So I want to make sure if you think you signed a contract in 2013, do you have a copy of that?
A It was either December of 2013 or January of 2014 -- let me restart. It was either December of '13 or January of '14, yes, sir.
Q Okay. So if we look at this contract here -- let's look at Exhibit No. 1.
This is a contract that, if we look at on the second page, that you signed on February 26, 2013. Do you see that? This is called your broiler production contract performed 5177. This is your contract with Tyson, right, your broiler production contract; correct?
A The 2/26/14?
Q Yeah.
A The only thing that I signed then was to go from the 52-week back to the tournament. That's all I signed.
Q I think if we go through this, I think your dates might get reoriented. If they don't, then tell me that because I'm not trying to mislead you on dates, but I think

Page 52

you're off on the dates, and maybe we ought to -- because if we look at this contract, look at amended Schedule A, you signed amended Schedule A, you just told me, on February 26, 2014.
A That sounds right.
Q Same day you signed the broiler -- and that is the performance base system.
A Okay.
Q Is that your signature there?
A Yes.
Q Okay.
A That's 117006.
Q Yes.
A Yes, sir, that is my signature.
Q And also if you look on Tyson 117015, is that your signature there?
A Yes, sir.
Q Now, if we go through, that's Schedule B to this. Do you see that on 117016?
MR. WHITFIELD: 117016. Schedule B.
A Schedule B, yes, sir.
BY MR. TATUM:
Q And then if you go to the end of Schedule B, which is 117020, is that your signature there?
A 020, yes, sir.

Page 53

Q Dated 2/26/14?
A Yes, sir.
Q And now if we flip to -- this, I think, is where we're going to start honing in on the change to the 1-week from 52-week, but I just want to be clear. Go to 117027.
Is that your signature there on the acknowledgment page?
A Yes, sir.
Q And this is also dated 2/26/14?
A Yes, sir.
Q And this is the acknowledgment of your broiler contract that you signed along with the contract; right?
Now if we go to the next page, I think this is where the amendment happens from your performance base system to your weekly base system, at least according to the documents we have.
So if you look at Exhibit No. 1, Tyson 117028 to 029, this is called broiler production contract Robards, and it says in the first paragraph it's amending Schedule A.
A Okay.
Q And it says it's amending Schedule A, date of 2/26/14, which is the contract we just looked at.
Is that your signature on the second page dated May 13, 2014?
A Yes, sir.

Page 54

Q And let me just carry it through all the way. Then you've got your Schedule B attached to that as well, if you flip through, and the last two things I want to show you is on 117036. Is that your signature dated 5/13/2014?
A Yes, sir. Wait a minute. What did you say?
Q Is that your signature?
A Which page.
Q 117036?
A Thirty-six. Yes, sir.
Q And then one more amendment, it looks to me like, and that is on the last two pages of Exhibit No. 1, which is 117037 to 038, looks like another amendment to Schedule A was put in place of contract broiler production contract dated 2/26/2014 that you signed on 1/16/15. Do you see that?
A Yes, sir.
Q Is that your signature there on 111-7038?
A Yes, sir.
Q Okay. So now -- like I said, I wasn't trying to get you off, but I was trying to orient you to see if there was other dates of contracts that I don't have contracts for. What I have here is that on 2/26/14 you signed your second broiler agreement.
A Okay.
Q And then what I have here is that Schedule A to

Page 55

that agreement was amended twice, and it was amended first on 5/13/14, and then it was amended again on 1/16/15. Tracking me there?
A Yes, sir.
Q And that's what we just went through. And then just so I can make sure we're on the same page, your 2/26/14 contract did have the performance incentive base system as Schedule A?
A Okay.
Q Then that was amended to the other system, as we just talked about, on 5/13/14?
A Okay. My dates are wrong.
Q Okay, just wanted to make sure. Like I said, not at all trying to trick you, but when you said 2013, I thought maybe I'm missing a contract.
A I was thinking -- I was thinking we did it the month before it actually took effect, but apparently we didn't.
Q Okay. So Exhibit No. 1 is essentially your second set of contracts with Tyson?
A Yes.
Q Sounds like we're on the same page there.
A Yes.
Q And you said you had a discussion with Jared Shelton about those contracts and getting back on the weekly

Page 56

tournament system?
A Yes.
Q And he asked if you wanted to do that, and you said yes?
A Yes.
Q Because you had settled one flock under the 52-week average and felt like it didn't pay as well as the weekly?
A Yes.
Q And so your contract was amended to put you back on the weekly?
A Yes.
Q And that's how you were paid the rest of your time with Tyson?
A Yes.
Q Did you have any discussions with anyone else at Tyson besides Jared Shelton about getting off the 52-week -- or what's called the performance incentive base system and back onto the weekly system?
A Yes.
Q And who was that?
A I guess it was Kenny Bartley at the time, yes.
Q And when did you have a discussion with Jim Bartley about this?
A That day or the next day.

