# Exhibit 20

# Deposition of Douglas Brown

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, TCJJ CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LO HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, And CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., ET AL,

Defendants.

DEPOSITION OF DOUGLAS RAY BROWN
February 8, 2018
Taken on Behalf of the Defendants

---

Videotaped deposition of DOUGLAS RAY BROWN, held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:30 a.m., on the above date, before Marilyn Morgan, Kentucky Licensed Court Reporter, pursuant to the Federal Rules of Civil Procedure governing depositions.



APPEARANCES

John C. Whitfield, Esq.
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esq.
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Kerri C. Boling, Esq.
Corporate Counsel II, Tyson Foods
2200 W. Don Tyson Parkway
Springdale, Arkansas 72762
479.871.1965
Kerri.boling@tyson.com

Also Present: Mr. Todd Davis, Videographer



I N D E X


| WITNESS | PAGE |
|---|---|
| DOUGLAS RAY BROWN | |
| Examination by Mr. Tatum . . . . . . . . . . | 4 |
| Examination by Mr. Whitfield . . . . . . . | 197 |
| Examination by Mr. Tatum . . . . . . . . . | 207 |


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| 1 | 5032 Contract | 67 |
| 2 | Contract for Farm 2 | 72 |
| 3 | Contract on Charleston Road | 74 |
| 4 | Documents | 115 |
| 5 | Photos | 161 |
| 6 | Certified letter | 164 |
| 7 | Mortality card | 168 |
| 8 | Tickets | 168 |
| 9 | Flock Visitation Summary | 171 |
| 10 | Broiler Turn-out Checklist | 174 |
| 11 | Litter Management Form | 175 |
| 12 | Answers to Interrogatories | 186 |




VIDEOGRAPHER: This is the videotaped deposition of Doug Brown on February 8, 2018, at the time indicated on the video screen which is 9:34 a.m. Full introduction has been waived. The court reporter will please swear in the witness.

DOUGLAS RAY BROWN
after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. TATUM:
Q. Would you state your full name?
A. Douglas Ray Brown.
Q. Are you married?
A. Yes.
Q. And what's your wife's name?
A. Jonetta Collins Brown.
Q. How long have you been married?
A. About 40 years.
Q. Do you have any children?
A. Yes, sir.
Q. How many children?
A. I have -- I had two. I have one now. Daughter and son.
Q. One is deceased?

Page 5

A. Yes.
Q. How old is the daughter?
A. My daughter will be -- she'll be 40 this April.
Q. Does anyone else live with you besides you and Jonetta?
A. No, sir.
Q. Where do you live?
A. 525 Fox Road, Dawson Springs.
Q. Kentucky?
A. Yes, sir.
Q. How long have you lived there?
A. I believe since 1990.
Q. Is that a farm?
A. Yes, sir.
Q. How many acres?
A. On that farm, it's about 28. I'm not sure. It's close.
Q. Do you have chicken operations on that farm?
A. I have a four-house farm on that location.
Q. How long have you had that four-house farm there in operation?
A. I believe it went in operation, I

Page 6

believe it was around June -- May or June of '97.
Q. Do you have other farming operations at that farm besides the chicken houses?
A. No, sir.
Q. So it's just acreage?
A. Yes.
Q. You don't run cattle or anything like that?
A. No, sir.
Q. So on the about 20 acres, you've got your house and the four chicken houses?
A. Yeah. 28 acres or whatever it is. I'm not sure. House and four chicken houses, yes, sir.
Q. Any other structures?
A. Yes.
Q. What other structures?
A. Pump house, shop, a couple small storage buildings. I have a mobile home.
Q. Do you own that farm?
A. Yes, sir.
Q. Do you have a mortgage on it?
A. It's all tied up in liens with Farm Credit.
Q. In other words, they hold the mortgage on it?

Page 7

A. Yes. Against everything I own.
Q. When did you buy that property?
A. 1990.
Q. Where did you live before that?
A. We were living in Madisonville.
Q. On a farm?
A. No, sir.
Q. In a neighborhood?
A. We were living -- I believe we were living in -- I believe it was 8 -- I don't remember. It was over by the Chickasaw subdivision in town.
Q. Were you involved in any farming operation before 1990?
A. Just helping my dad. He had farms up in Christian County.
Q. But you didn't own any?
A. No, sir.
Q. Were you involved in any chicken operations before 1990?
A. No, sir.
Q. So the first time you ever got involved in growing chickens was in 1990?
A. No, sir. 1997.
Q. Oh, 1997, sorry. Did you do any farming

Page 8

operations on your property between 1990 and 1997 on Fox Road?
A. No, sir. Just gardening.
Q. Okay. How much did you pay for that property?
A. 48,000, I believe was right.
Q. Does that include all the structures?
A. It included everything, all the structures that was there at the time when I purchased it.
Q. Did it have a house on it?
A. The house, yes, the house is still there.
Q. Is that the house you live in now?
A. Yes, sir.
Q. What structures have you added to the property since that time?
A. Chicken houses, pump house, a mobile home, and a shop.
Q. Does someone live in the mobile home?
A. No, sir.
Q. When was it added?
A. Lord have mercy. I have no idea. Probably, just a wild guess, I'm going to say 2002. I don't remember. I'm not sure.

Page 9

MR. WHITFIELD: You don't need to guess.
A. Okay. I'm not sure.
Q. (By Mr. Tatum) What was the purpose of buying the mobile home?
A. To put my son in.
Q. So your son lived in it?
A. My son lived in it until he passed away, yes.
Q. And how many years did he live in it?
A. Until 2013.
Q. So he lived there from 2002 to 2013?
A. Estimated, yes. He lived there until 2013. When he actually moved in, I don't remember.
Q. Okay. You said you paid $48,000 for the property which included the house. Did you pay cash?
A. No, sir.
Q. Did you finance it?
A. Yes, sir.
Q. Who did you finance it through?
A. I don't remember.
Q. Do you know how much you put down?
A. I don't remember that either. It's been too many years.
Q. Do you know if that 48,000 has been paid

Page 10

off?
A. Yes.
Q. And it has been paid off?
A. Yes.
Q. Was it paid off by you or another bank?
A. It was -- I would -- well, it's been a lot of years. I don't remember exactly how we done that. I'm believing that it wound up being paid off by Farm Credit when we done the chicken houses, after we done the chicken -- a few years down the road.
Q. You said you added chicken houses to the property. When did you add those?
A. The chicken houses?
Q. Yes, sir.
A. 1997.
Q. How many did you add?
A. Four.
Q. How many square feet are they?
A. They're 43-by-460.
Q. Each?
A. Yes, sir.
Q. Did you add -- when did you add the pump house?
A. At the same time that we built the

Page 11

chicken houses.
Q. And what about the shop?
A. The shop? I don't remember the exact year, but I would say approximately 2007, '08, somewhere in there, just guessing.
Q. How much did you pay to put in each chicken house?
A. I believe -- I don't remember exact numbers. I'm thinking it was around 525,000, I believe was what the first four chicken houses cost if I remember.
Q. Is that inclusive of equipment, fans, all that?
A. Yes, sir. It was pretty much a turnkey, dirt work, everything.
Q. Did you finance that or did you pay for it?
A. I financed it.
Q. Who did you finance it through?
A. I believe the original loan was through the Farmers Bank in Henderson, Kentucky.
Q. And you say original loan. Is there a second loan?
A. Yes. Well, a few years down the road, we transferred to, I believe it was, First

Page 12

Financial Bank out of Elizabethtown.
Q. And is the loan still held by them?
A. No, sir.
Q. Where is it now?
A. It's with Farm Credit Services.
Q. Do you know what the principal is on the loan from that original $525,000 price tag?
A. I would say -- I'm thinking there's around 70 or 80,000 that's left on one particular loan that was associated with the original.
Q. You're still making those payments?
A. Yes, sir.
Q. What are the payments?
A. I have no idea.
Q. Okay.
A. I have so many different things that come out quarterly, I can't recall.
Q. You said you also put a pump house in at the same time?
A. Yes, sir.
Q. Was this a separate payment from the 525 or was that included?
A. That was included.
Q. It was part of the turnkey operation?
A. Yes, sir.

