# Exhibit 26

# First Deposition of Dr. Kyle Stiegert

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

vs. Case No. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

Videotape Deposition of KYLE W. STIEGERT, Ph.D.

Thursday, October 10, 2019

9:01 a.m.
at
COYNE, SCHULTZ, BECKER & BAUER, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin

Stenographically Reported by Shelly A. Loniello, RPR

Page 2

Deposition of KYLE W. STIEGERT, Ph.D., a witness in the above-entitled action, taken at the instance of the Defendants, pursuant to all the applicable rules for the State of Kentucky, pursuant to Notice, before Shelly Loniello, Registered Professional Reporter and Notary Public, State of Wisconsin, at COYNE, SCHULTZ, BECKER & BAUER, S.C., 150 East Gilman Street, Suite 1000, Madison, Wisconsin, on the 10th day of October, 2019, commencing at 9:01 a.m. and concluding at 4:49 p.m.

A P P E A R A N C E S:

WHITFIELD, BRYSON & MASON LLP, by
Mr. John C. Whitfield
19 North Main Street
Madisonville, Kentucky 42431
john@wbmllp.com
Appeared on behalf of Plaintiffs.

SHOOK, HARDY & BACON LLP, by
Mr. Mark C. Tatum
Mr. Steve Soden, via telephone
2555 Grand Boulevard
Kansas City, Missouri 64108
mtatum@shb.com
Appeared on behalf of Defendants.

TYSON FOODS, INC., by
Mr. Eli J. Glasser
2200 Don Tyson Parkway
Springdale, Arkansas 72762
eli.glasser@tyson.com
Appeared via telephone on behalf of Tyson Chicken, Inc.

ALSO PRESENT: Jon Hansen, Videographer.

Page 3

I N D E X


| Examination by: | Page |
|---|---|
| Mr. Tatum | 5 |
| Mr. Whitfield | 312 |
| Mr. Tatum | 320 |


E X H I B I T S


| EXHIBIT NO. | | PAGE IDENTIFIED |
|---|---|---|
| Exhibit 1 | Deposition notice | 65 |
| Exhibit 2 | 7/15/19 Report | 66 |
| Exhibit 3 | Ansong-Danquah study | 117 |
| Exhibit 4 | Sample contract | 147 |
| Exhibit 5 | June 2014 MacDonald report | 167 |
| Exhibit 6 | July 2008 MacDonald and Key paper | 206 |
| Exhibit 7 | 2012 MacDonald and Key article | 209 |
| Exhibit 8 | Supplemental declaration | 317 |


(Original exhibits attached to the original transcript; copies provided to attorneys ordering exhibit copies.)

Page 4

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are now on the record. Today's date, October 10, 2019. The time is 9:01. This is the video recorded deposition of Kyle Stiegert, M.D.(sic.) in the matter of Charles Morris, et al. versus Tyson Chicken, Inc., et al., United States District Court for the Western District of Kentucky, Owensboro -- Owensboro Division, Case No. 15-CV-00077.

This deposition is being held in Madison, Wisconsin. My name is Jon Hansen, CLVS, and I am the certified legal videographer with Alaris Litigation Services.

At this time, if the attorneys would announce their presence and introduce themselves, who they represent; after which, our reporter will swear the witness.

MR. TATUM: Mark Tatum on behalf of defendants.

MR. WHITFIELD: I'm John Whitfield. I'm counsel for the plaintiffs.

THE VIDEOGRAPHER: On the phone, please.

MR. SODEN: On the phone, Steve Soden, from Shook, Hardy & Bacon, for defendant.

MR. GLASSER: Eli Glasser, of Tyson

Page 77

-- if Jonathan or Ram was involved in a phone call --
**Q Okay.**
A -- but I was not.
**Q And your understanding though is this was obtained in furtherance of your report in Exhibit 2?**
A Yes. Yes, there was a -- there was an interest in understanding this whole dimension of free-range and organic chicken, so it was --
**Q Do you agree that generally producing free-range chicken or nonfree-range chicken involves the same processes from a grower's perspective?**
A Say that -- can I have the question back.
**Q Yeah.**
**Do you agree with -- do you agree that, from a broiler farm perspective, growing free-range chicken or nonfree-range chicken generally involves the same processes?**
MR. WHITFIELD: Objection to form.
THE WITNESS: You're -- you're separating the organic?
MR. TATUM: Well, including organic.
THE WITNESS: Well --
BY MR. TATUM:
**Q Did you do anything to study that?**

