# Exhibit 29

# Expert Report of Dr. Walter Thurman

CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

CHARLES MORRIS, *et al.*,

Plaintiffs,

v.

TYSON CHICKEN, INC., *et al.*,

Defendants.

Case No: 4:15-cv-00077-M

**EXPERT REPORT OF WALTER N. THURMAN**

August 30, 2019

**Table of Contents**

**I. INTRODUCTION** .......... 1

**A. Qualifications** .......... 1

**B. Assignment** .......... 1

**C. Overview of the allegations and of Professor Stiegert's opinions** .......... 2

**II. SUMMARY OF OPINIONS** .......... 3

**III. OVERVIEW OF THE BROILER INDUSTRY** .......... 4

**A. Chicken supply and production** .......... 5

**B. Chicken demand and consumption** .......... 6

**C. Vertical integration and contracting** .......... 7

**IV. CLAIMED MONOPSONY POWER AT TYSON'S ROBARDS COMPLEX** .......... 9

**A. Growers can and do sell their services to Perdue's Livermore complex** .......... 10

**B. Growers can and do sell their labor services to other employers** .......... 14

**C. Growers can and do put their capital to alternative uses** .......... 16

**V. CLAIMED ENHANCEMENT OF MONOPSONY POWER AT ROBARDS** .......... 17

**A. Entry of new growers is inconsistent with enhancement of monopsony power** .......... 18

**B. Asset prices and appraised values are inconsistent with enhancement of monopsony power** .......... 20

**C. Access to borrowed funds is inconsistent with enhancement of monopsony power** . 21

**VI. CLAIMED EXERCISE OF MONOPSONY POWER AT ROBARDS** .......... 22

**A. Empirical evidence is inconsistent with the claim that Tyson has suppressed grower pay at its Robards complex** .......... 22

**1. Tyson's grower cost at the Robards complex is consistent with Tyson's grower cost at complexes that, according to Professor Stiegert's benchmark, are "competitive"** .......... 22

**2. Grower base pay at the Robards complex has kept pace with pay in the agricultural sector** .......... 26

**B. Professor Stiegert's claims regarding grower pay volatility and Tyson's tournament system are incomplete and misleading** .......... 29

**1. The economic rationale for tournaments in the broiler industry** .......... 29

**2. Professor Stiegert ignores important sources of risk in broiler production** .......... 33

**3. Tyson's contracts with Plaintiffs provide additional grower benefits** .......... 41

**4. Tyson's tournament system has reduced volatility in Plaintiffs' pay since 2010** .......... 43

**C. Professor Stiegert's claim that Tyson "disadvantaged" Plaintiffs relative to other growers is without economic foundation ........ 46**

**VII. ASSESSMENT OF PROFESSOR STIEGERT'S DAMAGES CALCULATIONS ..... 47**

**A. Assessment of Professor Stiegert's damages based on suppression of grower pay .. 48**

**B. Assessment of Professor Stiegert's damages based on "days-out" ........ 50**

**C. Assessment of Professor Stiegert's damages based on condemnation ........ 52**

# I. INTRODUCTION

## A. Qualifications

1. My name is Walter N. Thurman. I am a William Neal Reynolds Distinguished Professor of Agricultural and Resource Economics at North Carolina State University. I conduct research and teach courses in agricultural markets, economic theory, and econometrics. I have authored articles in the leading economics and agricultural economics journals, and I am the author of a book on agricultural policy and its environmental consequences. I am also the recipient of multiple awards for published research from the Agricultural and Applied Economics Association (AAEA). In 2010 I was elected a Fellow of the AAEA, which is an award for outstanding continuous contributions to the advancement of agricultural economics. I have published research on the broiler industry and the use of the tournament system to compensate growers in that industry in a variety of academic journals and industry publications. My curriculum vitae is included as Appendix A. I have previously testified at trial as an expert in agricultural economics. A list of the cases in which I have testified at deposition or trial during the past four years is included as Appendix B.

## B. Assignment

2. I have been asked by counsel for Tyson Chicken, Inc., James Gottsponer, and David Mears (collectively, "Tyson") to provide economic analysis of claims by certain individual chicken growers who contract with Tyson at the Tyson chicken production complex in Robards, Kentucky ("Plaintiffs").[1] In particular, I have been asked to respond to the opinions offered by Plaintiffs' expert, Professor Kyle Stiegert, that: (1) Tyson has monopsony power at its chicken production complex in Robards because it is the sole buyer of services offered by chicken growers who contract with Tyson at that complex; (2) Tyson has contracted with growers in a manner that further entrenches its monopsony power at the Robards complex; and (3) Tyson has exercised its monopsony power to suppress grower pay, increase the volatility

---

[1] Plaintiffs' First Amended Complaint and Jury Demand, *Charles Morris et al. v Tyson Chicken, Inc., et al.*, 4:15-cv-00077-JHM-HBB, July 30, 2015 ("Complaint").



Confidential - Subject to Protective Order

108. Second, Professor Stiegert's "days-out" damages appear to be based entirely on a conversation with Plaintiff Morris in which Professor Stiegert was told that Tyson had represented to all Plaintiffs that it would ensure a certain time between flocks. At most, this might be relevant to Plaintiff Morris's damages. However, Professor Stiegert apparently used this information as the basis for his calculation of "days-out" damages to all of the Plaintiffs in the case, which indicates that his "days-out" damages approach is not reliable.[161]

109. Moreover, I do not have insight into Professor Stiegert's conversation with Plaintiff Morris. I have reviewed Plaintiffs' grower contracts with Tyson, and they state that Tyson will provide the grower with five flocks per year on average when certain conditions are met. As Figure 12 illustrates, the settlement data demonstrate that Plaintiffs, with a single exception, received five or more flocks per calendar year on average for the full years during which settlement data are available (2011-2018) and Plaintiffs contracted with Tyson. The single exception is Plaintiff Clapp, whose average is slightly less than five per year (4.75) because he received three flocks in 2012. Excluding 2012, Plaintiff Clapp's average number of flocks per calendar year is five.

**Figure 12 – Plaintiff average flocks per calendar year[162]**

| Plaintiff | Plaintiff Avg. |
|---|---|
| Doug Brown | 5.13 |
| Chris Burch | 5.00 |
| Dennis Clapp | 4.75 |
| Keith Crabtree | 5.00 |
| Loi Hong | 5.33 |
| Calvin Leisure | 5.13 |
| Charles Morris | 5.06 |
| Mike Murphy | 5.06 |
| John Pinkston | 5.25 |
| Sondra Rickard | 5.00 |
| William Rickard | 5.08 |
| Tim Vincent | 5.13 |

[161] *See, e.g.*, Rickard Deposition, p. 92 ("Q. You understood Tyson would determine how often to give you birds under the contract? A. Yes. Q. And you understood that Tyson's contract was five flocks per year? A. Yes.").

[162] Robards settlement data. I calculate the number of settlements in which each Plaintiff grower ID appears in each calendar year during 2011-2018. I then take the average over those calendar years for each Plaintiff grower ID. In taking these averages, I exclude 2016-2018 for grower 5161 (Charles Morris, BD Luck) because this farm's contract was subject to termination beginning in 2015. Morris Deposition, pp. 200-202. I also