# Exhibit 46

# Deposition of Loi Hong

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

________________________________

DEPOSITION OF LOI MOC HONG
FEBRUARY 27, 2018

\- - - -

Videotaped deposition of LOI MOC HONG held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:37 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.

Page 2

I N D E X


| WITNESS | | PAGE |
|---|---|---|
| LOI MOC HONG | | |
| Examination by Mr. Tatum | | 4 |

EXHIBITS

| | | |
|---|---|---|
| 1 | Broiler Production Contract, Bates HONG001537 and TYSON_116659 through _116698 | 112 |
| 2 | Composite of Photographs, Bates TYSON_167589 through _621 | 132 |
| 3 | Photograph, Bates TYSON_167622 | 146 |
| 4 | Photograph, Bates TYSON_167623 | 147 |
| 5 | Letter dated September 18, 2013, Bates HONG000142 | 149 |
| 6 | Letter dated January 23, 2014, Bates HONG 000346 and _347 | 150 |
| 7 | Letter dated January 30, 2014 | 151 |
| 8 | Letter dated April 23, 2014, Bates HONG 000349 | 152 |
| 9 | Letter dated September 26, 2014, Bates HONG 000308 | 153 |
| 11 | Tyson of Robards, KY Grower Meeting Agenda dated June 5, 2014, Bates HONG 000329 | 154 |
| 10 | Handwritten Note dated July 13, 2015, Bates HONG 000112 | 155 |
| 12 | Composite of Settlement Documents, Bates TYSON-078100 through _078285 | 168 |
| 13 | Composite of Certificates, Bates TYSON-120450 through _458 | 173 |
| 14 | Property Damage Release, Bates HONG 000113 and _114 | 176 |


Page 3

A P P E A R A N C E S

John C. Whitfield, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Also Present: Mr. Todd Davis, Videographer

Page 4

VIDEOGRAPHER: This is the videotaped deposition of Loi Hong on February 27, 2018 at the time indicated on the video screen, which is 9:37 a.m.

Full introduction has been waived. Would the court reporter please swear the witness.

\- - - -

WHEREUPON,

LOI MOC HONG

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. TATUM:

Q Would you please state your full name?
A My first name is Loi, last name Hong, and middle name is Moc.
Q How do you spell Moc?
A M-o-c.
Q Where do you live?
A In Henderson, Main Street.
Q Henderson, Kentucky?
A Yes.
Q What's the address?
A 1629 South Main Street, Apartment 131.
Q How long have you lived there?
A I moved there in June.

Page 73

Q That was just something you felt was a good idea by talking to BB&T Bank?
A I told them, I don't make enough money, and you know, I need money to keep up the place and negotiate, so I need some cash.
Q Okay.
A Because they ask me why -- I think they ask -- seems like they ask why you need to refinance it. I say I need cash, you know, to do this, to do that, and when BB&T approached me, then that's why I think it's a good idea. That's all.
Q Who was the service tech?
A Who was at that time?
Q Yeah, that you were talking about that you talked to.
A I think I talked to Ruben.
Q Rufus?
A Ruben.
Q Do you know Ruben's last name?
A Bruce.
Q Bruce?
A Yeah.
Q When you -- do you remember when you got your first flock?
A Was October. It was end of October.

Page 74

Q Of 2013?
A Yes.
Q And when you receive a flock, it's for all eight houses, right? That's what we're talking about when we talk about a flock of chickens, filling up all eight houses?
A At one time?
Q Yeah.
A Two different days, yeah.
Q Right, but one period of time you get them all filled up?
A Yes. Yes.
Q And you manage all the chickens at the same time in all eight houses?
A Yes.
Q And was it that way the whole time you contracted with Tyson?
A What do you mean by contracting?
Q The whole time that you grew for Tyson?
A Oh, yes.
Q Prior to receiving your first flock, were you required to make any upgrades to the houses?
A Like if anything broke down, you're saying?
Q I'm sorry?
A Are you asking like if anything broke down in the first flock?

Page 75

Q Prior to receiving the first flock -- after you bought the houses, prior to receiving the first flock, were you required by Tyson to make any upgrades to the houses?
A No.
Q Were you required to make any repairs to the houses?
A No.
Q Did you make any upgrades or repairs to the houses?
A Yes.
Q What upgrades did you make?
A Lightbulb, motor.
Q Lightbulbs, and what was the second one?
A Motor, fan motor.
Q Fan motor. Anything else?
A That's all I recall.
Q So you had to replace some lightbulbs?
A They always broke down. Always --
Q All the lightbulbs?
A No, not all.
Q So you had to replace some?
A Yeah. Every flock we have to do it.
Q So you knew when you bought the houses some lightbulbs needed replaced?
A Oh, yes.

Page 76

Q You knew when you bought the houses that the fan motor was broke down?
A No, fan motor was running. They old. If they broke down, they broke down.
Q So you had one that you had to replace before you got your first flock because it broke down? Why did you replace a fan motor before --
A When a fan motor is broke down, you're going to change it, a new one.
Q Why did you replace the fan motor before your first flock?
A Oh, before, no, no.
Q Later?
A It's in the flock. I mean it's in the flock, when it broke down, and I have to replace it.
Q Got it. The only thing you did to the houses, from a repair upgrade standpoint before you got your first flock, was change some lightbulbs?
A Yes.
Q Before you got your first flock, did you get any help with anyone to get the houses ready to receive chickens?
A What do you mean by anyone? My helper, yes.
Q So you had an employee?
A Yes.

