# Exhibit 49

# Deposition of Calvin Leisure

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

______________________________

DEPOSITION OF CALVIN L. LEISURE, JR.
FEBRUARY 28, 2018

- - - -

Videotaped deposition of CALVIN L. LEISURE, JR. held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:36 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.



I N D E X


| WITNESS | PAGE |
|---|---|
| CALVIN L. LEISURE, JR. | |
| Examination by Mr. Tatum | 4 |


EXHIBITS


| Number | | |
|---|---|---|
| 1 | Broiler Production Contract, Bates TYSON_116556 through _579 | 191 |
| 2 | Broiler Production Contract, Bates TYSON_116623 through _648 | 197 |
| 3 | Letter dated April 12, 2010, Bates LEISURE 002919 | 203 |
| 4 | Handwritten Letter dated April 23, 2011, Bates TYSON-113420 and _421 | 209 |
| 5 | Letter dated September 15, 2011, Bates LEISURE 002914 | 210 |
| 6 | Letter dated October 31, 2011, Bates LEISURE 002896 | 211 |
| 7 | Letter dated April 12, 2010, Bates LEISURE 002897 | 213 |
| 8 | Composite of Photographs, Bates LEISURE 003396 through _400 | 216 |
| 9 | Catch Crew Damage Report dated January 24, 2011, Bates TYSON-113458 | 220 |
| 10 | Composite of Settlement Documents, Bates LEISURE 000075 through _180 | 221 |




A P P E A R A N C E S

John C. Whitfield, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Also Present: Mr. Todd Davis, Videographer



VIDEOGRAPHER: This is the videotaped deposition of Calvin Leisure on February 28, 2018 at the time indicated on the video screen, which is 9:36 a.m.
Full introduction has been waived. Will the court reporter please swear in the witness.

- - - -

EXAMINATION

BY MR. TATUM:
Q Would you state your full name?
A Calvin Leisure. Calvin Luther Leisure, Jr.
Q What's your date of birth, Mr. Leisure?
A 4th of December, 1954.
Q Are you married?
A Yes.
Q What's your wife's name?
A Janice.
Q How long have you been married?
A Since 1974.
Q Do you have any children?
A Yes.
Q How many children?
A Two.
Q How old are they?
A '77 and '83.
MR. WHITFIELD: Born.

Page 17

A Yeah.
Q Gave you what's called a settlement?
A Yeah.
Q Do you know how much they settled for you to stop raising tobacco?
A It was around $10,000.
Q Per acre?
A No. It was around $10,000, my allotment. Weight was allotment -- like a base, and then over so many years.
Q So it was like $10,000 per year for so many years?
A No. No. Mine wasn't that much. Mine was -- I don't know. I'd have to pull the records. I couldn't tell you.
Q How many acres of tobacco were you --
A I raised around four, but I only owned one-acre base.
Q And so you chose to take the government settlement rather than continue?
A Yes.
Q You weren't required to take the government settlement?
A No.
Q Is there a reason why you chose to go ahead and settle out?

Page 18

A There's no more government support for it.
Q So you didn't get any subsidies and grants and things like that anymore?
A Right. No government support is the main thing.
Q And what do you mean by "government support"?
A They had an auction, and they give a bid price, give you a grade system.
Q And that went away?
A Yeah.
Q So you had to sell it on another market?
A Yeah, an open market like a contract.
Q And so that wasn't regulated by the government anymore?
A I don't know. I didn't do it, so I couldn't tell you exactly. It wasn't feasible for me to look at it, my size.
Q Just too small of an operation?
A Right.
Q What did you pay for the land when you bought it in 1979?
A Roughly $170,000 just for the land and place.
Q For the structures that were on it?
A Yes.
Q And that's for both plots?
A Yes.

Page 19

Q Did you pay cash or did you get a loan for that?
A Got a loan.
Q Is that paid off?
A One of them -- yeah, the original land, yes.
Q When did you pay that off?
A Roughly 1990.
Q When you bought the land, did it have a house on it?
A Yes.
Q Were both houses there that are there now?
A No, just one homestead.
Q And is that homestead still there?
A Yes.
Q Is that the one you or your brother lives?
A One my brother lives in.
Q And are any of the barns still there?
A Yes.
Q Do you still use those?
A Yes.
Q What do you use the barns for?
A Park the equipment in.
Q Were there any chicken houses on it?
A No.
Q Litter barns?
A No.

Page 20

Q Mechanic sheds, anything relating to your poultry business? Was any of that sort of structures on it?
A Just a -- our farm had, we called it a livestock/tobacco barn, and then a shop, 32-foot shop, homemade shop.
Q So the shop was there. You now use that in the poultry business?
A It's storage.
Q And you converted one of your tobacco barns for use with the chickens?
A No, just for equipment storage.
Q Okay. You said your brother helps you with the chicken?
A He does off and on. Not very much.
Q How many houses do you have on your property, chicken houses?
A Five.
Q Has it always been five?
A No. I had six at one time.
Q Did you originally start with six?
A Started with two.
Q Okay. And then built four more?
A Built two more, then two more general.
Q Okay. Then lost one?
A Yes.

