# Exhibit 52

# Deposition of Michael Murphy

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVAT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, TCU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, TO HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, And CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., ET AL,

Defendants.

DEPOSITION OF MICHAEL ANTHONY MURPHY
February 16, 2018
Taken on Behalf of the Defendants

Videotaped deposition of MICHAEL ANTHONY MURPHY, held at 19 North Main Street, Madisonville, Kentucky, commencing at 8:30 a.m., on the above date, before Marilyn Morgan, Kentucky Licensed Court Reporter, pursuant to the Federal Rules of Civil Procedure governing depositions.

Page 2

APPEARANCES

John C. Whitfield, Esq.
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esq.
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Also Present: Ms. Tasha Lemley, Videographer

Page 3

I N D E X


| WITNESS | PAGE |
|---|---|
| MICHAEL ANTHONY MURPHY | |
| Examination by Mr. Tatum | 5 |
| Examination by Mr. Whitfield | 152 |
| Examination by Mr. Tatum | 157 |


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| 1 | Contract for Farm 5147 | 80 |
| 2 | Contract for Farm 5148 | 84 |
| 3 | 12/12/06 Letter | 86 |
| 4 | 3/21/07 Letter | 87 |
| 5 | 3/21/07 Letter | 88 |
| 6 | 12/6/07 Letter | 89 |
| 7 | 12/17/07 Letter | 90 |
| 8 | 1/8/08 Letter | 92 |
| 9 | 4/10/08 Letter | 93 |
| 10 | 4/16/10 Letter | 93 |
| 11 | 4/19/10 Letter | 97 |
| 12 | 2/1/11 Letter | 97 |
| 13 | 2/23/11 Memo | 100 |
| 14 | Letter | 101 |
| 15 | Memo | 102 |
| 16 | 11/28/11 Letter | 103 |
| 17 | 4/9/12 Letter | 104 |
| 18 | 9/28/12 Letter | 106 |


Page 4

EXHIBITS (Contd.)


| | | |
|---|---|---|
| 19 | 10/17/13 Letter | 108 |
| 20 | 1/23/14 Letter | 108 |
| 21 | 5/5/14 Letter | 110 |
| 22 | 7/9/14 Letter | 111 |
| 23 | 5/12/15 Memo | 113 |
| 24 | Memo | 114 |
| 25 | 10/21/15 Letter | 117 |
| 26 | 12/2/15 Handwritten Note | 118 |
| 27 | 12/10/15 Notes | 121 |
| 28 | Notes | 122 |
| 29 | Photographs | 123 |
| 30 | Documents | 137 |
| 31 | Texts | 145 |
| 32 | Texts | 147 |

Page 5

VIDEOGRAPHER: This is media No. 1 to the videotaped deposition of Mike Murphy in the matter of Charles Morris, et al, versus Tyson Chicken, Incorporated, et al, being heard before the United States District Court for the Western District of Kentucky, Owensboro Division, Case file 4:15-cv-00077. This deposition is being held at Whitfield, Bryson, and Mason, LLP, on February 16, 2018, at 8:40 a.m. My name is Tasha Lemley, and I'm the videographer. The court reporter is Marilyn Morgan.

Counsel, will you please introduce yourselves and affiliations? And then the witness will be sworn.

MR. WHITFIELD: I'm John Whitfield. I represent the plaintiffs.

MR. TATUM: Mark Tatum representing the defendants.

MICHAEL ANTHONY MURPHY

after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. TATUM:

Q. Would you state your full name, please.

Page 6

A. Michael Anthony Murphy.
Q. Is this the first time you've given a deposition?
A. Yes, sir.
Q. Is this the first time you've been involved in a lawsuit?
A. Yes.
Q. Are you married?
A. Yes.
Q. What's your wife's name?
A. Tonya.
Q. Tonya Murphy?
A. Yes, sir.
Q. How long have you been married?
A. 30 years.
Q. Do you have any children?
A. Three.
Q. How old are they?
A. The oldest one is 26. The other one is 25 and 17.
Q. Any of them live with you anymore?
A. Yes. They all still live at home.
Q. All three of them?
A. Yes.
Q. Okay. Are you employed anywhere?

Page 7

A. Other than the farm, just the farm.
Q. Just do farming?
A. Yes, sir.
Q. Do you do any farming besides raising chickens?
A. That's all I do.
Q. And how long has that been your sole work?
A. Going on 13 years.
Q. Is your wife employed anywhere?
A. She works part-time at the bank in Owensboro.
Q. What does she do there?
A. Accounting.
Q. Is the name of your farm Murphy Farms, LLC?
A. Yes.
Q. When did you first form Murphy Farms, LLC?
A. 13 years ago.
Q. Did you have any experience in the poultry business prior to forming Murphy --
A. No.
Q. -- Farms, LLC?
A. No.

