# Exhibit 56

# Deposition of Morgan Rickard

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

___________________________

DEPOSITION OF WILLIAM MORGAN RICKARD
MARCH 2, 2018
- - - -

Videotaped deposition of WILLIAM MORGAN RICKARD held at 19 North Main Street, Madisonville, Kentucky, commencing at 8:34 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.



I N D E X


| WITNESS | PAGE |
|---|---|
| WILLIAM MORGAN RICKARD | |
| Examination by Mr. Tatum | 4 |


EXHIBITS


| Number | | |
|---|---|---|
| 1 | Broiler Production Contract, Bates TYSON_167625 through _639 | 135 |
| 2 | Broiler Production Contract, Bates TYSON_167640 through _654 | 138 |
| 3 | Broiler Production Contract, Bates TYSON_167655 through _699 | 140 |
| 4 | Broiler Production Contract, Bates TYSON_116774 through _802 | 141 |
| 5 | Composite of Settlement Documents, Bates TYSON-100390 through _423 | 184 |
| 6 | Composite of Photographs, Bates RICKARD 008128 through _172 | 199 |
| 8 | Letter dated September 26, 2014, Bates RICKARD 000433 | 210 |
| 9 | Letter dated October 21, 2015, Bates RICKARD 000376 | 211 |
| 7 | Composite of Certificates of Understanding, Bates TYSON-124107 through _110 | 212 |
| 10 | Composite of Certificates of Understanding, Bates TYSON-123663 through _666 | 213 |
| 11 | 2015 43' X 600' New House Spec Sheet, Bates RICKARD 000435 and _436 | 213 |
| 12 | Composite of Copies of Text Messages, Bates TYSON_118121 through _123 | 214 |




A P P E A R A N C E S


Caroline Ramsey Taylor, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com


Also Present: Mr. Todd Davis, Videographer



VIDEOGRAPHER: This is the videotaped deposition of Morgan Rickard on March 2, 2018 at the time indicated on the video screen, which is 8:34 a.m.
Full introduction has been waived. Will the court reporter please swear in the witness.
- - - -
WHEREUPON,
WILLIAM MORGAN RICKARD
was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. TATUM:
Q Would you state your full name, please?
A William Morgan Rickard.
Q Do you go by Morgan or --
A Yeah, Morgan.
Q Are you married?
A Yes.
Q What's your wife's name?
A Sondra.
Q How long have you been married?
A Twenty-five years.
Q Do you have children?
A Yes.
Q How many?

Page 9

Q So how old are you today?
A 54, pushing 55.
Q Do you have any employees?
A Yes.
Q How many employees?
A Three.
Q Are they full-time employees?
A Part-time.
Q All of them are part-time?
A Yeah.
Q Who are they?
A Mark Williams, Michael Harris, Daniel Wills.
Q And how long has Mark Williams worked for you?
A Three years.
Q How about Michael Harris?
A Five.
Q And Daniel?
A About four.
Q What's Mark do for you?
A Whatever we need to do on the farms.
Q Describe for me his duties.
A Whatever needs to be done on the farm, chicken farm, cattle, hogs. It doesn't --
Q What about Michael?
A They're all three the same.

Page 10

Q What do you pay them?
A Total for the year?
Q What do you pay Mark? Do you pay him an hourly rate, salary, what?
A I pay him hourly.
Q What do you pay him?
A $14.
Q How many hours does he work?
A He'll work from 20 to 40.
Q Each of them?
A Pardon? Each of the three guys?
Q Each of them work about 20 to 40 hours?
A Yes.
Q Per week?
A Per week.
Q And they all get $14 an hour?
A No.
Q What does Michael get?
A He gets $22.
Q And then what about Daniel?
A He's making about $19.
Q They all do the same jobs, help out on all --
A Pretty much.
Q -- chicken, cattle and hogs?
A Pretty much.

Page 11

Q Anything else?
A I don't know.
Q You don't know?
A No, I said, no, just farm work. I mean --
Q Anybody else help you with your farm work besides those three?
A No.
Q Does your wife work the farms?
A No. She does paperwork and keeps the books, secretary.
Q Does she get paid?
A Yes.
Q What does she get paid?
A I don't know. I can't tell you exactly. I just know she gets a check.
Q Do you pay yourself?
A No.
Q Does she pay herself weekly or monthly, or do you know?
A Weekly.
Q You mentioned your farms. What are your farms?
A SMR Chickens, which is owned by Rickard Farms, LLC.
Q And you have other farms?
A ICU Chickens, which is owned by ICU Chickens, LLC. Wishbone Poultry, which is owned solely by me. Branch Farm, which is owned by my wife.

Page 12

Q Solely by her?
A Yeah.
Q Do you have any other farming operations besides those four that are business entities?
A No.
Q You mentioned --
A Well, I have -- I own -- it's not a farming business. We have a poultry cleanout business that I own part of.
Q What's that called?
A Wishbone Poultry, Incorporated.
Q And who owns that?
A Eric Williams, Scott Anderson, and myself.
Q Are you equal partners?
A No.
Q What percentage do you own?
A Twenty-five.
Q And what about Scott?
A Twenty-five.
Q And what about Eric?
A Fifty.
Q How long has Wishbone Poultry, Inc. been in business?

Page 21

A I said SMR, Rickard Farms, LLC.
BY MR. TATUM:
Q SMR, Rickard Farms, LLC. Got it.
SMR Farms was on the 93.
Then what's -- do you have a different farm business on the 26 acres you bought in '09?
A ICU Chickens.
Q And then what about the 34 acres you bought in 2000?
A Branch Farm.
Q And then what about the 26 acres you bought in '16?
A It doesn't have any houses on it.
And the Wishbone Farm is actually on part of that 93 acres, too.
Q And what about the 15 acres in '12?
A Doesn't have anything on it.
Q When you say it doesn't have anything on it, what do you do with the 15 acres you bought? Anything?
A Run cattle on it.
Q Is that where all your cattle run?
A No.
Q What do you do with the 26 acres you bought in 2016?
A All those farms are cattle running on them.

Page 22

Q You say all of those farms, you mean every one of them?
A All of them have cattle on them at some time or another through the year.
Q Does the 26 acres have cattle on it right now?
A No. The last 26 I bought doesn't have any cattle on it right this minute. It's fenced for cattle, but I haven't rotated them in there because it's too muddy.
Q So it's just sitting empty land?
A No. It's hay.
Q So you hay as well?
A I mean, you've got to have hay if you're going to raise cattle.
Q Do you sell?
A Do I sell hay?
Q Yeah.
A A little bit every year.
Q Do you grain?
A No.
Q What do you do -- so on the 34 acres you bought in 2000, that's Branch Farms. How many houses do you got there?
A Four.
Q Four poultry houses? Do anything else on that land besides four poultry houses?

Page 23

A Cattle.
Q Do you grain off that land too?
A (The witness nodded.)
Q What about the 26 acres for ICU, how many houses?
A Four.
Q Do anything else on that land?
A Cattle.
Q No grain?
A (The witness nodded.)
Q And then the 93 acres, what do you got on that land?
A When you say "no grain," years past we did row crop those fields before I got in the cattle business.
Q Okay.
A But the last six years or seven has been nothing but cattle.
Q Okay.
A To clarify that. It has been drained in the past.
Q Okay. What about SMR Wishbone Farms, the 93 acres? How many houses are on that?
A Six.
Q And are part of them SMR and part of them Wishbone?
A Two are SMR. Four are Wishbone. And I believe

Page 24

there's two separate deeds on that. We divided that farm, that 93 acres -- I can't remember exactly how we divided it -- to keep it to two separate entities, but they both run cattle on it.
And at different times of the year there may be a few hogs on each place. We just rotate things around.
Q Okay. So did you first get into the poultry business when? In '95?
A '97.
Q '97. What did you do before then?
A Iron worker.
Q Where did you work?
A Wherever they needed me.
Q You were an independent contractor?
A Local 103 Union Iron Workers.
Q Full-time?
A Full-time.
Q How long did you do that?
A I went to apprenticeship when I was 18.
Q So you were a full-time iron worker from your apprenticeship at 18 until '90-what?
A 2001.
Q Until 2001. So there was overlap when you were still doing iron work and also had your houses?
A Yes.

