# Exhibit 58

# Deposition of Timothy Vincent

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

______________________________

DEPOSITION OF TIMOTHY VINCENT
MARCH 1, 2018

- - - -

Videotaped deposition of TIMOTHY VINCENT held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:43 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.

Page 2

I N D E X


| WITNESS | PAGE |
|---|---|
| TIMOTHY VINCENT | |
| Examination by Mr. Tatum | 4 |
| Examination by Mr. Whitfield | 163 |
| Further Examination by Mr. Tatum | 169 |


EXHIBITS


| Number | | |
|---|---|---|
| 1 | Broiler Production Contract, Bates TYSON_167670 through _682 | 114 |
| 2 | Broiler Production Contract, Bates TYSON_139672 through _686 | 118 |
| 3 | Composite of Settlement Documents, Bates TYSON-093988 through _094078 | 122 |
| 4 | Letter from Lisa and Tim Vincent to Tyson Foods Live Production Management, Bates TYSON_118126 | 143 |
| 5 | Broiler Animal Welfare Training, Bates TYSON-122437 through _122443 | 148 |
| 6 | Composite of Certificates of Understanding, Bates TYSON-123775 through _123781 | 159 |


Page 3

A P P E A R A N C E S


John C. Whitfield, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com


Also Present: Mr. Todd Davis, Videographer

Page 4

VIDEOGRAPHER: This is the videotaped deposition of Timothy Vincent on March 1, 2018, at the time indicated on the video screen, which is 9:43 a.m.
Full introduction has been waived. Will the court reporter please swear in the witness.

- - - -

WHEREUPON,

TIMOTHY VINCENT

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. TATUM:

Q Would you state your full name?
A Timothy Earl Vincent.
Q What's your date of birth?
A 4/28/1964.
Q Are you married?
A I am.
Q What's your wife's name?
A Lisa.
Q How long have you been married?
A Twenty-two years.
Q Any children?
A Three.
Q How old are they?

Page 9

Q You don't do it for business anymore?
A No.
Q Is your mom and dad -- you said you inherited your mother's half, so she passed away?
A No.
Q So she gave it to you before she died?
A Right.
Q Mom and Dad are still alive?
A They are.
Q Do they live on the farm?
A They do.
Q So how many structures are on the farm?
A One, two, three, four. Four barns, four chicken houses and three homes -- two mobile homes and a house, my house.
Q Yours -- is yours a modular home or mobile home?
A No. I live in my grandfather's old house. We remodeled it.
Q That house has been there --
A We've been there since '95 in that house.
Q How long has the land been in the family?
A Well, it's called Brooks Schoolhouse Road. My grandfather bought the schoolhouse, tore it down, and built that house with it. So I couldn't tell you. Probably since the '30s. My mother was born in that house, and she's 76.

Page 10

Q Born in the house you live in now?
A Mm-hmm.
Q So on the property, your mom and dad live there, you live there with your two kids, younger kids with your wife?
A Right.
Q Anybody else live on the property?
A No.
Q Have you added anything to the property since -- well, you inherited it in 1997 from your mom? In other words, she just gave it to you?
A Mm-hmm.
Q Was it -- did it have any debt on it when she gave it to you?
A No.
Q You don't owe her anything for it?
A She gets a percentage of the chicken money.
Q What percentage does she get?
A That's a good question. She used to get a percentage. Now I just pay her $3,000 a flock. It's kind of her retirement fund.
Q Is there -- have you been paying that to her since you got into the business?
A Twenty years.
Q And it just goes on forever?

Page 11

A Yeah, evidently, as long as we're a growing business.
Q Is that just an oral agreement, or do you have a contract with her?
A No contract.
Q Nothing in writing?
A Nope.
Q So you've been paying her $3,000 per flock for 20 years?
A Yep.
Q For the 20 acres of land she let you have?
A Mm-hmm.
Q Does she help on the chicken farm?
A She did the first ten years, maybe. Nah, probably the first six, seven years maybe. I had to make her quit. She was getting too old. She liked it.
Q That's about $300,000 you've paid her for that 20 acres?
A She did pretty good, didn't she, for 20 acres? The Bible does say you're supposed to take care of your parents; right?
Q Pay your dad anything?
A No.
Q Do you pay anything else on that land?
A No.

Page 12

Q When you inherited it, did it already have the four barns on it?
A No. Just had two.
Q You've added two barns?
A Mm-hmm.
Q When did you add those?
A The first one in '97. It was a litter barn. I built it myself. Then in 2000 probably '01 I put in to get one of those litter barns that the government helped you with and got that built.
Q That was '01?
A Mm-hmm.
Q The government was provided you a subsidy to build a barn, so they paid for it?
A They paid for 75 percent, I think.
Q What was your outlay for that barn in '01?
A How much was I out?
Q Yeah.
A I think it cost $27,000 to build it, and they paid me 20, so I was out about 7.
Q Did you pay cash for that 7?
A Yeah, I guess.
Q Do you still use that old litter barn, or was it a replacement?
A I use the old one for tractors and equipment.

Page 49

Q So did you talk with other growers and say, hey, I'm building four for 500. Is that a good deal or a bad deal?
A I'm sure we all knew about what it cost. Just like today, it costs double that to build the same. So everybody talks what it costs to build.
Q Today it would be double that to build the same houses?
A Yeah, and then some.
Q So you went to build four. One of them fell down during build?
A Correct.
Q But you already had it insured?
A Yeah. You have to have a construction loan -- I mean a construction insurance while you're building them.
Q Right. So one went down, and you decided to just convert that to a litter barn?
A No. I just used some of the lumber out of it that we, you know, had to tear it all down. We used some of it to build back. Some of it I used on the litter barn that was leftover.
Q Did you ultimately start with four houses or three?
A Started with four. Just the one fell. It didn't take us a week to clean it up and start back with it.

