# Exhibit 60

# Deposition of Dennis Clapp

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

___________________________

CONFIDENTIAL - FOR ATTORNEYS' EYES

DEPOSITION OF DENNIS G. CLAPP
FEBRUARY 26, 2018
- - - -

Videotaped deposition of DENNIS G. CLAPP held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:37 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.

Page 2

I N D E X


| WITNESS | PAGE |
|---|---|
| DENNIS G. CLAPP | |
| Examination by Mr. Tatum | 4 |


EXHIBITS


| Number | | |
|---|---|---|
| 1 | Broiler Production Contract, Bates TYSON_167570 through _588 | 104 |
| 2 | Composite of Settlement Documents, Bates TYSON-054859 through 055047 | 118 |
| 3 | Photograph | 130 |
| 4 | E-mail dated February 17, 2016, Bates CLAPP 000004 | 132 |
| 5 | E-mail dated January 16, 2015 and Letter dated December 15, 2014, Bates CLAPP 000008 through _013 | 134 |


Page 3

A P P E A R A N C E S

John C. Whitfield, Esquire
WHITFIELD, BRYSON & MASON, LLP
(Appearing on behalf of the Plaintiffs)
19 North Main Street
Madisonville, Kentucky 42431
270.821.0656
john@wbmllp.com

Mark C. Tatum, Esquire
SHOOK, HARDY & BACON, LLP
(Appearing on behalf of the Defendants)
2555 Grand Blvd.
Kansas City, Missouri 64108
816.474.6550
mtatum@shb.com

Also Present: Mr. Todd Davis, Videographer

Page 4

VIDEOGRAPHER: This will be the videotaped deposition of Dennis Clapp on February 26, 2018 at the time indicated on the video screen, which is 9:37 a.m.
Full introduction has been waived. Will the court reporter please swear in the witness.
- - - -
WHEREUPON,
DENNIS G. CLAPP
was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. TATUM
Q Would you state your full name?
A Dennis Gene Clapp.
Q Is that G-e-n-e?
A Yes, sir.
Q And where do you live?
A Madisonville, Kentucky.
Q And what's the address?
A 570 Hollis Lane.
Q How long have you lived there?
A Nineteen years.
Q Is that a farm?
A Excuse me?
Q Is that a farm?

Page 9

the poultry business?
A Silent partnership. They never did anything.
Q Was it your understanding he was a silent partner? Was he claiming to be a silent partner?
A Yes.
Q So he was a silent partner in your mind?
A Yes.
Q What did he think he was entitled to?
A You'd have to see the court documents on all of that.
Q What did you settle for?
A That's personal between me and my brother.
Q I understand, but since it relates to your poultry business and this is a poultry lawsuit, it may have some --
A It had nothing to do with Tyson. My name has always been on the documents. His name has never been on anything dealing with Tyson. That is mine and my brother personal.
MR. WHITFIELD: Let's take a break just for a second.
MR. TATUM: Just so you know, we can mark it confidential.
MR. WHITFIELD: That's probably what we're going to want to do.

Page 10

VIDEOGRAPHER: The time is 9:43. We're off the record.
- - - -
(Sealed and confidential transcript.)
VIDEOGRAPHER: The time is 9:46. We're back on the record.
MR. WHITFIELD: We took a break a second ago, and Mr. Tatum was asking certain questions about another lawsuit. Mr. Tatum and I, off the record, have agreed from this point, until we say different, we're going to be under seal.
Is that correct, Mark?
MR. TATUM: Yes.
MR. WHITFIELD: Okay. Go ahead.
BY MR. TATUM:
Q All right. I was asking you about a lawsuit involving your brother and you. What is your understanding of what he sued you over?
A A difference in what we both thought the agreement -- what I originally agreed to 18 years ago and what he ended up having me sign a paper for was different.
Q Okay. So 18 years ago you two got in as partners into the chicken business?
A Eighteen, 19.
Q And he was a silent partner, and you were an

Page 11

active partner?
A Yes, sir.
Q You did all the work?
A Yes, sir.
Q He felt like, did he put up money for it?
A No, sir. They didn't put anything.
Q But he felt like you two had an agreement that he was going to make money off the poultry business?
A Yes, sir.
Q And what percentage of that business did he feel like he had an agreement for?
A 50 percent.
Q And what did you feel like?
A The original agreement was, when it was all said and done, I would have the income off of six houses and him two houses, because he already owned four houses.
Q Okay. You know, I'll probably ask you in a minute about how you got into the houses, and maybe that will help flush all those out a little bit.
A Yes, sir.
Q So how many houses do you have?
A Eight.
Q You have eight houses. And you've always had eight houses?
A Yes, sir.

