**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| CHARLES MORRIS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:15-cv-00077 |
| | ) | |
| v. | ) | |
| | ) | Judge: Honorable Joseph H. McKinley |
| TYSON CHICKEN, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TYSON CHICKEN, INC.'S MOTION FOR SUMMARY JUDGMENT**

---

## I. INTRODUCTION.

Defendant Tyson Chicken, Inc.'s Motion for Summary Judgment, Dkt. No. 210 ("Tyson Br."), is built on a series of strawmen. Tyson states Plaintiffs have failed to establish their Packers and Stockyards Act ("PSA") claim because they have not produced evidence that Tyson's anticompetitive power over its poultry growers at its Robards complex harmed consumers, Tyson Br. 2-7, but no court has ever required such a showing. At most, Plaintiffs must establish Tyson's conduct is *likely* to harm competition. The authority on which Tyson relies repeatedly emphasizes no evidence of actual anticompetitive harm is required. Tyson Br. 4-5, 7. Further still, Tyson affirmatively argued in discovery such evidence is unnecessary, meaning it should be estopped from advancing the opposite contention now.

Were that not enough (and it is), Tyson also fails to address that "deceptive practices" violate the PSA, *see id.* at 7 (contesting only that Plaintiffs cannot make out claims for Tyson's "unfair, unjustly discriminatory" or disadvantageous conduct, not other claims under the PSA); and that claim requires *no* evidence of anticompetitive activities—although, of course, Tyson's deception of its own growers lacks a competitive justification.[1] Tyson's material omissions and misrepresentations to Plaintiffs, which were amply documented during discovery, are such "deceptive practices." Thus, there is a dispute of fact as to whether Tyson violated the PSA, regardless of whether it wielded its anticompetitive power.[2]

Similarly, Tyson contests Plaintiffs' claims for breach of contract and the covenant of good faith and fair dealing by refusing to address inconvenient facts and law. Tyson states Plaintiffs cannot identify a breach of their contracts' provisions or prove damages for that claim.

---

[1] *Antitrust Federalism, Preemption, and Judge-Made Law*, 133 Harv. L. Rev. 2557 (2020).

[2] For these reasons, Plaintiffs intend to present Tyson's deception as part of their PSA claim and will not pursue common law fraud at trial.

Tyson Br. 1. But, Tyson overlooks that its violation of the PSA *also* breached its contracts. Tyson's contracts guarantee it will comply with the law, meaning if Plaintiffs prove a PSA claim and the damages that flow from it (as they can), they also prove their contract claim.

Tyson also insists Kentucky does not recognize Plaintiffs' claim for breach of the covenant of good faith and fair dealing, and here too Plaintiffs did not establish damages. Tyson Br. 20. But, while Kentucky has narrowed that claim in tort, it remains a robust standalone claim in contract, which is what Plaintiffs raise. Elsewhere Tyson admits Dr. Kyle Stiegert,[3] Plaintiffs' expert, performs individualized damages calculations for each Plaintiff, *id.* at 15, which include damages from Tyson's practices that violate the covenant of good faith, *i.e.* failing to compensate Plaintiffs for chicken they grew, and providing Plaintiffs fewer flocks than they were promised.

Put simply, Tyson seeks summary judgment based on an ill-conceived view of the law and record, one that is so implausible it repeatedly contradicts positions it took elsewhere in these proceedings and takes now in its summary judgment brief. Its motion should be denied.

## II. STANDARD OF REVIEW

"Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a)." *Dixon v. River Town Constr., LLC*, No. 4:17-CV-00087-JHM, 2019 WL 418440, at *1 (W.D. Ky. Feb. 1, 2019) (McKinley, J.). "The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact." *Id.* If the moving party carries

[3] References are made throughout this Opposition to Dr. Kyle Stiegert's reports. Because those reports are already filed in the record at Doc. 175, Ex. 2, 23, Plaintiffs will cite to the record instead of filing these reports again.

that burden, the non-moving party must come forward with evidence showing that, taking the "evidence in the light most favorable to the non-moving party," a jury could find in its favor. *Id.*

## III. ARGUMENT

Despite what Tyson pretends the law requires, Plaintiffs can prove their PSA claims in multiple ways, first by establishing Tyson possessed and used anticompetitive power in a manner that is *likely* to harm competition, and second by showing that Tyson engaged in deceptive practices. Through evidence establishing that Tyson violated both tests, Plaintiffs also prove a breach of their contracts. Tyson's contracts with Plaintiffs provide it will comply with the PSA in all its dealings. Moreover, the record at least establishes a dispute of material fact as to whether Tyson breached the covenant of good faith and fair dealing. Kentucky recognizes this duty is implied in all contracts and Tyson failed to fulfill this obligation in two ways: by profiting from chickens Plaintiffs grew but for which Tyson refused to compensate Plaintiffs, and by extending Plaintiffs' "days out," thereby reducing their ability to earn wages from Tyson. This case is ripe for trial, not summary judgment.

### a. Plaintiffs Have Substantial Evidence Tyson's Robards Complex Is Engaged In Anticompetitive Activities That Violate the PSA.

Tyson's attack on Plaintiffs' PSA claims depends on misstating the law. The authority on which Tyson itself relies provides there is a PSA violation where a "chicken dealer," like Tyson, possess anticompetitive monopsony (buyer) power, and uses that power against "chicken growers" from whom it purchases growing services, like Plaintiffs. Tyson's concern with whether Plaintiffs have shown its misconduct had "broader market impact," and in particular reduced chicken "production levels" and increased consumer prices, *see, e.g.*, Tyson Br. 4, 7, is a distraction, as no such proof is required. Indeed, to adopt Tyson's view of the PSA would effectively gut the statute, turning it from one meant to protect farmers from agribusinesses'

mistreatment, into one that is redundant of the Sherman and Clayton Acts, which are largely focused on consumer welfare. *See, e.g.*, *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 945 (E.D. Tenn. 2008) (explaining the "general rule that the purpose of the [Sherman and Clayton] antitrust laws is to protect consumers"). And even those statutes do not require a plaintiff to "prove end-user impact," when alleging "a monopsony." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1134-36 (10th Cir. 2002) (collecting cases). In fact, Tyson repeatedly took the position in this case that evidence regarding its sales and profits, evidence that would establish a "broader market impact," "is unrelated to Plaintiffs' claims," which should prohibit it from presenting the opposite contention now. *See, e.g.*, SOF Ex. 34 First Response RFP No. 49, 50.[4]

