# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| CHARLES MORRIS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:15-cv-00077 |
| | ) | Judge: Joseph H. McKinley, Jr. |
| TYSON CHICKEN, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS**

---

Plaintiffs[1] Charles Morris, et al., by and through counsel, respectfully respond to the Defendants' Statement of Uncontroverted Facts by addressing each paragraph outlined by Defendant Tyson Chicken, Inc. ("Tyson"), and by supplementing the record with additional facts not addressed by Tyson. As can be seen by this Response, the record is replete with controverted facts and summary judgment should be denied.

## I. PLAINTIFFS' RESPONSE TO TYSON'S ALLEGED UNCONTROVERTED FACTS

### The Robards Complex

1. Tyson owns and operates the Robards Complex, which is a complex of multiple buildings located at 14660 US-41 S, Robards, KY 42452.

**Response**: Plaintiffs' agree with paragraph 1 of Defendants' Statement of Uncontroverted Facts.

2. The Robards Complex is vertically integrated, meaning it has integrated various levels of production into one complex, such as a breeder department, a hatchery, feed mill, a live haul

[1] Plaintiffs do not herein concede any facts for purposes of trial or otherwise.

(transportation) department, a processing plant, and other animal welfare functions. Ex. 1, Deposition of David Mears, 58:19-59:6; Ex. 2, Deposition of Jim Gottsponer, 98:18-24.

**Response**: Plaintiffs' agree in part with paragraph 2 of Defendants' Statement of Uncontroverted and Material Facts, and object to the extent that other relevant facts and context are not mentioned by Tyson. Tyson does own and operate the vertically integrated Robards' complex which includes various areas of production. Plaintiff objects to this paragraph to the extent that Tyson fails to mention its River Valley Rendering dog food plant that is part of the main Robards complex. Ex. 1 David Dickey Dep. 125:16-126:-20.[2] Plaintiffs object to the reference as to "other welfare functions" in paragraph 2 as not indicating the animal welfare functions of which Tyson speaks. [3]

3. The Robards Complex processes broiler chickens for human consumption. Mears Dep. 44:17-45:6, 113:4-6, 123:6-12.

**Response:** Plaintiffs' agree with paragraph 3 of Defendants' Statement of Uncontroverted Facts.

4. A "broiler" is a chicken that is raised and processed for human consumption, i.e. for its meat. Mears Dep. 44:17-45:6. A "pullet" is a young female chicken that will develop into a hen and lay the eggs that become broilers. Gottsponer Dep. 55:1-9. Pullets are breeder chickens and are not bred or raised for human consumption. *Id.*

**Response**: Plaintiffs' agree with paragraph 4 of Defendants' Statement of Uncontroverted Facts.

5. The Plaintiffs in this case are broiler growers who contract with the Robards Complex to

---

[2] All references throughout this document to the Deposition of David Dickey will be combined and collectively marked as Exhibit 1. The same will be done for all other witness depositions referenced herein.

[3] The record outlines in detail that the animal welfare concerns of Tyson are an anomaly. Tyson's own animal welfare specialist testified that Tyson's goal was just to keep the birds alive until they could be slaughtered. Ex. 2, Eric Brown Dep. 101:4-7. Tyson crams over twenty thousand (20,000) chickens in each broiler house thereby allotting each of them a living space of approximately .85 of a square foot. Ex. 3, Jim Gottsponer Dep. 53:10-21; Ex. 1, David Dickey Dep., 191:11-19. Tyson requires growers to cull (kill) birds that are impaired, sick or non-uniform in size by holding the bird by its feet upside down and then breaking its neck. *Id.* 201:3-7 and Ex. 7 to deposition. Tyson retains all control for veterinary services and will not allow growers to obtain their own veterinarian for the birds. Ex. 4, Rubin Dep. Page 125:1-10.

receive chicks and raise them to processing weight. Ex. 3, Deposition of Christopher Burch, 34:1-10.

**Response**: Plaintiffs' agree with paragraph 5 of Defendants' Statement of Uncontroverted Facts.

6. Contractually, the broiler growers furnish the "labor, material, and utilities necessary for the receipt of chickens and the production of Broilers." *See* Ex. 4, Broiler Contract of Charles Morris (5157), ¶ 3; Ex. 5, Deposition of Charles Morris, 231:7-232:22.

**Response**: Plaintiffs' agree with paragraph 6 of Defendants' Statement of Uncontroverted Facts.

7. The Robards Complex and Tyson, on the other hand, develop and process broilers for human consumption, which includes breeding the grandparent, parent, and broiler generation of chicken; managing the breeder hen operations; collecting and hatching the eggs into broiler chicks; delivering those chicks to the contract growers; providing the proper feed, veterinary, and service assistance to help raise those broilers; retrieving the broilers when they are fully grown; and processing them at the plant. *See* Mears Dep. 58:19-59:6, 121:20-23, 123:6-8, 125:8-10, 126:22-24, 130:3-5; Gottsponer Dep. 98:18-24, 107:7-108:1; Broiler Contract of Charles Morris (5157), ¶ 2.

**Response**: Plaintiffs agree in part with paragraph 7 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts as to the control of the grow out process that Tyson utilizes. Tyson controls the majority of the grow-out process. Tyson controls the density of the birds in the growers houses; the temperature in the chicken houses; the tunnel ventilation and lighting in the houses; the type of feed that the birds are to eat and its quality; the type of birds (sex and breed) delivered to the growers and when they are delivered and picked up; subclinical and clinical disease of the birds delivered and the health of the birds delivered; veterinary services to the birds; feeder system and water delivered to the birds; the age of the birds when picked up; Ex. 5, Michael Lacy Dep. 186:7-10, 192:8-14, 199:5-12, 214:10-15, 214:17-23, 215:12-20, 220:5-19, 262:20-23; Ex. 6, Walter Thurman Dep. 132:22-133:8, 137:13-17, 139:3-7. Tyson also controls the size of the houses; the temperature and wind speed of the houses (via computers); "every piece of equipment in

the house"; the need for upgrades in the houses; breed of birds delivered; pest control of the houses; whether sick birds are delivered to the grower; feed delivery and type of feed delivered to growers; when and how the birds are caught and delivered to the Robards facility; and whether any grower in any given tournament would received an "exception" and not participate in a tournament. Ex. 7, David Mears Dep. 118-124, 129:5-130:5, 134:6-12.

8. "Processing" a broiler, as it is referred to here, is the process of slaughtering, de-feathering, eviscerating, and cleaning a broiler to an end product of consumable chicken. Ex. 6, Deposition of Ben Grant, 34:8-37:16.

**Response**: Plaintiffs' agree with paragraph 8 of Defendants' Statement of Uncontroverted Facts.

**Employees**

9. **David Mears**: For the period of 2007 through the end of 2009, David Mears worked at the Robards Complex as Live Production Manager. Mears Dep. 49:3-11. Mears served in the Army as a battalion commander and in 2009 his battalion was called up for duty in Afghanistan. *Id.* 15:1-15. For the period of 2014 until October 2017, Mears returned to the Robards Complex and worked as Complex Manager. *Id.* 57:4-5. As Complex Manager, Mears was generally responsible for all aspects of the poultry complex, including the contract grower relations, processing facility, hatchery, feed mill, delivery, and live haul aspects. *Id.* 58:19-59:4.

**Response**: Plaintiffs agree in part with paragraph 9 of Defendants' Statements of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts as to the background of David Mears and his experience in the industry. David Mears is not certified by any regulatory body through his work. Ex. 7, Mears Dep. 21:8-10. He believes the tournament system is used by Tyson because of cost factors, including but not limited to ingredients, feed, and chick costs. *Id.* 47:8-15, 155:23-116:8. The tournament system is a cost measurement tool for Tyson. *Id.* 136:8-9. Mears also believes efficiency was another reason why Tyson used the tournament system. *Id.* 48:8-10. Mears left the Robards Complex in 2009 to return to Cobb-Ventress, a company that provides breeds of birds to various integrators. *Id.* 50:14-21. Cobb-Ventress (owned by Tyson) would sell four breeds of birds to the Robards complex, namely Cobb 500, Cobb 700, Cobb Male and MV male. *Id.* 51:7-11, 52:9-12. The grower needed to provide the Cobb 700 more light and greater warmth then the 500 when

growing these two breeds. *Id*. 53:6-10. The Cobb 500 and Cobb 700 would grow differently, with the yields of these two breeds being different. *Id*. 144:24-146:22. Mears testified male birds will grow larger than female birds. *Id*. 55:11-14. Mears confirmed that Grower Pay Recaps would evidence the hen breed and male breed numbers being different which indicated that different breed birds would be grown in the same tournament. *Id*. 102:17-24. If a Grower Pay Recap has an "S" on the input it meant the birds of a flock were a "straight run", meaning they were believed to be 50/50 male vs. female, although Mears could not name one article that backed up this 50/50 theory. *Id*. 104:22-105:15. Mears left the Robards facility in 2017, as he was offered another job in Arkansas (Tyson Boot Camp), that he did not want, as he wanted a Complex Manager job in Dardanelle, Arkansas (which he did not get) prior to him leaving Robards. He complained to a Vice President at Tyson (Kendall Beach) about not getting the Complex Manager job, so he left the company as he had a "bad taste" in his mouth for Tyson Foods. *Id.* 76:10-80:12.

10. **Kenny Bartley**: For the period of December 2009 to 2013, Kenny Bartley worked at the Robards Complex as Live Production Manager. Ex. 7, Deposition of Kenny Bartley, 64:25-65:20, 250:1-13. As Live Production Manager, Bartley was generally responsible for all aspects of live bird production, from the breeder farms to the hatchery, and through broiler development until the meat entered the plant. *Id.* 58:7-15; Gottsponer Dep. 87:11-15.

**<u>Response</u>**: Plaintiffs agree in part with paragraph 10 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts as to the background of Kenny Bartley and his experience in the industry. Bartley was terminated from his position with Tyson November 2013, and claimed he did not know the real reason for his termination. Ex. 8, Kenny Bartley Dep. 250:11-253:12. Jim Gottsponer testified he believed that Bartley was terminated by Tyson because Bartley modified a mortality card. Ex. 3, Gottsponer Dep. 84:11-85:14. It was common knowledge at the Robards Complex that Bartley was fired from his job. Ex. 9, William Rickard Dep. 171:21-24. Bartley testified that while he worked at Tyson contract growers with Tyson would be delivered a mix of male and female birds. Ex. 8, Bartley Dep. 107:15-18. He would go over the contract that a potential grower would sign with Tyson. *Id*. 139:24-140:8. Bartley would go over the tournament system with the potential grower outlining that this system is based upon a series of inputs developed by Tyson that would rank growers in a given tournament. *Id*. 140:15-142:9. Bartley never explained to the growers before they signed the Tyson contract that they would be competing in tournaments where some growers fed their birds reclaimed feed and others did not; that some growers in the same tournament would grow different breed or sex of birds; that grow out times for growers participating in a tournament may be different; that veterinary services for the birds might be different for participants in a tournament; that bird catch days for participants in a tournament might be different; that some flocks prior

to slaughter may be affected by shrinkage due to the time of the trip from the grower farm to the facility; that some growers may be given a exception and be removed from a given tournament; and if the inputs that comprise the tournament system were not noted in the contract specifically, he would not go over them with the potential grower. *Id*. 139:24-149:15, 177:8-179:16, 186:25-187:7. Bartley admitted that the breed of bird delivered to the growers was within the control of Tyson. *Id*. 156:21-157:12.

11. **Jim Gottsponer**: For the period of December 2013 to May 2017, Gottsponer worked at the Robards Complex as Live Production Manager. Gottsponer Dep. 82:4-5. *Id.* 87:11-15.

**<u>Response</u>**: Plaintiffs agree in part with paragraph 11 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts as to the background of Jim Gottsponer and his experience in the industry. Gottsponer worked in the poultry industry for 29 years and had a working knowledge with the tournament system. Ex. 3, Gottsponer Dep. 157:1-9. Gottsponer testified at no time while he was with Tyson did Tyson sex the birds delivered to the growers to determine the sex of the flock. *Id*. 44:10-21. In 2010 Gottsponer got a job in transportation of Cobb-Ventress, only to be terminated from that position in 2011, as he knowingly permitted a truck full of birds to run overweight, in excess of the law. *Id*. 64:23-72:1. In June of 2011, Gottsponer returned to Tyson as a broiler tech, taking a reduction in pay. *Id*. 72:23-73:16. In December 2013, Gottsponer moved to the Tyson Robards Complex as the Live Production Manager. *Id.* 81:12-82:5. When Gottsponer arrived at Robards, the complex was running both Cobb and Ross birds, but no sexing (determination of sex) of the birds was done by Tyson due to the cost as there was no "financial benefit" for sexing. *Id.* 92:13-93:10. Gottsponer testified quality of feed is very important in growing birds. *Id.* 146:14-147:7. He testified that he was aware that growers in a tournament would compete growing different breeds of birds. Gottsponer admitted that he wrote an email dated June 23, 2014, regarding Plaintiff Charles Morris, where he stated, "We can move him up a long way and still have bird health issues and performance issues with his farms." *Id.* 246:4-10, 233:22-25, and Ex. 7 to deposition. Gottsponer was asked to leave by Tyson and resigned as Live Production Manager in May 2017, due to a fire at the feed mill in April 2017, testifying that Tyson was "in favor his leaving." *Id*. 117:22-24, 120:8-122:25, 125:2-3. David Mears informed him that he would have to leave and Gottsponer was escorted out of the building that very day in May 2017. *Id*. 125:12-126:14.

12. **David Dickey**: David Dickey started at the Robards Complex as a Broiler Manager, and held that position from January 2015 to summer 2017. Ex. 8, Deposition of David Dickey, 56:13-21. Since the summer of 2017, Dickey has worked at the Robards Complex as Live Production Manager. *Id*. 59:10-12, 60:6-21.

**<u>Response</u>**: Plaintiffs agree in part with paragraph 12 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts as to the background of David Dickey and his experience in the industry. Mr. Dickey testified in this case as a corporate representative for Tyson pursuant to FRCP 30(b)(6). Dickey has no formal certifications of any sort. Ex. 1, Dickey Dep. 20:8-11. He had experience with pullet operations that contracted with Tyson and testified these pullet contracts were paid by the square foot and not by the tournament system. *Id*. 46:15-21. Breeder operations that contract with Tyson are paid by dozen eggs produced. *Id.* 48:5-18. The average broiler grow out time period is 53 days. *Id.* 50:16-22. Broiler operators who contract with Tyson are paid via the tournament system. *Id*. 51:8-12. The Robards facility would settle eight to twelve tournaments/settlements a week. *Id*. 121:21-23. Participants of the weekly tournaments are determined by the next growers whose birds were to be picked up. *Id.* 123:24-124:17. Tyson required growers at the Robards complex to upgrade the grower facilities in 2012 or lose their contracts. *Id.* 130:14-131:17. Dickey reviewed Grower Pay recap sheets weekly. *Id.* 144:12-23. If the Grower Pay Recap sheet shows an "S" that mean straight line birds, with no way of knowing the percentage of male versus female birds. *Id*. 159:21-160:18, 161:1-162:20. There is no credit given to a participant in an tournament who feeds birds reclaimed feed versus fresh feed. *Id*. 167:21-168:2, 277:24-278:13. The ages of birds picked up for slaughter in any tournament will not be consistent, yet Tyson gives no credit for this in the tournament. *Id*. 171:6-11. Ages of the hens the chickens come from is not considered in tournament rankings of participants, even though these ages may be different. *Id*. 177:20-25, 268:20-269:6. Tyson agrees that different breeds/types of chickens grow differently. *Id.* 264:20-265:12, 266:3-5. Tyson agrees that male chickens grow larger than female chickens. *Id.* 266:3-12, 266:22-24. Tyson gives no handicap or consideration for different breeds of bird that may be grown in the same tournament, as Tyson considers the genetics of the birds "all the same." *Id*. 179:13-24, 182:15-19, 277:11-14. Tyson allocates only .90 of a square foot for each bird to thrive, and participants in a tournament may grow chickens with different densities. *Id*. 192:4-12, 273:1-10. Tyson treats all growers in a given tournament with different size chicken houses the same. *Id*. 278:19-279:1. Tyson controls the type of chickens (breed) delivered to the grower, the pest control the grower receives, the medication the chickens receive, the feed delivered to the grower and the method of transport of the feed, the differences in service techs that oversee the growers, when the chickens are picked up for slaughter, the weighing of the birds before slaughter, the condition of the environment of the farm the chickens are grown in, the inputs of the tournament system, and whether a grower gets an exception in a tournament. *Id*. 277-291. Condemned chickens at the Robards facility are used by Tyson at the River Valley Rendering dog food plant. *Id*. 234:20-235:8.

13. **Jared Shelton**: Jared Shelton began working with Tyson in 2005 as a supervisor trainee. Ex. 9, Deposition of Jared Shelton, 23:12-24:11. From 2006 to 2008, Shelton supervised catch crews, which caught and transported broilers at the end of their growing period. *Id.* 27:20-29:4.

For the period of March/April 2008 to 2011, Jared Shelton worked at the Robards Complex a Service Technician. *Id.* 38:21-39:12. For the period of March/April 2011 to December 2014, Shelton was a Broiler Manager at the Robards Complex. *Id.* 52:25-53:10. From January 2015 to February 2016, Shelton was the Feed, Order, and Delivery Supervisor. *Id.* 89:1-12. And since February 2016, Shelton serves as the Breeder Manager for the Robards Complex. *Id.* 95:23-96:9.

**Response**: Plaintiffs agree in part with paragraph 13 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts as to the background of Jared Shelton and his experience in the industry. Prior to his work with Tyson, Mr. Shelton had no involvement in the chicken industry whatsoever. Ex. 10, Jared Shelton Dep. 27:8-19. Shelton, while he was a Service Tech with Tyson, managed four, eight house Tyson company farms growing chickens. *Id*. 43:20-45:10. The four Tyson farms managed by Shelton would be included in a tournament to calculate the tournament pay, and then the four Tyson farms would be pulled from the tournament and the same tournament would be recalculated (without the four Tyson farms). *Id*. 50:6-15. He had heard that former Live Production manager Kenny Bartley had been terminated by Tyson. *Id*. 52:1-15. Tyson had certain specs and specification that it expected the growers to live up to. *Id*. 57:22-58:1. Tyson expected temperature, ventilation, and lighting specifications mandated by Tyson to be complied with my the growers, or they would risk losing their contracts. *Id*. 62:14-25, 63:18-21. Tyson was growing Cobb 500 and Cobb 700 birds while he was with Tyson. *Id*. 66:14-20. Cobb 700 chickens were known to Shelton to grow larger than Cobb 500 chickens. *Id*. 65:7-66:11. Cobb 500 chickens require a different lighting program than Cobb 700 chickens, and these lighting programs are mandated by Tyson to be complied with by the grower. *Id*. 69:12-70:1. The grower chicken houses all have computers (controllers) that regulate feed lines and lights coming on and off, duration and intensity of light, ventilation controls, fans, inlets, temperature histories, and heaters in the houses, among other things. *Id*. 70:16-25. The controller must comply with mandatory Tyson specifications for the growing of chickens. *Id*. 71:15-24. Shelton admits that growers in individual tournaments will grow different breeds of birds. *Id*. 127:7-17, 130:22-131:5. Tyson does not sex the chickens, so it doesn't know in a "straight run" the percentage of male versus female chickens, although it is accepted by Tyson and the industry that male birds grow bigger than female birds. *Id*. 136:6-137:8.

**The Hatchery**

14. The Robards Complex hatches on average 1.3 million chicks every week. Grant Dep. 90:4-24.

**Response**: Plaintiffs' agree with paragraph 14 of Defendants' Statement of

Uncontroverted Facts.

15. Tyson does not sex its broilers upon hatch, meaning its hatchery does not sort the gender of the chick before delivery to a given grower. Bartley Dep. 101:20-103:18.

> **<u>Response</u>**: Plaintiffs agree in part with paragraph 15 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts. Due to the fact that Tyson does not sex its broilers upon hatch, it does not know in a "straight run" the percentage of male versus female chickens; however it is accepted by Tyson and the industry that male birds grow bigger than female birds. Ex. 10, Shelton Dep. 136:6-137:8. The Rule 30(b)(6) corporate representative of Tyson, David Dickey, agreed that different breeds/types of chickens grow differently. Ex. 1, Dickey Dep. 264:20-265:12, 266:3-5. Tyson agrees that male chickens grow larger than female chickens. *Id*. 266:3-12, 266:22-24.

16. Chick deliveries to the growers are set by the placement schedule. In general, the placement schedule functions on a first-in, first-out basis, meaning when a grower's house is empty his farm is placed in line to receive chicks. In general, the hatchery delivers whatever chicks it has to whichever grower is next in line. Dickey Dep. 113:22-116:2, 182:20-183:23, 185:14-18, 186:8-14.

> **<u>Response</u>**: Plaintiffs' agree with paragraph 16 of Defendants' Statement of Uncontroverted Facts.

17. As a species, chickens have two chromosomes: Z and W. A female chicken has ZW, and a male chicken has ZZ. Like humans, each parent chicken donates one chromosome to its offspring at random. As a result, like humans, any given chicken has a 50/50 chance of being born female or male, depending on the female chicken's donating chromosome. Ex. 10, Expert Report of Dr. Michael Lacy, Sec. V.

> **<u>Response</u>**: Plaintiffs agree in part with paragraph 17 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts. Dr. Steve McCarter, the in-house veterinarian for the Tyson Robards complex, is of the opinion that because Tyson does no sexing of the chickens, it is mere "common sense" that the flocks delivered to the growers will be 50/50 male versus female. Ex. 11, Steve McCarter Dep. 50:18-51:7. Dr. McCarter indicated that

there is no document that exists that would support his opinion that flocks are 50/50 male versus female. *Id*. 51:8-52:13. Dr. Michael Lacy, the Tyson expert that opined that "*any given chicken has a 50/50 chance of being born female or male*" also testified as follows:

> "Q: All right. So you're saying, then, when chicks hatch at the hatchery, they're going to come out 50/50?
>
> A: No.
>
> Q: Okay what are you saying then?
>
> A: *I'm saying that at the time of fertilization, it's 50/50. If you continue reading, it's been observed by some that a few more female embryos die during incubation than male embryos. This may skew the ratio of females to male chicks 1 or 2 percent in favor of males that hatch.*"
>
> Ex. 5, Lacy Dep. 249:11-17 (Emphasis Added).

**Placement of Flocks**

18. The time between when a broiler grower's flock is picked up for processing and he or she receives a new flock is referred to as "out-time" or "days-out." *See, e.g.*, Ex. 11, Deposition of Keith Crabtree, 178:7-21.

> **Response**: Plaintiffs' agree with paragraph 18 of Defendants' Statement of Uncontroverted Facts.

19. Broiler growers use the time between flocks to clean out the litter in the chicken houses, sanitize the water system, and generally prepare for a new flock. Burch Dep. 42:12-23.

> **Response**: Plaintiffs agree in part with paragraph 19 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiff objects to this paragraph to the extent that it leaves out relevant facts. Rubin Bruce is a former service tech for Tyson and is now employed by the USDA as a GD-82 in charge of inspection functions dealing with the national School Lunch program. Ex. 4, Bruce Dep. 15:6-15. Bruce worked as a Service Tech for Tyson for approximately ten years. *Id*. 153:20-22, 159:10-14. Mr. Bruce testified that participants in any given tournament may compete with different layout terms, and that a longer layout term is a "perk":
>
> "Q: Okay. What do I mean when I say "layout time"? What is that?
>
> A: Layout time is the time in between one flock being caught and the next

flock being placed.

Q: Okay. And that's in the control of Tyson?

A: Yes, sir.

Q: And there are different layout times among growers in the tournament, correct?

A: Yes, sir.

Q: Okay.

A: That -- that -- that brings up another point. When you say -- like I said, I mean, we're going through this fairly quickly. But that would be another instance where different layout times can help or hinder a flock. The longer the layout time, generally the better off the flock's going to do when it comes back in there. Well, what you get is you get a bacteria load that gets to die down. And like I had talked to you before about bacteria loads, once you get a high bacteria count, ain't a whole lot you can do about it but clean that -- clean that house out.

Q: Yeah.

A: So any time you've got a long extended period of time of layouts, you're always going to have a better potential -- you have a potential to do better. Doesn't mean you're going to do better, but it's a -- it's a -- it's a perk."

*Id*. 150:7-151:9.

**The Feed Mill**

20. The Robards Complex's feed mill mills, stores, weighs, and distributes feed for all the broiler growers. Dickey Dep. 69:9-17.

**Response**: Plaintiffs' agree with paragraph 20 of Defendants' Statement of Uncontroverted Facts.

21. "Milling" feed is the process of mixing together the various ingredients which make up chicken feed, the two main ingredients being corn and soybeans. Gottsponer Dep. 102:4-7.

**Response**: Plaintiffs' agree with paragraph 21 of Defendants' Statement of Uncontroverted Facts.

22. The feed mill has four types of feed: starter feed, finisher feed, withdraw feed, and withdraw 2 feed. Dickey Dep. 70:20-71:4. Starter feed is a crumbled feed which is easier for smaller chickens to eat and digest. *Id.* 71:5-14. Chicks are usually placed on this feed for 14 days. *Id.* After starter feed, chickens are placed on finisher feed until they are 26 to 28 days old. *Id.* 72:14-73:10. At the age of 26 to 28 days until the last 10 days of the growing period, broilers will eat withdraw feed, which is lower in nutritional value, but sufficient for gaining mass. *Id.* 73:17-74:4; Gottsponer Dep. 102:11-22. And for the final 10 days before harvesting, broilers will eat withdraw 2 feed. Gottsponer Dep. 102:23-103:15.

**Response**: Plaintiffs agree in part with paragraph 22 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to broilers eating reclaimed feed/refurbished feed (which can have an adverse effect on feed conversion and performance) and the timing of the delivery of the feed. Ex. 4, Bruce Dep. 112:20-22. The quality of the feed given to the chickens affects the size of chickens even though refurbished feed is used on some farms and not others. Ex. 12, Neal Barfield Dep. 206:21-207:1, 207:17-22. Broilers would not eat reclaimed feed which was reported to management but to no avail. Ex. 13, Jennifer Heltsley, 74:25-75:7, 76:21-25. No handicap is given in any give tournament for differences in feed, including no handicap for refurbished feed. Ex. 14, Jim Leis Dep. 129:8-130:3. Tyson believes that feed conversion is the most important input for ranking of growers in the tournament system and that Tyson has a responsibility to deliver feed in a timely manner. Ex. 7, Mears Dep. 107:11-17, 125:14-17. Food outage of over 6 hours more or less impacts the performance of the chicken. *Id.* 126:11-15. Tyson recognizes feed outages but only if a broiler house is out for more than twelve consecutive hours in twenty-four hours time, and in said event the grower does not get paid for anything over twelve hours. If a grower is out eleven hours then that grower is treated the same as those not out of feed. Ex. 1, Dickey Dep. 208:3-210:7.

23. The feed mill delivers the feed it has, as appropriate to the age of the chicken. *Id.* 209:12-22; Dickey Dep. 72:14-73:10.

**Response**: Plaintiffs' agree with paragraph 23 of Defendants' Statement of Uncontroverted Facts.

24. The Robards Complex delivers the broiler feed to each Plaintiffs' farm and typically, the

feed delivery truck will deliver around 50,000 pounds of feed at a time. Ex. 12, Timothy Vincent Feed Ticket Report.

> **<u>Response</u>**: Plaintiffs agree in part with paragraph 24 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the timing of the delivery of the feed. Tyson controls when feed will be delivered, the amount and type of feed delivered, and whether a grower gets reclaimed feed. Ex. 12, Barfield Dep. 231:6-22.

25. The Robards Complex weighs and documents the amount of feed delivered to each broiler grower, and uses that number in calculating feed conversion for a given flock. *See* Dickey Dep. 69:9-22; Ex. 13, Deposition of Neil Barfield, 150:7-151:21; Ex. 14, Calvin Leisure Settlement Sheet for 3/19/16; Ex. 15, Morgan Rickard Settlement Sheet and Grower Recap for 8/2/14 (showing total feed consumed and feed conversion for each flock in tournament settlement).

> **<u>Response</u>**: Plaintiffs agree in part with paragraph 25 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to how feed conversion is calculated. Tyson believes feed conversion/efficiency is the single most important factor in determining "net pound value." Ex. 1, Dickey Dep. 164:4-6; Ex. 7, Mears Dep, 107:11-17. Tyson tracks feed conversion per house, although in calculating feed conversion the calculation is averaged by farm and not calculated per chicken house. Ex. 4, Bruce Dep. 72:4-10; Ex. 1, Dickey Dep. 164:17-165:4.

26. When it delivers feed, the Robards Complex provides a feed ticket to the broiler grower, showing how much feed was delivered. *See* Ex. 16, Timothy Vincent Feed Tickets.

> **<u>Response</u>**: Plaintiffs agree in part with paragraph 26 of Defendants' Statement of Uncontroverted and Material Facts to the extent that the document referenced in this paragraph speaks for itself. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to documentation of reclaimed feed. Tyson at one time provided feed tickets to growers stamped "reclaimed feed" in person or through the mail advising growers they had received "reclaimed feed." Tyson stopped that practice so growers are now not aware if they are receiving "reclaimed feed." Ex. 15, Charles Morris Dep. 146:24-147:6.

27. When a broiler grower's flock is retrieved for processing, Tyson picks up any feed the grower did not use, and this feed is commonly referred to as "reclaimed feed." Reclaimed feed is

then delivered to a grower who needs withdraw feed. Reclaimed feed is only fed to broilers for the last seven days of the grow-out period. Ex. 17, Deposition of Beau McGuire, 159:9-17; Gottsponer Dep. 209:23-210:9; Ex. 18, Deposition of John Pinkston, 152:6-21. Reclaimed feed is always withdraw feed, because it is the feed given to broilers in the final days before harvesting. Ex. 19, Deposition of Jennifer Heltsley, 67:21-68:19.

**Response**: Plaintiffs agree in part with paragraph 27 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to documentation of reclaimed feed. Reclaimed feed is not eaten at the same rate or vigor as fresh feed by the broilers. Ex. 13, Heltsley Dep. 74:25-75:7, 76:21-25; Ex. 15, Morris Dep. 115:8-21, 146:3-20, 242:18-243:17; Ex. 16, John Pinkston Dep. 133:23-134:24; Ex. 9, Rickard Dep. 137:21-138:17, 166:16-167:10. "Fresh feed is always different than reclaimed feed." Ex. 4, Bruce Dep. 111:22-23. Growers have complained for years that broilers eat fresh feed more readily then reclaimed feed. Ex. 17, Beau McGuire Dep. 131:13-21. Tyson Service Tech Jennifer Heltsley specifically described the issue of broilers not eating the reclaimed feed like fresh feed, and that she reported this fact to Tyson management to no avail:

Q: Okay. So these growers were complaining to you that the birds would not eat the reclaimed feed like they would what I'm calling nonreclaimed or fresh feed?

A: That's correct.

Q: Okay. Did you notice that, as a tech, when you would go to the farms and watch the birds, did you happen to notice that yourself?

A: I did notice it. We had - - I had a farm. It's one of the Latta farms. And he was probably one of the first growers, Bobby Latta - - I mean Bobby Snell. At the Latta farm. He was probably one of the first growers that brought it to my attention, during a phone call. I had ordered his final feed and he had called me the next day and was out. And so just in conversation when he called me, I said, but I'd ordered you this X amount of pounds and today is this many hours, you know. Based off my calculations of feed consumption, I don't understand why they're out. And so he said, I'm not really sure either, but I'm out. Well, a few days later I'd gone to the farm and we were discussing it and he said, you know, that particular load I noticed in the feed pans was pelleted very well. So the chickens ate through that feed. Well, the next load he got, it was more of a mash and he actually ended up having a lot of feed left over from what I had ordered. So that was the comparison and the difference right then,

and so that's when I started paying more attention to it. And it, I mean, it wasn't just his farm. It was multiple farms that it would happen on. I would order my feed and then they would never - - they would make it - - they wouldn't even make it within hours of cutoff time. I mean, they would be out the day prior. And it was - - you know, they would make reference to me as, well, I got a really good pellet quality feed. And so that's when I noticed the difference in the mashed feed, the chickens eating it versus the pelleted feed.

Q: Did you ever talk to anybody in management about that issue, reclaimed versus nonreclaimed feed and the chickens apparently liking the nonreclaimed better?

A: During meetings we would discuss it. And, I mean, nothing was, nothing was done about it. Pass it on to the Feed Mill; and the Feed Mill, that's their job to take care of it. It's very departmentalized as far as how management would talk to you. If you would bring up issues of other departments, they would tell you, that's not our issue. We need to focus on our round of what we can control.

Q: Well, even through these complaints that were given to you and then you passed on in these meetings, was there ever a change as to use of the reclaimed feed in any way?

A: No.

Q: Okay. So Tyson kept using the reclaimed feed in the manner that you're talking about?

A: That's correct. When it comes in, right prior to before I left, if he comes in, he would finish filling his truck and then go straight back out to another farm. They had done away with even the rework bin or the rework side unless they got an abundance of feed. They would just ship it straight back out. It would not go and be run back through the mill any longer."

Ex. 13, Heltsley Dep. 74:25-77:9.

