# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY, OWENSBORO DIVISION

CHARLES MORRIS, ET AL.,

Plaintiffs,

vs. No. 4:15-CV-00077

TYSON CHICKEN, INC., ET AL.,

Defendants.

________________________________________

VIDEO DEPOSITION OF JIM GOTTSPONER
TAKEN ON BEHALF OF THE PLAINTIFFS
ON OCTOBER 11, 2018, BEGINNING AT 9:01 A.M.
IN SPRINGDALE, ARKANSAS
REPORTED BY MIKE WASHKOWIAK, CCR

APPEARANCES:

On behalf of the PLAINTIFFS
John C. Whitfield
WHITFIELD, BRYSON & MASON LLP
19 North Main Street
Madisonville, Kentucky 42431
270-821-0656
john@wbmllp.com

On behalf of the PLAINTIFFS
Caroline Taylor
WHITFIELD BRYSON & MASON LLP
19 North Main Street
Madisonville, Kentucky 42431
270-821-0656
caroline@wbmllp.com

A I don't recall. I just don't. It may have been -- I don't recall. I don't know.
Q Okay. Do you know what type of sex of bird was being grown at that time?
A In that particular area it was all one. We were not sexing.
Q Okay.
A Sexing was not being done, so it was all -- it was all one sex. Yeah, there was no sexing there.
Q Okay. While you were at Tyson the whole time, was there ever any sexing or itemization of the birds male versus female in any flocks?
A No, sir, not at Tyson.
Q That's all I'm asking, just for Tyson?
A Tyson was not sexing.
Q In fact, on some of these settlement sheets we've seen, we've seen the letter S as far as the flock. Does that mean straight line, is that what that means?
A Straight run.
Q Straight run?
A I would assume that's what you're referring to.
Q I am. We'll get to that later. A straight run basically is a male and female flock?
A That's nature's mix, yes.
Q It's nature's mix. There's no way to tell

correctly and getting water in all areas of the house correctly.

Q About how many birds would comprise a flock, at least when you were a tech from '91 to '94? What was the typical density?

A Density or a number of birds?

Q Both. Let's do both.

A They're two different things.

Q They are. Go ahead.

A I really don't remember for sure, but I would think about .85 density. So on a 20,000 square foot barn, which is what almost all of them were back in those days that's about 21,000 chickens without getting a calculator out and checking myself.

Q So .85 foot, square foot?

A Yes, sir.

Q Okay so the bird would have .85 of a square foot of which to thrive?

A At day one, yes, sir.

Q That's the density, right?

A At day one before any bird died.

Q Then how did that change?

A As birds die they have more room.

Q I get that, okay. Let's talk then about your job at Cobb-Vantress, okay?

A Yes, sir.
Q How many people work there?
A Twenty.
Q How many birds a day were hatched there?
A 60,000.
Q And then I assume sexing went on there as well?
A Yes.
Q All right. So did you essentially, Jim, stay in the Siloam Springs hatcheries for these 12 years as hatchery manager?
A Yes, sir.
Q Who was your immediate supervisor at that time?
A Scott Martin.
Q What was Mr. Martin's title at Cobb-Vantress?
A He was director of hatcheries.
Q At Cobb-Vantress?
A At Cobb-Vantress, yes.
Q All right. When did you leave the hatcheries there, about what date?
A I'm going to be lucky to get the year correct, and I don't even know -- I don't have confidence in my year even, but we'll say, oh gosh, maybe 2010.
Q Why did you leave in 2010?
A I received a promotion into the Transportation Department from Cobb-Vantress.

