# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | |
|---|---|
| CHARLES MORRIS, et al., Plaintiffs, | ) |
| v. | ) Civil Action No. 4:15-cv-00077 |
| TYSON CHICKEN, INC., et al., Defendants. | ) |

**VIDEO DEPOSITION OF KENNY BARTLEY**

**MARCH 4, 2019**

The video deposition of Kenny Bartley was taken pursuant to Notice on the 4th day of March 2019, beginning at 9:57 a.m., at the law offices of King, Deep & Branaman, located at 127 North Main Street, Henderson, Kentucky; said video deposition was taken for any and all purposes permitted by law.

where growers in any given period - I'm talking about broiler growers - would grow different types of birds?

A Well, we had both Cobb males and Hubbard females, and I know that they were out there. As far as being on facility, I'm sure there were both because there was never enough of one or another that had to get out to the farms. You always had to make sure you were putting birds on the farm as what the grower placement needs were, as you stated earlier. I don't know if I've answered that correctly. I don't know if I understood the question correctly.

Q Well, I'm just asking you. I mean, if you've got Morgan Rickard - - do you know who he is?

A I do know his name, yes.

Q And then Charles Morris, do you know who he is?

A Yes, sir.

Q And there would be instances, I would assume, where Charles Morris and Morgan Rickard are growing birds at the same time because they had a significant amount of houses, correct?

A Yes.

Q Are there instances that you're familiar with in this example I'm giving you - this is just an example only - where Morris might be growing Hubbard males

Q Okay. Do you know what an average base pay is?

A Well, it was a base bay. I don't know if it was called average base pay or base pay. I don't recall that.

Q Do you know what -- strike that.

Do you know how the base pay was arrived at?

A Not how it was arrived at.

Q Do you know how it was calculated?

A In some areas I have a little bit of remembrance of it, but not totally. If you had the numbers in front of me and --

Q Well, you were live production manager for --

A Just shy of four years.

Q Yeah. And I think you said that you have talked to individuals about the contract, either individuals that were already with Tyson or perhaps individuals that may come with Tyson, correct?

MR. TATUM: Objection. Misstates his testimony.

Q Is that right or wrong?

A I've made comment of people that I knew were growers that we had a contract with, yes.

Q And was it a part of your job to go over the contract with the potential grower before they signed

it?
A Wasn't necessarily a part of my job. I just went over it as - -
Q You just did it anyway?
A I did it as a courtesy. Hey, let's go over this, make sure so you can see that there's nothing going on here; here's what the contract is, which is exactly what you have over here. Straight up.
Q I get it. And so when you were talking to these growers about the contract, you talked about the base pay, right?
A Uh-huh.
Q Is that yes?
A Yes.
Q And did you talk about - - you talked about the competitive system, that they would be compliant?
A They would have the basis of how they were still being paid. That's what they would still be being paid on.
Q Which would be the tournament system?
A Yes, sir. If that's what you want to call it.
Q All right. Again, do you have a working knowledge of the tournament system?
A I did then, yes.

Q Okay. And is it fair for me to assume that the tournament system was based upon a set of inputs that were utilized by Tyson to rank growers in any individual pay period?

A By their performance?

Q Yeah.

A I don't know if it would rank it, but, yes there was a ranking. I guess it would be an easy way to say that.

Q That's right. And performance was based upon certain inputs that Tyson came up with; for example, a mortality rate or a feed conversion rate or things of that nature, correct?

MR. TATUM: Objection. Lack of foundation. Calls for speculation.

A If I saw the contract I'd remember a whole lot more what that number came from. I do recall a number of chicks being placed on the farm - -

Q Number of chicks, yeah.

A That's what I remember at this point in time.

Q Okay.

A Again, if I saw the contract I'd be able to go through it, maybe more memory may come back, but I do not recall.

Q And did you talk to growers, that they may be involved in a competitive pay system where some growers would get reclaimed feed and some weren't?
A No, sir.
Q You never said that to them?
A No, sir, not that I recall.
Q And did you ever speak to them and tell them, while you were going over the contract, that they may be competing with growers in the same tournament that might be growing different birds than they were growing? Did you ever explain that to them?
A Not that I recall.
Q And while we're talking with growers about the contract did you ever explain to them that there may be growers that would be growing different sexes of birds, male versus female?
A No.
Q Okay. Did you ever tell them that there may be instances in any individual tournament that the growout times would be different?
A Growout times would be different from what standpoint? No, sir.
Q Okay.
A What I always made reference to in that point was that we need a certain size bird, we need to

raise the birds to this size as we bring them into the plant.

Q But did you ever tell them that in any given tournament that one guy may be going, you know, 56 and another guy may be going 53? Did you tell them that?

A I don't recall that.

Q Okay.

