# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

DEPOSITION OF WILLIAM MORGAN RICKARD

MARCH 2, 2018

\- - - -

Videotaped deposition of WILLIAM MORGAN RICKARD held at 19 North Main Street, Madisonville, Kentucky, commencing at 8:34 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.

Q Do you remember any conversations about cost to get in?

A I mean, there was conversations, but I can't give you details. That's been 21 years ago or 22.

Q I understand. Did you understand the basic program to be, if you wanted to get there, you're going to have to invest and build houses?

A Yes.

Q And then once you finished that up, you'd get a contract, and they would deliver you chickens to grow?

A Yes.

Q Did you talk at all about what your expected income might be?

A I'm sure we did, but I can't give you details.

Q Can't remember those numbers?

A (The witness nodded.)

Q Did you talk at all about the method of payment, the tournament system of pay come up?

A The tournament system is what we'd be paid under, yes.

Q So you talked about that a little bit?

A Yeah.

Q What did you understand from him about that?

A We didn't understand everything there was to understand at that time. I mean, we just took them at their

word that they were going to treat us fair and everything would work out.

Q Do you remember anything he told you about the tournament system?

A No, I can't say anything in specific that he told us about the tournament system.

Q Did he tell you why the pay was under a tournament system as opposed to anything else?

A We didn't know what a tournament system was at that time.

Q Did he explain to you that basically meant you were competing against other growers every week?

A We don't have a problem with competing against growers.

Q I'm just asking if he told you that.

A I'm sure they did. I can't quote what was said.

Q When you say "we" -- I'm talking to you -- who are you talking about?

A I'm talking about me and Jerry were together at the meeting with Frank Perdue and his wife.

Q Okay, yeah. No, I'm just wondering -- I'm just trying to make sure I understand what was talked about.

A I mean, it was talked about the chicken business and the profitability of it, I'm sure, and the --

Q Okay. So kind of your first step was talking

had had about six or eight months of those 35-day layouts.
Q So that would be two flocks?
A It wasn't cash-flowing very good with 35-day layouts.
Q I understand, but six to eight months would be one layout and two flocks on either end. So I'm trying to figure out how many times it happened.
A I can't tell you. I just know that it was coming pretty regular, 35-day layouts.
Q Any idea how many times it happened to you?
A Three or four times in a row, probably.
Q On all 12 houses or a particular farm?
A All 12 houses.
Q Were you taking flocks in all 12 houses at the same time, or do you separate them out?
A They were separated.
Q So four, four and four?
A (The witness nodded.)
Q Each under their own contracts, the same contract?
MS. TAYLOR: Out loud.
A Yes.
BY MR. TATUM:
Q But the same contract?
A Same contracts. No, each one had its own

that?
A Yes.
Q And even despite knowing that you'd have to get some extra pay beyond your chicken growth to make this work, you still went into the deal; right? You knew it wouldn't cash flow just on the loan and the chickens themselves. You needed this incentive pay?
A Yes.
Q Right?
A Yeah.
Q And even despite knowing that, you wanted to do it?
A Yes. They would cash flow with that incentive pay.
Q And you got incentive pay; right?
A Yes.
Q And that's a ten-year contract for incentive pay?
A Yes.
Q And how much incentive pay did you get?
A Thirty-eight cents a square foot per year, whatever that --
Q You don't know what it was?
A $41,800 a year.
Q So you got $41,800 additional pay a year for ten years?

A (The witness nodded.)
Q Do you have any understanding as to why it's a three-year term as opposed to any other term?
A I was told the reason that we don't get five-year or seven-year contracts is because it did not require any upgrades on the houses.
Q Because your houses didn't require upgrades?
A Yes.
Q And then in Schedule A to Exhibit No. 1, is that also your signature there on the second page of Schedule A?
We're going to go through, and I'm going to make sure it's your signature on several pages, so you might want to keep your glasses on.
A Where now?
Q You're on it. The second page of Schedule A. Just so to help you along, there's a tracking number on the lower right, and we're on TYSON 167628.
A Yes, that's my signature.
Q And if we go to Schedule B of Exhibit 1, towards the back of Schedule B, the last page of Schedule B, there's a signature page. Is that your signature there?
A Yes.
Q And then the next page, the acknowledgment form, that's your signature there?
A Yes.

