# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY, OWENSBORO DIVISION

CHARLES MORRIS, ET AL.,

Plaintiffs,

vs. No. 4:15-CV-00077

TYSON CHICKEN, INC., ET AL.,

Defendants.

___________________________

VIDEO 30(b)6 DEPOSITION OF JIM LEIS
TAKEN ON BEHALF OF THE PLAINTIFFS
ON OCTOBER 10, 2018, BEGINNING AT 9:01 A.M.
IN SPRINGDALE, ARKANSAS
REPORTED BY MIKE WASHKOWIAK, CCR

APPEARANCES:

On behalf of the PLAINTIFFS
John C. Whitfield
WHITFIELD, BRYSON & MASON LLP
19 North Main Street
Madisonville, Kentucky 42431
270-821-0656
john@wbmllp.com

On behalf of the PLAINTIFFS
Caroline Taylor
WHITFIELD BRYSON & MASON LLP
19 North Main Street
Madisonville, Kentucky 42431
270-821-0656
caroline@wbmllp.com

A Yes, sir.
Q And does that have any bearing on ranking?
A No, sir.
Q Why do you want to know it?
A It's just a measure to track the bird health.
Q Okay. And then gross pounds, now, tell me what that means?
A Gross pounds would be the total pounds, weight pounds, for the plant for the flock.
Q So for example with Mr. Brown, 429,440, that's the gross poundage of his birds after they're gathered?
A Yes, sir.
Q But is that measured at the plant?
A Off the weigh scale, yes, certified scale weights.
Q Is there any consideration for the distance that birds travel?
A No, sir.
Q So in some instances in this particular tournament there are differences in the mileage from the farm to the Robards facility?
A Correct. Now, let me restate that. There may be. Some plants do have an adjusted amount to offset the fuel in the vehicles depending on how they weigh their vehicles at the plant on the certified scale. So -- and

Let's say a farmer's flock is caught, and let's say it weighs, and again I'm making this up, 100 pounds. So they weigh the truck at the scales at the facility?

A Correct.

Q Let's say it's 100 pounds. Then they go through condemn, all right? Then let's say that the condemn is ten pounds of birds, okay? How is the 10 pounds charged against the 100 pounds?

A Okay. Back up a little bit because as you take your trucks across the scale and weigh all the trucks and birds coming in, we use the grower's door charts that has the birds placed minus any mortality for a head to the plant.

Q Okay.

A So we take that head to the plant against the weighed pounds to get an average bird weight.

Q Okay.

A So now then we've got the average bird weight for the flock, and that's what we use for the number of head condemned for the pounds that you see here for condemned pounds.

Q Okay.

A So per the contract it tells you that we will use the average farm weight for the flock to calculate the condemned pounds.

Q It's the average farm weight?
A Correct.
Q Okay.
A So a USDA inspector is quantifying the number of birds, and then we're taking that average farm weight to get the pounds.
Q All right, and that's how you get the pounds?
A Yes.
Q Got it. All right, that's what I thought was the answer. I wanted to make sure.
Now let's look, then, at Exhibit 2. We went this morning in great detail about how to get to the net pound value, and I think I understand it now. Then we've got grower pay, all right, which is the next line item in Exhibit 2. Walk me through, and let's just use an example of -- we were using Dennis Clapp. That's probably the best example, and that's Exhibit 3, okay? Dennis Clapp's net pound per value was .2162 in Exhibit 2, and his pay was .0588, okay?
A Okay.
Q Now, walk me through how you go from the net pound value to the grower pay.
A Okay. So up in the top of Exhibit 3, the very top, it shows you what his individual net point value is, .2162, and then your average net point value for the

There's no handicap given in the tournament system for individuals that may grow different sexes of birds, is there?
A No.
Q There's no handicap given for individuals that might grow different -- strike that. Let's try that again.
There is no handicap for individuals in any given tournament that might be utilizing different feed?
A No.
Q And in fact there are different types of feed, correct?
A There are different feed types that you see on your Exhibit 3 that each grower is given, and everybody is on the same feed schedule so they should get a proportional amount of each of feed type.
Q And do you know what I mean when I say refurbished feed?
A Yes.
Q What is refurbished feed?
A It's picked up at the end of the flock.
Q Okay. And then that's used to feed other birds, correct?
A Yes.
Q Is there any handicap given to any individual in

any given tournament that might be feeding his or her birds refurbished feed versus fresh feed?

