# Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT )
ENTERPRISES, LLC, WILLIAM )
RICKARD, SONDRA RICKARD, )
RICKARD FARMS, LLC, ICU, )
CHICKENS, LLC, WISHBONE )
POULTRY, DENNIS CLAPP, JOHN)
PINKSTON, LOI HONG, H & L )
FARMS, LLC, DOUG BROWN, TIM)
VINCENT, TLC POULTRY, LLC, )
POULTRY SPECIALTY SERVICE, )
LLC, KEITH CRABTREE, )
CHRISTOPHER BURCH, MIKE )
MURPHY, MURPHY FARMS, LLC, )
And CALVIN LEISURE, )
)
Plaintiffs, )
)
v. ) NO. 4:15-cv-00077
)
TYSON CHICKEN, INC., )
ET AL, )
)
Defendants. )

DEPOSITION OF DOUGLAS RAY BROWN

February 8, 2018

Taken on Behalf of the Defendants

---

Videotaped deposition of DOUGLAS RAY BROWN, held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:30 a.m., on the above date, before Marilyn Morgan, Kentucky Licensed Court Reporter, pursuant to the Federal Rules of Civil Procedure governing depositions.

A. Oh, I'm sure there is. I don't keep up with that.

Q. Okay. Have you ever received, to your knowledge, 35,000 birds in either house?

A. Never.

Q. Do you know what you have received?

A. 32,000 something is the most I can ever recall getting in there. And then as low as around 30,400 or so about the least.

Q. Have you ever had any discussions with anyone at Tyson since you've been operating these superhouses, as you call them, that you thought you would be getting 35,000 birds each?

A. Well, the discussion was between me and Steve Keys and then he left shortly -- he left, I think actually may have been gone before the new houses was completed. I don't remember when exactly he left.

Q. Was he gone before you started construction?

A. I don't believe so. I believe he was still here at that time.

Q. Do you remember when you started construction?

A. It was in '08, the best I can remember.

he wasn't.
Q. (By Mr. Tatum) Have you come to believe he's dishonest?
MR. WHITFIELD: Object to the form. Go ahead.
A. I can't say that he's either dishonest or he was misinformed himself.
Q. (By Mr. Tatum) In what specific way are you talking about?
A. With saying that they would place 35,000 birds in there and there never was.
Q. Do you have any document you're aware of that is a document that you submitted to a bank or any lending company that calculates income based on a $35,000 bird assumption?
A. No. I didn't have any paperwork, no, sir.
Q. Do you have any document yourself that you've ever used and said, well, if I'm going to build these houses, I'm going to project how many birds I'm going to get, the income I'm going to get, and it includes 35,000 birds?
A. The only thing I discussed with Daniel Smith at Farm Credit when I went to him to inquire about the loan and I give him all the specifics,

the cost, the birds placed, and the whole nine yards, that that would be what I would be relying on to make my payments.
Q. And this was all oral?
A. Yes, sir.
Q. Do you know if Daniel Smith relied on any of what you told him to issue the loan?
MR. WHITFIELD: Objection to form.
Q. (By Mr. Tatum) I'm just asking if you know what he relied on.
A. I have no idea what he relied on.
Q. Okay.
A. I'm sure he did.
Q. You have no idea if he did any independent investigation himself?
A. No, sir.
Q. No idea if he ran any independent numbers and stuff?
A. No, sir.
Q. Did Daniel -- was Daniel Smith the person you worked with for your loans on your other farms at the time?
A. Yes, sir.
Q. Do you still work with him?
A. I don't -- he's not at Farm Credit any

A. Yes, sir.
Q. And then your W-9 is attached to this form. Do you see that?
A. Yes, sir.
Q. Is that your signature?
A. Yes, sir.
Q. Okay. And then the last is a checklist. This is -- do you recognize any of the initials on those as being yours?
A. No, sir.
Q. And these signatures, do you recognize any of the signatures on the last page?
A. David Mears, David Deaton, yes, sir.
Q. You can't read the complex --
A. Complex manager, I have no idea.
Q. So you signed this contract as indicated in the various places on August 30, 2017th; right?
A. Yes. But I don't believe I did this. I don't recall none of that.
Q. The checklist; right? You did everything but the checklist?
A. The best I can remember.
Q. Okay. And where were you when you signed this contract?
A. Probably on the farm most likely.

