# Exhibit 21

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

v. NO. 4:15-cv-00077

TYSON CHICKEN, INC.,

et al.,

Defendants.

---

DEPOSITION OF KEITH M. CRABTREE

FEBRUARY 14, 2018

- - - -

Videotaped deposition of KEITH M. CRABTREE held at 19 North Main Street, Madisonville, Kentucky, commencing at 9:42 a.m., on the above date, before Gina Hawkins, Registered Professional Reporter and Certified Realtime Reporter.

Q BB&T?
A Yes, sir.
Q Did you put any money down?
A No, sir.
Q When you built the two houses, what did you build? Two chicken houses. Anything else?
A That's it. Oh, no, I put the shop and my water room and my alarm system on there, and I built another litter barn.
Q You used the barn on the first set of property as a litter barn?
A The first litter barn that I had. I now keep my equipment in it.
Q Okay.
A And the second litter barn I built is where I keep all the -- throw all the litter in there.
Q Have you paid off the -- any of these loans?
A No. I used the first loan, the equity out of it, to build the two new houses.
Q How much equity did you have on the first loan?
A I'm going to guess it was around $200,000.
Q So you had paid that $500,000 down about $200,000?
A Probably.
Q Okay. Then you used that as a downpayment?

A Equity.
Q Equity?
A Yep.
Q So how much do you have in outstanding loans right now for your land?
A It's about $675,000.
Q So you spent about $500,000 on the first four houses and land, about $700,000 on the second 10 acres and houses, and about $21,000 on the 10 acres itself.
A Right.
Q And of that amount you still owe with $675,000?
A (The witness nodded.)
Q The rest of it you've paid down over time?
A Yes.
Q Have you taken out any other loans in relation to chicken operations besides those three?
A No, sir.
Q Do you do any other work on your farm besides raise chickens?
A No, sir.
Q Do you have any other job?
A No, sir.
Q Have you had any other source of income since you started in the poultry business?
A When I first started in the poultry business, I'd

unload grass for a little while, and I raised tobacco for a little while.

Q Did you get settled out on tobacco?

A No.

Q You raised tobacco on the 30 acres?

A No.

Q Where did you raise it?

A Down the road. I leased some ground from a farmer.

Q What years did you do that?

A I would say 2000 -- 2007, '08 -- 2007, '08, '09. I think I raised it for three or four years.

Q When did you first start in the chicken business?

A '18 right now. I'd say it was around 2007, give or take.

Q And you started -- so that was -- let me track the timing here.

You said you purchased the initial land, 30 acres and four houses, about 11 and a half years ago?

A Yes.

Q So that would have been 2007, 2006, something like that?

A Yes.

Q And did you start immediately into the poultry business?

A Yes.

Q And that was with your initial four houses that you bought?

A Yes, sir.

Q Did -- when you started in the poultry business -- I'm trying to get a sense of whether there was, you know, the chicken houses went dormant for a while the previous owner had them --

A They -- from the time, I guess, I purchased them, they sit for about a month, and then after I purchased them, they probably sit for another month, and I did some work to them trying to get them, you know, up to par, you know.

Q And who did you initially raise chickens for in 2007?

A Perdue.

Q And how did you get connected to Perdue to raise chickens?

A I called the assistant grow out manager.

Q Did you buy the initial farm with the intention of getting into the chicken business?

A Yes, sir.

Q Had you ever been in the chicken business before?

A No, sir.

Q Have any family that was in it?

A No, sir.

Q Any friends?
A No, sir.
Q What made you want to get in that business?
A I worked in the factory since I got out of high school and, you know, I was tired of being a robot, you know, sitting there doing the same thing every day. I was a welder at Dana Corporation. I mean, I did a few other jobs. But like I said, when I get off work with the factory, I'd help on the farm and did a little bit of that, and one thing led to another.
About the only way you can get into the farming business at the time was try chicken farming.
Q Did you grow up on a farm?
A No, sir.
Q So you don't come from a family of farmers?
A My granddad was a farmer, but that was early 1900s, you know. He passed away before I was ever born.
Q You said Dana Corp. You're kind of shrinking -- your chair is shrinking the backdrop there for the camera?
A Oh, sorry.
Q You can scoot up. I think your coat is just rubbing against it.
A Okay.
Q He just wants you to look good.
A Hard challenge.

