# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

---

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

vs. Case No. 4:15-cv-00077

TYSON CHICKEN, INC., et al.,

Defendants.

---

Videotape Deposition of KYLE W. STIEGERT, Ph.D.

Thursday, October 10, 2019

9:01 a.m.

at

COYNE, SCHULTZ, BECKER & BAUER, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin

Stenographically Reported by Shelly A. Loniello, RPR

A Oh.
**Q -- associate professor at Wisconsin until --**
A I was.
**Q -- about '09?**
A I was.
**Q Okay.**
A Yeah.
**Q And -- just focusing in on Wisconsin.**
A Okay. I was -- my associate professor split was the same, 70/30, research/teaching.
**Q Okay. When did you join the University of Wisconsin?**
A 2001.
**Q Did you join in -- I'm sorry if I move too fast, but did you join as an associate professor?**
A Yes.
**Q Okay. Have you been in the agriculture and applied economics department your entire tenure at the University of Wisconsin?**
A Yes.
**Q What does your research focus on?**
A My research is primarily in the areas of industrial organization, international trade, agricultural business and some agricultural finance.
**Q What does your teaching focus on?**

A I'd have to look here. I wouldn't know that.

**Q Sure.**

A My role in that situation was pretty narrow, so I didn't really delve into all of that.

**Q Okay. Have you taught anywhere other than K State and the University of Wisconsin?**

A I've done various teaching -- short-term teaching assignments in several other places.

**Q Where?**

A I taught a two-week course to -- to the competition authority in Armenia, I did guest lectures at Justus Liebig University in my recent sabbatical, I've done other guest lectures when I was in sabbatical at the University of Connecticut, this is back in 2000, but --

**Q Have any of your guest lectures or speeches or anything like that concerned the poultry industry?**

A No.

**Q Okay. As far as, you know, working as a -- as far as being an employee, then you've worked for K State and University of Wisconsin in your professional life?**

A As a -- as a -- as a professor, yes. I was a graduate fellow at Purdue during my -- my Ph.D. years, and I was a research assistant at the

A I don't know their involvement in -- or experience in poultry.
**Q Do you know if they have any professional experience in poultry?**
A I don't know their background at all, either way.
**Q Okay. Do you know if they've ever published anything in relation to the broiler industry?**
A I don't -- I don't know for sure, no.
**Q Okay. Do you know what their rates of retention are?**
A No.
**Q Okay. Do you know what they've been paid?**
A No.
**Q Okay. Where did you receive your Ph.D.?**
A At Purdue University.
**Q And when was that?**
A In August of '93.
**Q And so you went from Purdue, receiving your Ph.D., to K State --**
A Correct.
**Q -- as an associate or --**
A Assistant professor.
**Q -- assistant professor?**
**The hierarchy's assistant, associate --**

A Full.
**Q -- full? Got it.**
A Correct.
**Q What did you receive your Ph.D. in?**
A Agricultural economics.
**Q Okay. You received a master's before that?**
A I did.
**Q When was that?**
A In -- in -- you know, let me -- yeah, 1989. Yes.
**Q From?**
A University of Nebraska.
MR. WHITFIELD: I'm sorry, 1989? You said '89?
THE WITNESS: '89, yes.
BY MR. TATUM:
**Q And bachelor's, of what?**
A University of Nebraska.
**Q In what?**
A In -- I was a double major in economics and finance from the college of business administration.
**Q And when did you receive your bachelor's?**
A Man, it would have been 1981.
**Q Okay.**
A I believe.
**Q So your -- your professional life has been K State,**

the bank in the new environment.
Q Okay. Anything else in that --
A In 1987, I left there and started my master's program.
Q Okay. And what did you receive your master's in?
A In '89.
Q What -- what did you receive it in?
A In agricultural economics.
Q Did anything within your master's program have anything to do with the poultry industry?
A Not directly. It was a -- my master's thesis was on the imperfect competition in the beef sector, which is somewhat related.
Q Anything have to do with the broiler industry, within your master's program?
A No, no.
Q How about your Ph.D. program, what was your Ph.D. dissertation in?
A It was on real option theory in -- applied to the anhydrous ammonia, which is nitrogen fertilizer, so real option theory applied to the anhydrous ammonia industry.
Q Did anything about your Ph.D. program or dissertation have to do with the poultry industry?
A No.

**Q Have you ever published a paper dealing with monopsony?**
A Yes.
**Q How many times?**
A Well, I would have to look at my CV, but I've written three papers on monopsony power in the beef industry, at least.
**Q Have you ever written any papers dealing with monopsony in the poultry industry?**
A No.
**Q During your professional career within the university settings, have you ever -- I want to make sure I use the right word, have you ever had any -- subject to any censors or reprimands or demotions, things of that nature?**
A No. No.
**Q Have you ever had any papers rejected for publication?**
A Yes.
**Q How many?**
A If you don't -- if you don't get a paper rejected, it means you didn't aim high enough, so --
**Q How many papers have you had rejected for publication?**
A You mean rejected and never published?

A This would be my fifth.

**Q Have you ever, to your knowledge, had a report of yours stricken by any court?**

A No.

**Q Do you -- do you know that it's -- the facts, they've never been stricken, or -- or are you saying you just don't know?**

A No, they've never been -- I -- there's never even been a motion --

**Q Okay.**

A -- on my work.

**Q Okay. Have any of the cases that you've been retained on in the past dealt with the concepts of monopsony?**

A Yes. The North American cranberry market is a case of monopsony.

