# Exhibit 23

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

---

CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE,

Plaintiffs,

-vs-

Case No. 4:15-cv-00077

Judge: Honorable Joseph H. McKinley

TYSON CHICKEN, INC., et al.

Defendants.

---

Video Deposition of DR. KYLE STIEGERT

Thursday, January 16th, 2020

9:03 a.m.

at

COYNE, SCHULTZ, BECKER & BAUER, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin

Reported by: Wendy L. Hanneman, RPR

**per year?**

A The -- the days out work was -- was built upon the 12 and 17 that is alleged to have been promised.

**Q I understand. I'm just saying, you didn't -- and I'm just, you know, I've got to be clear on what you did and what you didn't do. And you didn't, in preparing your supplemental report, do any analysis at all to see if plaintiffs received flocks at the frequency set forth in the written broiler agreement in which they signed?**

A I reviewed the contracts.

**Q I understand, but you didn't analyze their flock placements to see if they received flocks consistent with those terms, correct? You simply looked at it through this assumption given to you to -- to analyze?**

A Well, the -- the point of -- of this is -- is -- really speaks to more the monopsony control of the contract itself, so.

**Q I understand, but you're --**

A So --

**Q Listen to my question. I understand, but I'm just saying, you didn't do any analysis to determine whether or not they received the number of flocks per year as mandated by the contract; whether you**

**liked the contract or not, you didn't do that**
**analysis, correct?**
A I did not present that analysis. Um, here again, the contract terms are -- are what's at question in this case.
**Q I understand.**
A Yeah.
**Q Similarly with condemnation, whether or not you liked the contract or not, you did not do any analysis to determine if in fact the growers had been paid according to the contract terms governing condemnation payments, correct?**
A My -- I'm trying to recall what the contract specifies. I would have to look back at that.
**Q You don't recall doing any analysis to determine, look, I may or may not like this contract, I may or may not think it's even fair, but I didn't analyze whether or not they paid according to what it says?**
A I'm just trying to recall if the contract said they were going to be paid on -- they were being paid zero dollars for, um, condemned weight.
**Q So sitting here today, you can't recall whether you did that analysis?**
A I can't recall whether that was in the contract.
**Q My question is, can you recall doing any analysis**

around that.

Q **And what opinions from those regression results are you saying that you challenge?**

A Everything.

Q **Everything. But you didn't analyze, for example, whether or not all growers received the same amount of -- same breeds over time, correct? I mean, you just literally didn't do that analysis?**

A I looked at Dr. Elam's graphical presentations of those hen breeds, as -- as you're referring to here. So now we're going to dive down into the weeds and look at hen breeds, that's fine.

Q **No, I'm just saying, you literally didn't do that analysis?**

A I analyzed --

Q **You might have looked at --**

A -- his work, yes.

Q **Right. But you didn't do it, correct?**

A No.

Q **Right. You didn't look at, for example, whether or not the age of the hen was consistent among growers as provided over time? I'm just saying, you didn't do the analysis?**

A There's a study out of the University of Georgia that suggests that age of hens matters.

Q I understand.
A And I do cite that study.
Q You're not -- you're not listening to --
A But that goes back to my original report.
Q But listen to my question. You didn't actually analyze in this case whether or not the age of the hen breed was relatively consistent over time among the growers as provided at the Robards complex, you didn't do that analysis, correct?
A There was no -- there's -- you know, you asked me a question of that nature, but there's no data coming out of Tyson that offered up that kind of -- the ability to do that analysis.
Q So the answer is, no, you didn't do that, correct?
A The answer is I would love to do that.
Q No, the answer is you didn't do it. You might like to, but you didn't, fair? I mean, if you did, say you did; if you didn't, say you didn't.
A Well, I -- I just -- I hate it -- I hate it when it comes across like -- it's almost like you're saying I failed to do it.
Q No, I'm literally, it's an objective issue, you either did it or you didn't. If there's reasons why you didn't, that's fine, but you didn't do it, correct?

**concerned about his methods --**
A Well, there are --
Q **-- I get that.**
A There are a few things that I -- we did look at, I had my team look at. And one of them was how much variability did each grower have tournament -- tournament over tournament, and there was variability. So, you know, to say that it's the grower that's responsible for everything, it's the same grower.
Q **Variability of what? What are you talking about?**
A In net -- net pound value. Um --
Q **So you looked at that one issue?**
A Yeah, looked at it. There was variability tournament over tournament, the performance of a specific grower changes. So to say that, oh, it's all the grower's fault is incorrect. There's variability in these inputs, there's -- there's --
Q **You haven't -- you haven't seen -- who's offered an opinion in this case that says it's all the grower's fault? You haven't seen that.**
A I think Dr. Elam said that.
Q **Okay, so your impression is that Dr. Elam's opinion was --**
A Well, it's --

Q **Yeah.**
A Are you talking about Tyson at that point?
Q **Talking about Robards.**
A Talking about the processing of Tyson?
Q **The Robards complex.**
A You said income at Robards. Is that referencing all the farm --
Q **The Robards complex. You didn't look at the Robards complex financials.**
A Okay, you're talking about Tyson, then?
Q **No, I'm talking about the Robards complex, just like I said.**
A So all the farmers?
Q **You have -- no, I'm talking about the -- the complex, the -- the processing plant.**
A Okay, that's what I was asking.
Q **You've never looked at their financials, correct?**
A No, I don't think it was ever --
Q **I mean, you have no idea whether they went up or down?**
A Wait -- we have their -- we have the Agri Stats data, so we know their gross margins from their operations there, yeah.
Q **But you -- you don't know what it is sitting here today, do you? You've not offered an opinion on**

And you go through another -- so you have your average daily gain, times the number of -- the number of days out beyond 12 or 17, and multiplied -- oh, yeah, multiplied by the grower pay, gives you a -- the amount of revenue lost. And then from that you have to take a subtraction, because Tyson gives credit for if you're over 21 days. Um, if you're -- if you wait over 21 days, they give you a calculation based on square footage. Took that into account, and took into account the variable cost of these operations to obtain the -- the damages there.

So the -- the third bucket -- the third bucket is -- is, ah, associated with the -- the grower pay. And I won't go into what happened in '17 and '18, but there is some -- there is some -- I didn't have Agri Stats' data for '17 and '18, so I had to do a little bit of mathematical gymnastics to obtain a couple numbers that allowed me to go forward. And I did that, explained it in the report.

**Q Because you didn't have the Agri Stat numbers?**

A Yeah. And I don't know why Tyson doesn't supply that to us.

**Q Okay.**

A But I didn't get it.
**Q Okay.**
A And, um -- and then, um, so we end up with this -- this margin number. You take the -- you -- you get the -- the grower pay, add 7 percent per the MacDonald and Key study, and then use the grower pay with the -- and then adjust upwards for sharing in the -- in the gross margin that Tyson enjoyed following the theory of vertical markets, and obtaining a total damage out of this bucket of activity.
And these are all -- these are all identifiably additive in nature. The condemnation problem, the, ah, the days out problem, and then the grower pay problem, can all be added together to come up with a total damage. And then of course we applied some -- we applied some interest calculations on the fact that the money is fairly old, so.
**Q And so that methodology is the one you utilized to come up with damage numbers?**
A Yes.
**Q Okay. And did you direct the folks at Nathan to assist you in coming up with these damage calculations?**