# Exhibit 24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENBORO DIVISION

CHARLES MORRIS, et al., )
)
Plaintiffs, )
)
vs. ) CASE NO.
) 4:15-cv-00077
TYSON CHICKEN, INC., et al., )
)
Defendants. )
_________________________________________ )

VIDEOTAPED DEPOSITION OF:

JASON ANDERSON

Taken on behalf of the Plaintiffs

January 30, 2020

is to determine whether or not the -- the net income meets or exceeds a per capita income in that area?

A. The analysis we did was to evaluate whether or not the cash flow and adjusted economic income -- and we can talk about how we move from point A to B on that -- exceeds the per capita income for that area.

And -- and then ancillary to that, as another rule of thumb, talking to bankers who are in that area and asking questions: Do you guys finance these deals?

Q. Okay. Which you --

A. Do you like those deals?

Q. But did -- you did in this case?

A. I did do -- yes, sir, I did.

Q. How many instances did you talk to bankers?

A. I had one primary. There's a couple that I talked to, I -- as I recall. But one primary banker who the president of a bank.

Q. Who is it?

A. Doug Lawson.

Q. Doug who?

A. Doug Lawson.
Q. Lawson?
A. Lawson.
Q. Who is he with?
A. Planters Bank, I think is the name of the bank.
Q. Okay. And where are they located?
A. Doug's a good friend of mine, and he's in Henderson.
Q. Okay. And who else did you talk to?
A. I can't recall, but I -- the -- the name of the bank now. But I did have a brief conversation with a -- with a Calloway banker, so it's not as relevant in my mind. But Brian Overby at, I think it's called First Financial Bank. It used to be Heritage. I'm trying to think of the name. I think it's First Financial Bank now.
Q. And that First Financial is located in Calloway County?
A. They are. They're -- they're in multiple counties, including Hopkinsville and that area. But -- but Brian's in Calloway.

heard it, anyway. They -- they are -- "their credit risk is minimal. We like those loans" --
Q. Uh-huh.
A. -- was a comment he made.
Q. Uh-huh. So -- so your comment here that "further research of financing opportunities for ventures of a similar nature" is based solely on a conversation you had with Doug Lawson at Planters Bank?
A. Yes.
Q. Okay. And how long was that conversation?
A. We talked -- I don't know. We -- we probably talk a half hour.
Q. On the phone?
A. Yes, sir.
Q. Okay. But you didn't look at any documents to back it up?
A. Oh, no, no, no. No.
Q. Okay.
A. We don't -- we wouldn't share the specific documents.
Q. Okay. Then it says: "Further, lending arrangements no longer require farm service agency -- agency guarantees in many

instances for perspective growers."
Now, tell somebody watching this what a farm service agency guarantee is.
A. That's Doug's comment to me --
Q. Okay.
A. -- that the bank will underwrite the loan without an FSA guarantee.
Q. Okay. All right. Have you talked with any other banker in the area besides your friend Doug Lawson?
A. No --
Q. Okay.
A. -- I haven't.
Q. To -- to form the basis of this opinion?
A. No, sir --
Q. All right.
A. -- I have not.
Q. Okay. Let's go to 4, then. 2A(4). "In some instances, Plaintiffs completely paid off loan principal on their farms from ongoing cash flow provided by the contract with Tyson."
You say in some instances. Do you know which ones?

A. Not off the top of my head. I know in the numbers, we'll be able to see that.

Q. Okay. All right. You say: "Further, we reviewed depositions taken in this case, and some indicated that their farms, with the assembled infrastructures from poultry-growing operations, had considerable value in an available market of interested buyers."

Now, that's based upon deposition testimony that you reviewed?

A. Yes, sir, it is.

Q. Which ones are we talking about there?

A. I don't recall the name, but it is in the depositions.

Q. Is it one person or more than one?

A. As I recall, one for sure. I don't know if -- if there are more than -- more than one.

Q. Can you tell --

A. At least one.

Q. -- me which one?

A. I can't recall which one.

Q. Okay. And you haven't done a valuation of the farms of any of my clients, have you?
A. No, sir.
Q. And then you say, next pr- -- next sentence: "This statement is consistent with information that we independently obtained through discussions with individuals who were involved in financing such operations at third-party financial institutions."
That's Doug Lawson?
A. Yes, sir.
Q. Nobody else?
A. No.
Q. So it's not individuals, it's individual? Not --
A. That's correct.
Q. Yeah. Okay.
A. That's right.
Q. All right. Just one guy?
A. Yes, sir.
Q. A half-hour conversation?
A. Yes, sir.
Q. No review of any documents of any sort to verify it?

A. But overall it's -- it's predictable and "generally" seemed to be the appropriate term to reflect that.

Q. What -- what -- what did you review to come to this opinion that it's generally predictable?

A. The tax returns.

Q. Okay. Nothing else?

A. No, sir.

Q. Okay. And you're saying here that based upon your review of the tax returns, that my clients would have a predictable revenue stream and they are not subjected to cyclical business cycles?

