**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO: 4:15-CV-00077-JHM**

**CHARLES MORRIS, et al.**                                                               **PLAINTIFFS**

**V.**

**TYSON CHICKEN, INC., et al.**                                                        **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on Plaintiffs' Motion to Exclude the Testimony of Jason Anderson. [DN 174]. Fully briefed, this matter is ripe for decision.

## I.       BACKGROUND

Plaintiffs have poultry growing arrangements with Defendant Tyson Chicken, Inc. [DN 18 ¶¶ 2–20]. Plaintiffs allege that "Tyson, and its named employees, acted illegally and unconscionably in a manner that prevented [] Plaintiffs from growing chickens in a fair and profitable manner." [*Id.* ¶ 32]. Plaintiffs sued Defendants alleging violations of the Packers and Stockyards Act of 1921 (PSA), breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. [*Id.* ¶¶ 165–197].[1] Plaintiffs seek to exclude Defendants' expert Jason Anderson. [DN 174].

## II.       STANDARD OF REVIEW

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has

---

[1] The Court dismissed some of the claims in Plaintiffs' Amended Complaint. [DN 35]. The claims mentioned here are the claims that remain.

reliably applied the principles and methods to the facts of the case."  Under Rule 702, the trial judge

acts as a gatekeeper to ensure that expert evidence is both reliable and relevant.  *Mike's Train House,*

*Inc. v. Lionel, LLC*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Kumho Tire Co., Ltd. v. Carmichael*,

526 U.S. 137 (1999)).

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements.  First, the witness must be qualified by "knowledge, skill, experience, training, or education."  FED. R. EVID. 702.  Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.*  Third, the testimony must be reliable.  *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).  "Rule 702 guides the trial

court by providing general standards to assess reliability."  *Id.*

In determining whether testimony is reliable, the Court's focus "must be solely on principles

and methodology, not on the conclusions that they generate."  *Daubert v. Merrell Dow Pharm. Inc.*,

509 U.S. 579, 595 (1993).  The Supreme Court identified a non-exhaustive list of factors that may

help the Court in assessing the reliability of a proposed expert's opinion.  These factors include:

(1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected

to peer review and publication; (3) whether the technique has a known or potential rate of error; and

(4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific

community."  *Id.* at 592–94.  This gatekeeping role is not limited to expert testimony based on

scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized'

matters" within the scope of Rule 702.  *Kumho Tire*, 526 U.S. at 147.  Whether the Court applies

these factors to assess the reliability of an expert's testimony "depend[s] on the nature of the issue,

the expert's particular expertise, and the subject of his testimony."  *Id.* at 150 (quotation omitted).

Any weakness in the underlying factual basis bears on the weight, as opposed to admissibility, of the

evidence.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citation omitted).  *See also Brooks v.*

*Caterpillar Glob. Mining Am., LLC*, No. 14CV-00022, 2017 WL 5633216, at *1–2 (W.D. Ky. Nov. 22, 2017).

### III.   DISCUSSION

Plaintiffs request that the Court exclude Anderson's entire report because his opinions are irrelevant and unreliable.  [DN 200 at 1–2].  Defendants retained Anderson to review the financial viability of the contracts between Tyson and Plaintiffs.  [DN 174-3 at 1].  Defendants also retained Anderson "to evaluate the benefit of the [] contracts in relation to the potential and actual profitability generated through the relationship with Tyson as compared to general economic opportunities in the Robards[2] area."  [*Id.* at 2].  Anderson concludes that the contracts are economically viable.  [*Id.* at 3]. His conclusion is based on six findings:

1) In most instances, growers reported generally strong positive cash flow before and after funding debt service on an ongoing basis.
2) In most instances, growers reported strong economic income from the relationships with Tyson.
3) Further research of financing opportunities for ventures of a similar nature in the area revealed that financial institutions have a strong appetite for lending to prospective growers resulting from generally positive historically performing loan experiences.  Further, lending arrangements no longer require Farm Service Agency guarantees in many instances for prospective growers.
4) In some instances, plaintiffs completely paid off [the] loan princip[al] on their farms from ongoing cash flow provided by the contracts with Tyson.  Further, we reviewed depositions taken in this case and some indicated that their farms with the assembled infrastructure for poultry growing operations had considerable value and an available market of interested buyers.  This statement is consistent with information we independently obtained through discussions with individuals who are involved in financing such operations at third party financial institutions.
5) The grower contracts with Tyson generally assure an ongoing and predictable revenue stream, and therefore cash flow, without the grower being subjected to cyclical business performance cycles.
6) In relation to per capita income for the area where the Robards Complex operates, and consequently where the plaintiffs operate their business, the relationship with Tyson generally produces substantially higher income for growers as compared to the general population of the area and thereby is above market in the context of providing the opportunity for improving a participants['] standard of living.

