# EXHIBIT 2

# Expert Report of Dr. Stiegert

# (Redacted Pursuant to Order DN 218)

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF KENTUCKY**

**OWENSBORO DIVISION**

| | |
|---|---|
| **CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE** | **Civil Action No. 4:15-cv-77-m** |
| **Plaintiffs,** | **DECLARATION OF KYLE STIEGERT IN SUPPORT OF PLAINTIFFS' RULE 26(a)(2) EXPERT DISCLOSURES** |
| **v.** | |
| **TYSON CHICKEN, INC., ET AL.** | |
| **Defendants.** | |

# Table of Contents

**I. INTRODUCTION....................4**
**II. SUMMARY OF ALLEGATIONS....................4**
A. SPECIFICS OF THE CASE....................4
**III. ASSIGNMENT....................7**
A. INFORMATION AND MATERIALS RELIED UPON....................8
B. CONCLUSIONS....................8
**IV. OVERVIEW OF THE CHICKEN GROWING INDUSTRY IN THE UNITED STATES 10**
A. ORGANIZATION OF PRODUCTION....................10
B. CONTRACTUAL RELATIONSHIP BETWEEN INTEGRATORS AND CHICKEN GROWERS....................12
C. BROILER INDUSTRY MARKET STRUCTURE....................14
**V. TYSON'S USE OF THE TOURNAMENT TO DETERMINE GROWER PAY....................15**
A. TOURNAMENT STRUCTURE....................15
B. TOURNAMENT OUTCOMES....................20
C. TYSON CONTROLS SEVERAL VARIABLES THAT DETERMINE GROWERS' TOURNAMENT PERFORMANCE....................24
**VI. TYSON'S ROBARDS COMPLEX – RELEVANT MARKET and MARKET POWER 33**
A. EXERCISE OF MONOPSONY POWER HARMS COMPETITION....................33
B. ROBARDS COMPLEX IS A MONOPSONIST IN ITS RELEVANT MARKET....................35
a. THE ROBARDS COMPLEX IS A RELEVANT ANTITRUST MARKET....................35
b. PERDUE FARMS IS NOT IN THE RELEVANT MARKET WITH TYSON, MAKING TYSON A MONOPSONIST AT THE ROBARDS COMPLEX....................36
c. IN THE ROBARDS COMPLEX MARKET, TYSON FURTHER ENHANCES ITS MONOPSONY BY REQUIRING INTEGRATOR SPECIFIC, NON-SALVAGEABLE INVESTMENTS AND UPGRADES....................39
C. TYSON EXERCISED ITS MONOPSONY POWER IN THE ROBARDS COMPLEX....................43
a. TYSON USED ITS MONOPSONY POWER TO IMPLEMENT THE TOURNAMENT IN A MANNER DETRIMENTAL TO GROWERS....................43
**VII. ESTIMATION OF DAMAGES....................54**
A. DAMAGES RESULTING TO PLAINTIFFS DUE TO SUPPRESSION OF GROWER PAY BY TYSON....................55
B. DAMAGES SUFFERED BY PLAINTIFFS DUE TO TYSON'S TREATMENT OF CONDEMNATION....................62
C. DAMAGES FROM EXCESS DAYS-OUT....................66

# Tables and Figures

Table 1: Comparison between the Reward Pay and Penalty in a Tournament – Without Exception (Outlier) .......... 19
Table 2: Number of Penalty and Reward Pay Instances by NPV Classification for all Plaintiffs across the Years .......... 22
Table 3: Number of Penalty and Reward Pay Instances by NPV Classification for all Plaintiffs for 2011 and 2012 .......... 23
Table 4: Instances with Difference of $0.01 in NPV between High-Ranking and Low-Ranking Grower .......... 24
Table 5: Investment on Building Houses by Plaintiffs .......... 42
Table 6: Comparisons of Base Pay, Agricultural Wages, Manufacturing Wages, CPI and Tyson’s Chicken Segment Profit .......... 45
Table 7: Effect of Condemnation on NPV (for Plaintiffs) .......... 49
Table 8: Effect of Condemnation on Growers' Ranks .......... 50
Table 9: Total Pounds of Condemned Birds and Value of these Birds at Base Rate .......... 52
Table 10: Annual Weighted Average Grower Pay .......... 58
Table 11: Tyson's Gross Margin per Pound .......... 60
Table 12: Damage Calculations .......... 62
Table 13: Effect of Condemnation at 50% Weight for Tournament Weekend September 16, 2017 .......... 64
Table 14: Damages based on Condemnation at 50% Weight .......... 65
Table 15: Damages based on Pay for Condemnation .......... 66
Table 16: Lost Revenue Calculation based on Days-out .......... 68
Table 17: Compensation Paid by Tyson for Days-out - after 21 Days of Days-out .......... 69
Table 18: Calculation of Damages .......... 70
Table 19: Damages for Suppression of Grower Pay by Plaintiffs .......... 71
Table 20: Damages based on Condemnation at 50% Weight by Plaintiffs .......... 72
Table 21: Damages based on Pay for Condemnation by Plaintiffs .......... 72
Table 22: Damages on Excess Days-out by Plaintiffs .......... 73
Table 23: Total Damages by Plaintiffs .......... 74

Figure 1: Net Pound Value and Penalty/Reward Pay for all Plaintiffs across the Years .......... 21
Figure 2: Average Farm Weight by Breed .......... 29
Figure 3: Average Net Pound Value by Breed .......... 30
Figure 4: Percentage of Tournaments by Number of Varieties of Breeds Involved in the Tournament .......... 31
Figure 5: Monthly Days-Out for the Robards Complex Compared to Tyson’s Representations .......... 54

# I. INTRODUCTION

1. My name is Kyle W. Stiegert and I am currently a Professor in the Department of Agricultural and Applied Economics at the University of Wisconsin-Madison. My appointment is split between teaching (30%) and research (70%). In the past 10 years, I have taught courses across a wide array of topics. This includes graduate courses in econometrics and applied industrial organization, and undergraduate courses in international markets and trade, malnutrition and world hunger, agricultural finance, and research methods. I also advise graduate students at the PhD and MS levels.

2. I have been continuously engaged in agricultural economics research since 1987. This includes two years as a research assistant from 1987-1989 at the University of Nebraska-Lincoln (MS agricultural economics), four years as a USDA research fellow from 1989-1993 at Purdue University (PhD in agricultural economics), eight years as a research-teaching faculty member from 1993-2001 at Kansas State University and 18 years as a research-teaching faculty member from 2001-present at the University of Wisconsin-Madison.

3. My research is focused primarily on international and domestic agricultural and food markets. All of my past and ongoing research relies on applied microeconomic methods. I have analyzed imperfect competition in the U.S. beef packing industry, the U.S. seed and ag-biotechnology sectors, the domestic and international wheat and malting barley markets and the U.S. nitrogen fertilizer industry. I have numerous studies of imperfect competition in food retail pricing and much of this research considers impacts through the associated food supply chains. Additional information about my background and experience is in my CV, which is attached as **Appendix A**.

# II. SUMMARY OF ALLEGATIONS

## A. SPECIFICS OF THE CASE

4. Plaintiffs, Charles Morris, Morvatt Enterprises LLC, William Rickard, Sondra Rickard, Rickard Farms LLC, ICU Chickens LLC, Dennis Clapp, John Pinkston, Bradley S. Salyer, as Chapter 7 Trustee of the Estate of Loi Moc Hong, H&L Farms LLC, Doug Brown, Tim Vincent, TLC Poultry, Keith Crabtree, Christopher Burch, Mike Murphy, Murphy Farms LLC, Calvin Leisure, ("Plaintiffs") are chicken

growers who contract with Tyson Chicken, Inc. ("Tyson")'s Robards Complex in Kentucky. The pending claims are against Tyson, and its employees, James Gottsponer (former Live Production Manager) and David Mears (former Complex Manger) – (hereinafter referred to as the "Defendants"). Among other allegations, Plaintiffs claim a violation under the Packers and Stockyard Act of 1921, 7 U.S.C. § 181 *et seq*. (hereinafter referred to as PSA) against Tyson.[1]

5. The PSA was enacted by the United States Congress to ensure fair competition and trade practices in the livestock marketing and meat packing industry and, among other things, to protect farmers from being exploited and being paid less than the true value of their livestock.[2] Specifically, as interpreted by the Sixth Circuit and other courts, the PSA is aimed at preventing business practices including unfair and deceptive practices that harm or are likely to harm competition.[3]

6. The Plaintiffs allege in their First Amended Complaint[4] that Tyson has monopsony power in the relevant market that comprises the vicinity of the Robards Complex and they used this monopsony power to (i) decrease the volume of chicken meat by delaying services or providing inadequate services, (ii) fail to pay for condemned birds that are sent to dog food processing plants, (iii) fail to provide the promised veterinary care services and antibiotics to certain plaintiffs while doing so for other growers, (iv) provide Plaintiffs with lower quality chicks, (v) fail to accurately record Plaintiffs' production and costs while charging them for services that it did not provide, and, (vi) force the Plaintiffs to upgrade their facilities.

7. In addition, the Plaintiffs allege that the Defendants engaged in unfair, unjustly discriminatory or deceptive practices; breached contracts; perpetrated fraud by concealing material information; and made false representations to Plaintiffs thereby

---

[1] Plaintiffs also allege Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, Fraudulent Concealment, Misrepresentation, Negligence, and Punitive Damages. See Plaintiffs' First Amended Complaint and Jury Demand, Morris et al v. Tyson Chicken Inc. et al, Civil Action No. 4:15-cv-77-m, United States District Court for Western District of Kentucky, Owensboro Division ("*Complaint*"), p. 2.

[2] "The Packers and Stockyards Act: An Overview" Available at https://nationalaglawcenter.org/overview/packers-and-stockyards/ (accessed April 10, 2019).

[3] Hovenkamp, Herbert J., (2011) "Does the Packers and Stockyards Act Require Antitrust Harm?". Faculty Scholarship. 1862. Available at https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?referer=https://www.google.co.in/&httpsredir=1&article=2862&context=faculty_scholarship.

[4] *Complaint*, pp. 39-46.

inducing them to enter into the agreements by falsely assuring them of reasonable returns and other incentives.

8. Defendant Tyson is a Delaware corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc. Tyson is the largest poultry integrator and broiler producing company in the United States,[5] accounting for 20 percent of total broiler production.[6] It is a fully vertically integrated company which owns and controls almost all stages of production processes including breeder stock, feed production/delivery operations, hatcheries, chicken processing, and further downstream chicken processing and distribution.[7] Tyson contracts with poultry farmers (also called chicken growers) to care for its chickens until they reach a weight acceptable for slaughter, as determined by Tyson. Tyson provides the growers with chicks, feed, medications, and also determines the amount, type, and frequency of provision of these inputs.[8] Apart from this, Tyson provides technical assistance, veterinary care, transportation, catching, and live-haul services.[9] Tyson further determines the time of delivery of chicks, feed, and medication and the timing for pick-up of chickens and feed.[10]

9. Tyson operates thirty-three broiler processing plants across the United States, known as "complexes." The Plaintiffs are contracted to provide grow-out services for the Robards Complex, which is one of Tyson's thirty-three broiler processing plants.

10. Tyson's Robards Complex is located in Robards, Henderson County, Kentucky.[11] It operates a feed mill (located in Sebree), a hatchery (located in Calhoun), and a processing plant (located in Robards).[12] Robards Complex also has a dog food

---

[5] WATT Poultry USA. (March 2018) Available at http://www.wattpoultryusa-digital.com/201803/.
[6] Tyson Foods Fiscal Factbook. (2017) Available at https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf.
[7] https://www.growwithtyson.com/chicken-production-process/; Tyson Foods Inc, - 2018 Annual Report on Form 10-K, p.4, Available at https://s22.q4cdn.com/104708849/files/doc_financials/quartely/2018/q4/TSN-FY18-10-K.pdf (accessed March 2, 2019).
[8] Broiler Production Contract (Robards) between Tyson Chicken and Calvin Leisure Jr. (5171) ("Leisure Contract"), Paragraph 2A. Duties of Company.
[9] Leisure Contract Paragraph 2B. Duties of Company.
[10] Leisure Contract Paragraph 2A. Duties of Company.
[11] https://www.tysonfoods.com/sites/default/files/2018-09/Tyson%20Foods%20Major%20Locations.pdf (accessed March 2, 2019); https://www.meatpoultry.com/articles/15559-tyson-foods-to-add-jobs-at-kentucky-poultry-plant.
[12] Tyson Foods Inc. Investor Factbook (2006-2007), Page 18. Available at http://media.corporate-ir.net/media_files/irol/65/65476/reports/0607_factbook.pdf, (accessed March 2, 2019).

processing plant operating under Tyson Food Inc.'s subsidiary River Valley Animal Foods.[13]

## III. ASSIGNMENT

11. I have been retained by Plaintiffs to determine whether the actions by Tyson uncovered during this case likely adversely affected competition during the relevant time period (April 24, 2010 to March 2, 2019) and to assess damages arising from Tyson's application of its production contract with the Plaintiffs and its tournament or ranking system over the course of the relevant time period.

12. I examined the potential anticompetitive effects of Tyson's (i) virtual total control of the grow-out process, resulting in a disparity of inputs into the grow-out process among growers including but not limited to the genetics of the chicks and quality of feed; (ii) grow-out requirements including investments and upgrades mandated by Tyson, (iii) distortion of the market by controlling the inputs – including the supply of chicks; (iv) impact of charging condemnation to the growers while profiting from the condemned birds; (v) tournament payment system, including the setting of base pay, and determination and exclusion of exceptions/outliers from the tournament; (vi) concealment of information about inputs into the grow-out process from Plaintiffs and other like growers, while sharing of such information with other poultry integrators; and (vii) other issues expressed in more detail in this report.

13. This report presents the results of my examination and application of my expertise. My opinions are based upon an independent review of documents produced by the parties in the case, publicly available professional literature, and my own research and professional experience. My opinions are rendered to a reasonable degree of scientific certainty.

14. I reserve the right to supplement this report if further information becomes available or if I am asked to consider additional information. Furthermore, I reserve the right to consider and comment on any additional expert's statements and testimony of witnesses, experts yet to be completed, or to reports in this matter. I also may rely

---

[13] https://www.tysonfoods.com/who-we-are/our-partners/farmers/prospective-farmers (accessed April 26, 2019).

upon demonstrative exhibits at the trial of this matter to explain my testimony and opinions.

## A. INFORMATION AND MATERIALS RELIED UPON

15. In carrying out this assignment, I have relied on information from a number of sources. I have reviewed documents produced by the parties in this case including the *Complaint,* the broiler production contracts between Tyson and the Plaintiffs, deposition testimony and Plaintiffs' interrogatory responses.

16. I have reviewed and analyzed growers' settlement data - including settlement statements and grower pay recaps (including those relating to the Plaintiffs) produced by the Defendants for the period from 2010 to 2019; Agri Stats data; publicly available information related to the broiler chicken industry in the United States; and economics literature dealing with the broiler chicken industry in the United States.

17. All the documents, materials, and sources of information I have reviewed and/or relied upon for the formation of my opinions in this matter are cited in this report and provided in **Appendix B**. I am paid $400/hour for my time committed to this assignment.

## B. CONCLUSIONS

18. Based on my analysis of the available evidence, I have concluded that Tyson's actions have harmed competition. This conclusion is based on the following findings:

**i)** The Robards complex is a relevant market for the purchase of chicken growing services.

**ii)** Tyson exercises monopsony power over the chicken growers it contracts with in the Robards complex.

**iii)** Tyson required Plaintiffs to make non-salvageable investments and upgrades that further enhanced its monopsony power.

**iv)** Tyson used its monopsony power to control the supply of chicks with the view to control the supply of chicken meat.

**v)** Tyson conducts the tournament in a manner that results in artificially low and volatile pay leading to competitive harm in the Robards Complex market for

grower services. Absent Tyson's monopsony power at the Robards Complex, Tyson would not likely have been able to maintain its tournament structure without compensating its growers with higher base pay.

**vi)** Economic theory strongly establishes that the exercise of monopsony power, such as Tyson's exercise of monopsony power at the Robards Complex, is likely to cause harm to competition. Tyson's exercise of monopsony power artificially lowers pay for growers. This has the effect of depressing the supply of chicken by either completely driving growers from the market or preventing growers from expanding output. Not only does this harm the upstream market for growing services but it can also result in reduced output and higher prices of chicken in the downstream market.

19. I have also calculated damages to Plaintiffs based on (a) the suppression of grower pay per pound grown; (b) the reduction in pounds grown based on flocks being spaced out longer than projected (i.e., higher "days-out"); and (c) Tyson's policies regarding condemnation. My conclusions regarding damages for each of these three categories are as follows:

a. My estimate of the effect of Tyson's suppression of grower pay per pound for all Plaintiffs is $10.74 million not including prejudgment interest and $12.33 million after adjusting for prejudgment interest.

b. Based on the assumption that the days-out should have averaged 12 in the summer months and 17.5 in the winter months, Plaintiffs incurred $2.77 million of damages not including prejudgment interest and $3.51 million after adjusting for prejudgment interest.

c. The effect of Tyson's policies on condemnation reduced grower pay by $366,088 not including prejudgment interest and $463,180 after adjusting for prejudgment interest.

## IV. OVERVIEW OF THE CHICKEN GROWING INDUSTRY IN THE UNITED STATES

### A. ORGANIZATION OF PRODUCTION

20. Chicken production in the United States began as a by-product market to the egg production sector. The development of chicken-for-meat or broiler production process did not gain a foothold until the 1920s. It took until the early 1950s for the commercial broilers to surpass farm chicken as the major source of chicken meat. Advancements in industrial processes, medicine, technology, food safety advances, government inspections of processing facilities, and print and media advertising, all served to increase the market size of the broiler industry.[14] By 1985, chicken consumption had surpassed pork consumption in the U.S and by 1992 chicken consumption surpassed beef production.[15]

21. By the mid-1960's, the commercial broiler industry became vertically integrated with chicken companies known as "integrators" controlling almost all stages of the hatching, feed, input delivery, broiler raising, processing, branding, and final distribution.[16] Vertical integration in this industry came in the form of downstream vertical ownership of the chicken slaughtering, processing, packaging, branding, and distribution to retail outlets. Integrators own and control upstream components as well, which include hatcheries and feed mills. The integrators control production of chickens with hardly any investment in on-farm assets. Instead the integrators control the on-farm production stage through the use of contracts. Typically, integrators contract the growing of chicks to "chicken growers" who raise the chicks for a fee (referred to as "grower pay"). The integrators provide the growers the chicks and pick up the birds from the growers' farms for processing when the birds reach the desired weight (as determined by the integrator) at the end of 6-8 weeks (grow-out period). While the land on which the growers build houses to bring the birds to slaughter-weight is owned by the grower, integrators maintain ownership of the birds throughout

[14] https://www.nationalchickencouncil.org/about-the-industry/history/ (accessed March 20, 2019).
[15] https://www.nationalchickencouncil.org/about-the-industry/history/ (accessed March 20, 2019).
[16] https://www.nationalchickencouncil.org/about-the-industry/history/ (accessed March 20, 2019).

their lives, including when they are on the growers' farms and determine when and whether the chickens should be picked up.[17]

22. As a part of their contract with the integrators, growers are mandated to raise and care for the birds in specialized houses designed according to the integrator's specifications.[18] The capital involved in building and maintaining the houses are borne by the growers who largely obtain financing through loans.[19] Growing houses are expected to have a useful physical life of 25-40 years. However, integrators require growers to periodically upgrade the houses - even before the end of the useful life span of the houses - and typically renew grower's contracts contingent on growers undertaking such upgrades.[20] According to 2011 USDA survey, of the fifty percent of growers who reported to have made capital investments for expansion, remodeling or equipment replacement one third of them did so because they were required by their integrators to make those investments.[21]

23. Growers typically assume debt to make upgrades to their facilities on the expectation that their contract will be renewed and integrators will supply them with a sufficient number of flocks to make such investments worthwhile. Without maintaining a contract with an integrator, their investments in their chicken houses will have no value and they will not have income to repay their loans.[22] It is not practical for growers to operate independently from an integrator. The integrators control the supply of chicks, the processing of grown chickens and the distribution of chickens.

24. When there is only one integrator in a geographic area, the implications of this need for a contract with an integrator are that the grower has to maintain the contract with that one integrator. Even when there is more than one integrator, it is often the case that a grower has to maintain a contract with a single integrator because it is difficult

---

[17] Weaver, Marin. Poultry. (January 2014), "Industry and Trade Summary" Publication ITS-10. Washington, DC: U.S. International Trade Commission, Available at https://www.usitc.gov/publications/332/poultry1.pdf.
[18] Doye,D.G. Freking B., Payne J. (2006) "Broiler Production: Consideration for Poultry Growers", OSU, Extension Facts, CES, Division of Agricultural Science and Natural Resources.
[19] U.S. Small Business Administration, Office of Inspector General (March 6, 2018). "Evaluation of SBA's 7(a) Loans to Poultry Farmers" Report No. 8-13. Available at https://www.sba.gov/node/1615442.
[20] Clapp Deposition, 31:7-23; TLC Poultry Deposition, 18-25; Mears Deposition, 139:12-140:7; Leis Deposition, 84:3-85:19; See Shelton Deposition, 55:3-19; 57:23-58:1.
[21] MacDonald, James M. (June 2014.) "Technology, Organization, and Financial Performance in U.S. Broiler Production", EIB-126, U.S. Department of Agriculture, Economic Research Service.
[22] U.S. Small Business Administration, Office of Inspector General (March 6, 2018). "Evaluation of SBA's 7(a) Loans to Poultry Farmers" Report No. 8-13. Available at https://www.sba.gov/node/1615442, Page 2.

to obtain contracts from other integrators due to differences in house specifications across integrators.[23] As described later in this report, the growers need to have a long-lasting relationship with the integrator after the initial contract is signed due to the large capital investments and long-life of the assets.[24] The need of the grower to maintain the relationship provides the integrator with additional leverage over the grower.

25. Besides the chicks, the integrators provide feed, medications, veterinary care, transportation (including delivering baby chicks, supplying feed to growers and transporting birds to the processing plants), and undertake regular supervision through a field representative (known as a service technician) sent to the farm who is employed and trained by the integrator. As a part of the contract, the integrators require the farmers to care for the birds according to specific conditions, down to the number of seconds of artificial light, which is then programed into the houses' computers.[25]

26. In addition to the investments needed to house the chickens, growers typically invest in water equipment such as a pump house, feed storage, adequate roads for access to the growing houses and all the land necessary for the operation.[26] Growers also provide labor, water, electricity, farm equipment, and litter removal services essential to grow the birds.

