# EXHIBIT 23

# Expert Reply Report of Dr. Stiegert

# (Redacted Pursuant to Order DN 218)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | |
|---|---|
| **CHARLES MORRIS, MORVATT ENTERPRISES, LLC, WILLIAM RICKARD, SONDRA RICKARD, RICKARD FARMS, LLC, ICU CHICKENS, LLC, WISHBONE POULTRY, DENNIS CLAPP, JOHN PINKSTON, LOI HONG, H & L FARMS, LLC, DOUG BROWN, TIM VINCENT, TLC POULTRY, LLC, POULTRY SPECIALTY SERVICE, LLC, KEITH CRABTREE, CHRISTOPHER BURCH, MIKE MURPHY, MURPHY FARMS, LLC, and CALVIN LEISURE** | **Civil Action No. 4:15-cv-77-m** |
| **Plaintiffs,** | **SUPPLEMENTAL DECLARATION OF KYLE STIEGERT IN SUPPORT OF PLAINTIFFS' RULE 26(a)(2) EXPERT DISCLOSURES** |
| **v.** | |
| **TYSON CHICKEN, INC., ET AL.** | |
| **Defendants.** | |

# Table of Contents


I. INTRODUCTION ..... 1

A. Summary of Allegations ..... 1

B. Assignment ..... 2

C. Summary of Conclusions ..... 2

II. TYSON HAD MONOPSONY POWER IN THE ROBARDS COMPLEX MARKET ..... 5

A. The Robards Complex Is a Relevant Antitrust Market ..... 6

i. Inelasticity of Grower Services Supply ..... 8

ii. Professor Thurman's Assumptions Concerning Labor Market Substitutes for Grower Services Are Inaccurate and Unfounded ..... 9

iii. Professor Thurman's Proposed Alternate Capital Investments are not Relevant to the Market at Issue ..... 10

B. Perdue Farms Is Not in The Relevant Market with Tyson ..... 11

III. TYSON EXERCISED ITS MONOPSONY POWER IN THE ROBARDS COMPLEX MARKET IN A MANNER DETRIMENTAL TO GROWERS ..... 14

A. Tyson Controlled Performance of Growers by Controlling the Quality of Inputs ..... 16

i. Dr. Elam ..... 16

ii. Dr. Lacy ..... 23

iii. Professor Thurman ..... 23

B. Tyson's Exercise of Monopsony Power in the Robards Complex Artificially Lowers Grower's Pay ..... 25

i. Professor Thurman's "Direct" Analysis is Insufficient ..... 26

ii. Professor Thurman Limited Quantity Analysis is Not Persuasive ..... 30

iii. Defendant's Experts' Claims Concerning the Viability of Chicken Growing Do Not Refute Tyson's Exercise of Monopsony Power ..... 32

C. Defendant's Experts Misrepresent the Incentive Structure and Risk Protection Provided by the Tournament System ..... 34

i. Defendant's Experts Mischaracterize the Limited "Risk Protection" Growers Receive ..... 35

ii. Growers Face High Pay Volatility ..... 36

iii. The Tournament Structure Benefits Tyson ..... 40

IV. PLAINTIFFS SUFFERED DAMAGES AS A RESULT OF TYSON'S EXERCISE OF MONOPSONY POWER IN THE ROBARDS COMPLEX MARKET ..... 42

A. Suppression of Grower Pay ..... 42

B. Condemnation ..... 45

C. Days Out ..... 46

## Tables and Figures

Table 1. Comparison of Volatility Between Base Pay and NPV Across All Growers ............................... 39

Table 2. Comparison of Volatility Between Base Pay and NPV for Each Plaintiff .................................. 40

Figure 1. Robards Grower Pay Comparison ............................................................................................ 30

Figure 2. Comparison of Average Base Pay Per Pound of Plaintiff Calvin Leisure to Average Base Pay Per Pound of All Growers ........................................................................................................ 38

Figure 3. Comparison of Average Base Pay Per Pound of Plaintiff Charles Morris to Average Base Pay Per Pound of All Growers ........................................................................................................ 38

# I. INTRODUCTION

1. I submitted my expert opinion ("Stiegert Declaration") on behalf of the Counsel for Plaintiffs on July 15, 2019.[1] The Stiegert Declaration details my background and qualifications including my education, professional experience as an economist, publications, and affiliations. My current CV can be found in Appendix A to this reply report.

2. The Stiegert Declaration also details Plaintiffs' allegations as well as my assignment and testimony concerning this matter as of July 15, 2019. I have summarized these for reference below.

## A. Summary of Allegations

3. The Plaintiffs allege in their First Amended Complaint that Tyson Chicken, Inc. ("Tyson") has monopsony power in the relevant market that comprises the vicinity of the Tyson Robards Complex and that Tyson used this monopsony power to (i) decrease the volume of chicken meat by delaying services or providing inadequate services, (ii) fail to pay for condemned birds that are sent to dog food processing plants, (iii) fail to provide the promised veterinary care services and antibiotics to certain Plaintiffs while doing so for other growers, (iv) provide Plaintiffs with lower quality chicks, (v) fail to accurately record Plaintiffs' production and costs while charging them for services that it did not provide, and, (vi) force the Plaintiffs to upgrade their facilities.[2]

4. In addition, the Plaintiffs allege that Tyson engaged in unfair, unjust and discriminatory or deceptive practices; breached contracts; perpetrated fraud by concealing material information; and made false representations to Plaintiffs inducing them to enter into the agreements by falsely assuring them of reasonable returns and other incentives.

---

[1]Declaration of Kyle Stiegert, *Morris et al v. Tyson Chicken Inc. et al*, Civil Action No. 4:15-cv-77-m, United States District Court for the Western District of Kentucky, Owensboro Division filed July 15, 2019 (hereafter "Stiegert Declaration").

[2] Plaintiffs' First Amended Complaint and Jury Demand, *Morris et al v. Tyson Chicken Inc. et al*, Civil Action No. 4:15-cv-77-m, United States District Court for Western District of Kentucky, Owensboro Division, filed July 30, 2015 ("*Complaint*"), p. 2.

### B. Assignment

5. For the Stiegert Declaration, I was asked by Plaintiffs' Counsel to determine whether the actions by Tyson uncovered during this case likely adversely affected competition during the relevant time period (April 24, 2010 to March 2, 2019) and to assess damages arising from Tyson's application of its production contract with the Plaintiffs and its tournament or ranking system over the course of the relevant time period. I provide a summary of my findings below.

6. Since preparing the Stiegert Declaration, I have been asked to review the reports prepared by Dr. Thomas Elam ("Elam Report"), Dr. Walter Thurman ("Thurman Report"), Jason Anderson ("Anderson Report"), and Dr. Michael Lacy ("Lacy Report"), filed on August 30, 2019. In their reports, Defendants' experts seek to rebut a number the conclusions I reached in the Stiegert Declaration. Plaintiffs' Counsel have asked me to review the Defendant's reports and determine whether any of their opinions affect my conclusions. I have also been asked to prepare this supplemental report responding to the Defendant's reports.

7. All the documents, materials, and sources of information I have reviewed and/or relied upon for the formation of my opinions in this matter are cited in this report and listed in Appendix B. I am paid $400/hour for my time committed to this assignment.

### C. Summary of Conclusions

8. In the Stiegert Declaration I concluded that Tyson's actions have harmed competition. This conclusion was based on the following findings:

(i) The Robards complex is a relevant market for the purchase of chicken growing services;

(ii) Tyson exercises monopsony power over the chicken growers it contracts within the Robards complex;

(iii) Tyson required Plaintiffs to make non-salvageable investments and upgrades that further enhanced its monopsony power;

(iv) Tyson used its monopsony power to control the supply of chicks with the view to control the supply of chicken meat;

(v) Tyson implements the tournament in a manner that results in artificially low and volatile pay leading to competitive harm in the Robards Complex market for grower services. Absent Tyson's monopsony power at the Robards Complex, Tyson would likely not have been able to maintain its tournament structure without compensating its growers with higher base pay; and

(vi) Mainstream economic theory establishes that the exercise of monopsony power, such as Tyson's exercise of monopsony power at the Robards Complex, is likely to cause harm to competition. Tyson's exercise of monopsony power artificially lowers pay for growers. This has the effect of depressing the supply of chicken by either completely driving growers from the market or preventing growers from expanding output. Not only does this harm the upstream market for growing services but it can also result in reduced output and higher prices of chicken in the downstream consumer market.

9. I also calculated damages to Plaintiffs as a result of Tyson's anticompetitive conduct based on (a) the suppression of grower pay per pound grown; (b) the reduction in pounds grown based on flocks being spaced out longer than projected (i.e., higher "days-out"); and (c) Tyson's policies regarding condemnation. My conclusions regarding damages for each of these three categories are as follows:

(i) My estimate of the effect of Tyson's suppression of grower pay per pound for all Plaintiffs is $10.74 million not including prejudgment interest and $12.33 million after adding prejudgment interest;

(ii) Based on the assumption that the days-out should have averaged 12 in the summer months and 17.5 in the winter months, Plaintiffs incurred $2.77 million of damages not including prejudgment interest and $3.51 million after adding prejudgment interest;

(iii) The effect of Tyson's policies on condemnation reduced grower pay by $366,088 not including prejudgment interest and $463,180 after adding for prejudgment interest;

(iv) The total damages amount to $13.88 million not including prejudgment interest and $16.30 million after adding prejudgment interest; and

(v) The total damages not including prejudgement interest amount to approximately 32% of total grower pay from 2010 through 2018.

10. Regarding my current assignment, I have read carefully the Elam Report, Thurman Report, Anderson Report, and Lacy Report. I have considered their opinions and nothing in their reports causes me to change my conclusions. That is, I continue to conclude that Tyson's actions have harmed competition and that the damage estimates that I put forth in the Stiegert Declaration are appropriate and reliable estimates of the harm suffered by Plaintiffs.

11. The central allegation of the Plaintiffs is that Tyson at the Robards Complex exercised its market (monopsony) power to institute a mechanism to determine grower pay that was unfair and that had the effect of underpaying them. Therefore, the key questions that one should ask, and which I answered in my initial report, are the following:

(i) Did Tyson have monopsony power at Robards?

(ii) Did Tyson exercise its monopsony power at Robards in the way it implemented the tournament system and by the amount that it compensated growers?

(iii) If Tyson exercised its monopsony power, how much did it affect the compensation that growers received?

12. Defendant's experts have failed to address any of these questions in a meaningful manner and have instead resorted to mischaracterizing my report and obfuscating the facts. Specifically, they have:

(i) Failed to define the relevant market, and their faulty arguments rebutting my market definition demonstrate their lack of understanding concerning relevant economic market definition;

(ii) Ignored the importance of growers having control over inputs that are critical to their success in the tournament, and instead present faulty

analysis to assert that differences in chick sex and breed, service technicians, hen age, do not affect performance; and

(iii) Failed to present alternate calculations or methodologies to show that the Plaintiffs did not suffer damages as a result of Tyson's exercise of monopsony power in the Robards Complex market, and merely state that my methodology is wrong without providing any justification.

13. In the following sections of this report, I show how the Defendant's experts have failed to address the key questions and I respond to their specific arguments. I have focused on refuting the main arguments posed by Defendant's experts. As such this rebuttal is not entirely comprehensive and to the extent I do not address specific arguments made by Defendant's experts it does not indicate that I agree with their assumptions, analyses, and/or conclusions.

## II. TYSON HAD MONOPSONY POWER IN THE ROBARDS COMPLEX MARKET

14. I explain in detail in the Stiegert Declaration that the relevant market consists of grower services in the 50-mile radius of Tyson's Robards Complex with the exception of Perdue Farms' Livermore facility; why the Perdue Farms' Livermore facility is not within the relevant market for this matter; and how Tyson has been able to further enhance its monopsony power over growers within the relevant market. None of the Defendant's experts define a relevant market. Professor Thurman focuses his analysis on what he considers to be evidence that Tyson did not have monopsony power and implicitly argues that the relevant market for the services of the growers is broader than just grower services because the growers could substitute their labor and capital to other industries.[3] Further, Professor Thurman mischaracterizes my conclusions concerning monopsony power when he states that I define it as "the ability of a buyer of a good or service to set prices or contract terms due to there being no other buyer within a relevant market."[4] As I explain in

[3] Thurman Report, pp. 14 - 15.
[4] Thurman Report, ¶ 23.

the same section which Professor Thurman cites, "It is possible for a firm to have monopsony power even if it is not the only buyer for a product located in a geographic area."[5]

15. I explain below why Professor Thurman's analysis does not provide any real insight into the definition of a relevant market and falls short of challenging Tyson's monopsony power in the Robard's Complex market for grower services.

**A. The Robards Complex Is a Relevant Antitrust Market**

16. In the Stiegert Declaration I concluded that the Robards Complex constituted a relevant market for the procurement of growing services. To reach this conclusion I used the framework of the "SSNIP" test, described in the Horizontal Merger Guidelines and utilized by the FTC and DOJ in defining relevant economic markets. [6] The "SSNIP" test is based on the impact of a hypothetical "small but significant and non-transitory increase in price" on the relevant market being considered.[7] Because this analysis is for a buyer-side market instead of an increase in price charged, it is appropriate to analyze a decrease in price paid. If the hypothetical monopsonist is able to permanently (that is, in a "non-transitory" way) lower prices paid for a product or group of products in a defined area by a "small but significant" amount (usually antitrust agencies use 5 percent) without losing so much in supply volume that the decrease in purchase price is unprofitable, then that product or group of products constitutes a relevant antitrust market.[8, 9] In the case of buyer side markets, the Buyer's SSNIP test for a hypothetical monopsonist is likely even less than

---

[5] Stiegert Declaration, p. 33.
[6] See the Horizontal Merger Guidelines jointly issued by the Department of Justice ("justice") and the Federal Trade Commission ("FTC") August 19, 2010 (hereafter "Horizontal Merger Guidelines").
[7] See Horizontal Merger Guidelines at § 4.1.1.
[8] See Horizontal Merger Guidelines at § 4.1.1. "Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition." Horizontal Merger Guidelines at § 4.1.3.
[9] Salop, Steven.C., Moresi.S, Woodbury, J.R., "Market Definition," 2017, Georgetown University Law Center, Scholarship@GEORGETOWNLAW, p.6.

what would be the case in the seller side market since "substantive buyer power arises under lower thresholds."[10]– In my initial report, I considered this fundamental assessment in the context of the upstream market and concluded that Tyson had the monopsony power to reduce compensation for growing services by a small but significant non-transitory amount without losing enough (or any) supply that would make the pay reduction unprofitable for Tyson.

17. As a first step, I determined that broiler growing services was the relevant product.[11] I then determined that the geographic market is the 50-mile radius from the Robards complex.[12] Peter Carstensen explains that, especially for agricultural commodities, "processing must occur relatively close to the place of production" due to the cost of transport as well as the importance of timing.[13] In terms of the relevant geographic market, the question is, what is the geographic boundary within which the grower can offer his chicken growing services. Professor Thurman criticizes my use of a 50-mile radius to define the geographic area since there are a couple farms that are farther than 50-miles from the Robards Complex. This is immaterial since the next closest integrators, aside from Perdue, are 119 and 157 miles away.[14]

18. Finally, I determined that while Perdue was within the 50-mile radius, due to the inability for most Tyson growers to switch to Perdue, Perdue did not serve as an effective constraint on Tyson's monopsony power.[15] That is, in response to a decrease in grower pay, Tyson

---

[10]Anchustegui, Ignacio Herrera, Market Definition in Buyer Power Cases: Revisiting Some Traditional Views Working Paper presented at the BECCLE Competition Policy Conference, April 23 and 24 2015, Bergen, Norway, p. 28.
[11] Stiegert Declaration, p. 35.
[12] Stiegert Declaration, pp. 35-36. As I explained, even Tyson's old website states that "…farms are required to be within thirty to forty miles of the feed mill in the complex." (see Tyson Company Information available at https://web.archive.org/web/20050311104802/http://www.tysonfoodsinc.com:80/corporate/info/growersFAQ.asp)
[13] Peter C. Carstensen, (February 17, 2004), "Buyer Power and Merger Analysis: The Need for Different Metrics", (Statement prepared for the Workshop on Merger Enforcement held by the Antitrust Division and the Federal Trade Commission). Available at https://www.justice.gov/atr/buyer-power-and-merger-analysis-need-different-metrics, p. 22. "The central point is that for many commodities especially basic agricultural commodities processing must occur relatively close to the place of production. This is both an issue of the costs of transportation (livestock need special handling, crops spoil) and of timing because many commodities once ready for market need prompt processing."
[14] Stiegert Declaration, pp. 36-37.
[15] Stiegert Declaration, pp. 36-39.

would not lose a sufficient enough portion of its suppliers to make the pay decrease unprofitable. This relevant market I defined as the market for grower services at Tyson's Robard Complex passes the SSNIP test.

