UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**CIVIL ACTION NO. 4:15-CV-00077-JHM**

**CHARLES MORRIS, et al.**                                                 **PLAINTIFFS**

**V.**

**TYSON CHICKEN, INC., et al.**                                        **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Tyson Chicken, Inc.'s Motion for Summary Judgment [DN 210]. Fully briefed, this matter is ripe for decision.

### I. BACKGROUND

Tyson is a poultry integrator that owns and operates the Robards Complex. [DN 222-1 Pls.' Resp. to Tyson's Alleged Uncontroverted Facts at ¶ 1]. Robards is a vertically integrated operation, which means it integrates various levels of production into one location. [*Id.* at ¶ 2]. For example, Robards has a breeder department, a hatchery, feed mill, a live haul (transportation) department, and a processing plant. [*Id.*]. Tyson uses the complex to process broiler chickens, which are chickens used for human consumption. [*Id.* at ¶¶ 3–4].

Plaintiffs are broiler growers that contract with Tyson to grow its chickens. [*Id.* at ¶ 5]. Tyson develops and processes the broilers, which includes aspects such as breeding the chickens, managing the breeder hen operations, collecting and hatching the eggs into broiler chicks, delivering the chicks to the growers, retrieving the broilers when they are fully grown, and processing them at the plant. [*Id.* at ¶ 7]. Under the contract, growers "furnish the labor, material, and utilities necessary for the receipt of chickens and the production of broilers." [*Id.* at ¶ 6].

Three issues in this case require some background information: Tyson's compensation system, days-out policy, and condemnation policy. First, to compensate growers, Tyson places them in a tournament system along with other growers. [*Id.* at ¶ 45]. In a tournament, all growers whose chickens are up for slaughter compete with one another. [*Id.*]. The broiler contract includes three potential pay components: base pay, premium pay, and fuel pay. [*Id.* at ¶ 44]. Base Pay is determined by the tournament system as set out in the broiler contract. [*Id.* at ¶ 45]. Premium pay and fuel pay are determined as set forth in the broiler contract. [*Id.* at ¶¶ 46–48].

Second, the time between when a grower's flock is picked up for processing and when the grower receives a new flock is called "out-time" or "days-out." [*Id.* at ¶ 18]. Third, broilers that have been delivered to the processing plant, but are not fit for human consumption are condemned. [*Id.* at ¶ 30]. United States Department of Agriculture inspectors determine if a broiler must be condemned. [*Id.* at ¶ 31]. Under the contract terms, broilers that are wholly condemned are chargeable to the grower. [*Id.* at ¶ 33]. If a broiler is only partially condemned, meaning some portion of the broiler remains fit for human consumption, then it is not chargeable to the grower. [*Id.* at ¶ 34].

Believing that certain actions of Tyson are unfair, unjust and deceptive, Plaintiffs sued Tyson and other defendants raising four claims: (1) violation of the Packers and Stockyards Act, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) fraud. [DN 18, DN 35]. Plaintiffs no longer intend to pursue the fraud claim at trial. [DN 222 at 2 n.2]. Therefore, summary judgment is **granted** on the fraud claim. Tyson moves for summary judgment on the remaining claims. [DN 210].

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the nonmoving party, the nonmoving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the nonmoving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" FED. R. CIV. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. Packers and Stockyards Act of 1921 (PSA)

Plaintiffs allege that Tyson violated the PSA §§ 192(a), (b), and (g). PSA § 192 states in relevant part:

> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
>
>> **(a)** Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
>>
>> **(b)** Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or
>>
>> **(g)** Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e).

7 U.S.C. §§ 192 (a), (b), (g).

The Sixth Circuit held that "to succeed on a claim under §§ 192(a) and (b) of the PSA, a plaintiff must show an adverse effect on competition." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 279 (6th Cir. 2010). Tyson is critical of Plaintiffs' proof claiming that Plaintiffs must show the anti-competitive effects stemming from the exercise of monopsony power. Much of the criticism seems to suggest that actual harm to competition must be shown. However, in order to succeed on a PSA claim, Plaintiffs may show either an actual or **likely** adverse impact on competition. *Id.* at 277 (quoting *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355 (5th Cir. 2009)).

