UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO: 4:15-CV-00077-JHM

CHARLES MORRIS, et al.                                                      PLAINTIFFS

V.

TYSON CHICKEN, INC., et al.                                                 DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Exclude the Testimony of Kyle Stiegert. [DN 175]. Fully briefed, this matter is ripe for decision.

### I. BACKGROUND

Plaintiffs have poultry growing arrangements with Defendant Tyson Chicken, Inc. [DN 18 ¶¶ 2–20]. Plaintiffs allege that "Tyson, and its named employees, acted illegally and unconscionably in a manner that prevented [] Plaintiffs from growing chickens in a fair and profitable manner." [*Id.* ¶ at 32]. Plaintiffs sued Defendants alleging violations of the Packers and Stockyards Act of 1921 (PSA), breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. [*Id.* at ¶¶ 165–97].[1] Defendants retained Stiegert to provide expert testimony to support their claims in this case. Defendants seek to exclude Stiegert's testimony. [DN 175].

### II. STANDARD OF REVIEW

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts

---

[1] The Court dismissed some of the claims in Plaintiffs' Amended Complaint. [DN 35]. The claims mentioned here are the claims that remain.

or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert evidence is both reliable and relevant. *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)).

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). "Rule 702 guides the trial court by providing general standards to assess reliability." *Id.*

In determining whether testimony is reliable, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 595 (1993). The Supreme Court identified a non-exhaustive list of factors that may help the Court in assessing the reliability of a proposed expert's opinion. These factors include: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Id.* at 592–94. This gatekeeping role is not limited to expert testimony based on scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. *Kumho Tire*, 526 U.S. at 147. Whether the Court applies these factors to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (quotation omitted). Any weakness in the underlying factual basis bears on the weight, as opposed to admissibility, of the evidence. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citation omitted). *See also Brooks v.*

*Caterpillar Glob. Mining Am., LLC*, No. 14CV-00022, 2017 WL 5633216, at *1–2 (W.D. Ky. Nov. 22, 2017).

### III. DISCUSSION

Plaintiffs retained Stiegert to determine whether Tyson's actions adversely affected competition and to assess their damages. [DN 180 ¶ 11]. Stiegert opines that Tyson exercised monopsony power over Plaintiffs and that they suffered damages as a result. [*Id.* at ¶¶ 18–19]. He defines a monopsony as "a market structure where there is only one buyer (known as a monopsonist) for a particular good or service, such as chicken growing services." [*Id.* at ¶ 63]. Defendants ask that the Court exclude Stiegert's testimony because (1) he is unqualified to give poultry-related opinions, (2) his opinion on Tyson's monopsony status is unreliable, and (3) his damage calculations are unreliable. [DN 175 at 12, 16, 33]. The Court addresses each issue in turn.

#### A. Qualifications

Defendants argue that since Stiegert has no knowledge, skill, experience, training, or education in the poultry industry and he makes statements outside of his area of expertise, Stiegert's poultry-related opinions are inadmissible. [*Id.* at 33]. Plaintiffs respond that Stiegert is "entitled to opine on what data regarding the chicken industry and chickens provides necessary background . . . even though he has not grown chickens himself." [DN 193 at 10].

"To be qualified as an expert witness under Rule 702, an expert need not be a blue-ribbon practitioner with optimal qualifications or have an intimate level of familiarity with every component of a product as a prerequisite to offering expert testimony." *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 387–88 (W.D. Ky 2018) (cleaned up). "In other words, experts need not even have direct experience with the precise subject matter or product at issue." *Id.* at 388 (cleaned up). Furthermore, "an expert is permitted wide latitude to offer opinions, including those that are not based

3

on firsthand knowledge or observation" as long as "the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.

