UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**Charles Morris, et al.**                                                          **Plaintiffs**

**v.**                                                                    **No. 4:15-cv-77-BJB**

**Tyson Chicken, Inc., et al.**                                                     **Defendants**

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

Several farmers who raise chickens for Tyson's poultry plant in Robards, Kentucky sued for breach of contract and violations of the Packers and Stockyards Act. Tyson moved for summary judgment (DN 210) and to exclude the Plaintiffs' economics expert, Dr. Stiegert (DN 175). Judge McKinley granted summary judgment on most of the contract claims. But he largely declined to exclude Dr. Stiegert's opinion testimony and relied on it to hold that genuine issues of material fact remained for the statutory claims. MSJ Order (DN 246), Daubert Order (DN 247).

Tyson moved to reconsider the denials or certify the issues for interlocutory appeal. DNs 252, 253. The case was then reassigned, DN 254, requiring a new judge to assess whether the previous judge, who had presided over this case for several years, had clearly erred. Revisiting prior rulings or pausing a case for an early appeal, however, demands a strong showing of error and efficiency. At this stage, the Court cannot say that Judge McKinley clearly erred in any of his rulings, or that the immediate intervention of the Court of Appeals would meaningfully speed this litigation. So the Court denies both motions.

## ANALYSIS

District courts have inherent authority, codified in Rule 54(b), to "reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Leelaneu Wine Cellars, Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 946 (6th Cir. 2004); *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). That said, courts typically view motions for reconsideration with some skepticism, asking whether they identify "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (quoting *Rodriguez*, 89 F. App'x at 959); *Vaughn v. Hawkins*, 2018 WL 2210873, at \*3 (W.D. Ky. May 14, 2018) (applying this standard).

Similarly, certifying an interlocutory appeal generally requires an "exceptional and extraordinary" showing. *In re Big Rivers Elec. Corp.*, 266 B.R. 100, 104 (W.D. Ky. 2000); *Kraus v. Bd. of County Rd. Comm'rs for Kent County*, 364 F.2d 919, 922 (6th Cir. 1966). Courts ask whether "[1] the order involves a controlling question of law to which there is [2] substantial ground for difference of opinion and ... [3] an immediate appeal may materially advance the termination of the litigation." *In re Trump*, 874 F.3d 948, 951 (6th Cir. 2017) (quoting 28 U.S.C. § 1292(b)).

In this case the only plausible grounds for reconsideration is "a need to correct a clear error." *Hotels.com, L.P.*, 590 F.3d at 389. The request for an interlocutory appeal faces a similarly high hurdle: substantial grounds for disagreement with the prior ruling. *In re Trump*, 874 F.3d at 951; *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) (substantial grounds generally rest on a split among courts or a lack of precedent). Either showing would be difficult here because both orders turn in large part on Judge McKinley's discretionary rulings on evidentiary questions under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), which affords trial judges "considerable leeway," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Motions to exclude are rarely appropriate for interlocutory appeal. *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 561 F. App'x 909, 911 (Fed. Cir. 2014) (denying interlocutory appeal of *Daubert* ruling even though the district court certified and the parties requested it). And the Sixth Circuit has observed that an "allegation of abuse of discretion on an evidentiary ruling does not create a legal issue under § 1292(b)." *In re City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002). Even assuming the legal rulings at issue in the MSJ Order were to raise substantial grounds for disagreement, moreover, their interlocutory examination by the Court of Appeals would need to speed the termination of this long-running litigation—another high bar for Tyson. *See id.* (evidentiary rulings rarely materially advance the case).