Page 57

Q And when you say that day or the next day?
A When Jared Shelton brought it to me to sign.
Q Brought you the agreement to put you back on the weekly?
A Yes. Yes.
Q And what did you and he talk about?
A I called him and asked if I was going to get the $6,100 that I didn't get because I was on the other pay scale.
Q And what did he say?
A He said, yes, he would give it to me.
Q Did you ever get it?
A Yes, I did.
Q So you got made whole on the $6,100?
A Yes, I did.
Q And I can't remember exactly when Bartley and Gottsponer changed. I'm not -- I can't remember if Gottsponer was already there, or if it was Bartley, but I think -- I think I remember it was him.
Bottom line is, you talked to someone about, hey --
A Grow-out manager.
Q I went on to this other system.
A Yes.
Q I think I made $6,100 less under that contract --

Page 58

A Yes.
Q -- than the other contract. I want to switch and want my $6,100.
A Yes.
Q And you were allowed to switch and got your $6,100?
A Yes.
Q And that was the only settlement that happened with?
A Yes.
Q Who was your service tech -- or excuse me.
Up to the signing of your second contract with Tyson, did you have any discussions with anyone else about whether to renew or not at all?
So you had your first contract -- we talked about that -- with Tyson.
A Okay.
Q Now I'm asking, now it's time to renew on your second contract that's Exhibit No. 1. Did you have any conversations with anyone at Tyson about whether or not you should or could renew?
A No, not that I recall.
Q Did you at that time make any effort to check in with Perdue about whether you wanted to switch back?
A No.

Page 59

Q Any other integrator, producer?
A No.
Q In fact, just so I'm clear, once you moved to Tyson, did you ever have a conversation with any other producer about growing with them again?
A No.
Q Do you know how many flocks on average you received from Tyson?
A Five. Per year?
Q Yeah.
A Five.
Q So you received approximately five per year?
A Approximately. And that's not -- I mean, five and a half, okay. Probably averaged about five and a half.
Q Okay.
A Get technical.
Q Okay. Do you know, did you ever track what type of breeds you received in your flocks?
A I'm not sure I understand the question.
Q Do you know that there's different types of chicken breeds?
A Yes.
Q Did you ever do anything to track what kind of breed you received?
A It was on the delivery sheet.

Page 60

Q And do you know -- do you have a preference of one breed over another?
A One of the breeds was more healthy, more hardy -- I want to say healthy, more hardy, and I don't remember which one it was. I'm willing to think it was the 700.
Q Cobb 700?
A Cobb 700.
Q Now, when you say more healthy, does that mean it would perform better at the end of the day?
A Yes, that's what I mean.
Q Do you have any idea what percentage of Cobb 700s you received over the life of your work with Tyson versus any other breed?
A No, sir, I do not.
Q Do you have any idea as to whether the percentage of Cobb 700 you received is any different from the percentage of Cobb 700 any other grower you ever settled with received?
MR. WHITFIELD: Objection to form. Go ahead and answer if you know.
A Mine would be less.
BY MR. TATUM:
Q Why do you think you got less Cobb 700s than others?
A Because I talked to the other producers.

Page 65

Q So you're saying Cobb 700s are all males?
A Yes.
Q That's your understanding?
A Yes.
Q And you're saying Cobb 500s are mixed?
A Yes.
Q That's your understanding?
A Yes. Well, that's -- yes.
Q Where did you get the understanding that Cobb 700s were all males?
A From Tyson.
Q Who told you that?
A I assume the technician.
Q Do you actually recall anyone telling you that specifically?
A No.
Q Were you ever -- I think I might have asked you this, but I can't remember if I asked you only for Perdue. I think I just did for Perdue.
As to Tyson, were you ever put on an intensified management program?
A No, sir.
Q Do you recall who your service techs were with Tyson?
A James Catlin and Rubin Bruce.

Page 66

Q And those are the only two you worked with?
A They were the only two assigned to me. Occasionally they would be on vacation and someone else would come out.
Q Did James Catlin treat you respectfully?
A Yes.
Q Do you think he ever lied to you about something?
A I would sooner believe he just didn't answer or didn't say anything rather than lied.
Q Can you tell me something, sitting here today, that he lied to you about?
A No.
Q How about Rubin Bruce, did he treat you respectfully?
A Yes.
Q Can you tell me something, sitting here today, that he lied to you about?
A No.
Q Did you ever have contact with anyone else at Tyson during your time working with them under either contract, one or two?
A Management people or --
Q Yeah, anyone. I know service techs are at your farms.
A The assistant grow-out manager and the grow-out manager.