Page 13

Q. And then you added the shop in '07, '08?
A. Yes, sir.
Q. Why did you add a shop?
A. Well, we needed a place to work on farm equipment and keep equipment inside when it's cold.
Q. What did you pay for that?
A. Well, we built it ourselves. I'm guessing roughly 40,000.
Q. Did you take a loan out for that?
A. No, sir.
Q. Paid cash?
A. Well, let me back up. We had done some improvements and stuff, I believe, on the chicken houses and we just -- when we upgraded, done some upgrades, that was included in the upgrade portions.
Q. So where did you get the money to pay for it?
A. Farm Credit.
Q. Okay. So you took out additional loans on the chicken houses and used that money in addition to whatever upgrades you made and built the shop?
A. Yes, because it was for the farm.
Q. Okay. What's your -- is Farm Credit the

Page 14

current lienholder on this particular farm?
A. Yes, sir.
Q. Do you know what the current balance is?
A. No, sir.
Q. You mentioned about 70- to $80,000 left on the original 525. I'm just trying to figure out if that's the amount that is the principal or if there's been more taken out?
A. Through the years, we've done so many different upgrade loans, that they -- all my farms are tied together as far as when I go borrow money to do an upgrade on farm 1, 2, 3, whatever, it's a lien against the whole, not just that particular four-house farm.
Q. Okay.
A. So everything -- they're all tied together.
Q. So I didn't ask you about your other two farms you have.
A. Yes, sir.
Q. This $525,000 original turnkey number, was that for all three farms or just the one at Fox Road?
A. Just the one at Fox Road, yes, sir.
Q. Okay. When did you -- what's your other

Page 15

farm? You have two others where you have chicken houses?
A. Yes, sir.
Q. What's the second one?
A. That would be farm No. 2. It's a four-house farm.
Q. Where is that?
A. Excuse me?
Q. What's its address?
A. 815 Charleston Road, Dawson Springs.
Q. How many acres are there?
A. I'm thinking about 200, 210, I believe is what we've got there.
Q. You own that land?
A. Yes, sir.
Q. Do you do any other operations on that land, farming operations besides chicken?
A. No, sir.
Q. What do you do with the rest of the land?
A. Hunt on it.
Q. You've got four houses there. When did you build those?
A. Those four houses was built in 1998.
Q. So did you buy them or did you build

Page 16

them?
A. Built them.
Q. Okay. What did you pay to build those?
A. I'm thinking it was around 650,000 for the chicken houses.
Q. Again, a turnkey operation?
A. Yes.
Q. Who did you get that loan through?
A. That loan was through First Financial Bank.
Q. When did you buy the land itself?
A. I had bought the land, I believe, the year prior. I believe it was in 1997, I believe.
Q. Did you pay cash for it?
A. No, sir.
Q. What did you pay for it?
A. I believe it was 72,000.
Q. Was that through a loan?
A. Yes, sir.
Q. Who with?
A. First Financial Bank.
Q. Is that loan still outstanding?
A. No, sir.
Q. It's paid off?
A. Yes.

Page 17

Q. When was it paid off?
A. It's all tied in with Farm Credit.
Q. So you don't know if it's paid off or you've refinanced it?
A. I think that -- I think that loan has been paid off. I have so many different loans on so many different upgrades and stuff, I can't remember which ones is which.
Q. Okay. Do you run any other businesses off that 815 Charleston Road farm besides the four houses?
A. Yes. There's a two-house farm located there also.
Q. And that's what you call farm 3?
A. Yes, sir.
Q. When did you build the two houses on that land?
A. 2009.
Q. What are the square footage of these houses?
A. They are 55 wide and 500 foot long.
Q. Is that 27,500?
A. That sounds close.
Q. How much did you pay to put these two houses in?

Page 18

A. Those houses were 625 for the two.
Q. And that was a turnkey operation?
A. Yes, sir. The loan that we took out on that was actually 650 but the other 25,000 was used for upgrades on the old eight houses.
Q. How much do you still owe on that loan?
A. I'm not certain.
Q. Are there any other structures on the farm at Charleston Road that has your farm 2 and 3?
A. Yes. And I need to clarify something. On farm No. 1, there's also a litter shed on that building. I forgot about the litter shed.
Q. Okay. Was the litter shed part of the original --
A. No, sir.
Q. -- investment?
A. No.
Q. When did you put that in?
A. I think we had been in operation four or five years maybe, six years, something like that, which would be early 2000s when we built that.
Q. Do you know how much you paid for it?
A. About 28,000.
Q. Did you pay cash?
A. No, sir.

Page 19

Q. How did you get the money?
A. Part of it was paid for by a state grant and the rest of it was paid for by me. I believe the state paid 75 percent of it.
Q. And then the 25 percent of it, did you pay cash?
A. I can't recall. I don't remember. It's been too many years.
Q. Do you have any other structures on your 210 acres on Charleston Road --
A. Yes.
Q. -- besides the farms?
A. There's a block barn that was there when I bought the place. There is an old barn, another old barn that was there when I bought the place. There is a mobile home there on that farm now. A pump house and two generators -- a generator shed per farm on that. And there's also a generator shed on farm 1 as well.
Q. What's a generator shed?
A. It's where the back-up emergency generator is located.
Q. How big is that?
A. Probably 14 by 20 roughly.
Q. Did you build that yourself?

Page 20

A. No, sir. Those were in the original turnkey operations.
Q. Is that also the case with the Charleston Road farm?
A. Yes, sir.
Q. So in the Charleston Road farm, the structures that were added with the addition of the initial houses was four houses and a pump house and one generator shed?
A. Yeah. When we built the first four-house farm, we had a generator shed and a pump house.
Q. Okay.
A. And then in 2009, we added the other two houses and another generator shed.
Q. Okay. Do you know how much you owe on the $650,000 that you paid for the two houses in '07?
A. No, sir, I don't. It was . . .
Q. You've mentioned various upgrades over time. Do you have any other loans out for chicken equipment, chicken operations, chicken housing, whatever?
A. Everything that I've got is all tied to the three farms on just all the continuous upgrades

Page 41

A. Yes, sir.
Q. And then at some point -- at that moment in time, have you switched over your Hudson contracts to Tyson contracts as well on farm No. 1?
A. Yes, sir. I believe whenever Tyson bought them out, I think at that time we had to sign new contracts under Tyson.
Q. Did you notice any differences between the Hudson contract and the Tyson contract?
A. No. I think they were relatively close to the same, I believe. I can't -- it's been so many years, I can't recall.
Q. Do you remember having any discussions with anyone at Tyson about any differences between the two contracts?
A. Not that I remember.
Q. Do you remember if you took the contracts to an attorney or anyone else to review and see if they were --
A. No, sir.
Q. -- okay?
A. No, sir.
Q. Okay. So you signed the Tyson contract, continued forward with operations?
A. I'm sorry. Excuse me.

Page 42

Q. So you signed -- when Tyson took over for Hudson, at some point, you signed contracts with Tyson?
A. Yes, sir.
Q. But operations kind of continued through that process?
A. Yes, sir.
Q. Was there any disruption to the operations at that time when Tyson acquired Hudson and you were signing new contracts with Tyson and that sort of thing?
A. No, sir. It continued, you know --
Q. Smooth transition?
A. -- pretty much a smooth transition.
Q. Same folks you were dealing with at Hudson and Tyson?
A. Yeah. I mean, I think there was maybe some changes, you know, in upper management, this, that, and the other. But, you know, as far as the day-to-day people, service techs on the farm, it was pretty much the same.
Q. Okay. Farm No. 2, you opened that farm up for operation with Tyson directly; right?
A. Yes, sir.
Q. Okay. And you entered into a contract

Page 43

with that. Do you know, was that in 1999?
A. It should have been around -- yeah, somewhere in mid 1999.
Q. And do you remember who you talked to in relation to getting those contracts signed?
A. It was Morris Hill. Morris Hill, that's who it was.
Q. Was Morris -- did you like Morris Hill?
A. Yeah.
Q. Did he treat you fairly?
A. Yeah.
Q. Okay. Did you have any concerns about the contract at that time?
A. No, sir.
Q. Did you have it reviewed or consult with an attorney or anything like that over it?
A. No, sir.
Q. Okay. As far as you know, it was the same contract you had for farm 1?
A. Yeah. Yes, sir.
Q. Were you given an opportunity or did you have any discussions with Morris Hill or anyone else at Tyson about different contracting options?
A. Such as options, no.
Q. Have you ever heard of a 52-week

Page 44

contract or -- it's also known as a performance contract?
A. Yes. I've heard of that, yes. I don't know when that came up but I know that was --
Q. That was later?
A. Some years later, yes, sir.
Q. And I thought it might have been. I'm just trying to figure out if it came up for you then or not?
A. No. I'm not even aware that that was even an option back in those days.
Q. Okay. All right. So you signed your contracts. And then since then in farm 1, you renewed each time that's become available under your contract; right?
A. Yes, sir.
Q. And the same with farm No. 2?
A. Yes, sir.
Q. I think when I looked at your history, you've renewed three or four times on each one?
A. Yeah, I couldn't recall. It's been several different times.
Q. Right. Okay. Have you ever in relation to farm 1 ever contacted another integrator and discussed the opportunity to grow for them?