Page 78

A Yeah, there's a -- there's a certification process for organic, and I would have to go back and look at what the -- what's in the details to call something free-range.
**Q Okay. So you're not --**
A I don't know that -- I don't know that every chicken housing operation can call their chickens free-range chickens.
**Q But you don't know it from a day-to-day farm management perspective as a broiler grower that's either dealing with free-range and organic chickens or not, what the differences are?**
A Well, I have a pretty good background on organics. It takes -- to be certified organic in any agricultural commodity, it takes quite a few steps to prove that you're certified organic. The free-range, I'd have to go back and look that over again, but I don't think that chicken houses can -- can claim they're -- they're all free-range.
**Q All right. Did you review Chris Burch's testimony on this point, where -- who grows for Perdue?**
A I -- I read Burch, yes.
**Q And you're aware that he said he does the same thing at Perdue that he did with Tyson, there's no real difference?**

Page 79

A And he's -- he's free-range -- he's certified free-range now, is that --
**Q Did you -- did you --**
A Yeah.
**Q -- look into his testimony to determine?**
A We have been looking into that testimony, and I was more dialed into why he switched than I --
**Q So you didn't analyze whether or not his belief that his processes were the same is accurate or not?**
A I didn't analyze that sentence in his deposition, where he makes that --
**Q Okay.**
A -- where he makes that claim.
**Q Did you review any Perdue contract documents in the context of your analysis for your July 15 report, I don't see any listed in your Appendix B?**
A I didn't -- I didn't review the Perdue contracts.
**Q Did you review any Perdue settlement information in preparation for your report on July 15?**
A No.
**Q Did you review any pricing or cost data of any kind in relation to Perdue in relation to your report prepared on July 15?**
A Just -- I -- the -- relied on the deposition

Page 80

information, is -- is that what you're referring to as data?
**Q You relied on deposition information from plaintiffs?**
A Is that data in your estimation; is that what you're saying data is?
**Q I'm fine if you say yeah, you looked at depositions --**
A Okay.
**Q -- but independent of deposition testimony, did you look at any contracts of Perdue?**
A No, no contracts.
**Q Okay. Did you look at any settlement data of Perdue?**
A No.
**Q Did you look at any production related data of Perdue?**
A No.
**Q Okay. Did you review any contracts of any Robards growers who are not a plaintiff in this case?**
A I'd have to look at -- I don't -- I don't -- sitting here today, I don't know that answer. There was the production contracts that were directly related to the plaintiffs, and they -- they all looked very much similar, so --

Page 81

**Q Are you -- are you aware of whether any contracts among the plaintiffs differed from each other?**
A Sitting here today, I -- I couldn't identify the differences.
**Q Okay.**
A It's -- I looked at these contracts quite a ways back, and they're largely similar, so --
**Q Okay.**
A -- any nuance differences that might be in there is a little hard to remember right now, if there are any.
**Q Do you know if all the plaintiffs were on what we commonly refer to as a tournament contract?**
A That's my understanding, they were --
**Q Okay.**
A -- all these were -- were in the tournament.
**Q Are you -- are you aware if any plaintiffs were not on the tournament contract, in other words a tournament contract that settled week to week?**
A That -- that's my understanding, is that these were all plaintiffs in the tournament.
**Q So does anything in your report account for any plaintiff who was not on the tournament contract?**
A Not to my memory, no. I don't think so.
**Q Did you review any settlement data for any**

Page 82

**nonplaintiff growers at Robards?**
A I would have to go back and look at the report to see if there's -- some of our tournament analysis included all of the growers, so the answer is yes, we did consider some of those.
**Q And that would be found within the grower recap by grower sheets that you list here on Exhibit -- Appendix B?**
A That's my memory at this point, yes.
**Q Okay. Did you review any data in relation to the age of the laying hens that provided flocks to any given grower?**
A No.
**Q Did you review any information relating to the settlement packets that were provided to the growers, upon each settlement?**
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q Are you aware that every time a grower settles, they receive a settlement packet of information?**
A I might have seen one, but I don't recall --
**Q I don't see one listed in your appendix.**
A Yeah. I mean --
**Q Did you review any condemnation certificates for any grower?**