Page 85

Q Every five flocks?
A Mm-hmm.
Q So prior to your first flock, prior -- at some point you signed a contract with Tyson, right?
A Yes.
Q You bought the land, bought the property. Did you bring Hoang up to work for you before you signed the contract to get everything ready?
A Yes.
Q And did you hire Nathan to get everything ready for your first flock before you signed your contract?
A The last owner will get the litter ready for me. Me and Hoang just put out a trade, prepare for the first -- what we need for the first flock, and after that I let Nathan take care of that.
Q Did the last owner live on the property?
A To choose, I don't know exactly. He told me he was in and out.
Q Did you live on the property the whole time you owned it?
A Yes.
Q You did?
A Yes, I did.
Q Did you have any other employment besides poultry business?

Page 86

A Can you rephrase that?
Q Besides raising chickens, did you have any other employment?
A At that time?
Q Mm-hmm.
A No.
Q Fair to say your sole employment and sole source of income was the chicken business --
A Yes.
Q -- as of October of 2013?
A Yes.
Q At the time that you got your first contract with Tyson, do you remember where you were when you signed it?
A On my farm.
Q And who brought it to you?
A Ruben.
Q And what's Ruben's last name?
A Bruce.
Q Had you had any further discussions with anyone at Tyson about what that contract might be, what it meant or anything along those lines before Ruben showed up?
A No.
Q And so when Ruben showed up, he brought you a contract?
A Yes.

Page 87

Q You had purchased the farm, got your help ready, et cetera?
A Yes.
Q Did he tell you anything about what the contract meant?
A No.
Q Did you take the contract and have it reviewed by anybody?
A No.
Q Did you talk to him about how the pay system worked?
A I remember I did. I asked.
Q And what did he say?
A He say you the owner. You decide what you want, which one you want to sign.
Q He gave you the option to signing a tournament contract and a performance contract?
A Yes.
Q And you chose the performance contract?
A Yes.
Q And why did you choose the performance contract?
A Because I'm new in business, and I don't want to go against with everybody.
Q So you thought it would be better for you not to compete weekly with other settlers?

Page 88

A Yes.
Q Did he recommend one or the other?
A No.
Q Did you talk at that time about how often you would receive -- up to the point you signed your contract, did you ever talk with Tyson to how many flocks you'd get a year?
A When the first time I meet with Ken and Jared, they already told me at least five flock, and sometime is six because it fall in to --
Q They said you'd get five minimum?
A Yeah.
Q Did you talk to them about how many birds you would get per house?
A By that time I didn't know what to ask.
Q I understand, but I'm just asking if you had any conversation about it.
A No.
Q Did you have any conversations prior to signing your contract about how many birds you might get?
A The last owner told me that, but I didn't ask Tyson.
Q What did the last owner tell you?
A It's 20 -- 23,800 per house.
Q And did he tell you that was an average number?

Page 89

A Yes.
Q And that was eight houses?
A Yes.
Q Are all the houses the same size?
A Yes.
Q What's the square footage of the houses?
A Forty-three, 510.
Q 43 by 510?
A Yeah.
Q Is that interior space or exterior?
A The truth, I don't know.
Q You're not sure?
A No.
Q Did you have any discussions with anyone at Tyson before contracting about how many birds per square foot you would get?
A No.
Q Did you have any discussions with Tyson before contracting about the type of birds you might get?
A I didn't discuss to them about it, no.
Q Did you have any discussions with anyone at Tyson about -- by type I mean breed. Did you have any discussions about the breed of birds?
A By that time I don't even know what kind of bird -- how many different kind of birds they have. I don't

Page 90

know.
Q Understood. So you had no discussions with Tyson about that?
A No.
Q Did you have any discussions with Tyson about out time and how long out time would be between flocks?
A Yes, they did tell me. They say 21 day.
Q Told you 21 days?
A Yes, sometimes more.
Q Did you understand if it was over 21 days you'd get paid for that under your contract?
A They didn't tell me that.
Q Did you understand that there was a minimum out time in your contract?
A What do you mean by a minimum?
Q Did you talk at all with them about whether there was a minimum out time required?
A At the time I didn't know, and they told me it was 21 day, going to be minimum, I mean -- let me try to remember.
Mostly it's 21 day. Sometime it more.
Q So they told you -- the one conversation you recall having before your contract about out time was someone from Tyson told you 21 days is usually the minimum, sometimes more?

Page 91

A Yeah.
Q Did you care whether the out time was 21 days, more or less?
A I didn't know. And for that time I trusted Tyson. Whatever they say, I just listen.
Q Did it matter to you whether it was 21 days, 14 or 20?
A The truth, I don't know if it matter or not because I'm not in the business yet.
Q Understood. So what they're telling you about out time didn't matter to you --
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q -- at the time you signed the contract?
A Yes. Put that way, yes, don't matter.
Q Did you discuss, prior to signing your contract, with Tyson, anything about culling requirements?
MR. WHITFIELD: I'm sorry. What?
BY MR. TATUM:
Q Did you have any discussion with Tyson personnel, prior to signing your contract with Tyson, about any culling requirements.
A I didn't really understand that question.
Q I'm just trying to understand if you had any conversations with anyone at Tyson, up to the point you

Page 92

signed your contract, about culling?
A Like backward?
Q Yeah.
A Yes, I think they mention about it. They say if bird is not healthy enough, you have to be culled -- you have to be cleaning up, put in that word.
Q So they told you culling is part of growing birds?
A Yes.
Q Do you remember anything else talking about that subject?
A I think they did mention about it. And I just said okay. If I have to do it, I have to do it.
Q Okay. Do you remember having any discussions with them about litter management between flocks?
A We didn't talk about it, but they say birds you have to clean up, prepare for new birds coming in.
Q They said during the out time period you've got to clean the barn up and prepare for new birds?
A Yes.
Q Did you have any discussions with them about your condemnation process prior to signing your contract?
A We didn't discuss about it.
MR. TATUM: Do you want to just take a break for lunch.