Page 21

Q When did you build the house that you live in?
A That's a modular home. Purchased it about five years ago, roughly.
Q Where were you living before you put that on the property?
A At the other homestead.
Q Where your brother now lives?
A Yes.
Q So you built -- purchased a modular home, put it on the other tract and moved there?
A Yes.
Q How much did you pay for that?
A Around $60,000.
Q Is that paid off?
A No.
Q That was a loan?
A Yes.
Q How much do you owe on it?
A $45,000.
Q Who is that loan with?
A 21st Mortgage, I think it's called.
Q Is that a 30-year note?
A 20-year originally.
Q Have you refinanced it?
A No. I changed it to 10.

Page 22

Q When did you change it to 10?
A I originally filed the loan for 20, and then at the end I changed it to 10.
Q So it started out as a 10-year note?
A Yeah.
Q Okay. And so you got that loan about five years ago. We're talking 2013?
A Roughly.
Q Had it installed in 2013 and been living in it since?
A Yeah.
Q On the ten year note then you've got about five years left?
A Yeah.
Q And that note is solely for that $60,000 for that modular home?
A Yes.
Q You put $15,000 down?
A Yes.
Q And that's where you and your wife and your daughter and your grandson live?
A Yes.
Q Does anybody else live with you?
A No.
Q Are you responsible financially for your

Page 23

daughter?
A No.
Q She has her own job? What about the grandson?
A Yes, he -- she provides for him.
Q But they live in your house?
A Yes.
Q Do you have any dependents at this point in time?
A No.
Q So you got into the poultry business in about 1996?
A Yes.
Q And what led you to want to get into the poultry business?
A Because the other economics on the farm, tobacco, the grain, the cows, less and less.
Q Because you settled out with tobacco, right, and wasn't going to do that anymore?
A Right.
Q And you said the economics of running cattle weren't in your favor?
A It got to where it was more than I could handle physically.
Q And it was just getting to be hard work?
A More than I could handle, yes.
Q And then on the grain, you said the economics of

Page 24

that just wasn't working out for your acreage?
A Yes.
Q So you were looking to do something else with the farm?
A Yes.
Q Did you investigate anything other than the poultry business when you were looking for alternatives?
A I've looked at several alternatives through the years.
Q Such as?
A Dairy, when I was a senior in high school.
Q Did you get into dairy?
A No.
Q Have you lived on a farm all your life?
A Yes.
Q Been a farmer all your life?
A Yes.
Q When you were thinking about sort of 1996 or circa leading up to that point when you decided to get into the poultry business, if you were at a point in your life where maybe you were investigating other alternatives as well and honed in on poultry, did you look for any other options?
A That's when they come and give the spiel.
Q Who came in and gave a spiel?

Page 25

A Poultry companies.
Q Okay. So a poultry company came in and gave a spiel?
A Yeah, gave the whole county, the whole state.
Q And you attended some sort of function?
A Yeah, for sales pitches, I call it.
Q And what put on that function? You originally grew with Perdue?
A Yeah, originally grew Perdue.
Q It was Perdue?
A It was Perdue and UK both, I think.
Q And UK is another integrator?
A Perdue is there and Hudson. That's what Tyson took over, I think.
Q Tyson wasn't there because they weren't in the area yet?
A No. It was Hudson then.
Q And you said UK?
A Yeah, University of Kentucky Agriculture.
Q Okay. So how did you -- how did you hear about this? Did you get mailing, someone call you up? Was there a flier on the --
A Talk farmer to farmer.
Q Talking farmer to farmer and someone said, hey, I'm looking to start growing poultry in this area?

Page 26

A Yes.
Q Did you -- did you have an understanding as to whether that was already occurring, that there were already broiler houses in the area?
A No, at the time there wasn't.
Q Wasn't any? So you up to 1996, as you understood it, there weren't any in the area?
A Yeah, it was either '95 or '96 when they come in, I think.
Q So Hudson didn't have a complex in Robards, for example, before 1996?
A Yes, I think they had one year before Perdue, but that's roughly.
Q And where's Perdue's complex?
A Cromwell, Kentucky.
Q What's your understanding as to when they built that complex?
A I think '95.
Q And then Hudson a year or two before that?
A Yes.
Q So you kind of heard through the grapevine from farmers that these companies were looking for more chicken farmers?
A Yes.
Q At that point in time you didn't have any

Page 27

experience in the industry?
A No.
Q Other than, you know we talked about your parents hens a long, long time ago?
A I did a little maintenance on a turkey farm in North Carolina every once in a while when I was in the service.
Q Little maintenance on the building and equipment?
A Yeah.
Q So you had kind of seen at least what a house looked like --
A Yes.
Q -- and what birds looked like? Turkeys quite a bit different than chickens.
A Yeah.
Q But the basic function of a house and all of that you had seen before?
A For the time.
Q For the time.
A Big difference between now and then.
Q Right, understood.
Okay. So did you like attend something somewhere?
A Yeah.
Q What did you attend?

Page 28

A The ASCS office or county extension service.
Q What was that again?
A UK extension service, agriculture extension service provided their building for the --
Q So UK was assisting in putting on a presentation on broiler development and chicken farming?
A Somewhat. I don't know exactly. It's been a while. We used their facility to participate in it, but they did give their things, seminars about it.
Q So you went and attended that?
A Yeah.
Q Did you go with other farmers or by yourself?
A There was other farmers.
Q Do you remember who you went with?
A No. We all went separate, but we met there.
Q Were there any farmers that you can remember that you talked about leading up to that meeting, are you interested in this?
A A whole bunch of them.
Q Who are we talking about?
A All the farmers in the county, I guess.
Q You think you talked to all of them?
A Yeah, well, I knew them all the time. There was 37 farmers in the county at the time.
Q And what county are you talking about?