Page 8

Q. What did you do up until that point?
A. Construction.
Q. Did you have your own company or work for others?
A. Worked for others.
Q. What kind of construction did you do?
A. Heating and air.
Q. Residential or commercial?
A. Commercial.
Q. Did you work for a company?
A. Yes.
Q. What company?
A. Local 20 out of Evansville, Indiana.
Q. So you were an independent contractor and a union member?
A. Yes.
Q. How long did you do that?
A. 20 years.
Q. Are you retired?
A. No.
Q. You don't receive like a pension or anything?
A. No.
Q. What made you decide you didn't want to do that anymore?

Page 21

Q. 21 was too much work?
A. Yes.
Q. So he wanted to downsize a little bit?
A. Yes.
Q. Okay. And is he still operating the -- did he leave himself with nine houses?
A. Eight houses.
Q. Eight houses. Is he still working the eight houses?
A. Yes.
Q. Has he expanded?
A. No.
Q. Did you talk with any other growers besides Vince about what it was like to grow chickens or anything like that before you got into the business?
A. No.
Q. So I guess I am just curious. How did it get in your mind -- I understand you were working construction. That's hard work, and traveling. Then you heard Vince was selling some chicken houses. But having never been in the business before, I'm kind of curious as to how it, you know, got in your mind I think this is what I want to do versus something else?

Page 22

A. You have something of your own once you get it paid for. That's what we were looking for.
Q. Had you looked at any other opportunities along those lines?
A. Before I purchased his farm?
Q. Yes.
A. Yes. Other farms was for sale in the area at the time.
Q. I guess -- I'll ask you about that. But I guess what I meant was, had you looked for other opportunities to meet your goals of getting out on your own that weren't chicken-related?
A. No.
Q. So you had looked at some other farms before you chose Vince's farm to try to buy it?
A. Yes.
Q. What other farms did you look at?
A. I can't recall. There was a four-house farm. I was too late. It was already sold by the time I approached it.
Q. Did Vince think running 12 houses was manageable?
A. Yes.
Q. Did you negotiate that 1.3 million purchase price with him? In other words, is that kind of like what you settled, on or was that his asking price?

Page 23

A. That was his asking price.
Q. So you paid him what he was asking?
A. Yes.
Q. Do you know how he came to that number?
A. No.
Q. Did you put any money down?
A. $100.
Q. Did Tyson work with you or your bank at all in any way to help you get that loan?
A. No.
Q. Did you have to put the houses and barns up as collateral?
A. Yes.
Q. Anything else?
A. No.
Q. Did you have to ever give Tyson -- or, I mean, Wells Fargo the contracts that Tyson then gave you?
A. Yes.
Q. Now, my understanding is you've got that farm broken up between farm 1 and farm 2?
A. Yes.
Q. And farm 1 is No. 5147?

Page 24

A. Yes.
Q. And 5147 is the Tyson tracking number?
A. Yes.
Q. Then farm 2 is 5148?
A. Yes.
Q. And that's the Tyson tracking number?
A. Yes.
Q. How many houses is farm 1?
A. Six.
Q. And how many houses is farm 2?
A. Five.
Q. Do you know why -- are they broken up by you from a business perspective, or do they all go into Murphy Farms, LLC?
A. They all go into Murphy Farms, LLC.
Q. And did you start Murphy Farms, LLC when you bought the business?
A. Yes.
Q. Do you own any other companies besides Murphy Farms, LLC?
A. No.
Q. Are you the manager of Murphy Farms, LLC?
A. Yes.
Q. Are there any other members?

Page 77

Tyson, you know, over when you've been doing this?
A. 13 years.
Q. 13 years. Have you ever worked with anyone else at Tyson over the last 13 years to, you know, get the job done?
A. No.
Q. Is there anyone else at Tyson you've had any problems with?
A. No.
MR. TATUM: Do you want to take a break?
MR. WHITFIELD: That's fine.
VIDEOGRAPHER: Stand by. Here marks the end of media No. 1. Going off the record. The time is 10:05 a.m.
(A break was taken.)
VIDEOGRAPHER: Back on the record. Here marks the beginning of media No. 2. The time is 10:14 a.m.
Q. (By Mr. Tatum) All right. Do you do anything to track your expenses to operate your chicken houses?
A. Tonya takes care of that.
Q. Do you have any idea what your annual expenses are to run your chicken houses?
A. Per year?