Page 49

to pay for? Labor?
A I mean, the labor, water and electricity is all that I had involved.
Q And then they were going to provide the chickens and feed and then vaccinations. Anything else?
A Yeah.
Q And then you understood you were going to get paid based on weight versus feed conversion in competition with all the other flocks at the time?
A Yes.
Q Did you have any talk -- before you got your loan, did they give you like a letter of intent?
A I'm sure they did.
Q So you could take that to the bank, and if you chose to --
A Yeah. Most banks ain't going to loan any money unless they think they're going to get a contract.
Q You didn't have to get the loan, but the letter of intent at least allowed the bank to say, you're going to put chickens in these houses if we give you the money for it; right?
A Sure.
Q Did you -- before you decided to go ahead and sign and get that loan, did you investigate any other options for use of your farm?

Page 50

A Nothing other than what I had already been doing on it.
Q Is there a reason why -- what was the ultimate sort of factor that made you decide to get into the chicken business?
A Looked like a lucrative business.
Q Looked like a lucrative business.
But had you looked at any other potential uses of your land?
A No, other than my row cropping and my tobacco and cattle or whatever.
Q And at that time you were still doing both? Were you making any money at row cropping?
A A little money.
Q How about cattle?
A Make a little money.
Q How about tobacco?
A Made a little money.
Q So you were looking just to expand the operations?
A I mean, that's what we all do them things for, to make money.
Q So you were looking to expand your farming operations?
A Yeah.

Page 51

Q Okay. So you started out -- when did you take your first flock with Perdue?
A February the 14th in '97, I believe it was.
Q At that time did you have any -- in your understanding, Perdue would give you a certain kind of bird, or did you have any idea?
A They grew three different type birds at that time.
Q Did you know that before you contracted with them?
A Yes.
Q And how did you know that?
A I mean, they disclosed what we would either get all females or all males or jumbos.
Q So they had a program where they said you'd get all females or all males or all jumbos. And did your contract say that?
A Yes. There was a contract for each one of them.
Q So you signed a contract with them, and if you got all females, it would be the female contract?
A You competed against people that had females.
Q Right. And so you had a contract, and it literally said, female birds.
What type of breed?
A Perdue's breed at that time. They were growing

Page 52

their own genetics.
Q All three of them were their own genetics?
A Yes. The only difference between the males and the jumbos was, you kept the males 49 days, and you kept the jumbos 63.
Q Same -- same breed. You just kept -- grew a bigger --
A Same bird.
Q -- grew a bigger -- right.
All four houses filled on your first flock?
A Yes.
Q And that's how you ran that farm, four houses, one flock.
Did they talk to you about how many flocks you'd get a year?
A Five and a half.
Q Did your contract say 5.5?
A Five and a half, yes.
Q How do you get a half flock in a year?
A Well, I suppose you started in December, and it doesn't go out until January, then next year that second half will show up.
Do you understand?
Q Uh-huh.
A You grew half that flock and didn't get paid for

incentive to build these houses?
A No.
Q So now you're a 12-house farmer. You said, as far as you knew, you were the only 12-house farmer in that complex?
A Yes.
Q Can you remember any specific discussions you had with Perdue about whether it was a good idea or bad idea to go to 12 houses?
A They were hesitant of anybody having more than four or more than eight because of control. They didn't want anybody to have that much of their week's production under their control. They'd rather keep it all divided out to a smaller number.
Q But you talked them into letting you do it?
A Yeah.
Q And do you remember, I mean, what was the -- what was your basic power to get them --
A Work ethic and performance.
Q You said, I'm a good performer, good worker. I can make this work for them?
A And they knew it. They had the numbers. We were --
Q So your pitch was, I can make this work for you if you get me more houses?


A I can make me money and make you money. I mean, that's what it's about, isn't it?
Q Did they warn you that that's a lot of work to have 12 houses?
A They didn't have to warn me.
Q You knew it?
A They knew I knew it.
Q Did they warn you that that's a lot of debt to have 12 houses?
A No.
Q You knew it?
A I was paying it off.
Q But you knew it's a lot more debt I'm taking on?
A Yeah, it's --I built three farms at that time for what one new one costs now for houses.
Q Yeah, I mean, prices go up. I get it.
A It was a lot more profitable in the beginning than it is now.
Q Yeah. I mean, cars went up in the last 20 years too. You can't get a $20,000 Mustang today. Do you agree with that?
A I agree.
MR. TATUM: Let's take a quick break. It's ten o'clock. We've been talking for awhile. Anytime you want to take a break, restroom or whatever, just


let me know.
VIDEOGRAPHER: The time is 9:57. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: The time is 10:09. We're back on the record.
BY MR. TATUM:
Q Did you get this third set of four houses paid off in ten years like the first two?
A Yes.
Q So then you built four more houses, it looks like, in 2009?
A '10.
Q 2010. Was that the next step?
A Yes.
Q And that's on the 26 acres we talked about?
A Yes.
Q And it's now ICU Chickens?
A Yes.
Q Did you buy that 26 acres --
A Yes.
Q -- at the time?
A Before I built the houses, a year or something.
Q Did you buy the acreage with the intent to put houses on them or for some other reason?


A No, bought it with intent to put houses.
Q Who did you buy it from?
A Philip Logston.
Q What did you pay him?
A One hundred -- I'm going to think 150, 160,000.
Q Did you pay cash or get a loan?
A Got a loan.
Q From whom?
A Did that with BB&T.
Q By this time you were with Tyson; is that right?
A I had been with Tyson about a year.
Q So you operated the 12 houses up until you switched with Tyson?
A Yes.
Q I guess I didn't ask you, but I assumed it. When you split up your 93 acres, you didn't have any more land cost in that?
A No.
Q So what made you switch to Tyson in, what was it, 2008?
A Yes.
Q Why did you switch to Tyson?
A Perdue was having 35-day layouts between flocks.
Q Were you still getting your 5.5 per year?
A I don't know at that time if we were or not. We

Page 81

had had about six or eight months of those 35-day layouts.
Q So that would be two flocks?
A It wasn't cash-flowing very good with 35-day layouts.
Q I understand, but six to eight months would be one layout and two flocks on either end. So I'm trying to figure out how many times it happened.
A I can't tell you. I just know that it was coming pretty regular, 35-day layouts.
Q Any idea how many times it happened to you?
A Three or four times in a row, probably.
Q On all 12 houses or a particular farm?
A All 12 houses.
Q Were you taking flocks in all 12 houses at the same time, or do you separate them out?
A They were separated.
Q So four, four and four?
A (The witness nodded.)
Q Each under their own contracts, the same contract?
MS. TAYLOR: Out loud.
A Yes.
BY MR. TATUM:
Q But the same contract?
A Same contracts. No, each one had its own

Page 82

contract.
Q Right. So did you call Tyson, or did they call you?
A When I switched?
Q Yeah.
A I called them. I had heard through the grapevine that they were needing houses bad and having three day turnarounds, and they were going to build some more houses.
Q And you were interested in building more houses?
A No, I wasn't. At the time I was interested in switching to Tyson to keep them from building more houses so both companies kept all the growers busy instead of building more houses and letting the market starve us all to death.
Q Okay. So your mental thought process at the time is, I'm going to switch to Tyson because that will even the market out?
A It will keep my neighbors with Perdue that don't switch from starving to death and keep Tyson satisfied not to build more houses so everybody can win out of it.
Q So you were going to be kind of like the local hero for all the growers?
A No, I wouldn't say that. We did it financial reasons too, I mean.
Q What were the financial reasons?
A There's a big difference between a five-day