Page 50

Q What stage was it in when you started?
A They were about to put the roof. Actually, they had started putting the roof on, and they left -- left a section of metal on one side, and the wind -- came a storm, and the wind caught it, and it just fell like a domino.
Q How much did you get paid in insurance for that?
A I think it was $10,000. I don't know. Enough to cover the framing.
Q At the end of the day, did it cost you any money out of your pocket?
A It did not.
Q Did you -- you said you received a letter of intent from Hudson?
A Correct.
Q And was that in a letter saying if you went ahead and decided to build houses, they would contract with you?
A They did.
Q How many houses was that letter of intent for?
A Four.
Q Now, you said you wanted to build six when you talked to the bank. Had you talked with --
A I didn't really want six. That was a ploy that she used to get me four.
Q Okay. Because Hudson had told you they only wanted you to build two to four?

Page 51

A No. That was Farm Credit said they could only loan me enough money to build two.
Q I thought we had talked earlier that you said Hudson was only looking for two to four house farms?
A Well, at the very beginning they did say that, yes, but by the time I built mine -- the woman that got me the loan that I was telling you about, she had six houses. Her brother and his dad had 12. They had six and six. So that doesn't -- forgot about that. They couldn't get enough growers, so they were allowing people to build whatever they want.
Q So you could have built more?
A I could have.
Q Didn't have the land and didn't really want it?
A Didn't have -- yeah.
Q You could have built less, but you wanted more?
A Exactly.
Q How long had Hudson been in Robards processing chickens at this time?
A Not long. I was one of the first -- they had probably been there a year, I guess. '96 -- I guess they started up the first house in '96, and I started in '97, March of '97.
Q How about Perdue, how long had it been in the area?

Page 52

A About the same time. They come in -- which is why we got to looking because you've got two companies coming in looking for --
Q They kind of came in at the same time?
A Pretty much, yeah.
MR. TATUM: Want to take a break real quick?
MR. WHITFIELD: Yeah.
MR. TATUM: We try to take a break about every hour.
VIDEOGRAPHER: Time is 10:41. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: The time is 10:47. We're back on the record.
BY MR. TATUM:
Q Did you have any other investment in getting started in the chicken business besides this $500,000 for the first four houses you built originally?
A No.
Q Were you still working at the body shop?
A I was.
Q Once you got the houses built, did you have any further meetings with anyone at Hudson about whether they were going to go forward with you or not?
A Once you got the loan to start construction,

Page 57

A Right.
Q Do you remember any other details about the sheet?
A Not really.
Q So at some point you signed your contract. Do you remember any discussions -- do you remember where you were when you signed your first contract with Hudson?
A I do not.
Q Do you remember any discussions with Hudson about the contract when you signed it?
A I do not.
Q Do you remember any discussions with Hudson when they gave you a letter of intent?
A I do not.
Q How long did you grow with Hudson?
A Seven years. Well, one year for Hudson. I'm sorry. One year for Hudson, then Tyson bought them out.
Q And how long have you grown with Tyson?
A I grew six years with Tyson, five years with Perdue, then I've been back with Tyson since '09. So whatever that comes to.
Q So been about another eight years with Tyson?
A Mm-hmm.
Q So you were with Hudson for -- when did you first take a flock?

Page 58

A March '97.
Q So you're with Hudson from March '97 to when?
A Roughly -- I don't know. Roughly a year. I don't remember exact.
Q Somewhere around '98?
A Right.
Q And then you were with Tyson from approximately '98 to '04?
A '04 and then to about '09.
Q And then '04 to about 09 --
A Perdue.
Q -- with Perdue. And then about '09 to today --
A Correct.
Q -- with Tyson?
A Correct.
Q Always all four houses?
A No. I actually bought a farm in -- when did I buy it -- '05, '06. Probably '06, sold it in '08.
Q In '05, '06 you bought a farm?
A I take that back. I bought it '08, sold it in '09, somewhere in there. I had it two years. I can't remember exact dates.
Q What was the address of that farm?
A Livermore, Kentucky. I don't remember the exact address.

Page 59

Q What's that county?
A McLean.
Q Who did you buy it from?
A Mark -- wait a minute. Andy Martinez.
Q And what did you buy from him?
A Eighteen and a half acres, four poultry houses, and a small residence/house.
Q And was it an ongoing poultry business?
A It was.
Q What did you pay for it?
A Roughly $650,000.
Q Did you get a loan for that?
A I did.
Q From who?
A Farm Credit.
Q Did you put any money down?
A I put my farm up for collateral. I didn't put any money down.
Q So by that time then did you have your original loan paid down so that you had equity?
A I did.
Q What was the original loan in '08 and '09, what was it paid down to?
A Probably less than $100,000. And that was just for upgrades. I didn't actually owe on that.

Page 60

Q So by '08 you had paid off your original $500,000 investment, but you had some loans for upgrades?
A Correct.
Q So you paid off the original $500,000, and you had an additional loan, though, for some upgrades you had made to your four-house farm?
A Correct.
Q And how much did you owe on upgrades at that point in time?
A Probably $50,000.
Q And original loan of what?
A On the other farm?
Q On the upgrades.
A Probably close to that same number.
Q So the bottom line is, you got around ten years later to buying a new farm, you had about $50,000 that you owed on your poultry business?
A Correct.
Q Were you making payments into that poultry business over those ten years from the income from chicken or from any other source?
A From the chicken, but I worked three other jobs.
Q So you had other jobs the whole time that you --
A Oh, yeah.
Q Do you still today have other jobs?

Page 61

A I do.
Q And what are your other jobs?
A Now or then?
Q Let's say that ten-year period.
A I worked in the body shop, sold cars, delivered groceries to the barns, mowed lawns.
Q Are these all part-time jobs?
A They are.
Q Body shop was the family body shop?
A It was.
Q Did you have employees running your chicken farm?
A No, I did not.
Q So you did that yourself?
A Yep.
Q Did you have any help in that first ten years?
A Just my wife.
Q In '08 it sounds like -- so you were with Perdue when you bought a new farm?
A I was.
Q When Tyson came in and bought Hudson, did you continue on your same contract?
A I'm sure we signed a new Tyson contract.
Q Do you remember any discussions with anyone at Tyson about that contract?
A I don't remember specifics.