Page 12

Q You originally signed up and got into business with Hudson; right?
A Yes, sir.
Q And Tyson took over for Hudson?
A Yes, sir.
Q And you've been with Tyson ever since?
A Yes, sir.
Q So when you first got into the chicken business, approximately when was that?
A 1999 was when we started.
Q And at that time had you been in the poultry business before?
A No, sir.
Q And at that time then you and your brother had some sort of arrangement on sharing the money?
A Yes, sir.
Q Were you sharing the expenses, too?
A No, sir.
Q So he owned two houses already?
A No. He owned four.
Q Oh, I'm sorry. He owned four. And -- but was he using them for poultry?
A Yes, sir, in Marshall County.
Q And at that time he was running the chicken operations for himself?

Page 85

A I've dealt with Neil. He's broiler manager now. I've dealt with David Dickey. I've dealt with the two before them. I'm trying to think of their names.
Q Jim Gottsponer?
A Who?
Q Jim Gottsponer.
A Yes. Even the one before -- I mean, it's -- Hill was -- Morris Hill was one.
Q Anybody else you can think of?
A Not that I can think of.
Q Were there any other Tyson employees you've ever had any dealings with besides these broiler managers and service techs?
A As they come to the farm and catch birds, I see them then.
Q Catch crew folks?
A Yeah, catch crew folks.
Q How about any of the complex managers?
A No, sir.
Q So you've never dealt with, like, David Mears?
A I've never dealt with him. I've met him, but I've never dealt with him, no, sir.
Q Was he nice to you when you met him?
A Yes, sir.
Q Has he ever wronged you in some way that you know

Page 86

of?
MR. WHITFIELD: Objection to form. Go ahead.
A I haven't dealt with David.
BY MR. TATUM:
Q How about Kenny Bartley?
A Yes, sir.
Q You dealt with him?
A Yes, sir.
Q Any other broiler managers or live production managers or complex managers you can think of you've dealt with?
A Jared.
Q Shelton?
A Shelton. Rufus --
Q I'm sorry?
A Rufus -- I'm trying to think of his last name.
Q Does John Snell --
A He's mine -- one right now.
Q Current?
A Current, yes. I've had two other ladies. I don't remember their names.
Q Did you ever have any problems with David Dickey?
A No, sir.
Q Did you ever have any problems with Jim Gottsponer?

Page 87

A No, sir.
Q You mentioned Morris Hill. Any problems with Morris Hill?
A Just a problem with him.
Q And what was that?
A Dealing with -- I thought I had been shorted a load of birds, and we never could find paperwork on it.
Q And so when was this?
A When Morris was here. I don't have a clue. There's been so many here, they all run together.
Q Are we talking about ten years ago or last year, any idea?
A You'd have to look and see when he was here.
Q Well, I mean, I'm just trying -- you're telling me the story.
A We've had so many people here, they all run together. I'm on the farm.
Q I'm asking you about this issue you had that you just described, which is you thought you got shorted birds.
A That would be when Morris Hill was here.
Q That's all you can say?
A That's all I can tell you.
Q What position was he in?
A Huh?
Q What position was he in?

Page 88

A Whatever David Dickey is in right now, he was over David Dickey, but David wasn't here. It was either David Dickey's job or the one right above it.
Q So you think he might have been complex manager?
A I don't think he was -- he might have been what David is right now.
Q And you can't --
A Jim -- what Jim was, I believe that's what Morris was.
Q Jim was live production manager?
A Okay. That's what David holds now, so that's -- pretty sure that's what Morris Hill would have been.
Q And so can you just ballpark for me? Are we talking ten years ago, five years ago, one year ago?
A Not one year ago.
Q No idea?
A No idea.
Q What has happened that you're talking about?
A My pay the way I received, it worked out to where I was about one load short of birds. We could not prove it. They couldn't prove it. So --
Q So you're saying that -- how many birds is one load?
A 4400 I think is on one load, but you'd have to check with Tyson to see approximately how many is on.

Page 89

Q You don't know?
A I don't know.
Q So you're saying you believe at some point when Morris Hill was working at Tyson, you received 4400 shorted birds, just didn't get a load of birds?
A I didn't get them. When they went to plant is where I was shorted. When I got paid, my pay was short.
Q So you're not saying they weren't placed at the farm?
A No.
Q You're saying that by the time you got pounds back and your settlement back, you thought you should have got pounds for 4,400 more birds?
A Or whatever a load was at that point. It worked out at that point to about one load.
Q So you're saying the loss of these birds is some point between your farm and the facility?
A Yes, sir.
Q And when you say a load, are you talking about a truckload?
A Truckload.
Q So you're saying one full truck of birds somehow left your farm and didn't get reported back to you on your settlement?
A That's what I believe.