Through Dr. Stiegert's reports and related evidence that show Tyson's Robards complex has monoponsy power and uses that power against Plaintiffs, Plaintiffs have sufficient proof to show Tyson is likely to harm competition. That is all that is required to prove a PSA claim. In this manner, Plaintiffs have more than enough to establish a dispute of material fact on this claim.[5]

**i. *At most, the PSA requires evidence of a likely, not proven, harm to competition, which can be shown through an impact on growers, not consumers.***

Congress passed the PSA because it concluded the Sherman Act, with its narrow goals,

[4] Plaintiff rebuts Tyson's Statement of Uncontroverted Facts and puts forth its own facts in its Response to Defendant's Statement of Uncontroverted Facts ("SOF") attached hereto as Exhibit A. All references to any documents not already filed in the record are attached as Exhibits to Plaintiff's SOF and are referenced as "SOF Ex." herein.

[5] Dr. Stiegert's reports also lay out the prototypical damages from Tyson's use of its monopsony power, what Plaintiffs would have received "but for" that misconduct. *See, e.g.*, *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 25 n.3 (1st Cir. 1999). Therefore, Tyson correctly concedes Plaintiffs have introduced evidence of damages in "the PSA context." Tyson Br. 12.

was ineffective at "protect[ing] sellers of cattle." *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 358-60 (5th Cir. 2009) (en banc). As a result, as Tyson is forced to concede, the PSA's text does not suggest the statute is narrowly focused on anticompetitive practices, but makes unlawful any "'unfair, unjust discriminatory, or deceptive practice or device,'" as well as all "'unreasonable preference[s] or advantage[s].'" Tyson Br. 2 (quoting 7 U.S.C. § 192(a), (b)). Relatedly, the PSA provides a cause of action not just to those harmed by the "sale … of livestock," but also those harmed by "any poultry growing arrangement[s] or swine production contract[s]." 7 U.S.C. § 209(a); *see also United States v. Donahue Bros.*, 59 F.2d 1019, 1023 (8th Cir. 1932) ("One of the purposes of this act was to protect the owner and shipper of livestock, and to free him from the fear that the channel through which his product passed, through discrimination, exploitation, overreaching, manipulation, or other unfair practices, might not return to him a fair return for his product."). The PSA is not a traditional antitrust law, but one meant to protect growers from the improper expressions of market power companies can use against them.

Therefore, where Courts have read antitrust elements into the PSA—and as discussed below they have not done so into all of its provisions—they have explained the antitrust evidence required must be modulated in light of the fact "Congress intended the PSA to have a broader scope than the antitrust laws." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1231 (10th Cir. 2007); *see also id.* at 1228 (same); *Armour & Co. v. United States*, 402 F.2d 712, 719 (7th Cir. 1968) (stating PSA cannot be directly "analog[ized]" to antitrust laws).

For these reasons, the Sixth Circuit, adopting the majority view of the PSA, stated at most the statute requires a plaintiff to show a challenged "'practice[] [] will *likely* affect competition adversely.'" *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277 (6th Cir. 2010) (emphasis added)

(quoting *Wheeler*, 591 F.3d at 357); *see also IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999) ("We have said that a practice which is likely to reduce competition and prices paid to farmers for cattle can be found an unfair practice under the Act"). As the Seventh Circuit explained in the foundational case to articulate this standard, the PSA does not require "that competitive injury must be proved" just that the challenged conduct "might lessen competition." *Armour*, 402 F.2d at 720, 722. "[T]he purpose of the Act is to halt unfair trade practices in their incipiency, before harm has been suffered; that unfair practices under [7 U.S.C. § 192] are not confined to those where competitive injury has already resulted, but includes those where there is a reasonable likelihood that the purpose will be achieved and that the result will be an undue restraint of competition." *De Jong Packing Co. v. U.S. Dep't of Agric.*, 618 F.2d 1329, 1336-37 (9th Cir. 1980).

Consistent with the statute's background and structure, 7 U.S.C. §§ 192(a) & 209, this allows growers to prove a violation through evidence of how they are treated. To the extent it demands evidence of anticompetitive conduct, the PSA's focus is not on the downstream "unlawful effect." *Been*, 495 F.3d at 1231. Instead, *Been* continues, any of the "buyer's practices," *e.g.*, those of a poultry dealer who purchases growing services from a grower, are actionable if they "threaten to injure competition." *Id.* at 1232.

In sum, contrary to Tyson's claim, evidence of a poultry dealer "arbitrarily decreasing prices paid to sellers" (growers), can be sufficient evidence under the PSA, so long as that conduct can be said to have the "likely effect of increasing resale prices." *Id.* This is true even if those downstream effects have not been shown to come to fruition. *See Farrow v. U.S. Dep't of Agr.*, 760 F.2d 211, 215 (8th Cir. 1985) (rejecting argument PSA only aimed at protecting downstream distributors, explaining it regulates dealers' relationships with growers).

**ii. *PSA claims can be established by showing the defendant possessed anticompetitive power over the grower plaintiffs and used it against the grower.***

Given that, at most, the PSA requires a likely, not established, harm to competition, both law and economic logic establish a violation exists if a grower shows the defendant poultry dealer possessed anticompetitive power and used that power to harm the plaintiff. For instance, *Been* states if the defendant is shown to be "a monopsonist[]" it is then sufficient to show that the defendant "engages in specific practices" that wields that power against "the input (supply) market," *e.g.*, the seller of services, growers. *Been*, 495 F.3d at 1234. Economic theory provides that a buyer with anticompetitive power that uses it against individuals with whom it contracts is "likely to result in [] anticompetitive effects" to the market. *Id.* That alone can prove a PSA claim. *Id.*

In this manner, while Plaintiffs may need to show that Tyson used its monopsony power against Plaintiffs, Tyson is wholly incorrect that Plaintiffs must demonstrate Tyson's use of its anticompetitive power altered the company's ability to compete with others in the "industry," allowing it to gain greater "market share." Tyson Br. 5. Instead, in PSA cases, it is appropriate to "presume[] consumer harm" where anticompetitive power has been used to harm growers, as that alone is likely to produce consumer harm. *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2008 WL 11389388, at *2 (E.D. Ok. July 3, 2008).