The Reclaimed feed is used toward the end of the grow-out period, i.e. after 40 days and the normal grow-out period is from 50 to 55 days therefore it is not just used during the last seven days of the grow-out period. Ex. 15, Morris Dep.116:3-20.

**Mortality and Condemnation**

28. Broiler growers are responsible for removing dead or sick broilers from their houses to

prevent disease. This is referred to as culling. Morris Dep. 231:21-232:2.

**Response**: Plaintiffs agree in part with paragraph 28 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the obligation of Tyson to provide healthy chicks to the growers. Tyson has the responsibility to provide healthy birds and a duty not to deliver deceased birds. Ex. 7, Mears Dep. 124:8-14. Tyson does not always produce the quality [of chick] that they shoot for. Ex. 12, Barfield Dep. 203:16-23, 205: 6-10. Tyson controls when and which birds must be killed by a grower. Ex. 7, Mears Dep. 128:21-23. Tyson requires growers to kill birds because of illness and lack of uniformity. Ex. 12, Barfield Dep. 116:1-20.

29. Broiler growers track the broilers culled from their broiler houses on a mortality card, which are filled out by the broiler growers themselves and later retrieved by the Robards Complex to track the number of broilers remaining in the house. Ex. 20, Deposition of Douglas Brown, 130:3-21; Ex. 21, Dennis Clapp Mortality Sheets.

**Response**: Plaintiffs' agree with paragraph 29 of Defendants' Statement of Uncontroverted Facts.

30. Broilers that have been delivered to the processing plant, but are not fit for human consumption, are condemned. Gottsponer, 124:2-4.

**Response**: Plaintiffs agree in part with paragraph 30 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the whether condemned chickens are charged against the grower. The growers are charged for these condemned carcasses based on the average weight of the flock not of the actual weight of the condemned birds. Ex. 18, Amber Hartley Dep. 57:14-58:9.

31. The USDA Inspectors control condemnation within the Robards Complex, and determine whether a broiler received into the plant may move on to processing for human consumption or must be condemned as not fit for human consumption. Dickey Dep. 137:7-138:22.

**Response**: Plaintiffs' agree with paragraph 31 of Defendants' Statement of Uncontroverted Facts.

32. Generally, there are roughly 10-20 USDA inspectors inside the plant at any given time.

*Id.*; Barfield Dep. 144:3-146:16.

**Response**: Plaintiffs agree in part with paragraph 32 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the number of USDA inspectors on the line at the Tyson Robards complex at any given time. There are at times as many as 16 inspectors on the salvage line and at other times as few as 2 or 3 inspectors on the line. Ex. 7, Mears Dep. 63:23-64:8.

33. The Robards Complex tracks the number of condemned broilers. In accordance with the contract terms, broilers that are wholly condemned are subtracted from a grower's total live weight, by multiplying the number of condemned birds by the average weight of the broiler in the flock. Broiler Contract of Charles Morris (Farm 5157), Schedule A, ¶ B.

**Response**: Plaintiffs' agree with paragraph 33 of Defendants' Statement of Uncontroverted Facts.

34. If a boiler is only partially condemned, meaning, some portion of the broiler remains fit for human consumption, then there is no debit of any kind to the grower and the grower receives full weight credit as if the broiler was wholly fit for human consumption. *Id.*; Barfield Dep. 147:3-13; Morris Dep. 125:12-25.

**Response**: Plaintiffs agree in part with paragraph 34 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the charging the grower for partially condemned birds. The USDA will allow for condemnation of broiler parts or organs as long as the carcass is not adulterated. 9 CFR § 381.86-89.

**Catching and Weighing Chickens**

35. When a contract grower's broilers are fully grown, the Robards Complex sends a catch crew to retrieve the broilers and deliver them to the processing plant. Gottsponer Dep. 90:22-92:4.

**Response**: Plaintiffs' agree with paragraph 35 of Defendants' Statement of Uncontroverted Facts.

36. To determine the gross weight of a broiler flock, the catch crew weighs its empty truck before going to pick up a flock of broilers; it then loads the broilers on the truck and returns to the processing plant, where it is weighed again. Dickey Dep. 141:7-142:19; Shelton Dep. 121:18-21; Mears Dep. 131:11-24; Bartley Dep, 178:2-23.

> **Response**: Plaintiffs agree in part with paragraph 36 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the shrinkage and the effect of same on the Plaintiffs' position in any given tournament. Tyson never explained the weighing of the birds and shrinkage of the birds to growers. Ex. 8, Bartley Dep. 179: 7-19. Tyson controls the time between the catching of the birds on the growers and the weighing of the birds at the processing plant which is also controlled by Tyson. Ex. 7, Mears Dep. 131:11-21. Tyson has an obligation to timely weigh the birds. *Id*. 131:17-21.There is no consideration in the tournament for travel time/distance to the Robards facility. Ex. 14, Leis Dep. 81:16-18. There will always be differences in the time from pickup to the time birds get to the plant because of the location of the farm. There would be some shrinkage from the time the birds are picked up until delivered to the plant. Ex. 1, Dickey Dep. 275:1-16, 276:1-10. Growers are paid by weight when originally weighed but the broilers are not weighed at the grower's farm but are weighted at the plant. *Id*. 276:15-20. There are instances where birds travel 50 miles to the complex and some that only go 5 miles so there is a time and mileage difference. Ex. 3, Gottsponer Dep. 226:16-24.

## Contracts

37. Plaintiffs are, or were, contract growers with the Robards Complex and grow broilers for the Robards Complex under a Broiler Contract. *See* First Amended Compl., ECF No. 18, "Parties" ¶¶ 2-20.

> **Response**: Plaintiffs' agree with paragraph 37 of Defendants' Statement of Uncontroverted Facts.

38. The Broiler Contracts refer to each contract growers as "Producer", and addresses each parties' roles under the broiler contract. Paragraph 2 states:

> A. Company will furnish Producer with and will retain title and ownership to chickens, feed, and medication. Company will determine the amount, type, frequency, and time of delivery to and pick-up from Producer of chickens, feed, and medication.
> B. Company will provide veterinary services and technical advice to assist Producer's production of Broilers.

C. Company will comply with all applicable federal, state, and local rules, regulations, and ordinances in performance of this Contract.

*See, e.g.*, Broiler Contract of Charles Morris (Farm 5157), ¶ 2.

**<u>Response</u>**: Plaintiffs' agree with paragraph 38 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

39. Paragraph 3 states:

A. Producer will furnish labor, material, and utilities necessary for the receipt of chickens and the production of Broilers and will when appropriate seek Company's technical advice.
B. Producer will maintain biosecure housing for Company's chickens, feed, and medication, and will promote a disease-free environment.
C. Producer will implement Company's recommended best animal management practices, including recommendations regarding lighting, brooding, watering, ventilation, and bedding.
D. Producers will comply with all applicable federal, state, and local statutes, rules, regulations, and ordinances in performance of this Contract, including but not limited to all those governing environmental and poultry litter management.

*Id.*, ¶ 3.

**<u>Response</u>**: Plaintiffs' agree in part with paragraph 39 of Defendants' Statements of Uncontroverted and Material Facts to the extent that said paragraph in the aforesaid contract speaks for itself. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the whether the producer is an independent contractor as referred to in paragraph 8 of the contract. However Tyson ignores its duties and responsibilities growing out of Paragraph 8 of its contract. Paragraph 8 entitled "Independent Contractor" in bold print states:

> **"Producer is engaged in and is exercising independent employment. Producer is an independent contractor and may join any organization or association of Producer's choice. Producer is not a partner, agent, or employee of, or joint venture with, Company**."

Tyson states in its Broiler Production Contract, solely drafted by Tyson and presented to growers on a take it or leave it basis, that growers will be Independent Contractors. Ex. 7, Mears Dep. 118:1-5. Tyson's contract states that growers can be terminated if they do not follow Tyson's mandated best animal management practices including recommendations regarding lighting, brooding, watering, ventilation and bedding. (Paragraph 3. C. "Duties of Producer"; Paragraph 9. iv. "Termination".) *See, e.g.*, Boiler Contract of Charles Morris (Farm 5157), ¶ 8 & 9 previously filed into the record as Exhibit 4 to Doc. 212 and under seal at Doc. 213.

Tyson utilizes significant control of these "Independent Contractors." Tyson controls the type of broiler house and equipment the grower uses on the farm. Ex. 13, Heltsley Dep. 121:23-24, 122:2-19; Ex. 7, Mears Dep. 118:6-13. Tyson controls the upgrades of the grower's farm. *Id*. 120:21-25, 121:7-16. Tyson has certain required mandated environmental controls of the chicken houses. The poultry house temperature, lighting programs, and air flow programs are mandated by Tyson. Ex. 4, Bruce Dep. 36:17-18; Ex. 7, Mears Dep. 118:14-119:18. The grow-out process begins with the grower preparing the broiler house to receive birds pursuant to Tyson's mandates. Tyson personnel, usually a service technician, inspects the broiler houses to see if they are in compliance with these mandates before chicks will be delivered to the grower's farm. Ex. 17, McGuire Dep. 160:21-161:2; Ex. 1, Dickey Dep. 288:14-16. Tyson controls the service technician and which technician will be assigned to oversee the grower's farm. Ex. 7, Mears Dep. 128:24-129:4. Tyson controls the grower's property adjacent to the chicken houses to the point that they mandate when the grower cuts his grass. Ex. 17, McGuire Dep. 165:1-14, 165:17-20. Tyson owns the genetics of the birds and controls the type, gender and breed of the birds that the grower receives. Ex. 7, Mears Dep. 121:17-23. Tyson controls the kind of animals that are allowed on a grower's farm. Ex. 17, McGuire Dep. 166:2-6. Tyson controls the veterinary services and the grower cannot use his or her veterinarian. Ex. 7, Mears Dep. 126:19-127:2, 128:10-20. The layout time, (the time between the flock being caught and the next flock placed delivered to grower's farm) is controlled by Tyson although there are different layout times among growers competing in the same tournament. Ex. 4, Bruce Dep. 150:7-15. Tyson controls when feed will be delivered, the amount and type of feed delivered, and whether a grower gets reclaimed feed. Ex. 12, Barfield Dep. 231:6-22; Ex. 7, Mears Dep. 126:16-18. Tyson owns the hatchery where the eggs are hatched. Ex. 12, Barfield Dep. 228:17-20. Tyson owns the pullets used to produce the laying hens and owns the laying hens that produce the eggs. Tyson owns the eggs that are hatched, owns and controls the hatchery, owns the broiler chicks, and controls the medication for the eggs and birds. Ex. 7, Mears Dep. 122:23-123:15. The age of the laying hens is important in that it effects the vigor and vitality of the chicks produced by the hens. The vigor and vitality of the chicks coming from prime laying hens is better than the ones from a young hen or old hen. Ex. 4, Bruce Dep. 60:15-19; Ex. 17, McGuire Dep. 97:15-98:1, 4-7. Younger hens usually produce smaller chicks called "nots" that do not perform well. Ex. 4, Bruce Dep. 61:1-10. Chicks from prime hens are preferable. *Id*. 62:1-6. Tyson provides growers in the same tournament flocks from laying hens of different ages, even though the laying hens' age impacts chick performance. Ex. 17, McGuire Dep. 95:17-98:7.

Tyson determines the density of chicks being placed. Ex. 1 Dickey Dep. 191:11-19. Tyson chooses not to determine the sex of its broilers and therefore cannot equitably provide growers with an equal amount of males and females in each house. Tyson does not know how many males and how many females are in each flock that any grower receives. Ex. 12, Barfield Dep. 134:9-135:1, 4-8. The grower with the males has an advantage. Ex. 4, Bruce Dep. 119:3-6. Tyson owns, formulates, controls and delivers the feed given to the growers. Ex. 7, Mears Dep. 124:16-125:17. Being out of feed for over six hours has a negative impact on the performance of the birds. *Id*. 126:13-15. Tyson

does not address the impact of this outage of feed on the grower's ranking in the tournament unless the grower has been out of feed for more that twelve hours. Ex. 1, Dickey Dep. 208:1-7. Tyson controls the breed of chick a grower gets and the grower has no control over the age of the laying hen. Ex. 12, Barfield Dep. 210:24-212:5. Tyson determines the density of chicks (the number of chicks in each house) being placed. Ex. 1, Dickey Dep. 191:11-19. Growers do not have control over the type/breed of birds they get or over the sex of the birds they get. Ex. 12, Barfield Dep. 202:21-203:6; Ex. 7, Mears Dep. 121:17-19. Different breeds of birds grow differently. Ex. 4, Bruce Dep. 73:17-74:3. Growers competing in the same tournament grow different breeds of birds. *Id*. 99:2-6. Tyson determines when birds will be delivered to the grower. Ex. 12, Barfield Dep. 232:2-4. Male birds grow differently from female birds. Ex. 4, Bruce Dep. 76:24-25, 77:1-4. The grower with the males has an advantage. *Id*. 119:3-6. The more days that the birds are on the farm also affects ranking. *Id*. 96:3-24. The method of delivery of birds to the growers' farms and the time of delivery is a variable that can affect performance and ranking. *Id*. 102:3-103:25, 105:25, 106:1-9. Tyson controls the feed given to the growers. Growers are not always getting feed with the same ingredients. *Id*. 109:1-7. The use of reclaimed feed affects the grow-out process negatively. *Id*. 112:20-22; Ex. 13, Heltsley Dep. 74:8-75:7. Growers competing in the same tournament are subject to many variables including but not limited to different breeds, different poultry house sizes, different sexes of birds, different temperatures, different times of delivery and age of birds when killed for processing. Ex. 4, Bruce Dep. 125:14-25; Ex. 13, Heltsley Dep. 117:5-18.

Growers complained to Tyson about the tournament system not being equal playing field. *Id*. 87:13-19. Growers complained to Tyson about reclaimed feed and feed pellet quality. *Id*. 101:12-23. Growers complained about competing in the same tournament with growers that got more male birds than female birds thereby putting them at a disadvantage. *Id*. 108:14-19.

Tyson controls when the birds are going to be picked up. Tyson controls the catch crew and controls the transporting of the birds to the processing plant. Ex. 1, Dickey Dep. 286:17-18, 21. Tyson controls how the birds get from farm to complex and the weighing of the birds. Ex. 7, Mears Dep. 130:3-5. Tyson controls the amount of time between catching and weighing. Tyson controls out time (time between flocks) and controls how many flocks a grower receives. Tyson also controls whether grower gets an exception. *Id*. 122:23-134:12; Ex. 12, Barfield Dep. 239:10-12. Tyson controls the amount of time between catching the birds on the grower's farm and the weighing of the birds at Tyson's plant. Ex. 7, Mears Dep. 131:11-16. Tyson controls the disposal of the excrement of the birds, how long the growers are held out between flocks and how many flocks a grower receives. *Id*. 133:1-18.

40. Paragraph 7 of the broiler contract states "**COMPANY DOES NOT WARRANT QUALITY, MERCHANTABILITY, OR FITNESS FOR A PURPOSE OF, OR OTHERWISE WARRANT, ANY PROPERTY OR PRODUCT (NOT**

**MANUFACTURED OR PRODUCED BY COPMANY) DELIVERED OR RECOMMENDED BY COMPANY TO PRODUCER**." *Id.* ¶ 7.

> **Response**: Plaintiffs agree in part with paragraph 40 of Defendants' Statement of Uncontroverted and Material Facts as this provision of the contract speaks for itself. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the duty of Tyson to deliver to the growers healthy chickens. Tyson admitted that it has a duty to deliver healthy chicks, veterinary services and quality feed in a timely matter as well as to timely weigh the grower's birds. Ex. 7, Mears Dep. 124:5-15; Ex. 14, Leis Dep. 130:22-131:6; Ex. 1, Dickey Dep. 283:17-21, 284:3-10, 284:17-19, 286:22-287:7.

41. Paragraph 12 states: "This Contract, including the attached Schedules, contains the entire agreement between Producer and Company regarding the production of Broilers. This Contract supersedes all prior agreements between Producer and Company." *Id.* ¶ 12.

> **Response**: Plaintiffs' agree with paragraph 41 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

42. Paragraph 9 of the broiler contract states: "Producer has the right to terminate this Contract at any time with no less than ninety (90) days written notice. Company has the right to terminate this Contract upon default by Producer." *Id.* ¶ 9.

> **Response**: Plaintiffs' agree with paragraph 42 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

43. The broiler contract states the following in relation to condemnation:

> A. The term "Farm Weight" used in the following formulas means the net difference between gross weight (i.e. tare weight plus weight of the flock of Broilers) and tare weight. Gross weight will be determined on a certified scale normally used for such purpose as promptly as possible after the flock of Broilers is loaded on the vehicle. . . .
>
> B. The phrase "farm-caused condemnation which is chargeable to Producer" used in the following formulas means whole chickens condemned as determined by approved U.S.D.A. inspection procedures for the following causes: tuberculosis, leucosis, septicemia, toxemia, synovitis, tumors, airsacculitis, and inflammatory process. Condemned weight will equal number of head condemned multiplied by the average live weight of the flock of Broilers. All bruises, parts condemnation, and plant condemnation consisting of chickens condemned for the following causes will not be charged against Producer's Farm Weight: cadavers, overscalds, no viscera,

contamination, and other plant-caused condemnation.

C. The term "Net Pound" used in the following formulas means Farm Weight less the farm-caused condemnation which is chargeable to Producer.

*Id.*, Schedule A.

**Response**: Plaintiffs' agree with paragraph 43 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

44. The broiler contract includes three potential pay components to a broiler grower: Base Pay, Premium Pay, and Fuel Pay. *Id.*

**Response**: Plaintiffs' agree with paragraph 44 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

45. Base Pay is determined by the "tournament" system, which is set out in the broiler contract as follows:

D. . . . First, an average value per pound shall be computed for all Producers of Broilers at this Complex who settle a flock of Broilers during the same week. Any Producer producing Broilers which are processed in more than one (1) calendar week will have his compensation calculated in the week of the final processing. The "Total Value" for all Producers at this Complex having flocks of Broilers settled in the week is determined by adding the "Chick Value" (equaling the number of chicks multiplied by [ ] cents (xx¢) each) and the "Feed Value" (equaling the amount of feed multiplied by [ ] and [ ] cents (x.x¢) per pound). This Total Value is then divided by the Net Pounds [(Farm Weight of chickens less the farm-caused condemnation)] produced by the same Producers to arrive at an "Average Net Pound Value" at this Complex.

E. Second, each such Producer's "Individual Net Pound Value" is calculated in the same manner and using the same valuation factors as above.

F. Third, each Producer whose individual Net Pound Value, as calculated above, is [__ ] and [ ] cents (x.x¢) more or less than the Average Net Pound Value shall be removed from the average. Also, each Producer who is known to be a Company management employee or a member of a Company management employee's immediate family (that is, spouse, parents, siblings, and children, whether by blood or marriage) shall be settled with all Producers for purposes of calculating the compensation of Company management employees/family, then shall be removed from the Average Net Pound Value for purposes of settling all other Producers. The Average Net Pound Value for the remaining Producers, calculated in the same manner set forth in Paragraph D, shall constitute the "Adjusted Average Net Pound Value" for Producers settling flocks of Broilers for the week.

G. Fourth, each Producer settling a flock of Broilers during the week whose Individual

> Net Pound Value is equal to the Adjusted Average Net Pound Value at this Complex, determined in Paragraph F, will receive the Base Pay of [ ] and [ ] hundredths cents (x.xx¢) per Net Pound. For each [ ] hundredth cent (.xx¢) per Net Pound that Producer's Net Pound Value is less than the Adjusted Average Net Pound Value, Producer shall receive [ ] hundredth cent (.xx¢) more per net Pound than the Base Pay per Net Pound. For each [ ] hundredth cent (.xx¢) per Net Pound that the Producer's Net Pound Value is more than the Adjusted Average Net Pound Value, Producer shall receive [ ] hundredth cent (.xx¢) less per Net Pound than the Base Pay per Net Pound. No Producer shall receive less than [ cents per pound. ] and [ ] hundredths (x.xx¢)

*Id.*

**Response**: Plaintiffs agree in part with paragraph 45 of Defendants' Statements of Uncontroverted and Material Facts as this provision of the contract speaks for itself. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the reason and rationale of ruse of the tournament system by Tyson. Tyson promotes the implementation of the tournament system claiming that it rewards the growers for being efficient in their management of the houses. Ex. 12, Barfield Dep. 175:18-176:1, 186:14-21; Ex. 14, Leis Dep. 167:7-21; Ex. 7, Mears Dep. 48:8-20.

46. Premium Pay is set forth in the broiler contract for growers who comply with the "Premium Compensation Requirements." *Id.*, Schedule A, ¶ J.

**Response**: Plaintiffs' agree with paragraph 46 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

47. How the contracts handle Fuel Pay has changed over the years. Before 2014, the contracts provided for an energy allowance based on total Net Pounds of broiler produced:

> Producer is eligible for a [__] hundredths cent (.xx¢) per Net Pound energy allowance for two (2) flocks of Broilers produced from chicks placed from the first accounting week of October through the last accounting week of February, and [__] hundredths cent (.xx¢) per Net Pound energy allowance for all additional flocks in addition to the Base Pay.

*Id.*, Schedule A, ¶ H; *see also* Ex. 22, Letter from Jim Gottsponer dated September 26, 2014.

**Response**: Plaintiffs' agree with paragraph 47 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

48. In late 2014, Fuel Pay changed to a system of paying based on square foot:

> Producer is eligible for a [____] and [___ ] hundredths cents (x.xx¢) per square foot of energy allowance for two (2) flocks of Broilers produced from chicks placed from the first accounting week of October through the last accounting week of February, in addition to the Base Pay. Producer is also eligible for an energy allowance of [ ] and [ ] hundredths cents (x.xx¢) per square foot energy allowance for all additional flocks, in addition to Base Pay.

See, *e.g.*, Ex. 23, Broiler Contract of Morgan Rickard (Farm 5174), Schedule A, ¶ H (executed on October 10, 2014).

**Response**: Plaintiffs' agree with paragraph 48 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

49. This change benefitted the growers, as it eliminated tying their fuel allowance to pounds returned, and instead measured it against the square footage of their house, which remained constant. Pinkston Dep. 94:8-95:6.

**Response**: Plaintiffs agree in part with paragraph 49 of Defendants' Statements of Uncontroverted and Material Facts as this provision of the contract speaks for itself. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the ability of Tyson to be able to go to a square foot model versus the tournament system it chooses to utilize. The growers themselves requested that the fuel pay be changed from a tournament performance based model to one based on square foot. Only after the growers requested this change, Tyson complied. Ex. 19, Doug Brown Dep. 86:16-87:9.[4] Tyson clearly choose to change from a pounds returned model from one that paid based simply on square footage of the houses. Ex. 20, Michael Murphy Dep. 116:11-118:12.

The growers wanted this change to a square foot model so that they "knew what they

---

[4] Q: And then the fuel pay is what as you understand it?
A: The fuel pay is -- it's just -- it's like an energy allowance cost to help pay gas bills or energy costs.
Q: And that's set by your contract as well?
A: Yes.
Q: That's set by square foot; correct.
A: Yeah. The fuel pay, the way I understand it, is set by square foot now. It used to be by per pound but I think it's based on square footage now.
Q: And is your understanding that that change to square foot was to help the grower so that it could get fuel pay independent of production?
A: Yes, because we requested it.
Q: And Tyson agreed and did that?

A: Yes.

were getting." Ex. 21, Keith Crabtree Dep. 75:6-14.[5] Tyson also chose to pay Premium Pay to growers by square foot as well versus a tournament completion model. *Id*. 12-22; Ex. 19, D. Brown Dep. 89:11-13. Tyson chooses to pay the pullet growers by square foot and not via the tournament system. Ex. 10, Shelton Dep. 97:1-18. Incentive pay was also based on square foot and not via the tournament system. Ex. 9, Rickard Dep. 105:15-21.

50. The contracts include a **"Performance Improvement Program"** ("PIP") set out in Schedule B, ¶ A.1. Broiler Contract of Charles Morris (Farm 5157), Schedule B, ¶ A.1.

**Response**: Plaintiffs' agree with paragraph 50 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

51. The PIP is a list of growing requirements for growers who settle two consecutive flocks with an Individual Net Pound Value of $0.0040 or more, higher than the weekly Adjusted Average Net Pound Value. *Id.*, Schedule B, ¶ A.1. Growers sometimes call settling at this level being in the "high 40s." Dickey Dep. 88:16-89:8.

**Response**: Plaintiffs' agree with paragraph 51 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

52. The contracts also set forth the average number of flocks each grower will receive under the contracts:

> Provided Producer continues to meet all terms and conditions of this Contract, Producer will receive on average 5 placements of Broilers per year. . . . In the event Producer does not receive five (5) placements in a year, Company will pay Producer [___ ] hundredths cents (x.xx¢) per square foot per day for all Out-Time in excess of twenty-one (21) days. Out time will begin when all Broilers are removed from Producer's farm and end the day a new flock of chickens is placed on Producer's farm.
>
> Broiler Contract of Charles Morris (Farm 5157), Schedule A, ¶ M.

**Response**: Plaintiffs' agree with paragraph 52 of Defendants' Statement of Uncontroverted Facts to the extent that the aforesaid contract speaks for itself.

---

[5] Q: Did you want the fuel pay to be changed to square footage or stay by pound?
A: I'm fine with square footage. That way you know what you're getting.
Q: And is it your understanding that other growers had approached the Robards Complex and had asked them to change it to the square-footage basis so it would be harmonized?
A: I believe -- I believe so."

53. After each grower's broilers are returned to Tyson and processed, they are provided a "settlement packet" that includes copies of documentation pertaining to their flock cycle, including copies of their chick delivery tickets, scale tickets, feed delivery tickets, feed reclamation tickets, mortality cards, condemnation certificates, payroll summaries, payment terms, and settlement sheets. *See*, *e.g.*, Brown Dep. 114:18-140:23.

**Response**: Plaintiffs' agree with paragraph 53 of Defendants' Statement of Uncontroverted Facts.

54. A settlement sheet summarizes data relating to that grower's flock, including that flock's average age at pick-up, number of chicks placed, number of broilers that were culled, pounds of feed consumed, pounds of chicken condemned, the broiler grower's Base Pay, Fuel Pay, Premium Pay, New House Pay, and settlement calculation data. *See, e.g.*, Morgan Rickard Settlement Sheet and Grower Recap for 8/2/14.

**Response**: Plaintiffs' agree with paragraph 54 of Defendants' Statement of Uncontroverted Facts.

55. The broiler growers also receive a Grower Recap sheet that shows how they performed as compared to all other growers that settled flocks in the same week, which includes an itemization of flock placements, total pounds, condemnation percentage, feed conversion, average weight, age of the flock in days, and daily weight gain for each grower settling in that week. *See, e.g.*, *Id.*

**Response**: Plaintiffs agree in part with paragraph 55 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to fact that placement in any given tournament is directly tied to who the participants are in said tournament. Ex. 14, Leis Dep. 160:8-23, 161:10-12.

> Q: Okay. So a function of what I'm going to get paid in any given tournament is directly related to the competition that's in the tournament with me?
>
> A: That is correct.

Q: And because my appearance in a tournament is based sequentially as we talked about, then that's out of my control?

A: Correct.

Q: So if I happen to be in, this is crude, but if I happen to be in a tournament where I'm competing with growers that are consistently at the top of their game versus the next tournament where I'm competing against growers that aren't necessarily at the top of their game, my pay is going to be different?

A: That's true. You as a grower would have the option of laying out an extra week if you wanted to move you into a different tournament.

Q: They can lay out?

A: Uh-huh.

Q: Do I know going in who it is I'm competing against?

A: No.

Q: So why would I lay out?

A: That's your prerogative.

Q: Okay. But it's fair for me to assume, is it not, that if I don't know who it is I'm going to be competing against I don't have any reason to lay out, do I?

A: Correct.

**Experts**

**Dr. Stiegert**

56. Plaintiffs presented one expert in this case, Dr. Kyle Stiegert. Ex. 25, Expert Report of Dr. Stiegert ("First Report").

**Response**: Plaintiffs agree in part with paragraph 56 of Defendants' Statements of Uncontroverted and Material Facts. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to the education, training and experience of Dr. Kyle Stiegert and the fact that he submitted two reports in this case. Declaration of Kyle Stiegert in Support of Plaintiffs' Rule 26(a)(2) Expert Disclosures, Doc. 175, Exh. 2, ¶¶ 28, 71-73 ("First Report); see also Supplemental

Declaration of Kyle Stiegert in Support of Plaintiffs' Rule 26(a)(2) Expert Disclosures, Doc. 175, Exh. 23,¶¶ 16-18 ("Second Report"). He gave two depositions in this case, the first being on October 10, 2019 ("Stiegert Dep. 1"), and the second on January 16, 2020 ("Stiegert Dep. 2"). Dr. Stiegert received a double bachelor degree in economics and finance from the University of Nebraska in 1981. Ex. 22, Stiegert Dep. 1, 52:16-22. He received his masters degree in agricultural economics from the University of Nebraska in 1989. *Id*. 54:5-8. In August, 1993, Dr. Stiegert received his Ph.D from Perdue University in agricultural economics. *Id*. 51:14-52:5. Dr. Stiegert spent his entire tenured career in agriculture and applied economics at the University of Wisconsin. *Id*. 7:11-20. He taught a two-week course to the competition authority in Armenia, and guest lectures at Justus Liebig University and the University of Connecticut. *Id*. 35:5-15. He has written 3 papers as to monopsony power. *Id*. 55:1-7. None of his work has been stricken or even challenged in a court of law prior to this case. *Id*. 62:2-11.

57. Dr. Stiegert did not offer any damage opinions or calculations for damages flowing from an alleged Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, or Fraud. First Report ¶ 19 ("I have also calculated damages to Plaintiffs based on (a) the suppression of grower pay per pound grown; (b) the reduction in pounds grown based on flocks being spaced out longer than projected (i.e., higher "days-out"); and (c) Tyson's policies regarding condemnation."); Ex. 26, First Deposition of Dr. Kyle Stiegert ("Stiegert Dep. 1"), 93:3-94:7.

**Response**: Plaintiffs agree in part with paragraph 57 of Defendants' Statement of Uncontroverted and Material Facts to the extent of the testimony quoted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts, specifically as it pertains to damage calculations that Dr. Stiegert made relative to contract provisions in Tyson contracts and to the implied covenant of good faith and fair dealing. Plaintiffs incorporate herein their Response to Tyson's Motion for Summary Judgment which fully outlines the damages at issue in this case.
Further, as noted in paragraph 38 of the Defendants' Statement of Uncontroverted Facts, Tyson is to "*comply with all applicable federal, state, and local rules, regulations, and ordinances in performance of this Contract.*" See, e.g., Boiler Contract of Charles Morris (Farm 5157), ¶ 2 previously filed into the record as Exhibit 4 to Doc. 212 and under seal at Doc. 213. Inclusive in this section is the obligation to comply with Sections 202 of the Packers and Stockyards Act. (7 U.S.C. 192.). See, e.g., Plaintiffs' First Amended Complaint, (Doc. 18, Count I: VIOLATIONS OF THE FEDERAL PACKERS AND STOCKYARDS ACT OF 1921, AS AMENDED ). Dr. Stiegert outlined the substance of what his opinions did relate to:

Q: So as I understand it then, is it fair for me to say your opinions that you offer in this case is that, A, the Robards Complex for Tyson is in a

monopsonist position, is that -- is that fair; and then, B, your opinion is that it is in fact exercising monopsony power because of that position?

A: Yes.

Q: And then, C, the effect of that exercise of monopsonist power has resulted in damages to plaintiffs in three categories; one, base pay suppression; two, days out inconsistent with expectations; and, three, condemnation calculations?

A: Yes.

Ex. 22, Stiegert Dep. 1, 93:3-17.

58. Dr. Stiegert testified at deposition that he did not even know the contract terms were at issue in the case. *Id.*, 97:4-99:3.

**<u>Response</u>**: Plaintiffs object to the language in with 58 of Defendants' Statement of Uncontroverted and Material Facts, as it mischaracterizes the testimony of Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically as it pertains to the scope of the opinions of Dr. Stiegert. Dr. Stiegert testified that he was aware that the contracts had a base pay element; a fuel pay element; a tournament system that "sets the formula on how the base pay element works"; and a premium pay element. Ex. 22, Stiegert Dep. 1, 97:4-98:4. Dr. Stiegert testified that the contract terms were "*the contract terms are -- are what's at question in this case*." Ex. 23, Stiegert Dep. 2, 368:22-369:7.

59. Dr. Stiegert testified at deposition that the Robards Complex's charges for condemned birds, per the contract, "all looked fine" and that he "didn't see anything that raised red flags." *Id.* 100:15-23.

**<u>Response</u>**: Plaintiffs agree in part with paragraph 59 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 59 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically as it pertains to the fact that the exchange quoted in paragraph 59 dealt with the concept of chicken condemnation, nothing more.[6]

---

Q. You -- in the -- preparation for your July 15, 2019 report, you didn't challenge and you didn't conduct any analysis to determine **at the end of the day if any plaintiff had not been charged per the contract term for the number of birds condemned**, you may have a -- you may have an issue, right?