Q Where would that have been, Jim?
A Siloam Springs.
Q Same place, okay.
A Yes, sir.
Q Talk to me about that. How did that happen? Who was the contact that said we're going to promote you to transportation?
A Aldo Rossi was over the Transportation Department.
Q Aldo Rossi?
A Uh-huh.
Q Okay. And?
A He was my boss.
Q Was your boss. So what was your responsibility, then, in the Transportation Department?
A So Cobb-Vantress ships baby chicks and eggs all over the world in specialized trucks that have heating and cooling and fresh air capabilities, and I was responsible for the shipping of all of the Cobb US eggs and chicks. If they were leaving the country, I had to get them to the airport. So I was responsible for all US product, even if it was leaving the country.
Q For the eggs and the chicks?
A Yes, sir.
Q What was your title, Jim?

A Transportation manager.
Q Okay. How many people worked in this department of Cobb-Vantress?
A Counting the truck drivers, 80.
Q All right. How long did you work there?
A Three years.
Q So that would've been through 2013 approximately?
A That doesn't sound right. I must be off somewhere. I must've went over there in 2008 and left in 2011. So 2008 I became transportation manager, I think.
Q 2008, not 2010?
A No, sir, sorry about that.
Q No worries. 2008 and then you left in 2011?
A Yes.
Q Okay. And then in 2011 you apparently moved to a different job?
A Yes.
Q Tell me what you did.
A I went to Tyson Foods Clarksville as a broiler service tech.
Q Clarksville what state?
A Arkansas.
Q At the Clarksville complex there?
A Yes.

Q You were a broiler tech?
A Yes.
Q Why did you take that job? Why did you move to that job?
A There were some issues at the transportation job, and I needed to leave.
Q Okay, what issues are you talking about?
A There were some DOT issues that we were struggling with.
Q What were they? Talk to me about these issues. What kind of DOT issues?
A Is there relevance to that?
Q Yeah, there is.
MR. TATUM: What's the relevance?
MR. WHITFIELD: I'm asking the question.
MR. TATUM: You said there's relevance. We just want to know what that is.
MR. WHITFIELD: Well, this is a discovery deposition, so I can ask.
MR. TATUM: I understand, but if you're asking him about something that happened pre-discovery according to the relevant time period you've defined in this case as the discovery period...
MR. WHITFIELD: This goes to credibility. This goes to all the other issues with this witness. I need to

know why it is that he left the job in the transportation department. There's issues relative to transportation issues. I need to know what those are. And if there's an issue with this down the road and you want to bring up a motion in limine, you can always do that. But this is a discovery deposition. I have the right to ask.

MR. TATUM: I get that. I'm just trying to -- so your articulation is you want a little bit of information for background?

MR. WHITFIELD: Yeah, just background. It's background information. It's all relevant.

MR. TATUM: It's not relevant, but go ahead.

A It was job performance. I wasn't meeting expectations.

Q (BY MR. WHITFIELD) So you were fired?

A I was allowed to find another job in the company.

Q What specifically was it that led to that?

A We had a truck ran overweight in Tennessee that I was aware of, so it was a DOT violation.

Q Okay. Being that you worked in the transportation department, then the Department of Transportation had jurisdiction over the size of the trucks, weight of the trucks, and probably even the amount of time the trucks operated, I assume?

A That's correct.
Q Okay. And there was a -- strike that.
There was a Cobb-Vantress truck in Tennessee that was pulled over and cited; is that fair?
A That's correct.
Q About when was that, Jim?
A I don't remember. Right around 2011.
Q Okay. How did that come to be -- strike that. That's a bad question.
How did you learn that there was one of the trucks that was cited by the DOT?
A So the driver called and told me.
Q Okay. Do you remember the actual citation, what it is the driver was cited for?
A He was cited for overweight.
Q When you say overweight, what was the requisite weight and then what was the weight that he was cited for?
A I don't remember.
Q Those trucks had to be a certain weight under the DOT standards?
A Right.
Q And if they exceeded that weight then they could be cited?
A That's correct.
Q All right. Is that a ticket or is it a

misdemeanor or what is it?
A It's just -- it's a ticket.
Q Okay. Do you remember how much over this truck was?
A No, I don't.
Q But you said you knew about it?
A Yes.
Q You knew going that he was overweight?
A I knew after he was in route with live chickens that he was overweight.
Q All right. And you just --
A There was no reasonable resolution that I could see to get it corrected.
Q Okay. So you're just hoping you don't get caught?
A I made the call and left it up to the driver whether he wanted to proceed or not.
Q Okay. So he proceeds and he does get caught and he gets cited; is that right?
A Yes, sir.
Q So then that made its way to somebody at Tyson?
A No, I reported that to my boss immediately.
Q Your boss again?
A At that time was Randy Vardeman. Aldo Rossi had already moved on to other things.