A No. Our bird weight was the most prominent thing that we needed to stay with, within the range.

Q I get that.

Did you ever tell them that in some instances some participants in a tournament may be given - - their birds may be given vaccines and others may not? Did you ever tell them that?

A No. Because our protocol was that these vaccines went through breeders; and, you know, the breeders is where everything was vaccinated at. Plus, that came through the hatchery, if any were given at that point in time.

Q And did you ever tell any of these individuals that were thinking about signing on with Tyson that the catch times would be different in any given tournament? Did you ever tell them that?

A Catch times?

Q Catch dates.

A No. Catch times I explained to them, though. You referenced catch times. You know, because of when we're going, bringing birds to the plant and the plant has its needs on a 16-hour day per se - they worked two eight-hour shifts - that, you know, we would be catching birds evening, into the next day, afternoons, things of that nature. I did explain that.

Q I get that. But did you ever tell them that in any given tournament there could be instances where one guy may be caught on day one and another guy in the same tournament may be caught on day four? Did you ever explain that to them?

A I'm not following the question, sir.

Q Okay. How long did these birds grow until they're typically caught?

A I'd have to go back to reference. We'll say around the 50-day mark because you used that as a reference earlier.

Q Yeah. Fifty-three, 54 days, around in there?

A It may be.

Q Okay. So my question to you is, did you ever tell them that in any given tournament one guy in the tournament, same tournament, may have his birds caught on day 55 and another guy in the same tournament may have his

birds caught on day 50?

A I don't recall doing that, other than the fact that we always referenced it back to meet the weight standards.

Q I get that. But you never told them that, did you?

A I don't recall any of that.

Q Okay. These questions I've been talking about as to what you may have told these potential growers - - and I think I talked about the sex of the bird and the gender of the bird and the type of bird, the breed of the bird and the growout times and the - -

A You didn't bring up anything about the breed of the bird.

Q Okay. Let's talk about the breed of the bird. Did you ever tell individuals, potential individuals that wanted to sign on with Tyson, that they may be involved in the tournament where they're competing against somebody that grew a different breed of bird?

A Well, obviously I didn't talk about the breed of the bird from that standpoint. I mean, I did say that we used the Cobb bird in our program.

Q While you were live production manager were you aware of instances where individuals in a tournament would be growing different breeds of bird?

A Could you repeat that, please?
MR. WHITFIELD: Could you read that back, please, ma'am?
COURT REPORTER: I'll play it back.
MR. WHITFIELD: I can restate it.
Q Are you aware of instances while you were live production manager where individuals in the same tournament were competing against each other and growing different breeds of bird?
A No, sir. And you keep bringing up the word "tournament." None of that was brought up as far as using the word "tournament."
Q Now, you know what a tournament is.
A I do.
Q Okay.
A But at the same time - -
Q Then don't act like you don't. I mean, you know what a tournament is.
A Sir, please don't raise your voice.
Q I'm not. But I want you to tell the truth; and you know what a tournament is, right?
A I do, but you keep using the word "tournament" and I did not use the word "tournament."
Q All right. What word do you want to use?
A No. You can use it, but I didn't use it -

Q Okay.
A - is all I want to state.
Q Well, I want to make sure that we understand each other because I'm afraid there may be a disconnect. When I say tournament I'm talking about the pay system, the competitive pay system that Tyson uses to pay these independent contractors.
A I understand.
Q Can we agree on that?
A We can.
Q Okay.
A Even though I did not use the word tournament.
Q Fair enough.
A Okay.
Q You didn't use the word tournament, but if I say the word tournament you know what I'm talking about?
A Okay.
Q Okay. Can we agree on that?
A Yes, sir.
Q All right. Now, - -
A I did not bring up about different breeds or anything of that nature, to answer your question.
Q Okay. That's my question.
A Okay.

Q But the other question is, you're not aware that different breeds of birds were being grown by growers in the same tournament?
A There were different breeds within the same tournament, I guess is a true statement.
Q All right. But you didn't tell these potential growers that there will be instances where you will be competing against individuals that have different breeds of bird; you didn't tell them that?
A I don't recall that, no.
Q Okay. You don't recall telling them that?
A No.
Q Okay. All right. That's all I'm asking. I'm sorry, Kenny.
So all of these things that we're talking about here - - and I'll try to clip them off by memory if I can. The breed of the bird, the sex of the bird, the pick-up dates, whether it's reclaimed feed, all of these things you're saying was not told to the theoretical grower before they signed the contract with Tyson?
MR. TATUM: Objection. Misstates his testimony. He was testifying about what he talked to them about. You've rephrased it to anything.
MR. WHITFIELD: Okay. That's a good point.
Q All you can talk about is what you know.

Okay? And you didn't tell these growers that information?

A That's correct.