Q Okay. So Exhibit 1 is your current contract, as you understand it, for the SMR two-house farm and then 5174; right?

A Yes.

Q And 5174 is the Tyson tracking number for that farm?

A Yes.

Q We're going to do, just so you can kind of get into the groove with it, the same exercise with what I think is all your contracts so I can make sure it's your signatures and so on.

(Exhibit 2 was marked for identification.)

BY MR. TATUM:

Q So here's Exhibit No. 2, and it is what I understand to be contract 5175 for your Wishbone Farm; is that right?

A Yes.

Q So this is the one under Wishbone, four houses, right?

A Yes.

Q And if I look at the second page, the same term, is that your signature there in the lower left?

A Yes.

Q Go to Schedule A, second page. Your signature?

A Yep. Yes.

Q I'm just asking you questions because you're suing, and trying to understand issues you've experienced while growing. I just assume you want to talk about that.
A I do want to talk about it, but I can't produce those dates.
Q Are you suing because you had an outbreak of Georgia 08? Maybe that makes it easier.
A No, I'm not suing for that.
Q Are you suing because you had an outbreak of Ark 99?
A No, sir.
Q Are you suing over the heat loss in 2012?
A No, sir.
Q You're not suing, obviously, over the human error of the Wishbone computer?
A No, sir.
Q What about the ICU issue in House 1 and 2 in 2012?
A I mean, that thing comes into play in this lawsuit. It's a loss.
Q So you are maybe suing over that?
A Well, I mean, whatever -- whatever has been wronged I'm suing for. I'm not the judge.
Q Well, this is your chance to tell me -- this is actually your obligation to tell me what you're suing for,

and so I just want to make sure I know. That's the purpose of this.
A I'm in the lawsuit for unfair practices, be it intentional or unintentional, that this tournament system is not being implemented in an equal thing for all growers.
Q So are you suing over the ICU outbreak in House 1 and 2 in 2012?
A Yeah, I'd like to be paid for that because it was out of my control.
Q What would you like to be paid?
A I don't know. I don't have a number. I'd have to go back and look.
Q Have you ever made a demand for Tyson before about getting paid for that?
A Yes.
Q And who did you make that to?
A Kenny Bartley.
Q How much did you ask for?
A I can't tell you. That was five -- four, five years ago.
Q What did he tell you?
A He told me they're not going to do anything.
Q Are you suing over the snow collapse and all the losses there?
A No.

A That I can remember right now.
Q Have you had your land appraised at any time in the last couple years?
A Hadn't had a reason to.
Q Have you had any of your property appraised in the last few years?
A Haven't had a reason to.
Q Do you prepare tax returns every year?
A We have them prepared. I don't prepare them.
Q Is there -- did you gather your tax returns for this lawsuit?
A Whatever was required of me, I gave them.
Q Do you have your tax returns at home?
A I have tax returns, as far as I know, at home.
Q At home?
A Yeah.
Q Do you do one tax return for all your businesses, or do you do an individual one for each business entity we've talked about?
A Each one does it individually, and it gets put together into my personal.
Q So it all flows up to you ultimately?
A Yes.
Q Who have been your service techs that you've worked with while at Tyson?

A James Catlin, Ruben Bruce, and Jennifer -- she got married, and I can't remember what her maiden name is now.

Q We've been calling her Jennifer Parks. Is that the right one?

A That's her. I think that was her name before she got married. That's what I call her, Jennifer Parks. That's the way it's in my phone.

Q Is she still your service tech today?

A Mm-hmm.