A No.

Q Is it fair for me to assume that under all the contracts in the Tyson system that any and all veterinary service it's the responsibility of the company?

MR. TATUM: Objection, calls for speculation.

Q (BY MR. WHITFIELD) Go ahead.

A I'm not sure of the question.

Q You've reviewed in general the contracts, let's say, of the Robards facility, and I think we heard you say today that they're basically the same?

A Yes.

Q There may be some differences as to premium pay and things like that, but basically they're the same?

A Between complexes or just Robards?

Q Just Robards.

A Yes, they're all the same.

Q And any given contract in any complex is going to be the same?

A Yes.

Q Okay. And is it fair based upon your review of the contracts that you've seen that the responsibility for veterinary services to the flock is the responsibility of the company as opposed to the grower?

A Correct.
Q So the company makes a determination of what type of veterinary services may be needed?
A Yes.
Q Or whether or not antibiotics may be needed?
A Yes.
Q And the contracts that you have reviewed for any given complex give specifications for the houses themselves in terms of what type of house, the configuration of the house, and things of that nature?
A The contracts spell out a premium house specification that they need to meet and maintain to get the premium pay.
Q I understand. We have we heard, and we talked about this this morning, that there are differences in configurations of these houses in, let's say, the Robards complex. For example, one guy might have one house configuration, Configuration A, and then somebody else might be Configuration B.
A Correct.
MR. TATUM: Objection, vague and ambiguous.
Q (BY MR. WHITFIELD) And we've determined in some instances those individuals with different types of house configurations may be competing against each other in the same tournament?

three-farm house -- strike that.
I have a three-house farm. I can't have a three-farm house. I've got three houses and I compete in tournaments as we go, and let's assume that I don't do anything different between one flock and the other one, the same computerized programmed that I've got, the same water system, same feed system. I don't change in any way. It's fair, is it not, that in one tournament I might be third and the next I might be ninth?
A True.
Q Okay. So isn't that a function of the fact that in the first tournament where I was third the competition might not have been as good as when the next tournament it's different?
A That's a possibility.
Q Okay. So a function of what I'm going to get paid in any given tournament is directly related to the competition that's in the tournament with me?
A That is correct.
Q And because my appearance in a tournament is based sequentially as we talked about, then that's out of my control?
A Correct.
Q So if I happen to be in, this is crude, but if I happen to be in a tournament where I'm competing with

growers that are consistently at the top of their game versus the next tournament where I'm competing against growers that aren't necessarily at the top of their game, my pay is going to be different?

A That's true. You as a grower would have the option of laying out an extra week if you wanted to move you into a different tournament.

Q They can lay out?

A Uh-huh.

Q Do I know going in who it is I'm competing against?

A No.

Q So why would I lay out?

A That's your prerogative.

Q Okay. But it's fair for me to assume, is it not, that if I don't know who it is I'm going to be competing against I don't have any reason to lay out, do I?

A Correct.

MR. TATUM: Objection, calls for speculation.

Q (BY MR. WHITFIELD) Because I want to get paid?

A Correct.

Q All right, let's go, then, to 2k, all the ways in which Tyson evaluates the tournament system and its ability to incentivize growers. Now that's kind of a lot

side of it, we have a performance improvement program that if you're 40 points worse than average for two consecutive flocks, then there's a meeting that's called in and they discuss to see what you can do husbandry-wise or if you need to update some equipment that they work out through the grower to help guide him to do better.

Q But is it Tyson's position that the reason the tournament system is used is to incentivize the growers to become efficient?

A Well, it's a way for pay that we use. The growers should be able to deduct that the better he performs the better pay he would get, more pay.