That's where they usually bring them.
Q. Did you have a discussion with anyone at that time about whether or not you wanted to enter into a new contract with Tyson?
A. Well, being knee deep in debt, I had no choice but to sign another contract to keep on going and keep paying bills.
Q. Do you know if this contract differs in any way from prior contracts of this farm?
A. I'm not certain.
Q. Did you attempt at this point in time to go talk with any other integrators about maybe going somewhere else?
A. No, sir.
Q. Did you meet -- do you know who presented this contract to you for signing?
A. Whoever my service tech was at the time.
Q. Do you recall who that might have been?
A. They change them like underwear. I have no idea.
Q. Do you recall any of your service techs?
A. Oh, yeah. I mean, I've had several techs through the years.
Q. Give me some names.
A. Okay. Jennifer Parks, Vince Callaway,

shakes out as far as I got paid X and should have got Y?

A. Well, yeah. When you go in, you go into the settlement, you're getting settled on your whole farm consistent with being shorted on feed. You get paid a lot less on your entire poundage for the whole farm.

Q. Now, I'm just wondering if you ran that math and said this is what it cost me?

A. It would not have mattered. No, I didn't, no.

Q. Okay. Go ahead.

A. I notified Tyson after I had talked to Neil and told them that we were short on feed and that I wanted to know what they were going to do. Well, let's let you settle and let's see how you do, then we'll look at it after that.

Well, after the settlement come in, performance wasn't near as good as it had been. And then when Jim and David Dickey drove out to the farm to tell me that they wasn't going to do anything, you can imagine I wasn't very happy.

Q. All right. Do you remember what settlement this was?

A. No, sir.

they're going to do and you go on from there. I mean, there's no reason to keep documentation. Never been a reason for us to have kept documentation.

Q. So I just want to be clear, you can't remember what year it was?

A. I'm just saying it was a couple of years back. You know, I can't tell you exactly when it was, no, sir, I can't.

Q. You say David and Jim came out to your farm. They were at a neighboring farm and came by the farm?

A. Yes. They were on the Latta farm, over local. They had called me and wanted to run by and talk to me about it.

Q. And so they were in the area?

A. Yes, sir.

Q. And you were okay with them coming by to talk about it?

A. Yes, sir.

Q. Okay. And what did they tell you?

A. They told me that they had looked at the settlement and they didn't see that they felt like there was anything there that they could do because they didn't have any proof that the feed wasn't

delivered.
Q. Where had you settled?
A. I just remember it wasn't as good as I normally do. I don't remember the placement.
Q. So you don't remember if it was above or below average?
A. I don't remember if it was above or below. I just remember it was below average for that farm, where that farm had typically settled.
Q. And you don't know how that at the end of the day affected the money you got paid for that settlement?
A. I know it definitely affected it. It wouldn't matter if it pushed me from first to second or first to last. It's still the issue that I was shorted on feed and they wouldn't do anything about it.
Q. Understood. I'm just trying to figure out if you can tell me how much money you got shorted?
A. No, sir.
Q. Okay. Now, you said they told you we can't do anything about it. They don't have proof in the record that it wasn't delivered. You said you think based on your eyeballing the feed and

you got delivered 55,000 pounds?
A. No. And it's never happened again since.
Q. Now, you said there was an altercation. What was the altercation?
A. The altercation was I told them to get in their truck and get off my farm and don't ever come back. If all you're going to do is come here and lie to me, I don't need this. You could have made a phone call to tell me what you told me.
Q. Well, what did you think David was lying about?
A. What did I think they were lying about?
Q. No, David.
A. They were --
Q. I'm asking what you think David was lying about, specifically David Dickey?
A. What did I think -- they were specifically not going to do anything even though they had been notified the day that there was an issue and they just let it run through the system and now there's no way to prove it. The feed is gone. At that point in time, they could have reclaimed that feed and took it back in and checked it to verify.

Q. Who had been notified?

A. I talked to Neil Barfield the day the feed was delivered.

Q. Okay. But what I asked you was, what did Dickey lie about, Dickey himself personally? You said he lied about this. What did he lie about?

A. What did he lie about?

Q. Yeah.

A. Saying that the feed was not -- saying that the feed wasn't there. Saying that I was not charged for feed I didn't get, and I most certainly was charged for feed I didn't get.

Q. So do you know if he knew that you actually got less feed other than what you were telling him?

A. Well, he's in management. When I tell my tech, it's supposed to go up the chain.

Q. Okay. So it was you saying you got less and the feed ticket saying you got more; right?

A. Yes.

Q. Okay. Do you have any reason to think that Dickey knew you were right and the ticket was wrong?

A. No. Because they wouldn't do anything

about it at the point in time that the event occurred. I requested it to be reclaimed and they wouldn't reclaim it.