Q I might ask you to spell Dana Corp because she's just typing down what we're talking about.
A Dana Corporation.
Q How do you spell that?
A D-a-n-a Incorporation.
Q What is Dana Corporation?
A They built frames for Toyota, Sequoia, and the Tundra.
Q Where is that?
A Owensboro, Kentucky.
Q When did you start working there?
A '99.
Q When did you stop working there?
A The year that I bought the farm.
Q Approximately 2007?
A Mm-hmm.
Q And you were a welder?
A Welder, tech. I guess you could just say tech, you know, which kind of -- I did everything, pretty much, to do with the plant. I drove a forklift for a while, was a quality tech for a while. I was a welder for a while.
Q You were -- it sounds like you were single when you bought the farm initially?
A Yes, sir.
Q Did you have any partners?

A No, sir.
Q So you're the sole investor?
A Yes, sir.
Q So you bought it, you were looking to get into the chicken business?
A Yes, sir.
Q Did you have any conversation with Ronald Dickens or his son about whether that was a good idea or bad idea?
A I went to a different farmer that an acquaintance I know knew from when they was growing up. I went over there with him and worked for a couple weeks just helping him to see what I thought about it and, you know. And I did it, and the next thing you know, here I am a chicken farmer.
Q Who was that?
A Dale Howard.
Q He was a Perdue grower?
A Yes, sir.
Q How do you pronounce his last name?
A Howard.
Q Oh, Howard. I'm sorry. And so you decided, I'm going to give this a go and find some property?
A That's right.
Q Had you run into Ronald Dickens and know that he was trying to sell?
A I actually went to a farmer that was right down

the road from the road from him, which was Mr. Edwards, and I spoke to him, and he was for sale at the time, but he was in the process of selling someone else.

So I went to Mr. Dickens. I don't remember how, through the grapevine, I got the knowledge that he was wanting to sell, but I went to his business where he sold TVs and appliances and asked him if he was wanting to sell, and he kind of said, "Yeah, I think I am. Let me think it over, and I'll call you back." And he did. He called me back.

Q And was the other guy with Perdue also that you first tried to talk to?

A No. He was from Tyson.

Q He was with Tyson, okay. Did he give you any feedback on whether the chicken business was a good or bad --

A No, he didn't. He didn't say one way or the other.

Q Okay. Who did you end up selling to, if you know?

A Mike Murphy.

Q Did you, at that time in 2007 or so when you were looking to get into the chicken business, have any conversations with anyone at Tyson?

A No.

Q So you bought the four houses, and then you must have met with someone at Perdue. Was it before or after you bought the land and the houses?
A Before.
Q Okay. And who did you meet with?
A Chris Creech.
Q And who was Chris Creech?
A Assistant grow-out manager.
Q And I guess he told you they'd keep contracting on that farm if you took over?
A Mm-hmm.
Q And you thought that sounded like a good opportunity?
A Right. I wanted to get into farming, so I thought it would be a good opportunity.
Q Did Perdue help you in any way in getting your loans or anything like that?
A No, sir.
Q Did they help negotiate the price or anything?
A No, sir.
Q Did you negotiate the price with Mr. Dickens?
A Not really. I didn't know a whole lot about chicken houses or anything else. I just -- he had it appraised, and that's what it appraised for, so I just assumed that's what it was worth, and that's what I give him

for it.
Q And so there was like an official appraisal by an appraising company?
A Yes, sir.
Q And it appraised it at $500,000?
A Mm-hmm.
Q Do you still have that appraisal?
A Probably not.
Q Do you know how that $500,000 value was determined?
A No, sir.
Q Was it based on sort of value today or future income from chicken or --
A I have no idea.
Q Did you have anyone helping you take a look at it, like a lawyer or an accountant or anything like that?
A Dale, the guy I went with to walk chickens, he went up there with me and walked them a little bit and, you know, with that --
Q And did Dale think it was a good idea?
A I mean, it was all right, you know. It probably wasn't the greatest deal, by no means, but I had my mind set that I wanted to be a chicken farmer.
Q Kind of one of those may not be the best deal, but it's not the worst deal?