**Q Okay. Any others?**

A No.

**Q And in the North American cranberry case, remind me, have you provided a written report in that case?**

A I have.

**Q And is your conclusion that there is a monopsony in that case?**

A Ocean Spray -- you're talking about Ocean Spray,

A My -- my findings are summarized on page 8, Paragraph 18 -- page 8 and page 9.

**Q So as I understand it then, is it fair for me to say your opinions that you offer in this case is that, A, the Robards Complex for Tyson is in a monopsonist position, is that -- is that fair; and then, B, your opinion is that it is in fact exercising monopsony power because of that position?**

A Yes.

**Q And then, C, the effect of that exercise of monopsonist power has resulted in damages to plaintiffs in three categories; one, base pay suppression; two, days out inconsistent with expectations; and, three, condemnation calculations?**

A Yes.

**Q Are you offering any other opinions in this case besides what I've just summarized? And I understand there's a background to how you get to those opinions, but you can understand my view of just wanting to make sure I've got it.**

A These are the -- these are the three areas that -- that I felt like we could -- we could develop supportable damage estimates for. There are other

Q -- exercise of monopsony power, your opinion is
these damages wouldn't exist?
A Yes.
Q Okay. Now, did you do any analysis in the
formulation of your July 15, 2019 report to
determine if Tyson, under the contracts that exist,
in other words, you're familiar with the contracts
have a base pay element?
A Yeah.
Q And they have a fuel pay element?
A Yes.
Q And they have a system, what we commonly call the
tournament system, that -- that sets the formula on
how the base pay element works, correct?
A Yes.
Q And -- and there may be a premium housing pay
element, right? There's a variety of pay elements
within the contract?
A Yep.
Q Did you do any analysis to determine whether or not
under those contract terms, just what those terms
are, in other words I'm supposed to get paid this,
in writing, it may be a good amount or it may be a
bad amount, but this is the amount in writing I'm
supposed to get paid for this pound of meat --

A Yep.
**Q -- did you do any analysis to determine whether any plaintiff didn't get paid according to the terms as written in the contracts?**
MR. WHITFIELD: Objection to form.
BY MR. TATUM:
**Q And I'll start with base pay. So did you do any analysis to determine whether or not a given plaintiff just got shorted base pay, based on the amount; so if I was supposed to get 4.9, I got 4.8, or I got shorted the number of pounds I got paid for, whatever?**
A Well, some -- to my knowledge, the -- the contract terms were not -- are not at issue here.
**Q Okay.**
A That's my understanding of this --
**Q Okay.**
A -- of this -- my assignment.
**Q Okay. And so you --**
A And my -- I didn't -- in my discovery, I didn't come across anything that --
**Q Okay. You weren't asked to look in to see, you know, just from a pure pen to paper on the contract perspective, did it -- did each grower get paid what it says?**

A Yes.

**Q -- right?**

A Because they apply a -- an average weight.

**Q Right. You understand that, right?**

A Yeah.

**Q And you understand that's what the contract says?**

A Right. I -- the part I -- the part I was still investigating, that I'm not quite comfortable with, is who gets to decide what a condemned bird is, how does that process work --

**Q So you're not familiar with who regulates what a condemned bird is?**

A I -- I am. And I'm still in the process of truly digesting all that.

**Q You -- in the -- preparation for your July 15, 2019 report, you didn't challenge and you didn't conduct any analysis to determine at the end of the day if any plaintiff had not been charged per the contract term for the number of birds condemned, you may have a -- you may have an issue, right?**

A Oh, yeah. The -- the financing of it all, the -- the accounting and the economics all looked fine to me. I didn't see anything that raised red flags.

**Q Okay.**

A I'm still trying to digest a little bit of that,

for its ingredients, like a -- like a poultry scientist might or an animal scientist might, but rather you're looking for trends in productivity, at least that's what an economist would be interested in --

Q **Uh-huh. In the --**

A -- so --

Q **-- but not in the broiler industry?**

A Yeah, there's -- there's a lot of similarity in the -- in the way feed gets developed. I mean, there's a whole poultry science industry, there's a whole hog science, there's a whole beef science.

Q **I understand. But you've never done it in the poultry industry is what I'm --**

A Of course I have not done it.

Q **Right.**

A I'm not a -- I'm not a feed specialist.

Q **Right. And you've never written anything on that, in the poultry industry, right?**

A I'm not a specialist in that area --

Q **Right.**

A -- so, naturally, I didn't write anything on that.

Q **Right. I'm just trying to be clear.**

**You wouldn't hold yourself out as an expert on feed usage in a broiler farm?**

Q -- just covering what you're offering opinions in in this case, and you're not offering opinions in this case about that, because it's not in your report, and that's all I'm trying to do is just make sure --
A Okay.
Q -- we're on the same page there.
A Well, I'd have to go back and look at every paragraph in my report again to see if I didn't say anything. It's -- I would want to -- and also I have the supplemental report that I just submitted.
Q And you've not quantified any damages based on any sort of variability of inputs to the growers?
A We didn't quantify that, no.
Q Okay.
A Even though it -- it is a -- a problem.
MR. TATUM: Let me check something here.
BY MR. TATUM:
Q Do you agree with me that the plaintiffs in this case have a financial stake in the outcome of it?
A I don't really know what that would be, but there's something -- they get -- they get something and the lawyers get something and -- I have no -- I have no idea how that works out and how it will be worked out.