A. Right. They -- they don't have -- what I'm trying to say with that is it's -- it's -- I think by way of the -- the contract with Tyson, assessing the risks, as we talked about earlier, with Tyson itself performing, I think they should be reasonably assured that they will have a buyer for their goods, they will have goods to sell, and they can reasonably estimate the profitability, revenue, all the attributes that it would take to really budget appropriately. I think the contract and -- and

relationship with Tyson provides visibility and stability in a way that a lot of other businesses don't -- don't have.

Q. In what way?

A. Because --

Q. Because I think I heard you say a minute ago that your only review of the contracts was to determine the term?

A. That's correct.

Q. And whether or not you had a buyer?

A. That's correct.

Q. That's it?

A. Those two things are --

Q. So -- so how would --

A. And the pricing.

Q. And the pricing.

So how in the world with those three things that you're looking at when you reviewed these contracts can you say that the income stream is it predictable based on upon the contract review you just did?

A. Because if you assume counterparty performance that Tyson is going to deliver birds, you have a product to sell. You

have a long term under the contract to do it. You also have a buyer for your goods, Tyson. You have a pricing mechanism and formula that you can be reasonably assured of if I produce X number of flocks per year, call it five, then I'll have some measure of calculating what my gross income should be, and therefore, I can budget the other operating expenses of the farm, you know, accordingly.

Q. But did you factor other things in the fee that we've learned in discovery in this -- in this case, namely that individuals in the same tournament may be growing different breeds of birds? Do you factor that into it?

MR. TATUM: Objection, lack of foundation.

BY MR. WHITFIELD:

Q. Did you -- did you factor that into it?

A. It -- it was outside of the scope of what I did. I don't --

Q. Well, don't you think if you're trying to determine whether or not these contracts are viability and whether or not they

Q. So the only basis for this comment that you write in here that "Tyson has, historically, very infrequently terminated a contract with a grower," are you limiting that comment to the Robards' area or Tyson in general?
A. In general.
Q. Okay.
A. Because I -- because it would include that -- you know, that -- that research that I did online to see what -- you know, what's out there.
Q. So you just Googled it?
A. I did. I did that. And I -- you know, I did look at the -- at the contracts. I think one of the Plaintiffs in this case had a terminated contract.
Q. Well, what site would you go to through a Google search to determine how many instances in the relevant time period that Tyson terminated contracts with growers?
A. I don't -- I don't remember a specific site. I couldn't cite one. I just -- I actually was just doing it as a foundational research point to see if it's a common thread

that -- that I could find. And -- and I didn't find that.

And that's why I say "from my review." Which includes that and includes conversation, you know, with -- I think I may have asked this question of -- of -- of counsel. And certainly I noticed the -- the contract that was terminated in -- in the Plaintiff -- in the Plaintiff of this case. But beyond that, I didn't find anything specific, and I wouldn't --

Q. So besides this generic Google search that you're making reference to, you can't point me to any specific document or -- or analysis or review to support your comment that you wrote here that "Tyson has historically very infrequently terminated a contract with a gower [sic] -- grower" during the contract term?

A. No, I don't cite you with any -- provide you any other documentation around that.

Q. All right. Have you ever heard of Tyson -- strike that.

Have you ever heard Tyson threatening to cancel contracts with growers?

A. I have.

Q. Okay.
A. Not at all.
Q. So you don't have access to any specialized treatises or articles or anything relative to the poultry industry at all, do you?
A. No, sir, I do not.
Q. So anything that you've gotten in regard to the statement about frequency of termination of contracts and now from flock-to-flock duration, you got just through a Google search?
A. Yes, in going to the USDA website. I would include that as a Google search as well. I mean, there's -- there's a lot of data out there. But foundationally, Google is a good place to start. But the USDA website is one we relied on as well, and that's a fair amount of information on that.
Q. And the USDA website, does it make reference to the industry standard of 15-year terms for the contracts?
A. As I recall, there's a document that is out there. I -- I -- I'd actually have to -- to validate that, though. I

apologize. I don't remember the name of it. But it was a pretty good writeup for a foundational understanding.

And again, you asked me what did I do to assess risks, and part of that is -- is that research. Which it's -- it's -- you know, it's not unlike a lot of other things. I'm going to Google it, I'm going to find some specific sites that I want to see, and I'll read a document about: Well, what should I really be thinking about in the context of risk?

Risk doesn't play specifically into the numbers we calculated truly, but it does provide that assessment and basis for, you know, some measure of reasonable assurance of stability of the relationship.

Q. Okay. That -- I appreciate that, but -- but coming back to me on my -- my original question. I mean, I -- I'm taking your deposition today, and I'm trying to figure out the basis for your opinions, and one of the things I've got to explore and do a deep dive into is the basis for your opinions.

And so far under Overview of Broiler Contracts, you haven't told me one place