---

[2] Robards is one of Tyson's regional complexes for their operations.  [DN 18 ¶ 22].

[*Id.* at 3–4].  Anderson's report also includes an overview of the contracts.  [*Id.* at 4].  In describing

the contracts, Anderson says, "Tyson has historically very infrequently terminated a contract with a

grower during the contract term and, it is reasonable for a grower to expect renewal of the contract

following the expiration of the initial term."  [*Id.*].  He also says, "[o]verall, the industry sees grower

contract durations ranging from 'flock to flock' up to 15 years."  [*Id.*].  The Court will address the

relevance and reliability of Anderson's opinions below.

## A.  Relevance

"Expert testimony which does not relate to any issue in the case is not relevant . . . ."  *Daubert*,

509 U.S. at 591 (citations omitted).  Under the relevance requirement "there must be a 'fit' between

the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the

case is not relevant and therefore not helpful."  *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.

1993).  "Whether an opinion 'relates to an issue in the case' or helps a jury answer a 'specific question'

depends on the claims before the court.  Thus, when analyzing the relevancy of expert testimony, a

court should consider the elements that a plaintiff must prove."  *Madej v. Maiden*, 951 F.3d 364, 370

(6th Cir. 2020).  In determining the relevancy of Anderson's opinions, the Court considers what

Plaintiffs must prove under the PSA,[3] breach of contract,[4] breach of the implied covenant of good

faith and fair dealing,[5] and fraud.[6]

---

[3] The PSA provides, in relevant part, that "[i]t shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to: (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or (g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.  7 U.S.C. § 192.

[4] To prove a breach of contract claim, a plaintiff must show (1) the existence of a contract, (2) a breach of that contract, and (3) that the breach caused damages.  *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007)).

[5] The implied covenant of good faith and fair dealing imposes a duty on the parties "to do everything necessary to carry" out the contract.  *Farmers Bank & Tr. Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *Rainier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)).

[6] "A party claiming fraud must establish six elements by clear and convincing evidence: [1] material representation, [2] which is false, [3] known to be false or recklessly made, [4] made with inducement to be acted upon, [5] acted in reliance

In his report, Anderson opines about Plaintiffs' income in relation to the general population in Henderson County.  [DN 174-3 at 4].  Anderson also includes an analysis of the economic conditions for individual plaintiffs which discusses cash flow, average income, and the median household income for Henderson County, Kentucky.  [*See e.g.*, *id.* at 6].  Defendants have not shown that comparing the median household income for Henderson County with Plaintiffs income is relevant.  *See Ashburn v. Gen. Nutrition Ctrs., Inc.*, 533 F. Supp. 2d 770, 772 (N.D. Ohio 2008) ("The party offering the expert has the burden of proving admissibility.").  It will not help the jury determine whether Defendants violated the PSA, breached their contract with Plaintiffs, breached the implied covenant of good faith and fair dealing, or if they were fraudulent.  Indeed, Defendants acknowledge that Anderson does not directly opine on the allegations under the PSA.  [DN 194 at 8].  It is also not relevant to any allegations Plaintiffs make in their complaint.  Thus, Anderson's discussion of the median household income for Henderson County and his opinions about Plaintiffs income or cash flow in relation to the Henderson County median household income are **excluded**.