## B. CONTRACTUAL RELATIONSHIP BETWEEN INTEGRATORS AND CHICKEN GROWERS

27. As stated earlier, chicken growers who want to provide their services to integrators must enter into a contractual arrangement with the integrator. The integrator, after assessing its needs, the financial soundness of the grower, and the growers' facilities, will decide whether to offer the grower a chicken growing contract.[27] The integrator then issues a letter of intent based on which the grower typically seeks a loan to cover

[23] University of Maryland (October 2017). "Broiler Production. Management for Potential and Existing Growers." Extension Bulletin, EB-431.
[24] C. Robert Taylor and David A. Domina (2010) "Restoring Economic Health to Contract Poultry Production".
[25] Shelton Deposition, 61:4-62:7;71:15-21; Gottsponer Deposition, 115:15-116:14.
[26] Vincent Deposition, 21; Murphy Farms Deposition, 43;55; ICU Deposition, 25-27.
[27] Tyson Foods Inc website, "Prospective Farmers" Available at https://www.tysonfoods.com/who-we-are/our-partners/farmers/prospective-farmers.

his costs and invests in the chicken houses.[28] The integrator thereafter issues a contract to the grower.

28. A key factor that goes into an integrator's decision to contract with a grower is the distance between the grower's houses and the integrator's facility. According to USDA, integrators typically contract only with growers who are within approximately 35 to 50-mile radius from the integrator's processing facility or feed mill.[29] This is mainly because of distance related costs associated with shipping live chicks, fully-grown chickens, and feed.[30] In addition, given the rather frequent interaction that is required between the integrator – in terms of supervision and technical assistance – it becomes increasingly difficult and expensive to work with chicken growers as distances increase.

29. According to literature, the actual duration of growers' contracts varies widely. MacDonald observes that contracts covered short durations such as flock to flock to longer durations such as 15 years.[31] A large percentage of the broiler production contracts, nearly 45 percent, only covered the duration of the current flock placed in the farm for growing.[32] Once a farmer decides to build chicken houses on his or her land, the farmer is essentially locked into growing chickens, because the expensive chicken houses are not useful for growing other animals. [33] Given the long life of the on-farm growing houses and the inability of the farmer to use those investments to produce anything but broilers, short duration contracts expose the farmer to risks because the integrator may opt out of supplying chicks at any time they choose, leaving the grower with debt on houses built to that integrator's specifications.[34] The 2008 Pew Commission report on Industrialized Farm Animal Production emphasizes

---

[28] Rickard Deposition, 49.
[29] Dr. Tom Tabler, Jessica Wells, and Dr. Morgan Farnell. (2014) "Potential Contract Growers Face Important Decisions". Extension Service of Mississippi State University.
[30] Vukina, T. and P. Leegomonchai. (2006). "Oligopsony Power, Asset Specificity and Hold-Up: Evidence from the Broiler Industry." American Journal of Agricultural Economics, Vol. 88 (3), (August): 589-605.
[31] MacDonald, James M. (June 2008), "The Economic Organization of U.S. Broiler Production", Economic Information Bulletin No. 38. Economic Research Service, U.S. Dept. of Agriculture.
[32] MacDonald, James M. (June 2008), "The Economic Organization of U.S. Broiler Production", Economic Information Bulletin No. 38. Economic Research Service, U.S. Dept. of Agriculture.
[33] Domina, D. A., & Taylor, C. R. (2009). "The Debilitating Effects of Concentration in Markets Affecting Agriculture" Drake Journal of Agricultural Law, 15(1), 61–108, p. 100.
[34] https://www.ers.usda.gov/amber-waves/2014/august/financial-risks-and-incomes-in-contract-broiler-production/; Daryll E. Ray (2010), "Poultry Growers Air Complaint," Article Number 514, Agricultural Policy Analysis Center, The University of Tennessee.

the limited choices growers have, "Once the commitment is made to such capital investment, many farmers have no choice but to continue to produce until the loan is paid-off. Such contracts make access to open and competitive markets nearly impossible for most….poultry producers, who must contract with integrators (meat packing companies) if they are to sell their product."[35]

### C. BROILER INDUSTRY MARKET STRUCTURE

30. An important characteristic of the broiler industry is the high degree of concentration among integrators. Over the years, the industry has undergone consolidation. Currently there are 35 integrators operating in the United States.[36] While 35 may seem like a sufficiently high number of firms vying for grower-services, this statistic is misleading for at least three reasons. First, the broiler industry is comprised of only a few large integrators that contract with growers and process the bulk of chicken production. The top five largest broiler processor companies (i.e. the integrators) account for almost 60 percent of the total broiler production.[37] Second, the number of integrators that might compete for a grower's contract production of chicken is spatially limited to around a 35 to 50-mile distance from an integrator's processing and feed facilities. Thus, in a typical growing region, the number of integrators available for contracting is much smaller than 35, in fact, it can be as small as one. Third, even when there is more than one integrator, it is not reasonable to presume the integrators will attempt to take growers from each other at any given time. I discuss this third point below in the context of the Robards Complex.

31. In a significant percentage of cases within the U.S., there is only one integrator that operates within a geographic market. MacDonald's study (based on a USDA survey) shows that 21.7 percent of the growers reported having only one integrator in their local area, 50.6 percent reported two or three integrators in their area, while only 23.9

---

[35] Pew Charitable Trusts (2008). "Putting Meat on the Table: Industrial Farm Animal Production in America," A Report of the Pew Commission on Industrial Farm Animal Production, The Pew Charitable Trusts and John Hopkins Bloomberg School of Public Health, p. 49.
[36] https://www.nationalchickencouncil.org/about-the-industry/statistics/broiler-chicken-industry-key-facts/ (accessed March 8, 2018).
[37] WATT Poultry USA (March 2018) Available at https://www.wattagnet.com/articles/26925-top-5-broiler-producers-dominate-us-production.

percent reported four or more integrators in their area.[38] The bargaining position of an integrator for any given region tends to improve as the number of integrators declines.

# V. TYSON'S USE OF THE TOURNAMENT TO DETERMINE GROWER PAY

## A. TOURNAMENT STRUCTURE

[redacted]

[38] MacDonald, James M (June 2014). "Technology, Organization, and Financial Performance in U.S. Broiler Production", EIB-126, U.S. Department of Agriculture, Economic Research Service, pp 29.
[39] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph H and J.
[40] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph J.
[41] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph H.

[redacted]

[42] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph D.
[43] Leis Deposition, 112:23-113:8.
[44] Dickey Deposition; 127:3-8.
[45] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph F.

[redacted]

---

[46] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Executed on February 2, 2015, Schedule A - Paragraph G.
[47] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule B.
[redacted]

[redacted]

[redacted]

## B. TOURNAMENT OUTCOMES

[redacted]

[49] Tsoulouhas and Vukina (2000) Regulating Broiler Contracts: Tournaments versus Fixed Performance Standards.
[50] The data is available for 450 tournament weekends between April 24, 2010 and March 2, 2019. From 450 tournaments, I excluded 5 tournaments (September 13, 2014, September 20, 2014, September 27, 2014, October 04, 2014, October 11, 2014) where all growers were considered as exceptions and one tournament (July 16, 2011) where 7 growers were considered as exceptions by Tyson.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## C. TYSON CONTROLS SEVERAL VARIABLES THAT DETERMINE GROWERS' TOURNAMENT PERFORMANCE.

46. Robards' production contracts with growers characterize the growers (including the Plaintiffs) as independent contractors.[51] Therefore it would be reasonable to expect that growers have a high level of control over the production process and, consequently, over the factors that influence their performance. What I found instead is that Tyson, not the growers, is in control of almost all aspects of the production process that determines tournament performance. This is underscored by the finding by the U.S Small Business Association in its March 2018 report on "Evaluation of SBA's 7(a) loans to poultry farms,

[51] Broiler Production Contract between Tyson and Plaintiffs; Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Paragraph 8.

that "…integrator exercised control through a series of contractual restriction, management agreements, oversight inspections, and market controls." [52] By varying these factors under its control differentially across the growers, Tyson can influence the performance of growers and therefore the outcomes in the tournament. This introduces volatility in grower pay and increases the risk borne by the growers. As income volatility increases, chicken growers face increased risk of loan defaults leading to possible financial penalties, reduced credit scores, higher future interest rates and possible bankruptcy.

47. In the previous sections, I described how Tyson conducts the tournament and determines grower pay, and the observed volatility in grower pay resulting from the tournament. In the following paragraphs, I discuss how Tyson influences the performance of growers by controlling the following critical factors in the broiler production process:

a. The quality of feed;
b. The quality of chicks;
c. The delivery of services such as veterinary, live-hauling, weighing of chicks at the processing plant;
d. The sex of chicks, and
e. The breed of chicks.

[redacted]

[52] U.S. Small Business Administration, Office of Inspector General (March 6, 2018). "Evaluation of SBA's 7(a) Loans to Poultry Farmers" Report No. 8-13. Available at https://www.sba.gov/node/1615442.
[53] Barfield Deposition, p. 207.
[54] Barfield Deposition, p. 207.
[55] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises, LLC (5157). Schedule B, Section C.II, Paragraph 9 "Equipment."
[56] Mears Deposition, 288:24-25;289:1-5.

[redacted]

49. The quality of chicks, as measured by the weight of a day-old chick, yolk free body mass, and chick length, is a key determinant of the final performance of the bird.[62] According to literature and Tyson's own employees, the mortality rate of the chicks in the first week after placement can be used to determine the quality of chicks placed on growers farms, including the Plaintiffs.[63] Generally, a shipment of low quality chicks tend to have high mortality in the first week.[64] However, it is my understanding based on deposition testimony of Doug Brown that Tyson tells growers not to cull sick birds that have a low probability of survival during the first week of the chicks' life,[65] which results in an artificially low mortality rate.

50. Tyson owns the pullets that are used to produce the laying hens, the laying hens that produce the eggs, the eggs that are hatched by the laying hens, and also owns and controls

---

[57] Bruce Deposition, 147:2-4; Barfield Deposition, 230:2-4; 231:20-22.
[58] Tyson uses different types of feed - 210, 214, 215, 218.These feed types differ in nutritional value and components. Heltsley Deposition, 67-72.
[59] Interview with Charles Morris, April 22, 2019; Heltsley Deposition, 75-77.
[60] Rickard Deposition, 176-179.
[61] Shelton Deposition, 134:25-135:18.
[62] Olnood C.G. et al (2009). "Effects of novel probiotic on growth performance and microbial composition of broiler chickens with Salmonella sofia challenge". Available at https://www.researchgate.net/profile/Paul_Iji/publication/224930733_Effects_of_novel_probiotic_on_growth_performance_and_microbial_composition_of_broiler_chickens_with_Salmonella_sofia_challenge/links/09e4150c0305cb1a37000000.pdf#page=178.
[63] Hjelm C. (2018) "Identifying Factors of Importance for Chick Quality and Traits that may Predict Chick Quality" Available at https://stud.epsilon.slu.se/13865/19/Hjelm_C_180711.pdf; McGuire Deposition,159:21-60:3; Dickey Deposition, 85; Brown Deposition, 152-153.
[64] Leegomonchai P. and Vukina T. (2005). "Dynamic Incentives and Agent Discrimination in Broiler Production Tournaments". Available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.571.7048&rep=rep1&type=pdf.
[65] Brown Deposition, 152:15-25;153:1-19.

the hatchery where the eggs are hatched.[66] In other words, Tyson and/or Tysons's Robards Complex controls the chick quantity and quality that is delivered to each grower. Below, I discuss further the dimension of breeding technology and chicken growing performance.

51. Growers do not control the quality of chicks supplied to them by Tyson.[67] However, a grower with chicks that are of lesser quality has to compete with growers who might have healthier chicks, and hence is in a disadvantageous position in the tournament.

[redacted]

53. Similarly, Tyson controls grower performance by determining whether a grower gets a mostly male flocks or a straight-line flock – which has a mix of males and females.[69] As male birds grow larger than females, the composition of the flock affects the performance of the grower in a tournament.[70] Thus, growers have very little control over their potential output because they do no control their primary input-the chicks-in addition to having very little information to ascertain the quality of chicks supplied to them.

54. Apart from controlling the quality and quantity of feed and chicks, Tyson controls the delivery of its services to the Plaintiffs farms such as when the chicks will be delivered to the Plaintiffs' farms;[71] when and what kind of veterinary care and services broilers receive,[72]when and which farms will be picked up for processing,[73] amount of time

---

[66] Mears Deposition, pp. 121-134.Tyson owns Cobb Vantress, the company that supplies breeder hens. https://www.cobb-vantress.com/about-cobb/career-profiles/our-history.
[67] Mears Deposition, 124:8-14.
[68] Barfield Deposition, 210:19-23; McCarter Deposition, 98:21-23: Gottsponer Deposition, 220:5-9.
[69] Bruce Deposition, 116:14-119:24; Mears Deposition,54:23-25; Mears Deposition, 113:4-114:22; 156-58; Leis Deposition, 129:1-4; Gottsponer Deposition, 233:2-9.
[70] Heltsley Deposition, 122:20-25; 123:1-6; 101:1-8.
[71] Mears Deposition, 285:5-7.
[72] Mears Deposition, 285:8-10; Barfield Deposition, 231-232.
[73] Barfield Deposition, 231-232.

between catching the broilers at the Plaintiffs' farms and the weighing of the broilers at its processing plant;[74] the weighing of the broilers at its processing plant;[75] and the time of processing of the broilers at its processing plant.[76] All of these have an impact on the weight gain of the chicks and hence the pay received by the grower.[77] Another example of Tyson's ability to control the health of the broilers grown is its unilateral decision to stop using certain antibiotics.[78] While antibiotic free chicken is a branding feature that may strengthen Tyson's position at retail, growers face higher mortality rates and increased number of sick birds as a result,[79] which as discussed here directly impacts the growers bottom line without effecting Tyson's costs.

55. Sex variability in each delivery is likely to have a significant determining role in defining the tournament rankings.[80] In a 2012 study from scientists at the University of Georgia,[81] male chickens at 35 days of growth weighed 13.3% more and has 2.5% better feed conversion and slightly less mortality than the female chickens. At 48 days production, males weighed 17.1% more and 4.5% better feed conversion with much higher mortality (+32.8% more male death). Given that Tyson controls the sex of the birds [82] and determines when to pick up the birds for slaughter, [83] the growers do not control the weight gain or the mortality of the birds. This in turn directly affects the performance of the growers. Tyson and the growers recognize that despite whatever increased mortality there may be associated with male chicks, a grower that receives an all-male flock has an unfair advantage and is likely to win the tournament.[84] Since growers do not typically

[74] Dickey Deposition 286:25; 287:1-2.
[75] It is important to note that, Tyson has the duty to timely weigh the broilers at its processing plant, See Dickey Deposition 286:22-24; 287:3-7.
[76] Dickey Deposition, 287:12-14.
[77] Bruce Deposition, 146:3-47:25; McGuire Deposition, 116:18-117:25, 165:2-173:17; Broiler Production Contract between Tyson Chicken and Morvatt Enterprises, LLC, Schedule A - Paragraph D.
[78] Leis Deposition, 185:5-14.
[79] Leisure Deposition, 250:12-18; Brown Deposition, 209:15-18.
[80] Barfield Deposition, 215:21-216:4; McCarter Deposition, 95:8-10; McCarter Deposition, 68:24-69:2.
[81] Shim et al, (2012). "Strain and sex effects on growth performance and carcass traits of contemporary broiler crosses." *Poultry Science.* 91:2942-2948. Available at https://www.researchgate.net/publication/232611601.
[82] Barfield Deposition, p. 228.
[83] Barfield Deposition, 231-232.
[84] McGuire Deposition,57:6-18; McGuire Deposition, 92:24-95:13Bruce Deposition, 116:14-119:24; Morris Deposition, 245:2-245:15.

know the sex of the chicks, they bear the risks of low feed conversion and a tournament penalty when they receive more female chicks than their tournament competitors.

[redacted]

[redacted]

[85] Mears Deposition, 144-145.

[redacted]

[redacted]

[redacted]

[redacted]

[87] Barfield Deposition, 188:3-10; Mears Deposition,102:21-24; Leis Deposition, 93: 4-8.

[redacted]

59. Therefore, the only variables that are to some degree in the control of the growers are the amount of effort they can expend, whether to implement recommendations of Tyson, and to a certain extent the improvements they can make to their facilities. However, regardless of a grower's investments based on one or all of these dimensions, the output of a grower can vary depending on all of the above-mentioned factors, the majority of which are controlled by Tyson. Moreover, growers compete with one another without knowing or having little knowledge about the quality of Tyson's feed or Tyson's chicks—livability, health—or the breed and sex of the chicks that have been supplied to them by Tyson. Thus, the grower cannot determine the extent of the investment needed or the benefit from the investment to output and also, because of the variability of payments under the tournament system, the economic benefits of improving their performance as measured by Tyson.

60. Tyson conceals information about inputs into the grow-out process from Plaintiffs. For example, when Plaintiffs get their settlements at the end of each flock, all of the other

growers names are redacted.[88] Likewise, growers are not told if they have reclaimed feed or not.[89] However, while Tyson refuses to provide information to Plaintiffs, Tyson shares extensive details of the grow-out process to Agri Stats.[90] Agri Stats is a company that complies a wide variety of information about the broiler chicken industry in the United States.[91] Agri Stats compiles the information, and circulates it among its members who subscribe to its information service for purposes of benchmarking their process and results to other poultry producers. Most major poultry producers subscribe to Agri Stats.[92] Thus, Tyson is effectively sharing the information with other integrators while withholding it from Plaintiffs.

61. Tyson shifts all or nearly all the economic and financial risks related to feed and chick quality onto the growers. In the current structure, the grower manages the operation without an understanding of the sex, breed, or quality of the delivered chicks, without certitude that the feed on their farm is fresh, and without any knowledge of what other growers received from Tyson in the tournament. Although Tyson owns the feed and the chicks, all quality variation present within and across shipments to the growers lead to variation in returns that Tyson does not pay for. If the growers could choose their input suppliers, they could search for a higher level of quality control, could threaten to change suppliers if quality is not maintained, and would have a better indication of the quality that is being received. This would help them select other and more optimal combinations of input levels such as labor, capital investments, and owner effort. While Tyson bears the cost of low feed efficiency when the chicks and/or feed quality is poor, growers' performance and pay are directly affected by poor quality of chicks and feed.

62. The pattern of passing the risk of quality variation onto the growers is consistent with the alleged concerns about monopsony power. Indeed, the exercise of monopsony power by Tyson at the Robards Complex has the effect of disadvantaging some growers vis-à-vis

[88] Leisure 0004 for an example.
[89] Shelton Deposition, 134:25-135:18.
[90] Leis Deposition 132:16-136:12; 140:21-141:7.
[91] https://www.agristats.com/history (accessed July 5, 2019); https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (accessed July 5, 2019).
[92] Leis Deposition, 132:18-22.

others, and eliminates many of the choices that would be available in a free market setting leading to competitive harm in the market for growing services.

## VI. TYSON'S ROBARDS COMPLEX – RELEVANT MARKET AND MARKET POWER

### A. EXERCISE OF MONOPSONY POWER HARMS COMPETITION

63. A monopsony is a market structure where there is only one buyer (known as a monopsonist) for a particular good or service, such as chicken growing services. A monopsonist, by virtue of being the only effective buyer in the market, has the power to dictate the terms of trade and purchase according to its requirements.[93]

64. A monopsony can occur naturally without any attempt by the monopsonist to erect barriers to entry and exclude other buyers from the market. The monopsonist can cause harm to competition if it exercises its monopsony power to the detriment of sellers/service providers who it buys from or to downstream customers to whom it sells.

65. It is possible for a firm to have monopsony power even if it is not the only buyer for a product located in a geographic area. Economist Robert Taylor states that, "Even though there may be several integrators in some areas, integrators maintain monopsony power over their contract growers in nearly all phases of their business lives."[94]

66. According to economic theory, "[m]onopsony power involves the ability of buyers to lower input prices below competitive levels, which requires the ability to restrict the quantity demanded of the input."[95] Specifically, the profit maximizing strategy of a monopsonist is to exercise its monopsony power by setting a purchase price lower than what would prevail in a market with multiple buyers, or using its superior bargaining power by virtue of being the sole buyer to distort the market conditions by setting unfair terms and conditions. By setting a price lower than what would prevail in a competitive

---

[93] Blair and Harrison, (1991) "Antitrust Policy and Monopsony", 76 Cornell L. Rev. 297 Available at https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?referer=https://scholar.google.co.in/&httpsredir=1&article=3487&context=clr; OECD, (2008) "Monopsony and Buyer Power". DAF/COMP 38, at 19-20.
[94] Robert C Taylor (2010) Restoring Economic Health to Contract Poultry Production.
[95] Blair and Harrison, (1991), "Antitrust Policy and Monopsony", 76 Cornell L. Rev. 297.

market or by setting unfair terms and conditions, the monopsonist is able to extract a portion of the returns (profits) that sellers would have otherwise made in a market with many buyers. The monopsonist therefore maximizes its profits at the expense of the seller.

67. Facing low monopsony prices, sellers either produce less or exit the market – a clear case of competitive harm in the market for those products or services. In both cases, the output brought to the market by the sellers facing a monopsonist is lower than it would be in a competitive buying market. According to economic theory, "when the monopsonist has market power in its output market, the reduced input prices cause higher output prices."[96] Higher prices in the downstream market results in lower consumer welfare in the downstream market.