19. None of the Defendant's experts define a relevant market. The only expert that offers any opinions related to market definition is Professor Thurman. Professor Thurman has implied that he thinks the product market is broader than chicken growing and includes unrelated labor services, such as manufacturing and other farm activities. Professor Thurman explains that buyer power depends on the elasticity of supply facing the buyer, and claims that the Robards Complex grower services supply is elastic because growers can sell their labor services to other employers and can put their capital to alternative uses outside of the chicken growing industry. While the framework for Professor Thurman's elasticity of supply argument is consistent with the SSNIP analysis I explained in my report, contrary to Professor Thurman's conclusion, the supply is inelastic. I further explain that Professor Thurman's presumptions concerning options for chicken grower employment and capital outside of the chicken industry are not relevant to the matter at hand.

**i. Inelasticity of Grower Services Supply**

20. While Professor Thurman does not explicitly reference the SSNIP test that I describe above, he bases his argument concerning Tyson's monopsony power on the same fundamentals of the SSNIP test when he argues that Tyson's monopsony power depends on the elasticity of supply.[16] In other words, the more elastic grower supply (the greater degree that a grower's supply will respond to changes in pay), the less monopsony power that Tyson has, since a cut in grower compensation from Tyson would cause a dramatic decrease in the quantity that growers would supply.

21. Professor Thurman's framework of elasticity of supply is consistent with the SSNIP test as both are based on the ability of market players to respond to changes in price. Both frameworks pose the question of whether Tyson can profitably lower the price that it pays for chicken growing. If grower supply was elastic, it would not be profitable for Tyson to

[16] Thurman Report, p. 10.

cut grower compensation even by a small amount since that would lead to a large decrease in chicken quantity as a result of growers either existing the market or switching to competing integrators. While Professor Thurman ignores the analysis in my report indicating that grower supply is inelastic due to lack of alternative options and simply presumes that Tyson would not be able to suppress grower pay at Robards without losing a large portion of its supply of grower services.[17] As I explained in the Stiegert Declaration, growers are locked in to growing for Tyson due to chicken-specific investments and lack of alternative integrator buyers, making the supply of grower services inelastic. As I explained in the Stiegert Declaration, the assets required are specific to chicken growing and so growers cannot switch to growing other poultry or put the chicken houses to any other uses. Further, growers have no choice in terms of the number of chicks they can grow, they are simply given chicks by Tyson and they grow them. Therefore, the only alternative growers have is to stop growing chicks for Tyson. This further contributes to the inelasticity of the growers' supply.

22. For these reasons, which I have explained in detail in my prior report, the supply of chicken growing services is inelastic at the competitive level.

**ii. Professor Thurman's Assumptions Concerning Labor Market Substitutes for Grower Services Are Inaccurate and Unfounded**

23. Professor Thurman claims that growers can sell their labor services to other employers and therefore, "Tyson must compete for grower services not just against other integrators but also against employers in other industries, which limits Tyson's ability to suppress grower pay at its Robards complex".[18] He cites some examples of Plaintiffs engaging in employment outside of chicken growing, such as pesticide control and raising of animals such as cattle and hogs.[19]

24. That some growers derive income from other sources while engaged in chicken growing is entirely irrelevant to whether they would be receiving higher pay in a grower services

[17] Thurman Report, p. 10.
[18] Thurman Report, p. 15.
[19] Thurman Report, p. 15.

market where buyer competition exists. The relevant question to ask (in this case) is whether the grower has options available in terms of demand for his or her chicken growing services, and not whether he can work in a factory or on a farm. There is no evidence that the growers that had these other sources of income would forego chicken growing and rely solely on these other sources of revenue in response to a pay cut from Tyson. Particularly, once a grower has made the large initial investment and constructed a chicken house, the only potential way for the grower to exit the chicken growing industry is to sell the chicken house to a new grower who has letter of intent for an integrator to contract with them

### iii. Professor Thurman's Proposed Alternate Capital Investments are not Relevant to the Market at Issue

25. Professor Thurman claims that growers can put their capital to alternative use by selling their chicken houses and using the proceeds for alternative investments, including "other business opportunities and financial investments such as bonds or mutual funds."[20]

26. First, Professor Thurman only addresses the potential value of assets, assuming growers can sell. He does not provide alternative uses for the chicken growing assets themselves. Second, Professor Thurman's argument that bond or mutual fund investments are in the same market as chicken grower services, serve as substitutes for grower capital, and would impact the Tyson's monopsony power over growers is a drastic overreach and mischaracterization of the relevant market.

27. Once a grower contracts with an integrator to build chicken houses to grow broilers, he or she is tied to chicken growing. As Dr. Elam has previously explained, "once a grower is committed to producing chicken, he or she has made a substantial long term investment in chicken-growing facilities."[21] Again, the relevant question to ask is whether the grower has options available in terms of integrators who demand his or her chicken growing services,

---

[20] Thurman Report, pp. 16-17.
[21] Elam, Dr. Thomas E. "Competition in the U.S. Chicken Sector", May 19, 2010. Available at https://faunalytics.org/wp-content/uploads/2015/05/Citation1377.pdf (hereinafter "Elam U.S. Chicken Sector") p. 23.

and not whether there is any other possible investment he or she can put money towards, assuming the grower is able to sell and receives adequate compensation. Professor Thurman mischaracterizes the barriers to exit, since the farms only have value if there is a contract with an integrator such as Tyson.

28. Professor Thurman cites examples of Plaintiffs making investments outside of the chicken growing industry, but his point is entirely off-mark.[22] Just because some of the growers had made other capital investments does not mean that those other investments are in the same relevant market as growing chicken. For instance, it is not accurate to say that stocks and bonds are relevant substitutes for chicken houses.

29. Without actually defining a relevant market, one cannot measure or determine the existence of market power since there is no established market to analyze. Therefore, Professor Thurman's general failure to define a relevant market renders his monopsony power analysis unreliable.

### B. Perdue Farms Is Not in The Relevant Market with Tyson

30. As discussed in the Stiegert Declaration, Perdue is the only integrator that exists within a fifty-mile radius of any of the Plaintiffs' farms. I explained that this Perdue facility does not compete with Tyson's Robards Complex for grower services due to 1) Perdue not freely accepting new grower houses, 2) Perdue having longer out-time and restrictions on expansion, and 3) Perdue shifting to free-range and organic chickens that require different grow-out facilities.

31. Professor Thurman states that there is an overlap between Tyson and Perdue for certain growers within the Robards Complex. I have acknowledged this in my report. I do not conclude that there is no competition whatsoever between Tyson and Perdue at the Robards facility, but rather that the amount of competition is insufficient to discipline Tyson's

---

[22] Thurman Report, pp. 16-17.

monopsony power. In other words, Perdue is not in the same relevant market as Tyson's Robards Complex.

32. As I explained in the Stiegert Declaration, switching to Perdue was not possible simply because Perdue was not taking new growers.[23] Given the instances when growers who have wanted to switch (to Perdue) have been turned down by Perdue, it is clear that growers cannot simply switch on their own terms but rather it is the integrator who makes the decision on whether a grower is able to switch. Therefore, Perdue is not a viable competitor for grower services in the Robards Complex market.

33. While Professor Thurman has pointed out instances of Plaintiffs switching between Tyson and Perdue and vice versa, such cases of switching are infrequent, a clear indication that switching is difficult or rarely possible. Further, based on deposition testimony I have reviewed it is clear that oftentimes Perdue was not even an option since they had longer out-days, or they were simply not offering any contracts. The following are reasons offered by Plaintiffs in their deposition regarding the choice they have between Perdue and Tyson in the Robards Complex market.

(i) In 2015, Calvin Leisure attempted to switch back to Perdue, but could not, because Perdue was not interested in taking in any growers at that time.[24] Calvin Leisure switched from Perdue to Tyson in 2008 after contracting with Perdue for 12 years from 1996 to 2008.[25] Mr. Leisure mentions in his testimony that he left Perdue because of an unresolved issue with them regarding poor quality chicks supplied to him for about a year.[26]

(ii) Perdue was not a viable option for John Pinkston when he owned houses because, as he explained in his deposition testimony, Mr. Pinkston

[23] Stiegert Declaration, p. 37.
[24] Leisure Deposition, pp. 152: 18-25.
[25] Plaintiffs' Answers to Defendant Tyson Chicken Inc. First Interrogatories to Plaintiff Calvin Leisure, p. 4.
[26] Leisure Deposition, pp. 102-103.

switched from Perdue since Perdue had a longer out-time (the time between a flock taken for slaughter and the arrival of the next flock), which made it difficult to manage cash flow.[27]

(iii) Perdue is not a viable option for Tim Vincent, as demonstrated by his switch back to Tyson in 2009 due to Perdue's longer out-times.[28]

(iv) Professor Thurman highlights Christopher Burch's switch to Perdue in 2015. However, this is the only example of a grower successfully switching from Tyson to Perdue since 2010. Furthermore, even Christopher Burch was initially told that Perdue did not have any capacity to accommodate him. Perdue was only willing to take Mr. Burch's houses once another Perdue grower had left.[29]

(v) Perdue was not a viable option for Keith Crabtree because Perdue would not allow him to build more houses. This is why he switched from Perdue to Tyson in 2010.[30]

(vi) Morgan Rickard was not able to switch back to Perdue since Perdue would not prefer so many houses in one lump sum.[31]

(vii) Professor Thurman claims that Mr. Morris chose not to split his houses between Perdue and Tyson,[32] but Mr. Morris explained in his deposition that "it would be bad business to have one farm at Perdue and one at Tyson".[33]

34. Professor Thurman mischaracterizes what I say about monopsony power when he states that I define monopsony power as the ability of a buyer to set prices due to there being no

[27] Pinkston Deposition, p. 33.
[28] Vincent Deposition. p. 84
[29] Burch Deposition, pp. 58:14-18, 90.
[30] Crabtree Deposition, pp. 56-57.
[31] Rickard Deposition, p. 133:4-22.
[32] Thurman Report, p. 11.
[33] Morris Deposition, pp. 131: 21 – 132:6.

other buyer within a relevant market.[34]As I explained clearly in the Stiegert Declaration, a monopsonist is the only *effective* buyer in a relevant market. In fact, I explain that, "It is possible for a firm to have monopsony power even if it is not the only buyer for a product located in a geographic area."[35]

35. As explained in the Stiegert Declaration, the MacDonald and Key study shows the negative impact that fewer integrators and therefore lower levels of competition have on grower pay. They find that growers in duopsony or 3-firm oligopsony regions received 4% lower pay compared to markets where there were four or more integrators therefore even an integrator that is part of a duopsony can harm competition. Growers in single monopsony regions received 7% lower pay than the base case of four or more integrators. The lack of competition between Tyson and Perdue lead me to conclude that the most relevant pay differential from the MacDonald and Key study is the single integrator statistic of 7%.

## III. TYSON EXERCISED ITS MONOPSONY POWER IN THE ROBARDS COMPLEX MARKET IN A MANNER DETRIMENTAL TO GROWERS

36. I explained in the Stiegert Declaration how Tyson's monopsony power in the Robards Complex market enabled it to structure the tournament compensation to the benefit of Tyson's Robards complex and the detriment of its growers. Tyson's buyer power ensured that growers had no choice but to accept the parameters of the Robards Complex tournament system including 1) Tyson's artificially low base pay, 2) Tyson's skewed thresholds concerning exceptions / outliers, 3) Tyson's harmful and biased treatment and calculation of condemnation, and 4) Tyson's misrepresentation of expected days-out and therefore revenue potential. [36] This is based on my analysis and review of the tournaments that Tyson conducts every week at its Robards complex in order to assess how growers are performing relative to other growers and thereby determine their pay. These tournaments are structured such that growers have no control over the inputs critical to their performance including the chicks (quality, sex, and breed), feed (quality, timing of ration

[34] Thurman Report, ¶ 23.
[35] Stiegert Declaration, p. 33.
[36] Stiegert Declaration, Section C.a.

changes), and veterinary services. If the growers had control over these inputs, they can make decisions on the methods of procuring inputs, and production that is more efficient – such as choosing the inputs by considering both the quality and costs of those inputs. Each participant in a tournament would be free to make decisions on how to produce more efficiently. While in case of the tournament structure at Tyson's Robards, growers have no or little control because Tyson controls the inputs. In addition, Tyson controls other aspects of the growing operation through weekly inspections of growout houses and facilities.

37. The overall pay growers receive is artificially lowered due to Tyson's monopsony power in the Robards Complex and its ability to structure the tournament system without fear of competition from other buyers.

38. The Defendant's experts extoll the general efficiencies of a tournament system and claim that growers receive extensive benefits including risk protection and payment stability.[37] Contrary to what Professor Thurman suggests, I do not argue that a tournament style system is economically inefficient or provides no benefits to the participants. As I explained in the Stiegert Declaration, it is Tyson's exercise of its monopsony power in the Robards Complex market that negatively impacts the implementation and outcomes of the tournament system to the detriment of the Robards Complex growers. Without Tyson's buyer power, a tournament system may still exist in the grower services market, but the parameters of such a tournament would be subject to competition, therefore resulting in improved grower agreements and /or pay.

39. In addition to controlling all parameters of the tournament structure, Tyson also controls all aspects of the production process including the critical inputs that growers rely on and which impact their overall tournament performance and therefore pay.

---

[37] Thurman Report, p. 29.

### A. Tyson Controlled Performance of Growers by Controlling the Quality of Inputs

40. In the Stiegert Declaration I explain how grower performance is affected by the quality of inputs and how Tyson's control of the critical inputs (including quality of feed, quality of transport, veterinary and other services, and the breed, sex and quality of chicks) enables it to control the growers' actual performance.[38]

41. While Professor Thurman points out performance of growers depends on how well they care for the chicks, and that factor such as temperature affects all growers, he fails to mention the impact quality of inputs has on grower performance.

42. Dr. Elam has attempted to show that these factors – breed, sex and technical support services do not impact grower performance, but the regression analyses he relies on to form his opinions is severely flawed. I explain in detail below the shortcomings of Dr. Elam's analysis and how they do not contradict or alter my conclusion that grower performance is impacted by inputs controlled by Tyson.

#### i. Dr. Elam

##### *a. Dr. Elam's General Approach to Regression Analysis is Fatally Flawed*

43. Dr. Elam has conducted flawed regression analysis in his attempt to show the impact these factors – breed, sex, technical support services – had on various metrics of performance. He has estimated separate regressions to assess the impact of each of these factors on the performance metrics he has chosen, ignoring the fact that all of these factors influence the metrics together and not separately. Considering I do not present the opinion that each of these factors individually and unilaterally impact grower pay, Dr. Elam's analysis utilizing separate regressions provides no insight into how grower performance is impacted by these factors controlled by Tyson.

44. Dr. Elam purports to show that grower performance is not impacted by the quality of chicks (as measured by hen age, house density, broiler weights), the quality of feed, the delivery of veterinary and other services from Tyson, the sex of chicks, or the breed of

---

[38] Stiegert Declaration, Section V.C.

chicks. Dr. Elam does not present a regression that actually explains the variation in NPV difference (his dependent variable) and which would therefore provide a basis for an opinion regarding the impact these various factors have on NPV difference. Dr. Elam has simply provided regression results from a series of incomplete models, which do not, demonstrate the relationship between each individual factor and the NPV difference.

45. Dr. Elam's approach appears to have been "establishing" that each individual input factor he includes in his models does not impact the NPV difference, and then concluding that therefore grower performance must impact NPV difference since that is the only remaining factor. While Dr. Elam has run 22 misspecified models, he does not actually provide a model that is consistent with his argument – one that shows the impact of grower performance on their pay. There is only one regression that Dr. Elam performed that has a high R-squared, meaning that it is only regression where Dr. Elam could explain a large percentage of the variation. Of course even in this faulty regression (see paragraph 51 below) there is still a large unexplained portion of grower pay which demonstrates that there is unpredictiblity in grower pay even holding constant feed conversion, weight gain and condemnation. Further all of Dr. Elam's regressions, including the only regression with a high R-squared, suffer from critical econometric flaws, such as endogeneity, as I explain in further detail below.

46. All of Dr. Elam's remaining regressions explain only a trivial portion of the variation in grower pay. Further, because his models are poorly specified and do such a poor job of explaining overall grower pay, it is improper to draw any conclusions from these regressions. In particular, Dr. Elam has not performed any analysis to demonstrate that grower skill actually is meaningful in predicted grower pay. Thus it is improper for him to reach that conclusion due to his inability to explain grower pay in any of his models.