Here, Plaintiffs rely primarily on Kyle Stiegert's expert report and supplemental report to prove its PSA claim. [DN 222 at 11–14]. Kyle Stiegert is a professor in the Department of Agricultural and Applied Economics at the University of Wisconsin-Madison. [DN 180 at ¶ 1]. Plaintiffs asked him to determine whether Tyson's actions likely adversely impacted competition and to assess damages as a result of Tyson's practices. [*Id.* at ¶ 11].

In his expert report, Stiegert determined that Robards is a monopsonist in its relevant geographic market and that nearby Perdue is not in the relevant market with Tyson. [DN 180 at

¶¶ 69–76]. He defines a monopsony as "a market structure where there is only one buyer (known as a monopsonist) for a particular good or service . . . ." [*Id.* at ¶ 63]. Stiegert also explains that Tyson enhances its monopsony power by requiring Plaintiffs to make nonsalvageable investments and upgrades. [*Id.* at ¶18]. In contrast, Tyson's expert Walter Thurman disagrees that Tyson has monopsony power. [DN 233-2 at ¶¶ 25–26]. Being an alleged monopsonist does not alone prove a violation of the PSA, but the PSA is violated when a monopsonist engages in certain practices that result in or are likely to result in anti-competitive effects. *See Been v. O.K. Indus., Inc.,* 495 F.3d 1217, 1234 (10th Cir. 2007).

There is evidence in the record that Tyson exercised monopsonist power in way that adversely impacts or is likely to adversely impact competition. [DN 180 at ¶18]. Stiegert opines that Tyson can lower grower pay without concern that it will switch to another integrator. [*Id.* at ¶ 77]. He also determined that Tyson acted on its monopsony power in several ways. He opines that Tyson "used its monopsony power to control the supply of chicks with the view to control the supply of chicken meat." [*Id.* at ¶ 18]. In other examples, Stiegert explains that Tyson kept base pay artificially low, used control over the tournaments to manipulate grower pay, used its condemnation policy to reduce grower pay, and the days-out representations that Tyson allegedly made was an exercise of its power. [*Id.* at ¶¶ 18, 62, 91, 96, 97, 99, 105, 107, 108]. Stiegert concludes that "[i]f Tyson faced competition in the Robards Complex market, then it would have had to make sure that it compensated growers on par with compensation they would receive in a competitive marketplace." [*Id.* at ¶ 109]. Stiegert's examinations of these practices led to his determination that Tyson's actions likely cause harm to competition:

> Tyson's exercise of monopsony power artificially lowers pay for growers. This has the effect of depressing the supply of chicken by either completely driving growers from the market or preventing growers from expanding output. Not only

> does this harm the upstream market for growing services but it can also result in reduced output and higher prices of chicken in the downstream market.

[*Id.* at ¶ 18]. After reviewing Tyson's expert reports, Stiegert concluded in his supplemental report that their reports do not cause him to change his conclusion that Tyson's actions have harmed competition. [DN 180-2 at ¶ 10].

Contrary to Tyson's assertions, there is evidence that supports that Tyson is a monopsony in the relevant regional market and that Tyson's alleged practices have adversely impacted or will likely have an adverse impact on competition. Likewise, there is evidence to the contrary, thus, there is a dispute of material fact as to whether Tyson is a monopsonist that has exercised its power in a way that will or is likely to adversely affect competition.

Tyson argues another independent basis as to why Plaintiffs' PSA claim fails. It argues that Plaintiffs PSA claim also fails because they have not offered any evidence that it took actions that were unfair, unjustly discriminatory, gave undue or unreasonable preference or advantage to any grower, or undue or unreasonable prejudice or disadvantage in any respect under §§ 192(a) and (b). [DN 211 at 12]. "To prove that a practice is 'unfair,' 'unjustly discriminatory,' or an 'undue or unreasonable preference,' a plaintiff must demonstrate an actual or potential adverse impact on competition." *Wheeler*, 591 F.3d at 371 (Jones, J., concurring). In other words, proof of a practice by a monopsonist that has or is likely to impact adversely on competition is all that Plaintiffs need to show. Summary judgment is **denied** on the §§ 192(a) and (b) claims.