While Stiegert's experience with the broiler growing industry may be lacking, Stiegert does have significant experience in economics. Stiegert is a professor in the Department of Agricultural and Applied Economics at the University of Wisconsin-Madison. [DN 180 at ¶ 1]. Before Stiegert's almost two decades as a professor at the University of Wisconsin-Madison, he spent eight years as a research-teaching faculty member at Kansas State University. [*Id.* at ¶ 2]. While he was pursing his doctorate in agricultural economics, he spent four years as a United States Department of Agriculture (USDA) research fellow at Purdue University. [*Id.*]. Stiegert was also a research assistant for two years at the University of Nebraska-Lincoln, while working on his master's degree in agricultural economics. [*Id.*]. His primary research areas are agricultural and food markets, both international and domestic. [*Id.* at ¶ 3]. Stiegert has over two decades of experience in economic analysis, research, and teaching. [*Id.* at 80]. He has taught courses such as Agricultural Finance, Econometric Analysis, Applied Microeconomics, Quantitative Methods, and Agribusiness Management. [*Id.*]. Additionally, Stiegert has consulted on antitrust issues. [*Id.* at 82]. The Court is satisfied that Stiegert has the qualifications to determine whether Tyson's action adversely affected competition and to assess Plaintiffs' damages. Defendants concerns about Stiegert's experience are best suited for cross-examination. *See Brooks*, 2016 WL 276126, at *3 (finding that an engineering expert's "lack of practical experience designing safety features on roof bolters is an issue of weight best suited for cross-examination") (citation omitted).

Next, Defendants argue that some of Stiegert's opinions fall outside the scope of his expertise. [DN 175 at 33]. The opinions that Defendants take issue with relate to the facts and data that Stiegert relies on to reach his economic opinions, which are well within his expertise. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (affirming the district court's decision to allow an economics expert

4

to testify on damages related to real estate fraud, even though the expert had no specific real estate experience). To the extent there are weaknesses in Stiegert's qualifications to testify about a topic related to monopsony power and damages, cross-examination is the appropriate time to address those weaknesses. Stiegert, however, will not be able to testify to poultry-related opinions that have no relation to his ultimate conclusions.

## B.  Reliability

Defendants argue that Stiegert's opinion about Tyson's monopsony status and his damages calculations are unreliable. [DN 175 at 12, 16]. Plaintiffs respond that Stiegert's opinion about Tyson's monopsony power is based on extensive analysis and that Defendants issues with Stiegert's damages calculations should be left for trial. [DN 193 at 13, 22].

### 1. Monopsony

Defendants argue that Stiegert's opinion about Tyson's monopsony status does not meet Rule 702's standard because he did not use reliable principles or methods, he did not reliably apply his principles or methods, and it is not based on sufficient facts or data. [DN 175 at 12].

Defendants specifically take issue with who Stiegert includes in the relevant market to determine if Tyson is a monopsony. [DN 175 at 13]. Stiegert relied on information about general practices in the broiler growing services market and the location of the growers who contract with Tyson at Robards to determine the boundaries of the geographic market for Robards. [DN 180 ¶ 71]. After determining that Perdue Farms was the only integrator within the geographic boundaries of Robards, Stiegert determined Perdue was not in the relevant market based on testimony from Plaintiffs and the location of the farms of two Plaintiffs in relations to Perdue's facility. [*Id.* at ¶¶ 72–76]. Stiegert testified that Tyson being a single integrator and little switching between Perdue and Tyson are the elements that form the basis of his monopsony opinion. [DN 177 Stiegert Dep. 238:22–

239:9]. The weaknesses underlying Stiegert's opinion on Tyson's monopsony status go to the weight and not the admissibility of the testimony.

Second, Defendants also argue that Stiegert did not reliably apply his methodology because the record contradicts his findings. [DN 175 at 15]. Stiegert determined that Perdue was not in the relevant geographic market, in part, because of Plaintiffs' testimony that they could not switch to Perdue. For example, Stiegert says, "[b]ecause of Tyson's monopsony position at the Robards Complex, Tyson could maintain a higher number of days-out[2] compared to its representations without fear that growers would switch to another integrator that would offer a lower number of days-out." [DN 180 ¶ 107]. Defendants claim that Stiegert's reference to Plaintiffs' testimony shows the opposite when he says, "John Pinkston, Tim Vincent and Morgan Rickard state they switched from Perdue to Tyson because Perdue had a long out-time . . . ." [*Id.* at ¶ 73]. The Court does not find Defendants argument persuasive because it is not necessarily contradictory. Also, Defendants concerns such as Stiegert not considering any difference between Tyson and Purdue like changes in grower pay, contract terms, specification requirements, or benefits are the types of issues that should also be explored with vigorous cross-examination. [DN 175 at 15, DN 201 at 13]. The Court finds that Stiegert reliably applied his methodology to determine whether Tyson was a monopsony.