## A. Challenges to Dr. Stiegert's opinions

Tyson contends that Judge McKinley clearly erred when he declined to exclude several opinions Dr. Stiegert disclosed in his report: (1) Tyson's Robards complex was a "monopsony" (the only buyer in a relevant market), (2) damages could be calculated by comparing a hypothetical but-for world, (3) Tyson would have fewer "days-out" in a competitive market, (4) Tyson would pay growers a percentage of its gross margins, and (5) Tyson would weigh condemned birds differently. Motion to Reconsider (DN 253) at 1–2.[1] For all of these opinions, Judge McKinley acknowledged Tyson's various concerns but held that they went to the weight of the evidence, not its admissibility, and could be appropriately addressed on cross-examination rather than through

---

[1] Tyson styled its motion in response to the summary-judgment order as a motion to certify the decision for interlocutory appeal or, in the alternative, to reconsider the decision. DN 252. Its motion in response to the Daubert Order is styled as a motion to reconsider or, in the alternative, to certify for interlocutory appeal. DN 253. For ease of reference, this Order refers to the former as the Motion to Certify and the latter as the Motion to Reconsider.

exclusion. DN 247 at 5–13. Given the discretion inherent in each decision under *Daubert*, the Court cannot say that Judge McKinley clearly erred. *United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015); *Kumho Tire*, 526 U.S. at 141.

**1. Competition.** Tyson argues that Stiegert incorrectly concluded that the Robards facility was a monopsony, given that its competitor Perdue operates a facility 33 miles away in Livermore. Stiegert Report (DN 180) ¶ 73. The motion to reconsider (at 11–18) contends Stiegert's opinion impermissibly relied on Plaintiffs' depositions, cherry-picked a low number of "switches" by plaintiff-farmers (as opposed to all chicken farmers) between the two facilities, and ignored contrary evidence. But Judge McKinley's order identified several pieces of evidence Stiegert relied on to reach his conclusion, including a low level of switching overall between facilities and long "days out" (the time between new chicks). Daubert Order at 5–6. Indeed, Stiegert's report explains that most of the switches in question involved farmers *coming* to Tyson, and that returning to Perdue may be impractical: Perdue is not contracting with new farmers, limits the number of chickens it will take, and (like Tyson) requires huge investments in coops that farmers must build to its own specifications. Stiegert Report ¶¶ 73–85. And Perdue is moving toward free-range, organic, and other types of chickens that are different enough to make switching even harder. *Id*. ¶ 75; *see also In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015) ("Free-range and cage-free eggs, for example, could require more capital per egg to produce").

Moreover, the evidence of switching and long "days out" were not the only ways in which Stiegert said Tyson exercised monopsony power to the detriment of farmers. The expert report also asserts that Tyson controls the inputs (chicks, feed, and more), used a tournament pay system (in which farmers compete with one another) that reduced farmer compensation, and condemnation practices (deducting pay for inadequate birds), all of which Stiegert says reflect monopsony power. Stiegert Report ¶¶ 46–62 (input control); 90–96 (tournament system); 98–99, 102 (condemnation); 105–07 (days out). Some of Tyson's concerns and counterarguments are already addressed in Stiegert's supplemental report. He acknowledged that some farmers switched to Perdue, but contended these instances were infrequent and increasingly impractical; he also opined that the farmers couldn't repurpose their investments in an economical manner if they left the chicken industry. Stiegert Supplemental Report (DN 180-2) ¶¶ 23–34 (responding to the report of Prof. Thurman on behalf of Tyson). Judge McKinley's decision to allow this testimony was reasonable. Whether a jury accepts it, despite Tyson's critiques and the opinions of its own witnesses, is of course a very different question.

**2. Damages.** Tyson also revives a number of criticisms Judge McKinley rejected regarding Stiegert's damages calculations.

First, Stiegert allegedly should have used real-world comparators or a set of previously accepted methods for determining damages rather than a hypothetical

3

"but-for" world in which chicken integrators compete for the services of chicken farmers. Motion to Strike (DN 175) at 10–12; Motion to Reconsider at 3–11. His approach of comparing the current (allegedly anticompetitive) state of affairs to a hypothetical (allegedly competitive) but-for world, however, is a central aspect of assessing antitrust damages. "Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation." *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La. 2016) (citing ABA Section of Antitrust Law, Antitrust Law Developments 783 (7th ed. 2012)).