Page 67

Q And who were they?
A Well, there was a bunch of them. Kenny Bartley and Jared Shelton were the second two. And Jim Gottsponer and David Dickey were the third two. The first two was the ones that was there when I switched to Tyson, and I cannot recall either one of those people's name. I wish I could.
Q Did Kenny Bartley ever lie to you about anything?
A Yes, sir.
Q And what did he lie to you about?
A Well, several things.
Q And tell me what they are.
A I can't -- I can't specifically -- during Kenny Bartley's time there, I went from being this the top ten in the complex as far as down as in the upper 70s, 77, 78 out of 92. That's pretty bad. It's about as bad as you get. I didn't know what was going on. I didn't know why it was happening. Nothing changed on my end that I was aware of. Nothing changed on my end. And I repeatedly asked those people, and they kept telling me they didn't know, when they did know.
Q How do you know they knew? Well, what is it you're saying they knew?
A They knew why I was doing bad.
Q And why were you doing bad?

Page 68

A I don't know.
Q So you're saying they knew, but they didn't tell you?
A Yes, sir.
Q Did they ever tell you?
A No, sir.
Q You're talking about Kenny Bartley here?
A And Jared Shelton.
Q So you're saying they knew why you were doing poorly, but they never told you?
A Yes, sir.
Q And you didn't know why you were doing poorly?
A No, sir.
Q Did anyone ever tell you why you were doing poorly?
A No, sir.
Q Did you ever -- and so when was this period that you were doing poorly?
A I guess it would have been two years, three years before I quit. I quit in '15, so you're looking at 12 -- 11, 12, 13. 12, 13.
Q So you had a period in 12 or 13 when you were performing poorly for a couple of years?
A For several flocks. I don't remember it exactly being two.

Page 93

A Yeah. Yes.
Q And then you also received a premium pay based on your housing specifications?
A Yes.
Q And you received that, in the life of your relationship with Tyson, all three of those elements of pay?
A Yes.
Q And then so when we're talking about the supplemental fuel pay, this was a one-time payment Tyson was making to the growers that wasn't part of their contract?
A Yes.
Q It was to compensate for the market increase in propane?
A Yes.
Q In other words, to help the growers out a little bit?
A Yes.
(Exhibit 7 was marked for identification.)
BY MR. TATUM:
Q Let me show you what's been marked as Exhibit No. 8.
Do you remember receiving this letter on -- on or around September 26, 2014, regarding the complex increase in your base pay under your contract?
A Yes.

Page 94

Q And did they in fact increase the base pay under your contract?
A Yes.
Q And did that result in more money to you?
MR. WHITFIELD: Objection to form. Go ahead.
A Yes.
BY MR. TATUM:
Q And then the third paragraph says in there, "We sought input from numerous growers, and their consensus was that the new energy allowance payment should be calculated by using square feet floor space."
And that's as opposed to by bird weight; correct?
It goes on to say at the end of that paragraph, "The energy allowance square-foot payment method is replacing the pay-per-pound method."
Do you recall that happening?
A Would you ask the question again, please?
Q Do you recall in 2014 Tyson changing the fuel pay allowance under your contract from a per-pound basis to a per-square-foot basis based on input of growers?
A I don't remember that.
Q Do you know one way or the other if it ever changed for you?
A I don't know.
Q Do you agree with me that if it changed the

Page 95

square foot that eliminated any performance or tournament-based system to that pay?
A Yes. To the fuel pay, yes.
Q That was better for the grower on fuel pay; correct?
A Yes. Yes.
(Exhibit 9 was marked for identification.)
BY MR. TATUM:
Q Let me show you what's marked as Exhibit No. 9. This is a letter dated May 5, 2014, concerning various contract options that growers could operate under.
Do you recall receiving this letter?
A Yes.
Q And this referenced that a grower could exist under the old performance pay incentive, the new performance pay incentive, or the tournament pay.
Do you see that?
A Yes.
Q And then it outlines the various base-pay elements and averages and so on in relation to those pay elements; correct?
A Yes.
Q It says in the second paragraph, "Regardless of which contract you decide you want to sign, the duration of the contract will remain the same as the current contract."