Page 49

higher?
A. I want there to be less -- yes, higher, yeah. I want less chickens in a house.
Q. You want less chickens?
A. Yeah.
Q. And why is that?
A. Because there's too many chickens in the houses and they just -- they get the floors too wet because there's just too many birds per square foot.
Q. Are you aware that there are other growers who want more chickens in the house?
A. I'm sure everybody has got their own preference. But, you know, when I say less chickens, it would have to mean more pay per bird. You definitely couldn't do it on less money.
Q. Have you talked with any other integrators about possibly switching or just inquiring about options besides Perdue?
A. No, sir.
Q. That was you said several years?
A. Several years, yes.
Q. Was it before or after this lawsuit was filed which was in 2015?
A. Way before. Way before. It was way

Page 50

before.
Q. All right. So farm No. 3 --
A. Uh-huh.
Q. -- this has two houses?
A. Yes, sir.
Q. And those square footages are 27,500 each, 55,000 total; right?
A. I guess so.
Q. And you built these in '08, did I hear you say?
A. Started building them, I think, in '08. I think they actually went in operation, I think it was in '09.
Q. And the first contract that you entered into in relation to these houses was with Tyson; right?
A. Yes, sir.
Q. And you've entered into a couple of contracts since?
A. Yeah, I'm sure.
Q. Okay. And the contracts themselves, are they the same contracts as the other farms, 1 and 2?
A. As far as the -- yeah, as far as I know, they're the same. I mean . . .

Page 51

Q. When you -- what made you decide to build two more houses on Charleston Road? Let me -- I can go back to that question. We've been talking for an hour. Any time you want a break, just say you want a break. I don't really care when.
MR. WHITFIELD: I can take one.
MR. TATUM: Okay.
VIDEOGRAPHER: The time is 10:27. We're off the record.
(A break was taken.)
VIDEOGRAPHER: The time is 10:34. We're back on the record.
Q. (By Mr. Tatum) Okay. Talking about farm 3 now, you built those in 2008 and put them in operation in about 2009?
A. Yes, sir.
Q. And these are the two houses. I've seen the phrase from you called super house.
A. Yeah.
Q. Where does that phrase come from?
A. That was kind of the terminology some of the guys were throwing around, Tyson guys, whenever, you know, when we first started talking about building these houses.

Page 52

Q. And what does that mean, just bigger?
A. Just bigger, I guess.
Q. Okay. Who were you talking to about the possibility of building these houses back in '08?
A. Well, Steve Keys was one of the guys that was there at that time. I think he was broiler manager, I believe.
Q. Okay. Did you have a good relationship with Steve Keys?
A. Yes, sir.
Q. And who approached you? Were you looking to build more houses or did they approach you about building more houses?
A. They were expanding and one of the techs showed up on the farm one day doing the routines. Hey, we're building more houses, do you want to build anymore. I mean, I tossed it around awhile and finally decided to go ahead and build two more.
Q. So as far as you know, they were kind of checking in with other existing growers too?
A. Yes, sir.
Q. Okay. And it was the service tech who mentioned it to you when he was there on the farm?
A. Yeah. It was one of the techs, yeah.
Q. Do you remember who?

Page 53

A. No, sir.
Q. You weren't obligated to build them or not build them?
A. No, sir, I wasn't obligated.
Q. It was just an opportunity that was out there that you could do it if you thought it was the right thing to do?
A. Yes, sir.
Q. And so did Tyson assist you in obtaining any loans for those houses?
A. No, sir.
Q. Did they provide you any money to pay for them?
A. Well, now they got that addendum contract, you know, where they pay on the new houses now.
Q. Right. And I think I saw -- yeah, it has an addendum contract where they gave you maybe a ten year payment?
A. Yes. That's the only way they'll cash flow.
Q. What's called new house incentive or something like that?
A. New house incentive, yes, sir.
Q. Okay. So that was an incentive they

Page 54

gave you if you went forward and built the houses, they give you pay based on building the houses, not on growing chickens?
A. Yes. It's based on building the houses, which was the only way you could build them. They wouldn't cash flow any other way.
Q. And what do you mean they wouldn't cash flow any other way? You mean while they're in build process?
A. No. I mean while you're running them. There wasn't enough cash flow in the contract money to make it worth building them.
Q. Okay. So you ended up getting this new house incentive pay in addition to that?
A. Yes, sir.
Q. Okay. And so the new house incentive pay, was that your idea or was that Tyson's idea?
A. Tyson.
Q. So someone came to you and said, hey, you're going to be eligible for this new house incentive pay as well?
A. Yes, sir.
Q. Okay. Had you told Tyson without that, you weren't going to go forward, or had you gotten that far?

Page 55

A. Well, that was the only determining factor once I found out that they were going to pay that. I mean, I wouldn't have built them any other way.
Q. Okay. Who were you having these discussions with?
A. Steve Keys.
Q. Okay. Do you know if around that time any other growers in the Robards area built houses?
A. Yeah, I'm sure there was probably several that built, expanded, added in houses.
Q. Do you know any of their names?
A. I think Morgan Rickard built some of the big houses. I think he built his after I built mine. Other than that, I don't know them personally, no.
Q. Do you know if any other growers in the Robards area got these incentive contracts?
A. The new house incentive?
Q. Yeah.
A. I'm sure everybody got it.
Q. Did you have any discussions with anyone at Tyson about how many chickens you were going to get, how many chickens you were going to process --
A. Yes.

Page 56

Q. -- any of the parameters? And what discussions did you have?
A. Well, with Steve Keys. He met me at the farm and we talked over different things and I questioned him, you know, well, how many birds are we going to get in these new houses, this, that, and the other, and he said 35,000.
Q. 35,000 per house?
A. Per house.
Q. So that would be a lot more birds in a lot less square foot?
A. I assume it would be. You know, that's not for me to determine how they do their houses because those houses have a lot more feeding space and watering space than do the old houses. So, you know, it would not be for me to decide how many birds they were going to put in the houses.
Q. Is it your understanding that the density level is variable depending on the house?
A. That's not my determination. That's theirs.
Q. Okay. Did you want 35,000 birds per square foot?
A. Well, that's what I relied on when I went to the bank, when I went to Farm Credit and

Page 57

told them this is the pay. This is the new house addendum pay. This is how many birds we're getting. That's the numbers I relied on to know what my income would be.
Q. Do you have a document somewhere that says you thought you were going to get 35,000 birds per square foot?
A. No. It was a verbal between me and Steve Keys.
Q. What was your understanding as to what Tyson's density parameters were at that time?
A. I don't know. I don't keep up with what their density is. They change it from time to time. It's been changed through the years multiple times.
Q. Do you have any idea what it's ever been?
A. Well, I've been placed -- I mean, I've been placed anywhere like on a 510 house, I've had anywhere from probably 26,500 all the way down to 24,400 through the years. So it's just a variation of densities, whatever they decide they want to do at that time.
Q. So you're not familiar with whether there's a target density level?

Page 58

A. Oh, I'm sure there is. I don't keep up with that.
Q. Okay. Have you ever received, to your knowledge, 35,000 birds in either house?
A. Never.
Q. Do you know what you have received?
A. 32,000 something is the most I can ever recall getting in there. And then as low as around 30,400 or so about the least.
Q. Have you ever had any discussions with anyone at Tyson since you've been operating these superhouses, as you call them, that you thought you would be getting 35,000 birds each?
A. Well, the discussion was between me and Steve Keys and then he left shortly -- he left, I think actually may have been gone before the new houses was completed. I don't remember when exactly he left.
Q. Was he gone before you started construction?
A. I don't believe so. I believe he was still here at that time.
Q. Do you remember when you started construction?
A. It was in '08, the best I can remember.