Page 83

A Not to my memory, no.
**Q Did -- did you review any mortality cards for any grower?**
A I don't -- no.
**Q Did you review any feed tickets for any grower?**
A No feed tickets.
**Q Okay. Did you review any grower recap reports, grower copies?**
A What -- may I have that back, please.
**Q Did you receive -- did you review the grower copy of any grower recaps?**
A No. I don't recall that.
**Q Did you review any actual settlement statements for any growers for any of their settlements? You have listed the settlement data spreadsheet, I'm just asking if you reviewed any of the actual settlement statements?**
A No, not to my recollection.
**Q Did you review any feed delivery tickets for any growers?**
A No, not to my recollection.
**Q Did you review any scale tickets for any growers?**
A No scale tickets.
**Q So the sum total of settlement data in relation to the growers that you reviewed is found in**

Page 84

**Appendix B, which is the grower recap sheets listed by Bates number and the settlement data listed by Bates number; is that fair?**
A My understanding, this is what we relied on, so --
**Q Did you review plaintiff's tax returns?**
A I don't -- I don't recall getting any tax return data.
**Q Did you review any bank records of plaintiffs?**
A No bank records.
**Q Loan records?**
A Can you tell me --
**Q Did you review any --**
A -- the difference between loan records and bank records?
**Q Well, I guess I was trying to be all-inclusive, in case you looked at it differently. I mean, a bank record might be a -- you know, your -- your check balance --**
A Uh-huh.
**Q -- but, you know, I'm just trying to be inclusive, loan, finance, credit records, things of that nature, did you review anything like that?**
A No.
**Q Okay. You noted in Appendix B that you reviewed the Agri Stats data provided to you that I believe**

Page 85

covered the time period roughly 2010 to 2016?
A Yes.
Q Did you review any Agri Stats data post 2016?
A I'm trying to recall if -- you know, at the time we wrote this report, I would say no. I don't know if we're -- if we're going down that path yet or not.
Q Did you review, in preparation for your July 15 report, any Robards production data?
A Robards production --
Q -- production data.
A What does --
Q Well, meaning plant production data, volume of chickens being produced --
A We --
Q -- purchases of --
A I relied on data from the tournaments that -- are we talking about the output side of Robards?
Q Uh-huh, the -- on the output side.
A No, no.
Q No.
And you're not able to opine whether Robards' output has went down or up or remained constant over the last ten years, correct?
A You mean output as compared to inputs?
Q Output as compared to meat leaving the plant.

Page 86

A I don't -- I don't -- I didn't rely on that data.
Q Okay. You're not able to say whether or not Robards has ever changed its output in any way over the last ten years, whether they've decreased output or increased output, correct?
A Well, the relationship between chicken meat input is pretty strongly correlated with the output side, so --
Q But you didn't analyze that?
A But I didn't analyze it, no.
Q Right. And you didn't --
A It would be some differences over time.
Q But you didn't analyze that?
A No.
Q You've never -- you did not analyze anything about Robards' own financial positions, whether -- its financial statements, for example?
A When you say Robards, are you referring to --
Q Robards Complex.
A -- Tyson?
Q I'm referring to the Robards Complex.
Did you review any financial statements for the Robards Complex?
A Not to my recollection.
Q Any -- any income statements, profits and loss,

Page 87

anything of that nature, I just want to make sure I'm being inclusive on that?
A I don't think so, no.
Q Okay. Did you, in preparation for your July 15, 2019 report, look at any other integrator's production history?
A What -- define other, please.
Q Any other integrators.
A Oh, other -- other complexes, other --
Q Yeah. Did you actually look at their actual production data for any other integrator?
A No.
Q Did you look at any contracts for any other integrator?
A No.
Q Okay. Did -- so did you look at any other integrator's actual contract terms with any particular grower?
A I may have looked at a contract or two down in -- but -- but I don't recall with -- what they would be or where they were at.
Q Okay.
A Some of that stuff is available online, I think I might have just looked at them on a --
Q But you can't recall?