Page 93

MR. WHITFIELD: Do that.
VIDEOGRAPHER: This is the end of Disk 1. The time is 11:41. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: This is the beginning of Disk 2. The time is 12:56. We're back on the record.
BY MR. TATUM:
Q Mr. Hong, the first flock you said was October of '13?
A Yes.
Q When was your last flock?
A Last flock in is December 24 of 2016.
Q Is that the settlement, or is that the placement date, December 24?
A The sale date, the pickup, yes.
Q Between those two periods, did you make any further upgrades to your farm?
A Yes.
Q What other upgrades did you make?
A I changed all the lightbulb to LED. I changed all the cable to stainless steel -- most of the cable, not all of it. And that's -- I'm trying to think. And fix the feed line. I didn't change it. I fixing it. Whatever is broke, I replace a new one, new bulb in. And I repaired some of the floor. And I put dirt outside the house around

Page 94

the house, all eight houses. I fix the barn. I fix the water house.
Q Is that it?
A And upgrade the computer system.
Q Anything else you can recall?
A I think that's all I can recall.
Q Why did you change all the lightbulbs to LED?
A Because LED is -- sent more power, and it -- the term of life longer.
Q Did you do that in all the houses?
A Yes, all the lightbulb.
Q Did you do that yourself or have someone do it?
A I have someone -- I pay someone help me to, and I do it too.
Q One of your workers or someone else?
A One of the worker and somebody come in and help me, too.
Q Did Tyson tell you to do that, or is that something you wanted to do?
A No, something I wanted to do.
Q Do you know how much you spent on that?
A I spend on lightbulb probably around $7,000. And labor, I pay myself -- myself I didn't pay. My employees already paid. I paid around $600 to help me do it.
Q 600 additional?

Page 95

A Yeah, additionally.
Q And cable to stainless steel, what are you talking about there?
A Like most of the cable is galvanized, and in chicken house moisture. They break easy. For stainless steel, the water cannot get in that much, reliable more.
Q So what are the cables used for? What are we talking about?
A Like cable used for the feed line, the water line, the tunnel door.
Q To hold them up?
A To -- yeah, to hold them up and to raise them up, bring them down.
Q Did Tyson tell you to do that?
A No.
Q You did that to get better climate, less water?
A Yes. Better for us.
Q Did you do it for all eight houses?
A Yes.
Q What did you spend on that?
A The cable itself, they charge by feet, forty-cent a feet. $2,500 on the cable itself. And that's only me and my worker doing it.
Q You said you fixed the feed line. Which house?
A The feed line, I didn't change it. I fixing it.

Page 96

Like some bolts broken, and it have holes so we have to replace a new bolt and this and that.
Q Okay. So that was things that were wear and tear?
A Yeah. Wear and tear, yes.
Q Tyson -- did Tyson tell you to do that?
A No.
Q What about you said you repaired some of the floors. What was wrong with the floors?
A Floor is like -- some of the floor, it leaking in. Then I have somebody to pour those things and compact it so there's no water going in.
And I did the outside. I put more dirt around the house so prevent water to get into the house.
Q So you had water leakage into the house?
A Yes.
Q Coming up through the floor and then also through the sides?
A Yes.
Q And water leakage is obviously something you want to control inside?
A Yes.
Q It negatively affects bird health and bird growth?
A Yes.

Page 101

meeting specification?
A I didn't know.
Q Did you later find that out?
A I find out when they told me to do the nipple.
Q And were you having problems with your birds getting water?
A Well, a few. I didn't have no problem. I didn't know.
Q You just didn't flow?
A No.
Q That's what they were telling you, that your birds weren't getting water?
A No, the birds getting water, but they say not enough nipple for the bird.
Q Right. The birds weren't getting enough water because there weren't enough nipples for the number of birds?
A Yes.
Q And so you made those changes?
A No, I didn't make those changes.
Q You never made the water line changes?
A No. I didn't have a chance to make water line changes. I was working on the feed line. I want to change the feed line first. Then I was making a loan for the feed line, but I didn't have a chance to do it. They approve

Page 102

everything, but then Tyson just power up with like all kinds of change in the house, and I added it up to like $650,000, and I cannot do that.
Q Tyson also was concerned that your houses had holes all over them; right?
A When they say the ceiling have holes, yes, we do that. Nathan coming in and helping tape all the hole, and we work on it.
Q And Tyson was concerned that the houses were getting water coming up through the houses too; correct?
A Yes. And the water was -- is all way coming in as before. Water coming in. I told you I fix the floor a few years -- a year and two years and come back.
Q Right. So you had a water leakage issue in the house the second time?
A Yes.
Q Did Tyson make any recommendations to you about how to fix the water leakage problem?
A They just say put dirt into it.
Q Who told you that?
A David Dickey and Jim.
Q And did you -- you did that one time. Did you do it the second time?
A I did some spots. I didn't do the whole house. They asked me to do the whole house. And I asked them who

Page 103

you recommend to do it. They go, I don't know. You have to find out.
Q Is there a reason why you couldn't do it?
A It's a big job.
Q You -- you didn't work your farm full time, right?
A No, I work my farm full time. I live there.
Q I understand you lived there, but you didn't raise the chickens full time. You had someone doing it for you?
A I raise the chickens full time.
Q Did you understand that Tyson felt like your houses had gotten in such disrepair that it was affecting bird health and bird quality?
A I didn't know. I think my house was better than before I bought it.
Q Did Tyson ever tell you they felt like your houses were in such disrepair they were causing animal welfare concerns?
A Before they tell me that, David Mears coming down say the farm is looking better, looking good. That's before they sell me out they mention that.
Q So --
A Then when they start ordering me to upgrade all kind of things, and they start -- say that is no good for