Page 77

projected goal was.
Q Two-week layout?
A Yes.
Q So they said -- and by "layout," I was calling it out time. You need time without chickens?
A Yes.
Q Between the chickens going out and new ones coming in?
A Yes.
Q And so they told you they project a two-week layout, which was 14 days, but then going forward sometimes you have no layout. Is that what you were trying to say?
A The first people that was in production didn't. Like I said, they were real tight. I had a few tight ones, but most of mine were around two weeks.
Q You were told -- you knew going in that some growers were getting no layout or very little layout?
A Yeah.
Q But you knew going in they told you they're projecting 14 days?
A Yeah.
Q And there were times it was shorter than that?
A Yeah.
Q But on balance it was 14 days for Perdue?
A Yes.

Page 78

Q Did you have the contract they gave you reviewed by anyone besides yourself?
A No.
Q Did they say you could or couldn't do that?
A Didn't -- didn't say either way.
Q Just didn't come up, okay. So you signed the contract. Do you remember when you signed the contract with Perdue?
A I think October of '96, I think.
Q At the time you signed the contract, did you have any discussions with them about, hey, these are some upgrades we're going to be requiring down the road for farms or --
A Not then.
Q -- equipment needs you might think about to make it easier on you?
A No, not then.
Q And so you got your first flock January of '97?
A Roughly.
Q How many flocks did you end up receiving from Perdue?
A About six a year.
Q And how many years did you contract with Perdue?
A I want to say roughly ten. I've been doing it 22 years.

Page 79

Q Twenty-two years in the business. You're still doing it today, right?
A Yes.
Q And so going forward you grew chickens for Perdue for about ten years?
A And I'd do the numbers. Probably 12 because I think I've been with Tyson eight. So maybe 14 years.
Q Maybe 14 years with Perdue?
A Yeah.
Q Did you start with Tyson in '06?
A I think so.
Q '08, might have been '08?
A I think '08.
Q '08. I think it might have been '08.
A I'm not sure. I'd have to --
Q So roughly got your first flock January '97, and took flocks from Perdue for somewhere around 12, 13, 14 years. Fair enough?
A Yes.
Q Got around six per year?
A Yes.
Q Out time around 14 days?
A That's an average, yes.
Q And you started out with two houses?
A Right.

Page 80

Q Did you ever add any houses while with Perdue?
A Yes. Two years later I built two more.
Q So this is roughly '99?
A Yes.
Q And why did you build two more houses?
A Needed more money.
Q And I guess I should have asked you, those first two houses, were they on -- which plot of land were they on?
A On the Centertown address.
Q So that's the 96 acres?
A Yes.
Q And then you built two more houses in roughly '99?
A Yeah.
Q On that same land?
A Yes. I think it was '98.
Q '98?
A Yes, sir.
Q Now, your bank had told you a year or two earlier they wouldn't loan you money for two more?
A Right.
Q How did you get the money to build two more houses?
A Guaranteed loan. Once you realized you was a good producer, they'd want a whole lot more than that.

Page 113

A Yeah, whenever the payments was due. I always paid on time.
Q Make any early payments or anything?
A No.
Q And in the six to 650 loan, was that a 10, 20, 30?
A When I went to Tyson, I the first year switched over and the second year I built the two more houses.
Q Right.
A And this is when I got the combined loan. Some of the credit card debt I had for the upgrades I had done, and then the -- I got a $300,000 -- I'll just tell you what all it was. I got a $300,000 loan for the original old houses and the farm, the all combined into one loan. And I built Tyson's two new houses and had to borrow $500,000 for those.
Q So at the time you switched to Tyson and then decided to build two new houses, you had about $300,000 outstanding, it sounds like, because you --
A Yeah. Yeah.
Q You got a new loan for that. That was your upgrades from Perdue, your four houses you built from Perdue, the land you had bought years earlier.
A Yeah.
Q And all that. Was that also -- did you build the

Page 114

home on your land while you were with Perdue or with Tyson?
A The modular home I have now?
Q Yeah.
A That's when I did it. I guess the year after I built the new houses.
Q The final two?
A Yes, sir.
Q Okay. So with Tyson?
A Yes, sir.
Q So sounds like you transferred over to Tyson. When you kind of signed up with Tyson, you're about $300,000 in debt?
A Yeah.
Q All in, sounds like?
A Yeah. That's individual loans for it, but I -- when I built the two new ones, then we combined them and put them all into one, two different loans.
Q So one way we can kind of get in our mind, what was the Perdue debt that carried over? That was what you consolidated, about $300,000?
A Yes.
Q And then you got another loan for $500,000 for two more houses?
A Yes.
Q Did you take anything out of either one of those

Page 115

loans, take any cash?
A No.
Q So in 2008 you made the decision to switch to Tyson. What led to your desire to switch from working with Perdue to Tyson?
A One thing is for other farmers, Tyson didn't bother me, henpeck me too much. I'm a very independent person. I've been farming my whole life, and my father has. We've always been animal-based, and that's the reason we do good at it.
Q So other growers told you Tyson doesn't nitpick as much as Perdue?
A Yes.
Q Any other reason that led you to think about switching to Tyson?
A That was basically it.
Q And when you say nitpick, kind of what are we talking about?
A Flock tech trying to almost call it bullying, but it's not really bullying. Being too nitpicky.
Q Okay. And that was you felt like at Perdue they were too nitpicky?
A Yeah, they was, yes.
Q Was there any -- and that was from talking to other growers who were with Tyson?