Page 78

Q. Yeah.
A. It's around 500 something thousand ballpark figure.
Q. And what's included in those expenses?
A. The gas, the electrical, labor, insurance.
Q. And the labor costs, what are those?
A. The paying Teo on the farm.
Q. Any other labor costs?
A. Tonya pays me.
Q. You receive a salary?
A. Yes.
Q. What do you pay yourself?
A. 400 a week.
Q. Does anyone else get paid out of the business?
A. Just part-time, Coy and Nick.
Q. What do you pay them when they work?
A. Nick, $10 an hour.
Q. What about Coy?
A. Coy, $10 an hour.
Q. Okay. Then you've got your electrical cost, gas is propane?
A. Yes.
Q. So it looks to me like in 2017, for

Page 79

example, you were paid about $297,541.95 on farm 1. Farm 2, $230,594.47. Does that sound right?
A. I would have to talk to Tonya.
Q. Do you ever track what your annual profit is in running the farms?
A. Tonya takes care of that.
Q. You don't have any idea?
A. Ballpark figure, are you talking about the expenses?
Q. Yeah. I'm talking about once you get your income and once you take out your expenses, what your profit is?
A. Around 75 to 80,000 a year after expenses.
Q. It looks like over 2010 to 2017 between your two farms, you got paid about 5 million. Does that sound right?
A. That would be close.
Q. Tonya, it sounds like, is the bookkeeper of Murphy Farms?
A. Yes.
Q. Have you ever been put on an intensified management status at Tyson?
A. No.
Q. And do you know what that is?

Page 80

A. Yes.
Q. That means when you've had a certain number of flocks finished poorly, you go under a program that might threaten the contract if that continues?
A. Yes.
Q. You've never done that?
A. No.
Q. I want to show you what I will mark as Exhibit Number 1.
MR. WHITFIELD: He's going to show you some documents.
(Exhibit 1 was marked.)
Q. (By Mr. Tatum) I think what I'm showing you in Exhibit No. 1 is your contracts for farm 5147, just to try to orient you what it is. 5147 is currently the six-house farm?
A. Yes.
Q. And if you flip to the second page of Exhibit No. 1.
A. I don't have my glasses. I didn't know I needed to bring glasses.
COURT REPORTER: You can use mine.
THE WITNESS: I can see a little.
Q. (By Mr. Tatum) Sorry. You're on camera

Page 81

with those.
A. I don't care.
Q. I wanted to ask you, this is -- Exhibit No. 1 is a broiler production contract. And on the second page it's dated November 23rd, 2011. And I wanted to verify that's your signature there on the left side?
A. Yes.
Q. And this is your current contract for 5147?
A. Yes.
Q. And it looks like it was also a seven-year contract that's running through November 23rd, 2018?
A. Yes.
Q. Have you had any discussions with Tyson about whether you want to renew your contract at the end of this year?
A. No.
Q. Do you plan on renewing it?
A. Yes.
Q. Have you had any discussions at all with Tyson about whether it's going to be renewed or not?
A. No.

Page 82

Q. Do you remember any conversation you had with anyone at Tyson when you signed this contract in Exhibit 1?
A. I don't understand the question.
Q. Do you remember any discussions you had with anyone at Tyson about signing this contract?
A. No.
Q. If you flip the pages, there's going to be several spots that I've got to ask you if that's your signature.
A. Okay.
Q. And if you flip to Schedule A of Exhibit 1 on the second page of Schedule A, is that your signature there on the lower left?
A. Third page?
Q. It's the second page of Schedule A.
A. Yes.
Q. We'll try to flip together and make it easier.
A. Yes, it's my signature.
Q. If you flip again to Schedule B, this is Schedule B of your broiler contract. And at the end of that Schedule B is another signature page?
A. Yes.
Q. Is that your signature?

Page 83

A. Yes.
Q. And then continue, you'll see your tax ID number. The next page is an acknowledgement page. Do you see that?
A. Is that what I signed?
Q. Keep on going. You're almost there.
A. Okay.
Q. That's your -- you're looking now -- just stop right there. That's your signature to Schedule B of Exhibit 1?
A. Yes.
Q. Okay. Then flip again.
A. Okay.
Q. That acknowledgement page is also your signature?
A. Yes.
Q. And then if you flip again -- that's all I've got to ask you about on that contract. So that's your current contract with Tyson --
A. Yes.
Q. -- for farm 5147?
A. Yes.
Q. And do you know if it's been amended in any way since you signed it?
A. No.

Page 84

(Exhibit 2 was marked.)
Q. (By Mr. Tatum) Now I want to show you what I think is your contract documents for 5148. It's a little bit bigger. Exhibit No. 2, I'm going to ask you, first of all, Exhibit No. 2 is a document dated February 24, 2012, broiler production contract between Murphy Farm 5148 and Tyson. Is this your current contract for that farm?
A. Yes.
Q. It looks like it expires February 24, 2019. Have you had any discussions with anyone at Tyson about whether or not to renew this contract?
A. No.
Q. Is it your intention right now to renew your contract with Tyson?
A. Yes.
Q. Do you remember any discussions you had with anyone at Tyson about this contract when you signed it?
A. No.
Q. Flip to Schedule A. Is that your signature on the second page?
A. Yes.
Q. And flip to Schedule B. Then the last

Page 85

page of Schedule B, is that your signature there on the last page of Schedule B of Exhibit 2?
A. Yes.
Q. And then flip two more pages. Is that your signature on the acknowledgement page of your broiler production contract for 5148?
A. Yes.
Q. And then flip a couple of pages, one more. This is an amendment to Schedule A. It's dated March 19, 2011. Is that your signature there on the second page?
A. Yes.
Q. And then Schedule B is included again if you flip through it. If you get to the end of Schedule B, I need to ask if that's your signature?
A. Yes.
Q. And then the next page is an amendment to Schedule A dated October 20, 2014. Is that your signature there, Bates-numbered Tyson 116957?
A. Yes.
Q. The second half of this is your prior broiler production contract for 5148 and the set of documents all attached to it. Do you recognize that as your first contract on that farm?
A. Yes.