Page 83

turnaround and a 35-day turnaround in growing birds a year.
Q So you thought it was financially better for you to look about switching to Tyson and make more money?
A Sure. You can make more money if you own more flocks.
Q So you felt like you wanted more flocks?
A I needed more flocks to make the bills.
Q So did you call Tyson, or did they call you?
A I called them.
Q And who did you talk to?
A Steve Keys and David Mears.
Q And were they open to you switching over?
A Tickled to death.
Q They thought, it sounds great if you want to grow with us. But they didn't recruit you?
A No, did not.
Q Were they open to taking all 12 of your houses?
A Yes.
Q Did you have any discussions about taking less than the 12 houses?
A No.
Q Do you remember having any discussions with them about what Tyson's programs where as opposed to Perdue's?
A We did discuss, because with Perdue we weren't charged for the condemn, and they explained how the condemn

Page 84

worked in a general form. It ain't exactly the way that it works in reality.
Q What did they say?
A They said you will be deducted -- for each bird that was condemned, you would be deducted a pound of average weight, but they didn't disclose that that was going to come out above your tournament.
Q What do you mean, "above your tournament"?
A It's going to come out and change your tournament. It's not just taking the poundage away from you and pay. It's changing the way you settle in the tournament by using the condemn pounds against you.
Q What they told you was, if you have whole birds condemned --
A If you have a runt bird, just say a runt, small bird to be condemned, and it only weighs 3 pounds, you're going to be charged whatever your average weight for the farm was. If it was 6.5 pounds at that time, that bird would take 6.5 pounds off of your gross pay pounds.
Q Right. Similarly, if there was an 8-pound bird that was condemned, you'd only be charged 6.5 because that was your average?
A That was your average.
Q And so if you had a whole bird condemned, they told you you're going to be charged for a whole bird

condemned, but the weight we're going to assign to it would be the average?
A It would come off your pounds after the settlement, the way I understood it.
Q As opposed to what?
A As opposed to taking that out in your settlement and changing your ranking in the settlement because of your condemn.
Q Well, if it comes off your pounds in your settlement, you get paid less per pound; right?
I mean, you get paid the same per pound, but you get paid for less pounds. You knew that?
A I understand. But they changed it in the settlement before the tournament system is done, and that cost of per-bird pound changes to a greater volume when you're in competition with other people, and it changes your feed conversion, and it changes everything.
Q So you knew that there was a charge for condemnation at Tyson that you didn't have at Perdue?
A I did.
Q And you knew that it was a whole bird condemnation process?
A Yes.
Q And you knew that it was based on the average weight of your flock?



A Yes.
Q And what you say you didn't know was the effect -- you knew you wouldn't be paid for those pounds?
A I understood that.
Q What you didn't know is how that would then run through the settlement and affect your overall numbers?
A Yes.
Q Did you go through that with them or just didn't understand it?
A Didn't understand it until I started seeing it in my settlements.
Q So you had that conversation with them. What other conversation?
A My three farms were the number one -- well, the three farms I had were in the top ten in Perdue when I left. And they agreed -- and they knew that, and they agreed to take me as a grower under the circumstances that as long as I stay above average on my settlements, I get to grow chickens my way and won't be micromanaged.
Q You don't like dealing with service techs, do you?
A I don't care about -- I don't have no problem dealing with service techs. They don't bother me a bit.
Q Well, you've told them not to come to your property.



A I have not.
Q You haven't? You had a lot of run-ins with service techs.
A I have not.
Q You've intimidated them.
A I have not.
Q Okay.
A Now, if you want to talk about live production managers and grow-out managers, that's a little bit different thing. The service techs, I haven't had any issues with my service techs, to speak of.
Q You -- so you said you had a conversation with David Mears and Steve Keys. You called them, wanted to switch over. You talked about condemnation. You talked about that you were a good grower at Perdue?
A I talked about that I wanted to be able to run my farms as long as I was doing good and wasn't doing anything detrimental to the chicken.
Q And you knew that Tyson had its own specifications on how they liked to grow chickens. It wasn't the same.
A The reason that we had that conversation is because I had Tyson friends that grew for Tyson, and micromanaging that I knew they were doing to them and the problems they were having.



Q So you knew that, from the grapevine, that Tyson was a more micromanager than Perdue?
A Yes.
Q Because you had friends -- so you were getting involved with a company that had that reputation?
A Yes.
Q Anything else you guys talked about?
A It's been 11 years ago.
Q Can't recall anything else? Anything else about the contract you talked about?
A Not that I can recall.
Q Did you understand that Tyson had a base rate that they paid per pound?
A Yes.
Q And did you understand there was a floor to that?
A Yes.
Q Did you understand that that was also subject to a competitive system called the tournament system?
A Yes.
Q Did you understand that they also had a fuel pay element?
A Yes.
Q Was that different or the same as at Perdue?
A Different. Perdue furnished the propane.
Q So you knew that at Tyson they didn't buy your

Page 97

BY MR. TATUM:
Q And were those contracts for a term?
A Seven years, I believe.
Q Seven-year contracts. All tournament system contracts?
A Yes.
Q Did Tyson talk to you about any other differences such as whether they paid for litter or anything like that before you signed up with them?
A We knew they didn't pay for the litter.
Q So that was going to be an additional cost?
A Yeah.
Q And you knew they didn't front fuel costs?
A Yes.
Q So that was going to be an additional cost to you; right?
A Yes.
Q Do you remember who you worked with in signing your contracts with Tyson?
A James Catlin, Steve Keys.
Q Did you have those contracts reviewed by anyone other than yourself?
A No.
Q Do you remember any discussions about the contracts before you signed them, other than what we've

Page 98

talked about?
A No.
Q And so once you flipped over to Tyson, did you have to give Perdue 90 days' notice?
A I gave notice we were switching.
Q And then how long were you out of chickens before you got new chickens from Tyson?
A Two weeks maybe.
Q So nothing out of the ordinary. When did you get your first Tyson flock?
A December of '08.
Q Now at that point in time in December '08, actually is that about when you signed your contracts, too, your first set?
A I would say, yeah.
Q At that point in time when you signed your first contracts with Tyson, had you had any discussion with them about your desire to build more houses?
A No, I had not.
Q So they didn't -- as far as they knew, that wasn't something you were interested in because it hadn't come up?
A No.
Q So you're getting your first flock. Everything going all right at that point in time?

Page 99

A Yes.
Q Okay. And then it looks like --
A I was a happy chicken farm with Perdue and the first year or two with Tyson.
Q And then it sounds like about a year later you decided to build some more houses?
A Yeah, decided to expand and offered it to me if I wanted to do it.
Q So what did you build?
A We built four jumbo houses, megahouses, whatever you want to call them.
Q So you had 12 at the time, and you decided to build four more?
A Yes.
Q Did you buy land to do that?
A 26 acres.
Q And I might have kind of jumped ahead to ask you about that before we got reoriented. That's what you paid -- bought it from Phillip Longshore?
A Longston.
Q Longston. You paid $150,000?
A Thereabouts.
Q Got a loan from BBT. Did you put any money down?
A No. I used one of my existing farms, collateral.
Q Any structures or equipment you bought with that?

Page 100

A It had just a toolshed on it.
Q Did you buy that for the purpose of putting houses on it?
A Yes.
Q And you bought that in 2009?
A 2009.
Q Do you remember when in 2009?
A I can't tell you.
Q About a year or more later from your first flock with Tyson?
A Probably.
Q What was he asking for the property?
A Whatever I paid him.
Q You didn't negotiate it?
A I needed the property because it joined my property.
Q Why did you need it because it joined your property?
A Because I wanted to build another set of houses on it.
Q And you wanted property that touched yours?
A Yes.
Q So you were willing to pay a premium for that?
A Yes.
Q Did you have the property appraised?