Page 62

Q Do you remember any differences between that contract and your Hudson contract?
A I do not remember.
Q Did you ever have any problems with Hudson while you were working growing with them?
A No, not that I recall.
Q And then you grew with Tyson for about six years and switched to Perdue in roughly '04?
A Correct.
Q Why did you switch to Perdue?
A Tyson and Perdue came to me and said -- Tyson said they didn't need us, and Perdue was expanding. So they actually offered me money to help with the upgrades. Tyson didn't. So they paid me to switch.
Q So Tyson came to you and said they didn't need you as a grower any longer. And did they tell you why?
A They lost some contracts. They didn't need the houses. I think actually 40 houses switched over at the time to Perdue.
Q And who did you talk to about that?
A I don't remember. Whoever was over the broiler and live production at the time. They changed every six months, so it's hard to keep up.
Q You don't think it had anything to do with your performance as a grower?

Page 63

A I was above average grower.
Q No one told you it had anything to do with your performance?
A Nope.
Q And you don't remember who told you it was because --
A Whoever the live production manager was. I don't remember.
Q You don't remember who that was?
A I don't remember.
Q Do you remember what year this was?
A '04, I guess. Well, actually it was probably the end of '03 because I waited all winter before I made my decision to switch.
Q And so they didn't tell you you had to switch?
A No.
Q They gave you a choice?
A It was an option.
Q And what was the options, switch or keep growing with Tyson?
A Correct.
Q So you could stay with Tyson --
A And be out of birds for 30 days between flocks and not be able to make my payment, or I could switch.
Q So they told you you could stay with Tyson under

Page 64

your contract, but out time might be extended?
A Exactly.
Q Or if you could find a place to switch to, they would help you make whatever improvements?
A They brought Perdue in my kitchen. They already had --
Q Who brought Perdue in your kitchen?
A Tyson.
Q I understand. I said who brought you --
A I don't remember. Whoever the live production manager was at the time and the broiler manager.
Q So you're saying Tyson and Perdue showed up in your kitchen?
A That's correct.
Q And what was the conversation that you remember from that?
A Basically Tyson didn't need as many houses, and Perdue was expanding, and they would pay me so much money to help with the upgrades.
Q And why was there upgrades needed?
A Well, because Perdue is center broods. Tyson half-house broods. So we had to change some things in the houses.
Q And what you mean by broods is, the baby chicks --

Page 73

A Right.
Q Had that paid off at some point while you were with Perdue?
A Correct.
Q You had made some upgrades to go to Perdue?
A Correct.
Q And Tyson had given you about $27,000 for that. You said the upgrades also were about 35?
A Right.
Q Did you pay cash for that?
A Right.
Q And so then when you got to the point where you switched back to Tyson in '09, I know you were getting ready to make some upgrades. But up to that point where you make up grades, are you debt-free?
A In what time period?
Q Before you switched back to Tyson in '09.
A No, I'm in debt on the other farm.
Q Well, you decided to buy a new farm, right?
A Right.
Q I'm talking about your original farm?
A No, the original, I didn't owe anything on the original farm.
Q You're debt free on your original investment on your original farm, right?

Page 74

A Pretty much, yeah.
Q Now, when you were with Hudson, you had -- you started with four houses. And then you grew with Tyson for about six years, the same four houses?
A Right.
Q And then you switched to Perdue in '04 to '09, same four houses?
A And bought four more.
Q Right.
A Yep.
Q And that's what I wanted to sort of get compartmentalized in my head.
So at some point you decided you're going to buy another farm?
A Correct.
Q And that's the one you bought from McLean in Livermore, Kentucky?
A Yes.
Q 18 and a half acres, four houses, and some residences; right?
A One residence.
Q One residence. And you got a loan for $650,000 for that?
A Correct.
Q At that moment in time, you're paid off on your

Page 75

first farm?
A Correct.
Q And you're looking to expand?
A Correct.
Q And how did you --
A Actually, I bought it for my son-in-law and daughter.
Q You bought it for your daughter and son-in-law?
A Yeah, for them to run it with the option to buy it after it's paid for.
Q And that note that you got from Farm Credit, was that a 10-year note or 30-year?
A It was 10-year.
Q Do you remember the rate?
A I don't recall.
Q So you bought it so your son and daughter could get in the business?
A Correct.
Q How did you find out it was for sale? Let me step back. Was McLean a Perdue guy or Tyson grower?
A He was a Tyson grower.
Q So it was a Tyson farm?
A Actually, he might have been a Perdue grower at the time. He had been a Tyson grower.
Actually, we switched about the same time.

Page 76

Sometime when I did, he had switched. He was a Tyson grower, and he switched to Perdue. So when I bought it, it was a Perdue farm.
Q And this is Livermore, Kentucky?
A Right.
Q And so you bought it as a Perdue farm, but it had previously been a Tyson farm?
A Correct.
Q Did you use it as a Perdue farm?
A I did.
Q Did it operate for a while under you?
A It did.
Q How long did you operate that farm?
A Roughly two years.
Q Did you run it, or did your daughter and son-in-law?
A He run it for about two flocks, and had something wrong with his lungs, couldn't be in the dust. Probably just didn't want to do it.
Q Yeah.
A So I ended up, had two or three different people in there trying to run the farm for me.
Q So he, bottom line, didn't work out for your son-in-law doing the job?
A Didn't work out.

Page 81

A Yeah.
Q What did you sell it for?
A $715,000, I think. But I had a new tractor that went with it.
Q Had you -- did you have to make any upgrades other than that?
A Oh, yeah.
Q What did you have to do?
A I had to put fans in it. I don't know. I worked on it for two years fixing stuff. It was run down pretty hard.
Q You knew it was run down houses when you bought it?
A I mean, they weren't in horrible shape, but some of the equipment hadn't been up kept, so I had to do a lot more manual labor than it was money-wise.
Q But you knew that going in?
A Right. Yes.
Q And so you sold it, made a little off of it?
A Right.
Q And who did you sell it to?
A Matt Turner.
Q Does Matt Turner still own it?
A He does.
Q Who does he grow with?