Page 90

Q And did you trace that to see if it had been the subject of condemnation?
A No, sir. No one could tell me anything.
Q And who did you talk to about it?
A Morris Hill.
Q And what made you think there were 4400 birds that left your farm that didn't report back to you?
A My pay based on the previous pays, that was about what it came out to a load.
Q And what were you looking at that was telling you about your pay?
A All of my past year settlement, every load, my final dollars, my pay.
Q So the pay was lower?
A My pay was lower, definitely lower.
Q So was the poundage lower?
A If it pays lower, poundage is lower.
Q Was the pounds lower?
A Yes.
Q How much?
A Without going back and looking -- and that's been so many years, it was dropped. There was nothing ever done. Nobody could prove anything. Nothing was ever done.
Q You couldn't prove anything?
A I couldn't prove anything. They couldn't prove

Page 91

anything.
Q So you just thought, my pay is less, so I think there's 4,400 birds missing.
A Yes.
Q Am I tracking?
A Yes.
Q And you went to talk to Morris Hill about it?
A Yes.
Q And what did he say; do you remember?
A I shared with him some stuff, and he talked to me, and he said he'd look into it, and he never could find anything.
Q He never could find anything either?
A Hmm-mm.
Q So he couldn't find that you were shorted?
A Hmm-mm.
Q Did he get back to you and say, I can't find that you were shorted?
A Yes, sir.
Q So you disagreed with each other over that.
Did you think -- did he treat you okay in that process?
A Yes.
Q Did you think he was lying to you in any way that he couldn't find that you were shorted?

Page 92

A Assume.
Q So do you know how much that affected your pay?
A At this point, no.
Q Have you ever calculated what that is?
A Back then we might have, but now I don't have a clue.
Q Where would I go to look into this? How would I possibly know what settlement to look at if I wanted to look at this?
MR. WHITFIELD: Objection to form. Go ahead.
BY MR. TATUM:
Q What would you do if you wanted to figure out which settlement it was?
A I wouldn't do anything because it was dropped years and years ago. And when they say it's dropped, it's dropped.
MR. WHITFIELD: Take a break?
THE WITNESS: Excuse me?
MR. WHITFIELD: Do you want to take a break? You all right?
THE WITNESS: I'm fine.
BY MR. TATUM:
Q So did you ever have any other issues with Morris Hill?
A No, sir.

Page 101

moved trailers and sold used trailers, so --
Q So this is like a mobile home trailer?
A Yeah, mobile home trailer.
Q Use it for anything else or just his quarters?
A His quarters.
Q Have you ever had anyone else that works for you?
A Yes, sir.
Q Who would that be?
A Paco-- I don't remember what Paco's last name was.
Q How long did he work with you?
A A year or so.
Q Was he full-time also?
A Yes.
Q Pay him the same?
A Yes.
Q Did you provide him living quarters?
A Yes.
Q Same mobile home?
A Yes.
Q Did you have anyone work with you before Paco?
A No. Just temporary people and my sons.
Q Yeah.
A No.
Q So pretty much you do all your chicken growing

Page 102

yourself?
A Yes.
Q All your work and maintenance and everything?
A Yes, sir.
Q What are Jose's responsibilities?
A The daily overseeing, looking at the chickens and picking up the dead.
Q Had he been in the business before he came to work for you?
A No, sir.
Q I'm sorry. Did you --
A No, sir.
Q How about Paco?
A Yes, sir.
Q He had been in the business before?
A He had worked on farms, yes.
Q How come he quit working for you?
A Personal.
Q Did he quit?
A I fired him.
Q Why did you fire him?
A Because he was messing around with a younger-age girl.
Q Have you ever talked with any other producers about moving your contracts to them, like Perdue or anyone

Page 103

else?
A I'm too far -- no, because I'm too far away.
Q How far are you from Perdue?
A I'm not for sure. Outside of limits, I've been told.
Q And who have you been told that by?
A Other farmers.
Q You've never approached another integrator or producer?
A No. No.
Q And you have no idea how far away you are?
A No, sir.
Q Other farmers have told you you're too far away?
A Mm-hmm.
Q Who was that?
A Just different ones I come in contact with and talk to.
Q Do you remember any of them by name?
A Not by name, no.
Q Have you done anything yourself to inquire about moving your operations?
A No, sir.
Q Do you know of any other poultry integrators around?
A Perdue is the only one I've heard of.