The *Been* district court underscored this point on remand from the Tenth Circuit. It explained Plaintiffs can prove their PSA claim with an expert who testifies the defendant possessed anticompetitive power and wielded that power to "unilaterally and arbitrarily reduce[] grower pay or production." *Id.* This is because, if a defendant with anticompetitive power acts in this manner, economic theory establishes that "'over time results in higher consumer prices.'" *Id.*

(quoting *Been*, 495 F.3d at 1232). That is, evidence of such behavior alone establishes the defendant is likely to harm competition. "Clearly, the Tenth Circuit did not place the burden on plaintiffs to demonstrate defendants' market share in the output market" and thus the extent to which its use of its anticompetitive power harmed consumers. *Id*.

Because growers can prove their PSA claim by demonstrating the defendant's anticompetitive power diminished their pay, Tyson is also incorrect that evidence Plaintiffs "were somehow individually disadvantaged" by Tyson's anticompetitive power is insufficient. Tyson Br. 6. The courts have been clear, "Growers might show an anticompetitive effect on their own level" and establish a PSA violation. *In re Pilgrim's Pride Corp.*, 448 B.R. 896, 903 (Bankr. N.D. Tex. 2011). This can be done by demonstrating growers' pay was influenced by factors other than market forces. *Id.* "[T]he PSA prevent[s] those practices that facilitate the [company's] arbitrary manipulation of prices" within growers' contracts. *Been*, 495 F.3d at 1233. In fact, the most recent case to consider the evidence that could establish a PSA claim explained, if plaintiffs demonstrate the defendant possessed anticompetitive power and with that power refused to enter into a contract with a grower that could entitle the grower to relief. *Breaking Free, LLC v. JCG Foods of Alabama, LLC*, No. 4:18-CV-01659-ACA, 2019 WL 1513978, at *5 (N.D. Ala. Apr. 8, 2019). The use of anticompetitive power to disadvantage individual growers does establish a PSA claim.

Tyson's reliance on *Terry* and *London v. Fieldale Farms Corp.*, 410 F.3d 1295 (11th Cir. 2005), Tyson Br. 3, in support of its expanded burdens of proof is misplaced. In both instances, the courts held against the PSA claim because they determined for those claims some evidence of anticompetitive conduct was required, and the plaintiff did not even contend the defendant

possessed anticompetitive power. These cases do not require greater evidence of anticompetitive effect.

In *Terry* the plaintiff did not allege the defendant possessed anticompetitive power whatsoever and, as a result, the Sixth Circuit held evidence that "Defendant's action harmed [the plaintiff] as an individual grower" was not enough, as it was not coupled with evidence that harm stemmed from the Defendant's anticompetitive power. *Terry*, 604 F.3d at 279; *see also id.* at 277 (stating Terry "fail[ed] to alleged such anticompetitive activity" and instead argued no such evidence was required for his claim).

In *London*, the plaintiff contended he was fired in retaliation for testifying in a "race discrimination case against [the defendant]" and from that act alone "the jury could infer an anticompetitive effect," but produced no other evidence or allegations of anticompetitive power. *London*, 410 F.3d. at 1305. As a result, the court held judgment was properly entered for the defendant because London did not attempt to show the defendant had the power to "adversely affect competition." *Id.* Tyson points exclusively to *dicta* at the end of *London* to imply its inflated burden of proof, but that just provides examples of evidence that could have shown the defendant exercised anticompetitive power. Plaintiffs have not been able to locate a single case, and Tyson cites none, stating that this riff identifies the necessary evidence under the PSA. *London* has been understood to merely articulate the same general test as *Terry*, *Wheeler*, and *Been*. *Been*, 495 F.3d at 1228-29. These opinions simply provide plaintiffs must show "the likelihood of competitive injury," such as that the defendant possessed and used its anticompetitive power against the plaintiff growers, exactly what Plaintiffs do here. *Id.* (citing *London*, 410 F.3d at 1303).

**iii. *Plaintiffs have generated substantial evidence of such PSA violations.***

With the law now properly laid out, there can be no disagreement that Plaintiffs have generated a dispute of material fact on their PSA claim. Indeed, Tyson does not even contest that Dr. Stiegert's report provides evidence that Tyson's Robards complex possesses anticompetitive, monopsony power it could use against Plaintiffs. Tyson Br. 5-7. This makes sense. Dr. Stiegert details Tyson's own website, United States government documents, and other public records—each its own piece of independent evidence in support of Plaintiffs' claim—establish a small geographic market for growing services, so that the only potential competitor for purchasing *some* Plaintiffs' growing services is a single Perdue complex, and that there is *no* competitor for other Plaintiffs' growing services. Declaration of Kyle Stiegert in Support of Plaintiffs' Rule 26(a)(2) Expert Disclosures, Doc. 175, Exh. 2, ¶¶ 28, 71-73 ("First Report); *see also* Supplemental Declaration of Kyle Stiegert in Support of Plaintiffs' Rule 26(a)(2) Expert Disclosures, Doc. 175, Exh. 23, ¶¶ 16-18 ("Second Report").

Further, drawing from Plaintiffs' sworn discovery responses, Dr. Stiegert details how Tyson "consolidated its monopsony power by requiring the Plaintiffs" to alter their chicken growing houses to meet Tyson-specific specifications, thereby further trapping Plaintiffs under Tyson's control, as Plaintiffs have essentially no way to recoup those investments except by continuing to work for Tyson. First Report ¶¶ 83-85, Table 5. Relying on testimony of Plaintiffs and other growers, he also explains that Perdue does not actually compete for the services of those Plaintiffs it could work with. *Id.* ¶¶ 73-75; *see also* Second Report ¶¶ 30-33. In sum, satisfying the first component of a PSA claim based on anticompetitive conduct, Plaintiffs have shown Tyson's Robards complex is the definition of a monopsony, providing it anticompetitive power over them. *See, e.g.*, First Report ¶¶ 111-12.