60. He also testified that: "Q: Okay. You weren't asked to look in to see, you know, just from a pure pen to paper on the contract perspective, did it – did each grower get paid what it says? A: Yeah, the -- the -- it -- it looks above board. The contracts look like they're being -- I didn't see anything that -- that raised alarm bells for me." *Id.* 98:22-99:4.

> **Response**: Plaintiffs agree in part with paragraph 60 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 60 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically as it pertains to the fact that the above exchange dealt with an aspect of contract interpretation, which Dr. Stiegert did not opine about. Ex. 22, Stiegert Dep. 1, 93:3-17. In addition Response 57 is incorporated by reference herein, in that a violation of the Packers and Stockyards Act. (7 U.S.C. 192.) is a violation of the Tyson contracts.

61. Dr. Stiegert testified that he did not "review any data in relation to the age of the laying hens that provided flocks to any given grower[.]" *Id.* 82:10-13.

> **Response**: Plaintiffs agree in part with paragraph 61 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 61 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert did indeed cite a study from the University of Georgia that indicates the age of hens does make a difference:

Q: Right. You didn't look at, for example, whether or not the age of the hen was consistent among growers as provided over time? I'm just saying, you didn't do the analysis?

A: There's a study out of the University of Georgia that suggests that age of hens matters.

Q: I understand.

A: And I do cite that study.

Q: You're not -- you're not listening to –

---

A. Oh, yeah. The -- the financing of it all, the --the accounting and the economics all looked fine to me. I didn't see anything that raised red flags. Ex. 22, Stiegert Dep. 1, 100:15-23 (emphasis added).

A: But that goes back to my original report."

Ex. 23, Stiegert Dep. 2, 385:20-386:4.

62. Dr. Stiegert testified that he did not "run any analysis on, for example, whether over time everyone got an equal amount of breed combinations." *Id*. 302:22-303:13.

> **Response**: Plaintiffs agree in part with paragraph 62 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 62 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert never held himself out as an expert on breed differences. Ex. 22, Stiegert Dep. 1, 105:15-20. Although he did in his report cite to instances where the breed differences affected Net Pound Value of the Plaintiffs. See Response 63 below.

63. Dr. Stiegert testified that he was not offering any opinions on whether breed combinations were evenly distributed: "[Q]: you're not offering any opinions on whether, you know, breeds were evenly -- breed combinations were evenly distributed – A: Yeah. Q: -- over time? I'm just assuming you're not here to offer opinions on that; is that fair? A: I am not here to offer an opinion on that." *Id.* 303:19-304:1.

> **Response**: Plaintiffs agree in part with paragraph 63 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 63 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert never held himself out as an expert on breed differences. Ex. 22, Stiegert Dep. 1, 105:15-20. In addition, Tyson Grower Pay Recaps would evidence the hen breed and male breed numbers being different which indicated that different breed birds would be grown in the same tournament, and that these differences in breed affected Net Pound Value. Ex. 7, Mears Dep. 102:17-24. See also Figure 3-4, Stiegert Report, 30-31.

**Figure 3: Average Net Pound Value by Breed**

[redacted]

**Figure 4: Percentage of Tournaments by Number of Varieties of Breeds Involved in the Tournament**

[redacted]

Cobb-Ventress (owned by Tyson) would sell four breeds of birds to the Robards

complex, namely Cobb 500, Cobb 700, Cobb Male and MV male. Ex. 7, Mears Dep. 51:7-11, 52:9-12. The grower needed to provide the Cobb 700 more light and greater warmth then the 500 when growing these two breeds. *Id*. 53:6-10. The Cobb 500 and Cobb 700 would grow differently, with the yields of these two breeds being different. *Id*. 144:24-146:22. Male birds will grow larger than female birds. *Id*. 55:11-14. The Poultry Science Association in 2011 conducted a symposium in St. Louis, Missouri, where the following was concluded. "*Based upon the overall conclusions of this symposium, genetics is critical to the successful future of the industry. According to Leeson, genetics account for 90 percent of the current and future status of the poultry industry, while the remaining criteria of nutrition, 5 percent, environment, 3 percent, and health, 2 percent, are considered supporting roles*." Ex. 5, Lacy Dep. 161:20-162:4 and Exhibit 4 to deposition.

64. Dr. Stiegert also testified that he did not quantify any damages flowing from any difference in inputs. *Id.* 307:12-14 ("Q: And you've not quantified any damages based on any sort of variability of inputs to the growers? A: We didn't quantify that, no.").

**Response**: Plaintiffs agree in part with paragraph 64 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 64 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert testified that differences in inputs was "a problem." Ex. 22, Stiegert Dep. 1, 307:12-16. Dr. Stiegert testified that variability of inputs was linked to variability in performance by growers in tournaments. Ex. 23, Stiegert Dep. 2, 409:11-18.[7]

65. Dr. Stiegert testified:

Q Right. The focus of your work had, in fact, nothing to do with determining whether or not [Defendants] complied with the terms of the contract, correct?
A: It wasn't my assignment, no.

---

[7] A: There are a few things that I -- we did look at, I had my team look at. And one of them was how much variability did each grower have tournament -- tournament over tournament, and there was variability. So, you know, to say that it's the grower that's responsible for everything, it's the same grower.

Q: Variability of what? What are you talking about?

A: In net -- net pound value. Um –

Q: So you looked at that one issue?

A: Yeah, looked at it. There was variability tournament over tournament, the performance of a specific grower changes. So to say that, oh, it's all the grower's fault is incorrect. There's variability in these inputs, there's -- there's…

> Q: Likewise, the focus of your assignment was not to determine whether or not any plaintiff versus other growers had been treated differently, it was to determine whether or not, as a general matter, pay was suppressed in this case, correct --
> A: That is --
> Q: -- through monopsony power? A: That is -- that is spot-on correct.
> Q: Right. So you have no opinion in this case as to whether or not any plaintiff was treated fairly or differently than anyone else at the Robards complex?
> A: I have -- as I sit here today, I have no opinion . . .

Ex. 27, Second Deposition of Dr. Stiegert, 392:4-20.

**Response**: Plaintiffs agree in part with paragraph 65 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 65 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts as to the individualized and separate damages Plaintiffs have suffered as to the monopsony power exerted by Tyson. Supplemental Declaration of Kyle Stiegert in Support of Plaintiffs' Rule 26(a)(2) Expert Disclosures, Doc. 175, Exh. 23, ¶¶ 42-46, Appendix C ("Second Report") and Declaration of Kyle Stiegert in Support of Plaintiffs' Rule 26(a)(2) Expert Disclosures, Doc. 175, Exh. 2, ¶¶ 28, Tables 23-24 ("First Report").

**Table 23: Total Damages by Plaintiffs**

| Plaintiffs | Damage Amount | Interest Amount | Total Damage Amount (Including Interest Amount) |
|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b] |
| Calvin Leisure | $679,642 | $111,426 | $791,068 |
| Charles Morris | $5,749,738 | $955,816 | $6,705,554 |
| Christopher Burch | $127,722 | $36,647 | $164,369 |
| Dennis G. Clapp | $992,822 | $157,347 | $1,150,168 |
| Douglas Brown | $1,271,679 | $221,902 | $1,493,581 |
| John W Pinkston | $450,144 | $79,924 | $530,069 |
| Keith Crabtree | $798,742 | $145,535 | $944,277 |
| Loi Hong | $577,204 | $128,875 | $706,078 |
| Murphy Farms | $1,309,521 | $238,356 | $1,547,877 |
| Rickard | $1,439,180 | $260,291 | $1,699,471 |
| Tim Vincent | $480,636 | $85,559 | $566,195 |
| **Total** | **$13,877,030** | **$2,421,679** | **$16,298,709** |

66. Dr. Stiegert did not look at the settlement data or the production data at the nearby Perdue Complex. Stiegert Dep. 1, 80:13-18.

**Response**: Plaintiffs agree in part with paragraph 66 of Defendants' Statement of Uncontroverted and Material Facts. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert outlined in his report that Perdue Farms is not in the relevant market with Tyson. First Report, ¶¶ 72-76.

67. Dr. Stiegert did not look at the production data or contracts of any other vertical integrator. ("Q Yeah. Did you actually look at their actual production data for any other integrator? A: No. Q: Did you look at any contracts for any other integrator? A: No.").

**Response**: Plaintiffs agree in part with paragraph 67 of Defendants' Statement of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 67 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert outlined in his report that, "*Barring Perdue Farms' (Perdue) facility in Livermore, there are no other integrator facilities that fall within the fifty mile radius of any of the Plaintiffs farms*." First Report, ¶ 72.

68. Dr. Stiegert did not review the production levels on the output side of the Robards Complex. *Id.* 85:7-86:14.

**Response**: Plaintiffs agree in part with paragraph 68 of Defendants' Statement of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 68 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert outlined in his Second Report certain criticisms of the work of Tyson expert Dr. Walter Thurman. Second Report, ¶¶ 78-81.

69. In calculating his damages, Dr. Stiegert used gross margin figures from the parent company Tyson Foods, Inc. as published for its operations as a whole. *Id.* 177:20-179:7; First Report, ¶¶ 120-122, Table 11, 12.

**Response**: Plaintiffs agree in part with paragraph 69 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 69 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Paragraph 120 of the First Report explains, "*I use Tyson's chicken segment financial information from Agri Stats data that was produced by Tyson in this litigation*." First Report, ¶ 120; Ex. 23, Stiegert Dep. 2, 454:21-23. The data from the parent company was only used to get estimates for 2017 and 2018 where the Agri Stats data had not been

produced in those years. *Id.* 493:13-494:1. None of the Tyson experts complained about the mechanics of calculating Tyson's gross margin in this manner.

70. Dr. Stiegert testified:

Q: Okay. And then what's the next column, gross margin?
A: That comes from Tyson's data and there's a description of how we calculated that in the document.
Q: And what data does it come from that you say is Tyson's data?
A: I think it comes from the -- what do they call those, the -- the 10-K reports out of Tyson.
Q: So that -- so that -- you're saying that there's a 10-K report that shows that Tyson receives, on average, a 13 cents per pound gross margin across the world?
A: In their chicken growing operation, 13 cents per pound, yes.
Q: Okay. Across the world?
A: Well, here again, I would have to check that. I don't know what percentage of their business is overseas.
Q: Let's just say everywhere they operate.
A: I would want to check that.
Q: Okay. It's not a Robards' gross margin number, right?
A: Oh, no, no.
Q: And you didn't cross-reference to see if the Robards complex operates at that margin or not?
A: Well, that would be a -- it would be very difficult to get that out of Tyson, because they're -- they're taking all the chicken meat from all of their complexes and then selling them, selling the chicken meat and generating an operating margin for themselves.
Q: You -- you don't -- you don't know if they run financial statements and profit margins by complex or not, correct?
A: Well, I'm sure they do, but we don't -- Q: Okay.
A: -- I didn't have those.

Stiegert Dep. 1, 177:20-179:7.

**Response**: Plaintiffs agree in part with paragraph 70 of Defendants' Statement of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 70 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert "thinks" the information on margins came from SEC filings, when Paragraph 120 of the Stiegert Report explains, "*I use Tyson's chicken segment financial information from Agri Stats data that was produced by Tyson in this litigation*." First Report, ¶ 120; Ex. 23, Stiegert Dep. 2, 454:21-23. The data from the parent company was only used to get estimates for 2017 and 2018 where the Agri Stats data had not been produced in those years. *Id.* 493:13-494:1. None of the Tyson experts complained about the mechanics of calculating Tyson's gross margin in this manner.

71. Dr. Stiegert testified "Q Okay. Did you review any contracts of any Robards growers who

are not a plaintiff in this case? A: I'd have to look at -- I don't -- I don't -- sitting here today, I don't know that answer. There was the production contracts that were directly related to the plaintiffs, and they -- they all looked very much similar, so --" *Id.* 80:19-25.

**Response**: Plaintiffs agree with paragraph 71 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 71 came from Dr. Stiegert.

72. Dr. Stiegert testified that the opinions he gave in this case were limited to the following:

Q: So as I understand it then, is it fair for me to say your opinions that you offer in this case is that, A, the Robards Complex for Tyson is in a monopsonist position, is that -- is that fair; and then, B, your opinion is that it is in fact exercising monopsony power because of that position?
A: Yes.
Q: And then, C, the effect of that exercise of monopsonist power has resulted in damages to plaintiffs in three categories; one, base pay suppression; two, days out inconsistent with expectations; and, three, condemnation calculations?
A: Yes.
Q: Are you offering any other opinions in this case besides what I've just summarized? And I understand there's a background to how you get to those opinions, but you can understand my view of just wanting to make sure I've got it.
A: These are the -- these are the three areas that -- that I felt like we could -- we could develop supportable damage estimates for.

*Id.* 93:3-25.

**Response**: Plaintiffs agree in part with paragraph 72 of Defendants' Statements of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 72 came from Dr. Stiegert. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert is not "limited" to the opinions noted in this paragraph 72, and that the totality of the opinions that Dr. Stiegert gives in this case are outlined in the two reports prepared by Dr. Stiegert. See First Report and Second Report previously filed in the record at Doc. 175.

**Dr. Elam**

73. Dr. Thomas Elam is an economist retained by Defendants. Ex. 28, Expert Report of Dr. Thomas Elam, Sec. I.

**Response**: Plaintiffs' agree with paragraph 73 of Defendants' Statement of

Uncontroverted Facts.[8]

74. Dr. Elam considered the following evidence in creating his report:

- Plaintiffs' First Amended Complaint and Jury Demand (Complaint).
- Plaintiffs' Expert Declaration of Dr. Kyle Stiegert (Declaration).
- Robards complex grower settlements from May 1, 2010 to March 3, 2019 (hereafter settlement data).
- Breeder hen flock data for chicks supplied from May 4, 2010 to December 13, 2018 to Robards live production growers (Hen Data Detail, hereafter hen data).
- Grower pay recaps for Robards settlements April 2010 to March 2019 (Grower Pay Recap by Grower - Accounting Copy 4.24.10 - 3.2.19)
- Grower 5163 production contract (Bates 116906-116931).
- Other Plaintiff contract documents.
- Grower 5163 original supporting documentation and settlements sheets for flocks delivered on January 29, 2016 and February 1, 2016 (Bates 016728-016915).
- Robards complex Grower Ranking by standard costs, various dates.
- Cobb 500 Breeder Management Supplement.
- Cobb 700 Breeder Management Supplement.
- Cobb 500 Broiler Performance & Nutrition Supplement.
- Defendant's depositions and supporting materials.
- Tyson Food annual 10-K reports 2005-2018 and quarterly 10-Q for Q1 and Q2 2019.
- Housing square footage data.
- Selected papers and other materials related to broiler industry and general farming economics, and other materials as shown in footnotes as cited sources all of which are referenced in this Report and its attachments.

*Id.* Sec. V.

**Response**: Plaintiffs' agree with paragraph 74 of Defendants' Statement of Uncontroverted Facts to the extent that the list of reliance materials outlined by Dr. Elam in Section V of his report are outlined in paragraph 74.

75. The average days out for all growers at the Robards Complex, including Plaintiffs, is approximately 20 days. *Id.* Sec. IX, Table 1.

**Response**: Plaintiffs' agree with paragraph 75 of Defendants' Statement of Uncontroverted Facts to the extent that Dr. Elam claims in Section IX, Table 1 of his

[8] Plaintiffs did not file a Motion to Exclude the Opinions of Dr. Elam pursuant to Federal Rule of Evidence 702 and case law requiring expert testimony be "relevant to the task at hand," and the product of expert "reasoning or methodology," *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 593 & 597 (1993); *Childress v. Kentucky Oaks Mall Co.*, 2007 WL 2772299, at *1 (W.D. Ky. Sep. 20, 2007) (quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir.2001)). However, Plaintiff's expert, Dr. Kyle Stiegert, expressed numerous criticisms of the opinions expressed by Dr. Elam.

report that the average out days for growers at the Robards Complex is 20 days. Dr. Stiegert is of the opinion that the out days average is different as illustrated below:[9]

**Figure 5: Monthly Days-Out for the Robards Complex Compared to Tyson's Representations**

[redacted]

76. On average, contract growers at the Robards Complex receive 5.3 flocks per year. *Id.*

**Response**: Plaintiffs' agree with paragraph 76 of Defendants' Statement of Uncontroverted Facts to the extent that Dr. Elam claims in his report that growers at the Robards Complex receive 5.3 flocks per year.

77. From 2010 to 2018, broiler grower performance was not statistically affected by which breed a grower received. *Id.* Sec. XI, ¶ 6.

**Response**: Plaintiffs agree with paragraph 77 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Dr. Elam may believe that from 2010 to 2018, broiler grower performance was not statistically affected by which breed a grower received. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert, Plaintiffs, and various Tyson personnel disagree with said statement. See Plaintiff Responses to Defendant Statement of Uncontroverted Facts ¶¶ 9, 11, 12, 13, 39, 63. Plaintiff Douglas Brown testified there is a big performance difference in birds and that

[9] Figure 5: *Monthly Days-Out for the Robards Complex Compared to Tyson's Representations.* First Report, p. 54.

there is always a different percentage of breeds of birds from farm to farm. Ex. 19, D. Brown, 143:19-22, 144:11-19. In particular, Dr. Stiegert at paragraph 42 of his Second Report says: "*Dr. Elam has attempted to show that these factors – breed, sex and technical support services do not impact grower performance, but the regression analyses he relies on to form his opinions is severely flawed*." Dr. Stiegert says in paragraph 44 of his Second Report: "*Dr. Elam has simply provided regression results from a series of incomplete models, which do not, demonstrate the relationship between each individual factor and the NPV difference*." At paragraph 46 he notes: "*All of Dr. Elam's remaining regressions explain only a trivial portion of the variation in grower pay. Further, because his models are poorly specified and do such a poor job of explaining overall grower pay, it is improper to draw any conclusions from these regressions*." Finally, Dr. Stiegert makes clear at paragraph 47, "*fundamental flaws in Dr. Elam's general approach to regression analysis render his results and interpretations meaningless*." Second Report, ¶¶ 42-47.

78. From 2010 to 2018, Tyson evenly distributed chicks from different ages of hens to all Plaintiffs, resulting in no adverse effect for any Plaintiff based on hen age. *Id.* Sec. XII, ¶ 15.

**Response**: Plaintiffs agree with paragraph 78 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Dr. Elam may have opined that from 2010 to 2018 Tyson evenly distributed chicks from different ages of hens to all Plaintiffs, resulting in no adverse effect for any Plaintiff based on hen age. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert states that the basis for this opinion is wrong, in that the regression that Dr. Elam used to rely upon this opinion is patently flawed. Dr. Stiegert writes, "*The regression in Table 4, if properly specified, implies that feed conversion is theoretically explained by the breed and sex of the hens and nothing else. The regression in Table 12, if properly specified, implies that Feed Conversion is theoretically explained by only "hen age" and nothing else. Both cannot be the true model because one does not encompass the other*." Second Report, ¶ 55. Dr. Elam at Table 17 (below) of his report indicates that Plaintiffs received different hen scores, evidencing that in no way did Tyson "evenly distribute[] chicks from different ages of hens to all Plaintiffs" as written in this paragraph.[10]

[10] Elam Report, Table 17.

**Table 17: Analysis of Variance, Hen Age Score by Plaintiff Grower**




N 931

| Hen Age, Weighted Score by GRWRNO | N | Mean | Mean SE* | SD* |
|---|---|---|---|---|
| 5032 | 42 | -3.406 | 0.315 | 1.970 |
| 5081 | 40 | -3.654 | 0.322 | 1.703 |
| 5098 | 43 | -3.544 | 0.311 | 2.449 |
| 5136 | 25 | -3.985 | 0.408 | 2.139 |
| 5147 | 41 | -3.367 | 0.319 | 2.000 |
| 5148 | 39 | -2.805 | 0.327 | 1.849 |
| 5156 | 42 | -3.879 | 0.315 | 1.631 |
| 5157 | 42 | -3.701 | 0.315 | 1.623 |
| 5159 | 42 | -4.066 | 0.315 | 1.655 |
| 5160 | 43 | -3.613 | 0.311 | 1.401 |
| 5161 | 23 | -3.565 | 0.425 | 1.633 |
| 5162 | 38 | -3.381 | 0.331 | 1.619 |
| 5163 | 41 | -4.147 | 0.319 | 1.640 |
| 5171 | 40 | -3.776 | 0.322 | 2.367 |
| 5172 | 39 | -3.340 | 0.327 | 2.265 |
| 5174 | 40 | -3.289 | 0.322 | 3.034 |
| 5175 | 40 | -3.721 | 0.322 | 1.952 |
| 5176 | 40 | -3.387 | 0.322 | 1.962 |
| 5177 | 23 | -3.186 | 0.425 | 1.864 |
| 5184 | 42 | -3.790 | 0.315 | 2.425 |
| 5186 | 43 | -3.665 | 0.311 | 2.639 |
| 5192 | 35 | -3.474 | 0.345 | 2.358 |
| 5193 | 37 | -2.824 | 0.335 | 1.531 |
| 5198 | 34 | -3.220 | 0.350 | 2.167 |
| 5210 | 17 | -4.127 | 0.495 | 1.946 |
| Pooled | 931 | | | 2.040 |

*Standard error of the mean based on the pooled sample variance and standard deviation

ANOVA

| Source | SS | DF | MS | F | p-value |
|---|---|---|---|---|---|
| GRWRNO | 1.054563E+02 | 24 | 4.394 | 1.06 | 0.3894 |
| Error | 3.768923E+03 | 906 | 4.160 | | |
| Total | 3.874379E+03 | 930 | 4.166 | | |

79. From 2010 to 2018, Tyson evenly distributed feed so that feed conversion was statistically controlled and evenly distributed among all broiler growers. *Id.* Sec. XVI, ¶ 12.

**Response**: Plaintiffs agree with paragraph 79 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Dr. Elam may opine that from 2010

to 2018, Tyson evenly distributed feed so that feed conversion was statistically controlled and evenly distributed among all broiler growers. Plaintiffs object and disagree to this paragraph to the extent that it leaves out relevant facts and context of the above statement, as feed, especially reclaimed feed, was in no way evenly distributed among the broiler growers. Charles Morris testified that Plaintiff Doug Brown got no reclaimed feed for years and he in turn got primarily reclaimed feed for a time. Ex. 15, Morris Dep. 115:8-19, 146:7-20, 242:14-243:17. Dr. Stiegert refutes the assertions made in this paragraph in his Second Report. Regarding Dr. Elam's opinion in this paragraph, the following is Footnote 45 of Stiegert Second Report explaining why Elam's conclusions regarding feed distribution are not sound:

"*Dr. Elam claims to have produced a regression of adjusted feed conversion, and then proceed to evaluate outliers. He describes the regression to obtain AFC outliers, (see Elam Report, pg. 35), but it appears to be a model explaining adjust feed conversion using just a trend variable, which therefore suggests that the correct model for adjusted feed conversion would have no other explanatory variables. But as I discussed above, Dr. Elam estimated feed conversion using four different models: one with hen breeds; one with hen age; one with hen sex; and one with Plaintiff/non-Plaintiffs as defensible models for explaining adjusted feed conversion. It appears now that he has defined a fifth way to estimated feed conversion patterns. They all cannot be correct and each suffers from the encompassing problem I discussed earlier. Most importantly, because the outliers in his trend regression are produced using a model that fails on several of the aforementioned problems, the outliers are not a reliable reflection of the true outliers, in average feed conversion. Therefore, any conclusions, such as those stated in paragraph 7 on page 36 are based on faulty findings*."

80. From 2010 to 2018, there is no evidence that assignment of a given service technician had a material causal effect on broiler grower performance. *Id.* Sec. XV, ¶ 7.

**Response**: Plaintiffs agree with paragraph 80 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Dr. Elam states from 2010 to 2018, there is no evidence that assignment of a given service technician had a material causal effect on broiler grower performance. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as there is evidence that service technicians do have a material causal effect on broiler performance. Second Report, ¶ 12. Charles Morris testified in this case he had numerous issues with Service Technician Beau McGuire, including McGuire lying to Mr. Morris on numerous occasions. Ex. 15, Morris Dep. 95:15-99:4. Plaintiffs also incorporate by reference Response 77 indicating that Dr. Stiegert materially disagrees with Dr. Elam relative to his regression models and how service technicians play into Dr. Elam's faulty regressions.

81. From 2010 to 2019, there was no statistical difference among broiler growers at the Robards Complex for days-out between flocks. *Id.* Sec. XVIII, ¶ 4.

**Response**: Plaintiffs agree with paragraph 81 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Dr. Elam may opine from 2010 to 2019, there was no statistical difference among broiler growers at the Robards Complex for days-out between flocks. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as Dr. Stiegert spends a whole section in his report as to the differences in days out times between growers at the Robards complex. First Report, ¶¶ 105-107. See also Plaintiff Responses to Defendant Statement of Uncontroverted Facts ¶ 75. Second Report, ¶¶ 79, 118-119.

82. From 2010 to 2018, broiler density was consistent among growers at the Robards Complex, including Plaintiffs, and there is no evidence that Plaintiffs suffered any material disadvantage in the number of broilers placed per square foot as compared to others. *Id.* Sec. XX, ¶ 10.

**Response**: Plaintiffs agree with paragraph 82 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Dr. Elam may opine from 2010 to 2018, broiler density was consistent among growers at the Robards Complex, including Plaintiffs, and there is no evidence that Plaintiffs suffered any material disadvantage in the number of broilers placed per square foot as compared to others. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as Dr. Stiegert spends paragraphs in his reports as to the effect of density and that Tyson controls density; how density affects broiler performance; and the differences in density among the growers. First Report, ¶ 52. See also, Ex. 12, Barfield Dep. 210:19-23; Ex. 11, McCarter Dep. 98:21-23; Ex. 3, Gottsponer Dep. 220:5-9. Tyson forces growers into tournaments against grower houses that have different broiler densities, even though density can have a dramatic affect on chickens and affect performance. Ex. 11, McCarter Dep. 98:21-23.

83. Dr. Elam wrote: "As a matter of cost and biological realities an integrator has no ability to supply all chicks solely from 34-week-old hens." *Id.* Sec. XII, ¶ 7.

**Response**: Plaintiffs agree with paragraph 83 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Dr. Elam writes "As a matter of cost and biological realities an integrator has no ability to supply all chicks solely from 34-week-old hens."

**Dr. Thurman**

84. Dr. Walter Thurman is an economist retained by Defendants. Ex. 29, Expert Report of Dr. Walter Thurman, ¶ 1.

**Response**: Plaintiffs' agree with paragraph 84 of Defendants' Statement of

Uncontroverted Facts.[11]

85. Plaintiffs received an average of five flocks per year. *Id.* Figure 12, ¶¶ 108-109.

**Response**: Plaintiffs agree with paragraph 85 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Dr. Thurman may opine that Plaintiffs received an average of five flocks per year.

86. By Plaintiff, each received the following average number of flocks per year from 2010 to 2018:

**Figure 12 – Plaintiff average flocks per calendar year**

| Plaintiff | Plaintiff Avg. |
|---|---|
| Doug Brown | 5.13 |
| Chris Burch | 5.00 |
| Dennis Clapp | 4.75 |
| Keith Crabtree | 5.00 |
| Loi Hong | 5.33 |
| Calvin Leisure | 5.13 |
| Charles Morris | 5.06 |
| Mike Murphy | 5.06 |
| John Pinkston | 5.25 |
| Sondra Rickard | 5.00 |
| William Rickard | 5.08 |
| Tim Vincent | 5.13 |

*Id.* Figure 12.

**Response**: Plaintiffs agree with paragraph 86 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Dr. Thurman may opine that Plaintiffs received an average of number of flocks as per the above chart.

[11] Plaintiffs did not file a Motion to Exclude the Opinions of Dr. Thurman pursuant to Federal Rule of Evidence 702 and case law requiring expert testimony be "relevant to the task at hand," and the product of expert "reasoning or methodology," *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579, 593 & 597 (1993); *Childress v. Kentucky Oaks Mall Co.*, 2007 WL 2772299, at *1 (W.D. Ky. Sep. 20, 2007) (quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir.2001)). However, Plaintiff's expert, Dr. Kyle Stiegert, expressed numerous criticisms of the opinions expressed by Dr. Thurman.

**Dr. Lacy**[12]

87. A given broiler chick has a 50/50 chance of being male or female. Lacy Rep., Sec. V.

**Response**: Plaintiffs agree in part with paragraph 87 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Dr. Lacy may opine a given broiler chick has a 50/50 chance of being male or female. Plaintiffs object and disagree with this paragraph to the extent that there is ample evidence in the record not supporting the premise that a given broiler chick has a 50/50 chance of being male or female. Due to the fact that Tyson does not sex its broilers upon hatch, it doesn't know in a "straight run" the percentage of male versus female chickens, although it is accepted by Tyson and the industry that male birds grow bigger than female birds. Ex. 10, Shelton Dep. 136:6-137:8. Dr. Steve McCarter, the in-house veterinarian for the Tyson Robards complex, is of the opinion that because Tyson does no sexing of the chickens, its is mere "common sense" that the flocks delivered to the growers will be 50/50 male versus female. Ex. 11, McCarter Dep. 50:18-51:7. Dr. McCarter indicated that there as no document that exists that would support his opinion that flocks are 50/50 male versus female. *Id.* 51:8-52:13. Dr. Michael Lacy, the Tyson expert that opined that "*any given chicken has a 50/50 chance of being born female or male*" also testified as follows:

Q: All right. So you're saying, then, when chicks hatch at the hatchery, they're going to come out 50/50?

A: No.

Q: Okay what are you saying then?

A: *I'm saying that at the time of fertilization, it's 50/50. If you continue reading, it's been observed by some that a few more female embryos die during incubation than male embryos. This may skew the ratio of females to male chicks 1 or 2 percent in favor of males that hatch.*"

Ex. 5, Lacy Dep. 249:11-17 (emphasis added).

88. Appropriate culling results in less condemnation at the plant and a more uniform delivery of birds within weight range, even if later condemned at the plant. *Id.* Sec. VII.

**Response**: Plaintiffs agree in part with paragraph 88 of Defendants' Statements of

[12] Plaintiffs did not file a Motion to Exclude the Opinions of Dr. Lacy pursuant to Federal Rule of Evidence 702 and case law requiring expert testimony be "relevant to the task at hand," and the product of expert "reasoning or methodology," Daubert v. Merrell Down Pharms., Inc., 509 U.S. 579, 593 & 597 (1993); Childress v. Kentucky Oaks Mall Co., 2007 WL 2772299, at *1 (W.D. Ky. Sep. 20, 2007) (quoting Nelson v. Tenn. Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir.2001)). However, Plaintiff's expert, Dr. Kyle Stiegert, expressed numerous criticisms of the opinions expressed by Dr. Lacy.

Uncontroverted and Material Facts to the extent that Dr. Lacy may opine appropriate culling results in less condemnation at the plant and a more uniform delivery of birds within weight range, even if later condemned at the plant. Plaintiffs object and disagree with this paragraph to the extent that there is no credible evidence supported by any peer reviewed authority to support such an opinion, as admitted by Dr. Lacy:

Q: Okay. Then it says, In fact, this study encourages culling birds that would likely be condemned to minimize the number of emaciated birds sent to processing, exactly the same procedure used by the Tyson Robards complex. I get that.

You say, If growers cull out small birds as they should, the weight of condemned birds would more closely resemble the average flock weight than the 50 percent or lower weight claimed by Plaintiffs' expert. What do you base that on?

A: My experience.

Q: No study?

A: No.

Q: No peer-reviewed study?

A: No.

Q: Nothing that -- that you know of that's accepted in industry. That's just your opinion.

A: My opinion.

Q: Okay. It's not been peer-review tested in any way?

A: No.

Q: Okay. And you can't point me to any treatise that supports that, can you?

A: No.

Q: Okay. Do you have any evidence in this particular case that my clients, or anybody that grows for the Tyson Robards facility, are not culling the birds appropriately?

A: No.

Ex. 5, Lacy Dep. 284:10-285:15.

89. It is biologically impossible to produce perfectly identical chicks for every flock. *Id.* Sec. VIII.

**Response**: Plaintiffs' agree with paragraph 89 of Defendants' Statement of Uncontroverted Facts.

90. There is no material difference between the breeds that the Robards Complex uses among its growers from a health, viability, feed efficiency, and target weight standpoint. *Id.* Sec. IV.