Q Randy, can you spell his last name?
A Vardeman?
Q Yes, sir.
A V-a-r-d-e-m-a-n.
Q So you reported that to Mr. Vardeman and what happened then?
A He reported that to the president of Cobb, Jerry Moye.
Q Spell that, spell Moye for me.
A M-o-y-e.
Q All right. Did somebody contact you about this after the reporting process took place?
A Yes.
Q Who was it that contacted you about it?
A The HR department.
Q Who in the HR department contacted you?
A Dennis Padgett.
Q Dennis Padgett?
A P-a-d-g-e-t-t.
Q Got it. What did Mr. Padgett tell you?
A He said this is unacceptable neglect per DOT rules, and you can't be transportation manager anymore.
Q Okay. Did they give you an opportunity to resign, or what happened?
A He gave me a two-month period to find another

position in the company.
Q During this two-month period, then, you didn't work for anybody?
A Right.
Q Did they pay you during this two-month period?
A Yes, sir.
Q And then you were able to find a job with Tyson?
A Yes.
Q So you actually left the company -- you left Cobb-Vantress and you went to work for Tyson two months later?
A That's correct.
Q How did you find the job with Tyson?
A I called everybody I knew and asked if they had any jobs open within driving distance of my home so I wouldn't have to relocate.
Q You were where, Jim, at this time?
A Siloam Springs.
Q How far is that from here?
A Twenty-five, 30 miles.
Q Not that far?
A No.
Q So you were able to land with Tyson at the Clarksville complex as a broiler tech?
A Yes, sir.

Q And that's what you had do before in '91 through '94?

A Yes.

Q Okay. I don't want to know what they paid you, but was your pay as much as a broiler tech as it was when you worked as transportation department?

A No.

Q So it was a decrease in pay?

A Yes, sir.

Q When you were with Tyson as a broiler tech that would've been 2011, about?

A (Witness nods head.)

Q Do you remember what month, Jim?

A Maybe June.

Q June of '11?

A I'm guessing.

Q Okay. How many farms were you responsible for in the Clarksville facility?

A Farms probably -- I think probably around 40.

Q Okay. Do you remember what type of geographic area that you covered, how big of an area?

A No, I never put miles to it. But if you mean total from one the other?

Q Yes, sir.

A Probably 50 miles.

Q Okay, and what about Natural Dam? Were antibiotics used there as well?
A Yes, sir.
Q Was Naxcell used there as well?
A Yes, sir.
Q That was the only antibiotic used at that facility?
A The only that I recall.
Q Okay. Now, how long did you work -- you told me through December of 2013?
A Yes, sir.
Q And then December 2013 you got a different job?
A That's correct.
Q Okay, tell me about where you moved to.
A I moved to Robards, Kentucky.
Q Okay. That's close to Henderson, Kentucky?
A That's correct.
Q Is that the first time you'd ever been to the Robards facility?
A Yes, sir.
Q First time you'd ever moved to Kentucky?
A That's correct.
Q Did you get there around December of 2013 or January 2014?
A Yes. December 10, I believe.