Q Okay. Now, to Mark's issue, do you know whether or not anybody else at the Robards system explained this to growers, potential growers, before they signed with Tyson?

A Not in my presence that I recall.

Q Not in your presence, okay. And do you know whether or not that those issues were addressed by anybody else at management at the Robards facility, whether or not you were there or not?

A I have no knowledge of that.

Q No knowledge of that, okay.

A Sir, I could use a break after that yelling, after you getting excited with me.

Q Yeah. Sure.

- - - - (OFF THE RECORD) - - - -

VIDEOGRAPHER: We are back on the record. The time is 2:07 p.m.

(Direct Examination Continues by Mr. Whitfield:)

Q Okay. We're back on the record. Kenny, we were talking about things that you would talk to individuals about in regard to the contract.

A Yes, sir.

Q And this is theoretically people that may

those were in the contract.

Q That was in the contract?

A I believe it was.

Q Okay.

A I would have to reread it to make sure, but I would believe that that's in there.

Q All right. The type and the kind of chickens that were delivered to a grower's farm, Tyson controlled that, didn't it?

A Controlled from the standpoint it was always first out, first in type of scenario.

Q Well, when I say the type and kind, what I'm talking about, the breed. That was at the control of Tyson, was it not?

A Control? It was when they came off at the hatchery, Tyson would decide the chickens. Now, whether it would go to a certain grower by any stretch, no, they came out of the hatchery straight into the broiler houses.

Q Okay. Listen to my question.

A Okay.

Q My question is, the type of bird that made its way to the grower, whether it was a male or a female, whether it was a Cobb by-product or whether it was a Hubbard or anything else, that was controlled by Tyson; Tyson made that call, right?

A Tyson had the breeds.

Q Okay. The grower didn't make that call, did they?

A No, the grower did not make the call of the breed. No.

Q Right. And so that was the call of Tyson, correct?

A Correct, but as far as - -

Q Did you explain to the grower before he signed the contract?

A Not that I recall that was anywhere in the - -

Q Okay. Now, the type of - - strike that.

Tyson owned the birds; they've always owned the birds throughout the contract, don't they?

A Uh-huh.

Q Is that yes?

A To the best of my knowledge, yes. I don't know what it is today, but yes.

Q Okay. And I don't expect you to know anything after you're gone. I'm just talking about when you were there. Okay?

A Right.

Q And we'll leave it to that.

Tyson owned the pullets that were used to

weight from the farm itself to the scales?
A I'd have no knowledge of that.
Q You don't?
A No.
Q Have you ever heard of that?
A Well, I've never weighed birds at the farm so I would have no knowledge of it.
Q Okay. Tyson - - let me strike that.
Are you familiar whether or not the stress and the loss of body fluids, for example, that the birds would incur from the farm to the scales would create this shrinkage issue you're talking about?
A I'd have no knowledge of that.
Q You don't know about that?
A No.
Q You've never heard of that?
A I've heard different things, but I don't have any knowledge of it. You know, how do you measure stress? I have no way of knowledge, knowing that, how stress was measured.
Q The loss of body fluids, the loss of excrement from the bird from the time it gets to the farm to the scales?
A Yeah, I'd have no way of measuring that. I mean, if a bird excreted on the truck, that excretion is

still going to be there when they go weigh.

Q Okay. How the birds are weighed, the technical weighing of the birds, that's controlled by Tyson, isn't it?

A Bringing it to the plant and weighing it right away, yes, sir.

Q The grower didn't have any say in that?

A No.

Q Okay. Was that explained - -

A But they could come in and watch birds being weighed.

Q I get that. But they couldn't change anything even if they're watching it, could they?

A Never had an issue, so I don't know that anybody ever asked to change anything, so...

Q But if somebody wanted to change something, did the grower have the - -

A No. Our standard was based off of - oh, what's the name of the government agency? - weights and standards that the government agency uses. Weights and measures. I don't know if you can help me with that or not. But there's a standard out there that I know was protocoled on.

Q I get it. But you'll agree with me in a general sense that Tyson controlled how the birds were

weighed?
A Which was according to that protocol, yes.
Q According to that protocol?
A Yes.
Q And not the grower?
A That's correct.
Q Okay. Was that explained to the grower prior to signing the contract?
A I believe it's written in the contract that we would weigh the birds coming to the plant and, yes.
Q And did you explain to the grower how the birds would be weighed?
A I don't recall any of that.
Q And did you explain anything about shrinkage to the grower prior to him signing the contract?
A I don't recall anything of that nature.
Q Did you explain to him the potential for shrinkage prior to him signing the contract?
A Not that I recall.
Q Okay.
A I never specifically said that we were to weigh the birds at the plant.
Q After the birds are weighed, from that point in time to the time that the birds go through the line and are processed -

A I think it's spelled out in the contract that way.