Q Have you ever worked with any other service techs here and there?

A With Tyson?

Q Yes, sir.

A Just if someone is on vacation and they send someone out.

Q Have you ever had any problem with James Catlin, Ruben Bruce, or Jennifer Parks?

A No, not that I can --

Q Never felt like they lied to you?

A I don't feel that they lied to me, no.

Q Feel like -- you may agree with them or not, but you feel like at least they're trying to do their job and help the chickens grow?

A I agree with that.

Q Sometimes you take their advice, sometimes they don't -- you don't; is that fair?
A That's fair.
Q And then have you worked with any other Tyson employees besides service techs over the years?
A I mean, I've talked to David Mears, Steve Keys, Kenny Bartley, Craig Coberley, Jim Gottsponer, David Dickey, Jared Shelton.
Q Anyone else? Neil Barfield?
A Neil Barfield, I've talked to him.
Q Anyone else?
A Not that I can think of.
Q One name I didn't catch. Craig?
A Craig Coberley.
Q Oh, Craig Coberley.
Have you ever had any problems with David Mears?
A We've had some discussions.
Q Ever felt like he lied to you about anything?
A I never felt that David really lied to me about anything.
Q You said you had some discussions with him. Do you remember any discussions?
A We had a discussion a few weeks before he left this last time.
Q And what about?

A Feed issues and the corn they were buying at the mill that was being rejected and taken back that had weevils in it. They were buying it as damaged corn and discounting and running it through the mill.
Q And what did he say about that?
A He had every right in the world to feed the chickens damaged corn if that's what he wanted to do.
Q Do you know if you got any damaged feed?
A It was causing excessive diarrhea in a lot of the birds.
Q In your birds?
A My birds.
Q How many flocks was that?
A We had good floors in July when we passed the animal welfare audit. And after that August, September, October all the way to today we've had a lot of wet floors and unsanitary conditions in these houses due to diarrhea.
Q So you've had wet floors since about August of '17?
A And we had wet floors the winter prior to that. I mean, it's --
Q How do you know it's related to the feed?
A Because if you take the feed off the birds, they quit having diarrhea.
Q Well, if you take the feed off the birds, they

die; right?
A No. They quit dying when you take them off the feed, if you want to know the truth about it.
Q They quit going to the bathroom if you don't feed them; right?
A They will.
Q So how do you know it's the feed?
A It's almost like the mortality this winter when we were out of feed during this ice event. If you were losing 50 or 80 birds a day, and you ran out of feed, and they couldn't get you feed the next day, your mortality would go down to picking up five or six chickens dead. And when you put them back on feed, they go right back to dying and squirting in the floors. I mean, it's in the feed.
Q Do you have any other issues with David Mears besides that feed issue?
A Not that I recall.
Q How about Steve Keys? Ever feel like he lied to you about something?
A Not that I remember. He wasn't around very long.
Q Ever have any problems with him?
A No, sir.
Q You mentioned Craig -- you mentioned Craig Coberley?
A Craig Coberley, complex manager.

Q Did you ever have any problems with him?
A Yeah, we had some problems.
Q What were your problems with him?
A Feed delivery.
Q Anything else?
A Just that they talked about fixing things they never did fix as far as feed deliveries and chick quality and some of those issues.
Q How long was he complex manager?
A Three years, four years.
Q Do you remember what years?
A Probably about '01 to '04. I would guess in that neighborhood. I don't have it documented.
Q Ever feel like he lied to you about anything?
A Yeah, I felt deceived on a few occasions.
Q What was it?
A I don't -- I can't recall every incidence.
Q How about Kenny Bartley? Ever have any problems with Kenny Bartley?
A Multiple.
Q When was Kenny Bartley on the scene? What years?
A From about 2010 to whenever they fired him.
Q How do you know he was fired?
A That's pretty common knowledge.
Q How do you know he was fired? Did some grower