Q All right. So the idea is if a grower is efficient with his work, then the more efficient he will be the more money he will get?

A In generalities.

Q Okay. Is there any other reason -- strike that.

Is there any other thing that Tyson does to incentivize growers besides utilization of the tournament system?

A Not that I'm aware of.

Q Do you know whether or not, Jim, that the tournament system is also used as a cost measure to provide Tyson the ability to budget their costs for the broiler production?

A They can use historical figures on what last year's grower pay in total was on a per pound basis to budget upcoming years, yes.
Q So they will know that the budget for the growers at Tyson is X amount and they can see that historically?
A On a per pound basis, yes.
Q On a net per pound basis, correct?
A Yes.
Q So to that extent it is way to budgetize their costs for this area of growing of the bird?
MR. TATUM: Objection, misstates his testimony.
A It could be used as that along with any upcoming expansions or changes that complex may have. There's multiple factors.
Q (BY MR. WHITFIELD) Okay. You will agree with me, won't you though, that if the purpose for the tournament system is to incentivize growers and to reward them for being efficient, there are instances in any given tournament, as we just talked about, that the pay is tied to not efficiency but the people that are in the tournament?
MR. TATUM: Objection, vague and ambiguous.
Q (BY MR. WHITFIELD) Did we not say that?
A The people in the tournament dictate where you

rank in that tournament, yes.

Q That's fine. So if I am Charles Morris and Charles Morris has a farm and he utilizes the tournament system to try to be efficient, as you say, and try to be profitable, because that's the purpose of the tournament, right? Correct?

A To be profitable for him.

Q Yes. And the whole thought process is if he's efficient he will be profitable, correct?

A If he is better than average in a tournament, he would make more money, yes.

Q And the more efficient he is the more money he would make, correct?

A Normally, yes.

Q But there are instances where that pay is not tied to efficiency as much as it's tied to who it is he's competing with, correct?

A True.

Q Okay. Now, let's go to l. The results from all such analysis of the tournament system and its ability to incentivize growers. I think we've talked about that, and I think that you told me that there are no such reports that analyze the tournament system?

A Correct.

Q Okay. Let's move on to z, policies and

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | |
|---|---|
| CHARLES MORRIS, et al., | ) |
| Plaintiffs, | ) Civil Action No. 4:15-cv-77-m |
| v. | ) Chief Judge Joseph H. McKinley, Jr. |
| TYSON CHICKEN, INC., et al. | ) |
| Defendants. | ) |

**AMENDED NOTICE OF ORAL AND VIDEO DEPOSITION OF DEFENDANT TYSON CHICKEN, INC., PURSUANT TO FED. R. CIV. P. 30(b)(6)**

TO: TYSON CHICKEN, INC.

**PLEASE TAKE NOTICE** that Plaintiffs in the above-captioned proceeding will conduct the deposition of Defendant, TYSON CHICKEN, INC., on August 2-3, 2018, beginning at 9:00 a.m. local time at a location to be mutually agreed upon by the parties. The deposition will be conducted pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. The matters for examination are set forth below with particularity in Exhibit A.

Pursuant to Rule 30(b)(6), the Defendant shall designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf.

The deposition shall be recorded by stenographic and audiovisual means and taken before a person authorized by law to administer oaths.

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
1
30b6 -Lewis

On this the 17th day of July, 2018.

Respectfully Submitted,

_/s/ John C. Whitfield_
John C. Whitfield
Caroline Ramsey Taylor
**WHITFIELD BRYSON & MASON, LLP**
19 North Main Street
Madisonville, Kentucky 42431
Tel: (270) 821-0656
Fax: (270) 825-1163
john@wbmllp.com
caroline@wbmllp.com

Gary E. Mason
**WHITFIELD BRYSON & MASON LLP**
5101 Wisconsin Ave., NW, Suite 305
Washington, D.C. 20016
Tel: (202) 640-1160
Fax: (202) 429-2294
gary@wbmllp.com