Q. So you wanted them -- it had already been brought to your place and dumped?

A. Yes, sir.

Q. In your feed bin?

A. Yes, sir.

Q. And you wanted them to dig it out, put it back in the truck and grab it back and weigh it?

A. Yes.

Q. Okay. Anyone ever done that before for you?

A. It has been done. Not for me, no, sir.

Q. So it's never been done before for you. You've heard of it being done for someone else?

A. I've heard of other people having it reclaimed, yes, sir.

Q. But you've never seen that happen?

A. No, sir.

Q. Is this something you've heard from others?

A. Yeah. But if there's a question, why would they not take it into consideration.

Q. Wouldn't that leave you with no feed?

Q. Do you receive any sort of ticket, delivery ticket or anything like that that tells you your breed?
A. The tickets that we get don't -- I've never seen it documented on there what they were. Usually the tech comes by the farm and he'll write it on the mortality card what they are.
Q. Do you have any preference for one breed over another?
A. Oh, yeah.
Q. What's your preference?
A. 708s, then 500s, then 700s.
Q. So you like the breed 708 best?
A. Yeah. It's not a Cobb bird. It's an Aviagen bird. It's a totally different breed.
Q. So you like the Aviagen 708. Then you like the Cobb 500 and the Cobb 700?
A. Yes, sir.
Q. And that's -- and what is the basis of you preferring those?
A. There's a big performance difference in the birds.
Q. And what's the performance difference?
A. Well, typically, you don't have -- you have more culls and stuff in certain breeds of the

500s and the 700s than you do in the 708s.
Q. And how do you know that over time, if you don't know what breeds you're getting?
A. Well, we've known it for several years. We've only started getting these 708s for the last couple of years.
Q. And you like those better?
A. Oh, yeah.
Q. Better performing bird?
A. Yes, sir.
Q. Do you know if the ratio of Cobb 500, 700, or 708 that you get is any different than the percentages that another grower gets?
A. Well, I know -- percentage-wise, it could be somebody that has a two-house farm that has a hundred percent 708s where you could have been a four-house farm and have 50 percent 708s. So percentage-wise, it's always a different percentage from farm to farm.
Q. Do you have any -- can you give me any examples of when you know that's happened where someone has got a hundred percent of something during your flock and you've gotten 50 percent of it?
A. Well, yeah. Well, I could probably

(Exhibit 12 was marked.)

Q. (By Mr. Tatum) Let me show you what's Exhibit 12. Exhibit 12 is a document that was provided to me from your attorney that was answers to questions. Would you turn to the last page? Is that your signature there where it says verification?

A. Yes, sir.

Q. So did you review these answers and make sure they were accurate?

A. I'm sure I did at the time that I signed it.

Q. I want to ask you about a couple of the questions. If you go to page -- there's pages down at the bottom middle. If you go to page 10, there's a series of bullet points there. Do you see that?

A. Yes, sir.

Q. The first one says in 2008, Steve Keys -- in a nutshell, this is the topic about providing 35,000 birds per flock?

A. Yes, sir.

Q. The second bullet says you remember a conversation you had with Steve Keys in which Keys assured plaintiff that Tyson takes care of its

people. When did that happen?
A. I'm sure that would have been along about the same -- the only conversations me and Steve Keys had was along about the time we were building the two new houses.
Q. Did you think he was lying when he said that?
A. I had no reason at that point in time to believe anything other than that.
Q. And you said he left Tyson shortly before you started taking flocks?
A. Sometime afterwards. I'm not sure of the timeline.
Q. You think this, then, was about somewhere around 2008 or so?
A. '09, 2008, '09. I'm not sure.
Q. And then the next bullet says prior to 2009, you had discussions with Tyson employees about replacing the heater in the house?
A. Heaters, yes, sir.
Q. And ultimately you went to radiant brooders?
A. Yes, sir.
Q. When was this prior to 2009? Like what year are we talking about?

perform in the tournament system as opposed to a 700 or 500?
A. Of course, yeah.
Q. Okay. So one example that you just gave to us that Morgan Rickard just got 708s and you got 700s?
A. Yes, sir.
Q. And you're going to be competing against him in the same tournament?
A. Yes, sir.
Q. All right. And do you think that's fair?
A. Absolutely not.
Q. And why is that not fair?
A. Because you can't -- you absolutely cannot compete a 700 against a 708. It just don't happen. We're having -- you can go back to the breeder flocks. I've talked to breeders that are raising these birds and their performance on their end, their paychecks are down by the thousands because this 700 is such a bad bird. You cannot compete. You just can't do it.
Q. And do you know or have you heard, or do you have an understanding probably is a better way of putting it, as to the performance based pay that