A Right.
Q He didn't try to tell you getting into the chicken business was a bad idea?
A No.
Q And he was, I think you said, a chicken grower at Perdue?
A Yes, sir.
Q So did you have your contracts in place or like a letter of intent in place before you bought the farms so you knew once you bought the farms you'd get chickens?
A Yes. But with Perdue, it was, as they call it, a flock by flock contract.
Q Okay. But you at least had some sort of commitment from them that they'd give you a flock?
A Yes, sir.
Q Once you bought it?
A It wasn't no borrowing no money if you didn't have no income coming in.
Q Right. Did you run any calculations at that time as to what you thought your income might be?
A I looked at the -- some of the previous ones from, you know, Mr. Dickens told me about what I would make.
Q What did he tell you he thought you'd make?
A At that time I think it was 20 -- probably average 20 to 24.

Q Did you have anyone helping you while you were with Perdue?
A No, sir.
Q So you do all your -- while with Perdue, you did all your chicken operations alone?
A Yes, sir.
Q No employees?
A No.
Q What made you -- what led to the decision to not contract with Perdue and instead contract with Tyson?
A Better opportunities with Tyson. I went, you know, to Tyson, and I talked to Mr. Allen. I can't remember his last name. And I brought him out to my farm. I said, "Would you be willing to take on some more houses?" He says, "Yes." I said, "Would you even be willing to build some more houses?" And he said, "Yes."
And I asked him -- and when he did that, when he gave me the opportunity, I thought that was a -- a better way to, you know, proposition myself.
Q So you wanted to build more houses?
A Yes, sir.
Q And had you asked Perdue if you could build more houses?
A Yes, sir.
Q And what did they say?

A To be -- to build more houses with them, you had to be above positive APC rating with them, and I was not.
Q And what does that mean to be above positive -- did you say "APC"?
A Yes, sir.
Q And what is APC?
A Above-average grower.
Q And so at that time you were, at least under their system, not ranked as an above-average grower?
A Right.
Q Meaning week-to-week in your tournaments you were finishing below average?
A Yes, sir.
Q And so they said their requirements for you to build more houses and therefore receive chickens, either, you'd have to be an above-average grower?
A Yes, sir.
Q And so they were not open to giving you more chickens if you built more houses?
A No, sir.
Q Did Perdue ever threaten to terminate sending you chickens?
A They never threatened to terminate, but I was thrown into their management program.
Q Into what would be like an intensified management

A No, sir.
Q And so did you talk with any fellow growers about growing for Tyson and whether that was a good idea or bad idea?
A Nobody really offhand. I was warned about going to Tyson, but I never went to nobody and really asked them.
Q When you say "warned," who warned you?
A Mr. Wall.
Q Mr. Who? I'm sorry.
A Mr. Wall.
Q Who is Mr. Wall?
A Tim Wall, he worked for Tyson at one time.
Q Was he working at Tyson when he warned you about going there?
A No. He had done switched to Perdue.
Q So he was a grower?
A Yes, sir.
Q Or an employee of Tyson?
A Grower.
Q So he had been a Tyson grower?
A Yes, sir.
Q And he was a friend of yours?
A Acquaintance.
Q An acquaintance. And then at some point he had switched from Tyson to Perdue?

A Yes, sir.
Q Do you know when he switched from Tyson to Perdue?
A No, sir.
Q Where is his farm?
A Beech Grove.
Q Beech Grove, Kentucky?
A Yes, sir.
Q Do you know when he switched to Perdue from Tyson?
A No, sir.
Q Do you know why?
A No -- do I know why he switched?
Q Yeah.
A He said because they mistreated people.
Q Did he say what he meant by "mistreated people"? No?
A No.
Q And so you talked with Mr. Wall prior to approaching Tyson?
A I never talked to Mr. Wall.
Q How did you receive a warning from him?
A A friend of mine come to me that he was friends with.
Q Oh, okay. So a friend of yours told you that

MR. TATUM: This might be -- we had a couple people, that when we were preparing for depos, we realized that their latest greatest contracts were post our production two years ago.