Regarding Anderson's other opinions, they do relate to issues in this case and, thus, are relevant.  In support of their claims in their Amended Complaint, Plaintiffs make several allegations regarding profitability.  For example, Plaintiffs allege that Tyson "prevented [them] from growing chickens in a fair and profitable manner."  [DN 18 ¶ 32].  Plaintiffs also allege that Tyson breached its commitments to them about "the type and volume of product they will be asked to produce— undermining growers' ability to turn a profit—and manipulating its operations so that growers can neither predict nor rely on a specific level of income."  [*Id.* ¶ 36].  Anderson's findings relate to those factual issues that are at least relevant to the breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud claims.  *See Allen v. Vill. Partners, L.P.*, No. 06-CV-59, 2008

---

thereon, and [6] causing injury."  *Farmers Bank*, 171 S.W.3d 4 at 11 (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)).

WL 3200721, at *3 (E.D. Tenn. Aug. 5, 2008) ("It is clear from the expert disclosure that Mr. Gerding

is addressing the issues raised by the plaintiffs in their complaint."); *see also Helton v. Am. Gen. Life*

*Ins. Co.*, No. 09-CV-00118, 2013 WL 2443166, at *3 (W.D. Ky. June 4, 2013) (finding an expert

opinion not relevant based on the facts stated in the second amended complaint).  The Court must still

consider whether these findings and Anderson's conclusion are reliable.

## B.  Reliability

"[A] trial judge must have considerable leeway in deciding in a particular case how to go

about determining whether particular expert testimony is reliable.  That is to say, a trial court should

consider the specific factors identified in *Daubert* where they are reasonable measures of the

reliability of expert testimony."  *Kumho Tire*, 526 U.S. at 152.

First, Anderson finds that "growers reported generally strong positive cash flow before and

after funding debt service on an ongoing basis."  [DN 174-3 at 3].  It appears that Plaintiffs do not

have an issue with Anderson's methodology to determine cash flow because they say "the problem

in Anderson's methodology stems not from how he used depreciation to determine cash flow . . . but

rather how he used it to determine economic income . . . ."  [DN 200 at 6].  However, Plaintiffs

highlight that Anderson did not have a precise definition of "strong" other than that "it's just

significantly positive."  [DN 199-1 Anderson Dep. 313:16–24].  Then, Anderson said that "perhaps

'strong'. . . shouldn't be in [the report]."  [*Id.* 315:25–316:1].  Nevertheless, Anderson may testify as

to cash flow and his terminology can be examined through cross examination.

Second, Anderson opines that "growers reported strong economic income from the

relationships with Tyson."  [DN 174-3 at 3].  Plaintiffs take issue with Anderson's calculation of

economic income because he relies on depreciation as a proxy for residual value to determine the

value of Plaintiffs' property.[7] [DN 174-1 at 9].  Defendants assert that Anderson's true reason for considering depreciation was "to account for the true nature of [] Plaintiffs' cash flow . . . ." [DN 194 at 13].  Anderson, however, confirmed that the methodology has nothing to do with his cash flow analysis.  [DN 194-3 Anderson Dep. 413:18–414: 14].  Furthermore, Anderson testified that the methodology is something that would not be generally accepted in the appraisal environment.  [*Id.* at 383:13–17].  In fact, as Anderson admitted, he cannot point to a treatise that supports using depreciation as a proxy for residual value as a generally accepted practice in his industry.  [*Id.* at 384:3–7].  Anderson even admitted that the methodology has not been "peer-reviewed tested."  [*Id.* at 388:10–19].  But Anderson explained that the methodology can be found in disclosed valuation reports periodically "because you have to have a proxy when you don't have . . . an appraisal."  [*Id.* at 386: 11–18].  He testified that the reason he used depreciation is because he did not have appraisals of the properties and depreciation is a proxy of fair value.  [*Id.* at 383:19–21].

Here, the fact that Anderson's methodology has not been subject to peer review does not render it unreliable.  *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (finding that "the fact that [a non-scientific expert's] opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible").  Nor does his admission, in this case, that using depreciation as a proxy for residual value is not a generally accepted method in appraisal make his methodology unreliable.  *See United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (". . . [E]xpert testimony that does not meet all or most of the Daubert factors may sometimes be admissible.").  Anderson

---

[7] Depreciation is "[a] reduction in the value or price of something; specif., a decline in an asset's value because of use, wear, obsolescence, or age." *Depreciation*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Residual value, which is also termed salvage value, is "[t]he value of an asset after it has become useless to the owner; the amount expected to be obtained when a fixed asset is disposed of at the end of its useful life.  Salvage value is used, under some depreciation methods, to determine the allowable tax deduction for depreciation." *Value*, BLACK'S LAW DICTIONARY (11th ed. 2019).

explained his reasoning for departing from using residual value and that his methodology is sometimes used in valuation reports.  The Court is satisfied that Anderson's methodology here is reliable.