68. The existence of monopsony is quite common in the market for broiler growing services. According to a USDA survey, most markets have only one integrator-a monopsony-that operates within a geographic market of broiler grower services.[97] Integrators in such markets exercise anticompetitive monopsony power. Specifically, a study by MacDonald and Key (2012) showed that compared to regions with 4 or more integrators, growers in a region with a single buyer receive 7-8% less revenue.[98] In fact, the Antitrust Division of the U.S Department of Justice (DOJ) and USDA conducted workshops to explore competition in agricultural sector, including the poultry sector. According to the records of the workshop, "many participants claimed that a disparity of bargaining power between processors, on one side, and producers who grow or sell animals under contract, on the other side, leaves those producers powerless to resist unfair treatment, particularly in the poultry sector." [99] The lack of competition enables processors to exercise their monopsony

[96] Blair and Harrison, (1991), "Antitrust Policy and Monopsony".
[97] Blair and Harrison, (1991), "Antitrust Policy and Monopsony".
[98] MacDonald, J.M. and Key N. (2012) "Market Power in Poultry Production Contracting? Evidence from a Farm Survey". Journal of Agricultural and Applied Economics, 44,4(November 2012):477–490.
[99] U.S. Department of Justice, (May 2012), Competition and Agriculture: Voices from the Workshops on Agriculture and Antitrust Enforcement in our 21st Century Economy and Thoughts on the Way Forward, Available at https://www.justice.gov/sites/default/files/atr/legacy/2012/05/16/283291.pdf.

or oligopsony (a handful of buyers in a market) power and engage in anticompetitive practices.[100]

## B. ROBARDS COMPLEX IS A MONOPSONIST IN ITS RELEVANT MARKET

### a. THE ROBARDS COMPLEX IS A RELEVANT ANTITRUST MARKET

69. The DOJ and Federal Trade Commission's Horizontal Merger Guidelines suggest defining relevant markets—product/services and geographic—for the purposes of analyzing the extent of buyer market power, based on the consideration of "the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist."[101] The amount of the decrease is characterized as a "small but significant non-transitory" amount.[102] While the product/service market in this instance is the market for broiler growing services, the relevant geographic market is defined on the basis of either (i) location of suppliers or (ii) location of customers. According to these Guidelines, "Geographic markets based on the locations of suppliers encompass the region **from** which sales are made" and "Geographic markets based on locations of customers encompass the region **into** which sales are made."[103] As explained by Peter Carstensen, the appropriate geographic market when analyzing buyer market power is often narrow.[104]

70. A key factor that drives an integrator's decision to contract with a grower is the distance between a grower's houses and the integrator's facility. The relevant geographic market for broiler growing services can therefore be defined as the maximum distance that a grower's facilities can be located from an integrator beyond which an integrator will not enter into a poultry growing arrangement with the grower. According to the USDA, integrators typically contract only with growers who are within approximately 35 to 50-

---

[100] U.S. Department of Justice, (May 2012), Competition and Agriculture: Voices from the Workshops on Agriculture and Antitrust Enforcement in our 21st Century Economy and Thoughts on the Way Forward, Available at https://www.justice.gov/sites/default/files/atr/legacy/2012/05/16/283291.pdf.
[101] Horizontal Merger Guidelines (19 August 2010), US DOJ and FTC, pp.7, 32-33.
[102] OECD, (2012) "Market Definition" DAF/COMP (2012)19, p. 11, Available at http://www.oecd.org/daf/competition/Marketdefinition2012.pdf.
[103] Horizontal Merger Guidelines (19 August 2010), US DOJ and FTC, pp 7.
[104] Peter C. Carstensen, (February 17, 2004), "Buyer Power and Merger Analysis: The Need for Different Metrics", (Statement prepared for the Workshop on Merger Enforcement held by the Antitrust Division and the Federal Trade Commission). Available at https://www.justice.gov/atr/buyer-power-and-merger-analysis-need-different-metrics.

mile radius from the integrator's processing facility or feed mill.[105] This is mainly because of distance related costs associated with shipping live chicks, fully-grown chickens, and feed.[106] The geographic area from which growers can only provide services to certain integrators can be considered a "captive draw area."[107] It is important to note that in the case of the broiler growing market, the integrator, i.e., the buyer actually defines the geographic extent of the market by stipulating how far a grower can be located from the integrator's facility for it to be able to contract with the integrator.

71. Based on the general practice in the broiler growing services market, and based on the location of the growers who contract with Tyson at the Robards Complex, I have come to a conclusion that the boundaries of the geographic market for the Robards Complex fall within no more than a 50-mile radius from the Robards Complex. In fact, according to Tyson's old website, "…farms are required to be within thirty to forty miles of the feed mill in the complex." [108] The fact that Tyson does not contract with growers at the Robards Complex beyond this geographic boundary[109] implies that they would find it unprofitable to contract with a grower who is located outside this geography.

### b. PERDUE FARMS IS NOT IN THE RELEVANT MARKET WITH TYSON, MAKING TYSON A MONOPSONIST AT THE ROBARDS COMPLEX

72. Barring Perdue Farms' (Perdue) facility in Livermore, there are no other integrator facilities that fall within the fifty-mile radius of any of the Plaintiffs farms. The next

---

[105] Dr. Tom Tabler, Jessica Wells, and Dr. Morgan Farnell. (2014) "Potential Contract Growers Face Important Decisions". Extension Service of Mississippi State University.

[106] Vukina, T. and P. Leegomonchai. (August 2006). "Oligopsony Power, Asset Specificity and Hold-Up: Evidence from the Broiler Industry." American Journal of Agricultural Economics, Vol. 88 (3):589-605.

[107] United States v. Cargill, Inc., No. 1:99CV01875 (D.D.C. July 8, 1999) Available at http://www.justice.gov/atr/cases/f2500/2552.pdf for a case where the Department of Justice was challenging Cargill's proposed acquisition of Continental Grain's Commodity Marketing Group. The DOJ used the term "Captive Draw Area" to refer to the geographic areas where transportation costs would make it cost-prohibitive to sell grain to purchasers outside the geographic area.

[108] https://web.archive.org/web/20050311104802/http://www.tysonfoodsinc.com:80/corporate/info/growersFAQ.asp.

[109] Mears Deposition, 130:11-15; Gottsponer Deposition, 226:11-15.

closest integrator is Pilgrim's Pride in Mayfield at a distance of 119 miles[110] from Robards and Pilgrim's Pride in Louisville at a distance of 157 miles from Robards.[111]

73. Even though the Perdue facility is about 33 miles from the Robards Complex, it is not part of the Robards Complex relevant market because of several reasons discussed below. The evidence I have reviewed demonstrates that Perdue is not a viable alternative to Tyson for Plaintiffs. For example, Keith Crabtree in his deposition stated that his reason for switching from Perdue to Tyson was because Perdue would not allow him to build more houses.[112] John Pinkston,[113] Tim Vincent[114] and Morgan Rickard[115] state they switched from Perdue to Tyson because Perdue had a longer out-time—the time between a flock taken for slaughter and the arrival of the next flock—which made it difficult to manage cash flow. The farms of two Plaintiffs, Doug Brown and Dennis Clapp, are situated beyond 50 miles from Perdue's facility. Further, Perdue is not taking new houses (per deposition in February of 2018), which makes switching impossible.[116] For example, Calvin Leisure, who previously grew chickens for Perdue from 1996 to 2008 before switching to Tyson, attempted to switch back to Perdue but Perdue was not interested in offering him a contract.[117] Another Plaintiff, Morgan Rickard stated in his deposition testimony that he tried switching to Perdue (there were no other integrators in the vicinity) since 2012-2013 but he was told that they would not prefer so many houses in one lump sum.[118] Nancy Butler who owns and operates Evans Butler Poultry, a contract grower for Perdue, in her Declaration states that to her knowledge, in the last three years Perdue has

---

[110] https://www.google.com/maps/dir/Pilgrim's+Pride+Corporation,+1195+Macedonia+St,+Mayfield,+KY+42066,+United+States/Tyson+Poultry,+U.S.+41,+Robards,+KY,+USA/@37.151296,-88.6138995,9z/data=!4m13!4m12!1m5!1m1!1s0x887a2e502f1049fb:0x9541ca27b3d5a74d!2m2!1d-88.66313!2d36.7228027!1m5!1m1!1s0x886fdf998d8478c7:0x568533161873f499!2m2!1d-87.5200959!2d37.6543176.

[111] https://www.google.com/maps/dir/Pilgrim's+Pride+Corporation,+Eastpoint+Centre+Drive,+Louisville,+Kentucky,+USA/Robards,+KY,+USA/@37.8658763,-87.0990496,9z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x8869992f71e1dd61:0x3d2380b909fee76d!2m2!1d-85.510623!2d38.28031!1m5!1m1!1s0x886fdf5e1112322b:0x7cd10056e74421ed!2m2!1d-87.5466747!2d37.6739325.

[112] Crabtree Deposition, pp. 56-57.

[113] Pinkston Deposition, p. 33.

[114] Vincent Deposition, p. 84.

[115] Rickard Deposition, pp. 80-81.

[116] Leisure Deposition, 162:2-14.

[117] Leisure Deposition, 162:2-14.

[118] Rickard Deposition, 133:4-22.

not accepted any growers who previously grew for Tyson.[119] In fact, according to the 10th Circuit Court of Appeals opinion "[m]onopsony may also exist when sellers are unable to find alternate buyers and must sell to a single purchaser."[120]

74. While there are instances of growers switching integrators in the past, based on a phone interview with Charles Morris, I learned that Perdue is no longer considering any switching from Tyson to Perdue.[121] Additionally, according to Morris, neither Perdue nor Tyson would allow the operation to split its contractual commitment between the integrators. Morris is by far the largest chicken grower in the Robards region with 56 houses at six locations. Unless a sizable group of chicken farmers operating with Perdue contracts would exit the market in the same time window, it is practically impossible for Perdue to offer a contract for the entire Morris operation. Thus, Morris is effectively operating in a pure monopsony region.

75. Further, I have learned that Perdue is shifting its operations from raising contract broilers in production houses to raising free-range broilers and will eventually move fully to raising organic chicken in their Cromwell facility, the closest facility to Robards. As the switch to free-range and (eventually) organic progresses at the nearby Perdue facility, Tyson will be the only integrator in the geographic area of that will require growing services to raise conventional broilers. As I have shown in my earlier discussion, in any case, Perdue does not compete with the Robards Complex and it is not accepting any growers from Tyson. The fact that Perdue is now moving to raising organic chicken only bolsters my conclusion that Perdue is not in the same relevant market as Tyson's Robards Complex.

76. Therefore, given the current structure of the Robards Complex market and future developments in terms of Perdue moving to production of organic chicken, it is clear that Tyson can reduce grower pay by a small but significant non-transitory amount without losing sufficient growers to Perdue that would make the reduction in pay unprofitable. In

---

[119] Declaration of Nancy Butler attached as **Appendix D.**
[120] Been v. O.K. Industries, Inc., 495 F.3d 1217 (10th Cir. 2007); Telecor Communications v. Southwestern Bell, 305 F.3d 1135, 1136, (10th Cir. 2002).
[121] Phone Interview with Charles Morris, April 22, 2019.

this sense, Tyson's Robards Complex has the monopsony power to set grower pay that is lower than competitive levels, and still be able to retain its growers.

### c. IN THE ROBARDS COMPLEX MARKET, TYSON FURTHER ENHANCES ITS MONOPSONY BY REQUIRING INTEGRATOR SPECIFIC, NON-SALVAGEABLE INVESTMENTS AND UPGRADES

77. Because of Tyson's monopsony power at the Robards Complex, it is able to lower grower pay or increase the volatility of grower pay without concern that its growers will switch to an alternative integrator. Absent "barriers to exit" chicken growers conceivably have the option to cease chicken growing activities and pursue other lines of work if they were unhappy with Tyson's treatment. However, as discussed in this section, growers were not and are not readily able to exit the industry as their houses have no value unless Tyson contracts with the potential purchaser of those houses. Thus, Tyson controls the ability to exit and essentially controls who will be a purchaser. In fact, Tyson's actions increased the barriers to exit that the chicken growers faced.

78. Chicken houses have extremely limited use for other farming activities.[122] The economic value of a chicken farm depends critically on access to production contracts from integrators. This is true with respect to the broiler houses on Tyson's growers' farms within the Robards complex.[123] In order to maintain a viable contract with Tyson, Tyson requires the grower to undertake upgrades to their facilities which may require additional investments.[124]

79. In addition to the risk of Tyson not renewing the contract if the growers do not comply with the upgrades demanded by Tyson, the growers face the risk that Tyson does not renew contracts because Tyson has decided to reduce the amount of chicken it wants to produce at the Robards Complex. For that matter, Tyson could choose to shutter the Robards Complex altogether. This risk, if realized, while not quantified in this report,

---

[122] MacDonald James M. and Korb P. (May 2006) "Duration in Production Contracts" Economic Research Service, US Department of Agriculture. pp 4.
[123] Interview with Charles Morris, April 22, 2019.
[124] Mears Deposition, 120-121.

would have devastating financial consequences to growers who anticipate that their chicken houses would be productive assets for the remaining useful life of the houses.

80. Tyson controls the wording of its grower contract.[125] In fact, Schedule B of the contract provides detailed specifications for the growers' houses. When their contracts come up for renewal, the growers' choice is simple: either accept the contract terms and comply with the requirements with regard to the stipulated upgrades and specifications, or default on loans. This is especially true because growers with capital loans on growing-houses do not have much bargaining power. This is clear from the deposition testimony of Jared Shelton who confirms that the growers would not get the contract if they did not meet Tyson's specifications.[126] The growers build and upgrade facilities to meet the requirements set out by Tyson, thereby entrenching them in their relationship with Tyson.

81. While Tyson claims that upgrades and new specifications are aimed at increasing the productivity of the grower and improving the living conditions for the birds, it has the effect of entrenching the grower into a long-term relationship with the integrator. In other words, if the grower does not make the upgrades then his/her contract will not be renewed. Given that chicken houses are irreversible investments—meaning they do not have alternate uses and therefore no salvage value outside chicken growing—the grower will not be able to put his/her houses to profitable use if the contract is not renewed. Therefore, it is in the interest of the grower to periodically upgrade their chicken houses, often using debt to finance these investments, in order to continue their relationship with Tyson even if there is no guarantee of a reasonable return. Growers thus get into a vicious cycle, as they need the chicken growing contracts from Tyson to service the debt and need additional debt to finance the upgrades required to renew their contract. In 2010, chicken growers successfully sued Tyson in Oklahoma alleging that Tyson forced the growers to borrow large amounts of money to construct new houses, and penalized growers who refused to undertake upgrades by providing lower quality inputs, including chicks and feed.[127]According to MacDonald and Korb, economists with ERS/USDA, "Once the

---

[125] Mears Deposition, 117:18-25; 118:1-6.
[126] Shelton Deposition, 55:3-19; 57:23-58:1.
[127] The Oklahoman (April 3, 2010) "Jury orders Tyson to pay $7.3M to chicken growers" Available at https://newsok.com/article/3451162/jury-orders-tyson-to-pay-73m-to-chicken-growers (accessed May 22, 2019).

investment is made, growers face the risk of opportunistic behavior by integrators, who may have considerable monopsony power at that point. … With a short-term contract, integrators may adjust payment schemes, or hold up growers for additional investments, as a condition of renewal."[128]

82. Although growers are labeled independent contractors,[129] they have to adhere to Tyson's requirements or face the risk of losing the contract because it can be cancelled at any time. In an independent study commissioned by Tyson in 1993 regarding the relationship issues between Tyson's growers and Tyson, nearly two-thirds reported that the contracts did not offer them a sense of security and they feared that they would be cut off by Tyson.[130]

[redacted]

James vs Tyson Foods Inc. 2012 OK 21 Case Number: 109046, ¶ 6, Available at https://law.justia.com/cases/oklahoma/supreme-court/2012/109046.html (accessed May 22, 2019).

[128] James M. MacDonald and Penni Korb (July 23-26, 2006) "Duration in Production Contracts," paper presented at the American Agricultural Economics Association Annual meeting, Long Beach, CA, pp. 4-5.

[129] Broiler Production Contract between Tyson and Plaintiffs; Broiler Production Contract (Robards) between Charles Morris and Tyson Chicken and Morvatt Enterprises. LLC (5157), Paragraph 8.

[130] Kathleen Hynes (1993). "Summary Report on the 1993 Tyson Grower Survey".

[131] (0063) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Doug Brown, p. 7

[132] Murphy Farms Deposition, p. 15:14-19; pp. 45-47; Murphy Farms Exhibit -5.

[133] Brown Deposition, pp. 22-23; Pinkston Deposition, pp. 75-79; Burch Deposition, p. 76.

[redacted]

84. It is clear from the above discussion that Tyson at the Robards Complex has further consolidated its monopsony power by requiring the Plaintiffs to make periodic upgrades and making the renewal of contracts conditional on them making such upgrades.

85. Tyson's monopsony power is enhanced when the chicken grower has limited opportunities to use the farm for other profit-making activities. As stated above, chicken growing houses represent irreversible investments. Further, when the specifications of the

---

[134] Mears Deposition, p. 121.

[135] The investments provided in this table are based on available information. Source: (0045) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Charles Morris, pp. 6-7; (0048) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff John Pinkston, p 7;
(0051) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Tim Vincent pp 6-7;
(0054) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Christopher Burch p. 6;
(0060) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Loi Hong, p. 6; (0063) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Doug Brown, p. 7;(0066) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Keith Crabtree; p. 6; (0069) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Mike Murphy, p. 7; Leisure Deposition, 57:18-23; 87:21-25; 93: 11-24; 173; 1-22; 176:1-9; Clapp Deposition, 28:10-25; 50:7-8; 68; 12-18; 82:1-25; Vincent Deposition, 43:1-8; 51:3-15; 65:11-21; 85:1-4; Pinkston Deposition, 14:2-4; 29:3-10; 31:1-7; Burch Deposition, 37-39; 63-65; 74;78-79; 81.

houses are specific to an integrator, it limits growers' ability to change integrators. This enhances the monopsony power of the integrator vis-à-vis the growers that have growing houses needing chickens. When the assets are obtained with borrowed capital, Tyson's monopsony power increases even more.

## C. TYSON EXERCISED ITS MONOPSONY POWER IN THE ROBARDS COMPLEX

### a. TYSON USED ITS MONOPSONY POWER TO IMPLEMENT THE TOURNAMENT IN A MANNER DETRIMENTAL TO GROWERS

86. As discussed in detail in Section V.A above, each week Tyson holds tournaments at its Robards Complex to assess the performance of growers at the facility.[136] The results of each tournament are the basis for determining a grower's pay. Tyson controls the tournament settlement system.[137] This includes but is not limited to determining the base pay, whether a growers is treated as an exception in a tournament,[138] which birds are to be salvaged, which growers are to be ranked against each other in each tournament,[139] the day the birds are picked up, when the birds are weighed, and several other aspects of the tournament such as adjustments and chick credit (compensation when Tyson's chicks die within 7 days).[140]

87. In the following paragraphs, I discuss how Tyson at the Robards Complex exercised its monopsony in the way it structured and conducted the tournaments and how this resulted in harm to competition.

#### i. Tyson set the base pay at an artificially low level

88. A crucial study by MacDonald and Key has estimated the price impacts of the chicken tournament system across the entire U.S. Their study was based on the economic theory that a single firm monopsonist will be more able to lower input prices than if there is a

[136] Leis Deposition, 154:17-23.
[137] McGuire Deposition, 25:17-25; 26:1-24.
[138] Barfield Deposition, p. 239.
[139] Heltsley Deposition, 131:17-25; 132:1-5.
[140] Tyson pays compensation for chick mortality within 7 days of placement in the grower's farm. This is based on 2 criteria – (i) over 2% mortality for house (ii) mortality has to be more than the weekly average. Leis Deposition, 170:16-172:3.

two-firm duopsony. Likewise, a two-firm duopsony would be in a better position to suppress input prices relative to a three-firm oligopsony. Using data relating to grower pay in markets with one, two or three, or four or more integrators, MacDonald and Key show that: 1) growers in single monopsony regions received 7% lower pay than the base case of four or more integrators and 2) growers in duopsony or 3-firm oligopsony regions received 4% lower pay compared to markets where there were four or more integrators.

[redacted]

91. In **Table 6**, I present the comparison of the grower base pay with several other measures of wages and cost of living such as agricultural wages, manufacturing wages, the consumer price index, and Tyson's chicken segment operating margin. While grower base pay when indexed to 2010 values increased by 13.54% during the period from 2010 to 2018, agricultural wages and manufacturing wages increased by 45.04% and 33.38%, respectively. Compared to the growth in grower pay, the cost of living measured by the consumer price index (CPI) grew by 15.13%. More strikingly, Tyson's operating margin for the chicken segment grew by 39.4% when indexed to 2010 values. This clearly shows that grower base pay has not kept pace with growth in agricultural wages and

---

[141] A review of Plaintiff Mike Murphy's contract show that the base pay received by Murphy Farms has remained constant from 2011 to 2013 changed in 2014 and then remained constant from 2014 to 2016.

manufacturing wages (which indicates the opportunity cost of engaging in chicken growing or the CPI, which is an indicator of cost of living) or the profitability of Tyson. In fact, the difference in the growth rate will be much higher if I reduce the base pay in 2010 by 7% to incorporate MacDonald and Key's estimate of 7% lower grower pay in a monopsony as compared to a market with four or more integrators. This is evidence that the non-negotiated base pay has been kept artificially low due to Tyson's monopsony power.

**Table 6: Comparisons of Base Pay, Agricultural Wages, Manufacturing Wages, CPI and Tyson's Chicken Segment Profit**

| Year | [redacted] | Annual Wage (Agriculture, forestry, fishing and hunting) | | Annual Wage (NAICS 31-33 Manufacturing Sector) | | Consumer Price Index (CPI-U) | | Tyson's Chicken Segment Operating Margins [1] | |
|---|---|---|---|---|---|---|---|---|---|
| | | Annual Agriculture Wage [1] | Wage Index to 2010 | Manufacturing Wage [1] | Wage Index to 2010 | Consumer Price Index (CPI-U) [2] | Indexed to 2010 | Operating Margin (%) | Indexed to 2010 |
| 2010 | [redacted] | $22,989 | 100.00 | $43,514 | 100.00 | 218.1 | 100.00 | 5.16% | 100.00 |
| 2011 | [redacted] | $25,273 | 109.94 | $44,534 | 102.34 | 224.9 | 103.12 | 1.56% | 30.21 |
| 2012 | [redacted] | $25,560 | 111.18 | $44,318 | 101.85 | 229.6 | 105.27 | 5.39% | 104.58 |
| 2013 | [redacted] | $23,218 | 101.00 | $45,514 | 104.60 | 233.0 | 106.83 | 6.22% | 120.51 |
| 2014 | [redacted] | $25,877 | 112.56 | $48,249 | 110.88 | 236.7 | 108.53 | 7.94% | 154.00 |
| 2015 | [redacted] | $28,112 | 122.28 | $49,534 | 113.83 | 237.0 | 108.67 | 11.99% | 232.51 |
| 2016 | [redacted] | $26,593 | 115.68 | $49,903 | 114.68 | 240.0 | 110.04 | 11.94% | 231.54 |
| 2017 | [redacted] | $32,638 | 141.97 | $54,471 | 125.18 | 245.1 | 112.38 | 9.23% | 178.94 |
| 2018 | [redacted] | $33,344 | 145.04 | $58,039 | 133.38 | 251.1 | 115.13 | 7.19% | 139.40 |

Note:
[1] Average Wage Rates for Henderson County, Kentucky - 2010 to 2018; Source: Bureau of Labor Statistics; Database: Quarterly Census of Employment and Wages; Annual Wage (Agriculture, forestry, fishing and hunting) and Annual Wage (NAICS 31-33 Manufacturing Sector) for 2018 are preliminary numbers
[2] US Inflation Calculator [online] Available at https://www.usinflationcalculator.com/inflation/consumer-price-index-and-annual-percent-changes-from-1913-to-2008/ (accessed on May 21, 2019)

92. While there is only a marginal growth in base pay for growers during this period, Tyson's chicken segment has experienced substantial growth in its operating margins. Operating margin is measured as (revenue–operating expenses)/(revenue). When applied to a division of a large company such as Tyson, the operating margin is a measure of how well that division managed its operating expenses by comparing it to the division's revenue.