47. These fundamental flaws in Dr. Elam's general approach to regression analysis render his results and interpretations meaningless. Further, I explain in detail below how even if we were to consider the models he has presented, they still fail to meet the basic criteria needed to generate unbiased results.

### *b. Dr. Elam's Models Are Incapable of Producing Unbiased Results*

48. All of Dr. Elam's regressions are estimated using ordinary least squares methodology (OLS). OLS is a very common regression approach, but there are strong underlying assumptions about the nature of the model and data that cannot be ignored. When these assumptions are violated, it usually requires the researcher take additional steps to at least mitigate the damage from such violations.

49. Upon evaluation of the work product by Dr. Elam, it became quickly evident that there existed serious and fundamental flaws and problems within the sphere of his regression work. I detail several of the most blatant mistakes in Dr. Elam's regression analysis below.

50. When using the OLS technique to estimate relationships between variables, the validity and reliability of the estimated relationships depends on certain characteristics of the data that are being used. For instance, one of the critical requirements is that the explanatory variables are *exogenous*. The explanatory variables (also referred to as independent, right-hand side or "RHS" variables) are used to explain movements in the variable of interest (also referred to as the dependent, left-hand side or "LHS" variable). In order for the independent variables to be exogenous, they must not be dependent on (or caused by) the LHS variable. In other words, the RHS variables must be determined outside the universe of the model.[39] In a regression, the dependent variable is regressed on the independent variables in order to determine how much of the variation in the dependent variable can be explained by the variation in the independent variables. Therefore, the dependent variable is endogenous to the model (explained by the independent variables), but the independent

---

[39] A good example of an exogenous variable might be average daily temperature in trying to explain the number of customers at a public pool. Certainly, we expect that there would be more customers as the temperature rises (positive and statistically important relationship is likely to exist). However, we can also say that the public pool we are studying has absolutely no control over the average daily temperature. Temperature is determined outside the model: it is exogenous. In practice, right-hand side variables are oftentimes endogenous. A variable that might be endogenous in this example is the quality of the pool water as measure by bacteria counts. People might start noticing if the pool water is poorly managed leading to a bad reputation and fewer customers. However, pool water quality is determined by the public pool management: it would be an endogenous regressor.

variables must be exogenous (not explained by either the dependent variable or any of the other independent variables) in order for the model to produce unbiased results.

51. Dr. Elam's regressions suffer from numerous and blatant endogenous right-hand side variable problems. This is a violation of the OLS assumptions required for Dr. Elam's approach, and therefore the estimates (of the relationships he has specified) that Dr. Elam obtains from his model are biased. This is obvious in the very first regression of the report, presented in Table 3. Dr. Elam regresses average base pay as the left-hand side variable on feed conversion, percent condemnations and average daily gain.[40]

52. By using feed conversion on the right-hand side to explain variation in grower base pay, Dr. Elam is subjecting his model to endogeneity issues. This is because there are factors that are related to variables on both sides of the equation and are not controlled for in the model. Therefore, any change in those variables – could be new house which is more efficient, sex and breed of chicken, quality of care, feed, etc. – will cause both feed conversion and average base pay (what I refer to as grower pay) to change, and therefore results in the error to be correlated with the RHS variable, feed conversion. Because Dr. Elam is assuming that base pay is controlled by the grower, and feed conversion is also at least partly controlled by the grower, the model suffers from endogenerity bias. Further, Dr. Elam uses feed conversion as a left-hand side variable in four other regressions (regressing on male and hen breed, hen age, service technician, and density)[41], demonstrating that Dr. Elam knows that feed conversion is endogenous but still includes this as a right-hand side variable in the regression in Table 3. In my opinion that this is a simple and straightforward mistake in Dr. Elam's regression work.

53. Dr. Elam's regression showing that grower pay (base pay plus the incentive pay) is explained by average feed conversion, average daily weight gain and condemnation is not surprising.[42] In fact feed conversion, weight gain, and condemnation are critical variables used to calculate the net pound value of a grower in tournament, which is the basis for

---

[40] Elam Report, p. 12.
[41] Elam Report, Tables 4, 12, 21 and 39.
[42] Elam Report, Table 3.

determining the grower's reward pay or penalty. The more pertinent question to address, which Dr. Elam strategically avoids, is what factors *determine* a grower's feed conversion, weight gain and condemnation, and how does the variation in these factors affect a grower's performance in a tournament? Had Dr. Elam considered this instead of relying on faulty, surface-level analysis, he would have found that grower pay is affected by inputs which are not controlled by the grower, and therefore the risk they bear is borne by the grower.

54. In practice, endogenous right-hand side variables are not uncommon, but the issue needs to be addressed in order to determine unbiased (accurate) estimates. One common correction approach is to conduct instrumental variable regression which is designed to purge the bias from the endogenous regression parameters. A newer approach is a control function approach. I have used both of these methods to manage endogenous regressors in my peer-reviewed research. Dr. Elam may or may not be aware of these methods. He did not report on any attempts to evaluate his regressions for endogeneity bias.

55. The most serious issue in Dr. Elam's regression analysis has to do with construction of the models. Damodar Gujarati, a distinguished professor and author of a widely circulated introductory econometrics textbook, does a wonderful job of synthesizing and explaining processes and procedures for model specification.[43] He explains that one of the six founding principles for a regression model is that the model be "encompassing," in that "the model should encompass or include all the rival models in the sense that it is capable of explaining their results. In short, other models cannot be an improvement over the chosen model."[44] In numerous occasions, Dr. Elam violates this simple and foundational principal. For example, I compare regressions presented in tables 4 and 12. The regression in table 4, if properly specified, implies that feed conversion is theoretically explained by the breed and sex of the hens and nothing else. The regression in table 12, if properly

---

[43] Gujarati D.N. 2003. *Basic Econometrics 4th Edition*. McGraw-Hill, New York, NY (hereinafter "Gujarati").
[44] Gujarati, p. 507.

specified, implies that Feed Conversion is theoretically explained by only "hen age", and nothing else. Both cannot be the true model because one does not encompass the other.

56. Dr. Elam does not establish which model he considers to be the correct one. It is my opinion that neither one is the correct specification: both should be disregarded. I make this claim because there are two additional regressions presented to explain feed conversion and they use other right-hand side variables besides hen breed, sex, and age. The regression in tables 21 and 31 suggests that feed conversion should be explained by whether a farmer joined this case as a plaintiff and nothing else. The regression in table 39 suggest that feed conversion should be explained by hen density, and nothing else. In summary, to my knowledge, there is not a single econometric textbook that would argue for four completely different models to explain the same left-hand side variable. [45] This a basic and egregious violation of a foundational principal (encompassing) of econometric estimation.

57. Dr. Elam proceeds to violate the encompassing principal throughout his analysis, as demonstrated by his regressions for percent livability,[46] average daily gain,[47] percent condemned,[48] and performance differences.[49] As a result, none of the 22 models Dr. Elam constructs to purportedly explain these relationships represent a correct model.

---

[45] Dr. Elam claims to have produced a regression of adjusted feed conversion and then proceeded to evaluate outliers. He describes the regression to obtain AFC outliers (see Elam Report, p. 35), but it appears to be a model explaining adjust feed conversion using just a trend variable, which therefore suggests that the correct model for adjusted feed conversion would have no other explanatory variables. But as I discussed above, Dr. Elam estimated feed conversion using four different models: one with hen breeds, one with hen age, one with hen sex, and one with Plaintiff/non-Plaintiffs as defensible models for explaining adjusted feed conversion. It appears now that he has defined a fifth way to estimate feed conversion patterns. They all cannot be correct and each suffers from the encompassing problem I discussed earlier. Most importantly, because the outliers in his trend regression are produced using a model that fails on several of the aforementioned problems, the outliers are not a reliable reflection of the true outliers in average feed conversion. Therefore, any conclusions, such as those stated in paragraph 7 on page 36 are based on faulty findings.

[46] Elam Report, Tables 5, 13, 38.

[47] Elam Report, Tables 6, 14, 22.

[48] Elam Report, Tables 7, 15, 23, 40.

[49] Elam Report, Tables 8, 16, 24, 41.

58. I have already established that Dr. Elam's regression models suffer from egregious problems with the fundamental principal of encompassing. The reason that his models fail to pass this basic criteria for regression analysis is largely because there is no theory guiding the work. Dr. Elam ignores the fundamentals of regression analyses when he simply performs a series of incomplete models.

59. Functional form is a term used by econometricians to describe how a model is structured: which variables belong in the model, and what form the variables should take in the model.[50] There are a myriad of concerns that an econometrician is faced with when developing a good final model. As I explain to my students in my graduate econometrics course, while any fool can run a regression, it takes real creativity, sharp statistical skills, and a solid grounding in theory to be an econometrician. A good functional form begins with theory, advances to the model development stage and then could include numerous pretests of possible outcomes before a final model is selected.

60. All of the regressions presented by Dr. Elam are presented using right-hand side variables which are introduced into the model in the simplest possible form: linear. This means each right-hand side variable enters the model as a standalone term and the numerical estimate of its impact on the left-hand side variable remains constant across the range of the data. Dr. Elam did not present any theoretical support for these linear relationships and does not perform any diagnostics test to determine if other functional forms might be superior. One easy set of tests to perform involve including squared and cubed versions of the right-hand side variables and then testing if they are significant. Another approach might be to see if the errors in each of the model constitute white noise. If the error terms in a regression do not constitute white noise, the model is misspecified and the estimates are therefore

---

[50] Going back to my swimming pool example, I earlier considered air temperature and pool water quality to be good variables to explain the number of customers at a pool. However, it is not sufficient to end there. Perhaps sun versus clouds, holidays, number of season passes sold, weekends versus weekdays, school in or out of session are all other important variables that would explain pool traffic. But it is not sufficient to end there. Perhaps a variable like temperature has a nonlinear relationship with the number of pool customers: as temperatures rise, the number of customers might increase but at an increasing rate. This would imply I should include temperature and the square of temperature as two variables in the model. Because the pool is less enjoyable as the number of people arrive to the pool, maybe the left-hand side variable should enter the model in a logarithmic transformation. This would naturally capture the lost utility of overcrowding at the pool.

statistically biased and inconsistent. There are numerous ways in which a researcher can address functional form issues. In Dr. Elam's approach, he reports nothing about how he arrives at the functional forms that he used.

61. Further, he has attempted to show that there was no difference between Plaintiffs and non-Plaintiffs with regard to the relationship between these factors and the performance metrics. In fact, the effect of a monopsony would be felt by all growers, not just Plaintiffs.

### ii. Dr. Lacy

62. In his report, Dr. Lacy opines on how various grower inputs do not impact grower flock performance. Dr. Lacy provides little in the way of support, but reaches conclusions that generally contradict information the growers themselves have provided. For instance, Dr. Lacy claims that a flock's feed consumption is high toward the end of a cycle (prior to processing), resulting in high turnover of feed and therefore "virtually" no quality concerns for reclaimed feed.[51] While it is not part of my expertise or assignment to opine on the quality of reclaimed feed, Dr. Lacy's assurances of quality are contradicted by those who have much more intimate knowledge than either of us. Charles Morris explained that they may get 20-day old feed[52] and that he could actually observe the detrimental impact of the rancid feed on the water intake and therefore chick growth.[53]

### iii. Professor Thurman

63. Professor Thurman says that I failed to determine if the same practices – that are prevalent in the Robards Complex - occur in complexes facing competition. I would not expect regions where there are more integrators to face real competition. The micro-economy generated by contract chicken growing lacks so many features of a competitive structure - no market determined price, no control over the quality of inputs, no control over the choice of a service representative, no ability to switch to other input suppliers - it is not at all clear that simply having more integrators in a region produces vibrant competition.

---

[51] Expert Report of Michael Lacy, August 30, 2019, p. 7.
[52] Morris Deposition, 115:8 – 19.
[53] Morris Deposition, 146:7 – 20.

Three of the defining market characteristics present in all the growing regions throughout the U.S. is that the assets owned by the growers require large irreversible investments, the assets last many decades, and there are likely new investments required to switch to other integrators. An integrator's latitude in setting the quality of service to growers might depend partly on what other integrators are doing. However, any number of barriers to switching may exist which eliminate the need to compete with other integrators, such as other integrators being at production capacity, engaging in a very different operation (such as organic production) or else a general lack of willingness to accept competing growers.

64. Also, Professor Thurman says that I have not shown whether individual growers were systematically disadvantaged. Risk to individual growers emanating from Tyson's control of services to the Robards complex implies directly that base pay should be higher in order to compensate all growers. I am not looking at each practice in isolation but rather all the practices (including base pay) together.

65. Professor Thurman says Tyson would have no incentive to give bad inputs to growers. This is not so if it is costly to control for input variability. For example, suppose Tyson wanted to make sure re-issued feed is as good as feed fresh from the feed mill. It is clear from the Morris deposition that bad feed from other farms do make it into the supply of delivered feed. To assure the quality of reclaimed feed, Tyson would probably need to pay for testing services before reissuing feed and would bear the costs of any feed not reclaimed. Instead, Tyson shifts that cost onto the growers in the form of poor performance, lower pay, and higher risks. If there is an economic incentive to control the quality of reclaimed feed quality, Tyson would control it. Furthermore, due to Tyson's implementation of its tournament system at the Robards Complex, growers will never compete on equal footing because the quality of inputs supplied by Tyson will vary across growers in a given tournament.

66. In yet another strawman argument, Professor Thurman makes the point that Tyson would not want to systematically disadvantage an individual grower because if that grower ends up getting the minimum, that grower's pay is capped on the downside. But Professor Thurman ignores the fact that Tyson removes the exceptions when calculating grower pay.

As I showed in my declaration, when there are downside exceptions, Tyson actually pays less overall.[54]

**B. Tyson's Exercise of Monopsony Power in the Robards Complex Artificially Lowers Grower's Pay**

67. In the Stiegert Declaration I explained how grower pay is artificially lower than what would have existed in a grower services market with buyer competition. Tyson's monopsony power enabled it to reduce base grower pay below competitive levels. As I discuss in the Stiegert Declaration, Tyson is able to exercise its monopsony power in the Robards Complex market by controlling the ability of growers to exit or enter the market for grower services. Tyson's existing monopsony power enables it to impose requirements upon growers without the check of competitive market forces because of the growers' limited ability to exit or switch. By requiring significant and irreversible investments and upgrades for growing houses, Tyson ensures that growers have little or no viable options outside of chicken growing without exiting the industry completely. Further, Tyson's integrator-specific requirements for houses and upgrades enhance Tyson's monopsony power by reducing or eliminating the ability of a grower to supply another integrator. Tyson's existing monopsony power is further enhanced by these requirements which growers have no choice but to accept.

68. As I explained in the Stiegert Declaration, the exercise of monospsony power results in artificially lower grower pay and output. Further, I explain that when there is downstream market power, those consumers pay higher prices.[55] None of the Defendant's experts rebut the general proposition that monopsony power is harmful to competition. While Professor Thurman attempts to show that Tyson does not exercise monoposony power at Robards, his supporting analysis is flawed and insufficient. I explain in more detail the problems with Professor Thurman's approach.

---

[54] Stiegert Declaration, pp 17 – 18, 47 – 48.
[55] We would expect to see many of these same effects in a duopsony market as well.

69. Professor Thurman claims to take a "direct data-based" approach by limiting his analysis to three of Tyson's integrator complexes (including Robards) and comparing grower costs.[56] Professor Thurman purports to show that grower cost is higher at Robards than the two other facilities, which have additional integrators in their vicinity, asserting that therefore the Robards Complex cannot be subject to monopsony power.[57] Professor Thurman further argues that there is no restriction in quantity purchased which is inconsistent with any suppression in grower pay.[58] This argument is not relevant and has no bearing on the existence of monopsony power in a market. As explained below, Professor Thurman is wrong.

**i. Professor Thurman's "Direct" Analysis is Insufficient**

70. Professor Thurman claims to take a "direct data-based" approach as an alternative to the "national econometric analysis" that I rely on in the Stiegert Declaration.[59] Professor Thurman's "direct" analysis consists of simple grower pay comparisons within a restricted sample of three facilities, which I will discuss in detail below. However, Professor Thurman appears to imply that his "direct" alternative is somehow superior to a (in his words) "national econometric analysis." [60] The following are just some of the reason why an econometric study, such as the MacDonald and Key study that I relied upon, is more reliable than one-off comparisons.