Tyson states that it is entitled to summary judgment on Plaintiffs' § 192(g) claim. [DN 211 at 7]. While Tyson provided arguments on why they are entitled to summary judgment on Plaintiffs' §§ 192(a) and (b) claims, there is no substantive arguments in its initial brief as to why it is entitled to summary judgment on the § 192(g) claim. In a footnote in its reply brief,

Tyson contends that Plaintiffs do not offer any evidence of violations of §§ 192(b) and (g). [DN 229 at 8]. While Tyson makes an excellent point that Plaintiffs have not addressed the § 192(g) claim in their response, Tyson as the moving party did not meet its initial burden of identifying the portion of the record that demonstrates the absence of a genuine issue of material fact on the § 192(g) issue. Therefore, summary judgment is **denied** on the § 192(g) claim.

Before moving on, the Court should address Plaintiffs' argument that a claim under § 192(a) of the PSA based on deceptive practices does not require evidence of anti-competitive effect. The Court rejects such a notion. The Sixth Circuit in *Terry v. Tyson Farms, Inc.* made no distinctions when it held that anti-competitive effect was necessary for an actionable claim under §§ 192(a) and (b).

### B. Breach of Contract

Tyson argues that Plaintiffs' breach-of-contract claim fails because there is no evidence that it violated the contract and Plaintiffs have waived all damages except those offered by Stiegert. [DN 229 at 12]. It also argues that Plaintiffs' reliance on Stiegert's damages calculations for their PSA claim does not show contract damages because Stiegert's calculations results from the PSA claim. [*Id.* at 12–13]. Plaintiffs contend that since they have established disputes of material fact on their PSA claim, then they have also established disputes of material fact regarding their breach-of-contract claim because the contract requires Tyson to comply with applicable laws. [DN 222 at 21].

In Kentucky, a breach-of-contract claim requires proof of the following: (1) the existence of a contract, (2) breach of that contract, and (3) that the breach caused damages." *Wood v. State Farm Fire & Cas. Co.*, No. 2019-CA-000462-MR, 2020 WL 1898401, at *3 (Ky. Ct. App. Apr. 17, 2020) (cleaned up). Here, there is evidence of the existence of a contract, which the parties

do not dispute. Regarding breach of the contract, it is undisputed that the contract says that Tyson "will comply with all applicable federal, state and local statutes, rules, regulations, and ordinances in performance of this Contract." [DN 222-1 Pls.' Resp. to Tyson's Alleged Uncontroverted Facts at ¶ 38]. Tyson agreed that it would comply with applicable federal laws like the PSA, so if Tyson violated federal law, then it naturally follows that a violation of the PSA would constitute as a breach of contract. *See Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, at *8–9 (Ky. Ct. App. Sept. 4, 2009).

The question becomes if there is evidence to show contract damages. Tyson argues that Plaintiffs cannot use Stiegert's damages calculations regarding the PSA claim to show contract damages. "In Kentucky, it is well established that damages for breach of a contract are normally that sum which would put an injured party into the same position it would have been in had the contract been performed." *Gulf States Protective Coatings, Inc. v. Caldwell Tanks, Inc.,* No. 3:15CV-00649-JHM, 2019 WL 7403970, at *19 (W.D. Ky. June 18, 2019) (citation omitted). Here, damages for breach of contract will be the sum which would put Plaintiffs into the same position it would have been in had Tyson not violated the PSA per the contract (if Tyson violated the PSA). Stiegert's damages calculations as a result of violations of the PSA can be used to show contract damages.[1] Therefore, summary judgment on the breach-of-contract claim is **denied**.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Tyson argues that it is entitled to summary judgment on the breach of the implied covenant of good faith and fair dealing for three reasons: (1) the claim is not an independent

---

[1] In an accompanying Memorandum Opinion and Order, the Court has excluded Stiegert's damages calculation of $135,958 based on the practice of Tyson not paying growers for condemned birds that it uses in its dog food processing plant.

cause of action, (2) undisputed evidence shows that Tyson abided by its contract, and (3) lack of damages. [DN 229 at 13].