Third, Defendants argue that Stiegert's opinion is not based on sufficient facts or data because he only examined Plaintiffs to evaluate Tyson's monopsony status rather than a larger number of the growers at Robards [DN 175 at 15]. After careful review of Stiegert's reports and testimony, the Court finds that Stiegert's opinion on Tyson's monopsony status is based on sufficient facts and data because it is based not only on Plaintiffs' deposition testimony and a phone interview with one of the plaintiffs, but also research. [DN 180 ¶¶ 63–76, DN 180-2 ¶¶ 16–18, 33]. Defendants' concern about

---

[2]The number of broiler flocks a grower receives in a year is "flock placement" and the "days-out" refers to the time between flocks. [DN 180-1 at 5].

the number of growers Stiegert relied on to determine that Purdue was not in the relevant geographic market goes to the weight of his testimony and not its admissibility.

### 2. Damages

Defendants argue that Stiegert's damages opinions are based on a "speculative and previously rejected method of calculating damages" and that his damage calculations are unreliable. [DN 175 at 17]. Stiegert made three damages calculations based on damages from the suppression of the rate of grower pay, lost earnings from the way Tyson deals with condemnation, and damages because of the days-out time period. [DN 180 ¶ 110].

#### a. But-for Methodology

The Court must first address Defendants complaint about Stiegert using the but-for methodology. Defendants argue that Stiegert's damages opinions are based on a "speculative and previously rejected method of calculating damages" because all three of Stiegert's damage calculations are based on a but-for world. [DN 175 at 17]. The but-for world "is a scenario in which Tyson at the Robards Complex competes with other integrators for the growing services offered by [] Plaintiffs and other growers in the Robards Complex market." [DN 180 ¶ 109]. In other words, Stiegert "compare[d] the current earnings of [] Plaintiffs with what they would have earned if Tyson did not engage in the practices" that he outlines in his report. [*Id.*].

"Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation." *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La. 2016) (citation omitted). In the context of the Sherman Act, the Sixth Circuit has acknowledged that three generally accepted methods for proving antitrust damages are regression analyses, a yardstick test, and a

7

before-and-after test.[3]  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (citations omitted).  However, the Sixth Circuit has not identified these methods as the *only* reliable methods.

Next, Defendants reliance on *In Re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124 (E.D. Pa. Nov. 10, 2015) is misplaced.  In that case, Plaintiffs alleged a "conspiracy by the nation's major egg producers to control and limit the supply of eggs and thereby increase the prices of eggs." *Id.* at 129.  In a motion for class certification, Plaintiffs relied on Stiegert's testimony to "demonstrate that common evidence can demonstrate antitrust impact and damages." *Id.* at 150.  Stiegert used a model to estimate the supply of eggs in the but-for world. *Id.* at 153.  The court determined that one of the reasons the model was flawed was because it "faile[d] to account for the effects on the supply of eggs by producers not involved in the conspiracy." *Id.* at 155.  The court did not adopt a complete rejection of Stiegert's use of a but-for methodology as Defendants seem to imply, but rather the court determined the way Stiegert applied the model in that case made it less reliable.  This Court will not reject Stiegert's use of a but-for methodology generally, but will examine how Stiegert applies the principle to each damage calculation to determine if they are reliable.  Ultimately, Defendants criticisms of Stiegert for his use of a but-for test and whether he should have used an alternative method go to the weight of Stiegert's opinions and not their admissibility.

---

[3]"A multiple regression analysis is useful in quantifying the relationship between a dependent variable . . . and independent variables . . . .  This type of model can also 'control for other independent variables so as to isolate and identify the effect of a single independent variable on the dependent variable.'" *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 285 (6th Cir. 2014) (citation omitted).  The yardstick test requires "the expert to analyze the differences in the price of the product at issue among meaningfully comparable markets, firms, or locations.  It is typically used when comparing profitability between similar firms . . . or to compare profit margins within the same company in differently situated markets." *Kentucky v. Marathon Petrol. Co. LP*, No. 15-CV-354, 2020 WL 2842842, at *7 (W.D. Ky. June 1, 2020) (citations omitted).  The before-and-after test "compares . . . the prices a plaintiff paid during the period of violations with . . . prices paid . . . after the violation period's termination." *In re Pool Prod.*, 166 F. Supp. 3d at 678 (cleaned up).