Judge McKinley's conclusion on this evidentiary question was understandable: as long as the expert uses a reasonable benchmark for constructing the hypothetical "but for" world, courts have allowed opinion testimony utilizing this method. *See, e.g., Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651, at *3 (E.D. Mich. Apr. 22, 2013) (allowing but-for damages analysis of agency-nurse fees to estimate increase in wages in hypothetical market with competition). Although real-world comparators may perform better in some circumstances, hypothetical constructs are permissible. *See In re Se. Milk Antitrust Litig.*, No. 2:08-md-1000, 2010 WL 8228839, at *4–5 (E.D. Tenn. Dec. 8, 2010) (rejecting argument that but-for method should be disregarded since it relied on hypothetical assumptions rather than real-world comparators); *In re Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 925–26 (E.D. Mich. 2002) (same). As a result, Judge McKinley declined to "reject Stiegert's use of a but-for methodology generally," but noted he would "examine how Stiegert applies the principle to each damage calculation," given that Tyson's criticisms largely "go to the weight of Stiegert's opinions and not their admissibility." Daubert Order at 8.[2]

Second, Tyson complains that Stiegert assumed a base level of days out without comparing its practices to competitors like Perdue with longer days out. Motion to Reconsider at 8–10. As Judge McKinley pointed out, however, Stiegert relied on plaintiffs' sworn affidavits, which indicate Tyson represented that its days out would be 10 to 14 days in the summer and 14 to 21 in the winter. Daubert Order at 13 (citing Stiegert Report ¶ 127). Stiegert's damages model merely averaged those ranges for consistency: 12 and 17.5 days. *Id.* (citing Stiegert Report ¶ 130). He further

---

[2] Tyson relied heavily on *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 154–56 (E.D. Pa. 2015), in which the court excluded parts of Stiegert's "but for" methodology offered to prove predominance in support of class certification. DN 175 at 12–13. Tyson contends that class-cert analysis was similar to the admissibility question raised here. *Id.* The court's reasoning in *Processed Egg*, however, focused on Stiegert's failure to account for several important variables, and didn't conclude his but-for methodology was per se inadmissible. *Processed Egg*, 312 F.R.D. at 153. And the court accepted other but-for methods dealing with flock size, which (like here) defendants criticized for not using real-world comparators. *Id.* at 154–57. If anything, therefore, the *Processed Egg* decision supports Judge McKinley's reasonable exercise of his discretion at the *Daubert* stage.

relied on company and public data regarding the actual days out. Stiegert Report ¶¶ 106, 127–134. Those days out, according to Stiegert, were longer and more erratic than Tyson had represented. *Id*. And when the days out increase, the farmers receive fewer chicks and thus less profits. *Id*. ¶ 105. So the difference between the represented and actual days out could be a fair estimate of potential damages from anti-competitive activities. Tyson may yet identify better evidence that Stiegert and the plaintiffs could or should have provided, but that does not mean this evidence is inadmissible or the prior ruling clearly erroneous. *See Daubert*, 509 U.S. at 596; *Ne. Ohio Coal. for Homeless v. Brunner*, 652 F. Supp. 2d 871, 877 (S.D. Ohio 2009) (declining to find clear error and "re-litigate issues previously considered").

Third, Tyson complains that Stiegert calculated base-pay damages by assuming that Tyson should pay farmers more than 30% of its gross margins, "[g]iven that the growers have been estimated to contribute approximately half of the capital and vast majority of the labor associated with the production of a whole chicken." Daubert Order at 10–11 (quoting Stiegert Report ¶ 122); *see* Motion to Reconsider at 3–6. Stiegert's opinion is questionable, and as yet apparently unsupported by corroborating evidence that this or related industries would, in a competitive environment, pay suppliers a share of gross margin. *See* First Stiegert Dep. (DN 253-1) at 194:1–196:24 (unable to identify any such industry). Nor does Stiegert explain why the pay of farmers serving one particular facility should correlate to the gross margins of Tyson's entire operations worldwide, in which margins presumably differ significantly by sector and location. *See* Stiegert Report at Table 11, n. 157; *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (excluding economist's damages model that made empirical assumptions not based in the record). If this question remains live as trial approaches, the Court may be willing to reevaluate this proposed testimony in response to an objection or a motion in limine that provided a fuller picture of the admissible evidence, the probativity of this specific testimony, its potential for prejudice, and countervailing expert testimony. *See, e.g.*, *United States v. Semrau*, 693 F.3d 510, 523 (6th Cir. 2012) (discussing interaction of FED. R. EVID. 403 and *Daubert*). On the current record, however, the decision not to exclude the opinion in full and in advance was not clearly erroneous.