Page 96

It goes on to say in the last paragraph, "We would also like to take this opportunity to invite you and a guest to a grower meeting on June 5, 2014 at 11:00 a.m. at Webster County Cooperative Extension Office. Lunch will be served."
Did you go to that meeting?
A Yes.
Q And the second page of that letter is an attachment outlining some of the basics between the three contract options; correct?
A Mm-hmm.
Q Do you recall having a preference as to which contract you wanted to go undergoing forward?
A No, sir.
Q You don't recall a preference?
A Not when I signed the contract, no, sir.
Q I'm asking about your preference. Did you have a preference?
A Oh, yes, I had a preference.
Q Which was that?
A The tournament.
Q The tournament, okay. Ultimately we saw that you signed the new performance pay?
A Yes, sir.
Q And then one flock later went back to the

tournament?
A Yes,sir.
Q And that's what we talked about earlier?
A That's true.
Q Do you know if other growers went ahead and signed the performance-based contract?
A Some did. I don't know how many.
Q Do you know if others stayed on it?
A I don't know if all did. I know some did not. They went back.
Q So you don't know if some stayed on it?
A I do not know.
(Exhibit 10 was marked for identification.)
BY MR. TATUM:
Q I show you Exhibit No. 10.
A Okay.
Q Do you recall receiving a letter on or about January 13, 2015, regarding the fact that mortality cards had been omitted for a certain period of time from your flock packets because a broiler tech advisor was on leave?
A Yes.
Q And do you recall receiving all of your mortality cards up to that point?
A From the time they started to give them to us. It was a long period of time when we first started growing



we didn't get them.
Q Then at some point you started to receive them?
A At some point they started putting them in our settlement packet.
Q And there was a period of time where the broiler tech went on leave, and they weren't getting included?
A Apparently, yeah.
Q And so they sent them to you, and you got them?
A From the time they started, as I recall, yes.
Q Do you know from what time they started sending you the --
A I don't remember.
Q Have you ever went and cross-checked your mortality cards against your settlement statements to see if they were consistent?
A Yes.
Q And did you find that they were consistent or inconsistent?
A For the most part, they were fairly consistent.
(Exhibit 11 was marked for identification.)
BY MR. TATUM:
Q Let me show you Exhibit No. 11. Exhibit No. 11 is a letter to you from David Dickey. At the top do you see that handwriting?
A Yes.



Q It says, "Brought in by Morgan Rickard on 4/20/2015"?
A Yes, sir.
Q Whose handwriting is that; do you know?
A I do not know.
Q You don't know how that got on there?
A I assume Dickey put it on there. I don't know.
Q Okay. But do you recall receiving this letter from David Dickey?
A Yes.
Q And is it -- the letter accurate that on Tuesday, March 17, 2015, you advised James Catlin that you were no longer interested in continuing to grow birds for Tyson, requested that your contract be terminated immediately at the end of the current flock?
A That is not true.
Q And what --
A I did inform him that I was selling my chicken houses.
Q Okay. So did you -- when -- did you want more flocks after that flock?
A No, sir. When I sold my chicken houses, that's it, but I didn't ask anybody to terminate my contract.
Q Well, did you expect to continue the contract without houses?



A No. I expected that I was through raising chickens.
Q Did you understand that the effect of that would be you'd no longer be under contract with Tyson?
A Yes.
Q So at least we're clear as of that date you didn't want any more flocks?
A I had chickens at that time.
Q Yeah.
A And once those chickens was gone, I did not want any more flocks.
Q Okay.
A It would be up to the new owner.
Q And you understood that you selling your farms and not wanting no more flocks would mean your contract would be terminated?
A Yes.
Q You're just saying you didn't use the words "terminate --
A I did not ask that it be terminated, no.
Q Okay. Did you have any further discussion with David Dickey after receipt of this letter?
A I didn't, no.
Q Okay. And as far as you're concerned, that's what was happening is, you were getting out of the chicken

Page 105

you received somewhere around February 2015 for a flock prior to that time that had been turned in and processed?
A Yes.
Q And for example, it looks like for this particular flock you've got a total payment of $47,141.79?
A Yes, what it looks like.
Q Okay. And do you have any idea whether that was kind of an average payment you got for a flock, high, or low?
A That was high.
Q It was high. So you did well?
A I did well.
Q And then the next document says, "Grower Check Payment Detail."
This just tells us how the pay broke down on that particular settlement, right, how they got to that 47 number?
A Yes.
Q The next document, this is actually the settlement sheet you received; right?
A Yes.
Q And so this tells us how many head you started with, how many you finished with --
A Yes.
Q -- your feed conversions, your condemnation, and