Page 59

Q. Since your conversation with Steve Keys along these lines, have you discussed your thought that you would get 35,000 birds per square foot with anyone else at Tyson?
A. I'm sure probably through the years, I've discussed that probably with several different service techs just in tongue-in-cheek conversation.
Q. Can you recall a specific one?
A. No, sir. But I know they've been there.
Q. But you can't recall sitting here today who or when?
A. Exactly who, no, sir.
Q. Okay. Did you discuss your desire for 35,000 birds per square foot when you signed a new contract with Tyson for these two houses?
A. No, sir.
Q. And you've had two contracts with those houses; is that right?
A. I'm not sure. Two or three. I'm thinking we changed the contract once. The houses weren't maybe a year old or so. I can't remember. They may have changed.
Q. When you built these houses, did Steve Keys or anyone else at Tyson tell you anything else about birds you were going to get, bird type you

Page 60

were going to get, number of birds, anything like that?
A. No. The only discussion me and Steve Keys had was about the type of heating at that point in time and the number of birds placed.
Q. And what did he say about the type of heating?
A. Well, we had always been on a strict brooder program and it was changed into radiant program at that time and Tyson was doing a major expansion and they needed a lot more houses. So they had started taking on houses from Perdue at that point in time.
Perdue growers had the only box heaters in their houses and Tyson wanted the houses but their growers wouldn't come knowing they had to change everything -- change their heating systems. And so Tyson changed the program to then say, well, now we'll take any kind of heat. It doesn't matter what it is as long as you get the equivalent BTUs.
Q. And when was this?
A. That was when we were building the new houses.
Q. And so the conversation was just around you can use any equipment you want as long as you

Page 65

the cost, the birds placed, and the whole nine yards, that that would be what I would be relying on to make my payments.
Q. And this was all oral?
A. Yes, sir.
Q. Do you know if Daniel Smith relied on any of what you told him to issue the loan?
MR. WHITFIELD: Objection to form.
Q. (By Mr. Tatum) I'm just asking if you know what he relied on.
A. I have no idea what he relied on.
Q. Okay.
A. I'm sure he did.
Q. You have no idea if he did any independent investigation himself?
A. No, sir.
Q. No idea if he ran any independent numbers and stuff?
A. No, sir.
Q. Did Daniel -- was Daniel Smith the person you worked with for your loans on your other farms at the time?
A. Yes, sir.
Q. Do you still work with him?
A. I don't -- he's not at Farm Credit any

Page 66

longer.
Q. Okay. So you've got a new representative you work with?
A. Yes.
Q. Who do you work with now?
A. I don't know who it is. I haven't had any -- Daniel Smith was there when I done my upgrades, and he's no longer there. So I haven't really dealt with anybody since then.
Q. Okay.
A. You'll have to excuse my chicken cough.
Q. I'm going to show you what I think is some of your current contracts. Do you know your farm numbers, you know, farm 1, 2, 3, what the numbers are?
A. I believe so.
Q. What are they?
A. 5032, 5098, 5184.
Q. And 5098 is farm 3?
A. 2.
Q. I'm sorry. What's 3?
A. 5184.
Q. And 5032 is farm 3?
A. 1.
MR. WHITFIELD: I'm sorry. Can you do

Page 67

that for me again, Doug?
THE WITNESS: Farm 1 is 5032, farm 2 is 5098, and farm 3 is 5184.
MR. WHITFIELD: Farm 3 is what?
THE WITNESS: 5184.
Q. (By Mr. Tatum) So let me how you --
MR. WHITFIELD: I'm sorry. Farm 1 is what?
THE WITNESS: 5032.
(Exhibit 1 was marked.)
Q. (By Mr. Tatum) I show you what we've marked as Exhibit 1. Exhibit 1, I believe, is a copy of your current 50 -- did I give you 5032?
A. Yes, sir.
Q. 5032 contract which is farm 1. Do you recognize that?
A. Yes, sir, I guess so.
Q. And if you look at the second page, is that your signature there above where it's typed Doug Brown?
A. Yes, sir.
Q. And you signed that somewhere around August 30, 2017?
A. Yes, sir.
Q. And then if you look at Schedule A, the

Page 68

second page, is that your signature there above producer?
A. Where at?
Q. Well, it's on the fourth page of the document I gave you.
A. Down at the bottom, yes, sir.
Q. Okay. And you wrote that date in there of 8/30/17 also?
A. Yes, sir.
Q. And then if you flip the page, it will say Schedule B. And if we just go towards the back, if you look in the lower right-hand number, there's a -- corner, there's a tracking number. And if you look at 167530, start there, just a few pages from the back, keep going, one more, there you go. Is that your signature there?
A. It appears to be.
Q. And you wrote that date as well of 8/30/17?
A. Yes.
Q. And then the next page that says acknowledgement, is that your signature there?
A. Yes, sir.
Q. And you wrote that date as well; is that right?

A. Yes, sir.
Q. And then your W-9 is attached to this form. Do you see that?
A. Yes, sir.
Q. Is that your signature?
A. Yes, sir.
Q. Okay. And then the last is a checklist. This is -- do you recognize any of the initials on those as being yours?
A. No, sir.
Q. And these signatures, do you recognize any of the signatures on the last page?
A. David Mears, David Deaton, yes, sir.
Q. You can't read the complex --
A. Complex manager, I have no idea.
Q. So you signed this contract as indicated in the various places on August 30, 2017th; right?
A. Yes. But I don't believe I did this. I don't recall none of that.
Q. The checklist; right? You did everything but the checklist?
A. The best I can remember.
Q. Okay. And where were you when you signed this contract?
A. Probably on the farm most likely.


That's where they usually bring them.
Q. Did you have a discussion with anyone at that time about whether or not you wanted to enter into a new contract with Tyson?
A. Well, being knee deep in debt, I had no choice but to sign another contract to keep on going and keep paying bills.
Q. Do you know if this contract differs in any way from prior contracts of this farm?
A. I'm not certain.
Q. Did you attempt at this point in time to go talk with any other integrators about maybe going somewhere else?
A. No, sir.
Q. Did you meet -- do you know who presented this contract to you for signing?
A. Whoever my service tech was at the time.
Q. Do you recall who that might have been?
A. They change them like underwear. I have no idea.
Q. Do you recall any of your service techs?
A. Oh, yeah. I mean, I've had several techs through the years.
Q. Give me some names.
A. Okay. Jennifer Parks, Vince Callaway,


Joe Duckworth. I've got some guy now whose name is Clayton; he's new. I've had him for about a month. I've had several young girl service techs in the last two or three years. Sky McGuffy was one of them. I can't recall. Two or three other young ladies that was techs. I've had a ton of them. I can't recall all their names.
Q. Have you obtained any additional loans since you signed this contract in Exhibit 1?
A. Since I signed this contract?
Q. Yeah.
A. No, sir.
Q. Did Tyson make any representations to you about the nature of your production or your activities on their behalf under this contract that led you to sign it?
MR. WHITFIELD: Object to the form. Go ahead.
A. Can you rephrase that.
Q. (By Mr. Tatum) Yeah. Did Tyson -- anyone at Tyson make any representations to you about the nature of your production that led you to sign this?
A. I mean, the only thing, you know, I'm assuming that they're going to bring me chickens


and feed and I'm going to raise them to the best of my ability.
Q. Did you ask to have any meetings with David Mears or anyone else at the complex to discuss entering into a new contract?
A. No, sir.
Q. Let me show you what I think is your contract for your second farm. We'll mark this as Exhibit No. 2.
(Exhibit 2 was marked.)
Q. (By Mr. Tatum) Now, before I ask you a few questions, we'll kind of do the same drill. I need to verify that's your signature on the document.
A. Yes, sir.
Q. So looking at the second page of Exhibit No. 2, is that your signature?
A. Yes, sir.
Q. And did you write that date as 6/27/17?
A. It appears.
Q. And then as we flip to Schedule A, the second page, is that your signature?
A. Yes, sir.
Q. And as we flip to Schedule B, we'll go back towards the end on what's labeled in the lower

Page 73

right-hand column Tyson 167545, which is the last page of Schedule B. Is that your signature?
A. Yes, sir.
Q. And you wrote that date there?
A. Yes, sir.
Q. And then on the next page under the acknowledgement sheet, is that your signature and date there?
A. Yes, sir.
Q. And then that's your signature and date on the W-9 tax payer form; right?
A. Yes, sir.
Q. And then similar to the first contract, the checklist is not a document you went over?
A. No, sir.
Q. Do you recall -- this one was signed on a different date than the Exhibit No. 1. Do you recall where you were when you signed this?
A. Always on the farm.
Q. Do you recall who brought it to you?
A. No, sir.
Q. Did anyone make any statements to you about the nature of your going forward production --
A. No, sir.