Page 88

A I don't recall.
Q Okay. Did you look at any other integrator to determine whether or not their contract terms were similar to or different from Tyson's?
A That was my intent. I think I looked at a couple -- there's a -- there's quite a bit of similarity in these contracts, so I think I just moved on.
Q Can you identify a contract that you looked at?
A I can't.
Q I don't see anything listed in Exhibit B about other contracts?
A Yeah, it was just a -- a cursory check.
Q But not something you considered and relied on for your opinion?
A No, no.
Q Okay. Did you look at any other integrator's equipment requirements for producing broilers in a grower house, what we might commonly call house requirements or upgrade costs and requirements over time?
A I -- I've become aware of these -- of some of this -- the dimensions of chicken growing --
Q But you --
A -- through various -- through various, you know, information sources.

Page 93

A My -- my findings are summarized on page 8, Paragraph 18 -- page 8 and page 9.
**Q So as I understand it then, is it fair for me to say your opinions that you offer in this case is that, A, the Robards Complex for Tyson is in a monopsonist position, is that -- is that fair; and then, B, your opinion is that it is in fact exercising monopsony power because of that position?**
A Yes.
**Q And then, C, the effect of that exercise of monopsonist power has resulted in damages to plaintiffs in three categories; one, base pay suppression; two, days out inconsistent with expectations; and, three, condemnation calculations?**
A Yes.
**Q Are you offering any other opinions in this case besides what I've just summarized? And I understand there's a background to how you get to those opinions, but you can understand my view of just wanting to make sure I've got it.**
A These are the -- these are the three areas that -- that I felt like we could -- we could develop supportable damage estimates for. There are other

Page 94

aspects of this case that I didn't feel necessarily that they were helpful to the growers, they may have been an evidence of monopsony power, but quantifying it was -- was outside the scope of -- was outside of our ability to get to.
**Q In other words, it was speculative, but if --**
A Yeah, yeah. Yeah, if --
**Q Fair enough?**
A -- things like -- things like the risk exposure, you're really talking about something that is much more difficult to identify damage claims on and things of that nature, so -- so these are the things that I was able to -- to hone in on and develop a damage model for.
**Q And -- and were you asked to hone in and develop a damage model for these three things or was that your independent judgment, that these were the three things that you felt like you could come to a conclusion on?**
A This is my independent --
**Q Okay.**
A -- judgment.
**Q Were there other damage elements that you were asked to look into that you rejected as not meeting your professional judgment as appropriate?**

Page 95

A Well, plaintiff -- plaintiff counsel says a lot of things, you listen, and from that, you investigate, and like I say, I think some of the things that I heard and read had merit, but I -- in the -- in the amount of time that we had and the amount of resources that we were using, this -- we weren't -- we weren't able to sort of construct a framework for getting at any possible damages in these arenas. And one thing that comes to mind is just this whole dimension of risk and whether there was a proper payment for risk, we just didn't go down that path.
**Q Okay. So the individual --**
A Even though there -- there could be something there.
**Q So at the end of the day, the three buckets of damages you felt like in your judgment you could express to your satisfaction was in relation to condemnation, base pay and out-time, as reflected in Paragraph 19?**
A Yes.
**Q And your ultimate opinion is these are derivative of Robards' exercise of monopsony power; in other words but for the exercise of monopsony power, these elements would be paid differently?**

Page 96

A Yes.
**Q And theoretically, they would not have suffered that damage, correct?**
A Correct.
**Q So your ultimate damage conclusions are dependent upon the exercise of monopsony power?**
A Correct.
**Q Now --**
A I guess we should add one caveat to that. There's prejudgment interest that is -- I'm not sure how the court -- or the law classifies that. I'm simply saying this -- this is the time value of money.
**Q Uh-huh.**
A That's all I'm adding there, so --
**Q No, I -- that's a good -- that's a fair caveat. Obviously the exercise of interest is a legal function, but the ultimate principal amounts that you list here in Paragraph 19 in each bucket of category is derivative, in your judgment and opinion in this case, of the exercise of monopsony power by Robards?**
A Yep.
**Q And absent that --**
A Yes.