Page 104

animal welfare, this and that.
Q And you were having high mortality and high condemnation on your farm, weren't you?
A I don't know.
Q So you quit growing. You took your last settlement in December 2016?
A Yes.
Q Do you still own the farm?
A Yes, right now still own the farm. The bank is already sue me, go to court for that.
Q Do you still live there?
A No. I moved in 2017.
Q So the farm is not being operated in any way right now?
A No.
Q Are the chicken houses still there?
A Yes.
Q Have you done any work to the chicken houses since you took your last flock in December of 2016?
A I trying to repair, trying to do whatever they ask for to bring the bird back in, but they keep delaying it, and finally they say -- they give me the whole list. They say, you've got to do all that before we bring the bird back in, and without the bird, I cannot survive there.
Q What list did they give you?

Page 117

going to affect you one way or the other from a money perspective?
A No, I didn't know that.
Q You didn't know one way or the other?
A Yes, they just come in and had me sign, then they say this need to be signed today, so then I just signed.
Q Okay. Did you have it reviewed by anyone before signing?
A No.
Q And if you go to the next document 116690, that's another amended Schedule A. And if you look at the last page of this one, this one is on October 10, 2014. Is that your signature there on the last page?
A Last page?
Q Yes, sir. It's Tyson 116698.
A Yes. That's my signature, yes.
Q Do you remember signing this amendment?
A I see my signature, and I know that I signed it, but you asked me to remember exactly, I don't.
Q Do you remember having any discussion with anyone at Tyson about what the purpose of this amendment in October was?
A Usually the tech just bring down and say you need to sign this and that and this and this, and I just sign.
Q Do you understand that the purpose of the

Page 118

amendments was, they were increasing pay to you?
A I didn't know.
Q You don't know one way or the other?
A No.
Q Are you aware of any other amendments or contracts you signed with Tyson while you grew with them?
A The only -- the only thing I know that I signed contract with Tyson is Tyson provide me chicken, bird so I can make my living because I trusted them at the beginning, so even worry what need to be signed because I already trusted them. They've been good to me, you know. That's why I trust for.
Q I understand. My question was, other than what we looked at in Exhibit 1, are you aware of anything else you signed in relation to your contracts with Tyson? I'm just trying to make sure this is everything, or you think, no, there was another contract or there was another amendment or something like that.
A Not that I know of.
Q Have you notified Tyson that you no longer intend to grow with Tyson?
A Notified them. I told them I cannot afford to do all the things that they asked to, and trying to release, pay the bank. I did notify them that.
Q So you notified them, I can't -- I'm not going to

Page 119

make these upgrades.
A I cannot make the upgrade. I have no money to do that.
Q And so did you tell them, therefore I'm not going to do this anymore?
A I asked them, you know, if you -- you can help me with it or you can do something about it, and they say no.
Q And who did you talk to?
A Jim, David. Jim and David Mears, who was there too.
Q Jim Gottsponer?
A Yes.
Q And David who?
A Dickey.
Q And Mears.
A Yes.
Q And they were telling you that you had an animal welfare issue at your farm, and some upgrade is needed to be -- happen to keep getting birds; correct?
A Yes, I believe they say that.
Q And you said, I can't do the upgrades?
A I told them I don't have the money to do it.
Q And they told you that they could -- if you could do some of the upgrades, you could do the water lines over time; correct?

Page 120

A No.
Q You don't recall that?
A No.
Q You even got a letter saying that. Do you remember that?
A Could you rephrase that?
Q Do you remember getting a letter saying that the water lines could be put on hold if you got these other things done?
A Yes, I think I recall that.
Q So the things that they thought you immediately needed to do to begin taking more birds again were what? What were the things that you understood that you needed to do immediately to get more birds?
A They wanted me to fix the floor. They wanted me to fix the feed line. And the floor, the time they asked me to do it is in the wintertime, and everything is wet, cannot do it. Have to wait until summer so the floors dry up so we can compact them. And they need that to be done right away, and that's impossible to be done right away because everything is wet outside.
Q So they needed the floor done right away. What else?
A Feed line done right away.
Q Anything else?

Page 121

A I think that's -- that's what I recall. That's all.
Q Those are the two things you recall that they were saying, these need to be done right away to get more birds?
A Yes.
Q And what did you understand they were saying was wrong with the floor?
A They say water is seeping in.
Q So you needed to eliminate the water, right?
A Yes.
Q Because water causes bad paws, bad climate, all kinds of issues for the birds; right?
A Yes.
Q And you were having high mortality at your farm and animal welfare issues; correct?
A Yes.
Q And you were having high condemnation at your farm because of all these issues, too; correct?
A Yes.
Q And so the water seepage issues was important for bird health. Do you agree with that?
A I agree with that.
Q And then the feed line, what were they telling you you needed to fix on the feed line?

Page 122

A They need to be changed.
Q What did they want it changed from and what to? So what did you have, and what did they want changed?
A Everything new.
Q They said you needed a new feed line?
A Yes.
Q And why did they say you needed a new feed line?
A For the feed conversion better.
Q They said your birds were converting -- eating too much feed or too little feed?
A Eating too much.
Q Eating too much. And so that was killing your performance; right?
A Yes.
Q And they were saying you could -- you could perform a lot better if your feed lines better regulated the feed; correct?
A Yes.
Q Did they want you to change the feed lines in all eight houses?
A Yes.
Q And when we talk about feed lines, what are we talking about?
A 200,000.
Q $200,000?