Page 116

A Yeah.
Q Was there anything else that started getting in your mind, yeah, I think I want to try out a different integrator, and these are the reasons why?
A That's basically it, right.
Q You were otherwise performing fine?
A Oh, yeah.
Q And so did you call Tyson, or they call you?
A I called them.
Q And who did you talk to?
A He's retired now. I can't think of his name.
Q Ken Bartley, heard that name a lot. Morris?
A Could have been Ken Bartley.
Q Ken?
A Yeah, could have been him.
Q Not sure, but you think it was him?
A Yeah.
Q And just said I'm a grower with Perdue and thinking about growing with you?
A Yes.
Q And were they open to that?
A Yes.
Q Did -- what do you remember they saying about what the process would be for you to stop growing with Perdue and start growing with them?

Page 189

A Yeah.
Q Did you have some periods of settlements where you looked at a few and thought, I should be doing better than this, and you pinpointed it down to that?
A No. I just noticed I'd go in a house after he got done and find a line kicked out. And he told me about one when there was two other kicked out.
Q So did this happen over the period of the year that you hired him?
A Yeah.
Q And he was a full-time worker?
A Yeah.
Q What were you paying him?
A Contracted at $500 a week.
Q Did he also live on the property?
A Yes.
Q In the old home?
A Yeah, trailer. I have a house trailer on one corner of it.
Q He lived in the house trailer?
A Yes.
Q For free?
A Yes.
Q So you terminated him?
A Yes.

Page 190

Q Anybody else ever work for you?
A No.
Q Just you and --
A Family.
Q Does your wife work the houses too --
A Yes.
Q -- or do you pretty much do it? What does she do?
A She walks them and works them.
Q Does she cull?
A When they're little she might. No, she mostly sets them out for me.
Q Yeah. Does she do any of the groundwork?
A No.
Q And you said I think your son and daughter have helped over time?
A Yeah. Yeah.
Q And then you said your brother lives on the property, but he doesn't help you any more?
A He does off and on. Mostly farm stuff.
Q What do you mean, mostly farm stuff?
A Bush hogging.
Q Mows grass and things like that?
A Yeah.
Q But not really dealing with the poultry?

Page 191

A He does help with chickens, yes, mostly because if I need to fix something or something like that.
Q He'll help you do some repairs?
A Yeah, on a week on a Saturday.
Q He'd otherwise work somewhere else?
A Yes.
(Exhibit 1 was marked for identification.)
BY MR. TATUM:
Q Okay. I think I have a copy of your current contracts.
I'll show you what's marked as Exhibit No. 1. Exhibit No. 1 is a set of documents that should be your contract documents for Farm 5171, and it should be the current contract documents. 5171 is the now three-house farm?
A Yes.
Q If you look on the second page of Exhibit No. 1, is that your signature there down on the left?
A Yes.
Q And so this is, as far as you understand it, your current contract running from January 26, '15 to January 26, 2022?
A Yes.
Q Did you have four houses when you signed this contract, or were you down to three in January of '15?

Page 192

A Could have been about to five. I couldn't tell you.
Q Tyson's never told you you're required to rebuild the house or anything like that?
A No. They wanted -- yeah, they wanted that.
Q They wanted you to, but you weren't required to?
A I haven't -- no.
Q And it's clear between you and them that house isn't coming back?
A Well, they still want me to, but I don't want to.
Q They have a 63 -- they haven't told you you can't have a contract because you're not going to rebuild your house?
A No.
Q Look at the third page of Exhibit 1. It's called Schedule A. Is that your signature on the second page of Schedule A?
A Yes, down here, yes.
Q Then we're going to flip to the next page, Schedule B. And this is the performance improvement program and housing requirements, both the minimum housing requirements and the premium housing requirements. You mentioned earlier you kind of called them premium one and premium two?
A Yeah.

Q Is this what you were talking about on Schedule B?
A I'm not sure this contract has it. I'll have to have my glasses to read it to be sure.
Q Okay. Look at -- if you look on the lower right, there's Tyson tracking numbers. It's 116566. It's the signature change of Schedule B?
MR. WHITFIELD: Signature page. Sorry.
A What's the number on it?
BY MR. TATUM:
Q 116566.
A Yes, that's my signature.
Q And then if we flip further, we see your W9, and then an acknowledgment page. Is that your signature there on 116568?
A Yes, that's my signature.
Q And then flip a few more pages past the checklist. It looks like there's an amendment to Schedule A. These are all from prior contract, it looks like.
So, as you understand it, is the broiler contract in Schedule A and Schedule B and the acknowledgment paperwork your current contract?
A As best I can see.
Q As best you can see. If you've got another one, are you aware of any amendments to that contract?



A I'm not sure. I'm not sure. I'm not aware -- I don't think there is.
Q Okay.
A I'm not sure, unless I have my glasses and full mind to see.
Q You didn't bring glasses today?
A I didn't.
Q So you understand under your contract you get a base pay?
A Yes.
Q And there's a floor to that base pay; right?
A Yes.
Q And you're not going to get paid below a certain amount per pound?
A Right.
Q And on this particular contract, does your house receive premium pay?
A Yes.
Q So your houses have met, and you get paid premium pay?
A Yes.
Q And then you also get a fuel pay?
A Yes.
Q And that fuel pay is based on square footage?
A Yes.