Page 86

(Exhibit 3 was marked.)
Q. (By Mr. Tatum) No more questions about Exhibit No. 2.
I'm going to ask you about some letters I've seen in the file that I've received and what they are. Okay.
Exhibit No. 3 is a letter to you dated December 12, 2006, from Tyson indicating that you recently contacted Tyson of Robards, Kentucky and expressed an interest in entering into a broiler contract. This will memorialize the intent of Tyson to enter into a broiler contract with you and then suggests that you notify them by January 1, 2017, if you intend to move forward. Do you recall receiving this letter?
A. No.
Q. Anything about this letter that's inaccurate that you contacted Tyson about contracting with them?
A. It would be Tonya.
Q. You or Tonya?
A. Yeah, Tonya.
Q. We talked about this earlier and sort of the progression of events was that you reached out to Tyson --

Page 87

A. Yes.
Q. -- expressed an interest in contracting with them. Ultimately, that led to them saying they would be interested in doing that and you needed to come meet?
A. Yes.
(Exhibit 4 was marked.)
Q. (By Mr. Tatum) I'm going to show you what we've marked as Exhibit No. 4.
MR. TATUM: You don't happen to have a stapler, do you?
MR. WHITFIELD: I'll get one.
MR. TATUM: Yeah. Let's keep this organized. Thank you.
Q. (By Mr. Tatum) Exhibit No. 4 is a letter dated March 21, 2007, in relation: Fuel costs. It's a two-page document from Tyson to you. The second page indicates that you will be receiving a supplemental energy payment to compensate for increasing energy costs.
Do you remember receiving this letter?
A. I can't recall.
Q. Do you remember actually getting a supplemental fuel payment because of increasing fuel costs around March of 2007?

Page 88

A. I can't recall.
Q. You're not saying it didn't happen?
A. Yeah. Tonya would be the one handling this.
Q. Okay. So you don't remember whether or not you got this or not, but you're not saying it didn't happen?
A. Yes, I'm not saying it didn't happen.
Q. You understand from time to time since you've been working with Tyson, they've provided growers with supplemental fuel costs --
A. Yes.
Q. -- to compensate for increased propane?
A. Yes.
(Exhibit 5 was marked.)
Q. (By Mr. Tatum) Let me show you what we'll mark as Exhibit No. 5. Exhibit No. 5 is a March 21, 2007, letter to you from Tyson with a second page attached regarding supplemental energy payment. This is the second document they sent you regarding making supplemental energy payments to you because of rising propane costs; correct?
A. Yes.
Q. The first one was in January '07 that we looked at and the second one in March?

Page 89

A. Yes.
Q. Do you recall receiving these supplemental payments?
A. No.
Q. But you're not saying they didn't happen?
A. Yes.
Q. That's correct?
A. Correct.
Q. These supplemental payments were in addition to your base pay and fuel payment allowance under the contract; right?
A. Yes.
(Exhibit 6 was marked.)
Q. (By Mr. Tatum) Here's Exhibit No. 6. Exhibit No. 6 is a letter to you dated December 6, 2007 from David Mears indicating that the complex was going to pay for half of the PLT litter treatments. Do you recall receiving that?
A. No.
Q. What is PLT, or poultry guard litter treatment?
A. We put them down to help control ammonia in the chicken houses.
Q. Do you know if Tyson, in fact, went

Page 90

forward and paid half of your PLT?
A. Yes.
Q. And did that stop at some point or did it continue?
A. It continues on today.
Q. So that wasn't part of your contract but that was something they began doing --
A. Yes.
Q. -- to help offset costs; correct?
A. Yes.
Q. And do you know if they did that for everyone? As far as you know, they did?
A. As far as I know, they did.
(Exhibit 7 was marked.)
Q. (By Mr. Tatum) Exhibit No. 7 is a December 17, 2007, letter to you, sent to other family growers discussing the density at each farm was going to be reduced to .85. Do you remember this?
A. No.
Q. Do you know if, in fact, across-the-board density was reduced?
A. No.
Q. Do you know what your average density is?

Page 91

A. Per barn?
Q. Yeah.
A. 22,500.
Q. So you get about 22,500 birds on average per farm?
A. Average, yes.
Q. Okay. And do you know what that translates density? Do you know what I mean by density?
A. Square footage?
Q. Bird per square foot?
A. Yes.
Q. Do you know what your average density of bird per square foot is?
A. I can't recall.
Q. Do you have a preferred density?
A. Per bird or --
Q. Do you have a preferred number of birds you like to receive per house?
A. I like to receive 22,000.
Q. You like to receive less?
A. Yes.
Q. Are you aware that some growers would like to receive more?
A. Yes.