BY MR. TATUM:
Q Go ahead.
A Yes, I've been successful as a poultry farmer.
Q Have you, since joining with Tyson, investigated about growing with anyone else?
A Yes.
Q When was that?
A Multiple times, at least once a year.
Q And who have you --
A Since 2002 -- 2012, 2013, somewhere along in there, I've called Perdue every year requesting to come back.
Q And what have they told you?
A They don't need that many houses in one lump sum.
Q So they said, you've got too many houses for their interest?
A To swallow in one lick.
Q Has Perdue otherwise been accepting houses from folks?
A They have took some four-house farmers.
Q Have you called any other integrators?
A There ain't any other integrators.
Q What's your -- do you have any understanding of what your reputation is in the industry today as a grower?
A My reputation?



Q Mm-hmm.
A I'd hope to think it's an honest grower.
Q Difficult to work with or good to work with?
A Easy to work with, I would think.
Q Successful?
A Trying to be the best I can.
Q Have you thought about switching part of your -- since you have four different farms you operate under, have you talked to Perdue about taking one or two of your farms instead of all of it?
A No, I have not.
Q How come?
A Mainly because I don't think they'd be interested in them being that close proximity to Tyson houses.
Q But you've never talked to them about that?
A I have not. I don't want to be split between them. It would be like living with two women.
MS. TAYLOR: No offense.
BY MR. TATUM:
Q You -- so you plan on staying in the chicken business going forward?
A If I can figure out something else to do with the houses, I'd do something else to make a living, but I don't know what that single-purpose building, what I can find to do with it.



Q No plans to retire anytime soon?
A No. I figure I'll work until I die. I love farming. I just don't like the unfair issues.
(Exhibit 1 was marked for identification.)
BY MR. TATUM:
Q Well, I hear you. Let me show you what's marked as Exhibit No. 1.
A Okay.
Q I think Exhibit No. 1 is a contract -- your current contract for what's known as farm 17 -- 5174. That's your SMR four-house, or how many houses is that today?
A Two.
Q That's the one with the two?
A Yes.
Q On the second page there of the broiler contract, is that your signature there on the lower left?
A Yes, sir.
Q And above it, it says, member. Did you write that? And then WMB or WMR maybe?
A Yeah, because when I signed it and put president of Rickard Farms, LLC, they brought the contract back and told me I couldn't put "president." I had to put "member." And wanted me to initial the MWMR over to the side of it, but I wrote "member" above the president.



Q Because an LLC doesn't have presidents; right? It's got members and managers. Is that -- is that -- did they tell you that?
A They didn't tell me that.
Q You don't have a problem with that?
A No, I don't have a problem with it.
Q Does your LLC have a manager?
A Me.
Q It looks like -- my understanding, this is your current contract for 5174 and the duration up there is September 1, 2017 to September 1, 2020. Is that your understanding too?
A Yes, sir.
Q Do you remember any conversation you had with anybody about this contract before you signed it?
A I don't know. I asked my flock supervisor when she brought it out to me, is that the same contract as what we did the last time.
Q Did she say yes?
A She said yes.
Q So you were okay with it?
A I didn't have any choice but to sign it or not grow chickens.
Q So you were okay it was the exact same contract as before?

Page 137

A (The witness nodded.)
Q Do you have any understanding as to why it's a three-year term as opposed to any other term?
A I was told the reason that we don't get five-year or seven-year contracts is because it did not require any upgrades on the houses.
Q Because your houses didn't require upgrades?
A Yes.
Q And then in Schedule A to Exhibit No. 1, is that also your signature there on the second page of Schedule A?
We're going to go through, and I'm going to make sure it's your signature on several pages, so you might want to keep your glasses on.
A Where now?
Q You're on it. The second page of Schedule A. Just so to help you along, there's a tracking number on the lower right, and we're on TYSON 167628.
A Yes, that's my signature.
Q And if we go to Schedule B of Exhibit 1, towards the back of Schedule B, the last page of Schedule B, there's a signature page. Is that your signature there?
A Yes.
Q And then the next page, the acknowledgment form, that's your signature there?
A Yes.

Page 138

Q Okay. So Exhibit 1 is your current contract, as you understand it, for the SMR two-house farm and then 5174; right?
A Yes.
Q And 5174 is the Tyson tracking number for that farm?
A Yes.
Q We're going to do, just so you can kind of get into the groove with it, the same exercise with what I think is all your contracts so I can make sure it's your signatures and so on.
(Exhibit 2 was marked for identification.)
BY MR. TATUM:
Q So here's Exhibit No. 2, and it is what I understand to be contract 5175 for your Wishbone Farm; is that right?
A Yes.
Q So this is the one under Wishbone, four houses, right?
A Yes.
Q And if I look at the second page, the same term, is that your signature there in the lower left?
A Yes.
Q Go to Schedule A, second page. Your signature?
A Yep. Yes.

Page 139

Q Schedule B, last page, that's your signature?
A Yes.
Q And then the acknowledgment form on Tyson 167651, that's your signature also?
A Yes.
Q And again, do you remember talking with anyone at Tyson about anything about this contract other than what we talked about?
A No.
Q Did you get them all at one time?
A They were two weeks apart as they came due.
Q But you don't remember any specific discussions --
A I questioned about the three years of the contract because we got seven years in the past, and if we did the little upgrade, we got another seven years.
Q And they said --
A And I was questioning them why we wasn't getting at least a five- or seven-year contract on these contracts.
Q And you were told because?
A We're not requiring you to spend any money. And if we require you to spend money, we'll give you a longer contract.
Q You were okay with that?
A Well, I didn't really -- I prefer seven-year

Page 140

contracts.
Q Well, but you didn't want to spend any money, did you?
A I didn't have to. I couldn't get no better than I am. I'm head and shoulders above what the norm is.
Q You are?
(Exhibit 3 was marked for identification.)
BY MR. TATUM:
Q Here's Exhibit No. -- I put the wrong tag on it. Exhibit No. 3, I think, is what's labeled contract 5176. This is your Branch Poultry contract, four houses?
A Yes.
Q And again on the second page, the Broiler Production Contract, that is your wife's signature there?
A Yes.
Q And you said she's the owner of Branch Poultry?
A Yes.
Q Why was that particular farm bought in her name?
A To keep the entities to four-house farms.
Q But even though she's technically the owner of Branch Poultry, you do all the work?
A Yes.
Q You run all the farms?
A Yes.
Q That's her signature there on the left?

Page 141

A Yes.
Q Same with Exhibit A. Is that her signature on the second page of Exhibit A?
A Yes.
Q We're also going to go to the last page of Exhibit B -- I mean Schedule B of Exhibit 3. Is that her signature?
A As far as I know.
Q And then acknowledgment page, that's her signature also?
A Yes.
Q And do you remember any -- do you know of any discussions she had with anyone at Tyson before signing this contract in Exhibit 3?
A No.
Q Did you have any discussions with anyone at Tyson about it?
A Same as I had with the rest of them.
Q Just about the term and upgrades?
A Yes.
Q Were you present when she signed this one?
A No, I don't think so.
(Exhibit 4 was marked for identification.)
BY MR. TATUM:
Q So those contracts are the contracts, as I

Page 142

understand it, for the houses you brought over to Tyson, originally built with Perdue; right?
A Yes.
Q Contracts 5174, 5175, and 5176?
A Yes, sir.
Q Now let me show you Exhibit No. 4. This is contract 5193 for ICU. Is this the four houses you built with Tyson?
A Yes, sir.
MS. TAYLOR: Mark.
MR. TATUM: Oh, I'm sorry.
BY MR. TATUM:
Q And that's your signature there on the second page?
A Yes.
Q Now, this one you signed back in November of 2011 or '10?
A '10.
Q And it's a ten-year contract; right?
A Yes, sir.
Q And this is the one you signed about a year after you started growing with Tyson under the other houses?
A Yes.
Q Right? And you got a ten-year contract here because you built new houses?