Page 82

A Perdue. He actually -- when he bought it, we switched back to Tyson.
Q Oh, so that farm did grow under Tyson?
A Yeah, I guess -- I'm sorry. Now that I think about it, getting the timeline right, when we sold it, we switched back to Tyson. Matt bought it, switched back to Perdue.
Q How many flocks under Tyson's banner did you take?
A I don't remember. Maybe less than a year, probably.
Q This probably answers the question I've had about your contracts because I knew you had two contracts, and one of them I was having trouble just personally getting my hands around. Was this considered Farm --
A Rooster Ridge.
Q This was the Rooster Ridge Farm?
A Mm-hmm.
Q Okay. So the Rooster Ridge Farm you bought, contracted with Perdue, and then switched it to Tyson at some point for a flock or two?
A Yeah, I don't remember exact how long. It was during that same time when we switched back to Tyson that I sold the farm. I could have grew -- I know I grew for probably at least a year.

Page 83

Q With Tyson?
A Yeah. I just remember Kenny Bartley being out there a couple of times.
Q Did he feel like the farm was in disrepair too?
A Not by then. You know, I done owned it a year, year and a half by then, so it was --
Q It had gotten in better shape?
A Oh, yeah.
Q Was it performing?
A It was. I was getting premium pay, premium contract.
Q Premium housing spec pay?
A I was.
Q Was it a premium house pay -- was it a premium house when you bought it?
A No. Well, I don't know. Perdue, whatever Perdue's contract was. I don't remember.
Q But when you switched to Tyson --
A If it was called that. I don't know.
Q When you switched to Tyson, you got the specs up to the premium element?
A I had, right.
Q And you said Matt Turner still operates that farm today?
A Yep.

Page 84

Q And he has since switched it to Perdue?
A That's right.
Q When did he do that?
A He grew about one or two flocks, and then he switched.
Q Did he tell you why?
A Yeah. He hated Tyson.
Q Is that what he said?
A You'll have to ask him why. I don't know.
Q So you at some point were growing with Perdue for about five years, and in late '09 you switched back to Tyson?
A Correct.
Q And that point in time, you switched not only your original four house farm on Schoolhouse Road, but also this Rooster Ridge Farm?
A Right.
Q Why did you switch back to Tyson?
A Same scenario. Perdue was 35 days out between flocks, and I'm in debt a half million dollars, so I had to -- I didn't have no choice, I felt like.
Q That was on your new farm?
A Yeah.
Q How much did you owe on that new farm when you sold it?

Page 85

A I think I come out of there with enough to pay the taxes, which was about $45,000, and I had that $50,000 upgrade note, and I paid that. So, you know, whatever, $90,000, somewhere. I don't know.
Q So at that moment in time, at least, when you sold that farm, you're free and clear in debt in the poultry business?
A As far as I remember.
Q So you switched back to Tyson because Perdue's out time had gotten long?
A Right.
Q You still getting five flocks per year, but waiting longer to get them?
A I'm not sure about that. I don't remember. I just know we were out.
Q Did you have any performance problems?
A Almost over a month between flocks.
Q Did you have any performance problems with Perdue?
A Had four number one flocks in a row before I left.
Q Did you call Tyson or did they call you?
A I probably called them because those companies don't usually search you out without one of the others with them. So I don't remember. I don't recall.

Page 86

Q You think you called them --
A Probably.
Q -- and said I'd like to come back? Did anyone at Tyson say okay?
A Yeah, sure.
Q Or were there discussions about what was needed?
A Oh, yeah.
Q Who did you talk to?
A I don't recall who was there at that time. They changed so many people.
Q Did they talk about -- now that time you're wanting to bring two farms over?
A Right.
Q Instead of one farm?
A Right.
Q Did you talk with anyone about any needs that would be done to either one of your farms to come back and contract with Tyson?
A I did. I wanted to make sure I didn't have to spend any money to do it, and I didn't.
Q So at that time no upgrades were needed?
A Not that I recall.
Q Did anyone come out and inspect your farms?
A I'm sure they did.
Q You can't recall any conversations along those

Page 87

lines?
A No.
Q So then you signed new contracts with Tyson?
A Correct.
Q Tournament-based contracts?
A Correct.
Q Did you talk to them about signing any other type of contract, performance-based or anything like that?
A Wasn't any other contract at that time.
Q So you knew what you were signing, tournament contract, right?
A Right.
Q Were you -- and you knew your houses would qualify for premium pay?
A Correct.
Q Did you understand that you were going to get paid more per pound under your new Tyson contracts than you were the Perdue contracts?
A I don't recall if it was more.
Q Do you recall running any calculations to see if you were going to make more or less?
A I just knew I was going to get more flocks through the year. With the out time that Perdue had, I was not going to get what would be the numbers.
Q So you heard Tyson's out time was lower than

Page 88

Perdue's?
A Yeah, they were turning birds pretty quick.
Q What did you understand Tyson's out time to be?
A I know some of them were saying 7 days, 10 days.
Q Ultimately you signed a contract that guaranteed you five flocks a year; right?
A Right.
Q So the same number of flocks as with Perdue, but you signed a 10-year or 7-year contract?
A 7-year.
Q So with Tyson you got a 7-year contract as opposed to flock-to-flock?
A Correct.
Q You got five flocks per year, right?
A Correct.
Q And both your farms were also going to get tournament pay subject to a floor, right?
A Right.
Q Premium house pay?
A Correct.
Q And fuel pay?
A Well, yeah.
Q Any other elements of pay you understood you were going to get with Tyson?
A Not that I recall.

Page 89

Q Any discussions you remember with Tyson about your new contracts and how they worked?
A No.
Q And you don't recall if you had any discussions with Tyson about whether any upgrades were going to be needed in your farms?
A I'm sure we did or I wouldn't have -- I wouldn't have spent a bunch of money to switch. I don't remember. Seems like I put stir fans in, which is about all I did, which is pretty minimal.
Q So you had to put stir fans in both farms?
A No. I think just mine. I can't remember that far back.
Q Do you know how much you spent on that? Pay cash?
A They're $100 a piece. I didn't spend much.
Q Paid cash?
A Yeah.
Q So at that point you signed new contracts with Tyson, and you're back with Tyson?
A Right.
Q And you've never worked with Perdue since?
A No.
Q Have you -- so we're in 2009 to today. Have you tried to go back to Perdue in the last several years?