Page 104

(Exhibit 1 was marked for identification.)
BY MR. TATUM:
Q Let me show you what I'll have marked as Exhibit No. 1. I believe this is a set of contract documents relating to your houses. Are you farm 5081? Is that your code with Tyson?
A I don't know. I'll have to look. It's always been known as Dennis Clapp Farm.
Q Okay. If you look at what I marked as Exhibit No. 1, it's labeled Broiler Production Contract, and on the second page it says it was executed down there towards the bottom on 4/11/2012. Do you see that?
A Yes, sir.
Q Is that your signature there on the left?
A Yes, sir.
Q Do you recognize the signature on the right?
A No.
Q Do you remember signing this contract?
A Yes, sir.
Q Where were you when you signed it?
A I do not remember.
Q What do you remember about signing the contract?
A That they would bring -- they would bring a new contract to the farm if you sign it, a tech would.
Q Now, my records show that this is your -- this is

Page 105

the third contract you signed with Tyson?
A I'm not sure.
Q Do you remember any discussions you've ever had with Tyson about signing a contract with them and what the contract meant?
A What do you mean by that?
Q Do you remember any discussions you've ever had with a Tyson employee regarding what the Broiler Production Contract means?
A No.
Q Do you recall any discussions you've ever had with Tyson about how you're paid under the broiler contract?
A Yes.
Q What do you recall about that?
A That we're on a tournament system, and they have a formula, and we're paid that.
Q And do you understand that you're paid a base pay?
A Yes, sir.
Q And there's a floor to that base pay that you can't go lower than?
A Yes, sir.
Q And do you understand that you're also paid a fuel allowance?
A Yes, sir.

Page 106

Q And that is currently by square foot?
A Yes, sir.
Q And are you also paid premium pay?
A Yes, sir.
Q And that's also based on square foot?
A Yes, sir.
Q And you currently receive all three types of payment?
A Yes, sir.
Q And it's the base pay that's subject to the tournament system?
A Yes, sir.
Q Have you ever had any of your contracts with Tyson, before you signed them, reviewed by an attorney or consultant or anybody?
A No, sir.
Q Have you ever talked with Tyson about not wanting to contract with them anymore?
A No, sir.
Q We're going to flip through this Exhibit Number 1 because there's several places where I've got to see if it's your signature.
A Okay.
Q So if you go to -- on the lower right there's what we call a tracking number.

Page 107

A Okay.
Q So if you flip to the fourth page of Exhibit No. 1, it's the second page of Schedule A to your contract. Is that your signature there --
A Yes, sir.
Q -- on the left dated 4/11/12?
A Yes, sir.
Q And then if we flip, you'll see the beginning of Schedule B. Do you see that?
Schedule B outlines --
A Yes.
Q -- the performance improvement program and housing requirements and premium compensation requirements. And I believe if you go to the end of that Schedule B, which on the lower right it's Tyson 167580.
A 780, yes, sir.
Q Is that your signature there?
A Yes, sir.
Q Then if we flip -- again, we're going to flip. That's your signature on your W9 form there?
A Yes, sir.
Q And then we go to the next page, which is titled Acknowledgment Page dated 4/11/2012, Tyson 167582. Is that your signature there?
A Yes, sir.

Page 108

Q If we flip again and go past this checklist, we go to Tyson 167585.
A Eighty-five.
Q This is an amendment to Schedule A that amended your contract, and it's dated 10/14/2014. Is that your signature there?
A Where are we at?
Q Tyson 167586, probably the next page.
A Yes.
Q And that's Jim Gottsponerer's signature there to the right?
A Yes, sir.
Q And do you understand what the changes were in this amendment?
A They told me at the time. I don't know what it says now without reading it.
Q What did they tell you at the time, or do you remember?
A I don't remember, sir.
Q Do you know if it increased your pay?
A Don't -- don't remember.
Q And then if we go to the last two pages of Exhibit No. 1, the very last page, Tyson 167588?
A Yes, sir.
Q Is that your signature dated 10/27/15?

Page 109

A Yes, sir.
Q And then to the right that's David Mears' signature, the complex manager at the time?
A Yes, sir.
Q And this also amended your Schedule A?
A If you say so.
Q Do you recall signing this amendment at all?
A I don't remember signing it.
Q Do you recall any discussions you had with anyone about it?
A No, sir.
Q As far as you know, is this your current contract with Tyson?
A Yes, sir.
Q And it looks to me, if you just go back to the top of it and look at the second page under duration, paragraph ten, it looks like this contract is set to conclude, the term is 4/11/2012 to 4/11/19, is that your understanding as well?
A Yes, sir.
Q Are you intending to seek renewal of this contract when it comes up?
A Yes, sir.
Q And this contract, as far as you know, covers all eight, currently six, of your houses?