Supporting the other part of the claim, Dr. Stiegert demonstrated Tyson used this power against Plaintiffs to arbitrarily manipulate their wages, exactly what is called for in *Been*, 495 F.3d at 1234. He documents that due to Tyson's anticompetitive power it artificially depressed Plaintiffs' base pay below what market forces would dictate. First Report ¶¶ 91-93, Table 6; *see also* Second Report ¶ 36. He also demonstrated that Tyson opportunistically reduced the total number of flocks Plaintiffs received and thus could be compensated for. First Report ¶¶ 105-07, Fig. 5.

Moreover, Dr. Stiegert showed that Tyson wielded its anticompetitive power in how it constructed its payment tournaments—in which growers' relative performance leads to rewards and demerits off of the base pay—further arbitrarily altering their compensation. *Id.* ¶ 36. Specifically, as supported by Tyson's settlement sheets, Dr. Stiegert shows Tyson uses its anticompetitive power to randomly select subsets of growers for each tournament so that the same output resulted in different compensation because growers are being compared to different sets of other growers. First Report ¶¶ 42-43, 45, Tables 2-3, Fig. 1. Tyson's records also establish it forces growers to face one another in tournaments even though it provides them flocks with different sex and breed makeups, which impacts outputs and relative placement. *Id.* ¶¶ 55-58, Figs. 2-4.[6] What is more, Tyson unilaterally decides to exclude certain growers from each tournament, which Dr. Stiegert demonstrates forces growers to vie against more high performers, leading to lower compensation than they should have received within the tournament system. *Id.* ¶¶ 94-96. In addition, Tyson uses its power to dictate that not all of the meat growers produce will count towards their output, again reducing growers' compensation below what they

[6] The record establishes Tyson places growers in the same tournament although they may have different breeds of chickens which grow differently. SOF Ex. 4 Rubin Bruce Dep. 73:17-74:10, 99:2-6. Moreover, growers can and did receive more male birds providing an advantage over those who receive more female birds. *Id.* at 119:3-6.

should have received within the tournaments. *Id.* ¶¶ 99-104, Tables 8-9. In other words, beyond using its anticompetitive power to arbitrarily suppress Plaintiffs' base compensation, Tyson also used that power to disconnect their final compensation from their output, imposing adjustments to base wages that had no connection to economic reality. That is sufficient to "establish [it] engaged in unfair practices in violation of § 202(a)" of the PSA. *Been*, 495 F.3d at 1234; *see also In re Pilgrims*, 448 B.R. at 903.[7]

Tyson does not truly dispute the existence of this evidence, but rather it returns to its false, inflated burden of proof, stating Dr. Stiegert did not "look at any effect the Robards Complex had on market prices, or the effect on prices paid by Tyson's customers." Tyson Br. 6. Yet, as explained above, direct evidence of these facts is not required. *See, e.g.*, *Been*, 495 F.3d at 1233. Indeed, Dr. Stiegert explains, "Economic theory strongly establishes that the exercise of monopsony power" described above will eventually "depress[] the supply of chicken by either completely driving growers from the market or preventing growers from expanding output"

[7] Tyson spends pages of its brief selectively presenting the report of its proffered expert Dr. Thomas Elam, which it argues undermines Dr. Stiegert's conclusions that Tyson manipulated the breeds growers received and number of flocks they were provided. Tyson Br. 8-9. Plaintiffs largely address this below in demonstrating there is a dispute of fact over whether Tyson engaged in such deceptive practices. Plaintiffs pause here to note merely that this discussion does nothing to address the numerous other ways in which Dr. Stiegert details Tyson wielded its anticompetitive power to harm Plaintiffs, producing a likely harm to competition, thereby violating the PSA. Moreover, looking at Dr. Elam's analysis, his claim is only that "over time," growers received the same inputs. SOF Ex. 33 Thomas Elam Dep. 204:13. He acknowledges that in any individual tournament inputs are "different" and nonetheless growers are required to compete against one another. *Id.* at 198-99, 209-210, 213. This *supports* rather than undermines Dr. Stiegert's conclusions. Dr. Stiegert explains that the way in which Tyson wields anticompetitive power means growers cannot know whether they are competing at an advantage or disadvantage—although they are never genuinely "competing" as the playing field is distorted—and thus they cannot make economically rational decisions. That uncertainly ultimately distorts the market and harms competition. *See, e.g.*, First Report ¶¶ 59-62; Second Report ¶¶ 36-37. Finally, while Tyson is correct that Plaintiffs did not file a *Daubert* motion against Dr. Elam, contrary to its assertion, Tyson is wrong to claim Plaintiffs concede his report is admissible. Tyson Br. 8. Plaintiffs simply determined it was more appropriate to raise their criticisms at trial.

because they cannot rationally predict the value of their labor and related investments. First Report ¶ 18(vi); *see also* ¶¶ 67, 96, 105. Where, at most, Plaintiffs are required to show a "practice that will *likely* affect competition adversely," no more can be required. *Terry*, 604 F.3d at 277.

Tyson's own pin cites support this conclusion. It tries to impugn Plaintiffs' evidence by insisting Plaintiffs cannot rely on "adverse effect[s] on [their] farming operations" Tyson Br. 5; but, it acknowledges *Been* states, "Growers may not rely on the sum total of various practices that individually are not likely to injure competition, but *must instead prove that specific practices have caused or are likely to cause injury*." *Been*, 495 F.3d at 1234 (emphasis added). This is what Plaintiffs have done through Dr. Stiegert' reports and the underlying evidence on which they rely. Plaintiffs have shown Tyson has anticompetitive power and uses it against growers to lower their base pay and engage in a series of practices, each of which further generates economically irrational final pay and collectively they establish the full scope of Tyson's harm. As Dr. Stiegert explains, the literature proves that because those practices individually and collectively disconnect compensation from genuine competition they will eventually harm the market, including consumers. That violates the PSA.