**Response**: Plaintiffs agree in part with paragraph 90 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Dr. Lacy may opine there is no material difference between the breeds that the Robards Complex uses among its growers from a health, viability, feed efficiency, and target weight standpoint. Plaintiffs object and disagree with this paragraph to the extent that there is a wealth of evidence in the record to the contrary. Dr. Lacy did not know whether different breeds of birds were even being grown in any given tournament.[13] He has never done any studies to determine if one breed of bird is more conducive to meat production than another. Ex. 5, Lacy Dep. 32:18-21. He admits that there are differences in meat yield with the breed of bird. *Id.* 94:8-10. Cobb-Ventress (owned by Tyson) would sell four breeds of birds to the Robards complex, namely Cobb 500, Cobb 700, Cobb Male and MV male. Ex. 7, Mears Dep. 51:7-11, 52:9-12. The grower needed to provide the Cobb 700 more light and greater warmth then the 500 when growing these two breeds. *Id.* 53:6-10. The Cobb 500 and Cobb 700 would grow differently, with the yields of these two breeds being different. *Id.* 144:24-146:22; Ex. 10, Shelton Dep. 65:7-66:11. Cobb 500 chickens require a different lighting program than Cobb 700 chickens, and these lighting programs are mandated by Tyson to be complied with by the grower. *Id*. 69:12-70:1. Mears testified male birds will grow larger than female birds. Ex. 7, Mears Dep. 55:11-14. Mears confirmed that Grower Pay Recaps would evidence the hen breed and male breed numbers being different which indicated that different breed birds would be grown in the same tournament. *Id*. 102:17-24. Tyson via a 30b)(6) corporate deposition admitted that different breeds/types of chickens grow differently. Ex. 1, Dickey Dep. 264:20-265:12, 266:3-5. Tyson also agrees that male chickens grow larger than female chickens. *Id*. 266:3-12, 266:22-24. Different breeds of birds grow differently. Ex. 4, Bruce Dep. 73:17-74:3. Growers competing in the same tournament grow different breeds of birds. *Id.* 99:2-6. Tyson determines when birds will be delivered to the grower. Ex. 12, Barfield Dep. 232:2-4. Male birds grow differently from female birds. Ex. 4, Bruce Dep. 76:24-77:4. The grower with the males has an advantage. *Id.* 119:3-6.

---

[13] Q: Okay. And do you know, in this particular case, whether growers in the same tournament are growing the same bird?

A: I don't know."

Ex. 5, Lacy Dep. 177:7-10.

**Mr. Anderson**

91. Jason Anderson is an accountant retained by Defendants. Ex. 30, Expert Report of Jason Anderson, 1.

**Response**: Plaintiffs' agree with paragraph 91 of Defendants' Statement of Uncontroverted Facts.

92. Mr. Anderson "reviewed tax returns, schedules of property, plant, and equipment, various financial statements or bookkeeping records, grower contracts, settlement statements, and deposition transcripts for each of the plaintiffs." *Id.*

**Response**: Plaintiffs' agree with paragraph 92 of Defendants' Statement of Uncontroverted Facts to the extent that the report of Mr. Anderson indicates that he reviewed the items noted in this paragraph. Plaintiffs object and disagree that all of the items noted in this paragraph were "reviewed" by Mr. Anderson. Mr. Anderson stated in his report that his "research of financing opportunities for ventures similar to Plaintiffs'" and his understanding of how Plaintiffs' contracts operate suggest Plaintiffs can expect their cash flow will continue. Expert Report of Jason Anderson ("Anderson Report"), p. 3-4 previously filed in the record at Doc. 174-3. The research of which Mr. Anderson speaks was based solely on the results of a Google search. Ex. 24, Jason Anderson Dep. 351:13-14. Mr. Anderson was unable to recount what he Googled, and could not "remember a specific site" he visited, "point to a specific document" he viewed, or identify any other "analysis or review" to support the claim. *Id.* 351:18-23, 352:11-18. Mr. Anderson also observed that banks have a "strong appetite for lending" to poultry growers, suggesting they expect growers to be able to pay off their loans, but he explained in his deposition this statement merely summarizes a thirty-minute conversation with a "good friend," who is also a banker. Anderson Report p. 3; Ex. 24, Anderson Dep. 184:20-185:13; 327:5-19; 327:24-328:17. Anderson states Plaintiffs are "generally assure[d] an ongoing and predictable revenue stream," Anderson Report, p. 4 (Doc. 174-3); Anderson Dep. 332:4-334:9, but he details this is wholly based on his observation that Plaintiffs contracts contained fixed terms and disclosed their pricing mechanisms. *Id.* The only other "research" Anderson could point to that had any bearing on this conclusion was he compared Plaintiffs' contracts terms to one's he believed he read about in a USDA report—but he could not name or produce the report—and he read Plaintiffs' testimony, explaining a grower he had paid off his loans—although he could not identify the Plaintiff. *Id.* 329:3-330:18, 355:8-356:3.

93. Mr. Anderson opined that "the contracts between Tyson and the growers [are] economically viable." *Id.* 3.

**Response**: Plaintiffs' agree with paragraph 93 of Defendants' Statement of Uncontroverted Facts to the extent that the report of Mr. Anderson opines " that the contracts between Tyson and the growers [are] economically viable." Plaintiffs object and disagree with this opinion, and have moved to strike this opinion for the reasons outlined in their Motion to Exclude The Testimony of Mr. Jason Anderson, incorporated by reference herein. See Doc. 174.

94. Mr. Anderson opined "growers reported generally strong positive cash flow before and after funding debt service on an ongoing basis." *Id.*

**Response**: Plaintiffs' agree with paragraph 94 of Defendants' Statement of Uncontroverted Facts to the extent that the report of Mr. Anderson opines opined "growers reported generally strong positive cash flow before and after funding debt service on an ongoing basis." Plaintiffs object and disagree with this opinion, and have moved to strike this opinion for the reasons outlined in their Motion to Exclude The Testimony of Mr. Jason Anderson, incorporated by reference herein. See Doc. 174.

## Plaintiffs' Individual Damages

95. All Plaintiffs provided collective Rule 26(a) disclosures for all of them, stating:

> Plaintiffs are unable to compute the amount of damages claimed by them at this time as much of the documentation which will prove these amounts is in the sole possession of Defendant Tyson. Plaintiffs anticipate using the documentation generated through discovery of this case, to support a damage computation.
>
> Plaintiffs agree to supplement this disclosure once more evidence is generated through the discovery process and damages are better ascertainable.
>
> Ex. 31, Plaintiffs' Disclosures Pursuant to Rule 26a.

**Response**: Plaintiffs' agree with paragraph 95 of Defendants' Statement of Uncontroverted Facts as this pleading speaks for itself.

96. Defendants served interrogatories on each individual grower Plaintiff in this suit. *See, e.g.*, Ex. 32, Plaintiffs' Answers to Defendants' First Interrogatories. Interrogatory No. 16 stated:

> **INTERROGATORY NO. 16:** Provide a computation of the total damages you claim you are owed in this lawsuit, and specifically indicate the methodology used by you in calculating this total.

**Response**: Plaintiffs' agree with paragraph 96 of Defendants' Statement of Uncontroverted Facts as this pleading speaks for itself.

97. Every Plaintiff grower provided the same response to Interrogatory 16:

> Plaintiff incorporates by reference each of his General Objections. Plaintiff further specifically objects to this interrogatory on the basis that it is premature as discovery is in its early stages and much of the documentation needed to answer this Interrogatory is in the sole control of Defendants. Plaintiff agrees to supplement this Interrogatory as more information becomes available.

*Id.*

**Response**: Plaintiffs' agree with paragraph 97 of Defendants' Statement of Uncontroverted Facts as this pleading speaks for itself.

98. And finally, in the 30(b)(6) depositions of ICU Chickens, LLC; Morvatt Enterprises, LLC; TLC Poultry, LLC; and Murphy Farms, LLC, Plaintiffs' Counsel deferred individual damage calculations for all Plaintiffs. Ex. 33, Deposition of ICU Chickens, LLC, 36:1-37:2; Ex. 34, Deposition of Morvatt Enterprises, LLC, 85:2-86:5, 123:20-124:7; Ex. 35, Deposition of Murphy Farms, LLC, 11:20-12:14; Ex. 36, Deposition of TLC Poultry, LLC, 8:4-16.

**Response**: Plaintiffs' agree with paragraph 98 of Defendants' Statement of Uncontroverted Facts to the extent that the undersigned Plaintiffs' counsel advised that damage calculations for each Plaintiff outlined in this paragraph would be given by expert testimony, which they ultimately were. Ex. 25, Morvatt Enterprises, LLC, Dep. 85:17-86:2;[14] Ex. 26, ICU Chickens LLC, Dep. 36:7-22;[15] *see also* Response 65 herein,

---

[14] MR. WHITFIELD: And for purposes of the record, those individuals claims of which the Court made reference to at the last hearing will not be utilized by Mr. Morris and Morvatt The claims and damage calculations that I'm using generically calling these the 30,000-foot calculations will be initiated, and so for purposes of the record, we do not waive our right to discuss things that you're talking about here, but we do not intend to utilize those things in a calculation of individualized damage claims by Morvatt or Mr. Morris. All right.

[15] MR. TATUM: The last topic -- is he designated, John, on Topic 7, the damages topic?

MR. WHITFIELD: No. And for purposes of the record, I'm going to make the same declaration I did in Mr. Morris' deposition in regard to Mr. Rickard and his companies. We intend not to make specific damage claims in regard to losses that may be incurred. We talked about, with Mr. Morris' deposition with the Court, we do intend to make an overall generic damage calculation, the 30,000-foot level, and we'll do that by and through our experts. So to that extent, he'll not be testifying on Topic 7 with damages, although we do reserve the right to talk about specific instances of damage to the extent that it applies to the damage calculation our experts will use.

First Report, Table 23-24, outlining individual damage calculations for each Plaintiff.

99. Defendants served a Notice of Deposition on ICU Chickens, Morvatt Enterprises, and Murphy Farms. *See* Ex. 37, Notice of Video Deposition, *Duces Tecum*, of Plaintiff ICU Chickens, LLC; Ex. 38, Notice of Video Deposition, *Duces Tecum*, of Plaintiff Morvatt Enterprises, LLC; Ex. 39, Notice of Video Deposition, *Duces Tecum*, of Plaintiff Murphy Farms, LLC; Ex. 40, Notice of Video Deposition, *Duces Tecum*, of Plaintiff TLC Poultry, LLC.

> **Response**: Plaintiffs' agree with paragraph 99 of Defendants' Statement of Uncontroverted Facts as these Notices speaks for themselves.

100. Each notice listed "Matters for Examination." *Id.* Item 7 of the matters for examination stated:

> 7. An itemization of the damages you allege to have incurred as result of the matters in this lawsuit, including the basis for those alleged damages, how incurred, when incurred, how calculated, and the dollar amounts so claimed.

*Id.*

> **Response**: Plaintiffs' agree with paragraph 100 of Defendants' Statement of Uncontroverted Facts as this pleading speaks for itself.

101. Each deponent deferred responding to item 7 at deposition. ICU Chickens Dep. 36:7-9 ("[*Defense Counsel*]: The last topic -- is he designated, John, on Topic 7, the damages topic? [*Plaintiffs' Counsel*]: No."); Morvatt Enterprises Dep. 41:5-7 ("Q: You're not here to testify as to topic six or seven? A: No, sir."); Murphy Farms Dep. 11:9-19 ("Q: You've looked at this notice before and the topics? A: Yes. . . . Q: There's seven topics here. Are there any topics on this notice you're not prepared to testify to today? You're welcome to take a look at it. A: Just Number 7. Q: You don't have any testimony on Topic 7? A: No."); TLC Poultry Dep. 8:4-7 ("[*Defense Counsel*]: Is he testifying on Topic 7, John? [*Plaintiffs' Counsel*]: No, he's not.").

> **Response**: Plaintiffs' agree with paragraph 101 of Defendants' Statement of Uncontroverted Facts to the extent that the undersigned Plaintiffs' counsel advised that

damage calculations for each Plaintiff outlined in this paragraph would be given by expert testimony, which they ultimately were. See Response 98 herein incorporated by reference. See also Response 65 herein incorporated by reference and First Report, Table 23, outlining individual damage calculations for each Plaintiff.

102. Plaintiffs' Counsel made the following statements on the record during depositions:

o At the deposition of Morvatt Enterprises, LLC, the following statement occurred: [*Plaintiffs' Counsel*]: Also for purposes of the record, which might streamline some of this, there was discussion early on about whether or not Morvatt Enterprises and Mr. Morris is going to initiate individual claims, individual damage calculation of claims, and --
THE WITNESS: You can pull those -- those as well.
[*Plaintiffs' Counsel*]: And for purposes of the record, those individuals claims of which the Court made reference to at the last hearing will not be utilized by Mr. Morris and Morvatt. The claims and damage calculations that I'm using generically calling these the 30,000-foot calculations will be initiated, and so for purposes of the record, we do not waive our right to discuss things that you're talking about here, but we do not intend to utilize those things in a calculation of individualized damage claims by Morvatt or Mr. Morris. All right.

Morvatt Enterprises Dep. 85:9-86:2.

o At the deposition of ICU Chickens, LLC, the following statement occurred:

[*Defense Counsel*]: The last topic -- is he designated, John, on Topic 7, the damages topic?

[*Plaintiffs' Counsel*]: No. And for purposes of the record, I'm going to make the same declaration I did in Mr. Morris' deposition in regard to Mr. Rickard and his companies. We intend not to make specific damage claims in regard to losses that may be incurred. We talked about, with Mr. Morris' deposition with the Court, we do intend to make an overall generic damage calculation, the 30,000-foot level, and we'll do that by and through our experts. So to that extent, he'll not be testifying on Topic 7 with damages, although we do reserve the right to talk about specific instances of damage to the extent that it applies to the damage calculation our experts will use.

[*Defense Counsel*]: All right. We'll just reserve whatever dispute or agreements we need to work out in that context down the road.

ICU Chickens Dep. 36:7-25.

o At the deposition of Murphy Farms, LLC, the following statement occurred: [*Defense Counsel*]

Q: So you're designated as the person on behalf of the company

that can answer questions in relation to these topics. Do you understand that? [*Witness*]

A: Yes.

Q: There's seven topics here. Are there any topics on this notice you're not prepared to testify to today? You're welcome to take a look at it.

A: Just Number 7 [damages].

Q: You don't have any testimony on Topic 7? A: No.

[*Defense Counsel*]: Do they have the same limitation as the others?

[*Plaintiffs' Counsel*]: For purposes of the record, I'll state that Murphy Farms, LLC will not bring individual claims relative to operation of this specific company, although like the other clients we have in this litigation, they'll be bringing a damage claim based on pleadings filed thus far in this case and will provide expert testimony as to the damages they claim in this litigation.

[*Defense Counsel*]: In relation to the 30,000-foot --

[*Plaintiffs' Counsel*]: Exactly. We've been talking about it as the 30,000-foot calculation, so that's what they're going to be utilizing in this case.

[*Defense Counsel*]: I probably should have asked you, John, does that apply to all the named plaintiffs?

[*Plaintiffs' Counsel*]: It will. Murphy Farms Dep. 11:5-12:13.

o At the deposition of TLC Poultry, LLC, the following statement occurred:

Q: You've seen this notice before? A: Mm-hmm.

[*Defense Counsel*]:· Is he testifying on Topic 7, John?

[*Plaintiffs' Counsel*]: No, he's not. For purposes of the record, I'll say that TLC Poultry, LLC, there will be no individual claims as to particular damage in regard to this case. There will be a claim of damage from what I'm generically calling the 30,000-foot level, which our experts will opine as to. But for any individual claims, he will not. And thus for purposes of today's deposition, he will not be testifying in regard to Item 7.

TLC Poultry Dep. 8:4-16.

**<u>Response</u>**: Plaintiffs' agree with paragraph 102 of Defendants' Statement of

Uncontroverted Facts to the extent that the undersigned Plaintiffs' counsel advised that damage calculations for each Plaintiff outlined in this paragraph would be given by expert testimony, which they ultimately were. See Response 98 herein incorporated by reference. See also Response 65 herein incorporated by reference and First Report, Table 23, outlining individual damage calculations for each Plaintiff. Plaintiffs object and disagree with this paragraph to the extent that it does not accurately reflect that Plaintiffs' damage calculations were given via expert testimony and counsel for Defendant Tyson was advised of same. The depositions as referenced in this paragraph were taken before Plaintiffs' expert disclosures were due.

103. Plaintiffs' expert, Dr. Kyle Stiegert opined on damages in three categories:

> 19. I have also calculated damages to Plaintiffs based on (a) the suppression of grower pay per pound grown; (b) the reduction in pounds grown based on flocks being spaced out longer than projected (i.e., higher "days-out"); and (c) Tyson's policies regarding condemnation.

First Report, ¶ 19.

**Response**: Plaintiffs' agree with paragraph 103 of Defendants' Statement of Uncontroverted Facts to the extent that the report of Dr. Stiegert speaks for itself.

104. Dr. Stiegert testified at deposition:

> Q: So at the end of the day, the three buckets of damages you felt like in your judgment you could express to your satisfaction was in relation to condemnation, base pay and out-time, as reflected in Paragraph 19?
> A: Yes.
> Q: And your ultimate opinion is these are derivative of Robards' exercise of monopsony power; in other words but for the exercise of monopsony power, these elements would be paid differently?
> A: Yes.

Stiegert Dep. 1, 95:16-96:1.

**Response**: Plaintiffs agree in part with paragraph 104 of Defendants' Statement of Uncontroverted and Material Facts to the extent that certain quoted testimony in paragraph 104 came from Dr. Stiegert. Plaintiffs object to this paragraph to the extent that it leaves out relevant facts and context of the above statement, specifically that Dr. Stiegert is not "limited" to the opinions noted in this paragraph 104, and that the totality of the opinions that Dr. Stiegert gives in this case are outlined in the two reports prepared by Dr. Stiegert. See Response 72 herein incorporated by reference. See First Report and Second Report.

## **Plaintiffs**

105. The Plaintiffs in this case include 11 different broiler growers. Four of these growers operate their broiler businesses under formal business entities, which are also named Plaintiffs.

**Response**: Plaintiffs' agree with paragraph 105 of Defendants' Statement of Uncontroverted Facts.

### Douglas Brown

106. Plaintiff Doug Brown ("Brown)" operates under three Broiler Contracts with Tyson which operate under the following farm names: Farm No. 1; Farm No. 2; Charleston Road. Brown Dep. 5:19-22; 15:4-6; 17:9-15.

**Response**: Plaintiffs' agree with paragraph 106 of Defendants' Statement of Uncontroverted Facts.

107. Farm No. 1 has four houses; Farm No. 2 has four houses; Farm No. 3 has two houses. *Id.*

**Response**: Plaintiffs' agree with paragraph 107 of Defendants' Statement of Uncontroverted Facts.

108. Brown originally contracted with Tyson in 1999. *Id.* 42:22-43:14. Brown's contracts have been continually renewed and he continues to operate with Tyson. *Id.* 68:15-24; Ex. 41, Broiler Contracts of Douglas Brown.

**Response**: Plaintiffs' agree with paragraph 108 of Defendants' Statement of Uncontroverted Facts.

109. Brown's contract dates and renewal dates are as follows:

o The Farm No. 1 (5032) contract was originally entered into in 1999. Brown Dep. 42:22-43:14. It was renewed on August 30, 2017, with a scheduled conclusion date of August 1, 2020. Broiler Contracts of Douglas Brown.

o The Farm No. 2 (5098) contract was originally entered into in 1999. Brown Dep. 9:13-19. It was renewed on June 27, 2017, with a scheduled conclusion date of June 28, 2020. Broiler Contracts of Douglas Brown.

o The Farm No. 3 (5184) contract was originally entered into with Tyson on July 20,

2010, with a scheduled conclusion date of April 1, 2018. Broiler Contracts of Douglas Brown.

**Response**: Plaintiffs' agree with paragraph 109 of Defendants' Statement of Uncontroverted Facts.

110. Regarding the contract for Farm 1 (5032), which Brown renewed in 2017, he testified: "Did Tyson -- anyone at Tyson make any representations to you about the nature of your production that led you to sign this? A: I mean, the only thing, you know, I'm assuming that they're going to bring me chickens and feed and I'm going to raise them to the best of my ability." Brown Dep. 71:20-72:2.

**Response**: Plaintiffs agree with paragraph 110 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above testimony, as Mr. Brown was promised a density of 35,000 birds for super houses by Tyson's broiler manager, Steve Keys. Mr. Brown has never received that many birds. Ex. 19, D. Brown Dep. 58: 3-5. He relied on Tyson's statements that he would be receiving 35,000 birds in his super houses to get his financing at Farm Credit. *Id*. 64:23-65:3.Mr. Brown testified Tyson brought contracts to the farm for grower's signature like they usually do; he had to sign the contracts because of debt. *Id*. 69: 23-70:7. Mr. Brown also testified that he was told the tournament system is designed so that everyone gets an equal chance from day one. *Id*. 202:23-203:6.

111. Regarding the contract for Farm 1 (5032), which Brown renewed in 2017, he testified: "Q: Did you ask to have any meetings with David Mears or anyone else at the complex to discuss entering into a new contract? A: No, sir." *Id.* 72:3-6

**Response**: Plaintiffs agree with paragraph 111 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

112. Brown did not have any discussions relating to his relationship with Tyson before signing his 2017 contract for Farm 2. *Id.* 74:3-7 ("Q: Did you call anyone at the complex and inquire and have any discussions about anything relating to your relationship with Tyson before signing this?

A: No, sir.”).

**Response**: Plaintiffs agree with paragraph 112 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

113. Plaintiff Doug Brown (“Brown”) did not “ask to have any meetings with David Mears or anyone else at the complex to discuss entering into a new contract.” *Id.* 72.3-6. When asked to name an instance where David Mears has lied to him about something, Brown again answered that he “never really had much dealings with David Mears.” *Id.* 113-23:114.1.

**Response**: Plaintiffs agree with paragraph 113 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

114. Brown testified that regarding the contract for Farm 3, which was originally signed in 2010, he “had conversations with Steve Keys about number of birds placed and about the heating element.” *Id.* 78:11-16.

**Response**: Plaintiffs agree with paragraph 114 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

115. Brown testified he believed Steve Keys was the Broiler Manager at the time. *Id.* 52:3-7.

**Response**: Plaintiffs agree with paragraph 115 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

116. Regarding this conversation with Steve Keys, Brown testified at deposition:

Q: Did you have any discussions with anyone at Tyson about how many chickens you were going to get, how many chickens you were going to process --
A: Yes.
Q: -- any of the parameters? And what discussions did you have?
A: Well, with Steve Keys. He met me at the farm and we talked over different things and I questioned him, you know, well, how many birds are we going to get in these new houses, this, that, and the other, and he said 35,000.
Q: 35,000 per house? A: Per house.

***

Q: Okay. Have you ever received, to your knowledge, 35,000 birds in either house? A: Never.
Q: Do you know what you have received?
A: 32,000 something is the most I can ever recall getting in there. And then as low as around 30,400 or so about the least.
Q: Have you ever had any discussions with anyone at Tyson since you've been operating these superhouses, as you call them, that you thought you would be getting 35,000 birds each?
A: Well, the discussion was between me and Steve Keys and then he left shortly -- he left, I think actually may have been gone before the new houses was completed. I don't remember when exactly he left.
Q: Was he gone before you started construction?
A: I don't believe so. I believe he was still here at that time. Q: Do you remember when you started construction?
A: It was in '08, the best I can remember.

*Id.* 55:22-56:9, 58:3-25.

**Response**: Plaintiffs agree with paragraph 116 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

117. Brown also stated in his interrogatories:

In approximately 2008, while discussions were happening regarding the potential of building super houses on his farm, Steve Keys told Plaintiff (while meeting at Doug Brown Number 2) that when he built the super houses he would get 35,000 birds per house per flock. Plaintiff relied on this statement when deciding to build his two super houses. Plaintiff has never gotten that many birds placed in his super houses for any given flock.

Plaintiffs' Answers to Defendants' First Interrogatories, Brown Inter. No. 14.

**Response**: Plaintiffs agree with paragraph 117 of Defendants' Statement of Uncontroverted and Material Facts to the extent that the pleading mentioned in this paragraph speaks for itself.

118. Throughout his career with Tyson, Brown received his average of five flocks per year.

Brown Dep. 80:1-7 (Q: Do you believe you've received on average five placements of broilers per

year on this farm? A: I would say close, yes, sir.”).

**Response**: Plaintiffs agree with paragraph 118 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

119. Brown received his payment for days-out exceeding 21 days. *Id.* 80:8-16. (“Q: And in the times that you've had excess 21-day out-time, did you receive your excess payment? A: Yes, sir.”).

**Response**: Plaintiffs agree with paragraph 119 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

120. Regarding Fuel Pay, Brown testified, “Q: Okay. And are you aware of any instance where Tyson has failed to make the fuel payment to you per the contract? A: Not to me.” *Id.* 88:19-22.

**Response**: Plaintiffs agree with paragraph 120 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

121. Regarding Premium Pay, Brown testified, “Q: And have you always received your premium pay? A: Yes, sir.” *Id.* 89:14-16.

**Response**: Plaintiffs agree with paragraph 121 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

122. Brown testified that he was not aware of any instance where his mortality cards did not match the figures on his settlement. *Id.* 130:22-131:2 (“Q: Are you aware of any instance where your mortality cards didn't match the summary weekly mortality report that ultimately went into your settlement on any of your farms? A: None that I'm thinking of at this point in time, no.”).

**Response**: Plaintiffs agree with paragraph 122 of Defendants’ Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

123. Regarding the accuracy of his settlement figures, Brown testified, "Q: So you can't pinpoint for me a time where you think the birds looked different than what the documentation came back? A: No, sir."). *Id.* 141:20-23.

**Response**: Plaintiffs agree with paragraph 123 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

124. Brown testified that sometime around 2016 he "got cheated out of about 8- or 10,000 pounds of feed" on a particular feed delivery, in which the feed ticket stated 55,000 pounds of feed had been delivered. *Id.* 97:22-99:15.

**Response**: Plaintiffs agree with paragraph 124 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

125. Brown testified he knew the feed amount delivered was not 55,000 pounds "from looking in the bins to see how much feed is in the bin" and because it took his broilers "less than 48 hours to go through the 55,000 pounds of feed" which Brown believed was less time than typical for his broilers to eat 55,000 pounds of feed. *Id.*

**Response**: Plaintiffs agree with paragraph 125 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

126. Brown blamed David Dickey for failing to remedy the situation. But at deposition, when asked if he had "any reason to think that Dickey knew you were right and the [feed] ticket was wrong," Brown responded "No." *Id.* 108:22-109:3.

**Response**: Plaintiffs agree with paragraph 126 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it apparently purposely leaves out relevant facts and context of the above statement. The actual testimony, and the context from which it is based is as follows:

Q: I'm asking what you think David was lying about, specifically David Dickey?

A: What did I think -- they were specifically not going to do anything even though they had been notified the day that there was an issue and they just let it run through the system and now there's no way to prove it. The feed is gone. At that point in time, they could have reclaimed that feed and took it back in and checked it to verify.

Q: Who had been notified?

A: I talked to Neil Barfield the day the feed was delivered.

Q: Okay. But what I asked you was, what did Dickey lie about, Dickey himself personally? You said he lied about this. What did he lie about?

A: What did he lie about?

Q: Yeah.

A: Saying that the feed was not -- saying that the feed wasn't there. Saying that I was not charged for feed I didn't get, and I most certainly was charged for feed I didn't get.

Q: So do you know if he knew that you actually got less feed other than what you were telling him?

A: Well, he's in management. When I tell my tech, it's supposed to go up the chain.

Q: Okay. So it was you saying you got less and the feed ticket saying you got more; right?

A: Yes.

Q: Okay. Do you have any reason to think that Dickey knew you were right and the ticket was wrong?

A: No. ***Because they wouldn't do anything about it at the point in time that the event occurred. I requested it to be reclaimed and they wouldn't reclaim it.”***

(Emphasis added and omitted in ¶ 126). Ex. 19, D. Brown Dep. 107:16-109:3.

127. When asked if he “ran that math and said this is what it cost me,” Brown answered “It would not have mattered. No, I didn’t, no.” *Id.* 102:8-11.

**Response**: Plaintiffs agree with paragraph 127 of Defendants’ Statements of

Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. The actual testimony, and the context from which it is based is as follows:

Q: Now, I'm just wondering if you ran that math and said this is what it cost me?

A: It would not have mattered. No, I didn't, no.

Q: Okay. Go ahead.

A: I notified Tyson after I had talked to Neil and told them that we were short on feed and that I wanted to know what they were going to do. Well, let's let you settle and let's see how you do, then we'll look at it after that. Well, after the settlement come in, performance wasn't near as good as it had been. And then when Jim and David Dickey drove out to the farm to tell me that they wasn't going to do anything, you can imagine I wasn't very happy."

Ex. 19, D. Brown Dep. 102:8-22.

128. Brown was not able to say how much money he believed this error cost him, or how he might figure that out. *Id.* 105:10-21.

**<u>Response</u>**: Plaintiffs agree with paragraph 128 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. The actual testimony, and the context from which it is based is as follows:

Q: You say David and Jim came out to your farm. They were at a neighboring farm and came by the farm?

A: Yes. They were on the Latta farm, over local. They had called me and wanted to run by and talk to me about it.

Q: And so they were in the area?

A: Yes, sir.

Q: And you were okay with them coming by to talk about it?

A: Yes, sir.

Q: Okay. And what did they tell you?

A: They told me that they had looked at the settlement and they didn't see that they felt like there was anything there that they could do because they didn't have any proof that the feed wasn't delivered.

Q: Where had you settled?

A: I just remember it wasn't as good as I normally do. I don't remember the placement.

Q: So you don't remember if it was above or below average?

A: I don't remember if it was above or below. I just remember it was below average for that farm, where that farm had typically settled.

Q: And you don't know how that at the end of the day affected the money you got paid for that settlement?

A: I know it definitely affected it. It wouldn't matter if it pushed me from first to second or first to last. It's still the issue that I was shorted on feed and they wouldn't do anything about it.

Ex. 19, D. Brown Dep. 104:10-105:17.

129. Brown testified:

Q: Do you have any other instances where you think anyone else at Tyson has lied to you? We've talked about your 35,000 bird issue. So I don't --
A: Yeah.
Q: -- want to make you think I'm thinking about that. I'm thinking about other instances.
A As far as verbal speaking, no.

*Id.* 113:15-22.

**Response**: Plaintiffs agree with paragraph 129 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph.

130. Brown testified, "Q: Are there any other instances where anyone at Tyson has, you think, lied to you? A: None that I can recall sitting here." *Id.* 114:2-4.

**Response**: Plaintiffs agree with paragraph 130 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Brown testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to

the extent that it apparently purposely leaves out relevant facts and context of the above statement. Mr. Brown testified to numerous instances where he believed Tyson lied to him, namely:
(1) Being charged for feed he didn't get and Dickey lying about it. Ex. 19, D. Brown Dep. 108:4-13
(2) Being promised 35,000 chickens for superhouses and never getting them. *Id*. 186:13-187:9.

**Christopher Burch**

131. Burch operates under one Broiler Contract with Tyson, operating as the Burch Poultry farm. Burch Dep. 132:5-13.

**Response**: Plaintiffs' agree with paragraph 131 of Defendants' Statement of Uncontroverted Facts.

132. Under this contract, Burch operates four houses. *Id.* 66:12-17.

**Response**: Plaintiffs' agree with paragraph 132 of Defendants' Statement of Uncontroverted Facts.

133. Burch Poultry contract was first entered into in 2005. *Id.* 7:13-14, 98:2-102:25.

**Response**: Plaintiffs' agree with paragraph 133 of Defendants' Statement of Uncontroverted Facts.

134. That contract was renewed on October 17, 2012, with a scheduled conclusion date of May 17, 2019. Ex. 42, Broiler Contract of Christopher Burch.

**Response**: Plaintiffs' agree with paragraph 134 of Defendants' Statement of Uncontroverted Facts to the extent that the contract mentioned in this paragraph speaks for itself.

135. In 2015, prior to his current contract's expiration, Burch terminated his contract with Tyson and moved his operations to Purdue Farms, and he has not contracted with Tyson since that time. Burch Dep. 7: 7-11.

**Response**: Plaintiffs agree with paragraph 135 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Burch testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it apparently purposely leaves out relevant facts and context of the above statement.

Christopher Burch testified he left Tyson because he was not being treated fairly. Different inputs in the tournament system was unfair, with every flock he got being different breeds. He knew this as he talked to other growers. Ex. 27, Christopher Burch Dep. 90:14-91:14. He testified as to the Tyson inputs for chicks and feed not being consistent. *Id*. 104:3-12.

136. Burch testified, "Q: Otherwise, did Tyson talk to you at all about what your contracts might look like or anything like that before you bought [your farms]? A: No." *Id.* 57:15-18.

**Response**: Plaintiffs agree with paragraph 136 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Burch testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. Christopher Burch testified he did speak with Tyson representative Kevin Tierce before buying his farm and that Tierce reported that it was a "good deal." Ex. 27, Burch Dep. 56:23-57:14.

137. Burch testified, "Q: And your first contract, did you have that reviewed by anyone before you signed it? A: Like have the lawyer look at it? Q: Lawyer or accountant or anybody? A: No. Q: Did you talk with anyone at Tyson about it? A: No." *Id.*, 66:19-67:1.

**Response**: Plaintiffs agree with paragraph 137 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Burch testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. See Response 136.

138. When he signed his first contract, Burch did not "have any discussions with Tyson about the type of breed of chicken [he] might be receiving and growing." *Id.* 69:3-6, 69:21-22.

**Response**: Plaintiffs agree with paragraph 138 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Burch testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. While with Tyson, Mr. Burch grew various breeds of chickens while other growers raised different breeds as well.[16]

---

[16] Q: Do you have any idea what type of breeds you were growing with Tyson?

A: I'm assuming Cobb, but they were going through a breed change so we had a little bit of everything.

Q: Do you know if your little bit of everything was any different than anybody else?

139. When he signed his first contract, Burch did not have "any discussion about growth time" or "the amount of days you pick up the chickens for growing." *Id.* 69:7-10, 69:21-22.