Q December 10?
A It was either the tenth or the 17th, I can't remember which.
Q What was your job title at the Robards facility?
A Live production manager.
Q All right. So when I say the Robards facility, we're going to make reference to the fact that means the Robards Tyson Foods complex.
A Okay.
Q Now, let's talk about that facility. How is it that you got that job as live production manager in Robards?
A Well, the job came open. The previous live production manager was no longer there.
Q Who was the previous life production manager?
A Kenny.
Q Bartley?
A Yes.
Q Okay. Do you know why Mr. Bartley was not the live production manager anymore?
A I do not know for sure.
Q Was he fired?
A I don't know for sure.
Q Well, what have you heard?
A I have heard he was fired, but that's

MR. TATUM: Objection.
A They didn't get along is what I heard.
MR. TATUM: Misstates his testimony.
Q (BY MR. WHITFIELD) You had heard that Mr. Bartley and Mr. Morris had an issue?
A Yes, sir.
Q You also heard -- strike that.
Did you hear that Mr. Bartley had an issue with anybody else in terms of a grower at the Robards facility?
A No, sir.
Q Okay. You also heard that there were issues with documentation, you said. What do you mean by that, Jim?
A So I understand that there was a mortality card that the producer had said was modified.
Q So you had heard that the producer, that would be Tyson?
A I'm sorry?
Q When you say producer, is that the farmer?
A That's Charles Morris.
Q Okay, you had heard that Mr. Morris modified --
A No, that he claimed that Mr. Bartley modified a mortality card.
Q Got it. Mr. Morris claimed that Mr. Bartley modified a mortality card, correct?

A Yes, sir.
Q That's what you heard. Do you know -- strike that.
Did you do any investigation at all on your behalf to determine if that was true or not?
A No, sir.
Q That's what you heard?
A Yes, sir.
Q And you'd also heard, then, that Mr. Bartley lost his job over that?
A Yes, sir.
Q Is there any other reason you heard that Mr. Bartley lost his job?
A No, no, sir.
Q Does Mr. Bartley still work for the company, do you know?
A Not to my knowledge.
Q Okay. Do you know how long Mr. Bartley was live production manager at the Robards facility?
A Speculation would be almost three years.
Q Okay. Did you know Mr. Bartley at all prior to you coming to assume his job as live production manager at the Robards facility?
A No, sir.
Q Didn't know him at all?

document what truck went where and what it weighed and get to put in the cooling shed and the birds kept comfortable. If it's hot, turn on the cooling. If it's not, leave the fans off so they don't get too cold.

Q Okay. All right, and then you had Jared Shelton. What was he at the time, broiler manager?

A Broiler manager, yes.

Q What's his job responsibility?

A So his job was to work with broiler producers and the service techs to receive the baby chicks at day one onto their farm and to grow them out until it was time for harvest.

Q Okay. As broiler manager, then, he was responsible for working with the farmers themselves once the chicks got to the houses and were grown for, what, 60 some odd days; is that right?

A It varied defending what the target weight was.

Q Okay. What was the target weight at that time?

A When I got there, I'm not 100 percent confident, but I think it was six pounds.

Q And what type, when you got there what type of birds as far as gender were being brought?

A Let me correct that. It was six and a half pounds.

Q Okay.

A To the best of my recollection.
Q That's fine. What type of bird was being grown at the time you got there December 10, 2013?
A The best I can remember they were all Cobb at that time.
Q Okay. Did that change over time?
A Yes, it did.
Q How did it change?
A We brought in some Ross birds at one time into the mix.
Q That would've been a different breed?
A That's correct.
Q So you're running Cobb and you're running Ross?
A Yes, sir.
Q Any other types of birds?
A Not that I can remember.
Q When Mr. Shelton would get these birds to the farmers, there was no itemization of the sex of the birds, was there, male and female mix?
A There was not with the birds that we produced. There were birds brought in from Cobb that were all -- that were sexed.
Q Okay. But as far as the birds coming from the hatchery, the Tyson hatcheries, there was no sexing?
A No sexing.