Q If it's not spelled out in the contract, did you take the time to talk to them about - -

A You know, I'm 99 percent sure it's spelled out in there because that's what I read off of them. That's what I recall.

Q That's not my question. If it's not spelled out in the contract, assuming it's not spelled out in the contract, did you take the time to go over the inputs with the grower, potential grower, prior to him signing the contract?

A Again, I know it was in the contract, so if it wasn't - - I went over that with growers because I know it was in the contract.

Q Then tell me what it is that you went over with then.

A I'd have to read the contract. That's how I read it to them. We went over it and read it to them.

Q Okay.

A If it wasn't in there, then I did not go over it, but we went over those inputs.

Q That's my question to you.

A Okay.

Q If the inputs and the itemization of the

inputs is not noted in the contract, you didn't go over them with the potential grower?

MR. TATUM: Objection. Asked and answered. Vague and ambiguous. I don't even know what we're talking about in the negative at this point.

Q Go ahead.

A I didn't talk about it that I recall.

Q Okay. Fair enough.

Exceptions; do you know what an exception is?

A An exception? Could you put more definition behind that, please?

Q We've learned in this case an exception is the situation where a potential grower - - let me rephrase the question.

In a tournament system itself we've learned in this case that there are certain situations where a person in a tournament may be taken out, excepted out of the tournament for whatever reason. That's what I'm calling an exception. Is that something that you've heard of or are familiar with?

A I have heard of it. The familiarity, I couldn't be in specific to a certain area about it. I believe, for instance, there was a natural disaster event that took place and that particular grower got an exception out of the system for that.

Q We are. Thank you.

You indicated, Kenny, that you had a parting of the ways with Tyson.

A Yes, sir.

Q Would have been November 14th of what year?

A I believe it was around November the 7th of 2013.

Q Sorry. November 7th of '13. So you got there 12/09?

A Yes, sir.

Q And then you left November 7th of 2013, right?

A Yes, sir.

Q Why is it that you left?

A You may have to ask Charles Morris about that. The reason is Charles had told me - - and there's certain things that we always remember very well, certain things that came to light and certain things we don't remember because it wasn't significant. But Charles made a comment to me in May of that same year that I know HR very well and I know Craig Cobley very well, and you won't be there as long as you think you will.

Q Okay. So Charles told you that?

A Yes, sir.

Q When did he tell you that?

A In May of that year.
Q In May of 2013?
A Yes, sir.
Q Okay. And so did anybody at HR or anybody talk to you about it?
A No, sir.
Q Okay. So tell me how it is then you were notified that - - were you terminated?
A I was.
Q Okay. Do you know - - strike that.
Can you tell me the first time that you learned that you were going to be terminated?
A That afternoon of November the 7th.
Q Okay. And walk me through then what happened there. How did that happen?
A I was called into the office and terminated.
Q Who terminated you?
A Dave Phillips, the HR manager, and Craig Cobley.
Q Got it. What did they tell you the reason was?
A I don't recall. They had multi different things at that point in time. I'd have to go back and actually look at the sheet, and I don't remember even

where the sheet is. They would have documentation on that. You may have to reference Tyson for that. I don't have the sheet in my hand.

Q I get it. They had documentation that they were looking at?

A They had documentation of my termination.

Q Okay. Who is it that did the talking?

A I guess they both did. I don't remember.

Q Okay. This sounds petty, but what type of day was it?

A Steve McCarter was there that week.

Q The vet?

A The vet, uh-huh. It was a Thursday.

Q Thursday.

A I'm trying to remember the - -

Q In the morning time?

A No, it was in the afternoon. Steve and I had just got back from being in the field.

Q Did you have any - - besides what Mr. Morris told you, did you have any clue this was coming?

A No, sir.

Q Okay. So they called you in the office and they said what?

A Specifically, I don't recall. I do remember that, because I had a company vehicle, that

so-and-so, some intern that they had in there was going to take me home. That's all I do remember.

Q And did you ask them why they were terminating you?

A I'm sure I did at the time, but I don't remember all of the specifics because it was written down. Tyson has it written down.

Q They do have it written down?

A Tyson has - - they have my file.

Q Okay. So the reason that you were terminated would be in your file?

A I'm sure that it is. I don't know that.

Q Okay. Did they pay you any severance?

A No, sir. They offered, but I declined.

Q Why did you decline?

A You see, sir, I was raised with lots of morals. And if you don't work for money, then you're not bound to anybody. From the standpoint if you don't collect any money, you're not bound to anybody. I got a paycheck every two weeks because I performed work over the last two weeks. My integrity precedes me.

Q How much were you making a year?

A Do I have to answer that?

Q Yeah. How much money were you making?

MR. TATUM: You're not represented here, but