tell you that?
A No. Somebody from Tyson did.
Q Who told you?
A I can't remember who it was.
Q What problems did you have with him?
A We had some disagreements in the beginning, and we were in the top of the grow-out. And after our disagreements, we were took to the bottom of the grow-out. The year after he left, we were back to the top of the grow-out.
Q When you say "top," you mean rank --
A Ranking.
Q -- on your flocks? What were some of the disagreements over?
A Feed, bird quality, vaccinations.
Q How do you know he had anything to do with it?
A He's the live production manager. He's over all of it.
Q Understood, but how do you know he had anything to do with your ranking?
A He was upset with us or me, and to prove a point.
Q And how do you know that?
A I know I didn't change anything from the time before he got there until the time that he left, and I didn't change anything afterwards, and my settlements will

show the difference.
Q So you just feel like maybe he somehow changed your settlement?
A I believe he could pistol whip you if he wants you. They have control over all the numbers and the pencils, and I don't have any choice about it.
Q Do you know that he did any of that, or you just --
A Do you know he didn't?
Q I'm asking you. You're the one making the claim.
Do you know he did that, or are you just sort of conjecturing it?
Q For the what?
A Is this just conjecture, or do you know it happened?
A Cannot prove it.
Q Can you?
A I cannot.
Q Do you feel like he ever lied to you about something?
A Yes.
Q What about?
A Fixing the problems.
Q Fixing what problems?
A The problems they were having with feed.

Q Any other lies you think he told you?
A About the Georgia '08.
Q Anything else?
A That's all I can remember.
Q Now, the Georgia 08 you said was in 2012. What did he lie to you about the Georgia 08?
A We kept telling him that we had a problem with the health of these chickens, and they were dying and dying and dying. And they come out: "There's nothing wrong with the chickens. It's what you're doing."
Q What do you mean, "they"? I asked about --
A "They" as in the grow-out people, the live production.
Q Well, listen. We're talking about Ken. And if you're going to say Ken lied to you about something, I want to know what Ken said.
A Ken said that it wasn't nothing wrong with the chicken. It was in the grower. It's your problem. It's your farm's. Problem with what's wrong with these chickens.
Q Okay.
A That's not true.
Q And then later they determined it was some other problem?
A They determined it was Georgia 08 that they had all along, and it wasn't anything that we were doing or I

was doing to cause it.
Q Why do you think -- do you think maybe he honestly thought that at first and then figured out it was another issue?
A No, I don't.
Q So you think he knew from the very beginning what the cause was?
A I don't know if he did or not. I'm just telling you I don't --
Q So you don't know if he was lying. You just know that turned out not to be true; right?
A Yes.
Q And in fact, he and the complex were working to fix it and fixed it; right?
A Eventually.
Q Now, you said there were problems with feed. How do you know he didn't try to fix problems with feed?
A Because the problems didn't get fixed.
Q What were the problems?
A They did finally get it fixed.
Q Well, how do you know he wasn't trying to fix it?
A We went for a year going through -- they paid me four times in a year for feed that I didn't get.
Q So he said -- so you raised this issue with him; right?

A Yes.
Q He said, I'm trying to fix these feed issues; right?
A No, he don't acknowledge there was ever any feed issues.
Q Okay. But they got fixed?
A After about a year worth of --
Q So what did he say that was a lie about feed?
A That there wasn't no issues.
Q So he was lying saying there was no issues.
And what got fixed?
A They put mail -- we put mailboxes up at each farm with a farm number that you stamp the feed tickets to prove that they were even on our farms. Prior to that there was no documentation left on the farms.
Q Understood, but what is it you're saying was needing fixing?
Documentation?
A Or somebody to keep checks and balances to make sure the feed is even getting to your farm that you're being charged for.
Q So he was saying he doesn't think there needs to be more documentation? That was the issue?
A He's saying there's not any -- ever been any issue with feed in his complex.

Q Okay. And you were saying, yes, there have. And then later they instituted a documentation program where they dropped off feed tickets to document the feed?