J. Dudley Butler (MS Bar #7626)
**BUTLER FARM & RANCH LAW GROUP, PLLC**
499-A Breakwater Dr.
Benton, MS 39039
Tel: (662) 673-0091
Fax: (662) 673-0091
jdb@farmandranchlaw.com

David S Muraskin
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, D.C. 20036
Tel: (202) 797-8600
Fax: (202) 232-7203
dmuraskin@publicjustice.net

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

On this the 17th day of July, 2018, I hereby certify that a copy of the foregoing has been sent via the District Court electronic filing system and by email to:

Marc Wells
209 West Main Street
P.O. Box 644
Princeton, Kentucky 42445

Robert T. Adams
Mark C. Tatum
Shook, Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, Missouri 64108

***Attorneys for Defendants***

<u>/s/ *John C. Whitfield*</u>
John C. Whitfield
WHITFIELD BRYSON & MASON, LLP
19 N. Main Street
Madisonville, KY 42431
(270) 821-0656
john@wbmllp.com

***Attorney for Plaintiffs***

**EXHIBIT A**
**Deposition Topics**

Definitions

1. "Tyson", "Tyson Chicken, Inc.", "you", or "your" means Tyson Chicken, Inc., the Defendant in this action, and includes present and former officers, directors, agents, partners, servants, employees, assignees, lessees, affiliates, or anyone acting on behalf of Defendant.

2. "Communication" means and includes any transmission from any person or entity to another, whether written, oral, or in any form, including but not limited to, by personal meeting, telephone, radio, telegraph, electronic mail, facsimile, teleconference, and/or transmittal by letter or document.

3. "Robards," "Robards Facility" or "Robards Complex" means the entirety or part of Tyson Chicken, Inc. operations in or around Robards, Kentucky, whether they be located in geographic proximity or disparate places, including, but not limited to, hatcheries, feed mills, trucking operations, field operations, office staff, contractors, subcontractors, supervisors, board members, or persons acting on behalf of any of those operations.

4. "Relevant time period" for each area of inquiry is from April 27, 2010 to the date of the witness's deposition, unless otherwise specified.

Deposition Subject Matters

1. Information relating to Tyson's organizational structure during the relevant time period. For example:
    a. The structure of departments, managerial staff, and/or decision making personnel at the Robards Complex, including the roles and responsibilities of each and the identification of individuals in the chain of command;
    b. Any and all changes in the Robards facilities' organizational structure, departments, and managerial staffing during the relevant time period;
    c. The chain of command from Tyson's Robards facility to Tyson Chicken, Inc;
    d. The relationship between Tyson's Robards facility and any other Tyson owned facilities in the same vicinity, such as hatcheries, feed mills, and dog food plants;
    e. A general overview of the structure of Tyson Chicken, Inc. departments, managerial staff and/or decision making personnel, including the roles and responsibilities of each and the identification of individuals in the chain of command that leads to Tyson's Robards facility;

f. The name of the person(s) responsible for the decisions to recommend or mandate changes, modifications, and/or upgrades to Plaintiffs' farms or other poultry operations within the Robards facility and a description of how those decisions are made; and

g. A general overview of the functions of the Tyson Robards Complex, including but not limited to, a description of the complete process of broiler production from the pullet production to the shipping of Tyson products to its customers.

2. Information pertaining to the tournament system, its inputs, and implementation of the system. For example:

   a. A detailed description of every input or factor that affects the tournament system;

   b. A detailed explanation of why certain differences in inputs and factors are not used to determine grower ranking;

   c. A detailed explanation of why a handicap based on the certain differences in inputs and factors is not used when ranking growers;

   d. A detailed explanation of why there are the large disparities in base pay and grower compensation in the tournament system;

   e. A detailed explanation of how compensation is computed once all inputs have been entered for a given tournament;

   f. A detailed explanation of how the minimum and maximum amount of compensation paid in each settlement group is determined;

   g. A detailed explanation of how any data derived from the settlement is reported to Agristat or used to compile data that is reported to Agristat;

   h. Details regarding how Tyson determines participants in a given tournament, including who makes that decision and what factors go into that decision;

   i. Details regarding the payment methods to growers used by Tyson within the tournament system at the Robards complex during the applicable time frame.