MR. WHITFIELD: Yeah.

MR. TATUM: I don't -- let me see the date. This one is not that, obviously, from the date of it. I don't know why it doesn't have a Bates number on it.

MR. WHITFIELD: Yeah, it's no big deal.

BY MR. TATUM:

Q All right. Okay. So I want to look at this contract. Do you recognize this as a copy of your current broiler production contract for farm 5192?

A I believe so.

Q And on the second page, as we flip through, is that your signature there on the left side?

A Yes, sir.

Q So this was dated February 24, 2012; is that right?

A Yes, sir.

Q And do you recall who brought this out to you to sign?

A I would believe either Rubin Bruce or James Catlin.

Q Do you remember any discussions you had with them

on what this contract was or meant or anything like that?
A I asked him what it was about, but it's been so long, I'm not sure the conversation.
Q Can't recall?
A No.
Q And this is the second contract you signed for those four houses with Tyson, right?
A Right.
Q And it looks like it's also for a 7-year term there in paragraph 10? Is that your understanding?
A Yes, sir.
Q And then if you flip the page, you see Schedule A? And if you flip to the second page, it's Schedule A.
A Turning one more page?
Q Yes, sir.
A Do I want to keep both of them out or --
Q Oh, just flip them. I'm just going through where you signed it to make sure it's your signature.
A Oh, okay.
Q So we'll probably do a lot of flipping.
Is that your signature there on the second page of Exhibit A -- or Schedule A to Exhibit 1 on the left side?
A Yes, sir.
Q It is?
A Yes, sir.

you're not going to make as much. But if you raise this one, it's about this -- this is -- say, for instance, it's a seven-pound bird. That's about the same as what the square footage of getting the same amount of money, whether you're getting square footage or paid by the pound.

Q Did you want the fuel pay to be changed to square footage or stay by pound?

A I'm fine with square footage. That way you know what you're getting.

Q And is it your understanding that other growers had approached the Robards Complex and had asked them to change it to the square-footage basis so it would be harmonized?

A I believe -- I believe so.

Q And is it your understanding that these changes that you signed off on in Amendment A were offered to other -- all the other growers in the complex as well? It wasn't unique to you?

A What's that?

Q Amending Schedule A to increase your base pay and change your fuel allowance to square footage, that was offered to others as well?

MR. WHITFIELD: Objection to form.

BY MR. TATUM:

Q If you know.

BY MR. TATUM:

Q Is that right?

A Yes.

Q Whereas others might be -- you know, they might make a recommendation, but if you don't do it, they're not as hard-nosed about it?

A Right.

Q Has Beau ever lied to you?

A Yes.

Q What has he lied to you about?

A He lies on his paperwork that he turns into Tyson. He's -- he deceivingly writes it to make it, you know, look the way it ain't supposed to -- you know, he'll misuse dates. He'll misrepresent things that he writes down.

Q Give me -- tell me when he's done that and on what document.

A I will send a letter back when I was giving the arc 99 that, you know, just say for instance I have 40 something DO birds. My houses are running in full tunnel. It's raining outside. 100 percent humidity in there. You're not running enough air. I mean, then you get a thing saying, you know, this could have caused the real reason why your birds were sick. I don't know. That one form that they sent out to me, there was a bunch of stuff he wrote in

there that's miss guiding. This flock he has come out the first of the flock, and on a certain date he wrote -- he give me a call and said, Keith, I need you to cover up your chickens. Two and half weeks later he comes in. There's chickens that are being moved to the side while the litter is being removed. He writes down on a big long note, Keith, I told you to cover them birds up last week. Why haven't you done this? Once again, he's misguided what he wrote down that was something that happened two and a half weeks ago. Them birds were covered up, but misrepresents that says, hey, I see a farmer moving the litter. When you get done, cover the birds up.