Third, Anderson opines on whether financial institutions have a strong appetite for lending.  [DN 174-3 at 3].  He reached his opinion based on phone calls that he made to a couple of bankers in the area.  [DN 194-3 Anderson Dep. 184:18–22].  Anderson also testified that although he talked to a couple of bankers, Doug Lawson was the primary banker that he relied on because of Lawson's experience.  [*Id.* at 184:18–24].  When discussing Lawson, Anderson testified that he was someone that Anderson would rely on "in [his] community" for information on lending opportunities.  [*Id.* at 407:9–12].  Anderson then used the information he learned to form his opinions, which he may do.  *See Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 396 (W.D. Ky. 2018) (Under "'Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.'").  Plaintiffs complain that Anderson did not inquire about how many poultry lending arrangements Lawson has entered into or engage in any analysis to determine whether the lending institutions Plaintiffs relied on held similar views.  [DN 200 at 4].  These criticisms are a matter for cross-examination and do not go to admissibility.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Anderson's opinion on whether financial institutions have a strong appetite for lending is reliable.

Fourth, Anderson makes observations about Plaintiffs paying off their loan principal on their farms from cash flow from the contracts with Tyson.  [DN 174-3 at 3].  He also explains that in the depositions he reviewed, some Plaintiffs indicated "that their farms with the assembled infrastructure for poultry growing operations had considerable value and an available market of interested buyers."  [*Id.*].  Anderson found that was consistent with information he obtained from individuals "who are

8

involved in financing such operations." [*Id.*].  Contrary to Plaintiffs' argument that such observations

are no different than those that a lay witness can make, Anderson uses the information to support his

expert findings on who is willing to finance these types of operations.  [DN 174-1 at 10]; *see Pledger*

*v. Reliance Tr. Co.*, No. 15-CV-4444, 2019 WL 4439606, at \*12 (N.D. Ga. Feb. 25, 2019) ("However,

as opposed to providing a mere factual narrative, [an] expert is allowed to articulate the factual

underpinning upon which [s]he bases h[er] opinion.") (alterations in original).

Fifth, Anderson opines that "[t]he grower contracts with Tyson generally assure an ongoing

and predictable revenue stream, and therefore cash flow, without the grower being subjected to

cyclical business performance cycles."  [DN 174-3 at 4].  Anderson testified that he did a "flip

through" of several of the contracts, in part, "to establish whether or not there's some measure of

comfort to believe reasonably that there's ongoing cash flow opportunity for a grower."  [DN 199-1

Anderson Dep. 200:1–9, 333:18–334:9].  Anderson reviewed the contracts to determine the term,

whether there was a buyer, and pricing.  [*Id.* at 333:6–16].  His review of those three factors helped

him determine whether revenue stream was predictable.  [*Id.* at 333:18–334:9].  Anderson may testify

to this finding.  Plaintiffs' criticisms of his methodology go to the weight of his testimony rather than

its admissibility.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence.").

Finally, in relation to the contracts, some of Anderson's opinions are based, in part, on a

Google search.  Anderson says, "Tyson has historically very infrequently terminated a contract with

a grower during the contract term and, it is reasonable for a grower to expect renewal of the contract

following the expiration of the initial term."  [DN 174-3 at 4].[8]  In another instance, Anderson opined

that "[o]verall, the industry sees grower contract durations ranging from 'flock to flock' up to 15

---

[8] Defendants say that Anderson's conclusion "in no way hinge on this statement . . ."  [DN 194 at 15 n.8].

years." [*Id.*].  Plaintiffs' complaints about Anderson using Google searches goes to the weight of the Anderson's opinions and not their admissibility, especially considering the work Anderson did in addition to his Google searches.  The weaknesses in Anderson's methodology should be explored through vigorous cross-examination.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Ultimately, Anderson's conclusion that the contracts are economically viable is admissible.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Exclude the testimony of Anderson [DN 174] is **DENIED IN PART AND GRANTED IN PART**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

July 21, 2020

cc: counsel of record