Based on my calculation of Tyson's operating margins using data presented by Tyson in its 10-K filings with the Securities Exchange Commission (SEC), its operating margin increased by 39.4% from 2010 to 2018, when the values are indexed to 2010. This raises the question of where this money comes from. Some of it may be due to more efficient operation of the Tyson chicken division or perhaps higher wholesale prices of chicken sold downstream. However, if Tyson were operating in a competitive environment without monopsony power, such good fortune means that Tyson and Tyson's competitors would want to expand to take advantage of the profitable opportunity. Thus, both Tyson and Tyson's competitors would be competing to both retain existing growers and obtain new growers so that they could increase their supply of chicken to the downstream market. The primary way in which integrators can compete for grower services is by increasing base pay. But as I point out in the previous paragraph, the improvements in base pay have not even kept pace with growers' opportunity cost or the cost of living. This is not surprising given Tyson's exercise of its monopsony power.

93. The review of MacDonald and Key's research indicates that the U.S. tournament system for broiler production suffers from negative price effects associated with monopsony power. Specifically, broiler producers receive 7-8% lower prices in regions that have only one integrator. Because, as I have explained, Perdue does not represent meaningful competition to Tyson at the Robards Complex, the Robards Complex is similar to a geographic area that only has one integrator. The above tables and accompanying discussion demonstrate that Tyson controls the level of base pay provided to chicken growers in the Robards Complex. Chicken growers under contract with Tyson have no other good option other than accepting the contract terms set by Tyson. Since Tyson set up and manages so much of the tournament system, if a competitive pricing structure is what is desired, then it would be incumbent upon Tyson to set base payments to reach such an objective. However, Tyson at the Robards Complex has not maintained the base pay at a level sufficient for growers to keep up with the increasing cost of chicken production. And Tyson has done this during a time in which they have enjoyed large increases in the profit margins for their chicken.

### ii. Exceptions/ Outliers

[redacted]

96. This shows that the rule set by Tyson to categorize exceptions is skewed towards identifying exceptions due to below par performance rather than identifying exclusions due to above par performance. Due to Tyson's unilateral authority to decide whether to

---

[142] Barfield Deposition, p. 239.

[143] Broiler Production Contract (Robards) between Charles Morris and Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A - Paragraph F.

[144] Leis Deposition, 126:15-128:2; Gottsponer Deposition, 168:9-169:17; Shelton Deposition, 152:7-17.

[145] Leis Deposition, 125:3-8; Gottsponer Deposition, 248:2-24.

[146] To conduct this analysis, we have removed instances where exceptions in the tournament were because the farm was owned by Tyson or the employees or the Company's relatives. In a tournament weekend, there may be more than 1 exception.

categorize a certain situation as an exception and because the decision to grant an exception will affect the pay of every other member of a given tournament, Tyson is able to use its control over the tournament to manipulate growers' pay.

### iii. **Condemnation**

97. In this section, I highlight Tyson's policy relating to condemnation of birds at the Robards Complex that results in competitive harm to growers. Not only does Tyson determine the rules of the tournament system, including the base pay and the thresholds for identifying exceptions, it also determines the way it chooses to implement USDA rules relating to condemnation of birds.

[redacted]

[147] However, not all integrators take the step of charging the growers for condemnation. For example, the nearby Perdue facility did not charge growers for condemnation. McGuire Deposition, 60:21-24.
[148] Interview with Charles Morris, April 22, 2019.
[149] Leis Deposition, 19:11-24; 111:10-17.
[150] Ansong-Danquah J, (January/February 1987). "A Survey of Carcass Condemnation at a Poultry Abattoir and its Application to Disease Management" Veterinary Inspection Directorate, Food Production and Inspection Branch, Agriculture Canada, Can Vet J Volume 28, Nos. 1-2.

[redacted]

[redacted]

[redacted]

[redacted]

[151] Dickey Deposition, 125:16-25; 126:1-10; 126:21-25.
[152] Dickey Deposition, 127:3-8. Interview with Charles Morris, April 22, 2019.
[153] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph G.

[redacted]

[redacted]

### i. Days-Out in Excess of Tyson's Representations

[redacted]

[154] David Mears Deposition, 133:13-15.

[redacted]

[155] Agri Stats data was not available after July 2016. In Section VII. D. below, I quantify the days-out for each of the Plaintiffs during the damage period.

[redacted]

107. Because of Tyson's monopsony position at the Robards Complex, Tyson could maintain a higher number of days-out compared to its representations without fear that the growers would switch to another integrator that would offer a lower number of days-out.

## VII. ESTIMATION OF DAMAGES

108. As I discuss in Section VI. C., Tyson at the Robards Complex has used its monopsony power to affect the pay that growers earn by engaging in various practices, including suppressing base pay, affecting ANPV in a manner unfavorable to the growers and hence grower pay through their (arbitrary) determination of exceptions and condemnation, influencing the performance of growers in the tournament, making growers wait longer than Tyson represented to them for new flocks (days-out), and transferring risk to the growers through their control of several factors that determine a growers performance (including, chick quality, feed quality, sex and breed of chicks, among others). In this section, I provide the economic basis and the calculations for my estimate of damages suffered by the Plaintiffs that are attributable to Tyson's monopsony power in the Robards Complex.

109. A well accepted approach to estimate damages is to compare the current earnings of the Plaintiffs with what they would have earned if Tyson did not engage in the practices stated above.[156] In other words, comparing earnings of the Plaintiffs with what they would have earned in the 'but-for" world. I have determined that Tyson has been able to engage in various practices that resulted in lower earnings for the Plaintiffs' without the fear of losing Plaintiffs to other integrators because of its monopsony power at the Robards Complex. Therefore, the "but-for" world is a scenario in which Tyson at the Robards Complex competes with other integrators for the growing services offered by the Plaintiffs and other growers in the Robards Complex market. If Tyson faced competition in the Robards Complex market, then it would have had to make sure that it compensated growers on par with compensation they would receive in a competitive marketplace. My conclusion is that Tyson at Robards Complex was not compelled to and did not pay competitive rates for growing services rendered by the Plaintiffs or other growers.

110. Therefore, in order to assess damages, I have to ascertain the Plaintiffs' earnings if Tyson faced competition from other integrators at the Robards Complex. Specifically, I consider three aspects of damages. First, I assess damages resulting to the Plaintiffs from the suppression of the rate of grower pay by Tyson. Second, I estimate the earnings lost by the Plaintiffs due to the way Tyson at the Robards Complex dealt with condemnation. Third, I estimate the range of damages that Plaintiffs suffered because Tyson at the Robards Complex made the Plaintiffs wait longer between flocks (days-out) than I understand it had represented to them. In the following sections, I present my damage calculations for each of these aspects.

## A. DAMAGES RESULTING TO PLAINTIFFS DUE TO SUPPRESSION OF GROWER PAY BY TYSON

111. My damage methodology to assess damages resulting from the Tyson's suppression of grower pay is based on the well accepted economic theory of monopsony. According to this theory, a profit maximizing monopsonist will set and pay a price for the goods or

[156] OECD (2011), "Quantification of Harm to Competition by National Courts and Competition Agencies" DAF/COMP (2011)25, Available at http://www.oecd.org/daf/competition/QuantificationofHarmtoCompetition2011.pdf, pp169.

services that it purchases at a level that is lower than what would prevail when there are several buyers competing for those goods or services. By setting and paying these low prices, the monopsonist is able to extract a portion of the revenue that the providers of goods or services would have made in a competitive market. As a result, the monopsonist is able to increase its profitability while reducing that of the providers of goods or services.

112. This is precisely what I observe in the market for broiler growing services at the Robards Complex. Tyson has used its monopsony power in the Robards Complex market to lower grower pay. For instance, in Table 6 of this report, I illustrate this using the growth in base pay that Tyson has been paying Plaintiffs at the Robards Complex in comparison with the growth rate in other metrics including annual agricultural wages in Henderson County in Kentucky, the consumer price index, and Tyson's chicken segment operating margin. My analysis clearly showed that the base pay of the Plaintiffs grew at a slower rate than these other metrics from the period from 2010 to 2018.

113. For the purpose of my damage calculation, I consider the effect Tyson's monopsony at the Robards Complex had on the grower pay-which comprises several components including the base pay, reward pay, penalty, energy allowance, premium house pay-received by the Plaintiffs. Specifically, I compare Tyson's gross margin per pound before it compensates the growers with the grower pay received by the Plaintiffs during the period from 2010 to 2018, and estimate how much higher the grower pay would have been if it had kept pace with Tyson's gross margin. In the following paragraphs, I provide the economic theory that my damage methodology is based on, the details of the data I use, and my calculations to estimate damages resulting from Tyson's suppression of grower pay.

114. As I explained earlier, a profit maximizing monopsonist will set the price of the service or product it procures at a level lower than what would prevail in a competitive market. Therefore, a portion of the monopsonist's profits is expropriated from the sellers or service providers. As the demand for the products sold by the monopsonist grows, it would strive to increase its sales and therefore its production. This will result in an increase in demand for the goods or services (inputs) it buys. If the market for these goods

or services is not a monopsony, but one with multiple buyers, then the increase in demand for these goods or services will result in an increase in their price. The buyers of these goods or services will be willing to pay the increased price as long as they can maintain their profitability. However, a monopsonist will be able to exercise its monopsony power and force the producers or service providers to produce/provide the extra units at a lower price than what would prevail in a competitive market with multiple buyers. As a result, the profitability of the monopsonist increases, with no corresponding increase in the price of these products or services. This is exactly what I observe when I compare the grower pay at the Robards Complex with the growth of Tyson's chicken segment profitability.

115. Applying this to Tyson's monopsony power at the Robards Complex, I conclude that Tyson suppressed grower pay even as the selling per pound of chicken (that Tyson sells to wholesalers in the downstream market) and Tyson's profit margin increased. Treating the Plaintiffs as providing labor to Tyson, in a competitive labor market, workers should receive the marginal revenue product of their labor, i.e., the revenue generated from an additional unit produced by an extra unit of labor. As the profit margin of producing chicken increases—that is to say, as increases in the market price of chicken exceed the increases in feed and other costs of producing chicken—the marginal revenue product of the Plaintiffs' labor increases. What I show in my damage analysis is that while Tyson's gross margin (after paying for all other costs relating to producing and processing the chickens, except the growers pay) increased, i.e., the value marginal product of the growers' effort increased, growers share of these margins decreased as the grower pay did not keep up with increases in Tyson's gross margin before growers were paid. I therefore use this as the basis for comparing grower pay received by the Plaintiffs with Tyson's gross margin, calculated before it pays the growers, for damage analysis.

116. In the following paragraphs, I describe the steps I took to arrive at my estimate damages resulting to the Plaintiffs from Tyson's suppression of growers. First, I describe the data that was used, including the source of the data and the key characteristics. Then I describe the analysis that I undertook. Finally, I highlight the results of my analysis.

117. The key variables that I used to calculate damages to the Plaintiffs from suppression of their grower pay are the Plaintiffs' grower pay, total pounds produced by the Plaintiffs, and Tyson's chicken segment gross margin. I obtained the data used for this analysis from two sources, tournament information for the Robards Complex and Tyson's chicken segment financial information from Agri-stats.

[redacted]

119. While the grower pay that I have reported in the above table is what is paid by Tyson on average for each of the years from 2010 through 2018, this is lower than what would Tyson would have had to pay if it is was competing with other integrators for growers'

services at the Robards Complex market. As I have mentioned previously, MacDonald and Key have estimated that grower pay in a monopsony market is lower by 7% than in a market with four or more integrators. I have therefore used this estimate of MacDonald and Key to adjust the grower pay upwards in 2010, the first year in my analysis. I explain the adjustment I have made in a subsequent paragraph.

120. For the purpose of my analysis, in addition to the information on grower pay that I obtained from the Robards Complex's Grower Recap by Grower sheets, I use Tyson's chicken segment financial information from Agri Stats data that was produced by Tyson in this litigation. The data from Agri Stats covers the period from 2010 through July of 2018. From Tyson's chicken segment monthly profitability statements, I have used data reported on three variables: sales revenue, good live pounds, and cost of goods sold. From these three variables, I first calculated the sales revenue per pound and cost of goods per pound. I then calculated Tyson's gross margin per pound by subtracting the cost of goods sold per pound from the sales revenue per pound. I then added the Plaintiffs' weighted average grower pay per pound to Tyson's gross margin per pound to obtain the gross margin per pound before payment is made to the growers. Table 11 below presents the information I obtained from Agri Stats and the calculations I describe above.

**Table 11: Tyson's Gross Margin per Pound**[157]

| Year | Sales (in Millions) [1] | Pounds (in Millions) [1] | Cost of Goods Sold (in Millions) [1] | Sales Per Pound | Cost of Goods Sold Per Pound | Gross Margin Per Pound | Gross Margin Percentage | Operating margin from 10-K [2] | Ratio Operating margin to Gross Margin |
|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d]=[a]/[b] | [e]=[c]/[b] | [f]=[b]-[c]/[a] | [g]=[f]/[d] | [h] | [i]=[h]/[g] |
| 2010 | $7,662 | 8,896 | $6,472 | $0.86 | $0.73 | $0.13 | 15.5% | 5.2% | 33.2% |
| 2011 | $9,889 | 10,511 | $9,029 | $0.94 | $0.86 | $0.08 | 8.7% | 1.6% | 17.9% |
| 2012 | $10,394 | 10,388 | $8,990 | $1.00 | $0.87 | $0.14 | 13.5% | 5.4% | 39.9% |
| 2013 | $11,126 | 10,456 | $9,410 | $1.06 | $0.90 | $0.16 | 15.4% | 6.2% | 40.3% |
| 2014 | $11,209 | 10,576 | $9,231 | $1.06 | $0.87 | $0.19 | 17.6% | 7.9% | 45.0% |
| 2015 | $11,467 | 10,722 | $9,104 | $1.07 | $0.85 | $0.22 | 20.6% | 12.0% | 58.2% |
| 2016 | $6,684 | 5,996 | $5,222 | $1.11 | $0.87 | $0.24 | 21.9% | 11.9% | 54.6% |
| 2017 | | | | $1.11 | | $0.25 | 22.3% | 9.2% | 41.3% |
| 2018 | | | | $1.11 | | $0.19 | 17.4% | 7.2% | 41.3% |
| | | | | | | | | Avg OM/GM ratio 2010-16 | 41.3% |

Note:
[1] Source: Agri Stats
[2] Source: Tyson Annual Report Form 10-K

121. I estimated damages relating to the suppression of grower pay as the difference between the ‘but-for’ grower pay and the actual grower pay received by the Plaintiffs. I estimated the ‘but-for’ grower pay received by the Plaintiffs using the ratio of Plaintiffs’ weighted average grower pay in 2010 with Tyson’s gross margin excluding grower pay in the same year. When I calculated the ratio, I adjusted the grower pay in 2010 upward by 7% to reflect the effect of a monopsonist integrator underpaying growers by 7% vis-à-vis markets with 4 or more integrators. I then applied this ratio to Tyson’s gross margin excluding grower pay to estimate the ‘but-for’ grower pay received by the Plaintiffs. As I explained above, I base my analysis on the conclusion that Tyson uses its monopsony power at the Robards Complex to reduce the portion of the gross margin it earns (after

[157] Given that I have access to Agri Stats data only till June 2016, I am unable to calculate Tyson’s gross margin for 2017 and 2018. I therefore use the average of the ratio of Tyson’s chicken segment percentage operating margin obtained from Tyson’s annual reports filed with the Securities Exchange Commission (https://ir.tyson.com/reports/annual-reports/default.aspxt) to Tyson’s percentage gross margin for the period from 2010 to 2016 (which I calculate as 41%) and apply it Tyson’s percentage operating margin in 2017 and 2018 to estimate the percentage gross margin for those years. I further assume that the sales revenue per pound in 2017 and 2018 (years for which I do not have Agri Stats data) remains at the level 2016 level of $1.11 per pound. I then multiply the estimated percentage gross margin for 2017 and 2018 with the sales revenue per pound for 2017 and 2018, respectively to estimate the gross margin per pound for 2017 and 2018.

paying for all other costs related to producing and processing chicken meat) that it shares with the growers in the form of payment for their services.

122. I then multiplied the pounds of chicken produced by the Plaintiffs' by the per pound damages for each of the years from 2010 through 2018 to estimate the damages resulting to the Plaintiffs from Tyson's suppression of grower pay. I estimate this aspect of damages to the Plaintiffs from the period from 2010 to 2018 to be $10.74 million. I present these calculations in Table 12. Given that the growers have been estimated to contribute approximately half of the capital and vast majority of the labor associated with the production of a whole chicken, my estimate of the share of gross margin that should go to the growers is reasonable.[158]

[158] C. Robert Taylor and David A. Domina (2010) "Restoring Economic Health to Contract Poultry Production" p. 4.

**Table 12: Damage Calculations**

| [redacted] | Damages |
|---|---|
| | [i]=[h]x[g] |
| | $231,598 |
| | ($1,254,919) |
| | $86,308 |
| | $930,677 |
| | $1,340,933 |
| | $2,357,623 |
| | $2,973,238 |
| | $2,886,403 |
| | $1,189,984 |
| Total | $10,741,844 |

Note:
This analysis excludes 5 tournaments(September 13, 2014; September 20, 2014; September 27, 2014; October 04, 2014; October 11, 2014) where all growers were considered as exceptions and one tournament (July 16, 2011) where 7 growers were considered as exceptions by Tyson.
[redacted]

## B. DAMAGES SUFFERED BY PLAINTIFFS DUE TO TYSON'S TREATMENT OF CONDEMNATION

[redacted]

[redacted]

[redacted]

[redacted]

**Table 14: Damages based on Condemnation at 50% Weight**

| | | Damages [3] |
|---|---|---|
| [redacted] | | $96 |
| | | $4,798 |
| | | $20,537 |
| | | $32,070 |
| | | $45,213 |
| | | $45,466 |
| | | $40,396 |
| | | $32,686 |
| | | $7,841 |
| | | $1,028 |
| Total | [redacted] | $230,130 |

Note:
This analysis excludes 5 tournaments (September 13, 2014; September 20, 2014; September 27, 2014; October 04, 2014; October 11, 2014) where all growers were considered as exceptions and one tournament (July 16, 2011) where 7 growers were considered as exceptions by Tyson.
Source: "Grower Pay Recap by Grower" sheets
[redacted]
[3] Plaintiffs' condemnation damage at tournament level are summed up by year.

[redacted]

[159] https://www.ehstoday.com/news/ehs_imp_32655 (accessed July 5, 2019); Dickey Deposition; 125:2-4.

[redacted]

**Table 15: Damages based on Pay for Condemnation**

| [redacted] | | Damages |
|---|---|---|
| | | [c]=[b]*0.04 |
| | | $2,398 |
| | | $4,151 |
| | | $8,149 |
| | | $26,090 |
| | | $22,783 |
| | | $35,489 |
| | | $19,942 |
| | | $12,857 |
| | | $3,443 |
| | | $656 |
| Total | [redacted] | $135,958 |

Note:
[1] This analysis excludes 5 tournaments (September 13, 2014; September 20, 2014; September 27, 2014; October 04, 2014; October 11, 2014) where all growers were considered as exceptions and one tournament (July 16, 2011) where 7 growers were considered as exceptions by Tyson. [redacted]

## C. <u>DAMAGES FROM EXCESS DAYS-OUT</u>

[redacted]

128. I understand that the houses have to be cleaned and be prepared to receive the next flock of birds, and that there is a minimum number of days that would be required for this

purpose. But if the houses remain unused beyond this minimum number of days growers lose the opportunity to profitably use the houses to grow chicks.

129. Plaintiffs have made investments in the chicken houses on the understanding that they would receive a certain number of flocks and that their houses will be used profitably to grow chickens for a certain number of days. Tyson has total control over when and how often it provides birds to the Plaintiffs. Therefore, Tyson controls the return that the Plaintiffs earn on their investments.

[redacted]

[160] I calculated the days-out as the number of days between two successive tournaments and from that, subtracted the day age of the chicks (i.e., the number of days the chicks were grown).

[redacted]

[redacted]

**Table 16: Lost Revenue Calculation based on Days-out**

| [redacted] | Lost Revenue |
|---|---|
| | $10,051 |
| | $204,866 |
| | $672,126 |
| | $421,072 |
| | $559,757 |
| | $271,208 |
| | $351,675 |
| | $389,508 |
| | $501,925 |
| | $166,953 |
| Total [redacted] | $3,549,139 |

Note:
[redacted]
Winter Months run from October of the previous year through April of the stated year.

[redacted]

[162] Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157), Schedule A – Paragraph M.

[redacted]

132. In addition to the compensation paid by Tyson to Plaintiffs, I have also considered variable costs that the Plaintiffs would have incurred to raise the additional flocks. This variable cost is then deducted from the days-out lost revenue that I have calculated in Table 16, above. I have used data from a budget that is periodically prepared by Oklahoma State University Extension Service and presented in a report titled "Broiler Production: Considerations for Potential Growers."[163] I use the latest edition of this report that was prepared in 2017. From a table in this report relating to 100% financed – 24,100 bird broiler building (43 feet x 510 feet), I calculated the share of variable operating costs to grower revenues as 12.84%. (See **Appendix C**, **Table 1** for calculations on share of variable operating costs to grower revenues.) I have then applied the percentage share of variable operating costs to the additional revenues the Plaintiffs would have made if they did not suffer excess days-out to arrive at the dollar value of the estimated variable operating costs.

[163] Doye.D,G. Freking B., Payne J. (May,2017) "Broiler Production: Consideration for Poultry Growers", Oklahoma State University, Extension Facts, CES, Division of Agricultural Science and Natural Resources.

133. In **Table 18** below I present the calculation of net damages relating to excess days-out (after deducting the compensation that Tyson would have contractually paid the Plaintiffs for excess days-out, and the variable operating costs of raising additional birds). I calculate the net damages due to excess days-out to be $2.77 million.

**Table 18: Calculation of Damages**

| [redacted] | Lost-Revenue | [redacted] | Damages |
|---|---|---|---|
| | [a] | | [d]=[a]-[b]-[c] |
| | $10,051 | | $8,761 |
| | $204,866 | | $163,116 |
| | $672,126 | | $508,194 |
| | $421,072 | | $335,734 |
| | $559,757 | | $436,001 |
| | $271,208 | | $220,066 |
| | $351,675 | | $274,809 |
| | $389,508 | | $299,911 |
| | $501,925 | | $400,786 |
| | $166,953 | | $121,719 |
| Total | $3,549,139 | | $2,769,098 |

Note:
Source: "Grower Pay Recap by Grower" sheets
[1] Tyson Paid Estimated = Total Out Days* Total Square Foot of the Farm* $0.0015

134. In addition to the damages from the three aspects I have described above, I have also calculated the pre-judgement interest that would accrue to the Plaintiffs. I have been instructed by Counsel to use a simple interest of 8% for the period from 2010 through March 15, 2017, and 6% for the remaining period. For the purposes of this calculation, I have assumed interest accrues starting January 1 of the year following the year in which the damages were incurred. I calculated interest through June 30, 2019. For instance, damages from 2012 will accrue six and half years of interest from January 1, 2013 through June 30, 2019. Based on my calculations, I estimate the total accrued pre-judgement interest to be $1.59 million for damages from suppression of grower pay, $97,092 for damages from Tyson's condemnation policy, and $0.74 million for damages from excessive days-out. (See **Appendix C, Tables 2, 3, 4,** and **5** for calculation of pre-judgement interest.)