71. The MacDonald and Key study uses a survey dataset that is representative of the varying market contract conditions that broiler producers face. The data was obtained from over 1,650 respondents from which 1,387 observations were used in their regression models. MacDonald and Key focused their research on only one type of broiler producer: those that had production contracts with a downstream integrator. With this many observations, the model results are commonly referred to a coming from a 'large' set of data. A good regression model usually includes all the major forces that impact the variable the

[56] Thurman Report, p. 22.
[57] Thurman Report, p. 22-26.
[58] Thurman Report, p. 26.
[59] Thurman Report, p. 22.
[60] Thurman Report, p. 22.

researcher is trying to explain. The focus of the MacDonald and Key study is on the degree of monetary impact associated with integrator competition has on grower pay. Their measure of integrator competition is the number of integrators a grower could obtain a contract from. It would be completely inappropriate to base my opinion solely on an examination of the average difference between grower pay by the number of integrators in a region. The reason such an approach is inappropriate is because there are likely to be many factors that impact grower pay. It is only after a researcher has properly accounted and controlled for all the major factors that impact grower pay can you safely state that the impact of grower pay has been measured in an unbiased fashion. Indeed, one of the foundational assumptions of a regression model is that there are no omitted variables. When there are omitted variables, the estimated impact of the variables in the model are mismeasured (omitted variable bias).

72. In my opinion, MacDonald and Key do a masterful job in building a complete regression model. They added groups of variables to the initial simple model and found each group was statistically significant at the 99% level. This supports the decision to evaluate the results with all the right-hand side variables in play. As a matter of good science, MacDonald and Key then evaluated the model against different specifications of the left-hand side variable. When the model is estimated with the left-hand side variable transformed with logs, the monopsony estimate is interpreted as a percentage: 7.2% to 7.4% decline due to competition collapsing to a single monopsonist as compared to a region with four integrators. Without the transformation to logs, MacDonald and Key calculated the impact at about 8%, which is only slightly higher than the logarithmic transformations. In summary, MacDonald and Key followed best econometric practices to arrive at findings that support inclusion of all their variables and found that the impact of concentration was robust to various transformations of the left-hand side. Thus, the measure of a 7% decline is not only strongly supported by the science used by MacDonald and Key, it is the lower end of the range that MacDonald and Key stated in their conclusions (7-8%).

73. I summarized the approach and finding from MacDonald and Key as a way to compare it to the method used by Professor Thurman showing that grower pay is somehow adequate in

the Robards' region. His first approach relies on comparative data in Clarksville Arkansas and Cummings Georgia from 2010 to 2016. In light of the complex differences among growers managed in the MacDonald and Key regression, this comparative approach is insufficient to draw any conclusions about grower pay. Professor Thurman does not explore these differences. For example, he does not examine the age of the chicken houses, the share of farmers on long-term contracts, whether or not farmers have adjustments in the contract for energy costs. All of the characteristics managed by MacDonald and Key are basically ignored. Professor Thurman merely draws up two figures and claims Robards is doing better. Simply put, these figures do not establish the superior region.

74. Professor Thurman purports to show that Tyson's Robards complex grower pay was not suppressed by comparing the grower cost at Tyson's Robards facility to that at Tyson's Clarksville, Arkansas complex and at Tyson's Cumming complex in Georgia. He claims that Tyson's Clarksville facility faces two non-Tyson competitors and its Cummings facility faces ten.[61]

75. Professor Thurman determined the distance between the Tyson complexes and their "competitor" facilities by "identifying each plant's longitude and latitude using Google Maps, [and] calculate[ing the] straight-line distance between Tyson's Clarksville or Cummings facility and the nearby non-Tyson plants that process and slaughter broilers."[62] However, the "straight-line" distance between facilities is entirely different from the actual distance chickens must be transported and are irrelevant to the determination of a relevant geographic market. For instance, Professor Thurman claims that the Wayne Farms facility is located only 29.2 miles from Tyson's Clarksville complex, but the shortest route available utilizing roads is over 52 miles.

---

[61] Thurman Report, pp. 22-25.
[62] Thurman Report, fn. 95.

76. Taking Professor Thurman's "direct" comparison approach, we also find that the grower pay at some of Tyson's other complexes are consistently higher than that at Robards. Tyson's Sedalia plant (which is one of the plants that, unlike Cummings and Clarksville, Tyson uses as a comparison for grower pay for Robards throughout the entire timeframe)[63] has one non-Tyson competitor plant within the 50 mile radius, and Tyson's Noel plant has 7. Alone, this comparison, in Figure 1 below, is not sufficient to conclude that since the grower pay at Tyson's Robards plant is consistently lower than 1) a Tyson plant in a market with one potential competitor and 2) a Tyson plant in a market with several potential competitors then Tyson's Robards growers have received artificially lower pay. Professor Thurman's "direct" analysis does not impact my conclusion that grower pay at Robards complex was artificially lower than it would have been in a competitive market for grower services because: 1) As discussed above, this conclusion is based on a comprehensive study, and not just two individual comparisons; and 2) Professor Thurman's limited comparison is not sufficient and, as illustrated below, can result in outcomes that contradict his arguments.

[63] Professor Thurman choses the Cummings and Clarksville facilities for comparison because they are instant quick freeze ("IQF") complexes like Robards, stressing that "[d]ifferent facility types serving different downstream customers typically process bird of different sizes, and grower pay is sensitive to bird size due to different grow-out times and practices." (See Thurman Report, p. 23) However Professor Thurman entirely ignores the comparisons that Tyson relies across its own plants – through July 2011 Tyson uses an average grower cost calculated specific to 6lb birds – an average Tyson uses for its Robards, Sedalia, Albertive, Alabama, and New Holland Plants. Notably, Tyson is using another average grower cost "General Run Average" for the Cummings and Clarksville complexes. The "General Run Average" is used across a number of other plants including IQF, traypack, further processed, medium bird, value added, etc. Professor Thurman's claim that the appropriate comparison for grower pay is limited to IQF plants is unfounded and not supported by Tyson's own reporting and comparisons. After July 2011 Tyson uses the "General Run Average" for Robards as well as the other plants that previously utilized the 6lb average.

**Figure 1. Robards Grower Pay Comparison**




*Source: Dr. Thurman's backup materials and referenced Agri-Stats reports for Figures 2 – 4.*

77. As a general matter, Professor Thurman does not seem to appreciate that the monopsony power that an integrator enjoys does not depend entirely on the number of integrators that are in a geographic area. As I have explained with regard to the Robards facility, even though Perdue is in the same geographic area as Tyson, Perdue does not act as a competitive constraint on Tyson's behavior. There is no reason to expect that the Tyson plants with several integrators are truly competitive and Professor Thurman does no investigation of this whatsoever.

### ii. Professor Thurman Limited Quantity Analysis is Not Persuasive

78. Professor Thurman also purports to show that the quantity processed is similar at Robards than the other facilities which he indicates means that there is no quantity effect from the supposed monopsony. Professor Thurman claims that any suppression in grower pay would be accompanied by a restriction of the quantity purchased as a matter of economic theory.

Nothing in Professor Thurman's analysis constitutes reliable analysis to prove that there is no quantity effect.

79. Professor Thurman relies on an analysis of the live pounds of chicken produced in the same comparative regions (Robards versus Clarksville or Cummings), claiming, again, that the "direct analysis" provides evidence against monopsony power in a region. As I explained above, this limited comparative analysis provides no foundation whatsoever for determining monopsony power. As an initial matter, I described in the Stiegert Declaration my analysis of days-out that shows how Tyson had more days out between flocks than what was represented to the Plaintiffs, and as a result supplied them with fewer chicks than what they could have grown, therefore reducing supply. This is in fact a clear demonstration of the monopsony power, and not the comparative analysis that Professor Thurman has conducted.

80. Second, for the reasons I explained above, a limited comparison between 2 plants is not sufficient to determine the existence of monopsony power. This point is further strengthened by the fact that we would not expect other Tyson plants (or non-Tyson plants for that matter) to have a different pattern in supply. The Department of Justice is currently investigating allegations against Tyson and the other major integrators that include just that: supply restriction.[64] There is no reason to imagine, as Professor Thurman assumes, that another Tyson plant would be buying at levels similar or equal to that of a competitive market. Further, the overall demand for chicken at the consumer level moves over time. Tyson's downstream demand from the food retail sector would also be moving. How Tyson manages to supply product in changing marketplace is a complicated process that involves decisions at all of their production facilities and therefore comparing production levels at Robards to other regions is not even remotely helpful in demonstrating the level of competition in each region.

81. Third, as I explain below, Tyson's margins have been increasing and in a market where Tyson is acting as a competitive buyer and seller, one would expect Tyson to increase

[64] Perlman, Matthew "DOJ Probing Chicken Industry For Anti-Competitive Conduct", Law360, June 25, 2019.

production when margins are increasing and variable cost is low. As Professor Thurman shows in his Figure 4, Tyson's purchases of chicken from the Robards complex stay surprising flat throughout the timeframe.

### iii. Defendant's Experts' Claims Concerning the Viability of Chicken Growing Do Not Refute Tyson's Exercise of Monopsony Power

82. Professor Thurman claims that the entry of new growers, the asset values of poultry houses, and the lending terms related to poultry house construction contradict the ability of Tyson's Robards Complex to maintain and enhance its monopsony power.[65] Likewise Mr. Anderson analyzes the individual tax returns of growers to support his claim that they were earning sufficient returns to pay off their loans and have higher incomes than the median Henderson County income. Defendants' Experts conflate a market in which there exists monopsony power with one in which the supplier (grower in this case) is not able to make any profit. Monopsonies exist and firms and individuals enter these markets and offer their products and services to these monopsonists in many of the markets. A monopsonist will not reduce the price they offer for products or services below a point where it will cause too many suppliers to exit the market, as that would be detrimental to the monopsonist. This does not mean however, that the monopsonist prices are at the same level as a competitive market.

83. Similarly, the fact that banks offer loans to chicken growers at Robards Complex does not indicate Tyson does not have monopsony power. If the monopsonist makes it unviable/unprofitable for growers to operate in the market then they will leave/or not enter in the first place, and this will affect the monopsonist negatively. My understanding is that the loan repayments are often made directly from Tyson deducted from the pay earned by the growers, so loans will be repaid even if the growers themselves are not earning decent returns. And Tyson, even with monopsony power, is not going to set rates so low that that they cannot attract growers or that growers are going to abandon houses.

[65] Thurman Report, pp. 17-21.

84. The real question that needs to be addressed is not, as Professor Thurman suggests, whether the growers were able to achieve any profit, but whether Tyson had the market power to pay growers lower than what they would have been paid if the market for purchasing growing services at Robards was competitive.

85. Professor Thurman claims that there is considerable evidence of growers being able to pay off their loans from their chicken growing operation. He also claims that some growers have exited the industry and sold their chicken growing assets at levels higher than they initially invested.[66] Neither of these points provide evidence of a competitive market for grower services. Tyson would not rationally use their market power to push growers into foreclosure with the bank and leave them without the ability to produce chicken. Thus, it is not surprising that growers could pay off their loans in a monopsony environment. Being able to find a buyer and settle on a real-estate transaction happens in markets regardless of the existence of monopsony power. Of course, the sale price of the grower assets would be influenced by possible upgrades to the growing facility, taxes, risk, profitability, interest rates, inflation, energy prices, changes in farm, trade and environmental policies, and a host of other possible issues that can increase or decrease the value of a farm asset, as I explain to my agricultural finance students. In a monopsony environment or in a competitive environment for grower services, I would expect many or most well-managed grower operations would pay off loans in a timely fashion. I would expect farm asset values to change depending on many factors. Professor Thurman does not analyze the factors that would explain the sale price of these farm assets and did nothing to determine how much the houses would have gone up in appraised value absent Tyson's exercise of monopsony power. He simply claimed that an increase in value over 10 years would be inconsistent

[66] Thurman Report, pp. 20-21.

with Tyson having monopsony power. Professor Thurman provides no evidence that is inconsistent with the exercise of monopsony power.[67]

86. Further, Professor Thurman only addresses the value of assets, assuming growers can sell. He does not provide alternative uses for the chicken growing assets themselves. The only way that chicken growers could secure the amounts that were invested in the chicken houses were by obtaining bank loans based on having a contract with Tyson and becoming chicken growers. As Dr. Elam has previously explained, "once a grower is committed to producing chicken, he or she has made a substantial long term investment in chicken-growing facilities."[68]

### C. Defendant's Experts Misrepresent the Incentive Structure and Risk Protection Provided by the Tournament System

87. Professor Thurman extolls the benefits of the tournament structure such as sharpened incentives and risk protection for growers. Professor Thurman's point in many ways is that growers are willing to grow for Tyson in Robards so it must not be a bad deal. This is not an economic argument. This logic is akin to defending a price fixing case by arguing that since people still bought the product there is no harm.

88. This increased incentive for effort that Professor Thurman claims comes from the tournament system does not actually apply to the grower's tournament since it only actually exists if there is a clear relationship between effort and tournament performance. As I explained in my report, since the inputs that Tyson controls are critical for grower performance in any given tournament, grower performance is impacted by factors controlled by Tyson, not solely by the grower. This hinders the relationship between the grower's effort and the grower's performance and ultimately pay.

---

[67] Professor Thurman says that Chris Burch's houses were appraised in 2005 for more than he paid for them, had an even higher appraisal value in 2014. Importantly, Mr. Burch also made upgrades to the chicken houses he purchased. It is not surprising that a facility that with upgrades should be appraised for more than a facility that does not have the upgrades. Furthermore, an asset simply having a higher appraisal value in 2014 compared to ten years earlier, is not inconsistent with monopsony power and certainly does not indicate a competitive market.

[68]Elam U.S. Chicken Sector, p. 23.

89. The tournament system rewards growers who perform relatively better than the average tournament performance, and penalizes growers who perform relatively worse than the average. Contrary to what Professor Thurman says, Tyson uses the penalties from poor performing growers to pay the high performing growers. Therefore, it does not pay more than the base pay on average and is clearly far from what would be considered a profit-sharing system.

90. I explain in detail below why the risk protection that Professor Thurman claims benefits the growers is a gross misunderstanding of the tournament structure and outcomes at Tyson's Robards complex. Growers are worse off because the "risk protection" benefit that they receive is actually dwarfed by the volatility in their pay. Tyson benefits because the tournament pay structure results in stable aggregate grower pay and therefore predictability in terms of grower costs to Tyson.

### i. Defendant's Experts Mischaracterize the Limited "Risk Protection" Growers Receive

91. Professor Thurman insists that Tyson's tournament system shields growers from risks, such as output and input price volatility and common production risk.

92. Professor Thurman and Dr. Elam make the point that Tyson assumes the risk of volatility in feed and chick cost and shields the growers from these risks. This argument completely misses the point that growers are paid for growing services they provide. As I explained in the Stiegert Declaration, the structure of the broiler chicken industry has evolved over the years and the integrator model where growing services are outsourced is now the industry norm. Under this structure, growers bear the risks related to growing chicks. If growers have to bear the risk of chick and feed cost and meat price, they would have been independent operators, and not contract their growing services to integrators such as Tyson. However, this is not even possible as the market is dominated by large integrators and it is not possible for an independent chicken farmer to compete with large corporations such as Tyson. Therefore, those risks always belonged to the integrator and not to the contract grower. While it is understandable that growers will be willing to accept a lower pay to be protected from volatility in chick and feed cost, a monopsonist such as Tyson at Robards

Complex is able to reduce grower pay below what would have prevailed, given these conditions, in a competitive market.

93. As explained in the Stiegert Declaration, the reward and penalty cancel each other out such that Tyson has predictability in how much it pays for grower services. Professor Thurman's point that Tyson may not know how much it will have to pay for the feed or the chicks is beside the point. Indeed, Professor Thurman's chart of average grower pay shows remarkable stability (See Thurman Figure 8). But individual growers receive much more volatile pay.

94. Defendant's experts present a number of strawman arguments regarding the tournament structure. Professor Thurman compares the outcomes from the tournament to how Plaintiffs would have fared without a contract from Tyson at all. Professor Thurman points out that growers benefit from not being independent operators, but he ignores that the chicken market is structured in a way that an independent operator cannot be viable as they are too small to compete with large integrators such as Tyson that control the market. That fact that chicken growers cannot be independent operators is indeed the source of Tyson's monopsony power. As I stated in the Stiegert Declaration: "It is not practical for growers to operate independently from an integrator. The integrators control the supply of chicks, the processing of grown chickens and the distribution of chicken."[69]

**ii. Growers Face High Pay Volatility**

95. Professor Thurman claims that Tyson's tournament system protects growers from payment volatility that arise from common shocks affecting feed conversion and / or mortality.[70] He compares the volatility of average grower pay (i.e., the average across all growers) with the volatility of NPV, claiming that because average NPV is more volatile than average grower pay that growers are protected from common shocks. I explain in detail below: 1) how the analysis relied on by the Defendant's experts to support these arguments is faulty and misleading; and 2) that this argument entirely misses the point I made in the Stiegert

---

[69] Stiegert Declaration p. 11.
[70] Thurman Report, p. 38.