"Every contract contains an implied covenant of good faith and fair dealing." *Mountain Motorsports Paving & Const. LLC v. Yamaha Motor Corp., U.S.A.*, No. CIV. 14-76-ART, 2014 WL 5341865, at *5 (E.D. Ky. Oct. 20, 2014) (citing *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)). This covenant means that "every contract carries a duty to do everything necessary to carry them out." *KSA Enters., Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 460 (6th Cir. 2019) (cleaned up). "Although a breach of this covenant does not create a standalone cause of action, it may serve as the basis for a breach of contract claim." *Id.* at 460–61 (cleaned up).

The party must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Id.* at 461 (cleaned up). "It is not inequitable or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained." *Epps Chevrolet Co. v. Nissan N. Am. Inc.*, 99 F. Supp. 3d 692, 703 (E.D. Ky. 2015) (cleaned up).

To address Tyson's arguments on whether the implied covenant claim fails because it is not an independent cause of action, Plaintiffs have asserted a separate claim for the contractual breach of the implied covenant of good faith and fair dealing. Breach of this implied covenant is not an independent cause of action. However, alleging a general breach of contract claim does not preclude Plaintiffs from alleging a separate claim arising from the alleged breach of the covenant of good faith and fair dealing. *See James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 817 (E.D. Ky. 2013) ("The fact that the

plaintiffs have alleged general breach of contract claims for the [agreements] . . . does not preclude the plaintiffs from alleging separate claims arising from the alleged breach of the covenant of good faith and fair dealing."); *see also Babbs v. Equity Grp. Kentucky Div. LLC*, No. 19-CV-00064, 2019 WL 5225471, at *3 (W.D. Ky. Oct. 16, 2019).

Next, Plaintiffs identify two bases on which Tyson failed to fulfill the implied covenant: (1) Tyson failed to compensate Plaintiffs for chicken they grew and (2) Tyson provided Plaintiffs fewer flocks than they were promised. [DN 222 at 3]. First, Plaintiffs argue that Tyson should have compensated them for the condemned meat it uses at the dog processing plant and it over charged for Plaintiffs' condemned birds because Tyson contractually uses the average weight of the broiler in the flock to calculate the chargeable amount to the grower. [*Id.* at 25].

It is undisputed that under the contract terms, broilers that are wholly condemned are chargeable to the grower. [DN 222-1 Pls.' Resp. to Tyson's Alleged Uncontroverted Facts at ¶ 33]. Under the contract, "broilers that are wholly condemned are subtracted from a grower's total live weight by multiplying the number of condemned birds by the average weight" of the flock of broilers. [*Id.*]. If a broiler is only partially condemned, then it is not chargeable to the grower. [*Id.* at ¶ 34]. There is no evidence sufficient to support a conclusion that Tyson has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.

Second, Plaintiffs contend that there is a dispute of material fact as to whether Tyson breached the implied covenant through extending the days-out. [DN 222 at 26]. Plaintiffs maintain "Tyson regulates the frequency of the supply of chicks in a way that was disconnected from market forces, which maximize its profits while disregarding profitability to growers." [*Id.*]. They also argue, "This supply control, by increasing the days-out between flocks, denies

Plaintiffs the benefit of their contracted bargain by denying Plaintiffs the opportunity to earn more revenue, as they would have with efficient flock placement." [*Id.*]. Considering that it appears that Tyson acted in accordance with the contract coupled with there being no evidence sufficient to support a conclusion that Tyson has engaged in some conduct that denied the benefit of the bargain originally intended by the parties, a reasonable jury could not conclude a violation of the covenant on this basis. Therefore, summary judgment on a breach of contract based on the theory of a violation of the implied covenant of good faith and fair dealing is **granted**.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Tyson Chicken, Inc.'s Motion for Summary Judgment [DN 210] is **GRANTED IN PART AND DENIED IN PART**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

October 27, 2020

cc: counsel of record