### b. Suppression of Grower Pay Damages

Defendants criticize Stiegert's suppression of grower pay damage calculation on two basis: (1) Defendants disagree with Stiegert's reliance on an article to determine that Plaintiffs were paid 7% less based on Tyson's monopsony status, (2) they assert that Stiegert assumes in a but-for world that the Robards growers would be paid based on Tyson's gross margins. [DN 175 at 19–20].

First, when calculating the ratio of Plaintiffs' weighted average grower pay in 2010 with Tyson's gross margin excluding grower pay in the same year, Stiegert adjusted the grower pay in 2010 upward by 7% because of research that he believes estimates that grower pay in a monopsony market is lower by 7% than in a market with four or more integrators. [DN 180 ¶¶ 119, 121; DN 177-13 at 13, DN 180-2 ¶ 72]. Defendants say that Stiegert "did no independent review of the article or its conclusions, nor did he test its applicability to the Robards Complex." [DN 175 at 20]. They also criticize the article itself to show that it has no "probative force in this case." [*Id.*]. For example, Defendants point out that "[t]he article is based on survey responses from 2006" and that "[t]here is no indication that any responses forming the basis of the article included any Robards grower." [*Id.*]. Defendants also emphasize the article finds 7% lower revenues for growers in a market with a single integrator is an *average*. [*Id.*]. As another example, they take issue with Stiegert not examining Plaintiffs' contracts to see if they were long-term contracts or paid for fuel reimbursements because the article found those factors correlate with an increase in grower pay. [*Id.* at 21]. Each of Defendants criticisms of Stiegert's reliance on the 7% figure from the article go to the weight of his testimony and not its admissibility.

Second, Defendants argue that Stiegert's margin-based pay opinions are unreliable because (a) he never does anything to show competitive integrators pay growers based on the company's gross margins; (b) the only academic support Stiegert offers for that pay system is a reference to his own

9

article from his days as a graduate student, and (c) Stiegert arrives at an arbitrary number of 30.6% for the percentage of Tyson's margins that are owed to the growers. [DN 175 at 23].

Stiegert explained the economic principles behind his use of gross margins when he said, "[a]s the profit margin of producing chicken increases—that is to say, as increases in the market price of chicken exceed the increases in feed and other costs of producing chicken—the marginal revenue product of [] Plaintiffs' labor increases." [DN 180 ¶ 115]. He described what he shows in his damage analysis is that "while Tyson's gross margin . . . increased, i.e., the value marginal product of the growers' effort increased, growers share of these margins decreased as the grower pay did not keep up with increases in Tyson's gross margin before growers were paid." [*Id.*]. So, Stiegert used "as the basis for comparing grower pay received by [] Plaintiffs with Tyson's gross margin, calculated before it pays the growers, for damage analysis." [*Id.*]. The source of Stiegert's data to calculate damages on this basis is from tournament[4] information for the Robards Complex, Tyson's chicken segment financial information from Agri-stats, and Tyson's annual report form 10-K. [DN 180 ¶ 117, Table 11 at 61]. Stiegert explained that because he only had access to Agri-stats data up to June 2016, he used the average ratio of Tyson's chicken segment percentage operating margin from Tyson's 10-K. [DN 180 at 61 n.157]. While Stiegert's reliance on his article "Third World Debt and Wheat Imports: An Analysis for Selected Countries" for support for using a base year for his calculations, may be questionable [DN 177-16, DN 177 Stiegert Dep. 315:21–316:23], the Court is nonetheless satisfied that Stiegert used a reliable method by using gross margins based on his application of economic principles of which he has knowledge based on his education and experience.

Stiegert uses 30.6% as the share of grower pay to gross margin in Table 12 of his damage calculation. [DN 180 at 63]. Stiegert said that his estimate of the share of gross margin that should go to the growers is reasonable "[g]iven that the growers have been estimated to contribute

---

[4]Growers are paid for their performance based on the tournament system. [DN 18 ¶ 45].