Similarly, Tyson contests the reliability of and real-world support for Stiegert's opinion that condemned birds (which reduce a farmer's compensation) should be assigned a weight at 50% of the flock's average. Motion to Reconsider at 6–9. Stiegert opined that "it is common knowledge that condemned birds weigh approximately fifty percent of the weight of a healthy bird." Stiegert Report ¶ 123. Not that common. But Stiegert didn't pluck the 50% figure out of thin air; he relied on an old study that described diseased and condemned birds as weighing 50% of an average bird. Stiegert Supplemental Report at ¶ 116 (citing Ansong-Danquah J, *A Survey of Carcass Condemnation at a Poultry Abattoir and its Application to Disease Management*, 28 CAN. VET. J. 53, 55 (1987), which asserts that "the producer is charged for birds of a given weight when, in fact, the majority of these birds may be half this weight").

Tyson's motion leans heavily on Judge McKinley's decision to exclude a related damages calculation premised on chicken farmers receiving pay for condemned birds that Tyson could still use to make dog food. Daubert Order at 12. Stiegert, the Court ruled, did not show that anyone else paid for such meat. *Id.* Nor, Tyson now contends, has he shown that any poultry processor pays half for sick birds. Motion to Reconsider at 8. Judge McKinley's contrary conclusion, however, is not clearly erroneous: unlike Stiegert's dog-food opinion, his half-bird opinion at least rests a journal article. Whether some other weight (or no weight) for condemned birds is more appropriate is quite likely a question on which Tyson may offer witnesses and evidence in rebuttal. But this evidentiary ruling, too, could conceivably be revisited through a timely objection or motion in limine that explains the potential probativity, prejudice, and reliability of Stiegert's view in light of related evidence and testimony. *See, e.g., Semrau*, 693 F.3d at 523.

## B. Packers and Stockyards Act

Tyson argues that the summary-judgment ruling either lacked precedential support or legally erred in three ways. But none of the concerns it raises amount to clear error or otherwise support interlocutory review. Motion to Certify (DN 252) at 1–2.

**1. Specific practices likely to injure competition.** First, Tyson complains that Judge McKinley held that the mere status of monopsony meant the Robards plant was likely to injure competition. This misconstrues the opinion, which did not rely solely on Tyson's alleged monopsonist status. Motion to Certify at 5–9. Tyson is right that every circuit has interpreted the Packers and Stockyards Act, 7 U.S.C. §§ 181–229, to require plaintiffs to show that "specific practices" of the defendant "have the effect of injuring competition or are likely to do so." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1231 (10th Cir. 2007). *See also id.* at 1234 ("We are by no means suggesting that vertically integrated markets will always violate the PSA. Rather, we hold that § 202(a) is violated when a monopsonist engages in specific practices that result in or are likely to result in the anticompetitive effects the PSA was designed to prevent."); *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277, 279 (6th Cir. 2010) ("those practices that will likely affect competition adversely") (collecting cases).

Judge McKinley's order is consistent with this caselaw. It determined that Stiegert's opinion provided enough evidence to conclude that Tyson did or was likely to harm competition based on its alleged monopsonist status *and* several of its practices that could lower pay, reduce supply, and affect prices. MSJ Order at 5–7. The order pointed to proffered expert testimony that Tyson controlled the input for the farmers, kept pay low through a tournament system, maintained condemnation and days-out policies that suppressed competition, required heavy up-front investments to gain leverage over farmers, and more. *Id.* (citing Stiegert Report ¶¶ 18, 62, 91, 96–97, 99, 105, 107, 108); *see also* Stiegert Report ¶¶ 41–61, 84, 87). This

is evidence of "specific practices" that a reasonable jury could find "likely" to injure competition. *See id.*; *Been*, 495 F.3d at 1234–35 (considering similar expert testimony under the Act).