Page 106

basis of condemnation, et cetera; right?
A Right.
Q So, for example, it looks like, if I look at the settlement of this particular document, you started -- you had 92,400 chickens placed in your 80,000 square foot capacity; right?
A Yes.
Q And it looks like there were 87,132 chickens picked up?
A Yes.
Q That's what "chicks sold" means; right?
A Yes.
Q Which means there was a mortality number of 5,268 chickens; right?
A Mm-hmm.
Q Which translates to, you know, 100 percent of the chicks -- if 100 percent of the chicks were alive on the day they were delivered, when they picked them up 94.3 percent were still alive?
A Yes, sir.
Q Is that, in your experience, a good liveability, average, or bad?
A A little bit low.
Q Little bit low meaning too many mortality?
A Yes, too many died.

Page 107

Q And then it says your gross farm pounds was 683,600. Average farm weight was 7.85 pounds; right?
A Yes, sir.
Q That's the average weight of the chicken; right?
A Of this flock, yes.
Q Of this flock. And then at the USDA line, 647 were condemned?
A Yes.
Q And then if we look in that middle box under "Condemnation," this tells us the categories of condemnation; right?
A That's right.
Q And what is SEPT, S-E-P-T?
A That's short for septosis.
Q What is your understanding of what septosis is?
A Small birds, inferior birds that should have been called and wasn't.
Q And then what are tumors?
A Growths on the chicken or whatever.
Q And then what's airsac?
A Airsacculitis. So I'm not exactly sure. That is inflammation around the lung area.
Q Okay. Then what is INF process?
A That is scratches, punchers. The chickens get on top of one another fighting for feed or whatever, and they

Page 108

scratch one another, and that gets infected, and that can't be -- can't be used.
Q Have you ever looked at your settlement and compared to your condemnation certificates and thought that the numbers didn't match up?
In other words, as we look through your packet, we'll see a condemnation certificate that you generally received; right?
A This is -- this is the -- I'm not sure I understand what you're asking.
Q Have you -- have you ever discovered that the numbers reported on your settlements as far as what was -- the number of chickens --
A Number condemned.
Q -- condemned and the reason was inconsistent with what the USDA determined on the line?
A No.
Q Now, the next page is a document, and just for reference, it's Pinkston 2129. This is your Grower Pay Recap by Grower (Grower Copy); correct?
A Yes.
Q And this tells you that you finished first that week?
A Yes.
Q So you finished strong your last flock ever;

right?
A This is actually not my last flock.
Q Oh, okay.
A Is it?
Q For week ending 2/7/15.
A I grew another flock. I had one more.
Q Okay. That might be on there. I don't have that sample packet of documents with me, but let me see what I have your last flock as being.
A I'm pretty sure -- I could be wrong, but I'm pretty sure there was one more. This is -- what was this week ending?
Q 2/7/15. I have your last flock as being -- I think it was ending 4/25/15. This is your next to last?
A Next to last flock, yeah, because I sold my houses in February --
Q And I have --
A I'm sorry. April.
Q And I have that you finished number one your last flock.
A Yes, sir.
Q Is that right?
A Yes, sir.
Q Okay. So this tells you -- this tells you there were nine growers in your tournament that week: Right?



A Yes, sir.
Q And it tells you how many head were placed at each grower, how many pounds they turned in, their liveability percentage, their condemnation percentages, their feet conversion, average weight, days old, and so on throughout; correct?
A Yes, sir.
Q And so I realize you may or may not know who number two, three, four and five are, but you know you competed against nine folks, and this is how everyone's numbers played out?
A That is exactly right.
Q So you knew, for example here you ended -- the average weight of your chicken at 7.85 was better than everybody else's?
A Yes, sir.
Q And you -- yours were aged 54 days, and some others were 52, 53, 54, based on pickup and delivery time?
A Yes, sir.
Q And you understand those numbers kind of fluctuated a little bit because you've got to get them delivered, and you've got to get them picked up?
A Yes, sir.
Q Okay. Now, the next document, Broiler Production Settlement by Grower, what's this tell you?