Page 74

Q. -- that led you to sign this?
A. No, sir.
Q. Did you call anyone at the complex and inquire and have any discussions about anything relating to your relationship with Tyson before signing this?
A. No, sir.
Q. Then the last one I want to show you I think is 5184. We'll mark this as Exhibit No. 3.
(Exhibit 3 was marked.)
Q. (By Mr. Tatum) Do you recognize what we've marked as Exhibit No. 3 as your contract package in relation to your two houses on Charleston Road?
A. Yes, sir.
Q. And the first page there, is that your signature on the first page?
A. Yes, sir.
Q. And the date. And this relates to the new house incentive agreement that we discussed; correct?
A. Yes, sir.
Q. And this says in paragraph 3 that you're going to receive a total payment of $20,900, which is referred to as square footage pay, over ten

Page 75

equal installments; correct?
A. Yes, sir.
Q. And so this was signed on 7/20/2010. If I understand it, those are annual installments?
A. Yes, sir.
Q. Have you received payments each year so far?
A. Yes, sir.
Q. So you're due, I guess, maybe three more?
A. I'm not sure how many more. I don't think -- I don't know that it's three. But I do know I have some more coming.
Q. You do know you've gotten an equal installment every time one has been due so far?
A. Yes, sir.
Q. Okay.
A. I've gotten one once a year for every year, yes, sir.
Q. And your understanding is this was -- it says here in paragraph 4, The terms and conditions of this agreement will begin the date of its execution and will continue for nine years or after until its conclusion on 4/1/2018. Do you see that?
A. Yes.

Page 76

Q. And so you got one payment?
A. Well, it was a week or two later, but yes, sir, we got the time.
Q. So at least according to this -- we're in 2018.
A. Yes, sir.
Q. So you might be due one more?
A. It looks like one more, yes, sir.
Q. Okay. But you think you've otherwise got all the others?
A. Yes, sir.
Q. Okay. And this was an incentive payment to you assuming you're performing otherwise under your contract and it hasn't been terminated, this was just a square footage payment, not performance related, right, other than the fact you're still a contract grower?
A. Right. You had to be growing chickens to get it.
Q. We look at the second page of Exhibit No. 3. That's your signature on the W-9?
A. Yes, sir.
Q. And then that's your signature on the third page under the form that says acknowledgement dated 7/20/2010?

Page 77

A. Yes, sir.
Q. And then this is -- if we go to the next page which is 116433 to 116434, this is actually the broiler production contract for this farm.
A. What's the page number?
Q. In the lower right-hand corner, you see it says Tyson 116433? You've just got to flip a couple.
A. 433?
Q. Yeah.
A. I don't have a 433.
Q. I think it might be under that.
MR. WHITFIELD: It is.
A. I'm sorry. Yes.
Q. (By Mr. Tatum) I think it just took the paperclip off. So that's actually the production contract you signed in relation to these two houses; correct?
A. It appears to be.
Q. Is that your signature there on the second page labeled 116434?
A. I don't have a -- yes.
Q. Okay. And I notice that the term of this contract according to paragraph 10 began on July 20, 2010 and runs to 4/15/2018. Do you see

Page 78

that?
A. Yes.
Q. So do you anticipate signing another contract along these lines or are you going to terminate production in these houses?
A. Being that I still owe 400,000 on it, I suspect I don't have any other choice.
Q. So you intend to enter into a new contract and continue?
A. Yes.
Q. And this is the contract that you said we talked about earlier and you said you had conversations with Steve Keys about number of birds placed and about the heating element?
A. Yeah. That was when we built the houses.
Q. These two houses?
A. When we built the two-house farm, yes, sir.
Q. Now, when you say you owe 400,000, are you saying you -- I'm a little -- it could just be we've talked about a lot of things. But are your loans consolidated? You don't have individual companies?
A. They're all at one -- all my loans are

Page 79

at Farm Credit Services.
Q. And are they consolidated?
A. They're all multiple different loans.
Q. Okay. And so you have them based on the different houses for the different farm numbers?
A. Some of the loans like the 400 roughly thousand dollars loan is pertaining to farm 3.
Q. The start up and cost of farm 3?
A. Yeah. Then there's roughly 13- to $15,000 loan that's left remaining that this last installment will pay off. And then the other loans that I have are, you know, upgrade loans associated with all houses, different houses, different farms.
Q. Got it. Let's flip through this so I can verify your signatures. You see Schedule A to that contract that starts on 116435?
A. Yes, sir.
Q. Is that your signature on the second page?
A. Yes, sir.
Q. You look at paragraph L there, the first sentence says, Producer will receive on average five placements of broilers per year. Do you see that?
A. Yes.

Page 80

Q. Do you believe you've received on average five placements of broilers per year on this farm?
A. I would say close, yes, sir. I can't say exactly five. But I mean, it would be -- they pay out-time pay if you're not between the out-time.
Q. And it actually says there later in the paragraph that if your out-time is in excess of 21 days, you receive a square footage payment; correct?
A. Yes, sir.
Q. And in the times that you've had excess 21-day out-time, did you receive your excess payment?
A. Yes, sir.
Q. Okay. And your understanding is that that five placements per year contract term is in all your broiler contracts --
A. Yes, sir.
Q. -- with your other farms as well?
And have you -- you know, sitting here today, is it your understanding you've received on average five flocks per year at your other farms also?

consecutive flocks in a row that they place you on intensified management.
Q. What does high 40s mean?
A. That means below average, the average settlement for the week.
Q. What's your understanding as -- when you say average settlement for the week, what does that mean?
A. Well, however many farms comes in for that particular week, you have an average. And if you're over 40 points below average, for three flocks in a row, consecutive flocks, then you get put on intensified management.
Q. So based on your contracts, you understand that there's a base pay that you receive?
A. Yes.
Q. Per pound that is returned to the plant; correct?
A. Yes, sir.
Q. And not condemned; correct?
A. Yeah. There's a base pay, yes.
Q. Okay. And then there's also fuel pay?
A. Yes, sir.
MR. WHITFIELD: I'm sorry. Say again.



MR. TATUM: Fuel pay.
MR. WHITFIELD: Okay.
Q. (By Mr. Tatum) Then there's also what's called premium pay?
A. Yes, sir.
Q. Do all three of your farms qualify for all three of those elements of pay?
A. Yes, sir.
Q. Okay. And all of those are set by your contract; correct?
A. Yes, sir.
Q. And base pay is essentially a base rate that you received per pound; right?
A. Yeah. The base pay is the average pay for the week.
Q. And then the fuel pay is what as you understand it?
A. The fuel pay is -- it's just -- it's like an energy allowance cost to help pay gas bills or energy costs.
Q. And that's set by your contract as well?
A. Yes.
Q. That's set by square foot; correct?
A. Yeah. The fuel pay, the way I understand it, is set by square foot now. It used



to be by per pound but I think it's based on square footage now.
Q. And is your understanding that that change to square foot was to help the grower so that it could get fuel pay independent of production?
A. Yes, because we requested it.
Q. And Tyson agreed and did that?
A. Yes.
Q. And do you know if that's a Robards specific modification to the contract, or do you know?
A. It's not everywhere. That's something that happened here because I know it's not other places.
Q. Okay. And do you know if that applied to all growers across the board at Robards?
A. All that I'm aware of.
Q. Do you know when that changed from paying the fuel allowance per pound to per square foot was?
A. No, sir, not exact date. It hasn't been that long ago.
Q. And then premium pay, what's your understanding of premium pay?



A. Well, that's a pay that you get for having premium houses.
Q. And so premium houses means houses that comply with Schedule B of your contracts like we looked at in Exhibit 1, 2, and 3?
A. Yeah. We used to have standard and then they came up with premium and that was two different pays. Then they've changed it now to basically where everybody is premium, the way I understand it.
Q. As long as their house complies with Schedule B?
A. Yes. You have to comply, yes.
Q. Okay. And so is your understanding does your fuel pay, it's always constant under your contract; correct? Every settlement you get the same fuel pay because it's based on square foot?
A. Yes, sir.
Q. Okay. And are you aware of any instance where Tyson has failed to make the fuel payment to you per the contract?
A. Not to me. But I've heard it from other growers.
Q. You've heard that maybe they didn't make the fuel pay payment to other growers?