Page 97

**Q -- exercise of monopsony power, your opinion is these damages wouldn't exist?**
A Yes.
**Q Okay. Now, did you do any analysis in the formulation of your July 15, 2019 report to determine if Tyson, under the contracts that exist, in other words, you're familiar with the contracts have a base pay element?**
A Yeah.
**Q And they have a fuel pay element?**
A Yes.
**Q And they have a system, what we commonly call the tournament system, that -- that sets the formula on how the base pay element works, correct?**
A Yes.
**Q And -- and there may be a premium housing pay element, right? There's a variety of pay elements within the contract?**
A Yep.
**Q Did you do any analysis to determine whether or not under those contract terms, just what those terms are, in other words I'm supposed to get paid this, in writing, it may be a good amount or it may be a bad amount, but this is the amount in writing I'm supposed to get paid for this pound of meat --**

Page 98

A Yep.
**Q -- did you do any analysis to determine whether any plaintiff didn't get paid according to the terms as written in the contracts?**
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q And I'll start with base pay. So did you do any analysis to determine whether or not a given plaintiff just got shorted base pay, based on the amount; so if I was supposed to get 4.9, I got 4.8, or I got shorted the number of pounds I got paid for, whatever?**
A Well, some -- to my knowledge, the -- the contract terms were not -- are not at issue here.
**Q Okay.**
A That's my understanding of this --
**Q Okay.**
A -- of this -- my assignment.
**Q Okay. And so you --**
A And my -- I didn't -- in my discovery, I didn't come across anything that --
**Q Okay. You weren't asked to look in to see, you know, just from a pure pen to paper on the contract perspective, did it -- did each grower get paid what it says?**

Page 99

A Yeah, the -- the -- it -- it looks above board. The contracts look like they're being -- I didn't see anything that -- that raised alarm bells for me.
**Q Okay.**
A There's -- there's certain things with the condemnation process that make me wonder about if they're -- are there specifics in the contract itself or the way they handle those things that I -- I -- I -- I've yet -- not made a final opinion on, but I'm working on it.
**Q You -- in your July 15, 2019 report, you didn't analyze whether or not -- for example, we were just talking about the pay terms, now I'm --**
A Yeah.
**Q -- going to talk about the condemnation terms. In general, and I know you have an opinion on the appropriateness of this method, but in general, the contracts, as you know, have a condemnation process involved, right?**
A Yeah.
**Q And in general, if a whole bird is condemned, there's an average price metric applied to that whole bird and that bird is deducted from the pounds delivered, you understand that --**

Page 100

A Yes.
**Q -- right?**
A Because they apply a -- an average weight.
**Q Right. You understand that, right?**
A Yeah.
**Q And you understand that's what the contract says?**
A Right. I -- the part I -- the part I was still investigating, that I'm not quite comfortable with, is who gets to decide what a condemned bird is, how does that process work --
**Q So you're not familiar with who regulates what a condemned bird is?**
A I -- I am. And I'm still in the process of truly digesting all that.
**Q You -- in the -- preparation for your July 15, 2019 report, you didn't challenge and you didn't conduct any analysis to determine at the end of the day if any plaintiff had not been charged per the contract term for the number of birds condemned, you may have a -- you may have an issue, right?**
A Oh, yeah. The -- the financing of it all, the -- the accounting and the economics all looked fine to me. I didn't see anything that raised red flags.
**Q Okay.**
A I'm still trying to digest a little bit of that,

Page 177

THE WITNESS: So that's the starting point of this.
BY MR. TATUM:
**Q So when I look at Table 12, for example, of your report, which is what we're looking at now, what is the number .0536 represent in Column A?**
A Well, that's the grower pay we're talking about.
**Q So is that an average grower pay or what is that; is that the contractual grower pay?**
A It's -- it's the grower pay that the -- that the tournaments in that year -- was -- experienced.
**Q So that's -- when you say the tournaments, you're talking about plaintiffs or the entire complex?**
A The entire complex.
**Q Is that -- is that the average pay received or is that the base pay received?**
A That's the average base pay received.
**Q Average base pay received by the complex?**
A Yes.
**Q Okay. And then what's the next column, gross margin?**
A That comes from Tyson's data and there's a description of how we calculated that in the document.
**Q And what data does it come from that you say is**

Page 178

**Tyson's data?**
A I think it comes from the -- what do they call those, the -- the 10-K reports out of Tyson.
**Q So that -- so that -- you're saying that there's a 10-K report that shows that Tyson receives, on average, a 13 cents per pound gross margin across the world?**
A In their chicken growing operation, 13 cents per pound, yes.
**Q Okay. Across the world?**
A Well, here again, I would have to check that. I don't know what percentage of their business is overseas.
**Q Let's just say everywhere they operate.**
A I would want to check that.
**Q Okay. It's not a Robards' gross margin number, right?**
A Oh, no, no.
**Q And you didn't cross-reference to see if the Robards complex operates at that margin or not?**
A Well, that would be a -- it would be very difficult to get that out of Tyson, because they're -- they're taking all the chicken meat from all of their complexes and then selling them, selling the chicken meat and generating an operating margin for