Page 123

A Yes.
Q But what are we talking about as far as what you had? What did they want you to change to? Was there a new system they wanted you to do that's different from what you had, or did they feel yours wasn't operating correctly?
A They just wanted -- for what I feel, they just wanted a new system in there.
Q What they were telling you was, they didn't think yours was operating the way it should?
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q Did they tell you that?
MR. WHITFIELD: Did they tell you that or not?
A They tell me what?
BY MR. TATUM:
Q Did they tell you yours wasn't functioning properly?
A Mine function properly, but when it's all broken, it's falling, but we tie it up, and I think that's modern then. The feed line is functioning rightly. Feed is coming when what needing to eat.
Q And so your feed line has been broken and things like that, you'd tie it up?
A We tie it up. We -- if the bowl will leak, we would change the new bowl.

Page 124

Q And they felt like those repairs weren't allowing it to operate as efficiently as it should. Is that what they told you?
MR. WHITFIELD: Objection to form.
A They told me -- they told me for a better conversion, I can use this kind of feed line for the new system they got, but what I feel, if the feed line is not working functionally, no feed in the bowl, then that is not working.
BY MR. TATUM:
Q So did they -- so you don't have any idea how much feed is supposed to be fed to the birds there a given day. You just know if feed comes down, it goes in the bowl, it's working? I mean, do you know how much feed a bird is supposed to eat in a day?
A What do you mean, how much --
Q Do you know what the recommended amount of feed is a given bird should eat in a day?
A The bowl -- the bowl is empty, automatically they fill up feed for the bird to eat.
I don't understand what the question is. Do I know the bird -- how much they eat a day? That's kind of like -- I don't really know exactly.
Q Do you know any parameters around that? You know, you can feed a dog ten bowls of food, or you can feed

Page 133

recognize that picture as a picture of your cool pad cells on house number one?
A Yeah, right now they look that.
Q And that's the condition they were in when you stopped receiving birds as well; correct?
A No.
Q No?
A Because the house is empty. That's why they're like that.
Q So your -- have you ever seen these photos before?
A No.
Q Do you know when they were taken?
A No.
Q Do you know who took them?
A No.
Q But you believe this is a picture post -- when do you think this picture was taken, or do you have any idea?
A Probably March and April.
Q Look at the next picture.
A Yes.
Q Do you agree that rats around the house cause problems for chickens and are evidence of entry into the farms?
A Yes.

Page 134

Q Did you have rat issues on your farms?
A Yes.
Q Did you do anything to fix that?
A Yes.
Q And when did you do something to fix that?
A Every -- every flock I put rat bait out. I try to kill them.
Q But they kept coming; correct?
A Yes.
Q The next picture is a picture of your cool cell pads on house one long view. This is -- is that in fact your house?
A This picture, the house empty probably three or four months, and cool pad to throw out.
Q So this would be somewhere around March or April of 2017?
A That's what I believe.
Q Were you present for any of these pictures?
A When they take this picture?
Q Yeah.
A No.
Q This is the state of the house -- this is the state the house was in after you missed one flock; correct?
A That's what I believe so.
Q Look at the next picture on Exhibit No. 2.

Page 135

That's a picture of a dead bird pile at your property. Is that your property?
A Yes.
Q What did you normally do with dead birds?
A Okay. This is when I fixing the -- the stack house, put compost. Remember I told you I raise up the floor. I cannot compost the birds inside. I ask them, I can bury the bird outside for a flock, and they said it's okay. That's why I did it, to fix the compost inside.
Q I understand, but these aren't buried. Do you understand that's a health issue not to have them buried? Do you understand that, that it's a health issue not to have them buried?
A Just go there?
Q Do you understand that you need to bury --
A Yes. I understand, yes.
Q You understand it can be a health issue if they're not buried?
A Yes.
Q Look at the next picture, which is labeled Tyson 167593. Are these -- is this a dead bird pile right outside your house, your litter shed?
A Yes.
Q These are not buried either; correct?
A I think it's the same spot.

Page 136

Q Do you have any idea when this was taken?
A No.
Q The next picture is Tyson 167594. Is this your tractor?
A Yes.
Q So that's the John Deere tractor you had bought?
A Yes.
Q And what's that attachment. Is that the leveler?
A That's the pulverizer.
Q What do you use the pulverizer for?
A We pulverize before we decake it.
Q So that's to pulverize the litter after the birds have been gone to then decake it?
A Yes.
Q That means take away the solid mass of litter; right?
A Breaking off the solid mass, yes.
Q Look at the next picture, 167595. Do you know when this was taken?
A No.
Q Within House 8, a picture of your pulverized litter? Do you know if that litter has been properly pulverized?
A What do you mean?
Q Do you have any idea what litter should look like

Q You mentioned those three service techs. Is there anybody else at Tyson that you ever had any interaction with?
A What do you mean by interaction?
Q I mean talk to. Did you ever talk with Jim Gottsponerer?
A Yes.
Q How about David Dickey?
A Yes.
Q How about David Mears?
A Yes.
Q How about Neil Barfield?
A I don't know who it is.
Q You mentioned Robert Bruce earlier.
A Ruben Bruce.
Q Ruben Bruce?
A Yes.
Q Can you think of any other names of Tyson folks that you had any dealings when you were growing with Tyson?
A Like different service techs?
Q Anyone else.
A A lot of techs coming out to the farm, like Bo, Neil.
Q I thought you just said you didn't know who Neil was.