Q And the premium pay is based on square footage?
A Yes.
Q And then the base pay is based on poundage?
A Poundage, right.
Q That's all I wanted to know, if that was your contract.
Now, do you recall any -- we talked about your contracts originally, but do you recall any -- recall any conversations you had with anyone at Tyson before you signed this second contract? I understand this is your current contract with Tyson, and the second one you signed with Tyson.
Do you recall any conversations with anyone before you signed this one?
A Nothing specifically, nothing stands out.
Q Okay.
A Other than normal.
Q Other than normal conversation?
A Yes.
Q Did they call you, or did you call them about going ahead and signing a new contract and continuing to grow?
A I think that's when mine run out, but I'm not sure.
Q Right. And it probably is because your prior



contract was probably also a seven year contract.
So this one was signed in January 2015. I'm just asking if you remember talking to anyone at Tyson about, I want a new contract, or I don't want a new contract?
A Not specifically, other than they expecting they thought I wanted a new one. I've got the debts now too.
Q And so you wanted a new contract to continue to pay off the debt you had accumulated?
A Yeah.
Q Did you remember in 2015, before you signed this, trying to talk to any other integrators or anything about moving?
A Yeah, I tried to switch over to them about three years ago, to Perdue, back to Perdue.
Q But what I want to know is if you remember if it was before January 21, 2015 or after?
A I can't specifically remember that, no.
Q Can't remember?
A Not exactly, no.
Q Can you remember if it was before you signed your second level contracts in Exhibit 1 or before?
A I can't remember exactly, no.
Q Can you remember if it was before or after this lawsuit was filed by you?
A It was before, I think.

Page 197

Q Before the lawsuit was filed?
A Yeah. I'm not sure.
Q Not sure?
A I'm not sure exactly on the dates, no.
(Exhibit 2 was marked for identification.)
BY MR. TATUM:
Q Okay. Let me show you Exhibit No. 2. I think Exhibit No. 2 is a copy of contract documents concerning Farm 5186. This is your super house farm, your two houses. I have the same series of questions.
Is that your signature there on the second page dated February 3, 2012?
A Yes.
Q And this is, as you recall, your second set of contracts for this farm?
A Yeah. They did -- they changed them from the original.
Q And what is it you understand they changed?
A Somewhere on here it said -- I read it. Well, it said amendment to the original.
Q Okay. Do you remember the broiler agreement -- the first two pages are broiler production contract. Do you remember that being changed?
A No, not sure. I think it was the -- because of the new house contract -- new house incentive pay, whatever

Page 198

you call that.
Q And so look at Schedule A on the second page. Is that also your signature there on the lower left --
A Yes.
Q -- on 116626?
Schedule B, if we go to the last page of Schedule B, it's Tyson 116633.
Is that your signature there on February 3, 2012?
A Yes.
Q And if we flip through, you got your W9 there. And then we get to the acknowledgment page, 116635. Is that your signature there?
A Yes.
Q And then I see, if we go to Tyson 116638, there's an amendment to Schedule A. If you look at the second page, it's signed by you on 1/21/15. Is that your signature there?
A Yeah. Yes.
Q Do you know what this amended, sitting here today?
A Not exactly. I'd have to read it to get the specifics of it.
Q And then if you look at the next page, there's a second amendment to Schedule A. It looks like that relates to your previous contract.

Page 199

Do you remember looking at your current contract for 5186, which is, as I understand it, the second one you signed for those two farms, do you remember any conversations you had with Tyson about signing this contract in February of 2012?
A This amendment?
Q No. This contract here in Exhibit No. 2.
A Oh, no. The only change is the amendment. They started giving me premium two pay.
Q Premium two pay?
A Yeah.
Q Do you -- this contract term says it lasts from February 3, 2012 to 12/4/2019. So is your current -- this is your current contract on the two houses?
A Yes.
Q Before you signed this in 2012, did you have any talks with Tyson about whether or not you wanted to continue to grow with them?
A Every time there was a contract, yes.
Q Do you remember any of those conversations?
A Nothing specifically.
Q You wanted to continue to grow with them?
A Yes. On the debts, I had to have a contract.
Q Do you remember in 2012 if you had contacted any other integrators about switching at that time before you

Page 200

signed this contract?
A It's roughly -- when did you say that's signed, the date that's signed?
Q This one, which is your super house contract, was signed on February 3, 2012.
A Yeah, no. I talked to them after that.
Q After that?
A Yeah.
Q Okay. So at this time you weren't looking to switch?
A No.
Q I assume you've dealt with various service techs over the years?
A Yes.
Q Can you identify for me those service techs?
A The first one was one -- he's retired now. I can't think of his last name. An older guy. He'd be talking his age. I can't think of his last name. Wayne was the first one. Then I think James Catlin, I think.
Q James Catlin?
A Yeah. I may have had Bo there a little bit, but I can't recall exactly. Then Jennifer Parks I think that's --
Q That's it?
A I think.