Page 92

Q. And different growers have different ways that they think they can maximize their return; right?
A. Yes.
Q. Do you have any idea if the average density that you receive is any different from any other grower?
A. No.
(Exhibit 8 was marked.)
Q. (By Mr. Tatum) Let me show you Exhibit No. 8. Exhibit 8 is a January 8, 2008, letter to you, again referencing rising fuel costs and indicating that a supplemental payment will be made as indicated in the first and second page of Exhibit 8. Do you remember receiving this?
A. No.
Q. Do you remember receiving the supplemental fuel payment?
A. No.
Q. You're not saying you didn't get it?
A. Yes, I'm not saying that I didn't get it.
Q. Do you know if that was given across the complex?
A. No.

Page 97

(Exhibit 11 was marked.)
Q. (By Mr. Tatum) Let me show you what's been marked as Exhibit No. 11. Exhibit No. 11 is a letter to you April 19, 2010, as well as other farmers from Tyson regarding the fact that chicks were going to be colored with a red dye going forward in relation to the cocci vaccine to help spread that vaccination among chicks.
Do you remember anything about this or what it was in relation to?
A. No.
(Exhibit 12 was marked.)
Q. (By Mr. Tatum) That's all I wanted to know.
Exhibit 12, I believe, is a letter from you to Ken Bartley at Tyson. This is dated February 1, 2011. First of all, on the second page, is that Tonya's signature?
A. Yes.
Q. Do you remember anything about this letter? This letter primarily concerns an ammonia issue at your farm, high ammonia blinding chickens and concerns about that. And then, secondly, a concern about a driver named Reuben honking the horn when he showed up.

Page 98

A. Yes.
Q. What was the ammonia issue, if you recall?
A. I remember Tonya typing all this up.
Q. Okay.
A. Kenny showed up and said the ammonia is a little bit too high.
Q. Kenny Bartley?
A. Yes.
Q. Okay. And what's the consequence of high ammonia?
A. It blinds the chickens.
Q. Then they can't eat or drink?
A. Yes.
Q. That makes them not come to weight or die?
A. Yes.
Q. Okay. So he had said he thought when he showed up, the ammonia was too high?
A. Yes. We finished first place in this flock.
Q. Okay. So you ended up finishing first?
A. Yes.
Q. So you got it fixed and moved on?
A. Yes.

Page 99

Q. Okay. Did you feel like Kenny was trying not to help?
A. He was probably trying to help.
Q. Okay. And then what's the issue you had with Reuben?
A. Reuben, the truck driver?
Q. I think he might be Ken's crew. I'm not sure.
A. I can't recall.
Q. You write in here --
A. He was the truck driver that come on the farm hitting his air horn. You don't do that on a chicken farm. It scares the chickens in the chicken house, causes IP.
Q. So he had come on and hit his air horn, and you were asking Kenny to tell him not to hit his air horn?
A. Yes.
Q. And had you ever talked to Reuben about that?
A. No.
Q. Did you talk to him about it before you wrote this?
A. Tonya approached him.
Q. And said, Don't hit the air horn?

Page 100

A. Yes.
Q. And what was his reaction?
A. I can't recall.
Q. Okay. But you wanted to make sure Kenny knew, Hey, make sure and tell these guys don't hit their air horn on the way back?
A. Yes.
Q. Okay. Did that stop?
A. Yes.
(Exhibit 13 was marked.)
Q. (By Mr. Tatum) Let me show you what's been marked as Exhibit No. 13. Exhibit No. 13 is a February 23, 2011, memo to broiler producers from the Robards Complex talking about an increase in the energy allowance under your contract. Do you remember receiving that?
A. No.
Q. You're not saying it didn't happen?
A. I'm not saying it didn't happen.
Q. So at some point in 2011 -- this is actually different from the supplemental energy payments we were looking for before; correct? This is actually an increase in what you're going to get paid for fuel under your contract on a flock basis; right?

Page 125

Q. And when did that happen?
A. I think it was two or three years ago.
Q. Did Tyson help you fix it at all?
A. They didn't help us fix it but --
Q. They paid for it?
A. -- they reimbursed us a hundred percent on it.
Q. Okay. So they acknowledged our truck ran over your meter and reimbursed you for it?
A. Yeah. I caught it on camera.
Q. Okay. Do you have cameras at your place?
A. Yes.
Q. Do you remember how much they paid you to reimburse you?
A. I can't recall at this time.
Q. So it was an accident?
A. It was an accident, a hundred percent accident.
Q. And that's what most of these pictures are of the backhoe at least?
A. Yes, the excavator, the small excavator.
Q. Do you know what these pictures are that looks like a tire track?
A. These are the Moffits that gets hauled

Page 126

into the farm. We try to, you know, disease factors.
Q. What is it that these are showing?
A. This is the mud and litter from the other farms what's brought into our farm.
Q. And when did you take this picture?
A. Two or three years ago. They're supposed to have everything clean as they come to every chicken farm to keep from spreading diseases.
Q. So you felt like this time, it didn't. So you took pictures. This is the mud track; right?
A. Yes, of the trailer that hauls this Moffit machine on.
Q. Okay.
A. It's supposed to be cleaned out.
Q. Did you talk to Tyson about that?
A. Yes.
Q. Did they get it cleaned out going forward?
A. For a little bit, for a little while.
Q. Have you had that problem since?
A. No.
Q. Okay. So you raised it with Tyson and they got it figured out?