Page 143

A Yes.
Q Do you intend on extending this contract when its term comes up?
A I'm sure I will.
Q And then on the second page of Schedule A, is that your signature?
A That's this one, right?
MS. TAYLOR: 777.
BY MR. TATUM:
Q It's 116777.
A Yes.
Q And if we flip through to Schedule B and go to the last page, is that your signature there? It's Tyson 116782?
A 82?
Q 116782, yeah. It's the last page of Schedule B.
A Okay. I was looking in the wrong spot.
Q That's okay.
A Yes, sir.
Q The next page is your W9 form you provided Tyson. That's your signature there; right?
A Yes.
Q And the next page is the acknowledgment form. That's your signature there, Tyson 116784?
A Yes.

Page 144

Q Now we're going to flip past to a couple of amendments that I think might be attached to this. If you go to 116789 --
A Okay.
Q -- this is a document amending Schedule A that on the second page looks like you signed on March 9, 2011. Do you see that?
A Yes.
Q Do you remember what the amendment was for?
A I believe it was for adding the cool cell lines.
Q You believe it was for adding the cool cell lines?
A We added something. I don't remember. I can't tell you. Oh, we got a pay increase.
Q Base pay increase?
A I believe that's what -- might have been 1. -- .015 cents. Is that right?
Q Well, it looks to me like the energy allowance went up in paragraph H.
It looks to me like the base pay went up in paragraph G and was subject to a floor. Is that your understanding as well?
And then finally the Schedule A includes a premium pay that wasn't part of your original contract.
A They changed some things around, and I can't,

Page 145

without reviewing the whole contract. That's when they started the -- about the time they started the other contract they were doing.
Q Now, if we flip through, there's an amended Schedule B. Go to the last page. It's Tyson 116797. Is that your signature there?
A Yes.
Q And then finally the last two pages of Exhibit 4 is another amendment to Schedule A, if you'd go to those, 116801 to 802.
Is that your signature there on the last page?
A Yes.
Q And this was another amendment to Schedule A increasing your pay; correct?
A This was the .015.
Q And also increased your base pay, correct? And it also increased -- or changed the square footage pay from a pound to a square foot --
A On the fuel.
Q -- computation. Fuel?
A On the fuel allowance?
Q Right.
A Yeah.
Q Base pay went up; right?
A Yeah, base pay went up. And they base that

Page 146

square footage pay on a 7-pound chicken, and they told us -- Jim Gottsponer told us that if we went heavier birds than the 7 pounds that we'd be compensated and adjusted.
Q And so they changed the fuel pay to a rate per square foot as opposed to by the bird; right?
A Yes, because we had gotten some birds that were extremely -- they were picking them up at like six and a quarter or whatever in the winter, and it was killing us on fuel.
Q Right. And so this was -- this was making the fuel pay more harmonized just based on the feed, not based on performance?
A It was -- it was, as long as we were growing that size bird. But now that we're growing a 7.3/4-pound bird, 7.5-pound bird, this contract is actually costing me money.
Q Have you went back to anybody and said, I want --
A Yes.
Q -- to handle my fuel paid in a different way?
A I went back and told them, and they said they would adjust it. If we went over a 7-pound chicken, that they would adjust the square footage pay, but it's never been done.
Q But it's never been done yet?
A No.
Q And then also your premium pay went up with this

Page 147

amendment as well; correct?
A That must have been the .015. That first one we talked about, the base pay, they adjusted that base pay. That wasn't an increase in pay. That was just an adjustment.
Q What do you mean, "an adjustment"?
A They took it from four cents to -- I'd have to go back and review it. I remember when it happened. But they took the base pay up to a little bit higher level, but it didn't give you -- unless you fell to that base pay, it didn't affect you.
Q You're talking about the floor?
A The floor. They changed the floor.
Q Right.
A And it did -- and unless you fell to that floor, that increase there didn't affect anybody.
Q Right, yeah. I understand there's two elements to the base pay. One is just the amount per pound you get paid; right?
A Yes.
Q And do you know if the amount per pound you get paid is the same as every other grower or different under your contract?
A As far as I know, it's the same. I mean, it depends on where you're at. The base pay is the same for

Page 148

everybody, as far as I know.
Q You've never looked at any other -- anybody else's contract to know if they get the same?
A No, I have not.
Q And then the base pay also has a floor to it. So if you happen to fall at a certain level, you're just going to get that floor?
A Yes.
Q Right. And I understand what you're saying --
A They changed that bottom to a different number.
Q Yeah.
A Which doesn't affect anybody other than if somebody has a disaster.
Q Well, it certainly affects growers that aren't as good as you who may be bottom growers; right?
I understand it may not affect you. But you understand there are growers who aren't as good as you; right?
A Yes.
Q And some of those growers need that base floor. You understand that?
A I understand.
Q Do you remember any discussions -- now that you've looked at your 5193 contract that was signed several years ago -- about it, other than what we talked about

Page 165

Q Did Tyson try to sue you over that?
A No.
Q I mean, you lost 45,000 of their birds. They didn't point the finger at you, did they? Did they?
A Not that I'm aware of.
Q When you made -- when you had human error and you killed a bunch of their birds and suffocated them, they didn't point the finger back at you and say you owed them a bunch of money?
A Yeah. No, they didn't say I owed them a bunch of money, but...
Q But what?
A They sent me out a certified letter threatening my contracts.
Q They kept contracting with you; right?
A They sent me a certified letter threatening my contracts.
Q They kept contracting with you after that; right?
A Yes, they have.
Q Tyson has never asked you to pay them for birds you've killed on your property that didn't have anything to do with them; right?
A No, sir.
Q Okay. So are those the only sort of abnormal losses that you've had?

Page 166

A That I can remember right now.
Q Have you had your land appraised at any time in the last couple years?
A Hadn't had a reason to.
Q Have you had any of your property appraised in the last few years?
A Haven't had a reason to.
Q Do you prepare tax returns every year?
A We have them prepared. I don't prepare them.
Q Is there -- did you gather your tax returns for this lawsuit?
A Whatever was required of me, I gave them.
Q Do you have your tax returns at home?
A I have tax returns, as far as I know, at home.
Q At home?
A Yeah.
Q Do you do one tax return for all your businesses, or do you do an individual one for each business entity we've talked about?
A Each one does it individually, and it gets put together into my personal.
Q So it all flows up to you ultimately?
A Yes.
Q Who have been your service techs that you've worked with while at Tyson?

Page 167

A James Catlin, Ruben Bruce, and Jennifer -- she got married, and I can't remember what her maiden name is now.
Q We've been calling her Jennifer Parks. Is that the right one?
A That's her. I think that was her name before she got married. That's what I call her, Jennifer Parks. That's the way it's in my phone.
Q Is she still your service tech today?
A Mm-hmm.
Q Have you ever worked with any other service techs here and there?
A With Tyson?
Q Yes, sir.
A Just if someone is on vacation and they send someone out.
Q Have you ever had any problem with James Catlin, Ruben Bruce, or Jennifer Parks?
A No, not that I can --
Q Never felt like they lied to you?
A I don't feel that they lied to me, no.
Q Feel like -- you may agree with them or not, but you feel like at least they're trying to do their job and help the chickens grow?
A I agree with that.