Page 90

A Last flock I was going back. They already had my sign made. Ultimately I didn't go. I'm still with Tyson.
Q So last flock meaning early '18?
A Yeah, maybe -- maybe the flock right before the end of the year, somewhere in that -- right at the turn of this year.
Q You contacted Perdue and said you'd like to go back with them?
A I did.
Q And why did you want to go back with Perdue?
A I was sick and tired of picking up all them dead chickens.
Q And so you contacted Perdue and said, I'd like to grow with you?
A I did.
Q And were they open to that?
A They were.
Q But you decided not to switch?
A That's correct.
Q Why did you decide not to switch?
A Because I also have a pesticide business with Tyson that I spray the darkwing beetles in all their houses. And the word was that they were going to take that job from me, so...
Q What was the word? Who told you that?

Page 91

A Well, Neil Barfield told me, he said -- he said, "We're going to leave it like it is for now," but he said, "It probably won't stay that way."
So I got the hint. If I didn't grow for Tyson, I couldn't work for Tyson.
Q So Neil said, "We're going to leave it like it is for now"?
A Yeah.
Q Even if you switch?
A Right.
Q But it may not stay that way?
A Exactly.
Q Do you have a written contract for your pesticide business, or is it oral?
A I do not. Even though David Mears requested me to have one, David Dickey and Jim Gottsponerer wouldn't give it to me.
Q Pardon? Have you agreed to sign a written contract with them?
A I have.
Q But you have not seen the copy?
A I never got -- I never have signed a contract in five years we've been doing this.
Q You've been doing it under an oral agreement; right?

Page 92

A Correct.
Q And David Dickey came to you said, I'd really like to lock this into a written contract?
A No, David Mears. We had a meeting with David Mears, David Dickey and Jim Gottsponerer, and David Mears said, "I want him to have a contract. I want him to spray the pullet houses."
Then he left, and Jim Gottsponerer says, "Would you take a pay -- would you consider lowering your prices?"
Q And you said yes or no?
A I said no.
Q And you're still doing it?
A And they never gave me a contract.
Q And you're still doing it?
A Still doing it.
Q Under the same price you had?
A Still doing it, the same price.
Q So all that happened was, they wanted to know if you'd lower your price. You said, no, and they kept paying you to do it at your price?
A Right.
Q Do you want a written contract, or do you like it the way it is?
A I'd like to have a written contract.
Q Have you ever asked them for that?

Page 101

fortunately only lost about 4,500 birds in the back half.
If it had been a little hotter -- my fans had come on just enough to keep most of them alive.
Q Birds die fast --
A They do.
Q -- if elements get off?
A They were small. It was not extremely hot, but enough they needed some air, and the backups kept most of them alive.
Q I think people who are intuitive would think, you know, like a human can go without water, and can go a week. Birds die fast, don't they?
A They do. From heat and suffocation, yeah.
Q Yeah. And so it is real important you've got to just be on top of it. Your equipment has got to work and all of that.
So you lost about 4,500 birds due to a breaker issue at your Rooster Ridge Farm?
A Right.
Q Did you get any credits or anything for that?
A No.
Q That wasn't Tyson's -- were you even with Tyson then?
A Pretty sure I was.
Q That wasn't Tyson's fault, though?

Page 102

A No, it was not.
Q And then you said the 100-degree heat that affected the whole -- several states, that wasn't Tyson's fault?
A No.
Q Any other major losses you've had?
A No.
MR. TATUM: We might as well break here, grab a bite to eat. He's got to change the tape anyway.
VIDEOGRAPHER: This is the end of Disk 1. The time is 11:42. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: This is the beginning of Disk 2. The time is 12:57. We're back on the record.
BY MR. TATUM:
Q Since you came back to join Tyson and grow with them in '09, have you made any upgrades to your Schoolhouse Road Farm?
A No major upgrades, no.
Q And then obviously you had Rooster Ridge for about a year or more and then sold it?
A Mm-hmm.
Q Did you make any upgrades to that one after you came back to Tyson?
A No.

Page 103

Q So sitting here today, do you owe anything on your Schoolhouse farm?
A I do not.
Q So I take it when you came back, your houses -- we talked about this -- that they were already -- they had the equipment they needed and so on to qualify for premium housing pay --
A Right.
Q -- and you've been working them ever since?
A Mm-hmm.
Q Who have been your service techs for Tyson in this last run since '09?
A Oh, mainly James.
Q James Catlin?
A Catlin and Jennifer Parks.
Q Anybody else?
A Nobody permanently. Every once in a while somebody goes on vacation. They've been pretty much it.
Q Have you had any problems with James?
A No.
Q Any problems with Jennifer?
A No.
Q Ever feel like they lied to you about anything?
A Not that I know of.
Q Then you said you've also dealt with some other

Page 104

folks at Tyson since '09. Who else have you dealt -- you mentioned a meeting you had with David Mears. This will make sure I capture the names. Jim Gottsponerer?
A Yeah. Before they came, it was Kenny Bartlett, Bartley. I don't remember if it's Bartlett or Bartley.
Q David Dickey?
A David Dickey.
Q You mentioned Neil Barfield?
A Yeah.
Q Anybody else you've had any interaction with?
A Jared.
Q Shelton?
A Shelton. He was the grower manager, the second one when I came back. I can't remember the first guy's name.
Q Grower managers, David Dickey. He's live production?
A He's live production now. He was.
Q Neil?
A Neil is, mm-hmm.
Q Have you met with the new complex manager?
A I have not met with him yet. I've been planning to.
Q Did you ever have any problems with Jared Shelton?