Page 110

A Yes, sir.
Q Do you recall anything anyone at Tyson told you about Exhibit No. 1 and what it meant for you?
A Excuse me?
Q Do you recall anything anyone at Tyson told you about Exhibit No. 1 and what it meant?
A No.
Q Do you recall any discussions with Tyson over Exhibit No. 1 or the various amendments we looked at and how that affected your pay or anything?
A At this point I don't.
Q Do you need to take a break?
A No, I cut it off. I thought I turned it off, and it kept buzzing me.
Q Do you recall any discussions you've had with Tyson about wanting a different contract than what we looked at in Exhibit No. 1?
A No, sir.
Q Do you recall any discussions you've had with Tyson about wanting to be paid in a different way than what's represented in Exhibit No. 1?
A Is this Exhibit 1?
Q Yes, sir. I'm just trying to figure out if you, sitting here you can tell me, yeah, I remember talking about pay with so-and-so, and this is what I wanted, whatever the

Page 111

case may be.
A I don't remember speaking to anybody specifically, no, sir.
Q Do you know if your contract is the same or different from any grower you compete with?
A No, sir.
Q Do you recall being offered the opportunity by Tyson to enter into a 52-week performance contract as opposed to the term of the contract here in Exhibit No. 1?
A No, sir.
Q Are you saying that didn't happen, or you just can't recall?
A I don't -- I don't recall them offering it to me, no, sir.
Q Do you recall Tyson giving you fuel supplemental payments over time as you've been working with Tyson?
A Yes, sir.
Q How many do you recall?
A I don't remember. I mean, per flock?
Q No. I'm talking about -- I understand your contract gives you fuel pay per square feet.
A Yes.
Q But over time do you recall that Tyson has also paid you supplemental fuel payments to compensate for increased propane costs that aren't part of your contract?

Page 112

A Not propane. Twice I remember them giving us a bonus at the end of the year.
Q Do you remember that happening twice?
A Yes.
Q When do you remember that happening?
A I do not -- I don't remember that, sir.
Q Do you recall Tyson entering -- or giving you the opportunity to split litter costs with them?
A No.
Q Do you have a particular breed of bird you prefer to work with when you're growing chickens for Tyson?
A I don't have a choice.
Q I said, do you have a particular breed you prefer?
A The 500 breed was a about -- good breed for me.
Q And are you still receiving 500 breed?
A No, sir.
Q What is your understanding as to what you're receiving today?
A 700s or 708s.
Q 700s or seven --
A I think it's 708s that they've gone to. We have no choice.
Q So you believe you receive all 708s now? Have you actually examined your breed profiles, or you just --

Page 113

what's the basis of you thinking you're only getting 708s?
A It's either 700s or 708s. Tyson has changed and they tell us what the flocks are.
Q Is it your understanding that Tyson determines what type of breed you get?
A Yes, sir.
Q Do you have any idea if you received any different breeds from anyone else you compete with in a given flock?
A Yes, sir.
Q And how do you know that?
A By talking to different farmers.
Q So other farmers, in a given tournament you've competed in, said they got a different breed than you?
A Yes, sir.
Q When did that happen?
A It's been over the past -- just been in the past. Sometimes I would have 500s. They would have 700s or 708s or Coves, but.
Q Do you have any idea of the percentage of those breeds you've gotten over time is any different than anyone else?
A No, sir, I have no idea.
Q Why is it you like -- you prefer the Cobb 500 breed over these others we're talking about?

Page 114

A Nonmortality, the growth, less problems for me personally.
Q What are the problems that are caused by other breeds, in your experience?
A That I've seen?
Q Yeah.
A Leg issues at certain times, having to run totally different light programs, and it's all dictated by -- by Tyson what we can run.
Q Do you try to run the recommendations that Tyson provides?
A Yes, sir. Yes, sir.
Q Have you ever been on an IMP program, performance improvement program?
A No, sir.
Q Historically -- you receive your rankings report every settlement, right?
A Yes, sir.
Q Historically where would you say you settle?
A Up until this collection -- I mean this collapse of the barns, what I was ranked, I was ranked number seven out of 96 farms.
Q So a top grower?
A Yes, sir.
Q And when you say that, you mean is that in a

Page 115

particular year?
A That was the last five flocks. They do a five flock ranking or six flock. It's either five or six. And before this accident I was number seven out of 96.
Q And then you went down because your bird --
A This time, yes.
Q Capacity went down, right?
A Well, I don't know on that until we get a new flock in. I don't have a new flock yet.
Q I'm sorry. So you haven't had a new flock since you had two houses went down?
A No, sir.
Q Not even in the other four houses?
A No, sir. Other six houses.
Q So how long have you been out of birds?
A I'd have to go back and look. With all the building and everything, you know, dealing with insurance company, I don't -- I don't remember. It's -- I'll get birds either next week or the week after, and it's close to their time -- regular out time. I'm on pretty close track.
Q You know, I might have got off when we were talking earlier. I just don't quite remember right.
So out time is about 14 to 21 days, right?
A It's been close to 28 to 30. That's what I was told.