**iv. *Tyson is estopped from advancing more stringent requirements now.***

Lastly on this issue, even if Tyson's articulation of the PSA's burdens was colorable (it is not), it is estopped from seeking to impose them here because of the positions it took during discovery. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Here,

Plaintiffs requested "documents relating to the money earned from the sale of chicken and related products processed at the Tyson's Robards facility" and "relating to the market price of chicken," the exact type of information that would demonstrate how Tyson's use of its anticompetitive power against growers ultimately harmed consumers, as Tyson now claims is required. SOF Ex. 34, First Response RFP No. 49-50. In discovery, Tyson responded that both requests are "unrelated to Plaintiffs' claims." SOF Ex. 35, Tyson's First Supplement to Plaintiffs' Document Requests No. 49-50. As a result, Tyson explained it would "not produce documents responses to th[ese] requests." *Id.* Having taken that position, Tyson should not be able to fault Plaintiffs for failing to present that evidence—although as explained above, it is not necessary.

**b. PSA Violations Can Also Be Established Through Evidence of Deceptive Practices Without Any Evidence of Anticompetitive Conduct.**

The PSA case law that demands evidence of a likely harm to competition, such as by showing the defendant used anticompetitive power against the plaintiffs growers, further explains it is solely concerned with a subset of the PSA's causes of action. *Terry*, 603 F.3d at 276 (stating it was focused on claims of "unfair discriminatory practices of undue preference"); *Been*, 495 F.3d at 1226 ("At issue in this case is only what constitutes an 'unfair' practice within the meaning of § 202(a)."); *London*, 410 F.3d at 1302 (explaining the issue is what is required "to prove that any practice is 'unfair'"). The PSA also provides other causes of action, including if Defendants engage in "deceptive practices," which does not require evidence of anticompetitive power or use against growers, and which Plaintiffs can prove here.

Tyson itself appears to concede certain PSA claims can proceed absent evidence of anticompetitive conduct whatsoever. Tyson Br. 8 (seeking to refute that it "arbitrarily and capriciously manipulated" its tournaments in violations of the PSA). However, it seeks to evade

this issue by focusing on whether Plaintiffs can prove they were treated "unfair[ly,]" a cause of action that has required anticompetitive conduct, Tyson Br. 10, ignoring that Plaintiffs can also prove a PSA claim by showing the defendant "engage[d] in or use[d] any deceptive practice or device." 7 U.S.C. § 192(a); *see also* Tyson Br. 2 (same).

Tyson's refusal to acknowledge this distinct PSA claim that does not require evidence of anticompetitive power is particularly peculiar as the Sixth Circuit made clear that it has adopted the majority view of the PSA. *Terry*, 604 F.3d at 279. The case on which *Terry* relied for that majority view, *Wheeler*, states PSA claims only require evidence of anticompetitive power where the statute's language is so broad "[i]t is appropriate and necessary" to limit its reach through importing the "context" within which the PSA was passed—to stop anticompetitive power from harming food production at its inception—into its elements. *Wheeler*, 591 F.3d at 362-63. The terms that were of concern in *Wheeler* were "unfair," "unjust," "undue," and "unreasonable." *Wheeler*, 591 F.3d at 362-63; *see also id.* at 365 (Jones, J., concurring) (explaining the focus of the opinion is on these terms). This leaves "deceptive practice" claims to proceed without evidence of anticompetitive conduct. Lest there be any doubt, courts have warned against over-reading case law that seeks to narrowly construe certain language in the PSA and applying that to other provisions. *Wilson & Co. v. Benson*, 286 F.2d 891, 895 (7th Cir. 1961).

Indeed, the Seventh Circuit has suggested that the PSA should be read to encompass all activities "deemed 'unfair' by the Federal Trade Commission (15 U.S.C. § 45)," *Armour,*, 402 F.2d at 718 n.7, 722, which includes activities that could impact "competition" or that are "deceptive." 15 U.S.C. § 45; *see also Armour*, 402 F.2d at 722 (isolating "deceptive" practices as a distinct claim under the PSA).

Moreover, the Supreme Court and other courts have upheld PSA violations where there was no evidence of anticompetitive power, but rather the company engaged in the deceptive practice of "underweighing of consigned livestock." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 184 (1973); *see also Spencer Livestock Comm'n Co. v. Dep't of Agric.*, 841 F.2d 1451, 1455 (9th Cir. 1988) (similar); *Van Wyk v. Bergland*, 570 F.2d 701, 704 (8th Cir. 1978) (similar).

Therefore, although Tyson hopes the Court will overlook this issue, Plaintiffs should be allowed to prove their PSA claim without any evidence of anticompetitive power and its likely effect on competition, if they establish that Tyson engaged in deceptive practices. The record establishes they can do so.

***i. Plaintiffs possess evidence Tyson engaged in deceptive practices.***

There is at least a material dispute of fact regarding whether Tyson engaged in deceptive practices that violate the PSA. Tyson's former manager admitted it does not tell its growers anything beyond what is in the contract. SOF Ex. 8, Kenny Bartley Dep. 186:3-22 (testifying that he only talked to a grower about what was written in the contract). As its employees explain, such communications (or lack thereof) regarding how the tournament payment scheme operates were meant to leave the impression the tournaments measure and reward efficiency. *See* SOF Ex. 3, Jim Gottsponer Dep. 157:25-158:2 (agreeing that success would be defined in a tournament as efficiency in grower the bird); SOF Ex. 12, Neil Barfield Dep. 175:18-176:1 (tournament used to incentive farmers to grow effectively and efficiently); SOF Ex. 7, David Mears Dep. 48:8-10 (tournament system is an incentive for the farmer to be efficient); SOF Ex. 14, Jim Leis Dep. 167:7-16 (the grower should be able to deduct that the better he performs the better pay he would get, more pay and "in general[]" the more efficient the more money a grower will get).

Therefore, Plaintiffs were deceived into believing that tournament inputs, which affect growers' tournament performance, SOF Ex. 12 Barfield Dep. 186:22-187:9, would be divided fairly among the growers so that their rewards and demerits based on their ranking would reflect their relative performance. *See* SOF Ex. 9 William Rickard Dep. 34:17-35:2 (when initially discussing tournament system he understood and took the integrator at its word that he would be treated fair); *id.* at 163:24-164:5 (stating that he is in the lawsuit for unfair practices in that the tournament system is not being implemented equally for all growers); SOF Ex. 15, Charles Morris Dep. 253:14-18 (testifying that at the time he signed the contract he was of the belief that he was going to get the best inputs every flock); SOF Ex. 19, Doug Brown Dep. 202:23-203:6 (stating that the way the tournament system is designed is that everyone gets an equal chance from day one); SOF Ex. 31, Timothy Vincent Dep. 153:25-154:12 (stating that the tournament system was designed for everything to be equal).