**Response**: Plaintiffs agree with paragraph 139 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Burch testified to the statements noted in said paragraph.

140. When he signed his first contract, Burch did not have "any discussions with Tyson about condemnation processes or procedures or how that affected [him]." *Id.* 69:15-22.

**Response**: Plaintiffs agree with paragraph 140 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Burch testified to the statements noted in said paragraph as to his "first contract." Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. Subsequent to his first contract, Mr. Burch had numerous conversations with Tyson as to condemnation. Ex. 27, Burch Dep. 69:15-20.

141. When he renewed his contract with Tyson in 2012, Burch does not recall any discussions he had with anyone at Tyson. *Id.* 139:10:19.

**Response**: Plaintiffs' agree with paragraph 141 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Burch testified as to the matters pertained in this paragraph.

142. Burch's interrogatory responses include two instances in which he believed Tyson employees made misrepresentations to him:

O Approximately 4 years ago (when the Georgia-08 became a problem) Plaintiff had 3 bad flocks in a row and his technician at the time, Eric Brown, told Plaintiff that it was his fault. Approximately 6 months later Plaintiff was told by Neil Barfield while eating lunch with him at Subway that Georgia-08 was found on his farm from testing

---

A: Yeah. I mean, I may have four different types of chickens in my four barns and then somebody else may have, you know, a whole farm of a certain breed.

Q: Can you tell me when that happened?

A: '12, '13, maybe.

Ex. 27, Burch Dep. 91:23-92:10.

done surrounding the bad flocks. Plaintiff went to the Tyson plant and met with Kenny Bartley and Jared Shelton who ended up compensating him $1,000 because of the problems with his past flocks.

- o During Plaintiff's second to last flock he was told by his technician Eric that his chickens would be caught on Monday night. At 3:00 a.m. Monday night/Tuesday morning Plaintiff called Tyson's headquarters and was told they were not going to catch his chickens that night but would be caught the next night (Tuesday) which caused his birds to be taken off feed for an extended period of time. Tyson paid Plaintiff $120 which was to cover 10 hours of his time for waiting on the catch crew to never come.

Plaintiffs' Answers to Defendants' First Interrogatories, Burch Inter. No. 14.

**Response**: Plaintiffs agree with paragraph 142 of Defendants' Statement of Uncontroverted and Material Facts to the extent that the pleading mentioned in this paragraph speaks for itself.

143. Burch testified, "Q: Okay. So you don't -- sitting here today, you're not able to say, well, I think my settlement statement, you know, had the wrong numbers on it? A: No. I wouldn't say that, no." *Id.* 154:2-6.

**Response**: Plaintiffs' agree with paragraph 143 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Burch testified as to the statements in this paragraph.

144. Burch testified, "Q: Did you ever go through any of these materials and feel like the numbers reported on the settlement didn't match up with feed delivered? A: Like they -- no, I don't -- I mean, the feed tickets would match that." *Id.* 152:15-19.

**Response**: Plaintiffs' agree with paragraph 144 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Burch testified as to the statements in this paragraph.

145. Burch testified, "Q: Did you ever go through and determine that the live scale information didn't match up with the numbers or the settlement that you were paid? A: No." *Id.* 153:14-18.

**Response**: Plaintiffs' agree with paragraph 145 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Burch testified as to the statements in this paragraph.

146. Burch testified, "Q: Did you ever go through and determine that the amount you were paid was calculated incorrectly based on mor[t]ality, based on feed conversion, based on condemnation? A: No." *Id.* 153:19-23.

**Response**: Plaintiffs' agree with paragraph 146 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Burch testified as to the statements in this paragraph.

**Dennis Clapp**

147. Dennis Clapp operates under one Broiler Contract with Tyson, operating as the Dennis Clapp Farm (Farm 5081). Ex. 60, Deposition of Dennis Clapp, 104:3-13.

**Response**: Plaintiffs' agree with paragraph 147 of Defendants' Statement of Uncontroverted Facts.

148. Farm 5081 includes eight houses. *Id.* 11:21-25.

**Response**: Plaintiffs' agree with paragraph 148 of Defendants' Statement of Uncontroverted Facts.

149. Clapp first contracted with Tyson to raise Broilers in 1999. *Id.* 11:21-22. His contract has been continually renewed and he continues to operate under a contract with Tyson. Ex. 43, Broiler Contract of Dennis Clapp.

**Response**: Plaintiffs' agree with paragraph 149 of Defendants' Statement of Uncontroverted Facts.

150. The Dennis Clapp Farm contract was originally entered in 1999. Clapp Dep. 11:21-22. It was renewed on April 11, 2012, with a scheduled conclusion date of April 11, 2019. Broiler Contract of Dennis Clapp.

**Response**: Plaintiffs' agree with paragraph 150 of Defendants' Statement of Uncontroverted Facts.

151. Clapp does not remember "any discussions [he's] ever had with a Tyson employee

regarding what the Broiler Production Contract means." Clapp Dep. 105:7-10.

**Response**: Plaintiffs' agree with paragraph 151 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

152. Clapp does not remember "any discussions [he] had with anyone about" his contract executed in 2015 amending schedule A. *Id.* 108:22-109:11; Broiler Contract of Dennis Clapp.

**Response**: Plaintiffs' agree with paragraph 152 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

153. Clapp testified, "Q: Do you recall anything anyone at Tyson told you about Exhibit No. 1 [Clapp's contract for Farm 5081] and what it meant? A: No. Q: Do you recall any discussions with Tyson over Exhibit No. 1 or the various amendments we looked at and how that affected your pay or anything? A: At this point I don't." Clapp Dep. 110:5-11; Broiler Contract of Dennis Clapp.

**Response**: Plaintiffs' agree with paragraph 153 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

154. Regarding his contracts, Clapp testified, "I don't remember speaking to anybody specifically, no, sir." Clapp Dep. 111:2-3.

**Response**: Plaintiffs' agree with paragraph 154 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

155. When asked if anyone at Tyson ever lied to him, Clapp testified, "Q: Is there anyone at Tyson that you think lied to you about something? A: The only different -- yes. Q: What was that? A: Just different issues, Kenny Bartley. He's the only one." *Id.* 145:19-24.

**Response**: Plaintiffs agree with paragraph 155 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Clapp testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. Mr. Clapp testified that Kenny Bartley lied to him so much "*I didn't believe anything he said at that point.*"

Ex. 28, Dennis Clapp Dep. 145:16-146:4.

156. When asked what Kenny Bartley had lied about, Clapp responded that he did not know any specific lies, he just did not trust Mr. Bartley. *Id.* 145:25-146:8 ("Q: And what do you think he lied? A: It -- it was just lots -- lots of issues. No particular thing. One thing can come back. It's just dealing with Kenny Bartley. I didn't believe anything he said at that point. Q: Can you give me – A: No, sir. Q: any examples of him lying to you? A: No, sir. No, sir.").

**Response**: Plaintiffs' agree with paragraph 156 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

157. Clapp testified at deposition that he had never dealt with Mears, but indicated that Mears was nice to him. *Id.* 85:20-86:3. In fact, until the deposition itself, Clapp was unaware that Mears was a defendant in the case. *Id.* 149:24-151:4.

**Response**: Plaintiffs' agree with paragraph 157 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the matters in this paragraph.

158. Clapp has always been paid for out-time exceeding 21 days. *Id.* 116:1-9 ("Q: Have you ever not gotten paid for out time over 21 days? A: No, no, no.").

**Response**: Plaintiffs' agree with paragraph 158 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

159. Regarding the accuracy of his settlement sheets Clapp testified:

Q: Have you ever, in a settlement, had an experience where you thought -- you're looking right now at the settlement document of Exhibit No. 2, which is Tyson 054959. And so that's a settlement reflected in this settlement packet. Exhibit No. 2, this would be for week end date January 16, 2016. Have you ever had an occasion where you went through your settlement, which ultimately translated to what you got paid, and thought that it misidentified the number of head placed at your farm?

A: No, sir.

Q: Have you ever had an instance where you thought it miss identified the mortality at your farm?

A: No, sir.

Q: Mortality is birds pulled out, right? Have you ever had a situation where you went through and you thought it miss identified the number -- level condemnation off your farm?

A: The condemnation is done there at the plant.

Q: Right. But have you ever had a situation where you went and looked at your condemnation certificates that are provided in this packet, and they're provided here in Exhibit No. 2, and thought, wait, those numbers don't match up?

A: No, sir.

***

Q: You've never had an occasion where you thought you were looking at your condemnation certificates and thought they weren't tracked right on your settlement?

A: No, sir.

Q: Have you ever had a discussion with anyone at Tyson that you can recall over any of your settlements where you said, I don't think this is right. Something is off on what I'm getting paid or how my pounds are being counted or whatever?

A: The only thing is, one time with Morris Hill, that was the only time I've discussed anything with them.

***

Q: Do you -- have you ever had any instance in looking at your settlement sheets where you didn't think it properly accounted for the feed usage that was done at your farm?

A: No, sir. One time.

Q: Okay. What happened?

A: I thought I actually received an extra load of feed, and they couldn't prove I did or didn't, just like I thought I was shorted one time.

***

Q·: Have you ever felt like your pay wasn't right, in other words, you got shorted what you were due under your settlement?

A: Just the one time with Morris Hill.

Q: Just the load of birds?

*Id.* 120:5-121:4, 121:20-122:5, 122:22-123:5, 124:19-22.

**Response**: Plaintiffs' agree with paragraph 159 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

160. Regarding the episode with Morris Hill, Clapp testified that "[he] thought [he] had been shorted a load of birds, and we never could find paperwork on it." *Id.* 87:6-7.

**Response**: Plaintiffs' agree with paragraph 160 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

161. Clapp testified that he believed "there were 4,400 birds that left [his] farm that didn't report back to [him]." *Id.* 89:22-90:9.

**Response**: Plaintiffs' agree with paragraph 161 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

162. Clapp based this belief on the fact that "my pay was lower" and "poundage [was] lower." *Id.* 90:10-19.

**Response**: Plaintiffs' agree with paragraph 162 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

163. In the way of evidence to support his belief, Clapp testified, "Nobody could prove anything." *Id.* 90:23.

**Response**: Plaintiffs' agree with paragraph 163 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

164. As to how much an error might have cost him, Clapp testified, "Q So do you know how

much that affected your pay? A: At this point, no. Q: Have you ever calculated what that is? A: Back then we might have, but now I don't have a clue." *Id.* 92:2-6.

**Response**: Plaintiffs' agree with paragraph 164 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it does not accurately outline that Plaintiffs' damage calculations were given via expert testimony and counsel for Defendant Tyson was advised of same. The deposition of Mr. Clapp was taken before Plaintiffs' expert disclosures were due. See Responses 98 and 102 herein incorporated by reference. See also Response 65 herein incorporated by reference, and First Report, Table 23, outlining individual damage calculations for each Plaintiff.

165. Clapp testified, "[Q]: Do you know if you get any different feed from anybody else? A: I don't know, sir." *Id.* 124:15-17.

**Response**: Plaintiffs' agree with paragraph 165 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Clapp testified as to the statements in this paragraph.

**Keith Crabtree**

166. Plaintiff Keith Crabtree ("Crabtree") operates under two different Broiler Contracts with Tyson which operate under the following farm names: K&C (Farm 5192); Farm 5198. Crabtree Dep. 68:16-18, 78:5-8.

**Response**: Plaintiffs' agree with paragraph 166 of Defendants' Statement of Uncontroverted Facts.

167. K&C includes four houses; Farm 5198 includes two houses. *Id.* 27:13-16, 27:20-23.

**Response**: Plaintiffs' agree with paragraph 167 of Defendants' Statement of Uncontroverted Facts.

168. Crabtree's contract dates are as follows:

- o The K&C contract was entered into on February 24, 2012, with a scheduled conclusion date of February 24, 2019. Ex. 44, Broiler Contracts of Keith Crabtree.
- o The Farm 5198 contract was entered into on October 14, 2011, with a scheduled

conclusion date of October 14, 2021. *Id.*

**Response**: Plaintiffs' agree with paragraph 168 of Defendants' Statement of Uncontroverted Facts.

169. Prior to contracting with Tyson in 2011, Crabtree was a contract grower for Perdue. Crabtree Dep. 27:17-19.

**Response**: Plaintiffs' agree with paragraph 169 of Defendants' Statement of Uncontroverted Facts.

170. Crabtree switched to Tyson from Perdue due to "[b]etter opportunities with Tyson," including the opportunity to "build some more houses." *Id*. 26:24-27:19, 31:9-19.

**Response**: Plaintiffs agree with paragraph 170 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Crabtree testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. Mr. Crabtree also testified that he left Perdue for Tyson so he could build more chicken houses. Perdue would not allow it. Ex. 21, Crabtree Dep. 31:9-32:2. He was warned about going to Tyson and was informed that they mistreated people. *Id*. 34: 2-6, 35: 9-15.

171. Crabtree testified that in 2011, when he switched to Tyson, he dealt with a person named Mr. Allen when he transitioned from Perdue to Tyson, and signed his contracts as brought to him by Rubin Bruce and James Catlin. *Id*. 31:9-16; 69:21-24.

**Response**: Plaintiffs' agree with paragraph 171 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Crabtree testified as to the matters stated in this paragraph.

172. Rubin Bruce was a Service Technician at the time. *Id.* 49:7-11.

**Response**: Plaintiffs' agree with paragraph 172 of Defendants' Statement of Uncontroverted Facts.

173. James Catlin was a Service Technician for Crabtree. *Id.* 155:5-11.

**Response**: Plaintiffs' agree with paragraph 173 of Defendants' Statement of Uncontroverted Facts.

174. Crabtree testified he could not recall "any discussions [he] had with [Rubin Bruce and

James Catlin] on what this contract was or meant or anything like that." *Id.* 69:25-70:8.

**Response**: Plaintiffs agree with paragraph 174 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Crabtree testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. Mr. Crabtree also testified he did have a conversation as to his second contract, and had this conversation with Rubin Bruce. His testimony on this point is as follows:

Q: All right. Okay. So I want to look at this contract. Do you recognize this as a copy of your current broiler production contract for farm 5192?

A: I believe so.

Q: And on the second page, as we flip through, is that your signature there on the left side?

A: Yes, sir.

Q: So this was dated February 24, 2012; is that right?

A: Yes, sir.

Q: And do you recall who brought this out to you to sign?

A: I would believe either Rubin Bruce or James Catlin.

Q: Do you remember any discussions you had with them on what this contract was or meant or anything like that?

A: I asked him what it was about, but it's been so long, I'm not sure the conversation.

Q: Can't recall?

A: No.

Q: And this is the second contract you signed for those four houses with Tyson, right?

A: Right.

Ex. 21, Crabtree Dep. 69:11-70:8.

175. Crabtree testified that he believed his service technician once lied to him; but then clarified

that he was not lying to him but rather he "lies on his paperwork that he turns into Tyson." *Id.* 159:8-162:2 ("Q: Has Beau [(Crabtree's Service Technician)] ever lied to you? A: Yes. Q: What has he lied to you about? A: He lies on his paperwork that he turns into Tyson. He's -- he deceivingly writes it to make it, you know, look the way it ain't supposed to -- you know, he'll misuse dates. He'll misrepresent things that he writes down.").

**Response**: Plaintiffs agree with paragraph 175 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Crabtree testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement. Mr. Crabtree also testified that the "lies on his paperwork" were lies relative to Mr. Crabtree as outlined in the actual exchange in Mr. Crabtree's deposition:

Q: Has Beau ever lied to you?

A: Yes.

Q: What has he lied to you about?

A: He lies on his paperwork that he turns into Tyson. He's -- he deceivingly writes it to make it, you know, look the way it ain't supposed to -- you know, he'll misuse dates. He'll misrepresent things that he writes down.

Q: Give me -- tell me when he's done that and on what document.

A: I will send a letter back when I was giving the arc 99 that, you know, just say for instance I have 40 something DO birds. My houses are running in full tunnel. It's raining outside. 100 percent humidity in there. You're not running enough air. I mean, then you get a thing saying, you know, this could have caused the real reason why your birds were sick. I don't know. That one form that they sent out to me, there was a bunch of stuff he wrote in there that's miss guiding. This flock he has come out the first of the flock, and on a certain date he wrote – he give me a call and said, Keith, I need you to cover up your chickens. Two and half weeks later he comes in. There's chickens that are being moved to the side while the litter is being removed. He writes down on a big long note, Keith, I told you to cover them birds up last week. Why haven't you done this? Once again, he's misguided what he wrote down that was something that happened two and a half weeks ago. Them birds were covered up, but misrepresents that says, hey, I see a farmer moving the litter. When you get done, cover the birds up. He's also lied on a Cert – his paperwork. I've watched him go around all my computers and never put on a suit. Go through my computers, write do you know when he gets off of

them, calls me, talks to me for 15 minutes and asks me every question he needs to do to fill out his report. And I have a witness.

Ex. 21, Crabtree Dep. 159:8-160:19.

176. Regarding the effects these lies had on him, Crabtree testified, "Q: Any of that ever cause you to lose money? A: No." *Id.* 161:23-24.

**Response**: Plaintiffs agree with paragraph 176 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Crabtree testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that the next sentence of Line 24 of the cited testimony appears to be purposely left out. The actual exchange is as follows:

Q: Any of that ever cause you to lose money?

A: No. ***But I mean, you know, you see this right here is this if you don't do what I say, you could lose your contract. I've had him come to me and say that. Is that how service techs are supposed to represent their sells?***

Ex. 21, Crabtree Dep. 161:23-162:2 (Emphasis Added).

177. Crabtree testified that he believed Jim Gottsponer lied to him one time:

Q: How about Jim Gottsponer?

A: Yes.

Q: What did he lie to you about?

A: When I went to that meeting, you know, showing him everything that I had, you know, presenting my case, hey, this is what's been going on.

Q: Is this about the feed or about –

A: No.· About the --

Q: Density?

A: -- the density and then the raise, both. I went up there and showed him all my papers and how all the utilities have went up, you know, that the raise they were trying to give us really didn't compensate for the – what do you call it -- the price of --

Q: Propane?

A: -- inflation, you know, just propane, electric, you know.

Q: What do you think he lied to you about?

A: After it was all said and done, he said, "Keith, I'm going to try to get you a little raise every year." Well, he got us a raise that one time, and never seen another one after that. And then he said that he would go to corporate and present what I showed to him. So I took everything to him, and he made copies of it and said, "I'll get back with you," and he never got back with me.

Q: Do you know -- you don't know whether he went to corporate with it or not?

A: He never come back -- he never spoke to me.

Q: And so he did get you, we saw two amendments. He got you two raises, but that's it?

A: I think the one might have come before he was in there. I'm not sure. But I know he got the one 15th of a cent. I do -- I do remember, you know, on the 14th. And then he said, you know, "If you'll just bear with me, I'll get you a little bit every year," he said, "But get what you want, you know, I can't do that, but if you'll just go ahead and sign it now, you know, that way you don't lose out all together. I'll try to get you a little bit every year."

Q: So he said he'll try to get you a little bit every year?

A: Yeah.

Q: Do you know if he tried?

A: I don't know.

Q: And this was in around 2014?

A: '14.

*Id.* 170:3-172:24.

**Response**: Plaintiffs agree with paragraph 177 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Crabtree testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that Mr. Gottsponer while discussing this pay raise with Mr. Crabtree pressured Mr. Crabtree into

signing a contract. The rest of this exchange is as follows:

Q: So the context of this was, you went and met with him and felt – and wanted your contract rate pay increased?

A: Well, what they did is, they come -- like I'm selling birds on a Friday, and he told me -- my service tech run the papers out on a Thursday -- "if you don't sign this, we're not going to give you a raise on this flock. "

I said, "Why do I have to sign that right now"?

If you want a raise, you better take it right now."

Q: That's the Amendment A to the broiler contract; right?

A: Yeah, I said where's -- I mean, I said, "I want to talk to Jim." I said, "This -- I don't believe this is enough." I said, "I don't think he understands how much inflation has went up," I said.

"Well, if you want your money."

I said, well, I said, "I'm not going to sign it." I said, "I want to talk to Jim first." And that way I can bring, you know, my gas receipts, my electric receipts, everything from four or five years there, throw it out, look how much everything has gone up, you know. And we're seeing percentages of, you know, raises on utility bills and stuff like that. He agreed that the raise wasn't enough but, you know –

Q: When you say "raise," you're talking about a change in your contract price; right?

A: Right.

Q: And so you had a contract with a price?

A: Right. And if you wanted to get the 15-cent, you better sign it real quick. I'm like, where's the negotiation in that, you know? Why, you know -- if I'm bringing you, you know papers showing how much my output keeps going up and keep going up, but what, you know -- that profit of mine is getting smaller because everybody else's hands are getting bigger, but the company ain't trying to do their job of keeping -- what you call it -- keeping up with the, you know, the times basically.

Ex. 21, Crabtree Dep. 173:3-174:14.

178. Crabtree further testified he was not aware what Gottsponer did to negotiate for a price

raise for Crabtree. *Id.* 175:2-18 ("Q. And so you signed it and took it, and then you don't know what he did from there to try to get more raises under the contract; right? A. No, sir.").

**Response**: Plaintiffs' agree with paragraph 178 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Crabtree testified as to the statements noted in this paragraph.

179. During his time with Tyson, Crabtree's farms have received the following increases in Base Pay on October 22, 2014 and November 15, 2015. Broiler Contracts of Keith Crabtree.

**Response**: Plaintiffs' are unable to respond to paragraph 179 of Defendants' Statement of Uncontroverted Facts to the extent that it is unclear what "the following increases" in this paragraph is referring to.

180. Regarding Jared Shelton and Kenny Bartley, Crabtree testified, "Q: What about Jared Shelton? Has he ever lied to you about anything? A: No. Q: What about Ken Bartley? A: No." Crabtree Dep. 176:4-8.

**Response**: Plaintiffs' agree with paragraph 180 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Crabtree testified as to the matters stated in this paragraph.

**Loi Hong** [17]

181. Plaintiff Loi Hong ("Hong") operated under one Broiler Contract with Tyson, as H&L (5210) farm. Ex. 45, Broiler Contract of Loi Hong.

**Response**: Plaintiffs' agree with paragraph 181 of Defendants' Statement of Uncontroverted Facts.

182. H&L farm operated eight houses. Ex. 46, Deposition of Loi Hong, 73:23-74:11.

**Response**: Plaintiffs' agree with paragraph 182 of Defendants' Statement of Uncontroverted Facts.

183. H&L farm operated as H&L Farms, LLC, which he formed shortly after purchasing the farm from a third party. *Id.* 186: 13-25; 187:8-9.

[17] Mr. Hong is Vietnamese, having come to the Unites States in 1996 and becoming a U.S. citizen in 2011. Ex. 29, Loi Hong Dep. 8:19-9:2.

**Response**: Plaintiffs' agree with paragraph 183 of Defendants' Statement of Uncontroverted Facts.

184. Hong entered into the H&L 5210 contract with Tyson on September 9, 2013. *Id.* 73:23-74:2; Broiler Contract of Loi Hong.

**Response**: Plaintiffs' agree with paragraph 184 of Defendants' Statement of Uncontroverted Facts.

185. His contract had a scheduled conclusion date of September 9, 2020. Broiler Contract of Loi Hong.

**Response**: Plaintiffs' agree with paragraph 185 of Defendants' Statement of Uncontroverted Facts.

186. Hong stopped receiving broilers from Tyson in December 2016. Hong Dep. 93:11-12.

**Response**: Plaintiffs' agree with paragraph 186 of Defendants' Statement of Uncontroverted Facts.[18]

187. Hong testified he stopped receiving broilers because he was having animal welfare issues at his farm, "Q: And you were having high mortality at your farm and animal welfare issues; correct? A: Yes. Q: And you were having high condemnation at your farm because of all these issues, too; correct? A: Yes. Q: And so the water seepage issues was important for bird health. Do you agree with that? A: I agree with that." *Id.* 121:15-23.

**Response**: Plaintiffs agree with paragraph 187 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Hong testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that Mr. Hong was burdened with having to pay a significant amount in water line upgrade cost as required by Tyson.[19]

---

[18] Subsequent to the filing of this action, Mr. Hong filed for bankruptcy protection in the U.S. Bankruptcy Court, W. D. of Kentucky. Case No. 18-40565-thy, Hon. Bradley Salyer, Trustee.

[19] Q: You never made the water line changes?

A: No. I didn't have a chance to make water line changes. I was working on the feed line. I want to change the feed line first. Then I was making a loan for the feedline, but I didn't

188. At the time Hong stopped receiving broilers, he had "water coming in" his houses and a "water leakage issue." *Id*. 102:9-16, 120:22-121:17.

**Response**: Plaintiffs' agree with paragraph 188 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

189. Hong testified he had a rat issue on his farm, "Q: Did you have rat issues on your farms? A: Yes." *Id.*134:1-2; Ex. 47, Pictures of Loi Hong's Farm.

**Response**: Plaintiffs' agree with paragraph 189 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

190. Before signing his contract, Hong testified he did not discuss with anyone at Tyson about "what that contract might be, what it meant or anything along those lines." Hong Dep. 86:19-22.

**Response**: Plaintiffs agree with paragraph 190 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Hong testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that Kenny Bartley and Jason Shelton, both Tyson employees, told him that figures about income looked good and they would help him because they knew he had no experience growing chickens. Ex. 29, Hong Dep. 56:15-57:21.

191. Hong also testified that he talked with Tyson about out-time, and they told him out-time would be 21 days and sometimes more: "Q: Did you have any discussions with Tyson about out time and how long out time would be between flocks? A: Yes, they did tell me. They say 21 day. Q: Told you 21 days? A: Yes, sometimes more." *Id.* 90:5-9.

**Response**: Plaintiffs agree with paragraph 191 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Hong testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that Mr. Hong made

---

have a chance to do it. They approve everything, but then Tyson just power up with like all kinds of change in the house, and I added it up to like $650,000, and I cannot do that."

Ex. 29, Hong Dep. 101:21-102:3.

clear that he trusted Tyson and "*Whatever they say, I just listen*":

Q: So they told you -- the one conversation you recall having before your contract about out time was someone from Tyson told you 21 days is usually the minimum, sometimes more?

A: Yeah.

Q: Did you care whether the out time was 21 days, more or less?

A: I didn't know. And for that time I trusted Tyson. Whatever they say, I just listen.

Ex. 29, Hong Dep. 90:22-91:5.

192. Hong did not sign a tournament contract like the other Plaintiffs in this case. Broiler Contract of Loi Hong. Hong testified that Tyson "gave him the option to signing a tournament contract and a performance contract" and he chose the performance contract. *Id.* 87:16-18.

**Response**: Plaintiffs' agree with paragraph 192 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

193. A performance contract pays broiler growers a flat fee as opposed to entering the grower's broilers into the weekly tournament and determining Base Pay through the settlement process. Broiler Contract of Loi Hong, Schedule A.I, Base Pay.

**Response**: Plaintiffs agree with paragraph 193 of Defendants' Statements of Uncontroverted and Material Facts to the extent that the document mentioned in this paragraph speaks for itself.

194. Hong testified that the person who sold him his farm "told [him] that he thought [he'd] bring in about $420,000 a year" operating the farm. Hong Dep. 178:17-20.

**Response**: Plaintiffs' agree with paragraph 194 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

195. Hong showed these numbers to Kenny Bartley, who told Hong that the numbers looked "doable." *Id.* 180:2-3.

**<u>Response</u>**: Plaintiffs' agree with paragraph 195 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph. See also Response 191 above.

196. Hong testified that he believed Bartley "lied" to him because "that the paper I showed to him, he said was good. Two years later I have to refinance." *Id*. 164:18-24.

**<u>Response</u>**: Plaintiffs' agree with paragraph 196 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

197. In terms of lies Tyson told Hong, Hong testified that the Bartley statement about his papers was "all I can think of." *Id.* 164:25-165:2.

**<u>Response</u>**: Plaintiffs' agree with paragraph 197 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

198. Regarding the accuracy of his settlement packets, Hong testified: "Q: Did you ever go through any settlement packet you received from Tyson and determine that the numbers reflected in your settlement and ultimately your pay were not correct based on the heads placed at your farm? A: The truth, I don't know." *Id.* 170:24-171:3.

**<u>Response</u>**: Plaintiffs' agree with paragraph 194 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

199. Hong testified: "Q: So you never had occasion to believe, based on what you were paid under a settlement, that some part of the feed or the mortality or the condemnation or the head placements was wrong? [*Plaintiffs' Counsel*]: Objection to form. Q: Wrongly calculated based on the records? A: The beginning work with Tyson, I already told you I trusted them. So whatever number they give it to me, and I believe in it." *Id.* 171:24-172:8.

**<u>Response</u>**: Plaintiffs' agree with paragraph 199 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

200. Hong testified: “Q: And sitting here today, do you have any reason to think -- has anything changed in your mind to say now I have reason to believe it was miscounted here or there, and here's when? A: I cannot prove it. I can't say anything about it.” *Id.* 172:23-173:3.

**Response**: Plaintiffs’ agree with paragraph 200 of Defendants’ Statement of Uncontroverted Facts to the extent that Mr. Hong testified as to the statements noted in this paragraph.

**Calvin Leisure**

201. Calvin Leisure operates under two Broiler Contracts with Tyson, operating as Farm 5171 and Farm 5186. Ex. 49, Deposition of Calvin Leisure, 191:9-16; 197:7-17.

**Response**: Plaintiffs’ agree with paragraph 201 of Defendants’ Statement of Uncontroverted Facts.

202. Farm 5171 operates three houses; Farm 5186 operates two houses. *Id.* 20-15:21.

**Response**: Plaintiffs’ agree with paragraph 202 of Defendants’ Statement of Uncontroverted Facts.

203. Leisure began growing with Tyson in 2008. *Id.* 25:7-9, 79:10-19.

**Response**: Plaintiffs’ agree with paragraph 203 of Defendants’ Statement of Uncontroverted Facts.

204. The Farm 5171 contract was renewed on January 21, 2015, with a scheduled conclusion date of January 26, 2022. Ex. 50, Broiler Contracts of Calvin Leisure.

**Response**: Plaintiffs agree with paragraph 204 of Defendants’ Statements of Uncontroverted and Material Facts to the extent that the document mentioned in this paragraph speaks for itself.

205. The Farm 5198 contract was renewed on February 3, 2012, with a scheduled conclusion date of December 4, 2019. *Id.*

**Response**: Plaintiffs agree with paragraph 205 of Defendants’ Statements of Uncontroverted and Material Facts to the extent that the document mentioned in this paragraph speaks for itself.

206. Leisure's contract dates are as follows:

- o The Farm 5171 contract was entered into on January 21, 2015, with a scheduled conclusion date of January 26, 2022. *Id.*
- o The Farm 5198 contract was entered into on February 3, 2012, with a scheduled conclusion date of December 4, 2019. *Id.*

**Response**: Plaintiffs agree with paragraph 206 of Defendants' Statements of Uncontroverted and Material Facts to the extent that the document mentioned in this paragraph speaks for itself.

207. Prior to contracting with Tyson, Leisure was a contract grower for Perdue. *Id.* 115:3-10.

**Response**: Plaintiffs' agree with paragraph 207 of Defendants' Statement of Uncontroverted Facts.

208. Leisure switched to Tyson from Perdue because "Tyson doesn't nitpick as much as Perdue." Leisure Dep. 115:11-13.

**Response**: Plaintiffs agree with paragraph 208 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Leisure testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that Mr. Leisure attempted to go to Perdue because of "rot" chickens he was getting from Tyson, but he could not make the transition to Perdue:

Q: Since you joined Tyson, have you made any attempts to go with any other integrator?

A: No. Well, I did call Perdue, and they said they wasn't taking any growers at the time.

Q: And when did you call Perdue?

A: About three years ago, roughly.

Q: Approximately 2015?

A: Something like that, yes.

Q: And you said, hey, I'd like to come talk to you about coming over here?

A: Yeah.

Q: And what did they tell you?

A: Said they didn't need any at this time.

Q: Said they had plenty of growers?

A: Uh-huh.

Q: Have you talked to them since?

A: No.

Q: And why did you want to switch to Perdue in 2015?

A: Basically over this lawsuit we're involved in.

Q: What is it about the lawsuit that made you want to switch to Perdue?

A: Getting, I call them rot on chickens.

Q: You felt like you were getting rot on chickens?

A: Yeah.

Q: Did you feel like you were getting more or less rotten chickens than anyone else, or did you know?

A: At my new farm, yes.
Q: You think they were getting more than someone else?

A: Yes.

Q: Why was that?

A: Because it's conditional. I do the same practices on both arms. In about three weeks they start showing up on the new farm.

Q: And so you're saying you're getting different chickens in the new farm than the old farm?

A: I'm getting I call it a bad hatch.

Q: You call it bad hatch?

A: Yeah.

Q: So do you know if the breeds going in the new farm are any different than the old farm?

A: At one time it was both. Like I said, they had two different breeds going out.

Ex. 30, Calvin Leisure Dep. 152:18-156:10.

209. Leisure testified that he could not recall any conversations with anyone at Tyson when renewing his contract in 2015 for on Farm 5171. *Id.* 195:5-19, exhibit 1 ("Q. Do you recall any conversations with anyone before you signed this one? A. Nothing specifically, nothing stands out.").