production manager?
A Close to three and half years.
Q So you started December 10, 2013?
A Yes.
Q Then when did you move to a different job?
A May of '17?
Q May of '17, okay. What happened in May of '17?
A I resigned.
Q You resigned?
A Yes.
Q You resigned as live production manager?
A That's correct.
Q Why did you resign?
A I wanted to come home, and my wife was living here. You used the word relocate earlier, and I didn't correct you. But the fact is I have a farm, a chicken farm, cattle, and my wife and my children and my grandchildren here, and I was there. So I committed to a three-year commitment, and then I was going to be looking for another opportunity. I found that opportunity at that time.
Q Okay. So you resigned as live production manager in May of 2017?
A Yes.
Q Okay. And you're telling me the reason you did

A Than what?
Q Than Tyson.
A That's correct.
Q Where is Liberty located?
A Decatur, Arkansas.
Q How far is that from here?
A Thirty miles.
Q All right, so you left, then. What day in May of 2017 did you resign?
A I have no idea. I should've brought my daytimer.
Q Okay, sometime in May?
A Yes, sir.
Q Were you not asked to leave?
A I voluntarily left.
Q I understand you voluntarily left, but I'm asking you did Tyson ask you to leave?
A They were in favor of me leaving.
Q Why were they in favor of leaving?
A There were some -- there were some challenges at the feed mill, a safety issues.
Q Let's talk about that. What challenges did you have at the feed mill?
A So we had a small fire.
Q At the feed mill?

A At the feed mill in a very sensitive location.
Q When did that happen, Jim?
A Maybe April.
Q Of 2017?
A 2017 yes.
Q Okay. So you had a fire at the feed mill. Do you know what caused the fire?
A It was a bad bearing, a bearing went out.
Q A bearing went out on a piece of equipment?
A Yes.
Q Caught fire?
A Yes.
Q What's the type of equipment you're talking about?
A It's an auger that unloads grain out of the trucks. It's underground.
Q Okay.
A It was very combustible and enclosed, safety sensitive, very safety sensitive area.
Q All right. So this happened in April. What type of damage did you incur?
A None.
Q But you had a fire at the feed mill. It was caught, apparently?
A Yes.

Q Do you remember what day in April that would've been?
A No, sir, I don't.
Q All right. The Robards facility is in Webster County, isn't it, or is it Henderson County?
A Henderson County.
Q Was the Henderson County Fire Department called?
A Yes. Well, no.
Q Was not?
A They were not.
Q Okay. So the fire was put out by Tyson employees?
A Yes.
Q But didn't sustain any damage?
A None.
Q Okay. Then why was that an issue, if you knew?
A The potential for an explosion.
Q The potential for an explosion? Didn't explode, but there was a threat?
A Didn't explode. There was a flame in an area that flames cannot be tolerated.
Q All right. And then is that the only issue that you had to deal with at Tyson in terms of you leaving?
A Yes. Performance was just always there and a challenge, but yes, that was the only thing I'm aware of.

not why they asked me to leave.
Q Okay, then why did they ask you to leave?
A Because of the fire at the mill.
Q Fire at the mill, but you said there were performance issues, and the performance issues, was that a factor in asking you to leave?
A I don't think so.
Q Did they tell you that?
A No.
Q You're just surmising that may be an issue?
A That could be a possible contributor.
Q Okay. Did someone at Tyson say to you Jim, we think it's time for you to go ahead and leave?
A Yes.
Q Who did that?
A David Mears.
Q Okay. When did Mr. Mears do that, if you remember?
A The day I left. I don't know what day that is.
Q That would've been sometime in May of 2017?
A Yes, sir.
Q Did you meet with Mr. Mears specifically about this?
A Yes.
Q Okay. Did you meet at the facility?