A Yeah.

Q Okay. So you saying his lying was saying he didn't think they had issues?

A I mean, after I proved them four times that they had to pay me, I think they realized they have issues, and I could prove it.

Q So is it fair to say maybe he didn't think they had issues and that you proved him wrong?

A No.

Q Well, how do you know?

A All I can tell you is, my settlements went up as that started in compared to what they were before.

Q So his opinion was, there were no issues when you first talked to him?

A Yes.

Q And then you proved to him that you did have issues?

A Yes.

Q And then they instituted a plan to better document the feed deliveries?

A Yes.

Q Did you do anything to calculate whether or not

that cost you any money, that issue of documentation of feed deliveries?
A It cost me on all the settlements we had problems on.
Q And what years was this?
A 2011 to whenever we put those in, 2004, maybe -- 2003, 2004.
Q So 2001 to 2004?
A Somewhere in that range.
Q And then about --
MS. TAYLOR: Did you say 2001?
A No, not 2001. 2011 to -- I'm off ten years. I'm sorry.
BY MR. TATUM:
Q 2011 to 2014?
A Yes.
Q Do you have any idea how many flocks that affected?
A I settled 20 flocks a year.
Q How many pounds of feed are we talking about?
A Truckloads.
Q Well, I mean, if you're going to claim that you're suing over it, you need to tell me what the details are.
A That's why I got these lawyers.

Q So you don't know?
A Nope. We'll find out.
Q You can't -- you can't tell me how many truckloads of feed you got more or less than you should have; right?
A Nope.
Q So what about Jim Gottsponer? Do you have any problems with him?
A Yes, sir.
Q And what are your problems with him?
A He told me some untruths.
Q And what did he tell you that was untrue?
A He told me going into summer that if we would grow these chickens to 7 pounds, when they hit 7 pounds they would pick them up to make sure you grow them and grow them fast. We usually grow a 7.25, 7.5-pound chicken. We didn't want to -- they wasn't going to cut the summer density, and we weren't going to push the bird to make them grow fast if they weren't going to pick them up at 7 pounds because they would die from heat loss.
Q When did he tell you that?
A Two years ago.
Q 2015?
A I would say.
Q So this was the summer of 2015?

So do you have any other voicemails than that?
A I'll have to look.
Q And all the videos we looked at are all from relatively the same time period, too. Do you have any more videos than that, or is that it?
A I'd have to look.
Q You're not sure?
A Well, I made one Tuesday of some birds I got that were terrible when I put them in.
Q So you got one from Tuesday. Any others ring a bell?
A I'll have to look back and look through my GoPro.
Q All right. That's all I've got on those. Like I said, they just come to me, so I've got to ask you about it.
Did you ever talk with Jim about any expectations of what you'll make, Jim Gottsponer?
A Talked to him about expectations about what the two houses were going to make.
Q What was that?
A Two or three growers he had talked to came by and talked to me about building new houses and the number he put out that they were going to make as average pay.
Q And what was that?
A $2.49 a square foot.
Q Do you think maybe that got lost in translation?

A No. I confronted him about it.
Q $2.49 per square foot is what he told you?
A What he told them. He didn't tell me.
Q Oh, so he never told you that?
A Yes, he told me that when I confronted him about it. That's the number he was putting out.
Q Per square foot?
A Per square foot, was average pay in the complex.
Q Okay. And what do you think the average pay in the complex actually was?
A 25, 30 cents less than that. That would be --
Q You know if that actually is the average square foot?
A But if you add the PLT cost share, the bug spray, the new house incentive pay to the houses that have new house incentive pay and everything -- and everything that they pay out to a grower they back into it.
Q How do you know if it includes all that?
A Because he told me how they was figuring it.
Q Jim told you that?
A Jim told me that.
Q He said, well, the average pay, and here's all the things that go into it.
So he told you, this is what it is, and these are all the things that go into that number. You just thought