      i. This request includes how pullet growers and growers growing laying hens are paid;

      ii. Details regarding how growers who are also directly employed by Tyson (such as managers who also have farms) are paid for their growing services within the Robards Complex; and

      iii. Details regarding how Tyson pays its farm managers and maintenance men at its company owned farms or research farms.

   j. Details regarding the type of computer software program used to determine ranking including an explanation of the algorithm used by the software;

   k. All of the ways in which Tyson evaluates the tournament system and its ability to incentivize growers;

l. The results from all such analysis of the tournament system and its ability to incentivize growers;

m. Details regarding Tyson's knowledge related to the correlation between chick quality and the hatchery.

   i. This includes details related to the amount of time the chick stays at the hatchery after hatching; and
   ii. Any other factors at the hatchery which impact chick quality.

n. Policies and practices regarding the selection of chicks provided to any grower in the Robards complex including how certain breeds are selected to be grown, how Tyson decides what grower gets what breed of chicks, who is responsible for assignment or selection of chicks at the hatchery to specific growers, and what factors can affect who gets what chicks;

   i. What information is available to the person assigning chicks at the time of assignment (for example, the age of the breeder hens, related diseases or other health issues);
   ii. Description of the safeguards Tyson implements to ensure that chick selection is random so that one grower does not receive consistently better chicks than another.

o. Policies and practices concerning the feed including:

   i. How the Robards complex determines the sources of the feed ingredients;
   ii. How feed consistency and quality is monitored and the safeguards in place related to ensuring consistency and quality; and
   iii. A general description of the delivery and timing of such feed including procedure for when a grower runs out of feed and how feed outage time is tracked for growers in the Robards complex.

p. Policies and practices for vaccinations and/or medications, whether at the hatchery or on the farm, specifically how is it determined what chickens will get what medication, the timing of said medication, and who makes the decision whether to give chicks/chickens medication on a given farm during the relevant time frame;

q. Policies and practices related to farm condemnation of chickens grown by growers in the Robards complex including;

   i. Why these certain diseases, impairments and infirmities are listed in the Tyson broiler growing *contracts*;
   ii. A detailed description of each disease, impairment and infirmity;
   iii. A detailed description of the causes of each disease, impairment and infirmity and the history of each disease, impairment and infirmity in Tyson's flocks;
   iv. A detailed description of the actions taken by Tyson to prevent each disease, impairment and infirmity and;
   v. A detailed description of the basis and reasoning behind the reduction of grower compensation because of each disease, impairment and infirmity.

r. Tyson's policies and practices concerning compliance with Federal, State and local animal welfare laws, rules and regulations as it directly relates to the "live side" of Tyson's broiler grower operations;

s. Policies and practices related to plant condemn including how and why this is charged against the grower;

t. Policies and practices related to certain chickens or parts of chickens being provided to the dog food plant beside the Robards complex known as River Valley;

u. Policies and practices related to exceptions given to growers in the tournaments at the Robards complex;

   i. This includes whose decision it is to give exceptions, the rational behind exceptions, the reasons for giving exceptions; and how exceptions affect the tournament and other growers within that given tournament;

v. Policies and practices regarding chick placement. This includes:

   i. Timing of placement;
   ii. Grow out length;
   iii. Quantity of chicks per house;
   iv. Who decides the placement of chicks, and
   v. What factors go into determining chick placement (i.e. how is this decided).

w. The process of catching broilers from growers' farms;

x. The process of weighing broilers caught from growers' farms;

y. The process of slaughtering chickens at the Robards processing plant, including how employees know which chickens were grown at which farms while being processed;

z. Policies and practices regarding how the inputs that go into the tournament system are altered for any tournament at the Robards complex during the relevant time period; and

aa. A description of the investigation and outcome of any audits that have been done by Tyson of the tournament system.