He's also lied on a Cert -- his paperwork. I've watched him go around all my computers and never put on a suit. Go through my computers, write do you know when he gets off of them, calls me, talks to me for 15 minutes and asks me every question he needs to do to fill out his report.

And I have a witness.

Q And you think that's bad to ask you information to put in his report?

A If it's your job to walk to that house and get every answer that you're supposed to do, and that's what you get paid for. Why would you call on me to answer all them questions for you?

Q I guess -- so you don't want him to call you and ask you questions about your farm operations?

A Well, he's been given a report that he's supposed to go through and answer these questions. It is his job to walk through the houses and make sure that each -- you know, this is done, that's done, this is done, that's done, but if you just as soon go through all my computers, write down, you know, off of them, not go in my house and do what you're paid to do, and then call me and let me answer every question for you.

Q Has he ever not taken your word for it?

A He knows I tell the truth so he calls on me and allows me to do his work for him.

Q So you believe he trusts you?

A Oh, yeah, he -- but it's -- when you go in there and you write some of the stuff on there that you never really even checked, that's falsifying records. There will be some stuff on that that I -- what he actually says it is --

Q Is it because he took your word for it?

A No. Because he's just trying to get in, get out and --

Q Any of that ever cause you to lose money?

A No. But I mean, you know, you see this right here is this if you don't do what I say, you could lose your

contract. I've had him come to me and say that. Is that how service techs are supposed to represent their sells?

Q Would you consider yourself an above-average, or below-average performer with Tyson?

A Average.

Q Is your goal to be above average?

A My goal is to make what's due to me.

Q But my question was, is your goal to be above average?

A Knowing that I take money from other farmers, my goal is to make average what's due to me.

Q I don't understand. You said take from other farmers.

A Where do you think my bonus money comes from?

Q I didn't know you received bonus money.

A They take money away from one grower and give it to another in the tournament system.

Q So you believe that certain growers don't have full basis to their pay like you do?

A I think everybody is paid -- in the tournament system, and if somebody does better than the other, they take money from one farmer and give it to the next.

Q You're not trying to say they actually take money out of the farmer's pocket?

A Yes, sir.

talking to him at one of the meetings, but I don't think I ever brought it back up, no.

Q So the context of this was, you went and met with him and felt -- and wanted your contract rate pay increased?

A Well, what they did is, they come -- like I'm selling birds on a Friday, and he told me -- my service tech run the papers out on a Thursday -- "if you don't sign this, we're not going to give you a raise on this flock. "

I said, "Why do I have to sign that right now"? If you want a raise, you better take it right now."

Q That's the Amendment A to the broiler contract; right?

A Yeah, I said where's -- I mean, I said, "I want to talk to Jim." I said, "This -- I don't believe this is enough." I said, "I don't think he understands how much inflation has went up," I said.

"Well, if you want your money."

I said, well, I said, "I'm not going to sign it." I said, "I want to talk to Jim first."

And that way I can bring, you know, my gas receipts, my electric receipts, everything from four or five years there, throw it out, look how much everything has gone up, you know. And we're seeing percentages of, you know, raises on utility bills and stuff like that. He agreed that the raise wasn't enough but, you know --

Q When you say "raise," you're talking about a change in your contract price; right?

A Right.

Q And so you had a contract with a price?

A Right. And if you wanted to get the 15-cent, you better sign it real quick. I'm like, where's the negotiation in that, you know?

Why, you know -- if I'm bringing you, you know papers showing how much my output keeps going up and keep going up, but what, you know -- that profit of mine is getting smaller because everybody else's hands are getting bigger, but the company ain't trying to do their job of keeping -- what you call it -- keeping up with the, you know, the times basically.

Q So you had a contract that had a price set in it; right?

A Right.

Q And then someone came to you and said, we're going to -- we're offering to increase that price, and here's what it is?

A A 15th of a cent.

Q Right. And you said, wait, I'd like to talk to Jim because I'd like my price to be increased more?

A Right.

Q And then you went and talked with Jim?