135. While what I have presented above is the aggregate damages for all the Plaintiffs during the period from 2010 to 2019, I have also calculated the individualized damages for each of the three aspects of damages that I have presented above by Plaintiff by year. In the following paragraphs, I present these damages for each Plaintiff.

136. For the purpose relating to suppression of grower pay, I have used the net pounds sold by the Plaintiffs and the difference between but-for grower pay per pound and actual grower pay per pound. I have calculated the individual damages by multiplying the net pounds sold by the Plaintiffs and the difference between but-for grower pay per pound and the actual grower pay per pound. **Table 19** below presents the individual damages by Plaintiffs (including pre-judgement interest) and year relating to suppression of grower pay by Tyson.

**Table 19: Damages for Suppression of Grower Pay by Plaintiffs**

| Plaintiffs | Damage Amount | Interest Amount | Total Damage Amount (Including Interest Amount) |
|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b} |
| Calvin Leisure | $553,993 | $75,086 | $629,079 |
| Charles Morris | $4,431,272 | $614,406 | $5,045,678 |
| Christopher Burch | $76,881 | $16,084 | $92,965 |
| Dennis G. Clapp | $740,507 | $103,605 | $844,112 |
| Douglas Brown | $1,020,154 | $151,151 | $1,171,305 |
| John W Pinkston | $355,738 | $52,759 | $408,496 |
| Keith Crabtree | $615,780 | $96,504 | $712,285 |
| Loi Hong | $511,495 | $114,923 | $626,419 |
| Murphy Farms | $986,143 | $150,618 | $1,136,761 |
| Rickard | $1,076,990 | $154,796 | $1,231,786 |
| Tim Vincent | $372,891 | $55,728 | $428,619 |
| Total | $10,741,844 | $1,585,661 | $12,327,504 |

Source: "Grower Pay Recap by Grower” sheets

137. In **Table 20** below, I present the individual damages as a result of Tyson’s practice of overestimation of condemnation. I have calculated these damages on a tournament by tournament basis and aggregated them across Plaintiffs by year.

**Table 20: Damages based on Condemnation at 50% Weight by Plaintiffs**

| Plaintiffs | Damage Amount | Interest Amount | Total Damage Amount (Including Interest Amount) |
|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b} |
| Calvin Leisure | ($3,104) | ($1,050) | ($4,154) |
| Charles Morris | $176,003 | $43,606 | $219,609 |
| Christopher Burch | ($412) | ($252) | ($664) |
| Dennis G. Clapp | ($4,598) | ($591) | ($5,189) |
| Douglas Brown | ($5,390) | ($1,177) | ($6,567) |
| John W Pinkston | $6,295 | $2,026 | $8,321 |
| Keith Crabtree | $21,427 | $6,005 | $27,433 |
| Loi Hong | ($2,830) | ($886) | ($3,716) |
| Murphy Farms | $27,154 | $6,273 | $33,427 |
| Rickard | $13,197 | $4,953 | $18,150 |
| Tim Vincent | $2,389 | $426 | $2,815 |
| Total | $230,130 | $59,333 | $289,464 |

Source: "Grower Pay Recap by Grower" sheets

138. In **Table 21** below, I present individual Plaintiff level damages relating to Tyson not compensating Plaintiffs for meat from condemned chicks used by Tyson in its dog food processing facility. I also present the pre-judgement interest relating to these damages.

**Table 21: Damages based on Pay for Condemnation by Plaintiffs**

| Plaintiffs | Damage Amount | Interest Amount | Total Damage Amount (Including Interest Amount) |
|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b} |
| Calvin Leisure | $3,226 | $940 | $4,167 |
| Charles Morris | $78,411 | $21,235 | $99,646 |
| Christopher Burch | $1,268 | $463 | $1,732 |
| Dennis G. Clapp | $4,196 | $1,299 | $5,495 |
| Douglas Brown | $6,118 | $1,685 | $7,803 |
| John W Pinkston | $4,328 | $1,339 | $5,668 |
| Keith Crabtree | $9,980 | $2,810 | $12,791 |
| Loi Hong | $2,537 | $615 | $3,153 |
| Murphy Farms | $14,540 | $4,027 | $18,568 |
| Rickard | $8,851 | $2,692 | $11,544 |
| Tim Vincent | $2,501 | $652 | $3,153 |
| Total | $135,958 | $37,759 | $173,717 |

Source: "Grower Pay Recap by Grower" sheets

139. I have calculated the Plaintiff level damages from excess days-out using tournament by tournament days-outs for each of the Plaintiffs. I have done this analysis for summer and

winter months separately. I have also calculated the contractual compensation paid by Tyson for excess days-out and the variable operating costs of raising additional chicks at the level of the Plaintiffs and have subtracted these from the days-out damages to arrive at the net damages by Plaintiff by year. The **Table 22** below shows the net damages including prejudgment interest accrued by Plaintiffs.

**Table 22: Damages on Excess Days-out by Plaintiffs**

| Plaintiffs | Damage Amount | Interest Amount | Total Damage Amount (Including Interest Amount) |
|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b} |
| Calvin Leisure | $125,527 | $36,450 | $161,977 |
| Charles Morris | $1,064,053 | $276,569 | $1,340,622 |
| Christopher Burch | $49,985 | $20,352 | $70,337 |
| Dennis G. Clapp | $252,717 | $53,034 | $305,750 |
| Douglas Brown | $250,797 | $70,244 | $321,040 |
| John W Pinkston | $83,784 | $23,800 | $107,584 |
| Keith Crabtree | $151,554 | $40,215 | $191,769 |
| Loi Hong | $66,001 | $14,222 | $80,223 |
| Murphy Farms | $281,684 | $77,438 | $359,122 |
| Rickard | $340,142 | $97,850 | $437,992 |
| Tim Vincent | $102,855 | $28,754 | $131,608 |
| Total | $2,769,098 | $738,927 | $3,508,024 |

Source: "Grower Pay Recap by Grower" sheets

140. To calculate total damages, I sum the damages that I have calculated under each of the three categories – suppression of grower pay (**Table 19**), treatment of condemnation (**Table 20** and **Table 21**), and excessive days out (**Table 22**). In Table 23 below, I present the damages summed across these three categories, with and without the prejudgment interest, by Plaintiff. The total damages without prejudgment interest is $13.9 million, and with prejudgment interest is $16.3 million. The total interest accrued is $2.4 million.

**Table 23: Total Damages by Plaintiffs**

| Plaintiffs | Damage Amount | Interest Amount | Total Damage Amount (Including Interest Amount) |
|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b} |
| Calvin Leisure | $679,642 | $111,426 | $791,068 |
| Charles Morris | $5,749,738 | $955,816 | $6,705,554 |
| Christopher Burch | $127,722 | $36,647 | $164,369 |
| Dennis G. Clapp | $992,822 | $157,347 | $1,150,168 |
| Douglas Brown | $1,271,679 | $221,902 | $1,493,581 |
| John W Pinkston | $450,144 | $79,924 | $530,069 |
| Keith Crabtree | $798,742 | $145,535 | $944,277 |
| Loi Hong | $577,204 | $128,875 | $706,078 |
| Murphy Farms | $1,309,521 | $238,356 | $1,547,877 |
| Rickard | $1,439,180 | $260,291 | $1,699,471 |
| Tim Vincent | $480,636 | $85,559 | $566,195 |
| Total | $13,877,030 | $2,421,679 | $16,298,709 |

141. Based on my review and analysis of the facts, information, and data relating to this litigation, I have concluded that Tyson is a monopsonist at the Robards Complex and has used its monopsony power to engage in various practices that have had a detrimental effect on the performance of the Plaintiffs and consequently caused financial harm to the Plaintiffs. That such practices cause harm to competition is recognized in the economics profession.

142. I have calculated damages suffered by the Plaintiffs from the suppression of grower pay by Tyson; Tyson's practice of overestimating the weight of condemned birds and not compensating them for meat from condemned birds that is diverted by Tyson to its dog food production facility; and Tyson's practice of delaying time between flocks (more than it represented to the Plaintiffs) which thereby reduced the birds received by the Plaintiffs. I have estimated the damages suffered by the Plaintiffs to be $16.3 million inclusive of pre-judgement interest. In my opinion, damages will continue to accrue to the Plaintiffs as long as Tyson continues with the practices - that are likely to continue to harm competition - I have identified in this report, at the Robards Complex.

143. I reserve my right to update my damage calculations prior to the trial based on information that might become available.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed at Budapest, Hungary, this 15th day of July, 2019.



Kyle W. Stiegert

# APPENDIX – A

# KYLE W. STIEGERT



516 Taylor Hall
427 Lorch St.
Madison, WI 53706

T (608) 217 5836
kwstiegert@wisc.edu

## CURRENT POSITIONS

Professor and Director of Food Systems Research Group,
Department of Agricultural and Applied Economics,
University of Wisconsin-Madison, Madison, 2001 to present
Visiting Professor, Justus Liebig University, 2019 to present
Visiting Fellow, Victoria University, 2010 to present
Visiting Professor, Cal-Poly, 2012 to present

## EDUCATION

Ph.D., Agricultural Economics, Purdue University, 1993
M.S., Agricultural Economics, University of Nebraska, 1989

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

- Industrial Organization: competition, agricultural processing, retailing, and input industries
- Food and Agribusiness: organics, food demand, biotechnology, investment
- International Economics: trade and trade policy, cartels, international competition policy, FDI.

## PAST POSITIONS

| | | |
|---|---|---|
| 2000 - 2001 | Visiting Professor, University of Connecticut | Storrs, Connecticut |
| 1993 - 2001 | Assistant and Associate Professor, Kansas State University | Manhattan, Kansas |
| 1990 - 1993 | Graduate Fellow, Purdue University | West Lafayette, Indiana |
| 1987 - 1989 | Research Assistant, University of Nebraska | Lincoln, Nebraska |
| 1984 - 1986 | Software Specialist, Information Technology, Inc. | Lincoln, Nebraska |
| 1981 - 1983 | Futures Market Analyst, First Mid America, Inc. | Lincoln, Nebraska |

## COURSES TAUGHT

Agricultural Finance, Global Hunger and Malnutrition, Econometric Analysis, International Trade and Agribusiness, Industrial Organization, Applied Microeconomics, Applied Microeconomics, International Marketing and Trade, Introduction to Math Programming, Agribusiness Management

# KYLE W. STIEGERT

## EXPERIENCE SUMMARY

Mr. Stiegert has over 25 years of experience in economic analysis, research and teaching. His consulting practice centres on antitrust litigation, price analysis, survey development and analysis, economic damage claims, and international market reports. His research interests include investigating the competitive structure of agricultural markets, trade and policy issues in international agriculture, and competition and policy issues in food retailing. Mr. Stiegert's experience as an economic expert is extensive, with testimony in wide range of matters relating to agricultural and food markets. He is currently a Professor in the Agricultural and Applied Economics Department and Director of Food System Research Group at the University of Wisconsin, and has previously taught at Kansas State University.

## PROFESSIONAL EXPERIENCE – TEACHING AND ADVISING

### *Teaching Experience*

- AAE419 - Agricultural Finance (undergraduate) (1 semester, 2018 to present)
- AAE350 - Global Hunger and Malnutrition (undergraduate) (4 semesters; 2016 to present)
- AAE636 - Econometric Analysis I (graduate) (8 semesters; 2006-2013)
  Focus of this course is on econometrics including an extensive review of probability and statistics, linear algebra, hypothesis testing, and OLS estimation. Model design, dummy variables, GLS estimation and diagnostic testing are emphasized. The course also features extensive training in STATA software applications.
- AAE319 - International Trade and Agribusiness (undergraduate) (8 semesters 2012 to present).
  International trade theory, policy, and cases.
- AAE747 - Industrial Organization (PhD) (4 semesters; 2001, 2002, 2006, 2008, 2015).
- AAE705 - Applied Microeconomics (PhD) (3 semesters; 2004-2006)
- AAE426 - Quantitative Methods (undergraduate). (2 semesters, 2003-2005).
- International Marketing and Trade (graduate; Kansas State U.): (5 semesters; 1997-2001)
- Introduction to Math Programming (graduate; Kansas State U.): (3 semesters; 1994-1996)
- Agribusiness Management (undergraduate; Kansas State U.): (8 semesters; 1994-2001)

### *Advising Experience*

#### *Graduate Advisee Awards for Thesis Research*

- Todd Sharkey: 2005 UW-AAE Outstanding M.S. Thesis.
- Shinn-Shyr Wang: 2004 AAEA Outstanding PhD Dissertation.
- Fenxia Dong: 2003 KSU- Gamma Sigma Delta Outstanding Doctoral Dissertation Award

- Newman Kahiya: 1998 KSU- Outstanding M.S. Thesis, Kansas State University.

***Undergraduate Advisee Awards for Research***

- Chris Cable: UW Hilldale Undergraduate/Faculty Research Award.

***Thesis Committee Chairs***

***Ph.D.:***

- Minsun Jang. Current student
- Ryo Sakamoto. Current student
- Vardges Hovhannisyan. 2012. Three Essays on Competition in Dairy Markets
- Ming-Feng Hsieh. 2012. Store Format Choice
- Du Ying. 2009. Strategic Pricing Analysis in a Vertical Sector.
- Xiaowei Cai. 2008. Essays on Cartels.
- Shinn-Shyr Wang. 2004. Strategic Behavior under Asset Value Maximization.
- Fenxia, Dong. 2003. Evaluating Prepayment Systems by the Canadian Wheat Board and Australian Barley Board.

***M.S.:***

- Ryo Sakamoto. 2016. Competitive Toughness.
- Yutaka Shibuya. 2013. Panel Data Analysis of international rice, beef and pork trade.
- Steve Fenrick. 2011. Cost Structure of Electricity Firms: Benchmarking and Grid Outages.
- Narek Sahakyan. 2009. Who Benefits From Corruption?
- Taya Shinichi 2006. Theoretical Analysis of Special Safeguards.
- Xu Cheng. 2005 Evaluating the Rational Addiction Model.
- Todd Sharkey. 2004. The Impacts of Non-Traditional Supercenters on Food Price Changes.
- Amir Ardalan, Arash. 2000. Evaluation of the 1992 Maastrict Treaty on FDI in the EU.
- Goode, David. 2000. Foreign Direct Investment into the Latin American-Caribbean Basin Region.
- Schultz, Michael. 1999. Foreign Direct Investment into Asia.
- Balzer, Brian. 1999. Analysis of the Wheat Gluten Industry.
- Peng, Hsing Ming. 1997. Liberalization of the Taiwan Milling Industry.
- Parcell, Joe. 1996. Characteristic Demand Analysis of Hard Red Winter and Hard Red Spring Wheat.
- Carton, Olivier. 1996. Market Power in the Wheat Milling Industry.
- Kahiya, Newman. 1996. A CGE Analysis of Botswana Policy Adjustments.

# KYLE W. STIEGERT

## TESTIMONIES/DEPOSITIONS/CONSULTANCIES

- Contract dispute legal consultancy. (2017) Case settled prior to submission of report.
- Antitrust Legal Consultancy: Abuse of Dominance in the North American Cranberry Market. (2015 to Ongoing)
  - Class Certification Expert Report for the Plaintiffs (October 30, 2015)
  - Class Certification Deposition (December 8, 2015)
- Antitrust Legal Consultancy: Collusion in U.S. Egg Production and Export Dumping. (2009-15)
  - Class Certification Expert Report (August 29, 2014)
  - Class Certification Deposition (September 22-23, 2014)
  - Class Certification Rebuttal Report (December 22, 2014)
  - Merits Report (January 22, 2015)
  - Merits Rebuttal Report (April 3, 2015)
  - Merits Deposition (May 19, 2015)
- Legal Consultancy. Market structure of high-end beef producing and breeding markets. (2013)
  - Expert Report
- Legal Consultancy. Calculating conferred benefits in Idaho potato transactions. (2010-11)
  - Expert Report (February, 2011)
- U.S. Department of Justice: Consultancy to discuss biotech seed markets and antitrust issues in food and agricultural markets. (January 28, 2010)
  - Conference Presentation
- Consultant: General Accounting Office. Understanding market power in vertical food channels. (2009)
  - Conference Call (June, 2009)
- Microsoft Corporation: Capacity absorption in technical assistance to nascent antitrust agencies.
  - Research Report
  - Presentation to International Competition Network; Capetown, South Africa; May, 2006
- Report: FAO: United Nations: Assessing the role of strategic trade on developing nations. (2006)
  - Research Report, published as a chapter in FAO's Commodity Market Review, 2007-2008
- Legal Consultancy. Farmers Legal Action Group. Report on the economic impact of generic advertising in U.S. Pork Markets. Spring, 2002.
  - Expert Report (May, 2002)
  - Deposition (June, 2002)
- Press Release. "Is this the last time you will ever hear, 'Pork: the Other White Meat'?" Find at: http://www.aae.wisc.edu/fsrg/publications/press releases
- General Accounting Office. Consultancy on hedonic pricing of Montana wheat markets. (1999)
  - Conference Call

# KYLE W. STIEGERT

- U.S. Wheat Associates: Comparative assessment of Canadian, Australian, and U.S. wheat marketing systems. (1996)
  - Research Report
  - Presentation to cereal scientists, Second International Wheat Quality Conference, Manhattan, KS.
  - Published (German language) in Getreide Mehl und Brot, December 2001.

## RESEARCH PAPERS AND PUBLICATIONS

- Chavas, JP, G Shi, R. Nehring, and K. Stiegert. 2018. "The Effects of Biotechnology on Productivity and Input Demands in U.S. Agriculture." Journal of Ag and Applied Economics." https://doi.org/10.1017/aaa.2018.6. Published online 25, April, 2018
- Stiegert, Kyle, (w/Ryo Sakamoto). 2018 "Comparing competitive toughness to benchmark outcomes in retail oligopoly pricing," Agribusiness: An International Journal. 34(1)44-60.
- Stiegert, Kyle, (w/Vitor Della Corte and Paulo Dabdab Waquil). 2015. "Wheat Industry: Which Factors Influence Innovation". J. of Technology Management & Innovation. Vol 10, No 3, pps 11-16.
- Stiegert, Kyle (w/Borneman, D. and Ingham, S). 2015. "Limitation of on-site dairy farm regulatory debits as milk quality predictors". Journal of Dairy Science, published online: January 16, 2015. link
- Stiegert, Kyle (w/Hovhannisyan, V. and Bozic, M). 2014. "On Endogeneity of Retail Mark-ups in an Equilibrium Analysis: A Control Function Approach." Journal of Agricultural and Resource Economics. 39(2)188-200.
- Stiegert, Kyle (w/Cai, X.). 2014. "Market Analysis of Ethanol Capacity." International Food and Agribusiness Management Review. Volume 17, Issue 1, 83-93.
- Stiegert, Kyle (w/Hamilton, S. and Richards, T.) 2013. "How Does Advertising Effect Market Performance: A Note on Generic Advertising." Economic Inquiry. Vol. 51, No. 2, April, 1183–1195.
- Stiegert, Kyle (w/Hsieg, M.) 2012. "Store Format Choice in Organic Food Consumption." American Journal of Agricultural Economics: Papers and Proceedings. 94(2): 307-313.
- Stiegert, Kyle (w/Shi, G. and Chavas, J.P., Meng, X). 2012. "An Analysis of Bundle Pricing: The Case of Biotech Seeds. Agricultural Economics. 43(s1)125-139.
- Stiegert, Kyle (w/Hsieh, M. F.). 2012. "The Consumption Choice of Organics: Store Formats, Prices, and Quality Perception – A Case of Dairy Products in the United States." In Organic Food and Agriculture Book 1, Matt Reed (Ed.), ISBN: 978-953-307-1071-6, InTech: Open Access Publishing (http://www.intechweb.org), October. Link
- Stiegert, Kyle (w/Sahakyan, N.). 2012. "Corruption and Firm Performance: The Case of Armenia." Eastern European Economics. 50(6)5-27.
- Stiegert, Kyle (w/Cai, X), 2012. "Modal FDI Strategies in Asia-Pacific Region." International Food and Agribusiness Management Review. Volume 15, Issue 2.