Declaration that grower pay is volatile because small changes in individual performance or NPV result in dramatic changes in individual grower pay. Nothing in Professor Thurman's or Dr. Elam's analysis contradicts the clear evidence that small differences in performance result in large swings in grower pay.

96. In Figure 8 of his report, Professor Thurman presents average base pay across all growers at the Robards Complex thereby ignoring the actual question about the level of volatility in pay for an individual grower. As the figures below show, the average grower pay for each Plaintiff is very volatile, especially when compared to Professor Thurman's aggregate series depicted in his Figure 8. I have included some of the Plaintiffs' plots below, the rest are included in Appendix C.

[redacted]

97. Professor Thurman argues that growers are protected from common shocks, claiming that average NPV is more volatile than aggregate grower pay. Not only is Professor Thurman's average aggregate pay an incorrect and misleading portrayal of grower pay volatility, but

his entire argument about common factors driving grower pay volatility is undercut by the fact that the volatility in the individual grower pay (that he is ignoring) is significantly greater than the volatility in the NPV. Professor Thurman's claim that growers benefit from Tyson's tournament system based on being protected from common shocks is incorrect since they are exposed to an even greater degree of volatility at an individual level than any of the volatility due to common shocks, as shown in Professor Thurman's Figure 9.

[redacted]

[73] Robert A. Hanneman, Augustine J. Kposowa, Mark D. Riddle. 2012. Basic Statistics for Social Research. John Wiley & Sons.[74] Stiegert Declaration, p. 15.

[redacted]

**Table 2. Comparison of Volatility Between Base Pay and NPV for Each Plaintiff**

| Plaintiff | Average of Base Pay | Average of Individual NPV | SD of Base Pay | SD of Individual NPV | CV of Base Pay | CV of Individual NPV |
|---|---|---|---|---|---|---|
| Calvin Leisure | 0.0548 | 0.2099 | 0.0045 | 0.0065 | **8.27** | **3.07** |
| Charles Morris | 0.0478 | 0.2182 | 0.0051 | 0.0084 | **10.73** | **3.86** |
| Christopher Burch | 0.0475 | 0.2187 | 0.0036 | 0.0083 | **7.66** | **3.81** |
| Dennis Clapp | 0.0523 | 0.2130 | 0.0046 | 0.0064 | **8.88** | **3.00** |
| Doug Brown | 0.0541 | 0.2114 | 0.0054 | 0.0068 | **10.01** | **3.24** |
| John Pinkston | 0.0506 | 0.2155 | 0.0050 | 0.0082 | **9.82** | **3.80** |
| Keith Crabtree | 0.0497 | 0.2146 | 0.0052 | 0.0085 | **10.45** | **3.95** |
| Loi Hong | 0.0502 | 0.2168 | 0.0023 | 0.0075 | **4.50** | **3.47** |
| Mike Murphy | 0.0514 | 0.2137 | 0.0043 | 0.0072 | **8.45** | **3.38** |
| Morgan Rickard | 0.0527 | 0.2121 | 0.0049 | 0.0069 | **9.32** | **3.25** |
| Tim Vincent | 0.0541 | 0.2106 | 0.0041 | 0.0062 | **7.54** | **2.96** |

Data Source: Elam's Production "CTRL00000008.xlsx"

### iii. The Tournament Structure Benefits Tyson

101. As I explained in the Stiegert Declaration, Tyson controlled all aspects of the tournament from the scheduling and exceptions to the equipment requirements and critical inputs.[74] Tyson benefits from their tournament set-up because the payment structure provides Tyson with predictability for grower costs.

102. Professor Thurman has mischaracterized my conclusion regarding the risk faced by Tyson, claiming that I say integrators face no risk.[75] In reality, I explained in the Stiegert Declaration that integrators do not face uncertainty of what they pay for growing services.[76] That is an important distinction. As I explained above, Tyson provides chicks

[74] Stiegert Declaration, p. 15.
[75] Thurman Report, ¶ 5.
[76] Stiegert Declaration, p. 18. "As a result, under the tournament system, Tyson has predictability on how much it will pay for growing services at the Robards facility, while the individual growers in the tournament are subject to volatility in pay based on how each of their flocks perform in a given tournament relative to the other participants Tyson selects for the tournament."

and feed to growers and the contract stipulates the cost of chicks and feed that will be used for calculation of growers' NPV. It is clear that the cost to Tyson of chicks and feed can vary over time, but since Tyson does not use the market rates for chicks and feed to calculate the NPVs it therefore bears a risk to the extent that the prices of chicks and feed exceed the stipulated prices it uses for NPV calculations. However, when it comes to grower pay, Tyson does not bear any risks. This is because, the base pay is set contractually and is therefore fixed for the duration of the contract, and as I have shown in my analysis, the sum of the premium it pays growers for above par performance equals the sum of penalties it deducts from growers for below par performance. As a result, Tyson knows exactly what it is going to pay growers to raise a pound of chicken and hence faces no risks on this count. In fact, it is the growers who face a risk since they are not guaranteed a fixed price per pound of chicken they produce and their pay depends on how well they perform vis-à-vis other growers who participate in the tournament.

103. Further, as I have shown in the Stiegert Declaration, the total premium paid by Tyson is offset by the total penalty for under-performance in a tournament (when there are no exceptions). In fact, this is clearly shown by Professor Thurman's own analysis of average grower pay. In Figure 8 in this report, Professor Thurman shows remarkable stability in average grower pay, which represents the payment made to Tyson to all growers.[77] However, it is the individual growers who face volatility in their pay, as they are not guaranteed a fixed price per pound of chicken they produce and their pay depends on how well they perform vis-à-vis other growers who participate in the tournament. As explained in the Stiegert Declaration, there is a large difference between pay for top performer and bottom performer in a given tournament. Tyson benefits from the tournament pay structure because Tyson's risk is reduced when the volatility in grower pay at the individual grower level pay is averaged across growers.

[77] Thurman Report, Figure 8.

## IV. PLAINTIFFS SUFFERED DAMAGES AS A RESULT OF TYSON'S EXERCISE OF MONOPSONY POWER IN THE ROBARDS COMPLEX MARKET

104. As explained in the Stiegert Declaration, I assessed damages resulting to the Plaintiffs from (1) the suppression of the rate of grower pay by Tyson (2) the earnings lost by the Plaintiffs due to the way Tyson at the Robards Complex dealt with condemnation and (3) Tyson at the Robards Complex made the Plaintiffs wait longer between flocks (days-out) than I understand it had represented to them. In this section, I respond to Defendant's experts' claims regarding my damages calculations. As explained below, nothing in Defendant's experts' reports cause me to change my estimate of damages or to change my conclusion that my estimates of damages are reliable.

### A. Suppression of Grower Pay

105. As explained in the Stiegert Declaration, I calculated the suppression of grower pay based on Tyson's failure to increase pay to growers commensurate with the increase in profits that Tyson was earning from the grower's investments and labor. I explained that in a competitive market grower pay would have been expected to increase as Tyson's profits increased but that what was actually observed is consistent with Tyson's exercise of monopsony power.

106. As part of my calculation of the suppression of grower pay I also adjusted the grower pay in 2010 upward by 7% to reflect the effect of a monopsonist integrator underpaying growers by 7% vis-à-vis markets with four or more integrators per MacDonald and Key.

107. Professor Thurman and Dr. Elam both criticize my reliance on MacDonald and Key although neither dispute that the MacDonald and Key study can be used to isolate the effect of there being only one integrator. Professor Thurman claims that his comparison to the two other Tyson facilities is superior to the econometric method. Professor Thurman also claims that because Perdue is in the same geographic area I should have used the MacDonald and Key estimate of 4% rather than the 7%. Dr. Elam claims that I should have applied MacDonald and Key's estimate of the positive effect of longer-term contracts as an offset to MacDonald and Key's estimate of the effect of monopsony power.

108. As explained above, Professor Thurman's ad hoc comparison to two other facilities is not useful for isolating the effect of monopsony power and is inferior to the econometric study performed by MacDonald and Key.

109. I do not agree with Professor Thurman's assertion that I should be using a 4% duopsony underpayment instead of 7%. The question is not whether there was an overlap between Perdue and Robards with respect to certain growers. The question is whether Perdue was a meaningful constraint on Tyson's ability to exercise its monopsony power. I have shown that Perdue did not offer meaningful competition to Tyson, and so the appropriate underpayment to use is 7%.

110. Dr. Elam's interpretation of MacDonald and Key's regression is faulty. In their regression, MacDonald and Key explain the effect the number of integrators in a market has on grower pay. In doing so they control for several factors that influence grower pay, including the length of contracts. Therefore, the effect of a monopsony versus a duopsony, four or more integrators on grower pay is estimated after controlling for the length of contracts. Further, 7% monopsony underpayment is estimated by MacDonald and Key by holding contract length constant. Dr. Elam has not established that contract lengths would have been different in the but-for world where Tyson was not a monopsonist in the Robards Complex market. Also, the allegations in this litigation are that Tyson used its monopsony power to reduce grower pay and not that it altered contract length. Therefore in my opinion, no adjustment is required to the 7% (monopsony undercharge) that MacDonald and Key have estimated, on account of the length of contract.

111. Professor Thurman complains that when applying the margin analysis, the suppression of grower pay exceeds the 7% estimate of MacDonald and Key. But MacDonald and Key were comparing grower pay with different counts of integrators in the geographic area. The lack of multiple integrators competing for Tyson's growers at Robards is only one source of Tyson's monopsony power and lack of competitive grower pay. There is no reason to expect that starting in 2010, the grower pay at facilities with four or more nearby integrators is truly competitive. In addition to the structural difficulties in switching between integrators that I have described in my declaration such as housing that needs to

meet a particular integrator's specifications, I understand that there have been lawsuits filed alleging that the integrators have been colluding with each other to limit grower pay.[78] Therefore, there is no reason for me to artificially cap my damages to be no more than the 7% MacDonald and Key estimate.

112. Professor Thurman criticizes my use of a fixed margin because he says that growers do not bear the risk of feed cost and broiler price so should not benefit when feed cost goes down or broiler price goes up. However, Professor Thurman does not refute the economic reasoning presented in the Stiegert Declaration for why the percentage of gross margin is an appropriate approach in the but-for world.[79] Professor Thurman simply excludes this very important element of damages and then claims that the fact that my damage estimates go down considerably as a result. Professor Thurman seems to think that it is noteworthy that removing a large segment of damages has a large effect on damages. However, it is not surprising that damages would be highly sensitive to the wholesale exclusion of a major category of damages.

113. As I explained in my report, growers provide their labor and assets to care for chickens. They are paid for these services after Tyson pays for feed and chicks and other expenses. In a competitive market, one would expect that growers would bargain for a higher pay when demand for chicken in the wholesale and retail market and as a consequence prices increases – as an increase in demand for chicken in the downstream market will result in increase in demand for growing services and as demand increases growers will be willing to supply their labor and assets only at a higher price. Therefore, it is reasonable to assume that in a competitive market, grower pay will increase at the same rate as the operating margin of the integrator after payment is made to other inputs.

114. Dr. Elam criticizes me for using Tyson's gross margin in 2010 as the base to calculate the but-for grower pay, and suggests that I should have used a period prior to 2010, as that would have accounted for the end of the 2012 drought. I chose 2010 for the simple reason

[78] Consolidated Amended Class Action Complaint, *Haff Poultry et al v. Tyson Chicken Inc. et al*, Case No. 6:17-cv-00033-RJS, United States District Court for the Eastern District of Oklahoma, filed July 10, 2017.
[79] Stiegert Declaration, Section VII.

that it is the start of the relevant time period for this litigation. Further, by Dr. Elam's logic, there will never be a period that is most appropriate to use as the base, as there are bound to be up-turns and downturns over time. In fact, as I have shown in Tables 11 and Table 12 of the Stiegert Declaration, Tyson's gross margin percentage fell from 15.5% in 2010 to 8.7% in 2011, and I report a negative value of $1.25 million in 2011 that I offset against the positive damage values in other years.[80]

**B. Condemnation**

115. In the Stiegert Declaration, I present two components of damages related to Tyson's policies regarding condemnation. First, I calculate damages stemming from Tyson's decision to assign the average weight to condemned birds even though condemned birds weigh less than healthy birds. Second, I calculate damages stemming from Tyson's decision not to compensate for condemned birds even though condemned birds still generate revenue for Tyson (since they are used in Tyson's dog food facility).

116. I use the Canadian study to get an estimate of the difference in weight between a condemned bird and a healthy bird. While Dr. Lacy, Professor Thurman, and Dr. Elam criticize my reliance on this study, it is the best estimate that I have seen. It should not be controversial that condemned birds weigh less than healthy birds. Without a superior estimate for the ratio of weight of a condemned bird to the weight of a healthy bird, I consider the 50% estimate from the Canadian study to be the most reliable available.

117. Professor Thurman also says that Tyson's condemnation policies were disclosed in the contracts and that there is no evidence that other complexes which are competitive have meaningfully different policies surrounding condemnation. However, growers are not able to negotiate with Tyson regarding the terms of the contract. Thus, even if the growers were informed as to the policies regarding condemnation it does not mean that such policies were reasonable. Likewise, even if there are other facilities that also have similar policies regarding condemnation, it does not mean that such policies are reasonable.

[80] Stiegert Declaration, pp. 60, 62.

### C. Days Out

118. Professor Thurman is wrong to assert that Tyson would need to have the downstream market power to restrict output for the days out component of damages to be valid. The days out damage calculation is based on Tyson not honoring its representations to Plaintiffs. Nevertheless, given the allegations of a cartel involving supply restrictions that are currently being investigated by the Department of Justice and are the basis of numerous civil lawsuits, Professor Thurman's assertion that Tyson could not have been restricting supply is unfounded.[81]

[redacted]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed at Madison Wisconsin, this 8th day of October, 2019.



Kyle W. Stiegert

[81] Perlman, Matthew "DOJ Probing Chicken Industry For Anti-Competitive Conduct", Law360, June 25, 2019.
[82] Stiegert Declaration, p. 67.

# Appendix A

# KYLE W. STIEGERT



516 Taylor Hall
427 Lorch St.
Madison, WI 53706

T (608) 217 5836
kwstiegert@wisc.edu

## CURRENT POSITIONS

Professor and Director of Food Systems Research Group, Department of Agricultural and Applied Economics, University of Wisconsin-Madison, Madison, 2001 to present
Visiting Professor, Justus Liebig University, 2019 to present
Visiting Fellow, Victoria University, 2010 to present
Visiting Professor, Cal-Poly, 2012 to present

## EDUCATION

Ph.D., Agricultural Economics, Purdue University, 1993
M.S., Agricultural Economics, University of Nebraska, 1989

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

- Industrial Organization: competition, agricultural processing, retailing, and input industries
- Food and Agribusiness: organics, food demand, biotechnology, investment
- International Economics: trade and trade policy, cartels, international competition policy, FDI.

## PAST POSITIONS

| | | |
|---|---|---|
| 2000 - 2001 | Visiting Professor, University of Connecticut | Storrs, Connecticut |
| 1993 - 2001 | Assistant and Associate Professor, Kansas State University | Manhattan, Kansas |
| 1990 - 1993 | Graduate Fellow, Purdue University | West Lafayette, Indiana |
| 1987 - 1989 | Research Assistant, University of Nebraska | Lincoln, Nebraska |
| 1984 - 1986 | Software Specialist, Information Technology, Inc. | Lincoln, Nebraska |
| 1981 - 1983 | Futures Market Analyst, First Mid America, Inc. | Lincoln, Nebraska |

## COURSES TAUGHT

Agricultural Finance, Global Hunger and Malnutrition, Econometric Analysis, International Trade and Agribusiness, Industrial Organization, Applied Microeconomics, Applied Microeconomics, International Marketing and Trade, Introduction to Math Programming, Agribusiness Management

# KYLE W. STIEGERT

## EXPERIENCE SUMMARY

Mr. Stiegert has over 25 years of experience in economic analysis, research and teaching. His consulting practice centres on antitrust litigation, price analysis, survey development and analysis, economic damage claims, and international market reports. His research interests include investigating the competitive structure of agricultural markets, trade and policy issues in international agriculture, and competition and policy issues in food retailing. Mr. Stiegert's experience as an economic expert is extensive, with testimony in wide range of matters relating to agricultural and food markets. He is currently a Professor in the Agricultural and Applied Economics Department and Director of Food System Research Group at the University of Wisconsin, and has previously taught at Kansas State University.