10

approximately half of the capital and [the] vast majority of the labor associated with the production of a whole chicken." [*Id.* at ¶ 122]. He described what 30.6% represented when he said it shows that Tyson "before it paid any growers was getting 19 cents as its operating margin, 30.6[%] of that is going back to the growers." [DN 177 Stiegert Dep. 181:3–9]. It was calculated using 2010 grower pay divided by gross margin in 2010. [*Id.* at 181:8–9; DN 180 Table 12 at 63]. He assumed that everyone should have received 30.6% of the gross margin from 2010–2018. [DN 177 Stiegert Dep. 183:3–13]. It is a benchmarking approach that Stiegert has used before. [*Id.* at 197:2–10]. Stiegert acknowledges that the percentage does not suggest that it is a constant throughout the entire time period of any economic condition. [*Id.* at 197:11–14]. The Court is satisfied as to the reliability of the percentage he uses in his calculation.

### c. Lost Earnings from Condemnation Practices

Defendants argue that Stiegert calculating the pay each Plaintiff would have received if Tyson weighed condemned birds at 50% instead using the average weight prescribed by the contract is unreliable. [DN 175 at 29]. Defendant also find Stiegert's method unreliable because his condemnation damages also stems from Robards' practice of not paying growers for condemned birds that are used at an animal food processing plant. [*Id.* at 30].

Condemnation is the process of removing birds from processing that are deemed unfit for human consumption as determined by the USDA. [DN 180-1 at 4]. A bird may be wholly condemned or partially condemned. [*Id.*]. Under the contract, wholly condemned birds are subtracted from the pounds allocated to the grower for payment according to the average weight of the whole birds delivered to the plant. [*Id.*]. If a bird is partially condemned, growers received full credit for the bird for pay purposes. [*Id.*].

Stiegert asserts that "it is common knowledge that condemned birds weigh approximately [50 %] of the weight of a healthy bird." [DN 180 ¶ 123]. So, he calculates the pay Plaintiffs would have

11

received if Tyson had weighed the condemned birds at 50% instead of the average weight. [*Id.*]. The 50% figure is from a 1987 Canadian article. [DN 177-17 at 4]. Stiegert relied on this article because he could not "find any data on the . . . actual weights that . . . Tyson was . . . extracting from the flocks." [DN 177 Stiegert Dep. 118:3–5]. Defendants contend that "[n]owhere in the article is there evidence that this was based on empirical analysis; and [] Stiegert made no effort to do that here." [DN 175 at 29]. Defendants also highlight that "the Canadian plant at issue handled condemnation and paid average weights *exactly as is done under the contract here with Plaintiffs*." [*Id.*] [emphasis in original]. Like Defendants' complaints about Stiegert's reliance on an article for his 7% figure to calculate damages based on suppression of grower pay, each of Defendants criticisms of Stiegert's reliance on the 50% figure from the Canadian article go to the weight of his testimony and not its admissibility.

Stiegert also calculates condemnation damages because Tyson does not pay growers for condemned birds that it uses at their dog food processing plant. [DN 180 ¶ 126]. However, Stiegert does not show in his determination that in a competitive market Tyson would pay growers for chicken meat that it recovers from the condemned birds and uses in its dog food production. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Therefore, Stiegert's damages calculations of $135,958 based on this practice of condemnation is **excluded**.

### d. Days-Out Damages

Defendants argue that Stiegert's damages calculation based on days-out is flawed because (1) it is based on the number of days-out Plaintiffs' counsel asked him to assume, (2) the assumption is not corroborated by Plaintiffs' depositions, and (3) the assumption is inconsistent with the contract. [DN 175 at 31–32].

Stiegert was informed that Tyson represented to one of the Plaintiffs that the number of days-out would be 10–14 days in the summer months and 14–21 days in the winter months. [DN 180 ¶ 127]. Stiegert "used Robards Complex tournament data to calculate the number of days-out between tournaments for each house and aggregated it across the years from 2010 through 2019." [*Id.* at ¶ 130]. Stiegert was asked to assume that the days-out had Tyson honored its representations was 12 days in the summer and 17.5 days in the winter." [*Id.*]. "Unless the information or assumptions that plaintiff's experts relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (citation omitted). Here, Stiegert has explained the basis of his assumption and it does not appear to be so unrealistic and contradictory as to suggest bad faith. Defendants can attack the weaknesses in the assumption on cross-examination.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Exclude the testimony of Stiegert [DN 175] is **DENIED IN PART AND GRANTED IN PART**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

October 27, 2020

cc: counsel of record

13