**2. Likely adverse competitive impact.** Tyson further contends that no court has ever relied solely on the *likelihood* of an injury to competition, rather than an actual injury, to support a PSA violation. Motion to Certify at 9–11. This is incorrect. Judge McKinley's order tracked the Sixth Circuit's phrasing of the harm requirement in just these terms: The PSA "does not require that the Secretary prove actual injury before a practice may be found unfair. The Secretary need only establish the likelihood that an arrangement will result in competitive injury to establish a violation." *Parchman v. U.S. Dep't Agric.*, 852 F.2d 858, 864 (6th Cir. 1988). And many other courts have long formulated (and applied) the statutory standard for finding an antitrust violation in this manner. *See, e.g., Been*, 495 F.3d at 1231 ("effect of injuring competition or are likely to do so"); *Terry*, 604 F.3d at 277 ("those practices that will likely affect competition adversely"); *De Jong Packing Co. v. U.S. Dep't of Agric.*, 618 F.2d 1329, 1337 (9th Cir. 1980); *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999); *Armour & Co. v. United States*, 402 F.2d 712, 722 (7th Cir. 1968); *Breaking Free, LLC v. JCG Foods of Ala.*, LLC, No. 4:18-cv-1659, 2019 WL 1513978, at *5 (N.D. Ala. Apr. 8, 2019) ("[T]enuous" allegations "that Defendants' acts are likely to harm competition" are sufficient). Tyson's argument that the legal standard applied on summary judgment lacked support in precedent identifies no clear error.

**3. Competition among farmers and "integrators" like Tyson and Perdue.** Finally, Tyson argues that only an adverse effect on other integrators—not farmers—can support a violation. Motion to Certify at 11–12. The briefs identify no general principle of antitrust law suggesting that an injury or anti-competitive effect is relevant here only if it concerns direct competition. And even so, this particular competition law is written broadly to protect farmers, not just the packers and stockyards whose business practices it regulates. As the Supreme Court held back in 1922, the "chief evil" addressed by the PSA was the monopolistic practices of the packers, "enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford v. Wallace*, 258 U.S. 495, 514–15 (1922). The Act also "safeguard[s] farmers and ranchers against receiving less than the true market value of their livestock." *Bruhn's Freezer Meats of Chicago, Inc. v. U.S. Dep't Agric.*, 438 F.2d 1332, 1337 (8th Cir. 1971); *see also Swift & Co. v. United States*, 393 F.2d 247, 254 (7th Cir.1968).

In *Been v. O.K. Industries*, on which Tyson places great weight, the Tenth Circuit held that a poultry integrator was a monopsony that could harm the chicken farmers it purchased from. 495 F.3d at 1231–33. The evidence included expert testimony that the integrator controlled the inputs for the farmers, could decrease their pay and supply, and wielded market power over consumer prices. *Id.* at 1234. So the Tenth Circuit affirmed the denial of summary judgment because "the record

contains evidence of the classic monopsony injury, namely that [the integrator] is depressing the *prices it pays the Growers* and reselling at inflated prices." *Id.* at 1233 (emphasis added). The potential injuries, evidence, and concerns regarding the farmers and consumers at issue in *Been* appear practically identical to those raised in this case.[3] Judge McKinley did not clearly err or implicate any substantial ground for disagreement in focusing on the harm to the farmers.

## ORDER

The Court denies Tyson's motion to reconsider or certify for interlocutory appeal the partial denial of Tyson's motion to exclude (DN 253) and the partial denial of Tyson's motion for summary judgment (DN 252).

---

[3] Tyson relies on *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 462 (5th Cir. 2013), for the idea that only harms to direct competitors count for competition. But that decision rested on a factual determination that the producer attempted to raise consumer prices because it had overextended and lowered prices too much, not to accomplish any anti-competitive gain relative to other producers. *Id.* The court's ruling did not turn on who suffered the injury. In fact, *Pilgrim* relied on the PSA's object "to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer." *Id.* at 460 (quoting *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 357 (5th Cir. 2009)) (en banc). Tyson cannot rely on this precedent to narrow the conception of relevant competition.

8