A Okay. That's the sheet I was telling you earlier that represents the new -- what was -- I can't think what they call it -- pay -- whatever. It was a new pay policy. That's what I keep calling it because I can't -- that's what I was telling you earlier.
We got one of those in every settlement for, I don't know, 18 months or so, several settlements. And I can't do it now, but I could take that, and I could look at those numbers, and I could figure what my paycheck would have been --
Q Had you done the 52-week?
A Had I done -- yes.
Q And that's what this is telling you?
A That's what this is telling me, yes.
Q So this is saying, well, if you had done the 52-week contract instead of the one you did, this is what you would have made?
A Yes.
Q Right?
A Yes.
Q And on this document anywhere, are you able to tell me whether you, based on --
Well, can you tell me, looking at this right now, whether you would have made more or less under the 52-week?
A Looking at it right now, I cannot. I can tell



you that overall I would have made less.
Q Overall meaning over time over many flocks?
A Yes.
Q But you don't know under this particular flock one way or the other?
A No.
Q The next document is designed that if you were on the 52 average, you would have been, right, but you weren't.
What's the next document? This is Pinkston 002132. It's titled "Grower Flock Balance (Settling Flocks)."
And these are the feed deliveries?
A I think -- I think that is --
Q I see feed value totals down at the bottom.
A Yeah, I think that at the top is telling you what the company had invested. I'm not sure, to be perfectly honest with you.
Q The top is telling you --
A I'm not sure.
Q -- each delivery of chicks, and the middle is telling you each delivery of feed?
A I'm not sure.
Q You don't recall today?
A I'm not sure what that's telling you.
Q Have you ever cross-checked your settlement

Page 113

statements or your settlement packets against any other materials and found that the feed represented to be delivered was not accurate?
A Yes.
Q And when was that?
A On several occasions.
Q Can you tell me each one?
A No, sir.
Q Can you tell me any one?
A No, sir.
Q Can you tell me a year that happened?
A No, sir.
Q Can you tell me an amount that might have cost you money?
A No, sir. I'd have to know more.
Q Why do you think that happened, if you can't tell me when that might have happened?
A Because the driver, when he brings a load of feed, he is supposed to leave a ticket. The tickets that I had did not correspond with the tickets that the feed mill had.
Q So the ticket you left didn't correspond with the feed mill ticket?
A No, sir. The number of tickets that I had -- the number of loads that I had did not correspond with the

Page 114

number of loads the feed mill had.
Q Is that because you went to the feed mill and counted their tickets, or how did you figure that out?
A Because I get -- there's a sheet in here -- in fact, that's what this is. That tells you all the loads of feed that the feed mill sent from Tysons --
Q Right. And so --
A -- from their settlement.
Q So if we look at next documents, we can orient this discussion. We're looking at Exhibit No. 13, document Pinkston 2133 to 2134. That's your Feed Ticket Report; right?
A Yes, sir. It's got the time -- I don't know if it has the time. It has the ticket number and how much was on the truck and so on.
Q So this is a summary of the tickets?
A Tyson's summary of the tickets, yes, sir.
Q So can you identify for me a time when the summary you -- so, the summary and the summary wasn't consistent with the number of tickets you had in your house?
A Specifically, no, but several times.
Q When you say "several," how many times?
A I don't know.
Q Can you -- do you know what year this might have been for any one of them?

Page 115

A Pretty much all along.
Q But you can't identify -- can you identify me anything -- any information about when this might have happened so I can go count the tickets and compare them to the settlement statements?
A No, I can't without --
Q Did you ever talk with anyone about that?
A Yes.
Q Who?
A Jared Shelton.
Q And who?
A Probably the feed mill. I don't recall.
Q What did Jared tell you?
A The driver just didn't leave the tickets. The feed -- what comes to the feed mill is what's accurate, but you're supposed to leave a ticket.
Q Do you still have the tickets from all your feed deliveries?
A I'm sorry?
Q Do you still have the tickets from all your feed deliveries?
A Yes.
Q So when they deliver the feed, they leave a ticket in your houses --
A Supposed to.

Page 116

Q -- saying they delivered this?
A Supposed to.
Q So you could go back and look at your tickets against your settlements and see if they match up?
A I could do that, yes.
Q Or figure out where they don't match up?
A Yes, I could do that.
Q And then your position would be that -- is it your position that feed wasn't delivered, or you just didn't get a ticket for it?
A How do I know the feed was delivered? My position is, it wasn't delivered.
Q Okay. And how do you know that?
A Don't have a ticket.
Q Any other basis to know that?
A Bad feed conversion.
Q But any other -- but you're saying feed wasn't delivered that Tyson says was at some point. You don't know when.
And I'm saying, how do you know the feed wasn't actually delivered?
A Because I don't have a ticket.
Q That's it?
A And because if, in that particular -- on that particular flock, if I had a really bad feed conversion.