Page 89

A. Right.
Q. But to you --
A. To me --
Q. -- you got it?
A. To me, I've always got it, yes, sir.
Q. Have you ever seen a document that showed you that they failed to make the fuel pay to another grower?
A. No. But I know that there have been just from hearsay from talking to growers.
Q. Premium pay, which is your housing pay, that's based on square footage as well; right?
A. Yes, sir.
Q. And have you always received your premium pay?
A. Yes, sir. Ever since we've had the premium house pay, as far as I can remember, I've gotten it every time.
Q. And so you've never been shorted?
A. Not that I'm aware of.
Q. Are you aware of anyone else who has ever been shorted premium pay?
A. Just hearsay.
Q. So you've heard other people haven't got their premium pay?

Page 90

A. Correct.
Q. But you haven't seen that to be true?
A. Yes, sir.
Q. Now, base pay, what's your understanding of base pay?
A. The base pay is the average pay for the week. After all farms are totaled and combined together, they come up with an average pay and that's where the base starts.
Q. And so when you say all farms for the week, you mean all farms who turn in birds on a given week?
A. Yes, sir.
Q. And now we're starting to talk about what's referred to what's known as the tournament system; correct?
A. Yes, sir.
Q. Okay. Now, have you been paid under the tournament system relative to base pay since you've been in the chicken business?
A. Yes. I mean, it's all derived from the base pay.
Q. Okay. So even with Hudson, you were paid under what's known as the tournament system?
A. Yes, sir.

Page 91

Q. So the base pay portion -- when we talk about tournament system, we're talking about the base pay portion of your pay?
A. Let me clarify something. When you're talking about base pay, you're talking about the average pay for the week.
Q. Yeah. I'm talking about the pay per pound.
A. You're not talking about the bottom pay, the 4 cents; you're talking about the average pay for the week?
Q. Well, as I understand it, and I'm trying to get your understanding really --
A. Yes, sir.
Q. But you really, you know, get three elements of pay each flock. You get your premium pay?
A. Yes, sir.
Q. You get your fuel pay and then you get your other pay?
A. Yes, sir.
Q. Now, I was calling it base pay. If you think there's a better term for it, I'm fine with that.
A. Well, we call it the average pay.

Page 92

Q. Okay.
A. But, I mean, base is fine. I mean, it's probably -- maybe the way it's terminology.
Q. Okay. And so what's your understanding of how that third element of pay, what we were calling base pay, is calculated?
A. It's calculated by averaging all farms together. And, in other words, you throw them all in a hat, you total them all together, divide it by how many farms it is, all the poundage turned in, and when you come out to your average, that would be your average base pay for the week.
Q. Okay. And then once that average -- so all farms who turn in a flock in a given week --
A. Yes, sir.
Q. -- their pounds are inputted into the system?
A. Yes, sir.
Q. And do you know any other elements that go into that calculation?
A. Well, everything goes into the calculation. Condemned and everything goes into that calculation of deriving, you know, fees, birds condemned, everything, you know, is combined into that average for the week.

Q. What's your -- go ahead.
A. The overall performance of all my farms are way down. It's not just that farm. It's all of them.
Q. And why do you feel that is?
A. Well, I can tell you it ain't nothing I'm doing different on my end because I'm in my houses every day.
Q. So you don't know what the difference -- why that is?
A. What's that, now?
Q. You don't know why your overall performance is down relative to folks you're competing with?
A. Well, I could give you -- I can say that if you go back two years ago, two and a half years ago, you can look at all my farm performance and then you can look at my farm performance after I had an altercation with the Tyson guys. You can look at my performance from that point forward and you can see that my performance has gone downhill.
Q. When did you have an altercation with Tyson guys?
A. With David Dickey and Jim Gottsponer. I can't give you dates or nothing like that. It's



been about two years ago.
Q. And what do you mean by altercation?
A. Well, I got cheated out of about 8- or 10,000 pounds of feed and I called their hand on it. And they just -- they told me they wasn't going to do anything about it. That's just the way it was.
Q. That was the altercation?
A. Yes. And I told them to get off the farm.
Q. So this was -- so you had them come out to the farm?
A. No. They came out to my farm because they were on a local farm and they called me and told me they wanted to come by and talk to me about it because I had called their hand on it the day the feed was delivered to the farm.
Q. And what was the issue with the feed?
A. Well, I got a load that said there was 55,000 pounds of feed on the truck and there was no way there was 55,000 pounds of feed on the truck.
Q. How do you know that?
A. How do I know that? Well, number one, I know it from 20 years of experience from looking in bins to see how much feed is in the bin. The other



way is by I keep documentation in each one of my houses on how many hours it takes to use each bin of feed. I document it each time the bin is changed.
And when I changed the bins after I had received that feed and called their hand on it, I had told Neil Barfield that I would document and make sure exactly how many hours of feed it took to use that feed and it had had best to take multiple hours more because it's 6- to 8,000 pounds more feed saying that's on that truck.
And it did not. It actually took less hours. It took less than 48 hours to go through 55,000 pounds of feed, and with 20 years of experience, that don't happen.
Q. So you're talking about you received a bunch of feed and then after usage, you developed a belief that it was short because it went faster?
A. No. I told Neil Barfield before the feed was even used. The feed was still in the bins. He had come in filling in for another service tech. And I told him that day, I said, I've been charged -- I showed him the ticket. I said, There's no way there's 55,000 pounds in them bins. I've done climbed the bins. I've looked in



them. He said, Well -- he said, you keep up with it, keep up with how many hours it takes to use the feed.
So that's what I done. After they used that bin of feed, it took around 46 to 47 hours to use 55,000 pounds of feed, and you don't do that.
Q. How many hours should it take?
A. It should have taken around 51 to 53 hours to have used -- no, let me back up. It was taking about 48 hours, typically 46 to 48 hours to use -- what they normally deliver is 48,000. Okay. I've got 55,000 plus here which is almost 8,000 pounds more. So it should have taken several hours more than 48 hours to consume that feed, and it actually took less.
Q. So on this particular delivery, you were getting more feed than normal?
A. Oh, yeah.
Q. So normally you get about 48,000?
A. Normally 48, sometimes you'll get 50.
Q. At this particular time, the ticket said 55,000?
A. 55 plus.
Q. That itself was not normal?
A. That was a red flag right there in the

Page 101

beginning.
Q. Okay. And so you talked to Neil about it, your service tech?
A. Yeah. He was a fill-in. He just pulled up on the farm.
Q. And he said, Well, keep track of your usage time?
A. Yes.
Q. Okay. Once you kept track of your usage time, you found out your usage time was consistent with getting what you normally get?
A. Yes.
Q. Not 55 --
A. Not 55 plus.
Q. Which is about another five to seven than you usually get?
A. Yes.
Q. Okay. So at that -- okay. So at that point in time do you have any -- do you have any idea what the cost difference to you is between being charged, as you said, 5,000 to 7,000 pounds of feed that you didn't get?
A. They've got their formula, you know, what they charge out per pound of feed.
Q. But you have no idea ultimately how that

Page 102

shakes out as far as I got paid X and should have got Y?
A. Well, yeah. When you go in, you go into the settlement, you're getting settled on your whole farm consistent with being shorted on feed. You get paid a lot less on your entire poundage for the whole farm.
Q. Now, I'm just wondering if you ran that math and said this is what it cost me?
A. It would not have mattered. No, I didn't, no.
Q. Okay. Go ahead.
A. I notified Tyson after I had talked to Neil and told them that we were short on feed and that I wanted to know what they were going to do. Well, let's let you settle and let's see how you do, then we'll look at it after that.
Well, after the settlement come in, performance wasn't near as good as it had been. And then when Jim and David Dickey drove out to the farm to tell me that they wasn't going to do anything, you can imagine I wasn't very happy.
Q. All right. Do you remember what settlement this was?
A. No, sir.