Page 179

themselves.
**Q You -- you don't -- you don't know if they run financial statements and profit margins by complex or not, correct?**
A Well, I'm sure they do, but we don't --
**Q Okay.**
A -- I didn't have those.
**Q Right. So you didn't -- you don't know if that is reflective of a gross margin of Robards or not, you're just saying that was derivative off a 10-K report of Tyson everywhere it operates chicken operations?**
A I'd have to check on everywhere --
**Q Okay.**
A -- versus U.S., so --
**Q Okay. Company wide though, Tyson Chicken Inc.?**
A Well, here again, I -- I want to check that --
**Q Okay.**
A -- against the possibility that it might just be U.S. only.
**Q Okay. We can at least agree it's not Robards?**
A Oh, no. No, no.
**Q Okay. Now, gross margin, gross of grower pay, what does this tell me?**
A That is the -- that is the taking -- see, when you

Page 180

have a gross margin, you're considering in that the part you're paying to the growers, so we're taking that back out and increasing their margin.
**Q Increasing whose margin?**
A Tyson's.
**Q Okay. So A plus B equals .19?**
A Yes.
**Q What's the purpose of doing that?**
A It's to get a sense for how large their margins would be before they paid anybody in the growing sector.
**Q What's the next column, Column D?**
A Well, that's -- that's Column A times 1.07. That's the monopsony effect.
**Q So in other words, you took -- basically you said well, if I -- if their average pay is 5. -- 0.536, I'm going to add 7 percent to it, and that's how I get Column D?**
A Yeah, relying once again on the -- the MacDonald and Key report --
**Q Right.**
A -- that was published in two thousand -- using a 2006 survey.
**Q Right. What's Column E?**
A Okay. Column E is the -- it's in -- the

Page 301

party has investments in it, that the other contracting party has investments in it, you're not trying to discount that they both lose out?
A I don't know about Tyson's situation, why -- they're so large that yeah, they might take a -- they might take a little ding in terms of their overall profitability, but I don't know that they don't have the means to manage a closedown of a factory in one region.
Q Okay.
A I'm suspecting it would be just a blip on their screen, whereas these farmers, that's their -- that's half or more of their livelihood, so I think the risks are not even close to similar.
Q Do you agree with MacDonald, that poultry growers can make more than the average income across the country and more than household farm income across the country?
A Well, that's --
Q And on average do?
A -- that's complicated because you -- you have an investment.
Q I'm just saying --
A You can't say make more money than a laborer.
Q -- I'm just saying he --

Page 302

A A laborer puts forth no investment.
Q -- I'm just saying he says in the articles you cite that average household income of a chicken farmer is greater than the average household income of the rest of the population and to farmers specifically; do you agree with that?
A I don't have any reason to dispute that, but here again, it's just not -- not even remotely relevant to this case.
Q You don't think it's relevant?
A No.
Q No. Okay.
A You can have monopsony power and have people earning above the average. It's really related about the profitability of the product that's being marketed. So if chicken is doing very well in the marketplace for food, there very well may be excessive profits in the system, some of which will filter down to the grower and give them a more -- give them a higher average income than, say, a tobacco farmer.
Q Did you do any analysis to determine whether or not growers across the Robards system receive different inputs over time than anybody else?
A I'm not sure what you mean by different inputs.

Page 303

What does that mean?
Q Do you know what inputs means? You used the term in your report.
A I know what import -- inputs are.
Q Inputs.
A Yeah, what -- but what different --
Q Did you do -- I'm just saying --
A -- what different inputs are you referring to?
Q -- did you run any analysis on, for example, whether over time everyone got an equal amount of breed combinations; did you do any analysis of that?
A Not -- not directly.
Q Okay.
A No.
Q Do you -- and I don't see any conclusions about that in your report --
A Yeah.
Q -- at all, and so I'm assuming you're not offering any opinions on whether, you know, breeds were evenly -- breed combinations were evenly distributed --
A Yeah.
Q -- over time? I'm just assuming you're not here to offer opinions on that; is that fair?