A You said Neil --
Q Barfield.
A -- Barfield. I didn't know his last name, so I didn't know. But when Neil was a service tech, he come down to the farm a couple time.
Q Any other service techs you dealt with?
A And some new tech that's coming in. I can't remember their name.
Q Do you ever feel like Neil lied to you about anything?
A I never talked to Neil that much.
Q Did you ever feel like Bo McGuire lied to you about anything?
A He just substitute tech, so I don't talk much. He just come in and out.
Q So you never had any problems with either Bo or Neil?
A I don't have no problem with any techs at all.
Q Including Ruben and James and Jennifer?
A Yes.
Q And then you said you've also had contact with Jim and David Dickey and David Mears?
A Yes. When every time I try to request something, techs tell me to contact them, so I call them. That's all.
Q Did you ever have any -- can you think of anyone



else at Tyson you ever dealt with?
A Want a name?
Q Mm-hmm.
A Cecilia. Call Cecilia for appointment, this and that.
Q Cecilia was what?
A I call her for appointment, this and that.
Q Did you ever have any problem with Cecilia?
A Oh, no.
Q Did you ever have any problem with Jim Gottsponerer?
A What do you mean? You put in problem. Like what? I just talk to him. I didn't have no problem with him.
Q Okay. Did you ever have any problems with David Dickey?
A No.
Q How about David Mears?
A No.
Q Did you ever feel like they lied to you about something?
A No.
Q And that includes Jim Gottsponerer, David Dickey and David Mears, never felt like any of them lied to you about anything?



A I sign contract with Kenny. Kenny the one who promised me things.
Q So you never felt like Jim, David or David lied to you about anything?
A No.
Q And then you said that you signed your contract, and Ruben Bruce brought it to you?
A Yes.
Q Do you feel like Ruben Bruce ever lied to you about anything?
A No.
Q Ever have any problems with him?
A No.
Q And then you just mentioned Ken Bartley?
A Yes.
Q Did you ever have any problems with Ken Bartley?
A No.
Q Do you feel like he ever lied to you about anything?
A Promised me a lot, but nothing coming out.
Q What did he promise?
A Promised me that the paper I showed to him, he said was good. Two years later I have to refinance so my cash flow can be flowed and make a living.
Q Anything else?

Page 165

A That's all I can think of. That's good enough for me right now.
Q Do you -- do you understand that your potential returns is only as good as a grower as you are?
A I understand that.
Q Based on your -- so you grew birds for Tyson for roughly three years, a little over three years?
A Yes.
Q At this point in time, you have no intention of being back in the poultry business?
A Not really.
Q Did you, over your three years, develop a preference for which breed of bird you liked over another?
A What kind of breed that I like?
Q Mm-hmm.
A I didn't 500 -- probably I like the 500 more.
Q You mean Cobb 500s?
A Yeah.
Q Do you have any idea if you got any more or less Cobb 500s than someone else?
A I have no idea.
Q Did you develop any opinion as to what type of feed you liked?
A Well, do I have a choice?
Q I don't know if you had a choice or not.

Page 166

A See, they bring it in, they bring it in. I didn't have no choice.
Q Did you ever have any problems with feed at Tyson while you were working with them?
A Yes, always out of feed.
Q You'd run out of feed?
A Yes.
Q And you'd have to order more?
A We'd have to call, yes.
Q You had to call and get more feed; right?
A Yeah.
Q That would be you or your employees on the farm managing what the feed level is; right?
A Yes. We -- we check feed. We call them. We let them know that -- how much left, and should be coming, and then will come in late all the time.
Q How many times did you run completely out of feed?
A In flock?
Q Yeah.
A I -- I don't count, but at least ten.
Q So you ran out of feed ten times?
A Ten times, yes.
Q And in those ten times, how long were you out of feed?

Page 167

A Sometimes long, sometimes short, sometimes three hours, sometimes two hours, sometimes ten.
Q So at times it was two hours, and another time ten hours?
A Yes.
Q That's the span of time that these ten instances of running out were?
A What exactly can you --
Q I'm just trying to figure out the shortest amount of time. You said at least ten times you ran out of feed. You said sometimes two hours, sometimes ten hours.
A Yes.
Q I'm just trying to figure out, is that like the minimum and maximum times you ran out of feed?
A Oh, yes.
Q So you ran out of feed ten times, so -- and in those instances you were out of feed for somewhere between two and ten hours?
A Yes.
Q And then got feed back?
A Yes, feed truck coming in.
MR. WHITFIELD: We've been going about an hour and a half. Are you close?
MR. TATUM: Yeah, I am getting close, but let's take a break and maybe I can --

Page 168

VIDEOGRAPHER: The time is 2:34. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: The time is 1442. We're back on the record.
(Exhibit 12 was marked for identification.)
BY MR. TATUM:
Q I'll show you Exhibit No. 12. Exhibit No. 12 is a series of documents relating to one of your settlements in roughly February of 2016. And if you'd flip through it, the reason it's a big stack of documents is, I believe this represents documentation that you would receive in relation to a given settlement from Tyson.
So you'd receive your settlement paper, your feed tickets, your mortality cards and so on. Do you remember that?
A (The witness nodded.)
Q And take your time, if you want to, but this is one such packet.
A Oh, okay.
Q And if you flip through, for example, I believe in this set your actual settlement sheet is 78196, and this is for week ending March 5, 2016.
It's on the lower right, Tyson 078196.
A Zero seven --

Page 169

Q 078196.
A Okay. Yes.
Q Was it typical for you to receive, along with your settlement sheet, such as we're looking at for the March 5, 2016 settlement, your live scale tickets, your mortality cards, your condemnation certificates, each settlement?
A Can you repeat that?
Q So each time you received a settlement from Tyson and they paid you, they would send you a packet of information?
A Yes.
Q And that would include your settlement sheet?
A Yes.
Q And that would include your mortality cards from your farm?
A Yes.
Q And that would include the live scale tickets from the delivery of the chicken to the complex; right?
A Yes.
Q And that would also include your feed delivery information?
A Yes.
Q All right. That would also include your condemnation certificates --

Page 170

A Yes.
Q -- showing how birds were condemned and so on; correct?
And it would also include your invoicing information and payment information so that you knew whether you got paid and if something had been forwarded to the bank and so on; correct?
A Yes.
Q It would also include a recap summary that would tell you where you ranked with everybody else such as you see here on document Tyson 78197; correct? So in this particular flock, for example, you happened to rank ninth out of ten growers this settlement period; correct?
A Mm-hmm.
Q You were on a performance-based system; correct?
A Yes.
Q And that's what the next document, 78198 reflects is performance relative to that; correct?
A Yes.
Q And so this packet, Exhibit No. 12, is exemplary of the packet of information you would receive each settlement from Tyson; correct?
A Yes.
Q Did you ever go through any settlement packet you received from Tyson and determine that the numbers reflected

Page 171

in your settlement and ultimately your pay were not correct based on the heads placed at your farm?
A The truth, I don't know.
Q Okay.
A Whatever number on here, they give it to me, then I know that they gave to me because I don't see the number.
Q You never had occasion in any of your settlements with Tyson to think, wait a minute, they placed more or less heads at my farm than I'm being accounted for?
A No.
Q Okay. Did you ever have occasion to look at your settlements and say, wait a minute, they counted more or less mortality than I actually had for my mortality cards into my settlement?
A The truth, I didn't check that.
Q Did you ever have an occasion to say, wait a minute, they counted more or less feed delivered to my farm than what actually occurred?
A No, I didn't check that.
Q Did you ever say, wait a minute, they're miss counting the condemnation that actually occurred in my settlement?
A I didn't check that either.
Q So you never had occasion to believe, based on what you were paid under a settlement, that some part of the

Page 172

feed or the mortality or the condemnation or the head placements was wrong?
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q Wrongly calculated based on the records?
A The beginning work with Tyson, I already told you I trusted them. So whatever number they give it to me, and I believe in it.
Q And sitting here today, you can't think of an instance where you thought, I got charged more feed than was given to me or less feed than was given to me?
A I never thought of that.
Q And same with condemnation and mortality or head placement, never had an occasion in any of your settlements with Tyson to think, I got charged for more or less than actually happened?
A How do I know they charged me more or less? I'm not there when they -- when they counting it.
Q Understood. I'm just asking if you ever thought that.
A I never thought of it. I trusted them. I told you that.
Q And sitting here today, do you have any reason to think -- has anything changed in your mind to say now I have reason to believe it was miscounted here or there, and

Page 173

here's when?
A I cannot prove it. I can't say anything about it.
Q Okay. You talked earlier -- you can put that aside, restack if you want to.
(Exhibit 13 was marked for identification.)
BY MR. TATUM:
Q I'll show you a series of documents that we'll label Exhibit 13. Exhibit 13 is a series of certificates that may or may not have been provided to you.
So when I ask you, do you recognize -- did you ever receive a copy of Tyson's animal welfare training program?
A Yes. Jennifer come and read it to me.
Q She read it to you each year?
A I remember I only heard her once.
Q Do you remember when that was?
A Can't remember when.
Q If you look through -- go to a few pages down. It's Tyson 120454. Do you see that?
A Yes.
Q Is that your signature there under Farm Manager/Contract Grower?
A Yes.
Q And at that point in time -- it's dated April 28,

Page 174

2016 -- did you receive a copy of the animal welfare training at that time? If you don't recall, I'm just asking.
A I don't recall, but probably yes.
Q Okay. And it also says under number two you were verbally trained by the service technician assigned to my farm, which is listed up there as James Catlin?
A Yes.
Q And you recall receiving that training from him?
A Maybe, yes, but I don't recall that.
Q Similarly, if we go back to Tyson 120456?
A Yes.
Q This is dated December 19, 2013. Is that your signature under grower signature?
A Yes.
Q Do you recall receiving grower animal welfare training then as well?
A Yes.
Q And at that time your service tech was Ruben Bruce?
A Yes.
Q And he also provided verbal training to you on animal welfare issues?
A Yes.
Q And did you also go through and read the

Page 175

materials?
A He read it to me like -- I remember they read it to me right in front of me, and we go through that.
Q And then go to the last page, Tyson 120458. Is that your signature there at the bottom under grower signature?
A Yes.
Q And this is dated May 29, 2015, also a certificate of understanding signed by you that you received grower animal welfare training; correct?
A Yes.
Q And you recall receiving it then as well?
A Yes.
Q I skipped over one. There's one dated 12/18/13, Tyson 120457. Is that your signature there?
A 457, no.
Q That's not your signature there? You don't recognize that?
A No. That's Hoang's signature.
Q Do you -- I'm sorry. I meant to ask you if you recognize it as his signature.
A Yes.
Q And this indicates that at least he signed to receive that same training?
A Yes.

Page 176

Q Were you present when he received the same training?
A Actually, I'm not -- I'm not -- I'm not there when they taking training. I take mine, then I do my work. Then he takes his.
MR. TATUM: Okay. That's all I wanted to ask you about that.
(Exhibit 14 was marked for identification.)
BY MR. TATUM:
Q I'm going to show you Exhibit No. 14. Exhibit No. 14 is captioned Property Damage Release. It's a two-page document. On the second page, is that your signature there?
A Yes, that's my signature there.
Q And who's the witness signature, do you know?
A That's my helper, yeah.
Q What was his name?
A Nhan.
Q Pardon me?
A Nhan.
Q How do you pronounce it?
A N-h-a-n, Nhan.
Q This is dated July 16, 2015. It indicates that a payment was made to you for property damage. Do you recall what this is all about?

Page 177

A Property damage, the fan. They hit the fan.
Q Somebody hit on the fan?
A Yeah. To catch a bird, they back up, they hit the fan.
Q And so they came to you and gave you $1,114.55 to pay you for that damage?
A They fixing it. They paid for the bill.
Q Okay. So you had it fixed, and they paid the bill?
A Yes.
Q So they paid it in full?
A I think so, yes.
Q Okay. So was that resolved to your satisfaction?
A Oh, yes.
Q You mentioned earlier that you're in the process of dealing with the bank over your property. How much do you currently owe on it?
A Currently right now is 1.060 -- 59 exactly.
Q Is that with penalties and interest, or is that just the principal?
A That's what the last letter I received from the bank, so I don't know if that included or not.
Q You said you had refinanced it in 2016. Do you remember when? Early, late?
A I believe it was like end of 2015, beginning of

Page 178

2016. I can't remember exactly, but about the time there.
Q Where is that lawsuit pending that the bank has filed against you?
A Henderson.
Q Henderson?
A Yes.
Q Henderson County?
A Yes.
Q And it's still going on?
A Exactly, I don't know.
Q Do you have an attorney defending you?
A Yes.
Q Who is that?
A Santurn Fisburger.
Q An attorney there in Henderson?
A Yes.
Q You had also mentioned earlier that when you talked to the seller of your farm, that he told you that he thought you'd bring in about $420,000 a year?
A Yes.
Q And he said maybe you'd make about ten or 12,000 in profit from that after expenses?
A Per flock, yes.
Q Per flock, right. And so per flock, he thought you'd get about five flocks a year?

Page 179

A Yes.
Q So he thought you'd get about how much per flock?
A 10 to 12 to 15. He said 10 to 15.
Q And do you recall him breaking down that 420,000 per flock, or was it about 105,000 per flock -- or excuse me.
What was it per flock you thought you were going to get that was getting him to the 10 to 15?
A He said probably around 80,000 for the flock and add the litter that they sell, this and that, so it come to like 420 to 450 sometimes, if you fall into a sick flock or not.
Q So he told you you'd get about 80,000 per flock?
A Yeah.
Q About five flocks per year, maybe about 420,000 gross a year?
A Yeah.
Q And then after expenses that might make you 10 to 15 per flock a year?
A Yes.
Q So that's somewhere around 50 to $70,000, 75?
A Yes.
Q And then you said you showed that -- you wrote notes on that with those numbers and showed it to Mr. Bartley?

Page 180

A Yes.
Q And he said it looks doable?
A Yes.
Q Did you do anything once you started growing with Tyson to track what your actual expenses per flock was?
A I didn't wrote it down. We just spend, and I know that I have to put a lot of money in to keep the house up.
Q So can you tell me now, sitting here today, what your actual expenses were per flock with Tyson?
A Depend on -- what do you mean? Exactly, I cannot give you an exact number.
Q Can you ballpark it for me?
A Like you mean add everything up?
Q Well, I'm just trying to figure out -- I don't want you to guess, but did you do anything to track, you know, per flock these are basically what my expenses are running?
A I didn't write down to track it down.
Q So you didn't actually track your expenses per flock?
A No.
Q Did you track them annually?
A I just keep everything in receipt and I give it to my CPA.

Page 185

A Half flock pay. So one 21-day, then they pay you that much money if you request, and they count by square feet.
Q Right. So you had requested they give you an advance on your flocks halfway through?
A Yes.
Q All right. And so all this is doing is just accounting for the fact that once your final numbers were taken care of, they had already paid you $21,052.80, right?
A Yes.
Q So ultimately the check you received was $43,000, right?
A Yes.
Q Because you had already received $21,000?
A Yes.
Q And this is how -- is this typically how you were paid throughout your tenure with Tyson?
A Three year with Tyson, yes.
Q Have you contacted any other integrator since Tyson stopped placing flocks with you to try to start growing with them?
A No.
Q Why not?
A I don't know.
Q So you had no --

Page 186

A I'm losing my confidence after I didn't trust.
Q So you had no idea whether another integrator would take you or not because you never inquired?
A No.
Q Were you ever placed on an intensified management program by Tyson?
A Can you tell me exactly what you mean by that?
Q IMP letter or anything like that?
A IMP?
Q Notice of performance needing to be improved, anything like that ring a bell?
A Notice of performing, I don't recall.
Q Did you -- you said that you didn't have a separate business entity for your poultry farms; correct? It was all run through you, Loi Hong, sole proprietor?
A It is -- the farm is run to me, yes.
Q Did you have a D/B/A for it?
A What you mean, D/B/A?
Q Did the business have a name, or was it just Loi Hong?
A H&L Farm. I -- how do I say this?
Q H&L Farms and --
A H&L Farm and LLC, yes.
Q Is it still a current active LLC?
A I believe so.

Page 187

Q Do you have any other business operations besides chicken under that business name?
A In this year?
Q Yeah.
A No.
Q How about in the last four years?
A No.
Q When did you form H&L Farms?
A I can't remember exactly, but right after I got the farm.
Q Are you intending to keep that business alive, or are you going to close that business as well?
A Going to be closing.
MR. TATUM: All right. I don't have any more questions for you at this time.
THE WITNESS: All right.
MR. WHITFIELD: No questions. Thank you.
VIDEOGRAPHER: This is the end of the deposition. The time is 1515. We're off the record.
(Whereupon, the deposition was concluded at 3:15 p.m.)

Page 188

CERTIFICATE

I, Gina Hawkins, Registered Professional Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 27th day of February, 2018.

GINA HAWKINS
MY COMMISSION # EE 187382
EXPIRES: August 8, 2016
Bonded Thru Notary Public Underwriters

GINA HAWKINS, RPR