Page 201

Q Ever feel like any of them mistreated you in any way?
A No.
Q Ever feel like any of them lied to you about anything?
A No.
Q Always -- are they basically trying to help?
A Yes.
Q You may agree with them, you may not?
A Yes.
Q But you feel like they're trying to help?
A Yes.
Q There's some other service techs that come up in some of these cases. Maybe you worked with them or maybe you didn't. Ever work with Neil Barfield?
A Yeah -- no, never assigned to me. He's been to my farm for certain other things.
Q How about Jared Shelton?
A Jared's been there, yes. Used to be the assistant live production or something like that.
Q Ever have any problems with either one of them?
A No.
Q Ever feel like they lied to you about anything?
A Nothing I can recall, no.
Q How about, ever work with David Dickey?

Page 202

A Yes.
Q Ever feel like he mistreated you in any way?
A No.
Q Lied to you about anything?
A No.
Q How about Jim Gottsponer?
A No.
Q Never felt like he lied or mistreated you -- lied to you or mistreated you?
A Nothing in my head that stands out.
Q How about David Mears?
A No.
Q No? Is there anyone at Tyson -- how about Ken Bartley. You mentioned him earlier. Did you ever have any problems with Ken Bartley?
A No.
Q Never felt like he lied or mistreated you?
A No.
Q Is there anyone at Tyson that you can recall right now that you feel like, you know, I do think this one person lied to me about something?
A No.
Q Is there anyone that sticks out at you from Tyson you think, I think this one person has mistreated me over something?

Page 203

A There's probably misunderstandings, but that's with everyone. No more than anyone else.
Q Nothing that you would consider --
A No.
Q -- rises to the level of something is wrong?
A No.
(Exhibit 3 was marked for identification.)
BY MR. TATUM:
Q I'm going to show you a few letters here just so I understand what they are. Let me get myself organized.
Let me show you Exhibit No. 3. Exhibit No. 3 is a document that came from you, as I understand it, and it's a April 12, 2010 letter to producers from the Robards Complex talking about in 2004 the adoption of minimum housing specifications for broiler farms.
And it goes on to state that effective August 1, 2012, Tyson will no longer offer contracts to producers whose housing does not meet the new housing or Robards housing specifications.
Do you recall receiving this?
A Yes.
Q Do you recall -- we talked about the upgrades and things you made to your houses.
Do you recall needing to do anything as a consequence of this to go forward, or were your houses up to

Page 204

spec?
A Up to spec other than what they might defer a little bit and you'd have to do something, right. You know, like, there's always things that need to be done.
Q Well, we talked earlier -- I tried to go through everything that Tyson ever required of you to date.
A Right.
Q On your houses, and I just want to make sure we covered that. And then two, I was really honing in on this letter, well, at this point did there cause you to do anything, or maybe there's nothing more to talk about?
A Nothing that stands out. It was just constantly -- my beef is not getting the premium two when I should have had it on the new ones.
Q Now, let me ask you about that.
When you say premium one and premium two, where is -- where's the source of you saying there's a primum one pay and a premium two pay?
A My terminology may be wrong.
Q Okay.
A It may be some other terminology to it.
Q Okay. And so you're saying on your two houses, your two super houses we're calling them there's another premium pay that you're not getting or --
A I get now with that new contract, the last one I

Page 225

average head you get in that farm, that being the Leisure Farms, the two-house farm?
A Mm-hmm.
Q It is? Are those numbers consistent with what you understand your head placements are?
A I was going to calculate it out, but I ain't got a piece paper to see.
Q What are you wanting to calculate?
A The density per square foot.
Q Do you have a preferred density?
A I figured it had one for everything. Density, whatever you want to call it, .9 should be the density for every farm they got.
Q So .9 is the target density?
A I'm just using that for reference. I don't want to get -- I'd have to calculate it out.
Q Okay. I'm asking if just the total head, 61,400, based on your experience in growing in your two super houses, based on reviewing your settlement sheets, that's about the number of head you typically get?
A Yeah, it changes from -- changes yearly.
Q Okay. Have you ever had an occasion to go through any of your settlement statements and think that it miscalculated your mortality cards?
A I haven't noticed one ever.

Page 226

Q Have you ever had occasion to go through and think it miscalculated your condemnation certificates?
A No, not miscalculation.
Q Have you ever had -- have you ever talked with Tyson and challenged, you know, brought a concern to Tyson that you think the mortality count is off?
A Me or at the processing plant?
Q Mortality is you at the farm.
A At the farm, no. I try to do it as accurate as I can.
Q Have you ever went through your settlement statements and felt like -- you understand the USDA condemns, right?
A Yeah.
Q And you receive those condemnation certificates?
A Right.
Q They list out the number of head condemned and why?
A Right.
Q Have you ever went through and thought the way Tyson calculated your settlement wasn't consistent with the condemnation certificates?
A No, they're probably consistent with it, but I don't think it was -- I first started with four, five years, I had super high processing condemnation.

Page 227

Q You had high condemnation?
A Yes. Yes.
Q Do you know that Robards plant is generally a high condemnation area around here, and that's a problem in this area?
A No.
Q You're not aware of that. So when you first started, we're talking about back there '08 there was high condemnation?
A Yeah.
Q Higher than you were used to at Perdue?
A Oh, yes.
Q By how many?
A Oh, I couldn't tell you that. I'd have to have the numbers.
Q At some point did that settle down in your view?
A Yes.
Q And when did that settle down?
A I guess when it come to everybody's attention.
Q Understood. You started in '08, so I don't know if we're talking about it settled down in 2010 or yesterday, you know, so I'm trying to figure out --
A It did gradually. It didn't do it suddenly.
Q Yeah?
A I couldn't tell you exact because I haven't

Page 228

studied it.
Q So you thought it was high for a while, and then it got back to what you would think are normal expectations?
A Yes, within reason, right.
Q And can you give me a ballpark of when you thought it was back to normal expectations?
A Took them two years from the time it peaked, roughly, and that's roughly.
Q Two years from the time peaked?
A The time numbers got to where it was crazy condemnation.
Q And did you ever talk with Tyson about what their view was as to why condemnation was high?
A Not one-on-one, no.
Q So you can't tell me anything Tyson ever told you as, here's why we think we've got high condemnation here?
A Well, they always -- I took it, the way I understanding it in conversation, it was my fault.
Q And can you tell me about any of those conversations you had?
A What I used earlier when -- I can't get his name right.
Q Gottsponerer?
A And Jared Shelton come to the farm when I had the tremendous leg problems in that one house right there in the

Page 229

back of it.
Q You think they indicated it was your fault?
A Yeah.
Q And did they give you a reason why they thought it was your fault?
A No, they didn't go into detail, and it wasn't specifically pointed that way.
Q Wasn't pointed at you. It was just their saying it wasn't something wrong with the chicken itself, to start with?
A Yeah, it wasn't -- wasn't nothing black and white.
Q Okay. Any other time you can recall having a conversation with anyone at Tyson about condemnation?
A Other than just to maybe a flock tech, nothing serious.
Q Have you ever looked at one of your settlement packets like we're looking at here in Exhibit 10 and thought your feed conversions were not calculated as actually used in that flock?
A I think the numbers they use are correct.
Q Have you ever talked with anyone about Tyson about concerns you have over feed?
A Yes.
Q And can you tell me what those were?

Page 230

A Sometimes I get shorted on feed. This last flock I had -- on the two-house farm, I was shorted 6-ton in B bin instead of A bin in house two. And the reason I know that -- but I didn't bring it up because all this is going on. It kind of seems useless when I did it in the past. That's why the one picture you had there, feed bin -- feed, because I didn't get the right amount of feed that it should.
Q So on your last flock, which is in December of 2017?
A Yes.
Q So in December of 2017 on your two super house farms, you thought B bin was short 6 tons?
A Yes.
Q And how many loads is 6 tons?
A It's roughly 25-ton to a load.
Q Okay.
A Divided between two houses.
Q And a load is a truck?
A Yes, sir.
Q So you thought that's about a quarter of a truck?
A Yeah.
Q Did you see the truck come in?
A No, it was at night.
Q Okay. And so did you call anyone and talk to

Page 231

anyone about that?
A No.
Q Didn't do anything about it?
A No. I've gotten used to it.
Q Did you -- have you crossed checked -- have you received a settlement for that yet?
A No. Yeah, I had the settlement.
Q Did you cross-check that against your feed delivery tickets to see if you were 6 tons short?
A No. I didn't have it calculated. It showed the feed ticket, and it showed no corrections.
Q Do you have any -- you never raised it with Tyson, right?
A No.
Q So they wouldn't know?
A No, probably not. Falls to a deaf ear.
Q Well, you haven't --
A It has in the past.
Q You didn't on this one, right?
A No.
Q Okay. And have you done anything to determine whether or not that cost you any performance?
A Yeah, I calculated it. It cost me three percentage points on feed conversion.
Q And then have you translated that to money?

Page 232

A Not money, but feed.
Q What would that translate to on money to you?
A I couldn't tell you. I'd have to calculate it out.
Q How would you calculate it?
A Three points feed conversion, take you 185 to 182, and it can take you from the middle of the pack to the top of the pack. It can be as much as roughly a 2 percent -- 2-cent difference, roughly. There's 3cents difference in the contract: Minimum, maximum and medium.
Q Did you -- so you can't sit here today and say, I think it cost me this much money?
A No. Deaf ear.
Q Well, my ear's not deaf.
A Right.
Q So can you tell me how much?
A I can tell you they shorted me feed on that load because they brought two loads of feed that night, one that evening and one that night. The one they brought that evening was a partial load. And the one they brought that they shorted me on was a full load, and they tapped exact same A bin and B bin. The level was the same, and one was 6 tons more on the ticket I didn't get.
Q So you're saying you got a ticket for 6 tons more than you actually got?

Page 233

A Right, didn't get the feed.
Q Was both feed bins equally empty?
A When the two loads were dumped, they tapped out the same.
Q I understand, but did you check and tap them out before they put the load in to see if they were equally level at that time?
A Right. One was empty. The other was empty.
Q They both were dead empty?
A Right.
Q So this was three flock?
A It's the last load of the flock.
Q And they both -- so you were calling in for empty feed in both bins?
A That's the one the tech orders.
Q But I'm just saying, you had birds and no feed, empty feed bins?
A I can't recall exactly, but I know they brought me two loads, and one was six tons short.
Q You know that because you said you tapped the bins, and they were level in both; right?
What I'm asking you is if you know what the level was you started with in both bins.
A Well, I'm saying before they brought the feed, I checked them. I knew how much feed was in the house. I

Page 234

can't exactly recall it to the tee because that was three months ago or four maybe -- three.
And then after they brought the feed, I tapped it. And the one that they was feeding out of, it just coned a little bit, but when you tap it, it taps the same because it doesn't come down on the side, and it was six tons short, like the feed was dumped in it.
Q And how do you know it was six tons?
A Because one was 18 ton. The other was supposed to have been 24, and they tapped the same.
Q So you're saying --
A It was dumped within like two hours of each other.
Q So one feed bin is bigger than the other?
A No, they're the same.
Q One was supposed to be 18, and one was supposed to be 24?
A Supposed to be what they dumped in. It was supposed to be what they dumped in.
Q So you got a ticket for six more tons than you think you got based on you tapping the side of the bin?
A Yes.
Q Any other -- and then have you went through and looked at your tickets? That ticket actually shows that you got six more tons?

Page 235

A Yes.
Q And it's six?
A Yeah.
Q And you determined that you were six short before you settled?
A Yes.
Q And it just -- and you were dead on when you got your feed ticket?
A Yeah, the tickets correspond with -- the settlement tickets correspond with the tickets I got.
Q And never raised this with anyone at Tyson?
A No. Deaf ears.
Q Now, how many other times have you felt like there was an issue with your feed?
A It started with Tyson the second year, feed shortages.
Q Tell me the other times this has happened.
A I can't recall now, but it's been numerous times I've brought it up with them.
Q You say feed shortage. That means running out of feed?
A No, not bringing me the amount of feed. Bringing a ticket -- and I even had it on my old farm one time. A truck backed into my house to dump a load of feed, left the ticket, but didn't dump no feed, a whole load.

Page 236

Q And when was -- was that Tyson or Perdue?
A Tyson.
Q And when was that?
A It was five years ago or so, because they broke my little concrete ramp going into the chicken house. He backed over it. Couldn't even get back there to the scale -- I mean to dump in the --
Q So the ramp broke, and they couldn't get the feed in?
A Now, I couldn't tell you that. I just know he left a ticket, and I got charged for it, but I didn't get no feed.
Q Did you ever raise that with Tyson?
A That's when I was in the middle of it, yes.
Q What do you mean, in the middle of it?
A In the middle of reporting all this stuff to them until I realized it was such a deaf ear.
Q Who did you report it to?
A Feed mill.
Q And what did they say?
A Said they brought the ticket and brought the feed.
Q So they disagreed with you?
A Yes.
Q Did you do anything to quantify what that cost

you?
A A whole load of feed, it would take you from the top to the bottom.
Q I understand, but can you tell me what flock it was?
A I could go back and pull the records and show you.
Q But you can't right here?
A No, not right here.
Q Can you tell me what year it was?
A It was early in my production, probably the second year, thereabouts.
Q About '09?
A Yeah, '09, '10 or something like that.
Q Any other instances this happened that you can recall?
A Not enough -- not enough to go into detail about.
Q Well, I just want to make sure I've given you a chance to tell me any instances you can recall.
A There's been several feed shortages that I've had disagreements with through the years.
Q Can you give me another one that you can recall, sitting here today?
A Okay. I had Jim -- okay. It's at the new farm. I had a feed shortage roughly four or five years ago. This



is rough. And so Jim Gottsponerer come down, and the feed mill superintendent of the feed mill come down. They come up there, and you can tap it, and it was shorted, like I said, about a half a ring, and it's a full load, never been touched, half a ring short. All right.
They say I was just tapping, and I can't go by that. Then I said, well, just suck it up, take her back and weigh her again. Then they said -- they said that it would cost me $1,000 to do it. I said, okay, just do it. I'll take that back. I don't think Jim was there. They called Jim.
Anyway, he called -- then they said, oh, they can't do that. Everybody would be wanting us to weigh the feed. Couldn't get into that.
Q So the feed mill superintendent said -- tapping the side of the feed bin is not a sufficient way in his mind to gauge how much feed is actually in the bin?
A Right.
Q So you two disagreed on whether that was a good method?
A Yeah.
Q And then you said, well, I want it all taken out, sucked out and taken back to the feed mill. Did you have birds in the house.
A Yes, but I had another bin of feed.



Q And Jim Gottsponerer come up and said, we're not going to get involved in delivering feed, sucking it out, and taking it back.
A First they told me they was going to do it, but they would charge me $1,000 to do it. I had to think for a minute because money is money.
Q Right.
A So I thought about it. Well, it had been aggravating and eating on me, so I said, yeah, I'll pay $1,000. Then that's when he called me. Then he come up and said, ohm we couldn't get into that.
Q And Jim said, we're not going to do that?
A Right.
Q And do you have any -- did you get any feed credit or anything for that?
A No.
Q Just had a disagreement on whether it was short?
A Right.
Q And you thought it was based on tapping?
A Yes.
Q And that's the same reason you thought these other ones were short, based on tapping the side?
A Yeah.
Q Any other examples you can think of?
A That's the same measurement the techs do when



they order feed.
Q Any other examples you can think of?
A There's others, but I can't think specifically.
Q Do you have any idea if that one that involved Jim saying they weren't going to suck it all up and take it back cost you any money?
A Well, it's about a couple, 3 tons, so it would be about one percentage.
Q Can you quantify one percentage of what?
A I don't know the exact number. It can take you from top to second or third place, almost place to the bottom.
Q Has your farm ever -- have you ever had an Arkansas 99 break out?
A Not that I know of.
Q How about Georgia 08?
A Not that I know of.
Q The only disease issues that you had an outbreak of is kinky back?
A Kinky back has been consistent since I've been with Tyson, and sometimes worse than others.
Q And --
A Still have it today.
Q Still have it today. Other growers got it too?
A Yeah.