Page 127

A. Yes.
Q. What's this picture with the Coke 12 cans?
A. That's the Mexican's catch crews. They come in in their vans. That's what the inside of the vans look like.
Q. Okay. And so when was this taken?
A. Two or three years ago.
Q. Did you raise that with -- what was your concern about the inside of their van?
A. How trashy they was and all this -- this is chicken litter from other farms. We try to maintain a disease-free farm.
Q. Did you talk with anyone at Tyson about making sure these are cleaned when they come in?
A. Yes.
Q. Did that get fixed?
A. Yes.
Q. Then the last one, the last two pages are kind of pages of multi pictures?
A. That's just pictures of the van and them tracking in.
Q. Same issue?
A. Same issue, yes, taken care of.
Q. The last two pages of Exhibit 29 are

Page 128

kind of multi pictures. These look like maybe they're the same issues?
A. That's the same issues.
Q. Okay. You don't know that they actually did spread any disease to your birds, but you were worried they might?
A. I was worried they might.
Q. And so you contacted Tyson about it?
A. Yes. We were just covering our steps.
Q. Okay. Now, every time you settle a flock, you end up receiving a packet of information from Tyson, your settlement documents; right?
A. Yes.
Q. That includes your settlement statement and your condemnation certificates and your feed delivery tickets?
A. Yes.
Q. And various other documents, live scale tickets?
A. Yes.
Q. And mortality cards?
A. Yes.
Q. And have you ever received -- I've got a sample here that I think came -- of information relating to just one settlement. But I guess my

Page 129

question is, are you aware of any time when you've gotten a settlement and you went and cross-checked your settlement against anything else and thought it was wrong?
A. No.
Q. So you've never looked at it and thought, Wait a minute, I'm looking at that settlement sheet and it says X number of heads were placed and that's wrong. I got more or less heads?
A. Tonya keeps up with that.
Q. You've never come to that conclusion?
A. No.
Q. The same with mortality --
A. Yes.
Q. -- you've never looked at it and said, I've had more or less mortality than they calculated on the settlement?
A. Yes.
Q. The same with condemnation, you've never looked at it and said, Wait a minute, the numbers don't match?
A. We do look at the condemnation. That's pretty critical on that part.
Q. Understood. But you've never looked at it on your settlement statement and thought, Wait a

Page 130

minute, that condemnation that I'm being charged for doesn't match the USDA condemnation certificates?
A. Yes, we have looked at them, but everything pretty well matches.
Q. Okay. How about on feed, have you ever looked at the feed conversions and thought, Wait a minute, there's a discrepancy between the feed I think I got or used versus what is being calculated on the settlement?
A. Yes.
Q. Yes, meaning you have --
A. Yes, we have looked at the feed. I keep up with my feed pretty thorough.
Q. But have you found a discrepancy?
A. Yes.
Q. So the others, you haven't found a discrepancy on?
A. No.
Q. But on feed, you think you have found that?
A. Yes, I have. Yes, feed conversion.
Q. Other than feed, is there any other discrepancy you think you've found on your settlements in the past?

Page 131

A. No.
Q. Okay. So what happened on the feed?
A. My back five houses, house 3, they were supposed to deliver 24,500 pounds of feed. They only delivered 24,500. They only delivered -- each semi-trailer holds four hoppers. They only put three hoppers in my feed bin. The fourth one never got delivered, but they left a ticket in my mailbox saying all four hoppers were there.
Q. Okay. And when was this?
A. Two years ago. John Snell was my tech at the time.
Q. Okay.
A. I took pictures and we documented it all.
Q. Okay. And so you are talking about farm --
A. Farm 2.
Q. Farm 2.
A. House 3.
Q. House 3. Bottom-line is you normally get four hoppers per house?
A. From the semi-trailer.
Q. From the semi-trailer. You got four hoppers for each house. But on house 3, you said,

Page 132

Wait a minute, I think I only got three?
A. Yes.
Q. But then you looked and there was a ticket that said you got four?
A. Yes.
Q. And so you took pictures and you contacted John Snell?
A. Yes.
Q. And what happened from there?
A. He come out the next day to verify it, and we were short 6,000 pounds.
Q. So he verified that?
A. Yes. Before I swapped to the next bin.
Q. So what happened after that?
A. He got ahold of Tyson, the feed mill, and they credited me for 3,000 pounds, but I was still missing 3,000 pounds.
Q. Okay. So you got a credit for 3,000 pounds. And what does a credit mean?
A. We get a credit for -- it's like a -- it's a credit for feed. If we use too much feed or not enough, they give us a credit for it.
Q. Okay. They basically said, All right, we won't count you as if -- first of all, is a hopper 3,000 pounds? You said you were missing a

Page 133

hopper.
A. Each hopper -- each semi is 6,000 pounds.
Q. Okay. So were you -- did you think you -- you thought you were missing 6,000 pounds?
A. Yes.
Q. And then you got credit for 3,000 pounds?
A. Yes.
Q. Did John say, Why not 6,000?
A. He said the pictures didn't match up with what I took.
Q. Pictures didn't match up with what?
A. I took pictures of it, and I had him to come out and take pictures too. He said that's just what -- they thought it was just 3,000 pounds so that's what I got credit for, is 3,000 pounds.
Q. So he felt like he looked at it, took pictures, you took pictures, and he felt like it was a 3,000 pound shortage?
A. Yes. I have argued with him, told him it was 6,000 pounds because I know. I'm there every day.
Q. And he said, look, he thought it was 3,000 pounds?

Page 134

A. Yes. And we finished dead last in that flock because of the feed conversion.
Q. Do you know what that cost you moneywise where you would have otherwise finished?
A. Around $6,000, is what it cost me.
Q. Is that the only time that's happened?
A. Yes.
Q. Now, so you two -- I mean, do you think he was -- I know you disagreed with him on how much feed. Do you think he was trying to be dishonest about it, or was it just we have a difference of opinion here on what's missing?
MR. WHITFIELD: Objection to form. Go ahead.
Q. (By Mr. Tatum) In other words, did you think he was being dishonest in him thinking it was 3,000 pounds?
A. I think he thought it was 3,000 pounds.
Q. Okay. So it's not that you think John was --
A. Dishonest.
Q. -- trying to be deceitful; you just had a disagreement on what it was?
A. Yes.
Q. And, you know, his argument carried the

Page 135

day, obviously?
A. Yes.
Q. So just so I can understand, you said, Look, you know, it takes four hoppers to fill a feed bin in a house. Is that what --
A. Yes.
Q. You've got one feed bin, four hoppers to fill it up?
A. Yes, on the semi trailers.
Q. On the semi trailers. And on house 3, you're saying only three hoppers got unloaded?
A. Yes.
Q. So not even a fourth got unloaded?
A. No. The fourth one stayed on the truck.
Q. Stayed on the truck?
A. Yes.
Q. Okay. But there were four tickets?
A. One ticket for that house.
Q. One ticket said four hoppers?
A. Yes.
Q. Okay. Did the fourth hopper, do you know, the one that stayed on the truck, was it full or empty?
A. I can't verify it.
Q. Okay.

Page 136

A. The tickets said 24,500 pounds. That's one whole bin on my farm.
Q. Okay.
A. The ticket was left in my mailbox at that.
Q. How did you notice that you were one hopper short? Was it because you were there watching and the fourth hopper never left, or did you just sort of look in the feed bin at some point and it looked short?
A. Every day when those feed trucks come to my farm, after they leave, I go look at the ticket and see if there's 24,500 pounds. I go back to the chicken house, open the top, crawl to the top, and look from the top down.
Q. Okay.
A. I know what 24,500 pounds is. I've been looking at it for 13 years.
Q. Okay. So bottom-line was you didn't visually see that the fourth hopper did or did not unload. What you did was after it had been done, you arrived, looked in the hopper and said that's short?
A. Yes.
Q. So something happened; right?

Page 137

A. Yes.
Q. Okay. So you don't actually know, then, if the fourth hopper left the truck or not, if it had a half hopper full, or a quarter hopper full, or nothing full. You just know you looked in the bin and it was short?
A. Yes.
Q. Okay. So you look in the bin, it was short. You estimated it was one full hopper?
A. Yes.
Q. Then you called John Snell at Tyson. He came out, looked in the bin. He estimated it was half a hopper short?
A. Yes. 3,000 pounds.
Q. Okay. Has that ever happened -- have you ever seen any other feed discrepancy that raised concern for you?
A. Just that one incident.
Q. Okay. Any other discrepancies you've ever felt were -- within your settlement documents between what you actually did versus what the settlement said you did?
A. No.
(Exhibit 30 was marked.)
Q. (By Mr. Tatum) Let me show you a set of

Page 138

documents I'm going to mark as Exhibit 30. So I'm showing you a group of documents that we've labeled Exhibit 30 which I believe represent settlement documents in relation to a settlement in around February 2015.
If you look at the back page, they're kind of in reverse order, it looks to me like. If you look at the last page, it looks like it's your payment summary. And then if you go forward, you've got your settling flock balances, and you've got your actual settlement statement in here, and so on.
Do you review these when you receive these documents each flock?
A. Yes. Me and Tonya go over them together.
Q. So, for example, if you look towards the bottom on the lower right, there's a number system. There's Tyson 083688.
A. Okay.
Q. And this is the one that kind of shows where you ranked?
A. Yes.
Q. So in this particular settlement, it looks like this is Murphy farm 1 settlement, you

Page 139

ranked fourth that period?
A. Yes.
Q. And then the document in front of that named Tyson 083687 is the actual settlement detail?
A. Yes.
Q. And so you receive these documents every settlement; right?
A. Yes.
Q. Okay. And just if you just scanned further through this set of Exhibit 30, you would see your live scale tickets. You would see your condemnation certificate and so on. These are the types of documents you get every settlement?
A. Yes.
Q. And so when I was asking you earlier about, you know, have you ever taken a look at your settlements and felt like some of the inputs were wrong, this is the type documentation you get every month?
A. Yes.
Q. And the one time you saw it was when you had this feed issue?
A. Yes.
Q. And you got from your point of view a half credit back?

Page 140

A. Yes.
Q. Okay. Do you have a preferred breed of chicken that you prefer to raise?
A. Cobb 700s.
Q. You feel like the Cobb 700 performs best?
A. Yes.
Q. And why is that?
A. On our farm, we don't have a lot of trouble with mortality issues on that part. They perform from day one until kill.
Q. Do you know if the percentage of Cobb 700s you get is any different from any other grower you compete with?
A. No.
Q. Do you know if you at times receive other breeds?
A. Like a Cobb 500?
Q. Yeah.
A. We can't tell by looking at the chicken. But the techs come and write it on our mortality card.
Q. Yeah, I mean, you can't look at a chicken and tell whether it's a Cobb 700 or Cobb 500 or a byproduct or anything else; right?

Page 141

A. No.
Q. So you know what you got based on a card that's left with the delivery ticket?
A. Yes. The mortality cards, the techs come and write and say it's Cobb 700s or Cobb 500s.
Q. Is there ever a time in their growth period where you can just eyeball a chicken and know what it is?
A. No.
Q. Do you know if you ever get different percentages of breed versus any other grower?
A. What's the question again?
Q. Do you ever know -- are there times where you get multiple breeds in one flock?
A. No.
Q. You always get the same breed?
A. Yeah. I mean -- I'm sorry. Yes.
Q. There are times you get multiple breeds in one flock?
A. Sometimes we get 700s. Sometimes we get 500s.
Q. Do you know if, you know, on average the percentage of 500s and 700s you get is any different from anyone else?
A. No. What's the question again?

Page 142

Q. I just want to know if you're getting any different percentage of breeds from any other grower you're competing with?
A. I don't understand the question.
Q. Well, like you said, you said you prefer Cobb 700s but you said the only way you really know what breed you get is if the documents or the tech tells you; right?
A. Yes, that's the only way I know.
Q. Because you said you can't eyeball it at any moment and tell?
A. No.
Q. And you said sometimes you get 700s, sometimes you get 500s, and sometimes you get a mix?
A. Yes.
Q. So I was just trying to figure out if you know whether or not at any one time you've got different breeds from anybody else?
A. From different --
Q. Other growers, not you. In other words, do you have any information that tells you that there are times when you're growing with one breed and a grower down the road in your tournament is growing another breed?

Page 143

A. Just by talking to some other farmers sometimes.
Q. Have you heard that from other farmers?
A. Yes.
Q. Have you done any investigation into that?
A. No.
Q. What have you heard about that?
A. Just some farmers get all 700s. Some farmers get all 500s.
Q. Do you know of any instances where you have personal knowledge that's happened?
A. No.
Q. Other than the issue you had on the feed shortage that we talked about with John Snell and the load, have you had any other trouble with feed from Tyson?
A. Not that much. Occasionally, you might lose a couple hundred pounds here and there.
Q. Nothing that -- you would consider that out of the ordinary?
A. Yeah, that one there.
Q. Because you're dealing with a high volume of feed usage; right?
A. Yes.

Page 144

Q. So as it relates to feed, then, you've never had any other concerns or issues about feed?
A. No.
Q. Do you text back and forth with your techs? I've got some texts from you but maybe they're all your wife's. I don't know.
A. They're not allowed to receive texts no more. So we just call them.
Q. Who is not allowed to receive texts?
A. We can text to them, but they have to call us back. They can't text back to us.
Q. How do you know that?
A. Bo McGuire told me.
Q. And is that because they felt like being on the phone and being on the same page and being personal is a better relationship?
A. I'm not for sure why.
Q. Okay. I think I got a lot of texts from you. Did you do anything to gather texts and everything in response to this lawsuit, or did your wife do all that?
A. My wife.
Q. Okay. I went through them, and honestly it looked like a lot of them was just sort of, I got this text, but it didn't have any real meaning