Page 168

Q Sometimes you take their advice, sometimes they don't -- you don't; is that fair?
A That's fair.
Q And then have you worked with any other Tyson employees besides service techs over the years?
A I mean, I've talked to David Mears, Steve Keys, Kenny Bartley, Craig Coberley, Jim Gottsponer, David Dickey, Jared Shelton.
Q Anyone else? Neil Barfield?
A Neil Barfield, I've talked to him.
Q Anyone else?
A Not that I can think of.
Q One name I didn't catch. Craig?
A Craig Coberley.
Q Oh, Craig Coberley.
Have you ever had any problems with David Mears?
A We've had some discussions.
Q Ever felt like he lied to you about anything?
A I never felt that David really lied to me about anything.
Q You said you had some discussions with him. Do you remember any discussions?
A We had a discussion a few weeks before he left this last time.
Q And what about?

Page 169

A Feed issues and the corn they were buying at the mill that was being rejected and taken back that had weevils in it. They were buying it as damaged corn and discounting and running it through the mill.
Q And what did he say about that?
A He had every right in the world to feed the chickens damaged corn if that's what he wanted to do.
Q Do you know if you got any damaged feed?
A It was causing excessive diarrhea in a lot of the birds.
Q In your birds?
A My birds.
Q How many flocks was that?
A We had good floors in July when we passed the animal welfare audit. And after that August, September, October all the way to today we've had a lot of wet floors and unsanitary conditions in these houses due to diarrhea.
Q So you've had wet floors since about August of '17?
A And we had wet floors the winter prior to that. I mean, it's --
Q How do you know it's related to the feed?
A Because if you take the feed off the birds, they quit having diarrhea.
Q Well, if you take the feed off the birds, they

Page 170

die; right?
A No. They quit dying when you take them off the feed, if you want to know the truth about it.
Q They quit going to the bathroom if you don't feed them; right?
A They will.
Q So how do you know it's the feed?
A It's almost like the mortality this winter when we were out of feed during this ice event. If you were losing 50 or 80 birds a day, and you ran out of feed, and they couldn't get you feed the next day, your mortality would go down to picking up five or six chickens dead. And when you put them back on feed, they go right back to dying and squirting in the floors. I mean, it's in the feed.
Q Do you have any other issues with David Mears besides that feed issue?
A Not that I recall.
Q How about Steve Keys? Ever feel like he lied to you about something?
A Not that I remember. He wasn't around very long.
Q Ever have any problems with him?
A No, sir.
Q You mentioned Craig -- you mentioned Craig Coberley?
A Craig Coberley, complex manager.

Page 171

Q Did you ever have any problems with him?
A Yeah, we had some problems.
Q What were your problems with him?
A Feed delivery.
Q Anything else?
A Just that they talked about fixing things they never did fix as far as feed deliveries and chick quality and some of those issues.
Q How long was he complex manager?
A Three years, four years.
Q Do you remember what years?
A Probably about '01 to '04. I would guess in that neighborhood. I don't have it documented.
Q Ever feel like he lied to you about anything?
A Yeah, I felt deceived on a few occasions.
Q What was it?
A I don't -- I can't recall every incidence.
Q How about Kenny Bartley? Ever have any problems with Kenny Bartley?
A Multiple.
Q When was Kenny Bartley on the scene? What years?
A From about 2010 to whenever they fired him.
Q How do you know he was fired?
A That's pretty common knowledge.
Q How do you know he was fired? Did some grower

Page 172

tell you that?
A No. Somebody from Tyson did.
Q Who told you?
A I can't remember who it was.
Q What problems did you have with him?
A We had some disagreements in the beginning, and we were in the top of the grow-out. And after our disagreements, we were took to the bottom of the grow-out. The year after he left, we were back to the top of the grow-out.
Q When you say "top," you mean rank --
A Ranking.
Q -- on your flocks? What were some of the disagreements over?
A Feed, bird quality, vaccinations.
Q How do you know he had anything to do with it?
A He's the live production manager. He's over all of it.
Q Understood, but how do you know he had anything to do with your ranking?
A He was upset with us or me, and to prove a point.
Q And how do you know that?
A I know I didn't change anything from the time before he got there until the time that he left, and I didn't change anything afterwards, and my settlements will

Page 173

show the difference.
Q So you just feel like maybe he somehow changed your settlement?
A I believe he could pistol whip you if he wants you. They have control over all the numbers and the pencils, and I don't have any choice about it.
Q Do you know that he did any of that, or you just --
A Do you know he didn't?
Q I'm asking you. You're the one making the claim. Do you know he did that, or are you just sort of conjecturing it?
Q For the what?
A Is this just conjecture, or do you know it happened?
A Cannot prove it.
Q Can you?
A I cannot.
Q Do you feel like he ever lied to you about something?
A Yes.
Q What about?
A Fixing the problems.
Q Fixing what problems?
A The problems they were having with feed.

Page 174

Q Any other lies you think he told you?
A About the Georgia '08.
Q Anything else?
A That's all I can remember.
Q Now, the Georgia 08 you said was in 2012. What did he lie to you about the Georgia 08?
A We kept telling him that we had a problem with the health of these chickens, and they were dying and dying and dying. And they come out: "There's nothing wrong with the chickens. It's what you're doing."
Q What do you mean, "they"? I asked about --
A "They" as in the grow-out people, the live production.
Q Well, listen. We're talking about Ken. And if you're going to say Ken lied to you about something, I want to know what Ken said.
A Ken said that it wasn't nothing wrong with the chicken. It was in the grower. It's your problem. It's your farm's. Problem with what's wrong with these chickens.
Q Okay.
A That's not true.
Q And then later they determined it was some other problem?
A They determined it was Georgia 08 that they had all along, and it wasn't anything that we were doing or I

Page 175

was doing to cause it.
Q Why do you think -- do you think maybe he honestly thought that at first and then figured out it was another issue?
A No, I don't.
Q So you think he knew from the very beginning what the cause was?
A I don't know if he did or not. I'm just telling you I don't --
Q So you don't know if he was lying. You just know that turned out not to be true; right?
A Yes.
Q And in fact, he and the complex were working to fix it and fixed it; right?
A Eventually.
Q Now, you said there were problems with feed. How do you know he didn't try to fix problems with feed?
A Because the problems didn't get fixed.
Q What were the problems?
A They did finally get it fixed.
Q Well, how do you know he wasn't trying to fix it?
A We went for a year going through -- they paid me four times in a year for feed that I didn't get.
Q So he said -- so you raised this issue with him; right?

Page 176

A Yes.
Q He said, I'm trying to fix these feed issues; right?
A No, he don't acknowledge there was ever any feed issues.
Q Okay. But they got fixed?
A After about a year worth of --
Q So what did he say that was a lie about feed?
A That there wasn't no issues.
Q So he was lying saying there was no issues. And what got fixed?
A They put mail -- we put mailboxes up at each farm with a farm number that you stamp the feed tickets to prove that they were even on our farms. Prior to that there was no documentation left on the farms.
Q Understood, but what is it you're saying was needing fixing? Documentation?
A Or somebody to keep checks and balances to make sure the feed is even getting to your farm that you're being charged for.
Q So he was saying he doesn't think there needs to be more documentation? That was the issue?
A He's saying there's not any -- ever been any issue with feed in his complex.

Page 177

Q Okay. And you were saying, yes, there have. And then later they instituted a documentation program where they dropped off feed tickets to document the feed?
A Yeah.
Q Okay. So you saying his lying was saying he didn't think they had issues?
A I mean, after I proved them four times that they had to pay me, I think they realized they have issues, and I could prove it.
Q So is it fair to say maybe he didn't think they had issues and that you proved him wrong?
A No.
Q Well, how do you know?
A All I can tell you is, my settlements went up as that started in compared to what they were before.
Q So his opinion was, there were no issues when you first talked to him?
A Yes.
Q And then you proved to him that you did have issues?
A Yes.
Q And then they instituted a plan to better document the feed deliveries?
A Yes.
Q Did you do anything to calculate whether or not

Page 178

that cost you any money, that issue of documentation of feed deliveries?
A It cost me on all the settlements we had problems on.
Q And what years was this?
A 2011 to whenever we put those in, 2004, maybe -- 2003, 2004.
Q So 2001 to 2004?
A Somewhere in that range.
Q And then about --
MS. TAYLOR: Did you say 2001?
A No, not 2001. 2011 to -- I'm off ten years. I'm sorry.
BY MR. TATUM:
Q 2011 to 2014?
A Yes.
Q Do you have any idea how many flocks that affected?
A I settled 20 flocks a year.
Q How many pounds of feed are we talking about?
A Truckloads.
Q Well, I mean, if you're going to claim that you're suing over it, you need to tell me what the details are.
A That's why I got these lawyers.

Page 179

Q So you don't know?
A Nope. We'll find out.
Q You can't -- you can't tell me how many truckloads of feed you got more or less than you should have; right?
A Nope.
Q So what about Jim Gottsponer? Do you have any problems with him?
A Yes, sir.
Q And what are your problems with him?
A He told me some untruths.
Q And what did he tell you that was untrue?
A He told me going into summer that if we would grow these chickens to 7 pounds, when they hit 7 pounds they would pick them up to make sure you grow them and grow them fast. We usually grow a 7.25, 7.5-pound chicken. We didn't want to -- they wasn't going to cut the summer density, and we weren't going to push the bird to make them grow fast if they weren't going to pick them up at 7 pounds because they would die from heat loss.
Q When did he tell you that?
A Two years ago.
Q 2015?
A I would say.
Q So this was the summer of 2015?

Page 180

A I would say maybe the summer of 2016.
Q So the issue was, he said if your birds hit 7 pounds, we'll come pick them up?
A That's right.
Q How many -- did you actually gets birds at 7 pounds that weren't picked up?
A Yes.
Q How many flocks?
A I can't tell you how many.
Q Did you lose any birds because of it?
A I can't remember.
Q Any other untruths Jim Gottsponer told you?
A We went to Adam Austin's farm. He lost eight houses of chickens, a friend of ours. And we went down to help him get rid of the chickens with Tyson employees all down there, and he made the statement they would stay and help until all those birds were picked up and dead and gone.
And a whole bunch of us were down there working, and as soon as they got the last live bird picked up out of a third -- there was three houses left. They got the last live chicken out of there. They walked off with all their people and told them that it was the farmer's responsibility to deal with the dead.
They got rid of the -- picked up the last live chicken, and they passed their animal welfare

Page 181

responsibility, and they left it there for the rest of us.
Q How did he lose eight houses of chickens?
A His generator failed the day they were supposed to pick them up.
Q That was grower error?
A No, it wasn't grower error. The generator failed with some kind of --
Q It wasn't Tyson's fault; right?
A No, it wasn't Tyson's fault. Wasn't the grower's fault either. It was mechanical failure.
Q And the grower, as you understand it, is responsible for getting rid of dead chickens; right?
A Yes, sir.
Q And so you're saying you heard him say there that he would help pick up the dead chickens?
A They would stay until everything was cleaned up.
Q Okay. But they didn't?
A They did not.
Q Okay. So that didn't have anything to do with you?
A It did when I stayed and helped the guy get his chickens up.
Q Well, that was your choice; right?
A Yeah. Some of us do the right thing.
Q Are you one of those guys who always do the right

Page 182

thing?
A I try to.
Q Do you ever do the wrong thing?
A I have.
Q Anything else he's done that you have a problem with?
A No, that's fine.
Q When was this Adam Austin farm issue?
A August of maybe '15.
Q How about David Dickey? Have any problems with him?
A No.
Q Ever feel like he's lied to you? No?
A I said no.
Q How about Jared Shelton? Ever feel like he lied to you?
A He did when he was a grow-out manager, but I can't give you the details.
Q Can't remember what it was?
A Too many years ago.
Q Can you recall when?
A When he was grow-out manager, 2001 to 2004 or in there somewhere.
Q But you can't recall anything about it?
A (The witness nodded.)

Page 183

Q And then you mentioned that you worked with Neil Barfield as well. Has he ever lied to you about anything, in your opinion?
A Not that I'm aware of.
Q So no problems with him, and no problems with Jared, I take it?
A No.
Q We talked about David Dickey.
Anybody else that jumps in your mind that you worked with at Tyson that we haven't talked about?
A Not that I remember.
Q You get -- you get a settlement packet every time you settle?
A Yes.
Q And does that settlement packet include your ranking sheets and your delivery sheets and so on?
A Yes.
Q I think I have a sample here of a settlement packet that you might receive.
This is labeled Exhibit No. 7 (sic) for Farm 5174, and it looks like --
MS. TAYLOR: Mark, my last one is 4. Did we miss some?
MR. TATUM: Oh, I just grabbed off this. What did I mark it as? Five?

Page 184

MS. TAYLOR: Okay. You said 7.
MR. TATUM: I just couldn't read it. Sorry.
(Exhibit 5 was marked for identification.)
BY MR. TATUM:
Q So Exhibit No. 5 is a packet of settlement documents for your Farm 5174, and the settlement sheet is there towards the back. It looks like this is for week ending January 23, 2016.
So when you settle a flock, you normally get a settlement packet from Tyson?
A Yes.
Q And that will include your settlement sheet; correct?
A Yes.
Q Your grower recap will tell you where you ranked?
A Yes.
Q It will include your live scale tickets like we have here in Exhibit 5?
A Yes.
Q It will include your mortality cards?
A Yep. Yes.
Q Your condemnation certificates?
A Yes.
Q And your feed delivery schedules?
A Yes.

Page 185

Q Does it include any other data that I'm not thinking of? Well, it includes your check information; right?
A Yes.
Q And itemizes out how that's gotten paid.
So, for example, if we look at this Exhibit No. 5 settlement packet for Farm 5174, according to your grower pay recap, which is Tyson 100416, you ranked second that flock --
A Yes.
Q -- with 46,000 birds placed? Is this your two-house farm?
A Yes.
Q And you've got roughly 23,000 birds in each farm?
A Yes.
Q And then it looks like, if we look at the next page, which is your grower check payment worksheet, it looks like you got paid $23,311.94 for that particular two-house flock; right?
A Yes.
Q And you said that whole house is paid off, so you're not having them assign any payments to the bank or anything; right?
A Yes.
Q It looks like the next page is a check.

Page 186

Have you ever, in any of your settlement documentation -- do you get these for every flock?
A Yes.
Q Similar set of documents? Have you ever had an occasion to look at them and think that the condemnation charts were calculated wrong?
A No.
Q Have you ever had an occasion to look at them and think the mortality charts were calculated wrong?
A No.
Q Have you ever had an occasion to look at them and think the live scale tickets were calculated wrong?
A I have one time, but I don't remember the details of it. It's been too many years ago.
Q Did you raise that with Tyson?
A Yes, I did.
Q And what happened from that?
A I was advised that I ought to take a video camera and video every truck that left my farm.
Q By whom?
A Jim Gottsponer.
Q So you had a dispute on the number of trucks that left your farm?
A Yes.
Q You felt like more or less trucks left your farm?

Page 187

A I feel like less trucks left my farm. I'm not going to say -- I'm going to say that I wasn't credited for either a half or three-quarters of a load of chickens.
Q Okay. And so Jim said they don't have a record of that, but the best thing you could do is videotape every time. That way if it's wrong, they can fix it. Is that fair?
A I suppose.
Q I mean, that puts everyone on the same page; right? That's not bad advice?
A No.
Q And then last question on the feed deliveries: Have you ever had an occasion to look at the feed delivery tickets on any of your settlements for any of your farms and think those aren't accurate?
A Yep. Yes, sir.
Q When did that happen?
A I can't give any exact dates on it. 2013, along in there somewhere.
Q What happened?
A On one in particular flock that comes to mind, the feed delivery on the browser tickets you've got here --
Q Yes, sir.
A -- showed that my bins wouldn't even hold the amount of feed that was delivered in a three-day period. It

Page 188

was an impossibility.
Q And which farm was that?
A It was on the SMR Farm, I think.
Q And so it showed over a three-day period more feed was delivered than your bins would hold?
A A truckload more than my bins would even hold with the birds eating.
Q So it was what you thought was one truckload too many?
A Yes.
Q Did you raise that with anyone?
A Yes, I did.
Q Who's that?
A Craig Coberley, Ken Bartley, Jared Shelton.
Q And what did they say?
A They agreed.
Q And so did you get a credit for it?
A I did.
Q So they said, you know what, you're right, and they fixed it?
A That was -- when they handed me a confidentiality clause to sign before they'd right me a check, and I wouldn't sign it, they got up and left the meeting.
Q And so you wouldn't take the payment?
A They sent it to me in the mail, but I wouldn't

Page 233

deal with people that you don't trust.
Q Well, you just said you had no reason not to trust -- you don't trust Morgan Rickard? You recorded him.
MS. TAYLOR: Object to form. Is there a question?
BY MR. TATUM:
Q What is it about Eric Williams you don't trust?
A Maybe I was practicing my recording.
Q We spoke about -- we've got some people here. Who is this? Do you know who that is talking?
A I can't hear it well enough.
Q Do you know where you are when you're recording this? It says it's dated April 5, 2013.
A I can't tell you. I'd have to listen to the whole video -- the whole recording.
Q It sounds like you had a meeting here, 4/5/13. Who's talking there?
A Somebody's ordering food.
Q Where are you?
A Farmhouse in Calhoun, I think.
Q So you were in another grower's farmhouse?
A No, I was in a restaurant.
Q You're recording at a restaurant?
A Through Tyson, meeting with Jim Gottsponer.
Q So you're with Jim?

Page 234

A Yeah.
Q Did you tell him you were recording?
A (The witness nodded.)
Q Who's talking here?
A That's me.
Q Who's that?
A David -- that's not David. That's Kenny Bartley.
Q It wasn't Jim on this?
A No. It's Kenny Bartley.
Q Do you know when that was taken? They're all dated in 2013, but I can't tell if that's just sort of your copy date or when they were actually taken.
A I would say that's when they were actually taken.
Q Who's that?
A Jennifer.
Q Does this ring a bell as to what it's about?
A It was over some kind of feed issue.
Q And she was telling you you weren't charged for feed you got?
A She was trying to explain to me whatever went on.
Q Who's that?
A Craig Coberley. Kenny Bartley.
Q So this one's an hour long. Do you remember anything about this? It's dated June 2013. Is that you?
A That's me. Jared Shelton.

Page 235

Q Is this a meeting with you at your farm?
A No, Tyson.
Q Do you remember the purpose of this meeting?
A It was over feed, one of those times they paid me for a load of feed that I didn't get.
Q Here's -- there's two more I got here, some dated 7/25/13. Who's that?
A That's me.
Q Who's that?
A That's me.
Q That's you talking there?
A Ken Bartley.
Q Do you remember what this is about?
A Feed issues.
Q They paid you for it?
A I don't know if they paid me for that one or not.
Q And then there's one more. Who's that? Do you know who was talking there?
A I'd have to listen to it again a time or two, hear his voice again. That's Charles.
Q You don't trust Charles?
A (The witness nodded.)
Q I don't blame you. All right. I think that's all the recordings. So all the recordings I have, I had that one from '15, and then the rest of them are all '13.

Page 236

So do you have any other voicemails than that?
A I'll have to look.
Q And all the videos we looked at are all from relatively the same time period, too. Do you have any more videos than that, or is that it?
A I'd have to look.
Q You're not sure?
A Well, I made one Tuesday of some birds I got that were terrible when I put them in.
Q So you got one from Tuesday. Any others ring a bell?
A I'll have to look back and look through my GoPro.
Q All right. That's all I've got on those. Like I said, they just come to me, so I've got to ask you about it.
Did you ever talk with Jim about any expectations of what you'll make, Jim Gottsponer?
A Talked to him about expectations about what the two houses were going to make.
Q What was that?
A Two or three growers he had talked to came by and talked to me about building new houses and the number he put out that they were going to make as average pay.
Q And what was that?
A $2.49 a square foot.
Q Do you think maybe that got lost in translation?

A No. I confronted him about it.
Q $2.49 per square foot is what he told you?
A What he told them. He didn't tell me.
Q Oh, so he never told you that?
A Yes, he told me that when I confronted him about it. That's the number he was putting out.
Q Per square foot?
A Per square foot, was average pay in the complex.
Q Okay. And what do you think the average pay in the complex actually was?
A 25, 30 cents less than that. That would be --
Q You know if that actually is the average square foot?
A But if you add the PLT cost share, the bug spray, the new house incentive pay to the houses that have new house incentive pay and everything -- and everything that they pay out to a grower they back into it.
Q How do you know if it includes all that?
A Because he told me how they was figuring it.
Q Jim told you that?
A Jim told me that.
Q He said, well, the average pay, and here's all the things that go into it.
So he told you, this is what it is, and these are all the things that go into that number. You just thought



some of those things shouldn't be in that number?
A Not to tell the new growers thinking about building houses to expect that's what they're going to make on their check.
Q So he never told you that in relation to building new houses? He wasn't even there when you built your houses.
A No.
Q Did you ever talk to Jim about building new houses at all?
A No, other than what we just talked about.
Q Did you ever talk to him about any other growers building new houses?
A I talked to him about the two to three growers that came and asked me about that price.
Q Did you ever talk to him about buying your houses?
A No, I don't remember talking to him about buying my houses.
Q Did you ever talk to him about buying anyone else's houses?
A He made a statement about buying Charles' one day.
Q Buying Charles Morris's?
A Mm-hmm.



Q What did he say?
A He wouldn't be interested unless he could buy them for .50 cents on the dollar.
Q Is anything wrong with that?
A Well, it's just confusing how you think people can pay full price, and the people that are in the business don't think they're worth .50 cents on the dollar.
Q Well, just because he doesn't think Charles' is worth .50 on the dollar doesn't mean he doesn't think yours are; right?
It might be -- It might be a statement as to what he thinks Charles has done with his houses; right?
A Could be.
Q You would agree with me, wouldn't you, that you and Charles are vastly different growers in that you're hands-on on top of your farms; right?
A Charles works more his farm than I do mine.
Q You think so? Does he perform as well as you?
A Nobody can perform with that many houses.
Q He's just got too many, in over his head?
A No. I think he's doing better.
Q You think he is? Have you ever had a conversation with David Mears where he felt like you were growing the chickens too fast --
A Yes.



Q -- and causing problems?
A Yes, I did. Him and David Mears and Jim Gottsponer told me I was too good a grower.
Q They wanted you to slow down the growth weight so -- they can cause leg problems? Do you recall that?
A Yes, I do.
Q Did you slow down after that?
A We put 12 hours of darkness on the birds to try to slow them down.
Q Did the leg problems lessen?
A They did.
Q Have you ever been told by Jared Shelton not to cull birds in the last week?
A Not by Jared Shelton. I was told by James Catlin --
Q When was that?
A -- not to cull any the last two weeks.
Q When was that?
A I'd say about 2013, 2012.
Q Did he say why?
A They wanted those birds to go to the plant, even if they were down.
Q So they wanted -- they needed the meat to meet production?
A Two weeks later Kenny Bartley was on my farm, and