Page 105

A Nope.
Q How about Neil Barfield?
A Nope.
Q David Dickey?
A Yep.
Q What problems have you had with David Dickey?
A He lied. He lied on me.
Q What did he lie to you about?
A Him -- he said I blinded some birds. That's been a couple years ago, I guess. He said I blinded some birds. And after the flock -- that was about a third of the way through the flock. They came out. I had some issues. I couldn't get Jennifer out there the one week. I kept telling her I've got problems.
Finally the next week she comes out and brings some stuff to run on with them. Here comes David Dickey and the vet. I can't think of his name. But anyway, the veterinarian comes out and David Dickey and Jennifer, and they're looking at the birds. And the first thing David Dickey wants to say, oh, I think you blinded them. I don't blind birds.
The veterinarian had them -- had the birds on the tailgate, cut them open. And David is over there cutting the eyelids off of chicks -- or chickens. He's saying, "Yeah, they're just about blind." And the veterinarian

Page 106

says, "No, David. Here's the problem. They've got enteritis.
Q I'm sorry. Enteritis?
A Enteritis. I don't know how to spell it. Anyway, I don't know, 7, 8 weeks later after the birds went out and I got my settlement, they sent me a letter saying I blinded the birds, and I wasn't following protocol and blah, blah.
So we kind of -- I called him and Jim Gottsponerer to my farm, and we had a few words about it. Twenty years I've never got a letter, and I wasn't too happy about it.
Q How many birds were affected?
A To my knowledge, none of them from being blind, but from the enteritis, I don't recall. It wasn't -- it wasn't a good flock. I didn't lose like thousands a day or anything but, I mean, they were dying.
Q Was this in one house or all four of them?
A All of them.
Q Do you remember about what year this was?
A It's not been over two years. I think it was about two.
Q Maybe 2016, late '15?
A Yeah. I'm sure you've got the letter, so whenever the letter was wrote, that's when it was.

Page 107

Q And what did -- I don't have the letter with me. I can't whip it out on you.
A They've got it.
Q What's the letter say that you recall?
A Just that I blinded birds, wasn't following protocol, had a long list of things that I didn't follow their recommendations, and that's why I did it.
Q And so you think David Dickey was lying about saying they had been blinded?
A Maybe in his mind he thought so, but me and Jennifer and the veterinarian all agreed it was enteritis.
Q Does enteritis affect the eyes?
A Intestines. No. He had cut them open -- had cut their intestines open and was showing David that was the problem.
Q Do you know if they did any further studies and determined that the birds had been blinded?
A They had checked the feed, sent some feed off for samples. Of course they've done that before and never seen nothing.
Q Did you get any sort of credits or anything for any of that?
A Nope.
Q Did anyone ever tell you what caused the enteritis that you thought was the issue?

Page 108

A The veterinarian may have explained it. I don't recall exactly what he said, no. I just know the name of it. A lot of farmers have had it.
Q So you weren't the only one dealing with that at the time, as you understand it?
A No.
Q Did you talk with any other farmers who had it?
A Oh, yeah.
Q And in the same tournament as you?
A Yeah.
Q Has anyone ever given you an indication as to what they think causes enteritis?
A I can't remember. I'm sure. I mean, it's on the Internet. Look it up. I can't remember exactly.
Q Any other problems you've had with David Dickey?
A Not other than that, not really.
Q So that was a one-flock thing where he felt like the birds had been blinded. You feel like they weren't blinded. You feel like the vet didn't think they were blinded. And then you got a subsequent letter from Dickey saying they were?
A Right.
Q Did the birds -- did the letter also indicate any other problems with the birds?
A No.

Page 109

Q Didn't mention enteritis or anything like that?
A No.
Q Did you ever get any other reports or anything about the birds?
A No.
Q Do you know -- how did you settle that time?
A Not good.
Q What's not good?
A Bottom third probably, maybe -- I don't remember.
Q Can't remember where you settled?
A No. I know it was not good. It was toward the bottom.
Q So that was kind of a one-off incident?
A Well, that's the latest I can remember.
Q I mean as far as with David Dickey, that's the one-off thing?
A Right.
Q The lie you thought he was saying was that the birds were blinded?
A Right.
Q Did the birds have eye problems?
A No. I've blinded birds before. I know what blind birds are. If you don't get enough air and the ammonia gets high, it hurts their eyes. That wasn't the case. It's never my fault -- I mean it's never their fault.

Page 110

It's always my fault.
Q Have you ever had any problems with Jim Gottsponerer?
A Yeah.
Q What's that?
A He's -- I don't know. He's just -- he was a politician.
Q Can you give me any examples?
A Probably could if I thought about it enough. Other than that time him and Dickey came out, and there's been other instances. He's said some things that I didn't think was true.
Q Can you tell me anything he's lied to you about?
A I can't tell you for a fact, no, other than he's going to get us a raise and never did.
Q Are you aware that in fact there were raises under the contracts provided?
A If you mean the .1500s of a cent, yeah, if you call that a raise.
Q But it was a raise, right?
A If you say so.
Q Is more money a raise?
A Yep.
Q And you did get an amendment to your contract for more money, right?

Page 111

A Yep.
Q Did you also get your contracts amend had to start calculating fuel pay by square foot instead of --
A We did.
Q Did you also -- did you also get some fuel supplements over time?
A I don't know what you mean by that.
Q Tyson gave you money to cover fuel costs -- fuel costs when prices were rising?
A When was the ice storm? '08, '09, '10, whenever the ice storm was, they paid some for diesel fuel.
Q Do you remember getting fuel supplemental payments in '14?
A For diesel? Propane?
Q Propane.
A Propane? May have. I don't recall.
Q Do you remember getting cost sharing for fuel payments at some point with Tyson for any costs over $2.50 a gallon?
A That was the ice storm.
Q That was the ice storm?
A Mm-hmm.
Q So you can't, sitting here today, tell me anything Jim's lied to you about?
A Not right offhand.

Page 112

Q Okay. Did I ask you about Neil Barfield? Any problems with him?
A No problems.
Q Okay. How about David Mears?
A No, no problems with David Mears.
Q Never feel like he's lied to you about anything.
And you mentioned Jim along with that other. You're talking about the Dickey issue over the flock with blindness or the enteritis?
A Mm-hmm.
Q Did he say anything in that meeting, or was he just there?
A No, he spoke his piece, yeah.
Q What did he say?
A He just backed up what David said. He was never there. He never looked at the birds.
Q Was he there with David or not?
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q Was he there with David when David came with the vet to look at the birds?
A No.
Q Oh, okay.
A That's what I'm saying. He never saw the birds.
Q So when did you talk to Jim about that issue?

Page 113

A When him and David came out after they sent the letter.
Q Okay. Tell me about that meeting. What happened?
A I just called them out there to talk to them why they sent me a letter. I said I ain't got a letter in 20 years. Plus I feel like it's all fabricated because David said I blinded the birds, and the veterinarian said it was enteritis, and we just argued back and forth about it. My word against theirs, pretty much, so there it is.
Q What did Jim say in that meeting?
A I don't remember specifics.
Q What did David say in that meeting?
A I don't remember specifics. Pretty much in the letter they sent me.
Q What about Ken Bartley? Ever have any problems with Ken?
A Oh, yeah.
Q What problems did you have with Ken?
A Oh, he was always causing problems. I don't know. He would -- he would ignore my phone calls. And we were doing -- we started the bug business when he was there. If I had problems, he would ignore the phone calls, and I'd have to go over there and pretty much walk in his office to get any communication and just -- I don't know. He was just

Page 114

hard to deal with.
Q This is in relation to the bug business?
A Both chickens and bugs.
Q Can you give me any instances where he was difficult to deal with over the chicken business?
A It's been so long, I don't really recall certain instances. It just seemed like the whole time he was here, it was --
Q Hard to deal with?
A Hard to deal with.
Q Did he ever lie to you about anything?
A I can't recall a specific lie, nothing factual.
Q Anybody else you can think of you've ever dealt with at Tyson besides these folks you talked about?
A No.
MR. TATUM: I think I have a copy of your contracts here.
(Exhibit 1 was marked for identification.)
BY MR. TATUM:
Q I'll show you what's marked as Exhibit No. 1. I think this is a copy of your Rooster Ridge contract that you had with Tyson.
A Okay.
Q I realize it's not in play anymore because you sold the farm.

Page 115

A Right.
Q It's labeled 5173 Rooster Ridge, and it's dated 12/2/08.
Do you see on the second page there of Exhibit No. 1 on the broiler production contract, is that your signature there on the left?
A It is.
Q So you remember signing this on December 2, '08?
A I do.
Q It looks like it was supposed to be a contract that was going to last through 12/20/13, if you look up the duration?
A Right.
Q Is that your understanding as well?
A It is.
Q And then going forward, you can track with me on this lower right. It's kind of tracking numbers.
A Right, gotcha.
Q Schedule A, is that your signature on the second page?
A Schedule A. It is.
Q Go forward a few pages. Do you see Schedule B there. At the end of Schedule B, which is Tyson -- doesn't look like -- your signature is out of order.
A On the back page?

Page 116

Q Yeah, it doesn't look like I got your signature on Schedule B. I guess I didn't get that page copied. Go all the way to the back, Tyson 167682. Is that your signature on the acknowledgment?
A It is.
Q So this was a contract you entered into with Tyson after you had bought Rooster Ridge and were switching over from Perdue?
A Correct.
Q And you sold that farm maybe a year later or so?
A That's right.
Q Do you remember any discussions you had with anyone at Tyson about this contract?
A Not in specifics, no.
Q Were you -- for the Rooster Ridge Farm, were you offered -- have any discussions with Tyson about any other type of contract that you might enter for that farm?
A I don't think so.
Q Have you heard of the performance contract?
A I have.
Q Have you ever considered contracting with Tyson under the performance contract instead of the --
A I did look at it.
Q And did you decide that wasn't best for you?
A That's right.

Page 117

Q They gave you the option to do one or the other?
A They did.
Q And they also gave you scenarios on which one would pay you more so you could really look at it based on your performance?
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q Is that right, they kind of went over the two of them and said, you know, based on your flocks, this is what you've been paid under the performance versus the tournament?
A Right.
Q And was it better off for you moneywise to be under the tournament one?
MR. WHITFIELD: Objection to form.
A I felt that it was better where I was because the other one, if you had one bad flock, it stuck with you for -- it actually brought all the rest of your numbers down, your pay down for the whole year, whereas on this tournament it only affects the one flock if you get the next one's a better flock, it doesn't affect.
BY MR. TATUM:
Q So you felt like the one you entered was better for you?
A Mm-hmm.

Page 118

Q Do you know people who think the other one's better for them?
A I do not. I know a few that's been on it and got off of it.
MR. TATUM: Let me show you Exhibit No. 2.
(Exhibit 2 was marked for identification.)
BY MR. TATUM:
Q I think this is your current contract for your Schoolhouse Road. And, you know, when we looked at Exhibit No. 1, it had a number up on the top of it. Was it 5173?
A Right.
Q That was your farm number assigned by Tyson --
A Okay.
Q -- for Rooster Ridge Farm? Does that ring a bell?
A It sounds familiar. I'm not positive.
Q And in this one says 5172, is that your original four-house farm?
A Yes.
Q And TLC Poultry, LLC, what's that?
MR. WHITFIELD: Do you have another copy of that?
A That's the farm name.
BY MR. TATUM:
Q Did you run Schoolhouse Road through that same company at the time, or did you have a different entity?

Page 119

A It's always been TLC Farm. When we went to LLC, we made it TLC Poultry.
Q Everything runs through the same company?
A Right.
Q Do you have any other companies you own?
A The PSS, Poultry Specialty Services, the bug spray.
Q That's an LLC too?
A That's an LLC.
Q Does it run separate books and everything?
A It does.
Q Now, if we look at this contract, this is broiler production contract in Exhibit 2. If you look at the second page, it's dated -- executed on July 11, 2017. Do you see that?
A I do.
Q So this is your current contract for your current operations?
A It is.
Q And the term here is listed as a three-year term?
A It is.
Q Do you know why it's a three-year term?
A No explanation for it. I asked because I always got 10 or 7.
It seemed like on this other one here somebody

Page 120

messed with the numbers. That's been scribbled. This one's been scribbled. I don't -- whatever. But yeah, I did ask why. No -- no answer.
Q Who did you ask?
A I asked Neil Barfield.
Q And what did he say?
A I asked Jennifer.
Q What did --
A They didn't know.
Q Did you ask anyone else?
A No.
Q Do you remember having any other discussions with anyone at Tyson about this contract?
A No.
Q You understood it to be a tournament system based contract, right?
A Yep, same contract.
Q If you look at the second page of Exhibit A, is that your signature there?
A It is.
Q I see -- is that Lisa Vincent next to it?
A It is.
Q Why did she sign it?
A I don't know. I think Jennifer, Neil, whoever asked for both of us to sign because it's an LLC or

Page 125

want, a little more in the winter?
A A little less in the winter this time, but yeah, I am now. They did go for -- they have their periods. One time they'll say you've got to take what we give you. Other times they say, well, how many do you want? It just depends who's running the show. Most of the time they determine that.
Q They determine the type and frequency?
A That's right.
Q Of birds? Do you know who you were competing with in this particular flock? You said stuck out at you as the second best ever.
A I know it is because I made 50,000. I made 52 in the flock before that. I just sold the same bird -- same age bird and made 38. See the discrepancy? Same amount of days, I made $12,000 less.
Q That would be based on mortality, condemnation, and feed conversion?
A Mostly weight.
Q Weight -- and less weight?
A Yeah.
Q What did you finish in that flock you're referring to?
A First. I had -- the one just now?
Q Yeah.

Page 126

A Like 5th out of 12. They didn't make 7 pounds.
Q So you still finished in the top half?
A The flock before this one was 8.5 pounds with the same amount of days growing, a pound and a half.
Q What's your understanding as to what contributes to --
A The bird?
Q -- the growth?
A The bird and the feed.
Q That's it?
A Well, I do everything I've been doing the same. I don't know.
Q Do you agree that the grower's skills --
A Can make a mistake? Is that what you're saying?
Q No. I said, do you agree that the grower's care for the birds contributes to bird health and bird production?
A It can.
Q I mean, bad growers don't do as well as good growers; right?
A Yeah.
Q I mean, you're a good grower; right?
A I think so.
Q And you know -- you visit all the complexes. You know there are other growers who aren't very good at doing

Page 127

it?
A A few. Most try to do their best. They're in it to make money. They ain't there --
Q We all try to do our best. That doesn't mean we're good at it.
A That's fair.
Q You agree with that? Have you ever had an occasion to go through -- you get a settlement packet like this every settlement from Tyson, right?
A Right.
Q Have you ever had an occasion to go through and say, hey, my condemnation numbers and the certificates aren't adding up to my settlement?
A I don't know if I went through and did that. I've argued about it, but it doesn't do you any good.
Q I understand. But I'm just trying to figure out if you ever, you know, felt like, yeah, they miss tracked my condemnation. My numbers are different than what ended up in the settlement?
A Oh, yeah, many times.
Q So you had say situation where the condemnation certificate said number same and the settlement said number B in the same packet?
A No. I'm thinking I had a flock that was tremendously excellent, didn't lose any, and then they send

Page 128

it to the plant and I've got 5 percent condemn.
Q So you've had flocks where you've had high condemn?
A I have.
Q Have you had situations where you thought that was tracked -- USDA condemns, right?
A I don't do the numbers. I just look at them. I mean, I don't know how they --
Q You understand the USDA does the condemnation?
A I do.
Q So what I'm really trying to focus on -- I know you feel like a lot of my birds got condemned and I don't know why. We can talk about that. I want to know from a record keeping standpoint you ever looked in here and say the numbers aren't right. Less condemned according to the certificates than what accounted for economic check?
A Not less.
Q Or more?
A That I thought?
Q Yeah.
A Several times I thought it should have been less.
Q Thought it should have been less, but were the records different?
A I can only go by what they put on here. I don't know. Know what I mean?

Q How about on the mortality cards? Have you ever felt like my mortality cards added up to 100 dead birds, but I've got -- in my settlement they counted a different number?
A No.
Q How about on the feed? Have you ever looked at the feed tickets and it said, well, it says I got delivered X feed, but I think I got more or less feed than that?
A Oh, yeah.
Q When did that happen?
A I couldn't remember dates. I mean, over the years it's happened several times. Sometimes they catch it. Sometimes they don't.
Q And if they catch it, they credit you?
A You have to prove it to catch it, I mean, for them to do anything.
Q Right. You've got to prove that you either did or did not get the feed for the tickets that you got?
A Yeah. But it's a fact that truck drivers go to the wrong farm. They put it in the wrong bins. They -- it happens.
Q It does happen.
A People make mistakes.
Q And when those mistakes --
A And a lot of times they don't get caught. They



can't prove it, so they don't do anything about it.
Q But other times it does get caught, and they've made it right for you?
A They have.
Q Can you identify for me any time when you felt like you caught it, and they didn't make it right?
A I mean, I don't know no specific flocks or dates, no.
Q Now, you characterize it as "mistakes." You don't think anyone's intentionally trying to over or under --
A I know of truck drivers that have said -- that have tried to sell feed to farmers.
Q Right, on the side. And they shouldn't have been doing it; right?
A Yeah. And that would count, if he sold a load -- part of a partial load out of my feed to the neighbor down there, then my feed conversion goes up, his goes down.
Q Did you ever buy feed off Tyson?
A No.
Q When I say "off Tyson," off books is probably a better way to put it.
A No.
Q So you can't identify for me any time when you think your feed conversion was wrongly counted?



A I can't -- I can't sit here and think at the time. I have argued the point many times over the years, yes.
Q Have you ever done anything to quantify any gains or losses that caused you?
A Clarify the question, please.
Q Can you give me an idea whether that ever cost you any money?
A Oh, yeah, sure.
Q How much?
A I couldn't tell you numbers. I mean, like I said, you can have -- if you're on top -- if you're on the bottom, you can lose $10,000 on a four house farm.
Q Can you tell me when that happened to you?
A Probably that flock that David Dickey told me I blinded those birds. I'm sure I lost quite a bit of money there.
Q That wasn't a feed issue there. We're talking about feed issues.
A No, it wasn't a feed issue. I couldn't tell you offhand.
Q Have you ever visited the hatchery?
A I have.
Q Everybody treat you fine there?
A Mm-hmm.



Q Did you see any problems there at the hatchery?
A No.
Q Have you ever visited the feed mill?
A I have.
Q Everybody treat you okay there?
A Yeah.
Q See anything that you thought was a problem at the feed mill?
A No.
Q And then have you ever visited the processing plant of Tyson?
A I have.
Q And ever see anything that you thought was a problem there?
A I thought they didn't have enough on the condemn line. They had two or three people on a 10 or 12 flying staff. So when they get overwhelmed, the birds just keep rolling to the dog food plant.
Q So you --
A You go there now, and it's different. This new guy, he's got -- he's got them staffed, and our condemn is not near what it was.
Q So when did you visit the processing plant and view the condemnation line?
A Oh, man, I can't think the last time I went.