Page 116

Q Now, you get paid for out time over 21 days, right?
A Yes, sir.
Q And have you gotten paid for any out time over 21 days as far as you know?
A Before?
Q Have you ever not gotten paid for out time over 21 days?
A No, no, no.
Q So when -- I guess sitting here today, just so I'm catching up with you, it's February 26.
A Okay.
Q When is the last time you had birds?
A I would have to go back and look at the settlement sheet. Like I say, my mind because of dealing with insurance companies and everything that's happening --
Q I understand. I'm off on our conversation right now on whether you had them three weeks ago, and that was your last pickup or whether it's three months ago.
A No, it's been right close to Tyson's 21 to 28 days. I'm close.
Q Okay. And so you're expecting more birds in your four houses?
A In my six houses.
Q Your two houses are about done?

Page 117

A Sir, I have eight houses.
Q I know, but you told me two of them have collapsed?
A So that leaves -- that leaves six houses.
Q Oh, okay, sorry. Okay, no problem.
So you're waiting on birds for your six houses?
A Yes, sir.
Q Okay. And you've been taking birds in your six houses while the other two are down? Am I right, or is it just one time so far? They collapsed the last flock?
A They just collapsed last month, and I settled, you know. Two weeks later I get my settlement sheet. It's just been settled, you know, not long ago.
Q That's the one you got the exception for that we talked about?
A Yes, sir.
Q Okay now you're waiting for new birds in the six good houses?
A Yes, sir.
Q Gotcha, okay. So you said your last five flocks that you got -- this was pre-collapse -- you were ranked 7 out of 96?
A Yes, sir.
Q And then over, say, the last five years, do you have any idea where you --

Page 118

A No, sir.
Q Would you consider yourself a top performer or average, or below?
A I've been -- I've been in the top 20 most of that. This is my first in the top 10.
Q Do you have a preferred out time?
A No, sir.
Q Do you know if your average out time is any different from anyone else's?
A No, sir.
VIDEOGRAPHER: Let me show you a set of documents that I believe represents a set of settlement documents.
(Exhibit 2 was marked for identification.)
BY MR. TATUM:
Q It's a big chunk of documents, Exhibit No. 2. Exhibit No. 2 has got a cover page, Dennis Clapp 5081, but if we look through here, it looks to me like this is a set of settlement documents relating to a flock that was delivered around mid January, 2016. And there's various documentation in here, including your live scale tickets are all on top.
A Yeah.
Q And if we go down, we've got your settlement documents. We've got your grower recap, which is your

Page 119

ranking and so on, your invoicing, feed tickets, mortality cards and so on.
Is this the type of documents you get each settlement?
A Yes.
Q So you typically get your settlement sheet?
A Yes, sir.
Q And then you get your grower recap which tells you your ranking?
A Yes, just like this.
Q And you get your live scale tickets?
A Yes, sir.
Q And you get your mortality cards back?
A Yes, sir.
Q Your mortality cards are cards kept in the farm to track birds pulled out; right?
A Yes, sir.
Q And then you also get your feed delivery tickets?
A Yes, sir.
Q And your live scale tickets?
A Feed delivery tickets, yes.
Q And your feed delivery --
A Feed tickets are left at our farm every time they drop feed off.
Q Excuse me, okay. And then also you get your feed

Page 120

summaries?
A Yes, sir.
Q And your live scale tickets and so on?
A Yes, sir.
Q Have you ever, in a settlement, had an experience where you thought -- you're looking right now at the settlement document of Exhibit No. 2, which is Tyson 054959. And so that's a settlement reflected in this settlement packet. Exhibit No. 2, this would be for week end date January 16, 2016.
Have you ever had an occasion where you went through your settlement, which ultimately translated to what you got paid, and thought that it misidentified the number of head placed at your farm?
A No, sir.
Q Have you ever had an instance where you thought it miss identified the mortality at your farm?
A No, sir.
Q Mortality is birds pulled out, right? Have you ever had a situation where you went through and you thought it miss identified the number -- level condemnation off your farm?
A The condemnation is done there at the plant.
Q Right. But have you ever had a situation where you went and looked at your condemnation certificates that

Page 121

are provided in this packet, and they're provided here in Exhibit No. 2, and thought, wait, those numbers don't match up?
A No, sir.
Q What's your understanding of who conducts the condemnation?
A I've never been in the plant. That's the people on the line, the inspectors.
Q The USDA inspectors?
A Yes, sir.
Q And they condemn for disease or whatever the case may be?
A Or my understanding is the people on the line pulling out birds, yes, sir.
Q Right. If it's supposed to be done -- birds that aren't fit for human consumption for one reason or another?
A Yes, sir.
Q And it can be whole bird or part of a bird?
A Yes, sir.
Q You've never had an occasion where you thought you were looking at your condemnation certificates and thought they weren't tracked right on your settlement?
A No, sir.
Q Have you ever had a discussion with anyone at Tyson that you can recall over any of your settlements where

Page 122

you said, I don't think this is right. Something is off on what I'm getting paid or how my pounds are being counted or whatever?
A The only thing is, one time with Morris Hill, that was the only time I've discussed anything with them.
Q Have you ever had any problems with your feed at Tyson?
A Besides not being delivered, being out. We've been out of feed for long periods of time. That's been my issues. Grain bins being left open, that's my only feed issues.
Q Do you know if any of the issues -- you've been growing since '99, right?
A Yes, sir.
Q Do you know if any of these issues over time are any different than anyone else's?
A I don't know, sir.
Q Have you found that when you try to deal with Tyson day-to-day to get feed or whatever that people are trying to be responsive and get it done?
A Yes, sir.
Q Do you -- have you ever had any instance in looking at your settlement sheets where you didn't think it properly accounted for the feed usage that was done at your farm?

Page 123

A No, sir. One time.
Q Okay. What happened?
A I thought I actually received an extra load of feed, and they couldn't prove I did or didn't, just like I thought I was shorted one time.
Q The other time we talked about you thought you were shorted --
A Birds, a load of birds.
Q A load of birds?
A And I brought that to their attention.
Q And the other time you thought, wait, I've got an extra load of feed here?
A Just based on how high the numbers was and things, and they couldn't find anything going back through looking.
Q In other words, you thought that the settlement was showing that birds had eaten a lot more feed than normal, or you had an extra delivery ticket of feed?
A I didn't have an extra delivery. We didn't have anything. It was just my numbers was so good one time. It was like I had something that wasn't accounted for.
Q Because your numbers were good?
A Yes.
Q So that it worked in your favor?
A It worked in my favor.

Page 124

Q You got paid well?
A But I'm going to say either way.
Q Right. And so you thought, wait a minute, I think I might have got some extra feed here.
And so as far as you know, someone went back to see what your feed delivery was?
A Yeah. They never found a thing.
Q Never found that you had gotten too much?
A No, sir.
Q Do you remember when this was?
A No, sir.
Q Was Tyson cooperative in trying to look at it?
A Extremely. We through with this one?
Q Yes, sir.
Do you know if you get any different feed from anybody else?
A I don't know, sir. It goes through the feed mill.
Q Have you ever felt like your pay wasn't right, in other words, you got shorted what you were due under your settlement?
A Just the one time with Morris Hill.
Q Just the load of birds?
A Yeah.
Q Do you windrow?

Page 145

A Yes, sir.
Q So it wasn't anything malicious about him saying I don't want to text anymore, as far as you know?
A No.
Q He just didn't want to screw up directions trying to follow texts.
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q Is that your understanding?
MR. WHITFIELD: Do you know that?
THE WITNESS: What's --
BY MR. TATUM:
Q Your understanding was, he just didn't want to get overburdened with texts?
A Yes, sir.
Q Is there anyone at Tyson that you think has ever lied to you about anything?
A That I can prove, no.
Q Is there anyone at Tyson that you think lied to you about something?
A The only different -- yes.
Q What was that?
A Just different issues, Kenny Bartley. He's the only one.
Q And what do you think he lied?

Page 146

A It -- it was just lots -- lots of issues. No particular thing. One thing can come back. It's just dealing with Kenny Bartley. I didn't believe anything he said at that point.
Q Can you give me --
A No, sir.
Q -- any examples of him lying to you?
A No, sir. No, sir.
Q Do you have a preferred density?
A No, sir.
Q Do you know if the density birds you receive is any different from anyone else?
A No, sir.
Q Do you know what I mean by "density"?
A Yes, sir, placement.
Q Birds per square foot?
A Birds per square foot.
Q Do you have a preferred out time?
A No, sir.
Q So you don't have a minimum or maximum you prefer?
A Minimum is 14 days. That's Tyson.
Q Do you know if that's any different for anyone else?
A No, sir.

Page 147

Q Do you know how much money you've made from your chicken operations a year?
A You can go back and look. I can go back and look on W2s.
Q Do you know what your annual expenses are?
A Can go back and look with the bookkeeper.
Q And who's the bookkeeper I'd talk to?
A Mary Fuller, Fuller Tax Service, Henderson, Kentucky.
Q You don't know?
A No, sir.
Q Do you track it at all?
A No, sir. I give her all the papers.
Q Do you know if you make a profit?
A Yeah, I make a profit, yes, sir. My average was 92,000 a flock times five.
Q That's your average revenue? That's your average revenue?
A Yes.
Q And out of that -- you say that's 92,000 per flock, five flocks a year, roughly?
A Last year.
Q Last year you got five, you sometimes get six?
A That was average last year.
Q I said, sometimes you get five, sometimes you get

Page 148

six flocks?
A Yes, sir.
Q Your contract says you'll get five?
A Yes, sir.
Q You've always gotten at least five?
A Yes, sir.
Q Out of that 92,000 times five per year, do you have any idea --
A No, sir.
Q -- what your profit was from that?
A No, sir.
Q But you do think you do make money?
A Yes, sir, some years.
Q Do you know if you've ever not made money?
A Yes, sir.
Q What year?
A Don't know.
Q Why are you suing Tyson?
MR. WHITFIELD: Objection to form. Go ahead and answer.
A It says in our complaint why we are.
BY MR. TATUM:
Q Well, your complaint says you've sued Neil Barfield, and you told me you don't have any problems with him. So that's why I'm asking.

Page 149

A I haven't --
Q Yeah, you did.
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
Q You sued Neil Barfield. So, I mean, you may not know why, and that's okay, but that's why I'm asking why you're suing Tyson.
A I hire lawyers to deal with this, and they have the answers.
Q You can't tell me, sitting here today?
A No, sir.
Q Is this the first time you've been aware that you're suing David Dickey? Did you know you're suing David Dickey?
A No, sir.
Q Did you know you're suing Jim Gottsponerer?
MR. WHITFIELD: Objection to form. Those individuals are not in this case anymore. You know that, Mark.
BY MR. TATUM:
Q Did you know you're suing Jim Gottsponer?
A That's why I hire lawyers just to handle all this.
Q Did you know you're suing David Mears?
MR. WHITFIELD: Objection to form. Same

Page 150

objection.
A I've answered the question to every one of them. I have lawyers.
BY MR. TATUM:
Q Is this the first time you've ever heard that you're suing Jim Gottsponerer?
MR. WHITFIELD: Objection.
A It's been answered. I have lawyers that --
BY MR. TATUM:
Q I know, but listen to my question.
Is this the first time you've ever heard that you're suing Jim Gottsponerer?
A And my answer is, I have lawyers that deal with this to handle my best interest.
Q Understood.
A Okay.
Q But my question for you is, is this the first time --
A Asked and answered.
Q -- that you've heard that you're sueing Jim Gottsponer?
A Asked and answered.
Q You haven't answered that question. Is this the first time you've heard it?
A Can I ask my lawyer a question?

Page 151

Q Sure.
THE WITNESS: Do I have to answer this?
MR. WHITFIELD: Go ahead and answer.
A Yes.
BY MR. TATUM:
Q Is this the first time you've heard that you're suing David Mears?
MR. WHITFIELD: Now, listen, I'm going to object to these questions because those individuals are not in the case anymore.
MR. TATUM: Those two are in the case. They are.
MR. WHITFIELD: All right.
MR. TATUM: Those two were not dismissed.
A Which two wasn't?
BY MR. TATUM:
Q David Mears and Jim Gottsponerer. Is this the first time you've heard that you also originally sued Neil Barfield?
A That's been asked and answered. You asked me that question awhile ago.
Q And the answer was yes, this is the first time you've heard that?
A Yes.
Q Is this the first time you've heard that you also sued Jerry Shelton?

Page 152

A You asked that question.
Q I didn't ask Jerry Shelton.
A Yes.
Q Is this also the first time you heard that you sued David Dickey?
A You asked that question before, and it was answered.
Q And it was yes?
A Yes.
Q Has anyone --
THE WITNESS: Can I have a break, please?
MR. TATUM: Yeah, sure.
VIDEOGRAPHER: The time is 1401. We're off the record.
(Recess was taken.)
VIDEOGRAPHER: The time is 1405. We're back on the record.
BY MR. TATUM:
Q Have you ever been denied veterinary services that you've requested from Tyson?
A No, sir.
Q You've talked a lot about your 21,000 bird loss. Was that in January of 2015?
A Sir, I don't know without going back and looking and talking.