Yet, Tyson's corporate representative admitted that in actuality growers' rewards and demerits are *not* tied to their relative efficiency as much as who was placed in a given tournament, a factor solely controlled by Tyson. SOF Ex. 14, Leis Dep. 168:16-169:18. A grower can perform the exact same but be ranked and thus compensated different amounts depending on who else Tyson has selected to be in the tournament, disconnecting their wages from performance. *Id.* at 160:2-161:19.

Dr. Thomas Elam, Tyson's expert, also admitted that Tyson's control of the inputs growers receive "might affect [grower performance] in an individual tournament." SOF Ex. 33, Elam Dep. 204:14-16. Tyson emphasizes that Dr. Elam also stated "over time" Plaintiffs received equal inputs, Tyson Br. 8-9, but that does not diminish the deception (or anticompetitive effects) of Tyson's behavior. Plaintiffs were told that their labor would determine their

tournament ranking and consequently their pay. Plaintiffs entered into the tournament system believing if they out worked the other growers they would earn more on each occasion. However, by unevenly distributing the quality of inputs in a given tournament like feed and chicks, Tyson randomly determined when growers' labor would pay off. Indeed, when asked if everyone was getting the same degree everyone else is getting Elam responded, "Materially, that is true. Is it exactly true? No. But close enough." SOF Ex. 33, Elam Dep. 349:13-19. Tyson's admission that it decided it need not ensure a fair distribution of inputs, but rather that growers had to accept what it deemed "close enough" and then participate in its tournaments that rank growers by a ten-thousandth of a point difference violates the PSA's prohibition on deceptive practices—as well as confirming that it wielded is anticompetitive power against Plaintiffs.

This is particularly true because Dr. Elam's admission is confirmed by substantial evidence from Tyson that establish it forced growers to face-off with meaningfully disparate inputs, making the tournament payments disconnected from the growers' relative efficiency, let alone fair market prices. For instance:

- Tyson provides growers in the same tournament flocks with different sex make-ups, despite the fact that male birds will consistently outperform female birds. SOF Ex. 7, Mears Dep. 54:23-25; SOF Ex. 4, Bruce Dep. 116:8-24.

- Tyson provides growers in the same tournament flocks with different breeds, even though different breeds grow differently. SOF Ex. 7, Mears Dep. 102:17-24; SOF Ex. 1, David Dickey Dep. 265:1-4; SOF Ex. 33, Elam Dep. 198:10-11, 210:1-4.

- Tyson provides growers in the same tournament flocks from laying hens of different ages, even though the laying hens' age impacts chick performance. SOF Ex. 4, Bruce Dep. 55:15-59:4; SOF Ex. 17, Beau McGuire Dep. 95:17-98:7; SOF Ex. 33, Elam Dep. 210:5-7; SOF Ex. 12, Barfield Dep. 205:22-25.

- Tyson provides growers in the same tournament with different quality feed, despite the fact that feed is arguably the most important factor for tournament ranking. *Id.* 207:7-22; SOF Ex. 14, Bruce Dep. 111:8-113:1, SOF Ex. 13, Jennifer Heltsley Dep. 74:8-75:7; SOF Ex. 7, Mears Dep. 107:13-25; SOF Ex. 33, Elam Dep. 264:12-13.

- Tyson forces growers into tournaments against birds who have been provided additional time to grow. SOF Ex. 12, Barfield Dep. 160:18-21, 215:3-216:22.

- Tyson forces growers into tournaments against grower houses that have different broiler densities, even though density can have a dramatic affect on chickens and affect performance. SOF Ex. 1, Dickey Dep. 273:4-8; SOF Ex. 11, McCarter Dep. 98:21-23; SOF Ex. 33, Elam Dep. 290:18-19.

- Tyson forces growers into tournaments where the houses have had different layout times, even though layout time impacts performance. SOF Ex. 4, Bruce Dep. 150:9-151:9.

Tyson led Plaintiffs to believe that their inputs would be fair such that they would have an equal opportunity to win each tournament, not simply that their performance would be similar over time, timing solely controlled by Tyson. Because the record establishes Tyson manipulated each individual tournament, SOF Ex. 33 Elam Dep. 204, Plaintiffs were deceived and such deception by Tyson is a violation of the PSA.[8]

[8] Lest there be any doubt, Dr. Stiegert's determination of what Plaintiffs would have been paid in the "but for" world had Tyson not possessed anticompetitive power also establishes their damages for these deceptive practices. Dr. Stiegert explains it is Tyson's "monopsony power" that enables the company to "disadvantage[e] some growers vis-à-vis others." First Report ¶ 62. Indeed, he documents how Tyson's ability and willingness to give growers in the same tournament disparate inputs is an expression of its anticompetitive power. *Id.* ¶¶ 46-61. Put another way, "Tyson at the Robards Complex has used its monopsony power to affect the pay that growers earn by engaging in various practices, including … transferring risk to the growers through their control of several factors that determine a growers performance (including, chick quality, feed quality, sex and breed of chicks, among others)." *Id.* ¶ 108; *see also* Second Report ¶ 36. The only reason that Tyson can do this is because it does not have "the fear of losing Plaintiffs to other integrators." First Report ¶ 109. Therefore, the proper way to compensate Plaintiffs for Tyson's deceptive practices is to provide what they would have earned had Tyson not possessed anticompetitive power and thereby been able to engage in those practices.

Even were the jury to disagree, Dr. Stiegert also details specific damages that resulted from Tyson's deceptive manipulation of the tournament system due to its anticompetitive power: damages from Tyson's condemnation practices. Dr. Stiegert explains Tyson's "anticompetitive exercise of monopsony power" allows it to "overestimate[] the number of pounds condemned in a tournament," *id.* ¶ 123, and deny growers' compensation for meat they grew that Tyson profits from by sending it to its dog food plant. *Id.* ¶ 126. He then calculated the damages that resulted from each of these deceptive practices. *Id.* ¶¶ 124-26, Tables 13-15.

**c. Tyson expressly breached its contracts with Plaintiffs.**

Because Plaintiffs have raised disputes of material fact regarding whether Tyson violated the PSA, they have also established a dispute of material fact regarding their contract claim, as Tyson's contracts require it to comply with the law—another fact Tyson entirely fails to address. *See* Tyson Br. 12-19. Moreover, because Tyson's breach of contract is tied to its violation of the PSA, contrary to Tyson's claims, Plaintiffs have established their damages, which are the same Dr. Stiegert details for Tyson's violation of the PSA.

"To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citing *Barnett v. Mercy Health Partners–Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007)); *see also Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (stating substantially the same). Tyson, rightly, does not contest the first element, that there is a contract between each Plaintiff and Tyson.

Regarding the second element, while Tyson insists Plaintiffs cannot "identify a provision which could have been breached," Tyson Br. 16, it wholly fails to address Section 2(C) of the contract with each Plaintiff, "Duties of Company." This section of the contract is the same for each grower and provides: "Company will comply with all applicable federal, state, and local statutes, rules, regulations, and ordinances in performance of this Contract." Broiler Production Contract, Ex. 7 to Tyson Br. (Doc. 214).

Based on this plain language, Tyson is contractually bound to comply with all applicable laws, which includes the PSA. As discussed previously in this response, Plaintiffs' have created a genuine issue of material fact regarding whether Tyson's actions are a violation of the PSA.

Consequently, if Plaintiffs prove that Tyson violated the PSA they have necessarily proven a breach of contract as well.

While Tyson asserts Plaintiffs "never provided damages" for this claim and thereby fail the third and final element, Tyson Br. 15, this too ignores how the PSA and contract claims overlap. Tyson admits that in "the PSA context, Plaintiffs have offered" damage calculations. Tyson Br. 12. All damages related to violations of PSA, as articulated by Plaintiffs' expert, necessarily flow through to the breach of contract claim as well. *See Metro Louisville*, 326 S.W.3d at 8. In Kentucky, the general "measure of damages for breach of contract is 'that sum which will put the injured party into the same position he would have been in had the contract been performed.'" *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995) (quoting *Perkins Motors, Inc. v. Autotruck Federal Credit Union*, 607 S.W.2d 429, 430 (Ky. Ct. App. 1980)). Had Tyson performed under the contract, it would not have violated the PSA and Plaintiffs would not have incurred the damages for said PSA violation. Thus, the damages flowing from the PSA violation is the sum that would put Plaintiffs into the same position they would have been in had Tyson performed under the contract, and refrained from abusing its anticompetitive power. Therefore, Plaintiffs can proceed with their contract claim.

**d. Tyson breached the implied covenant of good faith and fair dealing with each Plaintiff.**

Finally, keeping to its pattern, Tyson also misstates what can amount to a breach of the covenant of good faith and fair dealing and then uses that to argue Plaintiffs have failed to meet their burden. Contrary to Tyson's assertion, Tyson Br. 19, Kentucky *does* recognize a cause of action for breach of this duty, which is implied in all contracts, if Plaintiffs fail to receive the benefit of the bargain. That is true here. Moreover, because Tyson denied Plaintiffs the benefit of the bargain by failing to pay for chicken meat Plaintiffs grew and providing them fewer flocks

than promised, Tyson is also again incorrect that Plaintiffs have failed to identify damages. Tyson Br. 12-15. Those figures are calculated in Dr. Stiegert's report. Thus, this claim too can proceed.

**i. *Kentucky law recognizes a cause of action for breaching the covenant of good faith and fair dealing.***

Contrary to Tyson's wishes, Plaintiffs' claim for breach of the covenant of good faith and fair dealing is recognized under Kentucky law. Implicit in every contract in Kentucky is the covenant of good faith and fair dealing. *LJM Corp. v. Maysville Hotel Grp., LLC*, No. 2004–CA–120–MR, 2005 WL 790602, at *2 (Ky. Ct. App. Apr. 8, 2005); *see also Ranier v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). This covenant "impose[s] on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *Ranier*, 812 S.W.2d at 156).

It is true that Kentucky only allows *tort* claims based on a breach of the implied covenant of good faith and fair dealing where the situation involves parties with a special relationship not found in ordinary commercial settings. *See Atmos Energy Corp. v. Honeycutt*, Nos. 2011–CA–601/783, 2013 WL 285397, at *10 (Ky. Ct. App. Jan. 25, 2013) (unpublished decision). However, the breach of the implied covenant can be the basis of a viable *contract* claim. *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 196–97 (6th Cir. 2015) citing *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F.Supp.2d 807, 816–17 (E.D. Ky. 2013).[9] Another court in this district has explained that contrary to Tyson's insinuation,

---

[9] All of the cases that Tyson relies upon in claiming that there is no independent cause of action for a breach of the covenant of good faith and fair dealing are inapplicable. *Peacock v. Damon Corp.*, 458 F.Supp.2d 411 (W.D. Ky. 2006), dealt with a breach of warranty claim and stated that the Kentucky UCC does not create an independent cause of action for breach of the obligation of

Tyson Br. 20, this is an independent cause of action from a contract claim. It is a claim "based on a different type[] of breach," as the contractual obligations are derived from common law rather than the text of the agreement, thus it can and should be pled separately." *N. Atl. Operating Co., Inc. v. ZZSS, LLC*, No. 3:17-CV-00214-CRS, 2018 WL 1411266, at *3 (W.D. Ky. Mar. 21, 2018).

To succeed on this implied contract claim, the plaintiff must show "that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Babbs v. Equity Grp. Kentucky Div. LLC*, No. 1:19-CV-00064-GNS, 2019 WL 5225471, at *2 (W.D. Ky. Oct. 16, 2019) (internal citations omitted). For instance, this district has allowed a claim for breach of the implied duty of good faith and fair dealing where it was plausible that "defendant denied plaintiffs the benefit of their bargained for settlement agreement by acting in direct contravention to its terms." *N. Atl. Operating Co., LLC*, 2018 WL 1411266, at *3. This is precisely what Plaintiffs can prove here.

**ii. *There is a dispute of material fact as to whether Tyson breached the implied covenant and damaged Plaintiffs through its condemnation practices.***

As Tyson's own documents acknowledge, the bargain it entered into with Plaintiffs is that it would compensate them for the "production of marketable, target-weight, and processable broiler chickens." *See* Broiler Production Contract, Ex. 7 to Tyson Br. (Doc. 214). In fact, however, Tyson uses meat from so-called "condemned" birds it fails to compensate Plaintiffs for to process and produce dog food at its neighboring dog food facility. SOF Ex. 1, Dickey Dep.

---

good faith. *Id.* at 419. *State Auto Prop. & Cas. Ins. Co.*, 785 F.3d 189, as cited above, emphasizes that Kentucky law only provides *tort* recovery for breach of the implied covenant if there is a special relationship but reiterates that the covenant can be the basis for a viable breach of *contract* claim, *id.* at 196., which is the exact claim Plaintiffs make herein. *Breaking Free, LLC*, 2019 WL 1513978 (N.D. Ala. Apr. 8, 2019), is completely irrelevant in this context as it relies on Alabama law as opposed to Kentucky.

137:8-138:2. Put another way, Tyson profits from the birds Plaintiffs grew (proving that they are marketable) but does not pay for this meat, denying Plaintiffs the benefit of the bargain. *Id.* 127:3-8.

Instead, Tyson deducts the pounds of growers' condemned bird carcasses, and does so at more than their actual weight. As Dr. Stiegert details in his report, Tyson overestimates the weight of condemned birds and then deducts this excess weight from Plaintiffs' production in calculating their tournament ranking. First Report at ¶ 123; SOF Ex. 31, Vincent Dep. 168:9-169:7. Rather than actually weighing the condemned broilers to get the real weight, Tyson uses the average broiler weight of the flock to calculate the condemned pounds, SOF Ex. 14 Leis Dep. 112:23-113:8, which it then subtracts from the amount of meat it credits a grower for producing, a core factor in determining their tournament ranking. But, the weight of diseased birds are generally fifty percent lower than a healthy bird. First Report at ¶ 99. Thus, deducting the condemned birds at an average weight overestimates condemned bird weight such that Tyson underestimates the performance of Plaintiffs which alters tournament performance. *Id.* at ¶ 123.

Given Tyson's behavior, Dr. Stiegert's calculations of damages provide the appropriate measure of damages for this breach of the implied covenant of good faith and fair dealing. Dr. Stiegert's calculations show what Plaintiffs should have received had Tyson compensated them for meat Tyson did use, including by backing out Tyson's use of condemnation against growers.[10] This dispute of material fact allows Plaintiffs to proceed to trial on Tyson's breach of the covenant of good faith and fair dealing claim.

---

[10] Dr. Stiegert opined that based upon Tyson's condemnation policies that grower pay was reduced by $366,088 not including prejudgment interest. First Report at ¶19(c). Dr. Stiegert calculated damages for each Plaintiff based upon the excessive charges for condemned birds, and also for those pounds used at Tyson's dog food facility. *Id.* at Table 20-21.

**iii. *There is a dispute of material fact as to whether Tyson breached the implied covenant and damaged Plaintiffs through extending "days out."***

Tyson also denied Plaintiffs the benefit of the bargain by manipulating grow out and out-times such that Plaintiffs were not able to grow their maximum number of flocks possible, depriving them of compensation for those flocks. Implicit in the tournament contracts, which only compensate growers if they deliver birds within a given week, is that Tyson would do everything necessary to carry out the terms of the contract. *Farmers Bank,* 171 S.W.3d at 11 (citing *Ranier,* 812 S.W.2d at 156). This includes fairly and efficiently placing and picking up broilers. However, Tyson breaches this agreement. Using its monopsonist position, Tyson regulates the frequency of the supply of chicks in a way that was disconnected from market forces, which maximize its profits while disregarding profitability to growers. First Report at ¶ 105-106 and Declaration of Charles Morris attached as Exhibit B. This supply control, by increasing the days-out between flocks, denies Plaintiffs the benefit of their contracted bargain by denying Plaintiffs the opportunity to earn more revenue, as they would have with efficient flock placement. First Report at ¶ 105.

Dr. Stiegert analyzed this control and put forth damage estimates for the excessive days out which Plaintiffs' endured due to Tyson's actions, totaling over $3.5 million. *Id.* at Table 22. Such actions and the damages flowing therefrom create a genuine issue of material fact regarding whether these actions violate the covenant of good faith and fair dealing such that summary judgment should be denied.

## IV. CONCLUSION.

For the foregoing reasons, Defendants' motion should be denied.

RESPECTFULLY SUBMITTED this 10th day of July 2020.

/s/ John C. Whitfield
John C. Whitfield
Caroline Ramsey Taylor
**WHITFIELD BRYSON LLP**
19 North Main Street
Madisonville, Kentucky 42431
Tel: (270) 821-0656
Fax: (270) 825-1163
john@whitfieldbryson.com
caroline@whitfieldbryson.com

J. Dudley Butler (MS Bar #7626)
**BUTLER FARM & RANCH LAW GROUP, PLLC**
499-A Breakwater Dr.
Benton, MS 39039
Tel: (662) 673-0091
Fax: (662) 673-0091
jdb@farmandranchlaw.com

David S. Muraskin
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, D.C. 20036
Tel: (202) 797-8600
Fax (202) 232-7203
dmuraskin@publicjustice.net

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

On this the 10th day of July 2020, I hereby certify that a copy of the foregoing has been sent via the District Court electronic filing system and by email to:

Marc Wells
209 West Main Street
P.O. Box 644
Princeton, Kentucky 42445

Robert T. Adams
Mark C. Tatum
Shook, Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, Missouri 64108

***Attorneys for Defendants***

/s/ John C. Whitfield
John C. Whitfield
WHITFIELD BRYSON LLP
19 N. Main Street
Madisonville, KY 42431
(270) 821-0656
john@whitfieldbryson.com

***Attorney for Plaintiffs***