**Response**: Plaintiffs' agree with paragraph 209 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph.

210. Leisure testified that he could not remember anything specific about any conversations he had when renewing his contract in 2012 for Farm 5198, "Q: Before you signed this in 2012, did you have any talks with Tyson about whether or not you wanted to continue to grow with them? A: Every time there was a contract, yes. Q: Do you remember any of those conversations? A: Nothing specifically. Q: You wanted to continue to grow with them? A: Yes." *Id.* 199:16-23, exhibit 2.

**Response**: Plaintiffs' agree with paragraph 210 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph.

211. Leisure testified he could not identify anyone at Tyson who lied to him. Leisure Deposition, 202:19-22 ("Q. Is there anyone at Tyson that you can recall right now that you feel like, you know, I do think this one person lied to me about something?" A. No.").

**<u>Response</u>**: Plaintiffs' agree with paragraph 211 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph.

212. Leisure testified he has never noticed a miscalculation of his mortality on his settlement statements: "Q: Okay. Have you ever had an occasion to go through any of your settlement statements and think that it miscalculated your mortality cards? A: I haven't noticed one ever." *Id.* 225:22-25.

**<u>Response</u>**: Plaintiffs' agree with paragraph 212 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph.

213. Leisure testified he has never thought Tyson miscalculated his condemnation certificates: "Q: Have you ever had occasion to go through and think it miscalculated your condemnation certificates? A: No, not miscalculation." *Id.* 226:1-3.

**<u>Response</u>**: Plaintiffs' agree with paragraph 213 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph.

214. Leisure testified he has never thought the feed conversion numbers on his settlements were miscalculated: "Q: Have you ever looked at one of your settlement packets like we're looking at here in Exhibit 10 and thought your feed conversions were not calculated as actually used in that flock? A: I think the numbers they use are correct." *Id.* 229:17-21.

**<u>Response</u>**: Plaintiffs' agree with paragraph 214 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph.

215. Leisure testified he believed one time he was shorted 12,000 pounds of feed. *Id.* 230:1-8. Leisure testified that he did not "see the truck come in," did not "call anyone and talk to anyone about that," and did not "do anything about it." *Id.* 230:21-231:4.

**<u>Response</u>**: Plaintiffs agree with paragraph 215 of Defendants' Statements of

Uncontroverted and Material Facts to the extent that Mr. Leisure testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that Mr. Leisure testified that he was shorted 6 tons of feed which materially affected his tournament ranking:

Q: So can you tell me how much?

A: I can tell you they shorted me feed on that load because they brought two loads of feed that night, one that evening and one that night. The one they brought that evening was a partial load. And the one they brought that they shorted me on was a full load, and they tapped exact same A bin and B bin. The level was the same, and one was 6 tons more on the ticket I didn't get.

Q: So you're saying you got a ticket for 6 tons more than you actually got?

A: Right, didn't get the feed."

Ex. 30, Leisure Dep. 232:16-233:1.

*****

Q: Okay. And have you done anything to determine whether or not that cost you any performance?

A: Yeah, I calculated it. It cost me three percentage points on feed conversion.

Q: And then have you translated that to money?

A: Not money, but feed.

Q: What would that translate to on money to you?

A: I couldn't tell you. I'd have to calculate it out.

Q: How would you calculate it?

A: Three points feed conversion, take you 185 to182, and it can take you from the middle of the pack to the top of the pack. It can be as much as roughly a 2 percent -- 2-cent difference, roughly. There's 3cents difference in the contract: Minimum, maximum and medium.

Q: Did you -- so you can't sit here today and say, I think it cost me this much money?

A: No. Deaf ear.

Ex. 30, Leisure Dep. 231:21-232:13.

216. Leisure testified that this 12,000 pound shortfall occurred sometime around 2009 or 2010, but he was not sure, "Q: Can you tell me what year it was? A: It was early in my production, probably the second year, thereabouts. Q: About '09? A: Yeah, '09, '10 or something like that."). *Id.* 237:4-14.

**Response**: Plaintiffs' agree with paragraph 216 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph. See also Response 215.

217. Leisure testified that after this incident, he did not check his settlement packet and that the feed tickets showed no corrections: "Q: Did you -- have you crossed checked -- have you received a settlement for that yet? A: No. Yeah, I had the settlement. Q: Did you cross-check that against your feed delivery tickets to see if you were 6 tons short? A: No. I didn't have it calculated. It showed the feed ticket, and it showed no corrections." *Id.* 231:5-11.

**Response**: Plaintiffs' agree with paragraph 217 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Leisure testified as to the statements noted in this paragraph. See also Response 215.

218. Leisure testified that one time he believed that the Robards Complex charged him for a load of feed it did not deliver, but that he discussed it with the feed mill and they disagreed, showing him the tickets. *Id.* 236:3-24. ("Q: So the ramp broke, and they couldn't get the feed in? A: Now, I couldn't tell you that. I just know he left a ticket, and I got charged for it, but I didn't get no feed. Q: Did you ever raise that with Tyson? A: That's when I was in the middle of it, yes. . . . Q: Who did you report it to? A: Feed mill. Q: And what did they say? A: Said they brought the ticket and brought the feed. Q: So they disagreed with you? A: Yes.").

**Response**: Plaintiffs agree with paragraph 218 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Leisure testified to the

statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that lines 236:15-17 of the cited testimony quoting Mr. Leisure that complaints of this sort fell on a "deaf ear" appears to be purposely left out. The actual exchange is as follows:

Q: Now, how many other times have you felt like there was an issue with your feed?

A: It started with Tyson the second year, feed shortages.

Q: Tell me the other times this has happened.

A: I can't recall now, but it's been numerous times I've brought it up with them.

Q: You say feed shortage. That means running out of feed?

A: No, not bringing me the amount of feed. Bringing a ticket -- and I even had it on my old farm one time. A truck backed into my house to dump a load of feed, left the ticket, but didn't dump no feed, a whole load.

Q: And when was -- was that Tyson or Perdue?

A: Tyson.

Q: And when was that?

A: It was five years ago or so, because they broke my little concrete ramp going into the chicken house. He backed over it. Couldn't even get back there to the scale -- I mean to dump in the --

Q: So the ramp broke, and they couldn't get the feed in?

A: Now, I couldn't tell you that. I just know he left a ticket, and I got charged for it, but I didn't get no feed.

Q: Did you ever raise that with Tyson?

A: That's when I was in the middle of it, yes.

Q: ***What do you mean, in the middle of it?***

A: ***In the middle of reporting all this stuff to them until I realized it was such a deaf ear.***

Q: Who did you report it to?

A: Feed mill.

Q: And what did they say?

A: Said they brought the ticket and brought the feed.

Q: So they disagreed with you?

A: Yes.

Ex. 30, Leisure Dep. 235:13-236:24 (Emphasis Added).

219. Leisure did not "do anything to quantify what that cost [him]." *Id*. 236:25-237:3.

**Response**: Plaintiffs agree with paragraph 219 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Leisure testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that lines 237:2-3 of the cited testimony quoting Mr. Leisure that a shortage of this sort would take one from the top to the bottom (of the tournament) appears to be purposely left out. The actual exchange is as follows:

Q: Did you do anything to quantify what that cost you?

A: ***A whole load of feed, it would take you from the top to the bottom.***

Q: I understand, but can you tell me what flock it was?

A: I could go back and pull the records and show you.

Q: But you can't right here?

A: No, not right here.

Ex. 30, Leisure Dep. 236:25-237:9 (Emphasis Added).

**Charles Morris; Morvatt Enterprises, LLC**

220. Plaintiff Charles Morris ("Morris") established Plaintiff Morvatt Enterprises, LLC in 2008.

Morris Dep. 31:14-22.

**Response**: Plaintiffs' agree with paragraph 220 of Defendants' Statement of Uncontroverted Facts.

221. Morris's farms are established under the Morvatt Enterprises entity. *Id.*

**Response**: Plaintiffs' agree with paragraph 221 of Defendants' Statement of Uncontroverted Facts.

222. Collectively, Morris operates under seven different Broiler Contracts with Tyson which operate under the following farm names: Morvatt #1; Morvatt #2; Gravel Pit; Honeysuckle Lane; B. D. Luck; Highway 56 #1; Highway 56 #2. *Id.* 7:13-8:19.

**Response**: Plaintiffs' agree with paragraph 222 of Defendants' Statement of Uncontroverted Facts.

223. In total, Morris has 52 chicken houses. *Id.* 28:15-20. Each of Morris's seven farms operate eight houses each, except for the B. D. Luck farm. *Id.* 9:9-11, 9:13-14, 19:2-7, 24:25-25:7, 26:3-18, 29:22-30:1.

**Response**: Plaintiffs' agree with paragraph 223 of Defendants' Statement of Uncontroverted Facts.

224. One of the farms, B.D. Luck, is not currently raising chickens. The Robards Complex stopped placing birds at this farm after it entered into intensified management and continued to settle at $0.0040 or higher than the average pound value for three flocks. *Id.* 85:25-86:20, 88:4-89:17.

**Response**: Plaintiffs' agree with paragraph 224 of Defendants' Statement of Uncontroverted Facts.

225. Morris testified that the performance at B.D. Luck "had been low." *Id*. 85:10-24.

**Response**: Plaintiffs' agree with paragraph 225 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

226. Jim Gottsponer testified at his deposition that Morris had significant animal welfare concerns at his farms: "[*Gottsponer*]: Well, there was a lot of management issues [at Morris's farms], a lot of equipment issues. Ammonia would be too high, the birds weren't being, obviously, walled correctly and the culls weren't being removed. There was a lot of light control issues with

leg issues. Q: Were there mortality issues that he was having? A: Yes, tremendous." Gottsponer Dep. 196:22-197:11.

**Response**: Plaintiffs agree with paragraph 226 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Gottsponer testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, in that the record reflects significant management and personality issues between Mr. Gottsponer and Mr. Morris. Gottsponer testified instances where Morris had "flipped me off" allegedly because Gottsponer "wanted to do his job." Ex. 3, Gottsponer Dep. 201:6-203:17. Gottsponer admitted Morris never said he did not want Gottsponer to do his job. *Id*. 203:5-17.[20] Morris believed Gottsponer to be a liar. Ex. 15, Morris Dep. 102:1-10. Mr. Morris's frustrations with Gottsponer included:

(1) Saying that chickens in Morris's care had E coli disease when chickens with the same flock numbers in the same week owned by Plaintiff Douglas Brown who died in the "hundreds" did not, thereby paying Mr. Brown and not Mr. Morris. Ex. 15, Morris Dep. 103:3-11; 105:1-5;

(2) Not permitting a vet to review the chickens who allegedly died of E-coli to confirm that disease. *Id*. 104:4-18;[21]

---

[20] Q: Okay, and one time in his office, all right. But you don't know why he would do that?

A: No.

Q: You don't know why there -- I mean, that's obviously an act of animosity towards somebody, correct?

A: Yes.

Q: You don't have any idea why he would do that?

A: Other than me doing my job, which I suspect was troubling him.

Q: You doing your job made him mad, and so you think that he flipped you off because you're doing your job?

A: I don't know. I'd be guessing.

[21] Q: Did you have any independent evaluation of the birds they said had E.coli?

A: Tried to. Tried to get the vet out. I even asked Tyson if I could hire my own vets, and they refused.

Q: Why do you need Tyson's permission to have a vet come look at your birds?

A: Because Tyson owns the birds.

(3) Giving exceptions to some growers and not to others. *Id.* 106:23-107:3;
(4) Lying about chickens not eating by saying the problem was a water issue (alleging the growers caused the problem) when actually it was because the feed had fat in it (a Tyson problem). *Id.* 107:12-108:23; and
(5) Moving growers up the tournament ranking with no basis to do so. Ex. 3, Gottsponer Dep. 246:4-10[22] and *see* Exhibit 7 to Gottsponer Dep.

227. Morris first contracted with Tyson to raise Broilers under each of his seven contracts in 2008. *Id.* 9:17-19.

**Response**: Plaintiffs' agree with paragraph 227 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the matter noted in this paragraph.

228. Morris' contract dates and renewal dates are as follows:

- The Morvatt #1 (Collins Road #1) contract was originally entered into in 2008. *Id.* 8:22-25. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. Ex. 51, Broiler Contracts of Charles Morris (TYSON_134386).

- The Morvatt #2 (Collins Road #2) contract was originally entered into in 2008. *Id.* 9:13-19. It was renewed on December 2, 2013, with a scheduled conclusion date of

---

Q: But you're free to have anyone come look at the birds, aren't you?

A: No.

Q: No?

A: No, sir.

Q: Who told you you couldn't have --

A: Jim Gottsponer.

22 Q: (BY MR. WHITFIELD) You wrote here June 23, 2014 at 9:57, it's the last transmission in this email thread and you say, you admit that you said we have plans to get him moved up the sheet. We can move him up a long way and still have bird health issues and performance issues with his farms. You wrote that, didn't you?

A: Yes, sir.

December 2, 2020. *Id.* (TYSON_116803).

- o The Gravel Pit Road contract was originally entered into in 2008. *Id.* 19:2-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116829).

- o The Honeysuckle Lane contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116846).

- o The B. D. Luck contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116872).

- o The Highway 56 South #1 contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116889).

- o The Highway 56 North #2 contract was originally entered into in 2008. *Id.* 19:11-17. It was renewed on December 2, 2013, with a scheduled conclusion date of December 2, 2020. *Id.* (TYSON_116906).

**Response**: Plaintiffs' agree with paragraph 228 of Defendants' Statement of Uncontroverted Facts to the extent that the documents referenced in this paragraph speak for themselves.

229. Morris does not recall having any discussions with Tyson about any of his contracts at the time of renewals. He stated:

- o Morvatt #1: "Q. Do you remember having any discussions with Tyson about this contract in 2013 when you signed it? A. No, sir, not really." Morris Dep. 67:3-6.

- o Morvatt #2: "Q. Do you remember any conversations you had with anyone at Tyson

when you signed this contract?" A. Not sure." *Id.* 68:18-21.

o Gravel Pit: "Q. Do you remember any discussions you had with anyone at Tyson in signing this contract? A. No, sir." *Id.* 70:3-5.

o Honeysuckle Lane: "Q. Do you remember any discussions you had with Tyson about this contract? A. No, sir." *Id.* 71:8-10.

o B. D. Luck: "Q. Do you remember any discussions with anyone at Tyson about signing this contract? A. No, sir." *Id.* 72:9-11.

o Highway 56 #1: "Q. Do you remember having any discussions with anyone at Tyson about signing this contract?" A. No, sir." *Id.* 73:8-10.

o Highway 56 #2: "Q. Do you remember any discussions you had with anyone at Tyson in relation to signing this agreement? A. No, sir." *Id.* 74:5-8.

**Response**: Plaintiffs agree with paragraph 229 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as Mr. Morris testified that at the time he signed the contract he was of the belief that he was going to get the best inputs every flock. Ex. 15, Morris Dep. 253:14-18.

230. Morris testified that "in the spring of 2007 . . . [he was] told that Tyson gives an extra fuel allowance to each eight-house farm each year" by Michael Sheets. *Id.* 212:1-3.

**Response**: Plaintiffs' agree with paragraph 230 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

231. Morris testified that "[t]he first year I was there, they stopped doing it." *Id.* 212:25.

**Response**: Plaintiffs' agree with paragraph 231 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

232. Morris acknowledged that the extra fuel pay was not a contractual provision, testifying, "I

mean, it's not in the contract. So I know they weren't contractually obligated to give it to us. I know that." *Id.* 214:3-9.

**Response**: Plaintiffs' agree with paragraph 232 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

233. At deposition, Morris identified only one instance where a Tyson employee lied to him. Morris claimed that at an unspecified time, "a couple of years ago," Jim Gottsponer told him that Gottsponer believed a certain flock of Morris' birds had E. coli. Morris alleged Gottsponer said "[t]hey would get some vets out and look and see what it was. They never showed up. Then without a vet even coming to my farm, they called it E.coli." *Id.*, 103:5-16; 106:2-14.

**Response**: Plaintiffs agree with paragraph 233 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as there were numerous instances that Mr. Morris claimed he was lied to by Mr. Gottsponer. See Response 226 incorporated by reference herein. To that extent the reference in this paragraph that "*Morris identified only one instance where a Tyson employee lied to him*" is factually incorrect.

234. Morris claimed this was a lie because "I mean, you're on my farm, you're telling me I've got E.coli, and a veterinarian did not even look at my chickens. That's a lie." *Id.* 106:10-14.

**Response**: Plaintiffs agree with paragraph 234 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris reflects he tried to get a vet, at his own cost, to examine the birds, but to no avail. See Response 226 incorporated by reference herein.

235. When asked if he knew if the birds had E.coli or not, Morris responded "I don't know." *Id.* 106:15-22.

**Response**: Plaintiffs agree with paragraph 235 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to

the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris reflects he tried to get a vet, at his own cost, to examine the birds; that no Tyson person ever told him or showed him documents as to whether his birds had E coli; and if he tried to autopsy a chicken to determine the cause their demise, he was told by Mr. Gottsponer that he would lose his contract. Ex. 15, Morris Dep. 167:11-13; See Response 226 incorporated by reference herein.

236. Morris was unable at deposition to quantify any damages he suffered due to his birds contracting E. coli, and did not "do any calculations as to what that cost [him]." *Id.* 105:1-11.

**Response**: Plaintiffs agree with paragraph 236 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris at his deposition indicated he could not provide a number but could obtain such a number if need be. Ex. 15, Morris Dep. 105:1-18;[23] see Response 226 incorporated by reference herein.

237. When asked about Mears's role in communicating with Morris, Morris replied: "A. Mears would come in, but it was Michael … Mears just come in and introduce himself. He recall wasn't a part of the meetings. *Id.* 55:2-8.

---

[23] Q: Do you know how many birds were affected?

A: No. We were losing by the hundreds. I don't -- I would have to go back and look what the livability was, but it was terrible.

Q: You can't tell me sitting here today though --

A: No, sir, not sitting here today.

Q: Did you do any calculations as to what that cost you?

A: No.

Q: So how would I go back and figure out when this happened?

A: I mean, I can get you that information.

Q: What would you look at to figure it out?

A: I would go back to my settlement dates and my notes and go back and figure out when it was.

**Response**: Plaintiffs' agree with paragraph 237 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

238. When asked at deposition whether Mears had ever lied to Morris, Morris responded: "I can't recall right this second. But it's been some untruths told, yeah." *Id.* 110:5-13. When asked to elaborate with an example, Morris was unable to think of any such examples. *Id.*

**Response**: Plaintiffs' agree with paragraph 238 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

239. Morris alleges in his Interrogatory Responses that he "was assured by Tyson supervisor David Mears that Tyson would increase the number of employees inspecting birds delivered to the plant." Plaintiffs' Answers to Defendants' First Interrogatories, Morris Inter. No. 14.

**Response**: Plaintiffs' agree with paragraph 239 of Defendants' Statement of Uncontroverted Facts to the extent that the pleading noted in this paragraph speaks for itself.

240. At deposition, Morris indicated that Mears's staffing decision was actually following "industry average, which is three." Morris Dep. 128:16-19.

**Response**: Plaintiffs agree with paragraph 240 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris indicated that the Robards complex had ten condemn stations to man, while Tyson chose to just man three. The actual testimony as to this point is as follows:

Q: Have you ever had a conversation with anyone about the salvage line and manning the salvage line at Tyson?

A: Yes, we've asked -- you know, and, of course, they're not going to tell us. That's fine, you know. Your condemn comes high. Well, did y'all staff the salvage line? I mean, they run the business. We can't tell them what to do. I mean, that's up to the complex manager.

Q: Has anyone ever told you, Well, we'll put more on it or less on it, or we're doing

what we can?

A: Yeah. Mears promised one time, Guys, I'm going to start salvaging -- putting more guys on the salvage line.

Q: When did --

A: We got people in the plant that are friends and neighbors, and they'll . . .

Q: When did that happen? When did he tell you that?

A: I don't know exactly when, Mark.

Q: Was it --

A: It was an ongoing thing.

Q: -- in the last couple of years?

A: Oh, yes. It's been --

Q: While he was the complex manager?

A: Yes, sir, while he was the complex manager. Yes, sir.

Q: So since your contracts and all of that?

A: Correct. Yes, sir.

Q: What did he say?

A: Well, you know, we would ask him, How many are you staffing? He said, Well, I'm just going to do industry average, which is three. I mean, you've got ten stations there. I've been in there many times. Just it's a real priority to salvage them for the farmers, you know, because it does help us.

Ex. 15, Morris Dep. 127:11-128:23.

241. At deposition, Morris indicated that Mears's staffing decision following "industry average, which is three." *Id.* 128:16-19.

**<u>Response</u>**: This paragraph appears to be a duplication of paragraph 240 above. Plaintiff incorporates by reference Response 240.

242. When asked if he had "run any calculations to determine any money [Morris has] not earned because birds could have been salvaged that weren't," Morris replied that he had not run such calculations. *Id.* 129:7-10.

**Response**: Plaintiffs agree with paragraph 242 of Defendants' Statement of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris indicated that he was told by Tyson Broiler Manager Steve Keys that many of the birds could have indeed been salvaged.[24]

243. Morris could not identify any other Tyson employee who had lied to him. *Id.* 110:20-111:10. He testified:

Q: Is there anyone else at Tyson that you feel like has lied to you about something?

A: That's there now?

Q: Ever. I mean, I guess we could start with there now just to compartmentalize it.

A: Yeah, I mean, that's the ones – Mears is not here. Gottsponer is not here. You know. right offhand, Mark, I mean, I would have to go back and look at my notes on my computer. But it just got to be –

Q: You can't think of anybody? A: Not right now, no.

Q: How about former Tyson employees? Anybody you think has lied to you?

A: Right off the top of my head, not right now.

*Id.*

**Response**: Plaintiffs' agree with paragraph 243 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

---

[24]

Q: Have you run any calculations to determine any money you've not earned because birds could have been salvaged that weren't?

A: No. Steve Key, you know, he was out on my farm. And he said, Charles, he said, most of these birds can be salvaged.

Ex. 15, Morris Dep. 129:7-12.

244. Morris testified that he has always received his proper Premium Pay: "[Q]: you've been receiving premium pay for each house? A: Yes, sir." *Id.* 76:1-5.

**Response**: Plaintiffs' agree with paragraph 244 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

245. Morris testified that he was "not aware of a situation where [he has] been over 21 [days] and not gotten paid for out-time." *Id.* 117:23-118:1.

**Response**: Plaintiffs' agree with paragraph 245 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

246. Regarding the number of flocks he received each year, Morris testified: "Q: Do you receive on average five flocks per year? A: On average, I would say so. Sometimes it's six." *Id.* 121:21-25.

**Response**: Plaintiffs' agree with paragraph 246 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

247. Morris testified he did not know of "a situation where the condemnation certificate didn't match up to [his] settlement statement." *Id.* 141:9-15.

**Response**: Plaintiffs' agree with paragraph 247 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in this paragraph.

248. Regarding the accuracy of the poundage and mortality numbers of his settlement statements, Morris testified: "Q: Have you ever reviewed your settlement statement and come to the conclusion that the pounds reported or the heads placed at your farm or the mortality numbers inputted into your settlement statement were wrong? A: Not me, I haven't." *Id.* 141:16-21.

**Response**: Plaintiffs' agree with paragraph 248 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Morris testified as to the statements noted in

this paragraph.

249. When asked if he had "ever come to the conclusion that feed reported as delivered to [his] farm and the feed conversion numbers reported on [his] farm [were] wrong," Morris testified that there were situations in which "feed was sent to the wrong farm" but that "that got fixed." *Id.* 141:25-142:18, 143:22-144:14.

**Response**: Plaintiffs agree with paragraph 249 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris indicated that there were feed issues with trucks delivering feed to the wrong houses, and although that got "fixed" the growers were promised that trucks would be tracked by a GPS system that never happened. Ex. 15, Morris Dep. 144:2-14.

250. Morris testified that he did not "have any idea if the percentage of birds' breeds [he] get[s] is any different than anyone else's over a year's period." *Id.* 114:7-12.

**Response**: Plaintiffs agree with paragraph 250 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Morris testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Morris indicated that his experience growing chickens for many years taught him that breeds grow differently and that he was regularly competing in the same tournament with growers growing different breeds of birds. The actual testimony in the record is as follows:

Q: But let's back that up and break that down just a little bit, then. You were talking about earlier that there were four types of birds that I was making in my notes here. You've got a Cobb byproduct, which is a 90 percent male bird; right?

A: Yes, sir. Right.

Q: Then you've got 708s, and you've got 700s, and then you've got 500s?

A: Correct.

Q: Those are different breeds of birds?

A: They're all different breeds. Yes, sir.

Q: And is it based upon your training and experience of 27 years of growing birds that these birds grow differently?

A: They all grow differently, yes, sir.

Q: Is it fair for me to assume that if you and I are competing to grow ten birds, let's say, and I've got ten Cobb byproducts and you've got ten 500s, who's going to win?

A: You are.

Q: Why is that?

A: They're 90 percent males. Males grow better. They perform better. And then you're competing against me, it's usually 49/51 females to males, and the males just perform better.

Q: Now, are you familiar, then, with instances where they have been people, growers within your tournament, that has a different bird that he or she is growing as opposed to what you're growing?

A: Oh, yeah. We all talk every week. Yeah. Your breeds are on the charts. And we'll ask -- you know, Morgan will come and say, Charles, what kind of birds have you got this week? Well, I've got 708s in five houses, and I've got 700s in the rest of them. And, like Doug Brown's got 500s. We talk. This complex is -- finally, growers are talking to each other.

Q: Is it a fact that because you're so large with 52 houses, that you may even have different types of birds growing within your houses?

A: Oh, absolutely. You might get 16,000 708s. You might get the rest of 24,900 in 500s. It's mixed up all the time.

*****

Q: (By Mr. Whitfield) I get that. So the fact, then, that -- what I'm hearing from you and what you're testifying to under oath is that you have individuals within the same tournament that will be growing different birds and perhaps even growing or utilizing – strike that. Is it a fact that because you have a tournament system where you're competing with individual growers within the tournament that are growing different birds and utilizing different types of feed, do you think that's fair?

MR. TATUM: Objection: Lack of foundation.

A: No.

Q: (By Mr. Whitfield) Why is that?

A: If we're going to compete, the playing field has to be level. It's got to be. I mean, why are you competing with different birds? It's got to end -no, I want to be No. 1 every time. I want you to have the same opportunity to do what I do. You know, we need the same thing – when they come to those chicken houses, we need the same thing. Tyson could do this, but it's going to cost them money to make the playing field level.

Q: You're not shying away from competition?

A: I love it.

Q: But what I'm hearing from you is if you're going to have competition --

A: Let's make it even.

Q. -- the various inputs need to be the same?

A: Need to be the same.

Q: So you need to be growing chickens the same breed within a tournament that you're competing with?

MR. TATUM: Objection: Lack of foundation.

A. That's exactly right."
Ex. 15, Morris Dep. 244:25-246:20, 248:8-249:23.

**Michael Murphy; Murphy Farms, LLC**

251. Mike Murphy established Murphy Farms, LLC in 2005. Murphy Dep. 7:18-20.

**Response**: Plaintiffs' agree with paragraph 251 of Defendants' Statement of Uncontroverted Facts.

252. Murphy's farms are established under the Murphy Farms, LLC entity. *Id.* 24:12-18.

**Response**: Plaintiffs' agree with paragraph 252 of Defendants' Statement of Uncontroverted Facts.

253. Murphy operates under two Broiler Contracts with Tyson, operating as the Farm 5147 and

Farm 5148 farms. *Id.* 80:14-18; 84:2-10.

**Response**: Plaintiffs' agree with paragraph 253 of Defendants' Statement of Uncontroverted Facts.

254. Farm 5147 has six houses; Farm 5148 has five houses. *Id.* 24:8-11.

**Response**: Plaintiffs' agree with paragraph 254 of Defendants' Statement of Uncontroverted Facts.

255. Murphy began growing with Tyson in 2006. *Id.* 86:2-16.

**Response**: Plaintiffs' agree with paragraph 255 of Defendants' Statement of Uncontroverted Facts.

256. Murphy's contract dates are as follows:

- The Farm 5147 contract was entered into on November 23, 2011, with a scheduled conclusion date of November 23, 2018. Ex. 53, Broiler Contracts of Michael Murphy.
- The Farm 5148 contract was entered into on February 24, 2012, with a scheduled conclusion date of February 24, 2019. *Id.*

**Response**: Plaintiffs' agree with paragraph 256 of Defendants' Statement of Uncontroverted Facts to the extent that the documents noted in this paragraph speaks for themselves.

257. Murphy testified that he could not recall any conversations with anyone at Tyson before renewing his Farm 5147 contract in 2011. Murphy Dep. 82:1-7 ("Q. Do you remember any discussions you had with anyone at Tyson about signing this contract? A. No.").

**Response**: Plaintiffs' agree with paragraph 257 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

258. Murphy testified that he could not recall any conversations with anyone at Tyson before renewing his Farm 5148 contract in 2012. *Id.* 84:2-21 ("Q. Do you remember any discussions you had with anyone at Tyson about this contract when you signed it? A. No.").

**Response**: Plaintiffs' agree with paragraph 258 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

259. Murphy testified that he was not "aware of any time when [he has] gotten a settlement and [he] went and cross-checked [his] settlement against anything else and thought it was wrong." *Id.* 129:1-130:5.

**Response**: Plaintiffs' agree with paragraph 259 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

260. One time, Murphy testified that there was a discrepancy in his settlement sheets. *Id.* 130:20-22. In that instance, Murphy testified that the delivery truck "left a ticket in my mailbox saying all four hoppers [of feed] were there" but "[t]hey only put three hoppers in my feed bin." *Id.* 131:2-9.

**Response**: Plaintiffs' agree with paragraph 260 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

261. Murphy took photos of the feed bin and "got ahold of Tyson, the feed mill, and they credited me for 3,000 pounds, but I was still missing 3,000 pounds." *Id.* 132:14-17.

**Response**: Plaintiffs' agree with paragraph 261 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

262. Regarding the 3,000 pounds Murphy felt were still short, he testified:

> [A Tyson employee] said the pictures didn't match up with what I took. Q: Pictures didn't match up with what?
> A: I took pictures of it, and I had him to come out and take pictures too. He said that's just what -- they thought it was just 3,000 pounds so that's what I got credit for, is 3,000 pounds.
> Q: So he felt like he looked at it, took pictures, you took pictures, and he felt like it was a 3,000 pound shortage?
> A: Yes.

*Id.* 133:11-21.

**Response**: Plaintiffs agree with paragraph 262 of Defendants' Statements of Uncontroverted and Material Facts to the extent that Mr. Murphy testified to the statements noted in said paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Murphy disagreed with the argument he lost only 3,000 pounds when he actually lost 6,000 pounds. The actual testimony in the record is as follows:

Q: Did John say, Why not 6,000?

A: He said the pictures didn't match up with what I took.

Q: Pictures didn't match up with what?

A: I took pictures of it, and I had him to come out and take pictures too. He said that's just what -- they thought it was just 3,000 pounds so that's what I got credit for, is 3,000 pounds.

Q: So he felt like he looked at it, took pictures, you took pictures, and he felt like it was a 3,000 pound shortage?

A: Yes. I have argued with him, told him it was 6,000 pounds because I know. I'm there every day.

Q: And he said, look, he thought it was 3,000 pounds?

A: Yes. And we finished dead last in that flock because of the feed conversion.

Q: Do you know what that cost you moneywise where you would have otherwise finished?
A: Around $6,000, is what it cost me."

Ex. 20, Murphy Dep. 133:10-134:5.

263. Murphy characterized this difference as simply a "disagreement" over how much feed was missing. *Id.* 134:19-24.

**Response**: Plaintiffs' agree with paragraph 263 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

264. Murphy believes the feed miscalculation cost him $6,000, based on where he "would have otherwise finished" in the tournament. *Id.* 134:3-5.

**Response**: Plaintiffs' agree with paragraph 261 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph. See also Response 262.

265. Murphy testified he did not "have any idea if the average density that [he] receive[s] is any different from any other grower." *Id.* 92:5-8.

**Response**: Plaintiffs' agree with paragraph 265 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the statements noted in this paragraph.

266. Murphy testified at deposition that he was upset with a Tyson truck driver "that come on the farm hitting his air horn" because it scared the broilers. *Id.*99:11-14. And that he was concerned with how "trashy" the catch crew's van was. *Id.* 127:2-18.

**Response**: Plaintiffs' agree with paragraph 266 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Murphy testified as to the matters noted in this paragraph.

**John Pinkston**

267. John Pinkston sold his farm in 2015 and is now retired. Pinkston Dep. 6:22-7:2, 10:10-13.

**Response**: Plaintiffs' agree with paragraph 267 of Defendants' Statement of Uncontroverted Facts.

268. Pinkston operated under one Broiler Contract with Tyson, for Farm 5177. Ex. 54, Broiler Contract of John Pinkston.

**Response**: Plaintiffs' agree with paragraph 268 of Defendants' Statement of Uncontroverted Facts.

269. Farm 5177 included four houses. *Id.* 47:14-18.

**Response**: Plaintiffs' agree with paragraph 269 of Defendants' Statement of Uncontroverted Facts.

270. Pinkston began growing with Tyson in 2008. *Id.* 44:20-21.

**Response**: Plaintiffs' agree with paragraph 270 of Defendants' Statement of

Uncontroverted Facts.

271. Pinkston originally grew with Perdue, and switched to Tyson in 2008 because Tyson's out time between flocks was shorter than Perdue's. *Id*. 33:7-14.

**Response**: Plaintiffs' agree with paragraph 271 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph. Mr. Pinkston never tried to switch back to Perdue. Ex. 16, Pinkston Dep. 58:23-59:2.

272. Pinkston's Farm 5147 contract was renewed on February 26, 2014, with a scheduled conclusion date of February 26, 2021. *Id*.

**Response**: Plaintiffs' agree with paragraph 272 of Defendants' Statement of Uncontroverted Facts to the extent that the document noted in this paragraph speaks for itself.

273. Pinkston testified that before signing his contract, he had phone call with Tyson and some conversations with Plaintiffs Morgan Rickard and Tim Vincent: "Q: Up until that point that you signed the contract, did you talk with anyone else besides that phone call you had with Tyson and then with Morgan and maybe Tim? A: In relation to growing for Tyson? Q: Yeah. A: No." *Id.* 39:18-23.

**Response**: Plaintiffs' agree with paragraph 273 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

274. In this phone call from 2008, Pinkston testified that "Tyson said [he] might get about six flocks a year" but that he could not remember the name of the man with whom he spoke. *Id*. 39:24-40:23.

**Response**: Plaintiffs' agree with paragraph 274 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

275. Pinkston also testified that when he renewed his contract in 2014, Tyson told him he "had

to switch to the 52-week average" contract, as opposed to the tournament-style contract. *Id.* 45:1-22.

**Response**: Plaintiffs' agree with paragraph 275 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

276. Pinkston testified he was on this contract for one flock, "[a]nd then [he] went back to the weekly." *Id.* 47:2-6.

**Response**: Plaintiffs' agree with paragraph 276 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

277. Pinkston testified that he earned "$6,100 less" on that flock, based on his type of contract. *Id.* 47:23-25.

**Response**: Plaintiffs' agree with paragraph 277 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

278. Pinkston testified that he discussed this shortfall with Jared Shelton: "Q: Do you recall having any discussions with anyone about signing this contract in February of 2014? A: Yes. Q: And who did you talk with about it? A: Jared Shelton." *Id.* 49:3-7.

**Response**: Plaintiffs' agree with paragraph 278 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Pinkston indicated that Jared Shelton lied to him regarding contracts. The actual testimony in the record is as follows:

Q: How about Jared, has he ever lied to you about anything?

A: Yes, sir.

Q: And what did he lie to you about?

A: This -- one thing in particular was this contract that we're talking about.

Q: What did he lie to you about?

A: Well, for one thing he said that if I went on the -- or when I went on the new pay policy that, from the time I went on new pay policy until -- or when I went on the new pay policy, that from that point on is what I be – how I would be evaluated, but my previous flocks, how I did, wouldn't be considered, and that absolutely was not true, and he knew it absolutely was not true."

Ex. 16, Pinkston Dep. 70:10-23.

279. Pinkston testified that Jared Shelton, "asked me if I wanted to go back to the tournament way of settlement, and I said I did. He said, well, I have a contract here for you to sign, and I signed it." *Id.* 49:17-20.

**Response**: Plaintiffs' agree with paragraph 279 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Pinkston indicated that he complained to Tyson about the fact that tournaments were being conducted with different breeds being grown by growers in the same tournament. The actual testimony in the record is as follows:

Q: Have you done anything to quantify whether you lost money over getting a breed different from someone else in a given tournament?

A: Yes, sir.

Q: And what have you done?

A: The Cobb 700 performed better. They were all males, for one thing, and you can't compete with straight-run chickens, which was theoretically 50/50 males and females against an all-male flock.

Q: And so have you done anything to say, gosh, based on the information I have in this particular flock, this tournament, I lost out on X dollars because I had all females and someone else had all males?

A: I never had all females, but -- I'm not sure what you're asking. I mean, I knew it. Everybody knew it, and we complained to Tyson about it."

Ex. 16, Pinkston Dep. 63:23-64:13.

280. Pinkston testified he brought his concerns to Tyson, and the following resulted:

Q: Did you have any discussions with anyone else at Tyson besides Jared Shelton about getting off the 52-week -- or what's called the performance incentive base system and back onto the weekly system?
A: Yes.
Q: And who was that?
A: I guess it was Kenny Bartley at the time, yes.
Q: And when did you have a discussion with Jim Bartley about this?
A: That day or the next day.
Q: And when you say that day or the next day?
A: When Jared Shelton brought it to me to sign.
Q: Brought you the agreement to put you back on the weekly?
A: Yes. Yes.
Q: And what did you and he talk about?
A: I called him and asked if I was going to get the $6,100 that I didn't get because I was on the other pay scale.
Q: And what did he say?
A: He said, yes, he would give it to me.
Q: Did you ever get it?
A: Yes, I did.
Q: So you got made whole on the $6,100? A: Yes, I did.

*Id.* 56:16-57:15.

**Response**: Plaintiffs' agree with paragraph 280 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

281. Pinkston testified:

Q: Did Kenny Bartley ever lie to you about anything?
A: Yes, sir.
Q: And what did he lie to you about?
A: Well, several things.
Q: And tell me what they are.
A: I can't -- I can't specifically -- during Kenny Bartley's time there, I went from being this the top ten in the complex as far as down as in the upper 70s, 77, 78 out of 92. That's pretty bad. It's about as bad as you get. I didn't know what was going on. I didn't know why it was happening. Nothing changed on my end that I was aware of. Nothing changed on my end. And I repeatedly asked those people, and they kept telling me they didn't know, when they did know.
Q: How do you know they knew? Well, what is it you're saying they knew?
A: They knew why I was doing bad.
Q: And why were you doing bad?
A: I don't know.
Q: So you're saying they knew, but they didn't tell you?

A: Yes, sir.
Q: Did they ever tell you?
A: No, sir.

*Id.* 67:8-68:6.

**Response**: Plaintiffs' agree with paragraph 281 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

282. Pinkston has checked the mortality cards against his settlement statements and found "for the most part, they were fairly consistent." *Id.* 97:22-98:19.

**Response**: Plaintiffs' agree with paragraph 282 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

283. Pinkston testified that his condemnation numbers on his settlement packets were consistent with what the USDA determined: "[Q]: In other words, as we look through your packet, we'll see a condemnation certificate that you generally received; right? A: This is -- this is the -- I'm not sure I understand what you're asking. Q: Have you -- have you ever discovered that the numbers reported on your settlements as far as what was -- the number of chickens – A: Number condemned. Q: -- condemned and the reason was inconsistent with what the USDA determined on the line? A: No."). *Id.* 108:6-17; John Pinkston Settlement Packet.

**Response**: Plaintiffs' agree with paragraph 283 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

284. Pinkston testified to the following regarding his feed numbers:

Q: Have you ever cross-checked your settlement statements or your settlement packets against any other materials and found that the feed represented to be delivered was not accurate?
A: Yes.
Q: And when was that? A: On several occasions.
Q: Can you tell me each one? A: No, sir.
Q: Can you tell me any one?

A: No, sir.
Q: Can you tell me a year that happened?
A: No, sir.
Q: Can you tell me an amount that might have cost you money?
A: No, sir. I'd have to know more.

*Id.* 112:25-113:15.

**Response**: Plaintiffs' agree with paragraph 284 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

285. Pinkston testified that there were "several times" his feed ticket summary "wasn't consistent with the number of tickets [he] had in [his] house," but that he could not identify specifically when. *Id*. 114:9-23; John Pinkston Settlement Packet.

**Response**: Plaintiffs' agree with paragraph 285 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

286. Pinkston similarly testified regarding his mortality cards:

Q: Have you ever seen -- have you ever cross-checked your mortality cards against your settlement statements?
A: Yes.
Q: And have you ever found them to be different?
A: Yes.
Q: When? Can't name a time?
A: No.
Q: Name a year?
A: No.
Q: Give me a number that they were different?
A: Not really, no.
Q: Give me any calculation as to whether or not that cost you any money?
A: No.
Q: Have you ever talked to anyone at Tyson about it?
A: I don't remember.

*Id.* 117:21-118:11; Ex. 55, John Pinkston Mortality Cards.

**Response**: Plaintiffs' agree with paragraph 286 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph.

287. When asked "Have you done anything to try to quantify what you think Tyson might owe you from when you were running your chicken business that it hasn't paid you under your contract?" Pinkston replied, "No." Pinkston Dep. 125:11-15.

**Response**: Plaintiffs' agree with paragraph 287 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Pinkston testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Pinkston indicated that he believed Tyson did not pay him money he was owed. The actual testimony in the record is as follows:

Q: Have you done anything to try to quantify what you think Tyson might owe you from when you were running your chicken business that it hasn't paid you under your contract?

A: No.

Q: Do you have any reason to believe they've not paid you money they owe you under your contract?

A: Yes.

Q: What is that?

A: Those horrible settlements were not -- horrible. Therefore I got less money than I should have."

Ex. 16, Pinkston Dep. 125:11-21.

**William Rickard; Sondra Rickard; Rickard Farms, LLC; ICU Chickens**

288. William Rickard, along with his wife Sondra Rickard, operates the entities Rickard Farms, LLC and ICU Chickens. Ex. 56, Deposition of Morgan Rickard, 11:21-12:7.

**Response**: Plaintiffs' agree with paragraph 288 of Defendants' Statement of Uncontroverted Facts.

289. Rickard switched his operations from Perdue to Tyson in 2008. *Id.* 80:19-23. Rickard switched to Tyson because Perdue's out time was getting to be too long to be profitable. *Id.* 80:22-

81:11.

**Response**: Plaintiffs' agree with paragraph 289 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph; more particularly Mr. Rickard testified that the out time at Perdue didn't "cash flow." Ex. 9, Rickard Dep. 81:3.

290. Collectively, Rickard operates under four different Broiler Contracts with Tyson which operate under the following farm names: SMR; Wishbone; Branch Poultry; ICU. *Id.* 135:6-142:9.

**Response**: Plaintiffs' agree with paragraph 290 of Defendants' Statement of Uncontroverted Facts.

291. SMR operates 2 houses; Wishbone operates 4 houses; Branch Poultry operates 4 houses; and ICU operates 4 houses. *Id.* 22:20-23, 23:4-5, 23:20-25.

**Response**: Plaintiffs' agree with paragraph 291 of Defendants' Statement of Uncontroverted Facts.

292. Rickard first contracted with Tyson to raise Broilers under three of his four contracts in 2008. *Id.* 141:25-142:5.

**Response**: Plaintiffs' agree with paragraph 292 of Defendants' Statement of Uncontroverted Facts.

293. Rickard contracted with Tyson to raise Broilers under the ICU contract in 2010. *Id.* 142:6-18.

**Response**: Plaintiffs' agree with paragraph 293 of Defendants' Statement of Uncontroverted Facts.

294. His contracts have been continually renewed through 2018. Ex. 57, Broiler Contracts of Morgan Rickard.

**Response**: Plaintiffs' agree with paragraph 294 of Defendants' Statement of Uncontroverted Facts to the extent that the document noted in this paragraph speaks for itself.

295. Rickard's contract dates and renewal dates are as follows:

- The Farm 17 (5174) contract was originally entered into in 2008. *Id.* 141:25-142:5. It was renewed on August 29, 2017, with a scheduled conclusion date of September 1, 2020. *Id.* (TYSON_167625).

- The Wishbone (5175) contract was originally entered into in 2008. *Id.* 141:25-142:5. It was renewed on September 19, 2017, with a scheduled conclusion date of September 22, 2020. *Id.* (TYSON_167640).

- The Branch Poultry (5176) contract was originally entered into in 2008. *Id.* 141:25-142:5. It was renewed on August 29, 2017, with a scheduled conclusion date of September 1, 2020. *Id.* (TYSON_167655).

- The ICU (5193) contract was originally entered into on November 5, 2010. *Id.* 142:6-18. Its scheduled conclusion date is November 5, 2020. *Id.* (TYSON_116774).

**Response**: Plaintiffs' agree with paragraph 295 of Defendants' Statement of Uncontroverted Facts to the extent that the documents noted in this paragraph speaks for itself.

296. When asked "[d]o you remember who you worked with in signing your contracts with Tyson," Rickard answered "James Catlin, Steve Keys." Rickard Dep. 97:18-20. Rickard testified that they discussed how the Robards Complex handled condemnation, as opposed to Perdue, and that "they explained how the condemn worked in general form." *Id.* 83:25-86:1.

**Response**: Plaintiffs' agree with paragraph 296 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

297. James Catlin was a Service Technician for Rickard. *Id.* 166:24-167:3.

**Response**: Plaintiffs' agree with paragraph 297 of Defendants' Statement of Uncontroverted Facts.

298. Steve Keys was a Broiler Manager. Brown Dep. 52:3-7.

**Response**: Plaintiffs' agree with paragraph 298 of Defendants' Statement of Uncontroverted Facts.

299. Regarding his understanding of condemnation and his conversation with James Catlin and Steve Keys, Rickard testified:

> Q: So you knew that there was a charge for condemnation at Tyson that you didn't have at Perdue?
> A: I did.
> Q: And you knew that it was a whole bird condemnation process?
> A: Yes.
> Q: And you knew that it was based on the average weight of your flock?
> A: Yes.
> Q: And what you say you didn't know was the effect -- you knew you wouldn't be paid for those pounds?
> A: I understood that.
> Q: What you didn't know is how that would then run through the settlement and affect your overall numbers?
> A: Yes.
> Q: Did you go through that with them or just didn't understand it?
>
> A: Didn't understand it until I started seeing it in my settlements.

Rickard Dep. 85:18-86:11.

**Response**: Plaintiffs' agree with paragraph 299 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

300. Other than his discussion with Catlin and Keys, Rickard does not remember any other discussions related to his contracts before he signed them. *Id.* 97:24-98:2 ("Q: Do you remember any discussions about the contracts before you signed them, other than what we've talked about? A: No.").

**Response**: Plaintiffs' agree with paragraph 300 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Rickard indicated that when initially discussing the tournament system he understood and took the integrator at its word that he would be treated fair. He also stated that he is in the

lawsuit for unfair practices in that the tournament system is not being implemented equally for all growers. Ex. 9, Rickard Dep. 163:24-164:5, 34:17-35:2.

301. Rickard testified he had "multiple" problems with Kenny Bartley. *Id.* 171:18-20.

**Response**: Plaintiffs' agree with paragraph 301 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Rickard indicated that these problems, and the testimony outlining same are as follows:

**Arbitrarily Moving Rickard in the Tournament Rankings**

Q: What problems did you have with him?

A: We had some disagreements in the beginning, and we were in the top of the grow-out. And after our disagreements, we were took to the bottom of the grow-out. The year after he left, we were back to the top of the grow-out.

Q: When you say "top," you mean rank --

A: Ranking.

Q: -- on your flocks? What were some of the disagreements over?

A: Feed, bird quality, vaccinations.

Q: How do you know he had anything to do with it?

A: He's the live production manager. He's over all of it.

Q: Understood, but how do you know he had anything to do with your ranking?

A: He was upset with us or me, and to prove a point.

Q: And how do you know that?

A: I know I didn't change anything from the time before he got there until the time that he left, and I didn't change anything afterwards, and my settlements will show the difference.

Q: So you just feel like maybe he somehow changed your settlement?

A: I believe he could pistol whip you if he wants you. They have control over all the numbers and the pencils, and I don't have any choice about it."

Ex. 9, Rickard Dep. 172:5-173:6.

**Georgia 08 Issue**

Q: Now, the Georgia 08 you said was in 2012. What did he lie to you about the Georgia 08?

A: We kept telling him that we had a problem with the health of these chickens, and they were dying and dying and dying. And they come out: "There's nothing wrong with the chickens. It's what you're doing."

Q: What do you mean, "they"? I asked about --

A: "They" as in the grow-out people, the live production.

Q: Well, listen. We're talking about Ken. And if you're going to say Ken lied to you about something, I want to know what Ken said.

A: Ken said that it wasn't nothing wrong with the chicken. It was in the grower. It's your problem. It's your farm's. Problem with what's wrong with these chickens.

Q: Okay.

A: That's not true.

Q: And then later they determined it was some other problem?

A: They determined it was Georgia 08 that they had all along, and it wasn't anything that we were doing or I was doing to cause it."

*Id*. 174:5-175:1.

**Feed Issues**

Q: Now, you said there were problems with feed. How do you know he didn't try to fix problems with feed?

A: Because the problems didn't get fixed.

Q: What were the problems?

A: They did finally get it fixed.

Q: Well, how do you know he wasn't trying to fix it?

A: We went for a year going through -- they paid me four times in a year for feed that I didn't get.

Q: So he said -- so you raised this issue with him; right?

A: Yes.

Q: He said, I'm trying to fix these feed issues; right?

A: No, he don't acknowledge there was ever any feed issues.

Q: Okay. But they got fixed?

A: After about a year worth of --

Q: So what did he say that was a lie about feed?

A: That there wasn't no issues.

Q: So he was lying saying there was no issues. And what got fixed?

A: They put mail -- we put mailboxes up at each farm with a farm number that you stamp the feed tickets to prove that they were even on our farms. Prior to that there was no documentation left on the farms.

Q: Understood, but what is it you're saying was needing fixing? Documentation?

A: Or somebody to keep checks and balances to make sure the feed is even getting to your farm that you're being charged for.

Q: So he was saying he doesn't think there needs to be more documentation? That was the issue?

A: He's saying there's not any -- ever been any issue with feed in his complex.

Q: Okay. And you were saying, yes, there have. And then later they instituted a documentation program where they dropped off feed tickets to document the feed?

A: Yeah.

Q: Okay. So you saying his lying was saying he didn't think they had issues?

A: I mean, after I proved them four times that they had to pay me, I think they

realized they have issues, and I could prove it.

*Id*. 175:16-177:9.

302. Rickard testified he believed Bartley "lied" when Georgia-08 was affecting chickens and he told Rickard "that it wasn't nothing wrong with the chicken. It was the grower." *Id.* 174:14-19.

**Response**: Plaintiffs' agree with paragraph 302 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 301.

303. However, Rickard testified that he did not know if Bartley was actually lying when he told Rickard he thought the disease was caused by the grower:

Q: And then later they determined it was some other problem?
A: They determined it was Georgia 08 that they had all along, and it wasn't anything that we were doing or I was doing to cause it.
Q: Why do you think -- do you think maybe he honestly thought that at first and then figured out it was another issue?
A: No, I don't.
Q: So you think he knew from the very beginning what the cause was?
A: I don't know if he did or not. I'm just telling you I don't --
Q: So you don't know if he was lying. You just know that turned out not to be true; right?
A: Yes.

*Id.* 174:24-175:12.

**Response**: Plaintiffs' agree with paragraph 303 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 301.

304. Rickard testified that Bartley also "lied" by initially taking the stance that he did not know there was an issue with properly delivering feed: "Q: So he was saying he doesn't think there needs to be more documentation? That was the issue? A: He's saying there's not any -- ever been any issue with feed in his complex. Q: Okay. And you were saying, yes, there have. And then later they instituted a documentation program where they dropped off feed tickets to document the feed? A: Yeah." *Id.* 176:24-177:4.

**Response**: Plaintiffs' agree with paragraph 304 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 301.

305. However, Rickard acknowledged that, once Bartley became aware of a feed delivery issue, the issue was resolved. *Id.* 175:13-177:24 ("Q: So his opinion was, there were no issues when you first talked to him? A: Yes. Q: And then you proved to him that you did have issues? A: Yes. Q: And then they instituted a plan to better document the feed deliveries? A: Yes.").

**Response**: Plaintiffs' agree with paragraph 305 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 301.

306. Regarding damages he may have suffered for any feed miscalculations, Rickard testified:

> Q: Did you do anything to calculate whether or not that cost you any money, that issue of documentation of feed deliveries?
> A: It cost me on all the settlements we had problems on.
> Q: And what years was this?
> A: 2011 to whenever we put those in, 2004, maybe -- 2003, 2004.
> Q: So 2001 to 2004?
> A: Somewhere in that range. Q: And then about --
> [*Plaintiffs' Counsel*]: Did you say 2001?
> A: No, not 2001. 2011 to -- I'm off ten years. I'm sorry. BY [*Defense Counsel*]:
> Q: 2011 to 2014?
> A: Yes.
> Q: Do you have any idea how many flocks that affected?
> A: I settled 20 flocks a year.
> Q: How many pounds of feed are we talking about?
> A: Truckloads.
> Q: Well, I mean, if you're going to claim that you're suing over it, you need to tell me what the details are.
> A: That's why I got these lawyers.
> Q: So you don't know?
> A: Nope. We'll find out.
> Q: You can't -- you can't tell me how many truckloads of feed you got more or less than you should have; right?
> A: Nope.

*Id.* 177:25- 179:6.

**Response**: Plaintiffs' agree with paragraph 306 of Defendants' Statement of

Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 301.

307. In his Interrogatory Responses, Rickard alleged Mears told Rickard "that he was doing too good of a job because he was growing the chickens so fast that they were having leg problems and/or kinky back."). Plaintiffs' Answers to Defendants' First Interrogatories, Rickard Inter. No. 14.

**Response**: Plaintiffs' agree with paragraph 307 of Defendants' Statement of Uncontroverted Facts to the extent that the pleading referenced in this paragraph speaks for itself.

308. At deposition, Rickard was asked whether slowing down the growth rate cured the chickens. Rickard admitted, after putting the chickens in 12 hours of darkness on the birds to try and slow them down, the leg problems lessened. Rickard Dep. 239:22-240:11.

**Response**: Plaintiffs' agree with paragraph 308 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

309. Beyond this statement, Rickard did not identify any other misrepresentations by Mears. *Id.* 170:15-16 ("Q. Do you have any other issues with David Mears besides that feed issue? A. Not that I recall.")

**Response**: Plaintiffs' agree with paragraph 309 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Rickard testified in detail as to the feed issues he had with Mears. The testimony outlining same is as follows:

Q: Have you ever had any problems with David Mears?

A: We've had some discussions.

Q: Ever felt like he lied to you about anything?

A: I never felt that David really lied to me about anything.

Q: You said you had some discussions with him. Do you remember any discussions?

A: We had a discussion a few weeks before he left this last time.

Q: And what about?

A: Feed issues and the corn they were buying at the mill that was being rejected and taken back that had weevils in it. They were buying it as damaged corn and discounting and running it through the mill.

Q: And what did he say about that?

A: He had every right in the world to feed the chickens damaged corn if that's what he wanted to do.

Q: Do you know if you got any damaged feed?

A: It was causing excessive diarrhea in a lot of the birds.

Q: In your birds?

A: My birds.

Q: How many flocks was that?

A: We had good floors in July when we passed the animal welfare audit. And after that August, September, October all the way to today we've had a lot of wet floors and unsanitary conditions in these houses due to diarrhea.

Q: So you've had wet floors since about August of '17?

A: And we had wet floors the winter prior to that. I mean, it's --

Q: How do you know it's related to the feed?

A: Because if you take the feed off the birds, they quit having diarrhea.

Q: Well, if you take the feed off the birds, they die; right?

A: No. They quit dying when you take them off the feed, if you want to know the truth about it.

Q: They quit going to the bathroom if you don't feed them; right?

A: They will.

Q: So how do you know it's the feed?

A: It's almost like the mortality this winter when we were out of feed during this ice event. If you were losing 50 or 80 birds a day, and you ran out of feed, and they couldn't get you feed the next day, your mortality would go down to picking up five or six chickens dead. And when you put them back on feed, they go right back to dying and squirting in the floors. I mean, it's in the feed.

Q: Do you have any other issues with David Mears besides that feed issue?

A: Not that I recall.

Ex. 9, Rickard Dep. 168:16-169:17.

310. When asked "Have you ever had an occasion to look at [the settlement documentation] and think the condemnation charts were calculation wrong?" Rickard testified, "No." *Id.* 186:4-7.

**Response**: Plaintiffs' agree with paragraph 310 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

311. When asked "Have you ever had an occasion to look at [the settlement documentation] and think the mortality charts were calculated wrong?" Rickard testified "No." *Id.* 186:8-10.

**Response**: Plaintiffs' agree with paragraph 311 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

312. When asked "Have you ever had an occasion to look at them and think the live scale tickets were calculated wrong?" Rickard testified "I have one time, but I don't remember the details of it. It's been too many years ago." *Id.* 186:11-14.

**Response**: Plaintiffs' agree with paragraph 312 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

313. Rickard testified that on one occasion the feed delivery tickets on his settlement was not

accurate. *Id.* 187:12-16. Rickard testified his feed tickets showed "A truckload more than my bins would even hold with the birds eating." *Id.* 188:6-7. Rickard testified that he raised this issue with Tyson and was given a credit: "Q: Did you raise that with anyone? A: Yes, I did. Q: Who's that? A: Craig Coberley, Ken Bartley, Jared Shelton. Q: And what did they say? A: They agreed. Q: And so did you get a credit for it? A: I did." *Id.* 188:11-18.

**Response**: Plaintiffs' agree with paragraph 313 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

314. The Amended Complaint alleges that Gottsponer informed certain unnamed growers the Robards facility average pay was $2.47 per pound, then admitted to Rickard that the average pay was much less once expenses were factored in. First Amended Complaint, ECF #18, ¶¶ 58, 74.

**Response**: Plaintiffs' agree with paragraph 314 of Defendants' Statement of Uncontroverted Facts to the extent that the pleading referenced in this paragraph speaks for itself. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Rickard indicated that he was told by Gottsponer himself that the expected pay would be $2.49 per square foot. The testimony outlining same are as follows:

Q: "Did you ever talk with Jim about any expectations of what you'll make, Jim Gottsponer?

A: Talked to him about expectations about what the two houses were going to make.
Q: What was that?

A: Two or three growers he had talked to came by and talked to me about building new houses and the number he put out that they were going to make as average pay.

Q: And what was that?

A: $2.49 a square foot.

Q: Do you think maybe that got lost in translation?

A: No. I confronted him about it.

Q: $2.49 per square foot is what he told you?

A: What he told them. He didn't tell me.

Q: Oh, so he never told you that?

A: Yes, he told me that when I confronted him about it. That's the number he was putting out.

Q: Per square foot?

A: Per square foot, was average pay in the complex.

Q: Okay. And what do you think the average pay in the complex actually was?

A: 25, 30 cents less than that. That would be --

Q: You know if that actually is the average square foot?

A: But if you add the PLT cost share, the bug spray, the new house incentive pay to the houses that have new house incentive pay and everything -- and everything that they pay out to a grower they back into it.

Q: How do you know if it includes all that?

A: Because he told me how they was figuring it.

Q: Jim told you that?

A: Jim told me that.

Ex. 9, Rickard Dep. 236:15-237:21.

315. Rickard repeated this assertion in his Interrogatory Responses and deposition testimony: "Q … Did you ever talk with Jim about any expectations of what you'll make, Jim Gottsponer? … A. Two or three growers he had talked to came by and talked to me about building new houses and the number he put out that they were going to make as average pay. Q. And what was that? A. $2.49 a square foot." Plaintiffs' Answers to Defendants' First Interrogatories, Rickard Inter. No. 14; Rickard Dep. 236:15-24.

**Response**: Plaintiffs' agree with paragraph 315 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 314.

316. At his deposition, Rickard clarified that Gottsponer did not make any statements about average pay to Rickard himself: "Q. $2.49 per square foot is what he told you? A. What he told them. He didn't tell me." Rickard Dep. 237:2-3.

**Response**: Plaintiffs' agree with paragraph 316 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of Mr. Rickard indicated that he was told by Gottsponer himself that the expected pay would be $2.49 per square foot. See Response 314. The testimony outlining same, and left out by Tyson, is as follows:

Q: Did you ever talk with Jim about any expectations of what you'll make, Jim Gottsponer?

A: Talked to him about expectations about what the two houses were going to make.

Q: What was that?

A: Two or three growers he had talked to came by and talked to me about building new houses and the number he put out that they were going to make as average pay.

Q: And what was that?

A: $2.49 a square foot.

Q: Do you think maybe that got lost in translation?

A: No. I confronted him about it.

Q: $2.49 per square foot is what he told you?

A: What he told them. He didn't tell me.

Q: Oh, so he never told you that?

A: Yes, he told me that when I confronted him about it. That's the number he was putting out.

Q: Per square foot?

A: Per square foot, was average pay in the complex.

Q: Okay. And what do you think the average pay in the complex actually was?

A: 25, 30 cents less than that. That would be –

Ex. 9, Rickard Dep. 237:15-238-11.

317. In fact, Gottsponer was not a part of the Robards facility when Rickard built his houses and formed his relationship with Tyson: "Q. So he never told you that in relation to building new houses? He wasn't even there when you built your houses. A. No." *Id.* 238:5-8.

**Response**: Plaintiffs' agree with paragraph 317 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 316.

318. Rickard also testified that in 2015, another grower Adam Austin lost eight houses of chickens due to a failed generator. *Id.* 180:12-181:4.

**Response**: Plaintiffs' agree with paragraph 318 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

319. In working to remediate that incident, Rickard testified that he was told by Gottsponer that Tyson "would stay until everything was cleaned up." *Id.* 181:14-16. However, once Tyson's staff finished assisting with the live chickens, the staff departed and stated "it was the farmer's responsibility to deal with the dead." *Id.*, 180:12-23.

**Response**: Plaintiffs' agree with paragraph 319 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

320. However, Rickard admitted at deposition that this incident actually had nothing to do with his farm, but instead happened to another grower and did not affect any of Rickard's birds: "Q. Okay. So that didn't have anything to do with you? A. It did when I stayed and helped the guy

get his chickens up." *Id.* 181:19-22.

**Response**: Plaintiffs' agree with paragraph 320 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

321. Rickard further admitted that he understood growers were responsible for disposing of the dead chickens: "Q. And the grower as you understand it, is responsible for getting rid of dead chickens; right? A. Yes, sir." *Id.* 181:11-13.

**Response**: Plaintiffs' agree with paragraph 321 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph. See also Response 314.

322. Rickard claims Gottsponer represented in 2015 that "if we want heavier birds than the 7 pounds that we'd be compensated and adjusted." *Id.* 145:8-24.

**Response**: Plaintiffs' agree with paragraph 322 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

323. At deposition, Rickard was unable to testify that any failure to pick up birds weighing over seven pounds resulted in any damage to Rickard or loss of any flocks. *Id.*, 180:5-11 ("Q. How many – did you actually get birds at 7 pounds that weren't picked up? A. Yes. Q. How many flocks? A. I can't tell you how many. Q. Did you lose any birds because of it? A. I can't remember.").

**Response**: Plaintiffs' agree with paragraph 323 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

324. Beyond these statements, Rickard did not identify any other misrepresentations by Gottsponer. *Id.* 182:5-7 ("Q. Anything else he's done that you have a problem with? A. No, that's fine.").

**Response**: Plaintiffs' agree with paragraph 324 of Defendants' Statement of

Uncontroverted Facts to the extent that Mr. Rickard testified as to the statements noted in this paragraph.

**Timothy Vincent; TLC Poultry, LLC**

325. Timothy Plaintiff Tim Vincent ("Vincent") first became a contract broiler grower with a different integrator, Hudson, in 1997. Ex. 58, Deposition of Timothy Vincent, 51:18-23.

**Response**: Plaintiffs' agree with paragraph 325 of Defendants' Statement of Uncontroverted Facts.

326. In 1998, Vincent became a contract grower for Tyson. *Id.* 58:7-9.

**Response**: Plaintiffs' agree with paragraph 326 of Defendants' Statement of Uncontroverted Facts.

327. At that time, Vincent operated four houses as the Schoolhouse Road Farm. *Id.* 74:2-5, 119:1-4.

**Response**: Plaintiffs' agree with paragraph 327 of Defendants' Statement of Uncontroverted Facts.

328. In 2004, Vincent switched his broiler operations from Tyson to Perdue because "Tyson said they didn't need us, and Perdue was expanding." *Id.* 62:7-14.

**Response**: Plaintiffs' agree with paragraph 328 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony indicates that Perdue and Tyson both approached Mr. Vincent. The testimony outlining same, and left out by Tyson, is as follows:

Q: And then you grew with Tyson for about six years and switched to Perdue in roughly '04?

A: Correct.

Q: Why did you switch to Perdue?

A: Tyson and Perdue came to me and said – Tyson said they didn't need us, and Perdue was expanding. So they actually offered me money to help with the upgrades. Tyson didn't. So they paid me to switch.

Ex. 31, Vincent Dep. 62:7-63:14.

329. Vincent purchased the Rooster Ridge Farm in 2008. *Id.* 82:12-25.

**Response**: Plaintiffs' agree with paragraph 329 of Defendants' Statement of Uncontroverted Facts.

330. In 2009, Vincent terminated his contracts with Perdue and switched back to Tyson. *Id.* 57:15-21.

**Response**: Plaintiffs' agree with paragraph 330 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

331. Vincent returned to Tyson because Perdue's out time between flocks had gotten too long. *Id.* 85:9-11.

**Response**: Plaintiffs' agree with paragraph 331 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

332. Upon returning to Tyson as a broiler grower in 2009, Vincent entered into two Broiler Contracts with Tyson for the Schoolhouse Road Farm he had previously operated with Perdue, as well as the new Rooster Ridge Farm. *Id.* 84:10-17.

**Response**: Plaintiffs' agree with paragraph 332 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

333. The Rooster Ridge Farm contract was first entered with Tyson on December 2, 2008, with a scheduled conclusion date of December 2, 2013. Ex. 59, Broiler Contracts of Timothy Vincent.

**Response**: Plaintiffs' agree with paragraph 333 of Defendants' Statement of Uncontroverted Facts to the extent that the document referenced in this paragraph speaks for itself.

334. In 2009, before the completion of the Rooster Ridge Farm contract, Vincent sold the

Rooster Ridge property and terminated the Rooster Ridge Farm contract. Vincent Dep.

116:10-

11.

**Response**: Plaintiffs' agree with paragraph 334 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

335. The Schoolhouse Road Farm contract was renewed on July 11, 2017, with a scheduled completion date of July 12, 2020. Broiler Contracts of Timothy Vincent.

**Response**: Plaintiffs' agree with paragraph 335 of Defendants' Statement of Uncontroverted Facts to the extent that the document referenced in this paragraph speaks for itself.

336. Schoolhouse Road Farm operates four houses. Vincent Dep. 9:12-15.

**Response**: Plaintiffs' agree with paragraph 336 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

337. Vincent established Plaintiff TLC Poultry, LLC, and his farm operates under that name. *Id.* 7:18-20; 118: 24-119:4.

**Response**: Plaintiffs' agree with paragraph 337 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

338. When asked: "Q: Any discussions you remember with Tyson about your new contracts and how they worked?" Vincent testified, "No." *Id.* 89:1-3.

**Response**: Plaintiffs' agree with paragraph 338 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as Mr. Vincent testified that that the tournament system was designed for everything to be equal. Ex. 31, Vincent Dep. 153:25-154:12.

339. Vincent testified that he remembered asking Neil Barfield and "Jennifer" about why his

current contract was three years, and they replied that "They didn't know." *Id.* 119:12-120:14.

**Response**: Plaintiffs' agree with paragraph 339 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

340. Beyond that, Vincent testified that he did not "remember having any other discussions with anyone at Tyson about [his] contract." *Id.* 120:12-14.

**Response**: Plaintiffs' agree with paragraph 340 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

341. Regarding whether the Robards Complex miscalculated any of his numbers, Vincent testified:

> Q: So what I'm really trying to focus on -- I know you feel like a lot of my birds got condemned and I don't know why. We can talk about that. I want to know from a record keeping standpoint you ever looked in here and say the numbers aren't right. Less condemned according to the certificates than what accounted for economic check?
> A: Not less.
> Q: Or more?
> A: That I thought?
> Q: Yeah.
> A: Several times I thought it should have been less.
> Q: Thought it should have been less, but were the records different?
> A: I can only go by what they put on here. I don't know. Know what I mean?
> Q: How about on the mortality cards? Have you ever felt like my mortality cards added up to 100 dead birds, but I've got -- in my settlement they counted a different number?
> A: No.
> Q: How about on the feed? Have you ever looked at the feed tickets and it said, well, it says I got delivered X feed, but I think I got more or less feed than that?
> A: Oh, yeah.
> Q: When did that happen?
> A: I couldn't remember dates. I mean, over the years it's happened several times. Sometimes they catch it. Sometimes they don't.
> Q: And if they catch it, they credit you?
> A: You have to prove it to catch it, I mean, for them to do anything.
> Q: Right. You've got to prove that you either did or did not get the feed for the tickets that you got?
> A: Yeah.

*Id.* 128:11-129:19.

**<u>Response</u>**: Plaintiffs' agree with paragraph 341 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the rest of testimony of Vincent at line 129:19, left out by Tyson, indicates that Vincent said, "*But it's a fact that truck drivers go to the wrong farm. They put it in the wrong bins. They – it happens*."

342. Regarding how much money any miscalculations cost him, Vincent testified: "Q: Can you give me an idea whether that ever cost you any money? A: Oh, yeah, sure. Q: How much? A: I couldn't tell you numbers." *Id.* 131:7-11.

**<u>Response</u>**: Plaintiffs' agree with paragraph 342 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the rest of testimony of Vincent at line 131:11-13, was as follows:

Q: Can you give me an idea whether that ever cost you any money?

A: Oh, yeah, sure.

Q: How much?

A: I couldn't tell you numbers. ***I mean, like I said, you can have -- if you're on top -- if you're on the bottom, you can lose $10,000 on a four house farm.***"

Ex. 31, Vincent Dep. 131:11-13 (emphasis added).

343. Vincent testified that David Dickey "lied on me." *Id.* 105:7.

**<u>Response</u>**: Plaintiffs' agree with paragraph 343 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the matters noted in this paragraph.

344. Vincent testified:

Q: What did he lie to you about?
A: Him -- he said I blinded some birds. That's been a couple years ago, I guess. He said I blinded some birds. And after the flock -- that was about a third of the way through the flock. They came out. I had some issues. I couldn't get Jennifer out there the one week. I kept telling her I've got problems.

Finally the next week she comes out and brings some stuff to run on with them. Here comes David Dickey and the vet. I can't think of his name. But anyway, the

veterinarian comes out and David Dickey and Jennifer, and they're looking at the birds. And the first thing David Dickey wants to say, oh, I think you blinded them. I don't blind birds.

The veterinarian had them -- had the birds on the tailgate, cut them open. And David is over there cutting the eyelids off of chicks -- or chickens. He's saying, "Yeah, they're just about blind." And the veterinarian says, "No, David. Here's the problem. They've got enteritis.

*Id.* 105:8-106:2.

**Response**: Plaintiffs' agree with paragraph 344 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

345. Vincent testified that this occurred "maybe 2016, late 2015." *Id.* 106:23.

**Response**: Plaintiffs' agree with paragraph 345 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

346. Vincent testified that "Q: And so you think David Dickey was lying about saying they had been blinded? A: Maybe in his mind he thought so, but me and Jennifer and the veterinarian all agreed it was enteritis." *Id.* 107:8-11.

**Response**: Plaintiffs' agree with paragraph 346 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony of indicates that Dickey never admitted the real cause of the chicken deaths and Vincent never received credit for this in his tournament ranking:

Q: So that was a one-flock thing where he felt like the birds had been blinded. You feel like they weren't blinded. You feel like the vet didn't think they were blinded. And then you got a subsequent letter from Dickey saying they were?

A: Right.

Q: Did the birds -- did the letter also indicate any other problems with the birds?

A: No.

Q: Didn't mention enteritis or anything like that?

A: No.

Q: Did you ever get any other reports or anything about the birds?

A: No.

Q: Do you know -- how did you settle that time?

A: Not good.

Q: What's not good?

A: Bottom third probably, maybe -- I don't remember.

Q: Can't remember where you settled?

A: No. I know it was not good. It was toward the bottom."

Ex. 31, Vincent Dep. 108:17-109:12.

347. Vincent testified that was the only problem he had with Dickey: "Q: Any other problems you've had with David Dickey? A: Not other than that, not really." *Id.* 108:15-16.

> **Response**: Plaintiffs' agree with paragraph 347 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

348. Vincent testified that James Catlin and Jennifer Parks never lied to him: "Q: Ever feel like they lied to you about anything? A: Not that I know of." *Id.* 103:23-24.

> **Response**: Plaintiffs' agree with paragraph 348 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

349. Regarding lies he had been told by other Tyson employees, Vincent testified:

Q: Okay. Did I ask you about Neil Barfield? Any problems with him?
A: No problems.
Q: Okay. How about David Mears?
A: No, no problems with David Mears.
Q: Never feel like he's lied to you about anything. And you mentioned Jim along with that other. You're talking about the Dickey issue over the flock with blindness or the enteritis?
A: Mm-hmm.

Q: Did he say anything in that meeting, or was he just there?
A: No, he spoke his piece, yeah.
Q: What did he say?
A: He just backed up what David said. He was never there. He never looked at the birds.

*Id*. 112:1-16.

**Response**: Plaintiffs' agree with paragraph 349 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph.

350. Regarding Kenny Bartley, Vincent testified that he could not remember any specific lie Bartley had told: "Q: Did he ever lie to you about anything? A: I can't recall a specific lie, nothing factual." *Id.* 114:11-12.

**Response**: Plaintiffs' agree with paragraph 350 of Defendants' Statement of Uncontroverted Facts to the extent that Mr. Vincent testified as to the statements noted in this paragraph. Plaintiffs object and disagree with this paragraph to the extent that it leaves out relevant facts and context of the above statement, as the testimony indicates that Vincent did say that Bartley had lied to him in the past.[25]

## II. PLAINTIFFS' COUNTERSTATEMENT OF UNCONTROVERTED FACTS.

Plaintiffs Charles Morris, et al., by and through counsel, respectfully supplement the record with additional facts and/or witnesses not addressed by Tyson.[26]

### Tyson Employee David Mears

1. The tournament system is an incentive for the farmer to be efficient. Ex. 7, Mears Dep. 48:8-10.

---

[25] Q: Well, who lied to you about something in that period?

A: Well, in that period I can only remember back as far as Kenny Bartley. He lied numerous times to me. I don't remember before that.

Ex. 31, Vincent Dep. 66:8-12.

[26] Plaintiffs incorporate by reference any an all citations made by lay and/or expert witnesses in this case referred to in the 350 Responses made by Plaintiffs herein.

2. Tyson provides growers in the same tournament flocks with different breeds, even though different breeds grow differently. *Id*. 102:17-24.

3. Tyson provides growers in the same tournament with different quality feed, despite the fact that feed is arguably the most important factor for tournament ranking. *Id.* 107:13-25.

**Tyson Employee Kenny Bartley**

4. Tyson does not tell its growers anything beyond what is in the contract before the contract is signed by the grower:

> Q: If it's not spelled out in the contract, did you take the time to talk to them about - -
>
> A: You know, I'm 99 percent sure it's spelled out in there because that's what I read off of them. That's what I recall.
>
> Q: That's not my question. If it's not spelled out in the contract, assuming it's not spelled out in the contract, did you take the time to go over the inputs with the grower, potential grower, prior to him signing the contract?
>
> A: Again, I know it was in the contract, so if it wasn't - - I went over that with growers because I know it was in the contract.
>
> Q: Then tell me what it is that you went over with then.
>
> A: I'd have to read the contract. That's how I read it to them. We went over it and read it to them.
>
> Q: Okay.
>
> A: If it wasn't in there, then I did not go over it, but we went over those inputs.

Ex. 8, Bartley Dep. 186:3-22.

**Tyson Employee Jim Gottsponer**

5. Communications (or lack thereof) regarding how the tournament payment scheme worked were meant to leave the impression the tournaments measure and reward efficiency. Ex. 3, Gottsponer Dep. 157:25-158:2 (agreeing that success would be defined in a tournament as

efficiency in grower the bird).

**Tyson Employee David Dickey**

6. Tyson provides growers in the same tournament flocks with different breeds, even though different breeds grow differently. Ex. 1, Dickey Dep. 265:1-4.

7. Tyson forces growers into tournaments against grower houses that have different broiler densities, even though density can have a dramatic affect on chickens and affect performance. *Id.* 273:4-8.

8. Tyson uses meat from so-called “condemned” birds to produce dog food at its neighboring dog food facility. *Id.* 137:8-138:2.

9. Tyson profits from the birds Plaintiffs grew (proving that they are marketable) but does not pay for this meat, denying Plaintiffs the benefit of the bargain. *Id.* 127:3-8.

**Tyson Employee and Corporate Representative Jim Leis**

10. Mr. Leis is Department Manager for Live Production Services for Tyson.[27] Ex. 14, Leis Dep. 28:13-15.

11. Rather than actually weighing the condemned broilers to get the real weight, Tyson uses the average broiler weight of the flock to calculate the condemned pounds. *Id.* 112:23-113:8.

12. In actuality growers’ rewards and demerits are not tied to their relative efficiency as much against whom was placed in a given tournament, a factor solely controlled by Tyson. *Id.* 168:16-169:18.

13. A grower can perform the exact same but be ranked and thus compensated different amounts depending on who else Tyson has selected to be in the tournament, disconnecting their wages from performance. *Id.* 160:2-161:19.

---

[27] Jim Leis testified in this case as a FRCP 30 (b)(6) witness.

14. The grower should be able to deduct that the better he performs the better pay he would get, more pay and "in general[]" the more efficient the more money a grower will get." *Id.* 167:7-16.

**Tyson Employee Rubin Bruce**

15. Mr. Bruce was a Tyson employee who began work at Tyson around 2001 in the first job that was available which was on the processing line. Ex. 4, Bruce 23:14-23.

16. A week or so weeks after starting, he became a service tech which serves as a liaison between the Tyson and the farmer. *Id.* 24:3, 27:19-21, 32:20-25.

17. After leaving Tyson around 2014 or 2015 Mr. Bruce started with the United States Department of Agriculture ("USDA") after passing security clearance. *Id.* 18:3-11, 159:4-6.

18. At the time of his deposition Mr. Bruce worked for USDA as a GS-82 which basically means he can review poultry facilities, egg facilities, frozen food facilities; and do inspections on the product. *Id.* 14:10-12, 15:6-9.

19. Tyson retains all control for veterinary services and will not allow growers to doctor the birds. *Id.* 125:1-10.

20. The layout time, the time between the flock being caught and the next flock placed (delivered to grower's farm) is controlled by Tyson and there are different layout times among growers competing in the same tournament. *Id.* 150:7-15.

21. Reclaimed or refurbished feed can have an adverse effect on feed conversion and performance. *Id.* 112:20-22.

22. The poultry house temperature, lighting programs, air flow programs are mandated by Tyson. *Id.* 36:17-18.

23. The vigor and vitality of the chicks coming from prime laying hens is better than the ones

from a young hen or old hen. *Id.* 60:15-19.

24. Younger hens usually produce smaller chicks called "nots" that do not perform well. *Id.* 61:1-10.

25. Tyson provides growers in the same tournament flocks from laying hens of different ages, even though the laying hens' age impacts chick performance. *Id.* 55:15-59:4

26. Chicks from prime hens are preferable. *Id.* 62:1-6.

27. The grower with the males has an advantage. *Id.* 119:3-6.

28. Different breeds of birds grow differently. *Id.* 73:17-25, 74:1-3.

29. Growers competing in the same tournament grow different breeds of birds. *Id.* 99:2-6.

30. Tyson places growers in the same tournament although they may have different breeds of chickens which grow differently. *Id.* 73:17-74:10, 99:2-6.

31. Male birds grow differently from female birds. *Id.* 76:24-25, 77:1-4.

32. Growers that receive more male birds have an advantage over those who receive more female birds. *Id.* 119:3-6.

33. Tyson provides growers in the same tournament flocks with different sex make-ups, despite the fact that male birds will consistently outperform female birds. Ex. 7, Mears Dep. 54:23-25; Ex. 4, Bruce Dep. 116:8-24.

34. The more days that the birds are on the farm also affects ranking. *Id*. 96:3-24.

35. Tyson forces growers into tournaments where the houses have had different layout times, even though layout time impacts performance. *Id*. 150:9-151:9.

36. The method of delivery of birds to the growers' farms and the time of delivery is a variable that can affect performance and ranking. *Id*. 102:3-25, 103:1-25, 105:25, 106:1-9.

37. Tyson controls the feed given to the growers. Growers are not always getting feed with

the same ingredients. *Id*. 109:1-7.

38. The use of reclaimed feed affects the grow-out process negatively. *Id*. 112: 20-22.

39. Tyson provides growers in the same tournament with different quality feed, despite the fact that feed is arguably the most important factor for tournament ranking. *Id*. 111:8-113:1.

40. Growers competing in the same tournament are subject to many variables including but not limited to different breeds, different poultry house sizes, different sexes of birds, different temperatures, different times of delivery and age of birds when killed for processing. *Id*. 125:14-25.

**Tyson Employee Jennifer Heltsley**

41. Ms. Heltsley was hired by Tyson in December of 1999 as a Human Resources clerk. Ex. 13, Heltsley Dep. 18:1-8.

42. Ms. Heltsley changed positions in December of 2000 and became a vaccinator. *Id*. 20:15-22.

43. Ms. Heltsley became a service tech in July of 2001. *Id*. 26:18-23.

44. Ms. Heltsley left Tyson in July of 2003. *Id*. 22:19-21.

45. Ms. Heltsley came back to work at Tyson as a service tech in February 2012 and also filled in as a manager in the dispatch office at the feed mill. *Id*. 79:23-25, 80:1-13.

46. Ms. Heltsley was a service tech from July of 2001 through July of 2003, and then was also a service tech from February of 2012 through August of 2018. *Id*. 31:5-8.

47. Tyson charges growers with diseased related whole bird condemnation even though there is no determination that the grower caused these diseases. *Id*. 92: 22-25, 94:1-4.

48. The condemned birds are sent to Tyson's River Valley dog food plant and Tyson does not compensate the growers for the birds in any way for this occurrence. *Id*. 94:8-14.

49. Heltsley was aware that the chicken would not eat the reclaimed feed and reported it to her superiors but to no avail. *Id*. 74:25, 75:1-7, 76:21-25.

50. Tyson provides growers in the same tournament with different quality feed, despite the fact that feed is arguably the most important factor for tournament ranking. *Id*. 74:8-75:7.

51. Tyson controls the type of broiler house and equipment the grower uses on the farm. *Id*. 121:23-24.

52. Growers competing in the same tournament are subject to many variables including but not limited to different breeds, different types of birds, different sexes of birds, different temperatures, different times of delivery and age of birds when killed for processing. *Id*. 108:14-19, 112:18-22, 113:7-10, 117:5-18.

53. Growers complained to Tyson about the tournament system not being equal playing field. *Id*. 87:13-19.

54. Growers complained to Tyson about reclaimed feed and feed pellet quality. *Id*. 101:12-23.

55. Growers complained about competing in the same tournament with growers that got more male birds than female birds thereby putting them at a disadvantage. *Id*. 108:14-19.

56. Growers competing in the same tournament had different types of houses, different type equipment and different age equipment. *Id*. 96:11-19, 97:6-10.

57. Growers that received reclaimed feed compete in the same tournament with growers that did not receive any reclaimed feed. *Id*. 101:20-23.

**Tyson Employee Neil Barfield**

58. Mr. Barfield became a Service Technician with Tyson in the spring of 2003. Ex. 12, Barfield Dep. 68:10-18.

59. He came Broiler Manager at the Tyson Robards complex in the summer of 2017. *Id*. 71-72:24-11.

60. The tournament is used to incentive farmers to grow effectively and efficiently. *Id*. 175:18-176:1.

61. Tournament inputs affect growers' tournament performance. *Id*. 186:22-187:9.

62. Tyson provides growers in the same tournament flocks from laying hens of different ages, even though the laying hens' age impacts chick performance. *Id*. 205:22-25.

63. Tyson provides growers in the same tournament with different quality feed, despite the fact that feed is arguably the most important factor for tournament ranking. *Id*. 207:7-22.

64. Tyson forces growers into tournaments against birds who have been provided additional time to grow. *Id*. 160:18-21, 215:3-216:22.

**Tyson Employee and Corporate Representative Jerry Smith**

65. At the time of his deposition Mr. Smith had been an employee with Tyson for 25 years, working primarily with live poultry applications.[28] Ex. 32, Jerry Smith Dep. 5:18-23, 7:4-9.

66. His business unit within Tyson deals with IT issues- this unit was responsible for feed mills, hatcheries, and grow out operations (growers). *Id*. 8:8-18.

67. He has familiarity with the Grower Information System ("GIS") which deals with the growers. *Id*. 9:11-19.

68. GIS is the hub and the "mothership" of information tracking for Tyson. *Id*. 61:5-11.

69. The GIS tracks both growers and breeders. *Id*. 61:13-15.

70. The GIS tracks information inputs from breeder all way to plant. *Id*. 61:16-19.

71. The GIS tracks all feed the birds receive, and when they get it. *Id*. 61:20-25.

---

[28] Jerry Smith testified in this case as a FRCP 30 (b)(6) witness.

72. GIS is the main tracking software to track growers performance. It is the driving force of the settlement process and the performance indicators. *Id*. 38:7-15.

73. The broiler management system set up by Tyson is designed to keep track of Tyson guidelines as to feed, lighting, water, environment, chicken body weight, mortality, pre-placement form, temperature. *Id*. 18:15-25.

74. The tournament system inputs are housed in the GIS. *Id*. 41:15-17, 73:7-10.

75. Growers get placed into a tournament based on date birds get to complex, i.e. "time of closing." *Id*. 73:11-19, 79:3-80:16, 81:4-82:14.

76. Tournaments are complex specific. *Id*. 81:4-6.

77. Participants in any given tournament are based on GIS's algorithm at the end of grow out period, and "other" unknown variables. *Id*. 74:2-76:24.

**Plaintiff's Expert Dr. Kyle Stiegert**

78. Dr. Stiegert details Tyson's own website, United States government documents, and other public records—each its own piece of independent evidence in support of Plaintiffs' claim—establish the only potential competitor for purchasing some Plaintiffs' growing services is a single Perdue complex, and that there is no competitor for other Plaintiffs' growing services. First Report; see also Second Report.

79. Tyson "consolidated its monopsony power by requiring the Plaintiffs" to alter their chicken growing houses to meet Tyson-specific specifications, thereby further trapping Plaintiffs under Tyson's control, as Plaintiffs have essentially no way to recoup those investments except by continuing to work for Tyson. First Report ¶¶ 83-85, Table 5.

80. Perdue does not actually compete for the services of those Plaintiffs it could work with. *Id.* ¶¶ 73-75; see also Second Report ¶¶ 30-33.

81. Tyson's Robards complex is the definition of a monopsony, providing it anticompetitive power over them. First Report ¶¶ 111-12.

82. Due to Tyson's anticompetitive power it artificially depressed Plaintiffs' base pay. *Id.* ¶¶ 91-93, Table 6; see also Second Report ¶ 36.

83. Tyson "opportunistically" reduced the total number of flocks Plaintiffs received and thus could be compensated for. First Report ¶¶ 105-07, Fig. 5.

84. Tyson wielded its anticompetitive power in how it constructed its payment tournaments—in which growers' relative performance leads to rewards and demerits off of the base pay—further arbitrarily altering their compensation. *Id.* ¶ 36.

85. Tyson uses its anticompetitive power to randomly select subsets of growers for each tournament so that the same output resulted in different compensation because growers are being compared to different sets of growers. *Id.* ¶¶ 42-43, 45, Tables 2-3, Fig. 1.

86. Tyson's records establish it forces growers to face one another in tournaments even though it provides them flocks with different sex and breed makeups, which impacts outputs and relative placement. *Id.* ¶¶ 55-58, Figs. 2-4.

87. Tyson unilaterally decides to exclude certain growers from each tournament, which forces growers to vie against more high performers, leading to lower compensation than they should have received within the tournament system. *Id.* ¶¶ 94-96.

88. Tyson uses its power to dictate that not all of the meat growers produce will count towards their output, again reducing growers' compensation below what they should have received within the tournaments. *Id.* ¶¶ 99-104, Tables 8-9.

89. The way in which Tyson wields anticompetitive power means growers cannot know whether they are competing at an advantage or disadvantage and thus they cannot make

economically rational decisions and that uncertainly ultimately distorts the market and harms competition. *Id.* ¶¶ 59-62; Second Report ¶¶ 36-37.

90. "Economic theory strongly establishes that the exercise of monopsony power" will eventually "depress[] the supply of chicken by either completely driving growers from the market or preventing growers from expanding output" because they cannot rationally predict the value of their labor and related investments. First Report ¶ 18(vi); see also *id*. ¶¶ 67, 96, 105.

91. Tyson's "monopsony power" enables the company to "disadvantage[e] some growers vis-à-vis others." *Id.* ¶ 62.

92. Tyson's ability and willingness to give growers in the same tournament disparate inputs is an expression of its anticompetitive power. *Id*. ¶¶ 46-61.

93. Tyson at the Robards Complex has used its monopsony power to affect the pay that growers earn by engaging in various practices, including … transferring risk to the growers through their control of several factors that determine a growers performance (including, chick quality, feed quality, sex and breed of chicks, among others). First Report. ¶ 108; see also Second Report ¶ 36. The only reason that Tyson can do this is because it does not have "the fear of losing Plaintiffs to other integrators." First Report ¶ 109.

94. Plaintiffs suffered specific damages that resulted from Tyson's deceptive manipulation of the tournament system due to its anticompetitive power: damages from Tyson's condemnation practices Tyson's "anticompetitive exercise of monopsony power" allows it to "overestimate[] the number of pounds condemned in a tournament," First Report ¶ 123, and deny growers' compensation for meat they grew that Tyson profits from by sending it to its dog food plant. *Id.* ¶ 126.

95. Tyson overestimates the weight of condemned birds and then deducts this excess weight

from Plaintiffs' production in calculating their tournament ranking. *Id.* at ¶123, Ex. 31, Vincent Dep. 168:9-169:7.

96. The weight of diseased birds are generally fifty percent lower than a healthy bird. First Report ¶ 99. Thus, deducting the condemned birds at an average weight overestimates condemned bird weight such that Tyson underestimates the performance of Plaintiffs, *id.* at ¶ 123, which alters tournament performance. *Id.*

97. Dr. Stiegert opined that based upon Tyson's condemnation policies that grower pay was reduced by $366,088 not including prejudgment interest. First Report ¶19(c). Dr. Stiegert calculated damages for each Plaintiff based upon the excessive charges for condemned birds, and also for those pounds used at Tyson's dog food facility. *Id*. at Table 20-21.

98. Using its monopsonist position, Tyson opportunistically regulates the frequency of the supply of chicks to maximize profits while disregarding profitability to growers. *Id.* ¶ 105.

99. Dr. Stiegert analyzed this control and put forth damage estimates for the excessive days out which Plaintiffs' endured due to Tyson's actions, totaling over $3.5 million. *Id.* Table 22.

**Tyson's Expert Dr. Thomas Elam**

100. Dr. Elam claims that "over time," growers received the same inputs. Ex. 33, Dr. Thomas Elam Dep. 204:13. He acknowledges that in any individual tournament inputs are "different" and nonetheless growers are required to compete against one another. *Id*. 198-99, 209-210, 213.

101. Tyson's control of the inputs growers receive "might affect [grower performance] in an individual tournament." *Id.* 204:14-16.

102. When asked if everyone was getting the same degree everyone else is getting Elam responded, "Materially, that is true. Is it exactly true? No. But close enough." *Id.* 349:13-19.

103. Tyson provides growers in the same tournament flocks with different breeds, even though different breeds grow differently. *Id.* 198:10-11, 210:1-4.

104. Tyson provides growers in the same tournament flocks from laying hens of different ages, even though the laying hens' age impacts chick performance. *Id*. 210:5-7.

105. Tyson provides growers in the same tournament with different quality feed, despite the fact that feed is arguably the most important factor for tournament ranking. *Id.* 264:12-13.

106. Tyson forces growers into tournaments against grower houses that have different broiler densities, even though density can have a dramatic affect on chickens and affect performance. *Id.* 290:18-19.

107. Tyson knows and documents on a "Settlement Spreadsheet" for all Robards' growers a significant amount of detail by individual grower regarding performance, pay, condemnation and bird numbers. *Id.* 156:22-25, 157:1-15.

108. Tyson knows and documents on the Hen Recap Report what and how many breeder farms the chicks came from, the number of chicks from each breeder farm, and what broiler farm they went to and when they were delivered to that farm. They also know the breeds, the ages, the breeder farm number, the breeder farm name, the breed of the female and the breed of the male on the breeder farm that produced the chick. However, Tyson chooses to not sex the chicks. *Id.* 157:16-25, 158:1-25, 159:1-22.

109. Dr. Elam received Robards complex growing ranking by standard cost for various dates but chose not to rely on any of that information for his report. *Id.* 169:16-25.

110. Tyson did not furnish him any of the Plaintiffs' depositions. He did not request nor read any of the Plaintiffs' depositions even though he thinks they would be relevant. *Id.* 172:1-15, 174:1-9.

111. Tyson's live production manager at the Robards complex said it was not worth the trouble to sex the chicks. *Id.* 180:7-181:1.

112. Dr. Elam has seen performance information on males and females and they are different. Males have better feed conversion and gain weight faster. Dr. Elam agrees there is a difference in male and female performance. *Id.* 181:1-9.

113. Perdue sexes chicks. *Id.* 181:10-14.

114. It is better for the grower to have males because they have better feed conversion than females and will get bigger that females in the same number of days. *Id.* 186:15-25, 187:1-6.

115. Growers are growing three types of birds in the same tournament. *Id.* 196:6-25.

116. It is not shown in Tyson's contract that growers will be given different types of birds in the same tournament. *Id.* 199:24-200:4, 200:10-15.

117. Dr. Elam did not review the data and cannot tell in any given flock which grower or farm got reclaimed feed. *Id.* 202:9-19.

118. Age and days out are under the control of Tyson and they might affect an individual tournament. *Id.* 204:21-25.

119. Dr. Elam cannot tell how much reclaimed feed a grower is getting in an individual tournament because there is not data on that. *Id.* 207:10-25.

120. Dr. Elam is not suggesting that the breed of bird does not affect performance, in fact the breed of the bird can affect performance. *Id.* 209:2-4, 210:1-4.

121. The age of the laying hen in any given tournament can affect performance and the average age of the laying hen can affect performance. *Id.* 210:5-7, 210:22-24.

122. There are numerous variables that affect the quality of the chick such as age of the hen, the weight of the chicks and the sorting and culling of the chicks at the hatchery. *Id.* 212:1-213:1.

Sex can affect performance of the chick. *Id.* 213:2-6.

123. Dr. Elam lists the elements of grower performance that are outside of the grower's control, i. e. disease, subclinical disease which will generate subpar performance, feed, feed system specifications, chicks, placement and pick-up times, weather, veterinary service, poultry house temperature, airflow, ventilation, lighting and water delivery system. *Id.* 213:22-25, 214:1-7, 214:10-25, 219:1-25.

124. Tyson techs check to see if Tyson's environmental mandates are followed and growers can lose their contracts if they do not follow Tyson's mandates. *Id.* 220:13-24, 221:6-10.

125. Dr. Elam looked at averages instead of the individual flocks that have random fluctuations that cannot be explained. *Id.* 239:10-15.

126. Feed quality will have an effect on performance and poor feed quality can cause a grower to perform poorly. *Id.* 264:10-19.

127. Randomized feed quality variability is a risk to the grower in a tournament. Randomized chick quality variability is a risk to the grower in a tournament. Randomized age of hen variability is a risk to the grower in a tournament. *Id.* 265:11-266:2.

128. Tyson did not furnish Dr. Elam any Agri Stat reports to be used in developing his report and opinion. *Id.* 274:19-275:1.

**Pleadings/Documents**

129. Tyson repeatedly took the position in this case that evidence regarding its sales and profits, evidence that would establish a "broader market impact," "is unrelated to Plaintiffs' claims." Ex. 34, First Response RFP No. 49, 50. Plaintiffs requested "documents relating to the money earned from the sale of chicken and related products processed at the Tyson's Robards facility" and "relating to the market price of chicken," the exact type of information that would

demonstrate how Tyson's use of its anticompetitive power against growers ultimately harmed consumers, as Tyson now claims is required. *Id.* In discovery, Tyson responded that both requests are "unrelated to Plaintiffs' claims." Ex. 35, Tyson's First Supplement to Plaintiffs' Document Requests No. 49-50. As a result, Tyson explained it would "not produce documents responses to th[ese] requests." *Id.*

130. Section 2(C) of the contract with each Plaintiff, "Duties of Company," which is the same for each grower, provides: "Company will comply with all applicable federal, state, and local statutes, rules, regulations, and ordinances in performance of this Contract." Broiler Production Contract, Ex. 7 to Tyson Motion for Summary Judgment (Doc. 214).

131. The bargain Tyson entered into with Plaintiffs is that it would compensate them for the "production of marketable, target-weight, and processible broiler chickens." *Id.*

/s/ John C. Whitfield
John C. Whitfield
Caroline Ramsey Taylor
**WHITFIELD BRYSON LLP**
19 North Main Street
Madisonville, Kentucky 42431
Tel: (270) 821-0656
Fax: (270) 825-1163
john@whitfieldbryson.com
caroline@whitfieldbryson.com

J. Dudley Butler (MS Bar #7626)
**BUTLER FARM & RANCH LAW GROUP, PLLC**
499-A Breakwater Dr.
Benton, MS 39039
Tel: (662) 673-0091
Fax: (662) 673-0091
jdb@farmandranchlaw.com

David S. Muraskin
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, D.C. 20036
(202) 797-8600
fax (202) 232-7203
dmuraskin@publicjustice.net

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

On this the 10th day of July 2020, I hereby certify that a copy of the foregoing has been sent via the District Court electronic filing system and by email to:

Marc Wells
209 West Main Street
P.O. Box 644
Princeton, Kentucky 42445

Robert T. Adams
Mark C. Tatum
Shook, Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, Missouri 64108

***Attorneys for Defendants***

/s/ John C. Whitfield
John C. Whitfield
WHITFIELD BRYSON, LLP
19 North Main Street
Madisonville, KY 42431
(270) 821-0656
john@whitfieldbryson.com

***Attorney for Plaintiffs***