A At the corporate office in Robards.
Q Okay. And was anybody else in the room besides Mr. Mears?
A No.
Q What did Mr. Mears tell you that day?
A He just said you're going to have to -- you're going to have to leave.
Q Like that day?
A Yes.
Q Were you escorted out of the premises?
A That's correct. So I said well, I'm resigning anyway right now. They all knew that I was seeking other employment. I was very open with everybody, even corporate. And so --
Q Pull up a little bit. That's going back and forth.
A I think it's following me. Every time I scoot up, it scoots up. I think my leg's hitting it. Is that better?
Q That's better, yeah.
All right, so you're meeting Mr. Mears. This is in May 2017, don't remember what day.
A No, I don't. It was a Friday.
Q It was a Friday and he asked you to leave?
A Yes.

farmers in the Robards complex, let's say, the Robards farmers, you don't know whether or not they're male or female, do you?

A No, sir, not on those Cobb chicks we were getting from Cobb.

Q Okay. You certainly don't know that from the chicks that are hatched from the Tyson facilities, do you?

A It's absolutely 50-50 is our expectation.

Q Okay. All right, so then genetics is less than a percent, I think, in terms of success in the tournament system. What about food? What's food -- what's feed play into that?

A Like feed formula?

Q Yeah, the type of feed, the frequency of the feed, whether or not the feed is refurbished feed or not, how does that play into success in the tournament system?

MR. TATUM: Objection, overbroad, vague, and ambiguous.

Q (BY MR. WHITFIELD) Go ahead.

A So feed quality is very important.

Q Okay. In the overall zero to 100 percent involvement, where would you put that, feed quality?

MR. TATUM: Objection, calls for speculation, lack of foundation.

Q (BY MR. WHITFIELD) Go ahead.

A I wouldn't be comfortable giving it a percent.
Q Well, is it very important? Is it less important?
A It's very important. That's why we have these huge feed mills with all these systems and equipment and nutritionists and teams and quality monitoring and feed sampling. It's very important.
Q Okay. Well, I thought I heard you say that the quality of the manager, you have to have a strong manager, that's the most important?
A Definitely.
Q Okay. And so where would that fall from zero to 100 percent? Where would that fall in terms of importance?
A I don't know how to assign it a number. I don't feel like I have a good measurement system to apply to that.
Q But it's the most important thing?
A It is the most constant determination of performance.
Q And genetics is probably the least?
MR. TATUM: Objection.
Q (BY MR. WHITFIELD) If it's less than one percent.
MR. TATUM: Objection, vague and ambiguous, lack

A Yes, sir. Employed by the poultry system for 29 years.

Q Twenty-nine years, okay. You've spent time as a live production manager and you've spent time as a tech, correct?

A Yes, sir.

Q And by virtue of that you have a working knowledge of the tournament system and how it works?

A Yes, sir.

Q Okay. So we were talking about the different variables that go into success of any grower in the tournament system, and we talked about those five different things. What I think maybe is not clear is how we define success, okay?

A Okay.

Q My definition, at least, under what we've learned in this case is the first grower in a tournament is the person that has the net pound value at the least number?

A Yes.

Q Okay. So then the individual that can grow a bird that has the lowest net pound value would be the number one person in the tournament, correct?

A Yes.

Q So success would be defined in a tournament as

efficiency in growing the bird?
A Yes, I agree.
Q Okay. So that is your definition of success, correct?
A Yes.
Q I want to make sure I made that link because I'm not sure I was very clear with that before the break.
A Okay.
Q And again, your testimony is the strength and quality of the manager is the most important thing in order to achieve success in the tournament system?
A Yes.
Q Okay. Now, we talked about your job at Liberty, and I want to make sure the date of leaving that you gave me was correct because I think you said December of '18?
A Oh, leaving Liberty?
Q Yes, sir.
A September, September 10.
Q Yeah, that's what I thought. Okay, September 10 of this year?
A Yes, a Monday.
Q On a Monday. You left because the company shut down?
A That's correct.
Q You weren't terminated?

disposal, following all the rules and laws of the land.
Q Did he comply?
A He corrected it.
Q So he did comply?
A Yes.
Q What other issues did you have with Mr. Morris, conversations you remember?
A Well, I mean, a lot of them I don't remember. The one in particular is when I requested he discontinue flipping me off when he sees me.
Q He would flip you off?
A Yes.
Q What do you mean flipping you off?
A He would give me the -- he would throw the finger at me.
Q Okay. The middle finger?
A The middle finger, yeah.
Q Okay. How many times did he do that?
A Three times that I can remember.
Q Okay. Why -- strike that.
Was there an issue that you and he had that would cause him to give you the middle finger that you're aware of?
A Not that I'm aware of.
Q So he's just doing it just because he wants to?

A I don't know why he's doing it.
Q Did you ever have any heated conversations?
A That one right there when I requested he discontinue that kind of behavior.
Q Did you call him or did --
A No.
Q You went to his farm?
A Yes.
Q Do you remember what that was, Jim?
A No, I don't. I don't remember. It was in that last -- that final year, probably.
Q You went to his farm, and what did you say to him?
A I just said Charles, I'm committed to treating you with dignity and respect and I expect you to reciprocate, and you flipping me off is not acceptable anymore.
Q Okay. Where were you when he flipped you off?
A One time in, what's that bar in Henderson? It's a sports bar.
Q Not Rookies, but --
A Rookies, yeah, down by the river.
Q Not that I've ever been there.
A Yeah, it's a nice place.
Q I actually have been there a bunch of times.

A And then one time in my office.
Q On time in your office. So one time at Rookies?
A One time in his vehicle driving down the road in Sebree, Kentucky.
Q Okay, and one time in his office, all right. But you don't know why he would do that?
A No.
Q You don't know why there -- I mean, that's obviously an act of animosity towards somebody, correct?
A Yes.
Q You don't have any idea why he would do that?
A Other than me doing my job, which I suspect was troubling him.
Q You doing your job made him mad, and so you think that he flipped you off because you're doing your job?
A I don't know. I'd be guessing.
Q Okay, fair enough.
A But I know he didn't want me to do my job.
Q He didn't want you to do your job. Did he ever say that to you?
A He -- no, he didn't ever say that directly.
Q So why do you think that, Jim?
A Because he wanted to be left alone and perform poorly. If we would let him perform poorly, he's made

due to poor performance, so there's some of those.

Q Fifteen percent density reduction which means the birds would have more room?

A That's right.

Q Is it fair for me to assume that as far as the birds growing appropriately the more density you've got, the more room they've got, the better?

A The more room they have the easier it is for the producer to accommodate their needs.

Q Fair enough. That's a better way of saying it. Thank you.

A Everything is there to do it, but that farmer is not getting it done, so we make it where they have an easier opportunity.

Q What about medications or vaccinations, did that have any affect on rankings in the tournament system?

A Not to my knowledge. Everybody should have been on the same program, so which would have been apples to apples.

Q Is it your opinion when you were live production manager that everybody that participated in the tournament system at Robards got the same type of feed?

A The same type of feed?

Q Yep?

A You mean formula and volume?

impact performance in the tournament ranking in the tournament, and I was going through a laundry list of those things. What about time spent on the truck after pickup, okay? I thought at least when you were in Arkansas and you were a tech you told me that there were some instances where birds were picked up 50 miles away from the facility. Did that apply also to the Robards facility? Were there some instances where growers were closer to the facility to other ones?

A Yes, sir.

Q With Robards what was that range in terms of the longest away from the complex and the closest to the complex?

A Probably -- I'm trying to think who the closest farm was. Probably five miles and 50 miles.

Q Okay. So there were some instances where birds were picked up and then they would travel 50 miles on the truck before they got to the complex, correct?

A That's correct.

Q There were some that would go five miles and be picked up?

A That's correct.

Q So there's a time difference there as well?

A Yes, sir.

Q You ever heard of something called shrinkage?

A Yes.
Q Were there any instances you can remember while you were live production manager where someone was given all male birds, for example?
A Their entire farm got males?
Q One house would get all males.
A I would think that occurred. But again, I don't know for sure that they were all males but they appeared to be. That has happened.
Q Okay. Has it happened before in your experience at Robards that somebody in a tournament, in a theoretical tournament, would have all males versus somebody that would have a straight line production?
A No, I never -- I have never been aware of that happening, and I've seen no correlation between efficiency and that.
Q I'm not asking that question. I'm asking whether or not you are aware of instances where somebody had all males in a tournament and they were competing against somebody that had a mix of males and females?
A I'm not aware of that happening.
Q But you have said you're aware of instances where people in a tournament will compete with birds of different breeds?
A Yes.

MR. WHITFIELD: Quit interrupting me.

MR. TATUM: No, quit arguing with him. That's what needs to happen.

Q (BY MR. WHITFIELD) You wrote here June 23, 2014 at 9:57, it's the last transmission in this email thread and you say, you admit that you said we have plans to get him moved up the sheet. We can move him up a long way and still have bird health issues and performance issues with his farms. You wrote that, didn't you?

A Yes, sir.

Q Okay.

A And that meant that we can improve his performance a great deal and he'd still have a whole bunch of problems and increase his pay.

Q And one way you can do that is arbitrarily move him up the tournament, correct?

A No, sir, that's not correct. I already told you that we can't do that.

Q Okay. Well, this says a little bit different.

MR. TATUM: Objection, it's argumentative.

THE WITNESS: I disagree with you completely.

MR. WHITFIELD: Fair enough. We'll move on, then.

MR. TATUM: Finish your thought, go ahead. You disagree with him?

Message

**From:** Gottsponer, Jim [Jim.Gottsponer@tyson.com]
**Sent:** 6/23/2014 9:57:13 PM
**To:** Graves, Chris (Clarksville)
**Subject:** RE: Charles Morris

You can see why he wants us to increase base pay AND minimum pay. That is where is lives, minimum. He was the leader of the grower meeting last week where the growers requested a pay increase. Very frustrating. We have plans to get him moved up the sheet. We can move him up a long way and still have bird health issues and performance issues with his farms.
Did you get my text that Bob will be here Thursday?

**From:** Graves, Chris (Clarksville)
**Sent:** Monday, June 23, 2014 4:50 PM
**To:** Gottsponer, Jim
**Subject:** RE: Charles Morris

Looking at his performance that would be a stretch goal.

---

**From:** Gottsponer, Jim
**Sent:** Monday, June 23, 2014 10:43 AM
**To:** Graves, Chris (Clarksville)
**Subject:** FW: Charles Morris

Chris, as you requested, here is a list of all of Charles Morris contracts. We have our top tech, Neal Barfield, servicing all these contracts. Neal is a Tech 2. Bird health is a constant struggle on these farms. He has 52 houses. We are making progress. We showed Charles where he would have made an additional $400,000 in the last year if he had settled average on all his contracts. FYI – Charles informed me he would have all his farms paid off in 20 months.

---

**From:** Hanor, Cecilia
**Sent:** Monday, June 23, 2014 9:59 AM
**To:** Gottsponer, Jim
**Subject:** Charles Morris

| | | | |
|---|---|---|---|
| Gravel Pit | 6 flock ranking | 83 of 91 | as of 5/10/14 |
| Honeysuckle | 6 flock ranking | 84 of 92 | as of 4/19/14 |
| Morvatt #2 | 6 flock ranking | 87 of 91 | as of 5/10/14 |
| Morvatt #1 | 6 flock ranking | 88 of 92 | as of 4/26/14 |
| Hwy 56 North | 6 flock ranking | 77 of 92 | as of 5/3/14 |
| Hwy 56 South | 6 flock ranking | 91 of 91 | as of 5/17/14 |
| B D Luck | 6 flock ranking | 91 of 91 | as of 5/24/14 |

PLAINTIFF'S EXHIBIT 7 Gottsponer PENGAD 800-631-6989