3. Tyson's policies and practices concerning the interpretation and enforcement of its broiler production contracts with growers including each and every provision therein and attachments, including details related to:

   a. The duties, responsibilities and obligations of Tyson under its broiler production contract;

   b. Housing and equipment standards required of growers at the Robards complex during the applicable time period including any changes during this period, how such changes were decided upon, who made those decisions to change standards and how were those changes communicated to growers;

c. Incentives or assistance provided to growers relating to equipment or housing specs or upgrades during the reasonable time period, including the reasoning for said incentives and who determines what incentives to give;
d. How Tyson determines when to approach growers about renewing their contracts;
e. Tyson's communications with growers' lenders; and
f. Policies and practices concerning acceptable animal husbandry practices expected from growers including changes to these practices over the relevant time period at Robards complex;

4. Information pertaining to service technicians at the Robards facility including:
   a. How it is determined what service technician will service what farm;
   b. The training and qualifications required of service technicians within the applicable time period at the Robards complex; and
   c. How performance impacts compensation of service technicians.

5. Information sources and the type of retained information available to Tyson related to:
   a. The performance of growers at the Robards facility during the applicable time period;
   b. Chick sources, breeds, parent crosses, laying hens, and the overall quality of chicks grown by growers at the Robards facility during the relevant time period;
   c. Tyson employee visits to farms of growers at the Robards complex;
   d. Representations made to growers at the Robards facility regarding expected compensation for growers and the equitable treatment of growers at this facility;
   e. Discussions either among Tyson personnel or between Tyson's personnel and third-parties (including growers) about:
      i. Contracting with growers who grow for Tyson at the Robards complex;
      ii. Expectations of growers at the Robards complex;
      iii. Problems or issues related to specific flocks frown at the Robards complex;
      iv. Terminating a grower's contract at the Robards complex;
      v. Recommendations or advice provided to growers at the Robards complex;
      vi. Which growers would receive which chicks at the Robards complex;
   f. Any complaints, inquiries or reported issues from growers other than Plaintiffs in the Robards facility during the applicable time period;
   g. All flock data collected by Tyson regarding Robards tournaments, including anything not shown on a grower settlement sheet and not used to compute tournament pay and a description of how this data is used for internal research affecting flocks in Plaintiffs' tournaments including;

i. A detailed explanation of the computer software used internally for collecting and retaining data—factors and variables—on individual flocks;
ii. A detailed explanation of the types of documents Tyson generates relating to all types of flock data collected by Tyson, including that not shown on grower settlement sheets and that not used to compute tournament pay;
iii. A detailed explanation of how this detailed data—that is shown and not shown on settlement sheets--is used for internal research on factors affecting flock performance.

h. Who had access to each of those sources or information; and
i. Tyson's policies for using each of those sources or information.

6. Specific information pertaining to Agri-Stat, including:
   a. What software is used by Tyson to report information to AgriStat;
   b. Who (to Tyson's knowledge) has access to AgriStat;
   c. Tyson's policies for using the information in AgriStat; and
   d. Tyson's tracking of download of information from Agristat.

7. Tyson's opinions related to The Watt Ag Net.com publication, dated November 24, 2011, by Christine Alvarado on behalf of the Poultry Science Association attached hereto as Exhibit B, regarding the roles that genetics, nutrition, environment and health play in determining the outcomes of the broiler grow-out process.

8. Information pertaining to the identity of likely sources of discoverable information relevant to the claims or defenses raised in this litigation; the existence, description, nature, custody, condition, and location of the discoverable information or other tangible things; and the identity and location of persons who know of any discoverable matter.

9. For any information source identified in Topic 8 above, describe the essential features of the information source. Essential features include:
   a. the business functions and business units served by the information system;
   b. the type of information collected, created, maintained, or exported by the system, and the way in which the information is used;
   c. the methods by which the system's information can be searched, identified, and exported;
   d. the policies and procedures related to the preservation, retention, or life-cycle management of the system's information;
   e. the essential architecture of the system, including the primary software and hardware components that comprise the system, and an overview of the system's networking functionality.

**END OF SUBJECT MATTERS**