# KYLE W. STIEGERT

- Stiegert, Kyle (w/Cai, X. and Koontz, S.). 2011. "Oligopsony Fed Cattle Pricing: Did Mandatory Price Reporting Increase Beefpacker Market Power"? Applied Economics Perspectives and Policy. Volume 33, Winter (4), 606-622.
- Stiegert, Kyle (w/Hsieh, M. F.). 2012. "The Consumption Choice of Organics: Store Formats, Prices, and Quality Perception – A Case of Dairy Products in the United States." In Organic Food and Agriculture Book 1, Matt Reed (Ed.), ISBN: 978-953-307-1071-6, InTech: Open Access Publishing (http://www.intechweb.org), October. Link
- Stiegert, K.W. (w/Shi, G., Chavas. J.P.). 2011. "Spatial Pricing of Genetically Modified Hybrid Corn Seeds" Colin Carter, Giancarlo Moschini, and Ian Sheldon, eds. Frontiers in Economics and Globalization, Volume 10: Genetically Modified Food and Global Welfare. Emerald Publishing Group Limited. Bingley, United Kingdom.
- Stiegert, Kyle (w/Shi, G., Chavas. J.P.). 2011. "An Analysis of Bundle Pricing in Horizontal and Vertical Markets: The Case of the U.S. Cottonseed Market" Agricultural Economics. 42:77-88.
- Stiegert, Kyle (w/Cai, X. and Koontz, S.). 2011. "Regime Switching and Oligopsony Power: The Case of U.S. Beef Processing." Agricultural Economics 42(1):99-109.
- Stiegert, Kyle (w/Shi, G., Chavas. J.P.). 2010. "*An Analysis of the Pricing of Traits in the U.S. Corn Seed Market.* American Journal of Agricultural Economics 92(5):1324-1338.
- Stiegert, Kyle W., (w/Shi, G., Chavas. J.P.) 2010. "Innovation, Integration, and the Biotechnology Revolution in U.S. Seed Markets." Choices. 25(2).
- Stiegert, Kyle (w/Sokol, D.). 2010. "Exporting Knowledge Through Technical Assistance and Capacity Building." Journal of Competition Law and Economics, 6(2), 233–251 [find at: DOI 10.1093/joclec/nhp010].
- Stiegert, Kyle (w/Wang, S. and Dhar, T.). 2010. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets," Canadian J of Agricultural Economics, 58(2):151-170.
- Stiegert, Kyle (w/Fanning, J., Marsh, T). 2010. "Determinants of Fast Food Consumption." British Food Journal. 112(1):5-20.
- Stiegert, Kyle (w/Shi, G., Chavas. J.P.). 2009. "Pricing of Herbicide Tolerant Soybean Seeds: A Market Structure Approach" AgBioforum. 12(3&4), 326-333.
- Stiegert, Kyle (w/Hsieh, M. Mitchell,P.D.). 2009. "Potato Demand in an Increasingly Organic Marketplace." Agribusiness: an International Journal, 25(3):369-394.
- Stiegert, Kyle (w/Wang, S. and Rogers,R). 2009. "Structural Change and Market Power in the U.S. Food Manufacturing Sector." Agribusiness: an International Journal, 25(2):164-180.
- Stiegert, Kyle (w/Kim, D.H.). 2009. Editors: Structural Changes in Food Retailing: Six Country Case Studies. FSRG, Madison WI. Find at www.aae.wisc.edu/fsrg.
- Stiegert, Kyle. (w/Hovhannisyan, V.). 2009. "Food Retailing in the United States: History, Trends, Perspectives" Chapter 7 in Structural Changes in Food Retailing: Six Country Case Studies. eds. K.W. Stiegert and Dong Hwan Kim. FSRG Madison WI. pgs 131-145

- Stiegert, K. (w/Huang, K.). 2009. “Evaluating a supermarket merger event: the case of Copps and Kohls in Madison WI.” FSRG Monograph Series, #21. Food System Research Group, Madison WI, March. 76p.
- Stiegert, Kyle. 2008. “Cooperative, Food Retailing and Farming in the U.S.” Chapter in "Development of Large Food Companies and Agriculture," Agro-food New Marketing Institute, Seoul, Korea.
- Stiegert, Kyle. 2008. “Imperfect competition, agriculture and development.” chapter in
  Hallam, David and George Rapsomanikis, eds, Commodity Market Review, 2007-2008. Food and Agriculture Organization, United Nations. Rome. pgs 35-50. available at: fao.org/es/ESC/en/index.html
- Stiegert, Kyle (w/Sharkey, Todd). 2007 “Food Pricing, Competition, and the Emerging Supercenter Format.” Agribusiness: an International Journal, Vol. 23, Issue No. 3, Summer: 295-312.
- Stiegert, Kyle (w/Dong, F. March, T.). 2006. “State Trading Enterprises in a Differentiated Environment: The Case of Global Malting Barley Markets.” American Journal of Agricultural Economics. 88(1):90-103.
- Stiegert, Kyle (w/Reimer, J.) 2006. "Imperfect Competition and Strategic Trade Theory: Evidence for International Food and Agricultural Markets," *J. of Ag. & Food Industrial Organization*: 4(1), Article 6. at: http://www.bepress.com/jafio/vol4/iss1/art6
- Stiegert, Kyle (wArdalan, A. and Marsh, T). 2006. “Foreign Market Entry Strategies in the European Union” J. Food Distribution Research. 37(3) 44-55.
- Stiegert, Kyle (w/Sharkey, T.). 2006. “Impacts of Nontraditional Food Retailing Supercenters on Food Price Changes.” FSRG Monograph Series, #20. Food System Research Group, Madison WI, 78p.
- Stiegert, Kyle (w/Hamilton, S.). 2002 “An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises.” J. of International Economics. 58:135-157.
- Stiegert, Kyle W. 2002. “The Producer, the Baker, and a Test of the Mill Price-Taker.” Applied Economic Letters. 9:365-368.
- Stiegert, Kyle (w/Balzer, B.). 2001. “Evaluating the Wheat Protein Complex.” Canadian Journal of Agricultural Economics. 49:337-351.
- Stiegert, Kyle (w/Boland, M., Mitchell, N.). 2000. “Midwest Grain” International Food and Agribusiness Management Review. 3: 457-72.
- Stiegert, Kyle (w/Hamilton, S.). 2000. “Vertical Coordination, Antitrust Law, and International Trade.” Journal of Law and Economics. April:143-156

## OTHER ACTIVITIES

***Invited Speaker***

- 2010 USDA-USDOJ “Conference on Margins”. Expert panel member on food retailing. December Washington D.C.
- 2010 Auckland, New Zealand. Wespac Bank. “Issues and Aspects of Special Safeguards in Agriculture.” May10th

KYLE W. STIEGERT

- 2010 Wellington, New Zealand. Institute for the Study of Competition and Regulation, School of Business and Commerce, Victoria University. "The Theory of Special Safeguards in Agriculture. May 9th.
- 2010 West Lafayette, IN, Department of Agricultural Economics, Purdue University. "Spatial Pricing of Genetically Modified Hybrid Corn Seeds" January, 28.
- 2009 Washington DC, USDA-Farm Foundation Joint Seminar, "Price Analysis of Biotech Seed Markets: Bundling, Integration, Patenting, Efficiency, and Market Power." December 8th.
- 2009 St Louis, MO, Annual Convention of the Organization for Competitive Markets. "Price Analysis of Biotech Seed Markets: Bundling, Integration, Patenting, Efficiency, and Market Power." August 7.
- 2008 Seoul, South Korea, National Cooperative Conference. "Food Retailing and the role of cooperatives in U.S. farming." June 12th.
- 2008 Seoul, South Korea, Department of Economics, Seoul National University, "Strategic pricing under asset value maximization." June 10th.
- 2008 Seoul, South Korea, Korean Rural Economics Institute. "Strategic pricing under asset value maximization." June 9th.
- 2007 Washington DC, World Bank, "Assessing the efficiency of competition related technical assistance." March 1st.
- 2007 Washington DC, Inter-American Development Bank. "The effectiveness of technical assistance to emerging countries to address anti-competitive behavior" March 2.
- 2006 Chicago, IL, Conference of the Federal Reserve Board of Chicago: Globally Competitive Agriculture and the Midwest. "International Food Retailing and the Emerging Supercenter Format." Omni Hotel, September 29.
- 2006 Capetown, South Africa, International Competition Network Annual Conference. "Assessing the efficiency of competition agencies and related technical assistance programs." May 2-May 4.
- 2005 Viçosa, MG Brazil. XXVII Seminário Internacional de Política Econômica, Universidade Federal de Viçosa, "Identifying Structural Characteristics of High Performing Industries Versus Industries with Considerable Market Power." October 26.
- 2003 San Antonio, TX, International Agricultural Trade Research Consortium, "Imperfect competition and strategic trade theory: what have we learned?" December 13
- 2002 Omaha, NE, Annual Convention of the Organization for Competitive Markets. "Cost Efficiencies versus Market Power: Do we have the correct framework? August 16
- 2001 Hamilton, S. and K. W. Stiegert, "An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises." University of Wisconsin-Madison, February 12
- 2001 Manhattan, KS, Second International Wheat Quality Conference. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. May 23.

- 2000 Storrs, CT, Department of Ag and Natural Resource Economics, University of Connecticut. "Evaluating the Wheat Protein Complex." November 10th.
- 2000 Amhearst, MA, Department of Resource Economics, University of Massachusetts. "Evaluation of the 1992 Maastritch Treaty on Foreign Direct Investment in the E.U. October, 25th, 2000.
- 1999 Fargo, ND, Department of Agricultural Economics. North Dakota State University. "Evaluating the Wheat Protein Complex." November, 1999.
- 1997 Lincoln, NE, Department of Agricultural Economics. University of Nebraska. "Testing the Validity of Standard Representative Agent Import Demand Systems." November 17th, 1997.
- 1997 Manhattan, KS, International Wheat Quality Conference. "Market Responses to Wheat Quality." Manhattan, KS, May 18-22. 1997.

***<u>Conference Proceedings, Trade Publications, Extension and Departmental Publications</u>***

- Narek Sahakyan and Kyle W. Stiegert. 2010. "Corruption and Firm Performance." FSWP2010-01. January.
- Cai, Xiaowei and Kyle W. Stiegert. "Regime Switching in the U.S. Beef Packing Sector." FSWP2010-02, January.
- Kun Huang and Kyle W. Stiegert "Evaluating and Supermarket Event: The Case of Copps and Kohl's in Madison WI. FSWP2010-03, January.
- Shi, G., KW Stiegert and JP Chavas "An Analysis of Bundle Pricing in Horizontal and Vertical Markets: The Case of the U.S. Cottonseed Market" FSWP2010-04
- Hamilton, Steve, Tim Richards, and Kyle W. Stiegert. "How does Advertising Affect Market Demand? A Note on Generic Advertising." FSWP2010-05
- Shi, G., JP Chavas and KW Stiegert. 2009. "An Analysis of the Pricing of Traits in the U.S. Corn Seed Market." Staff Paper No. 544, December, 39p.
- Shi, G., JP Chavas and KW Stiegert. 2008. "An Analysis of Bundle Pricing: The Case of the Corn Seed Market." FSRGWP2008-01.
- Hsieh, Ming-Feng, Paul D. Mitchell, and Kyle W. Stiegert. 2007. "Demand for Organic and Conventional Potatoes" FSWP2007-01, February.
- Stiegert, K. and T. Sharkey. 2006. "Food Pricing, Competition, and the Emerging Supercenter." Food System Research Group Working Paper Series. FSWP2006-04.
- Reimer, J. and K. Stiegert. 2006. Imperfect competition and strategic trade theory: what have we learned? Food System Research Group Working Paper Series. FSWP2006-03.
- Wang, S.S., K.W. Stiegert. 2006. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation". AAE Staff Paper No. 496, March, 42p.
- Reimer, J. and K. Stiegert. 2006. "Imperfect competition and strategic trade theory: what have we learned?" Food System Research Group Working Paper Series. FSWP2006-03.
- Wang, S.S., K.W. Stiegert, and T. Dhar. 2006. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets." Food System Research Group Working Paper Series. FSWP2006-02.

# KYLE W. STIEGERT

- Wang, S.S., and K.W. Stiegert. 2006. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation." Food System Research Group Working Paper Series. FSWP2006-01.
- Wang, S-S, K. Stiegert, and T. Dhar. 2005. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets" In Proceedings of the Second Biennial Food System Research Group. ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Fanning, J. T. Marsh, and K. W. Stiegert. 2005. "Determinants of Fast Food Consumption," Food System Research Group Working Paper Series. FSWP2005-02.
- Dong, F., T. L. Marsh, and Kyle Stiegert 2005. "State Trading Enterprises in a Differentiated Product Environment: The Case of Global Malting Barley Markets." Food System Research Group Working Paper Series." FSWP2005-01.
- Stiegert, Kyle. 2003. "Imperfect competition and strategic trade theory: what have we learned?" in Proceedings of the International Agricultural Trade Research Consortium Annual Conference, ed Ian Sheldon.
- Wang, S-S and K. Stiegert. 2003. "Industrial Organization and Equity Value Maximization." In Proceedings of the First Biennial Food System Research Group. ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Fanning, Jasper, T. W. Marsh, and K. Stiegert. 2003. "Baysian Methods and the Demand for Fast Food." In Proceedings of the First Biennial Food System Research Group. Ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Stiegert, Kyle. 2003. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." In Proceedings of the First Biennial Food System Research Group. Ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Dhar, T., K.W. Stiegert, and B. Gould. 2002. "Price Dispersion, Search, and Market Power." Food System Research Group Working Paper Series. FSWP2002-08.
- Balzer, B. and K.W. 2001. "Evaluating the U.S. Wheat Protein Complex." Food System Research Group Working Paper Series. FSWP2001-5
- Hamilton, S. and K.W. Stiegert. 2001. "An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises." Food System Research Group Working Paper Series. FSWP2001-04.
- Stiegert, Kyle. 2001. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. in Second International Wheat Quality Conference. eds. J.L. Steele and O.K. Chung. Grain Industry Alliance, Manhattan, KS.
- Stiegert, Kyle. 2001. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. Getreide Mehl und Brot. December.
- Stiegert, Kyle. 1999. "Assessing the behavior of the Australian Wheat Board." in Risk and Profit Management Conference Proceedings, ed. Terry Kastens. August 1999.
- Stiegert, Kyle and Brian Balzer. 1999. "Evaluating the U.S. Wheat Gluten Quota Policy." Department of Ag Economics Research Report #27. Kansas State University. August.
- Stiegert, Kyle. 1998. "Marketing Wheat in a Quality Oriented System." in Risk and Profit Management Conference Proceedings, ed. Terry Kastens.

# KYLE W. STIEGERT

- Stiegert, Kyle and Brian Balzer. 1998. "Assessment of the E.U.-U.S. Wheat Gluten Trade Dispute." Department of Ag Economics Research Report #26. Kansas State U. October.
- Stiegert, Kyle and Olivier Carton. 1998 "The Producer, the Baker, and Mill-Price-Taker. in WCC-72 Conference Proceedings."
- Stiegert, Kyle and Hsing Ming Peng. 1998. "Liberalization of the Taiwan Wheat Milling Industry." in WCC-72 Conference Proceedings."
- Stiegert, Kyle, Joe Parcell, and J. P. Blanc. 1997. "Market Responses to Wheat Quality." in International Wheat Quality Conference Proceedings. eds. J.L. Steele and O.K. Chung. Grain Industry Alliance, Manhattan, KS. 339-362.
- Peng, Hsing Ming, and Kyle Stiegert. 1997. "Structural Change in the Taiwan Flour Milling Industry." World Grain. June 1997.
- Hamilton, Steve and Kyle Stiegert. 1997. "Backwards Linkages and Strategic Firm Behavior." Vertical Relationships and Coordination in the Food System Conference Proceedings. Piacenza, Italy.
- Stiegert, Kyle W. and J. P. Blanc. 1995. "A Characteristic Demand Analysis of Japanese Wheat Imports." Proceedings of the NC186 Conference on Structural Change in U.S. Agriculture.
- Stiegert, Kyle W. 1995. "Marketing Strategies for U.S. Hard Winter Wheat." Department of Ag Economics Research Report #18. Kansas State University. January 16.

***<u>Selected Papers, Posters, and Published Abstracts</u>***

- Sakamoto, Ryo, and Stiegert, Kyle. W. 2016. "Comparing competitive toughness to benchmark outcomes to benchmark outcomes in retail oligopoly pricing," 153th EAAE Seminar 'New Dimensions of market power and bargaining in the agri-food sector: Organizations, policies, and models. Gaeta, Italy, June 9-10, 2016
- Hovhannisyan, V., and Stiegert, K.W., 2011. "Vertical Channel Analysis of the U.S. Milk Market," Selected Paper at Annual Meeting of Agricultural and Applied Economics Association, Pittsburgh, PA.
- Hovhannisyan, V., and Stiegert, K.W., 2011. "Imperfect Competition between Milk Manufacturers and Retailers in a Midwestern State in the U.S.," Selected Paper at Annual Meeting of Southern Agricultural Economics Association, Corpus Christi, TX.
- Stiegert, Kyle and Shinichi Taya. 2010. "The Theory of Special Safeguards in Agriculture." Selected Paper. International Industrial Organization Conference. Vancouver BC. May 14-16.
- Stiegert, Kyle and Xiaowei Cai. 2010. "Optimal Timing of Cartel Formation Under Uncertainty." Selected Paper. International Industrial Organization Conference. Vancouver BC. May 14-16.
- Hovhannisyan, V., and Stiegert, K.W. 2010. "Do Retailers Exercise Market Power: The Case of Milk," Selected Paper at Annual Meeting of Mid-Continent Regional Science Association, St. Louis, MO.

# KYLE W. STIEGERT

- Shi, Guanming Kyle Stiegert, and J.P. Chavas. 2009. "An Analysis of Pricing in Horizontal and Vertical Markets: The Case of the U.S. Cottonseed Market. Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Cai, X., K. Stiegert and S. Koontz. 2009. "Regime Switching in the U.S. Beef Packing Sector." Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Hamilton, S., T. Richards, and K. Stiegert "How does Advertising Affect Market Demand? A Note on Generic Advertising." Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Du, Ying and K. W. Stiegert. 2009. "Vertical Channel Analysis of the U.S. Butter Market." Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Wang, S-S. K. Stiegert and Rich Rogers. Price Cost Margins and Market power across the U.S. food sector. Selected Paper, AAEA Annual Meetings, Long Beach, CA.
- Cai, Xaiowei., K. Stiegert, and S. Koontz. "Regime Switching in the U.S. Beef Packing Sector." Selected Paper, NCCC-134 Annual Conference, St. Louis Missouri, April 17-18. 2006.
- Wang, S-S., K. Stiegert, and T. Dhar. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets" Selected Paper, AAEA annual meeting, Providence R.I., July 2005.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected Paper, International Industrial Organization Conference, Atlanta, GA. April, 8-11, 2005.
- Stiegert, K. and Xu Cheng. "Evaluating the Rational Addiction Model." Selected paper, WAEA annual conference, San Francisco, CA, July 2005.
- Wang, S-S., K.W. Stiegert, and T. Dhar. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets" Selected paper, Food System Research Group. Second Biennial Conference. Madison, WI, June 2005.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected paper, Annual Conference: European Association of Research in Industrial Economics. Helsinki, Finland, August, 2004.
- Wang, S-S, T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products." Selected Paper, AAEA annual meeting, Denver CO, July 2004.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected Paper, 6th INRA-IDEI Conference: Industrial Organization and the Food Processing Industry, U. of Toulouse, Toulouse France, June, 2004.
- Wang, S., T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products." Selected Paper, Marketing Science Conference, Rotterdam, Netherlands, June 2004.
- Dong, F., T. Marsh, and K. Stiegert. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." Selected Paper, 6th INRA-IDEI Conference: Industrial Organization and the Food Processing Industry, U. of Toulouse, Toulouse France, June, 2004.

# KYLE W. STIEGERT

- Wang, S., T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products," Selected Paper, 6th INRA-IDEI Conference: Industrial Organization and the Food Processing Industry, U. of Toulouse, Toulouse France, June, 2004.
- Wang, S-S, T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products." Selected Paper, International Industrial Organization Conference, Chicago, IL. April, 2004.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected paper, Food System Research Group. First Biennial Conference. Madison, WI, June 2003.
- Fanning, Jasper, T. W. Marsh, and K. Stiegert. "Baysian Methods and the Demand for Fast Food." Selected paper, Food System Research Group. First Biennial Conference. Madison, WI, June 2003.
- Dong, F., T. Marsh, and K. Stiegert. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." Selected paper, Food System Research Group. First Biennial Conference. Madison, WI, June 2003.
- Dhar, T, K. Stiegert and B. Gould. "Economics of Price Dispersion in Food Retailing." Selected Paper, AAEA Annual Meeting, Long Beach CA, August 2002.
- Fanning, J.T. Marsh, and K. Stiegert. "Determinants of Fast Food Consumption" Selected paper. WAEA 2002 Annual Meeting, July 28-31, 2002, Long Beach, California.
- Dong, F., T. Marsh, and K. Stiegert. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." Selected paper, WAEA Annual Meeting, July 28-31, 2002, Long Beach, California.
- Stiegert, Kyle. 2001. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. Second International Wheat Quality Conference. Grain Industry Alliance, Manhattan, KS.
- Stiegert, Kyle. 1999. "Assessing the behavior of the Australian Wheat Board." Risk and Profit Management Conference August 1999.
- Stiegert, Kyle. 1998. "Marketing Wheat in a Quality Oriented System." Risk and Profit Management Conference Proceedings, August, 1998.Stiegert, K. "Factors Affecting Wheat Quality Characteristics." Selected Paper, 1999 AAEA Annual Meetings, Nashville, TN. Abstract in Amer. J. of Ag. Econ. 81(5), December 1999, p 1292.
- Hamilton, S., and K. Stiegert. "Backward Implicit Contract, Precommitment and Market Power in the International Durum Market" Selected Paper, AAEA Annual Meetings, Salt Lake City, Utah. Abstract in Amer. J. of Ag. Econ. 80(5), December 1998, p. 1191.
- Stiegert, K. and O. Carton. "Increasing Concentration in the U.S. Hard Wheat Milling Industry: Efficiency Gains or Market Power?" Selected Paper, 1998 AAEA Annual Meetings, Salt Lake City, Utah. Abstract in Amer. J. of Ag. Econ. 80(5), December 1998, p.1187.
- Parcell, J. and K. Stiegert. "Spatial Competition for U.S. Hard Wheat Characteristics." Selected Paper. AAEA Annual Meetings, Toronto, Canada. Abstract in Amer. J. of Ag. Econ. 79(1997) p. 1721.

# KYLE W. STIEGERT

- Hamilton, S, and K. Stiegert. "Backwards Contracting and the Strategic Trade Implications of Antitrust." Selected Paper, AAEA Annual Meetings, Toronto, Canada. Abstract in the Amer. J. of Ag. Econ. 79(1997) p. 1712.
- Hill, H. and K. Stiegert. "Testing the Validity of Standard Representative Agent Import Demand Systems." Selected Paper, WAEA Annual Meetings, Reno, NV. July, 1997. Abstract in J. of Ag. and Resource Econ. 23(1997) 398.
- Stiegert, K, and J. P. Blanc, "Protein Quantity and Quality: A Characteristic Demand Analysis of Japanese Wheat Imports." Selected Paper, AAEA Annual Meetings, San Antonio, TX. Abstract in Amer. J. of Ag. Econ. 78(1996) pp.1395-1396.
- Stiegert, K. and T. Hertel. "Optimal Capacity in the Anhydrous Ammonia Industry." Selected Paper, AAEA Annual Meetings, San Antonio, TX. Abstract in Amer. J. of Ag. Econ. 78(1996) p. 1400.
- Featherstone, A, and Stiegert, K. "Dynamic Relationships in the Farm Sector Nitrogen Market." Selected Paper, AAEA Annual Meetings, Indianapolis, IN. Abstract in Amer. J. of Ag. Econ. 77(1995) p.1361.
- Hertel, T., K. Stiegert, and H. Vroomen, "Implications of Managerial Heterogeneity in Corn Production." Selected Paper, 1994 AAEA Annual Meetings, San Diego, CA. Abstract in the Amer. J. of Ag. Econ. 76(1994) p. 1265.
- Patterson, P., P. Abbott, and K. Stiegert. "Firm Level Competition in International Markets: The Impact of the Export Enhancement Program." Selected Paper, 1994 AAEA Annual Meetings, San Diego, CA. Abstract in Amer. J. of Ag. Econ. 76(1994) p.1248.
- Stiegert, K. and A. Azzam. "Market Power in the Beef Packing Industry." Selected Paper, AAEA Annual Meeting in Manhattan, KS. Abstract in Amer. J. of Ag. Econ. 73(1991) p.1549.
- Stiegert, K. and A. Azzam. "LDC Debt and Wheat Trade." Selected Paper, 1989 SAEA Annual Meetings, Nashville, TN.

***Extension and Outreach***

- January, 2011, Television interview (WKOW) to discuss strategies to lower personal food expenditures.
- December,2010 Presentation to the Joint USDOJ-USDA meetings on marketing margins in agriculture.
- March 2010. Radio interview for NPR on topic of local food, industrial organization, and the overall food system.
- December, 2009. Presentation to the USDA on the pricing of biotech seeds. Washington DC.
- September, 2009. Mayoral appointee, Fitchburg Ag and Rural Affairs Committee. Fitchburg WI.
- August, 2009.Presentation to the Organization for Competitive Markets on the pricing of biotech seeds. St. Louis, MO
- June, 2008, Presentation at the Korean National Cooperative Conference on the structure of U.S. food retailing. Seoul.
- Television interview: WKOW. Provided interview describing forces related to high food prices. Summer, 2007.

# KYLE W. STIEGERT

- March, 2007. Presentation to the World Bank. "Assessing the efficiency of competition related technical assistance." World Bank. Washington D. C.
- March, 2007. Presentation to the Inter-American Bank. "The effectiveness of technical assistance to emerging countries to address anti-competitive behavior." Washington, DC
- September, 2006. Presentation to the Federal Reserve Board of Chicago. Discussed food retailing topics and the emerging supercenter format." Chicago IL.
- May, 2006. Presentation to the International Competition Network on the efficiency of competition agencies and related technical assistance programs.
- October, 2005, Presentation to students and faculty at the Universidade Federal de Vinosa. Discussed the characteristics of high performing industries versus industries with market power. Viçosa, MG Brazil.
- January, 2005. Presentation of Food System Research Group Activities. Ag staffers from Kohl, Obey, CRS, and other offices. Washington, D.C.
- October, 2004 Panel member- Fitchburg planning commission-rural-urban affairs.
- Summer, 2004. Advisor to Fitchburg city council: rural-urban agricultural planning.
- February, 2004. Presentation of Food System Research Group Activities. Senator Herb Kohl Staff Member Campus Visit (Phil Karstens).
- December, 2003. Presentation to the International Agricultural Trade Research Consortium. Discussed the relevance of strategic trade issue on agricultural prices. San Antonio, TX.
- February, 2003. Presentation of Food System Research Group Activities. Senator Herb Kohl Staff Members Campus Visit (Ben Miller and Galen Fountain).
- August 2002. Presentation to the Organization for Competitive Markets on the tradeoff issues of cost efficiencies versus market power. Omaha, NE, August 16.
- April, 2002. Presentation of Food System Research Group Activities. Senator Herb Kohl Staff Members Campus Visit (Ben Miller and Galen Fountain).
- May 2001. Presentation to cereal scientists outlining the Canadian, U.S. and Australian Wheat Marketing Systems. Second International Wheat Quality Conference, Manhattan, KS.
- August 19, 1999. Presentation to cereal scientists on the strategic behavior of the Australian Wheat Board." Risk and Profitability Conference, Manhattan, KS.
- May, 1999. Radio interview with Eric Atkinson, KKSU radio, Manhattan, KS. discussing the U.S. international wheat gluten quota." Manhattan, KS.
- August 1998. Presentation to extension agents and producers on the marketing wheat in a quality-oriented system." Risk and Profitability Conference, Manhattan, KS.
- January, 1997. Radio interview with Eric Atkinson, KKSU radio, discussing how to value wheat protein in international markets." Manhattan, KS.
- May, 1996 (also in 1995). Presentation to grain industry experts on the marketing and pricing of world wheat." International Grains Program Annual Short Course. Manhattan, KS.
- November, 1995. Presentation to wheat industry experts on the pooling and pricing of U.S. hard winter wheat." Agri Expo Annual Meeting. Wichita, KS.
- February, 1995. Radio interview with Eric Atkinson, KKSU radio discussing marketing strategies for U.S. hard winter wheat." Manhattan, KS.

- March, 1995 Presentation to KAWG and the Kansas Wheat Commission on the pooling and pricing of hard winter wheat." Identity Preserved Marketing Meeting. Manhattan, KS.
- November, 1995 Presentation to the Kansas Wheat Commission on the pooling and pricing of hard winter wheat." Annual Board Meeting of the Kansas Wheat Commission. Wellington, KS

***Press releases, newsletters, issue sheets, and other correspondence***

- July 2010. New Zealand Institute for the Study of Competition and Regiulation (ISCR) Newsletter. "'Cottoning' on to the competitive consequences of genetic modification." Issue #32. Available at: http://www.iscr.org.nz/f584,16670/16670_ISCR_July_2010_2_.pdf
- March, 2009 FSRG press release. "Commercial Banking, Agriculture, and the Financial Crisis." Find at: http://www.aae.wisc.edu/fsrg/publications/press releases
- February, 2007. FSRG Issue Sheet #10. "Potato Demand in an Organic World." Find at: http://www.aae.wisc.edu/fsrg/publications/issue sheets
- February, 2007. FSRG Issue Sheet #8. "Impacts on Non-traditional Food Retailing Supercenters on Food Price Changes." Find at: http://www.aae.wisc.edu/fsrg/publications/issue sheets
- September, 2006. Summary findings of research on the effectiveness of TA service to antitrust agencies. Correspondence to Russel Damtoft, Federal Trade Commission.
- December, 2003. FSRG Press Release. "Is this the last time you will ever hear, 'Pork: the Other White Meat'?" Find at: http://www.aae.wisc.edu/fsrg/publications/press releases
- December, 2003. FSRG Issue Sheet #2. "The "Other White Meat": Was the pork checkoff worth it?" Find at: http://www.aae.wisc.edu/fsrg/publications/issue sheets.
- March, 1998. "Economics of Wheat Quality." in Ag Econ Agribusiness Report. Volume 1, 1998. Kansas State University. Manhattan, KS.
- July, 1997. Stiegert, Kyle, "Economics of Wheat Quality." in Wheat Gleanings. Kansas Association of Wheat Growers, Manhattan, KS.

**SERVICE**

***National Committees and Service***

- Mayoral appointee, Fitchburg committee for ag and rural affairs. (2009 - 2012)
- Member, Ind. Org. Society, Conference Planning Committee. (2009 to present)
- Editorial Board, J. of Agro-Food Ind. Org. (2005-2009)
- Chair, FSRG second biennial conference of industrial organization. (2005)
- Moderator, EARIE conference, Helsinki, September. (2003)
- Chair, FSRG first biennial conference of industrial organization. (2003)
- Selected paper session reviewer/moderator: AAEA Annual Meetings (94-98)
- Selected paper session reviewer/moderator: AAEA Annual Meetings (2000-2003)
- Selected paper session reviewer/moderator (1997)
- Ad Hoc Reviewer for markets and trade division of the USDA National Research Initiative. (1997, 1999-2002)

- Chair, USDA NC224 regional research committee on competitiveness in grain and oilseed sectors. (1999-2001)
- Chair, USDA NC186 regional committee. "Structural Change in Grain Marketing." (1998-1990)
- NRI. Panel Review Board, Markets and Trade Division (1998)
- Editor: economics section of the International Wheat Quality Conference (1997)
- Editorial Board Member for J Agricultural and Resource Economics. (1994-1997)
- Steering Committee Member for the National Wheat Research Center. Manhattan KS. (1996)
- NC186 regional committee member. "Structural Change in Grain Marketing." (1993-1997)
- Secretary NC186 regional committee "Structural Change in Grain Marketing." (1994-1997)

***<u>Reviewer for (reviews completed)</u>***

- USDA Monograph "Recent Developments in the U.S. Food Marketing System"
- Stock and Watson: Introduction to Econometrics
- NRI-USDA, Markets and Trade Division (36)
- American Journal of Agricultural Economics (17)
- Journal of Ag and Resource Economics (11)
- Review of Agricultural Economics (5)
- Canadian Journal of Ag Economics (3)
- Journal of Food Distribution Research (2)
- Journal of Agricultural Economics (1)
- Journal of Environmental and Economic Management (1)
- UW-Madison, Babcock Institute: Annual Proposal (3)
- European Journal of Agricultural Economics (1)
- Contemporary Economic Policy (1)
- Agricultural Economics (2)
- Agribusiness: An International Journal (4)
- AAEA Contributed Papers (26)
- WAEA Contributed Papers (14)

# APPENDIX – B

# APPENDIX B

**Pleadings and Legal Correspondence**
Plaintiffs' First Amended Complaint and Jury Demand, Morris et al v. Tyson Chicken Inc. et al, Civil Action No. 4:15-cv-77-m, United States District Court for Western District of Kentucky, Owensboro Division
Been v. O.K. Industries, Inc., 495 F.3d 1217 (10th Cir. 2007); Telecor Communications v. Southwestern Bell, 305 F.3d 1135, 1136, (10th Cir. 2002).
James vs Tyson Foods Inc. 2012 OK 21 Case Number: 109046

**Reports and Declarations**
Declaration of Nancy Butler

**Depositions**
Deposition and Exhibits of Dennis Clapp
Deposition and Exhibits of TLC Poultry
Deposition and Exhibits of David Mears
Deposition and Exhibits of Jim Leis
Deposition and Exhibits of Jared Shelton
Deposition and Exhibits of William Morgan Rickard
Deposition and Exhibits of Doug Brown
Deposition and Exhibits of Jennifer Heltsley
Deposition and Exhibits of Neil Barfield
Deposition and Exhibits of David Dickey
Deposition and Exhibits of Rubin Bruce
Deposition and Exhibits of Beau McGuire
Deposition and Exhibits of Jim Gottsponer
Deposition and Exhibits of Keith Crabtree
Deposition and Exhibits of John Pinkston
Deposition and Exhibits of Tim Vincent
Deposition and Exhibits of Mike Murphy
Deposition and Exhibits of Murphy Farms
Deposition and Exhibits of ICU Chicken
Deposition and Exhibits of Calvin Leisure
Deposition and Exhibits of Christopher Burch

**Bates-Stamped Documents**

**Grower Recap by Grower Sheets**

| | | | | |
|---|---|---|---|---|
| Tyson_01948242 | Tyson_01950190 | Tyson_01952679 | Tyson_00158736 | Tyson_00140118 |
| Tyson_00139684 | Tyson_01957061 | Tyson_01952760 | Tyson_00158775 | Tyson_01952379 |
| Tyson_01948319 | Tyson_01950232 | Tyson_01953038 | Tyson_00158814 | Tyson_00140057 |
| Tyson_01948346 | Tyson_01950261 | Tyson_01953123 | Tyson_00158893 | Tyson_01956944 |
| Tyson_01948362 | Tyson_01950343 | Tyson_01952821 | Tyson_00144939 | Tyson_01956949 |
| Tyson_01948394 | Tyson_01950361 | Tyson_00145354 | Tyson_00144902 | Tyson_01956935 |
| Tyson_01948377 | Tyson_00138437 | Tyson_01952959 | Tyson_00144862 | Tyson_01956662 |
| Tyson_01948424 | Tyson_00138566 | Tyson_01953099 | Tyson_00144828 | Tyson_01956953 |
| Tyson_01948443 | Tyson_00138649 | Tyson_01953668 | Tyson_00144802 | Tyson_01956680 |
| Tyson_01948491 | Tyson_01950423 | Tyson_00145358 | Tyson_00144773 | Tyson_01956688 |
| Tyson_01948531 | Tyson_00138780 | Tyson_01953178 | Tyson_00144740 | Tyson_01956671 |
| Tyson_01948546 | Tyson_00138664 | Tyson_00139741 | Tyson_00144708 | Tyson_01956683 |
| Tyson_01948570 | Tyson_00138721 | Tyson_01953485 | Tyson_00144674 | Tyson_01957022 |
| Tyson_01948585 | Tyson_00138844 | Tyson_00151486 | Tyson_00144641 | Tyson_01957008 |
| Tyson_01948638 | Tyson_01950519 | Tyson_01953549 | Tyson_00144610 | Tyson_01956666 |
| Tyson_01948665 | Tyson_00138885 | Tyson_01953630 | Tyson_00144586 | Tyson_01957018 |
| Tyson_01948698 | Tyson_00137408 | Tyson_00145360 | Tyson_00144576 | Tyson_01956841 |
| Tyson_01948725 | Tyson_00137348 | Tyson_00145364 | Tyson_00144515 | Tyson_01957020 |

| | | | | |
|---|---|---|---|---|
| Tyson_01948760 | Tyson_00137317 | Tyson_00145366 | Tyson_00166086 | Tyson_01956676 |
| Tyson_01948775 | Tyson_00137453 | Tyson_01953843 | Tyson_00144488 | Tyson_01956690 |
| Tyson_01948801 | Tyson_00137498 | Tyson_00145368 | Tyson_00144458 | Tyson_01956673 |
| Tyson_01948843 | Tyson_00137562 | Tyson_01953988 | Tyson_00144425 | Tyson_01956950 |
| Tyson_01948871 | Tyson_00137630 | Tyson_01953918 | Tyson_00144393 | Tyson_01956955 |
| Tyson_01948904 | Tyson_00137671 | Tyson_01954163 | Tyson_00144357 | Tyson_01957011 |
| Tyson_01948928 | Tyson_01950557 | Tyson_00143891 | Tyson_00144339 | Tyson_01957014 |
| Tyson_01948957 | Tyson_00137773 | Tyson_01954057 | Tyson_00144306 | Tyson_01956681 |
| Tyson_01948985 | Tyson_00137739 | Tyson_00151588 | Tyson_00144272 | Tyson_01956934 |
| Tyson_01948999 | Tyson_00137856 | Tyson_00145376 | Tyson_00144236 | Tyson_01956941 |
| Tyson_01949027 | Tyson_00138023 | Tyson_01954331 | Tyson_00144197 | Tyson_01956962 |
| Tyson_01949054 | Tyson_00137989 | Tyson_00145382 | Tyson_00144181 | Tyson_01956936 |
| Tyson_01949104 | Tyson_00137958 | Tyson_01954224 | Tyson_00144148 | Tyson_01956947 |
| Tyson_01949083 | Tyson_00137925 | Tyson_01954257 | Tyson_00144111 | Tyson_01956665 |
| Tyson_01949121 | Tyson_00137887 | Tyson_00145378 | Tyson_00144078 | Tyson_01956669 |
| Tyson_01949152 | Tyson_138226 | Tyson_00145384 | Tyson_00144048 | Tyson_01956839 |
| Tyson_01949233 | Tyson_00138172 | Tyson_00145386 | Tyson_00144016 | Tyson_01956964 |
| Tyson_01949263 | Tyson_00138243 | Tyson_00145388 | Tyson_00143982 | Tyson_01956682 |
| Tyson_01949248 | Tyson_00138276 | Tyson_00145392 | Tyson_00143947 | Tyson_01956942 |
| Tyson_01949290 | Tyson_00138309 | Tyson_00145394 | Tyson_00143910 | Tyson_01956933 |
| Tyson_01949315 | Tyson_00138345 | Tyson_00145398 | Tyson_00150151 | Tyson_01956685 |
| Tyson_01949357 | Tyson_01950593 | Tyson_00145400 | Tyson_00150101 | Tyson_01956939 |
| Tyson_01949341 | Tyson_01950625 | Tyson_00145402 | Tyson_00150021 | Tyson_01957027 |
| Tyson_01956659 | Tyson_00138380 | Tyson_01954971 | Tyson_00149922 | Tyson_01956946 |
| Tyson_01949390 | Tyson_01950728 | Tyson_00156702 | Tyson_00149829 | Tyson_01956956 |
| Tyson_01949404 | Tyson_01950658 | Tyson_00139833 | Tyson_00149659 | Tyson_01956840 |
| Tyson_01949424 | Tyson_01950696 | Tyson_00139800 | Tyson_00149594 | Tyson_01956963 |
| Tyson_01949441 | Tyson_01950753 | Tyson_00145498 | Tyson_00149544 | Tyson_01957026 |
| Tyson_01949470 | Tyson_01950778 | Tyson_00151791 | Tyson_00149446 | Tyson_01956932 |
| Tyson_01949498 | Tyson_01950849 | Tyson_00145535 | Tyson_00149387 | Tyson_01956937 |
| Tyson_01949527 | Tyson_01950816 | Tyson_00139874 | Tyson_00149322 | Tyson_01956664 |
| Tyson_01949567 | Tyson_01950882 | Tyson_00145564 | Tyson_00149241 | Tyson_01956675 |
| Tyson_01949583 | Tyson_01956661 | Tyson_00151945 | Tyson_00149192 | Tyson_01956954 |
| Tyson_01949616 | Tyson_01950971 | Tyson_00151958 | Tyson_00149066 | Tyson_01956686 |
| Tyson_01949633 | Tyson_01950907 | Tyson_00145572 | Tyson_00149004 | Tyson_01956961 |
| Tyson_01949655 | Tyson_01951161 | Tyson_00145584 | Tyson_00148922 | Tyson_01957016 |
| Tyson_01952591 | Tyson_01951014 | Tyson_00152480 | Tyson_00148870 | Tyson_01956667 |
| Tyson_01956672 | Tyson_00143861 | Tyson_00145605 | Tyson_00148794 | Tyson_01956663 |
| Tyson_01949692 | Tyson_01951176 | Tyson_00145586 | Tyson_00148732 | Tyson_01956960 |
| Tyson_01949720 | Tyson_01951239 | Tyson_00145588 | Tyson_00148679 | Tyson_01956958 |
| Tyson_01949741 | Tyson_00143863 | Tyson_00157301 | Tyson_00148619 | Tyson_01957017 |
| Tyson_01949781 | Tyson_01951357 | Tyson_00145590 | Tyson_00148550 | Tyson_01956689 |
| Tyson_01949796 | Tyson_00143874 | Tyson_00145592 | Tyson_00141908 | Tyson_01956943 |
| Tyson_01949815 | Tyson_01951295 | Tyson_00158288 | Tyson_00141830 | Tyson_01957021 |
| Tyson_01949832 | Tyson_1957062 | Tyson_00145594 | Tyson_00143634 | Tyson_01956952 |
| Tyson_01949859 | Tyson_01951455 | Tyson_00145596 | Tyson_00141683 | Tyson_01956940 |

| | | | | |
|---|---|---|---|---|
| Tyson_01949886 | Tyson_01951387 | Tyson_00157269 | Tyson_00141629 | Tyson_01956965 |
| Tyson_01949913 | Tyson_01951626 | Tyson_00157492 | Tyson_00141579 | Tyson_01956945 |
| Tyson_01949940 | Tyson_01951438 | Tyson_00145630 | Tyson_00141524 | Tyson_01956684 |
| Tyson_01949970 | Tyson_01951536 | Tyson_00157577 | Tyson_00141467 | Tyson_01957019 |
| Tyson_01949992 | Tyson_01951493 | Tyson_01955036 | Tyson_00141412 | Tyson_01956668 |
| Tyson_00167090 | Tyson_01951571 | Tyson_00145632 | Tyson_00139542 | Tyson_01956674 |
| Tyson_00167098 | Tyson_01951588 | Tyson_00158386 | Tyson_00139506 | Tyson_01957023 |
| Tyson_00136971 | Tyson_00145279 | Tyson_00157816 | Tyson_01952505 | Tyson_01957009 |
| Tyson_01950049 | Tyson_01951670 | Tyson_00157899 | Tyson_00139468 | Tyson_01956959 |
| Tyson_00136990 | Tyson_01951775 | Tyson_00158255 | Tyson_00139433 | Tyson_01957012 |
| Tyson_00137030 | Tyson_01951819 | Tyson_00143826 | Tyson_00139400 | Tyson_01957007 |
| Tyson_00137054 | Tyson_01951834 | Tyson_00159203 | Tyson_00139362 | Tyson_01957013 |
| Tyson_00137103 | Tyson_00145281 | Tyson_00143838 | Tyson_00139341 | Tyson_01956678 |
| Tyson_00137132 | Tyson_01951970 | Tyson_00159266 | Tyson_00139310 | Tyson_01956679 |
| Tyson_00137169 | Tyson_01951943 | Tyson_01952352 | Tyson_00140876 | Tyson_01956938 |
| Tyson_00137191 | Tyson_01952001 | Tyson_00143818 | Tyson_00140794 | Tyson_01957025 |
| Tyson_00137217 | Tyson_01952032 | Tyson_00158032 | Tyson_00140672 | Tyson_01956670 |
| Tyson_00137246 | Tyson_00145283 | Tyson_00143820 | Tyson_00140614 | Tyson_01956838 |
| Tyson_00137278 | Tyson_01952132 | Tyson_00159374 | Tyson_00140519 | Tyson_01956951 |
| Tyson_01950076 | Tyson_00145287 | Tyson_00159406 | Tyson_00140453 | Tyson_01957015 |
| Tyson_01957010 | Tyson_01952194 | Tyson_00143822 | Tyson_00140396 | Tyson_01956948 |
| Tyson_01956687 | Tyson_00139704 | Tyson_00143824 | Tyson_01952407 | Tyson_01957024 |
| Tyson_01950102 | Tyson_01952241 | Tyson_00145636 | Tyson_00140337 | Tyson_01956677 |
| Tyson_01950130 | Tyson_01952312 | Tyson_00159465 | Tyson_00140242 | Tyson_01956966 |
| Tyson_01950163 | Tyson_01952277 | Tyson_01952350 | Tyson_00140201 | Tyson_01956957 |

**Settlement Data**

Tyson 1957060

**Agri Stats – Broiler Bottomline Report Monthly Data**

| | | | | |
|---|---|---|---|---|
| Tyson_00172285 | Tyson_00324303 | Tyson_00592127 | Tyson_01018519 | Tyson_01497372 |
| Tyson_00186087 | Tyson_00339409 | Tyson_00608372 | Tyson_01023688 | Tyson_01528174 |
| Tyson_00202541 | Tyson_00354799 | Tyson_00624311 | Tyson_01064761 | Tyson_01544852 |
| Tyson_00218530 | Tyson_00370085 | Tyson_00640295 | Tyson_01115848 | Tyson_01584249 |
| Tyson_00232205 | Tyson_00385214 | Tyson_00656204 | Tyson_01142779 | Tyson_01615691 |
| Tyson_00247475 | Tyson_00400356 | Tyson_00675819 | Tyson_01157091 | Tyson_01643172 |
| Tyson_00272989 | Tyson_00415661 | Tyson_00686788 | Tyson_01195895 | Tyson_01674995 |
| Tyson_00288533 | Tyson_00431308 | Tyson_00720842 | Tyson_01221169 | Tyson_01702358 |
| Tyson_00294031 | Tyson_00447612 | Tyson_00746992 | Tyson_01246850 | Tyson_01717362 |
| Tyson_00308517 | Tyson_00463118 | Tyson_00776990 | Tyson_01276981 | Tyson_01757379 |
| Tyson_00314146. | Tyson_00479473 | Tyson_00806203 | Tyson_01307780 | Tyson_01787262 |
| Tyson_00314147. | Tyson_00494430 | Tyson_00836298 | Tyson_01322463 | Tyson_01814636 |
| Tyson_00314148. | Tyson_00510369 | Tyson_00865909 | Tyson_01363356 | Tyson_01843796 |
| Tyson_00314149. | Tyson_00526843 | Tyson_00895729 | Tyson_01374492 | Tyson_01871488 |
| Tyson_00314150. | Tyson_00543307 | Tyson_00928208 | Tyson_01406722 | Tyson_01894464 |
| Tyson_00314151. | Tyson_00560212 | Tyson_00958183 | Tyson_01446442 | Tyson_01935009 |
| Tyson_00314152. | Tyson_00576162 | Tyson_00987803 | Tyson_01473666 | |

**Agri Stats - Monthly Live Production General Run**

| | | | | |
|---|---|---|---|---|
| Tyson-00179926 | Tyson-00423777 | Tyson-00685101 | Tyson-01149386 | Tyson-01564189 |
| Tyson-00193301 | Tyson-00439716 | Tyson-00703938 | Tyson-01177225 | Tyson-01592930 |
| Tyson-00211137 | Tyson-00456431 | Tyson-00724658 | Tyson-01202431 | Tyson-01621632 |
| Tyson-00225917 | Tyson-00471553 | Tyson-00755220 | Tyson-01228949 | Tyson-01648915 |
| Tyson-00240378 | Tyson-00487918 | Tyson-00785632 | Tyson-01254679 | Tyson-01680325 |
| Tyson-00254991 | Tyson-00503869 | Tyson-00811591 | Tyson-01282881 | Tyson-01708960 |
| Tyson-00269833 | Tyson-00520411 | Tyson-00842309 | Tyson-01284002 | Tyson-01734400 |
| Tyson-00286849 | Tyson-00536120 | Tyson-00876366 | Tyson-01315416 | Tyson-01763740 |
| Tyson-00316991 | Tyson-00552955 | Tyson-00904008 | Tyson-01346510 | Tyson-01794280 |
| Tyson-00332069 | Tyson-00568644 | Tyson-00933676 | Tyson-01370448 | Tyson-01794843 |
| Tyson-00347403 | Tyson-00584654 | Tyson-00964545 | Tyson-01397777 | Tyson-01820026 |
| Tyson-00362680 | Tyson-00600686 | Tyson-00994362 | Tyson-01424754 | Tyson-01847943 |
| Tyson-00377784 | Tyson-00613491 | Tyson-01024744 | Tyson-01451511 | Tyson-01872569 |
| Tyson-00393012 | Tyson-00632843 | Tyson-01055941 | Tyson-01482395 | Tyson-01902755 |
| Tyson-00407900 | Tyson-00647643 | Tyson-01085363 | Tyson-01505995 | Tyson-01940628 |
| Tyson-00414510 | Tyson-00668259 | Tyson-01121397 | Tyson-01533392 | Tyson-00301977 |

**Broiler Production Contracts**

| | | | | |
|---|---|---|---|---|
| Tyson-01956691 | Tyson-01956808 | Tyson-01956979 | Tyson-01956995 | Tyson-00167535 |
| Tyson-01956691 | Tyson-01956823 | Tyson-01956981 | Tyson-01956997 | Tyson-00167625 |
| Tyson-01956702 | Tyson-01956967 | Tyson-01956983 | Tyson-01956999 | Tyson-00167640 |
| Tyson-01956717 | Tyson-01956969 | Tyson-01956985 | Tyson-01957001 | Tyson-00167655 |
| Tyson-01956732 | Tyson-01956971 | Tyson-01956987 | Tyson-01957003 | |
| Tyson-01956747 | Tyson-01956973 | Tyson-01956989 | Tyson-01957005 | |
| Tyson-01956782 | Tyson-01956975 | Tyson-01956991 | Tyson-00167520 | |
| Tyson-01956793 | Tyson-01956977 | Tyson-01956993 | Tyson-00167520 | |

**Additional Data Produced In The Litigation**

**Broiler Production Contracts**

Broiler Production Contract (Robards) between Tyson Chicken and Calvin Leisure Jr. (5171)
Broiler Production Contract (Robards) between Tyson Chicken and Morvatt Enterprises. LLC (5157)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Murphy Farms LLC. (5148)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Christopher Burch (5136)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Douglas R. Brown (5032)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Dennis Clapp (5081)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Keith Crabtree (5192) K&C
Broiler Production Contract (Robards) between Tyson Chicken Inc, and John Pinkston (5177)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Loi Moc Hong (5210) H&L
Broiler Production Contract (Robards) between Tyson Chicken Inc, and Timothy E.Vincent TLC (5172)
Broiler Production Contract (Robards) between Tyson Chicken Inc, and William M. Rickard (5174) SMR

**Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories**

(0042) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Calvin Leisure
(0045) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Charles Morris
(0048) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff John Pinkston
(0051) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Tim Vincent
(0054) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Christopher Burch
(0057) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Dennis Clapp
(0060) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Loi Hong
(0063) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Doug Brown
(0066) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Keith Crabtree
(0069) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Mike Murphy

(0072) Plaintiff's Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiffs Morgan Rickard and Sondra Rickard

**Additional Communications**

Interview with Charles Morris, April 22, 2019.
Phone Interview with Charles Morris, April 22, 2019

**Websites**

https://nationalaglawcenter.org/overview/packers-and-stockyards/
https://www.growwithtyson.com/chicken-production-process/
https://www.tysonfoods.com/sites/default/files/2018-09/Tyson%20Foods%20Major%20Locations.pdf
https://www.meatpoultry.com/articles/15559-tyson-foods-to-add-jobs-at-kentucky-poultry-plant
https://www.tysonfoods.com/who-we-are/our-partners/farmers/prospective-farmers
https://www.ers.usda.gov/amber-waves/2014/august/financial-risks-and-incomes-in-contract-broiler-production/
https://www.nationalchickencouncil.org/about-the-industry/history/
https://www.ehstoday.com/news/ehs_imp_32655
https://www.cobb-vantress.com/about-cobb/career-profiles/our-history
https://www.agristats.com/history
https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged
https://web.archive.org/web/20050311104802/http://www.tysonfoodsinc.com:80/corporate/info/growersFAQ.asp
https://www.google.com/maps/dir/Pilgrim's+Pride+Corporation,+1195+Macedonia+St,+Mayfield,+KY+42066,+United+States/Tyson+Poultry,+U.S.+41,+Robards,+KY,+USA/@37.151296,-88.6138995,9z/data=!4m13!4m12!1m5!1m1!1s0x887a2e502f1049fb:0x9541ca27b3d5a74d!2m2!1d-88.66313!2d36.7228027!1m5!1m1!1s0x886fdf998d8478c7:0x568533161873f499!2m2!1d-87.5200959!2d37.6543176
https://www.google.com/maps/dir/Pilgrim's+Pride+Corporation,+Eastpoint+Centre+Drive,+Louisville,+Kentucky,+USA/Robards,+KY,+USA/@37.8658763,-87.0990496,9z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x8869992f71e1dd61:0x3d2380b909fee76d!2m2!1d-85.510623!2d38.28031!1m5!1m1!1s0x886fdf5e1112322b:0x7cd10056e74421ed!2m2!1d-87.5466747!2d37.6739325
https://www.tysonfoods.com/who-we-are/our-partners/farmers/contract-poultry-farming/contract-poultry-farmers-bill-rights
https://newsok.com/article/3451162/jury-orders-tyson-to-pay-73m-to-chicken-growers
https://www.usinflationcalculator.com/inflation/consumer-price-index-and-annual-percent-changes-from-1913-to-2008/
https://ir.tyson.com/reports/annual-reports/default.aspxt

**Publications**

Hovenkamp, Herbert J. (2011). "Does the Packers and Stockyards Act Require Antitrust Harm?". Faculty Scholarship. 1862.
Weaver, Marin. Poultry. (January 2014). "Industry and Trade Summary" Publication ITS-10. Washington, DC: U.S. International Trade Commission.
Doye,D.G. Freking B., Payne J. (2006) "Broiler Production: Consideration for Poultry Growers", Oklahoma State University, Extension Facts, CES, Division of Agricultural Science and Natural Resources.
MacDonald, James M. (June 2014). "Technology, Organization, and Financial Performance in U.S. Broiler Production", EIB-126, U.S. Department of Agriculture, Economic Research Service.
University of Maryland (October 2017). "Broiler Production. Management for Potential and Existing Growers." Extension Bulletin, EB-431.
C. Robert Taylor and David A. Domina. (2010). "Restoring Economic Health to Contract Poultry Production"
Dr. Tom Tabler, Jessica Wells, and Dr. Morgan Farnell. (2014). "Potential Contract Growers Face Important Decisions". Extension Service of Mississippi State University.
Domina, D. A., & Taylor, C. R. (2009). "The Debilitating Effects of Concentration in Markets Affecting Agriculture" Drake Journal of Agricultural Law, 15(1), 61–108.
Daryll E. Ray (2010), "Poultry growers air complaint," Article Number 514, Agricultural Policy Analysis Center, The University of Tennessee.
Pew Charitable Trusts (2008). "Putting Meat on the Table: Industrial Farm Animal Production in America," A Report of the Pew Commission on Industrial Farm Animal Production, The Pew Charitable Trusts and John Hopkins Bloomberg School of Public Health.

Vukina, T. and P. Leegomonchai. (2006). “Oligopsony Power, Asset Specificity and Hold-Up: Evidence from the Broiler Industry.” American Journal of Agricultural Economics, Vol. 88 (3), (August): 589-605.
MacDonald, James M. (June 2008), “The Economic Organization of U.S. Broiler Production”, Economic Information Bulletin No. 38. Economic Research Service, U.S. Dept. of Agriculture.
Tsoulouhas and Vukina (2000) Regulating Broiler Contracts: Tournaments versus Fixed Performance Standards.
Olnood C.G. et al (2009). “Effects of novel probiotic on growth performance and microbial composition of broiler chickens with Salmonella sofia challenge.”
Hjelm C. (2018) “Identifying Factors of Importance for Chick Quality and Traits that may Predict Chick Quality.”
Leegomonchai P. and Vukina T. (2005). “Dynamic Incentives and Agent Discrimination in Broiler Production Tournaments.”
Shim et al, (2012). “Strain and sex effects on growth performance and carcass traits of contemporary broiler crosses.” Poultry Science. 91:2942-2948.
Blair and Harrison, (1991) “Antitrust Policy and Monopsony”, 76 Cornell L. Rev. 297.
OECD, (2008) “Monopsony and Buyer Power” (2008). DAF/COMP 38, at 19-20.
MacDonald, J.M. and Key N. (2012) “Market Power in Poultry Production Contracting? Evidence from a Farm Survey”. Journal of Agricultural and Applied Economics, 44,4(November 2012):477–490.
U.S. Department of Justice, (May 2012), Competition and Agriculture: Voices from the Workshops on Agriculture and Antitrust Enforcement in our 21st Century Economy and Thoughts on the Way Forward
Horizontal Merger Guidelines (19 August 2010), US DOJ and FTC.
United States v. Cargill, Inc., No. 1:99CV01875 (D.D.C. July 8, 1999).
MacDonald James M. and Korb P. (May 2006) “Duration in Production Contracts” Economic Research Service, US Department of Agriculture.
James M. MacDonald and Penni Korb (July 23-26, 2006) “Duration in Production Contracts,” paper presented at the American Agricultural Economics Association Annual meeting, Long Beach, CA.
Kathleen Hynes (1993). “Summary Report on the 1993 Tyson Grower Survey.”
Ansong-Danquah J, (January/February 1987). “A Survey of Carcass Condemnation at a Poultry Abattoir and its Application to Disease Management” Veterinary Inspection Directorate, Food Production and Inspection Branch, Agriculture Canada, Can Vet J Volume 28, Nos. 1-2.
OECD (2011), “Quantification of Harm to Competition by National Courts and Competition Agencies” DAF/COMP (2011)25.
OECD, (2012) "Market Definition" DAF/COMP (2012)19, p. 11, Available at http://www.oecd.org/daf/competition/Marketdefinition2012.pdf.
WATT Poultry USA. (March 2018).
Tyson Foods Fiscal Factbook. (2017).
Tyson Foods Inc, 2010 Annual Report on Form 10-K.
Tyson Foods Inc, 2011 Annual Report on Form 10-K.
Tyson Foods Inc, 2012 Annual Report on Form 10-K.
Tyson Foods Inc, 2013 Annual Report on Form 10-K.
Tyson Foods Inc, 2014 Annual Report on Form 10-K.
Tyson Foods Inc, 2015 Annual Report on Form 10-K.
Tyson Foods Inc, 2016 Annual Report on Form 10-K.
Tyson Foods Inc, 2017 Annual Report on Form 10-K.
Tyson Foods Inc, 2018 Annual Report on Form 10-K.

# APPENDIX – C

# APPENDIX C

## Table 1: Share of Variable Operating Costs to Grower Revenues

| | | Average Profitability for Six Houses [1] | Share of Variable Operating Costs to Grower Revenues |
|---|---|---|---|
| Total Receipts | | $321,120 | |
| Variable Operating Costs | | | |
| Fuel | $30,000 | | 9.3% |
| Litter or Shavings | $1,980 | | 0.6% |
| Litter Clean-out | $3,300 | | 1.0% |
| Utilities with Rural Water | $5,940 | | 1.8% |
| Total | | $41,220 | 12.84% |

Notes:
[1] Figures in the table are from Table 2: Sample Broiler Budget [100% financed - 24,100 Bird Broiler Bilding (43 feet x 510 feet)], in "Broiler Production: Considerations for Potential Growers," (2010) prepared by Damona Doye, Brian Freking, Josh Payne, and, Shannon Ferrell at Oklahoma Cooperative Extension Service, Oklahoma State University

**Table 2: Interest Calculations for Suppression of Grower Pay**

| Year | Interest Rate | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Damages | | $231,598 | ($1,254,919) | $86,308 | $930,677 | $1,340,933 | $2,357,623 | $2,973,238 | $2,886,403 | $1,189,984 |
| 2011 | 8% | $18,528 | | | | | | | | |
| 2012 | 8% | $18,528 | -$100,394 | | | | | | | |
| 2013 | 8% | $18,528 | -$100,394 | $6,905 | | | | | | |
| 2014 | 8% | $18,528 | -$100,394 | $6,905 | $74,454 | | | | | |
| 2015 | 8% | $18,528 | -$100,394 | $6,905 | $74,454 | $107,275 | | | | |
| 2016 | 8% | $18,528 | -$100,394 | $6,905 | $74,454 | $107,275 | $188,610 | | | |
| Jan to Mar 15 2017 | 8% | $3,756 | -$20,354 | $1,400 | $15,095 | $21,749 | $38,239 | $48,223 | | |
| Mar 16 to Dec 2017 | 6% | $11,079 | -$60,030 | $4,129 | $44,519 | $64,144 | $112,778 | $142,227 | | |
| 2018 | 6% | $13,896 | -$75,295 | $5,178 | $55,841 | $80,456 | $141,457 | $178,394 | $173,184 | |
| Until Jun 2019 | 6% | $6,948 | -$37,648 | $2,589 | $27,920 | $40,228 | $70,729 | $89,197 | $86,592 | $35,700 |
| Interest Accrued | | $146,846 | ($695,294) | $40,915 | $366,738 | $421,126 | $551,813 | $458,042 | $259,776 | $35,700 |
| Total Interest Accrued | | | | | | | | | | $1,585,661 |

Note
[1] From Jan to Mar 15 2017, the interest rate is assumed as 8%
[2] From Mar 16 to Dec 2017, the interest rate is assumed as 6%

**Table 3: Interest Calculations for Condemnation at 50% Weight**

| Year | Interest Rate | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Damages | | $96 | $4,798 | $20,537 | $32,070 | $45,213 | $45,466 | $40,396 | $32,686 | $7,841 |
| 2011 | 8% | $8 | | | | | | | | |
| 2012 | 8% | $8 | $384 | | | | | | | |
| 2013 | 8% | $8 | $384 | $1,643 | | | | | | |
| 2014 | 8% | $8 | $384 | $1,643 | $2,566 | | | | | |
| 2015 | 8% | $8 | $384 | $1,643 | $2,566 | $3,617 | | | | |
| 2016 | 8% | $8 | $384 | $1,643 | $2,566 | $3,617 | $3,637 | | | |
| Jan to Mar 15 2017 | 8% | $2 | $78 | $333 | $520 | $733 | $737 | $655 | | |
| Mar 16 to Dec 2017 | 6% | $5 | $229 | $982 | $1,534 | $2,163 | $2,175 | $1,932 | | |
| 2018 | 6% | $6 | $288 | $1,232 | $1,924 | $2,713 | $2,728 | $2,424 | $1,961 | |
| Until Jun 2019 | 6% | $3 | $144 | $616 | $962 | $1,356 | $1,364 | $1,212 | $981 | $235 |
| Interest Accrued | | $61 | $2,658 | $9,736 | $12,637 | $14,199 | $10,642 | $6,223 | $2,942 | $235 |
| Total Interest Accrued | | | | | | | | | | $59,333 |

Note
[1] From Jan to Mar 15 2017, the interest rate is assumed as 8%
[2] From Mar 16 to Dec 2017, the interest rate is assumed as 6%

**Table 4: Interest Calculations - Pay for Condemnation**

| Year | Interest Rate | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Damages | | $2,398 | $4,151 | $8,149 | $26,090 | $22,783 | $35,489 | $19,942 | $12,857 | $3,443 |
| 2011 | 8% | $192 | | | | | | | | |
| 2012 | 8% | $192 | $332 | | | | | | | |
| 2013 | 8% | $192 | $332 | $652 | | | | | | |
| 2014 | 8% | $192 | $332 | $652 | $2,087 | | | | | |
| 2015 | 8% | $192 | $332 | $652 | $2,087 | $1,823 | | | | |
| 2016 | 8% | $192 | $332 | $652 | $2,087 | $1,823 | $2,839 | | | |
| Jan to Mar 15 2017 | 8% | $39 | $67 | $132 | $423 | $370 | $576 | $323 | | |
| Mar 16 to Dec 2017 | 6% | $115 | $199 | $390 | $1,248 | $1,090 | $1,698 | $954 | | |
| 2018 | 6% | $144 | $249 | $489 | $1,565 | $1,367 | $2,129 | $1,197 | $771 | |
| Until Jun 2019 | 6% | $72 | $125 | $244 | $783 | $684 | $1,065 | $598 | $386 | $103 |
| Interest Accrued | | $1,521 | $2,300 | $3,863 | $10,281 | $7,155 | $8,306 | $3,072 | $1,157 | $103 |
| Total Interest Accrued | | | | | | | | | | $37,759 |

Note
[1] From Jan to Mar 15 2017, the interest rate is assumed as 8%
[2] From Mar 16 to Dec 2017, the interest rate is assumed as 6%

**Table 5: Interest Calculations for Days Out Analysis**

| Year | Interest Rate | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Damages | | $8,761 | $163,116 | $508,194 | $335,734 | $436,001 | $220,066 | $274,809 | $299,911 | $400,786 |
| 2011 | 8% | $701 | | | | | | | | |
| 2012 | 8% | $701 | $13,049 | | | | | | | |
| 2013 | 8% | $701 | $13,049 | $40,656 | | | | | | |
| 2014 | 8% | $701 | $13,049 | $40,656 | $26,859 | | | | | |
| 2015 | 8% | $701 | $13,049 | $40,656 | $26,859 | $34,880 | | | | |
| 2016 | 8% | $701 | $13,049 | $40,656 | $26,859 | $34,880 | $17,605 | | | |
| Jan to Mar 15 2017 | 8% | $142 | $2,646 | $8,242 | $5,445 | $7,072 | $3,569 | $4,457 | | |
| Mar 16 to Dec 2017 | 6% | $419 | $7,803 | $24,310 | $16,060 | $20,856 | $10,527 | $13,146 | | |
| 2018 | 6% | $526 | $9,787 | $30,492 | $20,144 | $26,160 | $13,204 | $16,489 | $17,995 | |
| Until Jun 2019 | 6% | $263 | $4,893 | $15,246 | $10,072 | $13,080 | $6,602 | $8,244 | $8,997 | $12,024 |
| Interest Accrued | | $5,555 | $90,375 | $240,912 | $132,298 | $136,928 | $51,508 | $42,336 | $26,992 | $12,024 |
| Total Interest Accrued | | | | | | | | | | $738,927 |

Note
[1] From Jan to Mar 15 2017, the interest rate is assumed as 8%
[2] From Mar 16 to Dec 2017, the interest rate is assumed as 6%

# APPENDIX – D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | |
|---|---|
| CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE | |
| Plaintiffs, | Civil Action No. 4:15-cv-77-m |
| v. | |
| TYSON CHICKEN, INC., et al. | Judge: Honorable Joseph H. McKinley |
| Defendants. | |

**DECLARATION OF NANCY BUTLER**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1. My name is Nancy Butler.

2. I currently own, operate and do business as Evans Butler Poultry in McLean County, Kentucky. I have been a contract broiler grower with Perdue Farms, Inc. ("Perdue") since 1996. My farm is serviced by the Perdue hatchery and processing plant in Ohio County, Kentucky and the Perdue feed mill in McLean County, Kentucky. The area grow-out (administration) office is located in Beaver Dam, Ohio County, Kentucky.

3. Based on my more than two decades growing chickens for Perdue, the Perdue complex in my part of Kentucky has only rarely formed contracts with growers who previously

grew for Tyson to grow chickens for Perdue, and to my knowledge it has not accepted any growers who previously grew for Tyson in the last three years.

4. Moreover, Perdue has informed its current growers, including me, that it is changing the production methods it will require for growers in this area of Kentucky who work with this complex; in fact it will require these new production methods for all growers in this part of the United States.

5. Perdue has informed growers, including me, that it is transitioning to only producing "free range" broiler chickens in this part of the United States (including my complex), with the goal in the near future that it will only produce "organic" broiler chickens in this part of the United States (including my complex).

6. Perdue has provided its current growers in my area with commercials, pictures, and videos describing the transition.

7. I am aware that the Tyson, Robards complex only produces broiler chickens in the conventional manner, meaning they are not free range or organic.

8. Therefore, under Perdue's stated plans, Tyson would be the only integrator in my area for which caring for broilers in the conventional manner could work.

9. I declare under Penalty of perjury that the foregoing statement is true and correct.

Executed this 13 day of June, 2018 in Madisonville, Kentucky.

Nancy Butler

Nancy Butler

STATE OF KENTUCKY

COUNTY OF HOPKINS

The foregoing instrument was subscribed, sworn, and acknowledged before me this the 13 day of June, 2019 by Nancy Butler to be her free act in due form of law.

Amy Fox
Notary Public
State at Large
My commission expires: 11/14/21
Notary Number: 590148