## PROFESSIONAL EXPERIENCE – TEACHING AND ADVISING

### ***Teaching Experience***

- AAE419 - Agricultural Finance (undergraduate) (1 semester, 2018 to present)
- AAE350 - Global Hunger and Malnutrition (undergraduate) (4 semesters; 2016 to present)
- AAE636 - Econometric Analysis I (graduate) (8 semesters; 2006-2013)
  Focus of this course is on econometrics including an extensive review of probability and statistics, linear algebra, hypothesis testing, and OLS estimation. Model design, dummy variables, GLS estimation and diagnostic testing are emphasized. The course also features extensive training in STATA software applications.
- AAE319 - International Trade and Agribusiness (undergraduate) (8 semesters 2012 to present).
  International trade theory, policy, and cases.
- AAE747 - Industrial Organization (PhD) (4 semesters; 2001, 2002, 2006, 2008, 2015).
- AAE705 - Applied Microeconomics (PhD) (3 semesters; 2004-2006)
- AAE426 - Quantitative Methods (undergraduate). (2 semesters, 2003-2005).
- International Marketing and Trade (graduate; Kansas State U.): (5 semesters; 1997-2001)
- Introduction to Math Programming (graduate; Kansas State U.): (3 semesters; 1994-1996)
- Agribusiness Management (undergraduate; Kansas State U.): (8 semesters; 1994-2001)

### ***Advising Experience***

#### ***Graduate Advisee Awards for Thesis Research***

- Todd Sharkey: 2005 UW-AAE Outstanding M.S. Thesis.
- Shinn-Shyr Wang: 2004 AAEA Outstanding PhD Dissertation.
- Fenxia Dong: 2003 KSU- Gamma Sigma Delta Outstanding Doctoral Dissertation Award

- Newman Kahiya: 1998 KSU- Outstanding M.S. Thesis, Kansas State University.

***Undergraduate Advisee Awards for Research***

- Chris Cable: UW Hilldale Undergraduate/Faculty Research Award.

***Thesis Committee Chairs***

***Ph.D.:***

- Minsun Jang. Current student
- Ryo Sakamoto. Current student
- Vardges Hovhannisyan. 2012. Three Essays on Competition in Dairy Markets
- Ming-Feng Hsieh. 2012. Store Format Choice
- Du Ying. 2009. Strategic Pricing Analysis in a Vertical Sector.
- Xiaowei Cai. 2008. Essays on Cartels.
- Shinn-Shyr Wang. 2004. Strategic Behavior under Asset Value Maximization.
- Fenxia, Dong. 2003. Evaluating Prepayment Systems by the Canadian Wheat Board and Australian Barley Board.

***M.S.:***

- Ryo Sakamoto. 2016. Competitive Toughness.
- Yutaka Shibuya. 2013. Panel Data Analysis of international rice, beef and pork trade.
- Steve Fenrick. 2011. Cost Structure of Electricity Firms: Benchmarking and Grid Outages.
- Narek Sahakyan. 2009. Who Benefits From Corruption?
- Taya Shinichi 2006. Theoretical Analysis of Special Safeguards.
- Xu Cheng. 2005 Evaluating the Rational Addiction Model.
- Todd Sharkey. 2004. The Impacts of Non-Traditional Supercenters on Food Price Changes.
- Amir Ardalan, Arash. 2000. Evaluation of the 1992 Maastrict Treaty on FDI in the EU.
- Goode, David. 2000. Foreign Direct Investment into the Latin American-Caribbean Basin Region.
- Schultz, Michael. 1999. Foreign Direct Investment into Asia.
- Balzer, Brian. 1999. Analysis of the Wheat Gluten Industry.
- Peng, Hsing Ming. 1997. Liberalization of the Taiwan Milling Industry.
- Parcell, Joe. 1996. Characteristic Demand Analysis of Hard Red Winter and Hard Red Spring Wheat.
- Carton, Olivier. 1996. Market Power in the Wheat Milling Industry.
- Kahiya, Newman. 1996. A CGE Analysis of Botswana Policy Adjustments.

# KYLE W. STIEGERT

## TESTIMONIES/DEPOSITIONS/CONSULTANCIES

- Contract dispute legal consultancy. (2017) Case settled prior to submission of report.
- Antitrust Legal Consultancy: Abuse of Dominance in the North American Cranberry Market. (2015 to Ongoing)
    - Class Certification Expert Report for the Plaintiffs (October 30, 2015)
    - Class Certification Deposition (December 8, 2015)
- Antitrust Legal Consultancy: Collusion in U.S. Egg Production and Export Dumping. (2009-15)
    - Class Certification Expert Report (August 29, 2014)
    - Class Certification Deposition (September 22-23, 2014)
    - Class Certification Rebuttal Report (December 22, 2014)
    - Merits Report (January 22, 2015)
    - Merits Rebuttal Report (April 3, 2015)
    - Merits Deposition (May 19, 2015)
- Legal Consultancy. Market structure of high-end beef producing and breeding markets. (2013)
    - Expert Report
- Legal Consultancy. Calculating conferred benefits in Idaho potato transactions. (2010-11)
    - Expert Report (February, 2011)
- U.S. Department of Justice: Consultancy to discuss biotech seed markets and antitrust issues in food and agricultural markets. (January 28, 2010)
    - Conference Presentation
- Consultant: General Accounting Office. Understanding market power in vertical food channels. (2009)
    - Conference Call (June, 2009)
- Microsoft Corporation: Capacity absorption in technical assistance to nascent antitrust agencies.
    - Research Report
    - Presentation to International Competition Network; Capetown, South Africa; May, 2006
- Report: FAO: United Nations: Assessing the role of strategic trade on developing nations. (2006)
    - Research Report, published as a chapter in FAO's Commodity Market Review, 2007-2008
- Legal Consultancy. Farmers Legal Action Group. Report on the economic impact of generic advertising in U.S. Pork Markets. Spring, 2002.
    - Expert Report (May, 2002)
    - Deposition (June, 2002)
- Press Release. "Is this the last time you will ever hear, 'Pork: the Other White Meat'?" Find at: http://www.aae.wisc.edu/fsrg/publications/press releases
- General Accounting Office. Consultancy on hedonic pricing of Montana wheat markets. (1999)
    - Conference Call

- U.S. Wheat Associates: Comparative assessment of Canadian, Australian, and U.S. wheat marketing systems. (1996)
  - Research Report
  - Presentation to cereal scientists, Second International Wheat Quality Conference, Manhattan, KS.
  - Published (German language) in Getreide Mehl und Brot, December 2001.

## RESEARCH PAPERS AND PUBLICATIONS

- Chavas, JP, G Shi, R. Nehring, and K. Stiegert. 2018. "The Effects of Biotechnology on Productivity and Input Demands in U.S. Agriculture." Journal of Ag and Applied Economics." https://doi.org/10.1017/aaa.2018.6. Published online 25, April, 2018
- Stiegert, Kyle, (w/Ryo Sakamoto). 2018 "Comparing competitive toughness to benchmark outcomes in retail oligopoly pricing," Agribusiness: An International Journal. 34(1)44-60.
- Stiegert, Kyle, (w/Vitor Della Corte and Paulo Dabdab Waquil). 2015. "Wheat Industry: Which Factors Influence Innovation". J. of Technology Management & Innovation. Vol 10, No 3, pps 11-16.
- Stiegert, Kyle (w/Borneman, D. and Ingham, S). 2015. "Limitation of on-site dairy farm regulatory debits as milk quality predictors". Journal of Dairy Science, published online: January 16, 2015. link
- Stiegert, Kyle (w/Hovhannisyan, V. and Bozic, M). 2014. "On Endogeneity of Retail Mark-ups in an Equilibrium Analysis: A Control Function Approach." Journal of Agricultural and Resource Economics. 39(2)188-200.
- Stiegert, Kyle (w/Cai, X.). 2014. "Market Analysis of Ethanol Capacity." International Food and Agribusiness Management Review. Volume 17, Issue 1, 83-93.
- Stiegert, Kyle (w/Hamilton, S. and Richards, T.) 2013. "How Does Advertising Effect Market Performance: A Note on Generic Advertising." Economic Inquiry. Vol. 51, No. 2, April, 1183–1195.
- Stiegert, Kyle (w/Hsieg, M.) 2012. "Store Format Choice in Organic Food Consumption." American Journal of Agricultural Economics: Papers and Proceedings. 94(2): 307-313.
- Stiegert, Kyle (w/Shi, G. and Chavas, J.P., Meng, X). 2012. "An Analysis of Bundle Pricing: The Case of Biotech Seeds. Agricultural Economics. 43(s1)125-139.
- Stiegert, Kyle (w/Hsieh, M. F.). 2012. "The Consumption Choice of Organics: Store Formats, Prices, and Quality Perception – A Case of Dairy Products in the United States." In Organic Food and Agriculture Book 1, Matt Reed (Ed.), ISBN: 978-953-307-1071-6, InTech: Open Access Publishing (http://www.intechweb.org), October. Link
- Stiegert, Kyle (w/Sahakyan, N.). 2012. "Corruption and Firm Performance: The Case of Armenia." Eastern European Economics. 50(6)5-27.
- Stiegert, Kyle (w/Cai, X), 2012. "Modal FDI Strategies in Asia-Pacific Region." International Food and Agribusiness Management Review. Volume 15, Issue 2.

- Stiegert, Kyle (w/Cai, X. and Koontz, S.). 2011. "Oligopsony Fed Cattle Pricing: Did Mandatory Price Reporting Increase Beefpacker Market Power"? Applied Economics Perspectives and Policy. Volume 33, Winter (4), 606-622.
- Stiegert, Kyle (w/Hsieh, M. F.). 2012. "The Consumption Choice of Organics: Store Formats, Prices, and Quality Perception – A Case of Dairy Products in the United States." In Organic Food and Agriculture Book 1, Matt Reed (Ed.), ISBN: 978-953-307-1071-6, InTech: Open Access Publishing (http://www.intechweb.org), October. Link
- Stiegert, K.W. (w/Shi, G., Chavas. J.P.). 2011. "Spatial Pricing of Genetically Modified Hybrid Corn Seeds" Colin Carter, Giancarlo Moschini, and Ian Sheldon, eds. Frontiers in Economics and Globalization, Volume 10: Genetically Modified Food and Global Welfare. Emerald Publishing Group Limited. Bingley, United Kingdom.
- Stiegert, Kyle (w/Shi, G., Chavas. J.P.). 2011. "An Analysis of Bundle Pricing in Horizontal and Vertical Markets: The Case of the U.S. Cottonseed Market" Agricultural Economics. 42:77-88.
- Stiegert, Kyle (w/Cai, X. and Koontz, S.). 2011. "Regime Switching and Oligopsony Power: The Case of U.S. Beef Processing." Agricultural Economics 42(1):99-109.
- Stiegert, Kyle (w/Shi, G., Chavas. J.P.). 2010. "*An Analysis of the Pricing of Traits in the U.S. Corn Seed Market.* American Journal of Agricultural Economics 92(5):1324-1338.
- Stiegert, Kyle W., (w/Shi, G., Chavas. J.P.) 2010. "Innovation, Integration, and the Biotechnology Revolution in U.S. Seed Markets." Choices. 25(2).
- Stiegert, Kyle (w/Sokol, D.). 2010. "Exporting Knowledge Through Technical Assistance and Capacity Building." Journal of Competition Law and Economics, 6(2), 233–251 [find at: DOI 10.1093/joclec/nhp010].
- Stiegert, Kyle (w/Wang, S. and Dhar, T.). 2010. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets," Canadian J of Agricultural Economics, 58(2):151-170.
- Stiegert, Kyle (w/Fanning, J., Marsh, T). 2010. "Determinants of Fast Food Consumption." British Food Journal. 112(1):5-20.
- Stiegert, Kyle (w/Shi, G., Chavas. J.P.). 2009. "Pricing of Herbicide Tolerant Soybean Seeds: A Market Structure Approach" AgBioforum. 12(3&4), 326-333.
- Stiegert, Kyle (w/Hsieh, M. Mitchell,P.D.). 2009. "Potato Demand in an Increasingly Organic Marketplace." Agribusiness: an International Journal, 25(3):369-394.
- Stiegert, Kyle (w/Wang, S. and Rogers,R). 2009. "Structural Change and Market Power in the U.S. Food Manufacturing Sector." Agribusiness: an International Journal, 25(2):164-180.
- Stiegert, Kyle (w/Kim, D.H.). 2009. Editors: Structural Changes in Food Retailing: Six Country Case Studies. FSRG, Madison WI. Find at www.aae.wisc.edu/fsrg.
- Stiegert, Kyle. (w/Hovhannisyan, V.). 2009. "Food Retailing in the United States: History, Trends, Perspectives" Chapter 7 in Structural Changes in Food Retailing: Six Country Case Studies. eds. K.W. Stiegert and Dong Hwan Kim. FSRG Madison WI. pgs 131-145

- Stiegert, K. (w/Huang, K.). 2009. "Evaluating a supermarket merger event: the case of Copps and Kohls in Madison WI." FSRG Monograph Series, #21. Food System Research Group, Madison WI, March. 76p.
- Stiegert, Kyle. 2008. "Cooperative, Food Retailing and Farming in the U.S." Chapter in "Development of Large Food Companies and Agriculture," Agro-food New Marketing Institute, Seoul, Korea.
- Stiegert, Kyle. 2008. "Imperfect competition, agriculture and development." chapter in
Hallam, David and George Rapsomanikis, eds, Commodity Market Review, 2007-2008. Food and Agriculture Organization, United Nations. Rome. pgs 35-50. available at: fao.org/es/ESC/en/index.html
- Stiegert, Kyle (w/Sharkey, Todd). 2007 "Food Pricing, Competition, and the Emerging Supercenter Format." Agribusiness: an International Journal, Vol. 23, Issue No. 3, Summer: 295-312.
- Stiegert, Kyle (w/Dong, F. March, T.). 2006. "State Trading Enterprises in a Differentiated Environment: The Case of Global Malting Barley Markets." American Journal of Agricultural Economics. 88(1):90-103.
- Stiegert, Kyle (w/Reimer, J.) 2006. "Imperfect Competition and Strategic Trade Theory: Evidence for International Food and Agricultural Markets," *J. of Ag. & Food Industrial Organization*: 4(1), Article 6. at: http://www.bepress.com/jafio/vol4/iss1/art6
- Stiegert, Kyle (wArdalan, A. and Marsh, T). 2006. "Foreign Market Entry Strategies in the European Union" J. Food Distribution Research. 37(3) 44-55.
- Stiegert, Kyle (w/Sharkey, T.). 2006. "Impacts of Nontraditional Food Retailing Supercenters on Food Price Changes." FSRG Monograph Series, #20. Food System Research Group, Madison WI, 78p.
- Stiegert, Kyle (w/Hamilton, S.). 2002 "An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises." J. of International Economics. 58:135-157.
- Stiegert, Kyle W. 2002. "The Producer, the Baker, and a Test of the Mill Price-Taker." Applied Economic Letters. 9:365-368.
- Stiegert, Kyle (w/Balzer, B.). 2001. "Evaluating the Wheat Protein Complex." Canadian Journal of Agricultural Economics. 49:337-351.
- Stiegert, Kyle (w/Boland, M., Mitchell, N.). 2000. "Midwest Grain" International Food and Agribusiness Management Review. 3: 457-72.
- Stiegert, Kyle (w/Hamilton, S.). 2000. "Vertical Coordination, Antitrust Law, and International Trade." Journal of Law and Economics. April:143-156

## OTHER ACTIVITIES

***Invited Speaker***

- 2010 USDA-USDOJ "Conference on Margins". Expert panel member on food retailing. December Washington D.C.
- 2010 Auckland, New Zealand. Wespac Bank. "Issues and Aspects of Special Safeguards in Agriculture." May10th

- 2010 Wellington, New Zealand. Institute for the Study of Competition and Regulation, School of Business and Commerce, Victoria University. “The Theory of Special Safeguards in Agriculture. May 9th.
- 2010 West Lafayette, IN, Department of Agricultural Economics, Purdue University. “Spatial Pricing of Genetically Modified Hybrid Corn Seeds” January, 28.
- 2009 Washington DC, USDA-Farm Foundation Joint Seminar, “Price Analysis of Biotech Seed Markets: Bundling, Integration, Patenting, Efficiency, and Market Power.” December 8th.
- 2009 St Louis, MO, Annual Convention of the Organization for Competitive Markets. “Price Analysis of Biotech Seed Markets: Bundling, Integration, Patenting, Efficiency, and Market Power.” August 7.
- 2008 Seoul, South Korea, National Cooperative Conference. “Food Retailing and the role of cooperatives in U.S. farming.” June 12th.
- 2008 Seoul, South Korea, Department of Economics, Seoul National University, “Strategic pricing under asset value maximization.” June 10th.
- 2008 Seoul, South Korea, Korean Rural Economics Institute. “Strategic pricing under asset value maximization.” June 9th.
- 2007 Washington DC, World Bank, “Assessing the efficiency of competition related technical assistance.” March 1st.
- 2007 Washington DC, Inter-American Development Bank. “The effectiveness of technical assistance to emerging countries to address anti-competitive behavior” March 2.
- 2006 Chicago, IL, Conference of the Federal Reserve Board of Chicago: Globally Competitive Agriculture and the Midwest. “International Food Retailing and the Emerging Supercenter Format.” Omni Hotel, September 29.
- 2006 Capetown, South Africa, International Competition Network Annual Conference. “Assessing the efficiency of competition agencies and related technical assistance programs.” May 2-May 4.
- 2005 Viçosa, MG Brazil. XXVII Seminário Internacional de Política Econômica, Universidade Federal de Viçosa, “Identifying Structural Characteristics of High Performing Industries Versus Industries with Considerable Market Power.” October 26.
- 2003 San Antonio, TX, International Agricultural Trade Research Consortium, “Imperfect competition and strategic trade theory: what have we learned?” December 13
- 2002 Omaha, NE, Annual Convention of the Organization for Competitive Markets. “Cost Efficiencies versus Market Power: Do we have the correct framework? August 16
- 2001 Hamilton, S. and K. W. Stiegert, “An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises.” University of Wisconsin-Madison, February 12
- 2001 Manhattan, KS, Second International Wheat Quality Conference. “A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. May 23.

- 2000 Storrs, CT, Department of Ag and Natural Resource Economics, University of Connecticut. "Evaluating the Wheat Protein Complex." November 10th.
- 2000 Amhearst, MA, Department of Resource Economics, University of Massachusetts. "Evaluation of the 1992 Maastritch Treaty on Foreign Direct Investment in the E.U. October, 25th, 2000.
- 1999 Fargo, ND, Department of Agricultural Economics. North Dakota State University. "Evaluating the Wheat Protein Complex." November, 1999.
- 1997 Lincoln, NE, Department of Agricultural Economics. University of Nebraska. "Testing the Validity of Standard Representative Agent Import Demand Systems." November 17th, 1997.
- 1997 Manhattan, KS, International Wheat Quality Conference. "Market Responses to Wheat Quality." Manhattan, KS, May 18-22. 1997.

***Conference Proceedings, Trade Publications, Extension and Departmental Publications***

- Narek Sahakyan and Kyle W. Stiegert. 2010. "Corruption and Firm Performance." FSWP2010-01. January.
- Cai, Xiaowei and Kyle W. Stiegert. "Regime Switching in the U.S. Beef Packing Sector." FSWP2010-02, January.
- Kun Huang and Kyle W. Stiegert "Evaluating and Supermarket Event: The Case of Copps and Kohl's in Madison WI. FSWP2010-03, January.
- Shi, G., KW Stiegert and JP Chavas "An Analysis of Bundle Pricing in Horizontal and Vertical Markets: The Case of the U.S. Cottonseed Market" FSWP2010-04
- Hamilton, Steve, Tim Richards, and Kyle W. Stiegert. "How does Advertising Affect Market Demand? A Note on Generic Advertising." FSWP2010-05
- Shi, G., JP Chavas and KW Stiegert. 2009. "An Analysis of the Pricing of Traits in the U.S. Corn Seed Market." Staff Paper No. 544, December, 39p.
- Shi, G., JP Chavas and KW Stiegert. 2008. "An Analysis of Bundle Pricing: The Case of the Corn Seed Market." FSRGWP2008-01.
- Hsieh, Ming-Feng, Paul D. Mitchell, and Kyle W. Stiegert. 2007. "Demand for Organic and Conventional Potatoes" FSWP2007-01, February.
- Stiegert, K. and T. Sharkey. 2006. "Food Pricing, Competition, and the Emerging Supercenter." Food System Research Group Working Paper Series. FSWP2006-04.
- Reimer, J. and K. Stiegert. 2006. Imperfect competition and strategic trade theory: what have we learned? Food System Research Group Working Paper Series. FSWP2006-03.
- Wang, S.S., K.W. Stiegert. 2006. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation". AAE Staff Paper No. 496, March, 42p.
- Reimer, J. and K. Stiegert. 2006. "Imperfect competition and strategic trade theory: what have we learned?" Food System Research Group Working Paper Series. FSWP2006-03.
- Wang, S.S., K.W. Stiegert, and T. Dhar. 2006. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets." Food System Research Group Working Paper Series. FSWP2006-02.

# KYLE W. STIEGERT

- Wang, S.S., and K.W. Stiegert. 2006. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation." Food System Research Group Working Paper Series. FSWP2006-01.
- Wang, S-S, K. Stiegert, and T. Dhar. 2005. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets" In Proceedings of the Second Biennial Food System Research Group. ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Fanning, J. T. Marsh, and K. W. Stiegert. 2005. "Determinants of Fast Food Consumption," Food System Research Group Working Paper Series. FSWP2005-02.
- Dong, F., T. L. Marsh, and Kyle Stiegert 2005. "State Trading Enterprises in a Differentiated Product Environment: The Case of Global Malting Barley Markets." Food System Research Group Working Paper Series." FSWP2005-01.
- Stiegert, Kyle. 2003. "Imperfect competition and strategic trade theory: what have we learned?" in Proceedings of the International Agricultural Trade Research Consortium Annual Conference, ed Ian Sheldon.
- Wang, S-S and K. Stiegert. 2003. "Industrial Organization and Equity Value Maximization." In Proceedings of the First Biennial Food System Research Group. ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Fanning, Jasper, T. W. Marsh, and K. Stiegert. 2003. "Baysian Methods and the Demand for Fast Food." In Proceedings of the First Biennial Food System Research Group. Ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Stiegert, Kyle. 2003. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." In Proceedings of the First Biennial Food System Research Group. Ed, Kyle W. Stiegert, (www.aae.wisc.edu/fsrg).
- Dhar, T., K.W. Stiegert, and B. Gould. 2002. "Price Dispersion, Search, and Market Power." Food System Research Group Working Paper Series. FSWP2002-08.
- Balzer, B. and K.W. 2001. "Evaluating the U.S. Wheat Protein Complex." Food System Research Group Working Paper Series. FSWP2001-5
- Hamilton, S. and K.W. Stiegert. 2001. "An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises." Food System Research Group Working Paper Series. FSWP2001-04.
- Stiegert, Kyle. 2001. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. in Second International Wheat Quality Conference. eds. J.L. Steele and O.K. Chung. Grain Industry Alliance, Manhattan, KS.
- Stiegert, Kyle. 2001. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. Getreide Mehl und Brot. December.
- Stiegert, Kyle. 1999. "Assessing the behavior of the Australian Wheat Board." in Risk and Profit Management Conference Proceedings, ed. Terry Kastens. August 1999.
- Stiegert, Kyle and Brian Balzer. 1999. "Evaluating the U.S. Wheat Gluten Quota Policy." Department of Ag Economics Research Report #27. Kansas State University. August.
- Stiegert, Kyle. 1998. "Marketing Wheat in a Quality Oriented System." in Risk and Profit Management Conference Proceedings, ed. Terry Kastens.

- Stiegert, Kyle and Brian Balzer. 1998. "Assessment of the E.U.-U.S. Wheat Gluten Trade Dispute." Department of Ag Economics Research Report #26. Kansas State U. October.
- Stiegert, Kyle and Olivier Carton. 1998 "The Producer, the Baker, and Mill-Price-Taker. in WCC-72 Conference Proceedings."
- Stiegert, Kyle and Hsing Ming Peng. 1998. "Liberalization of the Taiwan Wheat Milling Industry." in WCC-72 Conference Proceedings."
- Stiegert, Kyle, Joe Parcell, and J. P. Blanc. 1997. "Market Responses to Wheat Quality." in International Wheat Quality Conference Proceedings. eds. J.L. Steele and O.K. Chung. Grain Industry Alliance, Manhattan, KS. 339-362.
- Peng, Hsing Ming, and Kyle Stiegert. 1997. "Structural Change in the Taiwan Flour Milling Industry." World Grain. June 1997.
- Hamilton, Steve and Kyle Stiegert. 1997. "Backwards Linkages and Strategic Firm Behavior." Vertical Relationships and Coordination in the Food System Conference Proceedings. Piacenza, Italy.
- Stiegert, Kyle W. and J. P. Blanc. 1995. "A Characteristic Demand Analysis of Japanese Wheat Imports." Proceedings of the NC186 Conference on Structural Change in U.S. Agriculture.
- Stiegert, Kyle W. 1995. "Marketing Strategies for U.S. Hard Winter Wheat." Department of Ag Economics Research Report #18. Kansas State University. January 16.

***<u>Selected Papers, Posters, and Published Abstracts</u>***

- Sakamoto, Ryo, and Stiegert, Kyle. W. 2016. "Comparing competitive toughness to benchmark outcomes to benchmark outcomes in retail oligopoly pricing," 153th EAAE Seminar 'New Dimensions of market power and bargaining in the agri-food sector: Organizations, policies, and models. Gaeta, Italy, June 9-10, 2016
- Hovhannisyan, V., and Stiegert, K.W., 2011. "Vertical Channel Analysis of the U.S. Milk Market," Selected Paper at Annual Meeting of Agricultural and Applied Economics Association, Pittsburgh, PA.
- Hovhannisyan, V., and Stiegert, K.W., 2011. "Imperfect Competition between Milk Manufacturers and Retailers in a Midwestern State in the U.S.," Selected Paper at Annual Meeting of Southern Agricultural Economics Association, Corpus Christi, TX.
- Stiegert, Kyle and Shinichi Taya. 2010. "The Theory of Special Safeguards in Agriculture." Selected Paper. International Industrial Organization Conference. Vancouver BC. May 14-16.
- Stiegert, Kyle and Xiaowei Cai. 2010. "Optimal Timing of Cartel Formation Under Uncertainty." Selected Paper. International Industrial Organization Conference. Vancouver BC. May 14-16.
- Hovhannisyan, V., and Stiegert, K.W. 2010. "Do Retailers Exercise Market Power: The Case of Milk," Selected Paper at Annual Meeting of Mid-Continent Regional Science Association, St. Louis, MO.

- Shi, Guanming Kyle Stiegert, and J.P. Chavas. 2009. "An Analysis of Pricing in Horizontal and Vertical Markets: The Case of the U.S. Cottonseed Market. Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Cai, X., K. Stiegert and S. Koontz. 2009. "Regime Switching in the U.S. Beef Packing Sector." Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Hamilton, S., T. Richards, and K. Stiegert "How does Advertising Affect Market Demand? A Note on Generic Advertising." Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Du, Ying and K. W. Stiegert. 2009. "Vertical Channel Analysis of the U.S. Butter Market." Selected Paper, AAEA Annual Meeting, Milwaukee WI.
- Wang, S-S. K. Stiegert and Rich Rogers. Price Cost Margins and Market power across the U.S. food sector. Selected Paper, AAEA Annual Meetings, Long Beach, CA.
- Cai, Xaiowei., K. Stiegert, and S. Koontz. "Regime Switching in the U.S. Beef Packing Sector." Selected Paper, NCCC-134 Annual Conference, St. Louis Missouri, April 17-18. 2006.
- Wang, S-S., K. Stiegert, and T. Dhar. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets" Selected Paper, AAEA annual meeting, Providence R.I., July 2005.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected Paper, International Industrial Organization Conference, Atlanta, GA. April, 8-11, 2005.
- Stiegert, K. and Xu Cheng. "Evaluating the Rational Addiction Model." Selected paper, WAEA annual conference, San Francisco, CA, July 2005.
- Wang, S-S., K.W. Stiegert, and T. Dhar. "Strategic Pricing Behavior under Asset Value Maximization: An Empirical Assessment of the U.S. Retail Margarine and Butter Markets" Selected paper, Food System Research Group. Second Biennial Conference. Madison, WI, June 2005.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected paper, Annual Conference: European Association of Research in Industrial Economics. Helsinki, Finland, August, 2004.
- Wang, S-S, T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products." Selected Paper, AAEA annual meeting, Denver CO, July 2004.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected Paper, 6th INRA-IDEI Conference: Industrial Organization and the Food Processing Industry, U. of Toulouse, Toulouse France, June, 2004.
- Wang, S., T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products." Selected Paper, Marketing Science Conference, Rotterdam, Netherlands, June 2004.
- Dong, F., T. Marsh, and K. Stiegert. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." Selected Paper, 6th INRA-IDEI Conference: Industrial Organization and the Food Processing Industry, U. of Toulouse, Toulouse France, June, 2004.

# KYLE W. STIEGERT

- Wang, S., T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products," Selected Paper, 6th INRA-IDEI Conference: Industrial Organization and the Food Processing Industry, U. of Toulouse, Toulouse France, June, 2004.
- Wang, S-S, T. Dhar and K. Stiegert. "An Empirical Analysis of Strategic Pricing and Advertising for Differentiated Products." Selected Paper, International Industrial Organization Conference, Chicago, IL. April, 2004.
- Wang, S-S. and K. Stiegert. "The Duopolistic Firm with Endogenous Risk Control: Case of Persuasive Advertising and Product Differentiation," Selected paper, Food System Research Group. First Biennial Conference. Madison, WI, June 2003.
- Fanning, Jasper, T. W. Marsh, and K. Stiegert. "Baysian Methods and the Demand for Fast Food." Selected paper, Food System Research Group. First Biennial Conference. Madison, WI, June 2003.
- Dong, F., T. Marsh, and K. Stiegert. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." Selected paper, Food System Research Group. First Biennial Conference. Madison, WI, June 2003.
- Dhar, T, K. Stiegert and B. Gould. "Economics of Price Dispersion in Food Retailing." Selected Paper, AAEA Annual Meeting, Long Beach CA, August 2002.
- Fanning, J.T. Marsh, and K. Stiegert. "Determinants of Fast Food Consumption" Selected paper. WAEA 2002 Annual Meeting, July 28-31, 2002, Long Beach, California.
- Dong, F., T. Marsh, and K. Stiegert. "Product Differentiation and Strategic Behavior in State Trading Enterprises: The International Malting Barley Market." Selected paper, WAEA Annual Meeting, July 28-31, 2002, Long Beach, California.
- Stiegert, Kyle. 2001. "A Comparative Analysis of the Canadian, U.S. and Australian Wheat Marketing Systems. Second International Wheat Quality Conference. Grain Industry Alliance, Manhattan, KS.
- Stiegert, Kyle. 1999. "Assessing the behavior of the Australian Wheat Board." Risk and Profit Management Conference August 1999.
- Stiegert, Kyle. 1998. "Marketing Wheat in a Quality Oriented System." Risk and Profit Management Conference Proceedings, August, 1998.Stiegert, K. "Factors Affecting Wheat Quality Characteristics." Selected Paper, 1999 AAEA Annual Meetings, Nashville, TN. Abstract in Amer. J. of Ag. Econ. 81(5), December 1999, p 1292.
- Hamilton, S., and K. Stiegert. "Backward Implicit Contract, Precommitment and Market Power in the International Durum Market" Selected Paper, AAEA Annual Meetings, Salt Lake City, Utah. Abstract in Amer. J. of Ag. Econ. 80(5), December 1998, p. 1191.
- Stiegert, K. and O. Carton. "Increasing Concentration in the U.S. Hard Wheat Milling Industry: Efficiency Gains or Market Power?" Selected Paper, 1998 AAEA Annual Meetings, Salt Lake City, Utah. Abstract in Amer. J. of Ag. Econ. 80(5), December 1998, p.1187.
- Parcell, J. and K. Stiegert. "Spatial Competition for U.S. Hard Wheat Characteristics." Selected Paper. AAEA Annual Meetings, Toronto, Canada. Abstract in Amer. J. of Ag. Econ. 79(1997) p. 1721.

- Hamilton, S, and K. Stiegert. "Backwards Contracting and the Strategic Trade Implications of Antitrust." Selected Paper, AAEA Annual Meetings, Toronto, Canada. Abstract in the Amer. J. of Ag. Econ. 79(1997) p. 1712.
- Hill, H. and K. Stiegert. "Testing the Validity of Standard Representative Agent Import Demand Systems." Selected Paper, WAEA Annual Meetings, Reno, NV. July, 1997. Abstract in J. of Ag. and Resource Econ. 23(1997) 398.
- Stiegert, K, and J. P. Blanc, "Protein Quantity and Quality: A Characteristic Demand Analysis of Japanese Wheat Imports." Selected Paper, AAEA Annual Meetings, San Antonio, TX. Abstract in Amer. J. of Ag. Econ. 78(1996) pp.1395-1396.
- Stiegert, K. and T. Hertel. "Optimal Capacity in the Anhydrous Ammonia Industry." Selected Paper, AAEA Annual Meetings, San Antonio, TX. Abstract in Amer. J. of Ag. Econ. 78(1996) p. 1400.
- Featherstone, A, and Stiegert, K. "Dynamic Relationships in the Farm Sector Nitrogen Market." Selected Paper, AAEA Annual Meetings, Indianapolis, IN. Abstract in Amer. J. of Ag. Econ. 77(1995) p.1361.
- Hertel, T., K. Stiegert, and H. Vroomen, "Implications of Managerial Heterogeneity in Corn Production." Selected Paper, 1994 AAEA Annual Meetings, San Diego, CA. Abstract in the Amer. J. of Ag. Econ. 76(1994) p. 1265.
- Patterson, P., P. Abbott, and K. Stiegert. "Firm Level Competition in International Markets: The Impact of the Export Enhancement Program." Selected Paper, 1994 AAEA Annual Meetings, San Diego, CA. Abstract in Amer. J. of Ag. Econ. 76(1994) p.1248.
- Stiegert, K. and A. Azzam. "Market Power in the Beef Packing Industry." Selected Paper, AAEA Annual Meeting in Manhattan, KS. Abstract in Amer. J. of Ag. Econ. 73(1991) p.1549.
- Stiegert, K. and A. Azzam. "LDC Debt and Wheat Trade." Selected Paper, 1989 SAEA Annual Meetings, Nashville, TN.

***<u>Extension and Outreach</u>***

- January, 2011, Television interview (WKOW) to discuss strategies to lower personal food expenditures.
- December,2010 Presentation to the Joint USDOJ-USDA meetings on marketing margins in agriculture.
- March 2010. Radio interview for NPR on topic of local food, industrial organization, and the overall food system.
- December, 2009. Presentation to the USDA on the pricing of biotech seeds. Washington DC.
- September, 2009. Mayoral appointee, Fitchburg Ag and Rural Affairs Committee. Fitchburg WI.
- August, 2009.Presentation to the Organization for Competitive Markets on the pricing of biotech seeds. St. Louis, MO
- June, 2008, Presentation at the Korean National Cooperative Conference on the structure of U.S. food retailing. Seoul.
- Television interview: WKOW. Provided interview describing forces related to high food prices. Summer, 2007.

- March, 2007. Presentation to the World Bank. "Assessing the efficiency of competition related technical assistance." World Bank. Washington D. C.
- March, 2007. Presentation to the Inter-American Bank. "The effectiveness of technical assistance to emerging countries to address anti-competitive behavior." Washington, DC
- September, 2006. Presentation to the Federal Reserve Board of Chicago. Discussed food retailing topics and the emerging supercenter format." Chicago IL.
- May, 2006. Presentation to the International Competition Network on the efficiency of competition agencies and related technical assistance programs.
- October, 2005, Presentation to students and faculty at the Universidade Federal de Vinosa. Discussed the characteristics of high performing industries versus industries with market power. Viçosa, MG Brazil.
- January, 2005. Presentation of Food System Research Group Activities. Ag staffers from Kohl, Obey, CRS, and other offices. Washington, D.C.
- October, 2004 Panel member- Fitchburg planning commission-rural-urban affairs.
- Summer, 2004. Advisor to Fitchburg city council: rural-urban agricultural planning.
- February, 2004. Presentation of Food System Research Group Activities. Senator Herb Kohl Staff Member Campus Visit (Phil Karstens).
- December, 2003. Presentation to the International Agricultural Trade Research Consortium. Discussed the relevance of strategic trade issue on agricultural prices. San Antonio, TX.
- February, 2003. Presentation of Food System Research Group Activities. Senator Herb Kohl Staff Members Campus Visit (Ben Miller and Galen Fountain).
- August 2002. Presentation to the Organization for Competitive Markets on the tradeoff issues of cost efficiencies versus market power. Omaha, NE, August 16.
- April, 2002. Presentation of Food System Research Group Activities. Senator Herb Kohl Staff Members Campus Visit (Ben Miller and Galen Fountain).
- May 2001. Presentation to cereal scientists outlining the Canadian, U.S. and Australian Wheat Marketing Systems. Second International Wheat Quality Conference, Manhattan, KS.
- August 19, 1999. Presentation to cereal scientists on the strategic behavior of the Australian Wheat Board." Risk and Profitability Conference, Manhattan, KS.
- May, 1999. Radio interview with Eric Atkinson, KKSU radio, Manhattan, KS. discussing the U.S. international wheat gluten quota." Manhattan, KS.
- August 1998. Presentation to extension agents and producers on the marketing wheat in a quality-oriented system." Risk and Profitability Conference, Manhattan, KS.
- January, 1997. Radio interview with Eric Atkinson, KKSU radio, discussing how to value wheat protein in international markets." Manhattan, KS.
- May, 1996 (also in 1995). Presentation to grain industry experts on the marketing and pricing of world wheat." International Grains Program Annual Short Course. Manhattan, KS.
- November, 1995. Presentation to wheat industry experts on the pooling and pricing of U.S. hard winter wheat." Agri Expo Annual Meeting. Wichita, KS.
- February, 1995. Radio interview with Eric Atkinson, KKSU radio discussing marketing strategies for U.S. hard winter wheat." Manhattan, KS.

- March, 1995 Presentation to KAWG and the Kansas Wheat Commission on the pooling and pricing of hard winter wheat." Identity Preserved Marketing Meeting. Manhattan, KS.
- November, 1995 Presentation to the Kansas Wheat Commission on the pooling and pricing of hard winter wheat." Annual Board Meeting of the Kansas Wheat Commission. Wellington, KS

***<u>Press releases, newsletters, issue sheets, and other correspondence</u>***

- July 2010. New Zealand Institute for the Study of Competition and Regiulation (ISCR) Newsletter. "'Cottoning' on to the competitive consequences of genetic modification." Issue #32. Available at: http://www.iscr.org.nz/f584,16670/16670_ISCR_July_2010_2_.pdf
- March, 2009 FSRG press release. "Commercial Banking, Agriculture, and the Financial Crisis." Find at: http://www.aae.wisc.edu/fsrg/publications/press releases
- February, 2007. FSRG Issue Sheet #10. "Potato Demand in an Organic World." Find at: http://www.aae.wisc.edu/fsrg/publications/issue sheets
- February, 2007. FSRG Issue Sheet #8. "Impacts on Non-traditional Food Retailing Supercenters on Food Price Changes." Find at: http://www.aae.wisc.edu/fsrg/publications/issue sheets
- September, 2006. Summary findings of research on the effectiveness of TA service to antitrust agencies. Correspondence to Russel Damtoft, Federal Trade Commission.
- December, 2003. FSRG Press Release. "Is this the last time you will ever hear, 'Pork: the Other White Meat'?" Find at: http://www.aae.wisc.edu/fsrg/publications/press releases
- December, 2003. FSRG Issue Sheet #2. "The "Other White Meat": Was the pork checkoff worth it?" Find at: http://www.aae.wisc.edu/fsrg/publications/issue sheets.
- March, 1998. "Economics of Wheat Quality." in Ag Econ Agribusiness Report. Volume 1, 1998. Kansas State University. Manhattan, KS.
- July, 1997. Stiegert, Kyle, "Economics of Wheat Quality." in Wheat Gleanings. Kansas Association of Wheat Growers, Manhattan, KS.

**SERVICE**

***<u>National Committees and Service</u>***

- Mayoral appointee, Fitchburg committee for ag and rural affairs. (2009 - 2012)
- Member, Ind. Org. Society, Conference Planning Committee. (2009 to present)
- Editorial Board, J. of Agro-Food Ind. Org. (2005-2009)
- Chair, FSRG second biennial conference of industrial organization. (2005)
- Moderator, EARIE conference, Helsinki, September. (2003)
- Chair, FSRG first biennial conference of industrial organization. (2003)
- Selected paper session reviewer/moderator: AAEA Annual Meetings (94-98)
- Selected paper session reviewer/moderator: AAEA Annual Meetings (2000-2003)
- Selected paper session reviewer/moderator (1997)
- Ad Hoc Reviewer for markets and trade division of the USDA National Research Initiative. (1997, 1999-2002)

- Chair, USDA NC224 regional research committee on competitiveness in grain and oilseed sectors. (1999-2001)
- Chair, USDA NC186 regional committee. “Structural Change in Grain Marketing.” (1998-1990)
- NRI. Panel Review Board, Markets and Trade Division (1998)
- Editor: economics section of the International Wheat Quality Conference (1997)
- Editorial Board Member for J Agricultural and Resource Economics. (1994-1997)
- Steering Committee Member for the National Wheat Research Center. Manhattan KS. (1996)
- NC186 regional committee member. “Structural Change in Grain Marketing.” (1993-1997)
- Secretary NC186 regional committee “Structural Change in Grain Marketing.” (1994-1997)

***Reviewer for (reviews completed)***

- USDA Monograph “Recent Developments in the U.S. Food Marketing System”
- Stock and Watson: Introduction to Econometrics
- NRI-USDA, Markets and Trade Division (36)
- American Journal of Agricultural Economics (17)
- Journal of Ag and Resource Economics (11)
- Review of Agricultural Economics (5)
- Canadian Journal of Ag Economics (3)
- Journal of Food Distribution Research (2)
- Journal of Agricultural Economics (1)
- Journal of Environmental and Economic Management (1)
- UW-Madison, Babcock Institute: Annual Proposal (3)
- European Journal of Agricultural Economics (1)
- Contemporary Economic Policy (1)
- Agricultural Economics (2)
- Agribusiness: An International Journal (4)
- AAEA Contributed Papers (26)
- WAEA Contributed Papers (14)

# Appendix B

## CASE FILINGS

*Morris et al v. Tyson Chicken Inc. et al*, Civil Action No. 4:15-cv-77-m, United States District Court for the Western District of Kentucky, Owensboro Division:

Plaintiffs' First Amended Complaint and Jury Demand, July 15, 2019

Expert Report of Dr. Thomas Elam, August 30, 2019

Expert Report of Dr. Walter Thurman, August 30, 2019

Expert Report of Jason Anderson, August 30, 2019

Expert Report of Dr. Michael Lacy, August 30, 2019

Consolidated Amended Class Action Complaint, *Haff Poultry et al v. Tyson Chicken Inc. et al*, Case No. 6:17-cv-00033-RJS, United States District Court for the Eastern District of Oklahoma, filed July 10, 2017.

## ACADEMIC RESOURCES

Anchustegui, Ignacio Herrera, Market Definition in Buyer Power Cases: Revisiting Some Traditional Views Working Paper presented at the BECCLE Competition Policy Conference, April 23 and 24 2015, Bergen, Norway.

Carstensen, Peter C. "Buyer Power and Merger Analysis: The Need for Different Metrics", February 17, 2004, (Statement prepared for the Workshop on Merger Enforcement held by the Antitrust Division and the Federal Trade Commission). Available at https://www.justice.gov/atr/buyer-power-and-merger-analysis-need-different-metrics.

Gujarati D.N. 2003. *Basic Econometrics 4th Edition*. McGraw-Hill, New York, NY

Hanneman, Robert A., Kposowa, Augustine J., Riddle, Mark D. 2012. Basic Statistics for Social Research. John Wiley & Sons.

Salop, Steven.C., Moresi, S, Woodbury, J.R., "Market Definition," 2017, Georgetown University Law Center, Scholarship@GEORGETOWNLAW

### *Miscellaneous*

Tyson Company Information, available at https://web.archive.org/web/20050311104802/http://www.tysonfoodsinc.com:80/corporate/info/growersFAQ.asp

Elam, Dr. Thomas E. "Competition in the U.S. Chicken Sector", May 19, 2010, available at https://faunalytics.org/wp-content/uploads/2015/05/Citation1377.pdf

Perlman, Matthew "DOJ Probing Chicken Industry for Anti-Competitive Conduct", Law360, June 25, 2019.

*and all other materials cited herein and in the Stiegert Declaration Appendix B.*

# Appendix C



CHARLES MORRIS
Average Adjusted Base Pay
0.0630
0.0580
0.0530
0.0480
0.0430
0.0380
Apr-10
Sep-10
Feb-11
Jul-11
Dec-11
May-12
Oct-12
Mar-13
Aug-13
Jan-14
Jun-14
Nov-14
Apr-15
Sep-15
Feb-16
Jul-16
Dec-16
May-17
Oct-17
Mar-18
Aug-18
Jan-19
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


CALVIN LEISURE
0.0600
0.0580
0.0560
0.0540
0.0520
0.0500
0.0480
0.0460
0.0440
0.0420
0.0400
Average Adjusted Base Pay
Jun-10
Oct-10
Feb-11
Jun-11
Oct-11
Feb-12
Jun-12
Oct-12
Feb-13
Jun-13
Oct-13
Feb-14
Jun-14
Oct-14
Feb-15
Jun-15
Oct-15
Feb-16
Jun-16
Oct-16
Feb-17
Jun-17
Oct-17
Feb-18
Jun-18
Oct-18
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


CHRISTOPHER BURCH
0.0630
0.0580
0.0530
0.0480
0.0430
0.0380
Average Adjusted Base Pay
May-10
Aug-10
Nov-10
Feb-11
May-11
Aug-11
Nov-11
Feb-12
May-12
Aug-12
Nov-12
Feb-13
May-13
Aug-13
Nov-13
Feb-14
May-14
Aug-14
Nov-14
Feb-15
May-15
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


DENNIS G. CLAPP
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
May-10
Sep-10
Jan-11
May-11
Sep-11
Jan-12
May-12
Sep-12
Jan-13
May-13
Sep-13
Jan-14
May-14
Sep-14
Jan-15
May-15
Sep-15
Jan-16
May-16
Sep-16
Jan-17
May-17
Sep-17
Jan-18
May-18
Sep-18
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


DOUGLAS BROWN
0.0700
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
May-10
Oct-10
Mar-11
Aug-11
Jan-12
Jun-12
Nov-12
Apr-13
Sep-13
Feb-14
Jul-14
Dec-14
May-15
Oct-15
Mar-16
Aug-16
Jan-17
Jun-17
Nov-17
Apr-18
Sep-18
Feb-19
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


JOHN W PINKSTON
0.0700
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
Jun-10
Oct-10
Feb-11
Jun-11
Oct-11
Feb-12
Jun-12
Oct-12
Feb-13
Jun-13
Oct-13
Feb-14
Jun-14
Oct-14
Feb-15
Jun-15
Oct-15
Feb-16
Jun-16
Oct-16
Feb-17
Jun-17
Oct-17
Feb-18
Jun-18
Oct-18
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


KEITH CRABTREE
0.0700
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
Oct-10
Feb-11
Jun-11
Oct-11
Feb-12
Jun-12
Oct-12
Feb-13
Jun-13
Oct-13
Feb-14
Jun-14
Oct-14
Feb-15
Jun-15
Oct-15
Feb-16
Jun-16
Oct-16
Feb-17
Jun-17
Oct-17
Feb-18
Jun-18
Oct-18
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


LOI HONG
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
Nov-13
Jan-14
Mar-14
May-14
Jul-14
Sep-14
Nov-14
Jan-15
Mar-15
May-15
Jul-15
Sep-15
Nov-15
Jan-16
Mar-16
May-16
Jul-16
Sep-16
Nov-16
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


MURPHY FARMS
0.0700
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
Apr-10
Sep-10
Feb-11
Jul-11
Dec-11
May-12
Oct-12
Mar-13
Aug-13
Jan-14
Jun-14
Nov-14
Apr-15
Sep-15
Feb-16
Jul-16
Dec-16
May-17
Oct-17
Mar-18
Aug-18
Jan-19
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


RICKARD
0.0700
0.0600
0.0500
0.0400
0.0300
0.0200
0.0100
-
Average Adjusted Base Pay
May-10
Oct-10
Mar-11
Aug-11
Jan-12
Jun-12
Nov-12
Apr-13
Sep-13
Feb-14
Jul-14
Dec-14
May-15
Oct-15
Mar-16
Aug-16
Jan-17
Jun-17
Nov-17
Apr-18
Sep-18
Feb-19
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound


TIM VINCENT
0.0650
0.0600
0.0550
0.0500
0.0450
0.0400
Average Adjusted Base Pay
May-10
Oct-10
Mar-11
Aug-11
Jan-12
Jun-12
Nov-12
Apr-13
Sep-13
Feb-14
Jul-14
Dec-14
May-15
Oct-15
Mar-16
Aug-16
Jan-17
Jun-17
Nov-17
Apr-18
Sep-18
Feb-19
Month Year
Plaintiff's Average Base Pay Per Pound
All Growers Average Base Pay Per Pound