Page 117

Q Okay. So I would look for, one, tickets versus settlement and then, two, a bad feed conversion, and those two things would pinpoint you to say, yeah, I probably didn't actually get the feed there as opposed to someone forgot to leave the ticket?
A If Tyson says I got a load of feed I did not get, I don't have a ticket for it, that's going to make my feed conversion worse than it would for the tickets that have.
Q Okay. Now, looking at the next document, what does the next document tell you? It says, Tyson -- well --
A Yes.
Q The next one is a mortality card; right? This is Pinkston 2136 to 2139. These are mortality cards?
A Yes.
Q I realize this is a copy of probably multiple copies that I've gotten, but at the end of the day these are cards that you keep in your farm tracking how many --
A Yes.
Q -- birds are pulled out of the house; right?
A Yes. Yes.
Q Have you ever seen -- have you ever cross-checked your mortality cards against your settlement statements?
A Yes.
Q And have you ever found them to be different?
A Yes.

Page 118

Q When? Can't name a time?
A No.
Q Name a year?
A No.
Q Give me a number that they were different?
A Not really, no.
Q Give me any calculation as to whether or not that cost you any money?
A No.
Q Have you ever talked to anyone at Tyson about it?
A I don't remember.
Q The next document is a condemnation certificate. This is Pinkston 2140. This is a document you receive with each settlement; is that correct?
A Yeah.
Q And I asked you earlier, you don't know of an instance where you thought your condemnation certificate didn't match up with your settlements, is that right?
A I don't know.
Q The next document is a series of scale tickets, and these are the scale tickets from when your chickens were delivered to the plant?
A Yes.
Q And I think that is all of the rest of this packet of information 2141 --

Page 119

A Yeah.
Q -- through 2184. So this is -- this is a set of documents you got from Tyson for each flock?
A Yes.
Q There's a few more things I want to ask you about, not too much.
(Exhibit 14 was marked for identification.)
BY MR. TATUM:
Q I'm going to show you Exhibit No. 14. Exhibit No. 14 is a document dated 9/12/14, and it's titled Farm Observations, Farm named John Pinkston.
Is this a document or type of a document you would ever see?
A I do not recall seeing that document.
Q So, for example, do you recognize the signature at the bottom?
A No.
Q So you don't recall receiving any of those types of observation documents or going over them with your service tech?
A I do not recall.
(Exhibit 15 was marked for identification.)
BY MR. TATUM:
Q Let me show you Exhibit 15. Exhibit 15 is a document called Flock Visitation Summary. It's dated

Page 120

Tyson -- or labeled Tyson 107259. Have you ever seen a record like this before?
A Yes.
Q And is this something that you would receive?
A Yes.
Q How often would you receive these?
A Supposed to each time they made a visit.
Q And did you, for the most part, receive them?
A Not always, but most of the time.
Q And it looks like here this one is dated June 4, 2015.
A It's not the one I've got, but --
Q This would have been after you; right?
A Yes. This is -- yes.
MR. WHITFIELD: June 4?
THE WITNESS: Actually, mine is 6/8/15.
MR. WHITFIELD: Mine too.
MR. TATUM: Oh, I'm sorry.
THE WITNESS: That was after I sold.
MR. TATUM: Oh, all right. I don't have any more questions about that.
BY MR. TATUM:
Q Do you know if you made a profit on the sale of your farms -- of your farm with the chicken houses?
A Are you asking -- reask the question, please.

Page 125

Q Any other expenses?
A As we discussed earlier, the bedding.
Q How much does that cost?
A I think it was $6,000 a year, $1,500 a house.
Q Anything else?
A I can't think of anything.
Q Did Tyson ever help you get loans of any kind?
A No.
Q No help with financing or anything?
A No.
Q Have you done anything to try to quantify what you think Tyson might owe you from when you were running your chicken business that it hasn't paid you under your contract?
A No.
Q Do you have any reason to believe they've not paid you money they owe you under your contract?
A Yes.
Q What is that?
A Those horrible settlements were not -- horrible. Therefore I got less money than I should have.
Q You're talking about, you think they owe you money settlements where you performed poorly?
A Yes.
Q And which rank -- what ranking would you say -- are you saying you should have been paid as a one, as a five, or what?

Page 126

A I'm saying I should have been paid what I actually had.
Q And what evidence do you have that you weren't paid what you actually had?
A Because I wasn't -- my settlement -- I wasn't a nine, ten consistent grower.
Q I understand, but you did have some finishes at nine or ten. Do you know how many?
A I had several.
Q Several?
A And I say nine or ten. Well below average, and that's my -- that's my gauge is average.
Q I see only one time ever where you finished ten. You say you finished tenth more than once?
A Yes, sir, I think so.
Q So you think you finished tenth more than once. Can you tell me when you finished tenth?
A No.
Q So in a settlement that you finished tenth, what do you think you should have been paid?
A I can't answer that.
Q What is the basis for you to say that Tyson did something wrong in that instance?

Page 127

A Because I don't think my chickens was that bad.
Q Okay. And what is it about -- that happened that you think Tyson did that miscalculated this, that or the other?
A They didn't miss calculate. They manipulated the numbers.
Q Okay. And what did -- what number did they manipulate?
A Probably the feed.
Q Probably the feed. And in what way?
A Going back to what we discussed awhile ago.
Q So you're saying they probably manipulated the numbers in relation to the feed in that you think you didn't have tickets for deliveries that were indicated?
A They said I got more feed than I got.
Q Any other reason you think, in any time you finished low, that they manipulated the numbers?
A I think it was all together.
Q That's it? What do you mean, "all together"?
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q What does that mean, "I think it was all together"?
MR. WHITFIELD: Go ahead, if you know.
A I think that the feed -- whatever Kenny Bartley was doing, I think that was all what caused me to be settling like I was settling.

Page 128

BY MR. TATUM:
Q What was Kenny Bartley doing?
A I have no idea.
Q Do you agree with me that at least in the abstract that the grower -- the growers' own actions in raising the chicken are a big part of how well they perform?
A Yes.
Q How good they do the job?
A Yes.
Q And it sounds to me like you take no responsibility for any placements you've had that were unsatisfactory to you?
A That's not true.
Q Are there times when you finish low where you take responsibility for that?
A Yes.
Q Which times?
A Obviously the heat loss wasn't Tyson's fault. That really wasn't my fault either. That was an act of nature.
Q When was that?
A I quit growing in '14. Probably the summer of '13. Either the summer of '12 or '13. Probably '13.

Page 149

resolved?
A Not really, no.
Q Okay. And do you know, John, whether or not the issue with the birds we were talking about, the different types of birds that were being used by Tyson and being grown by different growers, to your knowledge, did any of your friends that grew for Tyson, do you know whether or not they complained about this?
A Yes, I do know.
Q All right. And how do you know that?
A They told me.
Q Who is it that complained about it; do you remember?
A Morgan Rickard, for one.
Q Okay.
A Charles --
Q Okay.
A -- Morris. Tim Vincent.
Q All right. How about Doug Brown? Did he ever talk about it?
A I'm sure he did, yes.
Q And do you know whether -- when I say "complained," do you know whether or not these individuals spoke with somebody at Tyson complaining about trying to fix this problem?

Page 150

A I know Morgan did.
Q Okay.
A I know for a fact Morgan did.
Q All right.
A I know Charles did.
MR. WHITFIELD: Okay. That's all I have. Thank you, sir.
MR. TATUM: Just a few follow-ups.

FURTHER EXAMINATION

BY MR. TATUM:
Q The good news is, I'm about out of ink. Once you get out of ink, that's a sign you've got to stop.
A You're pretty much done.
Q Yeah, that's right. Just a few questions I want to follow up on.
You talked about feed, and you said there was a period where the feed was bad and the chicks couldn't eat. When was that?
A I do not know.
Q How long did that last?
A I don't know.
Q Do you know if this affected other growers besides you?
A Yes.
Q And so this was a complex-wide problem they were

Page 151

having with feed?
A Not all growers got bad feed.
Q Do you know if the growers that you competed against in any given tourney got bad feed?
A Yes.
Q So you were competing against some folks who had the bad feed issue too?
A Yes.
Q Do you have any ability to quantify whether someone got more or less bad feed than you during this period?
A No.
Q Do you know if it was one flock, two flocks, three flocks? How many flocks are we talking about?
A I do not know.
Q Do you know what percentage of the feed was bad for you compared --
A Me?
Q Yeah.
A I did not get very much bad feed myself.
Q Okay. So if it adversely affected someone, it might have adversely affected people you competed with in that tournament?
A And it affected me also.
Q But if they had more bad feed, they might have

Page 152

done worse?
A Yes.
Q So sounds like your memory of it is, you may not have faced the worst part of that situation?
A That is -- yes.
Q You were asked about refurbished feed. Do you agree with me refurbished feed is not fed to new chicks?
A To baby chicks?
Q Yeah.
A Yes, it's not.
Q It's not?
A No.
Q In fact, it's only fed at a very limited time during their growth period, right?
A It's fed at the end of the flock.
Q End of the flock, right, lasts how many days?
A Now that I can't say for sure about that, but it's at the end of the flock.
Q Basically once they've matured and are waiting to get picked up, right?
A Yes. Yes.
Q So when we talk about reclaimed feed, we're talking about feed that's only provided to a chicken after maturity at a certain period of time at the end of the growth period, right?