Page 103

Q. What month, what year?
A. No.
Q. You don't remember the year?
A. A couple of years back. You know, I could go back and run off a million scenarios through the years. You know, this is just one --
Q. Okay.
A. -- pertaining to in the recent history.
MR. TATUM: Let's let him change the tape real quick.
VIDEOGRAPHER: This is the end of disc 1. The time is 11:36. We're off the record.
(A break was taken.)
VIDEOGRAPHER: This is the beginning of disc 2. The time is 11:40. We're back on the record.
Q. (By Mr. Tatum) Okay. So I was asking you about this incident with the feed.
A. Yes, sir.
Q. And I am trying to figure out if you have any ability to figure out when this was?
A. Well, at this point in time, no. We typically don't, you know -- you know, you call the hand on a particular flock or a particular issue when it happens. And the decision is made on what

Page 104

they're going to do and you go on from there. I mean, there's no reason to keep documentation. Never been a reason for us to have kept documentation.
Q. So I just want to be clear, you can't remember what year it was?
A. I'm just saying it was a couple of years back. You know, I can't tell you exactly when it was, no, sir, I can't.
Q. You say David and Jim came out to your farm. They were at a neighboring farm and came by the farm?
A. Yes. They were on the Latta farm, over local. They had called me and wanted to run by and talk to me about it.
Q. And so they were in the area?
A. Yes, sir.
Q. And you were okay with them coming by to talk about it?
A. Yes, sir.
Q. Okay. And what did they tell you?
A. They told me that they had looked at the settlement and they didn't see that they felt like there was anything there that they could do because they didn't have any proof that the feed wasn't

Page 105

delivered.
Q. Where had you settled?
A. I just remember it wasn't as good as I normally do. I don't remember the placement.
Q. So you don't remember if it was above or below average?
A. I don't remember if it was above or below. I just remember it was below average for that farm, where that farm had typically settled.
Q. And you don't know how that at the end of the day affected the money you got paid for that settlement?
A. I know it definitely affected it. It wouldn't matter if it pushed me from first to second or first to last. It's still the issue that I was shorted on feed and they wouldn't do anything about it.
Q. Understood. I'm just trying to figure out if you can tell me how much money you got shorted?
A. No, sir.
Q. Okay. Now, you said they told you we can't do anything about it. They don't have proof in the record that it wasn't delivered. You said you think based on your eyeballing the feed and

Page 106

your usage and tracking of that, that it was shorted?
A. Most definitely.
Q. Okay. Did you have any documentation?
A. I did at that time. I had my feed consumption charts documented.
Q. Okay. And what's your feed consumption chart?
A. It's a feed inventory chart that I document every time from when I change -- at the moment I change a feed bin, say if it's 3 o'clock on Friday, the 10th, or whatever, until it runs out on the next bin switch time.
Q. Have you ever received a feed ticket with 55,000 pounds in feed before or since?
A. One time, about two weeks later.
Q. And did you feel like that was 55,000?
A. No.
Q. So you thought that was short also?
A. Yes. After I had called their hand and had a fit and told them that in 20 years of raising chickens, I had never ever received a load of feed with 55,000 pounds on it. Within two weeks I got another load at a different farm.
Q. Did anyone at Tyson ever tell you why

Page 107

you got delivered 55,000 pounds?
A. No. And it's never happened again since.
Q. Now, you said there was an altercation. What was the altercation?
A. The altercation was I told them to get in their truck and get off my farm and don't ever come back. If all you're going to do is come here and lie to me, I don't need this. You could have made a phone call to tell me what you told me.
Q. Well, what did you think David was lying about?
A. What did I think they were lying about?
Q. No, David.
A. They were --
Q. I'm asking what you think David was lying about, specifically David Dickey?
A. What did I think -- they were specifically not going to do anything even though they had been notified the day that there was an issue and they just let it run through the system and now there's no way to prove it. The feed is gone. At that point in time, they could have reclaimed that feed and took it back in and checked it to verify.

Page 108

Q. Who had been notified?
A. I talked to Neil Barfield the day the feed was delivered.
Q. Okay. But what I asked you was, what did Dickey lie about, Dickey himself personally? You said he lied about this. What did he lie about?
A. What did he lie about?
Q. Yeah.
A. Saying that the feed was not -- saying that the feed wasn't there. Saying that I was not charged for feed I didn't get, and I most certainly was charged for feed I didn't get.
Q. So do you know if he knew that you actually got less feed other than what you were telling him?
A. Well, he's in management. When I tell my tech, it's supposed to go up the chain.
Q. Okay. So it was you saying you got less and the feed ticket saying you got more; right?
A. Yes.
Q. Okay. Do you have any reason to think that Dickey knew you were right and the ticket was wrong?
A. No. Because they wouldn't do anything

Page 109

about it at the point in time that the event occurred. I requested it to be reclaimed and they wouldn't reclaim it.
Q. So you wanted them -- it had already been brought to your place and dumped?
A. Yes, sir.
Q. In your feed bin?
A. Yes, sir.
Q. And you wanted them to dig it out, put it back in the truck and grab it back and weigh it?
A. Yes.
Q. Okay. Anyone ever done that before for you?
A. It has been done. Not for me, no, sir.
Q. So it's never been done before for you. You've heard of it being done for someone else?
A. I've heard of other people having it reclaimed, yes, sir.
Q. But you've never seen that happen?
A. No, sir.
Q. Is this something you've heard from others?
A. Yeah. But if there's a question, why would they not take it into consideration.
Q. Wouldn't that leave you with no feed?

Page 110

A. Not if I've got feed in the other bin.
Q. Did you have feed in the other bin?
A. Yes. I was still running feed on the front bins. The feed -- the supposed 55,000 was dumped in the B bins. They could have come back and reclaimed that feed, took it back and scaled it. And if I was wrong, then I was wrong and that would have solved the issue, but they wouldn't even reclaim it.
Q. Were you going to offer to pay for all those costs if you were wrong? Did you offer to pay for those costs --
A. No, sir.
Q. -- if you were wrong?
A. No, sir.
Q. Would you have paid for those costs if you were wrong?
A. Well, I can't sit here and say that I would have, but I paid for the costs because they were wrong because I got shorted on my paycheck.
Q. So you did not offer to pay for the costs to put it back in the truck, reweigh it, take it back to the feed mill, bring it back and redump it if you were wrong?
A. No. That's their job to bring the right

Page 111

amount of feed for what says on the ticket, not mine.
Q. And you told them to get off your farm and never come back?
A. Yes, sir.
Q. Did they ever come back?
A. No, sir.
Q. What did Jim say that was a lie?
A. He was agreeing that the whole scenario -- we had no documentation and nothing other than like my feed chart that I had which was my documentation. The only thing they got a documentation is what they send to the farm. All the documentation is in their favor.
Q. So you had the feed chart and you had the feed delivery ticket?
A. Yes, sir.
Q. The feed chart is your own document tracking just how quickly the feed is being eaten?
A. Yes, sir.
Q. And then the feed delivery ticket is what Tyson gives you that says this is how much feed we just dropped off?
A. Yes, sir. That's what they put in my mailbox when they --

Page 112

Q. Do you still have that feed delivery ticket?
A. No, sir.
Q. Okay. So we can't go back and know which delivery we're talking about, look at the ticket and then pull some weight scale somewhere and compare it because you don't have a feed ticket?
A. No. There is no --the feed is gone anyway. There's nothing to check it with.
Q. So at this point in time, you're not aware of any way anyone can even figure out when this happened and cross check this data?
A. No. Because they wasn't willing to fix it when it happened. At this point, it doesn't matter.
Q. Okay. Did you also -- who was your service tech at the time? I know you said you talked with Neil because he --
A. Neil was filling in for somebody that was on vacation. I don't -- I don't remember who it was. Like I say, I've had so many techs over and over and over, I can't recall.
Q. Did you have any problems with Neil?
A. No, sir.

Page 113

Q. Do you think Neil is a good guy?
A. Neil is a fine fellow.
Q. Honest?
A. As far as I know. But it wasn't -- he wasn't my tech. He was just a fill-in for that day.
Q. Okay. Do you have any other instances where you think David Dickey lied to you?
A. Not that I'm sitting here thinking of right at this minute.
Q. Do you have any other instances where you think Jim Gottsponer has lied to you?
A. Not that's coming to my mind right at this time.
Q. Do you have any other instances where you think anyone else at Tyson has lied to you? We've talked about your 35,000 bird issue. So I don't --
A. Yeah.
Q. -- want to make you think I'm thinking about that. I'm thinking about other instances.
A. As far as verbal speaking, no.
Q. So you can't name me an instance where David Mears has lied to you about something?
A. I've never really had much dealings with

Page 114

David Mears.
Q. Are there any other instances where anyone at Tyson has, you think, lied to you?
A. None that I can recall sitting here right now, not sitting verbally talking, no, sir.
Q. Did Dave or Jim in that meeting yell at you?
A. No.
Q. Did you record the meeting?
A. No.
Q. Have you ever recorded any meetings you've had with any Tyson folks?
A. No, sir.
Q. So there are no recordings out there that you're aware of where you were meeting with anyone at Tyson and recording it?
A. Nothing I can recall. No, nothing, no.
Q. Okay. I'm going to ask you about some documents I've seen in the file that you've produced and ask you what they are and that sort of thing. So I'm going to have marked as Exhibit No. 4. This is a packet of documents that you produced.
A. That I produced?
Q. Yeah.

Page 115

(Exhibit 4 was marked.)
Q. (By Mr. Tatum) As I understand it, this is a set of documents relating to your settlement that occurred February 6, 2016. And these documents, you can see on the lower right-hand corner, they say Brown?
A. Yes, sir.
Q. That means that your attorney gave those to me and said they were from you?
A. Okay.
Q. And when I went through and looked at these, this was a package of documents you had that all relate to your settlement on 2/6/16. So you had individual files essentially for every settlement. Are you aware of that?
A. Well, I don't know what all they've got in here yet. It appears to be one of mine, I guess.
Q. So do you keep individual groupings of each of your settlements you receive for your farms?
A. Yeah. If you got this from my lawyer, that means I had them. I mean, if that's where that's coming from.
Q. You got like files of documents at your

Page 116

house or on your farm or what?
A. Yeah. I mean, I've got boxes full of stuff for 21 years, you know.
Q. Okay. Well, I'm looking at this one, for example. And on this first document that's labeled Brown 3131, it's titled broiler production settlement by grower, week ending date 2/6/2016. Do you see that?
A. Yes, sir.
Q. So is this a document you receive each time you settle?
A. It appears to be, yes.
Q. And this tells you, for example, the data that went into ultimately calculating your final pay; correct?
A. Yes.
Q. It tells you how many head replaced; correct?
A. Uh-huh.
Q. How many head were culled off the farm? In other words, called mortality?
A. Yes.
Q. And it tells you what that livability percentage was? In other words, on this one it says that they delivered 63,400 head and chicks

Page 129

5184, 35, comment, changed from 94.54 TO 95.67 for chick credit?
A. Yes, sir.
Q. And then it says the same below that. So this is a document that tells you any sort of -- the basis of any change in numbers for credit?
A. Chick credit, yeah.
Q. Okay. And you received this each time?
A. Yes.
Q. And then the next document 3135 is called grower flock balance, settling flocks. Do you see that?
A. Yes.
Q. What's your understanding of this?
A. Well, it appears it's a summary of the feed tickets.
Q. And this ultimately tells you each ticket --
A. How much you charge for feed --
Q. Delivered --
A. -- how much you charge for --
Q. And all of these numbers -- this is the detail --
A. It's all the detailed calculations that goes into figuring up your paycheck.

Page 130

Q. Right.
A. Yes, sir.
Q. And then the next document labeled 3136, grower weekly mortality, so this is a summary of the mortality on the farm; right?
A. Yes, the seven --
Q. And mortality is --
A. Week by week.
Q. And you keep mortality cards at the farm; right?
A. Yes, sir.
Q. And each time you kill a chicken, which they call culling --
A. Culling or dies, yes, sir.
Q. Or it dies, you've got to mark it on the board; right?
A. Yes, sir.
Q. And then those tickets are picked up and ultimately summarized in this document for you; right?
A. Yes, sir.
Q. Are you aware of any instance where your mortality cards didn't match the summary weekly mortality report that ultimately went into your settlement on any of your farms?

Page 131

A. None that I'm thinking of at this point in time, no.
Q. And then the next document 3137 to 3138 is called Tyson browse ticket report?
A. Yes. Feed mill report.
Q. That's feed mill report; right?
A. Yes, sir.
Q. The next document is just simply an invoice of the payment to you of 3139; right?
A. Yes, sir.
Q. So in this particular instance, it showed for this flock week ending 2/6/2016, you got paid $34,653.87 gross; right?
A. Gross, yes, sir.
Q. But then $10,124 of that was paid to your bank?
A. I think 10,000 goes to the bank. The other 124 was probably some kind of supplies.
Q. Ultimately you got paid into your pocket and I know there's expenses, but you received into your house 24,529.87 net from this flock?
A. Yes. That would have been the net check that I would have gotten, yes, sir, prior to anything being paid.
Q. Then the next page, Brown 3140, this is

Page 132

called grower check payment detail work sheet. Do you see that?
A. Yes, sir.
Q. You receive this each time you settle a flock too also; right?
A. Yes. Yes, sir.
Q. And this breaks down the payments that you received pursuant to the categories of pay we talked about earlier, base pay, fuel pay, premium pay; right?
A. Yes, sir.
Q. And it tells you how each breaks down and gets to your total?
A. Right.
Q. And so that way you know -- for example, we talked earlier, this is how much I'm getting paid for fuel, this is how much I'm getting paid for my housing equipment, and then this is what my base pay was per pound?
A. Yes, sir.
Q. So you know, for example, in this one you were paid for 488,326 pounds and you were paid 5.72 cents per pound; right?
A. Yes, sir. The base, yes, sir.
Q. Right. And if you look back at your

Page 141

A. Well, the only -- the only documentation that I have is the mortality card that I turn into Tyson. Everything else, all these is what Tyson has given me. So . . .
Q. So we talked about one instance where you thought feed conversion at some point in time was wrong because you had gotten charged for more feed than you had gotten?
A. Yes, sir.
Q. Have there ever been any other instances where you've gotten your information and you've looked at it and you thought this settlement is not accurate, there's some discrepancy in the record?
A. Well, the time that I referenced earlier about the 16 loads and the 15 loads, that was one time. Other than that, I've had a lot of them that didn't look right according to the way the birds looked when they went to the plant. But, you know, I get their documentation is what I get.
Q. So you can't pinpoint for me a time where you think the birds looked different than what the documentation came back?
A. No, sir.
Q. Are you aware of -- do you do anything to trace what kind of breed you receive?

Page 142

A. Well, I mean, I've questioned techs and stuff before about, you know, a particular house or particular flock, but we never get any feedback from that.
Q. Okay. So you don't really know what your breed ratios are from one to another?
A. They tell us now whether they're 500 or 700 or 708s. You know, that.
Q. When did they start telling you that?
A. I can't necessarily go back and say when. I just know for the last several years we've kind of known -- for years we didn't know what we had. And now they've kind of last few years, they dictate it because they gave us a lighting program. They tell us you've got 500s or you've got 700s, you've got 708s, you need to change your lighting program in accordance.
Q. Okay. So different breeds, as you understand it, require different lighting programs, for example, and so you need to know the breeds so you can adjust the lighting?
A. Yes, sir.
Q. And this is something you work with your service tech on?
A. Yes, sir.

Page 143

Q. Do you receive any sort of ticket, delivery ticket or anything like that that tells you your breed?
A. The tickets that we get don't -- I've never seen it documented on there what they were. Usually the tech comes by the farm and he'll write it on the mortality card what they are.
Q. Do you have any preference for one breed over another?
A. Oh, yeah.
Q. What's your preference?
A. 708s, then 500s, then 700s.
Q. So you like the breed 708 best?
A. Yeah. It's not a Cobb bird. It's an Aviagen bird. It's a totally different breed.
Q. So you like the Aviagen 708. Then you like the Cobb 500 and the Cobb 700?
A. Yes, sir.
Q. And that's -- and what is the basis of you preferring those?
A. There's a big performance difference in the birds.
Q. And what's the performance difference?
A. Well, typically, you don't have -- you have more culls and stuff in certain breeds of the

Page 144

500s and the 700s than you do in the 708s.
Q. And how do you know that over time, if you don't know what breeds you're getting?
A. Well, we've known it for several years. We've only started getting these 708s for the last couple of years.
Q. And you like those better?
A. Oh, yeah.
Q. Better performing bird?
A. Yes, sir.
Q. Do you know if the ratio of Cobb 500, 700, or 708 that you get is any different than the percentages that another grower gets?
A. Well, I know -- percentage-wise, it could be somebody that has a two-house farm that has a hundred percent 708s where you could have been a four-house farm and have 50 percent 708s. So percentage-wise, it's always a different percentage from farm to farm.
Q. Do you have any -- can you give me any examples of when you know that's happened where someone has got a hundred percent of something during your flock and you've gotten 50 percent of it?
A. Well, yeah. Well, I could probably