Page 304

A I am not here to offer an opinion on that.
Q And you're not here to offer any opinions on whether or not over time growers received the same eggs from -- you know, same relative age of laying hens over time, I just -- I just want to make sure you're not here to offer opinions about that, because I don't see it in your report?
A Yeah, there's a -- there's a lot of volatility in the data on these sorts of metrics.
Q Well, you didn't even look at the laying hen information, it's not even in your report or your index, so I'm just -- I think it's fair for me to assume you're not here to offer opinions on whether or not over time growers in this case received eggs from the same relative ages of hens?
A Yeah, there was a -- well, I'm -- I'm just thinking right now, there's three figures at the back of the -- of the Elam response to my report, and he -- there's just a tremendous amount of volatility in -- in average grower pay, average hen size, things of that -- and the average hen size relates to these genetics, and so there's plenty of information that there's volatility out there.
Q But you're not offering an opinion on that, right, you didn't -- there's not one here. I'm just

Page 305

trying to make sure we're clear --
A Yeah, all I've -- all I've -- you know, this is something I mentioned way back at the very beginning, we did not quantify the -- the -- the monopsony power dimension in this marketplace that's associated with -- with variability. The presence of these variabilities that are coming into the farm are evidence of -- of Tyson simply not -- not controlling that variability and passing on that risk onto the growers. Now, we did not quantify it, so we don't have to debate about what the impact is, because it's very hard to quantify that kind of risk assessment.
Q But what I'm saying is you didn't actually -- when you -- when you use the term variability, you mean variability in whether I got the same breed as you, for example, right; is that what you're talking about?
A Yeah -- well, more of the end result, sort of the average hen size, for example. There's average hen size at the end of the tournament, there's just a lot of variability that is partly related to the genetics, partly related to the feed quality, and there's variability in those.
Q You're not an expert to make that opinion, that

Page 306

it's related to genetics and feed quality?
A Oh, I'm --
Q You're never -- you've never been in a poultry science environment anywhere?
A Yeah, but I've read -- it's -- it's fairly -- it's fairly straightforward, and there's been improvements in feed technology over the years, and there's been -- there's been technology improvements in hen genetics and this stuff's changing and --
Q Yeah, but you're not -- you're not qualified to opine whether farm management practices, the type of breed, the type of feed, what sort of -- when you mix all that together, what's the most important factor, what drives what, you're just -- you're not here to opine on that?
A No.
Q Fair enough?
A Yeah.
Q Okay.
A But, I mean, I'm not -- I'm not -- I'm not ignorant of those -- of those issues as well. Just because I'm not a specialist doesn't mean --
Q Just covering what --
A -- I can't --

Page 307

Q -- just covering what you're offering opinions in in this case, and you're not offering opinions in this case about that, because it's not in your report, and that's all I'm trying to do is just make sure --
A Okay.
Q -- we're on the same page there.
A Well, I'd have to go back and look at every paragraph in my report again to see if I didn't say anything. It's -- I would want to -- and also I have the supplemental report that I just submitted.
Q And you've not quantified any damages based on any sort of variability of inputs to the growers?
A We didn't quantify that, no.
Q Okay.
A Even though it -- it is a -- a problem.
MR. TATUM: Let me check something here.
BY MR. TATUM:
Q Do you agree with me that the plaintiffs in this case have a financial stake in the outcome of it?
A I don't really know what that would be, but there's something -- they get -- they get something and the lawyers get something and -- I have no -- I have no idea how that works out and how it will be worked out.

Page 308

Q Do you agree that reliance on depositions, as a -- as a person of science, could be suspect, because it's not based on empirical facts and evidence? That really -- go ahead.
A I -- I've been involved in -- in several cases where I've read deposition testimony, I'm aware that there's -- there's -- you're looking for something there that is -- you're looking for lots of different people saying the same -- similar things and try to make an assessment of -- of that.
Q I know, but, for example, we talked much earlier where you have Charles Morris saying my out-time was supposed to be this, but we've got other people saying I was supposed to get five flocks a year --
A Yeah.
Q -- that would indicate unreliability based on what you just said, correct?
MR. WHITFIELD: Objection to form.
THE WITNESS: The -- well, here again, that -- there -- there may be more conversations between counsel and plaintiffs that I'm unaware of. I'm relying on that Charles Morris comment, yes, but I've also been instructed by counsel for what -- what parameters to use there and --
BY MR. TATUM: